# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

-----------------------------------------------------------

LAS AMERICAS IMMIGRANT ADVOCACY
CENTER
1500 East Yandell Drive,
El Paso, TX 79902;

No. 1:19-cv-____

*Plaintiff,*

v.

CHAD WOLF, *in his official capacity*,
Acting Secretary of the U.S. Department
of Homeland Security
245 Murray Lane, SW
Washington, DC 20528;

U.S. DEPARTMENT OF HOMELAND SECURITY
245 Murray Lane, SW
Washington, DC 20528;

KENNETH T. CUCCINELLI, *in his official capacity*,
Acting Director of U.S. Citizenship
and Immigration Services
111 Massachusetts Ave., NW
MS 2260
Washington, DC 20529;

U.S. CITIZENSHIP AND IMMIGRATION SERVICES
111 Massachusetts Ave., NW
MS 2260
Washington, DC 20529;

MARK A. MORGAN, *in his official capacity*,
Acting Commissioner of U.S. Customs and
Border Protection
1300 Pennsylvania Ave., NW
Washington, DC 20229;

TODD C. OWEN, *in his official capacity*,
Executive Assistant Commissioner of the
Office of Field Operations for
U.S. Customs and Border Protection
1300 Pennsylvania Ave., NW
Washington, DC 20229;

1

HECTOR A. MANCHA JR., *in his official capacity*,
U.S. Customs and Border Protection
Director of Field Operations, El Paso
9400 Viscount, Suite 104
El Paso, TX 79925;

GLORIA CHAVEZ, *in her official capacity*,
Border Patrol Sector Chief, El Paso
8901 Montana Ave.,
El Paso, TX 79925;

U.S. CUSTOMS AND BORDER PROTECTION
1300 Pennsylvania Ave., NW
Washington, DC 20229;

WILLIAM BARR, *in his official capacity*,
Attorney General of the United States
950 Pennsylvania Ave., NW
Washington, DC 20530;

U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Ave., NW
Washington, DC 20530;

                                   *Defendants.*
-----------------------------------------------------------

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

(Violation of Immigration and Nationality Act and Implementing Regulations, Administrative Procedure Act, Convention Against Torture, Foreign Affairs Reform and Restructuring Act of 1998 and Implementing Regulations, and Due Process)

## INTRODUCTION

1. Customs and Border Protection ("CBP") facilities are legal black holes. This case challenges the federal government's drastic change in policy to—for the first time—detain asylum seekers effectively incommunicado and in appalling conditions in those facilities throughout their asylum screening process, without any opportunity to meet in person, or even by telephone, with an attorney to obtain the assistance to which they are entitled by law.

2. Congress has mandated that asylum seekers, including those subject to "expedited removal" proceedings, have the opportunity to access and confer with counsel and third parties while they prepare for an initial screening for asylum and other protection from removal and for a review of that screening determination by an immigration judge. These screenings, known as "credible fear interviews," are the critical first step for many asylum seekers because they determine whether these individuals and families may pursue a claim for asylum or other protection or, instead, will be summarily sent back to the countries they are fleeing.

3. Defendants' new programs effectively deny all access to counsel and third parties, and therefore, all but guarantee that many asylum seekers will be erroneously sent back to countries where they face danger and that, as a result, some of them will be killed or endure horrific violence. This case seeks to ensure that those fleeing persecution and torture in their home countries have a fair opportunity to apply for asylum and other protection in the United States.

4. Prior to either October 7 or 8, 2019, noncitizens in expedited removal proceedings who expressed a fear of removal were transferred from CBP detention to Immigration and Customs Enforcement ("ICE") detention centers before their credible fear screenings.

5. Defendants are now implementing what they have termed the Prompt Asylum Claim Review program ("PACR") and the Humanitarian Asylum Review Process ("HARP").[1] Under PACR, asylum seekers from countries other than Mexico who are in credible fear proceedings are kept in CBP facilities instead of being transferred to ICE detention centers. HARP applies the same policy as PACR to Mexican asylum seekers in credible fear proceedings.

6. This change, from Defendants transferring asylum seekers to ICE custody for credible fear screenings to keeping them in CBP custody, is pivotal. In ICE custody, these asylum seekers were afforded more time and opportunity to contact counsel[2] or prospective counsel or others to aid them in their credible fear proceedings. They could also meet with attorneys, both in person and telephonically, prior to the credible fear interview with an asylum officer and again prior to an immigration judge's review of any negative credible fear determination.

7. CBP allows none of this to meaningfully occur for those in its custody, and CBP facilities are not set up to facilitate such access. CBP facilities do not afford in-person or telephonic access to counsel or, in fact, any meaningful communication with the outside world. CBP, unlike ICE, provides no system to locate people in its custody. Its facilities were designed for short-term detention and not for asylum seekers going through a credible fear process.

8. Under PACR and HARP, an asylum seeker in CBP custody is given only one window of approximately 30 minutes to one hour to call family members or retained counsel, or to call prospective attorneys from a limited list provided by CBP. There is no callback number or other

---

[1] Defendants have also referred to the PACR program as the Prompt Asylum Screening Review program or "PASR."

[2] Individuals in expedited removal may have been able to retain counsel because they did so prior to crossing into the United States; because their family members retained counsel on their behalf; because they retained counsel while in ICE custody; or through other means.

means by which lawyers may attempt to reach clients or prospective clients. The result is that it is functionally impossible for an asylum seeker in one of these programs to contact an attorney.

9. Even when an asylum seeker does manage to contact an attorney, PACR and HARP ensure that the asylum seeker does not have a meaningful opportunity to consult with that attorney. CBP denies attorneys physical access to its facilities, precluding all in-person meetings. CBP also does not provide for any regular telephonic access and provides no guarantee that the consultation will be confidential.

10. Even when CBP has been aware that an attorney is attempting to reach an individual prior to their interview or hearing before an immigration judge, CBP has forced that individual to proceed with their credible fear interview or hearing without any opportunity to consult with that attorney.

11. Consequently, under PACR and HARP, asylum seekers functionally have no opportunity to access counsel or prospective counsel or other individuals during their credible fear screening as mandated by Congress. Moreover, the terrible conditions of confinement in CBP facilities (known as "hieleras"—Spanish for "ice boxes"—due to their freezing temperatures) hinder asylum seekers' ability to meaningfully participate in their credible fear proceedings.

12. Defendants have to date implemented PACR and HARP in CBP's El Paso sector. As of November 26, 2019, 392 asylum cases had been processed through PACR. As of November 27, 2019, the government had placed at least 137 asylum seekers in HARP.

13. CBP has stated its intent to expand PACR and HARP to other parts of the border.

14. PACR and HARP systematically undermine the procedural safeguards guaranteed to those seeking asylum by rocketing asylum seekers through the credible fear process with no access to counsel. Congress provided for protections for people in credible fear proceedings in order to

prevent the United States government from erroneously sending asylum seekers back to places where they face persecution, torture, and possibly death.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 8 U.S.C. § 1252(e)(3). Jurisdiction is also proper under 28 U.S.C. §§ 1343 and 1361 and 5 U.S.C. §§ 702 and 706.

16. Venue is proper in the District of the District of Columbia under 28 U.S.C. § 1391(e) because Defendants are officers and employees of the United States, at least one defendant resides in the district, and a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this district. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district. Finally, venue is proper here because 8 U.S.C. § 1252(e)(3) requires that all § 1252(e)(3) actions be brought in this district.

## PARTIES

17. Plaintiff Las Americas Immigration Advocacy Center ("Las Americas") is a nonprofit organization based in El Paso, Texas that provides free and low-cost direct legal services to noncitizens, including asylum seekers, in West Texas and New Mexico. Its mission includes providing consultation and legal services to noncitizens detained by the federal government in the El Paso area, including by representing individuals through the credible fear interview process through a staff of four attorneys and three legal assistants. Las Americas has expended significant resources attempting to locate and represent individuals in the PACR and HARP programs.

18. Defendant Chad Wolf is the Acting Secretary of the U.S. Department of Homeland Security ("DHS"), an agency of the United States. Acting Secretary Wolf is ultimately responsible for the actions of DHS and its components. He is sued in his official capacity.

19. Defendant U.S. Department of Homeland Security ("DHS") is a cabinet-level department of the U.S. government. Its components include U.S. Citizenship and Immigration Services ("USCIS") and CBP.

20. Defendant Kenneth T. Cuccinelli is the Acting Director of USCIS, a component of DHS. Acting Director Cuccinelli is responsible for the actions of USCIS. He is sued in his official capacity.

21. Defendant USCIS is the sub-agency of DHS that, through its asylum officers, conducts interviews of individuals placed in the expedited removal process who express fear of return to their countries of origin or an intent to apply for asylum, to determine whether they have a fear of persecution or torture that entitles them to a full immigration hearing in proceedings under 8 U.S.C. § 1229a.

22. Defendant Mark A. Morgan is the Acting Commissioner of CBP, which is responsible for, among other things, the processing and admission of individuals at ports of entry and for the apprehension and detention of individuals seeking asylum at or near the border. Acting Commissioner Morgan is sued in his official capacity.

23. Defendant Todd C. Owen is the Executive Assistant Commissioner of the Office of Field Operations ("OFO") for CBP. OFO is responsible for the management of CBP's operations at ports of entry. Executive Assistant Commissioner Owen is sued in his official capacity.

24. Defendant Hector A. Mancha Jr. is the CBP Director of Field Operations in El Paso. He is responsible for ensuring that CBP officers under his supervision follow the agency's policies and procedures. He is sued in his official capacity.

25. Defendant Gloria Chavez is the El Paso Border Patrol Sector Chief.  She is responsible for ensuring that Border Patrol officers under her supervision follow the agency's policies and procedures. She is sued in her official capacity.

26. Defendant CBP is the sub-agency of DHS that is responsible for the initial processing of noncitizens who present at U.S. ports of entry without valid documentation or are apprehended at or between U.S. ports of entry.

27. Defendant William P. Barr is the Attorney General of the United States. He is ultimately responsible for the actions of the Department of Justice and its components, including the Executive Office for Immigration Review. He is sued in his official capacity.

28. Defendant U.S. Department of Justice (the "DOJ") is a cabinet-level department of the U.S. government. DOJ is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103.

## LEGAL BACKGROUND

**I.     U.S. Immigration Law's Protections for Individuals Fleeing Threatened Harm**

29. Under U.S. law, every noncitizen "who is physically present in the United States or who arrives in the United States" has the right to apply for asylum. 8 U.S.C. § 1158(a)(1).

30. Individuals are eligible for asylum if they experienced past persecution or have a well-founded fear of future persecution "on account of race, religion, nationality, membership in a particular social group, or political opinion" and if they are "unable or unwilling to return to, and

. . . unable or unwilling to avail himself or herself of the protection of" their country of origin because of that persecution or fear. 8 U.S.C. § 1101(a)(42)(A).

31. U.S. law also protects noncitizens who are not eligible for asylum but nevertheless face potential severe harm if they are returned to their home countries. The U.S. government cannot return individuals to a country where it is more likely than not that their "life or freedom would be threatened . . . because of [their] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A) ("statutory withholding of removal").

32. The government also cannot remove individuals to a country where they are more likely than not to be tortured. *See* 8 C.F.R. §§ 1208.16-1208.19 (regulations implementing the United States' obligations under the Convention Against Torture ("CAT")).

33. "Asylum seekers," as used in this complaint, refers to individuals who are seeking protection from removal to their home country based on the dangers they would face there. These individuals may be eligible for asylum, entitled to statutory withholding of removal, and/or entitled to withholding or deferral of removal pursuant to CAT.

## II.     The Expedited Removal System

34. Ordinarily, people whom the executive branch seeks to remove from the United States are placed in immigration removal proceedings under Section 240 of the Immigration and Nationality Act ("INA") (8 U.S.C. § 1229a). In these proceedings, they have a full hearing on the merits of their case before an immigration judge. During proceedings under § 1229a, an individual generally has a meaningful opportunity to develop claims for asylum or other forms of relief.

35. Removal proceedings under § 1229a provide for multiple layers of review. Following a hearing before an immigration judge, a person can appeal to the Board of Immigration Appeals

("BIA"). A noncitizen who receives an adverse ruling from the BIA can then file a petition for review in a federal court of appeals.

36. In 1996, as part of the Illegal Immigration Reform and Immigrant Responsibility Act, Congress created a highly truncated removal process called "expedited removal" for certain noncitizens who present at a port of entry or who have recently entered the country without inspection. The expedited removal process is an alternative to full immigration removal proceedings under § 1229a. People placed in expedited removal will not go through full removal proceedings unless they are taken out of the expedited removal track. Those subject to expedited removal are ordered removed by an immigration officer "without further hearing or review." 8 U.S.C. § 1225(b)(1)(A)(i); *id.* § 1225(b)(1)(B)(iii)(I).

37. Since the expedited removal process lacks many of the procedural protections of full removal proceedings, Congress sought to ensure that those who may have valid claims to asylum or other protection will not be erroneously removed.

38. Consequently, individuals in expedited removal who indicate a fear of return to their country of origin, or an intent to apply for asylum, must be referred for an interview with an asylum officer.  The asylum officer then makes a determination whether the person has a credible fear— that is, whether there is "a significant possibility . . . that the alien could establish eligibility for": (1) asylum; (2) for withholding under § 1231(b)(3); or (3) for relief from removal under CAT. 8 U.S.C. § 1225(b)(1)(B)(v); 8 C.F.R. § 1003.42(d)(1).

39. Individuals who are found to have a credible or reasonable fear that could make them eligible for protection must be taken out of expedited removal and placed into full immigration removal proceedings under § 1229a. They will accordingly have the opportunity to fully develop a case for asylum or relief from removal under the ordinary structure of immigration proceedings.

40. If the person receives a negative credible fear determination at the interview stage, the asylum officer must "provide . . . a written notice of decision" and ask whether the individual wants review of the negative determination by an immigration judge.[3] 8 C.F.R. § 208.30(g)(1); *id.* § 1208.30(g)(2)(ii). Unless the individual affirmatively waives review by an immigration judge, the agency must provide for such review. *Id.* § 1208.30(g)(2)(i).

41. If the immigration judge vacates the negative determination, the individual will then be placed into ordinary removal proceedings under 8 U.S.C. § 1229a, just as they would have been if the asylum officer had made a positive determination. If the immigration judge upholds the negative determination, the individual will be removed without further legal process. The immigration judge's decision on review is administratively "final and may not be appealed." 8 C.F.R. § 1208.30(g)(2)(iv)(A).[4]

42. Consistent with Congress's concern for preventing noncitizens' erroneous removal to places where they may face harm, the threshold for a noncitizen to successfully establish a credible fear in expedited removal proceedings is much lower than the threshold to establish eligibility for actual asylum or entitlement to other protection in full removal proceedings. The "significant possibility" of eligibility for relief that a person must establish at a credible fear interview is a *fraction* of the chance of persecution or torture that they must ultimately establish to prevail.[5]

---

[3] Immigration judges and immigration courts are under the jurisdiction of the Executive Office for Immigration Review, which is overseen and administered by Defendant Attorney General Barr.

[4] USCIS may, but need not, reconsider a negative credible fear finding that has been affirmed by an immigration judge.  8 C.F.R. § 1208.30(g)(2)(iv)(A). The immigration judge's decision is considered by the Executive Branch not to be subject to judicial review.

[5] Under regulatory provisions that are the subject of ongoing litigation, individuals are determined ineligible for asylum if they have transited through another country en route to the United States without first seeking asylum in that other country, absent certain exceptions. *See E. Bay Sanctuary Covenant v. Barr*, 19-16487 (9th Cir.); 8 C.F.R. § 208.13(c)(4). Nevertheless, such individuals will be placed in full immigration proceedings pursuant to 8 U.S.C. § 1229a on

43. The credible fear process is a critical phase in determining who ought to be placed in full removal proceedings under § 1229a and given the opportunity to build a full case showing that they merit asylum or other protection, rather than be issued an expedited removal order.

## III.    Access to Counsel in the Expedited Removal System's Credible Fear Process

44. In furtherance of Congress's intent to ensure that individuals in expedited removal proceedings are afforded a meaningful opportunity to seek asylum, withholding from removal, or protection under CAT, Congress has provided for access to and consultation with counsel and others prior to both the credible fear interview and the immigration judge's review of that interview for those in expedited removal proceedings. 8 U.S.C. § 1225(b)(1)(B)(iv) (providing that a noncitizen "may consult with a person or persons of [their] choosing prior to the interview or any review thereof").

45. During the credible fear interview itself, federal regulation also provides for the presence of an individual consulted—which includes an attorney. 8 C.F.R. § 208.30(d)(4) ("Any person or persons with whom the alien chooses to consult may be present at the interview . . . ."). The attorney or other consulted individual "may be permitted, in the discretion of the asylum officer, to present a statement at the end of the interview." *Id.*

---

a showing of a "reasonable fear" of persecution or torture during their initial screening with an asylum officer. 8 C.F.R. § 208.30(e)(5)(iii). Showing a reasonable fear of persecution or torture requires establishing a "reasonable possibility" of eligibility for relief. 8 C.F.R. § 208.31(c). This "reasonable possibility" standard is the same as the standard required for establishing "a well-founded fear of persecution" for asylum—at least as low as a one-in-ten chance. *See I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 440 (1987); 8 C.F.R. § 208.13(b)(2)(i)(B). It therefore remains a fraction of a chance of establishing ultimate eligibility for relief, far below the 50.1% chance necessary to ultimately gain relief from removal under statutory withholding or CAT. Implementation of similar regulatory provisions that would apply to individuals who have crossed the border at a place other than a port of entry is likewise the subject of ongoing litigation and is currently preliminarily enjoined. 8 C.F.R. § 208.30(e)(5)(ii); *E. Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094, 1121 (N.D. Cal. 2018); *stay pending appeal denied,* 932 F.3d 742, 780 (9th Cir. 2019).

46. Further, an individual "[i]n any removal proceedings before an immigration judge" has a right to representation by counsel at no expense to the government. 8 U.S.C. § 1362. Moreover, "[a] person compelled to appear in person before an agency or representative thereof" has the right "to be accompanied, represented, and advised by counsel . . . ." 5 U.S.C. § 555(b).

47. Fundamentally, individuals seeking asylum have a constitutionally protected interest under the Fifth Amendment in applying to the U.S. government for asylum, withholding of removal, and/or relief under CAT, and therefore are entitled to procedural due process in their proceedings on those claims. *See, e.g.*, *Haitian Refugee Ctr. v. Smith*, 676 F.2d 1023, 1037-38 (5th Cir. 1982); *Maldonado-Perez v. I.N.S.*, 865 F.2d 328, 332 (D.C. Cir. 1989). Asylum seekers also have constitutionally protected interests in avoiding persecution, torture, and death.

48. Because neither the right to apply for asylum and other protections from removal nor the right of access to counsel is an empty formality, noncitizens must have the opportunity to *meaningfully effectuate* them. They must have a reasonable opportunity to retain and work with counsel in their removal proceedings. And they must have a meaningful opportunity to apply for asylum and other protections from removal, consistent with the procedures established by Congress.

49. Accordingly, the government may not create obstacles to access to counsel, the cumulative effect of which is to prevent access. It also may not interfere with established attorney-client relationships. And for those in its custody, the government must put in place policies and practices that ensure these individuals may meaningfully effectuate their right to access counsel. Similarly, the government may not create numerous obstacles, the cumulative effect of which is to prevent meaningful access to the process of applying for asylum or other protections from removal.

**FACTUAL ALLEGATIONS**

I.     **Before PACR and HARP, Individuals Were Transferred from CBP Custody to ICE Custody for Credible Fear Proceedings in Expedited Removal, Where They Could Access Counsel.**

50. People who present themselves at a port of entry without proper documentation or who are apprehended at or near the southern border are supposed to be placed in CBP custody only for initial processing and for a short period of time (less than 72 hours).  CBP's National Standards on Transport, Escort, Detention, and Search ("TEDS") specify that "Detainees should generally not be held for longer than 72 hours in CBP hold rooms or holding facilities," and "every effort must be made to hold detainees for the least amount of time required."[6]

51. Before the implementation of the PACR and HARP programs, members of this group who were placed in expedited removal and expressed a fear of return to their country of origin were then transferred from CBP detention to an ICE detention facility for their credible fear proceedings.

52. At the ICE detention facility following transfer, these individuals had greater time and opportunity to access counsel. They could contact counsel or prospective counsel telephonically and also meet with counsel or prospective counsel in person. They also could contact family members or others by phone.

53. The credible fear interview did not occur until after a specific period of time—prior to July 2019, at least 48 hours, and starting in July 2019, at least one full calendar day—in ICE custody.[7]

---

[6] *National Standards on Transport, Escort, Detention, and Search*, U.S. Customs and Border Protection, (Oct. 2015) 14, *available at* https://www.cbp.gov/sites/default/files/assets/documents/2017-Sep/CBP%20TEDS%20Policy%20Oct2015.pdf.

[7] The policy change from a 48-hour waiting period to one calendar day is currently the subject of litigation in the U.S. District Court for the District of Columbia under the caption, *L.M.-M v. Cuccinelli*, No. 1:19-cv-2676 (RDM).  Plaintiff agrees that one calendar day is not a sufficient

This time gave individuals some opportunity to contact counsel, family members, or others and also to recuperate from their journeys.

## II.     PACR and HARP Now Require that Credible Fear Proceedings Be Conducted While in CBP Custody, Where Asylum Seekers Cannot Access Counsel.

54. On or after October 7, 2019, DHS and DOJ began implementing PACR—a new expedited removal program, established by written policy directives, guidelines, and procedures. Also in October 2019, subsequent to initial implementation of the PACR program, DHS and DOJ began implementing HARP, a similar expedited removal program established by written policy directives, guidelines, and procedures. PACR and HARP are the same, except that HARP applies to Mexican nationals seeking asylum in the United States while PACR applies to nationals from other countries.[8]

55. Currently, DHS and DOJ have implemented PACR and HARP as pilot programs in CBP's El Paso sector.  Individuals and families whom DHS has apprehended in or near the El Paso area or who have arrived and presented at a port of entry in the El Paso area are eligible to be placed in PACR or HARP.

56. PACR and HARP drastically change the credible fear process by requiring that asylum seekers go through the entirety of their credible fear proceedings—including the credible fear interview and any review by an immigration judge—while in CBP detention, without any transfer to an ICE detention facility.

---

time period to prepare for a credible fear interview, even in ICE detention, but that policy change is not at issue here.

[8] Although Defendants have labeled PACR and HARP as separate programs, there appears to be no meaningful difference between the two, except for the nationality of the asylum seekers subject to each program.

57. PACR and HARP also seek to conduct credible fear interviews within 24 hours, and any further review within 10 days.

58. CBP facilities are designed for "short-term" detention. Unlike those held in ICE detention centers, individuals detained in CBP facilities have essentially no opportunity to communicate with the outside world.

59. PACR and HARP create major obstacles to asylum seekers accessing the process of applying for protection in the United States.

III.   **PACR and HARP Effectively Deny Those in Credible Fear Proceedings Meaningful Access to Counsel.**

60. PACR and HARP's policy change to mandate that the credible fear process occur entirely while an individual is detained in CBP facilities, not ICE detention facilities, effectively denies asylum seekers the opportunity to meaningfully access counsel and prevents asylum seekers from communicating with anyone else in the outside world, including people with whom they might consult regarding the credible fear interview. They also force asylum seekers to remain in crowded, unsanitary, and inhospitable conditions of confinement that are unconducive to meaningfully participating in a credible fear interview or other aspects of the credible fear process.

A.   **While ICE detention facilities provide for access to counsel, CBP facilities do not.**

61. At ICE detention facilities, ICE standards require that the agency provide those in credible fear proceedings the opportunity to access counsel confidentially, both telephonically and in person. ICE detention centers generally provide telephones for access to legal representation and meeting spaces for attorneys to meet with clients and prospective clients.

62. ICE's Performance Based National Detention Standards ("PBNDS") specifically require that those in expedited removal proceedings shall have the opportunity to telephonically contact

both counsel and prospective counsel. PBNDS 5.6(V)(E) (providing that ICE detention centers "shall" grant "[f]ull telephone access" in order for a detainee to contact "legal representatives"; "to obtain legal representation"; to access "legal services providers or organizations" on the provided list; and, specifically, "*for consultation when subject to expedited removal*" and requiring that "*when a detainee is under an expedited removal order, his/her ability to contact pro bono legal representatives shall not be restricted*" (emphasis added)). The PBNDS also bar "limit[ing] a detainee's attempt to obtain legal representation," beyond "reasonable restrictions" on call hours, time, and frequency. *Id.* 5.6(V)(F)(1); *see also id.* 5.6(II)(7) ("Detainees shall be able to make free calls to the ICE/ERO-provided list of free legal services providers for the purpose of obtaining initial legal representation.").

63. The PBNDS also require ICE detention facilities to provide in-person attorney access. Attorneys must have physical access to ICE facilities, every single day, for at least eight hours a day during the work week and four hours a day on weekends and holidays. PBNDS 5.7(J)(2). The PBNDS requires that "each detainee may meet privately with current or prospective legal representatives and their legal assistants." *Id.* 5.7(J)(1).

64. CBP facilities, by contrast, provide no meaningful opportunity to access counsel either telephonically or in person—whether confidentially or otherwise. Those detained in CBP custody are held essentially incommunicado, with no meaningful opportunity to communicate with the outside world.

65. CBP categorically denies attorneys in-person meetings with clients or prospective clients. CBP asserts that its facilities are not designed to allow attorneys to meet in person with detained noncitizens. CBP facilities do not have confidential attorney-client meeting areas, nor do they have *any* space dedicated to in-person visitation by attorneys or others.

66. Moreover, unlike for those in ICE custody, there is no way for attorneys to easily verify whether a client or prospective client is in CBP custody and, if so, where that individual is located. For ICE detainees, an attorney or other interested person may use ICE's Online Detainee Locator System to look up an individual's location of detention using the individual's name, country of birth, and birthdate or alternatively name and A-number.[9] There is no such system for CBP detainees.

67. CBP's national standards, unlike ICE's, contain no provisions guaranteeing telephonic or in-person communication with attorneys or others in the outside world.

## B.  Asylum seekers in PACR and HARP cannot meaningfully access counsel or otherwise communicate with the outside world.

68. Individuals subject to PACR and HARP are provided with effectively no telephonic communication with the outside world. Once a credible fear interview is scheduled, individuals are provided a single window of approximately 30 minutes to one hour in which to attempt to reach a family member or attorney by telephone.

69. Even for an asylum seeker able to reach an attorney by telephone, this single window is insufficient for meaningful communication and consultation with counsel during the credible fear process.

70. During the time in which asylum seekers may use the telephone, the conversation is not confidential. Agents monitor phone calls by standing within earshot outside the door.

71. Critically, there is no opportunity for asylum seekers to leave a call-back number or otherwise provide for their call to be returned. If an asylum seeker in the PACR or HARP program

---

[9] Immigration and Customs Enforcement, *Online Detainee Locator System*, https://locator.ice.gov/odls/#/index.  An A-number is a unique registration number issued by USCIS to many noncitizens.

cannot reach a particular person or entity—or anyone at all—during the time frame provided for calls, they have no other opportunity to do so.

72. Like all CBP facilities, Border Patrol Station 1 in El Paso does not permit detainees to receive any visitors. There is therefore no opportunity for asylum seekers in the PACR and HARP programs to meet in person with anyone prior to or during their credible fear proceedings.

73. As described below, Las Americas has been functionally unable to communicate with individuals in CBP detention with whom it wishes to consult and for whom it may wish to serve as counsel.

74. Moreover, the list of attorneys that detainees in the PACR and HARP programs have received is independently insufficient for any meaningful communication or consultation with prospective counsel. Detainees have called the list they are provided "the list of ghosts" because of their inability to contact any person by calling the number on the list. Although Las Americas is on the ordinary list of free and low-fee attorneys provided by ICE to those with pending credible fear proceedings, it is not receiving calls from individuals in PACR and HARP based on the list that CBP provides.  Other legal services providers report similar experiences.

75. Those detained in CBP facilities also generally lack the ability to communicate with family or friends. Frequently, the loved ones of CBP detainees do not know where they are or even that they have been detained. CBP has said that, for those in its custody, it has "no obligation to notify family or counsel."[10] For PACR and HARP, the only exception to this rule is the single brief window during which asylum seekers may make outside calls—and hope those whom they call answer the phone.

---

[10] Max Rivlin-Nadler, *Asylum-Seeker Held Incommunicado for Three Weeks by Border Patrol*, KPBS, Nov. 26, 2019, https://www.kpbs.org/news/2019/nov/26/asylum-seeker-held-incommunicado-three-weeks-borde/ (quoting CBP statement).

76. Accordingly, asylum seekers in PACR and HARP are unable to meaningfully access counsel or anyone else with whom they may wish to consult, despite express statutory and regulatory right to do so.

**C.     Access to counsel is critically important in the credible fear process.**

77. Access to counsel is a critical protection for those in credible fear proceedings.

78. The interview and review can often require a detailed explanation from asylum seekers about extremely traumatic events and implicate complex legal determinations.

79. Asylum seekers have often traveled long distances and with children. They are frequently affected by mental health issues present in those fleeing violence, as well as by exhaustion and numerous other physical health challenges.  At the same time, they are expected to immediately defend their rights during accelerated removal proceedings in which their lives and futures—and those of their children—are at stake.

80. The vast majority of asylum seekers are fleeing serious violence or threats of serious violence or death. An attorney can assist an asylum seeker in preparing for their interview or review.

81. The ability to confidentially consult with a lawyer prior to the interview and review allows the asylum seeker to be better prepared to present all relevant information.

82. Attorneys are able to elicit information about why clients left their home countries and why they are afraid to return and to help determine whether a client's child may have separate or additional claims.  Attorneys can also assist clients in presenting their full stories in chronological order and fully explaining why they are going to be harmed if they are returned.

83. Attorneys are also able to advise clients about the interview process, including that clients can ask for a question to be repeated or clarified, can advise that the interpreter is inadequate, and

can say they do not know the answer to a question.  Attorneys can also inform clients that their testimony will be recorded. This knowledge is especially critical for individuals who will need to be prepared to recount traumatic experiences during their interview.

84. Further, an attorney may review documents or evidence in person and help clients prepare to present corroborating evidence of their claims.

85. Meaningful and confidential communication with an attorney assists an asylum seeker in presenting all of the relevant information concerning their personal and traumatic experiences and in ensuring they understand the standard under which their fear will be judged, whether they may volunteer additional information, and what information may be relevant to volunteer.

86. The presence of the asylum seeker's attorney during the credible fear interview is also necessary for the attorney to understand what occurred during the interview and to best prepare their client for the immigration judge's review of any adverse determination by an asylum officer.

87. In an asylum seeker's preparation for review of a negative credible fear determination by an immigration judge, an attorney is able to help evaluate why the credible fear interview was unsuccessful, better develop the asylum seeker's claims, and prepare for the hearing before the immigration judge.

88. Case outcomes demonstrate that attorney access is essential for noncitizens in immigration proceedings. Detained noncitizens with representation in immigration proceedings are more than twice as likely to receive relief from removal as those without representation.[11]

89. Attorney access has been particularly critical for asylum seekers in expedited removal. In 2014, advocates established a pro bono attorney project at a remote detention center in Artesia,

---

[11] Ingrid V. Eagly & Steven Shafer, *A National Study of Access to Counsel in Immigration Court*, 164 U. Pa. L. Rev. 1, 51 (2015).

New Mexico, which held Central American mothers and children seeking asylum and in expedited removal proceedings. After one month, removals decreased by 80%, and within two months, removals had decreased by 97%.[12] Likewise, a pro bono project at a detention center for families in expedited removal proceedings had, as of 2018, secured relief from expedited removal for more than 99.9% of those represented.[13] And in 2018, after asylum seekers held incommunicado at a federal prison pending their credible fear interviews secured access to counsel via court order, all 74 represented between the issuance of the temporary restraining order and the issuance of the preliminary injunction were determined to have a credible or reasonable fear of persecution. *Innovation Law Lab v. Nielsen*, 342 F. Supp. 3d 1067, 1073-75 (D. Or. 2018).

## IV.   PACR and HARP Require Asylum Seekers to Remain in Conditions of Confinement Incompatible with a Meaningful Credible Fear Interview.

90. CBP's facilities are commonly called *hieleras* for their freezing temperatures and are notoriously inhumane.

91. These facilities were designed for "short term" detention and not to hold people through the full duration of credible fear proceedings.

92. Individuals are often detained in small, concrete cells with concrete or metal benches. CBP's internal guidance states that the cells are neither designed nor equipped for overnight sleeping. It specifies that such cells shall have "no beds."[14]

93. In many CBP facilities, including Border Patrol Station 1, the lights are left on all night.

---

[12] Innovation Law Lab, *The Artesia Report*, https://innovationlawlab.org/the-artesia-report/the-artesia-report/.

[13] Kari E. Hong and Stephen Manning, *Getting it Righted: Access to Counsel in Rapid Removals*, 101 Marquette L. Rev. 673, 699-700 (2018).

[14] *See* U.S. Customs and Border Patrol Office of Internal Affairs Security Management Division, CBP Security Policy and Procedures Handbook, HB1400-02B (2009), 494, *available at* https://info.publicintelligence.net/CBPSecurityHandbook.pdf ("No beds; a hold room is not designed for sleeping.").

94. CBP holding facilities do not include regular access to basic hygiene, including showers and the means for detainees to brush their teeth.

95. A May 2019 report by DHS's own inspector general detailed extreme overcrowding and horrible conditions of confinement at a CBP holding facilities in the El Paso area, including detaining single adults in standing-room-only conditions for a week and holding approximately 900 detainees at a facility with a capacity of 125.[15]

96. Individuals and families in credible fear proceedings in the PACR and HARP programs have been held in El Paso's Border Patrol Station 1. Many detainees there are held in tents where people sleep on mats on the floor. Others are held in freezing hielera cells, which lack even mats.

97. Detainees have reported to members of Congress severely deficient detention conditions at El Paso Station 1, including that detainees were told to drink from toilets; were forced to sleep in extremely cramped conditions; and were denied access to medication.[16]

98. Asylum seekers are frequently exhausted and often ill from their long journeys. Detention in CBP facilities that lack such basic necessities as beds and basic hygiene materials does not allow asylum seekers to recuperate prior to the credible fear interview.

99. These conditions inhibit asylum seekers' ability to accurately or fully recount traumatic past events.

---

[15] DHS Office of Inspector General, Management Alert-DHS Needs to Address Dangerous Overcrowding Among Single Adults at El Paso Del Norte Processing Center (Redacted) 3 (May 30, 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-05/OIG-19-46-May19.pdf.
[16] Ryan Bort, *Drinking Out of Toilets: The Conditions in Border Patrol Facilities Are Beyond Horrifying*, Rolling Stone (July 2, 2019), https://www.rollingstone.com/politics/politics-news/border-patrol-facilities-conditions-aoc-democrats-854586/.

100. The conditions of confinement in CBP facilities hinder asylum seekers' ability to meaningfully participate in their credible fear interviews and in the credible fear process more broadly.

**V.    Las Americas' Experiences Demonstrate that PACR and HARP Deny Asylum Seekers the Opportunity to Meaningfully Access the Credible Fear Process and Seek Protection.**

101. Las Americas' experiences in attempting to represent asylum seekers in PACR and HARP demonstrate that it is impossible for such individuals to obtain meaningful access to counsel. Las Americas has been unable to communicate with prospective clients in PACR and HARP, whether telephonically or in person, prior to their credible fear interview or immigration judge review.

102. In light of the approximately 30-minute to 1-hour window that the PACR and HARP pilot programs provide for asylum seekers to contact counsel, Las Americas faces severe obstacles to directly connecting telephonically with any prospective client. One of Las Americas' attorneys must be on call and available in order to serve the prospective client immediately. This is especially burdensome because many of Las Americas' attorneys are frequently inside detention facilities providing legal representation. Moreover, PACR and HARP require Las Americas to have a staff member available to answer every single phone call before it goes to voicemail, since there is no means for the organization to call back an individual in one of the programs.

103. As a result, Las Americas has not yet received a phone call from an individual in PACR and HARP and has to date not been able to connect a person in PACR or HARP with an attorney in order to provide legal advice to the asylum seeker upon direct outreach.

104. Las Americas has been unable to meet in person with individuals in PACR and HARP. Las Americas' legal director requested an in-person meeting with a prospective client in PACR in order

to conduct an intake. A Border Patrol officer informed her, "We are not equipped to facilitate in-person meetings."

105. Historically, CBP has consistently denied Las Americas attorneys in-person access to CBP facilities, including El Paso's Border Patrol Station 1. It has told Las Americas that it cannot accommodate attorneys at Border Patrol Station 1.

106. In contrast, most individuals that Las Americas represents in the El Paso area are in ICE detention at the El Paso Processing Center and other ICE facilities. After confirming the prospective client's location through their assigned A-number in ICE's online detainee locator, Las Americas is able to send an attorney or paralegal to meet with the individual. Locating an individual in ICE detention takes no more than a few minutes. The entire process of locating and meeting with the person to conduct a screening interview can typically take place in a single morning or afternoon.

107. Las Americas has been functionally unable to track down individuals in CBP custody in the PACR and HARP programs within the compressed time frame necessary to meaningfully communicate with them.

108. Instead, Las Americas staff have been forced to expend significant amounts of time attempting to track down prospective clients in CBP custody. In trying to find and then speak telephonically to one person detained in CBP custody and subject to PACR, Las Americas staff exchanged at least 18 emails and 4 phone calls with various CBP officials over a period of 2 days.

109. For this prospective client, Las Americas first contacted CBP via email around 10:19 AM on November 20, 2019, requesting access to the prospective client in PACR. A Border Patrol officer requested that Las Americas "send . . . a proposed date and time" for the conversation. At no point did the Border Patrol officer indicate where the prospective client was in the credible fear

proceedings. The Las Americas legal director provided windows of availability for a telephone conversation that day and also requested an extension so that she could prepare her client. Border Patrol did not provide for a conversation that day.

110. The next day, November 21, at around 2:40 PM Border Patrol informed Las Americas that it "ha[d] not confirmed their [the prospective client's] location yet" and asked that Las Americas double check the spelling of her name. At roughly 4:59 PM on November 21, Border Patrol confirmed that it had located the prospective client "at the El Paso Station"—over 30 hours after Las Americas first sought to locate her.

111. On the following day, November 22, at around 2:48 PM, Border Patrol informed Las Americas that the prospective client had in fact gone through the immigration judge review process sometime on November 20. The immigration judge had already affirmed the adverse credible fear determination and had ordered Las Americas' prospective client removed.

112. Las Americas has to date been unable to connect with any individual in PACR or HARP prior to the completion of their credible fear proceedings. In contrast, Las Americas regularly connects with and represents individuals in ICE custody in their credible fear proceedings, including prior to the credible fear interview itself.

## VI.    PACR and HARP Erroneously Return Asylum Seekers to Places Where They Face Potential Harm.

113. PACR and HARP set asylum seekers up for failure in the credible fear process—no matter how strong their claims for protection. By forcing asylum seekers to proceed through the credible fear process while essentially incommunicado in CBP custody, without access to counsel, in conditions that significantly interfere with their ability to have a meaningful credible fear interview, and on a rushed timeline, PACR and HARP result in the erroneous removal of people who are at risk of persecution, torture, and death.

114. PACR and HARP also have kept Las Americas from accessing prospective clients in the credible fear process. Las Americas has sought to make contact with prospective clients in PACR and HARP without success.

115. If PACR and HARP remain in place, people who have claims for asylum or other forms of relief and protection that require that they be placed in full immigration proceedings will be erroneously sent back to danger, persecution, or even death.

116. Congress specifically implemented procedural safeguards to prevent this kind of erroneous deprivation of the right to apply for asylum, in requiring that individuals in the credible fear process have access to counsel to ensure a meaningful opportunity to seek relief. With PACR and HARP, the executive branch is attempting to effectuate an end run around the procedural safeguard of access to counsel, by implementing policies that are not in accordance with the duly enacted laws of the United States, with the executive branch's own regulations, and with the fundamental goals of the asylum system: protecting those at risk of persecution or torture, and ensuring that all those who may be eligible for protection have a full day in court.

**VII.   PACR and HARP Harm Las Americas.**

117. PACR and HARP have disrupted Las Americas' operations in the El Paso area and forced the organization to divert resources to attempt to provide legal and other assistance to asylum seekers in CBP detention. In doing so, they have greatly impaired Las Americas' ability to represent asylum seekers detained in the El Paso area—which is critical to Las Americas' mission. These harms are exacerbated every day that PACR and HARP remain in effect.

118. Las Americas seeks to provide direct legal services to individuals in PACR and HARP due to its long history of responding to urgent direct services needs for noncitizens in West Texas. If Las Americas is able to connect with individuals in PACR and HARP, it will seek to provide legal

services to those individuals. Las Americas has attempted to connect with such individuals in order to provide legal services and has been unable to do so.

119. In response to the extraordinarily narrow windows of time that individuals in PACR and HARP have to speak with an attorney, Las Americas has re-trained its intake staff to attempt to identify and elevate calls from or on behalf of individuals in PACR and HARP—for example, calls in which the individual expresses a particularly urgent need to speak with an attorney or a third party says they are unable to further contact an individual in immigration proceedings. Las Americas intake staff has created a separate tracker for calls from individuals who are in either PACR or HARP and now attempts to immediately contact an attorney while the caller is still on the line.  Las Americas will now staff a separate phone line with a dedicated legal assistant in order to free up a line solely for the purpose of providing representation to asylum seekers in the PACR and HARP programs.

120. PACR and HARP require Las Americas' director of legal services to divert time from Las Americas' docket working with individuals detained in ICE custody in anticipation of possible calls from asylum seekers in PACR and HARP. The director of legal services now is on call, ready to respond within hours to prepare those asylum seekers for the interview and to otherwise engage with asylum seekers in the credible fear process. From November 20, 2019 to December 3, 2019, Las Americas' director of legal services devoted approximately 60% of her time to attempting to locate and consult with individuals in PACR and HARP. The time that the legal services director has expended attempting to locate prospective clients in PACR and HARP is time that she has not devoted to supervising attorneys, working on behalf of asylum seekers, preparing for upcoming litigation on behalf of asylum seekers, and doing additional advocacy work regarding detention conditions at ICE facilities where her clients are detained.

121. In an attempt to account for the obstacles to access imposed by PACR and HARP, Las Americas sent a paralegal to Ciudad Juárez, Mexico to screen and sign up for representation Mexican asylum seekers who could be subject to the HARP program.  CBP has not been able to locate the five clients signed up through this method in their systems.

122. As a result of CBP's failure to provide timely information concerning and access to clients and potential clients, Las Americas is implementing plans to conduct CFI and RFI preparations in Ciudad Juárez. Pro bono counsel often assist Las Americas in providing CFI and RFI preparation and representation for clients detained in ICE custody.  However, pro bono counsel are significantly less likely to cross into Mexico to assist in these efforts. Las Americas therefore will be forced to extend resources beyond those required in similar cases where clients are in the United States or in ICE custody.

123. If PACR and HARP continue, Las Americas will be forced to hire additional staff. Las Americas will divert funds that it would have put into communications as well as previously planned staff raises designed to encourage retention. Hiring the additional staff member will result in additional costs, in terms of time invested in the hiring process and time invested in on-boarding and training. If PACR and HARP continue and Las Americas were to choose not to hire an additional staff member, it would need to decrease its representation for adult detainees in other settings—scaling back its representation in bond, parole, and full asylum proceedings—due to resource constraints.

124. Las Americas is working to develop a rapid response intake system for detained individuals that includes rapid intakes, preparation for the credible fear interview, and the ability to engage in full asylum legal representation. It has a grant contingent on this work to serve detained adults in

ICE custody. Las Americas will have to work to attempt to rearrange the grant if PACR and HARP continue.

## CLAIMS FOR RELIEF

125. All of the foregoing allegations are incorporated by reference in each of the following claims.

## FIRST CLAIM

### (Violation of the Immigration and Nationality Act, 8 U.S.C. § 1225(b)(1)(B)(iv))

126. The Immigration and Nationality Act, 8 U.S.C. § 1225(b)(1)(B)(iv), provides that a noncitizen in credible fear proceedings within the expedited removal process "may consult with a person or persons of [their] choosing prior to" a credible fear "interview or any review thereof, according to regulations prescribed by the Attorney General."

127. Defendants' PACR and HARP programs and their implementation violate 8 U.S.C. § 1225(b)(1)(B)(iv) by preventing individuals from accessing counsel or otherwise consulting with individuals of their choosing during the credible fear process.

## SECOND CLAIM

### (Violation of 8 C.F.R. § 208.30(d)(4))

128. Federal regulations governing credible fear proceedings for those in expedited removal provide that a noncitizen "may consult with a person or persons of [their] choosing prior to" a credible fear "interview or any review thereof." 8 C.F.R. § 208.30(d)(4). Under the regulation, "Any person or persons with whom the alien chooses to consult may be present at the interview

and may be permitted, in the discretion of the asylum officer, to present a statement at the end of the interview." *Id.*

129.        Defendants' PACR and HARP programs and their implementation violate 8 C.F.R. § 208.30(d)(4) by preventing individuals from accessing counsel or otherwise consulting with individuals of their choosing during the credible fear process. Defendants' acts also violate 8 C.F.R. § 208.30(d)(4) by preventing counsel and other individuals that asylum seekers choose to consult from being present at the credible fear interview.

### THIRD CLAIM

**(Violation of the Immigration and Nationality Act, 8 U.S.C. § 1362; Administrative Procedure Act, 5 U.S.C. §§ 555(b))**

130. The Immigration and Nationality Act, 8 U.S.C. § 1362, provides that "[i]n any removal proceedings before an immigration judge," the individual "shall have the privilege of being represented (at no expense to the Government) by such counsel, authorized to practice in such proceedings, as he shall choose."

131. The Administrative Procedure Act, 5 U.S.C. § 555(b), provides that "[a] person compelled to appear in person before an agency or representative thereof is entitled to be accompanied, represented, and advised by counsel or, if permitted by the agency, by other qualified representative. A party is entitled to appear in person or by or with counsel or other duly qualified representative in an agency proceeding." Individuals subject to expedited removal procedures are compelled to appear in person before agency representatives. Congress has not exempted expedited removal proceedings from the procedural protections provided in § 555(b).

132. Defendants' PACR and HARP programs and their implementation violate 8 U.S.C. § 1362 and 5 U.S.C. § 555(b) by preventing individuals from accessing counsel during the credible fear process, including in the credible fear interview itself.

## FOURTH CLAIM

### (Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2))

133. The Administrative Procedure Act, 5 U.S.C. § 706, provides that a Court "shall hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

134. The PACR and HARP programs are arbitrary, capricious, an abuse of discretion, and contrary to law. Among other reasons, the programs are arbitrary and capricious because they entirely failed to consider important aspects of the problem, including that the programs deny asylum seekers the ability to consult with counsel and other persons of their own choosing and to have those representatives present at the credible fear interviews and immigration judge review and that the programs do not take into account the effect of the conditions of confinement in CBP facilities on asylum seekers' credible fear interviews; the programs depart from prior policies without acknowledgment of or a reasoned explanation for the departure; and the programs are illogical and irrational. The programs are also contrary to law allowing asylum seekers to consult with persons of their own choosing, including counsel, prior to credible fear interviews and to review by an immigration judge and to have those individuals present at credible fear interviews.

## FIFTH CLAIM

### (Violation of the Immigration and Nationality Act, the Convention Against Torture, the Foreign Affairs Reform and Restructuring Act of 1998, and Implementing Regulations)

135. The Immigration and Nationality Act and implementing regulations, including 8 U.S.C. § 1225(b)(1), 8 C.F.R. §§ 235.3(b)(4), 208.30, and 1003.42 (expedited removal); 8 U.S.C. § 1158 (asylum); 8 U.S.C. § 1231(b)(3) (withholding of removal); and CAT, implemented in the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified at 8 U.S.C. § 1231 note) entitle

individuals to a meaningful opportunity to apply for asylum, withholding of removal, and CAT relief, as well as numerous procedural safeguards in connection with those applications. Defendants, through their implementation of the PACR and HARP programs, have violated these statutory and regulatory rights in multiple respects, including by:

    a.  Effectively denying a meaningful opportunity to consult with and be assisted by attorneys or others prior to and during the credible fear process and the immigration judge review process, and to have attorneys or others present at the credible fear interview; and

    b.  Maintaining conditions that hinder the ability to meaningfully participate in credible fear proceedings, including the credible fear interview.

## SIXTH CLAIM

### (Violation of the Due Process Clause of the Fifth Amendment to the United States Constitution)

136. The Due Process Clause of the Fifth Amendment to the United States Constitution provides that "[n]o person shall . . .  be deprived of life, liberty or property, without due process of law."

137. Asylum seekers have protected interests in applying for asylum, withholding of removal, and CAT relief, in obtaining withholding of removal and CAT relief upon a showing that meets the applicable standards, and in not being removed to a country where they face serious danger and potential loss of life.

138. Asylum seekers are entitled under the Due Process Clause to a fair hearing as to their eligibility for asylum and other relief from removal, including at a minimum a procedure that is in compliance with applicable statutory and regulatory standards.

139. Defendants, through their implementation of HARP and PACR, have violated asylum seekers' rights to due process, including by:

a.  Effectively denying a meaningful opportunity to consult with and be assisted by attorneys or others prior to and during the credible fear process and the immigration judge review process, and to have attorneys or others present at the credible fear interview; and

b.  Effectively denying a meaningful opportunity to apply for asylum, withholding of removal under 8 U.S.C. § 1231(b)(3), and relief from removal under CAT.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that this Court grant the following relief:

1.  Declare Defendants' policies requiring that individuals and families remain in CBP custody for the duration of their credible fear proceedings and the actions and practices of Defendants described above contrary to law;

2.  Enter an order vacating the programs keeping individuals and families in CBP custody for the duration of their credible fear proceedings, including but not limited to all written policies and guidance issued by DHS and DOJ regarding PACR and HARP;

3.  Enter an order permanently enjoining Defendants and their directors, officers, agents, and employees from continuing to apply the new programs to individuals and families who are placed in credible fear proceedings;

4.  Enter an order staying the credible fear proceedings of persons currently subject to PACR and HARP in the El Paso sector until they have been either paroled or transferred to ICE custody and have had an adequate opportunity to access counsel; and, for those who have already received an adverse determination in a credible fear interview, vacating any negative finding and/or removal order and enjoining Defendants from removing them until

they have been provided with a new credible fear process fully compliant with law or, in the alternative, full immigration court removal proceedings pursuant to 8 U.S.C. § 1229a;

5.  Enter an order enjoining Defendants to provide those previously subject to PACR and HARP with a new credible fear process fully compliant with law or, in the alternative, full immigration court removal proceedings pursuant to 8 U.S.C. § 1229a; to return them to the United States at no expense; and to parole them into the United States for the duration of those credible fear and/or removal proceedings;

6.  Award Plaintiff's counsel reasonable attorneys' fees under the Equal Access to Justice Act, and any other applicable statute or regulation; and

7.  Grant such further relief as the Court deems just, equitable, and appropriate.

Dated: December 5, 2019

Respectfully submitted,

/s/ *Arthur B. Spitzer*

Andre Segura*, TX Bar No. 24107112
Thomas Buser-Clancy*, TX Bar No.
24078344
Kathryn Huddleston*, AZ Bar No. 033622
ACLU Foundation of Texas, Inc.
5225 Katy Freeway, Suite 350
Houston, TX 77007
Tel. (713) 942-8146
Fax: (713) 942-8966
asegura@aclutx.org
tbuser-clancy@aclutx.org
khuddleston@aclutx.org

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
American Civil Liberties Union Foundation
  of the District of Columbia
915 15th Street, NW - 2nd floor
Washington, DC 20005-2302
Tel. (202) 601-4266
aspitzer@acludc.org
smichelman@acludc.org

Bernardo Rafael Cruz*, TX Bar No.
24109774
Brantley Shaw Drake*, NY Bar No. 5407440
ACLU Foundation of Texas, Inc.
109 N. Oregon St., Suite 600
El Paso, TX 79901
Tel. (915) 533-8091
Fax: (915) 308-7188
brcruz@aclutx.org
sdrake@aclutx.org

Anand Balakrishnan,* CT Bar No. 430329
American Civil Liberties Union
Foundation, Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
Tel. (212) 549-2600
abalakrishnan@aclu.org

*Pro hac vice application forthcoming*