UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LAS AMERICAS IMMIGRANT
ADVOCACY CENTER, *et al.*,

Plaintiffs,

v.

CHAD WOLF,
in his official capacity, Acting Secretary of the
U.S. Department of Homeland Security, *et al.*,

Defendants.

No. 1:19-cv-3640 (RDM)

**MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 4

I.    U.S. Immigration Law's Protections for Individuals Fleeing Threatened Harm ............... 4

II.   Defendants' New Policy of Keeping Asylum Seekers in CBP Custody under PACR and HARP ............................................................................................... 7

III.  Detainees in CBP Custody Lack Attorney Access and Lack Communication Channels with the Outside World ................................................................................ 9

IV.  The Inhumane Conditions in CBP Facilities Are Unsuitable For Those Preparing for and Undergoing Life or Death Legal Proceedings .................................................. 12

V.   Plaintiff's Experiences with PACR and HARP ................................................. 15

    A.   Individual Plaintiffs ........................................................................ 15

    B.   Organizational Plaintiff Las Americas ................................................. 18

APPLICABLE LEGAL STANDARD ................................................................... 20

ARGUMENT .................................................................................................... 20

I.    Plaintiffs Have a Substantial Likelihood of Success on the Merits ......................... 20

    A.   Defendants' Policies Violate Asylum Seekers' Statutory and Regulatory Rights to Access Counsel and Contact Third Parties During the Credible Fear Process 20

        1.   Congress Has Mandated that Asylum Seekers Must Have Access to Counsel in Credible Fear Proceedings. ......................................................... 20

        2.   Meaningful Access to Counsel is Legally Required and Critical for Asylum Seekers ............................................................................... 22

        3.   DHS's Own Policies Confirm that the Right to Access Counsel Must Be Meaningful ............................................................................ 30

        4.   PACR and HARP Deprived Individual Plaintiffs and Continue to Deprive Asylum Seekers of the Right to Counsel ........................................ 32

    B.   Defendants' New Policy Is Arbitrary and Capricious, and otherwise Contrary to Law, in Violation of the APA. ............................................................. 34

        1.   Defendants' New policy is Arbitrary and Capricious. .................................... 34

        2.   Defendants' New Policy Is An Abuse of Discretion and Not in Accordance with Law. ............................................................................... 38

C.      PACR and HARP Effectively Deprive Asylum Seekers of a Meaningful Right to Apply for Asylum, Withholding, and Protection under CAT. ............................ 38

II.      Plaintiffs are Suffering Irreparable Harm. ......................................................................... 40

A.      The Individual Plaintiffs are Suffering Irreparable Harm. ................................... 40

B.      Organizational Plaintiff Las Americas Is Suffering Irreparable Harm. .............. 42

III.     The Balance of Equities and the Public Interest Both Strongly Favor Injunctive Relief.  44

CONCLUSION ........................................................................................................................ 45

# TABLE OF AUTHORITIES

**Cases**

Am. Fed'n of Gov't Emps. v. FLRA,
   470 F.3d 375 (D.C. Cir. 2006) ............................................................... 37

Arroyo v. D.H.S.,
   2019 WL 2912848 (C.D. Cal. June 20, 2019) ......................................... 26

Baires v. INS,
   856 F.2d 89 (9th Cir. 1998) ..................................................................... 23

Benjamin v. Fraser,
   264 F.3d 175 (2d Cir. 2001) ..................................................................... 28

Biwot v. Gonzales,
   403 F.3d 1094 (9th Cir. 2005) ........................................................... 22, 23

CAIR Coalition v. Trump,
   1:19-cv-02530 (D.D.C.) .............................................................................. 6

Chaplaincy of Full Gospel Churches v. England,
   454 F.3d 290 (D.C. Cir. 2006) ................................................................. 40

Doe v. McAleenan,
   2019 WL 6605880 (S.D. Cal. Nov. 12, 2019) ......................................... 22

E. Bay Sanctuary Covenant v. Barr,
   19-16487 (9th Cir.) ...................................................................................... 6

*F.C.C. v. Fox Television Stations, Inc.,
   556 U.S. 502 (2009) ........................................................................... 34, 37

*Grace v. Whitaker,
   344 F. Supp. 3d 96 (D.D.C. 2018) ....................................................... 5, 40

Haitian Refugee Ctr. v. Smith,
   676 F.2d 1023 (5th Cir. 1982) ................................................................. 39

Halvorsen v. Baird,
   146 F.3d 680 (9th Cir. 1998) ................................................................... 34

I.N.S. v. Cardoza-Fonseca,
   480 U.S. 421 (1987) ............................................................................... 4, 6

\*Innovation Law Lab v. Nielsen,
   310 F. Supp. 3d 1150 (D. Or. 2018) ........................................................... 28, 30, 33

League of Women Voters of U.S. v. Newby,
   838 F.3d 1 (D.C. Cir. 2016) ......................................................................... 42, 43, 44

Leslie v. Att'y Gen. of U.S.,
   611 F.3d 171 (3d Cir. 2010) .................................................................................. 23

Louis v. Meissner,
   530 F. Supp. 924 (S.D. Fla. 1981) ..................................................................... 33, 39

Lyon v. ICE,
   171 F. Supp. 3d 961 (N.D. Cal. 2016) ....................................................................... 27

Make the Road N.Y. v. McAleenan,
   1:19-cv-2369, 2019 WL 4738070 (D.D.C. Sept. 27, 2019) ........................................ 44

Marincas v. Lewis,
   92 F.3d 195 (3d Cir. 1996) ..................................................................................... 38

Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,
   463 U.S. 29 (1983) ................................................................................................ 35

N. Mariana Islands v. United States,
   686 F. Supp. 2d 7 (D.D.C. 2009) .............................................................................. 45

Nken v. Holder,
   556 U.S. 418 (2009) .............................................................................................. 44

Open Cmties. Alliance v. Carson,
   286 F. Supp. 3d 148 (D.D.C. 2017) ........................................................................... 44

Orantes-Hernandez v. Meese,
   685 F. Supp. 1488 (C.D. Cal. 1988) .......................................................................... 24

\*Orantes-Hernandez v. Thornburgh,
   919 F.2d 549 (9th Cir. 1990) ............................................................................. passim

Prof'l Reactor Operator Soc. v. U.S. Nuclear Regulatory Comm'n,
   939 F.2d 1047 (D.C. Cir. 1991) ................................................................................ 22

R.I.L-R v. Johnson,
   80 F. Supp. 3d 164 (D.D.C. 2015) ........................................................................ 39, 44

Rios-Berrios v. INS,
    776 F.2d 859 (9th Cir. 1985) ........................................................................... 32

Rodriguez v. Robbins,
    715 F.3d 1127 (9th Cir. 2013) ......................................................................... 44

Rodriguez-Castillo v. Nielsen,
    2018 WL 6131172 (C.D. Cal. June 21, 2018) ................................................. 28

Sottera, Inc. v. Food & Drug Admin.,
    627 F.3d 891 (D.C. Cir. 2010) ......................................................................... 20

Ungar v. Sarafite,
    376 U.S. 575 (1964) ......................................................................................... 23

Yiu Fong Cheung v. I.N.S.,
    418 F.2d 460 (D.C. Cir. 1969) ......................................................................... 22

**Federal Statutes**

*5 U.S.C. § 555 .................................................................................................... 21

*5 U.S.C. § 706 .................................................................................................... 38

8 C.F.R. § 235.3 ................................................................................................... 22

*8 C.F.R. § 208.30 ........................................................................................ passim

8 C.F.R § 1003.42 ........................................................................................ passim

8 C.F.R. § 1208.30 ............................................................................................... 43

8 U.S.C. § 1101 ...................................................................................................... 4

8 U.S.C. § 1158 ................................................................................................. 4, 38

*8 U.S.C. § 1225 .......................................................................................... passim

8 U.S.C. § 1229a .......................................................................................... 5, 7, 45

8 U.S.C. § 1231 ............................................................................................ 4, 5, 38

8 U.S.C. § 1252 ...................................................................................................... 5

Foreign Affairs Reform and Restructuring Act ..................................................... 5

vi

Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ....................................... 5

Refugee Act of 1980 ............................................................................................................... 4, 39

## INTRODUCTION

Customs and Border Protection ("CBP") facilities are legal black holes. These facilities categorically deny individuals in-person access to attorneys and other members of the public. They provide no meaningful telephonic access to the outside world, including attorneys. Further, they were designed for only short-term detention, and they do not provide for basic human necessities: they have no beds, and individuals are forced to sleep on thin mats or concrete floors; lights remain on at all times; and detainees are rarely provided with hygiene products or afforded regular access to a shower. CBP facilities are neither designed nor equipped to hold asylum seekers preparing for and undergoing legal proceedings that have life-or-death stakes.

This case challenges the federal government's drastic change in policy to—for the first time—detain asylum seekers[1] in CBP facilities throughout their asylum screening process, effectively incommunicado and in appalling conditions, without any opportunity to meet in person, or any meaningful opportunity to communicate by telephone, with an attorney or others to obtain the assistance to which they are entitled by law.

Congress has long mandated that asylum seekers, including those subject to expedited removal proceedings, have the opportunity to access and consult with counsel and other third parties while they prepare for an initial screening for asylum and other protection from removal and for a review of that screening determination by an immigration judge. These screenings, known as "credible fear interviews," are the critical first step for many asylum seekers because they determine whether individuals and families placed in the fast-track expedited removal

---

[1] Throughout Plaintiffs' briefing, Plaintiffs use the term "asylum seeker" to refer to those who express fear of return to their country of origin or an intent to apply for asylum. *See* 8 U.S.C. § 1225(b)(1)(A)(ii). As explained further below, such individuals may be eligible for asylum, entitled to withholding of removal, and/or entitled to relief from removal under the United States' implementation of the Convention Against Torture.

process may pursue a claim for asylum or other protection or, instead, will be summarily sent back to the countries they are fleeing.

Defendants' new programs—the Prompt Asylum Claim Review program ("PACR") and the Humanitarian Asylum Review Process ("HARP")—implement DHS's new policy to hold asylum seekers in CBP facilities for the duration of the credible fear process.  Both PACR and HARP are currently in effect as pilot programs in Border Patrol's El Paso Sector.  Prior to the implementation of these programs, detained asylum seekers were not held in CBP custody. Instead, they were transferred to detention centers operated by Immigration and Customs Enforcement ("ICE") for their credible fear process.

The new policy eviscerates any meaningful opportunity for asylum seekers to consult with counsel during the credible fear process.  In ICE detention, asylum seekers were afforded more time and opportunity to contact counsel or prospective counsel or others to aid them in their credible fear proceedings.  They could meet with attorneys, both in person and telephonically, prior to the credible fear interview and again prior to an immigration judge's review of any negative credible fear determination.

CBP allows none of this to meaningfully occur for those in its custody, and CBP facilities are not set up to facilitate such access.  CBP facilities do not afford any in-person access to counsel or any meaningful telephonic access to counsel or, in fact, to the outside world.  CBP provides no system for attorneys or family members to locate people in its custody.  Its facilities and its policies regarding detainees were designed for extremely short-term detention, not for asylum seekers going through a credible fear process.  The new policy all but guarantees that many asylum seekers will be erroneously sent back to countries where they face danger and that, as a result, some of them will be killed or endure horrific violence.

Preliminary injunctive relief is necessary to prevent Defendants' fundamentally unlawful actions from continuing to harm Plaintiffs. Plaintiffs are likely to succeed on the merits of their claims. **First**, Defendants policy violates statutes and regulations that guarantee asylum seekers' rights to access counsel and others throughout the credible fear process. **Second**, Defendants' policy change violates the Administrative Procedure Act ("APA") because their new policy of keeping asylum seekers in CBP custody for the duration of the credible fear process is arbitrary and capricious and contrary to law. **Third**, forcing individuals to undergo the credible fear process in CBP custody deprives them of a meaningful opportunity to apply for asylum, statutory withholding, or relief pursuant to the Convention Against Torture ("CAT"), and thus is unlawful.

Without preliminary injunctive relief, Plaintiffs will continue to suffer irreparable harm. The Individual Plaintiffs, families removed after being rocketed through PACR and HARP, did not speak with a lawyer during the credible fear process, were confused throughout the proceedings, were held in inhumane conditions, and now have been removed to their home countries—which they fled due to death threats. They are now in danger—and in fact two of the three Plaintiff families are currently living in hiding. Additionally, the Organizational Plaintiff, Las Americas, has been forced to divert significant resources to efforts to represent those in the PACR and HARP programs. Despite tremendous efforts, however, Las Americas has been consistently thwarted by CBP's Kafkaesque limitations on access. So long as PACR and HARP remain in effect, Las Americas will be forced to continue diverting substantial resources to coping with Defendants' fundamentally unlawful program while representing fewer clients than it otherwise could.

Defendants' subversion of the congressionally mandated screening process for asylum seekers, which inevitably leads to people being sent back to danger and possible death, irreparably harms the Plaintiffs and is contrary to the public interest.

## BACKGROUND

I.    **U.S. Immigration Law's Protections for Individuals Fleeing Threatened Harm**

The current system of protection for asylum seekers is largely the product of the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, which set up the modern asylum framework.  *See I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 423 (1987).  Congress specifically intended to effectuate the "historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands." Refugee Act of 1980, § 101(a).

Every noncitizen "who is physically present in the United States or who arrives in the United States" has the right to apply for asylum. 8 U.S.C. § 1158(a)(1).  Individuals are eligible for asylum if they experienced past persecution or have a well-founded fear of future persecution "on account of race, religion, nationality, membership in a particular social group, or political opinion" and if they are "unable or unwilling to return to, and . . . unable or unwilling to avail himself or herself of the protection of" their country of origin because of that persecution or fear. 8 U.S.C. § 1101(a)(42)(A).

U.S. law also protects noncitizens who are not eligible for asylum but nevertheless face harm if returned to their home countries.  The U.S. government cannot return individuals to a country where it is more likely than not that their "life or freedom would be threatened . . . because of [their] race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1231(b)(3)(A) ("statutory withholding of removal").  Pursuant to the CAT, the government also cannot remove individuals to a country where they are more likely than not

to be tortured.  Foreign Affairs Reform and Restructuring Act ("FARRA"), Pub. L. No. 105-277, Div. G., Title XXII, § 2242, 112 Stat. 2681, codified as note to 8 U.S.C. § 1231; 8 C.F.R. §§ 208.16-208.18, 1208.16-1208.18.

Ordinarily, people whom the executive branch seeks to remove from the United States are placed in immigration removal proceedings under 8 U.S.C. § 1229a.  In these proceedings, they have a full, adversarial hearing on the merits of their case before an immigration judge.  8 U.S.C. § 1229a(b).  Multiple layers of review are available before (at minimum) the Board of Immigration Appeals and a federal court of appeals.  *See* 8 U.S.C. § 1252(a)(5); 8 C.F.R. § 1003.1(b).

In 1996, Congress created a highly truncated removal process called "expedited removal" for certain noncitizens who present at a port of entry or who have recently entered the country without inspection.  Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, Div. C, Title III, 110 Stat. 3009-579.  Those issued expedited removal orders are ordered removed by an immigration officer "without further hearing or review." 8 U.S.C. § 1225(b)(1)(A)(i); *id.* § 1225(b)(1)(B)(iii)(I).

Since the expedited removal process lacks many of the procedural protections of full removal proceedings, Congress sought to ensure that "there should be no danger that an alien with a genuine asylum claim will be returned to persecution."  H.R. Rep. No. 104-469, pt. 1, at 158 (1996).  It therefore created the credible fear process for asylum seekers in expedited removal, providing for referral to full removal proceedings if an individual makes a low threshold showing that they have a fraction of a chance of establishing, in full removal proceedings, that they are eligible for protection.  *See Grace v. Whitaker*, 344 F. Supp.3d 96, 104 (D.D.C. 2018), *appeal pending*, No. 19-5013 (filed Jan. 30, 2019); 8 U.S.C. § 1225(b)(1)(B).

Asylum seekers who meet this low threshold in the credible fear process are referred for full removal proceedings.  8 U.S.C. §1225(b)(1)(B)(ii); 8 C.F.R. § 208.30(f); *id.* § 1003.42(f).

Individuals in expedited removal who indicate a fear of return to their country of origin, or an intent to apply for asylum, must be referred for an interview with an asylum officer.  8 U.S.C. § 1225(b)(1)(A)(ii); 8 C.F.R. § 208.30(d).  The asylum officer then makes a determination whether the person has a credible fear—that is, whether there is "a significant possibility . . . that the alien could establish eligibility for": (1) asylum; (2) withholding under § 1231(b)(3); and/or (3) relief from removal under CAT. 8 U.S.C. § 1225(b)(1)(B)(v); 8 C.F.R. § 208.30(d), (e)(2), (e)(3).[2]  If the asylum officer makes a positive determination, the individual is taken out of expedited removal and placed into full proceedings under § 1229a.  8 C.F.R. § 208.30(f).

If the person receives a negative determination at the interview stage, the asylum officer must "provide . . . a written notice of decision" and ask whether the individual wants review of the negative determination by an immigration judge.  8 C.F.R. § 208.30(g)(1); *id.* § 1208.30(g)(2)(ii).  Unless the individual affirmatively waives review by an immigration judge, the agency must provide for such review.  *Id.* § 208.30(g)(1); *id.* § 1208.30(g)(2)(i).  If the immigration judge vacates the negative determination, the individual will then be placed into

---

[2] Under regulatory provisions currently in effect, individuals who have transited a third country en route to the United States are determined categorically ineligible for asylum and must show a "reasonable fear" of persecution or torture for statutory withholding or CAT relief.  8 C.F.R. § 208.13(c)(4); *id.* § 208.30(e)(5)(iii); *see E. Bay Sanctuary Covenant v. Barr*, 19-16487 (9th Cir.); *CAIR Coalition v. Trump*, 1:19-cv-02530 (D.D.C.).  Such a "reasonable fear" showing requires establishing a "reasonable possibility" of eligibility for relief.  8 C.F.R. § 208.31(c).  This standard is at least as low as a one-in-ten chance and remains a fraction of a chance of establishing ultimate eligibility for relief, far below the 50.1% chance of persecution or torture necessary to ultimately gain relief from removal under statutory withholding or CAT.  *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 440 (1987); 8 C.F.R. §§ 208.16(b), (c)(2).

ordinary removal proceedings under 8 U.S.C. § 1229a, just as they would have been if the

asylum officer had made a positive determination.  8 C.F.R. §§ 1003.42(f), 1208.30(g)(2)(iv)(B).

Otherwise, the expedited order of removal remains final.  8 C.F.R § 1003.42(f); *id.* §

1208.30(g)(2)(iv)(A).  There is no appeal of the immigration judge's decision.  8 C.F.R.

§1003.42(f); *id.* § 1208.30(g)(2)(iv)(A).

Pursuant to federal statute and regulation, asylum seekers have the right to consult and be

represented by counsel throughout the credible fear process, including at the credible fear

interview and at any review by the immigration judge.  8 U.S.C. § 1225(b)(1)(B)(iv) (providing

that asylum seekers "may consult with a person or persons of [their] choosing prior to the

[credible fear] interview or any review thereof"); *id.* § 1362; 5 U.S.C. § 555(b); 8 C.F.R. §

208.30(d)(4), (g)(2); *id.* § 1003.42(c); *id.* § 1208.30(g)(2).  *See infra* ARGUMENT, I.A.1.

## II.      Defendants' New Policy of Keeping Asylum Seekers in CBP Custody under PACR and HARP

Prior to October 2019, Defendants had a written policy of transferring asylum seekers

detained in CBP custody to ICE custody prior to the credible fear interview.  Ex. A., Declaration

of Christopher Clay ("Clay Decl.") at Ex. 1 (CBP Memorandum and Muster, Processing

Expedited Removal Cases, at 5 ("CBP must refer to ICE/ERO to detain all aliens referred for

credible fear interviews.")); *id*. at Ex. 2 (U.S. Citizenship and Immigration Services ("USCIS"),

Affirmative Asylum, Credible Fear, and Reasonable Fear (March 2019), at slides 17, 23

(indicating that credible fear interview occurs within ICE)).  Once in ICE custody—again

pursuant to written policy—asylum seekers had a period of time to recuperate and to consult

with others prior to the credible fear interview.  Before July 2019, this time period was a

minimum of 48 hours; a July 2019 USCIS memorandum shortened this time period to "one full calendar day."[3]  Clay Decl. at Ex. 3.

On or about October 7 or 8, Defendants adopted a new written policy: under the PACR and HARP programs, asylum seekers will remain detained in CBP custody for the duration of their credible fear proceedings, including the credible fear interview, and will not be transferred to ICE custody at all.  Clay Decl. at Exs. 4 (*The Trump Administration Launched A Secretive Program To More Quickly Deport Mexican Asylum-Seekers*, Buzzfeed News (November 6, 2019), 25-26 (email correspondence concerning start date of PACR and HARP).  Defendants have described the PACR and HARP programs as intended "to get people through an immigration process as quickly as we possibly can."  Clay Decl. at Ex. 5 (transcription of CBP leadership press conference in El Paso).  While PACR is Defendants' term for their program applying this policy change to non-Mexican asylum seekers and HARP their term for their program applying this change to Mexican asylum seekers, the underlying fundamental policy change—keeping asylum seekers in CBP custody—is the same.

Defendants are currently implementing PACR and HARP as pilot programs in the El Paso Sector.   Clay Decl. at Exs. 4, 5.  Asylum seekers placed in these programs are held in the El Paso Sector, including at Border Patrol Station 1.  Ex. I, Declaration of Danielle Escontrias ("Escontrias Decl.") ¶ 9; Ex. F, Declaration of Linda Corchado, Legal Director of Las Americas ("Corchado Decl.") ¶ 20.  Defendants have publicly described their intent to expand the programs. Clay Decl. at Ex. 5 (transcription of CBP leadership press conference).

---

[3] *L.M.-M. v. Cuccinelli*, 1:19-cv-02676 (D.D.C.), challenges the policy change decreasing the time to recuperate and prepare.

**III.    Detainees in CBP Custody Lack Attorney Access and Lack Communication Channels with the Outside World**

Individuals in CBP custody have "negligible to nonexistent access to counsel" and negligible to nonexistent communication channels to the outside world.  Ex. N., Declaration of Aaron Reichlin-Melnick ("Reichlin-Melnick Decl.") ¶ 9; Ex. K, Declaration of Scott Shuchart ("Shuchart Decl.") ¶¶ 6, 9, 12; Ex. P, Declaration of Clara Long ("Long Decl.") ¶ 15 (noting that individuals in El Paso Border Patrol facilities reported no in-person visits and that their families frequently did not know where they were); Ex. Q, Declaration of David Jackson ("Jackson Decl.") ¶ 11 (similar).  In practice, CBP does not permit in-person or telephonic communication; by design, CBP facilities lack the infrastructure to facilitate such communication.

First, CBP does not permit counsel or other members of the public to access its facilities in person, and CBP facilities lack dedicated meeting spaces for such regular access.  Reichlin-Melnick Decl. ¶ 11; Shuchart Decl. ¶¶ 6, 9, 12.  CBP categorically does not allow attorneys into its facilities, even when the attorney represents a client in its custody.  Ex. R, Declaration of Jodi Goodwin ("Goodwin Decl.") ¶ 9; Reichlin-Melnick Decl. ¶ 11; Shuchart Decl. ¶ 12.  The agency has maintained this policy under PACR and HARP, barring attorneys seeking to represent asylum seekers from meeting with those individuals in person.  Corchado Decl. ¶ 19; Escontrias Decl. ¶ 13.  CBP asserts that its facilities are not designed to allow attorneys to meet in person with detained noncitizens. Corchado Decl. ¶ 19; Escontrias Decl. ¶ 13.  CBP facilities do not have confidential attorney-client meeting areas, nor do they have any space dedicated to in-person visitation by attorneys or others. Shuchart Decl. ¶¶ 6, 9.  Just as CBP facilities are not open to attorneys, they are likewise not open to other members of the public; detainees cannot receive visitors.  Long Decl. ¶ 15; Reichlin-Melnick Decl. ¶ 11.  There is no dedicated space for meeting with visitors in CBP facilities.  Shuchart Decl. ¶¶ 6, 9.

Second, CBP does not provide for regular—or, typically, *any*—telephone access for detainees in its custody.  CBP National Standards on Transport, Escort, Detention, and Search ("TEDS") do not mandate that detainees have telephone access for phone calls to attorneys or others, and they do not mandate any minimum number of telephones for detainees.  Clay Decl. at Ex. 6 (TEDS standards).  In practice, CBP does not generally provide detainees with telephone access, nor do CBP facilities have the infrastructure for such access.  Shuchart Decl. ¶ 10; Long Decl. ¶ 14; Clay Decl. Ex. 10 (*U.S. Citizen Detained For Weeks, Nearly Deported By Immigration Officials*, NPR (July 25, 2019)).  CBP facilities do not have separate telephones dedicated to detainee access or areas where detainees can make confidential telephone calls.  *Id*. This is true in the El Paso sector as well.  Jackson Decl. ¶ 10 (noting little to no phone access in El Paso CBP facilities); Long Decl. ¶ 14.

The lack of access to the outside world has on multiple occasion led families to believe that people in CBP custody have died.  Jackson Decl. ¶ 10 ("on multiple occasions, people told me that their families presumed them to be dead due to long periods of no communication"); Reichlin-Melnick Decl. ¶ 12.

Third, there is no established mechanism for attorneys or others to verify whether a detainee is in CBP custody at a particular location—or in CBP custody at all—and the agency does not regularly provide this information.  CBP lacks a system for locating detainees in its custody: there is no searchable online database as there is for those in ICE custody, for example. Reichlin-Melnick Decl., ¶ 12; Corchado Decl. ¶ 11; Love Decl. ¶¶ 5-11. CBP has stated that it need not inform others that individuals (who, again, typically cannot themselves access telephones) are detained in its facilities: for those in its custody, it has "no obligation to notify

10

family or counsel." Clay Decl. Ex. 7 (Max Rivlin-Nadler, *Asylum-Seeker Held Incommunicado for Three Weeks by Border Patrol*, KPBS, Nov. 26, 2019 (quoting CBP statement)).

   In contrast, agency policy for ICE detention centers— the Performance-Based National Detention Standards ("PBNDS")—requires both in-person and telephonic access to attorneys and telephonic access to the outside world—and further specifies that those subject to expedited removal proceedings must receive such communication access.  For telephonic access, the PBNDS specifically require that those in expedited removal proceedings *shall* have the opportunity to telephonically contact both counsel and prospective counsel.  Clay Decl at Ex. 8 (PBNDS, section 5.6(V)(E)).  This must be "[f]ull telephone access" to allow individuals to contact counsel, obtain counsel, and have access to legal services providers for "for consultation when subject to expedited removal." *Id.*  Further, "when a detainee is under an expedited removal order, *his/her ability to contact pro bono legal representatives shall not be restricted*." *Id.* (emphasis added).  The PBNDS bar "limit[ing] a detainee's attempt to obtain legal representation," beyond "reasonable restrictions" on call hours, time, and frequency. *Id.* at 5.6(V)(F)(1); *see also id.* 5.6(II)(7) ("Detainees shall be able to make free calls to the ICE/ERO-provided list of free legal services providers for the purpose of obtaining initial legal representation[.]").  Additionally, detainees must be able to make calls to others, and there must be a minimum of one telephone per 25 detainees.  *Id.* 5.6(V)(A), (D).

   The PBNDS also require ICE detention facilities to provide in-person attorney access.  Attorneys must have physical access to ICE facilities, every single day, for at least eight hours a day during the work week and four hours a day on weekends and holidays.  PBNDS 5.7(J)(2).  The PBNDS requires that "each detainee [be able to] meet privately with current or prospective legal representatives and their legal assistants." *Id.* 5.7(J)(1), (2).

11

IV.    **The Inhumane Conditions in CBP Facilities Are Unsuitable For Those Preparing for and Undergoing Life or Death Legal Proceedings**

CBP holding facilities across the southern border are specifically designed for extremely short-term detention purposes. CBP's national standards specify that "Detainees should generally not be held for longer than 72 hours in CBP hold rooms or holding facilities," and "every effort must be made to hold detainees for the least amount of time required." Clay Decl. at Ex. 6 (TEDS, Section 4.1)). They are not designed to hold individuals and families for a longer time, including the time required for meaningful credible fear proceedings. The conditions are harsh even for their originally intended population, and are even more inhumane for those held for longer periods.

The harsh conditions in CBP facilities are well documented. *See, e.g.*, Reichlin-Melnick Decl. ¶ 13 (cataloguing consistent reports over more than ten years of inhumane conditions of confinement in CBP facilities); Long Decl. ¶ 18 ("Our research on conditions in CBP facilities demonstrates a consistent and pervasive violation of the human rights of those held in the facilities.").

CBP facilities do not provide for the basic needs of detainees in custody, such as sleep, warmth, and basic hygiene. Commonly, those in CBP custody are detained in small concrete cells with concrete or metal benches. Reichlin-Melnick Decl. ¶ 15.[4] While detainees are regularly held overnight—as CBPs own 72-hour time frame for short-term detention contemplates, *see supra*—CBP's internal guidance specifies that its hold room cells shall have

---

[4] *See also* Clay Decl. at Ex. 11 (Decl. of Eldon Vail ISO Plaintiffs' Mot. For Prelim. Inj., *Doe v. Nielsen*, 4:15-cv-00250-DCB, Doc. 206-2 (Aug. 17, 2016) at 12-13 describing lack of beds)); Clay Decl. at Ex. 12 (Decl. of Robert W. Powitz ISO Plaintiffs' Mot. For Prelim. Inj. ("Powitz Decl."), *Doe*, 4:15-cv-00250-DCB, Doc. 206-3 (Aug. 17, 2016), at 9-10 (documenting lack of beds)).

"no beds," because they are "not designed for sleeping."  Clay Decl. at Ex. 9 (CBP Policies and

Procedures Handbook at 6); *see also* Shuchart Decl. ¶ 8.  Instead, detainees sleep on thin

portable mats, on aluminum "blankets," or directly on the concrete floor.  Clay Decl. at Ex. 12

(Powitz Decl. at 12-13 (video footage showing detainees sleeping on Mylar blankets and thin

mats on concrete benches and floors); Reichlin-Melnick Decl. ¶ 15; Jackson Decl. ¶¶ 6, 8.

Lights remain on at all times.  Reichlin-Melnick Decl. ¶ 16; Jackson Decl. ¶ 9; Shuchart Decl. ¶

8.  CBP holding facilities are also known for being extraordinarily cold, so much so that

detainees commonly refer to the cells as "hieleras" ("iceboxes" in Spanish).  Jackson Decl. ¶ 8.

Toilets are not private.  Shuchart Decl. ¶ 8.

In addition to these structural flaws regarding detainees' environment, CBP fails to

provide for detainees' basic day-to-day needs in other ways.  The agency does not provide for

regular access to showers or laundry.  Shuchart Decl. ¶ 8; Long Decl. ¶ 9.  CBP routinely fails to

provide adequate food.  Reichlin-Melnick Decl. ¶ 17; Goodwin Decl. ¶ 11; Long Decl. ¶ 7.  The

same is true for medical care.  Jackson Decl. ¶ 12; Long Decl. ¶ 17.  It also typically bars

individuals in its custody from accessing the belongings that they had with them when

apprehended.  Reichlin-Melnick Decl. ¶ 14.

Those who have been detained by CBP often describe being cold, hungry, and sleep-

deprived while in custody due to the conditions of confinement.  Goodwin Decl. ¶ 11; Reichlin-

Melnick Decl. ¶¶ 15-17; Long Decl. ¶¶ 7, 10-11, 16.  The conditions in CBP facilities cause

sleep deprivation and increased stress.[5]

---

[5] Clay Decl. at Ex. 12 (Powitz Decl. at 10 (stating, regarding CBP holding facilities in Arizona, that "[t]he lack of clean beds and clean bedding serves no legitimate purpose and represents a potential safety hazard to the detainee" and explaining that the "sleeping arrangements impede the detainees' ability to sleep," which "can result in ordinate stress and ill health"); *id.* at 14

CBP short-term holding facilities in Border Patrol's El Paso sector, including Border

Patrol Station 1 where families and individuals in PACR and HARP have been held, maintain the

same conditions.  DHS itself has documented El Paso facilities' severely deficient conditions of

detention.  A May 2019 report by DHS's own inspector general detailed "conditions . . . that

represent an immediate risk to the health and safety of detainees" at a CBP holding facility in the

El Paso sector, including individuals being "held in standing-room-only conditions for days or

weeks."  Clay Decl. Ex. 13 (DHS Office of Inspector General, Management Alert-DHS Needs to

Address Dangerous Overcrowding Among Single Adults at El Paso Del Norte Processing Center

(Redacted) 3 (May 30, 2019)).  At one point the facility, which had a capacity of 125, held 900

detainees.  *Id.*  The DHS inspector general observed "detainees wearing soiled clothing for days

or weeks" and "detainees standing on toilets in the cells to make room and gain breathing space."

*Id.*

Independent reports corroborate that conditions at CBP facilities in the El Paso area,

including at El Paso's Border Patrol Station 1, are grim.  Many detainees are held in freezing

cells, referred to colloquially in Spanish as *hieleras*, or "ice boxes."  Ex. B, Declaration of

A.R.R.D. ("A.R.R.D. Decl.") ¶ 21; Ex. C, Declaration of B.G.R. ("B.G.R. Decl.") ¶ 14; Jackson

Decl. ¶ 8; Ex. G, M.D.C.G. Declaration ("M.D.C.G. Decl.") ¶ 4; Long Decl. ¶ 11.  In these cells,

detainees are typically not provided with mats—only a thin Mylar sheet.  Jackson Decl. ¶¶ 6, 8;

Long Decl. ¶ 8; B.G.R. ¶¶ 13-14.  Other detainees are held in tents, where they receive a thin mat

to sleep on.  B.G.R. ¶¶ 13-14; Long Decl. ¶ 8.  The conditions are often severely overcrowded.

Jackson Decl. ¶ 7 (noting that individuals reported sleeping in shifts because there was not space

---

(explaining that CBP "failure to provide basic products to allow detainees to clean themselves
creates an unhygienic facility" and "significantly contributes to a lack of wellbeing")).

for all of them to lie down on the floor simultaneously); Long Decl. ¶ 10 (similar); A.R.R.D. Decl. ¶ 21 (noting that she was held with 25 other people in a cell that had capacity for only 11); M.D.C.G. ¶ 4.  The lights are kept on 24 hours a day, seven days a week.  A.R.R.D. ¶ 21; Long Decl. ¶ 13; Jackson Decl. ¶ 9.  Some detainees have infrequent shower access; many have none. Long Decl. ¶ 9; Corchado Decl. ¶ 33.  Children often get sick, and medical care, including for children, is inadequate.  Jackson Decl. ¶ 12; Long Decl. ¶ 17; Corchado Decl. ¶ 33.  Clients whom Las Americas has represented in PACR or HARP have told Las Americas that they were contemplating relinquishing their claims because of the conditions, including their effect on children.  Corchado Decl. ¶ 33.

Detainees have reported to members of Congress severely deficient detention conditions at El Paso Station 1, including being told to drink from toilets; forced to sleep in extremely cramped conditions; and denied access to medication.[6]  The Individual Plaintiffs' experiences demonstrate that severely deficient conditions of confinement continue at Border Patrol Station 1 through the present day.

## V.   PLAINTIFFS' EXPERIENCES WITH PACR AND HARP

### A.   Individual Plaintiffs

The Individual Plaintiffs in this case all came to the United States seeking protection from death threats.  Plaintiff A.R.R.D. had a gun pointed at her baby's (minor Plaintiff L.E.R.D.'s) head by a gang member and was told that if she did not pay an extortion fee, the gang would kill her and her baby.  A.R.R.D. ¶ 7.   Plaintiff A.S.C.R. was told that if she and her husband, Plaintiff K.M.V., did not pay an extortion fee to a gang, A.S.C.R. and her children

---

[6] Clay Decl. at Ex. 14 (Ryan Bort, *Drinking Out of Toilets: The Conditions in Border Patrol Facilities Are Beyond Horrifying*, Rolling Stone (July 2, 2019)).

would wind up in body bags.  Ex. D, Declaration of A.S.C.R. ("A.S.C.R. Decl.") ¶ 3.  Gang

members threatened Plaintiff B.G.R.'s life and the lives of her children and specifically

mentioned the location of her children's school to demonstrate their ability to carry out threat.

B.G.R. ¶¶ 6-7.

Individual Plaintiffs were all rocketed through the credible fear process with no

meaningful opportunity to contact, much less consult with, an attorney before their credible fear

interview or review by an immigration judge.  Plaintiff A.R.R.D. was given only a single 30

minutes period to make phone calls. A.R.R.D. Decl. ¶ 13.  Plaintiff B.G.R. had only a single

approximately one-hour window to make phone calls.  B.G.R. Decl. ¶ 15.  After that time, they

had no other opportunity to call out from CBP.  A.R.R.D. Decl. ¶ 21; B.G.R. Decl. ¶ 20.

CBP provided the Individual Plaintiffs with a list of attorneys. A.R.R.D. Decl. ¶ 13;

B.G.R. Decl. ¶ 15.  Plaintiffs all tried calling some of the names on the list of attorneys provided

to them, but no one answered.  Plaintiff A.R.R.D. was told beforehand by her cellmates that no

one ever answered from the list provided by the government and for that reason, the list was

called "ghost list."  A.R.R.D. Decl. ¶ 13.  Plaintiff A.R.R.D. was able to reach a family member

during her 30 minute window for a phone call, but that family member was never able to reach

her again while she was in CBP custody.  A.R.R.D. Decl. ¶ 25 (noting that family called

consulate because they could not locate her).

None of the Individual Plaintiffs spoke with an attorney at all through the duration of the

credible fear processes.  A.R.R.D. Decl. ¶ 13; Ex. E, Declaration of K.M.V. ("K.M.V. Decl.") ¶

10; A.S.C.R. Decl. ¶ 10; B.G.R. Decl. ¶ 13. The Individual Plaintiffs were confused during the

asylum interview itself and the review by the immigration judge.  A.R.R.D. Decl. ¶¶ 16-20;

B.G.R. Decl.  ¶¶ 16-17.

Plaintiff A.R.R.D. was immediately confused in her interview because she thought it would be in person.  A.R.R.D. Decl. ¶ 16.  She did not feel prepared to immediately begin answering details about her traumatic experiences.  *Id.*  She was not recovered from her journey and also felt traumatized by the CBP officers.  *Id.*  She faced difficulty concentrating because she was forced to hold her baby and a telephone at the same time.  *Id.* ¶ 17.  There was nowhere to put her baby other than the cold floor or hard bench.  *Id.*  The baby cried during the interview and A.R.R.D. was distracted trying to soothe him.  *Id.*

While they were in CBP facilities, the Individual Plaintiffs all were subject to inhumane conditions.  None of them had beds to sleep on.  A.R.R.D. and her son slept on the cold floor for the fourteen days they were in CBP custody.  *Id.* ¶ 21.  The lights were kept on 24 hours a day, 7 days a week, and A.R.R.D. could not sleep.  *Id.*  To keep her baby warm, A.R.R.D. would sleep with him on her chest.  *Id.* at ¶ 21.  B.G.R. and her child were moved between facilities, occasionally they would have a thin mat to sleep on, but often they also slept on the floor. B.G.R. Decl. ¶¶ 13, 14.

B.G.R.'s child became sick with fever, but was not given any medicine.  B.G.R. Decl. ¶ 18.  A.R.R.D.'s child also got sick with a cold and a fever, but she was not given any medication. A.R.R.D. Decl. ¶¶ 21-22.  *See also* Corchado Decl. ¶ 33 (noting that clients in PACR or HARP report inadequate access to medical care).

Plaintiffs also report being mistreated by CBP.  CBP officers laughed at B.G.R. when she told them that her father was disappeared and accused her of lying.  B.G.R. Decl. ¶ 11.  A.R.R.D. did not have consistent access to water, and CBP officers would deny her requests for water. A.R.R.D. Decl. ¶ 22.  At one point, a CBP guard yelled at her and called her stupid because she was slow in picking up her mat.  *Id.* ¶ 23.

All of the Plaintiffs received a negative credible fear finding and were removed to their home countries.  A.R.R.D. Decl. ¶ 17; B.G.R. Decl. ¶¶ 22-23; A.S.C.R. Decl. ¶ 10; K.M.V. Decl. ¶ 10.  They all now fear for their lives, and many are living in hiding.  A.R.R.D. Decl. ¶¶ 28-30; B.G.R. Decl. ¶¶ 22-25; A.S.C.R. Decl. ¶ ¶ 11-13; K.M.V. Decl. ¶¶ 11-13.

### B.     Organizational Plaintiff Las Americas

Plaintiff Las Americas is a non-profit legal services organization founded in 1987 and based in El Paso, and is dedicated to serving the legal needs of low-income immigrants, including refugees and asylum seekers.  Corchado Decl. ¶ 4.  Las Americas' mission includes providing immigration counseling and legal services to immigrants detained by the federal government in the El Paso area, including by representing individuals in the credible fear process.  *Id.* ¶ 5.

Plaintiff Las Americas has not received a single call from an individual in CBP custody who is going through the PACR or HARP programs.  *Id.* ¶ 15.  This is despite the fact that Las Americas is listed in the "List of Pro Bono Legal Service Providers" for El Paso that the Executive Office for Immigration Review publishes and frequently receives intakes from individuals detained at other facilities in the area.  *Id.*  Las Americas' experience is consistent with that of other legal service organizations in the El Paso area.  Ex. H, Declaration of Rebecca Sheff  ("Sheff Decl.") ¶ 7 (Texas Rio Grande Legal Aid, another legal service organization on the list, has not received any calls); Escontrias Decl. ¶ 7 (Catholic Charities, another legal service organization on the list, has received only one call in the more two months that PACR and HARP have been in operation).

Las Americas has been unable to meet in person with individuals in PACR and HARP.  Corchado Decl. ¶ 19.  Las Americas' legal director requested an in-person meeting with a

prospective client in PACR in order to conduct an intake.  *Id.*  A Border Patrol officer informed her, "[W]e are not equipped to facilitate in-person meetings."  *Id.*  Historically, CBP has denied Las Americas attorneys in-person access to CBP facilities.  *Id.* ¶ 17.

When Las Americas has identified a client or potential client in PACR or HARP and sought to speak to that client, it has had to expend an enormous amount of time and effort just to establish a single phone call.  Corchado Decl. ¶¶ 9-11, 18-21, 28-30, 32.

For example, Las Americas staff exchanged at least 18 emails and 4 phone calls with various CBP officials over a period of 2 days in trying to find and then speak telephonically to one person detained in CBP custody and subject to PACR.  *Id.* ¶ 18.  After that considerable expenditure of resources, Las Americas was informed that the individual had had their IJ review on the first day that Las Americas had reached out.  *Id.* ¶ 21.  On another occasion, Las Americas was connected with an asylum seeker after they had gone through the CFI, and on a third, an asylum officer called Las Americas from the interview itself.  *Id.* ¶¶ 29, 32.  This experience is not unique to Las Americas; another legal services organization has similarly attempted to coordinate with CBP to schedule a time to prepare their client for a CFI, only to have the phone call scheduled for *after* their client had gone through the CFI.  Escontrias Decl. ¶¶ 11-15.

To date, despite considerable expenditure of resource—including sending staff to Ciudad Juárez to identify individuals who might be subject to either PACR or HARP, Corchado Decl, ¶¶ 26-27, altering the way that their phone lines are staffed, *id.* ¶¶ 13, 16, and engaging in intensive communications with CBP to locate individuals who are in their system, *id.* ¶ 18, Las Americas has succeeded only one time in having one conversation with one client for a single hour before a CFI interview—which was inadequate to meaningfully prepare the client for his CFI.  *Id.*¶¶ 30-32.

## APPLICABLE LEGAL STANDARD

On a motion for a preliminary injunction, a court must consider "whether (1) the plaintiff has a substantial likelihood of success on the merits; (2) the plaintiff would suffer irreparable injury were an injunction not granted; (3) an injunction would substantially injure other interested parties; and (4) the grant of an injunction would further the public interest." *Sottera, Inc. v. Food & Drug Admin.*, 627 F.3d 891, 893 (D.C. Cir. 2010) (internal quotation marks and citations omitted).

## ARGUMENT

### I.   Plaintiffs Have a Substantial Likelihood of Success on the Merits

#### A.   Defendants' Policies Violate Asylum Seekers' Statutory and Regulatory Rights to Access Counsel and Contact Third Parties During the Credible Fear Process

By mandating that the credible fear process occur while an individual is detained in CBP facilities—where there is no meaningful way to contact counsel or others, in person or by telephone, much less obtain meaningful representation from an attorney—Defendants' policies violate statutory and regulatory safeguards.  As the Plaintiffs' experiences demonstrate, it is impossible for asylum seekers to meaningfully access counsel while located within CBP facilities pursuant to PACR and HARP.

##### 1.   *Congress Has Mandated that Asylum Seekers Must Have Access to Counsel in Credible Fear Proceedings.*

Asylum seekers, including those who have been and are subject to PACR and HARP, have the right to access counsel throughout the credible fear process.

Congress has specifically provided for access to and consultation with counsel and others prior to both the credible fear interview and the immigration judge's review of that interview for those in credible fear proceedings.  This right is established at every stage of the credible fear process by the Immigration and Nationality Act and its implementing regulations.  8 U.S.C. §

20

1225(b)(1)(B)(iv) provides that a noncitizen "may consult with a person or persons of [their] choosing prior to the interview or any review thereof."

During the credible fear interview itself, "[a]ny person or persons with whom the alien chooses to consult may be present," and "may be permitted, in the discretion of the asylum officer, to present a statement at the end of the interview."  8 C.F.R. § 208.30(d)(4).

The statutory right to counsel continues through the immigration judge review of a negative credible fear finding. *See* 8 U.S.C. § 1362 ("In any removal proceedings before an immigration judge . . . the person concerned shall have the privilege of being represented (at no expense to the Government) by such counsel, authorized to practice in such proceedings, as he shall choose."); *see also, e.g.*, *Leslie v. Att'y Gen.*, 611 F.3d 171, 180 (3d Cir. 2010) (recognizing noncitizen's "right to counsel at removal hearings, which is manifestly a statutory right").  The hearing by an immigration judge to review a negative credible fear finding is a removal proceeding during which this right applies.  *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(III); 8 C.F.R. § 208.30(g)(2).

The APA confirms the right to rely on counsel through the credible fear process. The APA provides that "[a] person compelled to appear in person before an agency or representative thereof is entitled to be accompanied, represented, and advised by counsel . . . ."  5 U.S.C. § 555(b).  This provision grants any person who is compelled to appear before an agency the right to "counsel of one's choice." *SEC v. Higashi*, 359 F.2d 550, 553 (9th Cir. 1966); *see also Great Lakes Screw Corp. v. NLRB*, 409 F.2d 375, 3881 (7th Cir. 1969) (stating that "the statutorily provided right to be represented by counsel of one's own choice is fundamental"). Section 555(b) applies broadly to both formal hearings under the APA and other adjudicative proceedings.  *See Prof'l Reactor Operator Soc. v. U.S. Nuclear Regulatory Comm'n*, 939 F.2d

1047, 1051 (D.C. Cir. 1991).  Individuals subject to the credible fear process, therefore, are entitled to full representation by counsel.  *Cf. Doe v. McAleenan*, 2019 WL 6605880, at *4 (S.D. Cal. Nov. 12, 2019) (finding that Section 555(b) requires access to counsel for those held in CBP custody during non-refoulement interviews, which are similar to credible fear interviews in that an individual facing transfer to Mexico has an opportunity to show that they would face persecution or torture there).

Regulations further confirm these rights by requiring that individuals receive notice of them.  If a person "subject to the expedited removal provisions indicates an intention to apply for asylum, or expresses a fear of persecution or torture, or a fear of return to his or her country," the inspecting officer must inform the person of "[t]he right to consult with other persons prior to the interview and any review thereof" and that the person "shall be given time" to do so.  8 C.F.R. § 235.3(b)(4).  *See Yiu Fong Cheung v. I.N.S.*, 418 F.2d 460, 463 (D.C. Cir. 1969) (interpreting similarly worded regulation to conclude that "[t]here c[ould] be no doubt of the need for providing full opportunity to retain counsel").

By holding people incommunicado in CBP custody through their credible fear proceedings, PACR and HARP squarely violate this well-established right of access to counsel.

### 2.       *Meaningful Access to Counsel is Legally Required and Critical for Asylum Seekers*

An asylum seeker's right to access counsel in credible fear proceedings is a right of *meaningful* opportunity to *meaningfully* access counsel.  *Biwot v. Gonzales*, 403 F.3d 1094, 1098-99 (9th Cir. 2005) (in immigration proceedings, requiring procedural protection "[t]o infuse the critical right to counsel with meaning" and prevent it from becoming "an empty formality"); *accord Matter of C-B-*, 25 I. & N. Dec. 888 (B.I.A. 2012) ("[i]n order to meaningfully effectuate the statutory and regulatory privilege of legal representation"); *Baires v.*

*INS*, 856 F.2d 89, 91 n.2 (9th Cir. 1998) ("We have characterized a [person's] right to counsel as 'fundamental' and have warned immigration authorities' not to treat it casually. . . . [T]hat right must be respected in substance as well as form.").  The government may not erect obstacles, the cumulative effect of which is to effectively deny the right.  *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 565 (9th Cir. 1990) (affirming permanent injunction of "numerous obstacles, the cumulative effect of which was to prevent aliens from contacting counsel and receiving any legal advice").

Given the potential life or death stakes and the brief time frame for the credible fear process, a meaningful opportunity to access counsel and the opportunity for that counsel to engage in meaningful representation is especially critical for those in credible fear proceedings.  *Leslie v. Att'y Gen. of U.S.*, 611 F.3d 171, 181 (3d Cir. 2010) ("The right to counsel is a particularly important safeguard because of the grave consequences of removal.").  The government's failure to ensure such meaningful access here allows "a 'myopic insistence upon expeditiousness'" to "render the right to counsel 'an empty formality.'" *Biwot*, 403 F.3d at 1099 (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)).

This need for counsel is especially acute for asylum seekers at the southern border, who are often (as the Individual Plaintiffs were) in a highly vulnerable position.  A.S.C.R., K.M.V., A.R.R.D., B.G.R., and their children—like many asylum seekers—were fleeing traumatic experiences.  A.R.R.D. Decl. ¶¶ 2-7; B.G.R. Decl. ¶¶ 3-7; A.S.C.R. Decl. ¶¶ 2-3; K.M.V. Decl. ¶¶ 2-3; Love Decl. ¶ 13 ("[M]ost asylums seekers are suffering from severe trauma, stemming from the trauma they experienced in their home country and the journey they undertook to arrive in the United States."); Meza Decl. ¶ 10; Goodwin Decl. ¶ 5; Ex. L, Declaration of former Immigration Judge Rebecca Jamil ("Jamil Decl.") ¶ 8.  Asylum seekers are often exhausted and

sick from traveling long distances or from sleeping for weeks on the streets of northern Mexico while awaiting entry into the United States.  Jamil Decl. ¶ 8; Clay Decl. at Ex. 33 (ACLU Complaint to Office of Inspector General regarding metering of Mexican nationals); *see also Orantes-Hernandez v. Meese*, 685 F. Supp. 1488, 1496 (C.D. Cal. 1988) ("In many cases, at the time of processing [Salvadoran asylum seekers] have not recovered from the trauma of experiences suffered in El Salvador and during their journeys through Central America.").

Asylum seekers must then confront the complexities of immigration law.  Jamil Decl. ¶ 6 (former immigration judge explaining that "[a]sylum law is complicated and has only become more so over time."); Ex. M, Declaration of former asylum officer Doug Stephens ("Stephens Decl.") ¶¶ 11-12 (explaining that "many asylum seekers from Central America and from Mexico have very complicated claims for relief. . . . premised on the nuanced legal question of whether violence or threats they have experienced have a nexus to the particular social group ground for asylum or withholding of removal").  The Individual Plaintiffs' experience is demonstrative.  In attempting to navigate the credible fear process alone, as PACR and HARP required, they were confused and did not understand what information they needed to convey.  A.R.R.D. Decl. ¶18 (noting that she "felt confused by the process and their questions throughout the entire interview"); B.G.R. Decl. ¶ 17 (noting that she did not understand the purpose of the interview).

For asylum seekers like the Individual Plaintiffs and others in PACR and HARP, then, access to counsel—and as early as possible in the credible fear process—is critical.  Once an asylum seeker obtains counsel, they can begin to understand the process they will be facing and develop a relationship with their attorney, and start to prepare for their credible fear interview. Ex. O, Meza Decl. ¶ 7 (describing initial "intake" as critical to obtaining general information about the individual, the status of their case, and whether an interview has been scheduled;

24

effectively assess their legal case; and begin to establish a relationship and build a rapport);
*accord* Jamil Decl. ¶ 6 ("It is therefore critical for asylum seekers to have access to counsel.
They need to be able to talk with a lawyer to understand, as soon as possible, the process that
they are encountering.").

Attorneys assist asylum seekers in preparation for a credible fear interview in myriad
ways, which would have benefited the Individual Plaintiffs.  Consulting with an attorney helps
an asylum seeker to focus on facts that are relevant to their claim for asylum or other forms of
protection.  Jamil Decl. ¶ 7 ("[W]ithout attorney access to prepare for the credible fear interview,
asylum seekers may . . . fail[] to discuss or even mention past events that are highly significant
for purposes of asylum, withholding, and the Convention Against Torture because they do not
realize they are relevant."); Stephens Decl. ¶ 12 ("[I]t is difficult for an asylum seeker, even one
who is well educated, to establish a nexus to a particular social group in the credible fear
interview absent assistance from an attorney in understanding what facts are relevant and
necessary to do so."); *id.* ("Without specialized knowledge of immigration law and what social
groups are cognizable, it is not obvious to an asylum seeker which statements are relevant to
nexus.").  This can be especially important for claims that depend in part on cultural differences
that an asylum seeker may not realize need to be explained to an asylum officer.  Stephens Decl.
¶ 12 ("Without knowledge of cultural distinctions between their home country and the United
States, it is often difficult for asylum seekers to explain norms and behaviors that would establish
the existence of, and membership in, a social group.").  An attorney can also help to make sure
that the information is explained in a chronological and understandable way.  Goodwin Decl. ¶ 5;
Jamil Decl. ¶ 8.  Counsel can also help clients to recount traumatic events or details that they
otherwise may not raise.  Meza Decl. ¶ 10; Stephens Decl. ¶ 12.  Finally, an attorney also

provides a stabilizing presence for an asylum seeker facing uncertainty and undergoing a challenging experience.  *See* Jamil Decl. ¶¶ 8-9.

Adequate preparation for a CFI typically requires attorneys to meet with their clients multiple times and at length.  Goodwin Decl. ¶ 7; Meza Decl. ¶¶ 9-10.  This is because the CFI requires asylum seekers to recount extraordinarily traumatic events.  Attorneys must be able to establish a rapport and build trust with their clients.  Meza Decl. ¶ 10 (noting that "[t]rauma can often impact a person's ability to speak about the events that precipitated this trauma" and that "[o]n numerous occasions, only after rapport was built through multiple interactions, have traumatized individuals been able to share their stories"); *id.* ¶ 9 (explaining that most individuals did not understand the information provided to them by counsel at the first meeting, requiring follow up meetings); Goodwin Decl. ¶ 5 (noting need to meet multiple times because "many of my clients are fleeing traumatic experiences and still undergoing trauma"); *id.* at ¶ 7 ("Because preparing for a CFI can involve going through a large amount of information concerning a person's history, including traumatic events, it can be necessary to have multiple meetings to prepare for a CFI."); Love Decl. ¶ 13; Escontrias Decl. ¶ 11.

Critically, those in credible fear proceedings require *in-person* access to counsel in this preparation.  A "healthy counsel relationship in the immigration context requires confidential in-person visitation, especially where an immigrant must be forthcoming about sensitive matters such as past trauma, mental health issues, and criminal history."  *Arroyo v. D.H.S.*, 2019 WL 2912848, at *17 (C.D. Cal. June 20, 2019).  It is especially important that attorneys be able to meet in person to consult with individuals in the PACR and HARP program.  In-person consultation allows attorneys to gain the trust of the person, observe non-verbal cues, and exchange and review documents.  Telephone access alone, even if regularly provided, is

fundamentally inadequate.  Goodwin Decl. ¶ 6 ("Telephonic access is simply no substitute for in person preparation especially for CFIs."); Meza Decl. ¶ 11 ("Being forced to counsel clients solely over the phone, in my opinion, would put survivors in the extremely difficult situation of being asked to trust a stranger, who they cannot see, with the most intimate and traumatic parts of their life."); Jamil Decl. ¶ 9 ("[A]n asylum seeker often must describe past trauma in depth and often must respond to probing questions necessary for the attorney to understand the asylum seeker's case.  The trust that enables them to do so comes from face-to-face interaction—it is very hard to build this critical relationship in a telephonic consultation, especially one of limited duration."); Escontrias Decl. ¶ 11; Love Decl. ¶ 13.  In-person meetings are also critical to ensuring the effective use of an interpreter.  Meza Decl. ¶ 12 (explaining the large percentage of asylum seekers who speak only an indigenous language and the difficulty in "speak[ing] via three-way call to a client through an interpreter with no party in the same room").

Although telephonic access is not by itself sufficient (for the reasons stated above), it is nonetheless a necessary component of meaningful access to counsel for asylum seekers, including for those in PACR and HARP.  Most asylum seekers enter custody not having retained an attorney. Reichlin-Melnick Decl. ¶ 11.  As DHS has recognized, *see infra* ARGUMENT, I.A.3, asylum seekers need to be able to contact free and low-cost legal services by phone in order to locate attorneys.  *See* Escontrias Decl. ¶¶ 5-7 (describing legal intakes by phone pursuant to organizational presence on this list).  And, once an attorney-client relationship has formed, telephonic consultation provides an additional means for attorneys to work through their clients' cases—including if the attorney has a minor factual question or if the asylum seeker has an urgent question or concern.  *See Lyon v. ICE*, 171 F. Supp. 3d 961, 981-83 (N.D. Cal. 2016) (cataloguing effect of phone restrictions on detained noncitizens' efforts to communicate with

attorneys and gather evidence and determining that "nature and breadth of . . . systemic phone restrictions" posed "real risk" to "potentially affect the outcome of removal proceedings"). Telephonic access on its own is insufficient to provide meaningful access—it must be provided in combination with in-person access—but it is likewise essential for asylum seekers, both to facilitate the formation of attorney-client relationships and to supplement in-person communications between attorneys and clients.

Thus, courts regularly provide for both kinds of access in tandem in the immigration context, recognizing this dual need. *E.g.*, *Innovation Law Lab v. Nielsen*, 310 F. Supp. 3d at 1082-83 (issuing preliminary injunction requiring ability to get representation before credible fear interview; access for counsel to two visitation rooms for a minimum of six hours per day, seven days a week; attorney visitation rooms that have outside-line phones to facilitate interpretation, with unmonitored calls, phone lines within the detention united, and advance written notice to attorneys of scheduled credible fear interviews); *Rodriguez-Castillo v. Nielsen*, 2018 WL 6131172 at *3 (C.D. Cal. June 21, 2018) (requiring that detainees held in federal prison pending credible fear interviews be permitted communication "both in person and by phone" with immigration attorneys); *see also Orantes-Hernandez*, 919 F.2d at 567-68 (upholding injunction requiring, *inter alia*, telephone access, counsel to have reasonable access to detainees, and policies to ensure confidential communications). Courts have found that even mere delays in visits by attorneys to detained clients improperly "impaired their ability to establish rapport and trust with clients, to collect information from clients, [and] to counsel clients in a crisis." *Benjamin v. Fraser*, 264 F.3d 175, 180 (2d Cir. 2001).

Beyond preparation for the CFI, access to counsel at the credible fear interview and prior to and at any immigration judge review is also essential. The presence of counsel often makes

the asylum seeker more comfortable, and more able to answer the asylum officer's questions.

Stephens Decl. ¶ 14; Jamil Decl. ¶ 10.  This is particularly true in cases that involve domestic or

sexual violence, which make up a large percentage of cases for protection involving Central

American asylum seekers.  Jamil Decl. ¶¶ 3, 9; Stephens Decl. ¶ 15.  And counsel may more

clearly frame a pertinent issue for the asylum officer.  Stephens Decl. ¶¶ 16-17; Jamil Decl. ¶ 10.

If the outcome of the interview is adverse, counsel also helps to prepare the asylum seeker for

review by the immigration judge—including by identifying flaws in the credible fear interview

process and potential facts or claims that did not clearly come across in the interview.  Jamil

Decl. ¶ 10 ("Following the CFI and before the immigration judge's review, an attorney can

identify flaws in the credible fear process that the asylum seeker was provided in the CFI. For

example, I am familiar with CFIs in which the interviewee was not interviewed in the proper

language."); Meza Decl. ¶ 9 (noting that during consultation before review by an immigration

judge, attorneys "regularly discover bases for asylum and other protections that were not

disclosed in the original interview").

For all these reasons, access to counsel has a significant impact on the likelihood of

individuals who meet the appropriate threshold being found to have a credible fear.  *See*

Stephens Decl., ¶ 17 ("In my experience, there were interviews in which the attorney's

intervention at the end of the interview elicited sufficient additional facts to change the outcome

of the interview."); *see also* Jamil Decl. ¶¶ 10-11.  Case studies confirm the value of access to

attorneys in the credible fear context.  In 2014, advocates established a pro bono attorney project

at a remote detention center in Artesia, New Mexico, which held Central American mothers and

children seeking asylum and in expedited removal proceedings.  After one month, removals

decreased by 80%, and within two months, removals had decreased by 97%.  Clay Decl. at Ex.

15 (Innovation Law Lab, The Artesia Report.).  Likewise, a pro bono project at a detention

center for families in expedited removal proceedings had, as of 2018, secured relief from

expedited removal for more than 99.9% of those represented.[7]  *See* Meza Decl. ¶ 9 (noting that

change in ICE policy at the Karnes Detention facility decreasing the number of asylum seekers

that could secure representation led to a "marked increase" in negative credible fear findings).

The results of a federal district court's injunction preventing the government from

holding asylum seekers incommunicado under conditions much like those in PACR and HARP

demonstrates the importance of access to counsel to maintain the fairness of the system and

outcomes.  In 2018, the government held asylum seekers incommunicado at a federal prison

pending their CFIs.  *Innovation Law Lab v. Nielsen*, 342 F. Supp. 3d 1067 (D. Or. 2018).

Following an injunction to allow access to counsel, every single individual who was ultimately

represented by counsel for their CFI—74 individuals in total—were determined to have a

credible or reasonable fear of persecution.  *Id.* at 1075.  For individuals similarly trapped

incommunicado in PACR and HARP, the necessity of access to counsel is clear.

### 3.    *DHS's Own Policies Confirm That The Right To Access Counsel Must Be Meaningful*

DHS's internal policies for those held in ICE detention during their credible fear

proceedings demonstrate that the agency understands that this right must be made meaningful,

and demonstrate that it knows how to make it so.  These policies mandate that detention facilities

allow for the opportunity to access counsel confidentially and regularly, both telephonically and

in person.  *See supra*, BACKGROUND, III.  Indeed, that DHS has only issued policy directives

---

[7] Kari E. Hong and Stephen Manning, *Getting it Righted: Access to Counsel in Rapid Removals*, 101 Marquette L. Rev. 673, 699-700 (2018).

for the handling of credible fear interviews and the review thereof from ICE detention facilities demonstrates that CBP facilities were not intended for this purpose.

Moreover, DHS' own procedures for credible fear proceedings recognize that asylum seekers have the right of access to counsel in those proceedings, and that this right must be meaningful. The notice that DHS must provide to asylum seekers regarding the credible fear process (referred to as Form M-444) recognizes that they have the right to consult with counsel and others. It explains:

> The interview will usually occur at least 48 hours after you arrive at the detention facility
>
> ***
>
> **Whom You May Consult**
>
> While you wait for your interview, you may use this time to prepare and consult with consultant of your choice as long as it does not unreasonably delay the interview process.  The U.S. Government does not provide you with an attorney or representative, but you may choose to hire an attorney or representative at your expense.  You can have a consultant of your choice with you at your interview or participate by telephone.  Normally, the interview will not take place sooner than 48 hours after you arrive at the detention facility.  You may use this time to rest and consult with family members, friends, or other representatives. . . .
>
> A list of representatives who may be able to speak for free is attached to this notice. . . . You may also use the telephone while you are in detention to call a representative, friend or family member in the United States.

Clay Decl. at Ex. 16 (Form M-444).

Asylum officers' script for those proceedings has recognized the right of access to counsel, as have legal orientations provided to asylum seekers. Stephens Decl. ¶¶ 5-7; Clay Decl. at Ex. 17 (USCIS Credible Fear Guidance at 4).  The Asylum Office has provided procedure for asylum officers to delay credible fear interviews to allow individuals the opportunity to locate counsel—recognizing, again, that the right is not an "empty formality."  Stephens Decl. ¶¶ 8-9;

*see, e.g.*, *Rios-Berrios v. INS*, 776 F.2d 859, 862-63 (9th Cir. 1985) (failure to grant continuance

for reasonable opportunity to locate counsel violated right of access to counsel); *Matter of C-B-*,

25 I. & N. Dec. at 889-90 (same).

### 4. *PACR and HARP Deprived Individual Plaintiffs and Continue To Deprive Asylum Seekers of the Right To Counsel*

People in PACR and HARP simply cannot meaningfully access or rely on counsel.

PACR and HARP force individuals to go through their credible fear process "as quickly as [the

government] possibly can" expedite it, under conditions fundamentally unsuited to access to

counsel.  Clay Decl. at Ex. 5.  Under these programs, asylum seekers are held in facilities that

provide no in-person access to attorneys and no means for asylum seekers to establish regular

communication with attorneys, either prospective or retained.  *Supra*, BACKGROUND, III.  By

denying asylum seekers any meaningful way to consult with counsel or others prior to the

credible fear interview or the IJ review, Defendants' policy categorically violates their statutory

and regulatory rights of access to counsel during the credible fear process as a matter of law.

Plaintiffs' experiences, as well as those of other legal services providers in the El Paso

area, demonstrate that asylum seekers in PACR and HARP cannot adequately access counsel.

*See* A.R.R.D. Decl. ¶¶ 13-21; A.S.C.R. Decl. ¶ 10; K.M.V. Decl. ¶ 10; B.G.R. Decl. ¶¶ 15-17;

Corchado Decl. ¶¶ 7-17; Sheff Decl. ¶¶ 7-14; Escontrias Decl. ¶¶ 6-16.  CBP continues to bar

attorneys from accessing its facilities in person to meet with those in PACR and HARP.

Corchado Decl. ¶ 19; Escontrias Decl. ¶ 13.  Asylum seekers in the programs also clearly lack

regular telephone access:  the Individual Plaintiffs each had only one short opportunity to make a

phone call, with a list of attorneys that did not lead to anyone. If asylum seekers fail to reach an

attorney in that short window, they are effectively without any further recourse.  Organizations

on the list of free and low-cost legal services providers that regularly receive phone calls from

asylum seekers in ICE custody have received virtually no phone calls from people in PACR and HARP.  Corchado Decl. ¶ 15; Sheff Decl. ¶¶ 6-7; Escontrias Decl. ¶¶ 6-7.  And even where an attorney is seeking to represent an asylum seeker they know to be in PACR or HARP, CBP has repeatedly failed to locate that person or allow for any timely communication.  Corchado Decl. ¶¶ 18-21; Escontrias Decl. ¶¶ 8-16.

The Individual Plaintiffs had no meaningful opportunity to obtain representation or the assistance of an attorney during the credible fear process before they were ordered removed to face the immediate threat of severe harm. *See supra* at BACKGROUND, V.A.  Defendants' policy has likewise barred Organizational Plaintiff Las Americas from providing meaningful representation or consultation for those in PACR or HARP despite extensive efforts on Las Americas' part.  *See supra*, BACKGROUND, V.B.

Such isolation and interference with asylum seekers' meaningful access to counsel is unlawful.  *Orantes-Hernandez*, 919 F.2d at 565 (affirming permanent injunction predicated on obstacles that had "the cumulative effect of . . . prevent[ing] aliens from contacting counsel and receiving any legal advice," including "limited attorney visitation hours . . . long delays in bringing detainees to interviews, the inadequacy of systems used to apprise detainees of the presence of their attorneys, and INS's inadequate efforts to ensure the privacy of both in-person and telephonic attorney-client interviews"); *Innovation Law Lab*, 310 F. Supp. 3d at 1162-63 (repeated denial of in-person attorney access and conflicting instructions on in-person visits had "cumulative effect" of  denying access to counsel for those with pending credible fear interviews); *Louis v. Meissner*, 530 F. Supp. 924, 927 (S.D. Fla. 1981) (denial of access to counsel in transfer of asylum seekers to "remote areas, wholly lacking in counsel" and, moreover, where lists of attorney phone numbers contained "stale information" and telephone

access was "general[ly] unavailab[le]"); *cf. Halvorsen v. Baird*, 146 F.3d 680, 688-89 (9th Cir. 1998) ("There is a well established tradition against holding prisoners incommunicado in the United States.  It would be hard to find an American who thought people could be picked up by a policeman and held incommunicado, without the opportunity for anyone on the outside looking for them to confirm where they were."). By holding asylum seekers essentially incommunicado for the duration of their credible fear proceedings, Defendants have violated their rights to access counsel and consult with others in the credible fear process.

Ultimately, Defendants' holding of asylum seekers in CBP facilities is incompatible with asylum seekers' meaningful access to counsel.  The design of CBP facilities and the agency's lack of any system to timely locate detainees make CBP detention unequipped to provide the timely and ample access that asylum seekers in credible fear proceedings require.  In light of the speed of the proceedings, the complexity of asylum seekers' claims, and the difficulties of quickly forming meaningful and trusting attorney-client relationships, CBP detention certainly cannot provide meaningful access to counsel for asylum seekers in this expedited process.

**B.      Defendants' New Policy Is Arbitrary and Capricious, and otherwise Contrary to Law, in Violation of the APA.**

**1.      *Defendants' New policy is Arbitrary and Capricious.***

Defendants' policy of holding asylum seekers in CBP custody throughout the credible fear process is arbitrary and capricious in violation of the APA. Agency action changing a prior policy or rule requires a showing that "there are good reasons for the new policy." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Defendants can provide no "good reasons" for their shift to keeping people in CBP custody during the credible fear process. Instead, the new policy is irrational.  It entirely fails to consider a key aspect of the problem—that keeping people in CBP facilities during this critical period will undermine the accuracy of credible fear

34

determinations and lead to erroneous removals.  It also lacks any connection to Defendants'

asserted justification of bringing "integrity" to the immigration system

Defendants' new policy is irrational: it "entirely fail[s] to consider an important aspect of

the problem,"—the complete incompatibility of CBP custody with access to counsel, which is

required by statute and regulation, and with a meaningful credible fear process—and "runs

counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State*

*Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).  First, as described above, CBP facilities do

not provide for meaningful access to counsel or others. It is clear that CBP facilities, including

Border Patrol Station 1 and other facilities in the El Paso area, are not set up to provide for the

needs of people who require access to counsel and need to prepare for credible fear interviews,

and that they cannot do so.  In fact, DHS's own detention standards confirm that the agency

recognizes that asylum seekers require meaningful access to counsel and others.  *Supra*

BACKGROUND, III (comparing standards for ICE and CBP detention).  DHS previously held

asylum seekers at ICE detention centers and designed the standards for ICE detention centers—

unlike those for CBP facilities—specifically to meet the needs of those in expedited removal

proceedings. Clay Decl., Ex. 1; *supra* BACKGROUND, III.

DHS's abrupt shift in policy fails to account for the differences between ICE and CBP

detention regarding access to counsel—differences that are obvious from the agency's own

standards.  It likewise fails to account for the particular need for urgent access to counsel for

asylum seekers in credible fear proceedings given the compressed time frame for the credible

fear process—a time frame that the PACR and HARP programs themselves seek to accelerate.

Moreover, Defendants have failed to consider or address the harsh conditions in CBP

facilities, and their incompatibility with the integrity or reliability of the credible fear process.

As described above, at CBP facilities, individuals are typically detained in small concrete cells with concrete or metal benches; there are no beds, and detainees sleep on thin portable mats, on aluminum "blankets," or directly on the concrete floor; lights remain on at all times; there is no regular access to showers or laundry; inadequate food; and inadequate medical care.  *See supra* BACKGROUND, IV.  Such conditions are well documented, including in the El Paso sector.[8]

These conditions impair an asylum seeker's ability to prepare for their credible fear interview and any review by an immigration judge and therefore further hinder asylum seekers from asserting meritorious claims in the credible fear process.  These problems are especially acute because asylum seekers in the credible fear process are particularly in need of conditions that facilitate access to counsel and the opportunity for meaningful focus.  As described above, asylum seekers often arrive in CBP custody exhausted from long journeys, or from sleeping on the streets in northern Mexico for weeks while waiting for admission to the United States. They are preparing to recount traumatic experiences and describe fear of return to the place they fled in a legally coherent manner. *Supra* ARGUMENT I.2; Jamil Decl. ¶¶ 7-9.  And the credible fear interview both is extraordinarily important to an asylum seeker's ability to remain in safety and pursue ultimate relief, *see* 8 U.S.C. § 1225(b)(1)(B)(ii), (iii),  and often implicates complex legal questions,  Jamil Decl. ¶¶ 6-7; Stephens Decl. ¶¶ 11-12.  Consequently, asylum seekers need

---

[8] *See* Clay Decl. at Ex. 13 (El Paso OIG Report); *id.* at 27 (Human Rights Watch, "In the Freezer: Abusive Conditions for Women and Children in US Immigration Holding Cells," February 2018); Long Decl. ¶ 5 (noting report was based in part on interviews at CBP holding facilities in the El Paso area); Clay Decl. at Ex. 28 (No More Deaths, Crossing the Line (2008)); *id.* at Ex. 29 (No More Deaths, A Culture of Cruelty (2011)); *id.* at Ex. 30 (Americans for Immigrant Justice, The "Hieleras": A Report on Human & Civil Rights Abuses Committed by U.S. Customs and Border Protection (2013)); *id.* at Ex. 31 American Immigration Council, Hieleras (Iceboxes) in the Rio Grande Valley Sector (2015)); *id.* at 32 (DHS Office of Inspector General, Management Alert – DHS Needs to Address Dangerous Overcrowding and Prolonged Detention of Children and Adults in the Rio Grande Valley (July 2, 2019)).

access to counsel and the ability to concentrate on their claims in order for the credible fear

process to function effectively.  *See* Jamil Decl. ¶¶ 5-11; Stephens Decl. ¶¶ 12-17; Meza Decl. ¶¶

6, 8, 10.  Otherwise, they will not be able to make out their claims and will be erroneously

returned to danger, negating the purpose of the credible fear process.  *See* Jamil Decl. ¶ 11.

As a result, Defendants' shift from detaining individuals and families in ICE custody

throughout the credible fear process, from the time period before the credible fear interview to

the completion of the immigration judge's review, and instead keeping them in CBP custody for

this time is arbitrary and capricious.  *See Am. Fed'n of Gov't Emps. v. FLRA*, 470 F.3d 375, 380

(D.C. Cir. 2006) ("Certainly, if the result reached is illogical on its own terms, the [agency

action] is arbitrary and capricious.").  CBP facilities are wholly inappropriate for asylum seekers'

needs for access to counsel and conditions conducive to a meaningful credible fear process. In

implementing the statutes and regulations providing for credible fear proceedings, including the

procedural protections provided for by Congress, it is "illogical" to change from detaining people

in a location required to provide for their needs in that process to detaining them in a place that

clearly cannot do so. This lack of any possible "rational connection" between the underlying

facts and the choice made makes the policy change arbitrary and capricious. *State Farm Mut.*

*Auto. Ins. Co.*, 463 U.S. at 43.  Moreover, the agency's failure to consider this fundamental

flaw—particularly notwithstanding the extensive evidence before it, including its own Inspector

General's report, that the conditions in CBP custody are fundamentally at odds with a

meaningful credible fear process—further confirms that the shift is arbitrary and capricious.  *Id.*

The change in policy is also arbitrary because Defendants' proffered justification does

not fit with the policy's design. *See Fox*, 556 U.S. at 515 (agency action requires "reasoned

explanation").  Defendant CBP has described PACR and HARP as an effort to "bring[] integrity

to an immigration outcome" and "to find ways within a current legal framework . . . to bring

integrity back to [the] system." Clay Decl. at Ex. 5. But, by disregarding the legal framework's

requirement of access to counsel and its overarching goal of ensuring that all those who may face

persecution or torture have a full day in immigration court, PACR and HARP do not accomplish

these goals. They lead to perverse outcomes inconsonant with the credible fear system. Contrary

to defendant CBP's assertion, PACR and HARP are not means to accomplish an end of reaching

immigration outcomes that have integrity.

> **2.    *Defendants' New Policy Is An Abuse of Discretion and Not in Accordance with Law.***

Defendants' policy change also violates the APA because it is contrary to clear statutory

and regulatory requirements that noncitizens in credible fear proceedings have access to counsel,

and to the statutory guarantees that noncitizens may apply for asylum and are entitled to

withholding of removal under 8 U.S.C. § 1231 and CAT if they meet the relevant criteria. 5

U.S.C. § 706(2)(A); *supra* ARGUMENT, I.A; *infra* ARGUMENT, I.C. For these same reasons,

Defendants' new policy is also "in excess of statutory jurisdiction, authority, or limitations, or

short of statutory right." 5 U.S.C. § 706(2)(C).

> **C.    PACR and HARP Effectively Deprive Asylum Seekers of a Meaningful Right to Apply for Asylum, Withholding, and Protection under CAT.**

Defendants' new policy also violates the right to a meaningful opportunity to apply for a

asylum, withholding, and protection under CAT. 8 U.S.C. § 1158(a)(1); *id.* § 1231(b)(3)(A);

FARRA, § 2242, codified as note to 8 U.S.C. § 1231; 8 C.F.R. §§ 208.16-208.18; *id.* §§

1208.16-1208.18. Where Congress has set out statutory rights to apply for protection and

associated procedural protections, it intends that they be *meaningful*—accompanied by a fair

process. *See Marincas v. Lewis*, 92 F.3d 195, 203 (3d Cir. 1996) (interpreting Refugee Act of

1980 and concluding that "[w]hen Congress directs an agency to establish a procedure . . . it can be assumed that Congress intends that procedure to be a fair one").

Congress sought to preserve access to fear-based protections from removal.[9]  Yet Defendants' new policy of keeping asylum seekers in CBP holding facilities directly undermines this by depriving asylum seekers of meaningful access to counsel, *see supra* ARGUMENT, 1.A, and subjecting them to inhumane conditions fundamentally incompatible with a meaningful and fair credible fear determination, *see supra* ARGUMENT, II.A.

Courts have repeatedly enjoined governmental policies that have the effect of depriving asylum seekers of meaningful access to seeking protection.  *Orantes-Hernandez*, 919 F.2d at 551 (pattern of coercion by CBP and ICE interfering with counsel and ability to pursue claims violated "statutory right to apply for asylum"). *Haitian Refugee Ctr. v. Smith*, 676 F.2d 1023, 1027-32, 1039-40 (5th Cir. 1982) (affirming modified injunction where "accelerated processing" program "made it impossible for Haitians and their attorneys to prepare and file asylum applications in a timely manner"); *Louis*, 530 F. Supp. at 929 ("government owes these refugees the obligation fully to comply with all statutory, regulatory and treaty rights which these individuals may possess"); *see also R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 188-90 (D.D.C. 2015) (determining policy of detaining Central American families on rationale of seeking to

---

[9] *See, e.g.*, 142 Cong. Rec. S11491 (Sept. 27, 1996) (statement of Sen. Hatch) ("The standard . . . is intended to be a low screening standard for admission into the usual full asylum process."); 142 Cong. Rec. S10572 (Sept. 16, 1996) (statement of Sen. Simpson) (describing the credible fear process as "ensur[ing] that those who genuinely fear persecution at home can remain here"); 142 Cong. Rec. S4459 (May 1, 1996) (statement of Sen. Leahy) ("We want to make sure that we do not create barriers to true refugees and those deserving asylum, and prevent them from making an application for asylum."); 142 Cong. Rec. H11067 (Sept. 25, 1996) (statement of Sen. Smith) ("It is also important, however, that the process be fair—and particularly that it not result in sending genuine refugees back to persecution. . . . I think it should also be clear that our asylum officers will need to be very careful in applying the 'credible fear' standard.").

deter future asylum seekers from traveling to the United States likely unlawful and issuing preliminary injunction).

Defendants' end-run around protections for asylum seekers is flatly unlawful. In fact, the government has previously conceded that "a pattern of coercion and interference with the . . . right to apply for asylum" violates the Refugee Act. *Orantes-Hernandez*, 919 F.2d at 557 (characterizing government concession at oral argument). The executive branch cannot, through its practices, eviscerate the rights to apply for asylum, withholding, and relief under the CAT.

## II.   Plaintiffs are Suffering Irreparable Harm.

"[T]here is a 'clear and present' need for equitable relief to prevent" further irreparable harm. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (citation omitted). The Individual Plaintiffs, returned to danger and in fear for their lives, have been irreparably harmed by their inability to meaningfully seek protection in the United States. Organizational Plaintiff Las Americas is irreparably harmed by Defendants' continuing implementation of PACR and HARP.

### A.   The Individual Plaintiffs are Suffering Irreparable Harm.

The Individual Plaintiffs are suffering irreparable harm from Defendants' application of the PACR and HARP programs in their cases. "[W]ithout an injunction, the plaintiffs previously removed will continue to live in fear every day[.]" *Grace*, 344 F. Supp. 3d at 146 (D.D.C. 2018). Following their removal, Plaintiffs A.S.C.R., K.M.V., F.B.G.C., A.R.R.D., and L.E.R.D. are living in hiding in El Salvador, in terror that the gangs they fled will find them and carry out their threats to kill them. A.S.C.R. Decl. ¶¶ 11-13; A.R.R.D. Decl. ¶¶ 28-29. Plaintiffs B.G.R., D.M.F.G., B.C.F.G., J.M.F.G., and S.F.G. are likewise living in fear following their return to Mexico. B.G.R. Decl. ¶ 24. Each of the families is aware of people in similar positions who

have been murdered and is aware that the authorities in their country will not protect them.

A.S.C.R. Decl. ¶¶ 7, 12; A.R.R.D. Decl. ¶¶ 9, 29; B.G.R. Decl. ¶ 8.[10]

Many migrants from Central America and Mexico who were removed from the United States have suffered brutal harm, including death, following return to their home countries.  For example, one study documented that up to 83 individuals removed to El Salvador, Honduras, and Guatemala between 2014 and 2015 have been killed.[11]  Numerous murders of individuals removed to Mexico have also been documented.[12]

Each of the Individual Plaintiffs was unable to access counsel due to Defendants' new policy of keeping individuals in CBP custody; each of the Individual Plaintiffs experienced traumatizing conditions of confinement while in CBP custody and preparing for the interview; and none of the Individual Plaintiffs understood the credible fear process while attempting to access it under these conditions.  As a result, the Individual Plaintiffs were unable to meaningfully seek protection in the United States—and are now in danger.

---

[10] The president of El Salvador has described gang control of areas of El Salvador as "like a parallel state in some . . . communities." *See* Clay Decl. Ex. 18 (Sharyn Alfonsi, *"Our Whole Economy is in Shatters": El Salvador's President Nayib Bukele on the Problems Facing His Country*, CBS: 60 Minutes (Dec. 15, 2019).

[11] Clay Decl at Ex. 19 (Sibylla Brodzinsky & Ed Pilkington, *US Government Deporting Central American Migrants to Their Deaths*, The Guardian (Oct. 12, 2015) (discussing academic study)). One report found that in El Salvador, "[a]t least once a month, local news report the homicide of a recent deportee from the U.S." *Id.* at Ex. 20 (Elizabeth Kennedy, American Immigration Council, *No Childhood Here: Why Central American Children Are Fleeing Their Homes*, at 5 (July 1, 2014). *See also* Clay Decl. at Ex. 21 (Kevin Sieff, *When Death Awaits Deported Asylum Seekers*, Wash. Post (Dec. 26, 2018) (accounts of two asylum seekers murdered following removal to El Salvador)).

[12] Clay Decl. at Ex. 22 (Sarah Stillman, *When Deportation is a Death Sentence*, New Yorker (Jan. 8, 2018) (chronicling the murders of three people removed from the United States to Mexico and describing the identification of harm to more than sixty people removed from the United States, including murder, kidnapping, and sexual assault); *Id.* at Ex. 23 (Laura Benshoff, *Deported from Pennsylvania, Dead in Mexico: "What (He) Feared Is Exactly What Happened,"* WESA (Aug. 30, 2019)).

### B.     Organizational Plaintiff Las Americas is Suffering Irreparable Harm.

Las Americas is suffering irreparable harm from the continued implementation of PACR and HARP.  Harm to an organization that supports a preliminary injunction occurs when (1) "the actions taken by the defendant have perceptibly impaired the organization's programs" or, in other words, that the "defendant's conduct has made the organization's *activities* more difficult," and (2) "the defendant's actions directly conflict with the organization's mission."  *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (internal quotation marks omitted).  Defendants' new policy directly conflicts with Las America's mission and has perceptibly impaired Las America's programs that support its mission.

Las Americas' mission includes representing asylum seekers throughout the credible fear process.  Corchado Decl. ¶¶ 5-6.  PACR and HARP severely impair Las Americas in carrying out this mission.  Las Americas cannot represent asylum seekers in the El Paso area in the manner or to the extent that it ordinarily would.  *Id.* ¶¶ 7-9, 23, 27, 34.  While Las Americas has sought to provide direct legal services to individuals in PACR and HARP, it is functionally unable to connect with them to do so—absent herculean efforts.  *Id.* ¶¶ 16, 18-23, 27-32, 34.  Las Americas is undertaking efforts to establish CFI preparation for asylum seekers waiting for entry into the United States in Ciudad Juárez, Mexico, in response to the new programs.  *Id.* ¶ 25.  This will require the expenditure of additional resources beyond its normal CFI preparation, because pro bono counsel who would assist in El Paso will be unwilling to travel to Ciudad Juárez.[13]  *Id.*

---

[13] The State Department currently has a Level 3 travel advisory for the region, urging Americans to "[r]econsider travel" due to "[v]iolent crime and gang activity," and restricts travel for U.S. government employees within Ciudad Juárez. Clay Decl. at Ex. 24 (U.S. State Dep't, Mexico Travel Advisory.)

Moreover, PACR and HARP have caused Las Americas to divert significant resources from other programmatic needs.  In addition to hindering Las Americas' actions on behalf of asylum seekers, PACR and HARP harm Las Americas by otherwise requiring it to divert limited resources.  Las Americas has expended and continues to expend time and energy coping with PACR and HARP's disruption to its day-to-day work.  It has re-trained its intake staff and is staffing a separate phone line to respond to calls from individuals in PACR and HARP, in light of the narrow time window that they have to call out from CBP detention.  *Id.* ¶¶ 13, 16, 22.  Its director of legal services is on call to respond immediately to those in the PACR and HARP programs and has been dedicating 60 percent of her time to this work.  *Id.* ¶ 23.  Moreover, Las Americas has a grant contingent on its work to serve detained adults in ICE custody and, should PACR and HARP continue, will need to attempt to rearrange the terms of the grant.  *Id.* ¶ 36.

In *League of Women Voters*, the D.C. Circuit held that organizational harm in interference with the organization's accomplishment of its "mission of registering voters" was irreparable where registration deadlines for the November election loomed, because once the deadlines passed, there was "no do over and no redress."  838 F.3d at 8-9.  Similarly here, for the asylum seekers in credible fear proceedings to whom Las Americas wishes to provide legal services, there is no do over in the legal process once they go through proceedings without an attorney.  *See* 8 C.F.R. § 1208.30(g)(2)(iv)(A) ("The immigration judge's decision is final and may not be appealed.").  Las Americas will be unable to accomplish its mission of representing these individuals, and this has already occurred.  Corchado Decl. ¶¶ 18-21. Other damages to Las Americas' fulfillment of its mission in the form of diverted resources will work irreparable harm, because such damages cannot be remedied monetarily.  *See Open Cmties. Alliance v. Carson*,

286 F. Supp. 3d 148, 178 (D.D.C. 2017) (irreparable harm where organization's "monetary

losses . . . [we]re not recoverable, as the APA provides no damages remedy").

**III.  The Balance of Equities and the Public Interest Both Strongly Favor Injunctive Relief.**

Plaintiffs seek an injunction barring Defendants from implementing their unlawful

policies for the duration of this litigation, to prevent irreparable harm to vulnerable asylum

seekers and to Organizational Plaintiff Las Americas. The balance of hardships decidedly favors

Plaintiffs, and such an injunction is in the public interest.

For its part, the "[g]overnment 'cannot suffer harm from an injunction that merely ends

an unlawful practice.'" *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quoting

*Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)).  Moreover, Defendants can simply

revert to detaining individuals in ICE detention—as they have done for years, before the recent

policy change, and as they continue to do elsewhere across the southern border. Leaving

Defendants' unlawful policies in place for the duration of this litigation will, however, gravely

harm Plaintiffs.  *Supra*, ARGUMENT, II.

An injunction will also further the public interest. It will prevent the erroneous removal

of asylum seekers.  *Nken v. Holder*, 556 U.S. 418, 436 (2009) ("Of course there is a public

interest in preventing aliens from being wrongfully removed, particularly to countries where they

are likely to face substantial harm."); *Make the Road N.Y. v. McAleenan*, 1:19-cv-2369, 2019

WL 4738070 at *44 (D.D.C. Sept. 27, 2019), *appeal pending*, No. 19-5298 (filed Oct. 31, 2019)

("the public has a significant interest in avoiding the erroneous application of a policy that can

result in the swift and largely unreviewable deportation, without almost any procedural

safeguards").  It will further the public interest in the executive branch's compliance with the

law. *League of Women Voters*, 838 F.3d at 12 (D.C. Cir. 2016) ("[T]here is a substantial public

interest in having governmental agencies abide by the federal laws that govern their existence and operations."); *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009) ("The public interest is served when administrative agencies comply with their obligations under the APA."). Regarding asylum seekers in the credible fear process, whom Congress has specifically sought to protect through procedural safeguards, the public interest is similarly great.

Absent a preliminary injunction, the executive branch will continue to render the credible fear process meaningless for those in PACR and HARP.  Many of the "swift and largely unreviewable" removals that result will erroneously send people who have sought refuge here back to danger and possible persecution, torture, and death.  A preliminary injunction halting administrative evisceration of protections for those fleeing harm and seeking only a meaningful process to determine whether they may plead their case in immigration court will benefit the public, will prevent irreparable harm to asylum seekers and Organizational Plaintiff Las Americas, and will not harm the government.

## CONCLUSION

Accordingly, Plaintiffs respectfully request that this Court enjoin Defendants, their agents, and any persons acting in concert with them from continuing to operate PACR and HARP, and from otherwise continuing the policy of conducting the credible fear process in CBP facilities.

The Individual Plaintiffs request that the Court order Defendants to vacate any orders of expedited removal issued as to the Individual Plaintiffs; to return the Individual Plaintiffs to the United States, at no expense to them; to parole them into the United States;  and to provide each of them a new credible fear process fully compliant with law or, in the alternative, full immigration court removal proceedings pursuant to 8 U.S.C. § 1229a.

Dated: December 20, 2019

Respectfully submitted,

s/*Arthur Spitzer*

Andre Segura*, TX Bar No. 24107112
Thomas Buser-Clancy*, TX Bar No. 24078344
Kathryn Huddleston*, AZ Bar No. 033622
ACLU Foundation of Texas, Inc.
5225 Katy Freeway, Suite 350
Houston, TX 77007
Tel. (713) 942-8146
Fax: (713) 942-8966
asegura@aclutx.org
tbuser-clancy@aclutx.org
khuddleston@aclutx.org

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
American Civil Liberties Union Foundation
   of the District of Columbia
915 15th Street, NW - 2nd floor
Washington, DC 20005-2302
Tel. (202) 601-4266
aspitzer@acludc.org
smichelman@acludc.org

Bernardo Rafael Cruz*, TX Bar No. 24109774
Brantley Shaw Drake*, NY Bar No. 5407440
ACLU Foundation of Texas, Inc.
109 N. Oregon St., Suite 600
El Paso, TX 79901
Tel. (915) 533-8091
Fax: (915) 308-7188
brcruz@aclutx.org
sdrake@aclutx.org

Anand Balakrishnan,* CT Bar No. 430329
American Civil Liberties Union
Foundation, Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
Tel. (212) 549-2600
abalakrishnan@aclu.org

*Pro hac vice application pending*