# EXHIBIT B

## DECLARATION OF A.R.R.D.

I, A.R.R.D., hereby declare under the penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2. I am a citizen of El Salvador. I fled El Salvador with my child, who is currently seven-months-old, to request asylum in the United States. I am requesting asylum because gang members have repeatedly extorted me and threatened my life.

3. In 2017 I owned a small restaurant where I sold Mexican food. I worked for the city during the day as an executive assistant and then worked at the restaurant at night. (In a previous declaration, I inadvertently stated that this occurred in 2015.)

4. One day that year, gang members arrived at my house. A man knocked at my door and then passed me a phone. The person on the phone said that he was calling from jail and represented gang 18. He started yelling obscenities at me and told me that if I did not pay the gang 1,000 U.S. dollars they would kill my family members one by one so that I could see how they died, and then they would kill me.

5. I ended up selling the chairs and other supplies in my restaurant in order to pay them the money and was forced to close my restaurant.

6. After closing my restaurant, I worked full time for the city government as an executive assistant.

7. In early September 2019, two persons from the same gang that threatened me in 2017 came to my house. They knocked and slammed at the door until I opened it while I had my baby in my arms. The gang members said they were from gang 18 and that I had one week to give them 3,000 U.S. Dollars. They pointed a gun at my child's head and said if I did not pay, they would kill me and my baby.

8. That night I grabbed my wallet and left my house with my son. I left in such a rush that I left all of my belongings and did not even take a spare set of clothes with me. We stayed at a friend's house for the night.

9. The next day I went to the police to file a complaint. The police officer who took my statement told me that I should flee the country with my child because there was nothing

the police could do, and the gang would kill me if I could not pay. I had no option but to leave El Salvador because members of this gang are all throughout El Salvador.

10. On or about September 25, 2019, I made the decision, along with my sister and her family, to flee El Salvador. My sister and her family had also been threatened by gang members. While traveling to the U.S border my child's grandmother texted me and said that members from gang 18 were looking everywhere for me, saying they would kill me if they found me.

11. On or about October 8, 2019, I crossed into the U.S. with my child, looking for U.S. Border Patrol in order to seek asylum. We walked for over two hours before we found a Border Patrol agent. We turned ourselves in, and the agent arrested us and took us to a CBP facility. When I was initially processed, Border Patrol agents asked me why I was fleeing El Salvador and laughed when I told them my story. My child and I were placed in cold cells that other detainees called hieleras (Spanish for "ice boxes").

12. On or about October 9, 2019, my child and I were brought to a room by Border Patrol agents and were shown a video in Spanish. The audio for the video was only available via headphones that the agents handed out to people in the room. The video explained that I was going to be given an interview by an officer in the next 24 hours that would determine if my fear of returning to El Salvador was credible or not. If that officer determined my fear was not credible, that I would have the opportunity to speak with a judge. The video did not say if we would speak to the officer and judge over the phone and I thought that meant I would be able to speak with them in person. Even after watching the video, I did not have a clear understanding of what is necessary to obtain asylum in the United States.

13. On or about October 11, 2019, I was brought to a room with my child and given a phone and a list of names with phone numbers. The agent who brought me to the room said I had 30 minutes to call my family members or call one of the attorneys on the list. I had spoken with other detainees before entering this room who told me no one ever answered from this list. These other detainees called this the "ghost list." I tried calling several of the attorneys, but no one answered. There was no way to leave a message or a way to receive a call back. In the last ten minutes I had available, I spoke with my sister-in-law and quickly told her that I had been arrested by U.S. immigration authorities.

14. On or about October 13, 2019, I was brought into a room with my child and had my credible fear interview over the phone. I spoke with two people, one who was speaking in English, and the other who was translating the conversation into Spanish. The interview lasted for four hours.

15. I do not think that the Asylum Officer received all of my documentation. When I was first detained, I was carrying copies of the police complaint I filed when I was threatened by gang members. That paperwork was taken away from me when I first arrived and I was not able to present that paperwork to the asylum officer.

16. I also do not think I was prepared for the interview or that I had a fair chance to explain the danger I was fleeing in my home country. I was immediately confused about why the interview was over the phone, I thought I would have the opportunity to present my case to a judge in person. I was also still traumatized from the threats against my life by the gang members, and I was not prepared to immediately start answering detailed questions about those threats. My interview was even more difficult because I had never had a chance to recover from the grueling trip to reach the United States, because CBP had forced my baby and me to sleep on the freezing floor in horrible conditions for all of the days before the interview. I also felt traumatized by the mistreatment I received from CBP officials.

17. During the interview it was extremely difficult to concentrate because I had to hold my baby in my arms while also holding the telephone. There was nowhere to place my baby other than the cold floor or hard benches, and I did not have anyone in the room with me who I could ask to hold my baby. At times my baby was crying, and I was trying to soothe him while doing the interview. I was also confused by several of the questions because I did not really understand all of the Spanish the translator was using.

18. These difficulties made it difficult to understand the questions I was being asked, and it made it difficult for me to think clearly and answer to the best of my knowledge. In addition, there were times when I started telling the interviewers about my experiences and the interviewers cut me off and told me to stop talking and instead answer the question they had asked me. I thought I was answering their questions, so I got confused. I felt confused by the process and their questions throughout the entire interview.

19. On or about October 14, 2019, I was told by a government official that I had not passed the interview and that I could request a review of that decision by an immigration judge.

20. On or about October 17, 2019, I was brought into a room in the detention center to speak with an immigration judge over a phone. I thought that I would have a chance to speak with the judge in person. The phone call lasted approximately five minutes. The immigration judge just explained that I had failed the initial credible fear interview. This was not really an interview: the judge did not ask me any questions. The judge presented himself and told me to swear to tell the truth. The judge did not ask me to tell my story,

and he did not say why I had not passed the original credible fear interview. If I had more time to better prepare myself or had the opportunity to speak with the judge in person, I would have gone through the paperwork I carried with me with the judge, and I would have told him my reasons for fleeing El Salvador in a clearer manner.

21. During the 14 days my child and I were held in CBP detention cells, my child and I had to sleep on the floor. The lights were left on all day and all night, which made it difficult to sleep. The cells were very cold, and me and my baby got sick with a cold and a cough. To try and warm my baby up, I would place him on my chest while we slept. My baby became very sick with a cold and had a fever. I was unable to speak with an attorney about my asylum case. After the initial 30-minute window, I repeatedly asked Border Patrol agents for access to a phone to call my family, but they always refused. My child and I were held in a cell with a capacity for 11 when there were 25 people.

22. I felt invisible while I was in the hielera because I couldn't tell anyone on the outside what was happening to me. This made me afraid that the guards could just disappear me and no one would know. We were locked up all day, with no access to water inside the hielera. I would have to ask guards to provide us with drinking water. Several times when I asked for water, the guards would yell at me to get back inside, that we could not drink water. The water tasted very bad, and it smelled like bleach. The guards also slammed doors in my face. In the two weeks I was in CBP detention, I was only able to shower three times and change my clothing three times. While I was detained, I felt sick several times, and my child felt like he had a fever. I asked to see a doctor and was taken to a doctor inside CBP detention. The doctor said there was nothing wrong with us and never gave me any medication. While I was detained, I saw other children also get sick.

23. In CBP detention, guards would go into the detention areas every few hours and wake everyone up, and tell us to pick up our mat and blankets and stand in line to be counted. Once, a guard came in to do a count in the middle of the night and made me wake up. I was carrying my baby, and I was slow to pick up my mat to go to the count, so the guard yelled at me, saying "you are stupid, you are not at your house here, here, you do as you are told." I also observed a camera behind the toilet in the cell where I was held, which made me feel terrible, like they were spying on us at all times. As a migrant, I felt powerless, like I didn't exist, and I wondered whether human rights exist in the United States.

24. On or about October 17, 2019, Border Patrol agents took me into a room in the detention center and told me to sign some documents in English. I do not know what these papers were about and I never heard the immigration judge's final decision on my case.

25. On or about October 18, 2019, Border Patrol agents brought me into a room in the detention center. My sister, her husband, and their child were also in that room. The agents said we had a call from the Salvadoran consulate. The woman on the phone stated she was from the consulate and that my family had reached out to them because they could not find me. The woman from the consulate told me that we were going to be deported and there wasn't anything she could do about it.

26. On or about Friday, October 18, 2019, my child and I were taken from the hieleras and moved to a hotel room and told we were going to be taken to a shelter in San Antonio, Texas. Agents unplugged the telephone from the wall and took the phone out of the room. They locked the hotel room door so that I could not leave the room. An agent brought food to us in the room. We were never allowed to leave the room, and were kept there until Monday, October 21, 2019, when we were taken to a plane.

27. On or about October 21, 2019, I boarded an airplane thinking I was going to San Antonio, Texas, but the flight took me to El Salvador.

28. After being deported, my family and I went into hiding in a different part of the country from our previous home. I am terrified of going back to my home town with my child. I think I will be killed by gang members. At first, my sister, her husband, their child, my baby, and I all shared one room at an uncle's house. Because we are so afraid of being killed by gang members, we did not leave my uncle's house. We stayed indoors at all times and depended on my uncle to go out and buy us food. We did not let the neighbors see that we were staying with my uncle.

29. Last week, I and my baby moved to another part of El Salvador, different from my previous home and my uncle's home, to live with my grandfather. I am still afraid that the gang will identify me anywhere in El Salvador. I have seen gang members find and kill people who have tried to hide in other parts of El Salvador. I believe the gang members are looking for us throughout El Salvador. However, because I am a single mother who needs to provide for myself and my baby, I started leaving the house to go to work. I pay a friend to take me to and from work every day because I am afraid of walking on the street or using public transportation. I know that if someone recognizes me, word will spread around and the gang will find me and kill me.

30. I am afraid for my life and the life of my child while we are in El Salvador, and I wish to continue my fight to obtain asylum in the United States.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and recollection. This declaration was read back to me in Spanish, a language in which I am fluent.

Executed on December 16, 2019 at El Paso, Texas, Mexico.

__A.R.R.D. / Bernardo Rafael Cruz__
Signature

__A.R.R.D.__
Printed Name

## DECLARATION OF BERNARDO RAFAEL CRUZ

I, Bernardo Rafael Cruz hereby declare under the penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2. I am an attorney licensed to practice law in the State of Texas.

3. I am fluent in the English and Spanish languages.

4. On December 16, 2019 I electronically sent a copy of the attached Declaration of A.R.R.D. to the declarant, who is living in hiding in El Salvador and does not have the ability to print documents. I then telephonically read the attached declaration to her and orally translated it faithfully and accurately into Spanish while on the phone with the declarant. After I completed translating the declaration, the declarant verified that the contents of the foregoing declaration are true and accurate and authorized me to sign it on her behalf.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and recollection.

Executed on December 16, 2019 at El Paso, Texas, United States.

_____
Signature

Bernardo Rafael Cruz
Printed Name