# EXHIBIT K

## DECLARATION OF SCOTT SHUCHART
## IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

1.      My name is Scott Shuchart. I am an attorney licensed to practice in New York and

the District of Columbia.

2.      From August 2010 through July 2018, I served as Senior Advisor in the Office for

Civil Rights and Civil Liberties (CRCL) at the U.S. Department of Homeland Security (DHS).

CRCL is a statutory office, headed by a presidential appointee who reports to the Secretary of

Homeland Security. 6 U.S.C. § 345; *see also* 42 U.S.C. § 2000ee-1. I reported directly to that

appointee (or the acting substitute), known as the Officer for Civil Rights and Civil Liberties.

CRCL is an oversight and policy office that develops department-wide policy and advises DHS

leadership, including its component agencies, on issues affecting civil rights, civil liberties, and

human-rights treaty obligations. When I worked at CRCL, a principal focus of the Office's work

was conditions of confinement in the detention facilities operated by the DHS component

agencies, including U.S. Customs and Border Protection (CBP) and U.S. Immigration and

Customs Enforcement (ICE). Among other functions, CRCL accepts complaints from the public

and conducts investigations of allegations of rights abuses, and then reports findings and makes

recommendations as a consequence of those investigations. *See* https://www.dhs.gov/crcl;

https://www.dhs.gov/compliance-branch.

3.      As a part of my role, I both participated personally in on-site investigations of

facilities operated by CBP and ICE and supervised other policy advisor staff who assisted with

investigations. I reviewed and provided input on numerous policy papers, investigative reports,

and other CRCL projects relating to detention conditions at CBP and ICE, with a particular focus

on facilities that processed families and unaccompanied children. In that capacity, I visited

several CBP facilities in the Rio Grande Valley area, including ports of entry (operated by CBP's

Office of Field Operations (OFO)); U.S. Border Patrol (USBP) stations; a Border Patrol central

processing facility for families and children; and a temporary, "soft sided" influx facility

constructed on land adjacent to a port of entry. I have spoken with many CBP officers and agents

to understand the operation of those facilities. I have also attended dozens of meetings with CBP

officers, agents, and staff at DHS's and CBP's headquarters offices in Washington, D.C. Those

meetings encompassed, for example, nationwide CBP policies; issues at ports of entry in

California and Arizona; and Border Patrol activities along the northern border.

4.      CBP divides its border security responsibilities between OFO, which operates

ports of entry—the lawful land border crossing points, international airports, and maritime

facilities—and Border Patrol, which apprehends individuals who cross between ports of entry

and exercises authority throughout a 100-mile-zone along all U.S. borders.

**OFO**

5.      OFO may administratively detain an individual without permission to enter the

United States pending transfer to ICE custody for further immigration proceedings, or may

briefly detain an individual who has been arrested criminally, pending transfer to another law

enforcement agency's custody. OFO may also detain an individual suspected of harboring

contraband inside his or her body (such as drugs in the alimentary canal) for observation. OFO

will generally not grant entry to an individual's attorney. Indeed, CBP's operative public

guidance on transportation, escort, detention, and search (known as "TEDS") does not reference

contact with a subject's attorney at all. *See* U.S. Customs and Border Protection, *National*

*Standards on Transport, Escort, Detention, and Search* (Oct. 2015), *at*

https://www.cbp.gov/sites/default/files/assets/documents/2017-
Sep/CBP%20TEDS%20Policy%20Oct2015.pdf.

6.      Ports of entry are designed as offices and as processing facilities for goods and
travelers. While they may include a small holding cell or cells, in general they are not built as
secure or jail-like facilities. They generally do not contain security devices such as sally-ports.
They do not contain proper sleeping facilities: Detainees may simply sit in chairs in a waiting
room area for hours or days.  CBP has acquired thin foam matts to be placed on the floor in some
facilities to enable detainees to lie down. During times that large numbers of individuals are held
in a port of entry for processing or while they await transport to another facility, CBP may
convert offices, storage rooms, and even closets into temporary detention facilities. I have
observed a port of entry where the port director's own office was temporarily used to house
detained persons pending transportation. I have never observed a port of entry with space for
visitation of any kind; I have never observed a port of entry with a private place for an attorney-
client meeting. Ports of entry do not have shower or bathing facilities for detainees, do not have
kitchens to prepare food for detainees, and do not issue clothing to detainees.


**Border Patrol**

7.      Border Patrol operates as a law-enforcement agency, conducting patrols and
surveillance and engaging in physical apprehensions of individuals suspected of entering the
country

8.      Border Patrol stations are not configured for administrative processing, but rather
to receive individuals who have been arrested in the field, either for criminal or civil immigration
offenses. Accordingly, they are generally constructed like police stations, with a large secure

3

section comprising multiple holding cells, each holding several (and some perhaps as many as 20 or 40) detainees, arrayed in a ring around counters or desks where Border Patrol agents can process individuals they have apprehended. Detainees may be assigned to a particular holding cell based on age, sex, nationality or language spoken, communicable disease, processing destination, or other factors. The holding cells are designed for short-term detention: While they may have some concrete benches or seating, there are not beds or adequate seating for the maximum population of the cell. As with OFO, detainees may be issued disposable mylar blankets for warmth. Border Patrol stations generally lack kitchens or food service equipment; food for detainees is either pre-packaged and microwaved, or brought in from an outside vendor. Border Patrol stations generally lack bathing or shower facilities; common practice is to supply detainees with large-format "baby wipes" for self-cleaning. Border Patrol stations generally lack laundry facilities and do not issue detainees with clean clothing (except for some children), so it is common for Border Patrol detainees to sit for days in the same clothes they were apprehended in. Lights stay on 24 hours a day, limiting detainees' ability to rest. Toilet facilities are shared and not private. The stations are noisy, with clanging doors and people coming and going around the clock.

9.      The Border Patrol stations I have visited had no visitation rooms or appropriate areas for attorney-client communications. Indeed, even the processing of individual detainees by Border Patrol agents—who may be reporting the basis for a fear of return to their home countries—is generally conducted in the large open area, with multiple detainees being interviewed side by side, without full privacy.

10.     The Border Patrol stations I have visited had limited telephone facilities; to the extent that detainees could make telephone calls, I believe they generally did so from telephones

located at the desks or counters at which agents conducted processing. There were no private or separate telephone facilities, and detainees were not free to make calls at will or to use calling cards. There were certainly no private areas that would permit a confidential call with an attorney.

11.     Border Patrol has also constructed a small number of "soft-sided" facilities comprising large tent like buildings, and has housed detainees at them. Those facilities generally do have showers and some other amenities that are otherwise lacking in the permanent facilities, though they are fundamentally large holding pens designed for temporary detention for further processing. The soft-sided facilities I am familiar with were not constructed to accommodate any visitation, much less confidential attorney-client meetings.

## CBP's Understanding of its Processing Facilities

12.     One issue I worked on while at CRCL was the manner in which CBP conducted interviews of unaccompanied children, who are subject to particular processing requirements, including a statutory requirement that they be held for no longer than 72 hours before being transferred to the Department of Health and Human Services. Both CRCL and outside advocacy organizations urged CBP, over the course of many years, to hire staff trained in child welfare, such as social workers, to perform some of this work, to ensure appropriate interactions with children and to better look after their needs. CBP's response—both OFO and Border Patrol— was, consistently, that its facilities were not appropriate for *any* personnel other than individuals being processed and CBP's armed officers and agents. Officers and agents in managerial roles told us that social workers, child care workers, or medical personnel could not safely move about the facilities as they were constructed and operated. While I understand that CBP has added medical screening personnel to some facilities in the last year following the deaths of a number

5

of children detained in its custody, it seems that these same considerations would apply if outside attorneys were somehow expected to serve clients in OFO or Border Patrol facilities.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 18, 2019

SCOTT SHUCHART