# EXHIBIT N

# DECLARATION OF AARON REICHLIN-MELNICK

1. I, Aaron Reichlin-Melnick, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

2. I am a policy counsel at the American Immigration Council ("Immigration Council"), a nonprofit and non-partisan organization whose mission includes the use of facts to educate the public on the important and enduring contributions that immigrants make to America.

3. As a policy counsel at the Immigration Council, I track and analyze trends in Department of Homeland Security ("DHS") border enforcement policies and data. I also track and analyze immigration court policies and data produced by the Executive Office for Immigration Review ("EOIR"), including trends and policies related to expedited removal. In my role as policy counsel I have previously submitted expert declarations analyzing government-produced immigration statistics.[1] I have also helped prepare and submit complaints to the DHS Office of the Inspector General and the DHS Office of Civil Rights and Civil Liberties about conditions in CBP custody, including inadequate medical care and the use of coercion against asylum seekers.[2]

4. Prior to joining the Immigration Council, I worked as a removal defense attorney representing immigrants in immigration court proceedings. In that role, I interviewed dozens of asylum seekers to screen them for relief, which often required interviewing them about their interactions with a CBP officer who screened them for a fear of persecution while they were in

---

[1] *Innovation Law Lab v. Wolf*, 3:19-cv-00807-RS (N.D. Cal. filed Feb. 14, 2019), *Padilla v. ICE*, No. 2:18-cv-00928-MJP (W.D. Wash. filed June 25, 2018), *East Bay Sanctuary Coalition II v. Wolf*, 3:19-cv-04073-JST (N.D. Cal filed July 16, 2019).

[2] *See* Immigration Council & American Immigration Lawyers Association, *The Use of Coercion by U.S. Department of Homeland Security (DHS) Officials Against Parents Who Were Forcibly Separated From Their Children* (June 2018); Immigration Council, et. al, *Deprivation of Medical Care to Children in CBP Custody* (Sept. 2019).

CBP custody, as well as their experience during credible fear interviews. During these interviews, asylum seekers would often describe to me their experience in CBP custody.

5. In addition to my knowledge gained as a removal defense attorney, I have first-hand knowledge of conditions inside Customs and Border Protection ("CBP") facilities. Prior to becoming a policy counsel, I was a staff attorney with the Immigration Council, where I served as counsel on *Doe., et. al, v. Wolf*, No. 15-00250-DCB (D. Ariz. filed June 8, 2015), a class action lawsuit challenging conditions of confinement in Tucson Sector Border Patrol facilities. As counsel, I participated in class visits inside CBP's Tucson Coordination Center, where I interviewed detained people about their treatment in custody.

6. Most recently, in June 2018 I interviewed roughly 30 parents in Immigration and Customs Enforcement ("ICE") detention in the El Paso area who had been separated from their children as a result of Zero Tolerance. One purpose of these interviews was to determine whether separated parents had been coerced into giving up their rights either in CBP detention or in ICE detention. Many of these parents had been separated while in CBP custody in Border Patrol's El Paso Sector. These interviews formed the basis of an expert declaration I submitted in the *Ms. L v. ICE* litigation.[3]

7. The interviews I conducted in 2018, public reports on CBP custody in El Paso, and work that the Immigration Council has done in 2018 and 2019 relating to individuals detained in the El Paso area lead to the conclusion that conditions in El Paso CBP facilities are substantially similar to conditions in CBP custody across the border.

---

[3] Exhibit 43, Plaintiff's Reply in Support of Motion for a Stay of Removal, ECF. No. 153, *Ms. L v. ICE*, No. 3:18-cv-00428-DMS-MDD (S.D. Cal. July 25, 2018).

8. In this declaration I have drawn on my first-hand experiences interviewing asylum seekers about their time in CBP custody, as well as reports detailing conditions in CBP custody produced by the Immigration Council, human rights organizations, and government watchdogs.

9. Asylum seekers in CBP custody face conditions of confinement worse than most jails,[4] negligible to nonexistent access to counsel, and a persistent coercive environment in which asylum seekers are unable to advocate for themselves or are pressured into abandoning their cases. Given these problems, asylum seekers are unable to receive a meaningful or fair credible fear interview process while held in CBP custody.

### **CBP Custody Suffers from Systemic Problems Which Impede Access to Due Process in the Credible Fear Process**

10. When an individual enters the custody of CBP at the border, they are generally held in a "short-term" detention facility.[5] The majority of these facilities were built decades ago, when the primary population of individuals crossing the border were single Mexican adults who could be processed and rapidly returned to Mexico. Given the operational requirements for which the

---

[4] *See, e.g.* Order Granting Preliminary Injunction, *Doe v. Johnson*, 4:15-cv-00250-DCB at 9-10, 2016 WL 8188563 at *5-6 (Nov. 18, 2016).
> [T]he Court should presume the Plaintiffs are being subjected to punishment if they are confined in conditions identical to, similar to, or more restrictive than those under which the criminally convicted are held. … This is precisely the case here. Assistant Chief Patrol Agent for the Tucson Sector, George Allen, admitted, when this Court asked him to compare the conditions of confinement at Tucson Sector Border Patrol stations with those afforded criminal detainees at the Santa Cruz County jail, that in jail, detainees have a bed, with blankets, clean clothing, showers, toothbrushes and toothpaste, warm meals, and an opportunity for uninterrupted sleep. Likewise, the conditions of confinement for civil immigration detainees improve once they are transferred from Border Patrol holding cells to detention centers operated by the United States Marshals.

[5] CBP facilities are governed by the 2015 Transport, Escort, Detention, and Search (TEDS) standards, which provide in section 4.1 that "Detainees should generally not be held for longer than 72 hours in CBP hold rooms or holding facilities" and that "Every effort must be made to hold detainees for the least amount of time required for their processing, transfer, release, or repatriation as appropriate and as operationally feasible." Nevertheless, throughout 2019 individuals were routinely held for longer than 72 hours in CBP custody in the El Paso area. *See* DHS Office of Inspector General, *Management Alert - DHS Needs to Address Dangerous Overcrowding Among Single Adults at El Paso Del Norte Processing Center* (May 30, 2019), *available at* https://www.oig.dhs.gov/sites/default/files/assets/2019-05/OIG-19-46-May19.pdf.

3

facilities were designed, CBP has long argued that the facilities are not designed for long-term detention of asylum seekers.[6]

11. Unlike ICE detention centers, CBP short-term facilities are entirely closed to the public. Neither attorneys nor family members can access individuals held in CBP custody. There are no visitation spaces or confidential attorney-client meeting rooms in CBP facilities. It is only through my role as counsel in the *Doe* litigation that I was permitted to enter a CBP facility in the first place as part of negotiated access to our certified class. The vast majority of asylum seekers lack legal representation when they first arrive in the United States; however, even in the very rare circumstances when an asylum seeker arrives at border having already retained counsel, they will almost never will be able to speak with their attorney until they leave CBP custody.

12. There is also no official way to determine where a person is being held in CBP custody. If a person is held in ICE detention, attorneys and family members can enter the person's information in the online ICE Detainee Locator system and find their location. No such system exists for CBP custody, meaning that individuals effectively disappear from the outside world for days or weeks. This can be traumatic for family members, who may believe their loved one has died.[7]

13. Conditions inside CBP facilities have long been criticized as inhumane and punitive. Over the past decade, human rights watchdogs and government oversight bodies have repeatedly found that migrants in CBP custody are denied the ability to sleep, provided inadequate food and

---

[6] *See, e.g.*, Nick Miroff, *Top U.S. border official defends use of tear gas, says walls are 'important tool'*, Wash. Post (Dec. 11, 2018) ("U.S. Border Patrol stations have been primarily designed to process single male adults, not families with children, McAleenan told lawmakers.").

[7] *See, e.g.*, Max Rivlin Nadler, *Asylum-Seeker Held Incommunicado for Three Weeks by Border Patrol* (Nov. 26, 2019), https://www.kpbs.org/news/2019/nov/26/asylum-seeker-held-incommunicado-three-weeks-borde/.

water and limited access to medical professionals, coerced into signing documents in English they did not understand, and subjected to freezing conditions and verbal and physical abuse.[8] Noting the consistency of reports of these substandard conditions, one report described allegations of abusive conditions in CBP custody as "alarmingly consistent for years."[9]

14. When an individual first enters a CBP short-term detention facility, agents require them to remove all but one layer of clothing. Individuals are required to hand over all valuables to CBP officers. Depending on the condition of all remaining property, CBP may either maintain custody of any other belongings or throw them out.[10] During the time that an individual is held in CBP custody they are typically not permitted to access their belongings. This means that individuals in CBP custody are not able to access evidence which may be in their belongings.

15. Once individuals are initially processed upon arrival at a CBP short-term detention facility they are typically given a thin Mylar blanket for warmth. Many individuals held in these facilities describe them as "hieleras" ("iceboxes") because of the cold temperatures in cells. Individuals may be provided a thin mat to lay on the floor on which to sleep. If not provided a mat, individuals are forced to sleep on a bench or on the cold concrete floor. During the height of

---

[8] *See* No More Deaths, *Crossing the Line* (2008), at 4 (identifying "inhumane processing center conditions," "the routine failure to provide medical treatment and access to medical professionals," and "the failure to inform migrants of their rights [and] coercing them to sign forms" as common abuses in CBP custody); No More Deaths, *A Culture of Cruelty* (2011), at 5 (identifying "failure to provide medical treatment or access to medical professionals; inhumane processing center conditions; verbal abuse; physical abuse; psychological abuse; … and due process concerns" in CBP custody); Americans for Immigrant Justice, *The "Hieleras": A Report on Human & Civil Rights Abuses Committed by U.S. Customs and Border Protection* (2013) (describing similar problems); National Immigrant Justice Center et. al, *Systemic Abuse of Unaccompanied Immigrant Children by U.S. Customs and Border Protection* (2014) (CRCL complaint describing similar problems); Immigration Council, *Hieleras (Iceboxes) in the Rio Grande Valley Sector* (2015) (describing similar problems); Human Rights Watch, *In the Freezer: Abusive Conditions for Women and Children in U.S. Immigration Holding Cells* (2018) (describing similar problems); DHS Office of Inspector General, *Management Alert – DHS Needs to Address Dangerous Overcrowding and Prolonged Detention of Children and Adults in the Rio Grande Valley* (July 2, 2019) (describing overcrowding which prevented ability to sleep); San Diego State University, et. al, *The Right to Seek Asylum* (Dec. 10, 2019) (describing similar problems).
[9] No More Deaths, *A Culture of Cruelty* (2011), at 4.
[10] *See* DHS OIG, El Paso Management Alert, *supra* note 5 at 5 ("We also observed staff discarding all other detainee property, such as backpacks, suitcases, and handbags, in the nearby dumpster").

the overcrowding in May 2019 in El Paso, DHS OIG found that some individuals were forced to remain in "standing-room-only conditions" for weeks, unable to lie down at all.[11] In my experience, individuals who are subject to freezing conditions or who have been kept in severely overcrowded rooms often become disoriented and discombobulated, making it more difficult for them to assert their rights or remember key details relevant to their case.

16.  Sleep is difficult to obtain for individuals in CBP custody. The lights remain on 24 hours a day, disorienting people and making sleep even more difficult. Border Patrol officers will enter cells and call people for processing even in the middle of the night, disrupting sleep. In some areas along the border, agents provide "breakfast" at 4:00 AM,[12] further disrupting the ability to sleep. As a result, people in CBP custody for more than 24 hours tend to suffer from sleep deprivation, which can interfere with their ability to meaningfully participate in their cases. I have spoken to multiple people who were in CBP custody for more than two nights who reported that they were only able to sleep for a matter of hours.

17.     Individuals held in CBP custody also report inadequate food and water, leaving many suffering from hunger pangs the longer their stay in CBP custody. Those held in CBP custody are often provided the same meal every six hours: a microwaved Goya bean burrito or a defrosted bologna sandwich, crackers, and a juice box.[13] There are frequent reports of individuals being provided spoiled food, or burritos which are still frozen in the middle.[14] Many children

---

[11] *Id.* at 5 ("Border Patrol agents told us some of the detainees had been held in standing-room-only conditions for days or weeks.").
[12] Order Granting Preliminary Injunction, *Doe v. Johnson*, 4:15-cv-00250-DCB at 13, 2016 WL 8188563 at *7 (Nov. 18, 2016).
[13] Human Rights Watch, In the Freezer, *supra* note 7 (describing a woman who received only burritos as a meal for four days straight).
[14] Ray Sanchez & Chuck Johnston, *Detained migrants allege they were forced to drink foul-smelling water and spoiled food*, CNN (July 18, 2018), https://www.cnn.com/2018/07/18/us/trump-administration-migrant-detention-conditions/index.html.

refuse to eat the food provided in CBP custody. I have spoken to multiple people who, after several days in CBP custody, described being so hungry that they couldn't think.

18. Inside CBP custody, individuals often report that they are subject to verbal abuse. A 2011 study that interviewed 4,130 people processed by the Tucson Sector Border Patrol found that 41 percent of migrants reported verbal abuse from a CBP officer.[15] The report also found that the longer an individual was held in CBP custody, the more likely they were to be verbally abused by a CBP officer.[16] A 2019 study of 350 asylum seekers released in the San Diego area confirms that verbal abuse continues to be a problem, with 37 percent of individuals reporting verbal abuse by a CBP officer while in custody.[17]

19. Surveys also reveal serious concerns regarding physical abuse. The 2019 study of individuals released in San Diego found that 7 percent reported being subject to physical violence by a CBP officer.[18] Similarly, the 2011 study of individuals detained in the Tucson Sector found that 10 percent of individuals reported being physically abused by a CBP officer.[19] As with verbal abuse, the 2011 study found that the longer an individual was held in CBP custody, the more likely they were to suffer physical abuse.[20]

20. It is my experience that individuals who are subjected to verbal or physical abuse by a CBP officer are less willing to express themselves freely or assert their rights so long as an officer is present. Those subjected to verbal abuse, especially abuse related to their claim for asylum, often become afraid of CBP officers and unwilling to express intimate details of their asylum claims in an officer's presence.

---

[15] A Culture of Cruelty, *supra* note 9, at 24.
[16] *Id.*
[17] San Diego State University and The ACLU of San Diego & Imperial County, *The Right to Seek Asylum* (Dec. 10, 2019), at 25.
[18] *Id.* at 29.
[19] A Culture of Cruelty, *supra* note 9, at 25.
[20] *Id.*

21. In addition to the preceding issues, CBP officers often use coercion against individuals held in their custody, with migrants frequently reporting that CBP officers will force them to sign papers in English that they do not understand. Like reports of abusive conditions, human rights organizations have long documented how CBP officers will coerce some individuals into signing deportation orders or voluntary returns even though they were seeking asylum.[21]

22. CBP officers also frequently fail to adequately screen individuals for a fear of returning to their home country or fail to refer them for a credible fear interview. The U.S. Commission on International Religious Freedom ("USCIRF"), a nonpartisan government commission, studied the expedited removal process in 2005 and 2016. As USCIRF described in 2016, the 2005 study found systemic failures with CBP processing of asylum seekers for expedited removal:

> Their findings were alarming. In more than half of the interviews observed in the research for the 2005 Study, OFO officers failed to read the required information advising the non-citizen to ask for protection without delay if s/he feared return. At least one of the four required fear questions was asked approximately 95 percent of the time, but in 86.5 percent of the cases where a fear question was not asked, the record inaccurately indicated that it had been asked, and answered. And in 72 percent of the cases, asylum seekers were not allowed to review and correct the form before signing, as required. … Additionally, in nearly 15 percent of the cases observed in the research for the 2005 Study, asylum seekers who expressed a fear of return were removed without referral to a USCIS asylum officer for a credible fear determination. Moreover, in nearly half of those cases, the files indicated that the asylum seeker had not expressed any fear.[22]

23. The USCIRF 2016 study revealed continued problems with CBP processing of asylum seekers for expedited removal. USCIRF reported multiple "troubling findings," such as:

- "non-compliance with required procedures, including: failure to read back the answers to the interviewee and allow him to correct errors before signing, as required;

---

[21] *Id.* at 32 (describing how migrants are "[c]oerc[ed] into signing voluntary repatriation documents under threat of violence, criminal charges, or lengthy detention times"); Human Rights Watch, *In the Freezer*, *supra* note 8 (describing how "immigration officials pressured [several women] to accept return to their home countries" and that "[m]any women also reported that they were told to sign documents in English, a language they did not understand, under circumstances in which they did not believe they could refuse").

[22] U.S. Commission on International Religious Freedom, *Barriers to Protection: The Treatment of Asylum Seekers in Expedited Removal* (2016), at 19.

interviewing individuals together instead of separately and in private; failure to read the required script from the I-867A; and failure to record an answer correctly."[23]

- "concerns about CBP's interviewing and recordkeeping practices";[24]

- "reports of CBP officials denying non-citizens in Expedited Removal the opportunity to claim fear";[25] and

- Reports that "[Border Patrol] agents told [asylum seekers] that 'it's better if you just ask to be deported' or 'we're going to throw you out.'"[26]

24. Given the flaws in CBP processing of asylum seekers for expedited removal, it is not surprising that "USCIS [Asylum Officers] told USCIRF anecdotally that the majority of their credible fear interview referrals come from ICE, not CBP."[27] This is because asylum seekers are able to trigger a credible fear interview while in ICE custody, which is necessary when CBP does not record their fear or denies them the opportunity to express a fear of persecution.

**Asylum Seekers Cannot Meaningfully Participate in the Credible Fear Process While in CBP Custody**

25. As the Immigration Council described in a 2018 complaint to the DHS Office of Inspector General, deplorable conditions in CBP custody create "an inordinately coercive and stressful environment which color[s] the interactions that [migrants have] with all immigration

---

[23] *Id.* at 20.
[24] *Id.* at 21.
[25] *Id.* at 22.
[26] *Id.*
[27] *Id.*

officials throughout their time in custody."[28] These concerns are amplified even further when the credible fear process, including immigration judge review, occurs inside CBP detention centers.

26. Asylum seekers in CBP custody have virtually no access to attorneys and no ability to access evidence in their possession. If they have been held in custody for more than 24 hours, it is highly likely that they will be suffering from sleep deprivation, which could interfere with their ability to recall details of their asylum claims. Many will be suffering from hunger pangs and be unable to focus on the credible fear interview for that reason alone.

27. In addition, an asylum seeker who has been subject to verbal or physical abuse will likely not be able to discuss the worst moments of their lives while a CBP officer—possibly the same officer who subjected them to verbal or physical abuse—stands within earshot or is present in the room. This concern is particularly heightened under PACR and HARP because the credible fear interviews and immigration judge reviews occur over the telephone, making it harder for an asylum seeker to distinguish between the government agency which subjected them to abuse and the government agency which is evaluating their fear of persecution.

28. Given the above concerns, it is my professional opinion that asylum seekers held in CBP custody cannot be provided a meaningful opportunity to participate in the credible fear process.

EXECUTED this ___19th___ day of December, 2019.

AARON REICHLIN-MELNICK

---

[28] Immigration Council & American Immigration Lawyers Association, *The Use of Coercion by U.S. Department of Homeland Security (DHS) Officials Against Parents Who Were Forcibly Separated From Their Children* (2018).