UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LAS AMERICAS IMMIGRANT
ADVOCACY CENTER, *et al.*,

                Plaintiffs,

  v.

CHAD WOLF,
in his official capacity, Acting Secretary of the
U.S. Department of Homeland Security, *et al.*,

              Defendants.

No. 1:19-cv-3640 (KBJ)

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 3

I.     U.S. Immigration Law's Protections for Individuals Fleeing Threatened Harm ............... 3

II.    Congressionally Mandated Access to Counsel in Credible Fear Proceedings ................... 5

III.   Defendants' Prior Policy of Transferring Asylum Seekers to ICE Custody for Credible
Fear Proceedings ............................................................................................................... 6

IV.   Defendants' New Policy of Keeping Asylum Seekers in CBP Custody, Where They Lack
In-Person Access to Counsel or Other Communication Channels .................................. 10

V.    Plaintiffs' Experiences with PACR and HARP ............................................................... 11

       A.    Individual Plaintiffs ................................................................................................. 12

       B.    Organizational Plaintiff Las Americas ................................................................... 13

ARGUMENT ..................................................................................................................... 15

I.     Plaintiffs Are Entitled to Summary Judgment ................................................................. 15

       A.    Defendants' New Policy Is Arbitrary and Capricious in Violation of the APA. 16

           1.    Defendants Provided No Explanation for the Policy Change ........................ 17

           2.    Defendants Failed to Acknowledge the Ramifications of the Shift From
Detaining Asylum Seekers in ICE Custody to Now in CBP Custody ............ 17

           3.    Defendants Failed to Consider the Ramifications of Conducting the Credible
Fear Process in CBP Custody, Creating an Illogical Policy ........................... 21

           4.    Defendants' Decision Is Counter to Record Evidence Regarding the
Incompatibility of Conditions in CBP with the Credible Fear Process .......... 29

           5.    Defendants' Policy Is Fundamentally Inconsistent With the Credible Fear
Process's Role in the Asylum System ............................................................ 30

       B.    Defendants' New Policy Violates Asylum Seekers' Statutory and Regulatory
Rights to Access Counsel and Contact Third Parties .......................................... 33

       C.    PACR and HARP Effectively Deprive Asylum Seekers of a Meaningful Right to
Apply for Asylum, Withholding, and Protection under CAT. ............................ 39

       D.    The New Policy Violates Asylum Seekers' Due Process Right to Seek Asylum
and Other Protection. ........................................................................................... 40

II.    Relief ................................................................................................................................. 41

CONCLUSION ................................................................................................................... 45

# TABLE OF AUTHORTIES

**Cases**

*Abdi v. Duke*,
  280 F. Supp. 3d 373 (W.D.N.Y. 2017) ....................................................................... 34

*Accardi v. Shaughnessy*,
  347 U.S. 260 (1954) ...................................................................................................... 34

*AILA v. Reno*,
  199 F.3d 1352 (D.C. Cir. 2000) ............................................................................ 43, 44

*Am. Fed'n of Gov't Emps. v. FLRA*,
  470 F.3d 375 (D.C. Cir. 2006) .................................................................................... 21

*Am. Wild Horse Pres. Campaign v. Perdue*,
  873 F.3d 914 (D.C. Cir. 2017) .............................................................................. 16, 18

*Arroyo v. D.H.S.*,
  2019 WL 2912848 (C.D. Cal. June 20, 2019) ..................................................... 26, 36

*ASPCA v. Feld Entm't, Inc.*,
  659 F.3d 13 (D.C. Cir. 2011) ...................................................................................... 42

*Baires v. INS*,
  856 F.2d 89 (9th Cir. 1998) ......................................................................................... 35

*Benjamin v. Fraser*,
  264 F.3d 175 (2d Cir. 2001) ........................................................................................ 36

*Biwot v. Gonzales*,
  403 F.3d 1094 (9th Cir. 2005) ............................................................................... 34, 35

*CAIR Coalition v. Trump*,
  1:19-cv-02530 (D.D.C.) ................................................................................................. 5

*Children's Hosp. Ass'n of Tx. v. Azar*,
  933 F.3d 764 (D.C. Cir. 2019) .................................................................................... 18

*Clark v. Martinez*,
  543 U.S. 371 (2005) ...................................................................................................... 41

*Craig v. Boren*,
  429 U.S. 190 (1976) ...................................................................................................... 44

*CS 360 LLC v. U.S. Dep't of Veterans Affairs,*
  101 F. Supp. 3d 29 (D.D.C. 2015) ......................................... 15

*Del. Riverkeeper Network v. FERC,* 7
  53 F.3d 1304 (D.C. Cir. 2014) ............................................ 16

*Dennis v. INS,*
  2002 WL 295100 (D. Conn. Feb. 19, 2002) ............................ 43

*Dep't of Commerce v. N.Y.,*
  139 S. Ct. 2551 (2019) .................................................... 17

*E. Bay Sanctuary Covenant v. Barr,*
  19-16487 (9th Cir.) .......................................................... 5

*eBay Inc. v. MercExchange, L.L.C.,*
  547 U.S. 388 (2006) ........................................................ 15

*Encino Motorcars, LLC v. Navarro,*
  136 S. Ct. 2117 (2016) ............................................... 17, 18

*\*F.C.C. v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) ................................... 16, 17, 18, 28

*Grace v. Whitaker,*
  344 F. Supp.3d 96 (D.D.C. 2018) ........................ 4, 42, 43, 45

*Haitian Refugee Ctr. v. Smith,*
  676 F.2d 1023 (5th Cir. 1982) ............................................ 40

*Halvorsen v. Baird,*
  146 F.3d 680 (9th Cir. 1998) ............................................. 38

*Humane Soc'y of U.S. v. Zinke,*
  865 F.3d 585 (D.C. Cir. 2017) ...................................... 30, 32

*I.N.S. v. Cardoza-Fonseca,*
  480 U.S. 421 (1987) ..................................................... 3, 5

*\*Innovation Law Lab v. Nielson,*
  310 F. Supp. 3d 1150 (D. Or. 2018) ............................... passim

*\*Innovation Law Lab v. Nielson,*
  342 F. Supp. 3d 1067 (D. Or. 2018) ............................... passim

iv

*Jefferson v. Harris*,
   285 F. Supp. 3d 173 (D.D.C. 2018) ................................................................ 34

*L.M.-M. v. Cuccinelli*,
   1:19-cv-02676 (D.D.C.) ..................................................................................... 7

*Leslie v. Att'y Gen. of U.S.*,
   611 F.3d 171 (3d Cir. 2010) ............................................................................ 35

*Louis v. Meissner*,
   530 F. Supp. 924 (S.D. Fla. 1981) .............................................................. 38, 40

*Lyon v. ICE*,
   171 F. Supp. 3d 961 (N.D. Cal. 2016) ............................................................ 27

*Make the Road N.Y. v. McAleenan*,
   405 F. Supp. 3d 1 (D.D.C. 2019) ............................................... 21, 28, 32, 33

*Maldonado-Perez v. I.N.S.*,
   865 F.2d 328 (D.C. Cir. 1989) ........................................................................ 40

*Marincas v. Lewis*,
   92 F.3d 195 (3d Cir. 1996) ............................................................................. 39

*Morton v. Ruiz*,
   415 U.S. 199 (1974) ....................................................................................... 34

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ................................................................................... passim

*Ms. L v. ICE*,
   18-cv-0428 (S.D. Cal. Jun. 26, 2018) ........................................................ 22, 42

*N.Y. St. Citizens' Coal. for Children v. Poole*,
   922 F.3d 69 (2d Cir. 2019) ............................................................................. 43

*Nat'l Lifeline Ass'n v. FCC*,
   921 F.3d 1102 (D.C. Cir. 2019) ...................................................................... 30

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
   145 F.3d 1399 (D.C. Cir. 1998) ...................................................................... 42

*Nken v. Holder*,
   556 U.S. 418 (2009) ....................................................................................... 45

*O.A. v. Trump*,
   404 F. Supp. 3d 109 (D.D.C. 2019) ...................................................................... 42

*\*Orantes-Hernandez v. Meese*,
   685 F. Supp. 1488 (C.D. Cal. 1988) ................................................... 23, 24, 25, 28

*\*Orantes-Hernandez v. Thornburgh*,
   919 F.2d 549 (9th Cir. 1990) ........................................................... 28, 38, 39, 40

*Oshodi v. Holder*,
   729 F.3d 883 (9th Cir. 2013) .............................................................................. 40

*Powers v. Ohio*,
   99 U.S. 400 (1991).............................................................................................. 43

*R.I.L-R v. Johnson*
   80 F. Supp. 3d 164 (D.D.C. 2015) ...................................................................... 45

*Rantesalu v. Cangemi*,
   2004 WL 898584 (D. Minn. Apr. 23, 2004)......................................................... 42

*Rodriguez v. Robbins*,
   715 F.3d 1127 (9th Cir. 2013) ............................................................................ 45

*Rodriguez-Castillo v. Nielsen*,
   2018 WL 6131172 (C.D. Cal. June 21, 2018) ...................................................... 39

*Singh v. Waters*,
   87 F.3d 346 (9th Cir. 1996) ................................................................................ 42

*Singleton v. Wulff*,
   428 U.S. 106 (1976)............................................................................................ 43

*U.S. Dep't of Labor v. Triplett*,
   494 U.S. 715 (1990)............................................................................................ 44

*Ungar v. Sarafite*,
   376 U.S. 575 (1964)............................................................................................ 35

*Walters v. Reno*,
   145 F.3d 1032 (9th Cir. 1998) ............................................................................ 42

*Yiu Fong Cheung v. I.N.S.*,
   418 F.2d 460 (D.C. Cir. 1969) ......................................................................... 6, 43

**Federal Statutes**

5 U.S.C. § 555 ........................................................................................................ 27, 34

5 U.S.C. § 559 .............................................................................................................. 34

5 U.S.C. § 706 ................................................................................................... 16, 33, 42

8 C.F.R § 1003 ................................................................................................................ 5

8 C.F.R. § 208 ..................................................................................................... 4, 5, 6, 27

8 C.F.R. § 235 ............................................................................................................ 6, 33

8 C.F.R. §1003 ................................................................................................................ 5

8 U.S.C. § 1101 ............................................................................................................... 3

8 U.S.C. § 1158 ............................................................................................................... 3

8 U.S.C. § 1225 ...................................................................................................... passim

8 U.S.C. § 1229a ......................................................................................................... 4, 5

8 U.S.C. § 1231 ......................................................................................................... 4, 16

8 U.S.C. § 1252 ............................................................................................................. 16

Foreign Affairs Reform and Restructuring Act ................................................................ 4

Refugee Act of 1980 .................................................................................................. 3, 39

**INTRODUCTION**

Customs and Border Protection ("CBP") facilities are legal black holes. This case challenges the federal government's drastic change in policy to—for the first time—detain asylum seekers in CBP facilities throughout their asylum screening process, effectively incommunicado and in appalling conditions, without any opportunity to meet in person or any meaningful opportunity to communicate by telephone with an attorney or others to obtain the assistance to which they are entitled by law.

Congress has long mandated that asylum seekers subject to expedited removal proceedings have the opportunity to access and consult with counsel and other third parties while they prepare for an initial screening for asylum and other protection from removal and for a review of that screening determination by an immigration judge. These screenings, known as "credible fear interviews," are the critical first step for many asylum seekers because they determine whether individuals and families placed in the fast-track expedited removal process may pursue a claim for asylum or other protection or, instead, will be summarily sent back to the countries they are fleeing.

Defendants' new policy—known as Prompt Asylum Claim Review ("PACR") and the Humanitarian Asylum Review Process ("HARP")—holds asylum seekers in CBP facilities for the duration of the credible fear process. The new policy began as a pilot in Border Patrol's El Paso Sector. Defendants have since expanded it to the Rio Grande Valley, and DHS has announced that it intends to expand it across the entire southern border within two weeks. Prior to the new policy, detained asylum seekers were not held in CBP custody. Instead, they were transferred to detention centers operated by Immigration and Customs Enforcement ("ICE") for the credible fear process.

In ICE detention, asylum seekers were afforded time and a meaningful opportunity to contact counsel or prospective counsel and others to aid them in their credible fear proceedings. ICE standards specifically mandate that facilities afford liberal opportunity to consult both in person and telephonically during the credible fear process.

The new policy does not allow meaningful telephonic consultation or any in-person consultation, and CBP facilities are not set up to facilitate such access. CBP facilities do not afford any in-person access to counsel or any meaningful telephonic access. CBP provides no system for attorneys or family members to locate people in its custody. Its facilities and its policies regarding detainees were designed for extremely short-term detention, not for asylum seekers going through a credible fear process. The new policy all but guarantees that many asylum seekers will be erroneously sent back to countries where they face danger and that, as a result, some of them will be killed or endure horrific violence.

Plaintiffs' Motion for Summary Judgment should be granted. **First,** Defendants' policy change violates the Administrative Procedure Act ("APA"). Defendants have offered no explanation for the new policy. And in adopting the policy, Defendants have failed entirely to acknowledge the significant shift away from keeping individuals in ICE facilities or detention centers, which are subject to specific standards requiring, among other things, robust in-person access to counsel during the credible fear process. Defendants failed to consider numerous critical aspects of the problem, including the incompatibility of CBP facilities with a meaningful credible fear process, asylum seekers' vulnerability, and asylum seekers' need for meaningful access to counsel. Defendants' policy is also illogical as it runs contrary to the evidence in front of the agency, including existing statute and regulation, the agency's prior acknowledgment of legal requirements for access to counsel, and a court order in place to remedy past interference.

**Second,** Defendants' policy violates statutes and regulations that guarantee asylum seekers' access to counsel and others throughout the credible fear process. Asylum seekers are entitled to a meaningful opportunity to access and consult with counsel, including in-person consultation. Defendants' policy violates these guarantees.

**Third**, forcing individuals to undergo the credible fear process in CBP custody deprives them of the meaningful opportunity to apply for asylum or to seek statutory withholding or relief pursuant to the Convention Against Torture ("CAT") and thus is unlawful.

**Fourth,** Defendants' policy violates the due process rights of asylum seekers by detaining them in CBP facilities, in which they lack any meaningful ability to access or consult with counsel or others during the credible fear process.

## BACKGROUND

**I.      U.S. Immigration Law's Protections for Individuals Fleeing Threatened Harm**

The current system of protection for asylum seekers is largely the product of the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, which set up the modern asylum framework.  *See I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 423 (1987). Congress specifically intended to effectuate the "historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands." Refugee Act of 1980, § 101(a). Every noncitizen "who is physically present in the United States or who arrives in the United States" has the right to apply for asylum. 8 U.S.C. § 1158(a)(1). Individuals are eligible for asylum if they experienced past persecution or have a well-founded fear of future persecution and if they are "unable or unwilling to return to, and . . . unable or unwilling to avail himself or herself of the protection of" their country of origin because of that persecution or fear. 8 U.S.C. § 1101(a)(42)(A). U.S. law also protects noncitizens who are not eligible for asylum but

nevertheless face harm if returned to their home countries. 8 U.S.C. § 1231(b)(3)(A) ("statutory withholding of removal"); Foreign Affairs Reform and Restructuring Act ("FARRA"), Pub. L. No. 105-277, Div. G., Title XXII, § 2242, 112 Stat. 2681, codified as note to 8 U.S.C. § 1231; 8 C.F.R. §§ 208.16-208.18, 1208.16-1208.18 ("Convention Against Torture").[1]

Ordinarily, people whom the executive branch seeks to remove from the United States are placed in immigration removal proceedings under 8 U.S.C. § 1229a. In these proceedings, they have a full, adversarial hearing on the merits of their case before an immigration judge. § 1229a(b). In 1996, Congress created a highly truncated removal process called "expedited removal" for certain noncitizens who present at a port of entry or who have recently entered the country without inspection. Those issued expedited removal orders are ordered removed by an immigration officer "without further hearing or review." § 1225(b)(1)(A)(i).

Since the expedited removal process lacks many of the procedural protections of full removal proceedings, Congress sought to ensure that "there should be no danger that an alien with a genuine asylum claim will be returned to persecution." H.R. Rep. No. 104-469, pt. 1, at 158 (1996). It therefore created the credible fear process for asylum seekers in expedited removal, providing for referral to full removal proceedings if an individual makes a low threshold showing that they have a fraction of a chance of establishing, in full removal proceedings, that they are eligible for protection. *See Grace v. Whitaker*, 344 F. Supp. 3d 96, 104 (D.D.C. 2018), *appeal pending*, No. 19-5013 (filed Jan. 30, 2019); 8 U.S.C. § 1225(b)(1)(B). Asylum seekers who meet this low threshold in the credible fear process are referred for full removal proceedings. 8 U.S.C. §1225(b)(1)(B)(ii); 8 C.F.R. § 208.30(f); *id.* § 1003.42(f).

---

[1] Throughout Plaintiffs' briefing, Plaintiffs use the term "asylum seeker" to refer to those who express fear of return to their country of origin or an intent to apply for asylum. *See* 8 U.S.C. § 1225(b)(1)(A)(ii). Such individuals may be eligible for asylum, entitled to withholding of removal, and/or entitled to relief from removal under the United States' implementation of the Convention Against Torture.

Individuals in expedited removal who indicate a fear of return to their country of origin, or an intent to apply for asylum, must be referred for an interview with an asylum officer. 8 U.S.C. § 1225(b)(1)(A)(ii); 8 C.F.R. § 208.30(d). The asylum officer then makes a determination whether the person has a credible fear—that is, whether there is "a significant possibility" that the individual could establish eligibility for: (1) asylum; (2) statutory withholding; and/or (3) relief from removal under CAT. 8 U.S.C. § 1225(b)(1)(B)(v); 8 C.F.R. § 208.30(d), (e)(2), (e)(3).[2] If the asylum officer makes a positive determination, the individual is taken out of expedited removal and placed into full proceedings under § 1229a. 8 C.F.R. § 208.30(f).

If the person receives a negative determination at the interview stage, the individual is entitled to review by an immigration judge. 8 C.F.R. § 208.30(g)(1)-(2). If the immigration judge vacates the negative determination, the individual will then be placed into ordinary removal proceedings under 8 U.S.C. § 1229a, just as they would have been if the asylum officer had made a positive determination. 8 C.F.R. §§ 1003.42(f), 1208.30(g)(2)(iv)(B). Otherwise, the expedited order of removal remains final. 8 C.F.R § 1003.42(f); § 1208.30(g)(2)(iv)(A). There is no appeal of the immigration judge's decision. 8 C.F.R. § 1003.42(f); § 1208.30(g)(2)(iv)(A).

## II.   Congressionally Mandated Access to Counsel in Credible Fear Proceedings

Congress has specifically provided for access to and consultation with counsel and others prior to both the credible fear interview ("CFI") and the immigration judge's review of that interview for those in credible fear proceedings. This right is established at every stage of the

---

[2] Under regulatory provisions currently in effect, individuals who have transited a third country en route to the United States are determined categorically ineligible for asylum and must show a "reasonable fear" of persecution or torture for statutory withholding or CAT relief. 8 C.F.R. § 208.13(c)(4); *id.* § 208.30(e)(5)(iii); *see E. Bay Sanctuary Covenant v. Barr*, 19-16487 (9th Cir. 2019); *CAIR Coalition v. Trump*, 1:19-cv-02530 (D.D.C.). Such a "reasonable fear" showing requires establishing a "reasonable possibility" of eligibility for relief. 8 C.F.R. § 208.31(c). This standard is at least as low as a one-in-ten chance and remains a fraction of a chance of establishing ultimate eligibility for relief, far below the 50.1% chance of persecution or torture necessary to ultimately gain relief from removal under statutory withholding or CAT. *Cardoza-Fonseca*, 480 U.S. at 440; 8 C.F.R. §§ 208.16(b), (c)(2).

credible fear process by the Immigration and Nationality Act and its implementing regulations. 8 U.S.C. § 1225(b)(1)(B)(iv) provides that a noncitizen "may consult with a person or persons of [their] choosing prior to the interview or any review thereof." During the credible fear interview itself, "[a]ny person or persons with whom the alien chooses to consult may be present" and "may be permitted, in the discretion of the asylum officer, to present a statement at the end of the interview." 8 C.F.R. § 208.30(d)(4).

Regulations implement these rights by requiring that in the credible fear process, the inspecting officer must give notice to the person of "[t]he right to consult with other persons prior to the interview and any review thereof" and that the person "shall be given time" to do so. 8 C.F.R. § 235.3(b)(4); *Yiu Fong Cheung v. I.N.S.*, 418 F.2d 460, 463 (D.C. Cir. 1969) (interpreting similarly worded regulation to conclude that "[t]here c[ould] be no doubt of the need for providing full opportunity to retain counsel").

DHS policies and conduct have long recognized the right of access to counsel in the credible fear process. DHS's Form M-444, the notice that it provides to asylum seekers regarding the credible fear process, recognizes that asylum seekers have the right to consult with counsel and others throughout this process. SUF 57. DHS legal orientations provided to asylum seekers have also recognized the right to access counsel. SUF 58.

## III.   Defendants' Prior Policy of Transferring Asylum Seekers to ICE Custody for Credible Fear Proceedings

Before October 2019, and pursuant to written policy, Defendants transferred all individuals detained in CBP custody who expressed a fear of return or intent to apply for asylum to ICE custody prior to the credible fear interview. SUF 1. Once in ICE custody (pursuant to written policy) asylum seekers had time to recuperate and consult with an attorney or others in-

person and telephonically prior to the credible fear interview. SUF 2.[3]

ICE has four sets of standards for its detention facilities: the 2011 Performance Based National Detention Standards ("PBNDS"), which apply to almost all detention centers directly run by ICE; the Family Residential Standards ("FRS"), which apply to family detention centers; the National Detention Standards ("NDS"), which apply to detention facilities run by state or local law enforcement or the United States Marshals Service; and the 2008 Performance Based National Detention Standards ("2008 PBNDS"), which apply to a small number of detention centers. SUF 11. All of these ICE standards have policies specific to expedited removal that mandate "liberal" consultation access, both in-person and by telephone, and generally require in-person attorney access and robust telephone access. SUF 18-32.

*All* ICE detention standards—including those issued even *after* this new policy—require that asylum seekers have access to counsel and other consultation, both in-person and telephonic, throughout the credible fear process. SUF 20. The standards all recognize, in largely identical provisions, that those in the credible fear process are entitled by statute and regulation to consult with others, including attorneys, both prior to the interview and while the asylum officer's decision is under review. SUF 17; PBNDS 5.7.V.K.1; *see also* FRS Visitation V.11.a; NDS 5.5.H.1; 2008 PBNDS Visitation V.K.1. Critically, the standards require that "[b]ecause expedited removal procedures occur within short time frames, each facility shall develop procedures **that liberally allow an opportunity for consultation visitation**, in order to ensure compliance with statutory and regulatory requirements and to prevent delay in the expedited removal process." SUF 18; PBNDS 5.7.K.2 (emphasis added); FRS Visitation V.11.b; NDS

---

[3] Before July 2019, this time period was a minimum of 48 hours; a July 2019 USCIS memorandum shortened this time period to "one full calendar day." SUF 3. *L.M.-M. v. Cuccinelli*, 1:19-cv-02676 (D.D.C.), challenges the policy change decreasing the time to recuperate and prepare.

5.5.H.1; 2008 PBNDS Visitation V.K.2. ICE facilities must ensure that "consultation, whether in person, by telephone or by electronic means, proceed without hindrance." SUF 19; PBNDS 5.7.V.K.2; FRS Visitation V.11.b ("The facility shall facilitate consultation visitation by telephone and **face-to-face**" (emphasis added)); NDS 5.5.II.H.2 (similar); 2008 PBNDS Visitation V.K.2 (similar). Such in-person and telephonic consultation is specifically guaranteed from the time before the interview through review by an immigration judge. SUF 20; PBNDS 5.7.V.K.1; FRS Visitation V.11.a. Detainees must be permitted to consult with whomever they choose, including "attorneys and other legal representatives, prospective legal representatives, legal assistants, members of non-governmental organizations . . . and friends and family." SUF 21; PBNDS 5.7.V.K.3; FRS Visitation V.11.c.

ICE requires that "[d]etainees shall be able to receive visits from legal representatives." SUF 22; PBNDS 5.7.II.1; FRS Visitation II.1. For in-person access, ICE standards require that attorneys (retained and prospective counsel) have physical access, every single day, for at least eight hours a day during the work week and four hours a day on weekends and holidays. SUF 23; PBNDS 5.7.V.J.2; FRS Visitation V.10.b. For those in expedited removal, "consultation visitation shall be allowed during legal visitation hours and . . . general visitation hours," and "[i]f necessary to meet demand, the facility administrator shall increase consultation visiting hours." SUF 24; PBNDS 5.7.V.K.2; FRS Visitation V.11.b. The ICE facility "must provide for the exchange of documents" between a detainee and their attorney. SUF 25; PBNDS 5.7.V.J.10; FRS Visitation V.J.10.j. ICE standards require that detention facilities have the infrastructure to facilitate this in-person attorney access. ICE facilities must have "[p]rivate consultation rooms" available for legal visits. SUF 26-27; PBNDS 5.7.V.J.9; *id.* 5.7.H; FRS Visitation V.J.10.i.

For telephonic access, the PBNDS require that "[d]etainees and their legal counsel shall

be able to communicate effectively" and that "[t]elephone access procedures shall foster legal

access . . . ." SUF 28; PBNDS 5.6.II.4, *id.* 5.6.II.6. They mandate "[f]ull telephone access . . . for

consultation when subject to expedited removal" and specifically provide that "when a detainee

is under an expedited removal order, his/her ability to contact pro bono legal representatives

shall not be restricted." SUF 29; PBNDS 5.6.V.E; FRS Telephone Access V.5; *id.* Visitation

V.11.b. ICE standards require telephone access to allow individuals to contact counsel, obtain

counsel, and have access to legal services providers; they bar "limit[ing] a detainee's attempt to

obtain legal representation." SUF 30; PBNDS 5.6.V.E; FRS Telephone Access V.5. The

standards generally prohibit facilities from "restrict[ing] the number of calls" or "limit[ing] the

duration of such calls by rule or automatic cut-off."  SUF 31; PBNDS 5.6.V.F.1; FRS Telephone

Access V.6.a. ICE standards also require that detention facilities have the infrastructure

necessary to implement these telephone policies. SUF 32; PBNDS 5.6.V.A.1 (mandating at least

one telephone per 25 detainees and terming one per 10 detainees "optimal"); FRS Telephone

Access V.1.a (mandating "at least one telephone for every 16 residents").

ICE provides for access to counsel and legal information in additional ways. ICE

facilities must have law libraries with certain legal materials and must expedite requests for

additional materials for those in credible fear proceedings. SUF 33; PBNDS 6.3.II.2-4, 6.3.V.E,

G; FRS Law Libraries and Legal Material V. ICE detainees must have access to legal groups'

know-your-rights presentations and individual meetings following those presentations. SUF 34;

PBNDS 6.4.II.1, 6.4.V.J; FRS Legal Rights Group Presentations II.1, V.7.

Finally, any person may locate a detainee in ICE custody online by entering the

detainee's name and country of birth or A-Number and country of birth. SUF 35. Moreover, ICE

must provide a means for attorneys to call a facility "to determine whether a particular individual

9

is detained there." SUF 36; PBNDS 5.7.V.J.6; FRS V.10.f.

### IV.   Defendants' New Policy of Keeping Asylum Seekers in CBP Custody, Where They Lack In-Person Access to Counsel or Other Communication Channels

On October 7 or 8, 2019, pursuant to the new policy challenged here, Defendants began detaining asylum seekers in CBP custody for the duration of the credible fear process and not transferring them to ICE custody at all. SUF 4; Administrative Record ("AR") 640-43, 645-47. Defendants named their application of the policy to non-Mexican asylum seekers, PACR. The same policy as applied to Mexican asylum seekers was deemed HARP. SUF 5. Defendants' policy was first limited to Border Patrol's El Paso Sector. SUF 9; AR 640-41. They have since expanded it to at least to the Rio Grande Valley Sector in Texas and the Yuma Sector in Arizona and have announced plans to expand across the southern border. SUF 10.

CBP does not permit counsel or others to access its facilities in person. SUF 41. CBP's Standards on Transport, Escort, Detention, and Search ("CBP standards")—its equivalent to ICE's standards—do not provide for in-person access to attorneys or others. SUF 42; AR 607-35. As policy, CBP categorically does not allow attorneys into its facilities, even when the attorney represents a client in its custody. SUF 41-45. The agency has maintained this policy under PACR and HARP, barring attorneys seeking to represent asylum seekers from meeting with those individuals in person. SUF 43; *see also* AR 641, 645 (providing detainees only telephonic access to the outside world). CBP asserts that its facilities are not designed to allow attorneys to meet in person with detained noncitizens. SUF 44. CBP facilities do not have confidential attorney-client meeting areas, nor do they have any space dedicated to in-person visitation by attorneys or others; and CBP standards do not require any such space. SUF 46; AR 605-35.

Second, CBP does not provide for regular—or, typically, *any*—telephone access for detainees in its custody. SUF 49. CBP standards leave telephone access policies to the discretion

of the "operational office[]," do not guarantee telephone access to attorneys or others, and only

mandate telephone access for unaccompanied minors. SUF 47; AR 620-21.[4] CBP standards also

do not mandate any minimum number of telephones for detainees. SUF 48; AR 620-621. In

practice, CBP does not generally provide detainees with regular telephone access. SUF 49. And

CBP facilities lack the infrastructure for such access: they do not have separate telephones for

detainee access or areas where detainees can make confidential telephone calls. SUF 50.

Third, there is no established mechanism for attorneys or others to verify whether a

detainee is in CBP custody at a particular location—or in CBP custody at all—and the agency

does not regularly provide this information. There is no searchable online database as there is for

those in ICE custody, for example. SUF 51. Finally, as set forth below, CBP conditions are

designed for the extremely short-term detention of individuals (72 hours or less), and not for

detention of asylum-seekers through their credible fear process. SUF 52. They are not designed

for longer periods, and do not account for the basic needs that are required in that situation, let

alone amenities for asylum seekers, children, and families.

## V.      Plaintiffs' Experiences with PACR and HARP

The Individual Plaintiffs are three families who came to the United States seeking

protection from serious threats of death. Plaintiffs A.R.R.D. and A.S.C.R. and their families fled

their home country of El Salvador, and Plaintiff B.G.R. fled her home country of Mexico.

Pursuant to Defendants' new policy, they were all rocketed through the credible fear process in

CBP custody and never spoke with an attorney during the credible fear process. They all

received a negative credible fear determination and were removed to their home countries. SUF

---

[4] CBP's 2008 detention standards specified that those "detained more than 24 hours will be given access to a telephone for the purposes of contacting an attorney or other party . . . and will be given access at a minimum of once per day until they are no longer in Border Patrol custody." AR 420, 428. The agency's most recent standards do not contain these minimum telephone access guarantees.

95. The Individual Plaintiffs and the Organizational Plaintiff, Las Americas, rely collectively on all of the allegations set forth in their declarations attached to this Motion and Motion for Preliminary Injunction. *See* A.R.R.D. Decl., Dkt. No. 21-5 at ¶¶ 1-30; B.G.R. Decl., Dkt. No. 21-6, at ¶¶ 1-25; A.S.C.R. Decl., Dkt. No. 21-7 at ¶¶ 1-14; K.M.V. Decl., Dkt. No. 21-8 at ¶¶ 1-14; Linda Corchado Decl., Dkt. No. 21-9 at ¶¶ 1-36; Second Decl. of A.S.C.R. at ¶¶ 1-34.

### A.  Individual Plaintiffs

The Individual Plaintiffs in this case came to the United States seeking protection from death threats. Plaintiff A.R.R.D. had a gun pointed at her baby's head by a gang member and was told that if she did not pay an extortion fee, the gang would kill her and her baby. SUF 72. Plaintiff A.S.C.R. was told that if she and her husband, Plaintiff K.M.V., did not pay an extortion fee to a gang, A.S.C.R. and her children would wind up in body bags. SUF 73. Gang members threatened Plaintiff B.G.R.'s life and the lives of her children and specifically mentioned the location of her children's school to demonstrate their ability to carry out the threat. SUF 74.

Individual Plaintiffs were all subject to the new policy and detained in CBP custody for the duration of their credible fear proceedings. They were rocketed through the credible fear process with no meaningful opportunity to contact, much less consult with, an attorney before the credible fear interview or immigration judge review. A.R.R.D., A.S.C.R., and K.M.V. were given only a single 30-minute period to make phone calls. SUF 75-76. Plaintiff B.G.R. had only a single window of approximately one hour to make phone calls. SUF 77. After that time, the Individual Plaintiffs had no other opportunity to call out from CBP custody. SUF 78.

CBP provided the Individual Plaintiffs with a list of attorneys. SUF 79. Plaintiffs tried calling some of the names on the list of attorneys provided to them, but no one answered. SUF 79. Plaintiff A.R.R.D. and A.S.C.R. were told beforehand by their cellmates that no one ever

answered from the list provided by the government, and detainees called it the "ghost list." SUF 80. Plaintiff A.R.R.D. was able to reach a family member during her 30-minute window for a call, but that family member was not able to contact her again while she was in CBP custody. SUF 81. No Plaintiff spoke with an attorney at any point during their credible fear processes. SUF 82. Plaintiffs were also confused and unprepared during the process. SUF 82-88.

The Individual Plaintiffs all were subject to inhumane conditions. They did not have beds to sleep on. SUF 90. A.R.R.D. was unable to sleep. SUF 90. She and her child slept on the cold floor for the 14 days they were in custody; to keep her baby warm, she slept with him on her chest.  SUF 90. The lights were kept on at all times. SUF 90. B.G.R. and her children, who were moved between facilities, occasionally had a thin mat to sleep on but often slept on the floor. SUF 90. Multiple Plaintiffs' children got sick in CBP custody and did not receive any medicine. SUF 91-92.

### B.      Organizational Plaintiff Las Americas

Plaintiff Las Americas is a non-profit legal services organization dedicated to serving the legal needs of low-income immigrants, including asylum seekers. SUF 100. Las Americas' mission includes providing immigration counseling and legal services to immigrants detained by the federal government in the El Paso area, including asylum seekers in the credible fear process. SUF 101. The federal government includes Las Americas in its "List of Pro Bono Legal Service Providers" for immigration proceedings in the El Paso area, which it provides to detainees at area ICE facilities. SUF 104. Prior to Defendants' new policy, Las Americas regularly received calls from individuals in ICE detention seeking assistance in the credible fear process, with an average of one to two calls per day. SUF 105. It provided preparation for the credible fear interview for every single person seeking aid. SUF 106-07. Las Americas continues to seek to provide legal

services to asylum seekers detained pursuant to Defendants' new policy and would consult with

and represent all asylum seekers in their credible fear proceedings, as it did before under

Defendants' prior policy. SUF 108-09. The new policy has been in operation in El Paso for more

than three months; yet Las Americas has received only a single direct call from an individual in

credible fear proceedings in CBP custody.  SUF 102.  Las Americas' experience is consistent

with that of other legal service organizations in the El Paso area.  SUF 103-14.

Las Americas has been unable to meet in person with individuals in credible fear

proceedings in CBP custody. SUF 110. Las Americas' legal director requested an in-person

meeting with a prospective client in PACR in order to conduct an intake. SUF 111. A Border

Patrol officer informed her, "[W]e are not equipped to facilitate in-person meetings."  *Id.*

Historically, CBP has denied Las Americas attorneys in-person access to CBP facilities. SUF

110. When Las Americas has identified a client or potential client in credible fear proceedings in

CBP custody and sought to speak to that client, it has had to expend an enormous amount of time

and effort just to establish a single phone call. SUF 112.

The new policy has disrupted Las Americas' operations and forced it to divert resources

to seek to provide legal assistance to asylum seekers in CBP detention.  SUF 115.  In response to

the new policy, for example, Las Americas has altered its intake system in order to account for

and track calls from CBP facilities. SUF 116. Las Americas has begun sending a paralegal to

Ciudad Juárez, Mexico to screen and sign up for representation individuals who could be subject

to PACR or HARP. SUF 117. Between November 20 and December 19, 2019, Las Americas'

Legal Director devoted approximately 60% of her time to attempting to locate and consult with

individuals subject to Defendants' new policy. SUF 118. Between December 20, 2019 and

January 24, 2020, the legal director devoted approximately 75% of her time to creating internal

14

procedures to account for PACR and HARP, training staff on those procedures, communicating

with CBP in an attempt to navigate the obstacles to consulting with individuals in PACR and

HARP, and consulting with individuals in PACR and HARP. SUF 119. To date, despite this

considerable expenditure of resources, Las Americas has succeeded only three times in being

able to speak with a person in CBP custody prior to their CFI. SUF 120. All of the conversations

were by telephone, and all were wholly inadequate to prepare the client for the CFI. SUF 121.

## LEGAL STANDARD

Ordinarily, "[t]he court shall grant summary judgment if the movant shows that there is no

genuine dispute of any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a). A court's role in the APA context is to determine "whether as a matter of law the

agency action is supported by the administrative record and is otherwise consistent with the APA

standard of review." *CS-360, LLC v. U.S. Dep't of Veterans Affairs*, 101 F. Supp. 3d 29, 32 (D.D.C.

2015). A plaintiff seeking a permanent injunction must demonstrate: "(1) that it has suffered an

irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to

compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and

defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by

a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). The

injunctive relief granted by the district court "is an act of equitable discretion." *Id.*

## ARGUMENT

### I.      Plaintiffs Are Entitled to Summary Judgment

Defendants' policy change is unlawful in several ways. It is arbitrary and capricious, in

violation of the APA. It violates clear statutory and regulatory requirements that noncitizens in

credible fear proceedings have access to counsel. Moreover, it violates statutory and regulatory

guarantees that noncitizens have a meaningful opportunity to apply for asylum, withholding of

removal under 8 U.S.C. § 1231, and CAT relief if they meet the relevant criteria. Finally, it deprives asylum seekers of constitutional due process. 8 U.S.C. § 1252(e)(3) provides that this District is available for actions challenging written policies implementing 8 U.S.C. § 1225. Plaintiffs challenge such a written policy and filed their First Amended Complaint on December 5, 2019, less than sixty days after Defendants first began keeping individuals in CBP custody throughout the credible fear process. *See* 8 U.S.C. § 1252(e)(3)(B).

> ### A.      Defendants' New Policy Is Arbitrary and Capricious in Violation of the APA

Defendants' new policy of holding asylum seekers in CBP custody throughout the credible fear process is arbitrary and capricious in violation of the APA. 5 U.S.C. § 706(2)(A). The APA requires agencies to engage in "reasoned decisionmaking." *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014). While a court may not "substitute its judgment for that of the agency," its review must be searching and careful. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The court "consider[s] whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id*. And where an agency action changes a prior policy, the agency must show that that "there are good reasons for the new policy," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), and must "clearly set forth" its "ground for the departure from prior norms" to enable review of "the basis of the agency's action and . . . the consistency of that action with the agency's mandate," *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 928 n.7 (D.C. Cir. 2017) (citation and internal quotation marks omitted).

Here, Defendants did not engage in reasoned decision-making: 1) they did not provide any reason for their shift to keeping asylum seekers in CBP custody throughout the credible fear process; 2) they did not acknowledge or explain their departure from keeping asylum seekers in

ICE facilities—subject to ICE standards—during that process; 3) they failed to consider the flaws with this plan, namely how it would obliterate asylum seekers' ability to adequately prepare for the credible fear process and effectively prohibit them from meaningfully accessing counsel; 4) their decision is illogical in light of the evidence in the AR, and 5) the new policy fundamentally misunderstands the purpose of the credible fear process and makes it meaningless.

### 1.   *Defendants Provided No Explanation for the Policy Change*

Defendants' policy shift is arbitrary and capricious because the agency failed to provide *any* "genuine justification[]" or explanation for it. *Dep't of Commerce v. N.Y.*, 139 S. Ct. 2551, 2575 (2019). "[A]n agency must give adequate reasons for its decisions" by "articulat[ing] a satisfactory explanation for its actions, including a rational connection between the facts found and the choice made." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (citation omitted). The AR provides *no* rationale for the shift to keeping asylum seekers in CBP custody, other than a conclusory assertion that the goal is "the *more effective* processing of aliens amen[]able to the Third Country Transit [Interim Final Rule]." AR 640 (emphasis added). The agency never defines effectiveness in this context, nor does the agency provide any explanation as to *why* keeping asylum seekers in CBP custody for the credible fear process is more effective or to what end. Defendants therefore failed to demonstrate "good reasons" for the new policy. *Fox*, 556 U.S. at 515; *see also State Farm*, 463 U.S. at 43 ("We may not supply a reasoned basis for the agency's action that the agency itself has not given.").

### 2.   *Defendants Failed to Acknowledge the Ramifications of the Shift From Detaining Asylum Seekers in ICE Custody to Now in CBP Custody*

The policy change is also arbitrary and capricious because it is clear from the AR that Defendants failed to even acknowledge the significance of their shift away from detaining individuals in ICE custody, much less provide "good reasons for" doing so. *Fox*, 556 U.S. at 515.

An agency "must provide 'a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy,'" and "'unexplained inconsistency' with an earlier position renders a changed policy arbitrary and capricious." *Children's Hosp. Ass'n of Tx. v. Azar*, 933 F.3d 764, 773 (D.C. Cir. 2019) (quoting *Encino Motorcars*, 136 S. Ct. at 2125). In failing to acknowledge these critical facts underlying the prior policy of ICE detention or even explain the "ground for the departure from" that policy, *Am. Wild Horse Pres. Campaign*, 873 F.3d at 928 n.7, Defendants engaged in arbitrary and capricious decision-making. *Fox*, 556 U.S. at 515 ("[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it is changing position.").

Prior to the new policy, Defendants transferred asylum seekers to ICE custody for the credible fear process. *Supra* BACKGROUND III. The AR contains no evidence that Defendants considered the significance of their departure from this prior policy. Tellingly, while the AR includes the standards for CBP facilities, AR 605-35, it *does not* include the standards for ICE facilities. Had Defendants looked to such agency policies, they would have recognized that the standards for ICE facilities—unlike CBP—are designed specifically to meet the needs of those in the credible fear process. *Supra* BACKGROUND III.

Most notably, there is absolutely *no* indication that Defendants took into account the protections in ICE standards for those in credible fear proceedings, which specifically ensure the meaningful opportunity for access to counsel and others—both in-person and telephonic. *Id.* (detailing these standards). There is no indication that Defendants took into account that, by shifting the credible fear process to CBP facilities, they were depriving asylum seekers of in-person consultation. In fact, there is no evidence in the AR that Defendants even *acknowledged* this monumental change—much less grappled with the ramifications. *See* AR 640-43, 645-47

(policies providing solely for limited telephone access, with no acknowledgment that the change

to CBP facilities means that in-person access will be unavailable). As detailed above, ICE

standards provide for regular in-person access to prospective and retained counsel, and they

further require infrastructure such as "[p]rivate consultation rooms" to facilitate this access.

In contrast, CBP standards do not provide for any in person access. *See* AR 607-35. Nor

does the new policy provide for in-person access to attorneys. *See* AR 640-43, 645-47. Instead,

as described above, as a matter of policy CBP categorically denies in-person access to attorneys.

*Supra* BACKGROUND IV.

In creating their new policy, Defendants additionally failed to acknowledge that ICE

facilities provide for regular telephonic access to counsel—again, both by policy *and by design*.

As described above, ICE standards specifically require telephone access to allow individuals to

contact counsel, obtain counsel, and have access to legal services providers—including for

consultation in the expedited removal process. *Supra* BACKGROUND III. Further, the standards

mandate that detention facilities have the infrastructure necessary to implement these telephone

policies, mandating minimum numbers of telephones for detainees. *Id.*

CBP has no comparable standards. Telephone access is regulated by "the operational

office's policies and procedures," and the standard does not contemplate the "full telephone

access" required by ICE. AR 620-21. Nor does CBP require any minimum number of telephones

for detainees. *See id.* The AR contains no evidence that Defendants considered that transferring

the credible fear process to CBP custody would significantly reduce the telephonic access that

individuals were previously afforded.

Only ICE custody (not CBP custody) is designed for detention beyond 72 hours.

Defendants failed to consider that ICE facilities are required to provide soap, toothpaste,

shampoo, feminine hygiene items, clean bedding, linen, and towels. SUF 37-39. CBP does not even mandate the availability of soap for those who use the restroom, making it discretionary as "operationally feasible." SUF 56. In fact, the AR demonstrates that DHS has previously argued that CBP "hold rooms are not designed for sleeping," SUF 54; AR 444, *because of* this short-term detention. *See* SUF 52; AR 618 (CBP standards providing that "[d]etainees should generally not be held for longer than 72 hours in CBP hold rooms or holding facilities"). DHS has also justified the lack of showers for those in CBP custody on the ground that "detainees are transferred when approaching 72 hours." AR 453. ICE detention, by contrast, may be for a longer period. *See, e.g.*, SUF 40. And it features provisions for basic needs absent from CBP detention. *See, e.g.*, SUF 38-39; PBNDS 4.5.V.E.3 (shower requirements); *id.* 4.5.V.G (detainees "shall be issued" "at a minimum" "one mattress, one blanket and one pillow"); *see also* AR 443 (court order in litigation over conditions of confinement in CBP detention in Arizona stating, "[t]here is no dispute that upon transfer to detention by ICE, [that detention] affords conditions of confinement . . . where detainees have beds, blankets, clean clothing, showers, personal hygiene items like toothbrushes, etc., hot meals, and the opportunity to sleep uninterrupted").

Defendants also failed to acknowledge additional protections for access to counsel and access to legal process that ICE detention provides for, and that CBP does not: law libraries with immigration resources, including country condition reports, and means for attorneys and others to locate individuals in ICE custody. *Compare supra* BACKGROUND III *with* AR 605-35.

As a result, there is no evidence in the record that the agency engaged in "reasoned decisionmaking" in moving the credible fear process to CBP detention: it failed to acknowledge the policies and conditions of ICE detention that benefited asylum seekers and, as a result, it failed to account for the effect of the differences between the two types of facilities on the

credible fear process itself.

### 3.   Defendants Failed to Consider the Ramifications of Conducting the Credible Fear Process in CBP Custody, Creating an Illogical Policy

Defendants' policy change is also arbitrary and capricious because it fails to—and, in

fact, could not—provide any "rational connection between the facts found and the choice made,"

fails to consider the problems created by the lack of access to counsel and other problematic

conditions of CBP detention, and "runs counter to the evidence before the agency" regarding

CBP custody. *State Farm,* 463 U.S. at 43. In reaching the illogical conclusion that CBP custody

is appropriate during the credible fear process, notwithstanding the evidence before DHS of the

extraordinary shortcomings of CBP facilities, Defendants failed to consider the complete

incompatibility of CBP custody with a meaningful credible fear process. *See Am. Fed'n of Gov't*

*Emps. v. FLRA*, 470 F.3d 375, 380 (D.C. Cir. 2006) ("Certainly, if the result reached is illogical

on its own terms, the [agency action] is arbitrary and capricious.") (internal quotations omitted).

### a)   Defendants Failed to Consider that *Timely and Regular* Access to Counsel is Necessary in the Credible Fear Process

Defendants failed to consider that *timely and regular* access to counsel is necessary for

asylum seekers in the credible fear process. Both the credible fear process's compressed time

frame and the particular needs of asylum seekers make such access necessary. DHS's failure to

consider these relevant circumstances means it did not engage in reasoned decision-making. *See*

*Make the Road N.Y. v. McAleenan*, 405 F. Supp. 3d 1, 55 (D.D.C. 2019) ("[A]n agency cannot

possibly conduct reasoned, non-arbitrary decision making concerning policies that might impact

*real* people and not take such *real life circumstances* into account.").

The credible fear interview happens extremely quickly after initiation of the credible fear

process—potentially, as soon as "one full calendar day," AR 405. Review by an immigration

judge follows soon after a negative determination. As a result, asylum seekers' need for prompt and flexible access to counsel is particularly acute. DHS's failure to consider this need is especially glaring because, in its ICE standards, it previously crafted consultation policies for those in expedited removal with special attention to this problem. *Supra* BACKGROUND III.

CBP's standards have no comparable provision, however, and there is no indication that the agency took into account these problems. DHS's HARP "Info Sheet" provides that an asylum seeker will be "given opportunity to contact an attorney" telephonically in a one-hour time block, with "30-minute follow-up as needed," in a single 24-hour period. SUF 6; AR 645. The document does not contemplate in-person access, which as discussed *infra* is particularly necessary for asylum seekers; does not contemplate the opportunity to contact those other than an attorney, such as family members; and does not provide for the necessary, readily available access required under ICE detention standards. *Id*. The PACR procedures state that asylum seekers "will be given one calendar day . . . to access phones, as often as operationally feasible, and contact/consult with any person of their choosing, including an attorney." SUF 7; AR 641. There is no evidence that DHS considered the need for asylum seekers to *quickly* access counsel or the implications of CBP custody for that need. And there is evidence that it *did not* do so by failing to recognize the implications of its policy for in-person access.

In fact, the evidence in the record "runs counter" to the agency's decision, *State Farm*, 463 U.S. at 43—it demonstrates CBP's complete *inability* to quickly locate people in its custody, which is necessary for attorneys and families to be able to contact those in the rapidly moving credible fear process. The record includes the district court's preliminary injunction order in *Ms. L v. ICE*, 18-cv-0428 (S.D. Cal. Jun. 26, 2018), which explains that "[t]he unfortunate reality is that under the present system [of CBP custody] migrant children are not accounted for with the

same efficiency and accuracy as *property*." AR 549-50. It was eminently foreseeable that, without a preestablished system like ICE's online detainee locator, CBP would be unable to timely locate individuals in its custody—but the agency appears not to have acknowledged that fact or taken it into account in adopting its new policy.

Fundamentally, Defendants' new policy fails to recognize the well-established need for early and regular access to counsel—including in-person—in preparation for the credible fear interview. *Innovation Law Lab v. Nielson*, 310 F. Supp. 3d 1150, 1163 (D. Or. 2018) ("Early representation is particularly important in asylum claims, given the complexity of [the law] and the serious harm—including persecution, torture, and death—that may result if asylum is improperly denied."). The initial "intake" is essential for attorneys to effectively assess an asylum seeker's legal case, begin to build a rapport, and start assisting the asylum seeker in preparing for the CFI. SUF 68. Following that intake, adequate preparation for a CFI typically requires attorneys to meet with their clients multiple times and at length. SUF 69. Defendants were, in fact, well aware that courts have found that even "six and one-half hours of attorney visitation" prior to a credible fear interview "is insufficient time to provide attorney access that satisfies the requirements of due process." *Innovation Law Lab*, 310 F. Supp. 3d at 1164.

Beyond preparation for step one (CFI), access to counsel prior to the next step (review by an immigration judge) and the presence of counsel at both of these steps, as required by law is also essential. The presence of counsel often makes the asylum seeker more comfortable and more able to answer the asylum officer's questions. SUF 63; *Orantes-Hernandez v. Meese*, 685 F. Supp. 1488, 1497 (C.D. Cal 1988) (explaining asylum seekers' "reluctan[ce] to communicate their traumatic . . . experiences . . . based in part on a response to the trauma they experienced" or survivor's guilt). This is particularly true in cases that involve domestic or sexual violence—a

large percentage of cases for protection involving Central American asylum seekers. SUF 64. And counsel may more clearly frame a pertinent issue for the asylum officer. SUF 65. In preparing an asylum seeker for review by the immigration judge, counsel may identify flaws in the interview process and facts or claims that did not clearly come across. SUF 65.

Ultimately, Defendants failed to consider that access to counsel has a significant impact on the likelihood of individuals who would meet the threshold being found to have a credible fear. "The denial of access to legal assistance is likely to lead to the denial of asylum and ultimately to the deportation of detainees with meritorious asylum claims." *Innovation Law Lab*, 310 F. Supp. 3d at 1163; Stephens Decl. ¶ 17 ("In my experience, there were interviews in which the attorney's intervention at the end of the interview elicited sufficient additional facts to change the outcome of the interview."); SUF 65. Case studies confirm the value of access to attorneys in the credible fear context. SUF 71. But Defendants did not craft a policy that accounted for this consideration—that access to counsel is essential for accurate credible fear determinations.

### b)      Defendants Failed to Consider the Effects of Asylum Seekers' Vulnerabilities on their Needs for Access to Counsel

Defendants failed to consider the effects of asylum seekers' particular vulnerabilities on their needs regarding access to counsel. There is *absolutely no* evidence in the AR that the agency accounted for this. Asylum seekers at the southern border have frequently fled deeply traumatic experiences. SUF 59. They are often exhausted and sick from traveling long distances to the United States. SUF 60; *see Orantes-Hernandez*, 685 F. Supp. at 1496 ("In many cases, at the time of processing [Salvadoran asylum seekers] have not recovered from the trauma of experiences suffered in El Salvador and during their journeys through Central America."). But— in altering the credible fear process—Defendants did not consider this exhaustion and trauma. Moreover, Defendants failed to consider that asylum seekers in credible fear proceedings are

typically unfamiliar with the American legal system yet must navigate the complexities of immigration law. SUF 62; *Innovation Law Lab*, 310 F. Supp. 3d at 1163; *Orantes-Hernandez*, 685 F. Supp. at 1496, 1507 ("lack of knowledge and understanding" of asylum "adds to the likelihood of erroneous deprivation of rights").

The record contains no acknowledgment that access to an attorney in preparation for a credible fear interview is, in light of these circumstances, critical for asylum seekers to present their claims in a legally meaningful way. Defendants entirely failed to consider that consulting with an attorney helps an asylum seeker focus their credible fear interview on facts that are relevant to their claim for protection. SUF 63-71. They likewise failed to consider that counsel can help clients recount traumatic events or details that they otherwise may not raise—important for asylum seekers—and that building the rapport and trust necessary to do so requires *time* and multiple meetings. SUF 70; *Orantes-Hernandez*, 685 F. Supp. at 1497 (explaining that many asylum seekers would "only relate the totality of what happened to them . . . to someone with whom they have established a relationship of trust and confidence"); Goodwin Decl. ¶ 5 (noting need to meet multiple times because "many of my clients are fleeing traumatic experiences and still undergoing trauma"); SUF 70. Because Defendants did not contemplate the common mental and physical state of asylum seekers, they crafted a policy that failed to take into account the significance of such attorney access, or for a functioning credible fear process.

### c)  Defendants Failed to Consider that In-Person Access Is Necessary

Defendants failed to consider that telephonic access alone cannot provide an adequate substitute for the previous policy of in-person access. There is no evidence in the AR that Defendants considered the importance of *in-person* access to counsel—and, with Defendants' policy choice to detain individuals in CBP custody (where such access is unavailable), there is

evidence that they *did not* consider this factor whatsoever.

Critically, those in credible fear proceedings require *in-person* access to counsel in this preparation. As Defendants are aware, a "healthy counsel relationship in the immigration context requires confidential in-person visitation, especially where an immigrant must be forthcoming about sensitive matters such as past trauma, mental health issues, and criminal history." *Arroyo v. DHS*, 2019 WL 2912848, at *17 (C.D. Cal. June 20, 2019); *Innovation Law Lab*, 310 F. Supp. 3d at 1162 (policies that denied attorneys ability to meet in person with clients to prepare for credible fear interviews violated their right to access counsel). In-person consultation allows attorneys to gain an asylum seeker's trust, observe non-verbal cues, and exchange and review documents. Consequently, telephone access alone, even if regularly provided, is fundamentally inadequate. Meza Decl. ¶ 11 ("Being forced to counsel clients solely over the phone, in my opinion, would put survivors in the extremely difficult situation of being asked to trust a stranger, who they cannot see, with the most intimate and traumatic parts of their life."); Jamil Decl. ¶ 9 ("[A]n asylum seeker often must describe past trauma in depth and often must respond to probing questions necessary for the attorney to understand the asylum seeker's case. The trust that enables them to do so comes from face-to-face interaction—it is very hard to build this critical relationship in a telephonic consultation, especially one of limited duration."); SUF 66. In-person meetings are also critical to ensuring the effective use of an interpreter. Meza Decl. ¶ 12 (explaining the large percentage of asylum seekers who speak only an indigenous language and the difficulty in "speak[ing] via three-way call to a client through an interpreter with no party in the same room"); SUF 67. But Defendants failed to acknowledge, much less justify, the effect of their new policy as a per se bar on in-person access to counsel.

      **d)**      **Defendants Failed to Consider the Importance of *Regular* Telephonic Access to Counsel**

Defendants failed to consider the importance of *regular* telephonic access to counsel.
Defendants failed to acknowledge—and created a policy inconsistent with—the regular, robust
telephonic access to counsel that is required for access to counsel to be meaningful and that
Defendants mandate for ICE detention. Although telephonic access is not by itself sufficient (for
the reasons stated above), it is nonetheless a necessary component of meaningful access to
counsel for asylum seekers. Most asylum seekers enter custody not having retained an attorney.
SUF 61. Asylum seekers therefore need to be able to contact free and low-cost legal services by
phone in order to locate attorneys—as DHS itself has recognized. *Supra* BACKGROUND III
(describing relevant ICE detention standards). And, as Defendants are aware, once an attorney-
client relationship has formed, telephonic consultation provides an additional means for attorneys
to work through their clients' cases—including if the attorney has a minor factual question or if
the asylum seeker has an urgent question or concern. *See Lyon v. ICE*, 171 F. Supp. 3d 961, 981-
83 (N.D. Cal. 2016) (cataloguing effect of phone restrictions on detained noncitizens' efforts to
communicate with attorneys and gather evidence and determining that the "nature and breadth of
. . . systemic phone restrictions" posed "real risk" to "potentially affect the outcome of removal
proceedings"). Yet Defendants failed to consider the importance of regular telephonic access
throughout the credible fear process—as is evident from the documents describing PACR and
HARP, which provide only for *limited* access and *only* prior to the credible fear interview.

### e)   DHS's Decision Failed to Consider Statutory and Regulatory Requirements and Is Illogical In Light of Existing Court Order

In creating this new policy, DHS failed to consider that meaningful access to counsel is
*legally* required for asylum seekers. 8 U.S.C. §§ 1225(b)(1)(B)(iv), 1362; 8 C.F.R. §§
208.30(d)(4), 235.3(b)(4); 5 U.S.C. § 555(b). This omission is glaring in light of DHS's own

recognition that those "subject to expedited removal who have been referred to asylum officers are entitled by statute and regulation to consult with persons of the detainee's choosing, both prior to the interview and while the asylum officer's decision is under review." PBNDS 5.7.V.K.1; SUF 17. DHS has further recognized that this right must be *meaningful*. PBNDS 5.7.V.K.2 (requiring "procedures that liberally allow for consultation visitation, to ensure compliance with statutory and regulatory requirements"); SUF 18.

Additionally, Defendants' new policy can have no explanation consistent with the evidence before the agency. The new policy is in direct violation of the *Orantes-Hernandez* injunction, which is provided in the AR. This injunction, which has been in place for over 30 years and which applies to Salvadoran migrants (including the Salvadoran Individual Plaintiffs), *requires* in-person access to counsel for detainees where a notice of appearance has been entered, "between the hours of 9:00 a.m and 9:30 p.m, excluding such time as is necessary for reasonable security procedures." AR 602; *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 564-67 (9th Cir. 1990) (recognizing that such measures are necessary for access to counsel to be meaningful).

There is no "good reason[]," *Fox Television*, 556 U.S. at 515, for Defendants to change from a policy consistent with federal law and a federal court order to one in violation of them.

\*\*\*

The AR is silent on these obvious and critical issues—on the importance of access to counsel in the credible fear process, on asylum seekers' particular need for access to counsel, and on asylum seekers' need for that access to counsel to encompass both regular telephonic access and—critically—*in-person access*. *Make the Road N.Y.*, 405 F. Supp. 3d at 55 ("[I]n the absence of any such representation, the Court is left to wonder *where* in the administrative record does the agency consider, and attempt to address, these flaws and issues as part of its decision making

process regarding whether or not to adopt this new policy?"). Meaningful access to counsel is both legally required and an essential safeguard to ensure that asylum seekers are not erroneously returned to danger. Because there is no indication that the agency has considered, much less attempted to address, these issues, its determination to place asylum seekers in CBP custody for the duration of the credible fear process cannot be the product of reasoned decision-making.

**4.     *Defendants' Decision Is Counter to Record Evidence Regarding the Incompatibility of Conditions in CBP with the Credible Fear Process***

Beyond access to counsel, Defendants' decision is arbitrary and capricious because it is inconsistent with the ample evidence that the conditions in CBP facilities are incompatible with preparation for a high-stakes—potentially, life-or-death—interview. Federal court decisions regarding conditions in CBP facilities that are part of the AR make clear that those conditions are completely unsuitable for preparation for a credible fear interview. In fact, the decisions are based on the agency's own recognition that CBP facilities are only for short-term detention prior to their transfer to ICE. In both decisions in the AR, federal courts found appalling conditions of confinement in CBP facilities. The district court in *Flores v. Johnson* held that the government had failed to "provide 'safe and sanitary' holding cells for class members" in CBP custody, citing "the voluminous evidence . . . of the egregious conditions of the holding cells." AR 528. It described "widespread and deplorable conditions in the holding cells of the Border Patrol stations." AR 528. In the course of identifying constitutional violations, the district court in *Unknown Parties v. Johnson* observed, "Defendants fail to recognize the basic human need to wash during these detentions." AR 453.

Most notably, these court orders make clear that CBP facilities structurally do not provide conditions for sufficient sleep *by design*. In *Unknown Parties*, the government took the position that CBP facilities "are not designed for sleeping" and stated "that providing sleeping facilities

and turning off lights would require structural changes at the facilities." AR 444. Documents in

the AR highlight a litany of other reasons that CBP custody is fundamentally incompatible with

ensuring an ability to adequately seek to apply for asylum— "personal hygiene and sanitation

problems," including lack of regular access to showers, AR 450, 452; "extreme cold," AR 526;

*see also* AR 444, AR 448; and lack of adequate medical care, AR 456-59, AR 526-27. The

agency would also have been aware of—yet failed to consider—the appalling conditions in CBP

facilities from its administration of those facilities; CBP detention's failure to meet basic needs is

well known and well documented. SUF 53.

Finally, the AR contains evidence of the psychological toll of these conditions of

confinement—engendering stress that would clearly be unconducive to a meaningful credible

fear process. The *Unknown Parties* decision cites federal cases describing the "psychological

harm caused by living in constant illumination." AR 446. The AR indicated that time in CBP

custody is psychologically taxing—incommensurate with the need to focus on a stressful, high-

stakes process that requires the recalling and recounting of trauma in a coherent manner.

But there is no indication in the AR that Defendants considered the effect of their policy

shift on asylum seekers' ability to access the credible fear process. Had they done so, they would

have recognized the fundamental incompatibility of CBP custody with a meaningful credible fear

process. *See Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1113-14 (D.C. Cir. 2019) (holding

action arbitrary and capricious where agency "did not meaningfully address . . . evidence that

undercut its conclusion"); *Humane Soc'y of U.S. v. Zinke*, 865 F.3d 585, 589 (D.C. Cir. 2017).

### 5.   *Defendants' Policy Is Fundamentally Inconsistent With the Credible Fear Process's Role in the Asylum System*

Defendants' policy change is also arbitrary and capricious because it is fundamentally at

odds with the role of the credible fear process in the asylum system. Congress intentionally

designed the credible fear process as a safety net meant to ensure that individuals are not wrongfully sent back to persecution: it is a critical feature of that process, *by design*, that it is overly inclusive. *Supra* BACKGROUND I. But Defendants have effectively eviscerated Congress's system designed to ensure that, notwithstanding expedited removal, no asylum seeker be returned to face potential harm.

The AR indicates that Defendants have not acted in accordance with, and perhaps do not understand, this basic congressional purpose. Official White House communication faults "our weak asylum laws." AR 199-200. This purported "fact sheet[]" describes the credible fear process in a section on "[f]laws in our asylum system," stating, "Asylum seekers at the border only have to meet the low bar for establishing a 'credible fear' of returning under which they must show a 'possibility' to qualify for asylum. . . . As a result, illegal aliens with meritless cases that are released from detention are able to remain in our communities for years, while their cases are litigated in immigration courts." AR 199; *see also* AR 120 (remarks from President Trump: "Somebody walks into our country, reads a statement given by a lawyer, and we have a three-and-a-half-year court case for one person, whereas other people tell them, 'Out. Get out. Just get out.' Other countries—'Get out. We have a border. Get out.' We go through years and years of litigation because of . . . [the] very stupid laws that we have."). This record evidence evinces several basic misapprehensions about the credible fear process: its purpose as an initial screening mechanism, which requires a baseline demonstration of a chance that an individual will receive protection; its overinclusion by design; and the legality of seeking asylum or other protection under both United States and international law. *See supra* BACKGROUND I.

In light of these basic misunderstandings, it is no surprise that the agency's development of its new policy of holding asylum seekers in CBP detention during the credible fear process

entirely failed to consider a key aspect of the problem—the effect of this new policy on asylum seekers' ability to meaningfully access the credible fear process. The AR shows concern only for increasing the number and speed of removals—not for ensuring that protections in Congress's system to keep asylum seekers from being wrongfully returned to danger are instantiated. Defendants may argue that the AR shows a determination that this policy change was necessary in light of the number of migrants at the southern border and the time involved in processing asylum claims and immigration cases. As a threshold matter, such reasoning is not clear from the AR; while it includes statistics on these issues, there is no articulation of the relationship between the facts found and the policy decision. *See State Farm*, 463 U.S. at 43. And however Defendants sought to create a "more effective" policy for credible fear proceedings, AR 640—again, a measurement never defined—they could not do so in a way that contradicts legal requirements and is inconsistent with the mandate to ensure that asylum seekers who meet Congress's low threshold can seek protection. *Humane Soc'y*, 865 F.3d at 603 (describing "a statutory dodge" as "the essence of arbitrary-and-capricious and ill-reasoned agency action").

At best, Defendants "only considered the *upsides* of the [new policy]," not "the considerable *downsides* of adopting a policy that, in many respects, could significantly impact people's everyday lives in many substantial, tangible, and foreseeable ways." *Make the Road N.Y.*, 405 F. Supp. 3d at 55. The new policy entirely "fail[s] to reasonably analyze or consider . . . significant aspects of the" policy shift—its dismantling of meaningful access to counsel in credible fear proceedings and evisceration of meaningful access to the credible fear process. *Humane Soc'y*, 865 F.3d at 589. As explained above, for this credible fear process to function effectively, access to counsel is critical and often determinative—as was already evident when Defendants created this policy, given that *Defendants' own standards and past policies take this*

32

*into account*. And the result will be erroneous credible fear determinations—asylum seekers who are entitled to remain in safety in the United States will instead be wrongly removed to danger. It is all but inevitable that some asylum seekers will be grievously injured or die because they were forced to go through the credible fear process in CBP custody. These "storm clouds" are not difficult to predict, yet DHS has failed to "acknowledge the potential impact" of its new policy. *Make the Road N.Y.*, 405 F. Supp. 3d at 56.

### B.   Defendants' New Policy Violates Asylum Seekers' Statutory and Regulatory Rights to Access Counsel and Contact Third Parties

By mandating that the credible fear process occur while an individual is detained in CBP facilities—where there is no meaningful way to contact counsel or others (in person or by telephone), much less obtain meaningful representation from an attorney or consultation with anyone else—the new policy violates statutory and regulatory safeguards and is "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(A), (C).

As set forth above, asylum seekers, including those who have been and are subject to the new policy, have the right to access counsel and others throughout the credible fear process. Congress has specifically provided for access to and consultation with counsel and others prior to both the credible fear interview and the immigration judge's review of that interview for those in credible fear proceedings. 8 U.S.C. § 1225(b)(1)(B)(iv). This specifically includes the right to have adequate time to consult with a person, including an attorney, prior to the interview and immigration judge review, and to have such person present during the credible fear interview. *See* 8 C.F.R. §§ 208.30(d)(4), 235.3(b)(4); SUF 57.[5] Beyond this right to consult with an attorney

---

[5] Pursuant to the *Accardi* doctrine, Defendants must follow agency rules and policies for those in the credible fear process. "[G]overnment agencies are bound to follow their own rules, even self-imposed procedural rules that limit

*prior to* the credible fear interview and also *prior to* any review by an immigration judge, asylum seekers have a right to be fully represented by counsel at that immigration judge review hearing. *See* 8 U.S.C. § 1362; § 1225(b)(1)(B)(iii)(III); 8 C.F.R. § 208.30(g)(2). This statutory right to counsel continues through an immigration judge's review of a negative credible fear finding. *See* 8 U.S.C. § 1362 ("In any removal proceedings before an immigration judge . . . the person concerned shall have the privilege of being represented (at no expense to the Government) by such counsel, authorized to practice in such proceedings, as he shall choose."). The immigration judge hearing to review a negative credible fear finding is a removal proceeding during which this right applies. *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(III); 8 C.F.R. § 208.30(g)(2). The APA further confirms this right to rely on counsel throughout the credible fear process, providing that "[a] person compelled to appear in person before an agency or representative thereof is entitled to be accompanied, represented, and advised by counsel." 5 U.S.C. § 555(b).[6] Individuals subject to the credible fear process, therefore, are entitled to full representation by counsel.

The right to access counsel in credible fear proceedings is a right of *meaningful* opportunity to *meaningfully* access counsel. In other words, the procedures to access counsel cannot simply be "an empty formality." *Biwot v. Gonzales*, 403 F.3d 1094, 1098-99 (9th Cir. 2005) (in immigration proceedings, requiring procedural protection "[t]o infuse the critical right

---

otherwise discretionary decisions." *Jefferson v. Harris*, 285 F. Supp. 3d 173, 184 (D.D.C. 2018) (citing *Accardi v. Shaughnessy*, 347 U.S. 260, 267-68 (1954)); *Abdi v. Duke*, 280 F. Supp. 3d 373, 389 (W.D.N.Y. 2017) (finding that failure to comply with procedures set forth in an ICE directive for parole of those in expedited removal stated claim for habeas corpus relief). In particular, "[w]here the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures." *Morton v. Ruiz*, 415 U.S. 199, 235 (1974); *accord Jefferson*, 285 F. Supp. 3d at 185 ("interference with regulations that seek to safeguard plaintiff's individual rights implicates the Accardi doctrine and its requirement that agencies abide by their own procedures").

[6] The APA provides for counsel in the event of silence or ambiguity in specific provisions of the expedited removal statutory scheme. *See* 5 U.S.C. § 559 (providing that a "[s]ubsequent statute may not be held to supersede or modify this subchapter . . . except to the extent that it does so expressly"). Section 1225 contains no express exemption from the APA, nor does it contain any provisions that override or are incompatible with the APA's counsel guarantee.

to counsel with meaning"); *accord Matter of C-B-*, 25 I. & N. Dec. 888, 889 (B.I.A. 2012) ("In

order to meaningfully effectuate the statutory and regulatory privilege of legal representation . . .

the Immigration Judge must grant a reasonable and realistic period of time to provide a fair

opportunity for a respondent to seek, speak with, and retain counsel."); *Baires v. INS*, 856 F.2d

89, 91 n.2 (9th Cir. 1988) ("We have characterized the [person's] right to counsel of choice

'fundamental' and have warned immigration authorities not to treat it casually. . . . [T]hat right

must be respected in substance as well as in name.").

　　To this end, the government may not erect obstacles, the cumulative effect of which is to

effectively deny the right. *Orantes-Hernandez*, 919 F.2d at 565 (affirming injunction predicated

on obstacles that had "the cumulative effect of . . . prevent[ing] aliens from contacting counsel

and receiving any legal advice"). In light of the potential life-or-death stakes and the brief time

for the credible fear process, a meaningful opportunity to access counsel and the opportunity for

that counsel to engage in meaningful representation are critical for those in credible fear

proceedings. *Leslie v. Att'y Gen. of U.S.*, 611 F.3d 171, 181 (3d Cir. 2010) ("The right to counsel

is a particularly important safeguard because of the grave consequences of removal."). This right

is violated whenever a government's failure to ensure such meaningful access allows "a 'myopic

insistence upon expeditiousness' to render the right to counsel 'an empty formality.'" *Biwot*, 403

F.3d at 1099 (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)).

　　Here, Defendants violate this authority for multiple reasons. **First**, Defendants provide no

access to consultation at any point after the credible fear interview. AR 640-43, 645-47. Under

the new policy, they also do not provide for the physical presence of an attorney or others at the

credible fear interview and do not provide for any telephone or in-person communication after

the credible fear interview and before the immigration judge review, as required by law. *Id.*

Defendants likewise do not allow for a person to be represented at the immigration judge review hearing itself. *Id.* The new policy is unlawful and must be invalidated.

**Second**, the new policy is unlawful because it does not provide for in-person access to counsel while detained in CBP custody. A meaningful right to access counsel, particularly for asylum seekers in the credible fear process, requires in-person access to counsel. In-person consultation allows attorneys to gain an asylum seeker's trust, observe non-verbal cues, and exchange and review documents. A "healthy counsel relationship in the immigration context requires confidential in-person visitation, especially where an immigrant must be forthcoming about sensitive matters such as past trauma, mental health issues, and criminal history." *Arroyo*, 2019 WL 2912848, at *17; *Innovation Law Lab*, 310 F. Supp. 3d at 1162 (policies that denied attorneys ability to meet in person with clients to prepare for credible fear interviews violated their right to access counsel).  DHS has recognized that for those held in ICE facilities during the credible fear process, they must be provided with *liberal* consultation visitation and nearly uninhibited in-person (or "face-to-face") access to counsel. *Supra* BACKGROUND III. Even mere delays in visits by attorneys to detained clients have been found to improperly "impair[] their ability to establish rapport and trust with clients, to collect information from clients, [and] to counsel clients in a crisis." *Benjamin v. Fraser*, 264 F.3d 175, 180 (2d Cir. 2001).

As guidance documents set forth, Defendants permit only telephone access to attorneys or consultants while asylum seekers are in CBP custody. AR 641-43, 645-47. Moreover, CBP by policy categorically denies in-person access for attorneys or other visitors, and CBP facilities do not provide for the infrastructure to facilitate such access. *Supra* BACKGROUND IV. This lack of in-person access alone violates statute and regulation providing for access to counsel.

**Third**, the new policy's provision of only limited telephonic access is likewise

categorically insufficient. To be clear, the ability to regularly communicate by telephone is an essential component of meaningful access to counsel, both to facilitate the formation of attorney-client relationships and to supplement in-person communications between attorneys and clients. *See Lyon*, 171 F. Supp. 3d at 981-83. Here, the telephonic access that is provided in the new policy would be inadequate even if it were in combination with in-person access to attorneys.

Just any telephone access does not allow for *meaningful* access to prospective or retained counsel: guidance for the new policy provides for only limited telephone access subject to restrictions and only during the first day of detention. AR 641-47. The Individual Plaintiffs each had only one short opportunity to make a phone call, and they were unable to successfully contact any attorney from the provided list of telephone numbers. SUF 75-82. If asylum seekers fail to reach an attorney in that short window, they are effectively without any further recourse as there is no means to return a phone call. Organizations on the list of free and low-cost legal services providers that regularly receive phone calls from asylum seekers in ICE custody have received significantly fewer phone calls from people in PACR and HARP than they would from individuals in ICE detention. SUF 103. Defendants fail at the basic task of promptly locating an asylum seeker in CBP custody and promptly facilitating their telephonic communication with an attorney. Where an attorney has sought to represent an asylum seeker in PACR or HARP, CBP has repeatedly failed to locate that person or allow for any timely communication. SUF 113-14.

Courts have repeatedly held that this type of interference with meaningful access to counsel is unlawful in the immigration context, including for those in credible fear proceedings. For example, the Ninth Circuit upheld injunctive relief for asylum seekers from executive branch practices of denying meaningful access to counsel through "limited attorney visitation hours . . . long delays in bringing detainees to interviews, the inadequacy of systems used to apprise

detainees of the presence of their attorneys, and INS's inadequate efforts to ensure the privacy of both in-person and telephonic attorney-client interviews." *Orantes-Hernandez*, 919 F.2d at 565; AR 598-603. Similarly, denial of in-person attorney access, including for group legal consultation, and denial of in-person access through "nearly-impossible-to-follow instructions" regarding legal visitation had the "cumulative effect" of denying access to counsel for detained asylum seekers with pending credible fear interviews. *Innovation Law Lab*, 310 F. Supp. 3d at 1162-66 (also requiring the installation of additional telephone lines, available for a minimum of 12 hours per day, as part of injunctive relief). Likewise, transfer of asylum seekers to "remote areas, wholly lacking in counsel" and where telephone access was "general[ly] unavailab[le]" denied asylum seekers right to counsel. *Louis v. Meissner*, 530 F. Supp. 924, 927 (S.D. Fla. 1981). These decisions are in line with basic principles of our conception of liberty: "There is a well established tradition against holding prisoners incommunicado in the United States. It would be hard to find an American who thought people could be picked up by a policeman and held incommunicado . . . without the opportunity for anyone on the outside looking for them to confirm where they were." *Halvorsen v. Baird*, 146 F.3d 680, 688-89 (9th Cir. 1998).[7]

In these cases, remedies that courts have ordered have likewise recognized the necessity of providing both in-person access and robust telephone access—including in the credible fear context—to ensure meaningful access to counsel. *See Innovation Law Lab v. Nielsen,* 342 F. Supp. 3d 1067, 1082-83 (D. Or. 2018) (issuing preliminary injunction requiring ability to get representation before credible fear interview; counsel access to two visitation rooms for a minimum of six hours per day, seven days a week; attorney visitation rooms that have outside-

---

[7] *Orantes-Hernandez* and *Louis* predate the credible fear process but involved similarly situated asylum seekers—noncitizens detained following recent arrival to the United States who sought asylum. *Orantes-Hernandez*, 919 F.2d at 559; *Louis*, 530 F. Supp. at 926.

line phones to facilitate interpretation, with unmonitored calls, phone lines within the detention units, and advance written notice to attorneys of scheduled credible fear interviews); *Castillo v. Nielsen*, 2018 WL 6131172 at *3 (C.D. Cal. June 21, 2018) (requiring that detainees held in federal prison pending credible fear interviews be permitted communication "both in person and by phone" with immigration attorneys); *Orantes-Hernandez*, 919 F.2d at 567-68 (upholding injunction requiring, *inter alia*, telephone access, counsel to have reasonable visitation access to detainees, and policies to ensure confidential communications); AR 602 (*Orantes* modified injunction requiring in-person access). By keeping asylum seekers in CBP custody, where they lack any in-person access to attorneys or others and regular telephonic access, the new policy interferes with their statutory and regulatory rights to meaningfully access counsel.

### C.    PACR and HARP Effectively Deprive Asylum Seekers of a Meaningful Right to Apply for Asylum, Withholding, and Protection under CAT.

Defendants' new policy violates the right to a meaningful opportunity to apply for asylum, withholding, and CAT protection. BACKGROUND I. Where Congress sets out statutory rights to apply for protection and procedural protections, it intends that they be *meaningful*—with a fair process. *Marincas v. Lewis*, 92 F.3d 195, 203 (3d Cir. 1996) (interpreting Refugee Act of 1980, concluding that "[w]hen Congress directs an agency to establish a procedure . . . it can be assumed that Congress intends that procedure to be a fair one"). Congress sought to preserve access to fear-based protections from removal.[8] Yet Defendants' new policy directly undermines this goal by depriving asylum seekers of meaningful

---

[8] 142 Cong. Rec. S11491 (Sept. 27, 1996) (Sen. Hatch) ("The standard . . . is intended to be a low screening standard for admission into the usual full asylum process."); 142 Cong. Rec. S10572 (Sept. 16, 1996) (statement of Sen. Simpson) (describing the credible fear process as "ensur[ing] that those who genuinely fear persecution at home can remain here"); 142 Cong. Rec. S4459 (May 1, 1996) (Sen. Leahy) ("We want to make sure that we do not create barriers to true refugees and those deserving asylum, and prevent them from making an application for asylum."); 142 Cong. Rec. H11067 (Sept. 25, 1996) (Sen. Smith) ("It is also important, however, that the process be fair—and particularly that it not result in sending genuine refugees back to persecution. . . . I think it should also be clear that our asylum officers will need to be very careful in applying the 'credible fear' standard.").

access to counsel, ARGUMENT I.B, and subjecting them to inhumane conditions fundamentally

incompatible with a meaningful and fair credible fear determination, *see* ARGUMENT I.A..

Courts have repeatedly enjoined governmental policies that deprive asylum seekers of

meaningful access to seeking protection. *Orantes-Hernandez*, 919 F.2d at 551 (pattern of

coercion by CBP and ICE interfering with counsel and ability to pursue claims violated

"statutory right to apply for asylum"); *Haitian Refugee Ctr. v. Smith*, 676 F.2d 1023, 1027-32,

1039-40 (5th Cir. 1982) (affirming modified injunction where "accelerated processing" program

"made it impossible for Haitians and their attorneys to prepare and file asylum applications in a

timely manner"); *Louis*, 530 F. Supp. at 929 ("government owes these refugees the obligation

fully to comply with all statutory, regulatory and treaty rights which these individuals may

possess"). Defendants' end-run around protections for asylum seekers is flatly unlawful. In fact,

the government has previously conceded that "a pattern of coercion and interference with the . . .

right to apply for asylum" violates the Refugee Act. *Orantes-Hernandez*, 919 F.2d at 557

(characterizing government concession at oral argument). The executive branch cannot, through

its practices, eviscerate the rights to apply for asylum, withholding, and relief under CAT.

> **D.   The New Policy Violates Asylum Seekers' Due Process Right to Seek Asylum and Other Protection.**

All individuals who have been impacted by the new policy have "a Fifth Amendment

procedural due process right to petition the government for political asylum." *Maldonado-Perez

v. I.N.S.*, 865 F.2d 328, 332 (D.C. Cir. 1989); *accord Haitian Refugee Ctr.*, 676 F.2d at 1028

("Congress and the executive have created, *at a minimum*, a constitutionally protected right to

petition our government for political asylum." (emphasis added)). It follows that they likewise

have the right to procedural due process in their applications for withholding and relief from

removal under CAT. *See Oshodi v. Holder*, 729 F.3d 883, 894 (9th Cir. 2013). By detaining

individuals in CBP facilities, where they lack any meaningful ability to access or consult with counsel or others during the credible fear process, the new policy violates due process. The Court, however, need not reach this constitutional question, if it holds that the new policy is unlawful pursuant to statutory and regulatory authority.

The requirements under the consultation and access to counsel provisions of the INA, APA, and agency regulations must be read to at a minimum provide adequate time and a meaningful opportunity to contact counsel or prospective counsel and to meet with an attorney both in-person and telephonically in a confidential manner that is conducive to applying for asylum. While the applicable statutory and regulatory provisions on their own dictate that individuals must have a meaningful opportunity to apply for asylum, to the extent the Court finds there is any lack of clarity, the applicable provisions must be interpreted to require such a meaningful opportunity to meet constitutional due process standards for those in the credible fear process. *See Clark v. Martinez*, 543 U.S. 371, 380-81 (2005) (explaining that if one interpretation of a statute "would raise a multitude of constitutional problems, the other [interpretation] should prevail"). As detailed above, the new policy fundamentally violates these safeguards by forcing individuals to go through the credible fear process in CBP custody.

## II.    Relief

As Plaintiffs have shown, Defendants' new policy is unlawful. All Plaintiffs were directly injured by the policy. Individual Plaintiffs were removed after adverse determinations in credible fear proceedings conducted under the unlawful policy. Like the Individual Plaintiffs, Las Americas has direct standing to seek relief.[9] There is "a direct conflict between" Defendants' action and Las Americas' mission of providing direct legal services to asylum seekers in credible

---

[9] Las Americas asserts both third-party standing for all claims, and direct organizational standing for all claims except for the due process claim.

fear proceedings. *O.A. v. Trump*, 404 F. Supp. 3d 109, 142 (D.D.C. 2019) (quoting *ASPCA v. Feld Entm't, Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011)), *appeal pending*, No. 19-5272 (filed Oct. 11, 2019); SUF 101. Las Americas has "used its resources to counteract that injury." *O.A.*, 404 F. Supp. 3d at 142 (quoting *ASPCA*, 659 F.3d at 25). For example, it has reallocated staff time to the arduous process of tracking down and attempting to connect with individuals in CBP custody and has sent staff to Mexico to identify prospective clients who may be placed in PACR and HARP. SUF 117; *see also* BACKGROUND V.B; *see generally* SUF 100-21. Plaintiffs are therefore entitled to an order vacating the new policy—including all underlying policy documents—in its entirety and declaring it unlawful. The APA mandates that this Court "hold unlawful and set aside" agency action in contravention of 5 U.S.C. § 706(2), and invalidation of a broadly applicable agency action is the "ordinary result" of a ruling that a policy violates the APA. *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998).

Two additional consequences flow from the determination that the challenged policy is unlawful. First, the Individual Plaintiffs are entitled to be returned to the status quo through vacatur of their negative credible fear determinations and expedited removal orders issued under the invalid new policy; their return at no expense and parole into the United States; and a new credible fear process or, alternatively, full removal proceedings. As demonstrated recently in *Grace v. Whitaker*, 1:18-cv-01853, Doc. 105, the Court has equitable authority to order such relief.[10] The Individual Plaintiffs here have suffered and are suffering irreparable harm for which

---

[10] Numerous cases confirm courts' authority to order the return and parole of noncitizens unlawfully removed. *See, e.g.*, *Walters v. Reno*, 145 F.3d 1032, 1050 (9th Cir. 1998) (ordering "parole" of noncitizens unlawfully removed); *Ms. L. v. ICE*, 403 F. Supp. 3d 853, 861 (S.D. Cal. 2019) (holding that return of noncitizens to the United States was available where there had been "a statutory or regulatory violation in the immigration process . . . *e.g.*, a failure to provide a credible fear interview in the face of a credible fear claim"); *Singh v. Waters*, 87 F.3d 346, 350 (9th Cir. 1996) (ordering government to permit return for immigration hearing regarding whether favorable exercise of discretion in his case was warranted, following unlawful removal); *Rantesalu v. Cangemi*, 2004 WL 898584, at *8 (D. Minn. Apr. 23, 2004) (ordering government to "permit petitioner to re-enter the United States" after unlawful

traditional legal remedies are inadequate. *See Grace*, 344 F. Supp. 3d at 145-46 ("[W]ithout an injunction, the plaintiffs previously removed will continue to live in fear every day[.]"). Each of the families is living in fear, knows of people who have been murdered after not complying with the demands of gangs, and is aware that the authorities in their country will not protect them. SUF 96-99. They have to date received no meaningful process from the United States as to their claims that they fear return to their home countries.

Second, and for the same reasons, the Court should vacate all negative credible fear determinations and expedited removal orders for all individuals subject to the new policy before the 60-day deadline passed to challenge the policy. In the alternative, Las Americas seeks this relief through third-party standing for these asylum seekers. Third-party standing has long been recognized where the real parties in interest were "hind[ered]" in protecting their own rights and because Las Americas has a "close relation" to them. *Powers v. Ohio*, 499 U.S. 400, 411 (1991). Because these asylum seekers were unable to effectively access counsel or otherwise communicate with the outside world, they experienced the requisite "genuine obstacle" to filing suit on their own behalf. *Singleton v. Wulff*, 428 U.S. 106, 116 (1976) (plurality opinion). This functional barrier to protecting their own interests is sufficient for third-party standing. *See Powers*, 499 U.S. at 400; *N.Y. St. Citizens' Coal. for Children v. Poole*, 922 F.3d 69, 75 (2d Cir. 2019) (explaining that third-party standing "does not demand anything near impossibility of suit"). Unlike the individuals in *AILA v. Reno*, 199 F.3d 1352 (D.C. Cir. 2000), these asylum seekers were directly obstructed from obtaining representation.

Las Americas also has a close relation to these individuals. Ordinarily, the federal government connects asylum seekers with Las Americas due to the organization's placement on

---

removal); *Ying Fong v. Ashcroft*, 317 F. Supp. 2d 398, 408 (S.D.N.Y. 2004) (ordering noncitizen "be returned to the United States" after unlawful removal); *Dennis v. INS*, 2002 WL 295100, at *4 (D. Conn. Feb. 19, 2002) (same).

the list of pro bono legal service providers; Las Americas then fulfills all requests for credible

fear preparation. SUF 104-06; 8 C.F.R. §§ 1003.61-1003.63. Las Americas *would have* consulted

with and sought to represent these asylum seekers save for Defendants' unlawful interference

through this policy. In fact, some individuals subject to the new policy have sought out Las

Americas for representation (either directly or through family members) but were unable to

obtain meaningful representation due to Defendants' policy. SUF 112-13, 115, 121. Defendants'

wrongful action both directly interfered with further development of a relationship between Las

Americas and those asylum seekers and prevented asylum seekers from asserting their own

rights. Third-party standing is therefore available. *See U.S. Dep't of Labor v. Triplett*, 494 U.S.

715, 720 (1990) (where "enforcement of a restriction against the litigant prevents a third party

from entering into a relationship with the litigant (typically a contractual relationship), to which

relationship the third party has a legal entitlement," third-party standing is available); *Craig v.

Boren*, 429 U.S. 190, 194-95 (1976) (beer vendor had third-party standing to challenge statute on

behalf of prospective male customers ages 18-20).

     *AILA v. Reno*, 199 F.3d 1352 (D.C. Cir. 2000), is not to the contrary. Here, the policy was

issued without public notice, so Las Americas did not "kn[o]w well ahead of time what was

coming"; Las Americas, unlike the *AILA* organizational plaintiffs, "despite [its] best efforts . . .

w[as] unable to identify and provide legal assistance to any other potential plaintiffs"; and

obstacles to filing suit were the result of the unlawful executive branch policy itself, not merely

"Congress or . . . the normal burdens of litigation." *Id.* at 1363-64.  Moreover, the third parties

asserting standing in *AILA* sought to pursue claims "sweep[ing] in nearly all aliens anywhere in

the world who have tried or will try to enter the United States," *id.* at 1359—not claims on behalf

of a discrete group whom they could not assist due to the government's unlawful actions.

The balance of hardships and the public interest decidedly weigh in favor of granting the relief sought by Plaintiffs. Each of the Individual Plaintiffs and other asylum seekers impacted by the policy were unable to access immigration counsel due to Defendants' new policy, experienced traumatizing conditions of confinement while preparing for the credible fear process, and none could be expected to understand the credible fear process under these conditions. SUF 75-95. As a result, the Individual Plaintiffs and other individuals impacted by the new policy were unable to meaningfully seek protection in the United States—and are now in danger. The Individual Plaintiffs require return and renewed process in order to remedy this harm. *Grace*, 344 F. Supp. 3d at 146.

The "[g]overnment 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" *R.I.L-R v. Johnson* 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)). An injunction will further the public interest by remedying the erroneous removal of asylum seekers. *Nken v. Holder*, 556 U.S. 418, 436 (2009) ("[T]here is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm."). "[T]he public has a significant interest in avoiding the erroneous application of a policy that can result in the swift and largely unreviewable deportation, without almost any procedural safeguards." *Make the Road N.Y.*, 405 F. Supp. 3d at 65. Regarding asylum seekers in the credible fear process, whom Congress has specifically sought to protect through procedural safeguards, the public interest is similarly great.

## CONCLUSION

Plaintiffs respectfully request that the Court grant Plaintiffs' Motion.

Dated: January 27, 2020                    Respectfully submitted,

*/s/ Andre Segura*

Scott Michelman (D.C. Bar No. 1006945)      Andre Segura,* TX Bar No. 24107112
Arthur B. Spitzer (D.C. Bar No. 235960)     Thomas Buser-Clancy,* TX Bar No. 24078344
American Civil Liberties Union Foundation    Kathryn Huddleston,* AZ Bar No. 033622
  of the District of Columbia                ACLU Foundation of Texas, Inc.
915 15th Street, NW - 2nd floor              5225 Katy Freeway, Suite 350
Washington, DC 20005-2302                    Houston, TX 77007
Tel. (202) 601-4266                          Tel. (713) 942-8146
aspitzer@acludc.org                          Fax: (713) 942-8966
smichelman@acludc.org                        asegura@aclutx.org
                                             tbuser-clancy@aclutx.org
                                             khuddleston@aclutx.org


Anand Balakrishnan,* CT Bar No. 430329      Bernardo Rafael Cruz,* TX Bar No. 24109774
American Civil Liberties Union               Brantley Shaw Drake,* NY Bar No. 5407440
Foundation, Immigrants' Rights Project       ACLU Foundation of Texas, Inc.
125 Broad Street, 18th Floor                 109 N. Oregon St., Suite 600
New York, NY 10004                           El Paso, TX 79901
Tel. (212) 549-2600                          Tel. (915) 533-8091
abalakrishnan@aclu.org                       Fax: (915) 308-7188
                                             brcruz@aclutx.org
                                             sdrake@aclutx.org


*Admitted pro hac vice*

46