UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LAS AMERICAS IMMIGRANT
ADVOCACY CENTER, *et al.*,

          Plaintiffs,

     v.                                                    No. 1:19-cv-3640 (KBJ)

CHAD WOLF,
in his official capacity, Acting Secretary of the
U.S. Department of Homeland Security, *et al.*,

          Defendants.

## PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS

**Defendants' New Policy:**

1. Prior to October 2019, Defendants had a written policy of transferring asylum seekers detained in Customs and Border Protection ("CBP") custody to ICE custody prior to the credible fear interview. Dkt. No. 21-3, at Ex. 1, p. 5,(CBP Memorandum and Muster, Processing Expedited Removal Cases); *id*., at Ex. 2, p. 23 (U.S. Citizenship and Immigration Services ("USCIS"), Affirmative Asylum, Credible Fear, and Reasonable Fear (March 2019) (noting ICE as location of credible fear interview)).[1]

2. Once in ICE custody—again pursuant to written policy—asylum seekers had a period of time to recuperate and to consult with others prior to the credible fear interview. Administrative Record ("AR") at 405 (Memorandum from Ken Cuccinelli II, Director, USCIS, to the Acting Secretary re Reduction of Credible Fear Consultation Period (July 2, 2019)).

3. Before July 2019, this time period was a minimum of 48 hours; a July 2019 USCIS memorandum shortened this time period to "one full calendar day." *Id.*

4. On October 7 or 8, 2019, Defendants began a new written policy through written directives and guidelines of detaining asylum seekers in CBP custody for the duration of their credible fear proceedings and not transferring them to ICE custody at all. AR 640-

---

[1] The exhibits referenced as Exhibits 1 through 33 are attached to the Declaration of Christopher Clay in support of Plaintiffs' Motion for Preliminary Injunction, Dkt. No. 21-2.

43 (Prompt Asylum Claim Review ("PACR")); AR 645-47 (Humanitarian Asylum
Review Process ("HARP")); Dkt. No. 21-4, at Ex. 25, p. 50 (email from Special
Operations Supervisor-NGO Liaison Strategic Communications at U.S. Border Patrol
stating that PACR began on October 8, 2019); *id.* at Ex. 26, p. 53 (email from Office of
Assistant Chief Counsel for CBP stating that HARP began on October 28, 2019).

5.  Defendants termed their application of this policy only with respect to non-Mexican
    asylum seekers, PACR; they subsequently expanded the policy to Mexican asylum
    seekers, calling this HARP. AR 640, 645.

6.  DHS's HARP "Info Sheet" provides that an asylum seeker will be "given opportunity to
    contact an attorney {initial 1 hour; 30-minute follow up as needed}" telephonically,
    during a "24-hour consultation period." AR 645.

7.  The PACR procedures state that asylum seekers "will be given one calendar day . . . to
    access phones, as often as operationally feasible, and contact/consult with any person of
    their choosing, including an attorney." AR 641.

8.  The new policy does not provide for attorney access at any point *after* the credible fear
    interview. AR 642-43, 645-47.

9.  Defendants first began this policy in Border Patrol's El Paso Sector. AR 640-41.

10. They have since expanded geographically at minimum to Border Patrol's Rio Grande
    Valley Sector in Texas and Yuma Sector in Arizona and have announced plans to expand
    across the southern border. Declaration of Christopher Clay in Support of Motion for
    Summary Judgment ("Clay 2 Decl."), at Ex. 34 (*Program to expedite deportations of
    asylum-seekers at border expands*, CBS News (Dec. 31, 2019) (noting expansion to the
    Rio Grande Valley Sector)); *id.* at Ex. 35 (*Administration touts 100th mile of border wall
    under Trump*, StarTribune (Jan. 10, 2020) (noting expansion to the Yuma Sector)); *id.* at
    Ex. 36 (*Ken Cuccinelli previews expansion of Trump's border policies to deter asylum
    seekers*, CBS News (Jan. 24, 2020) (noting border-wide expansion)).

**ICE Standards**

11. ICE has four sets of standards for its detention facilities: the 2011 Performance Based
    National Detention Standards ("PBNDS"); the Family Residential Standards ("FRS"); the
    2008 Performance Based National Detention Standards ("2008 PBNDS"); and the
    National Detention Standards ("NDS"). Clay 2 Decl., at Exs. 50-52.

12. The PBNDS apply to almost all detention centers directly run by ICE and some others.
    *See* Clay 2 Decl., at Ex. 49 (ICE spreadsheet noting applicable standard for detention
    centers); *id.* at Ex. 51 (ICE Detention Standard Fact Sheet (February 24, 2012) (noting
    implementation of PBNDS across ICE detention facilities, with priority given to facilities
    housing the largest population of ICE detainees)).

13.  The FRS apply to family detention centers. Clay 2 Decl., at Ex. 52 (ICE Family Residential Standards Fact Sheet (March 25, 2011)).

14. The NDS apply to some detention facilities run by state or local law enforcement or the United States Marshals Service. *See* Clay 2 Decl., at Ex. 50 (2019 National Detention Standards for Non-Dedicated Facilities).

15. The operative NDS were issued on December 19, 2019, after the new policy began. *Id.*

16. The 2008 PBNDS apply to a small number of detention centers. Clay 2 Decl., at Ex. 49 (ICE spreadsheet noting applicable standard for detention centers); *id.* at Ex. 51 (ICE Detention Standard Fact Sheet (February 24, 2012) (noting implementation of PBNDS across ICE detention facilities, with priority given to facilities housing the largest population of ICE detainees)).

17. All ICE detention standards recognize that those in the credible fear process are entitled by statute and regulation to consult with others, including attorneys, both prior to the credible fear interview and while the asylum officer's decision is under review. Dkt. No. 21-3, at Ex. 8, p. 104 (PBNDS 5.7.V.K.1); *see also* Clay 2 Decl., at Ex. 42 (FRS Visitation V.11.a); Clay 2 Decl. at Ex. 46 (NDS 5.5.H.1); Clay 2 Decl. at Ex. 48 (2008 PBNDS Visitation V.K.1).

18. ICE standards require that "[b]ecause expedited removal procedures occur within short time frames, each facility shall develop procedures that liberally allow an opportunity for consultation visitation, in order to ensure compliance with statutory and regulatory requirements and to prevent delay in the expedited removal process." Dkt. No. 21-3, at Ex. 8 at p. 104 (PBNDS 5.7.K.2); Clay 2 Decl., at Ex. 42 (FRS Visitation V.11.b); Clay 2 Decl. at Ex. 48 (2008 PBNDS Visitation V.K.2); Clay 2 Decl. at Ex. 46 (NDS 5.5.H.1) ("Because expedited removal procedures occur within short timeframes, each facility shall develop procedures that liberally allow the opportunity for consultation visitation in accordance with this standard.")).

19.  ICE facilities must ensure that "consultation, whether in person, by telephone or by electronic means, proceed without hindrance," Dkt. No. 21-3, at Ex. 8, p. 104 (PBNDS 5.7.V.K.2); Clay 2 Decl., at Ex. 42 (FRS Visitation V.11.b) ("The facility shall facilitate consultation visitation by telephone and face-to-face"); Clay 2 Decl. at Ex. 46 (NDS 5.5.II.H.2 (similar)); Clay 2 Decl. at Ex. 48 (2008 PBNDS Visitation V.K.2 (similar)).

20.  ICE standards specifically guarantee in-person and telephonic consultation visitation throughout the credible fear process, from the time before the credible fear interview through review by an immigration judge. Dkt. No. 21-3, at Ex. 8, p. 104 (PBNDS 5.7.V.K.1); Clay 2 Decl., at Ex. 42 (FRS Visitation V.11.a).

21. ICE standards state that the consultation may occur with "whomever [asylum seekers] choose," including "attorneys and other legal representatives, prospective legal representatives, legal assistants, members of non-governmental organizations . . . and friends and family." Dkt. No. 21-3, at Ex. 8, p. 104 (PBNDS 5.7.V.K.3); Clay 2 Decl., at Ex. 42 (FRS Visitation V.11.c).

22. ICE requires that "[d]etainees shall be able to receive visits from legal representatives." Dkt. No. 21-3, at Ex. 8, p. 95 (PBNDS 5.7.II.1); *see also* Clay 2 Decl., at Ex. 42 (FRS Visitation II.1).

23. For in-person access, ICE standards require that attorneys (both retained and prospective counsel) have physical access to ICE facilities, every single day, for at least eight hours a day during the work week and four hours a day on weekends and holidays. Dkt. No. 21-3, at Ex. 8, p. 101 (PBNDS 5.7.V.J.2); Clay 2 Decl., at Ex. 42 (FRS Visitation V.10.b).

24. For those in expedited removal, "[c]onsultation visitation shall be allowed during legal visitation hours and . . . general visitation hours," and "[i]f necessary to meet demand, the facility administrator shall increase consultation visiting hours." Dkt. No. 21-3, at Ex. 8 p. 104 (PBNDS 5.7.V.K.2); Clay 2 Decl., at Ex. 42 (FRS Visitation V.11.b).

25. The ICE facility "must provide for the exchange of documents" between a detainee and their attorney. . ." Dkt. No. 21-3, at Ex. 8, p. 103 (PBNDS 5.7.V.J.10); Clay 2 Decl., at Ex. 42 (FRS Visitation V.J.10.j).

26. ICE facilities must have "[p]rivate consultation rooms" available for legal visits. Dkt. No. 21-3, at Ex. 8, p. 102 (PBNDS 5.7.V.J.9); *id.* p.98 (5.7.H); Clay 2 Decl., at Ex. 42 (FRS Visitation V.J.10.i).

27. In addition, where "practicable," in ICE facilities alternate visiting rooms should be made available if all private rooms are occupied. Dkt. No. 21-3, at Ex. 8, p. 102 (PBNDS 5.7.V.J.9); *id.* p. 98 (5.7.H); Clay 2 Decl., at Ex. 42 (FRS Visitation V.10.i).

28. For telephonic access, the PBNDS require that "[d]etainees and their legal counsel shall be able to communicate effectively" and that "[t]elephone access procedures shall foster legal access . . . ." Dkt. No. 21-3, at Ex. 8, p. 88 (PBNDS 5.6.II.4); *id.* (5.6.II.6).

29. The PBNDS mandate "[f]ull telephone access . . . for consultation when subject to expedited removal" and specifically provide that "when a detainee is under an expedited removal order, his/her ability to contact pro bono legal representatives shall not be restricted." Dkt. No. 21-3, at Ex. 8, p. 91 (PBNDS 5.6.V.E); *see also* Clay 2 Decl., at Ex. 41 (FRS Telephone Access V.5); Clay 2 Decl., at Ex. 42 (FRS Visitation V.11.b).

30. ICE standards require telephone access to allow individuals to contact counsel, obtain counsel, and have access to legal services providers; they bar "limit[ing] a detainee's attempt to obtain legal representation." Dkt. No. 21-3, at Ex. 8, p. 91 (PBNDS 5.6.V.E); Clay 2 Decl., at Ex. 41 (FRS Telephone Access V.5).

31. The standards generally prohibit facilities from "restrict[ing] the number of calls" or "limit[ing] the duration of such calls by rule or automatic cut-off."  Dkt. No. 21-3, at Ex. 8, p. 92 (PBNDS 5.6.V.F.1); Clay 2 Decl., at Ex. 41 (FRS Telephone Access V.6.a).

32. ICE standards also require that detention facilities have the infrastructure necessary to implement these telephone policies. *See, e.g.*, Dkt. No. 21-3, at Ex. 8, p. 89 (PBNDS 5.6.V.A.1 (mandating at least one telephone per 25 detainees and terming one per 10 detainees "optimal")); Clay 2 Decl., at Ex. 41 (FRS Telephone Access V.1.a (mandating "at least one telephone for every 16 residents")).

33. ICE facilities must have law libraries with certain legal materials and must expedite requests for additional materials for those in credible fear proceedings. Clay 2 Decl., at Ex. 38 (PBNDS 6.3.II.2-4, 6.3.V.E, 6.3.V.G); *see also* Clay 2 Decl., at Ex. 43 (FRS Law Libraries and Legal Material V).

34. ICE detainees must have access to legal groups' know-your-rights presentations and individual meetings following those presentations. Clay 2 Decl., at Ex. 39 (PBNDS 6.4.II.1, 6.4.V.J); Clay 2 Decl., at Ex. 44 (FRS Legal Rights Group Presentations II.1, V.7).

35. Any person may locate a detainee in ICE custody online by entering the detainee's name and country of birth or A-Number and country of birth. Clay 2 Decl., at Ex. 53 (Online Detainee Locator Print Out).

36. ICE must provide a means for attorneys to call a facility "to determine whether a particular individual is detained there." Dkt. No. 21-3, at Ex. 8, p. 102 (PBNDS 5.7.V.J.6); Clay 2 Decl., at Ex. 41 (FRS Telephone Access V.10.f).

37. ICE standards require the provision of basic hygienic materials including soap, toothpaste, shampoo, and feminine hygiene items. AR 443; Clay 2 Decl. at Ex. 37 (PBNDS 4.5.V.D); Clay 2 Decl. at Ex. 40 (FRS Personal Hygiene V.4).

38. ICE standards require that detainees be provided with a mattress, blanket, and pillow, in addition to clean bedding, linens, and towels. AR 443; Clay 2 Decl. at Ex. 37 (PBNDS, 4.5.V.G); Clay 2 Decl. at Ex. 40 (FRS Personal Hygiene V.7); *see also* AR 443 (court order in litigation over conditions of confinement in CBP detention in Arizona stating, "[t]here is no dispute that upon transfer to detention by ICE, [that detention] affords conditions of confinement . . . where detainees have beds, blankets, clean clothing, showers, personal hygiene items like toothbrushes, etc., hot meals, and the opportunity to sleep uninterrupted").

39. ICE requires regular shower access. Clay 2 Decl. at Ex. 37 (PBNDS 4.5.V.E.3).

40. ICE detention is designed for periods longer than 72 hours. *E.g.*, Clay 2 Decl. at Ex. 37 (PBNDS 4.5.V.H.3 (contemplating weekly exchange of linens)).

**CBP Custody**

41. CBP does not permit counsel or members of the public to access its facilities in person. Decl. of Aaron Reichlin-Melnick ("Reichlin-Melnick Decl."), Dkt. No. 21-17 at ¶ 11; Decl. of Scott Shuchart ("Shuchart Decl."), Dkt. No. 21-14 at ¶¶ 6, 9, 12; Decl. of Linda Corchado ("Corchado Decl.") Dkt. No. 21-9 at ¶ 19; Decl. of Danielle Escontrias ("Escontrias Decl."), Dkt. No. 21-12 at ¶ 13; Decl. of Jodi Goodwin ("Goodwin Decl."), Dkt. No. 21-21 at ¶ 9; Decl. of Clara Long ("Long Decl."), Dkt. No. 21-19 at ¶ 15.

42. CBP's National Standards on Transport, Escort, Detention, and Search ("CBP Standards") do not provide for in-person access to attorneys or other visitors. AR 605-35.

43. The agency has maintained this policy under PACR and HARP, barring attorneys from meeting with clients and prospective clients in person. AR 641 (providing only for telephone access); AR 645 (same); Corchado Decl., Dkt. No. 21-9 at ¶ 19; Escontrias Decl., Dkt. No. 21-12 at ¶ 13.

44. CBP asserts that its facilities are not designed to allow attorneys to meet in person with detained noncitizens. Corchado Decl., Dkt. No. 21-9 at ¶ 19; Escontrias Decl., Dkt. No. 21-12 at ¶ 13.

45. Just as CBP facilities are not open to attorneys, they are likewise not open to other members of the public; detainees cannot receive visitors.  Long Decl., Dkt. No. 21-19 at ¶ 15; Reichlin-Melnick Decl., Dkt. No. 17 at ¶ 11; Decl. of David Jackson ("Jackson Decl."), Dkt. No. 21-20 at ¶ 11.

46.  CBP facilities do not have confidential attorney-client meeting areas, nor do they have any space dedicated to in-person visitation by attorneys or other visitors. Shuchart Decl., Dkt. No. 21-14 at ¶¶ 6, 9, 10; Long Decl., Dkt. No. 21-19 at ¶ 14.

47. CBP standards leave telephone access policies to the discretion of the "operational office[]," do not guarantee telephone access to attorneys or others, and only mandate telephone access for unaccompanied minors. AR 620-21.

48. CBP standards also do not mandate any minimum number of telephones for detainees. AR 620-21.

49. In practice, CBP does not generally provide detainees with regular telephone access, nor do CBP facilities have the infrastructure for such access. Shuchart Decl., Dkt. No. 21-14 at ¶ 10; Long Decl., Dkt. No. 21-19 at ¶ 14.

50. CBP facilities do not have separate telephones dedicated to detainee access or areas where detainees can make confidential telephone calls. Shuchart Decl., Dkt. No. 21-14 at ¶ 10; Long Decl., Dkt. No. 21-19 at ¶ 14.

51. CBP lacks a system for locating detainees in its custody: there is no searchable online database as there is for those in ICE custody, for example. Reichlin-Melnick, Dkt. No. 21-17 at ¶ 12; Corchado Decl., Dkt. No. 21-9 at ¶ 11; Declaration of Allegra Love ("Love Decl."), Dkt. No. 21-13 at ¶¶ 5-11.

52. CBP holding facilities are specifically designed for short-term detention purposes, not to exceed 72 hours. AR 618 (CBP Standards, stating, "Detainees should generally not be held for longer than 72 hours in CBP hold rooms or holding facilities. Every effort must be made to hold detainees for the least amount of time required for their processing, transfer, release, or repatriation as appropriate and as operationally feasible."); AR 234 (Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children, 84 FR 44392 (August 23, 2019) ("CBP facilities are, as recognized by Congress in the Trade Facilitation and Trade Enforcement Act of 2015 (TFTEA), intended to be short-term detention facilities, generally designed to hold individuals for 72 hours or less, during the duration of their immigration processing. See 6 U.S.C. 211(m)(3) (defining 'short-term detention' as 'detention in a U.S. Customs and Border Protection processing center for 72 hours or less, before repatriation to a country of nationality or last habitual residence'). CBP makes efforts to transfer all individuals, especially minors, out of CBP facilities as expeditiously as possible, and generally within 72 hours.")); AR 443 (Order, *Unknown Parties, et al., v. Jeh Johnson, et al.,* No. 15-250 (D. Ariz. Nov. 18, 2016) (noting that CBP facilities are designed for short-term purposes)).

53. The failure of CBP to meet basic human needs is well known and well documented. Dkt. No. 21-3 at Ex. 13, p. 226 (El Paso OIG Report); Dkt. No. 21- 4 at Ex. 27, p. 57 (Human Rights Watch, "In the Freezer: Abusive Conditions for Women and Children in US Immigration Holding Cells," February 2018); *id.* at Ex. 28, p. 61 (No More Deaths, Crossing the Line (2008)); *id.* at Ex. 29, p. 175 (No More Deaths, A Culture of Cruelty (2011)); *id.* at Ex. 30, 249 (Americans for Immigrant Justice, The "Hieleras": A Report on Human & Civil Rights Abuses documented by U.S. Customs and Border Protection (2013)); *id.* at Ex. 31, 258 (American Immigration Council, Hieleras (Iceboxes) in the Rio Grande Valley Sector (2015)); *id.* at 32, 290 (DHS Office of Inspector General, Management Alert – DHS Needs to Address Dangerous Overcrowding and Prolonged Detention of Children and Adults in the Rio Grande Valley (July 2, 2019)); *see also* Dkt. No. 21-3 at Ex. 11, p. 124 (Decl. of Eldon Vail ISO Plaintiffs' Mot. For Prelim. Inj., Doe v. Nielsen, 4:15-cv-00250-DCB, Doc. 206-2 (Aug. 17, 2016) (documenting inhumane conditions at CBP facilities)); *id.* at Ex. 12, p. 184 (Decl. of Robert W. Powitz ISO Plaintiffs' Mot. For Prelim. Inj., Doe, 4:15-cv-00250-DCB, Doc. 206-3 (Aug. 17, 2016) (documenting inhumane conditions at CBP facilities)); Reichlin-Melnick Decl., Dkt. No. 21-17 at ¶¶ 10-28; Shuchart Decl., Dkt. No. 21-14 at ¶ 8; Long Decl., Dkt. No. 21-19 at ¶¶ 5-18; Jackson Decl., Dkt. No. 21-20 at ¶¶ 6-12.

54. The hold rooms in CBP facilities are not designed for sleeping. AR 444; Dkt. No. 21-3 at Ex. 9, p. 108 (CBP Policies and Procedures Handbook at 6).

55. CBP standards do not require specific personal hygiene items for all individuals in custody; they require generally that detainees be provided with hygiene items "consistent with short term detention and safety and security needs." AR 621.

56.  CBP standards do not guarantee the provision of soap for those who use the restroom. AR 621 ("Whenever operationally feasible, soap may be made available.").

**Access to Counsel for Asylum Seekers**

57. DHS's Form M-444, the notice that it provides to asylum seekers regarding the credible fear process, recognizes that asylum seekers have the right to consult with counsel and others throughout this process. Dkt. No. 21-3 at Ex. 16, p. 275 (M-444 ("You can have a consultant of your choice with you at your interview or participate by telephone.").

58. DHS legal orientations provided to asylum seekers have recognized the right to access counsel. Dkt. No. 21-3 at Ex. 17, p. 281 (USCIS Credible Fear Guidance).

59. Asylum seekers at the southern border have frequently fled deeply traumatic experiences. Love Decl., Dkt. No. 21-13 at ¶ 13; Decl. of Andrea Meza ("Meza Decl."), Dkt. No. 21-18 at ¶ 10; Goodwin Decl., Dkt. No. 21-21 at ¶ 5; Decl. of Rebecca Jamil ("Jamil Decl."), Dkt. No. 21-15 at ¶ 8.

60. Asylum seekers at the southern border are often exhausted and sick from traveling long distances. Jamil Decl., Dkt. No. 21-15 at ¶ 8.

61. Most asylum seekers enter custody not having retained an attorney. Reichlin-Melnick Decl., Dkt. No. 21- 17 at ¶ 11.

62. Asylum seekers in credible fear proceedings are typically unfamiliar with the American legal system yet must navigate the complexities of immigration law. Jamil Decl., Dkt. No. 21-15 at ¶ 6; Decl. of Douglas Stephens ("Stephens Decl."), Dkt.  No. 21-16 at ¶¶ 11-12.

63. The presence of counsel often makes the asylum seeker more comfortable and better able to answer the asylum officer's questions. Stephens Decl., Dkt.  No. 21-16 at ¶ 14; Jamil Decl., Dkt. No. 21-15 at ¶ 10.

64. This is particularly true in cases that involve domestic or sexual violence—a large percentage of the cases for protection that involve Central American asylum seekers. Jamil Decl., Dkt. No. 21-15 at ¶¶ 3, 9; Stephens Decl., Dkt. No. 21-16 at ¶ 15.

65. Counsel may more clearly frame a pertinent issue for the asylum officer; and, in preparing an asylum seeker for review by the immigration judge, counsel may identify flaws in the credible fear process and facts or claims that did not clearly come across in the interview. Stephens Decl., Dkt. No. 21-16 at ¶¶ 16-17; Jamil Decl., Dkt. No. 21-15 at ¶ 10; Meza Decl., Dkt. No. 21-18 at ¶ 9.

66. In-person consultation allows attorneys to gain an asylum seeker's trust, observe non-verbal cues, and exchange and review documents. Meza Decl., Dkt. No. 21-18 at ¶ 11 ("Being forced to counsel clients solely over the phone, in my opinion, would put survivors in the extremely difficult situation of being asked to trust a stranger, who they cannot see, with the most intimate and traumatic parts of their life."); Jamil Decl., Dkt. No. 21-15 at ¶ 9 ("[A]n asylum seeker often must describe past trauma in depth and often must respond to probing questions necessary for the attorney to understand the asylum seeker's case. The trust that enables them to do so comes from face-to-face interaction—it is very hard to build this critical relationship in a telephonic consultation, especially one of limited duration."); Goodwin Decl., Dkt. No. 21-21 at ¶ 6; Escontrias Decl., Dkt. No. 21-12 at ¶ 11; Love Decl., Dkt. No. 21-13 at ¶ 13.

67. In-person meetings are also critical to ensuring the effective use of an interpreter. Meza Decl., Dkt. No. 21-18 at ¶ 12 (explaining the large percentage of asylum seekers who speak only an indigenous language and the difficulty in "speak[ing] via three-way call to a client through an interpreter with no party in the same room"); *see also* Declaration of Linda Corchado in support of MSJ ("Corchado 2 Decl.") at ¶ 10.

68. The initial "intake" is essential for an attorney to effectively assess an asylum seeker's legal case, begin to build a rapport, and start assisting the asylum seeker in preparing for the credible fear interview. Meza Decl., Dkt. No. 21-18 at ¶ 7; Jamil Decl., Dkt. No. 21-15 at ¶¶ 5-7.

69. Following that intake, adequate preparation for a CFI typically requires attorneys to meet with their clients multiple times and at length. Goodwin Decl., Dkt. No. 21-21 at ¶ 7; Meza Decl., Dkt. No. 21-18 at ¶¶ 9-10.

70. Building the rapport and trust necessary for asylum seekers to recount traumatic events or details that they otherwise may not raise to attorneys requires time and often multiple meetings. Meza Decl., Dkt. No. 21-18 at ¶¶ 9-10; Goodwin Decl., Dkt. No. 21-21 at ¶¶ 5-7 (noting need to meet multiple times because "many of my clients are fleeing traumatic experiences and still undergoing trauma"); Love Decl., Dkt. No. 21-13 at ¶ 13; Escontrias Decl., Dkt. No. 21-12 at ¶ 11; Stephens Decl., Dkt. No. 21-16 at ¶¶ 12-14.

71. Case studies confirm the value of access to attorneys in the credible fear context. Dkt. No. 21-3, at Ex. 15, p. 250 (Innovation Law Lab, The Artesia Report); Kari E. Hong and Stephen Manning, *Getting it Righted: Access to Counsel in Rapid Removals*, 101 Marquette L. Rev. 673, 699-700 (2018).

**Individual Plaintiffs' Experiences with PACR and HARP**

72. Plaintiff A.R.R.D. had a gun pointed at her baby's (minor Plaintiff L.E.R.D.'s) head by a gang member and was told that if she did not pay an extortion fee, the gang would kill her and her baby. Decl. of A.R.R.D. ("A.R.R.D. Decl."), Dkt. No. 21-5 at ¶ 7.

73. Plaintiff A.S.C.R. was told that if she and her husband, Plaintiff K.M.V., did not pay an extortion fee to a gang, A.S.C.R. and her children would wind up in body bags. Decl. of A.S.C.R. ("A.S.C.R. Decl."), Dkt. No. 21- 7 at ¶ 3.

74. Gang members threatened Plaintiff B.G.R.'s life and the lives of her children and specifically mentioned the location of her children's school to demonstrate their ability to carry out the threat. Decl. of B.G.R. ("B.G.R. Decl."), Dkt. No. 21-6 at ¶¶ 6-7.

75. Plaintiff A.R.R.D. was given only a single 30-minute period to make phone calls. A.R.R.D. Decl., Dkt. No. 21-5 at ¶ 13.

76. Plaintiffs A.S.C.R. and K.M.V. were given only a single 30-minute period to make phone calls. Second Declaration of A.S.C.R. ("A.S.C.R. 2 Decl.") at ¶¶ 13-15.

77. Plaintiff B.G.R. had only a single window of approximately one hour to make phone calls. B.G.R. Decl., Dkt. No. 21-6 at ¶ 15.

78. After that time, the Plaintiffs had no other opportunity to call out from CBP custody. A.R.R.D. Decl., Dkt. No. 21-5 at ¶ 21; B.G.R. Decl., Dkt. No. 21-6 at ¶ 20; A.S.C.R 2 Decl. at ¶ 27.

79. CBP provided the Individual Plaintiffs with a list of attorneys. Plaintiffs all tried calling attorneys on the list provided to them, but no one answered. A.R.R.D. Decl., Dkt. No. 21-5 at ¶ 13; B.G.R. Decl., Dkt. No. 21-6 at ¶ 15; A.S.C.R. 2 Decl. ¶ 15.

80. Plaintiffs A.R.R.D. and A.S.C.R. were told beforehand by their cellmates that no one ever answered from the list provided by the government and for that reason, the list was called the "ghost list." A.R.R.D. Decl., Dkt. No. 21-5 at ¶ 13; A.S.C.R. 2 Decl. ¶ 14.

81. Plaintiff A.R.R.D. was able to reach a family member during her 30-minute window for a phone call, but that family member was not able to reach her again while she was in CBP custody. A.R.R.D. Decl., Dkt. No. 21-5 at ¶ 25 (noting that family called consulate because they could not locate her).

82. None of the Individual Plaintiffs spoke with an attorney at any point during the credible fear process. A.R.R.D. Decl., Dkt. No. 21-5 at ¶ 13; K.M.V. Decl., Dkt. No. 21-8 at ¶ 10; A.S.C.R. Decl., Dkt. No. 21-7 at ¶ 10; B.G.R. Decl., Dkt. No. 21-6 at ¶ 15; *see also* Decl. of M.D.C.G., Dkt. No. 21-10 at ¶¶ 6-7 (asylum seeker subject to HARP describing inability to contact counsel).

83. The Individual Plaintiffs were confused during the asylum interview itself and during the immigration judge's review. A.R.R.D. Decl., Dkt. No. 21-5 at ¶¶ 16-20; B.G.R. Decl., Dkt. No. 21-6 at ¶¶ 16-17; A.S.C.R 2 Decl. ¶ 19; *see also* M.D.C.G. Decl., Dkt. No. 21-10 at ¶¶ 8-9 (noting confusion during CFI).

84. Plaintiff A.R.R.D. was immediately confused in her credible fear interview. A.R.R.D. Decl., Dkt. No. 21-5 at ¶ 16.

85. A.R.R.D. thought that her credible fear interview would be in person. *Id.*

86. A.R.R.D. did not feel prepared to immediately provide detailed answers to questions about her traumatic experiences; she had not recovered and felt traumatized by CBP officers. *Id.*

87. A.R.R.D. also had difficulty concentrating during her credible fear interview as she was holding her baby and the telephone at the same time, she had nowhere to place her baby, and the baby was crying during the interview. A.R.R.D. Decl., Dkt. No. 21-5 at ¶ 17.

88. Plaintiff A.S.C.R. was confused in her interview and did not feel prepared. A.S.C.R. 2 Decl. ¶ 19.

89. A.S.C.R.'s baby would not stop crying during the interview, and A.S.C.R. could not feed her baby or change her dirty diaper during the five-hour interview. A.S.C.R. 2 Decl. ¶ 18.

90. While they were in CBP facilities, the Individual Plaintiffs slept on the cold floor or on a thin mat on the floor with the lights kept on twenty-four hours a day, seven days a week; A.R.R.D. could not sleep, and, to warm her baby up, A.R.R.D. placed him on her chest. A.R.R.D. Decl., Dkt. No. 21-5 at ¶ 21; B.G.R. Decl., Dkt. No. 21-6 at ¶¶ 13-14; A.S.C.R. 2 Decl. ¶ 11.

91. Plaintiffs each had small children who fell sick while detained by CBP. B.G.R. Decl. ¶ 18; A.R.R.D. Decl. ¶¶ 21-22; A.S.C.R. 2 Decl. ¶ 24.

92. A.R.R.D. and B.G.R. were refused medication while detained by CBP. B.G.R. Decl., Dkt. No. 21-6 at ¶ 18; A.R.R.D. Decl., Dkt. No. 21-5 at ¶¶ 21-22; *see also* Corchado Decl.., Dkt. No. 21-9 at ¶ 33 (noting that clients in PACR or HARP report inadequate access to medical care).

93. CBP officers laughed at B.G.R. and yelled at A.R.R.D. B.G.R. Decl., Dkt. No. 21-6 at ¶ 11; A.R.R.D. Decl., Dkt. No. 21-5 at ¶ 22 .

94. A.R.R.D. and her children lacked adequate access to water. A.R.R.D. Decl., Dkt. No. 21-5 at ¶ 22.

95. All of the Plaintiffs received a negative credible fear determination and were removed to their home countries. A.R.R.D. Decl., Dkt. No. 21-5 at ¶¶ 19-20, 26; B.G.R. Decl., Dkt. No. 21-6 at ¶¶ 19, 22-23; A.S.C.R. Decl., Dkt. No. 21- 7 at ¶ 10; K.M.V. Decl., Dkt. No. 21-8 at ¶ 10.

96. All of the Plaintiffs now fear for their lives, many are living in hiding, and they are all aware of others who have been murdered after not complying with the demands of gangs. A.R.R.D. Decl., Dkt. No. 21-5 at ¶¶ 28-30; B.G.R. Decl., Dkt. No. 21-6 at ¶¶ 22-25; A.S.C.R. Decl., Dkt. No. 21-7 at ¶¶ 11-13; K.M.V. Decl., Dkt. No. 21-8 at ¶¶ 11-13.

97. Many migrants from Central America and Mexico who were removed from the United States have suffered brutal harm, including death, following return to their home countries. Dkt. No. 21-3 at Ex. 20, p. 304 (Elizabeth Kennedy, American Immigration Council, *No Childhood Here: Why Central American Children Are Fleeing Their Homes*, at 5 (July 1, 2014); *see also id.* at Ex. 21, p. 327 (Kevin Sieff, *When Death Awaits Deported Asylum Seekers*, Wash. Post (Dec. 26, 2018) (accounts of two asylum seekers murdered following removal to El Salvador)).

98. One study documented that up to 83 individuals removed to El Salvador, Honduras, and Guatemala between 2014 and 2015 had been killed. Dkt. No. 21-3, at Ex. 19, p. 299 (Sibylla Brodzinsky & Ed Pilkington, *US Government Deporting Central American Migrants to Their Deaths*, The Guardian (Oct. 12, 2015) (discussing academic study)).

99. Numerous murders of individuals removed to Mexico have also been documented. Dkt. No. 21-4 at Ex. 22, p. 1  (Sarah Stillman, *When Deportation is a Death Sentence*, New Yorker (Jan. 8, 2018) (chronicling the murders of three people removed from the United States to Mexico and describing the identification of harm to more than sixty people removed from the United States, including murder, kidnapping, and sexual assault); *id.* at Ex. 23, p. 29 (Laura Benshoff, *Deported from Pennsylvania, Dead in Mexico: "What (He) Feared Is Exactly What Happened*,*"* WESA (Aug. 30, 2019)); *see also* Dkt. No. 21-4, at Ex. 24, p. 34 (*Mexico Travel Advisory* (December 17, 2019)).

**Organizational Plaintiff Las Americas**

100. Las Americas is a non-profit legal services organization dedicated to serving the legal needs of low-income immigrants, including asylum seekers. Corchado Decl., Dkt. No. 21-9 at ¶ 4.

101. Las Americas' mission includes providing immigration counseling and legal services to immigrants detained by the federal government in the El Paso area, including by representing individuals in the credible fear process. *Id.* at ¶ 5.

102. Las Americas has received only one direct call from an individual detained in CBP custody for the credible fear process. Corchado 2 Decl. at ¶ 6.

103. The lack of phone calls that Las Americas has received from asylum seekers in PACR or HARP is consistent with the experiences of other legal service organizations in the El Paso area. Sheff Decl., Dkt. No. 21-11 at ¶ 7 (Texas Rio Grande Legal Aid, another legal service organization on the list, had not received any calls as of December 20, 2019); Supplemental Declaration of Rebecca Sheff ¶¶ 3-5 (as of January 26, 2020, TRLA still had not received any calls from individuals in PACR or HARP—either in El Paso or in the Rio Grande Valley); Escontrias Decl., Dkt. No. 21-12 at ¶ 7 (Catholic Charities, another legal service organization on the list of pro bono legal service providers for the El Paso area, had received only one call from an individual in PACR or HARP); Supplemental Declaration of Danielle Escontrias, ¶¶ 3-4 (as of January 24, 2020, Catholic Charities had not received any calls from individuals in PACR or HARP).

104. The federal government includes Las Americas in its "List of Pro Bono Legal Service Providers" for immigration proceedings in the El Paso area, which it provides to detainees at area ICE facilities. Corchado Decl., Dkt. No. 21-9 at ¶ 15; Corchado 2 Decl. at ¶ 6, Ex. A.

105. Prior to the new policy, Las Americas regularly received calls from individuals in ICE detention seeking assistance in the credible fear process, with an average of one to two calls per day. Corchado 2 Decl. ¶ 6.

106. Las Americas staffed every single request from individuals in ICE detention for CFI preparation, either directly or through volunteers, prior to the new policy. *Id.*

107. Every time Las Americas has been contacted regarding an individual in PACR or HARP, they have attempted to represent that individual. Corchado 2 Decl. ¶ 7.

108. It is Las Americas' goal to consult with and represent all individuals detained pursuant to PACR and HARP. *Id.*

109. If Las Americas were able to establish meaningful communications with individuals detained pursuant to PACR and HARP, it would consult with and seek to represent them. *Id.*

110. Las Americas has been unable to meet in person with individuals in PACR and HARP, which is consistent with its historic practice of denying Las Americas physical access to clients in its custody. Corchado Decl., Dkt. No. 21-9 at ¶¶ 17-19.

111. A Border Patrol Officer stated that the reason for denying Las Americas in-person access to persons in PACR/HARP was that Border Patrol is "not equipped to facilitate in-person meetings." *Id.*

112. When Las Americas has identified a client or potential client in PACR or HARP and sought to speak to that client, it has had to expend an enormous amount of time and effort just to establish a single phone call. *Id.* at ¶¶ 9-11, 18-21, 28-30, 32.

113. On multiple occasions, Las Americas has sought to represent an asylum seeker in PACR or HARP in preparation for their CFI interview, only to have the phone call scheduled for after the client has gone through the CFI. *Id.* at ¶¶ 29, 32; Corchado 2 Decl. ¶ 9.

114. This experience is not unique to Las Americas: another legal services organization has similarly attempted to coordinate with CBP to schedule a time to prepare their client for a CFI, only to have the phone call scheduled for *after* their client had gone through the CFI. Escontrias Decl., Dkt. No. 21-12 at ¶¶ 11-15.

115. The new policy has disrupted Las Americas' operations and forced Las Americas to divert resources to seek to provide legal assistance to asylum seekers in CBP detention, and even where individuals have reached out (either directly or through family members) to Las Americas for representation, the policy has prevented Las Americas from providing meaningful representation. Corchado Decl., Dkt. No. 21-9 at ¶¶ 7-36; Corchado 2 Decl. at ¶¶ 2-13.

116. In response to the new policy, Las Americas has altered its intake system in order to be able to account for and track calls that may come in from a CBP facility. Corchado Decl., Dkt. No. 21-9 at ¶¶ 16, 22.

117. Las Americas has begun sending a paralegal to Ciudad Juárez, Mexico, to screen and sign up for representation individuals who could be subject to PACR or HARP.  *Id.* at ¶ 24.

118. Between November 20 and December 19, 2019, Las Americas' legal director devoted approximately 60% of her time to attempting to locate and consult with individuals subject to the new policy.  *Id.* at ¶ 23.

119. Between December 20, 2019 and January 24, 2020, Las Americas' legal director devoted approximately 75% of her time to creating internal procedures to account for PACR and HARP, training staff on those procedures, communicating with CBP in an attempt to navigate the obstacles to consulting with and representing individuals in PACR and HARP, and consulting with individuals in PACR and HARP. Corchado 2 Decl. at ¶ 4.

120. To date, despite considerable expenditure of resources, Las Americas has succeeded only three times in speaking with a client before a CFI.  *Id.* at ¶ 12.

121. All three conversations were over the phone and were inadequate to prepare the client for the CFI.  *Id.* at ¶ 13.

Dated: January 27, 2020                    Respectfully submitted,


                                           /s/ Andre Segura_____
Scott Michelman (D.C. Bar No. 1006945)     Andre Segura,* TX Bar No. 24107112
Arthur B. Spitzer (D.C. Bar No. 235960)    Thomas Buser-Clancy,* TX Bar No.
American Civil Liberties Union Foundation  24078344
  of the District of Columbia              Kathryn Huddleston,* AZ Bar No. 033622
915 15th Street, NW - 2nd floor            ACLU Foundation of Texas, Inc.
Washington, DC 20005-2302                  5225 Katy Freeway, Suite 350
Tel. (202) 601-4266                        Houston, TX 77007
aspitzer@acludc.org                        Tel. (713) 942-8146
smichelman@acludc.org                      Fax: (713) 942-8966
                                           asegura@aclutx.org
                                           tbuser-clancy@aclutx.org
Anand Balakrishnan,* CT Bar No. 430329     khuddleston@aclutx.org
American Civil Liberties Union
Foundation, Immigrants' Rights Project     Bernardo Rafael Cruz,* TX Bar No.
125 Broad Street, 18th Floor               24109774
New York, NY 10004                         Brantley Shaw Drake,* NY Bar No. 5407440
Tel. (212) 549-2600                        ACLU Foundation of Texas, Inc.
abalakrishnan@aclu.org                     109 N. Oregon St., Suite 600
                                           El Paso, TX 79901
                                           Tel. (915) 533-8091
                                           Fax: (915) 308-7188
                                           brcruz@aclutx.org
*Admitted pro hac vice                     sdrake@aclutx.org