# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| Las Americas Immigrant Advocacy Center, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 1:19-cv-03640-KBJ |
| | ) | |
| Chad F. Wolf, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## CERTIFIED ADMINISTRATIVE RECORD

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| Las Americas Immigrant Advocacy Center, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No. 1:19-cv-3640-KBJ |
| Chad F. Wolf, *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

**CERTIFICATION OF ADMINISTRATIVE RECORD**

My name is Juliana Blackwell. I am employed with the U.S. Department of Homeland Security, as the Acting Executive Secretary. I am responsible for the oversight and management of the Office of the Executive Secretary, which oversees the management of written communication intended for, and originated by, the Secretary and Deputy Secretary of Homeland Security and maintains official Department records. I have held this position since September 2019. Prior to this position, I was the Deputy Executive Secretary and an Associate Executive Secretary. I have been employed in the Office of the Executive Secretary since 2007, which predates and includes when the Department of Homeland Security decided to initiate the Prompt Asylum Claim Review (PACR) and the Humanitarian Asylum Review Process (HARP).

I am the custodian of the administrative record for PACR and HARP for DHS. I certify that, to the best of my knowledge, information, and belief, the attached index contains the non-privileged documents considered by DHS when deciding to initiate PACR and HARP, and that these documents constitute the administrative record the agency considered in deciding to initiate PACR and HARP.

Executed this 17th day of January, 2020, in Washington, D.C.

Juliana Blackwell
Acting Executive Secretary

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| Las Americas Immigrant Advocacy Center, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:19-cv-03640-KBJ |
| Chad F. Wolf, *et al.*, | ) ) | |
| Defendants. | ) ) ) | |

**CERTIFIED INDEX TO ADMINISTRATIVE RECORD**

<u>**DOCUMENT**</u>                                                                                           <u>**PAGE**</u>

1. Executive Office for Immigration Review, Pending Cases as of May 30, 2019 . . . . . .AR001

2. Executive Office for Immigration Review, Adjudication Statistics:
   Pending Cases (Apr. 23, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . .AR002

3. Executive Office for Immigration Review,
   Immigration Judge (IJ) Hiring (July 2019) . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . AR003

4. United States Citizenship & Immigration Services, Credible Fear
   and Reasonable Fear Statistics and Nationality Report:
   Fiscal Year 2018, 4th Quarter, July 1- Sept. 30, 2018 (Nov. 16, 2018) . . . . . . . . . . . .AR004

5. United States Citizenship & Immigration Services, Credible Fear
   Workload Report Summary: January 2019 (Feb. 22, 2019) . . . . . . . . . . . . . . . . . . . .AR008

6. Executive Office for Immigration Review, Adjudication Statistics:
   Total Asylum Applications (Apr. 23, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .AR012

7. Department of Homeland Security, Migrant Protection Protocols (Jan. 24, 2019) . . . .AR013

8. Department of Homeland Security, Border Security Metrics Report (May 1, 2018) . .AR018

9. U.S. Customs and Border Protection, Enforcement Actions
   Southwest Border Total: Apprehensions and Inadmissible Aliens
   by Country of Citizenship (FY17–FY19 TD May) . . . . . . . . . . . . . . . . . . . . . . . . . . AR086

10. United States Citizenship & Immigration Services, Credible Fear
    & Reasonable Fear Workload: FY06–FY13 Q1 (May 16, 2013). . . . . . . . . . . . . . . . AR087

11. Executive Office for Immigration Review, Adjudication Statistics:
Asylum Decision & Filing Rates in Cases Originating
with a Credible Fear Claim (Apr. 12, 2019) . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . AR088

12. Executive Office for Immigration Review, Adjudication Statistics:
"Family Unit" Data for Select Courts (June 17, 2019) . . . . . . . . . . . . . . . .. . . . . . . AR089

13. Department of Homeland Security, Southwest Border Encounters
of Non-Mexican Aliens by Month and Year FY2013–FY2019Q2 . . . . . . . . .. . . . . . AR090

14. U.S. Customs & Border Protection, Southwest Border Enforcement
Actions: March Official Reporting (Apr. 1, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . AR092

15. U.S. Customs & Border Protection, Southwest Border Total Apprehensions
& Inadmissible Aliens FY19 April–September Planning Profile (Apr. 10, 2019) . .. . AR094

16. Department of Homeland Security, OTM Caravan Breakdown
in Mexico (Apr. 22, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . AR103

17. U.S. Customs & Border Protection, Southwest Border Apprehensions
by Sector: Fiscal Year 2019 (July 10, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . AR104

18. Statement by Secretary Johnson on Southwest Border Security, Oct. 17, 2016 . . . . . AR113

19. Remarks by President Trump on the Illegal Immigration Crisis
and Border Security, Nov. 1, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . AR117

20. Department of Homeland Security, Memorandum from Secretary
Kirstjen M. Nielsen for Kevin K. McAleenan, Commissioner,
U.S. Customs and Border Protection, and Ronald D. Vitiello,
Deputy Director and Senior Official Performing the Duties of Director,
U.S. Immigration and Customs Enforcement, Policy Guidance for
Implementation of the Migrant Protection Protocols (Jan. 25, 2019) . . . . . . . . . . . . AR128

21. U.S. Customs and Border Protection, Guiding Principles for
Migrant Protection Protocols (Jan. 28, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . AR132

22. U.S. Customs and Border Protection, Memorandum from Kevin K. McAleenan,
Commissioner, for Todd C. Owen, Executive Assistant Commissioner,
Field Operations, and Carla L. Provost, Chief, U.S. Border Patrol,
Implementation of the Migrant Protection Protocols (Jan. 28, 2019) . . . . . . . . . . . . AR134

23. U.S. Customs and Border Protection, Memorandum from Todd A. Hoffman,
Executive Director, Admissibility and Passenger Programs,
Office of Field Operations, for Director, Field Operations, Office of Field
Operations and Director Field Operators Academy, Office of Training and
Development, Guidance on Migrant Protection Protocols (Jan. 28, 2019) . . . . . . . . . AR135

24. U.S. Immigration and Customs Enforcement, Memorandum from Ronald
    Vitello, Deputy Director and Senior Official Performing the Duties of the
    Director, for Executive Associate Directors and Principal Legal Advisor,
    Implementation of the Migrant Protection Protocols (Feb. 12, 2019) . . . . . . . . . . . . . AR136

25. U.S. Immigration and Customs Enforcement, Memorandum from
    Nathalie R. Asher, Acting Executive Associate Director,
    for Field Office Directors, Enforcement and Removal Operations,
    Migrant Protection Protocols Guidance (Feb. 12, 2019) . . . . . . . . . . . . . . . . . . . . . . . AR138

26. U.S. Citizenship and Immigration Services, Policy Memorandum PM-602-0169,
    Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality
    Act and the Migrant Protection Protocols (Jan. 28, 2019) . . . . . . . . . . . . . . . . . . . . . . AR142

27. Executive Office for Immigration Review, Adjudication Statistics:
    New Cases and Total Completions: FY1983–FY2019 Q2 (Apr. 23, 2019) . . . . . . . . . AR147

28. Executive Office for Immigration Review, Statistics Yearbook FY2017 . . . . . . . . . . . AR149

29. Executive Office for Immigration Review, Asylum Median
    Processing Time (I-862 & I-863 Case Completions),
    October 1, 2014 through June 30, 2019 (July 12, 2019) . . . . . . . . . . . . . . . . . . . . . . . AR194

30. Memorandum from President Donald J. Trump to the Attorney General and
    Secretary of Homeland Security, Additional Measures to Enhance Border Security
    and Restore Integrity to Our Immigration System (Apr. 29, 2019) . . . . . . . . . . . . . . .AR195

31. Executive Office for Immigration Review, Credible Fear & Asylum Process:
    FY2008–FY2019 Q2 (Apr. 23, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . AR197

32. U.S. Citizenship and Immigration Services, Credible fear Process at the FRCs. . . . . AR198

33. The White House, Our Nation's Weak Asylum Laws Are
    Encouraging an Overwhelming Increase in Illegal Immigration,
    Fact Sheet (Nov.1, 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . AR199

34. Order, Permanent Injunction, *Flores et al, v. Barr, et al.*, No. 85-4544 (C.D. Cal. Sept. 27,
    2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . AR201

35. Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien
    Children, 84 FR 44392 (August 23, 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .AR203

36. Opinion, *Flores v. Lynch, et al.*, No. 15-56434 (9th Cir. July 6, 2016). . . . . . . . . . . .  AR347

37. Asylum Eligibility and Procedural Modifications, 84 FR 33829 (July 16, 2019) . . . . AR370

38. U.S. Customs and Border Protection Enforcement Actions – Southwest Border, Total –
    Apprehensions and Inadmissible Aliens by Country of Citizenship FY17 - 19. . . . . . . AR387

39. Office of Field Operations – Southwest Border Family Unit Alien (FMUA) Inadmissible Aliens FY17 - 19. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . AR403

40. ERO-LESA Statistical Tracking Unit - ICE Removals of Mexican, Northern Triangle, and Other Nationals. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . AR404

41. Memorandum from Ken Cuccinelli II, Director, U.S. Citizenship and Immigration Services, to the Acting Secretary re Reduction of Credible Fear Consultation Period (July 2, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . AR405

42. Memorandum from David V. Aguilar, Chief, U.S. Border Patrol to Chief Patrol Agents, Tucson and Laredo Sectors re Expedited Removal Policy (August 11, 2004) . . . . . . . AR407

43. Memorandum from Michael J. Fisher, Chief, U.S. Border Patrol to All Chief Patrol Agents, All Directorate Chiefs re Clarification of Processing Procedures for Credible Fear (September 30, 2015) . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . AR410

44. Memorandum from Carla L. Provost, Chief, U.S. Border Patrol to All Chief Patrol Agents, All Directorate Chiefs re Prioritization of Removal Pathways Guidance (September 25, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . AR418

45. Memorandum from David V. Aguilar, Chief, U.S. Border Patrol to All Chief Patrol Agents re Hold Rooms and Short Term Custody (June 2, 2008) . . . . . . . . . . . . . . . . . . . . . . . AR419

46. Order, *Unknown Parties, et al., v. Jeh Johnson, et al.,* No. 15-250 (D. Ariz. Nov. 18, 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . AR434

47. Executive Order 13767—Border Security and Immigration Enforcement Improvements (January 25, 2017) . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . .. . . . AR463

48. Executive Order 13768—Enhancing Public Safety in the Interior of the United States (January 25, 2017) . . . . . . . . .. . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . .. . . . . . . AR468

49. Stipulated Settlement Agreement, *Flores et al. v. Reno, et al.* No. 85-4544 (C. D. Cal. Aug. 12, 1996). . . . . . . . . .. . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . .AR473

50. In Chambers—Order Re Plaintiffs' Motion To Enforce Settlement Of Class Action And Defendants' Motion To Amend Settlement Agreement [100, 120], *Flores, et al., v. Jeh Johnson, et al.,* No. 85-4544 (C. D. Cal. July 24, 2015). . . . . . . . . .. . . . . . . . . . . . AR511

51. Order Granting Plaintiffs' Motion For Classwide Preliminary Injunction, *Ms. L., et al. v. U.S. Immigration and Customs Enforcement, et al.*, No. 18-428 (S. D. Cal. June 26, 2018) . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . .. . . . . . . . . AR536

52. Memorandum from John Kelly, Secretary to Kevin McAleenan, Acting Commissioner U.S. Customs and Border Protection, Thomas D. Homan, Acting Director, U.S. Immigration and Customs Enforcement, Lori Scialabba, Acting Director, U.S. Citizenship and Immigration Services, Joseph B. Maher, Acting General Counsel, Dimple Shah, Acting Assistant

Secretary for International Affairs, and Chip Fulghum, Acting Undersecretary for Management re Enforcement of Immigration Laws to Serve the National Interest (February 20, 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .AR560

53. Opinion, *Innovation Law Lab, et. Al, v. McAleenan, et al.,* No. 19-15716 (9th Cir. May 7, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . AR566

54.  Modified, Consolidated Injunction, *Orantes-Hernandez et al., v. Gonzales, et al*., No. 82-1107 (C. D. Cal. Nov. 26, 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .AR598

55. U.S. Customs and Border Protection, National Standards on Transport, Escort, Detention, and Search (October 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .AR605

56. Memorandum from Mark A. Morgan, Acting Commissioner, U.S. Customs and Border Protection, Matthew T. Albence, Deputy Director and Senior Official Performing the Duties of the Director, U.S. Immigration and Customs Enforcement, and Kenneth T. Cuccinelli, Acting Director, U.S. Citizenship and Immigration Services, to Kevin K. McAleenan, Acting Secretary, Department of Homeland Security re Prioritization of Removal Pathways. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..AR636

57. Humanitarian Asylum Review Process (HARP) Info Sheet. . . . . . . . . . . . . . . . . . . . . AR645

# Executive Office for Immigration Review (EOIR)
# Pending Cases as of May 30, 2019

Pending Cases shown with I-589 Applications as of May 30, 2019

| FY | Pending I-862 and I-863 cases | Pending I-862 and I-863 cases with Asylum Application |
|---|---|---|
| 2019 (as of May 30, 2019) | 904,189 | 436,382 |

# EXECUTIVE OFFICE FOR IMMIGRATION REVIEW ADJUDICATION STATISTICS

## Pending Cases[1]



| FY | Pending Cases at End of Fiscal Year |
|---|---|
| 2008 | 186,095 |
| 2009 | 223,761 |
| 2010 | 262,718 |
| 2011 | 298,148 |
| 2012 | 327,527 |
| 2013 | 356,167 |
| 2014 | 430,004 |
| 2015 | 459,915 |
| 2016 | 521,284 |
| 2017 | 655,698 |
| 2018 | 794,316 |
| 2019 (Second Quarter)[1] | 876,552 |

Data Generated: April 23, 2019
[1] Pending cases equals removal, deportation, exclusion, asylum-only, and withholding only.
[2] FY 2019 Second Quarter through March 31, 2019.

# EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## ADJUDICATION STATISTICS

### Immigration Judge (IJ) Hiring



| FY | Total IJs Hired | Total IJs on Board |
|---|---|---|
| 2010 | 17 | 245 |
| 2011 | 39 | 273 |
| 2012 | 4 | 267 |
| 2013 | 8 | 262 |
| 2014 | 0 | 249 |
| 2015 | 20 | 254 |
| 2016 | 56 | 289 |
| 2017 | 64 | 338 |
| 2018 | 81 | 395 |
| 2019 (Third Quarter) | 69 | 431 |

AR003

**Credible Fear Workload Report Summary**
**FY 2018 Total Caseload**

| | Totals | Oct-17 | Nov-17 | Dec-17 | Jan-18 | Feb-18 | Mar-18 | Apr-18 | May-18 | Jun-18 | Jul-18 | Aug-18 | Sep-18 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 99,035 | 7,296 | 7,307 | 7,462 | 8,121 | 6,621 | 8,266 | 8,500 | 9,968 | 9,742 | 6,565 | 10,230 | 8,957 |
| Interviews Conducted | 85,018 | 5 339 | 6 365 | 6 265 | 6 926 | 5 699 | 7 280 | 7 142 | 8 877 | 8 941 | 6 065 | 8 066 | 8 053 |
| **All Decisions** | **97,728** | **6,359** | **7,494** | **7,164** | **8,108** | **6,880** | **8,640** | **7,869** | **10,067** | **10,080** | **7,155** | **8,755** | **9,157** |
| Fear Established (Y) | 74,677 | 4,797 | 5,781 | 5,606 | 6,171 | 5,134 | 6,347 | 6,175 | 8,079 | 7,472 | 5,246 | 6,639 | 7,230 |
| Fear Not Established (N) | 9,659 | 531 | 591 | 669 | 715 | 676 | 767 | 719 | 821 | 1 314 | 945 | 1 082 | 829 |
| Closings | 13,392 | 1,031 | 1,122 | 889 | 1,222 | 1,070 | 1,526 | 975 | 1,167 | 1,294 | 964 | 1,034 | 1,098 |

**Credible Fear Workload Report by Month Total Caseload**

**OCT. 2017 (FY 2018)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 7,296 | 859 | 46 | 10 | 152 | 5,390 | 244 | 59 | 199 | 13 | 59 | 265 |
| Interviews Conducted | 5,339 | 625 | 40 | 2 | 89 | 3,943 | 199 | 41 | 149 | 16 | 42 | 193 |
| **All Decisions** | **6,359** | **811** | **68** | **2** | **108** | **4,675** | **203** | **50** | **172** | **16** | **49** | **205** |
| Fear Established (Y) | 4,797 | 502 | 37 | 2 | 65 | 3,604 | 192 | 30 | 127 | 14 | 35 | 189 |
| Fear Not Established (N) | 531 | 124 | 4 | 0 | 24 | 328 | 7 | 11 | 22 | 2 | 7 | 2 |
| Closings | 1,031 | 185 | 27 | 0 | 19 | 743 | 4 | 9 | 23 | 0 | 7 | 14 |

**NOV. 2017 (FY 2018)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA |
|---|---|---|---|---|---|---|---|
| Case Receipts | 7,307 | 538 | 167 | 44 | 153 | 5,590 | 352 |
| Interviews Conducted | 6,365 | 497 | 46 | 1 | 136 | 4,972 | 322 |
| **All Decisions** | **7,494** | **660** | **75** | **1** | **163** | **5,809** | **346** |
| Fear Established (Y) | 5,781 | 411 | 36 | 1 | 124 | 4,545 | 302 |
| Fear Not Established (N) | 591 | 94 | 11 | 0 | 13 | 425 | 20 |
| Closings | 1,122 | 155 | 28 | 0 | 18 | 839 | 24 |

**DEC. 2017 (FY 2018)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 7,462 | 698 | 375 | 28 | 125 | 5 135 | 364 | 201 | 191 | 39 | 44 | 262 |
| Interviews Conducted | 6,265 | 488 | 102 | 18 | 131 | 4,412 | 271 | 96 | 181 | 0 | 47 | 219 |
| **All Decisions** | **7,164** | **632** | **434** | **18** | **152** | **5,043** | **288** | **106** | **196** | **0** | **60** | **235** |
| Fear Established (Y) | 5,606 | 360 | 367 | 17 | 108 | 4 011 | 246 | 84 | 159 | 0 | 41 | 213 |
| Fear Not Established (N) | 669 | 123 | 37 | 1 | 23 | 411 | 24 | 12 | 25 | 0 | 6 | 7 |
| Closings | 889 | 149 | 30 | 0 | 21 | 621 | 18 | 10 | 12 | 0 | 13 | 15 |

**JAN. 2018 (FY 2018)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA |
|---|---|---|---|---|---|---|---|
| Case Receipts | 8,121 | 883 | 400 | 15 | 108 | 5 675 | 432 |
| Interviews Conducted | 6,926 | 725 | 283 | 1 | 77 | 5,046 | 373 |
| **All Decisions** | **8,108** | **922** | **357** | **3** | **94** | **5,840** | **406** |
| Fear Established (Y) | 6,171 | 559 | 262 | 1 | 67 | 4 556 | 337 |
| Fear Not Established (N) | 715 | 175 | 21 | 0 | 9 | 443 | 37 |
| Closings | 1,222 | 188 | 74 | 2 | 18 | 841 | 32 |

**FEB. 2018 (FY 2018)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 6,621 | 653 | 217 | 5 | 120 | 4,878 | 255 | 103 | 155 | 4 | 47 | 184 |
| Interviews Conducted | 5,699 | 566 | 167 | 1 | 96 | 4 061 | 270 | 121 | 140 | 68 | 63 | 140 |
| **All Decisions** | **6,880** | **757** | **149** | **8** | **106** | **4,926** | **304** | **142** | **156** | **78** | **99** | **155** |
| Fear Established (Y) | 5,134 | 449 | 114 | 6 | 48 | 3,775 | 257 | 100 | 116 | 67 | 76 | 122 |
| Fear Not Established (N) | 676 | 157 | 20 | 0 | 23 | 411 | 24 | 11 | 7 | 5 | 10 | 8 |
| Closings | 1,070 | 151 | 15 | 2 | 35 | 740 | 23 | 27 | 33 | 6 | 13 | 25 |

**MARCH 2018 (FY 201..)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA |
|---|---|---|---|---|---|---|---|
| Case Receipts | 8,266 | 787 | 389 | 5 | 82 | 5,959 | 270 |
| Interviews Conducted | 7,280 | 609 | 363 | 7 | 57 | 5 531 | 166 |
| **All Decisions** | **8,640** | **683** | **386** | **8** | **126** | **6,615** | **205** |
| Fear Established (Y) | 6,347 | 435 | 301 | 8 | 69 | 4,884 | 141 |
| Fear Not Established (N) | 767 | 124 | 47 | 0 | 17 | 533 | 19 |
| Closings | 1,526 | 124 | 38 | 0 | 40 | 1,198 | 45 |

**APRIL 2018 (FY 2018)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 8,500 | 812 | 224 | 16 | 138 | 6 092 | 474 | 77 | 153 | 14 | 213 | 287 |
| Interviews Conducted | 7,142 | 753 | 207 | 9 | 93 | 4,857 | 482 | 44 | 149 | 1 | 217 | 330 |
| **All Decisions** | **7,869** | **905** | **246** | **9** | **97** | **5,249** | **551** | **52** | **174** | **1** | **249** | **336** |
| Fear Established (Y) | 6,175 | 558 | 187 | 7 | 69 | 4 209 | 453 | 39 | 160 | 0 | 216 | 277 |
| Fear Not Established (N) | 719 | 190 | 32 | 0 | 10 | 414 | 34 | 1 | 5 | 1 | 13 | 19 |
| Closings | 975 | 157 | 27 | 2 | 18 | 626 | 64 | 12 | 9 | 0 | 20 | 40 |

**MAY 2018 (FY 2018)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA |
|---|---|---|---|---|---|---|---|
| Case Receipts | 9,968 | 1 106 | 337 | 45 | 103 | 7 025 | 654 |
| Interviews Conducted | 8,877 | 924 | 263 | 27 | 91 | 6,452 | 556 |
| **All Decisions** | **10,067** | **1,107** | **309** | **35** | **119** | **7,279** | **570** |
| Fear Established (Y) | 8,079 | 730 | 212 | 28 | 78 | 6 040 | 484 |
| Fear Not Established (N) | 821 | 167 | 48 | 1 | 21 | 485 | 43 |
| Closings | 1,167 | 210 | 49 | 6 | 20 | 754 | 43 |

**JUNE 2018 (FY 2018)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 9,742 | 939 | 402 | 72 | 76 | 6,547 | 532 | 73 | 203 | 12 | 419 | 467 |
| Interviews Conducted | 8,941 | 878 | 420 | 54 | 40 | 6 126 | 521 | 43 | 189 | 2 | 351 | 317 |
| **All Decisions** | **10,080** | **1,034** | **488** | **55** | **37** | **6,988** | **566** | **59** | **225** | **1** | **368** | **259** |
| Fear Established (Y) | 7,472 | 668 | 316 | 49 | 26 | 5,224 | 479 | 34 | 178 | 1 | 281 | 216 |
| Fear Not Established (N) | 1,314 | 176 | 76 | 4 | 3 | 913 | 66 | 5 | 29 | 0 | 30 | 12 |
| Closings | 1,294 | 190 | 36 | 2 | 8 | 851 | 21 | 20 | 18 | 0 | 57 | 31 |

**JULY 2018 (FY 2018)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA |
|---|---|---|---|---|---|---|---|
| Case Receipts | 6,565 | 1,126 | 432 | 44 | 117 | 3,686 | 394 |
| Interviews Conducted | 6,065 | 840 | 242 | 31 | 106 | 3 680 | 375 |
| **All Decisions** | **7,155** | **950** | **287** | **37** | **136** | **4,384** | **403** |
| Fear Established (Y) | 5,246 | 640 | 163 | 27 | 83 | 3,231 | 343 |
| Fear Not Established (N) | 945 | 145 | 46 | 5 | 25 | 616 | 32 |
| Closings | 964 | 165 | 78 | 5 | 16 | 537 | 28 |

**AUGUST 2018 (FY 2018)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 10,230 | 1 492 | 127 | 42 | 230 | 6 986 | 637 | 74 | 156 | 15 | 277 | 194 |
| Interviews Conducted | 8,066 | 1,167 | 167 | 33 | 174 | 5,405 | 488 | 63 | 118 | 0 | 277 | 174 |
| **All Decisions** | **8,755** | **1,249** | **235** | **34** | **223** | **5,766** | **503** | **72** | **131** | **0** | **316** | **226** |
| Fear Established (Y) | 6,639 | 932 | 179 | 29 | 135 | 4 339 | 422 | 64 | 82 | 0 | 260 | 197 |
| Fear Not Established (N) | 1,082 | 179 | 25 | 4 | 45 | 717 | 48 | 3 | 21 | 0 | 38 | 2 |
| Closings | 1,034 | 138 | 31 | 1 | 43 | 710 | 33 | 5 | 28 | 0 | 18 | 27 |

**SEPTEMBER 2018 (FY 2...)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA |
|---|---|---|---|---|---|---|---|
| Case Receipts | 8,957 | 1 243 | 457 | 45 | 136 | 6 054 | 461 |
| Interviews Conducted | 8,053 | 987 | 410 | 13 | 118 | 5,577 | 476 |
| **All Decisions** | **9,157** | **1,246** | **470** | **8** | **99** | **6,375** | **497** |
| Fear Established (Y) | 7,230 | 916 | 377 | 5 | 62 | 5 054 | 425 |
| Fear Not Established (N) | 829 | 142 | 29 | 0 | 21 | 563 | 42 |
| Closings | 1,098 | 188 | 64 | 3 | 16 | 758 | 30 |



**U.S. Citizenship and Immigration Services**

The Asylum Division of U.S. Citizenship and Immigration Services routinely provides detailed asylum and credible fear data as part of a statistical package made available during regularly scheduled, quarterly stakeholder engagement meetings.

## Reasonable Fear Workload Report Summary
## FY 2018 Total Caseload

| | Totals | Oct-17 | Nov-17 | Dec-17 | Jan-18 | Feb-18 | Mar-18 | Apr-18 | May-18 | Jun-18 | Jul-18 | Aug-18 | Sep-18 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 11,101 | 862 | 856 | 855 | 922 | 775 | 888 | 915 | 1,041 | 979 | 969 | 1,125 | 914 |
| Interviews Conducted | 7,212 | 579 | 528 | 528 | 491 | 480 | 642 | 598 | 737 | 746 | 546 | 751 | 586 |
| All Decisions | 10,964 | 896 | 839 | 837 | 786 | 785 | 952 | 910 | 1,066 | 1,065 | 883 | 1,079 | 866 |
| Fear Established (Y) | 3,161 | 273 | 229 | 221 | 235 | 244 | 313 | 276 | 322 | 308 | 212 | 287 | 241 |
| Fear Not Established (N) | 3,826 | 306 | 283 | 306 | 258 | 249 | 313 | 304 | 373 | 393 | 311 | 435 | 295 |
| Closings | 3,977 | 317 | 327 | 310 | 293 | 292 | 326 | 330 | 371 | 364 | 360 | 357 | 330 |

## Reasonable Fear Workload Report Monthly Caseload by Office

### OCT. 2017 (FY 2018)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 862 | 142 | 121 | 5 | 48 | 277 | 50 | 18 | 46 | 29 | 39 | 87 |
| Interviews Conducted | 579 | 72 | 42 | 0 | 43 | 193 | 37 | 8 | 40 | 78 | 14 | 52 |
| All Decisions | 896 | 135 | 107 | 0 | 52 | 274 | 46 | 15 | 44 | 120 | 27 | 76 |
| Fear Established (Y) | 273 | 31 | 15 | 0 | 18 | 70 | 24 | 0 | 21 | 53 | 10 | 31 |
| Fear Not Established (N) | 306 | 42 | 26 | 0 | 25 | 121 | 15 | 8 | 19 | 25 | 4 | 21 |
| Closings | 317 | 62 | 66 | 0 | 9 | 83 | 7 | 7 | 4 | 42 | 13 | 24 |

### NOV. 2017 (F...

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZL... |
|---|---|---|---|---|---|---|---|
| Case Receipts | 856 | 133 | 99 | 17 | 47 | 370 | 3... |
| Interviews Conducted | 528 | 83 | 55 | 1 | 37 | 224 | 2... |
| All Decisions | 839 | 147 | 121 | 1 | 53 | 335 | 3... |
| Fear Established (Y) | 229 | 40 | 23 | 0 | 15 | 73 | 1... |
| Fear Not Established (N) | 283 | 40 | 31 | 1 | 22 | 138 | 1... |
| Closings | 327 | 67 | 67 | 0 | 16 | 124 | |

### DEC. 2017 (FY 2018)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 855 | 150 | 90 | 11 | 50 | 319 | 44 | 40 | 44 | 16 | 30 | 61 |
| Interviews Conducted | 528 | 97 | 51 | 5 | 34 | 214 | 23 | 21 | 31 | 0 | 11 | 41 |
| All Decisions | 837 | 155 | 101 | 6 | 50 | 339 | 31 | 25 | 34 | 1 | 32 | 63 |
| Fear Established (Y) | 221 | 40 | 20 | 1 | 11 | 63 | 10 | 14 | 20 | 0 | 8 | 34 |
| Fear Not Established (N) | 306 | 59 | 31 | 4 | 23 | 146 | 13 | 7 | 12 | 0 | 3 | 8 |
| Closings | 310 | 56 | 50 | 1 | 16 | 130 | 8 | 4 | 2 | 1 | 21 | 21 |

### JAN. 2018 (F...

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZL... |
|---|---|---|---|---|---|---|---|
| Case Receipts | 922 | 161 | 106 | 14 | 46 | 326 | 5... |
| Interviews Conducted | 491 | 98 | 25 | 6 | 45 | 190 | 2... |
| All Decisions | 786 | 164 | 80 | 8 | 54 | 302 | 3... |
| Fear Established (Y) | 235 | 49 | 12 | 2 | 13 | 74 | |
| Fear Not Established (N) | 258 | 49 | 14 | 4 | 31 | 118 | 1... |
| Closings | 293 | 66 | 54 | 2 | 10 | 110 | 1... |

### FEB. 2018 (FY 2018)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 775 | 102 | 102 | 10 | 54 | 315 | 54 | 21 | 21 | 8 | 34 | 54 |
| Interviews Conducted | 480 | 83 | 50 | 13 | 38 | 168 | 28 | 13 | 31 | 2 | 23 | 31 |
| All Decisions | 785 | 141 | 100 | 13 | 52 | 294 | 38 | 19 | 32 | 3 | 41 | 52 |
| Fear Established (Y) | 244 | 52 | 19 | 5 | 17 | 69 | 11 | 5 | 21 | 2 | 19 | 24 |
| Fear Not Established (N) | 249 | 45 | 23 | 8 | 19 | 109 | 15 | 7 | 10 | 0 | 5 | 8 |
| Closings | 292 | 44 | 58 | 0 | 16 | 116 | 12 | 7 | 1 | 1 | 17 | 20 |

### MARCH 2018 (...

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZL... |
|---|---|---|---|---|---|---|---|
| Case Receipts | 888 | 140 | 117 | 8 | 56 | 337 | 6... |
| Interviews Conducted | 642 | 90 | 54 | 2 | 34 | 276 | 6... |
| All Decisions | 952 | 123 | 115 | 2 | 53 | 409 | 7... |
| Fear Established (Y) | 313 | 42 | 28 | 0 | 14 | 122 | 3... |
| Fear Not Established (N) | 313 | 42 | 21 | 2 | 19 | 156 | 2... |
| Closings | 326 | 39 | 66 | 0 | 20 | 131 | 1... |

### APRIL 2018 (FY 2018)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 915 | 167 | 95 | 11 | 44 | 410 | 43 | 32 | 19 | 13 | 53 | 28 |
| Interviews Conducted | 598 | 126 | 53 | 8 | 32 | 242 | 44 | 27 | 14 | 8 | 17 | 27 |
| All Decisions | 910 | 172 | 95 | 7 | 43 | 377 | 59 | 36 | 21 | 8 | 51 | 41 |
| Fear Established (Y) | 276 | 58 | 18 | 3 | 16 | 97 | 33 | 9 | 10 | 8 | 8 | 16 |
| Fear Not Established (N) | 304 | 53 | 31 | 3 | 20 | 145 | 15 | 13 | 6 | 0 | 6 | 12 |
| Closings | 330 | 61 | 46 | 1 | 7 | 135 | 11 | 14 | 5 | 0 | 37 | 13 |

### MAY 2018 (F...

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZL... |
|---|---|---|---|---|---|---|---|
| Case Receipts | 1,041 | 142 | 126 | 12 | 51 | 468 | 4... |
| Interviews Conducted | 737 | 145 | 83 | 6 | 35 | 306 | 4... |
| All Decisions | 1,066 | 222 | 147 | 5 | 47 | 418 | 5... |
| Fear Established (Y) | 322 | 79 | 24 | 2 | 12 | 115 | 5... |
| Fear Not Established (N) | 373 | 67 | 38 | 1 | 18 | 173 | 1... |
| Closings | 371 | 76 | 85 | 1 | 17 | 130 | 1... |

### JUNE 2018 (FY 2018)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 979 | 138 | 156 | 9 | 67 | 356 | 55 | 30 | 24 | 1 | 92 | 51 |
| Interviews Conducted | 746 | 143 | 120 | 7 | 42 | 272 | 42 | 13 | 23 | 0 | 51 | 33 |
| All Decisions | 1,065 | 164 | 165 | 5 | 57 | 422 | 62 | 17 | 25 | 0 | 91 | 57 |
| Fear Established (Y) | 308 | 57 | 46 | 4 | 17 | 100 | 14 | 3 | 11 | 0 | 31 | 25 |
| Fear Not Established (N) | 393 | 52 | 55 | 1 | 22 | 180 | 28 | 11 | 11 | 0 | 19 | 14 |
| Closings | 364 | 55 | 64 | 0 | 18 | 142 | 20 | 3 | 3 | 0 | 41 | 18 |

### JULY 2018 (F...

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZL... |
|---|---|---|---|---|---|---|---|
| Case Receipts | 969 | 186 | 153 | 18 | 50 | 346 | 3... |
| Interviews Conducted | 546 | 89 | 63 | 6 | 39 | 241 | 1... |
| All Decisions | 883 | 158 | 110 | 10 | 49 | 362 | 3... |
| Fear Established (Y) | 212 | 40 | 23 | 4 | 6 | 84 | |
| Fear Not Established (N) | 311 | 40 | 38 | 4 | 29 | 143 | |
| Closings | 360 | 78 | 49 | 2 | 14 | 135 | 1... |

### AUGUST 2018 (FY 2018)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 1,125 | 187 | 101 | 12 | 48 | 534 | 57 | 22 | 39 | 0 | 64 | 61 |
| Interviews Conducted | 751 | 126 | 84 | 12 | 31 | 329 | 44 | 15 | 36 | 0 | 40 | 34 |
| All Decisions | 1,079 | 185 | 154 | 12 | 48 | 473 | 44 | 18 | 38 | 0 | 63 | 44 |
| Fear Established (Y) | 287 | 45 | 28 | 5 | 8 | 120 | 17 | 4 | 15 | 0 | 26 | 19 |
| Fear Not Established (N) | 435 | 64 | 44 | 7 | 25 | 220 | 19 | 12 | 21 | 0 | 13 | 10 |
| Closings | 357 | 76 | 82 | 0 | 15 | 133 | 8 | 2 | 2 | 0 | 24 | 15 |

### SEPTEMBER 201...

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZL... |
|---|---|---|---|---|---|---|---|
| Case Receipts | 914 | 149 | 132 | 18 | 56 | 372 | 3... |
| Interviews Conducted | 586 | 112 | 59 | 6 | 25 | 284 | 2... |
| All Decisions | 866 | 170 | 102 | 10 | 43 | 391 | 3... |
| Fear Established (Y) | 241 | 48 | 14 | 1 | 7 | 119 | 1... |
| Fear Not Established (N) | 295 | 43 | 26 | 5 | 14 | 172 | 1... |
| Closings | 330 | 79 | 62 | 4 | 22 | 100 | |



**U.S. Citizenship and Immigration Services**

The Asylum Division of U.S. Citizenship and Immigration Services routinely provides detailed asylum and credible fear data as part of a statistical package made available during regularly scheduled, quarterly stakeholder engagement meetings.

# Monthly Credible and Reasonable Fear Nationality Reports

| Credible Fear Nationality Report October 2017 (FY 2018) | | | Reasonable Fear Nationality Report October 2017 (FY 2018) | |
|---|---|---|---|---|
| **Nationality** | **Receipts** | | **Nationality** | **Receipts** |
| 1 | GUATEMALA | 2,126 | 1 | MEXICO | 313 |
| 2 | HONDURAS | 1,399 | 2 | HONDURAS | 164 |
| 3 | EL SALVADOR | 1,127 | 3 | GUATEMALA | 160 |
| 4 | MEXICO | 701 | 4 | EL SALVADOR | 149 |
| 5 | INDIA | 599 | 5 | UNKNOWN | 24 |

| Credible Fear Nationality Report November 2017 (FY 2018) | | | Reasonable Fear Nationality Report November 2017 (FY 2018) | |
|---|---|---|---|---|
| **Nationality** | **Receipts** | | **Nationality** | **Receipts** |
| 1 | GUATEMALA | 2,144 | 1 | MEXICO | 302 |
| 2 | HONDURAS | 1,509 | 2 | HONDURAS | 209 |
| 3 | EL SALVADOR | 1,222 | 3 | GUATEMALA | 161 |
| 4 | INDIA | 551 | 4 | EL SALVADOR | 134 |
| 5 | MEXICO | 533 | 5 | BRAZIL | 14 |

| Credible Fear Nationality Report December 2017 (FY 2018) | | | Reasonable Fear Nationality Report December 2017 (FY 2018) | |
|---|---|---|---|---|
| **Nationality** | **Receipts** | | **Nationality** | **Receipts** |
| 1 | GUATEMALA | 2,247 | 1 | MEXICO | 292 |
| 2 | HONDURAS | 1,576 | 2 | GUATEMALA | 200 |
| 3 | EL SALVADOR | 1,153 | 3 | HONDURAS | 178 |
| 4 | INDIA | 689 | 4 | EL SALVADOR | 124 |
| 5 | MEXICO | 467 | 5 | BRAZIL | 16 |

| Credible Fear Nationality Report January 2018 (FY 2018) | | | Reasonable Fear Nationality Report January 2018 (FY 2018) | |
|---|---|---|---|---|
| **Nationality** | **Receipts** | | **Nationality** | **Receipts** |
| 1 | GUATEMALA | 2,365 | 1 | MEXICO | 286 |
| 2 | HONDURAS | 1,948 | 2 | HONDURAS | 244 |
| 3 | EL SALVADOR | 1,059 | 3 | GUATEMALA | 194 |
| 4 | INDIA | 728 | 4 | EL SALVADOR | 146 |
| 5 | MEXICO | 630 | 5 | BRAZIL | 14 |

| Credible Fear Nationality Report February 2018 (FY 2018) | | | Reasonable Fear Nationality Report February 2018 (FY 2018) | |
|---|---|---|---|---|
| **Nationality** | **Receipts** | | **Nationality** | **Receipts** |
| 1 | GUATEMALA | 1,981 | 1 | MEXICO | 285 |
| 2 | HONDURAS | 1,648 | 2 | HONDURAS | 175 |
| 3 | EL SALVADOR | 755 | 3 | GUATEMALA | 146 |
| 4 | MEXICO | 649 | 4 | EL SALVADOR | 103 |
| 5 | CUBA | 325 | 5 | DOMINICAN REPUBLIC | 5 |

| Credible Fear Nationality Report March 2018 (FY 2018) | | | Reasonable Fear Nationality Report March 2018 (FY 2018) | |
|---|---|---|---|---|
| **Nationality** | **Receipts** | | **Nationality** | **Receipts** |
| 1 | GUATEMALA | 2,044 | 1 | MEXICO | 330 |
| 2 | HONDURAS | 1,115 | 2 | HONDURAS | 212 |
| 3 | EL SALVADOR | 705 | 3 | GUATEMALA | 175 |
| 4 | MEXICO | 868 | 4 | EL SALVADOR | 132 |
| 5 | CUBA | 181 | 5 | BRAZIL | 12 |

U.S. Citizenship and Immigration Services

The Asylum Division of U.S. Citizenship and Immigration Services routinely provides detailed asylum and credible fear data as part of a statistical package made available during regularly scheduled, quarterly stakeholder engagement meetings.

AR006

| | Credible Fear Nationality Report April 2018 (FY 2018) | | | | Reasonable Fear Nationality Report April 2018 (FY 2018) | | |
|---|---|---|---|---|---|---|---|
| | **Nationality** | **Receipts** | | | **Nationality** | **Receipts** | |
| 1 | HONDURAS | 2,531 | | 1 | MEXICO | 283 | |
| 2 | GUATEMALA | 1,878 | | 2 | HONDURAS | 231 | |
| 3 | EL SALVADOR | 972 | | 3 | GUATEMALA | 178 | |
| 4 | MEXICO | 613 | | 4 | EL SALVADOR | 140 | |
| 5 | CUBA | 546 | | 5 | BRAZIL | 12 | |

| | Credible Fear Nationality Report May 2018 (FY 2018) | | | | Reasonable Fear Nationality Report May 2018 (FY 2018) | | |
|---|---|---|---|---|---|---|---|
| | **Nationality** | **Receipts** | | | **Nationality** | **Receipts** | |
| 1 | HONDURAS | 2,952 | | 1 | MEXICO | 317 | |
| 2 | GUATEMALA | 2,406 | | 2 | HONDURAS | 242 | |
| 3 | EL SALVADOR | 1,245 | | 3 | GUATEMALA | 218 | |
| 4 | INDIA | 686 | | 4 | EL SALVADOR | 166 | |
| 5 | MEXICO | 654 | | 5 | BRAZIL | 11 | |

| | Credible Fear Nationality Report June 2018 (FY 2018) | | | | Reasonable Fear Nationality Report June 2018 (FY 2018) | | |
|---|---|---|---|---|---|---|---|
| | **Nationality** | **Receipts** | | | **Nationality** | **Receipts** | |
| 1 | HONDURAS | 3,169 | | 1 | MEXICO | 307 | |
| 2 | GUATEMALA | 2,348 | | 2 | HONDURAS | 269 | |
| 3 | EL SALVADOR | 1,416 | | 3 | GUATEMALA | 198 | |
| 4 | INDIA | 691 | | 4 | EL SALVADOR | 156 | |
| 5 | CUBA | 621 | | 5 | BRAZIL | 14 | |

| | Credible Fear Nationality Report July 2018 (FY 2018) | | | | Reasonable Fear Nationality Report July 2018 (FY 2018) | | |
|---|---|---|---|---|---|---|---|
| | **Nationality** | **Receipts** | | | **Nationality** | **Receipts** | |
| 1 | HONDURAS | 1,617 | | 1 | MEXICO | 328 | |
| 2 | GUATEMALA | 1,427 | | 2 | HONDURAS | 215 | |
| 3 | EL SALVADOR | 959 | | 3 | GUATEMALA | 203 | |
| 4 | INDIA | 677 | | 4 | EL SALVADOR | 151 | |
| 5 | CUBA | 480 | | 5 | BRAZIL | 19 | |

| | Credible Fear Nationality Report August 2018 (FY 2018) | | | | Reasonable Fear Nationality Report August 2018 (FY 2018) | | |
|---|---|---|---|---|---|---|---|
| | **Nationality** | **Receipts** | | | **Nationality** | **Receipts** | |
| 1 | HONDURAS | 2,636 | | 1 | MEXICO | 322 | |
| 2 | GUATEMALA | 2,035 | | 2 | HONDURAS | 311 | |
| 3 | INDIA | 1,343 | | 3 | GUATEMALA | 261 | |
| 4 | EL SALVADOR | 1,342 | | 4 | EL SALVADOR | 144 | |
| 5 | CUBA | 772 | | 5 | NICARAGUA | 31 | |

| | Credible Fear Nationality Report September 2018 (FY 2018) | | | | Reasonable Fear Nationality Report September 2018 (FY 2018) | | |
|---|---|---|---|---|---|---|---|
| | **Nationality** | **Receipts** | | | **Nationality** | **Receipts** | |
| 1 | HONDURAS | 2,541 | | 1 | MEXICO | 281 | |
| 2 | GUATEMALA | 1,728 | | 2 | HONDURAS | 268 | |
| 3 | EL SALVADOR | 1,284 | | 3 | GUATEMALA | 173 | |
| 4 | INDIA | 870 | | 4 | EL SALVADOR | 119 | |
| 5 | NICARAGUA | 604 | | 5 | NICARAGUA | 24 | |

U.S. Citizenship and Immigration Services — The Asylum Division of U.S. Citizenship and Immigration Services routinely provides detailed asylum and credible fear data as part of a statistical package made available during regularly scheduled quarterly stakeholder engagement meetings.

AR007

## Credible Fear Workload Report Summary
## FY2019 Total Caseload

| | Totals | Oct-18 | Nov-18 | Dec-18 | Jan-19 | Feb-19 | Mar-19 | Apr-19 | May-19 | Jun-19 | Jul-19 | Aug-19 | Sep-19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 35,310 | 9,446 | 7,918 | 8,070 | 9,876 | | | | | | | | |
| Interviews Conducted | 28,847 | 7,773 | 7,487 | 6,933 | 6,654 | | | | | | | | |
| All Decisions | 32,188 | 8,593 | 7,848 | 8,405 | 7,342 | | | | | | | | |
| Fear Established (Y) | 25,060 | 6,902 | 6,000 | 6,460 | 5,698 | | | | | | | | |
| Fear Not Established (N) | 3,403 | 721 | 1,028 | 881 | 773 | | | | | | | | |
| Closings | 3,725 | 970 | 820 | 1,064 | 871 | | | | | | | | |

### October 2018 (FY 2019)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 9,446 | 1,140 | 385 | 18 | 133 | 6,509 | 601 | 138 | 131 | - | 138 | 253 |
| Interviews Conducted | 7,773 | 1,192 | 273 | 15 | 113 | 5,110 | 498 | 111 | 122 | - | 120 | 219 |
| All Decisions | 8,593 | 1,178 | 259 | 25 | 158 | 5,822 | 508 | 149 | 139 | - | 151 | 204 |
| Fear Established (Y) | 6,902 | 842 | 188 | 20 | 108 | 4,782 | 435 | 104 | 120 | - | 124 | 179 |
| Fear Not Established (N) | 721 | 145 | 22 | 3 | 34 | 400 | 56 | 22 | 13 | - | 17 | 9 |
| Closings | 970 | 191 | 49 | 2 | 16 | 640 | 17 | 23 | 6 | - | 10 | 16 |

### November 2018 (FY 2019)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 7,918 | 909 | 279 | 23 | 191 | 5,486 | 476 | 127 | 81 | - | 122 | 224 |
| Interviews Conducted | 7,487 | 934 | 198 | 20 | 168 | 5,266 | 412 | 108 | 84 | - | 101 | 196 |
| All Decisions | 7,848 | 1,109 | 231 | 22 | 151 | 5,376 | 436 | 124 | 77 | - | 101 | 221 |
| Fear Established (Y) | 6,000 | 803 | 178 | 20 | 120 | 4,108 | 352 | 84 | 67 | - | 84 | 184 |
| Fear Not Established (N) | 1,028 | 152 | 18 | - | 14 | 742 | 49 | 24 | 9 | - | 4 | 16 |
| Closings | 820 | 154 | 35 | 2 | 17 | 526 | 35 | 16 | 1 | - | 13 | 21 |

### December 2018 (FY 2019)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 8,070 | 1,212 | 277 | 13 | 189 | 5,363 | 433 | 215 | 61 | 9 | 133 | 165 |
| Interviews Conducted | 6,933 | 840 | 246 | 4 | 151 | 4,858 | 411 | 150 | 41 | - | 109 | 123 |
| All Decisions | 8,405 | 1,000 | 319 | 7 | 210 | 5,928 | 448 | 180 | 49 | - | 122 | 142 |
| Fear Established (Y) | 6,460 | 685 | 230 | 3 | 142 | 4,670 | 362 | 121 | 41 | - | 94 | 112 |
| Fear Not Established (N) | 881 | 152 | 30 | 1 | 31 | 556 | 53 | 26 | 3 | - | 14 | 15 |
| Closings | 1,064 | 163 | 59 | 3 | 37 | 702 | 33 | 33 | 5 | - | 14 | 15 |

### January 2019 (FY 2019)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 9,876 | 1,434 | 466 | 14 | 164 | 6,591 | 498 | 154 | 68 | 81 | 152 | 254 |
| Interviews Conducted | 6,654 | 796 | 258 | 5 | 144 | 4,524 | 350 | 147 | 69 | 33 | 122 | 206 |
| All Decisions | 7,342 | 939 | 286 | 5 | 156 | 4,914 | 405 | 164 | 78 | 36 | 125 | 234 |
| Fear Established (Y) | 5,698 | 637 | 172 | 5 | 101 | 3,984 | 298 | 118 | 60 | 31 | 98 | 194 |
| Fear Not Established (N) | 773 | 159 | 49 | - | 36 | 426 | 46 | 28 | 10 | 2 | 8 | 9 |
| Closings | 871 | 143 | 65 | - | 19 | 504 | 61 | 18 | 8 | 3 | 19 | 31 |

### February 2018 (FY 2019)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | | | | | | | | | | | | |
| Interviews Conducted | | | | | | | | | | | | |
| All Decisions | | | | | | | | | | | | |
| Fear Established (Y) | | | | | | | | | | | | |
| Fear Not Established (N) | | | | | | | | | | | | |
| Closings | | | | | | | | | | | | |

### March 2018 (FY 2019)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | | | | | | | | | | | | |
| Interviews Conducted | | | | | | | | | | | | |
| All Decisions | | | | | | | | | | | | |
| Fear Established (Y) | | | | | | | | | | | | |
| Fear Not Established (N) | | | | | | | | | | | | |
| Closings | | | | | | | | | | | | |

U.S. Citizenship and Immigration Services

The Asylum Division of U.S. Citizenship and Immigration Services routinely provides detailed asylum and credible fear data as part of a statistical package made available during regularly scheduled, quarterly stakeholder engagement meetings.

| April 2019 (FY 2019) | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
| Case Receipts | | | | | | | | | | | | |
| Interviews Conducted | | | | | | | | | | | | |
| **All Decisions** | | | | | | | | | | | | |
| Fear Established (Y) | | | | | | | | | | | | |
| Fear Not Established (N) | | | | | | | | | | | | |
| Closings | | | | | | | | | | | | |

| May 2019 (FY 2019) | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
| Case Receipts | | | | | | | | | | | | |
| Interviews Conducted | | | | | | | | | | | | |
| **All Decisions** | | | | | | | | | | | | |
| Fear Established (Y) | | | | | | | | | | | | |
| Fear Not Established (N) | | | | | | | | | | | | |
| Closings | | | | | | | | | | | | |

| June 2019 (FY 2019) | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
| Case Receipts | | | | | | | | | | | | |
| Interviews Conducted | | | | | | | | | | | | |
| **All Decisions** | | | | | | | | | | | | |
| Fear Established (Y) | | | | | | | | | | | | |
| Fear Not Established (N) | | | | | | | | | | | | |
| Closings | | | | | | | | | | | | |

| July 2019 (FY 2019) | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
| Case Receipts | | | | | | | | | | | | |
| Interviews Conducted | | | | | | | | | | | | |
| **All Decisions** | | | | | | | | | | | | |
| Fear Established (Y) | | | | | | | | | | | | |
| Fear Not Established (N) | | | | | | | | | | | | |
| Closings | | | | | | | | | | | | |

| August 2019 (FY 2019) | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
| Case Receipts | | | | | | | | | | | | |
| Interviews Conducted | | | | | | | | | | | | |
| **All Decisions** | | | | | | | | | | | | |
| Fear Established (Y) | | | | | | | | | | | | |
| Fear Not Established (N) | | | | | | | | | | | | |
| Closings | | | | | | | | | | | | |

| September 2019 (FY 2019) | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
| Case Receipts | | | | | | | | | | | | |
| Interviews Conducted | | | | | | | | | | | | |
| **All Decisions** | | | | | | | | | | | | |
| Fear Established (Y) | | | | | | | | | | | | |
| Fear Not Established (N) | | | | | | | | | | | | |
| Closings | | | | | | | | | | | | |

U.S. Citizenship and Immigration Services

The Asylum Division of U.S. Citizenship and Immigration Services routinely provides detailed asylum and credible fear data as part of a statistical package made available during regularly scheduled, quarterly stakeholder engagement meetings.

**Monthly Credible Fear Top 5 Nationalities Received**
**Fiscal Year 2019**

| Monthly Credible Fear Nationality Report | |
|---|---|
| October-18 | |
| Nationality | Receipts |
| 1 HONDURAS | 2,507 |
| 2 GUATEMALA | 1,936 |
| 3 EL SALVADOR | 1,337 |
| 4 INDIA | 852 |
| 5 CUBA | 786 |

| Monthly Credible Fear Nationality Report | |
|---|---|
| November-18 | |
| Nationality | Receipts |
| 1 HONDURAS | 1,857 |
| 2 GUATEMALA | 1,482 |
| 3 EL SALVADOR | 997 |
| 4 CUBA | 870 |
| 5 INDIA | 713 |

| Monthly Credible Fear Nationality Report | |
|---|---|
| December-18 | |
| Nationality | Receipts |
| 1 HONDURAS | 1,853 |
| 2 GUATEMALA | 1,695 |
| 3 CUBA | 1,091 |
| 4 EL SALVADOR | 939 |
| 5 INDIA | 645 |

| Monthly Credible Fear Nationality Report | |
|---|---|
| January-19 | |
| Nationality | Receipts |
| 1 HONDURAS | 3,327 |
| 2 GUATEMALA | 1,747 |
| 3 EL SALVADOR | 1,145 |
| 4 CUBA | 1,005 |
| 5 INDIA | 508 |

| Monthly Credible Fear Nationality Report | |
|---|---|
| February-19 | |
| Nationality | Receipts |
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |

| Monthly Credible Fear Nationality Report | |
|---|---|
| March-19 | |
| Nationality | Receipts |
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |

| Monthly Credible Fear Nationality Report | |
|---|---|
| April-19 | |
| Nationality | Receipts |
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |

| Monthly Credible Fear Nationality Report | |
|---|---|
| May-19 | |
| Nationality | Receipts |
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |

| Monthly Credible Fear Nationality Report | |
|---|---|
| June-19 | |
| Nationality | Receipts |
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |

| Monthly Credible Fear Nationality Report | |
|---|---|
| July-19 | |
| Nationality | Receipts |
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |

| Monthly Credible Fear Nationality Report | |
|---|---|
| August-19 | |
| Nationality | Receipts |
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |

| Monthly Credible Fear Nationality Report | |
|---|---|
| September-19 | |
| Nationality | Receipts |
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |



U.S. Citizenship and Immigration Services

The Asylum Division of U.S. Citizenship and Immigration Services routinely provides detailed asylum and credible fear data as part of a statistical package made available during regularly scheduled, quarterly stakeholder engagement meetings.

AR010

Credible Fear Processing Times
FY 2019 through January 2019

| | Totals | % | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUNE | JUL | AUG | SEP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 28,495 | | 7,633 | 7,031 | 7,351 | 6,480 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 32,219 | | 8,603 | 7,851 | 8,414 | 7,351 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 16,775 | 52.1% | 4,934 | 3,237 | 4,700 | 3,904 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 15,444 | 47.9% | 3,669 | 4,614 | 3,714 | 3,447 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 52.1% | | 57.4% | 41.2% | 55.9% | 53.1% | | | | | | | | |

e Asylum Division of U.S. Citizenship and Immigration Services
utinely provides detailed asylum and credible fear data as part
a statistical package made available during regularly scheduled,
arterly stakeholder engagement meetings.

AR011

# EXECUTIVE OFFICE FOR IMMIGRATION REVIEW ADJUDICATION STATISTICS

## Total Asylum Applications[1]



| Fiscal Year | Filed | Granted | Total Receipts : Total Grants Ratio |
|---|---|---|---|
| 2008 | 42,836 | 8,777 | 4.88:1 |
| 2009 | 35,811 | 8,384 | 4.27:1 |
| 2010 | 32,882 | 8,234 | 3.99:1 |
| 2011 | 41,459 | 9,866 | 4.2:1 |
| 2012 | 44,562 | 10,460 | 4.26:1 |
| 2013 | 43,439 | 9,690 | 4.48:1 |
| 2014 | 47,491 | 8,559 | 5.54:1 |
| 2015 | 63,562 | 8,108 | 7.83:1 |
| 2016 | 82,224 | 8,684 | 9.46:1 |
| 2017 | 144,053 | 10,537 | 13.67:1 |
| 2018 | 162,060 | 13,168 | 12.3:1 |
| 2019 (Second Quarter[2]) | 103,658 | 7,563 | 13.7:1 |

Data Generated: April 23, 2019
[1] Total (affirmative and defensive) asylum applications filed and total asylum applications granted (initial case completions) in removal, deportation, exclusion, and asylum-only proceedings.
[2] FY 2019 Second Quarter through March 31, 2019.

 Official website of the Department of Homeland Security

 U.S. Department of
Homeland Security

# Migrant Protection Protocols

**Release Date:**  January 24, 2019

*"We have implemented an unprecedented action that will address the urgent humanitarian and security crisis at the Southern border. This humanitarian approach will help to end the exploitation of our generous immigration laws. The Migrant Protection Protocols represent a methodical commonsense approach, exercising long-standing statutory authority to help address the crisis at our Southern border." – Secretary of Homeland Security Kirstjen M. Nielsen*

## What Are the Migrant Protection Protocols?

The Migrant Protection Protocols (MPP) are a U.S. Government action whereby certain foreign individuals entering or seeking admission to the U.S. from Mexico – illegally or without proper documentation – may be returned to Mexico and wait outside of the U.S. for the duration of their immigration proceedings, where Mexico will provide them with all appropriate humanitarian protections for the duration of their stay.

## Why is DHS Instituting MPP?

The U.S. is facing a security and humanitarian crisis on the Southern border. The Department of Homeland Security (DHS) is using all appropriate resources and authorities to address the crisis and execute our missions to secure the borders, enforce immigration and customs laws, facilitate legal trade and travel, counter traffickers, smugglers and transnational criminal organizations, and interdict drugs and illegal contraband.

AR013

MPP will help restore a safe and orderly immigration process, decrease the number of those taking advantage of the immigration system, and the ability of smugglers and traffickers to prey on vulnerable populations, and reduce threats to life, national security, and public safety, while ensuring that vulnerable populations receive the protections they need.

Historically, illegal aliens to the U.S. were predominantly single adult males from Mexico who were generally removed within 48 hours if they had no legal right to stay; now over 60% are family units and unaccompanied children and 60% are non-Mexican. In FY17, CBP apprehended 94,285 family units from Honduras, Guatemala, and El Salvador (Northern Triangle) at the Southern border. Of those, 99% remain in the country today.

Misguided court decisions and outdated laws have made it easier for illegal aliens to enter and remain in the U.S. if they are adults who arrive with children, unaccompanied alien children, or individuals who fraudulently claim asylum. As a result, DHS continues to see huge numbers of illegal migrants and a dramatic shift in the demographics of aliens traveling to the border, both in terms of nationality and type of aliens- from a demographic who could be quickly removed when they had no legal right to stay to one that cannot be detained and timely removed.

In October, November, and December of 2018, DHS encountered an average of 2,000 illegal and inadmissible aliens a day at the Southern border. While not an all-time high in terms of overall numbers, record increases in particular types of migrants, such as family units, travelling to the border who require significantly more resources to detain and remove (when our courts and laws even allow that), have overwhelmed the U.S. immigration system, leading to a "system" that enables smugglers and traffickers to flourish and often leaves aliens in limbo for years. This has been a prime  cause of our near-800,000 case backlog in immigration courts and delivers no consequences to aliens who have entered illegally.

Smugglers and traffickers are also using outdated laws to entice migrants to undertake the dangerous journey north where on the route migrants report high rates of abuse, violence, and sexual assault. Human smugglers and traffickers exploit migrants and seek to turn human misery into profit. Transnational

AR014

criminal organizations and gangs are also deliberately exploiting the situation to bring drugs, violence, and illicit goods into American communities.  The activities of these smugglers, traffickers, gangs and criminals endanger the security of the U.S., as well as partner nations in the region.

The situation has had severe impacts on U.S. border security and immigration operations.  The dramatic increase in illegal migration, including unprecedented number of families and fraudulent asylum claims is making it harder for the U.S. to devote appropriate resources to individuals who are legitimately fleeing persecution. In fact, approximately 9 out of 10 asylum claims from Northern Triangle countries are ultimately found non-meritorious by federal immigration judges. Because of the court backlog and the impact of outdated laws and misguided court decisions, many of these individuals have disappeared into the country before a judge denies their claim and simply become fugitives.

The MPP will provide a safer and more orderly process that will discourage individuals from attempting illegal entry and making false claims to stay in the U.S., and allow more resources to be dedicated to individuals who legitimately qualify for asylum.

## What Gives DHS the Authority to Implement MPP?

Section 235 of the Immigration and Nationality Act (INA) addresses the inspection of aliens seeking to be admitted into the U.S. and provides specific procedures regarding the treatment of those not clearly entitled to admission, including those who apply for asylum.  Section 235(b)(2)(C) provides that "in the case of an alien  . . . who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the U.S.," the Secretary of Homeland Security "may return the alien to that territory pending a [removal] proceeding under § 240" of the INA."  The U.S. has notified the Government of Mexico that it is implementing these procedures under U.S. law.

## Who is Subject to MPP?

With certain exceptions, MPP applies to aliens arriving in the U.S. on land from Mexico (including those apprehended along the border) who are not clearly

AR015

admissible and who are placed in removal proceedings under INA § 240. This includes aliens who claim a fear of return to Mexico at any point during apprehension, processing, or such proceedings, but who have been assessed not to be more likely than not to face persecution or torture in Mexico. Unaccompanied alien children and aliens in expedited removal proceedings will not be subject to MPP. Other individuals from vulnerable populations may be excluded on a case-by-case basis.

## How Will MPP Work Operationally?

Certain aliens attempting to enter the U.S. illegally or without documentation, including those who claim asylum, will no longer be released into the country, where they often fail to file an asylum application and/or disappear before an immigration judge can determine the merits of any claim. Instead, these aliens will be given a "Notice to Appear" for their immigration court hearing and will be returned to Mexico until their hearing date.

While aliens await their hearings in Mexico, the Mexican government has made its own determination to provide such individuals the ability to stay in Mexico, under applicable protection based on the type of status given to them.

Aliens who need to return to the U.S. to attend their immigration court hearings will be allowed to enter and attend those hearings. Aliens whose claims are found meritorious by an immigration judge will be allowed to remain in the U.S. Those determined to be without valid claims will be removed from the U.S. to their country of nationality or citizenship.

DHS is working closely with the U.S. Department of Justice's Executive Office for Immigration Review to streamline the process and conclude removal proceedings as expeditiously as possible.

## Will Migrants in MPP Have Access to Counsel?

Consistent with the law, aliens in removal proceedings can use counsel of their choosing at no expense to the U.S. Government. Aliens subject to MPP will be

AR016

afforded the same right and provided with a list of legal services providers in the area which offer services at little or no expense to the migrant.

## What Are the Anticipated Benefits of MPP?

Every month, tens of thousands of individuals arrive unlawfully at the Southern Border.  MPP will reduce the number of aliens taking advantage of U.S. law and discourage false asylum claims.  Aliens will not be permitted to disappear into the U.S. before a court issues a final decision on whether they will be admitted and provided protection under U.S. law.  Instead, they will await a determination in Mexico and receive appropriate humanitarian protections there.  This will allow DHS to more effectively assist legitimate asylum-seekers and individuals fleeing persecution, as migrants with non-meritorious or even fraudulent claims will no longer have an incentive for making the journey.  Moreover, MPP will reduce the extraordinary strain on our border security and immigration system, freeing up personnel and resources to better protect our sovereignty and the rule of law by restoring integrity to the American immigration system.

## Additional Information

- Secretary Nielsen Implementation Memo (/publication/policy-guidance-implementation-migrant-protection-protocols) (January 25, 2019, PDF)

Topics:  Border Security (/topics/border-security) , Immigration and Customs Enforcement (/topics/immigration-enforcement)

Keywords:  Border Security (/keywords/border-security) , immigration enforcement (/keywords/immigra ion-enforcement) , southwest border (/keywords/sou hwest-border)

Last Published Date: January 29, 2019

AR017

# Department of Homeland Security Border Security Metrics Report

*May 1, 2018*



AR018

# Message from Homeland Security

May 1, 2018

The "Department of Homeland Security Border Security Metrics Report" is submitted pursuant to the Fiscal Year (FY) 2017 National Defense Authorization Act (NDAA), which directs that "Not later than 180 days after the date of the enactment of this section, the Secretary (of Homeland Security) shall develop metrics, informed by situational awareness, to measure the effectiveness of security between ports of entry, at ports of entry, in the maritime environment and to measure the effectiveness of the aviation assets and operations of Air and Marine Operations of U.S. Customs and Border Protection."  The Act further directs the Secretary to annually assess, report, and implement the specified metrics.

The outcome-based performance measures called for by the Act are the most comprehensive, rigorous set of border security metrics required of the Department of Homeland Security (DHS) to date.  Through previous efforts, DHS has established processes and procedures to collect and analyze essential data to meet most, but not all, of the Act's requirements.  This initial report identifies which measures are still unavailable; DHS commits to continuing efforts to produce all the measures required by the Act no later than submission of the next annual report.

DHS considers this report to be the beginning of a consequential dialogue with Congress and the American public wherein defensible data create the foundation for discussions of border security policies and strategies.  This initial report focuses on providing data and information on DHS methodological approaches.  In accordance with the Act, future annual reports will include trend analysis of the measures being reported.

Thank you for your continuing support and commitment to strengthening the operating effectiveness of DHS.

Pursuant to congressional requirements, this notification is being provided to the following Members of Congress:

> The Honorable Ron Johnson
> Chairman, Senate Committee on Homeland Security and Governmental Affairs
>
> The Honorable Claire McCaskill
> Ranking Member, Senate Committee on Homeland Security and Governmental Affairs
>
> The Honorable Michael McCaul
> Chairman, House Committee on Homeland Security
>
> The Honorable Bennie Thompson
> Ranking Member, House Committee on Homeland Security

Inquiries relating to this report may be directed to the DHS Office of Legislative Affairs at (202) 447-5890.

AR019

Sincerely,


James W. McCament
Deputy Under Secretary
Office of Strategy, Policy, and Plans

AR020



# DHS Border Security Metrics Report

# Table of Contents

I.      Legislative Language ................................................................................5

II.     Introduction .............................................................................................6

III.    SEC. 1092 BORDER SECURITY METRICS .........................................................9

§ 1092 (b) METRICS FOR SECURING THE BORDER BETWEEN PORTS OF ENTRY .........................9

§ 1092 (c) METRICS FOR SECURING THE BORDER AT PORTS OF ENTRY ..................................33

§ 1092 (d) METRICS FOR SECURING THE MARITIME BORDER ....................................................44

§ 1092 (e) AIR AND MARINE SECURITY METRICS IN THE LAND DOMAIN ...............................51

§ 1092 (g)(3)(D) Other Appropriate Information ..................................................................56

IV.     Conclusion ...............................................................................................62

Appendix A – Repeated Trials Model Methodology ............................................................63

Appendix B – Drugs Seizures – All Ports of Entry .............................................................66

AR021

# I.    Legislative Language

Section 1092 of the FY 2017 National Defense Authorization Act (NDAA), signed into law December 23, 2016, directs the Secretary of Homeland Security to provide annually to the Committee on Homeland Security of the House of Representatives and the Committee on Homeland Security and Governmental Affairs of the Senate specific "Metrics for Securing the Border Between Ports of Entry," "Metrics for Securing the Border At Ports of Entry," "Metrics for Securing the Maritime Border," and "Air and Marine Security Metrics in the Land Domain." The NDAA further directs that the Secretary "in accordance with applicable privacy laws, make data related to apprehensions, inadmissible aliens, drug seizures, and other enforcement actions available to the public, law enforcement communities, and academic research communities."

AR022

# II.  Introduction

As President Donald Trump indicated in Executive Order 13767 "Border Security and Immigration Enforcement Improvements" (January 25, 2017), border security is critically important to the national security of the United States.  The Department's ability to measure its border-security inputs, activities, outputs, and outcomes is essential to the effective and efficient management of the Department, including management of the new activities and investments directed by the President's Executive Orders on border security and immigration enforcement.

Comprehensive and rigorous performance management data provide DHS leadership with the foundation to support responsible evidence-based decision-making for resource allocation and investments and for operational and mission management.  Further, DHS implementation of this approach provides a pair of unifying border security goals under the Department's mission to secure and manage U.S. borders.  As summarized in the DHS Quadrennial Homeland Security Review (QHSR), the Department's first two goals under the border security mission area are to "Secure U.S. Air, Land, and Sea Borders and Approaches" by preventing illegal entry and to "Safeguard and Expedite Lawful Travel and Trade" by safeguarding key nodes, conveyances, and pathways, and by managing the risk of people and goods in transit.  Ultimately, the border security metrics described in this report are designed to assess the ability of the Department's border security policies and investments to achieve these outcomes.

For analytic purposes, the metrics included in this report may be divided into four categories:

- Inputs:  Resources acquired or expended to secure the border.  Examples of border security inputs include the number of U.S. Customs and Border Protection (CBP) Office of Field Operations (OFO) officers and U.S. Border Patrol (USBP) agents deployed, miles of fencing and other border infrastructure, and numbers of aircraft committed to the border security mission.
- Activities:  Specific actions taken to secure the border.  Examples of border security activities include illegal border crossers apprehended, travelers admitted or denied admission at ports of entry (POE), and pounds of narcotics seized.
- Outputs:  Immediate results of enforcement activities as they relate to the border security goals.  Examples of border security outputs include the rate at which intending unlawful border crossers are apprehended or interdicted, and the accuracy of screening results for travelers and goods at POEs.
- Outcomes:  The ultimate impacts of border security policies.  As defined by the QHSR, the most important border security outcomes are the numbers of illegal migrants and quantities of illegal goods entering the United States (Goal 2.1), and the ease with which lawful travelers and goods pass through POEs (Goal 2.2).

In general, border security *inputs* and *activities* are directly observable and can be measured with a high degree of reliability.  Policymakers have direct control over resource allocation, and data on inputs are available in budget and acquisitions documents.  Operational agencies also track enforcement activities as part of their case management process.  In short, the Department knows exactly how many agents it deploys, how many miles of fence it erects, how many aliens it apprehends, and how many travelers it admits.  Input and activity measures tend to provide insight into the level and type of enforcement effort undertaken—what the Department is

6

doing—that are useful for workload management and tactical decision-making; but in and of themselves these metrics typically provide limited insight into the state of border security.

*Outcome* and *output* measures often provide more insight than inputs and activities when it comes to evaluating border security and may be powerful tools for policy and program evaluation. Yet many output and outcome metrics are difficult to measure directly because illegal border crossers actively seek to evade detection, and some flows are undetected and therefore can never be measured directly. This challenge is nearly universal when measuring illegal activities, which is why law enforcement agencies typically rely on crime *reports* as indicators of *total* criminal activities, for example. Measuring border security outputs and outcomes is also difficult because of the diversity and complexity of the enforcement mission along the United States' 6,000 miles of land borders, 95,471 miles of coastline, and 350 POEs. Moreover, enforcement outcomes only partially depend on border security policies, since immigration flows also reflect numerous factors outside enforcement agencies' control, including the broader set of U.S. immigration policies and numerous economic, demographic, and other structural factors.

Historically, DHS and the legacy Immigration and Naturalization Service addressed these measurement challenges by relying on alien apprehensions (an activity metric) as a proxy measure of illegal immigration between POEs (an outcome metric). More recently, CBP and DHS have initiated a number of new estimation strategies to better model unknown flows. These efforts have focused primarily on border security between POEs in the land domain (NDAA § 1092(b)), a domain that has been identified by Congress and the last several Administrations as a top enforcement priority. Some of this research remains a work in progress as DHS is not yet able to validate certain modeling assumptions or to quantify the uncertainty around its new estimation techniques. In addition, many of the metrics in this report remain limited to the southwest border. The Department's future work on border metrics will continue to refine these new indicators of border security between POEs and expand data collection and methodologies to the northern border, while also developing additional indicators of border security, including those identified as incomplete in this report.

Pursuant to the NDAA, this report covers a mix of input, activity, output, and outcome metrics between POEs, at POEs, in the maritime domain, and with respect to air and marine security in the land domain. While most of these measures involve data the Department has tracked for many years, some remain under development or fall outside the scope of the Department's existing measurement methodologies. This report includes the following information for each border security metric:
- Definition of the metric and brief description of how the metric contributes to the Department's understanding of border security;
- Discussion of the Department's current methodology for producing the metric and related methodological limitations; and
- Available data, including historical data where possible, and brief discussion of implications for the current state of border security.

The following sections of this report provide this information for each metric directed by the NDAA. In addition to the specific metrics identified in sections §1092(b) – (e), this report

AR024

includes supplemental measures that inform the Department's assessment of the state of border security between POEs, as directed by NDAA § 1092(g)(3)(D).

AR025

# III.  SEC. 1092 BORDER SECURITY METRICS

## § 1092(b) Metrics for Securing the Border between Ports of Entry

### § 1092(b)(1)(A)(i) Attempted Unlawful Border Crosser Apprehension Rate

**Definition**

In general, the attempted unlawful border crosser apprehension rate is defined as the proportion of attempted border crossers that is apprehended by USBP:

$$Apprehension\ Rate = \frac{Apprehensions}{Unlawful\ Entry\ Attempts}$$

While USBP has reliable administrative data on apprehensions, the Department does not have an exact count of unlawful entry attempts since an unknown number of illegal border crossers evade detection.  As a result of this so-called "denominator problem," the Department must estimate the apprehension rate.  Current methodologies allow DHS to produce two apprehension rate estimates:

*Model-based Apprehension Rate* ($AR_{Model-based}$) – Based on statistical modeling, the estimated share of all attempted unlawful border crossers between land POEs that is apprehended.

*Observational Apprehension Rate* ($AR_{Observational}$) – Based on direct (unlawful border crossers observed by USBP) and indirect (residual evidence of a border crosser, i.e. footprints) observations of attempted unlawful border crossers, the estimated share of observed attempted unlawful border crossers that is apprehended.

The apprehension rate is an *output measure* that describes the difficulty of illegally crossing the border successfully.

A conceptual limitation of apprehension rate data is that they include information about border *apprehensions*, but exclude information about *turn backs* (see section 1092 (b)(1)(A)(iv) for definition), which are a key element of USBP's enforcement strategy, with underlying operational implications.  In this sense, measures of the apprehension rate understate USBP's overall enforcement success rate.  On the other hand, some analysts consider information about turn backs difficult to interpret since an unknown share of turn backs make additional entry attempts.

AR026

**Methodology and Limitations**

*Model-based Apprehension Rate*

The Model-based Apprehension Rate is based on the repeated trials model (RTM) methodology. As explained in detail in Appendix A, the RTM methodology yields an estimated partial apprehension rate (PAR) for southwest border crossers, which focuses on a relatively small share of attempted unlawful border crossers.  Following the calculation of the PAR, the AR$_{\text{Model-based}}$ methodology consists of four additional steps.

First, all attempted unlawful border crossers are divided into two groups, which are labeled "impactable" and "non-impactable" by traditional DHS enforcement policies.  Impactable border crossers include adults without children who are not asylum seekers and (prior to 2017) are not from Cuba.  Aliens in this group are described as impactable because they are generally subject to the full range of DHS and Department of Justice (DOJ) enforcement consequences, and therefore potentially impacted by existing border enforcement.  Non-impactable border crossers include unaccompanied minors, family units, individuals who request asylum, and (prior to 2017) Cubans.  Aliens in this group are described as non-impactable because, historically, they have usually been released into the United States with a Notice to Appear in immigration court for legal proceedings on a future date, rather than being subject to immediate DHS enforcement consequences.  These aliens are assumed generally to be "non-impactable" by traditional DHS enforcement activities at the border because even if they are apprehended they are typically unlikely to be immediately removed or returned.[1]

Second, the AR$_{\text{Model-based}}$ methodology assumes an apprehension rate for each of these two groups:  1) all attempted unlawful border crossers in the impactable population are assumed to be apprehended at the partial apprehension rate generated by the RTM methodology; and 2) all unlawful border crossers in the non-impactable population are assumed to intentionally present themselves to a USBP agent or OFO officer and therefore to have a 100 percent apprehension rate.  Notably, these assumptions do not reflect the actual behavior of all border crossers, as noted below, but they serve to construct a probability model.

Third, the Partial Apprehension Rate is used to calculate the total number of impactable aliens making illegal entry attempts.  The methodology assumes (in the previous step) that all impactable aliens are apprehended at the PAR rate generated by the RTM methodology:

$$PAR = \frac{Apprehensions_{Impactable}}{Attempts_{Impactable}}$$

---

[1] Cubans were considered "non-impactable" between 1995 and January 2017 because they were routinely granted parole into the United States if they reached U.S. soil, under the wet-foot/dry-foot policy.  The Obama Administration terminated the special parole component of the wet-foot/dry-foot policy in January 2017.

AR027

Mathematically, this equation can be re-arranged to define the total number of impactable aliens making an illegal entry attempt as follows:

$$Attempts_{Impactable} = \frac{Apprehensions_{Impactable}}{PAR}$$

Since non-impactable aliens are assumed to have a 100% apprehension rate, the number of entry attempts of non-impactable aliens is equal to the number of their apprehensions.

Finally, the Total Apprehension Rate is calculated as a weighted average of the total numbers of impactable and non-impactable aliens attempting unlawful entry times their respective apprehension rates:

$$AR_{Model-based} = \frac{(Attempts_{Impactable} * PAR) + (Attempts_{Non-impactable} * 100\%)}{(Attempts_{Impactable} + Attempts_{Non-impactable})}$$

The current AR_Model-based methodology makes a number of assumptions that cannot be fully validated. First, the AR_Model-based methodology builds on the RTM's partial apprehension rate, and so incorporates all of the RTM modeling assumptions and associated limitations discussed in Appendix A. In addition, the current AR_Model-based methodology also assumes: that the entire cohort of border crossers can be divided into impactable and non-impactable groups, that the entire impactable group is apprehended at the same rate as RTM aliens included in the PAR analysis, and that the entire non-impactable group is apprehended 100 percent of the time. Each of these additional assumptions introduces potential biases into the estimated apprehension rate.

The Department has not precisely quantified the impact of these assumptions on the AR_Model-based estimates. For these reasons, DHS considers the AR_Model-based methodology to be a work in progress. DHS is working to refine the AR_Model-based methodology to address these limitations and to more precisely describe their impact on the AR_Model-based estimate. The estimated apprehension rates reported here may be updated in the future as the Department continues to refine the model-based estimation methodology.

*Observational Apprehension Rate*

The Observational Apprehension Rate is calculated as the ratio of USBP apprehensions to the sum of apprehensions and observed (directly or indirectly) got aways:

$$AR_{Observational} = \frac{Apprehensions}{Apprehensions + Got\ Aways}$$

"Got aways" are defined as subjects at the southwest border who, after making an illegal entry, are not turned back or apprehended, and are no longer being actively pursued by USBP agents.

Since 2014, USBP has implemented a standard, southwest border-wide methodology for determining when to report a subject as a got away. Some subjects are observed directly as evading apprehension or turning back; others are acknowledged as got aways or turn backs after

agents follow evidence that indicate entries have occurred such as foot sign (i.e. tracks), sensor activations, interviews with apprehended subjects, camera views, and communication between and among stations and sectors. The scope of these data includes all areas of the southwest land border at or below the northernmost law enforcement posture (typically a USBP checkpoint) within a given area of responsibility, and those individuals apprehended less than 30 days after entering the United States.

In an effort to maintain reliable best practices, command staff at all southern border stations ensure all agents are aware of and utilize proper definitions for apprehensions, got aways and turn backs at their respective stations. They also ensure the necessary communication takes place between and among sectors and stations to minimize double-counting when subjects cross more than one station's area of responsibility. In addition to station-level safeguards, designated USBP Headquarters components validate data integrity by utilizing various data quality reports.

The primary limitation to $AR_{Observational}$ is that the denominator excludes an unknown number of unobserved got aways. Over the past several years, DHS has invested millions of dollars in technology that has facilitated the ability to see and detect more at the border. Improvements in situational awareness give DHS an ever-increasing, real-time ability to understand how much illegal activity agents are encountering at the immediate border and their ability to respond. As a result, despite the fact that overall border entries are substantially lower today than in any previous fiscal year, agents are currently interdicting slightly *lower* percentages of the total known flow. This observation reflects USBP's increased domain awareness—i.e., that through technological advances, the agency has improved its awareness of illegal entry attempts (known got aways)—rather than experienced a drop in enforcement effectiveness. Increasing situational awareness narrows the gap between the known and unknown flow, and puts DHS in a position to build ever better observational estimates of border security. The Department will continue to refine these observational estimates and is currently working on a methodology to estimate their statistical reliability.

An additional methodological limitation is that the estimated count of got aways aggregates potentially subjective observations from thousands of individual agents. USBP has taken a number of steps to establish reliable turn back and got away methodologies, as discussed above.

**Available Data and Discussion**

Table 1 provides the estimated model-based apprehensions rate for FY 2003 – FY 2016 and the estimated observational apprehension rate for FYs 2006-2016, the years for which these data are available.

AR029

Table 1:  Model-Based and Observational Apprehension Rates, FY 2000 – FY 2016

| Fiscal Year | Model-based Apprehension Rate | Observational Apprehension Rate |
|---|---|---|
| 2003 | 34.1 | NA |
| 2004 | 37.0 | NA |
| 2005 | 39.1 | NA |
| 2006 | 39.2 | 63.5 |
| 2007 | 40.2 | 64.1 |
| 2008 | 44.6 | 67.7 |
| 2009 | 47.2 | 70.7 |
| 2010 | 46.6 | 74.4 |
| 2011 | 46.1 | 79.4 |
| 2012 | 48.0 | 77.5 |
| 2013 | 51.0 | 70.8 |
| 2014 | 65.5 | 74.8 |
| 2015 | 63.5 | 76.7 |
| 2016 | 64.8 | 79.4 |

Since FY 2003, the model-based apprehension rate has climbed from less than 35 percent to nearly 65 percent in FY 2016.  These increases reflect a higher apprehension rate for "impactable" border crossers as well as an increase in the share of border crossers who are "non-impactable" and therefore assumed to be apprehended 100 percent of the time.

The observational apprehension rate has also shown improvements since FY 2006.  Despite its limitations, the upward trend in $AR_{Observational}$ is noteworthy because it independently reinforces the upward trend observed in the model-based estimate.  Moreover, with increasing situational awareness along the border during this period, it is likely that CBP detects an increasing share of total got aways over time.  As a result, the upward trend in $AR_{Observational}$ likely under-estimates the actual increase in the total share of attempted border crossers that is apprehended.

## § 1092(b)(1)(A)(ii) Detected unlawful entries

**Definition**

*Detected unlawful entries* – The total number of attempted unlawful border crossers between land POEs who are directly or indirectly observed or detected by USBP.

Detected unlawful entries is an *outcome measure* that describes the numbers of migrants detected crossing or attempting to cross the border unlawfully.  Detected unlawful entries is not a comprehensive outcome measure since it excludes undetected unlawful entries, as discussed below.  The ratio of detected to undetected unlawful entries, also discussed below, is an *output measure* that describes the Department's ability to detect unlawful entries.

13

**Methodology and Limitations**

The number of detected unlawful entries is calculated as the sum of turn backs, got aways, and apprehensions.  Turn backs are defined as subjects who, after making an illegal entry into the United States, return to the country from which they entered, not resulting in an apprehension or got away.  Got aways are defined as subjects who, after making an illegal entry, are not turned back or apprehended, and are no longer being actively pursued by USBP agents.  Apprehensions are defined as removable aliens arrested by USBP.

Turn backs and got aways are observational estimates; USBP records total and by-sector estimates of turn backs and got aways based on direct and indirect observations as described above.  Apprehensions are calculated based on nationwide DHS administrative data and are not limited to the southwest border; USBP apprehension data are considered a reliable count of apprehensions.

The primary limitation to detected unlawful entries is that this metric incorporates turn back and got away estimates that aggregate potentially subjective observations from thousands of individual agents.  USBP has taken a number of steps to address this problem by establishing consistent and reliable turn back and got away methodologies, as discussed above.

**Available Data and Discussion**

Figure 1 depicts available data on estimated detected unlawful entries for FY 2006 – FY 2016, the years for which data are available.  As the figure indicates, estimated detected unlawful entries (the sum of apprehensions, turn backs, and got aways) fell from 2.0 million to 624 thousand during this period, a 69 percent decrease.

Figure 1:  Estimated Detected Unlawful Entries Nationwide Between POEs, FY 2006 – FY 2016



AR031

# § 1092(b)(1)(A)(iii) Estimated undetected unlawful entries

**Definition**

*Undetected unlawful entries* – An estimate of the number of attempted unlawful border crossers between land POEs who are not directly or indirectly observed or detected by USBP.  By assumption, undetected unlawful entries evade apprehension and enter the United States unlawfully.

Undetected unlawful entries is an *outcome measure* that describe the numbers of migrants who completely evade detection and successfully enter the United States unlawfully.  Undetected unlawful entries is not a comprehensive outcome measure since it excludes detected unlawful entries, discussed above.  The ratio of detected to total unlawful entries (i.e., the probability of detection) is an *output measure* that describes the Department's ability to detect unlawful entries, as discussed below. At present, this methodology only exists for the southwest land border between ports of entry. Research is underway on methods to produce this estimate for the northern border.

**Methodology and Limitations**

Currently, the Department's best available methodology for estimating undetected unlawful entries builds on the repeated trials model (RTM) methodology to produce a model-based estimate of total successful unlawful entries.  The estimated number of undetected unlawful entries is calculated as the difference between the model-based estimate of total successful unlawful entries and the estimated number of got aways (i.e., *detected* successful unlawful entries):

$$Undetected\ Unlawful\ Entries$$
$$= Total\ Successful\ Unlawful\ Entries - Detected\ Got\ Aways$$

As explained in detail in Appendix A, the RTM methodology yields an estimated partial apprehension rate (PAR) for southwest border crossers.  Following the calculation of the PAR, the methodology for estimating total successful unlawful entries consists of three additional steps.

First, as in the calculation of the model-based apprehension rate discussed above, all attempted unlawful border crossers are divided into "impactable" and "non-impactable" groups.  Second, the PAR is used to estimate the odds of successful entry for aliens within the impactable population group.[2]  Third, the number of successful unlawful entries is estimated based on the odds of successful entry among this group times the apprehension count among impactable aliens.  Because non-impactable aliens are assumed to be apprehended 100 percent of the time, only impactable aliens contribute to the estimated count of total successful unlawful entries:

---

[2] Mathematically, $odds\ of\ successful\ entry = \left(\frac{1-PAR}{PAR}\right)$.

AR032

$$Total\ Successful\ Unlawful\ Entries$$
$$= Odds\ of\ Successful\ Entry * Apprehensions\ of\ Impactable\ Aliens$$

The estimated number of undetected unlawful entries is derived from the observational estimate of detected unlawful entries, with limitations discussed above, and the model-based estimate of total successful unlawful entries, which in turn is derived from the RTM methodology and the model-based apprehension rate, with additional limitations discussed above.  DHS is working to refine both the observational and model-based methodologies and to more precisely describe the impact of these limitations on estimates of total and undetected unlawful entries.

**Available Data and Discussion**

Figure 2 depicts available data on estimated undetected unlawful entries for FY 2006 – FY 2016, the years for which data are available. As the figure indicates, estimated undetected unlawful entries fell from approximately 851,000 to nearly 62,000 during this period, a 93 percent decrease.

Figure 2:  Estimated Southwest Border Undetected Unlawful Entries, FY 2006 – FY 2016



# § 1092(b)(1)(A)(iv) Turn backs

**Definition**

*Turn backs* –An estimate of the number of subjects who, after making an illegal entry into the United States, return to the country from which they entered, not resulting in an apprehension or got away.

Turn backs are an *activity measure* that USBP uses for tactical decision-making.

Turn backs also contribute to several other border security metrics, including Detected Unlawful Entries, discussed above, and the Unlawful Border Crossing Effectiveness Rate, discussed below.

**Methodology and Limitations**

Turn backs are a nationwide observational estimate; USBP records total and by-sector estimates of turn backs based on direct and indirect observations as described above.

The primary limitation to detected turn backs is that the estimate aggregates potentially subjective observations from thousands of individual agents.  USBP has taken a number of steps to address this problem by establishing consistent and reliable turn back and got away methodologies, as discussed above.  In addition, some unlawful border crossers may enter the United States to drop off drug loads or to act as decoys to lure agents away from a certain area and then return to Mexico, and therefore may be misidentified as turn backs.[3]

**Available Data and Discussion**

Table 2:  Southwest Border Turn Backs between POEs, FY 2007 – FY 2016

| FY2007 | FY2008 | FY2009 | FY2010 | FY2011 | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 |
|---|---|---|---|---|---|---|---|---|---|
| 254,490 | 204,176 | 178,566 | 150,005 | 121,007 | 121,079 | 156,581 | 147,025 | 105,670 | 108,601 |

The number of turn backs has decreased by more than 57 percent since FY 2007. This decrease is consistent with numerous other between-POE metrics than suggest a decrease in flow over the past 10 years.

# § 1092(b)(1)(A)(v) Got aways

**Definition**

*Got aways* – An estimate of the number of subjects who, after making an illegal entry, are not turned back or apprehended, and are no longer being actively pursued by USBP agents.

*Total Successful Unlawful Entries* – An estimate of the total number of subjects who cross the border unlawfully and who enter the United States without being apprehended.

**Methodology and Limitations**

*Got Aways*

---

[3] U.S. Government Accountability Office, "Border Patrol: Goals and Measures Not Yet in Place to Inform Border Security Status and Resource Needs," GAO-13-330T, February 26, 2013, p. 15.

AR034

Got aways are an observational estimate; USBP records total and by-sector estimates of got aways based on direct and indirect observations as described above.  While got aways are recorded by USBP at all borders, got aways in this section refer to the southwest border between-ports of entry only.

The primary methodological limitation of got aways is that the estimate aggregates potentially subjective observations from thousands of individual agents.  USBP has taken a number of steps to address this problem by establishing consistent and reliable turn back and got away methodologies, as discussed above.

Conceptually, the got aways metric is limited to *observed* (directly or indirectly) flows; it is not a comprehensive measure of successful unlawful entries.  USBP's recent work to increase situational awareness, including through the use of Geospatial Intelligence, gives the Department growing confidence in its got away count.  As situational awareness continues to improve, observed got aways will become an increasingly comprehensive measure of successful unlawful entries.  USBP and DHS are working to refine USBP's observational methodology and to more precisely describe the gap between observed and unobserved got aways.

*Total Successful Unlawful Entries*

The current methodology for estimating total successful unlawful entries is based on the repeated trials model (RTM) methodology.  As explained in detail in Appendix A, the RTM methodology yields an estimated partial apprehension rate (PAR) for southwest border crossings, which focuses on a relatively small share of attempted unlawful border crossers.  Following the calculation of the PAR, the methodology for estimating total successful unlawful entries consists of three additional steps, as described above:  attempted border crossers are divided into impactable and non-impactable groups; the PAR is used to estimate the odds of successful entry; and the number of successful unlawful entries is estimated based on the odds of successful entry among this group times the number of apprehensions of impactable aliens.

The RTM methodology to estimate the PAR confronts a number of methodological limitations, as discussed in Appendix A.  Each of the additional assumptions involved in using the PAR to estimate total successful unlawful entries introduces additional methodological limitations and potential biases.  DHS is working to refine the model-based methodology and to more precisely describe the impact of these limitations on estimates of total successful unlawful entries.

**Available Data and Discussion**

Figure 3 depicts southwest border between-ports of entry detected got aways for FY 2006 – FY 2016 and estimated total successful unlawful entries for FY 2000 – FY 2016, the years for which data are available.  As the figure illustrates, estimated total successful unlawful entries declined from 1.8 million to 168,000 between FY 2000 and FY 2016, a 91 percent decrease.  Estimated got aways declined from 615,000 to 106,000 between FY 2006 and FY 2016, an 83 percent decrease.

18

Figure 3:  Southwest Border Got Aways and Estimated Total Successful Unlawful Entries between POEs, FY 2000 – FY 2016

Notably, the model-based estimate of total successful unlawful entries declined at a faster rate than observed got aways, with the model based estimate falling 89 percent between FY 2006 and FY 2016 (the period for which both data series are available), versus an 83 percent decrease for detected got aways during this period.  Relatedly, the two series have substantially converged over this time period, with observed got aways accounting for 42 percent of total estimated successful unlawful entries in FY 2006 versus 63 percent in FY 2016.  These facts suggest that USBP detects an increasingly comprehensive share of all attempted unlawful border crossers.

## § 1092(b)(1)(B) A measurement of situational awareness achieved in each U.S. Border Patrol sector

**Definition**

*Situational awareness* – Knowledge and understanding of current unlawful cross-border activity.

Situational awareness is an output measure that describes the Department's awareness of unlawful cross-border activity.

**Methodology and Limitations**

DHS is in the process of developing a defensible, analytically sound measure for situational awareness for each USBP sector that meets the intent of the NDAA § 1092(b)(1)(B).  DHS anticipates this measure will be reported in the annual report due to Congress in November 2020.  In the interim, a number of the Department's existing metrics are informed by the Department's

AR036

awareness of migrants and other threats in the near border regions (CBP has operational jurisdiction within 100 miles of U.S. borders) and in the approaches [*See* § 1092(b)(1)(A)(ii to v) and § 1092(b)(1)(D)].

## § 1092(b)(1)(C) Unlawful Border Crossing Effectiveness Rate

**Definition**

*Unlawful Border Crossing Effectiveness Rate* – The estimated percentage of all attempted unlawful border crossers that is interdicted by USBP, where interdictions include apprehensions and turn backs.

The Unlawful Border Crossing Effectiveness Rate is an *output measure* that describes how difficult it is for unlawful border crossers to enter the United States without being interdicted.

**Methodology and Limitations**

The Unlawful Border Crossing Effectiveness Rate is calculated by dividing the number of apprehensions and turn backs between land POEs by the sum of the number of apprehensions, turn backs, and total estimated successful unlawful entries:

$$Effectiveness\ Rate = \frac{Apprehensions + Turn\ backs}{Apprehensions + Turn\ backs + Successful\ unlawful\ entries}$$

The NDAA calls for an effectiveness rate that incorporates USBP's observational estimate of turn backs and DHS's current model-based estimate of total estimated successful unlawful entries.  This measure would confront all of the methodological challenges associated with each of its component parts, as discussed above.

The Unlawful Border Crossing Effectiveness Rate is conceptually similar to USBP's Interdiction Effectiveness Rate (IER), which USBP reports in its Annual Performance Report pursuant to the Government Performance and Results Modernization Act (GPRMA) of 2010.  The Unlawful Border Crossing Effectiveness Rate differs from the IER in that the former includes total estimated successful unlawful entries in its denominator and IER includes known got aways.

The Unlawful Border Crossing Effectiveness Rate is also conceptually similar to the estimated apprehension rate, with the difference being that the Effectiveness Rate includes data on turn backs and apprehensions while the apprehension rate focuses exclusively on apprehensions.  An advantage to examining the effectiveness rate, rather than the apprehension rate, is that effectiveness rate more completely captures USBP's actual enforcement practices, which include efforts to turn back border crossers, in addition to efforts to apprehend them.  On the other hand, some analysts consider the effectiveness rate (along with IER) to be an ambiguous indicator of enforcement success since an unknown share of turn backs make additional entry attempts.

20

Despite its shortcomings as an analytic tool, to date, only the IER is available for analysis at the sector level.  While a southwest border-wide estimate has been developed, sector-level estimates of unlawful entries and attempts have not yet been produced and validated by DHS.  These estimates are projected to be available for the 2019 report.

**Available Data and Discussion**

Table 3:  Interdiction Effectiveness Rate by Southwest Border Sector, FY 2014 – FY 2016

|  | Big Bend, TX | Del Rio, TX | EL Centro, CA | EL Paso, TX | Laredo, TX | Rio Grande Valley, TX | San Diego, CA | Tucson, AZ | Yuma, AZ |
|---|---|---|---|---|---|---|---|---|---|
| **FY2014** | 72% | 76% | 85% | 92% | 74% | 80% | 89% | 75% | 91% |
| **FY2015** | 77% | 73% | 83% | 90% | 74% | 82% | 88% | 80% | 95% |
| **FY2016** | 70% | 79% | 81% | 89% | 78% | 83% | 89% | 82% | 96% |

IER often vary from year to year and by sector.  One point of note for FY 2016 is the 96 percent IER for Yuma, AZ, which often scores the highest rating.  Del Rio reported the largest increase in all sectors, climbing six percentage points in FY 2016 to 79 percent.  Big Bend reported the largest loss in FY 2016, decreasing by seven percentage points to 70 percent.  Due to the small number of attempted and successful entries along the Northern Border, a Northern Border IER has not been developed.

# § 1092(b)(1)(D) Probability of Detection Rate

**Definition**

*Estimated probability of detection* - The estimated probability that DHS detects attempted unlawful border crossers between land POEs.

The estimated probability of detection is an *output measure* that describes the ability of attempted unlawful border crossers to enter without being detected. Because successful unlawful entry estimate is available only for the southwest border between-ports of entry, data in this section refer exclusively to this region.

**Methodology and Limitations**

The estimated probability of detection is defined as the ratio of detected unlawful entries to estimated total unlawful entries:

$$Probability\ of\ Detection = \frac{Detected\ Unlawful\ Entries}{Estimated\ Total\ Unlawful\ Entries}$$

AR038

As described above, the number of detected unlawful entries is calculated as the sum of turn backs, got aways, and apprehensions, a mix of observational estimates and administrative data. The primary limitation to detected unlawful entries is that this metric incorporates turn back and got away estimates that aggregate potentially subjective observations from thousands of individual agents. USBP has taken a number of steps to address this problem by establishing consistent and reliable turn back and got away methodologies, as discussed above.

Estimated total unlawful entries is calculated as the sum of turn backs, apprehensions, and the model-based estimate of total successful unlawful entries. As described above, the methodology for estimating total successful unlawful entries begins with the RTM methodology's partial apprehension rate, discussed in detail in Appendix A. Following the calculation of the PAR, the methodology for estimating total successful unlawful entries consists of three additional steps: attempted border crossers are divided into impactable and non-impactable groups; the PAR is used to estimate the odds of successful entry; and the number of successful unlawful entries is estimated based on the odds of successful entry among this group times the apprehension count among impactable aliens.

The RTM methodology to estimate the PAR confronts a number of methodological limitations, as discussed in Appendix A. Each of the additional assumptions involved in using the PAR to estimate total successful unlawful entries introduces additional methodological limitations and potential biases. DHS is working to refine the model-based methodology and to more precisely describe the impact of these limitations on estimates of total successful unlawful entries in future State of the Border reports.

**Available Data and Discussion**

Figure 4 depicts the estimated probability of detection for FY 2006 – FY 2016, the years for which data are available. As the figure indicates, the estimated probability increased from 70 percent in FY 2006 (when an estimated 2.0 million unlawful border crossers were detected out of an estimated 2.9 million total unlawful border crossers) to 91 percent in FY 2016 (611,000 detected out of 673,000 total estimated unlawful border crossers).

Figure 4:  Southwest Border Between-Ports of Entry Estimated Probability of Detection, FY 2006 – FY 2016



# § 1092(b)(1)(E) Apprehensions in Each U.S Border Patrol Sector

**Definition**

*Apprehension* - The arrest of a removable alien by DHS USBP.

Apprehensions are *activity measures* that provide information used for program planning and operational purposes, among other uses.  Historically, the Department has also used apprehensions as a proxy indicator of illegal entries, an outcome measure.

For many years, DHS and the legacy Immigration and Naturalization Service also used apprehensions as a proxy indicator of successful unlawful border crossings, i.e., an *outcome measure*.  Over the long-term and across multiple locations, apprehensions are a problematic indicator of enforcement outcomes since the relationship between apprehensions and successful unlawful entries depends on the apprehension rate, which changes over time and may also differ by location.  But in the short-term and in a fixed geographic area, DHS continues to view changes in apprehensions as a useful outcome indicator because short term changes in apprehensions are more likely to be driven by changes in the number of unlawful border crossing attempts than by changes in the apprehension rate.

**Methodology and Limitations**

Apprehensions are recorded in administrative record systems with a unique identifier created for each apprehension.  USBP's count of apprehensions is considered reliable.

Apprehensions displayed below are event counts, meaning each apprehension of the same alien in a fiscal year is counted separately.  These data do not represent a count of unique aliens apprehended.

**Available Data and Discussion**

Table 4: Southwest Border Apprehension by USBP sector, FY 2007 – FY 2016

| Sector | FY2007 | FY2008 | FY2009 | FY2010 | FY2011 | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 |
|---|---|---|---|---|---|---|---|---|---|---|
| Big Bend, TX | 5,536 | 5,391 | 6,360 | 5,288 | 4,036 | 3,964 | 3,684 | 4,096 | 5,031 | 6,366 |
| Del Rio, TX | 22,920 | 20,761 | 17,082 | 14,694 | 16,144 | 21,720 | 23,510 | 24,255 | 19,013 | 23,078 |
| EL Centro, CA | 55,883 | 40,961 | 33,521 | 32,562 | 30,191 | 23,916 | 16,306 | 14,511 | 12,820 | 19,448 |
| EL Paso, TX | 75,464 | 30,312 | 14,999 | 12,251 | 10,345 | 9,678 | 11,154 | 12,339 | 14,495 | 25,634 |
| Laredo, TX | 56,714 | 43,668 | 40,569 | 35,287 | 36,053 | 44,872 | 50,749 | 44,049 | 35,888 | 36,562 |
| Rio Grande | 73,430 | 75,473 | 60,989 | 59,766 | 59,243 | 97,762 | 154,453 | 256,393 | 147,257 | 186,830 |

AR040

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Valley, TX | | | | | | | | | |
| San Diego, CA | 152,460 | 162,390 | 118,721 | 68,565 | 42,447 | 28,461 | 27,496 | 29,911 | 26,290 | 31,891 |
| Tucson, AZ | 378,239 | 317,696 | 241,673 | 212,202 | 123,285 | 120,000 | 120,939 | 87,915 | 63,397 | 64,891 |
| Yuma, AZ | 37,992 | 8,363 | 6,951 | 7,116 | 5,833 | 6,500 | 6,106 | 5,902 | 7,142 | 14,170 |
| **Total** | **858,638** | **705,015** | **540,865** | **447,731** | **327,577** | **356,873** | **414,397** | **479,371** | **331,333** | **408,870** |

Apprehension numbers often vary considerably from year to year and by sector.  Since FY 2013, the Rio Grande Valley (RGV) sector has displaced the Tucson sector as the leader in apprehensions, with over 120,000 more apprehensions than the next leading sector in FY 2016.  Apprehensions were up across the board in FY 2016, with each sector reporting increases.  The largest numeric increase was seen in RGV with almost 40,000 more apprehensions in FY 2016 than in FY 2015; however, the largest percent increase was seen in Yuma, where the apprehension count roughly doubled.  Tucson and San Diego, historically major sectors for apprehensions, continue to report considerably lower numbers than earlier years shown in the chart, with Tucson reporting 64,891 apprehensions in FY 2016, as compared to 378,239 in FY 2007.

## § 1092(b)(1)(F) Apprehensions of Unaccompanied Alien Children

**Definition**

*Unaccompanied alien child (UAC)* - one who has no lawful immigration status in the United States; has not attained 18 years of age, and with respect to whom; 1) there is no parent or legal guardian in the United States; or 2) no parent or legal guardian in the United States is available to provide care and physical custody [6 U.S.C. § 279(g)(2)].

UAC apprehensions are an *activity measure* that provide information used for program planning and operational purposes, among other uses.  Historically, the Department has also used apprehensions as a proxy indicator of illegal entries, an outcome measure.

**Methodology and Limitations**

Apprehensions are recorded in administrative record systems with a unique identifier created for each apprehension.  Since 2008, USBP systems have included a flag for children who are found to meet the legal definition of a UAC.  USBP's count of apprehensions is considered reliable, but some outside analysts have raised questions about agents' ability to reliably distinguish among older children and young adults (e.g., to distinguish between 17 and 18 year-olds) and to confirm whether children are traveling alone or in family groups.[4]

---

[4] OIG-10-12 Department of Homeland Security Office of Inspector General. *Age Determination Practices for Unaccompanied Alien Children in ICE Custody*.  November 2009

USBP began collecting data on UACs in FY 2008; data are unavailable for earlier years.

**Data and Discussion**

Tables 5a – 5d provide counts of UAC apprehensions by citizenship and by USBP sector for FY 2008 through FY 2016, the years for which data are available.

Table 5a:  Total Southwest Border Apprehensions of UACs, FY 2008 – FY 2016

| Sector | FY2008 | FY2009 | FY2010 | FY2011 | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 |
|---|---|---|---|---|---|---|---|---|---|
| Big Bend, TX | 84 | 147 | 197 | 189 | 168 | 125 | 256 | 839 | 951 |
| Del Rio, TX | 834 | 1,085 | 1,014 | 1,113 | 1,618 | 2,135 | 3,268 | 2,285 | 2,689 |
| EL Centro, CA | 337 | 673 | 448 | 457 | 498 | 434 | 662 | 668 | 1,379 |
| EL Paso, TX | 1,139 | 889 | 1,011 | 697 | 659 | 744 | 1,029 | 1,662 | 3,885 |
| Laredo, TX | 799 | 1,901 | 1,570 | 1,608 | 2,658 | 3,795 | 3,800 | 2,459 | 2,953 |
| Rio Grande Valley, TX | 2,523 | 3,835 | 4,977 | 5,236 | 10,759 | 21,553 | 49,959 | 23,864 | 36,714 |
| San Diego, CA | 888 | 3,028 | 980 | 549 | 524 | 656 | 954 | 1,084 | 1,553 |
| Tucson, AZ | 1,271 | 7,606 | 7,998 | 5,878 | 7,239 | 9,070 | 8,262 | 6,019 | 6,302 |
| Yuma, AZ | 47 | 276 | 216 | 222 | 280 | 247 | 351 | 1,090 | 3,266 |
| **Total** | **7,922** | **19,440** | **18,411** | **15,949** | **24,403** | **38,759** | **68,541** | **39,970** | **59,692** |

Table 5b:  Southwest Border Apprehensions of UACs from Mexico, FY 2008 – FY 2016

| Sector | FY2008 | FY2009 | FY2010 | FY2011 | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 |
|---|---|---|---|---|---|---|---|---|---|
| Big Bend, TX | 59 | 127 | 180 | 183 | 137 | 104 | 102 | 73 | 118 |
| Del Rio, TX | 396 | 851 | 772 | 801 | 911 | 1,082 | 821 | 798 | 867 |
| EL Centro, CA | 306 | 631 | 404 | 427 | 418 | 328 | 278 | 397 | 610 |
| EL Paso, TX | 1,067 | 841 | 947 | 663 | 616 | 654 | 698 | 823 | 1,149 |
| Laredo, TX | 118 | 1,308 | 886 | 1,022 | 1,369 | 1,652 | 1,354 | 1,299 | 1,515 |
| Rio Grande Valley, TX | 365 | 2,401 | 2,787 | 3,009 | 4,361 | 6,366 | 7,081 | 3,243 | 3,389 |
| San Diego, CA | 879 | 2,990 | 950 | 523 | 480 | 598 | 740 | 823 | 851 |
| Tucson, AZ | 79 | 6,582 | 6,485 | 4,893 | 5,405 | 6,241 | 4,394 | 3,412 | 3,293 |
| Yuma, AZ | 33 | 258 | 204 | 192 | 246 | 194 | 166 | 144 | 134 |
| **Total** | **3,302** | **15,989** | **13,615** | **11,713** | **13,943** | **17,219** | **15,634** | **11,012** | **11,926** |

Table 5c:  Southwest Border Apprehensions of UACs from Northern Triangle Countries, FY 2008 – FY 2016

| Sector | FY2008 | FY2009 | FY2010 | FY2011 | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 |
|---|---|---|---|---|---|---|---|---|---|
| Big Bend, TX | 23 | 19 | 16 | 6 | 29 | 18 | 151 | 760 | 824 |
| Del Rio, TX | 423 | 229 | 238 | 307 | 701 | 1,044 | 2,422 | 1,479 | 1,806 |
| EL Centro, CA | 28 | 42 | 42 | 29 | 70 | 104 | 379 | 269 | 641 |
| EL Paso, TX | 65 | 46 | 58 | 32 | 40 | 80 | 290 | 824 | 2,685 |
| Laredo, TX | 627 | 523 | 598 | 528 | 1,228 | 2,028 | 2,329 | 1,113 | 1,382 |
| Rio Grande Valley, TX | 2,051 | 1,389 | 2,057 | 2,030 | 6,229 | 14,696 | 42,020 | 20,260 | 32,935 |

AR042

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| San Diego, CA | 9 | 37 | 28 | 25 | 44 | 48 | 209 | 255 | 625 |
| Tucson, AZ | 1,091 | 938 | 1,326 | 927 | 1,753 | 2,731 | 3,727 | 2,497 | 2,904 |
| Yuma, AZ | 14 | 15 | 8 | 28 | 34 | 36 | 178 | 930 | 3,091 |
| **Total** | **4,331** | **3,238** | **4,371** | **3,912** | **10,128** | **20,785** | **51,705** | **28,387** | **46,893** |

Note:  Northern Triangle Countries refers to El Salvador, Guatemala, and Honduras.

Table 5d:  Southwest Border Apprehensions of UACs from All Other Countries, FY 2008 – FY 2016

| Sector | FY2008 | FY2009 | FY2010 | FY2011 | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 |
|---|---|---|---|---|---|---|---|---|---|
| Big Bend, TX | 2 | 1 | 1 | 0 | 2 | 3 | 3 | 6 | 9 |
| Del Rio, TX | 15 | 5 | 4 | 5 | 6 | 9 | 25 | 8 | 16 |
| EL Centro, CA | 3 | 0 | 2 | 1 | 10 | 2 | 5 | 2 | 128 |
| EL Paso, TX | 7 | 2 | 6 | 2 | 5 | 10 | 41 | 15 | 51 |
| Laredo, TX | 54 | 70 | 86 | 58 | 61 | 115 | 117 | 47 | 56 |
| Rio Grande Valley, TX | 107 | 45 | 133 | 199 | 169 | 491 | 858 | 361 | 390 |
| San Diego, CA | 0 | 1 | 2 | 1 | 0 | 10 | 5 | 6 | 77 |
| Tucson, AZ | 101 | 86 | 187 | 58 | 82 | 98 | 141 | 110 | 105 |
| Yuma, AZ | 0 | 3 | 4 | 2 | 0 | 17 | 7 | 16 | 41 |
| **Total** | **289** | **213** | **425** | **326** | **335** | **755** | **1,202** | **571** | **873** |

After averaging 15,000 per year from FY 2008 – FY 2011, UAC apprehensions increased an average of more than 60 percent per year in FY 2012 – FY 2014, peaking at 68,541 in FY 2014. UAC numbers returned to their FY 2013 level in FY 2015, but then climbed to 59,692 in FY 2016.  More than half of all UACs were reported in RGV (36,714), most of whom were from the Northern Triangle countries of Honduras, Guatemala, and El Salvador (32,935).

# § 1092(b)(1)(G) Apprehensions of Family Units

## Definition

*Family unit* - the number of individuals apprehended with a family member by the USBP.  For example, a mother and child apprehended together are counted as two family units.

Family unit apprehensions (FMUA) are *activity measures* that provide information used for program planning and operational purposes, among other uses.  Historically, the Department has also used apprehensions as a proxy indicator of illegal entries, an outcome measure.

## Methodology and Limitations

Apprehensions are recorded in administrative record systems with a unique identifier created for each apprehension.  USBP's count of apprehensions is considered reliable, but agents may not always be able to reliably identify family units.

AR043

USBP began collecting data on family units in FY 2012; data on family unit apprehensions are unavailable for earlier years.

**Data and Discussion**

Table 6a:  Total Southwest Border Apprehensions of FMUAs, FY 2015 – FY 2016

|  | Big Bend, TX | Del Rio, TX | EL Centro, CA | EL Paso, TX | Laredo, TX | Rio Grande Valley, TX | San Diego, CA | Tucson, AZ | Yuma, AZ | **Total** |
|---|---|---|---|---|---|---|---|---|---|---|
| FY2012 | 76 | 349 | 1,127 | 265 | 1,825 | 2,625 | 1,373 | 3,254 | 222 | **11,116** |
| FY2013 | 102 | 711 | 365 | 298 | 1,688 | 7,265 | 1,576 | 2,630 | 220 | **14,855** |
| FY2014 | 176 | 4,950 | 630 | 562 | 3,591 | 52,326 | 1,723 | 3,812 | 675 | **68,445** |
| FY2015 | 807 | 2,141 | 675 | 1,220 | 1,372 | 27,409 | 1,550 | 2,930 | 1,734 | **39,838** |
| FY2016 | 1,051 | 3,549 | 1,593 | 5,664 | 1,640 | 52,006 | 2,863 | 3,139 | 6,169 | **77,674** |

Table 6b:  Southwest Border Apprehensions of FMUAs from Mexico, FY 2015 – FY 2016

|  | Big Bend, TX | Del Rio, TX | EL Centro, CA | EL Paso, TX | Laredo, TX | Rio Grande Valley, TX | San Diego, CA | Tucson, AZ | Yuma, AZ | **Total** |
|---|---|---|---|---|---|---|---|---|---|---|
| **FY2012** | 56 | 218 | 699 | 241 | 1,623 | 1,555 | 1,325 | 2,940 | 194 | **8,851** |
| **FY2013** | 90 | 177 | 294 | 267 | 1,116 | 1,690 | 1,343 | 2,216 | 163 | **7,356** |
| **FY2014** | 61 | 141 | 260 | 213 | 779 | 1,832 | 1,213 | 1,057 | 83 | **5,639** |
| **FY2015** | 40 | 174 | 196 | 188 | 713 | 1,326 | 854 | 696 | 89 | **4,276** |
| **FY2016** | 38 | 229 | 163 | 224 | 518 | 1,392 | 346 | 487 | 84 | **3,481** |

Table 6c:  Southwest Border Apprehensions of FMUAs from Northern Triangle Countries, FY 2015 – FY 2016

|  | Big Bend, TX | Del Rio, TX | EL Centro, CA | EL Paso, TX | Laredo, TX | Rio Grande Valley, TX | San Diego, CA | Tucson, AZ | Yuma, AZ | **Total** |
|---|---|---|---|---|---|---|---|---|---|---|
| **FY2012** | 10 | 120 | 12 | 19 | 175 | 989 | 31 | 130 | 3 | **1,489** |
| **FY2013** | 8 | 522 | 40 | 23 | 522 | 5,354 | 39 | 254 | 19 | **6,781** |
| **FY2014** | 100 | 4,753 | 337 | 291 | 2,767 | 49,790 | 351 | 2,553 | 392 | **61,334** |
| **FY2015** | 764 | 1929 | 470 | 1,002 | 602 | 25,296 | 617 | 2,127 | 1,556 | **34,363** |
| **FY2016** | 1,005 | 3,233 | 1,380 | 4,634 | 827 | 49,919 | 1,615 | 2,496 | 5,298 | **70,407** |

Note:  Northern Triangle Countries refers to El Salvador, Guatemala, and Honduras.

AR044

Table 6d:  Southwest Border Apprehensions of FMUAs from All Other Countries, FY 2015 – FY 2016

|  | Big Bend, TX | Del Rio, TX | EL Centro, CA | EL Paso, TX | Laredo, TX | Rio Grande Valley, TX | San Diego, CA | Tucson, AZ | Yuma, AZ | **Total** |
|---|---|---|---|---|---|---|---|---|---|---|
| **FY2012** | 10 | 11 | 416 | 5 | 27 | 81 | 17 | 184 | 25 | **776** |
| **FY2013** | 4 | 12 | 31 | 8 | 50 | 221 | 194 | 160 | 38 | **718** |
| **FY2014** | 15 | 56 | 33 | 58 | 45 | 704 | 159 | 202 | 200 | **1,472** |
| **FY2015** | 3 | 38 | 9 | 30 | 57 | 787 | 79 | 107 | 89 | **1,199** |
| **FY2016** | 8 | 87 | 50 | 806 | 295 | 695 | 902 | 156 | 787 | **3,786** |

From 2015 to 2016, FMUA numbers increased considerably across all sectors.  Similar to the UAC trend observed in these two years, total FMUAs nearly doubled in 2016, and more than doubled in some sectors.  Yuma reported only 1,734 FMUAs in 2015 but 6,169 in 2016; El Paso saw a similar trend.  Like the UACs, most FMUAs (70,407 of 77,674) were from Northern Triangle countries.  In fact, despite the overall increase in FMUAs, the total count of FMUAs from Mexico decreased by 19 percent in 2016.

## § 1092(b)(1)(H) Between the Ports Illicit Drugs Seizure Rate

**Definition**

*Between the Ports Illicit Drug Seizure Rate* – For each type of illicit drug seized by USBP between POEs, the ratio of the amount of illicit drugs seized in any fiscal year relative to the average amount seized in the immediately preceding five FYs.

The Illicit Drug Seizure Rate is an *activity measure*, which compares trends in activity data over time.

**Methodology and Limitations**

Between-the-ports drug seizure data are obtained from USBP administrative records.  These data are considered reliable.

Pursuant to the definition of the Illicit Drug Seizure Rate directed by NDAA § 1092 (b)(1)(H), the drug seizure rate describes the ratio of each year's seizures relative to illicit drugs seizures in the preceding five years; the measure does not describe the rate at which illicit drugs are seized.

**Available Data and Discussion**

Table 7:  Illicit Drugs Seized Relative to Preceding Five Years ("Illicit Drug Seizure Rate") between POEs, FY 2012 – FY 2016

AR045

| Drug Type | | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 |
|---|---|---|---|---|---|---|
| Marijuana | Rate | 101% | 100% | 83% | 81% | 72% |
| | Lbs seized | 2,299,864 | 2,430,123 | 1,922,545 | 1,538,307 | 1,294,052 |
| Cocaine | Rate | 117% | 53% | 57% | 206% | 71% |
| | Lbs seized | 12,161 | 4,596 | 4,554 | 11,220 | 5,473 |
| Heroin | Rate | 151% | 142% | 142% | 141% | 129% |
| | Oz seized | 6,873 | 9,212 | 9,691 | 8,282 | 9,062 |
| Methamphetamines | Rate | 228% | 160% | 149% | 215% | 168% |
| | Lbs seized | 3,715 | 3,580 | 3,930 | 6,443 | 8,224 |

Drug seizure trends varied in FY 2016 by type of illicit drug. Marijuana and cocaine both saw declines in FY 2016 as compared to the previous five years (72 percent and 71 percent of the previous five year average, respectively).  This is a continuous trend for marijuana seizures, which have been on the decline since FY 2014.  Cocaine seizures had been declining until FY 2015, in which year a resurgence in seizures was observed.  Heroin and methamphetamines seizures continue to increase, as they have in each year at least since FY 2012.

# § 1092(b)(1)(I) Estimates of the Impact of the Consequence Delivery System on Recidivism

**Definition**

*Consequence Delivery System (CDS)* – a process implemented by USBP to uniquely evaluate each apprehended subject and to identify the most effective and efficient consequences to deliver to impede and deter further illegal activity.

*Recidivist Rate* – The share of subjects apprehended by USBP who are apprehended more than once in the same fiscal year.

The annual recidivist rate is an *output measure* that offers insight into what share of deportees are deterred from making additional unlawful entry attempts, though not accounting for unknown attempts/entries.  USBP use the annual recidivist rate as one of its 15 metrics of the effectiveness of enforcement consequences under the CDS.

**Methodology and Limitations**

Since 2007, USBP has collected biometric data (including fingerprints and digital photographs) from most unlawful border crossers it apprehends.  These data are used to identify subjects apprehended more than once in a given fiscal year.  USBP data on re-apprehensions in the same fiscal year is considered reliable.  The annual recidivist rate is defined as the number of unique subjects apprehended multiple times in a fiscal year divided by the total number of unique subjects in the fiscal year:

AR046

$$Annual\ Recidivist\ Rate = \frac{Number\ of\ Unique\ Subjects\ Apprehended\ Multiple\ Times}{Total\ Number\ of\ Unique\ Subjects}$$

The annual recidivism rate is a valid indicator of the probability that deportees make subsequent attempts at re-apprehensions in that a drop in the annual recidivism rate very likely reflects a drop in unlawful re-entry attempts.  The measure has the further advantages that USBP can calculate annual recidivism based strictly on its own apprehension data and that it can reliably be calculated at the end of each fiscal year.  These features make the annual recidivism rate a useful measure for USBP performance management.

Nonetheless, as the U.S. Government Accountability Office (GAO) has argued, if the goal is to accurately describe the share of deportees who make additional unlawful entry attempts, the current measure of recidivism could be strengthened in at least two ways:  1) count re-apprehensions based on the date on which a subject is removed or returned, rather than that the date of apprehension; 2) count re-apprehensions that occur within a fixed period of time defined by the subject's repatriation date, rather than by the fiscal year.[5]  When based on a one year window, these refinements yield a more expansive definition of the recidivism rate that DHS refers to as the "Total One-Year Recidivism Rate"; future versions of this report will include estimates of the impact of CDS on both the annual recidivism rate and a longer-term recidivism rate.

**Available Data and Discussion**

Table 8: CDS Recidivism Rate Change by Sector

| Southwest Border Sector | Year CDS Implemented | Average Annual Recidivism Rate in 3 Prior Years[1] | Average Annual Recidivism Rate in 3 Subsequent Years[2] |
|---|---|---|---|
| San Diego | FY 2012 | 38% | 31% |
| El Centro | FY 2012 | 42% | 36% |
| Yuma | FY 2012 | 18% | 16% |
| Tucson | FY 2012 | 26% | 20% |
| El Paso | FY 2012 | 10% | 10% |
| Big Bend | FY 2012 | 11% | 7% |
| Del Rio | FY 2012 | 8% | 6% |
| Laredo | FY 2012 | 14% | 12% |
| Rio Grande Valley | FY 2012 | 15% | 12% |

[1]Refers to the 3 years prior to CDS being implemented in that sector
[2]Refers to the 3 years after CDS was implemented in that sector

With the exception of the El Paso sector, where rates remained unchanged, the annual recidivism rates dropped across the board following the implementation of CDS.  While changes in

---

[5] U.S. Government Accountability Office, "Border Patrol: Actions Needed to Improve Oversight of Post-Apprehension Consequences," GAO-17-66, January 2017, pp. 13-17.

AR047

recidivism should not be interpreted solely as a function of CDS given that border enforcement is a complex, dynamic system, some sectors showed noticeable improvements in recidivism rates, such as the Tucson and El Centro sectors which saw six percent drops after CDS, and San Diego which saw a seven percent drop.  Other sectors, which already had the lowest recidivism rates, saw smaller improvements.  Recidivism data are not available to calculate the impact of CDS at the Northern Border due to the small number of attempted illegal entries along the Northern Border.

## § 1092(b)(1)(J) Examination of Each Consequence under the CDS

**Definition**

*Consequence* – An administrative, programmatic, or criminal justice process imposed on a subject following the subject's apprehension.  CDS is designed to identify, for any given subject, the ideal consequences to deliver to impede and deter further illegal activity.

**Methodology and Limitations**

USBP's current methodology for assessing the CDS involves analyzing the effectiveness and efficiency of each enforcement consequence.  One of the key effectiveness metrics is the annual recidivism rate, which is calculated separately for each enforcement consequence.

Under the CDS, USBP specifically targets aliens with more extensive records of unlawful border crossing behavior for consequences that are designed to have a greater deterrent impact.  For example, the Target Enforcement Initiative utilizes partnerships with the U.S. Department of Justice to prioritize and prosecute individuals with six or more apprehensions.  As a result, differences in recidivism rates by enforcement consequence may reflect differences in the propensity of the targeted population to make further re-entry attempts, in addition to the possible impact of each consequence on recidivism.

An additional limitation of currently-available data is that they are based on apprehension data for a given fiscal year, not repatriation data.  Depending on the consequence and the timing of the apprehension, some individuals may not be repatriated to their country of origin during the fiscal year of their apprehension, and therefore may not have an opportunity to attempt re-entry.  DHS and CBP are working to refine their analysis of CDS and will seek to address these limitations in the FY 2018 version of this report.

**Available Data and Discussion**

Table 9:  Annual Recidivism Rate by Consequence, FY 2012 – FY 2016

AR048

| Consequence | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 |
|---|---|---|---|---|---|
| Voluntary Return | 27.06% | 28.61% | 30.50% | 27.03% | 24.55% |
| Warrant of Arrest/ Notice to Appear | 3.83% | 1.44% | 0.60% | 0.89% | 0.41% |
| Expedited Removal | 16.44% | 16.66% | 17.54% | 18.08% | 15.46% |
| Reinstatement of Removal | 15.88% | 16.42% | 15.80% | 15.41% | 16.62% |
| Alien Transfer Exit Program | 23.82% | 25.48% | 28.63% | 27.17% | 28.80% |
| Criminal Consequence Program | 10.30% | 9.26% | 8.24% | 6.67% | 8.36% |
| Standard Prosecution | 9.09% | 10.17% | 9.18% | 8.79% | 8.16% |
| Operation Against Smugglers Initiative on Safety and Security | 10.24% | 18.04% | 18.25% | 22.97% | 30.93% |

While these data should be interpreted with caution for the reasons identified above, some trends are noteworthy.  For example, the more punitive consequence programs such as CCP and standard prosecution generally showed lower recidivism rates (8.36 percent, 8.16 percent) than less punitive programs like voluntary return (24.55 percent) or expedited removal (15.46 percent).  At the same time, recidivism rates are notably high among individuals in the Operation Against Smugglers Initiative on Safety and Security (OASISS) consequence group; this finding likely reflects the fact that the population selected for OASISS—suspected smugglers—routinely make multiple crossing attempts.

AR049

# § 1092(c) Metrics for Securing the Border at Ports of Entry

## § 1092(c)(1)(A)(i) Total Inadmissible Travelers at Ports of Entry

**Definition**

*Inadmissible Alien* – An alien seeking admission at a POE who does not meet the criteria in the INA for admission.

*Known Inadmissible Aliens* – Aliens seeking admission at a POE who are found by OFO to be inadmissible.

*Total Attempted Inadmissible Aliens* – The estimated number of inadmissible aliens who attempt to enter the United States.  Total attempted inadmissible aliens include known inadmissible aliens and successful unlawful entries at POEs.

Inadmissible aliens and known inadmissible aliens are *activity measures* that describes OFO officer workload.  Known inadmissible aliens may also be used as a proxy indicator of total attempted inadmissible aliens, which is an *outcome measure*.

**Methodology and Limitations**

Known inadmissible aliens are recorded in OFO administrative records with a unique identifier created for each inadmissibility determination.  OFO's count of known inadmissible aliens is considered reliable.

The Department does not currently have a methodology in place to estimate the number of attempted inadmissible aliens.  DHS and CBP are working to establish a methodology to produce such an estimate in time to be included in the 2018 State of the Border Report.

**Available Data and Discussion**

Table 10: Known Inadmissible Aliens at Ports of Entry, FY 2007 - FY2016

| FY 2007 | FY 2008 | FY 2009 | FY 2010 | FY 2011 | FY 2012 | FY 2013 | FY 2014 | FY 2015 | FY 2016 |
|---|---|---|---|---|---|---|---|---|---|
| 203,310 | 224,770 | 225,149 | 231,306 | 216,355 | 197,362 | 205,920 | 224,927 | 254,637 | 292,614 |

From the recent low in FY 2012, the number of aliens identified as inadmissible at POEs has continue to climb. In FY 2016, 292,614 aliens were deemed inadmissible at POEs, the highest number this decade. The FY 2016 count represents an increase of 48 percent over the 197,362 inadmissible aliens in FY 2012.

## § 1092(c)(1)(A)(ii) Refusal and Interdiction Rates at Ports of Entry

AR050

**Definition**

*Refusal Rate* – The share of all passengers seeking admission at a port of entry that is found inadmissible.  Refusal Rate is an *activity measure* that describes OFO officer workload.

*Port of Entry Interdiction Rate* – The share of attempted inadmissible aliens that is found inadmissible.  POE Interdiction Rate is an *output measure* that describes the difficulty of entering the United States unlawfully through a port of entry.

**Methodology and Limitations**

The refusal rate is calculated by dividing known inadmissible aliens (i.e., aliens found inadmissible by OFO officers at POEs) by the total number of passengers seeking admission at ports of entry:

$$Refusal\ Rate = \frac{Inadmissibility\ Determinations}{Arivals\ at\ POEs}$$

Data on inadmissibility determinations and total passengers is obtained from OFO administrative records; these data are considered reliable.

The Department does not have a methodology in place to calculate total attempted inadmissible aliens, and therefore currently cannot calculate a POE interdiction rate.

**Available Data and Discussion**

Table 11: Inadmissible Aliens and Refusal Rate at Ports of Entry FY 2007 - FY2016

|         | Passengers  | Inadmissible | Refusal Rate |
|---------|-------------|--------------|--------------|
| **FY 2007** | 407,677,568 | 203,310 | 0.05% |
| **FY 2008** | 401,481,071 | 224,770 | 0.06% |
| **FY 2009** | 361,191,781 | 225,149 | 0.06% |
| **FY 2010** | 352,980,607 | 231,306 | 0.07% |
| **FY 2011** | 340,364,884 | 216,355 | 0.06% |
| **FY 2012** | 351,551,007 | 197,362 | 0.06% |
| **FY 2013** | 362,333,988 | 205,920 | 0.06% |
| **FY 2014** | 374,974,750 | 224,927 | 0.06% |
| **FY 2015** | 383,200,225 | 254,637 | 0.07% |
| **FY 2016** | 390,592,745 | 292,614 | 0.07% |

Since 2012, the number of passengers at POEs has increased 11 percent (from 352 to 391 million), while the number of known inadmissible passengers has increased 48 percent (from 197,000 to 293,000), resulting in a 33 percent increase in the refusal rate (from under 0.06

34

percent to over 0.07 percent).  This increase may indicate that inadmissible aliens represent an increasingly large share of passengers, that OFO is better able to detect inadmissible aliens, or both.  With an FY 2016 refusal rate of .0749 percent, however, the number of known inadmissible aliens is still a very small share of passengers coming through POEs.

## § 1092(c)(1)(A)(iii) Unlawful Entries at Ports of Entry

**Definition**

*Successful Unlawful Entries* - The estimated number of inadmissible aliens who unlawfully enter the United States through POEs.

Successful unlawful entries is an *outcome measure*.

**Methodology and Limitations**

The Department does not currently have a methodology to reliably estimate the number of successful unlawful entries through POEs.  DHS and CBP are working to establish a methodology to produce such an estimate in time to be included in the 2018 State of the Border Report.

## § 1092(c)(1)(B) Illicit Drugs Seized at Ports of Entry

**Definition**

*Drug Seizures* – Seizures of illicit drugs by CBP officers at POEs.

Drug Seizures are an *activity measure*.  Drug seizures may also be interpreted as a proxy indicator of illicit drug inflows through POEs, an *outcome measure*.

**Methodology and Limitations**

Drugs seizure data are obtained from OFO administrative records, measured in kilograms.  These data are considered reliable.

**Available Data and Discussion**

Drug seizures at POEs is contained in Appendix B.  A total of 367,612.58 kilos of illicit drugs were seized at POEs in FY 2016, which represents a nine percent decline from a total of 400,719.44 kilos in FY 2015, but is still higher than the previous five-year average of 352,399.84 kilos.

AR052

# § 1092(c)(1)(C) Port of Entry Illicit Drug Seizure Rate

**Definition**

*Port of Entry Illicit Drug Seizure Rate* – For each type of illicit drug seized by OFO at POEs, the ratio of the amount of illicit drugs seized in any fiscal year to the average of the amount seized in the immediately preceding five fiscal years.

**Methodology and Limitations**

At-ports-of-entry drug seizure data are obtained from OFO administrative records.  These data are considered reliable.

Pursuant to the definition of the illicit drug seizure rate directed by NDAA § 1092(c)(1)(C), the drug seizure rate describes recent seizure trends (i.e., current year compared to five previous years); the measure does not describe the rate at which illicit drugs are seized.

The Drug Seizure Rate is an *activity measure*, which compares trends in activity data over time. Drug seizures may also be interpreted as a proxy indicator of illicit drug inflows through POEs, an *outcome measure*.

**Available Data and Discussion**

Table 12: Port of Entry Illicit Drug Seizure Rate, FY 2012 – FY 2016

| Drug Type | | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 |
|---|---|---|---|---|---|---|
| Marijuana | Rate | 88% | 81% | 77% | 118% | 102% |
| | Kg seized | 219,344 | 195,270 | 180,686 | 250,637 | 219,960 |
| Cocaine | Rate | 73% | 82% | 71% | 87% | 103% |
| | Kg seized | 7,294 | 7,413 | 6,234 | 7,190 | 8,209 |
| Heroin | Rate | 209% | 208% | 168% | 174% | 106% |
| | Kg seized | 1,125 | 1,475 | 1,556 | 1,984 | 1,483 |
| Methamphetamines | Rate | 233% | 263% | 200% | 200% | 203% |
| | Kg seized | 4,888 | 7,503 | 8,285 | 10,861 | 14,279 |

Unlike recent trends in drug seizures between POEs, marijuana and cocaine seizures at POEs held fairly constant in FY 2016 as compared to the previous five-year average (two percent and three percent increase respectively).  Notably, however, seizures of marijuana and cocaine have fallen in recent years, and the volume of seizures in FY 2016 were still relatively low by recent historical standards.  Heroin and methamphetamines, however, continued their increases into FY 2016, with heroin increasing six percent over a constantly growing five year average and methamphetamines more than doubling its previous five year average each of the past five years.

# § 1092(c)(1)(D) Major Infractions at Ports of Entry

**Definition**

AR053

*Major Infractions* – OFO considers major infractions to include all arrests, including arrests related to terrorism, drugs, criminal alien [including zero tolerance (ZT) arrests], currency, merchandise, agriculture products, National Crime Information Center (NCIC) hits, and Terrorist Screening Database (TSDB) hits, among others.

*Known Major Infractions* – The number of major infractions interdicted by OFO.

*Undetected Major Infractions* – The estimated number of major infractions not interdicted by OFO.

Known Major Infractions are an *activity measure*.  Undetected major infractions are an *outcome measure*.

**Methodology and Limitations**

These data are recorded in OFO administrative records and are considered reliable.

The Department does not currently have a methodology to estimate the number of undetected major infractions.

**Available Data and Discussion**

Table 13:  Known Major Infractions at Ports of Entry, FY 2007 – FY 2016

|         | Passengers  | Major Infractions | Infraction Rate |
|---------|-------------|-------------------|-----------------|
| **FY 2007** | 407,677,568 | 90,718  | 0.02% |
| **FY 2008** | 401,481,071 | 96,330  | 0.02% |
| **FY 2009** | 361,191,781 | 108,941 | 0.03% |
| **FY 2010** | 352,980,607 | 112,446 | 0.03% |
| **FY 2011** | 340,364,884 | 120,491 | 0.04% |
| **FY 2012** | 351,551,007 | 111,185 | 0.03% |
| **FY 2013** | 362,333,988 | 112,471 | 0.03% |
| **FY 2014** | 374,974,750 | 106,354 | 0.03% |
| **FY 2015** | 383,200,225 | 112,562 | 0.03% |
| **FY 2016** | 390,592,745 | 113,665 | 0.03% |

OFO officers interdicted 113,665 passengers based on major infractions at ports of entry in FY 2016.  The number of major infractions was almost unchanged from FY 2015, and similar to the number each year since FY 2010.  With the number of passengers increasing slightly over this period, the infraction rate fell slightly from 0.04 percent in FY 2011 to 0.03 percent in FY 2016.  Over the last 10 years (i.e., since FY 2007), both the number of total seizures and the infraction rate both showed modest increases.

# § 1092(c)(1)(E) Cocaine Seizure Effectiveness Rate

**Definition**

*Cocaine seizure effectiveness rate* – In consultation with the Office of National Drug Control Policy (ONDCP), the amount of cocaine seized by OFO at land POEs compared to the total estimated flow of cocaine through land POEs.

Cocaine seizures is an *activity measure*.  Seizures may also be used as a proxy indicator of total attempts to import cocaine, an *outcome measure*.  Seizure effectiveness rate (i.e., cocaine seized as compared to the total estimate cocaine flow) is an *output measure*.

**Methodology and Limitations**

Seizure data is obtained from OFO administrative records and is considered reliable.  Estimates of the total cocaine flow are provided by ONDCP.  The U.S. Government does not have an estimate of the share of the total cocaine flow that passes through land POEs, but the U.S. Drug Enforcement Agency's National Drug Threat Assessment states that the southwest border remains the key entry point for the majority of the cocaine entering the Unites States.

**Available Data and Discussion**

Table 14:  Estimates of Cocaine Seizure at Land Ports of Entry FY 2012 – FY 2016

|  | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 |
|---|---|---|---|---|---|
| Estimated Flow | 479 | 475 | 479 | 684 | 1,142 |
| Seizures | 45,260.18 | 39,074.63 | 41,311.88 | 38,145.00 | 52,900.67 |
| Seizure Effectiveness Rate | 4.2% | 3.7% | 3.9% | 2.5% | 2.1% |

Notes:  Estimated flow is measure in metric tons. Cocaine seizure estimates reported in pounds. Estimated cocaine flows are based on the IACM mid-point estimate for 2012-2014 and based on confirmed and substantiated CCDB estimate for 2015-2016.

# § 1092(c)(1)(F)(i) Average Wait Times and Traffic Volume

**Definition**

*Average Wait Time* – Average minute wait time for vehicles to pass through a land POE.

*Private Vehicle Volume* – The number of private vehicles passing through a land POE per year.

*Commercial Vehicle Volume* – The number of commercial vehicles passing through a land POE per year.

AR055

Average wait time is an *output measure* describing the ease of crossing the border.  Vehicle volume is an *activity measure*.

**Methodology and Limitations**

OFO calculates average wait times for each POE by a variety of methods, some automated using Radio Frequency Identification and others manually using either surveying or line of sight determinations.  For manual wait time determinations, OFO officers record average minute wait times in the Border Wait Time tool, for automated wait times the time is recorded automatically every 30 minutes.  Wait time data is not available for all POEs, particularly small northern border POEs with negligible wait times.  OFO leadership directed POEs to provide wait times in March 2014.  The policy is currently under review and new guidance will be issued in the near future to account for the improvements in automation and recording.

OFO records counts of Personally Owned Vehicles (POV) as administrative data in its Operations Management Report (OMR); these data are considered reliable.

**Available Data and Discussion**

Data on Average Wait Times, and counts of private and commercial vehicles for each land POE for which data are available are contained in Appendix C. Appendix C contains law enforcement sensitive information and has been redacted from this public report.


# § 1092(c)(1)(F)(ii) Infrastructure Capacity Utilization Rate

**Definition**

*Infrastructure Capacity Utilization Rate* – Average number of vehicles processed per booth, per hour at each land POE.

The Infrastructure Capacity Utilization Rate is an *output measure* that describes OFO's ability to process traffic relative to the physical and staffing capacity.

**Methodology and Limitations**

Data are obtained from OFO administrative records.  The data comes from CBP systems with booth hours and throughput as calculated fields.  The hours serve as a proxy measure for the number of CBP officer hours spent processing and are measured on a one-for-one basis.  Throughput is then calculated by summing all vehicles that passed through a site in a year and then dividing it by total booth hours.

**Available Data and Discussion**

Infrastructure capacity utilization rate data is contained in Appendix D. Appendix D contains law enforcement sensitive information and has been redacted from this public report.

AR056

Each OFO land POE is unique in terms of staffing authorizations and physical layouts.  Land POEs may be physically constrained by the available space around them and so unable to expand to yield greater capacity.  Land POEs in the United States are also impacted by the adjoining Canadian and Mexican land POE management decisions on staffing and physical layouts.  Both the OFO Mission Support Facilities Division and the CBP Office of Facilities and Asset Management are working on establishing methods to determine resourcing decisions for land POEs.

Infrastructure capacity utilization rate varies by location and year.  In general, the southern border reports higher utilization rates because of higher flows through the POEs.  The overall utilization rate increased in FY 2016 over the previous year, due to a combination of increased efficiency and increased traffic demand for a fixed number of processing lanes.  CBP processed an average of 47.4 vehicles per lane, per hour in FY 2016 (34.6 on the northern border; 54.4 on the southern border).

Table 15:  Average infrastructure capacity utilization rate FY 2012 – FY 2016

| Border | FY 2012 | FY 2013 | FY 2014 | FY 2015 | FY 2016 |
|---|---|---|---|---|---|
| Northern Border | 36.2 | 38.2 | 39 | 35.7 | 34.6 |
| Southern Border | 47.7 | 46.8 | 49.1 | 53 | 54.4 |
| Total | 43.1 | 43.5 | 45.3 | 46.6 | 47.4 |

## § 1092(c)(1)(F)(iii) Secondary Examination Rate

**Definition**

*Secondary Examination Rate* – Percentage of passengers subject to secondary inspection at each land POE.

Secondary Examination Rate is an *activity measure* that describes OFO workload and practices.

**Methodology and Limitations**

Data are obtained from OFO administrative records. Secondary examination rate is determined by the recorded number of passengers sent for secondary inspection versus the total number of recorded passengers.

**Available Data and Discussion**

Frequency of secondary inspections data is contained in Appendix E. Appendix E contains law enforcement sensitive information and has been redacted from this public report.

AR057

Secondary inspection rates vary considerably among the various POEs.  Among the northern border POEs, the rate of secondary inspection declined from 8.52 percent in FY 2012 to 7.30 percent in FY 2016.  The southern border Secondary Inspection Rate remained stable over the past four years, with 11.88 percent of passengers receiving secondary inspection in FY 2016.  This number is down from the prior three year average from FY 2010 to FY 2012, when closer to 15 percent of passengers received secondary inspection.  The highest secondary inspection rates were northern border POEs such as St. John (32.30 percent) and Vanceboro (29.83 percent).  Certain smaller land POEs have high secondary examination rates due to low volume of traffic that allow officers increased time to thoroughly examine a larger share of passengers.

## § 1092(c)(1)(F)(iv) Secondary Examinations Effectiveness Rate

This measure is under review.  OFO does not presently measure the effectiveness of secondary examinations at the enterprise level.

## § 1092(c)(1)(G)(i) Number of Potentially "High-Risk" Cargo Containers

### Definition

*Potentially High-Risk Cargo Containers* – Shipping containers carrying cargo shipments identified as potentially high-risk using National Targeting Center (NTC) security criteria.

Potentially High-Risk Cargo Containers is an *activity measure* that describes OFO workload.

### Methodology and Limitations

All international cargo shipments coming to the United States via the sea, land, and air modes of transportation are screened by the NTC using the Automated Targeting System (ATS) to identify those shipments that may be considered potentially high-risk according to NTC security criteria.  Any cargo container carrying a shipment identified as potentially high-risk is identified for immediate review and assessed or scanned prior to lading at a Container Security Initiative (CSI) member foreign port of origin or at arrival at a U.S. POE.  Assessing, resolving, and when required, scanning and physically inspecting cargo found to be potentially high-risk ensures the safety of the public and minimizes the impact to the trade through the effective use of risk-focused targeting.

The NTC periodically refines, improves, and revises the security criteria applied by the Automated Targeting System, which in turn improves the focus of the risk assessment applied and somewhat reduces the overall number of cargo shipments identified as potentially high-risk.  This process of continual review and refinement in the security criteria applied and ATS methodology has led to significant reductions in the total number of cargo containers identified as potentially high-risk year-to-year, even though the total amount of cargo arriving at U.S. POEs has increased over the same time period.

41

AR058

**Available Date and Discussion**

Table 16:  Potentially High-Risk Cargo Containers at Seaports, FY 2013 – FY 2016

| FY2013 | FY2014 | FY2015 | FY2016 |
|--------|--------|--------|--------|
| 89,598 | 74,509 | 72,974 | 71,815 |

The number of potentially high-risk cargo containers declined in 2016 for the third year in a row. Overall, the number of potentially high-risk containers fell from 89,598 in FY 2013 to 71,815 in FY 2016, a 20 percent decrease.

## § 1092(c)(1)(G)(ii) Ratio of Potentially High-Risk Cargo Containers Scanned Relative to High-Risk Containers Entering in Previous Fiscal Year

**Definition**

*Ratio of Potentially High-Risk Containers Scanned* – The ratio of potentially high-risk containers scanned relative to the number of potentially high-risk containers entering in the previous fiscal year.

*Percentage of Potentially High-Risk Containers Scanned* – The percentage of potentially high-risk containers scanned relative to the total number of potentially high-risk containers entering in the same fiscal year.

The ratio of potentially high-risk containers scanned is an *activity measure*, which compares trends in activity data over time. Ratio of High Risk Containers may also be interpreted as a proxy indicator of high risk containers successfully be scanned and entering through ports of entry, an *outcome measure*.

The percentage of potentially high-risk containers scanned is an *output measure*, which describes CBP's ability to scan containers identified as being potentially high-risk.

**Methodology and Limitations**

Inspection data are obtained from OFO administrative records.  These data include potentially high-risk cargo containers reviewed, assessed, or scanned.  These three methods of inspection are not currently distinguishable with available data sources.

The ratio compares potentially high-risk containers in one year to the number entering in the previous year and should not be confused with the percentage of potentially high-risk containers scanned relative to the number entering in the current year.

AR059

A container is considered "high-risk" if even one shipment within it is designated high-risk. One container may have multiple high-risk shipments within it which could cause the same container to be reviewed or scanned multiple times.

**Available Data and Discussion**

The ratio of potentially high-risk containers reviewed, assessed, or scanned relative to previous years' entries along with the percentage scanned in the current year are contained in Appendix F. Appendix F contains law enforcement sensitive information and has been redacted from this public report.

With respect to the percentage scanned, nearly all sea POEs reported 100 percent scanning of high-risk cargo containers in FY 2016 or indicated that no high-risk containers passed through the POE. The few POEs that reported lower than a 100 percent scanning rate reported at least a 99 percent rate.

## § 1092(c)(1)(G)(iii) Potentially High-Risk Cargo Containers Scanned Upon Arrival at a U.S. POE

This measure is under review and will be provided in the FY 2018 report.

## § 1092(c)(1)(G)(iv) Potentially High-Risk Cargo Containers Scanned Before Arrival at a U.S. POE

This measure is under review and will be provided in the FY 2018 report.

AR060

# § 1092(d) Metrics for Securing the Maritime Border

## § 1092(d)(1)(A) Situational Awareness in the Maritime Environment

**Definition**

The NDAA calls for DHS to develop a measure for situational awareness based on "knowledge and understanding of current unlawful cross-border activity, including the following: (A) Threats and trends concerning illicit trafficking and unlawful crossings; (B) The ability to forecast future shifts in such threats and trends; (C) The ability to evaluate such threats and trends at a level sufficient to create actionable plans; and (D) The operational capability to conduct persistent and integrated surveillance of the international borders of the United States."

Situational awareness is an *output measure*.

**Methodology and Limitations**

DHS is in the multi-year process of developing a defensible, analytically sound measure for situational awareness in the maritime domain that meets the intent of the NDAA.

In the interim, the Department reports on the following operational activities contributing to maritime domain situational awareness:
- CBP Aircraft Hours Flown for Situational Awareness or Interdiction Support
- USCG Aircraft Hours Flown for Situational Awareness or Interdiction Support
- USCG Cutter Hours Contributing to Situational Awareness or Interdiction
- CBP Boat Hours Contributing to Situational Awareness or Interdiction
- USCG Boat Hours Contributing to Situational Awareness or Interdiction
- CBP Tethered Aerostat Radar System (TARS) Radar Operating Hours
- Number of Vessel Manifests Screened by Coastwatch

**Available Data and Discussion**

Table 17a: CBP Aircraft Flight Hours Within/Outside Transit Zone, FY 2016

|  | **FY2016** |
|---|---|
| Inside Transit Zone - CBP | 6,420 |
| Outside Transit Zone – CBP | 13,188 |

Table 17b: USCG Aircraft Flight Hours Within/Outside Transit Zone, FY 2012 – FY 2016

|  | **FY2012** | **FY2013** | **FY2014** | **FY2015** | **FY2016** |
|---|---|---|---|---|---|
| Inside Transit Zone – USCG | 5,082 | 4,599 | 4,567 | 5,426 | 4,110 |
| Outside Transit Zone – USCG | 14,721 | 14,258 | 13,896 | 14,003 | 13,736 |

44

USCG reported a decrease in the number of flight hours both inside and outside the transit zone in FY 2016.  Between FY 2012 and FY 2015, an average of 4,919 hours were flown inside the transit zone, while only 4,110 were flown in FY 2016 – the lowest recorded flight hours in the last five years.  Similarly, 13,736 hours were flown outside the transit zone in FY 2016, as compared to the FY 2012-2015 average of 14,220.  This FY 2016 total was also the lowest number of hours flown outside the transit zone in the last five years.

Table 18:  USCG Cutter underway hours within/outside transit zone FY 2012 – FY 2016

|  | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 |
|---|---|---|---|---|---|
| Inside Transit Zone | 37,866 | 25,388 | 14,456 | 16,964 | 28,205 |
| Outside Transit Zone | 127,671 | 117,114 | 117,093 | 112,773 | 78,462 |

Table 19a:  USCG Boat underway hours within/outside transit zone FY 2012 – FY 2016

|  | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 |
|---|---|---|---|---|---|
| Inside Transit Zone | 0 | 2,031 | 0 | 0 | 0 |
| Outside Transit Zone | 46,326 | 37,640 | 30,726 | 32,701 | 28,525 |

Table 19b:  CBP Boat underway hours within/outside transit zone FY 2016

|  | FY2016 |
|---|---|
| Inside Transit Zone | 0 |
| Outside Transit Zone | 40,241 |

Note:  CBP maritime hours include Air and Marine Operations vessel underway hours.

Table 20:  Total operational hours for TARS radars FY 2012 – FY 2016

|  | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 |
|---|---|---|---|---|---|
| Cudjoe Key, FL | 5,752 | 6,289 | 6,165 | 6,306 | 4,886 |
| Lajas, PR | 0[1] | 0[1] | 1,230[1] | 5,049 | 4,559 |

[1] TARS site at Lajas, Puerto Rico crashed in 2011; CBP re-established operations in May 2014.
Source:  CBP administrative records

CBP's Air and Marine Operations (AMO) uses TARS to provide long-range detection of low-altitude aircraft at the radar's maximum range.  The elevated sensor mitigates curvature of the earth and terrain masking limitations.  The number of TARS operational hours declined for both locations in FY 2016.  Cudjoe Key saw a 1,420 hour decrease in hours (23 percent decrease from FY 2015).  Lajas reported a 490 hour decrease (10 percent decrease from FY 2015).  FY 2016 saw an increase in severe tropical weather throughout the storm season because of a La Niña effect, which impacted operations.  In addition to the weather, AMO switched out the aerostat envelope of the TARS in Cudjoe Key over March and April 2017.

Table 21:  Vessel Manifests Screened by Coastwatch for National Security Concerns Prior to Arrival at U.S. POE, FY 2012 – FY 2016

| FY2012 | FY2013 | FY2014 | FY2015 | FY2016 |
|---|---|---|---|---|
| 118,098 | 126,112 | 124,661 | 122,133 | 117,736 |

AR062

# § 1092(d)(1)(B) Known Maritime Migrant Flow Rate

**Definition**

*Known Maritime Flow* - Total maritime migrant flow interdicted, identified directly or indirectly but not interdicted, or otherwise believed to have unlawfully entered the United States

Known Maritime Flow is an *outcome measure*.

**Methodology and Limitations**

Migrant flow data are obtained from USCG and CBP administrative records.  The USCG maintains a robust accounting of USCG, international partner, and domestic partner interdictions and sightings of undocumented maritime migrants.  The USCG relies upon its partners to report their interdictions to the USCG for compilation in the database.  At times, undocumented maritime migrants are counted by both USCG and CBP (or other partners) when interdicted as agencies often cooperate during these operations.  In certain limited cases undocumented maritime migrant interdictions by partners are not reported to the USCG, and these cases are not accounted for in the figures below.  Additionally, while partners report cases to the USCG when undocumented maritime migrants are apprehended on shore or evidence is found of their arrival on shore, some migrants arrive without being apprehended and leave no evidence.  These cases are never reported and are also excluded from the known maritime migrant flow figures below.

Table 22:  Migrants interdicted in the maritime domain by DHS Component FY 2007 – FY 2016

|         | USCG  | CBP   | DHS and Partners |
|---------|-------|-------|------------------|
| **FY 2007** | 5,981 | NA    | NA               |
| **FY 2008** | 4,565 | NA    | NA               |
| **FY 2009** | 3,682 | NA    | NA               |
| **FY 2010** | 2,121 | NA    | NA               |
| **FY 2011** | 2,458 | NA    | NA               |
| **FY 2012** | 2,732 | NA    | NA               |
| **FY 2013** | 2,093 | NA    | NA               |
| **FY 2014** | 3,587 | NA    | 7,752            |
| **FY 2015** | 3,825 | NA    | 6,028            |
| **FY 2016** | 6,326 | 2,683 | 8,167            |

Note:  Some interdictions may be counted by both USCG and CBP as some migrant interdictions involve assets from both agencies.  Interdictions by DHS and partners may include international partners.

Table 23:  Known maritime migrant flow, FY 2007 – FY 2016

| FY2007 | FY2008 | FY2009 | FY2010 | FY2011 | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 |
|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|
| 14,682 | 10,879 | 9,850  | 4,443  | 4,566  | 5,298  | 7,631  | 10,631 | 8,057  | 10,319 |

AR063

# § 1092(d)(1)(C) Illicit Drug Removal Rate

**Terms**

*Illicit Drugs Removal Rate* –The ratio of illicit drugs removed by DHS maritime security in any fiscal year, including drugs abandoned at sea, relative to the average amount removed or abandoned in the immediately preceding five fiscal years.

The Illicit Drug Removal Rate is an *activity measure*, which compares trends in activity data over time.

**Methodology and Limitations**

Drug removals are obtained from USCG and CBP administrative records; these data are considered reliable.

Pursuant to the definition of the Illicit Drug Removal Rate directed by NDAA § 1092 (d)(1)(C), the Drug Removal Rate describes recent trends in drugs removed or abandoned at sea (i.e., current year compared to five previous years); the measure does not describe the rate at which illicit drugs are removed.

Non-commercial maritime drug removals includes those seized by the USCG, CBP, other law enforcement agencies, and international partners, as well as those disrupted or abandoned by drug trafficking organizations.

**Available Data and Discussion**

Table 24:  Ratio of Drugs Removed or Abandoned at Sea Relative to Previous Five Fiscal Years ("Illicit Drug Removal Rate"), FY 2012 – FY 2016

| Drug Type | | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 |
|---|---|---|---|---|---|---|
| Marijuana | Rate | 337% | 137% | 154% | 100% | 61% |
| | Quantity Removed | 124,585 | 81,008 | 108,535 | 78,262 | 52,613 |
| Methamphetamine | Rate | 0% | 150% | 265% | 36% | 4332% |
| | Quantity Removed | 0 | 17.4 | 32.1 | 4.8 | 599.5 |
| Heroin | Rate | 762% | 0% | 0% | 676% | 327% |
| | Quantity Removed | 24 | 0 | 0 | 52.4 | 44 |

Note:  Marijuana measured in pounds, amphetamines and heroin measured in kilograms.
Data only includes removals by USCG.

AR064

# § 1092(d)(1)(D) Cocaine Removal Effectiveness Rate

**Definition**

*Cocaine Removal Effectiveness Rate* – In consultation with ONDCP, the amount of cocaine removed by DHS inside and outside the maritime transit zone compared to total estimated flow of cocaine through the maritime domain.

Cocaine Removals is an *activity measure*.  Removals may also be used as a proxy indicator of total attempts to import cocaine, an *outcome measure*.  Cocaine Removal Effectiveness rate (i.e., cocaine seized as compared to the total estimate cocaine flow) is an *output measure*.

**Methodology and Limitations**

Drug removal data are obtained from ONDCP, JIATF-S, CBP, and USCG administrative records through the Consolidated Counter Drug Database (CCDB), and are considered reliable.  Flow quantities are the best estimates available based on intelligence reporting and case data. Additionally, while other government estimates for production in major cocaine producing countries in South America and consumption of cocaine within America do not align with the estimated non-commercial maritime flow figures inside the transit zone derived from the CCDB, this metric was derived based upon the non-commercial maritime flow estimates.

For the purposes of this metric, based upon where the data was gathered, the transit zone is defined by the Joint Interagency Task Force South area of responsibility.  Non-commercial maritime drug removals include those seized by USCG, CBP, other law enforcement agencies, and international partners, as well as those disrupted by anti-drug trafficking operations.  The cocaine removal rate is based on estimates of noncommercial maritime cocaine flow from the CCDB. Outside the transit zone data is not considered as robust with regard to intelligence on flow. As a result, the interdiction rate for cocaine outside the transit zone is not considered reliable.

**Available Data and Discussion**

Table 25:  Cocaine Removed by DHS Relative to the Total Estimated Flow in the Maritime Transit Zone, FY 2012 – FY 2016

| Location | | FY 2012 | FY 2013 | FY 2014 | FY 2015 | FY 2016 |
|---|---|---|---|---|---|---|
| Inside Transit Zone | Rate | 23% | 12% | 17% | 21% | 17% |
| | Quantity Removed | 186.4 | 155.4 | 178.8 | 277.2 | 482.7 |
| | Estimated Flow | 799.5 | 1260.4 | 1042.2 | 1308.8 | 2852.6 |
| Outside Transit Zone | Rate | 49% | 19% | 50% | 73% | 28% |
| | Quantity Removed | 21.3 | 15.1 | 13.2 | 39 | 17.7 |
| | Estimated Flow | 43.8 | 81.5 | 26.2 | 53.2 | 62.3 |

Note: Removal and estimated flow quantities measured in metric tons.

Figure 5:  Flow and Removal of Cocaine in the Maritime Transit Zone, FY 2012 – FY 2016

48



The flow of cocaine is estimated to have risen in 2016 to over 2,800 metric tons, based on the decrease in aerial eradication of cocaine crops in Colombia and improved intelligence reporting throughout the Transit Zone.

## § 1092(d)(1)(E) DHS Maritime Threat Response Rate

**Definition**

*DHS Maritime Threat Response Rate* – The ability of DHS maritime security components to respond to and resolve known maritime threats, whether inside or outside a transit zone, by placing assets on-scene, relative to the total number of known threats.

**Methodology and Limitations**

Currently, this data only exists associated with cocaine response activity.  Further, DHS data is part of a larger set of interagency data and may not be able to be separated from the larger interagency data set, which is currently assessed and reconciled on a cycle and process outside of DHS that does not support submission at this time.  DHS, in cooperation with interagency partners, intends to explore options to collect response data for non-cocaine response events, as well as options to provide the response rate measures data to meet the intent of the Act and hopes to provide an update in the November 2018 report.

## § 1092(d)(1)(F) Intergovernmental Maritime Threat Response Rate

**Definition**

AR066

*Intergovernmental Maritime Threat Response Rate* – The ability of DHS maritime security components or other U.S. Government entities to respond to and resolve known maritime threats, whether inside or outside a transit zone, by placing assets on-scene, relative to the total number of known threats.

**Methodology and Limitations**

Currently, this data only exists associated with cocaine response activity. Further, DHS data is part of a larger set of interagency data and may not be able to be separated from the larger interagency data set, which is currently assessed and reconciled on a cycle and process outside of DHS that doesn't support submission at this time. DHS, in cooperation with interagency partners, intends to explore options to collect response data for non-cocaine response events, as well as options to provide the response rate measures data to meet the intent of the Act and hopes to provide an update in the November 2018 report.

# § 1092(e) Air and Marine Security Metrics in the Land Domain

## § 1092(e)(1)(A) Flight Hour Effectiveness Rate

**Definition**

Flight Hour Effectiveness Rate in the Land Domain – Number of flight hours flown by DHS Air and Marine Operations in the Land Domain as a percentage of AMO's unconstrained and unfunded flight hour requirements.

Flight Hour Effectiveness Rate is an *output measure*.

**Methodology and Limitations**

This Flight Hour Effectiveness Rate is determined by dividing the total hours flown by the number of flight hours determined during the annual collection process. The flight hour requirements for the subsequent fiscal year are collected by AMO operating locations based on unconstrained requirements collected from USBP, ICE and other partner agencies as well as internal AMO requirements. In FY 2016, AMO collected the following unconstrained flight hour requirements from these partner agencies in the Land Domain: USBP – 209,448 hours; ICE – 54,580 hours; OFO - 6,820 hours; and 24,377 hours for all other enforcement and non-enforcement Land Domain missions (U.S. Secret Service event security, local Law Enforcement coordination, training, maintenance, etc.).  In 2016, AMO's unconstrained flight hour requirement in the Land Domain totaled 295,225 hours.  However, after incorporating the approved funding for FY 2016, the total funded flight hours in the Land Domain was reduced to 79,774 programmed hours.

**Available Data and Discussion**

AMO completed 27 percent of the unconstrained flight hour requirement during FY 2016, with 79,872 hours flown against the unconstrained 295,225 hours.  Data from previous years are not available for analysis.

## § 1092(e)(1)(B) Funded Flight Hour Effectiveness Rate

**Definition**

*Funded Flight Hour Effectiveness Rate* – Number of flight hours flown by Air and Marine Operations as a percentage of the number of flight hours funded by Congress.

Funded Flight Hour Effectiveness Rate is an *output measure*.

**Methodology and Limitations**

51

Flight hour data are obtained from AMO administrative records.  This rate is determined by dividing the total hours flown by the number of flight hours funded by Congress.

**Available Data and Discussion**

AMO's Flight Hour Effectiveness Rate was 100 percent in FY 2016, with 79,872 hours flown against 79,774 funded hours.  Data from previous years are not available for analysis.

# § 1092(e)(1)(C) AMO Readiness Rate

**Definition**

*AMO Readiness Rate* - The percentage of mission requests that AMO was able to fulfill, excluding those requests that could not be fulfilled due to reasons beyond AMO's control.

AMO Readiness Rate is an *activity measure*.

**Methodology and Limitations**

Missions data are obtained from AMO administrative records.  The rate is determined by dividing the missions flown by the total number of mission requests (number of missions flown plus the number of missions cancelled due to causes within AMO control, such as maintenance, personnel, and asset availability).

Table 26:  AMO Missions Cancelled and Readiness Rate FY 2016

|  | FY2016 |
|---|---|
| Total Non-Cancelled Missions | 31,635 |
| Missions cancelled - asset availability | 4,978 |
| Missions cancelled - crew availability | 1,738 |
| Total cancelled missions within AMO control | 6,716 |
| Readiness rate due to causes within AMO control | 82% |

AMO's readiness rate was 82 percent in FY 2016, with 6,716 out of 38,351  planned missions cancelled due to causes within AMO control.  Data from previous years are not available for analysis.

# § 1092(e)(1)(D) AMO Weather-Related Cancelation Rate

**Definition**

*AMO Weather-Related Cancelation Rate* - The number of missions cancelled by AMO due to weather as a percentage of total planned AMO missions.

AMO Weather-related cancelation rate is an *activity measure*.

**Methodology and Limitations**

Mission data are obtained from AMO administrative records. The Weather-Related Cancelation Rate is calculated by dividing the number of missions cancelled due to weather by the total number of missions requested by AMO's partner agencies.

**Available Data and Discussion**

Table 27:  AMO Weather-Related Cancelation Rate, FY 2016

| | |
|---|---|
| Total Missions Requested by Partner Agencies | 42,761 |
| Missions Cancelled – Weather | 3,083 |
| Cancellation Rate due to Weather | 7% |

Data from previous years are not available for analysis.

# § 1092(e)(1)(E) AMO Individuals Detected

**Definition**

*AMO Individuals Detected* – Number of individuals detected by CBP AMO through the use of unmanned aerial systems and manned aircraft.

AMO Individuals Detected is an *activity measure*.

**Methodology and Limitations**

Data are obtained from AMO administrative records. The Department's currently available data on detections by unmanned aircraft are limited to the number of VADER detections, and current data on detections from manned aircraft are limited to detections leading to apprehensions and arrests.

These data exclude certain detections because AMO does not presently track data from all sensors on unmanned and manned aircraft. For this reason, the Department considers the current AMO Individuals Detected measure to be a work in progress, and expects to provide more comprehensive data on AMO detections as part of the FY 2019 State of the Border Report.

**Available Data and Discussion**

Table 28:  Individuals Detected by AMO by Aircraft Type

| Aircraft Type | FY2016 |
|---|---|
| Manned | 54,879 |
| Unmanned | 7,908 |

AR070

Data from previous years are not available for analysis.

## § 1092(e)(1)(F) AMO Apprehensions Assisted

**Definition**

*AMO Apprehensions Assisted* – USBP apprehensions assisted by AMO through the use of unmanned aerial systems and manned aircraft.

AMO Apprehensions Assisted is an *activity measure*.

**Methodology and Limitations**

Data are obtained from AMO administrative records.  The metric consists of apprehensions and arrests that are attributed to manned and unmanned aircraft operations.  These data are based on Aircraft Enforcement Hours (non-maritime), therefore excluding DHC-8, P-3, and MEA aircraft operations occurring in the maritime domain

**Available Data and Discussion**

Table 29:  Apprehensions Assisted by AMO by Aircraft Type and Flight Hours

| | FY2016 | |
|---|---|---|
| Aircraft Type | Enforcement Flight Hours | Apprehensions |
| Manned | 64,639 | 50,646 |
| Unmanned | 4,857 | 1,729 |

Data from previous years are not available for analysis.

## § 1092(e)(1)(G) Illicit Drug Seizures Assisted by AMO

**Definition**

*Illicit Drug Seizures Assisted by AMO* - The number and quantity of illicit drug seizures assisted by AMO through the use of unmanned aerial systems and manned aircraft.

Illegal Drug Seizures Assisted is an *activity measure*.

**Methodology and Limitations**

54

Drug seizure data are obtained from AMO administrative records.  The metric consists of the total number of events and quantity in pounds of drug seizures using manned and unmanned systems.  A "drug event" is defined as a single law enforcement action resulting in a drug seizure(s).  This is based on Aircraft Enforcement Hours (non-maritime), therefore excluding DHC-8, P-3, and MEA aircraft operations occurring in the maritime domain.

**Available Data and Discussion**

Table 30:  Illicit Drug Seizures and Drug Events by AMO by Aircraft Type and Flight Hours

| Aircraft Type | FY2016 | | |
| --- | --- | --- | --- |
| | Enforcement Flight Hours | Drug Events | Drug Seizures (lbs) |
| Manned | 64,639 | 3,834 | 651,759 |
| Unmanned | 4,857 | 78 | 30,033 |

Data from previous years are not available for analysis.


# § 1092(e)(1)(H) AMO Actionable Intelligence

**Definition**

*AMO Actionable Intelligence* - The number of times that actionable intelligence related to border security was obtained through the use of unmanned aerial systems and manned aircraft.

This measure is under review and will be provided in the FY 2019 State of the Border report.

55

# § 1092(g)(3)(D) Other Appropriate Information

Pursuant to NDAA § 1092(g)(3)(D), this section provides three additional metrics of border security between ports of entry:  1) selected characteristics of USBP apprehensions; 2) the estimated at-the-border deterrence rate; and 3) estimated border crossing costs.

## Selected Characteristics of Recent USBP Apprehensions

**Definition**

Historically, the overwhelming majority of individuals apprehended between POEs along the southwest border have been Mexican adults, and very few of them have sought asylum or other forms of humanitarian relief from removal.  The profile of USBP apprehensions has changed in important ways in recent years, as growing shares of individuals apprehended are:  a) from countries other than Mexico (primarily the Northern Triangle of Central America countries of El Salvador, Guatemala, and Honduras), b) UACs or children and adults traveling together as FMUAs, and/or c) seeking asylum by claiming credible or reasonable fear of being returned to their countries of citizenship when potentially subject to expedited removal.

These shifting characteristics have an important impact on border security and USBP border enforcement because existing enforcement policies were largely designed with the more traditional alien profile in mind. For example, many consequences under CBP's Consequence Delivery Program such as the Alien Transfer Exit Program and the Mexican Interior Repatriation Program are only applicable to Mexican nationals.  And UACs, FMUAs, and aliens making successful credible/reasonable fear claims are generally not subject to expedited removal and have been considered "not impactable" by traditional USBP enforcement efforts because upon apprehension they have typically been released into the United States with a Notice to Appear in immigration court on a future date.  More generally, the drivers of migration from countries other than Mexico and for aliens who may seek humanitarian relief from removal may be different from those that motivated earlier generations of unlawful border crossers, potentially causing U.S. policymakers to rethink their policy response.

To monitor these changing dynamics, the Department tracks two main sets of characteristics:

*Apprehensions by Citizenship* – The share of aliens apprehended by USBP from Mexico, El Salvador, Guatemala, Honduras, and all other countries.

*Apprehensions by Potential Humanitarian Equities* – The share of aliens apprehended by USBP who are unaccompanied children, are apprehended as part of a family unit, and/or who make successful credible or reasonable fear claims.

Apprehensions is an *activity measure*.

AR073

## Methodology and Limitations

Apprehensions are recorded in administrative record systems with a unique identifier created for each apprehension.  Apprehensions by citizenship, by UAC status, and by family unit status are generally considered reliable, though agents may not always be able to identify UACs or family units.

## Available Data and Discussion

Table 31:  USBP Southwest Border Apprehensions by Citizenship, FY 2008 – FY 2016

| Country | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|
| Mexico | 653,035 | 495,582 | 396,819 | 280,580 | 262,341 | 265,409 | 226,771 | 186,017 | 190,760 |
| El Salvador | 12,133 | 11,181 | 13,123 | 10,368 | 21,903 | 36,957 | 66,419 | 43,392 | 71,848 |
| Guatemala | 15,143 | 14,125 | 16,831 | 17,582 | 34,453 | 54,143 | 80,473 | 56,691 | 74,601 |
| Honduras | 18,110 | 13,344 | 12,231 | 11,270 | 30,349 | 46,448 | 90,968 | 33,445 | 52,952 |
| All Other | 6,584 | 6,633 | 8,727 | 7,777 | 7,827 | 11,440 | 14,740 | 11,788 | 18,709 |
| **Total** | **705,005** | **540,865** | **447,731** | **327,577** | **356,873** | **414,397** | **479,371** | **331,333** | **408,870** |

In recent years, apprehensions have started to shift from consisting overwhelmingly of Mexican nationals to an equal share of Mexican nationals and border crossers from other areas, mostly Northern Triangle countries.  In 2014 and 2016, southwest border apprehensions peaked, most noticeably for Northern Triangle countries.  In 2016, only 46 percent of southwest border apprehensions were Mexican nationals while 48 percent were from Northern Triangle countries.  Apprehensions of border crossers from all other countries also rose considerably in 2016, increasing by more than 50 percent.

Table 32:  USBP Southwest Border Apprehensions by Potential Humanitarian Claim, FY 2008 – FY 2016

| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|
| FMUA | NA | NA | NA | NA | 11,116 | 14,855 | 68,445 | 39,838 | 77,674 |
| UAC | 7,922 | 19,440 | 18,411 | 15,949 | 24,403 | 38,759 | 68,541 | 39,970 | 59,692 |
| Credible/ Reasonable Fear Claim | 7,454 | 8,627 | 12,499 | 13,994 | 22,087 | 44,380 | 57,936 | 47,117 | 87,585 |
| **Total Apprehensions** | **705,005** | **540,865** | **447,731** | **327,577** | **356,873** | **414,397** | **479,371** | **331,333** | **408,870** |

Note: Table rows are not mutually exclusive categories; some individuals are counted as FMUA and credible/reasonable fear.

Consistent with the surge of apprehensions seen in 2016, the number of family unit apprehensions and UAC apprehensions rose in 2016, with family unit numbers roughly doubling from 2015 and UAC apprehensions increasing 49 percent.  Credible fear claims also rose substantially in 2016, with an 86 percent increase over the previous year. All three of these "non-impactable" flows have increased dramatically over the past decade.  As compared to 2008, credible fear/reasonable fear claims have increased eleven-fold, while UAC numbers have

increased seven-fold; and FMUA apprehensions have increased seven-fold since 2012 (the first year for which data are available).


## At-the-Border Deterrence

**Definition**

*Deterrence* - the estimated share of migrants who, following a failed unlawful entry attempt, are deterred from making a subsequent reentry and decide instead to return home or otherwise remain in Mexico.

The deterrence rate is an *output measure* associated with the difficulty of crossing the border unlawfully because it reflects decisions by people who have already decided to migrate illegally to abandon their effort.

**Methodology and Limitations**

As with the apprehension or interdiction rate, deterrence cannot be observed directly.

DHS currently estimates deterrence based on migrant surveys; the Department believes surveys or interviews are one of the only ways to directly measure deportees' intentions to make a further illegal entry attempt.  The most important survey data on deterrence comes from the Colegio de la Frontera Norte International Border Survey (EMIF), which interviews deportees immediately at repatriation facilities upon their return to Mexico and asks them about their intentions to return to the United States within the next 7-90 days.  In work for DHS, the Institute for Defense Analyses (IDA) Corporation used a combination of EMIF and CBP data to build an econometric model of 90-day deterrence for all USBP apprehensions since 2000.[6]

In addition to the standard concerns about the validity of survey samples and survey instruments, questions about deterrence are especially hard to measure accurately given the ever-evolving enforcement environment.  A further limitation is that the EMIF data is restricted to Mexican northern border deportees, and cannot be assumed to apply to migrants from other regions/countries because they face different trade-offs and geographic barriers when considering a re-entry attempt.

**Available Data and Discussion**

Figure 6:  At the Border Deterrence for Mexican Border Deportees, FY 1993 – FY 2016

---

[6] John W. Bailey et al., "Assessing Southern Border Security," Institute for Defense Analyses, IDA Paper NS P-5304, May 2016.

AR075



The data describe relatively limited deterrence levels prior to 2007 (20-40 percent in the seven-day survey and 10-30 percent in the 90-day model), and substantial growth in the deterrence rate since that time. Estimated seven-day deterrence rates have exceeded 75 percent every year since 2012, and estimated 90-day deterrence rates hovered around 60 percent in 2014 through 2016.

## Border Crossing Costs

### Definition

*Percent hiring smuggler* – the share of migrants who hire a smuggler.

*Border crossing costs* - the average fees that smugglers charge.

Smuggling usage and average smuggling fees are *output measures* associated with the difficulty of crossing the border unlawfully. Migrants will only tolerate higher fees to the extent that smugglers provide an essential and successful service. Smugglers also compete to attract customers by offering their services at the lowest profitable rate, so higher fees indicate rising costs to smugglers. Rising smuggling fees also reflect an increased risk to smugglers of a criminal conviction; smugglers pass this risk along to customers in the form of higher fees.

### Methodology and Limitations

The only available data on smuggling fees come from migrant surveys and USBP custodial interviews. These data may be subject to response bias if migrants are reluctant to admit to hiring a smuggler, but such bias should be broadly consistent over time, so changes in survey/interview data should reflect changes in the difficulty of crossing the border.

AR076

**Available Data and Discussion**

One finding across multiple surveys is that smuggler usage rates have increased steadily over the last five decades.  Previous research by the Office of Immigration Statistics found that smuggler usage rates climbed from 40-50 percent during the 1970s, to 59 percent in the late 1970s and early 1980s, 70-80 percent in the 1980s to 1990s, 80 to 93 percent in the 1990s to 2000s, and 95 percent for first-time crossers surveyed in 2006.  Similarly, according to USBP interviews, relatively few illegal border crossers hired a smuggler prior to 2001, but usage rates climbed to 80-95 percent among apprehended border crossers in 2015.

Figure 7:  Border Crossing Cost Estimates, FY 1999 – FY 2015



Source:  U.S. Border Patrol apprehension records, El Colegio de la Frontera Norte Encuestas sobre Migracion en las Fronteras Norte y Sur de Mexico (EMIF).

Survey results also indicate steady increases in fees paid to migrant smugglers.  Averaging across the available sources depicted in Figure X, smuggling fees increased by five percent per year during the 1980s, 12 percent per year during the 1990s, and nine percent per year during the decade ending in 2015.

Custodial interviews conducted by USBP have found that smuggling fees are often paid in stages.  Initial fees required to approach staging locations along the border were often lower than $100 prior to the late 2000s, and an additional $1,000-$3,000 in fees were charged upon delivery to the final destination.  More recently, smuggling fees for Mexicans and Central Americans reportedly have been as high as $1,200 for the initial staging payment and up to $8,000 at the final destination.  Custodial interviews also find evidence of an increase in alternative forms of payment in exchange for passage, including migrants being required to participate in smuggling controlled substances or other illicit items across the border or to work off debts upon arrival in

AR077

the United States, as well as reports of harsh negotiations concerning payment plans with family members.

AR078

# IV. Conclusion

DHS recognizes that its ability to accurately measure its border security outcomes, outputs, activities, and inputs is essential to the effective and efficient management of the Department. The metrics contained in this report will be the baseline that DHS uses to measure its progress towards meeting the goals contained in the Executive Order on *Border Security and Immigration Enforcement Improvement*. As such, the Department will continue to refine these metrics through internal and external engagement and collaboration, including with Congress. DHS looks forward to updating Congress on this progress through periodic briefings and formally with the submission of future State of the Border Reports.

# Appendix A – Repeated Trials Model Methodology

The Department's current model-based estimates of the Apprehension Rate, of the total number of successful unlawful entries, and of related measures such as undetected unlawful entries build on research conducted for DHS by the Institute for Defense Analyses (IDA) based on long-standing social science research on the Repeated Trials Methodology (RTM).[7]  The Department views some of IDA's assumptions as problematic and is still working to validate and refine the modeling methodology.  For this reason, while this report includes metrics based on IDA's model-based approach, DHS views the model itself as a work in progress, and future reports will update resulting metrics as the Department continues to improve its own modeling ability.

The primary building block for the model-based Apprehension Rate and total estimated successful unlawful entries is an estimated apprehension rate for a particular subset of border crossers that DHS refers to as a partial apprehension rate (PAR).  The approach focuses on illegal border crossers who are apprehended and deported to the Mexican border and who make a subsequent re-entry attempt.  The logic of the PAR is to use USBP biometric data to assess what share of migrants who make repeated entry attempts is subsequently re-apprehended.

The PAR methodology consists of three main steps (see Figure 2).  First, the model identifies a subset of illegal border crossers who are candidates to attempt re-entry, the so-called RTM population.  Under IDA's methodology, this group excludes all non-Mexicans, those deported to the Mexican interior or remotely through the Alien Transfer and Exit Program, aliens who have ever requested asylum, those facing criminal charges, and children under 18 years old.

---

[7] For a full discussion of IDA's model-based estimate, see John W. Bailey et al., "Assessing Southern Border Security," Institute for Defense Analyses, IDA Paper NS P-5304, May 2016.  Also see Thomas J. Espenshade, "Using INS Border Apprehension Data to Measure the Flow of Undocumented Migrants Crossing the U.S.-Mexico Frontier," *International Migration Review* (1995): 545-565; Joseph Chang, "CBP Apprehensions at the Border," Homeland Security Studies and Analysis Institute, 2006.

AR080

Figure 1:  Partial Apprehension Rate Methodology



Source:  DHS Office of Immigration Statistics adaptation of Bailey et al. 2016.

The second step in calculating the PAR is to distinguish between deportees who give up and return home or otherwise remain in Mexico versus those who attempt to re-enter the United States.  IDA estimates this share based on an analysis of a survey of recent deportees conducted by the College of the Northern Border, the so-called EMIF survey.

Third, by definition, RTM assumes deportees who are not deterred following an apprehension always make a subsequent reentry attempt.  Thus, by observing in DHS administrative records how many migrants from the RTM population are re-apprehended, the model infers the number that successfully re-enters.  The ratio of re-apprehensions to successful re-entries is used to estimate the partial apprehension rate.

The PAR model confronts important limitations at each point in the modeling process.  The most notable and challenging to overcome is the assumption of the RTM that subjects who are not deterred will always attempt re-entry until successful.  One problem with this assumption is the lack of reliable data on who is deterred.  IDA relies primarily on the EMIF survey to estimate the deterrence rate.  And while the EMIF is widely recognized as one of the best migrant surveys available, its results are still dependent on the characteristics of the sample, the quality of the survey instrument, and the honesty of the respondents.  More fundamentally, the EMIF survey asks recent deportees about their *intentions* to re-enter the United States, and it therefore does not take account of shifting border enforcement efforts, potential changes in behavior by individuals who have been exposed to consequence programs, or other deterrent factors along the border.  The structure of the RTM model means that any resulting undercount in the estimate of the deterred population results in a downward bias in the PAR.

Second, the RTM population represents a shrinking share of southwest border apprehensions.  Mexican adults quickly deported to the nearest border accounted for about 95 percent of apprehensions when the RTM methodology was developed in the 1990s.  But changes in the composition of border flows (i.e., rising numbers of Central Americans and asylum seekers);

64

changes in CBPs enforcement strategy to emphasize criminal charges, lateral repatriation, and other enforcement consequences; and IDA's restrictive modeling choices mean that as few as 20 percent of U.S. Border Patrol (USBP) apprehensions in recent years are used to estimate the PAR.  In addition, because the RTM sample excludes aliens who are more likely to surrender to USBP (i.e., aliens with a higher apprehension rate), the PAR is biased downwards as an indicator of the overall apprehension rate; this bias may be substantial given the number of aliens excluded from the RTM sample.

Third, IDA makes somewhat restrictive assumptions about which re-apprehensions to include in the final stage of the PAR calculation.  In particular, IDA excludes apprehensions occurring at check points and other remote locations and those occurring more than four days after an illegal entry.  Given USBP's defense-in-depth strategy, which places resources at and behind the border, these assumptions result in a slight further downward bias in the PAR.

Despite these limitations, the Department views the RTM methodology as a promising approach to estimating an apprehension rate that takes great advantage of USBP's collection of biometric data since 2000.  DHS is currently working to relax certain aspects of IDA's modeling assumptions and to more fully describe the impact of each assumption on the PAR and on related model-based metrics reported above.

# Appendix B – Drugs Seizures – All Ports of Entry

## OFO Drug Seizures at Ports of Entry FY 2007 to FY 2016

| DRUG | FY 2007 | FY 2008 | FY 2009 | FY 2010 | FY 2011 |
|---|---|---|---|---|---|
| Grand Total | 372,493.60 | 433,037.02 | 680,417.93 | 395,390.47 | 371,813.83 |
| COCA PRODUCTS, TEA BAGS OR LIQUOR | | | | | 953.62 |
| COCAINE | 35,635.13 | 18,246.01 | 27,946.47 | 28,063.88 | 23,517.88 |
| CRYSTAL METHAMPHETAMINES | 235.15 | 186.25 | 360.6 | 544.2 | 875.61 |
| DIHYDROCODEINONE (HYDROCODONE) | | | 70.92 | 26.37 | 8.46 |
| ECSTASY | 771.36 | 700.28 | 500.83 | 527.71 | 264.92 |
| EPHEDRINE | 888.58 | 7,901.41 | 8,762.73 | 7,738.18 | 4,475.71 |
| FENETHYLLINE-(CAPTAGON-AMPHETAMINE) | | | | | |
| GAMMA HYDROXY BUTYRATE | 39.28 | 48.34 | 26.16 | 79.86 | 24.28 |
| HASH,LIQUID (HASH OIL) | 0.06 | 0.1 | 0.08 | 0.26 | 0.04 |
| HASHISH | 128.94 | 105.3 | 276.83 | 143.11 | 104.83 |
| HEROIN | 932.08 | 845.46 | 827.61 | 1,316.57 | 1,594.24 |
| KETAMINE | 11.86 | 100.77 | 40.85 | 66.84 | 112.47 |
| KHAT (CATHA EDULIS) | 41,216.88 | 54,815.24 | 116,691.90 | 95,988.98 | 70,061.23 |
| LSD | 0.16 | 0.85 | 4.58 | 0.78 | 10.09 |
| MARIJUANA | 280,387.77 | 261,611.58 | 312,264.86 | 246,546.43 | 253,771.78 |
| MARIJUANA PLANTS | | | | | 13.15 |
| MDPV-(METHYLENEDIOXYPYROVALERONE) | | | | | |
| MEPHEDRONE | | | | 0.5 | |
| METHAMPHETAMINE | 1,164.53 | 1,155.95 | 1,970.25 | 2,900.33 | 3,824.11 |
| METHYLONE | | | | | 1.3 |
| METHYLPHENIDATE (RITALIN) | 39.95 | 46.74 | 38.95 | 23.79 | 28.11 |
| MORPHINE | 7.4 | 8.15 | 1.08 | 22.86 | 6.2 |
| N-BENZYLPIPERAZINE (BZP TABLETS) | 0.02 | 9.36 | 182.79 | 15.24 | 12.9 |
| NEXUS/2 CB | 0 | | 0.16 | 0 | 0.11 |
| OPIUM | 529.5 | 318.74 | 662.55 | 825.52 | 667.96 |
| OTHER DRUGS, PRESCRIPTIONS, CHEMICALS | 2,257.77 | 5,814.91 | 5,878.10 | 7,125.77 | 5,452.89 |
| OXYCODONE (OXYCONTIN) | 1.59 | 2.8 | 4.86 | 5.21 | 6.07 |
| PARAMETHOXYAMPHETAMINE | 0.03 | | | 0.01 | 0 |
| PRECURSOR CHEMICALS EXCEPT EPHEDRINE | 7,521.86 | 80,705.40 | 203,508.22 | 230.2 | 4,760.66 |
| PSILOCYN OR PSILOCYBIN MUSHROOMS | 24.58 | 25.81 | 4.81 | 4.71 | 3.74 |
| ROHYPNOL | 0.24 | 0.18 | 0.05 | 0.53 | 0.21 |
| STEROIDS | 698.88 | 386.16 | 389.02 | 3,117.40 | 331.81 |

AR083

| DRUG | FY 2012 | FY 2013 | FY 2014 | FY 2015 | FY 2016 |
|---|---|---|---|---|---|
| SYNTHETIC CANNABINOIDS - ALL TYPES | | | | 72.1 | 929.35 |
| YABA | | 1.25 | 2.67 | 3.14 | 0.08 |
| **Grand Total** | 344,129.80 | 336,121.66 | 309,214.45 | 400,719.44 | 367,612.58 |
| COCA PRODUCTS, TEA BAGS OR LIQUOR | 270.63 | 112.31 | 335.66 | 370.24 | 210.93 |
| COCAINE | 20,529.67 | 17,723.96 | 18,738.75 | 17,302.28 | 23,949.98 |
| CRYSTAL METHAMPHETAMINES | 1,377.53 | 1,522.53 | 1,742.36 | 1,625.40 | 2,084.99 |
| DIHYDROCODEINONE (HYDROCODONE) | 1.79 | 4.29 | 11.24 | 2.98 | 14.45 |
| ECSTASY | 49.56 | 104.26 | 111.04 | 103.97 | 704.61 |
| EPHEDRINE | 2,350.28 | 5.1 | 28.57 | 42.1 | 13.5 |
| FENETHYLLINE-(CAPTAGON-AMPHETAMINE) | | | | | 1.22 |
| FENTANYL | | | | | 208.25 |
| GAMMA HYDROXY BUTYRATE | 218.16 | 33.09 | 73.31 | 48.68 | 483.76 |
| HASH,LIQUID (HASH OIL) | 0.18 | 0.13 | 13.98 | 0.77 | 0.45 |
| HASHISH | 60.96 | 58.1 | 117.11 | 82.43 | 75.24 |
| HEROIN | 1,714.41 | 1,809.90 | 1,957.01 | 2,508.16 | 1,915.58 |
| KETAMINE | 81.31 | 88.58 | 77.78 | 43.69 | 150.59 |
| KHAT (CATHA EDULIS) | 47,972.07 | 84,023.03 | 67,478.21 | 66,953.87 | 70,087.11 |
| LSD | 17.82 | 3 | 7.02 | 3.57 | 2.41 |
| MARIJUANA | 237,053.80 | 213,186.12 | 198,650.99 | 273,423.14 | 233,774.29 |
| MARIJUANA PLANTS | 0.03 | 7.97 | 0.66 | 0.25 | 1.64 |
| MDPV-(METHYLENEDIOXYPYROVALERONE) | 29.22 | 335.14 | 225.68 | 234.05 | 41.75 |
| MEPHEDRONE | 12.4 | 11.82 | 9.11 | 5.72 | 2.66 |
| METHAMPHETAMINE | 5,032.37 | 7,884.50 | 8,796.53 | 11,529.10 | 15,018.32 |
| METHYLONE | 74.63 | 322.27 | 829.42 | 315.68 | 41.98 |
| METHYLPHENIDATE (RITALIN) | 36.63 | 20.03 | 15.14 | 13.69 | 12.3 |
| MORPHINE | 13.1 | 31.36 | 213.71 | 19.29 | 520.21 |
| N-BENZYLPIPERAZINE (BZP TABLETS) | 73.71 | 87.78 | 1.61 | 1.16 | 0.1 |
| NEXUS/2 CB | 0.06 | 0.09 | 0.11 | 1.26 | 0.06 |
| OPIUM | 1,150.49 | 1,289.80 | 1,637.34 | 652.98 | 905.89 |
| OTHER DRUGS, PRESCRIPTIONS, CHEMICALS | 5,719.66 | 4,135.02 | 5,117.21 | 22,330.66 | 12,987.55 |
| OXYCODONE (OXYCONTIN) | 13.72 | 13.17 | 11.14 | 6.46 | 20.65 |
| PARAMETHOXYAMPHETAMINE | 0.15 | | | | |
| PRECURSOR CHEMICALS EXCEPT EPHEDRINE | 18,778.76 | 739.27 | 748.2 | 1,293.69 | 3,377.95 |
| PSILOCYN OR PSILOCYBIN MUSHROOMS | 17.98 | 23.38 | 24.11 | 16.18 | 45.78 |
| ROHYPNOL | 0.23 | 0.74 | 0.04 | 0 | 0.08 |

AR084

| | | | | | |
|---|---|---|---|---|---|
| STEROIDS | 476.53 | 470.05 | 554.53 | 581.16 | 613.24 |
| SYNTHETIC CANNABINOIDS - ALL TYPES | 1,001.97 | 2,074.37 | 1,686.67 | 1,206.82 | 550.79 |
| YABA | | 0.47 | 0.18 | | 2.53 |

Note: Tea bags included in this table are those used to carry coca products.

AR085

**U.S. Customs and Border Protection Enforcement Actions - Southwest Border**
**Total - Apprehensions and Inadmissible Aliens by Country of Citizenship**
**FY17 - 19TD through May**

| | Oct-16 | Nov-16 | Dec-16 | Jan-17 | Feb-17 | Mar-17 | Apr-17 | May-17 | Jun-17 | Jul-17 | Aug-17 | Sep-17 | Oct-17 | Nov-17 | Dec-17 | Jan-18 | Feb-18 | Mar-18 | Apr-18 | May-18 | Jun-18 | Jul-18 | Aug-18 | Sep-18 | Oct-18 | No |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| El Salvador | 11,335 | 12,026 | 11,359 | 6,714 | 3,384 | 1,452 | 1,184 | 1,575 | 1,629 | 1,900 | 2,388 | 2,156 | 2,745 | 3,270 | 3,034 | 1,891 | 1,804 | 2,643 | 3,144 | 3,820 | 3,492 | 3,240 | 3,789 | 4,170 | 4,839 | 5 |
| Guatemala | 12,694 | 13,313 | 12,226 | 7,684 | 3,146 | 1,423 | 1,372 | 2,456 | 3,402 | 5,250 | 6,843 | 6,826 | 8,192 | 10,306 | 13,250 | 9,060 | 9,080 | 11,836 | 12,624 | 14,170 | 11,129 | 9,486 | 11,048 | 13,150 | 18,030 | 19 |
| Honduras | 8,702 | 9,958 | 9,876 | 5,973 | 2,765 | 1,558 | 1,081 | 1,634 | 2,257 | 2,773 | 3,449 | 3,604 | 3,959 | 5,198 | 5,105 | 4,721 | 4,709 | 8,247 | 9,304 | 10,576 | 8,858 | 7,744 | 9,526 | 10,325 | 13,059 | 14 |
| Mexico | 23,790 | 20,011 | 15,650 | 16,090 | 12,331 | 11,076 | 11,116 | 12,858 | 13,042 | 13,746 | 15,955 | 16,441 | 17,539 | 17,395 | 16,084 | 18,175 | 19,169 | 24,537 | 22,980 | 19,385 | 16,088 | 15,414 | 17,830 | 17,991 | 19,542 | 16 |
| Other | 10,321 | 7,910 | 9,268 | 5,898 | 1,931 | 1,285 | 1,045 | 1,443 | 1,343 | 1,400 | 1,947 | 2,253 | 2,436 | 2,882 | 3,046 | 2,058 | 1,989 | 3,084 | 3,116 | 3,911 | 3,613 | 4,265 | 4,526 | 4,932 | 5,307 | 6 |

| Other Than Mexico Enforcement Actions – CBP Total | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL |
|---|---|---|---|---|---|---|---|---|---|---|
| FY19 | 41,235 | 45,479 | 46,846 | 41,736 | 58,640 | 81,414 | 87,945 | 121,151 | | |
| FY18 | 17,332 | 21,656 | 24,435 | 17,730 | 17,582 | 25,810 | 28,188 | 32,477 | 27,092 | 24,735 |
| FY17 | 43,052 | 43,207 | 42,729 | 26,269 | 11,226 | 5,718 | 4,682 | 7,108 | 8,631 | 11,323 |



U.S. Customs and
Border Protection

| Credible Fear Cases | FY-06 | FY-07 | FY-08 | FY-09 | FY-10 | FY-11 | FY-12 | FY-13 |
|---|---|---|---|---|---|---|---|---|
| Referrals from CBP or ICE | 5,338 | 5,252 | 4,995 | 5,369 | 8,959 | 11,217 | 13,880 | 5 |
| Completed | 5,241 | 5,286 | 4,828 | 5,222 | 8,777 | 11,529 | 13,579 | 4 |
| CF Found | 3,320 | 3,182 | 3,097 | 3,411 | 6,293 | 9,423 | 10,838 | 3 |
| CF Not Found | 584 | 1,062 | 816 | 1,004 | 1,404 | 1,054 | 1,187 | |
| Closed | 1,337 | 1,042 | 915 | 807 | 1,080 | 1,052 | 1,554 | |
| Of cases decided on the merits, % where CF was found | 85.04% | 74.98% | 79.15% | 77.26% | 81.76% | 89.94% | 90.13% | 87 |
| Of all referred cases, % where CF was found | 63.35% | 60.20% | 64.15% | 65.32% | 71.70% | 81.73% | 79.81% | 70 |

| Reasonable Fear Cases | FY-06 | FY-07 | FY-08 | FY-09 | FY-10 | FY-11 | FY-12 | FY-13 |
|---|---|---|---|---|---|---|---|---|
| Referrals | 325 | 550 | 700 | 1,109 | 2,060 | 3,233 | 5,070 | 1 |
| Completed | 292 | 504 | 619 | 971 | 1,293 | 2,756 | 4,692 | 1 |
| RF Found | 55 | 122 | 135 | 163 | 202 | 603 | 938 | |
| RF Not Found | 57 | 128 | 172 | 165 | 206 | 270 | 960 | |
| Closed | 180 | 254 | 312 | 643 | 885 | 1,883 | 2,794 | |
| Of cases decided on the merits, % where RF was found | 49.11% | 48.80% | 43.97% | 49.70% | 49.51% | 69.07% | 49.42% | 52 |
| Of all referred cases, % where RF was found | 18.84% | 24.21% | 21.81% | 16.79% | 15.62% | 21.88% | 19.99% | 23 |

# EXECUTIVE OFFICE FOR IMMIGRATION REVIEW ADJUDICATION STATISTICS

## Asylum Decision and Filing Rates in Cases Originating with a Credible Fear Claim[1]



| FY | Grants | Grant Rate | Denials | Denial Rate | Other[2] | Other Rate | Admin Closure[3] | Admin Closure Rate | No Asylum Application Filed | Percentage of No Asylum Application Filed | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2008 | 1,014 | 29.34% | 835 | 24.16% | 303 | 8.77% | 64 | 1.85% | 1,240 | 35.88% | 3,456 |
| 2009 | 992 | 30.58% | 660 | 20.35% | 282 | 8.69% | 54 | 1.66% | 1,256 | 38.72% | 3,244 |
| 2010 | 1,001 | 33.94% | 513 | 17.40% | 241 | 8.17% | 88 | 2.98% | 1,106 | 37.50% | 2,949 |
| 2011 | 1,396 | 27.01% | 820 | 15.86% | 349 | 6.75% | 69 | 1.33% | 2,535 | 49.04% | 5,169 |
| 2012 | 1,503 | 22.33% | 957 | 14.22% | 501 | 7.44% | 179 | 2.66% | 3,590 | 53.34% | 6,730 |
| 2013 | 1,400 | 16.03% | 1,466 | 16.79% | 618 | 7.08% | 237 | 2.71% | 5,011 | 57.39% | 8,732 |
| 2014 | 1,690 | 12.62% | 2,703 | 20.18% | 1,281 | 9.56% | 409 | 3.05% | 7,312 | 54.59% | 13,395 |
| 2015 | 1,955 | 13.52% | 2,806 | 19.40% | 1,366 | 9.44% | 2,064 | 14.27% | 6,274 | 43.37% | 14,465 |
| 2016 | 2,481 | 11.94% | 3,765 | 18.12% | 1,762 | 8.48% | 3,703 | 17.83% | 9,063 | 43.63% | 20,774 |
| 2017 | 3,980 | 13.85% | 7,347 | 25.56% | 2,649 | 9.22% | 1,919 | 6.68% | 12,846 | 44.70% | 28,741 |
| 2018 | 5,601 | 16.33% | 10,063 | 29.34% | 4,793 | 13.97% | 342 | 1.00% | 13,499 | 39.36% | 34,298 |
| 2019 (Second Quarter[4]) | 3,544 | 15.20% | 7,035 | 30.18% | 2,545 | 10.92% | 3 | 0.01% | 10,185 | 43.69% | 23,312 |

Data Generated: April 12, 2019
[1] Asylum decisions subsequent to a credible fear book-in at Department of Homeland Security in completed removal, deportation, exclusion proceedings (initial case completions only) or in proceedings that have been administratively closed.
[2] Asylum Others have a decision of abandonment, not adjudicated, other, or withdrawn.
[3] Administrative Closure decisions that have not been placed back on the docket (redocketing occurs following an immigration judge's grant of a party's motion to recalendar).
[4] FY 2019 Second Quarter through March 31, 2019.

AR088

# EXECUTIVE OFFICE FOR IMMIGRATION REVIEW ADJUDICATION STATISTICS

## "Family Unit" Data for Select Courts[1]

| Court | Initial Receipts | Initial Case Completions | Initial Case Completion Decisions | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Removal | *In Absentia Removal* | Relief | Termination | Voluntary Departure | Other |
| ATLANTA | 4,510 | 1,926 | 1,888 | 1,571 | 0 | 1 | 37 | 0 |
| BALTIMORE | 1,616 | 419 | 402 | 366 | 1 | 0 | 16 | 0 |
| CHICAGO | 4,253 | 1,124 | 1,046 | 498 | 4 | 52 | 10 | 12 |
| DENVER | 2,306 | 561 | 552 | 550 | 0 | 5 | 4 | 0 |
| HOUSTON | 12,525 | 2,895 | 2,757 | 2,334 | 3 | 3 | 132 | 0 |
| LOS ANGELES | 6,045 | 806 | 770 | 660 | 8 | 18 | 10 | 0 |
| MIAMI | 7,602 | 2,303 | 2,201 | 2,065 | 3 | 50 | 49 | 0 |
| NEW ORLEANS | 5,076 | 1,415 | 1,383 | 1,274 | 3 | 2 | 27 | 0 |
| NEW YORK CITY | 5,961 | 1,521 | 1,471 | 1,327 | 15 | 11 | 23 | 1 |
| SAN FRANCISCO | 6,392 | 343 | 314 | 232 | 25 | 4 | 0 | 0 |
| TOTAL | 56,286 | 13,313 | 12,784 | 10,877 | 62 | 146 | 308 | 13 |

Data Generated: June 17 2019
Data for period from September 24, 2018 through June 14, 2019
[1] The term "family unit" is an apprehension classification used by the Department of Homeland Security (DHS), and EOIR does not generally differentiate "family unit" cases from other cases unless they are identified as such by DHS. Accordingly, the "family unit" cases represented in the chart do not include all cases of "family units" currently in immigration proceedings nationwide.

AR089

**Table 1. Southwest Border Encounters of non-Mexican Aliens by Month and Year (FY 2013 to FY 2019Q2)**

| Month | Apprehensions | Inadmissibles | Total Encounters |
|---|---|---|---|
| OCTOBER 2012 | 8,533 | 1,597 | 10,130 |
| NOVEMBER 2012 | 8,719 | 1,582 | 10,301 |
| DECEMBER 2012 | 7,731 | 1,903 | 9,634 |
| JANUARY 2013 | 6,950 | 1,818 | 8,768 |
| FEBRUARY 2013 | 10,848 | 1,855 | 12,703 |
| MARCH 2013 | 15,328 | 2,117 | 17,445 |
| APR L 2013 | 16,825 | 1,915 | 18,740 |
| MAY 2013 | 16,994 | 2,277 | 19,271 |
| JUNE 2013 | 13,950 | 2,134 | 16,084 |
| JULY 2013 | 14,507 | 2,066 | 16,573 |
| AUGUST 2013 | 14,709 | 2,029 | 16,738 |
| SEPTEMBER 2013 | 13,894 | 2,050 | 15,944 |
| OCTOBER 2013 | 14,978 | 2,154 | 17,132 |
| NOVEMBER 2013 | 14,391 | 2,360 | 16,751 |
| DECEMBER 2013 | 14,985 | 2,557 | 17,542 |
| JANUARY 2014 | 12,113 | 1,886 | 13,999 |
| FEBRUARY 2014 | 16,895 | 2,031 | 18,926 |
| MARCH 2014 | 24,501 | 2,654 | 27,155 |
| APR L 2014 | 26,782 | 2,818 | 29,600 |
| MAY 2014 | 38,078 | 3,640 | 41,718 |
| JUNE 2014 | 40,244 | 3,927 | 44,171 |
| JULY 2014 | 24,322 | 3,014 | 27,336 |
| AUGUST 2014 | 15,037 | 2,832 | 17,869 |
| SEPTEMBER 2014 | 10,274 | 2,579 | 12,853 |
| OCTOBER 2014 | 10,153 | 2,783 | 12,936 |
| NOVEMBER 2014 | 10,078 | 2,987 | 13,065 |
| DECEMBER 2014 | 11,260 | 3,877 | 15,137 |
| JANUARY 2015 | 7,591 | 3,334 | 10,925 |
| FEBRUARY 2015 | 8,570 | 2,824 | 11,394 |
| MARCH 2015 | 10,566 | 3,669 | 14,235 |
| APR L 2015 | 12,245 | 3,315 | 15,560 |
| MAY 2015 | 14,685 | 3,726 | 18,411 |
| JUNE 2015 | 14,444 | 3,968 | 18,412 |
| JULY 2015 | 14,791 | 4,610 | 19,401 |
| AUGUST 2015 | 15,656 | 6,177 | 21,833 |
| SEPTEMBER 2015 | 15,277 | 5,303 | 20,580 |
| OCTOBER 2015 | 16,801 | 7,309 | 24,110 |
| NOVEMBER 2015 | 18,425 | 7,484 | 25,909 |
| DECEMBER 2015 | 23,418 | 5,940 | 29,358 |
| JANUARY 2016 | 10,601 | 4,706 | 15,307 |
| FEBRUARY 2016 | 10,672 | 7,025 | 17,697 |
| MARCH 2016 | 13,854 | 6,927 | 20,781 |
| APR L 2016 | 17,940 | 4,741 | 22,681 |
| MAY 2016 | 21,329 | 9,114 | 30,443 |
| JUNE 2016 | 18,796 | 5,498 | 24,294 |
| JULY 2016 | 20,296 | 7,180 | 27,476 |
| AUGUST 2016 | 22,572 | 8,640 | 31,212 |
| SEPTEMBER 2016 | 23,406 | 10,883 | 34,289 |
| OCTOBER 2016 | 28,061 | 15,075 | 43,136 |
| NOVEMBER 2016 | 31,904 | 11,457 | 43,361 |
| DECEMBER 2016 | 31,994 | 10,807 | 42,801 |
| JANUARY 2017 | 20,154 | 6,259 | 26,413 |
| FEBRUARY 2017 | 9,632 | 1,647 | 11,279 |
| MARCH 2017 | 4,773 | 1,040 | 5,813 |
| APR L 2017 | 3,687 | 1,038 | 4,725 |
| MAY 2017 | 5,569 | 1,638 | 7,207 |
| JUNE 2017 | 7,190 | 1,590 | 8,780 |
| JULY 2017 | 9,349 | 2,068 | 11,417 |
| AUGUST 2017 | 11,915 | 2,800 | 14,715 |
| SEPTEMBER 2017 | 11,750 | 3,179 | 14,929 |
| OCTOBER 2017 | 13,435 | 4,059 | 17,494 |
| NOVEMBER 2017 | 17,363 | 4,406 | 21,769 |
| DECEMBER 2017 | 18,739 | 5,822 | 24,561 |
| JANUARY 2018 | 13,752 | 4,037 | 17,789 |
| FEBRUARY 2018 | 13,551 | 4,162 | 17,713 |
| MARCH 2018 | 19,721 | 6,130 | 25,851 |
| APR L 2018 | 21,873 | 6,370 | 28,243 |
| MAY 2018 | 26,805 | 5,737 | 32,542 |
| JUNE 2018 | 23,282 | 3,895 | 27,177 |
| JULY 2018 | 21,360 | 3,524 | 24,884 |
| AUGUST 2018 | 25,375 | 3,631 | 29,006 |
| SEPTEMBER 2018 | 29,066 | 3,640 | 32,706 |
| OCTOBER 2018 | 37,128 | 5,675 | 42,803 |



OTM Apprehensions at SW Border, FY2013 - FY2019Q2



OTM Encounters at SW Border, FY2013-FY2019Q2

AR090

| | | | |
|---|---|---|---|
| NOVEMBER 2018 | 40,706 | 5,833 | 46,539 |
| DECEMBER 2018 | 42,045 | 5,236 | 47,281 |
| JANUARY 2019 | 36,878 | 5456 | 42,334 |
| FEBRUARY 2019 | 54,008 | 5027 | 59,035 |
| MARCH 2019 | 75,851 | 5570 | 81,421 |

April 1, 2019

**Southwest Border Enforcement Actions: March Official Reporting**

**Key Observations:**

- March total enforcement actions increased 35% compared to February.  This rate of increase is consistent with previous years for March.
  - Overall, March is 35% higher (103,493) than February (76,535) - last FY, March was 37% higher and from FY12 – FY16 it averaged 28% higher.
  - CBP total enforcement actions this March are 132% higher than the last 7 year March average and 516% higher than March of FY17.
    - UAC increased 30% in March compared to February, last March increased 40%.
    - FMUA increased 41% in March compared to February, last March increased 48%.
- The last time that this March's level was observed (overall) was March FY08 (89,770) and April FY08 (91,566).
  - April of FY08 was the last time USBP apprehensions exceeded 70,000.
- Guatemala remains the highest country of origin/citizenship.
  - Guatemalan total enforcement actions increased 40%.
  - Honduran total enforcement actions increased 30%.
  - El Salvador total enforcement actions increased **68%**.
  - Mexico increased 25%.
- In March, UAC and FMUA are 64% of total CBP Enforcement Actions; FMUA alone are 55%.
  - FYTD, UAC and FMUA are 60% of total CBP Enforcement Actions; FMUA alone are 51%.
- In March, OTM enforcement actions are 75% of the total; 70% Northern Triangle.
  - FYTD, OTM enforcement actions are 71% of the total; 66% Northern Triangle.
- For FY19TD, CBP is on track to exceed 1 million apprehensions and inadmissible aliens along the southwest border – a level not seen since FY06.

**USBP**

- USBP Apprehensions through March (361,087) exceed fiscal year totals for FY17, FY15, FY12, and FY11.  4 of the last 10 years.
- USBP FMUA [alone] this March are **42**% higher than USBP <u>Total Apprehensions</u> last March.
- At the end of March (FY mid-point):
  - USBP will have apprehended 91% of the volume of all of last fiscal year in six months' time.
  - FMUA this FY are **77**% higher than all of last FY for USBP FMUA.
- USBP total apprehensions increased 38% in March compared to February.  This is the second consecutive month with 38% growth.
- OTM apprehensions account for 82% of March apprehensions.
  - Northern Triangle countries are 76% of total apprehensions.
- For the last month, peak apprehensions have occurred on 3 of the last 4 Tuesdays (5 of last 6).
  - Tuesday appears to be the most common peak day for UAC and FMUA apprehensions.
  - For the last 9 weeks, single adults have peaked on Tuesday, Wednesday or Thursday 3 times each.
- As a percent of total apprehensions, increases are observed in the El Paso Sector. In October, El Paso apprehensions were 14% of the total.  In March, they account for 24% of apprehensions.
  - Conversely, in October RGV apprehensions were 41% of the total – in March, they are 36%.



U.S. Customs and
Border Protection

**<u>OFO</u>**

- Inadmissible apprehensions this FY are tracking just below last FY (61,247 vs 63,845).  March is 13% higher than February.
- Inadmissible UAC decreased 1%.
- FMUA at the ports of entry remained nearly the same (4,194) as January and February.
- Single adults at the ports are 25% higher than February.



**FY19 Planning Profile based on data through April 10, 2019**

**U.S. Customs and Border Protection - Southwest Border**
**Total Apprehensions and Inadmissible Aliens**
**FY19 April - September Planning Profile**



Based on data through April 22, April is projected to
108,537 – right in the middle of the earlier model.

*April is based on April data through the 10th.*

<u>Projection 1</u>: April through September are based on the average rate of change occurring during FYs 15/16. Projected to

<u>Projection 2</u>: April through September is based on the monthly rate of change observed FY18.  Projected total: 1,028,63



U.S. Customs and
Border Protection

CB
Stati





U.S. Customs and Border Protection - Southwest Border
Total Unaccompanied Alien Children Apprehensions and Inadmissible Aliens
FY19 April - September Planning Profile

Based on data through April 22, April is projected to b[e]
9,325 – just below the lower bound of the earlier mode[l]

*April is based on April data through the 10th.*

Projection 1: April through September are based on the average rate of change occurring during FYs 15/16.  Projected t[otal]

Projection 2: April through September is based on the monthly rate of change observed FY18.  Projected total: 91,987



U.S. Customs and
Border Protection

CB[P]
Statis[tics]



**U.S. Customs and Border Protection – Southwest Border**
**Total Individuals in a Family Unit Apprehensions and Inadmissible Aliens**
**FY19 April – September Planning Profile**

Based on data through April 22, April is projected to 62,059 – right in the middle of the earlier model.

*April is based on April data through the 10th.*

Projection 1: April through September are based on the average rate of change occurring during FYs 15/16. Projected to

Projection 2: April through September is based on the monthly rate of change observed FY18. Projected total: 578,259



U.S. Customs and
Border Protection

CB
Stati





U.S. Customs and Border Protection - Southwest Border
Total Single Adult Apprehensions and Inadmissible Aliens
FY19 April - September Planning Profile

*April is based on April data through the 10th.*

Projection 1: April through September are based on the average rate of change occurring during FYs 15/16.  Projected t...

Projection 2: April through September is based on the monthly rate of change observed FY18.  Projected total:  357,908...



U.S. Customs and
Border Protection

CB...
Stati...



**U.S. Customs and Border Protection - Southwest Border**
**Total Child Apprehensions and Inadmissible Aliens**
**FY19 April - September Planning Profile**

No interim update is available for this slide.

*April is based on April data through the 10th.*

Projection 1: April through September are based on the average rate of change occurring during FYs 15/16.  Projected t...

Projection 2: April through September is based on the monthly rate of change observed FY18.  Projected total: 438,545



U.S. Customs and
Border Protection

CB...
Stati...



**U.S. Border Patrol - Southwest Border**
**Total Apprehensions**
**FY19 April - September Planning Profile**

Based on data through April 22, April is projected
98,633 – toward the lower bound of the earlier mod

*April is based on April data through the 10th.*

Projection 1: April through September are based on the average rate of change occurring during FYs 15/16.  Projected to

Projection 2: April through September is based on the monthly rate of change observed FY18.  Projected total: 909,365



U.S. Customs and
Border Protection

CB

Stati

**U.S. Border Patrol - Southwest Border**
**Unaccompanied Alien Children Apprehensions**
**FY19 April - September Planning Profile**



*April is based on April data through the 10th.*

Projection 1: April through September are based on the average rate of change occurring during FYs 15/16.  Projected t

Projection 2: April through September is based on the monthly rate of change observed FY18.  Projected total: 91,820

U.S. Customs and
Border Protection

CB

Stati





**U.S. Border Patrol - Southwest Border**
**Individuals in a Family Unit Apprehensions**
**FY19 April - September Planning Profile**

*April is based on April data through the 10th.*

Projection 1: April through September are based on the average rate of change occurring during FYs 15/16.  Projected t...

Projection 2: April through September is based on the monthly rate of change observed FY18.  Projected total: 554,093



**U.S. Border Patrol - Southwest Border**
**Single Adult Apprehensions**
**FY19 April - September Planning Profile**

Chart showing monthly single adult apprehensions from October through September, with data labels: 22,922 (OCT), 21,432 (NOV), 18,489 (DEC), 18,682 (JAN), 23,525 (FEB), 30,555 (MAR), 31,777 and 30,555 and 30,861 (APR), 32,413 (MAY), 27,875 and 24,688 (JUN), 25,645 and 22,960 (JUL), 26,671 and 24,567 (AUG), 28,0__ and 24,5__ (SEP).

Based on data through April 22, April is projected to be 31,08[...]
in the middle of the earlier model.

*April is based on April data through the 10th.*

Projection 1: April through September are based on the average rate of change occurring during FYs 15/16.  Projected to[...]

Projection 2: April through September is based on the monthly rate of change observed FY18.  Projected total: 293,804



U.S. Customs and
Border Protection



CB[...]
Stati[...]

# OTM CARAVAN
# BREAKDOWN IN MEXICO

## April 22. 2019
## 16,560 OTMs *GOM Reporting







Migrants traveling from Arriaga, Chiapas to Ixtepec, Oaxaca



| CHIAPAS |
| --- |
| REGIONAL: Traveling to Arriaga 430/ Tonala 110/Arriaga approx.500 -with partial on board train to Ixtepec, Oaxaca, from there, they will travel by train to Medias Aguas Ver. |
| TAPACHULA: Siglo XXI 2,229/Mesoamericana 1,309/Oth. 55 Haiti-Congo-Cameroon in town 383/Cubans in town 755 |
| SUCHIATE: Recino Fiscal |
| MAPASTEPEC: # Varies 284 to 400, reporting low number |
| PIJIJIAPAN: left over from current INM/PF Ops |
| MX/GT BORDER: TVHR 650/COMAR 156 |
| TOTAL |

# U.S. Border Patrol Southwest Border Apprehensions by Sector Fiscal Year 2019

https://www.cbp.gov/newsroom/stats/sw-border-migration/usbp-sw-border-apprehensions

## Southwest Border Unaccompanied Alien Children (0-17 yr old) Apprehensions

Comparisons below reflect Fiscal Year To Date 2019 compared to Fiscal Year To Date 2018.

| Unaccompanied Alien Children Apprehensions by Sector | | | |
|---|---|---|---|
| Sector | FY18TD JUN | FY19TD JUN | % Change FY18TD JUN to FY19TD JUN |
| Big Bend | 850 | 581 | -32% |
| Del Rio | 998 | 2,701 | 171% |
| El Centro | 1,921 | 2,286 | 19% |
| El Paso | 3,978 | 14,593 | 267% |
| Laredo | 2,137 | 2,058 | -4% |
| Rio Grande | 17,392 | 27,837 | 60% |
| San Diego | 1,692 | 2,861 | 69% |
| Tucson | 3,983 | 4,055 | 2% |
| Yuma | 4,421 | 6,652 | 50% |
| USBP Southwest Border Total | 37,372 | 63,624 | 70% |

# Southwest Border Family Unit* Apprehensions

Comparisons below reflect Fiscal Year To Date 2019 compared to Fiscal Year To Date 2018.

| Family Unit* Apprehensions by Sector | | | |
|---|---|---|---|
| Sector | FY18TD JUN | FY19TD  JUN | % Change FY18TD JUN to FY19TD JUN |
| Big Bend | 566 | 1,754 | 210% |
| Del Rio | 1,829 | 22,423 | 1,126% |
| El Centro | 1,976 | 7,464 | 278% |
| El Paso | 6,326 | 117,612 | 1,759% |
| Laredo | 411 | 778 | 89% |
| Rio Grande | 42,188 | 165,950 | 293% |
| San Diego | 2,392 | 14,996 | 527% |
| Tucson | 3,164 | 11,614 | 267% |
| Yuma | 9,689 | 47,717 | 392% |
| **USBP Southwest Border Total** | **68,541** | **390,308** | **469%** |

*Note: Family Unit represents the number of individuals (either a child under 18 years old, parent or legal guardian) apprehended with a family member by the U.S. Border Patrol.

# Southwest Border Single Adult Apprehensions

Comparisons below reflect Fiscal Year To Date 2019 compared to Fiscal Year To Date 2018.

| Single Adult Apprehensions by Sector | | | |
|---|---|---|---|
| Sector | FY18TD JUN | FY19TD JUN | % Change FY18TD JUN to FY19TD JUN |
| Big Bend | 5,043 | 4,792 | -5% |
| Del Rio | 8,772 | 15,583 | 78% |
| El Centro | 17,033 | 18,500 | 9% |
| El Paso | 10,412 | 23,595 | 127% |
| Laredo | 21,953 | 27,192 | 24% |
| Rio Grande | 54,958 | 72,649 | 32% |
| San Diego | 24,972 | 29,981 | 24% |
| Tucson | 33,121 | 34,715 | 5% |
| Yuma | 4,793 | 7,436 | 55% |
| **USBP Southwest Border Total** | **180,357** | **234,443** | **30%** |

# Southwest Border Unaccompanied Alien Children Apprehensions by Country

Numbers below reflect Fiscal Years 2014 - 2018 and 2019 TD.

| Unaccompanied Alien Children Apprehensions by Country | | | | | | |
|---|---|---|---|---|---|---|
| Country | FY14 | FY15 | FY16 | FY17 | FY18 | FY19TD JUN |
| El Salvador | 16,404 | 9,389 | 17,512 | 9,143 | 4,949 | 9,810 |
| Guatemala | 17,057 | 13,589 | 18,913 | 14,827 | 22,327 | 27,168 |
| Honduras | 18,244 | 5,409 | 10,468 | 7,784 | 10,913 | 16,892 |
| Mexico | 15,634 | 11,012 | 11,926 | 8,877 | 10,136 | 7,843 |

# Southwest Border Family Unit* Apprehensions by Country

Numbers below reflect Fiscal Years 2016 - 2018 and 2019 TD

| Family Units* Apprehensions by Country | | | |
|---|---|---|---|
| **Country** | **FY16** | **FY17** | **FY18** | **FY19TD JUN** |
| El Salvador | 27,114 | 24,122 | 13,669 | **44,198** |
| Guatemala | 23,067 | 24,657 | 50,401 | 167,104 |
| Honduras | 20,226 | 22,366 | 39,439 | 152,019 |
| Mexico | 3,481 | 2,271 | 2,261 | 3,209 |

*Note: Family Unit represents the number of individuals (either a child under 18 years old, parent or legal guardian) apprehended with a family member by the U.S. Border Patrol.

# Southwest Border Single Adult Apprehensions by Country

Numbers below reflect Fiscal Years 2016 - 2018 and 2019 TD

| Single Adult Apprehensions by Country | | | |
|---|---|---|---|
| **Country** | **FY16** | **FY17** | **FY18** | **FY19TD JUN** |
| El Salvador | 27,222 | 16,495 | 12,751 | 16,491 |
| Guatemala | 32,621 | 26,387 | 42,994 | 41,366 |
| Honduras | 22,258 | 17,110 | 26,161 | 36,128 |
| Mexico | 175,353 | 116,790 | 139,860 | 113,123 |

# Southwest Border Family Unit Subject, Unaccompanied Alien Children, and Single Adult Apprehensions Fiscal Year 2019 – By Month

FMUA:   Family Unit Apprehensions
UAC:    Unaccompanied Alien Children
SA:     Single Adult

### FY19 October

| Sector | FMUA FY 2019 OCT | UAC FY 2019 OCT | SA FY 2019 OCT | TOTAL FY 2019 OCT |
|---|---|---|---|---|
| Big Bend | 17 | 37 | 501 | 555 |
| Del Rio | 548 | 145 | 1,309 | 2,002 |
| El Centro | 782 | 256 | 2,205 | 3,243 |
| El Paso | 5,180 | 830 | 1,325 | 7,335 |
| Laredo | 121 | 265 | 3,063 | 3,449 |
| Rio Grande | 11,525 | 2,307 | 6,923 | 20,755 |
| San Diego | 1,156 | 227 | 2,844 | 4,227 |
| Tucson | 1,163 | 469 | 4,196 | 5,828 |
| Yuma | 2,623 | 429 | 561 | 3,613 |
| **Southwest Border Total** | **23,115** | **4,965** | **22,927** | **51,007** |

**FY19 November**

| Sector | FMUA FY 2019 NOV | UAC FY 2019 NOV | SA FY 2019 NOV | TOTAL FY 2019 NOV |
|---|---|---|---|---|
| Big Bend | 31 | 36 | 381 | 448 |
| Del Rio | 831 | 146 | 1,111 | 2,088 |
| El Centro | 914 | 273 | 2,002 | 3,189 |
| El Paso | 6,435 | 1,038 | 1,395 | 8,868 |
| Laredo | 49 | 181 | 2,439 | 2,669 |
| Rio Grande | 11,487 | 2,310 | 6,916 | 20,713 |
| San Diego | 1,495 | 310 | 2,771 | 4,576 |
| Tucson | 754 | 465 | 3,842 | 5,061 |
| Yuma | 3,168 | 500 | 575 | 4,243 |
| Southwest Border Total | 25,164 | 5,259 | 21,433 | 51,855 |

**FY19 December**

| Sector | FMUA FY 2019 DEC | UAC FY 2019 DEC | SA FY 2019 DEC | TOTAL FY 2019 DEC |
|---|---|---|---|---|
| Big Bend | 122 | 74 | 425 | 621 |
| Del Rio | 919 | 155 | 949 | 2,023 |
| El Centro | 1,012 | 211 | 1,493 | 2,716 |
| El Paso | 7,336 | 970 | 1,144 | 9,450 |
| Laredo | 74 | 148 | 1,837 | 2,059 |
| Rio Grande | 10,630 | 1,881 | 5,861 | 18,372 |
| San Diego | 2,413 | 356 | 3,046 | 5,815 |
| Tucson | 1,310 | 408 | 3,193 | 4,911 |
| Yuma | 3,691 | 550 | 539 | 4,780 |
| Southwest Border Total | 27,507 | 4,753 | 18,487 | 50,747 |

**FY19 January**

| Sector | FMUA FY 2019 JAN | UAC FY 2019 JAN | SA FY 2019 JAN | TOTAL FY 2019 JAN |
|---|---|---|---|---|
| Big Bend | 91 | 59 | 438 | 588 |
| Del Rio | 1,009 | 192 | 1,323 | 2,524 |
| El Centro | 808 | 236 | 1,417 | 2,461 |
| El Paso | 6,838 | 1,013 | 1,287 | 9,138 |
| Laredo | 73 | 191 | 2,368 | 2,632 |
| Rio Grande | 9,942 | 2,183 | 5,586 | 17,711 |
| San Diego | 1,118 | 283 | 2,723 | 4,124 |
| Tucson | 670 | 357 | 3,069 | 4,096 |
| Yuma | 3,640 | 593 | 473 | 4,706 |
| **Southwest Border Total** | **24,189** | **5,107** | **18,684** | **47,980** |

**FY19 February**

| Sector | FMUA FY 2019 FEB | UAC FY 2019 FEB | SA FY 2019 FEB | TOTAL FY 2019 FEB |
|---|---|---|---|---|
| Big Bend | 186 | 61 | 598 | 845 |
| Del Rio | 2,262 | 239 | 1,512 | 4,013 |
| El Centro | 1,189 | 336 | 1,794 | 3,319 |
| El Paso | 10,892 | 1,522 | 1,759 | 14,173 |
| Laredo | 61 | 249 | 2,812 | 3,122 |
| Rio Grande | 14,430 | 2,910 | 8,026 | 25,366 |
| San Diego | 2,036 | 383 | 3,029 | 5,448 |
| Tucson | 1,024 | 438 | 3,449 | 4,911 |
| Yuma | 4,451 | 679 | 557 | 5,687 |
| **Southwest Border Total** | **36,531** | **6,817** | **23,536** | **66,884** |

**FY19 March**

| Sector | FMUA<br>FY 2019 MAR | UAC<br>FY 2019 MAR | SA<br>FY 2019 MAR | TOTAL<br>FY 2019 MAR |
|---|---|---|---|---|
| Big Bend | 197 | 80 | 665 | 942 |
| Del Rio | 2,831 | 435 | 2,297 | 5,563 |
| El Centro | 1,139 | 299 | 2,125 | 3,563 |
| El Paso | 16,966 | 2,188 | 3,071 | 22,225 |
| Laredo | 106 | 300 | 3,787 | 4,193 |
| Rio Grande | 20,943 | 3,714 | 9,106 | 33,763 |
| San Diego | 2,504 | 429 | 3,947 | 6,880 |
| Tucson | 1,824 | 600 | 4,833 | 7,257 |
| Yuma | 6,696 | 918 | 835 | 8,449 |
| Southwest Border Total | 53,206 | 8,963 | 30,666 | 92,835 |

**FY19 April**

| Sector | FMUA<br>FY 2019 APR | UAC<br>FY 2019 APR | SA<br>FY 2019 APR | TOTAL<br>FY 2019 APR |
|---|---|---|---|---|
| Big Bend | 224 | 61 | 657 | 942 |
| Del Rio | 3,440 | 395 | 2,014 | 5,849 |
| El Centro | 741 | 256 | 2,390 | 3,387 |
| El Paso | 20,642 | 2,465 | 3,980 | 27,087 |
| Laredo | 101 | 259 | 3,612 | 3,972 |
| Rio Grande | 22,895 | 3,759 | 10,074 | 36,728 |
| San Diego | 2,106 | 366 | 3,726 | 6,198 |
| Tucson | 1,533 | 396 | 3,992 | 5,921 |
| Yuma | 7,034 | 936 | 1,236 | 9,206 |
| Southwest Border Total | 58,716 | 8,893 | 31,681 | 99,290 |

**FY19 May**

| Sector | FMUA FY 2019 MAY | UAC FY 2019 MAY | SA FY 2019 MAY | TOTAL FY 2019 MAY |
|---|---|---|---|---|
| Big Bend | 732 | 117 | 710 | 1,559 |
| Del Rio | 5,272 | 569 | 2,721 | 8,562 |
| El Centro | 576 | 243 | 2,666 | 3,485 |
| El Paso | 29,815 | 3,256 | 5,575 | 38,646 |
| Laredo | 110 | 266 | 3,736 | 4,112 |
| Rio Grande | 33,933 | 4,870 | 11,028 | 49,831 |
| San Diego | 1,366 | 308 | 4,212 | 5,886 |
| Tucson | 1,773 | 510 | 4,592 | 6.875 |
| Yuma | 10,914 | 1,350 | 1,660 | 13,924 |
| Southwest Border Total | 84,491 | 11,489 | 36,900 | 132,880 |

**FY19 June**

| Sector | FMUA FY 2019 JUN | UAC FY 2019 JUN | SA FY 2019 JUN | TOTAL FY 2019 JUN |
|---|---|---|---|---|
| Big Bend | 154 | 56 | 417 | 627 |
| Del Rio | 5,311 | 425 | 2,347 | 8,083 |
| El Centro | 303 | 176 | 2,408 | 2,887 |
| El Paso | 13,508 | 1,311 | 4,059 | 18,878 |
| Laredo | 83 | 199 | 3,538 | 3,820 |
| Rio Grande | 30,165 | 3,903 | 9,129 | 43,197 |
| San Diego | 802 | 199 | 3,683 | 4,684 |
| Tucson | 1,563 | 412 | 3,549 | 5,524 |
| Yuma | 5,500 | 697 | 1,000 | 7,197 |
| Southwest Border Total | 57,389 | 7,378 | 30,130 | 94,897 |

Last modified: July 10, 2019

# Statement by Secretary Johnson on Southwest Border Security

Release Date:
October 17, 2016
For Immediate Release
DHS Press Office
Contact: 202-282-8010

In Fiscal Year 2016, total apprehensions by the Border Patrol on our southwest border, between ports of entry, numbered 408,870.  This represents an increase over FY15, but was lower than FY14 and FY13, and a fraction of the number of apprehensions routinely observed from the 1980s through 2008.  Apprehensions are an indicator of total attempts to cross the border illegally.  Meanwhile, the demographics of illegal migration on our southern border has changed significantly over the last 15 years – far fewer Mexicans and single adults are attempting to cross the border without authorization, but more families and unaccompanied children are fleeing poverty and violence in Central America.  In 2014, Central Americans apprehended on the southern border outnumbered Mexicans for the first time.  In 2016, it happened again.

| Southwest Border Apprehensions - FY13-FY16 | | | | |
|---|---|---|---|---|
| **Category** | **FY13** | **FY14** | **FY15** | **FY16** |
| Unaccompanied children | 38,759 | 68,541 | 39,970 | 59,692 |
| Family members | 14,855 | 68,445 | 39,838 | 77,674 |
| Individuals | 360,783 | 342,385 | 251,525 | 271,504 |
| **Total** | **414,397** | **479,371** | **331,333** | **408,870** |

Unaccompanied children and families have presented new challenges in our immigration system.  I have traveled to the southwest border 17 times over the last 34 months as Secretary and have seen this personally.  We are determined to treat migrants in a humane manner.  At the same time, we must enforce our immigration laws consistent

with our enforcement priorities.  This has included, and will continue to include, providing individuals with an opportunity to assert claims for asylum and other forms of humanitarian relief.

At the same time, we are providing a safe, alternative paths to our country for individuals in need of humanitarian protection.  Earlier this year, the Government of Costa Rica announced its agreement to enter into a protection transfer arrangement with the U.N. High Commissioner for Refugees and the International Organization for Migration to help address the Central American migration challenge. We're also establishing an in-country referral program in countries of origin including Honduras, El Salvador, and Guatemala.  This program enables vulnerable residents in the region to be considered for refugee protection in the United States after being screened and interviewed by DHS officers. We have also announced an expansion of the categories of individuals eligible for participation in our Central American Minors program when accompanied by a qualified child.  We promote and encourage use of these programs.

Border security alone cannot overcome the powerful push factors of poverty and violence that exist in Central America. Walls alone cannot prevent illegal migration.  Ultimately, the solution is long-term investment in Central America to address the underlying push factors in the region. We continue to work closely with our federal partners and the governments in the region, and are pleased with the $750 million Congress approved in FY 2016 for support and aid to Central America. We urge Congress to provide additional resources in FY 2017.

But, there is more to do for border security.  I urge the next Administration and the next Congress to continue to make smart investments in border security technology, equipment and other resources.  This is what our experts on the border -- those on the front lines every day, charged with the responsibility of protecting our borders – tell me each time I ask them.

At all times throughout President Obama's administration, we have endeavored to enforce the immigration laws in a fair and humane way, consistent with the immigration system we have.   But, the reality is the system is broken, and badly need of comprehensive immigration reform that only Congress can provide.  For one thing, we must reckon with the millions of undocumented immigrants who live in the shadows in this country, who've been here for years,  and who should be given the opportunity to

come forward and get right with the law.  It is my profound hope that the next Congress will finally address this and other issues, and enact comprehensive immigration reform.

Other points:

- The new immigration enforcement priorities President Obama and I announced in November 2014, which focus on serious convicted criminals and those apprehended at the border, are being implemented effectively by our immigration enforcement personnel.  Our priorities are reflected in actual results.  Today, over 99% of those in immigration detention fit within one of our enforcement priorities; and around 85% are within the top priority for removal.  In 2009, just 35% of those deported by ICE were convicted criminals; today that percentage is about 60%.  Enforcement actions that began early this year, focused on families and unaccompanied children now over 18 that were apprehended at the border.

- Earlier this week, I paid my sixth visit to Mexico as Secretary of Homeland Security.   On this visit I met with President Peña Nieto, my counterpart the Secretary of Government Miguel Osorio Chong, Secretary of Foreign Affairs Claudia Ruiz Massieu, Secretary of Finance Jose Antonio Meade, and Attorney General Arely Gomez Gonzalez.  Our working relationship is strong, and we've committed to do even more for our mutual border security interests.  Additionally, we've resolved to create a standing U.S.-Mexican working group, staffed largely with career officials, to ensure a permanent dialogue on security issues that will sustain itself past the Obama and Peña Nieto Administrations.

- In recent months we've seen an influx of Haitian nationals on our southern border, principally at certain land ports of entry.  On September 22, I announced we would resume removals of Haitian nationals in accordance with our existing enforcement priorities.  In light of Hurricane Matthew, which struck Haiti on October 4, removal flights to Haiti have been suspended temporarily.  Working with the Government of Haiti, DHS intends to resume removal flights as soon as possible.  DHS and the Department of State are working with the Government of Haiti and other key partners to ensure that removals occur in as humane and minimally disruptive a manner as possible.  The policy change I announced on September 22 remains in effect. Haitians attempting to enter the United States without authorization will continue to be placed into immigration detention.

- With our interagency partners, DHS continues to aggressively target and dismantle the transnational criminal organizations that smuggle and exploit migrants. One

recent example is "Operation ALL IN."  This operation resulted in the apprehension of 100 individuals now facing federal prosecution at either the federal, state, or local level. Those arrested as part of Operation ALL IN include smugglers, as well as gang members and sex offenders.

# Remarks by President Trump on the Illegal Immigration Crisis and Border Security

Issued on: November 1, 2018

Roosevelt Room

4:19 P.M. EDT

THE PRESIDENT: Well, thank you very much, everyone. Appreciate it. And good afternoon. I would like to provide an update to the American people regarding the crisis on our southern border — and crisis it is.

Illegal immigration affects the lives of all Americans. Illegal immigration hurts American workers; burdens American taxpayers; and undermines public safety; and places enormous strain on local schools, hospitals, and communities in general, taking precious resources away from the poorest Americans who need them most. Illegal immigration costs our country billions and billions of dollars each year.

America is a welcoming country. And under my leadership, it's a welcoming country. We lead the world in humanitarian protection and assistance, by far. There's nobody even close. We have the largest and most expansive immigration programs anywhere on the planet.

We've issued 40 million green cards since 1970, which means the permanent residency and a path to citizenship for many, many people. But we will not allow our generosity to be abused by those who would break our laws, defy our rules, violate our borders, break into our country illegally. We won't allow it.

Mass, uncontrolled immigration is especially unfair to the many wonderful, law-abiding immigrants already living here who followed the rules and waited their turn. Some have been waiting for many years. Some have been waiting for a long time. They've done everything perfectly. And they're going to come in. At some point, they're going to come in. In many cases, very soon. We need them to come in, because we have companies coming into our country; they need workers. But they have to come in on a merit basis, and they will come in on a merit basis.

The communities are often left to bear the cost and the influx of people that come in illegally. We can't allow that.

There's a limit to how many people a nation can responsibly absorb into their societies. Every day, above and beyond our existing lawful admission programs, roughly 1,500 to 2,000 people try crossing our borders illegally. We do a very good job considering the laws are so bad. They're not archaic; they're incompetent. It's not that they're old; they're just bad. And we can't get any Democrat votes to change them. It's only the Republicans that are — in unison, they

want to change them. They want to make strong borders, want to get rid of any crime because of the borders, of which there's a lot.

And we've done a great job with the laws that we have. We're moving in tremendous numbers of people to get out the MS-13 gangs and others gangs that illegally come into our country. And we're getting them out by the thousands.

But this is a perilous situation, and it threatens to become even more hazardous as our economy gets better and better. A lot of the cause of this problem is the fact that we right now have the hottest economy anywhere in the world. It's doing better than any economy in the world. Jobs, unemployment — you look at any number.

Right now, we have more workers than any time in the history of our country. We have more people working, which is a tremendous statement. More people working than at any time in the history of our country. And people want to come in, and in some cases, they want to take advantage of that, and that's okay. And we want them to come in, but they have to come in through merit. They have to come in legally.

At this very moment, large, well-organized caravans of migrants are marching towards our southern border. Some people call it an "invasion." It's like an invasion. They have violently overrun the Mexican border. You saw that two days ago. These are tough people, in many cases. A lot of young men, strong men. And a lot of men that maybe we don't want in our country. But again, we'll find that out through the legal process.

But they've overrun the Mexican police, and they've overrun and hurt badly Mexican soldiers. So this isn't an innocent group of people. It's a large number of people that are tough. They've injured, they've attacked, and the Mexican police and military has actually suffered. And I appreciate what Mexico is trying to do.

So let me begin by stating that these illegal caravans will not be allowed into the United States, and they should turn back now, because they're wasting their time. They should apply to come into our country. We want them to come into our country very much. We need people to help us, with all of these companies that are coming in. We've never had anything like this. We have car companies coming in. We have Foxconn — so involved with the manufacturing of Apple products — coming in in Wisconsin. We have a lot of companies coming in, but they have to apply, and they have to be wonderful people that are going to love our country and work hard.

And we've already dispatched, for the border, the United States military. And they will do the job. They are setting up right now, and they're preparing. We hope nothing happens. But if it does, we are totally prepared. Greatest military anywhere in the world, and it's going to be, and is now, in great shape. No longer depleted like it was when I took over as the President of the United States.

The government of Mexico has generously offered asylum, jobs, education, and medical care for people within the caravan, but many members of the caravan have refused these offers, which demonstrate that these migrants are not legitimate asylum-seekers. They're not looking for

protection. Because if they were, they'd be able to get it from Mexico. Mexico has agreed to take them in and encouraged them to stay. But they don't want to stay; they want to come into the United States. So this is no longer safety, and asylum is about safety.

Asylum is not a program for those living in poverty. There are billions of people in the world living at the poverty level. The United States cannot possibly absorb them all. Asylum is a very special protection intended only for those fleeing government persecution based on race, religion, and other protected status.

These caravans and illegal migrants are drawn to our country by Democrat-backed laws and left-wing judicial rulings. We're getting rulings that are so ridiculous, so bad. They're writing the laws. Can't do that. Collectively known as — as an example, catch-and-release. It's a disgrace that we have to put up with it.

These policies lead to the release of illegal aliens into our communities after they've been apprehended. But we're not releasing anymore. Big change, as of a couple of days ago. We're going to no longer release. We're going to catch; we're not going to release. They're going to stay with us until the deportation hearing or the asylum hearing takes place. So we're not releasing them into the community.

We have millions of people that, over the years, have been released into the community. They never show up for the trials. They never come back. They're never seen again. And those people, they know who they are. And we know a lot of where they are, who they are. And those people will be deported, directly deported.

The biggest loophole drawing illegal aliens to our borders is the use of fraudulent or meritless asylum claims to gain entry into our great country. An alien simply crosses the border illegally, finds a Border Patrol agent, and using well-coached language — by lawyers and others that stand there trying to get fees or whatever they can get — they're given a phrase to read. They never heard of the phrase before. They don't believe in the phrase. But they're given a little legal statement to read, and they read it. And now, all of a sudden, they're supposed to qualify. But that's not the reason they're here.

This merely asserts the need for asylum, and then often released into the United States, and they await a lengthy court process. The court process will takes years sometimes for them to attend. Well, we're not releasing them into our country any longer. They'll wait for long periods of time. We're putting up massive cities of tents. The military is helping us incredibly well.

I want to thank the Army Corps of Engineers. They've been so efficient, so good, so talented. And we have thousands of tents. We have a lot of tents; we have a lot of everything. We're going to hold them right there. We're not letting them into our country. And then they never show up — almost. It's like a level of 3 percent. They never show up for the trial. So by the time their trial comes, they're gone. Nobody knows where they are. But we know where a lot of them are, and they're going to be deported.

There are now nearly 700,000 aliens inside the United States awaiting adjudication of their claims. Most of these people we have no idea how they got there, why they got there. And the number is actually going to be a much larger number as we look at all of the data. So if you look at just at a minimal number, it's the size of Vermont, or bigger. And the overall number could be 10 million people; it could be 12 million people; it could be 20 million people. The record keeping from past administrations has not exactly been very good.

As human smugglers and traffickers have learned how the game is played and how to game the system, we have witnessed a staggering 1,700 [percent] increase in asylum claims since the year 2010. They understand the law better than the lawyers understand the law. You have a lot of professionalism there. You have a lot of professionalism involved with setting up the caravans. You take a look at the way that's happening. Even the countries — you look at Honduras and El Salvador, and you look at what's happening at the different levels and different countries, and what's happening on the streets. There's a lot of professionalism taking place, and there seems to be a lot of money passing. And then, all of a sudden, out of the blue, these big caravans are formed and they start marching up. They got a long way to go.

On average, once released, an asylum case takes three and half years to complete. Think of it. Somebody walks into our country, reads a statement given by a lawyer, and we have a three-and-a-half-year court case for one person, whereas other people tell them, "Out. Get out. Just get out." Other countries — "Get out. We have a border. Get out."

We go through years and years of litigation because of the Democrats and the incompetent, very, very stupid laws that we have. They're the laughingstock all over the world, including the people that are marching up. They understand. But the difference is, we're not allowing them in, and we're not releasing, and we're not doing any of the things that were done for so many years that really are terrible for our country.

The overwhelming majority of claims are rejected by the courts, but by that time, the alien has usually long since disappeared into our country. So they never get to see the judge. They never get to have a ruling. They don't care because they're in the country and nobody knows where they are.

All told, there are approximately 1 million aliens who have received final orders of removal. They've actually got final orders of removal. You don't have to go to court anymore. The courts have already issued the orders of removal, and we've gotten a lot of them. But who remain at large in our country. So we've moving them out.

This endemic abuse of the asylum system makes a mockery of our immigration system, displacing legitimate asylum-seekers — and there are legitimate asylum-seekers — while rewarding those who abuse or defraud our system, which is almost everybody. Everybody is abusing it and just doing things to our system which were unthinkable, I'm sure even by the Democrats who were largely responsible for getting it done.

These individuals disrespect the foundations of American government by voluntarily choosing to break the law as their first act on American soil.

Furthermore, contained within this giant flow of illegal migration to our southwest border is the movement of illicit and deadly narcotics. It's in the southwest, most of it comes in. Nearly 100 percent of heroin in the United States enters through the southern border– think of that: 100 percent, almost, of heroin comes in through the southern border, along with roughly 90 percent of cocaine, and the majority of meth, and a substantial portion of the ultra-lethal fentanyl killing our youth. Fentanyl is killing our youth.

These drugs destroy the lives and kill much more than 70,000 Americans every single year. And the number goes up. It goes up and up and up, because we are so foolish with our laws that we allow this to happen. A death toll equivalent of the size of an entire American city every year. The current influx, if not halted, threatens to overwhelm our immigration system and our communities, and poses unacceptable dangers to the entire nation. We have to have our borders. Can't let drugs come in. Not just — it's not just people. It's people; it's drugs. It's human traffickers.

Human trafficking is now at the highest level in the world that it's ever been. And that's because of the Internet. Think of it — human trafficking. You think back 200 years, 500 years. Human trafficking — where they steal children; in many cases, women, unfortunately. They steal women. The human traffickers, the lowest scum on Earth. The lowest scum on Earth. And it's at a level that it's never been. Worldwide — never been at a level like this.

If these caravans are allowed into our country, only bigger and more emboldened caravans will follow. And you see that's what's happening now. We have one that's coming up, and it's being somewhat dissipated, as they march. But then other people are joining it. And then it gets bigger. And now, if you look back at Honduras, and if you look at El Salvador, other ones are solving and they're forming. They're forming. You have new ones that are forming. And we call it "caravan number two" is unbelievably rough people. Very, very hard for the military to stop it. Our military will have no problem. But very, very hard. Mexico is having a very, very hard time with it.

Once they arrive, the Democrat Party's vision is to offer them free healthcare, free welfare, free education, and even the right to vote. You and the hardworking taxpayers of our country will be asked to pick up the entire tab. And that's what's happening — medical and, in many cases, they've got some big medical problems before they get here.

No nation can allow itself to be overwhelmed by uncontrolled masses of people rushing their border. That's what's happening. They are rushing our border. They are coming up. And even before you get to the caravan, just on a daily basis, people coming in. And it's a very bad thing for our country. It's sad in many ways, but it's a very bad thing for our country. And again, costs us billions and billions and billions of dollars a year.

And I will therefore take every lawful action at my disposal to address this crisis. And that's what we're doing. The United States military, great people.

My administration is finalizing a plan to end the rampant abuse of our asylum system — it's abused — to halt the dangerous influx, and to establish control over America's sovereign

borders. We got borders. And once that control is set and standardized, and made very strong — including the building of the wall, which we've already started. $1.6 billion spent last year; $1.6 billion this year. We have another $1.6 [billion] that will be coming, but we want to build it at one time. All it does is turn people in a different direction if you don't. We want to build it at one time.

Under this plan, the illegal aliens will no longer get a free pass into our country by lodging meritless claims in seeking asylum. Instead, migrants seeking asylum will have to present themselves lawfully at a port of entry. So they're going to have to lawfully present themselves at a port of entry. Those who choose to break our laws and enter illegally will no longer be able to use meritless claims to gain automatic admission into our country. We will hold them — for a long time, if necessary.

The only long-term solution to the crisis, and the only way to ensure the endurance of our nation as a sovereign country, is for Congress to overcome open borders obstruction. That's exactly what it is: It's open border obstruction. No votes. You can come up with the greatest border plan, the greatest immigration plan. You won't get one vote from a Democrat. They have terrible policy. In many cases, they're terrible politicians. But the one thing I give them great credit for: They vote as a bloc. They stick together.

And we will end catch-and-release. We're not releasing any longer. We also must finish the job that we started by being strong at the border. When we're strong at the border, people will turn away and they won't bother. You will see, in a year from now, or in certainly a period of time from now, despite our very good economy, which some of them come for that — I can't blame them for that; you have to do it legally — but you will see that the numbers of people trying to get in will be greatly reduced.

But that can only happen if we're strong at the border. And the southern border is a big problem, and it's a tremendous problem for drugs pouring in and destroying our youth, and, really, destroying the fabric of our country. There's never been a drug problem like we have today. And as I said, much of it comes from the southern border.

So in the meantime, I will fulfill my sacred obligation to protect our country and defend the United States of America. And this is a defense of our country. We have no choice. We have no choice. We will defend our borders, we will defend our country.

Thank you very much.

Q Mr. President, what happens to the children then? If you're ending catch-and-release, what happens to those children? Do they stay in these tent cities? Or what happens?

THE PRESIDENT: We're working on a system where they stay together. But I will say that, by doing that, tremendous numbers — you know, under the Obama plan, you could separate children. They never did anything about that. Nobody talks about that. But under President Obama, they separated children from the parents. We actually put it so that that didn't happen.

But what happens when you do that is you get tremendous numbers of people coming. It's almost like an incentive to — when they hear they're not going to be separated, they come many, many times over. But President Obama separated the children, the parents. And nobody complained. When we continued the exact same law, this country went crazy.

So we are going to continue and try to continue what we're doing. But it is a tremendous incentive for people to try. But it's going to be very, very hard for people to come into our country. So we think we'll be able to do that.

Q With the military, do you envision them firing upon any of these people?

THE PRESIDENT: I hope not.

Q Could you see the military (inaudible)?

THE PRESIDENT: I hope not. It's the military — I hope — I hope there won't be that. But I will tell you this: Anybody throwing stones, rocks — like they did to Mexico and the Mexican military, Mexican police, where they badly hurt police and soldiers of Mexico — we will consider that a firearm. Because there's not much difference, where you get hit in the face with a rock — which, as you know, it was very violent a few days ago — very, very violent — that break-in. It was a break-in of a country. They broke into Mexico.

And you look at what's happening in Guatemala, just to mention Guatemala, along with El Salvador and Honduras. It's disgraceful that those countries aren't able to stop this. Because they should be able to stop it before it starts.

And the United States pays them a fortune, and we're looking at not doing that anymore. Because why should we be doing that when they do nothing for us?

Jeff. Jeff, go ahead.

Q Mr. President, how is this plan going to be legal, considering the current law?

THE PRESIDENT: Oh, this is totally legal. No. This is legal. We are stopping people at the border. This is an invasion, and nobody is even questioning that.

Q But in terms of your plans to change asylum, are you going to do this via executive order?

THE PRESIDENT: No, no, you don't have to — you don't have to release. You have — you can hold. The problem is, to hold people, you need massive facilities. It's the most ridiculous thing I've ever heard. Another country says, "Sorry, you can't come in." With us, we take their name, take their phone number, take their everything, and say, "Good luck." Only because we don't have the facilities to hold people. But we're building the facilities now. We're building massive numbers of tents, and we will hold them in tents. But you don't have to release them. They released them only because they didn't have the facilities to hold them.

Q Mr. President, is there like an executive order that you're going to be releasing today?

THE PRESIDENT: Oh, we will be doing an executive order sometime next week, yes.

Q (Inaudible) executive order dealing with ending catch-and-release and asylum?

THE PRESIDENT: It's going to end — it's going to be talking about everything. It'll be quite comprehensive. Many of the things we've talked about today.

Q Mr. President, so you're — so just to clarify, you are speaking of, in the tents, these family units that would arrive (inaudible) the children?

THE PRESIDENT: Well, we have other facilities also. But what's happened is we are holding so many facilities — so many people that our facilities are being overrun. They're being overrun. And we are putting up temporary facilities. Eventually, people won't be coming here anymore when they realize they can't get through.

Q So they will hold the children in those tents with their parents?

THE PRESIDENT: We will be holding the family and the children together. Remember this: President Obama separated children from families. And all I did was take the same law, and then I softened the law. But by softening the law, many people come up that would not have come up if there was separation.

Q Mr. President, what do you say to the critics who think this is a political thing before the midterms?

THE PRESIDENT: There's nothing political about a caravan of thousands of people, and now others forming, pouring up into our country. We have no idea who they are. All we know is they're pretty tough people when they can blast through the Mexican military and Mexican police. They're pretty tough people. Even Mexico said, "Wow, these are tough people." I don't want them in our country. And women don't want them in our country. Women want security. Men don't want them in our country. But the women do not want them. Women want security. You look at what the women are looking for. They want to have security. They don't want to have these people in our country. And they're not going to be in our country. It's a very big thing.

Yes.

Q Mr. President, when you talk about finalizing a plan to end asylum, is this a plan that would be included in that executive order?

THE PRESIDENT: Oh, no, people are going to have a chance to go for asylum. But if you look at the records, not very many people are allowed to stay once they go to court. But what happens is they'd go into — they were using asylum — first of all, they were told what to say by lawyers

and others. "Read this statement." You read the statement, and now you're seeking asylum. The whole thing is ridiculous. And we won't put up with it any longer.

Q President Trump, U.S. law and international law says that people who have valid claims have a right to seek asylum.

THE PRESIDENT: That's right.

Q So why would — why would they be —

THE PRESIDENT: Well, they're going to go to court. They're going to go to court, as crazy as it sounds. They're going to go —

Q But the law say that they don't — they're not —

THE PRESIDENT: Excuse me. Excuse me. Ready? They're going to go to court, and a judge is going to determine. But usually, when they go to court, they're deported. It just seems that most of the people are deported once they go. The problem is they never end up going to court, because when they come in, they're told to come back in a year, for a court case, and they disappear into the United States never to be seen again.

But we're going to be —

Q But the current laws doesn't say about holding people in tent cities.

THE PRESIDENT: And they're given deportation notices. We will be deporting those people.

Q Mr. President, you're saying rocks are — rock-throwing, like happened in Mexico, will be considered —

THE PRESIDENT: We will consider that the maximum that we can consider that, because they're throwing rocks viciously and violently. You saw that three days ago. Really hurting the military. We're not going to put up with that. If they want to throw rocks at our military, our military fights back. We're going to consider — and I told them, consider it a rifle. When they throw rocks like they did at the Mexico military and police, I say, consider it a rifle.

Jeff?

Q A separate topic, sir. Did you offer Heather Nauert the job of U.N. Ambassador?

THE PRESIDENT: Well, she's under very serious consideration. She's excellent. She's been with us a long time. She's been a supporter for a long time. And she's really excellent. So she's under very serious — we'll probably make a decision next week. We have a lot of people that want the job, and there are a lot of really great people. But we'll be talking about that next week sometime.

Q Did you see Oprah Winfrey's comments today?

THE PRESIDENT: I didn't. What did she say?

Q She was campaigning in Georgia at the same time that Vice President Pence was.

THE PRESIDENT: At the same time as who?

Q Excuse me, at the same time Vice President Pence was, encouraging people to vote and —

THE PRESIDENT: Well, that's okay. I mean, I was on Oprah's last week — the last week of her show. Oprah liked me very much. I've always liked Oprah. You know, Oprah is good. But the woman that she's supporting is not qualified to be the governor of Georgia, by any stretch of the imagination.

And I'll be in Georgia the next few days — the next few days — and we have a tremendous — around Macon — we have a tremendous crowd already. Nobody has a crowd like we have because people want to see a great governor of Georgia. And I think Brian is going to be a great governor of Georgia. I think he'll be a fantastic governor. He's totally qualified.

She is not qualified to be the governor of Georgia. She's not qualified. And Georgia is a great state —

Q Why is she not qualified?

THE PRESIDENT: — it's a great, great state. Take a — take a look. Take a look at her past. Take a look at her history. Take a look at what she wants to do and what she has in mind for the state. That state will be in big, big trouble very quickly. And the people of Georgia don't want that.

Question?

Q Mr. President, really quickly, just on election integrity? Can you say for a fact that our elections are secure next week? What can you tell us?

THE PRESIDENT: Yeah, yeah. I just met with — I just met with the FBI, with Chris; and the Justice Department; and with Secretary Nielsen. And they've spent a lot of time and effort and some money on making sure that everything with respect to the election coming up in five days is going to be perfect and safe. There will be hopefully no meddling, no tampering, no nothing. And we spent a lot —

Now President Obama had the chance to do that in September before '16, but he chose not to do that because he thought Hillary Clinton was going to win. And while everybody agrees it didn't affect the vote at all, nevertheless he could have done things that probably would have made it a little more obvious, a little clearer. But he was told by the FBI in September before the election

in '16 about potential meddling or potential Russian meddling, and he did nothing about it. He didn't do that because he thought that Hillary Clinton would win.

All right, one more.

Q Are you optimistic that you can still get the continuing resolution through December 7th for Homeland Security funded, even if the Democrats take the House?

THE PRESIDENT: I think if — I think we're going to do very well in the election, I must tell you. If you look at the races, if you look at the Senate, which is very important, obviously. I'm leaving today; I'll be in Missouri. And I'll be touching down at a number of places over the next five days. But I think we're doing very well in the Senate, and I think we're doing very well in the House.

The only problem is, with the House, there's so many people. I'd like to stop for every one of them, but there's so many people. But I think we're doing very well in the House. I think people want to see strong borders. I think they want to see security. They want to see good healthcare. They want to see the things that we're providing. They don't want to have their taxes increased. We're decreasing their taxes.

We just announced yesterday, you probably heard — Kevin Brady put it out — a reduction of tax. We're going for a reduction of middle-income tax or 10 percent. The Democrats want to, I mean, double up your taxes. In some cases, you'll have to pay three times what you're paying right now in order to get bad healthcare.

And so what we're doing is something that I think the people want, and I think we're going to do very well in the election, even though history says that whoever President it — whoever the President may be, it trends the other way. It certainly does seem that way.

But nobody has ever been President that has the greatest economy in the history of our country. This is the greatest economy in the history of our country. These are the greatest unemployment and employment numbers in the history of our country. Nobody has ever had that to campaign with. So I do.

Thank you all very much. I appreciate it. Thank you.

END

4:51 P.M. EDT



*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528

January 25, 2019

**ACTION**

MEMORANDUM FOR:     L. Francis Cissna
Director
U.S. Citizenship and Immigration Services

Kevin K. McAleenan
Commissioner
U.S. Customs and Border Protection

Ronald D. Vitiello
Deputy Director and Senior Official Performing the Duties of
Director
U.S. Immigration and Customs Enforcement

FROM:     Kirstjen M. Nielsen
Secretary

SUBJECT:     Policy Guidance for Implementation of the Migrant Protection
Protocols

On December 20, 2018, I announced that the Department of Homeland Security (DHS),
consistent with the Migrant Protection Protocols (MPP), will begin implementation of
Section 235(b)(2)(C) of the Immigration and Nationality Act (INA) on a large-scale basis to
address the migration crisis along our southern border. In 1996, Congress added Section
235(b)(2)(C) to the INA. This statutory authority allows the Secretary of Homeland Security to
return certain applicants for admission to the contiguous country from which they are arriving on
land (whether or not at a designated port of entry) pending removal proceedings under Section
240 of the INA. Consistent with the MPP, citizens and nationals of countries other than Mexico
("third-country nationals") arriving in the United States by land from Mexico—illegally or
without proper documentation—may be returned to Mexico pursuant to Section 235(b)(2)(C) for
the duration of their Section 240 removal proceedings.

## Section 235(b)(2)(C) and the MPP

The United States issued the following statement on December 20, 2018, regarding implementation of the Migrant Protection Protocols:

> [T]he United States will begin the process of implementing Section 235(b)(2)(C) . . . with respect to non-Mexican nationals who may be arriving on land (whether or not at a designated port of entry) seeking to enter the United States from Mexico illegally or without proper documentation. Such implementation will be done consistent with applicable domestic and international legal obligations. Individuals subject to this action may return to the United States as necessary and appropriate to attend their immigration court proceedings.

> The United States understands that, according to the Mexican law of migration, the Government of Mexico will afford such individuals all legal and procedural protection[s] provided for under applicable domestic and international law. That includes applicable international human rights law and obligations as a party to the 1951 Convention relating to the Status of Refugees (and its 1967 Protocol) and the Convention Against Torture.

> The United States further recognizes that Mexico is implementing its own, sovereign, migrant protection protocols providing humanitarian support for and humanitarian visas to migrants.

> The United States proposes a joint effort with the Government of Mexico to develop a comprehensive regional plan in consultation with foreign partners to address irregular migration, smuggling, and trafficking with the goal of promoting human rights, economic development, and security.[1]

The Government of Mexico, in response, issued a statement on December 20, 2018. That statement provides, in part, as follows:

> 1. For humanitarian reasons, [the Government of Mexico] will authorize the temporary entrance of certain foreign individuals coming from the United States who entered that country at a port of entry or who were detained between ports of entry, have been interviewed by U.S. immigration authorities, and have received a notice to appear before an immigration judge. This is based on current Mexican legislation and the international commitments Mexico has signed, such as the Convention Relating to the Status of Refugees, its Protocol, and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, among others.

---

[1] Letter from Chargé d'Affaires John S. Creamer to Sr. Jesús Seade, Subsecretaría para América del Norte, Secretaría de Relaciones Exteriores (Dec. 20, 2018).

2

2. It will allow foreigners who have received a notice to appear to request admission into Mexican territory for humanitarian reasons at locations designated for the international transit of individuals and to remain in national territory. This would be a "stay for humanitarian reasons" and they would be able to enter and leave national territory multiple times.

3. It will ensure that foreigners who have received their notice to appear have all the rights and freedoms recognized in the Constitution, the international treaties to which Mexico is a party, and its Migration Law. They will be entitled to equal treatment with no discrimination whatsoever and due respect will be paid to their human rights. They will also have the opportunity to apply for a work permit for paid employment, which will allow them to meet their basic needs.

4. It will ensure that the measures taken by each government are coordinated at a technical and operational level in order to put mechanisms in place that allow migrants who have receive[d] a notice to appear before a U.S. immigration judge have access without interference to information and legal services, and to prevent fraud and abuse.[2]

### Prosecutorial Discretion and *Non-Refoulement* in the Context of the MPP

In exercising their prosecutorial discretion regarding whether to place an alien arriving by land from Mexico in Section 240 removal proceedings (rather than another applicable proceeding pursuant to the INA), and, if doing so, whether to return the alien to the contiguous country from which he or she is arriving pursuant to Section 235(b)(2)(C), DHS officials should act consistent with the *non-refoulement* principles contained in Article 33 of the 1951 Convention Relating to the Status of Refugees[3] (1951 Convention) and Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT).[4] Specifically, a third-country national should not be involuntarily returned to Mexico pursuant to Section 235(b)(2)(C) of the INA if the alien would more likely than not be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion (unless such alien has engaged in criminal, persecutory, or terrorist activity described in Section 241(b)(3)(B) of the

---

[2] Secretaría de Relaciones Exteriores, *Position of Mexico on the Decision of the U.S. Government to Invoke Section 235(b)(2)(C) of its Immigration and Nationality Act* (Dec. 20, 2018).

[3] The United States is not a party to the 1951 Convention but is a party to the 1967 Protocol Relating to the Status of Refugees, which incorporates Articles 2 to 34 of the 1951 Convention. Article 33 of the 1951 Convention provides that: "[n]o Contracting State shall expel or return ('*refouler*') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion."

[4] Article 3 of the CAT states, "No State Party shall expel, return ('*refouler*') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." *See also* Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), Pub. L. No. 105-277, Div. G, Title XXII, § 2242(a) (8 U.S.C. § 1231 note) ("It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States.").

3

INA), or would more likely than not be tortured, if so returned pending removal proceedings. The United States expects that the Government of Mexico will comply with the commitments articulated in its statement of December 20, 2018.

U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, and U.S. Immigration and Customs Enforcement will issue appropriate internal procedural guidance to carry out the policy set forth in this memorandum.[5]

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

---

[5] A DHS immigration officer, when processing an alien for Section 235(b)(2)(C), should refer to USCIS any alien who has expressed a fear of return to Mexico for a *non-refoulement* assessment by an asylum officer.

4

**MPP Guiding Principles**

**Date:**                          January 28, 2019

**Topic:**                        Guiding Principles for Migrant Protection Protocols

**HQ POC/Office:**       Enforcement Programs Division

- Effective January 28, 2019, in accordance with the Commissioner's Memorandum of January 28, 2019, the Office of Field Operations, San Diego Field Office, will, consistent with its existing discretion and authorities, begin to implement Section 235(b)(2)(C) of the Immigration and Nationality Act (INA) through the Migrant Protection Protocols (MPP).
    - To implement the MPP, aliens arriving from Mexico who are amenable to the process (see below), and who in an exercise of discretion the officer determines should be subject to the MPP process, will be issued an Notice to Appear (NTA) and placed into Section 240 removal proceedings.  They will then be transferred to await proceedings in Mexico.

- Aliens in the following categories are not amenable to MPP:
    - Unaccompanied alien children,
    - Citizens or nationals of Mexico,
    - Aliens processed for expedited removal,
    - Aliens in special circumstances:
        - Returning LPRs seeking admission (subject to INA section 212)
        - Aliens with an advance parole document or in parole status
        - Known physical/mental health issues
        - Criminals/history of violence
        - Government of Mexico or USG interest,
    - Any alien who is more likely than not to face persecution or torture in Mexico, or
    - Other aliens at the discretion of the Port Director

- Nothing in this guidance changes existing policies and procedures for processing an alien under procedures other than MPP, except as specifically provided. Thus, for instance, the processing of aliens for expedited removal is unchanged. Once an alien has been processed for expedited removal, including the supervisor approval, the alien may not be processed for MPP.
- Officers, with appropriate supervisory review, retain discretion to process aliens for MPP or under other procedures (e.g., expedited removal), on a case-by-case basis.  Adverse factors precluding placement in the MPP process include, but are not limited to, factors such as prior removal, criminal history, it is more likely than not that the alien will face persecution or torture in Mexico, and permanent bars to readmission.
- If an alien who is potentially amenable to MPP affirmatively states that he or she has a fear of persecution or torture in Mexico, or a fear of return to Mexico, whether before or after they are processed for MPP or other disposition, that alien will be referred to a USCIS asylum officer for screening following the affirmative statement of fear of persecution or

torture in, or return to, Mexico, so that the asylum officer can assess whether it is more likely than not that the alien will face persecution or torture if returned to Mexico.

- If USCIS assesses that an alien who affirmatively states a fear of return to Mexico is more likely than not to face persecution or torture in Mexico, the alien may not be processed for MPP. Officers retain all existing discretion to process (or re-process) the alien for any other available disposition, including expedited removal, NTA, waivers, or parole.
- Aliens at the POE who are processed for MPP will receive a specific immigration court hearing date and time. Every effort will be made to schedule similar MPP alien populations (e.g. single adult males, single adult females, family units) for the same hearing dates.
- OFO and USBP will be sharing court dates using only one existing Immigration Scheduling System (ISS) queue.
- Any alien who is subject to MPP will be documented in the appropriate system of records, SIGMA, and the proper code will be added.
- POEs will provide aliens subject to MPP a tear sheet containing information about the process, as well as a list of free or low-cost legal service providers.
- Aliens who return to the POE for their scheduled hearing and affirmatively state a fear of return to Mexico will be referred to USCIS for screening prior to any return to Mexico. If USCIS assesses that such an alien is more likely than not to face persecution or torture in Mexico, CBP Officers should coordinate with ICE Enforcement and Removal Operations (ERO) to determine whether the alien may be maintained in custody or paroled, or if another disposition is appropriate. Such an alien may not be subject to expedited removal, however, and may not be returned to Mexico to await further proceedings.

*Hearing date and processing*

- POEs will establish scheduling for the arrival of aliens returning for their hearing to permit efficient transportation, according to applicable policy.
- Returning aliens who arrive at the POEs for proceedings will be biometrically identified, screened to ensure they have requisite documents, and turned over to ICE ERO.
- POEs will coordinate with ICE ERO to establish transfer of custody and expeditious transportation from the POE to the hearing. ERO is responsible for the transportation of aliens between the POE and court location, as well as the handling of the alien during all court proceedings.
- If the alien receives a final order of removal from an immigration judge, the alien will be processed in accordance with ERO operations.
- If the alien's INA section 240 removal proceedings are ongoing ERO will transport the alien back to the POE and CBP officers will escort the alien to the United States/Mexico limit line.



**U.S. Department of Homeland Security**
Washington, DC 20229

**U.S. Customs and Border Protection**

Commissioner

January 28, 2019

MEMORANDUM FOR:    Todd C. Owen
                               Executive Assistant Commissioner, Field Operations

                               Carla L. Provost
                               Chief, U.S. Border Patrol

FROM:                       Kevin K. McAleenan
                               Commissioner

SUBJECT:                 Implementation of the Migrant Protection Protocols

Effective January 28, 2019, and in furtherance of the provisions of the attached memorandum from the Secretary, U.S. Customs and Border Protection (CBP) will commence implementation of the Migrant Protection Protocols (MPP) under its existing discretion and the authority of Section 235(b)(2)(C) of the Immigration and Nationality Act (INA).

Section 235(b)(2)(C) of the INA provides that the Secretary of Homeland Security may return certain applicants for admission to the contiguous country from which they are arriving on land (whether or not at a designated port of entry) pending removal proceedings under Section 240 of the INA.

MPP implementation will begin at the San Ysidro port of entry on January 28, 2019, and it is anticipated that it will be expanded in the near future. Please ensure that each stage of MPP expansion beyond OFO implementation at San Ysidro is coordinated closely with my office.

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

1300 Pennsylvania Avenue NW
Washington, DC 20229



**U.S. Customs and
Border Protection**

January 28, 2019

MEMORANDUM FOR:    Directors, Field Operations
                                   Office of Field Operations

                                   Director, Field Operations Academy
                                   Office of Training and Development

FROM:                        Todd A. Hoffman
                                   Executive Director
                                   Admissibility and Passenger Programs
                                   Office of Field Operations

SUBJECT:                  Guidance on Migrant Protection Protocols

Effective January 28, 2019, in accordance with the Commissioner's Memorandum of January 28, 2019, and subject to the terms of policy, the Office of Field Operations (OFO) San Diego Field Office will, consistent with its existing discretion and authorities, implement Section 235(b)(2)(C) of the Immigration and Nationality Act (INA).

Under this implementation of section 235(b)(2)(C), referenced as the Migrant Protection Protocols (MPP), DHS is authorized to return certain applicants for admission who arrive via land at the San Ysidro Port of Entry, and who are subject to removal proceedings under Section 240 of the INA, to Mexico pending removal proceedings. Certain aliens, including vulnerable aliens, criminal aliens, or aliens of interest to the Government of Mexico (GoM) or the United States, will not be placed into MPP, in accordance with the Guiding Principles for Migrant Protection Protocols issued today by the Enforcement Programs Division (HQ) (Guiding Principles).

The Guiding Principles outline which aliens may be amenable to MPP. As part of the determination of whether an alien is amenable to MPP, OFO will refer aliens who are potentially amenable, but who affirmatively state fear of return to Mexico, whether before or after they are processed for MPP or other disposition, to United States Citizenship and Immigration Services (USCIS) for screening following the affirmative statement of fear of return to Mexico. Please see the Guiding Principles for MPP.

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

Please ensure that this memorandum is disseminated to all ports of entry within your jurisdiction.

Policy Number: 11088.1
FEA Number: 306-112-002b

*Office of the Director*

**U.S. Department of Homeland Security**
500 12ᵗʰ Street SW
Washington, DC 20536



**U.S. Immigration
and Customs
Enforcement**

February 12, 2019

MEMORANDUM FOR:    Executive Associate Directors
                   Principal Legal Advisor

FROM:              Ronald D. Vitiello
                   Deputy Director and
                   Senior Official Performing the Duties of the Director

SUBJECT:           Implementation of the Migrant Protection Protocols

On January 25, 2019, Secretary Nielsen issued a memorandum entitled *Policy Guidance for Implementation of the Migrant Protection Protocols*, in which she provided guidance for the implementation of the Migrant Protection Protocols (MPP) announced on December 20, 2018, an arrangement between the United States and Mexico to address the migration crisis along our southern border. Pursuant to the Secretary's direction, this memorandum provides guidance to U.S. Immigration and Customs Enforcement (ICE) about its role in the implementation of the MPP.

Section 235(b)(2)(C) of the Immigration and Nationality Act (INA) allows the Department of Homeland Security (DHS), in its discretion, with regard to certain aliens who are "arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, . . . [to] return the alien[s] to that territory pending a proceeding under [INA] section 240." Consistent with the MPP, third-country nationals (i.e., aliens who are not citizens or nationals of Mexico) who are arriving in the United States by land from Mexico may be returned to Mexico pursuant to INA section 235(b)(2)(C) for the duration of their INA section 240 removal proceedings. DHS will not use the INA section 235(b)(2)(C) process in the cases of unaccompanied alien children, aliens placed into the expedited removal (ER) process of INA section 235(b)(1), and other aliens determined, in the exercise of discretion, not to be appropriate for such processing (which may include certain aliens with criminal histories, individuals determined to be of interest to either Mexico or the United States, and lawful permanent residents of the United States).

The direct placement of an alien into INA section 240 removal proceedings (and, in DHS's discretion, returning the alien to Mexico pursuant to INA section 235(b)(2)(C) pending those proceedings) is a separate and distinct process from ER. Processing determinations, including whether to place an alien into ER or INA section 240 proceedings (and, as applicable, to return an alien placed into INA section 240 proceedings to Mexico under INA section 235(b)(2)(C) as

part of MPP), or to apply another processing disposition, will be made by U.S. Customs and Border Protection (CBP), in CBP's enforcement discretion.

MPP implementation began at the San Ysidro port of entry on or about January 28, 2019, and it is intended that MPP implementation will expand eventually across the southern border. In support of MPP, ICE Enforcement and Removal Operations (ERO) will provide appropriate transportation when necessary, for aliens returned to Mexico under the MPP, from the designated port of entry to the court facility for the scheduled removal hearings before an immigration judge and back to the port of entry for return to Mexico by CBP after such hearings. ERO also will be responsible for effectuating removal orders entered against aliens previously processed under INA section 235(b)(2)(C), including post-removal order detention. ICE attorneys will represent DHS in the related removal proceedings pursuant to 6 U.S.C. § 252(c).

As instructed by the Secretary, in exercising prosecutorial discretion concerning the potential return of third-country nationals to Mexico under INA section 235(b)(2)(C), DHS officials should act consistently with the *non-refoulement* principles contained in Article 33 of the 1951 Convention Relating to the Status of Refugees and Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. Specifically, a third-country national who affirmatively states a fear of return to Mexico (including while in the United States to attend a removal hearing) should not be involuntarily returned under INA section 235(b)(2)(C) if the alien would more likely than not be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion (unless described in INA section 241(b)(3)(B) as having engaged in certain criminal, persecutory, or terrorist activity), or would more likely than not be tortured, if so returned pending removal proceedings. *Non-refoulement* assessments will be made by U.S. Citizenship and Immigration Services (USCIS) asylum in accordance with guidance issued by the Director of USCIS.

Within ten (10) days after this memorandum, relevant ICE program offices are directed to issue further guidance to ensure that MPP is implemented in accordance with the Secretary's memorandum, this memorandum, and policy guidance and procedures, in accordance with applicable law.

This document provides internal ICE policy guidance, which may be modified, rescinded, or superseded at any time without notice. This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigative prerogatives of DHS.

Attachment:
DHS Secretary Memorandum, *Policy Guidance for Implementation of Migrant Protection Protocols*, dated January 25, 2019.



*Enforcement and Removal Operations*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536

**U.S. Immigration
and Customs
Enforcement**

February 12, 2019

MEMORANDUM FOR:     Field Office Directors
                    Enforcement and Removal Operations

FROM:               Nathalie R. Asher *Nathalie R. Asher*
                    Acting Executive Associate Director

SUBJECT:            Migrant Protection Protocols Guidance

Purpose

This memorandum provides operational guidance to impacted Enforcement and Removal
Operations (ERO) field offices to ensure that the Migrant Protection Protocols (MPP) are
implemented in accordance with applicable law, the Secretary's January 25, 2019, memorandum,
*Policy Guidance for Implementation of the Migrant Protection Protocols*, Acting Director
Vitiello's February 12, 2019, memorandum of the same title, and other applicable policies and
procedures.

Background

On January 25, 2019, Secretary Nielsen issued a memorandum entitled *Policy Guidance for
Implementation of the Migrant Protection Protocols*, in which she provided guidance for the
implementation of the MPP, an arrangement between the United States and Mexico to address
the migration crisis along our southern border announced on December 20, 2018. Thereafter, on
February 12, 2019, Deputy Director and Senior Official Performing the Duties of the Director
Vitiello issued U.S. Immigration and Customs Enforcement (ICE) Policy Memorandum 11088.1,
*Implementation of the Migrant Protection Protocols*, announcing that operational
implementation of MPP began at the San Ysidro port of entry on or about January 28, 2019, and
directing that ICE program offices issue further guidance to ensure that the MPP is implemented
in accordance with the Secretary's memorandum, applicable law, and policy guidance and
procedures.

Discussion

Under section 235(b)(2)(C) of the Immigration and Nationality Act (INA), the U.S. Department
of Homeland Security (DHS) may, in its discretion, with regard to certain applicants for
admission who are "arriving on land (whether or not at a designated port of arrival) from a
foreign territory contiguous to the United States, . . . return the alien[s] to that territory pending a
proceeding under [INA section] 240."

return the alien to Mexico pending removal proceedings pursuant to section 235(b)(2)(C) of the INA, as detailed in ICE Policy Memorandum 11088.1. Aliens processed under the MPP will be issued a Notice to Appear (NTA) by CBP and returned by CBP to Mexico to await their removal proceedings.

Aliens returned to Mexico under the MPP pursuant to section 235(b)(2)(C) of the INA will be required to report to a designated POE on their scheduled hearing dates and will be paroled into the United States by CBP for purposes of their hearings. As further explained in the next section, CBP will then transfer the aliens to ERO custody for transportation to designated Executive Office for Immigration Review (EOIR) court locations for their hearings.

If the alien is granted relief or protection from removal by the immigration judge or is ordered removed from the United States, and appeal is not reserved by either party, the alien will be processed in accordance with standard procedures applicable to final order cases. If the immigration judge continues proceedings or enters an order upon which either party reserves appeal, ERO will transport the alien back to the POE, whereupon CBP officers will take custody of the alien to return the alien to Mexico to await further proceedings.

MPP implementation began at the San Ysidro port of entry (POE) on or about January 28, 2019, and it is intended that MPP implementation will expand to additional locations along the southern border. This memorandum provides general procedural guidance applicable to ERO personnel in the implementation of the MPP. Field Office Directors should each assign a lead POC for MPP issues arising within their AORs and issue local operational guidance applicable to their individual areas of responsibility as the MPP is phased in.

*Hearing Transportation and Custody*

Before returning an alien to Mexico under the MPP to await his or her removal proceedings, CBP will provide the alien instructions explaining when and to which POE to report to attend his or her hearing. On the day of the hearing, an alien returned to Mexico under the MPP will arrive at the POE at the time designated—generally, a time sufficient to allow for CBP processing, pre-hearing consultation with counsel (if applicable), and timely appearance at hearings. Once CBP conducts POE processing (including verification of identity and a brief medical screening), for hearings set at immigration courts located in the interior of the United States, CBP will parole the alien into ICE's custody under INA section 212(d)(5)(A), and ERO will maintain physical custody of the alien during transportation of the alien from the POE to the designated immigration court location, making appropriate use of contract support and complying with applicable requirements concerning the transportation of aliens.

In cases in which ICE performs that transportation function between the POE and an inland immigration court, the alien is detained in ICE custody as an arriving alien.[1] ERO should coordinate locally with CBP officials at POEs where the MPP has been implemented, so that the

---

[1] Aliens participating in the MPP who CBP initially encounters at a POE are "arriving aliens" within the meaning of 8 C.F.R. §§ 1.2 and 1001.1(q) (defining "arriving alien" to include "an applicant for admission coming … into the United States at a port-of-entry"). Moreover, on their hearing dates before an immigration judge, aliens who CBP initially encountered *between* the POEs will come *to* a POE to attend their hearings, placing them within the "arriving alien" definition, as well.

daily volume of MPP cases can be monitored and any transportation needs may be properly met. ERO should also coordinate locally with EOIR concerning security arrangements at the immigration court location. While EOIR is responsible for security inside the courtroom, and ERO should generally defer to immigration judges' wishes concerning their presence in the courtroom, DHS is ultimately responsible for maintaining custody of the alien. If an alien is ordered released by an immigration judge, ERO should coordinate closely with the ICE Office of the Principal Legal Advisor (OPLA) regarding how to proceed with the case. After an alien's removal hearing is over, ERO will transport him or her back to the POE for return to Mexico or to retrieve property, as applicable. If the alien has received a final grant of relief or an administratively final order of removal, ERO will coordinate with CBP and make appropriate custody determinations.

*Access to Counsel*

Section 240(b)(4)(A) of the INA provides that an alien in removal proceedings before an immigration judge "shall have the privilege of being represented, at no expense to the Government, by counsel of the alien's choosing who is authorized to practice in such proceedings." Similarly, section 292 provides that "[i]n any removal proceedings . . . the person concerned shall have the privilege of being represented (at no expense to the Government) by such counsel . . . as he shall choose." Accordingly, in order to facilitate access to counsel for aliens subject to return to Mexico under the MPP who will be transported to their immigration court hearings by ERO, ERO will depart from the POE with the alien at a time sufficient to ensure arrival at the immigration court not later than one hour before his or her scheduled hearing time in order to afford the alien the opportunity to meet in-person with his or her legal representative.

*Non-Refoulement Considerations*

In accordance with Secretary Nielsen's January 25, 2019, memorandum, DHS should implement the MPP consistent with the *non-refoulement* principles contained in Article 33 of the 1951 Convention Relating to the Status of Refugees (1951 Convention) and Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT). Specifically, an alien should not be involuntarily returned to Mexico under the MPP if the alien would more likely than not be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion (unless such alien has engaged in criminal, persecutory, or terrorist activity described in section 241(b)(3)(B) of the INA), or would more likely than not be tortured, if so returned pending removal proceedings.

If an alien subject to the MPP affirmatively states to an ERO officer that he or she has a fear of persecution or torture *in Mexico*, or a fear of return *to Mexico*, at any point while in ERO custody, ERO will notify CBP of the alien's affirmative statement so that CBP officials at the POE may refer the alien to a U.S. Citizenship and Immigration Services (USCIS) asylum officer for screening before any return to Mexico to assess whether it is more likely than not that the alien will face persecution or torture if returned to Mexico in accordance with guidance issued by the Director of USCIS.

If USCIS assesses that such an alien is more likely than not to face persecution or torture in Mexico, ERO will determine whether the alien may be maintained in custody or paroled, or if another disposition is appropriate.  Such an alien may not be subject to expedited removal; however, and may not be returned to Mexico to await further proceedings.[2]

*Recordkeeping and Reporting*

MPP aliens booked in and out of ICE custody must be appropriately documented in the Enforce Alien Detention Module (EADM) and monitored per a final Form I-216, *Record of Person and Property Transfer*.  For MPP aliens booked into ICE custody, the comment "out to court pursuant to MPP," must be added to the comments section of EADM.

EADM records for MPP aliens booked out of ICE custody will need to reflect the appropriate court dispositions.  Comments in EADM should reflect "MPP, Returned to the POE for Future Hearing;" "MPP, Granted Relief, Released from Custody;" "MPP, Claimed Fear of Mexico, returned to the POE;" or "MPP, Ordered Removed," or similar comments indicating an MPP disposition as appropriate.

*Disclaimers*

Except as specifically provided in relation to the MPP, existing policies and procedures for processing and removing aliens remain unchanged.  That applies to record-keeping responsibilities as well as removal authority and responsibility.  The MPP does not change ERO's removal operations, and removable aliens will be processed in accordance with standard practices and procedures.

This document is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person. Likewise, this guidance places no limitations on the otherwise lawful enforcement or litigative prerogatives of DHS.

---

[2] In MPP cases where an immigration judge grants withholding or deferral of removal *to Mexico* and appeal is reserved, ERO should confer with OPLA about appropriate next steps prior to any return under INA section 235(b)(2)(C).

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director*
Washington, DC 20529



January 28, 2019                                             PM-602-0169

# Policy Memorandum

SUBJECT:     **Guidance for Implementing Section 235(b)(2)(C) of the Immigration and
             Nationality Act and the Migrant Protection Protocols**

## Purpose

This memorandum provides guidance to immigration officers in U.S. Citizenship and
Immigration Services (USCIS) regarding the implementation of the Migrant Protection Protocols
(MPP), including supporting the exercise of prosecutorial discretion by U.S. Customs and Border
Protection (CBP).  This memorandum follows the Secretary of Homeland Security's January 25,
2019, memorandum, *Policy Guidance for Implementation of the Migrant Protection Protocols*.

## Background

Section 235(b)(2)(C) of the Immigration and Nationality Act (INA) provides that aliens arriving
by land from a foreign contiguous territory (i.e., Mexico or Canada)—whether or not at a
designated port of entry—generally may be returned, as a matter of enforcement discretion, to
the territory from which they are arriving pending a removal proceeding under Section 240 of the
INA.

On December 20, 2018, Secretary of Homeland Security Kirstjen M. Nielsen announced that the
Department of Homeland Security (DHS) will begin the process of implementing Section
235(b)(2)(C) of the INA on a large scale.  That statutory provision allows for the return of certain
aliens to a contiguous territory pending Section 240 removal proceedings before an immigration
judge.  Under the MPP, aliens who are nationals and citizens of countries other than Mexico
(third-country nationals) arriving in the United States by land from Mexico—illegally or without
proper documentation—may be returned to Mexico for the duration of their immigration
proceedings as a matter of prosecutorial discretion.  *Accord* 8 C.F.R. § 235.3(d).

In her January 25, 2019, memorandum, Secretary Nielsen issued general policy guidance
concerning DHS's implementation of Section 235(b)(2)(C) at the southern border consistent with
the MPP.  Memorandum from Kirstjen M. Nielsen, Secretary of Homeland Security, *Policy*

*Guidance for Implementation of the Migrant Protection Protocols* (Jan. 25, 2019) (Jan. 25, 2019, Memorandum).  The Secretary advised that such authority should be implemented consistent with the *non-refoulement* principles contained in Article 33 of the 1951 Convention Relating to the Status of Refugees (1951 Convention)—as incorporated in the 1967 Protocol Relating to the Status of Refugees[1]—and Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT).[2]

The Secretary specifically advised that, consistent with those principles, "a third-country national should not be involuntarily returned to Mexico pursuant to Section 235(b)(2)(C) of the INA if the alien would more likely than not be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion (unless such alien has engaged in criminal, persecutory, or terrorist activity described in Section 241(b)(3)(B) of the INA), or would more likely than not be tortured, if so returned pending removal proceedings."  Jan. 25, 2019, Memorandum at 3-4.  Article 33 of the 1951 Convention and Article 3 of the CAT require that the individual demonstrate that he or she is "more likely than not" to face persecution on account of a protected ground or torture, respectively.[3]  That is the same standard used for withholding of removal and CAT protection determinations.  *See* 8 C.F.R. § 208.16(b)(2), (c)(2); Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478, 8480 (1999).

At the same time, under the MPP, the United States "understands that, according to the Mexican law of migration, the Government of Mexico will afford such individuals all legal and procedural protection[s] provided for under applicable domestic and international law," including the 1951 Convention and the CAT.  Letter from Chargé d'Affaires John S. Creamer to Sr. Jesús Seade, Subsecretaría para América del Norte, Secretaría de Relaciones Exteriores (Dec. 20, 2018).  Further, "[t]he United States expects that the Government of Mexico will comply with the commitments articulated in its statement of December 20, 2018."[4]

---

[1] The United States is not a party to the 1951 Convention Relating to the Status of Refugees but is a party to the 1967 Protocol Relating to the Status of Refugees, which incorporates Articles 2 to 34 of the 1951 Convention. Article 33 of the 1951 Convention provides that: "[n]o Contracting State shall expel or return ('*refouler*') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion."

[2] Article 3 of the CAT states, "No State Party shall expel, return ('*refouler*') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture."  *See also* Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), Pub. L. No. 105-277, Div. G, Title XXII, § 2242(a) (8 U.S.C. § 1231 note) ("It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States.").

[3] *See INS v. Stevic*, 467 U.S. 407, 429-30 (1984); *Auguste v. Ridge*, 395 F.3d 123, 132-33 (3d Cir. 2005); *Pierre v. Gonzales*, 502 F.3d 109, 115 (2d Cir. 2007); *see also* Senate Resolution of Advice and Consent to Ratification of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, S. Treaty Doc. No. 100-20, II(2), *available at* https://www.congress.gov/treaty-document/100th-congress/20/resolution-text; Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478, 8480 (1999).

[4] Jan. 25, 2019, Memorandum at 4.

The Secretary also advised that, where an alien affirmatively states a concern that he or she may face a risk of persecution on account of a protected ground or torture upon return to Mexico, CBP should refer the alien to USCIS, which will conduct an assessment to determine whether it is more likely than not that the alien will be subject to persecution or torture if returned to Mexico. The Secretary directed USCIS to issue appropriate internal procedural guidance to carry out this policy. That guidance is explained below.

**Guidance**

Upon a referral by a DHS immigration officer of an alien who could potentially be amenable to the MPP, the USCIS asylum officer should interview the alien to assess whether it is more likely than not that the alien would be persecuted in Mexico on account of his or her race, religion, nationality, membership in a particular social group, or political opinion (unless such alien has engaged in criminal, persecutory, or terrorist activity described in Section 241(b)(3)(B) of the INA),[5] or that the alien would be tortured in Mexico. The process or procedures described in INA Sections 208, 235(b)(1), (3), and 241(b)(3) and their implementing regulations, as well as those in the CAT regulations, do not apply to the MPP assessments.

### A. Interview

Upon receipt of such a referral, the USCIS officer should conduct the MPP assessment interview in a non-adversarial manner, separate and apart from the general public. The purpose of the interview is to elicit all relevant and useful information bearing on whether the alien would more likely than not face persecution on account of a protected ground, or torture, if the alien is returned to Mexico pending the conclusion of the alien's Section 240 immigration proceedings.

The officer should conduct the assessment in person, via video teleconference, or telephonically. At the time of the interview, the USCIS officer should verify that the alien understands that he or she may be subject to return to Mexico under Section 235(b)(2)(C) pending his or her immigration proceedings. The officer should also confirm that the alien has an understanding of the interview process. In addition, provided the MPP assessments are part of either primary or secondary inspection, DHS is currently unable to provide access to counsel during the assessments given the limited capacity and resources at ports-of-entry and Border Patrol stations as well as the need for the orderly and efficient processing of individuals.[6]

In conducting the interview, the USCIS officer should take into account the following and other such relevant factors as:

---

[5] The disqualifying grounds for *non-refoulement* vis-à-vis the 1951 Convention and 1967 Protocol are reflected in Section 241(b)(3)(B) of the INA. However, the reference to Section 241(b)(3)(B) should not be construed to suggest that Section 241(b)(3)(B) applies to MPP.
[6] *See* 8 C.F.R. § 292.5(b).

1. The credibility of any statements made by the alien in support of the alien's claim(s) and such other facts as are known to the officer.  That includes whether any alleged harm (i.e., the alleged persecution or torture) could occur in the region in which the alien would reside in Mexico, pending their removal proceedings, or whether residing in another region of Mexico to which the alien would have reasonable access could mitigate against the alleged harm;

2. Commitments from the Government of Mexico regarding the treatment and protection of aliens returned under Section 235(b)(2)(C) (including those set forth in the Government of Mexico's statement of December 20, 2018),[7] the expectation of the United States Government that the Government of Mexico will comply with such commitments,[8] and reliable assessments of current country conditions in Mexico (especially those provided by DHS and the U.S. Department of State); and

3. Whether the alien has engaged in criminal, persecutory, or terrorist activity described in Section 241(b)(3)(B) of the INA.

### B.  Assessment

Once a USCIS officer assesses whether the alien, if returned to Mexico, would be more likely than not persecuted in Mexico on account of a protected ground (or has engaged in criminal, persecutory, or terrorist activity described in Section 241(b)(3)(B) of the INA), or would be more likely than not tortured in Mexico, the assessment shall be reviewed by a supervisory asylum officer, who may change or concur with the assessment's conclusion.  DHS staff should inform the alien of the outcome of the final assessment.  USCIS should then provide its assessment to CBP for purposes of exercising prosecutorial discretion in connection with one or more of the decisions as to whether to place the alien in expedited removal or to issue a Notice to Appear for the purpose of placement directly into Section 240 removal proceedings, and if the latter, whether to return the alien to Mexico pending the conclusion of Section 240  proceedings under Section 235(b)(2)(C) pursuant to the MPP, and, when appropriate, to U.S. Immigration and Customs Enforcement for purposes of making discretionary custody determinations for aliens who are subject to detention and may be taken into custody pending removal proceedings.

If an officer makes a positive MPP assessment (i.e., that an alien is more likely than not either to be persecuted in Mexico on account of a protected ground and has not engaged in criminal, persecutory, or terrorist activity described in Section 241(b)(3)(B) of the INA, or to be tortured in Mexico), USCIS is *not* granting withholding of removal or protection from removal under the CAT regulations.  Nor shall there be further administrative review, reopening, or reconsideration of the assessment by USCIS.  The purpose of the assessment is simply to assess whether the alien meets one of the eligibility criteria under the MPP, pursuant to Section 235(b)(2)(C).

---

[7] Secretaría de Relaciones Exteriores, *Position of Mexico on the Decision of the U.S. Government to Invoke Section 235(b)(2)(C) of its Immigration and Nationality Act* (Dec. 20, 2018); *see* Jan. 25, 2019, Memorandum at 2-3.

[8] *See* Jan. 25, 2019, Memorandum at 4.

**Disclaimer**

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS.

**Contact Information**

Questions relating to this memorandum must be directed through the appropriate channels to the Asylum Division Headquarters point of contact.

# EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## ADJUDICATION STATISTICS

### New Cases and Total Completions

| Fiscal Year | Initial Receipts[1] | Average Initial Receipts per Month | Total Completions[2] | Average Total Completions per Month |
|---|---|---|---|---|
| 1983 | 5,754 | 480 | 902 | 75 |
| 1984 | 11,517 | 960 | 2,118 | 177 |
| 1985 | 24,423 | 2,035 | 9,459 | 788 |
| 1986 | 37,911 | 3,159 | 27,223 | 2,269 |
| 1987 | 39,858 | 3,322 | 37,841 | 3,153 |
| 1988 | 67,212 | 5,601 | 60,104 | 5,009 |
| 1989 | 112,282 | 9,357 | 72,939 | 6,078 |
| 1990 | 103,429 | 8,619 | 81,678 | 6,807 |
| 1991 | 93,773 | 7,814 | 101,785 | 8,482 |
| 1992 | 88,998 | 7,417 | 87,322 | 7,277 |
| 1993 | 106,590 | 8,883 | 89,762 | 7,480 |
| 1994 | 125,711 | 10,476 | 106,815 | 8,901 |
| 1995 | 159,300 | 13,275 | 140,757 | 11,730 |
| 1996 | 197,449 | 16,454 | 186,002 | 15,500 |
| 1997 | 211,885 | 17,657 | 196,277 | 16,356 |
| 1998 | 184,076 | 15,340 | 191,981 | 15,998 |
| 1999 | 162,493 | 13,541 | 174,553 | 14,546 |
| 2000 | 159,865 | 13,322 | 165,734 | 13,811 |
| 2001 | 176,111 | 14,676 | 160,946 | 13,412 |
| 2002 | 178,528 | 14,877 | 171,413 | 14,284 |
| 2003 | 193,002 | 16,084 | 200,068 | 16,672 |
| 2004 | 199,485 | 16,624 | 212,145 | 17,679 |
| 2005 | 271,631 | 22,636 | 270,446 | 22,537 |
| 2006 | 246,489 | 20,541 | 279,411 | 23,284 |
| 2007 | 213,379 | 17,782 | 223,967 | 18,664 |
| 2008 | 225,871 | 18,823 | 230,595 | 19,216 |
| 2009 | 255,034 | 21,253 | 232,676 | 19,390 |
| 2010 | 247,178 | 20,598 | 223,350 | 18,613 |
| 2011 | 238,142 | 19,845 | 220,016 | 18,335 |
| 2012 | 212,932 | 17,744 | 186,759 | 15,563 |
| 2013 | 196,620 | 16,385 | 156,573 | 13,048 |
| 2014 | 230,175 | 19,181 | 142,121 | 11,843 |
| 2015 | 192,994 | 16,083 | 143,719 | 11,977 |
| 2016 | 228,442 | 19,037 | 143,507 | 11,959 |
| 2017 | 295,127 | 24,594 | 163,171 | 13,598 |
| 2018 | 314,316 | 26,193 | 195,670 | 16,306 |
| 2019 (Second Quarter)[3] | 180,400 | 30,067 | 111,555 | 18,593 |

Data Generated: April 23, 2019
[1] Initial receipts equals removal, deportation, exclusions, asylum-only, and withholding only cases.
[2] Total completions equals initial case completions plus subsequent case completions.
[3] FY 2019 Second Quarter through March 31, 2019.

# EXECUTIVE OFFICE FOR IMMIGRATION REVIEW ADJUDICATION STATISTICS

## New Cases and Total Completions



Data Generated: April 23, 2019
[1] Initial receipts equals removal, deportation, exclusions, asylum-only, and withholding only cases.
[2] Total completions equals initial case completions plus subsequent case completions.
[3] FY 2019 Second Quarter through March 31, 2019.



**U.S. Department of Justice**
**Executive Office for Immigration Review**

# Statistics Yearbook
## Fiscal Year 2017

Prepared by the Planning, Analysis, & Statistics Division

**Contact Information**
Office of Policy
Communications and Legislative Affairs Division
5107 Leesburg Pike, Suite 1902
Falls Church, VA 22041
(703) 305-0289
(703) 605-0365 (fax)

**Disclaimer**
The Statistics Yearbook has been prepared as a public service by the Executive Office for Immigration Review and is strictly informational in nature. In no way should any information in the Statistics Yearbook, in whole or in part, be regarded as legal advice or authority, or be understood in any way to enlarge upon, or otherwise modify or interpret, any existing legal authority, including, but not limited to, the Immigration and Nationality Act and Title 8 of the Code of Federal Regulations.

# TABLE OF CONTENTS

A Note on Format ....................................................................................................................... 4
The Executive Office for Immigration Review ................................................................... 5
Statistics Yearbook Key Definitions ................................................................................... 7
Immigration Courts ................................................................................................................. 8
  Pending Caseload ...................................................................................................................... 8
  Total I-862 Matters Received and Completed ..................................................................... 10
  Cases Received and Completed by Type ............................................................................... 13
  I-862 Case Completions by Decision ..................................................................................... 14
  I-862 ICCs by Country of Nationality .................................................................................. 17
  I-862 ICCs by Language ........................................................................................................... 18
  I-862 ICCs for Detained Cases .............................................................................................. 19
  I-862 Institutional Hearing Program Cases Received and Completed ............................. 21
  I-862 ICCs with Applications for Relief ............................................................................... 22
  Asylum Cases Received and Completed ............................................................................... 24
  Asylum Cases Completed by Decision .................................................................................. 26
  Asylum Grants by Country of Nationality ........................................................................... 29
  Convention Against Torture ................................................................................................... 30
  I-862 Applications for Relief other than Asylum ............................................................... 32
  I-862 *In Absentia* Orders ....................................................................................................... 33
  Immigration Judge Hiring ...................................................................................................... 35
Board of Immigration Appeals .......................................................................................... 36
  Total Cases Received and Completed .................................................................................. 36
  Cases Received and Completed by Type ............................................................................... 37
  Appeals from IJ Decisions Completed by Country of Nationality .................................... 38
  Appeals from IJ Decisions (I-862) Completed by Representation Status ........................ 39
  Case Appeals from IJ Decision (I-862 ICCs) Completed for Detained Cases .................. 40
  IJ Decisions (I-862 ICCs) Appealed ...................................................................................... 41
Office of the Chief Administrative Hearing Officer ................................................... 42
  Total Cases Received and Completed .................................................................................. 42
Freedom of Information Act (FOIA) ................................................................................. 44
  FOIA Receipts ........................................................................................................................... 44

# LISTING OF TABLES

Table 1. Immigration Courts Pending Cases ................................................................. 9
Table 2. Total I-862 Immigration Court Matters Received by Court ................................ 11
Table 3. Total I-862 Immigration Court Matters Completed by Court and Type ................ 12
Table 4. Immigration Court Cases Received by Case Type ............................................ 13
Table 5. Immigration Court Initial and Subsequent Case Completions by Case Type ......... 13
Table 6. Credible Fear (CF) and Reasonable Fear (RF) Review ICCs by Decision ............. 15
Table 7. FY 2017 I-862 Changes of Venue and Transfers ............................................ 16
Table 8. I-862 ICCs by Top 25 Countries of Nationality ............................................ 17
Table 9. I-862 ICCs by Top 25 Languages ................................................................. 18
Table 10. FY 2017 I-862 Detained ICCs ................................................................... 20
Table 11. I-862 IHP ICCs by Decision ..................................................................... 21
Table 12. FY 2017 I-862 ICCs with Applications for Relief ......................................... 23
Table 13. Asylum ICCs by Court for FY 2017 ........................................................... 25
Table 14. Asylum Decision Rate by Immigration Court ............................................... 28
Table 15. Asylum Grants by Top 25 Countries of Nationality ...................................... 29
Table 16. Convention Against Torture Cases by Decision ............................................. 30
Table 17. Convention Against Torture Completions by Court ........................................ 31
Table 18. I-862 Cases Grants of Relief ..................................................................... 32
Table 19. I-862 *In Absentia* Orders and ICCs by Respondent Type ............................. 34
Table 20. BIA Receipts and Completions by Type ...................................................... 37
Table 21. BIA Appeals from ICCs by Top 25 Countries of Nationality .......................... 38
Table 22. BIA Detained Completions ....................................................................... 40

# LISTING OF FIGURES

Figure 1. OCIJ Pending Caseload.................................................................................. 8
Figure 2. BIA Pending Caseload ................................................................................... 8
Figure 3. Total I-862 Immigration Court Matters ....................................................... 10
Figure 4. I-862 Immigration Court Matters Received by Type ................................... 10
Figure 5. I-862 Immigration Court Matters Completed by Type ................................ 10
Figure 6. I-862 Case Completions .............................................................................. 14
Figure 7. I-862 ICCs by Decision .............................................................................. 14
Figure 8. I-862 Subsequent Case Completions by Decision ...................................... 14
Figure 9. Administrative Closures .............................................................................. 15
Figure 10. Total I-862 Changes of Venue and Transfers ........................................... 15
Figure 11. I-862 ICCs by Nationality ........................................................................ 17
Figure 12. I-862 ICCs by Language ........................................................................... 18
Figure 13. I-862 ICCs by Detention Status ................................................................ 19
Figure 14. I-862 Standard Detained ICCs .................................................................. 19
Figure 15. I-862 IHP Receipts and ICCs .................................................................... 21
Figure 16. I-862 ICCs by Application Filling Status .................................................. 22
Figure 17. Asylum Receipts ....................................................................................... 24
Figure 18. Asylum Receipts and ICCs ....................................................................... 24
Figure 19. Asylum ICCs by Decision ......................................................................... 26
Figure 20. Affirmative and Defensive Asylum ICCs by Decision ............................. 26
Figure 21. Administrative Closures of Asylum Cases................................................. 27
Figure 22. Asylum and Withholding of Removal ICCs by Decision .......................... 27
Figure 23. Withholding of Removal ICCs by Decision .............................................. 27
Figure 24. Asylum Grants by Country of Nationality ................................................ 29
Figure 25. I-862 *In Absentia* Rates ........................................................................... 33
Figure 26. Immigration Judge Hiring ......................................................................... 35
Figure 27. Total BIA Cases Received and Completed ................................................ 36
Figure 28. BIA Receipts and Completions by Case Type ........................................... 37
Figure 29. Completed Appeals from IJ Decisions by Nationality............................... 38
Figure 30. Completed Appeals from IJ Decisions (I-862 Cases) by Representation Status .................. 39
Figure 31. Complete Case Appeals from I-862 ICCs by Detention Status ................. 40
Figure 32. I-862 ICCs Appealed to BIA .................................................................... 41
Figure 33. OCAHO Receipts and Completions........................................................... 43
Figure 34. OCAHO Receipts and Completions by Type ............................................ 43
Figure 35. FOIA Receipts ........................................................................................... 44

## A NOTE ON FORMAT

Since publication of the Executive Office for Immigration Review (EOIR) fiscal year (FY) 2016 Statistics Yearbook, EOIR has reassessed the format of its annual yearbook, leading to some delay in the release of the FY 2017 Statistics Yearbook. For the FY 2017 Yearbook, EOIR has improved the graphics and the layout to make the data easier to understand. It has also endeavored to improve the precision of reported statistics and their utility for operations and public interest. Further, EOIR's ongoing public release of data reports, many of which have already reported FY 2017 data contained in the Yearbook, and the periodic public release of EOIR's overall Case Data file, which contains almost all data from FY 2017 that is otherwise presented in the Yearbook, potentially render the release of an annual yearbook obsolete. Nevertheless, EOIR anticipates releasing the FY 2018 Statistics Yearbook on a much more expeditious timetable, though its primary commitment will continue to be updates to its online data.

Please refer any questions on these improvements to EOIR's Office of Policy, Communications and Legislative Affairs Division.

# THE EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

EOIR is responsible for adjudicating immigration cases. On behalf of the Attorney General, EOIR interprets and administers federal immigration laws and regulations through immigration court cases, appellate reviews, and administrative hearings in certain types of immigration-related cases. EOIR consists of three adjudicatory bodies: The Office of the Chief Immigration Judge (OCIJ), the Board of Immigration Appeals (BIA), and the Office of the Chief Administrative Hearing Officer (OCAHO).

OCIJ provides overall program direction and establishes priorities for 338 immigration judges (IJ) located in 61 immigration courts throughout the nation. The BIA hears appeals from certain decisions rendered by IJs and by district directors of Department of Homeland Security (DHS) in a wide variety of cases. OCAHO conducts hearings in civil penalty cases arising from the unlawful employment of aliens, unfair immigration-related employment practices, and civil document fraud.

Although this Statistics Yearbook addresses each of EOIR's three adjudicatory bodies, most of the data presented comes from immigration court cases. Most immigration court cases involve removal proceedings. A removal proceeding has two parts. First, an immigration judge assesses whether an alien is removable as charged under the applicable law. If an immigration judge determines that the alien is not removable, then the immigration judge will terminate proceedings.[1] If the immigration judge sustains the charge or charges of removability, proceedings continue. A finding of removability by itself never guarantees that an alien will be ordered removed or that the alien will actually be removed. Rather, if the alien is found removable, the judge must also make a second determination as to whether the alien is eligible for any relief or protection that would allow the alien to remain in the United States. Examples of such relief or protection include asylum, withholding of removal, protection under the Convention Against Torture, adjustment of status, cancellation of removal for lawful permanent residents, cancellation of removal for certain non-permanent residents, and certain waivers provided by the Immigration and Nationality Act.[2]

The removal proceeding begins when the DHS (either U.S. Immigration and Customs Enforcement (ICE), U.S. Citizenship and Immigration Services (USCIS), or U.S. Customs and Border Protection (CBP)) serves an individual with a charging document, called a Notice to Appear (NTA), and files it with an immigration court.

Aliens in removal proceedings, called respondents, have a right to legal representation at no expense to the government. EOIR also provides a list of *pro bono* legal service providers to any respondent who appears in removal proceedings without representation.

---

[1] Although applicable regulations distinguish between the dismissal of proceedings and the termination of proceedings, EOIR classifies both of them as "terminations" for statistical purposes because the outcomes are substantively identical.

[2] Although relief (*e.g.* asylum) and protection (*e.g.* withholding of removal) are legally distinct outcomes, EOIR classifies both of them as "relief" for statistical purposes because the outcomes are similar in that for both, an alien is generally allowed to remain in the United States. Additionally, voluntary departure is a form of relief from removal, but it carries an alternate order of removal if the departure is not timely effectuated. Consequently, EOIR classifies it as a separate outcome for statistical purposes and does not count it as either relief or an order of removal.

During the removal proceeding, the immigration court schedules an initial hearing, referred to as a master calendar hearing, before an immigration judge.  At this hearing, the immigration judge informs the respondent of his or her rights and addresses representation. The judge may also take pleadings, determine removability, and ascertain apparent eligibility for any relief or protection provided for by law. If a judge finds an alien removable and the alien wishes to apply for relief or protection from removal, the judge will schedule an individual merits hearing on the alien's application where both parties (the respondent and DHS) may present arguments and evidence regarding that application.  If the immigration judge finds the alien eligible for relief or protection from removal, the judge will then grant the application.

If an immigration judge finds an alien is removable and ineligible for any relief or protection from removal, the judge will order the alien removed.  ICE is then responsible for any subsequent detention and removal activities. The issuance of a removal order does not guarantee the actual physical removal of an alien from the United States.

Within 30 days of the immigration judge's decision in a removal case, either party or both parties may appeal the decision to the BIA. If the BIA decision is adverse to the alien, the alien may file a petition for review of that decision with the appropriate federal circuit court of appeals within 30 days.

In certain circumstances, a party to a removal case may also file a motion with the immigration court to reconsider or reopen the case after an immigration judge or the BIA has rendered a decision.

In certain circumstances, for aliens detained by DHS or aliens recently released from custody by DHS, an immigration judge may consider requests to redetermine the conditions of custody or to ameliorate the conditions of release. Any alien may make such a request, and an immigration judge will preside over a hearing on the request, commonly called a "bond hearing." Whether an immigration judge grants the request ultimately depends on the facts and applicable law of each case.  Either party or both parties may appeal the immigration judge's bond decision to the BIA.

# STATISTICS YEARBOOK KEY DEFINITIONS

The following definitions are applicable to the FY 2017 Yearbook. Please note that prior Yearbooks may have utilized different definitions and that some terms may have different usages or definitions outside the Yearbook context.

**Immigration court matters** include cases, bond redeterminations, and motions to reopen, reconsider, and recalendar.

**Immigration court cases** include twelve case types, divided into four categories. I-862 case types include removal, deportation, and exclusion cases. I-863 case types include asylum-only, withholding-only, credible fear review, reasonable fear review, and claimed status review cases. Other case types include rescission, non-removal Nicaraguan Adjustment and Central American Relief Act (NACARA), departure control, and continued detention review cases.

**Immigration court receipts** is the total number of charging documents, bond redeterminations, and motions to reopen, reconsider, and recalendar received within the reporting period.

**Immigration court matter completions** is the total number of immigration judge decisions on cases and bond redeterminations, plus the total number of denied motions to reopen, reconsider, and recalendar.

**Initial case completion (ICC)** is the first dispositive decision rendered by an immigration judge. For instance, an I-862 removal case is completed by an order of removal, relief, voluntary departure, termination, or other. An order granting a continuance, changing venue, or administratively closing a case is not a dispositive decision and, thus, does not constitute a case completion.

**Subsequent case completion** refers to any dispositive decision by an immigration judge after an ICC.

# IMMIGRATION COURTS

## PENDING CASELOAD

**Figure 1.** The number of pending immigration court cases has grown by 84 percent since the end of FY 2013, and by 26 percent since the end of FY 2016.



**Figure 1. OCIJ Pending Caseload**

| | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| ■ Pending | 356,060 | 430,062 | 459,973 | 521,329 | 656,067 |

**Figure 2.** The BIA's pending caseload decreased 32 percent from FY 2013 to FY 2017.



**Figure 2. BIA Pending Caseload**

| | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| ■ Pending | 22,944 | 21,872 | 16,975 | 13,955 | 15,638 |

## Table 1. Immigration Courts Pending Cases

| Immigration Court | Pending Cases as of 9/30/2017 |
|---|---|
| Adelanto | 1,258 |
| Arlington | 38,966 |
| Atlanta | 19,159 |
| Aurora | 417 |
| Baltimore | 29,516 |
| Batavia | 317 |
| Bloomington | 6,210 |
| Boston | 22,505 |
| Buffalo | 1,466 |
| Charlotte | 12,981 |
| Chicago | 29,197 |
| Cleveland | 7,835 |
| Dallas | 16,940 |
| Denver | 10,660 |
| Detroit | 4,385 |
| El Paso | 4,879 |
| El Paso SPC | 440 |
| Elizabeth | 672 |
| Eloy | 1,096 |
| Fishkill | 119 |
| Florence | 589 |
| Harlingen | 2,498 |
| Hartford | 4,019 |
| Honolulu | 628 |
| Houston | 48,872 |
| Houston SPC | 1,219 |
| Imperial | 3,444 |
| Kansas City | 6,353 |
| Krome | 722 |
| Las Vegas | 3,652 |
| LaSalle | 318 |
| Los Angeles (N) | 61,885 |
| Los Angeles (D) | 526 |
| Louisville | 4,631 |
| Memphis | 10,858 |
| Miami | 32,486 |
| New Orleans | 8,483 |
| New York City | 84,090 |
| Newark | 33,532 |
| Oakdale | 268 |
| Omaha | 8,653 |
| Orlando | 10,410 |
| Otay Mesa | 808 |
| Otero | 196 |
| Pearsall | 765 |
| Philadelphia | 9,729 |
| Phoenix | 7,287 |
| Port Isabel | 527 |
| Portland | 4,215 |
| Saipan | 98 |
| Salt Lake City | 2,612 |
| San Antonio | 27,484 |
| San Diego | 4,530 |
| San Francisco | 47,878 |
| San Juan | 219 |
| Seattle | 8,789 |
| Stewart | 807 |
| Tacoma | 980 |
| Tucson | 723 |
| Ulster | 156 |
| Varick | 662 |
| York | 448 |
| **Total** | **656,067** |

## TOTAL I-862 MATTERS RECEIVED AND COMPLETED

**Figure 3.** The number of I-862 matters the immigration courts received increased by 28 percent between FY 2016 and FY 2017. The number of I-862 matters the immigration courts completed increased by 17 percent from FY 2016 to FY 2017.

**Figure 3. Total I-862 Immigration Court Matters**

|  | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| ■ Receipts | 271,726 | 307,017 | 274,920 | 316,343 | 405,947 |
| ■ Completions | 217,123 | 203,325 | 204,909 | 207,230 | 243,128 |

**Figure 4.** New NTAs constitute the bulk of the courts' work.

**Figure 4. I-862 Immigration Court Matters Received by Type**

|  | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| ■ New NTAs | 193,690 | 226,670 | 189,676 | 224,963 | 291,258 |
| ■ Bonds | 57,673 | 60,476 | 60,067 | 63,421 | 78,483 |
| ■ Motions | 20,363 | 19,871 | 25,177 | 27,959 | 36,206 |
| Total | 271,726 | 307,017 | 274,920 | 316,343 | 405,947 |

**Figure 5.** The majority of matters completed are I-862 ICCs.

**Figure 5. I-862 Immigration Court Matters Completed by Type**

|  | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| ■ Initial Case Completions | 137,329 | 124,649 | 127,452 | 128,201 | 149,581 |
| ■ Subsequent Case Completions | 17,511 | 14,448 | 13,650 | 12,433 | 10,164 |
| ■ Bonds | 57,531 | 59,852 | 59,543 | 62,197 | 77,278 |
| ■ Motions (Not Granted) | 4,752 | 4,376 | 4,264 | 4,399 | 6,105 |
| Total | 217,123 | 203,325 | 204,909 | 207,230 | 243,128 |

## Table 2. Total I-862 Immigration Court Matters Received by Court

| Immigration Court | FY 2016 Total Matters | FY 2017 | | | | Rate of Change: Total Matters |
|---|---|---|---|---|---|---|
| | | Total Matters | New NTAs | Bonds | Motions | |
| Adelanto | 7,664 | 8,486 | 3,681 | 4,754 | 51 | 11% |
| Arlington | 13,547 | 15,488 | 12,317 | 1,492 | 1,679 | 14% |
| Atlanta | 8,524 | 11,714 | 8,625 | 2,064 | 1,025 | 37% |
| Aurora | 3,044 | 3,848 | 2,016 | 1,776 | 56 | 26% |
| Baltimore | 8,825 | 14,583 | 12,880 | 750 | 953 | 65% |
| Batavia | 2,981 | 2,491 | 1,226 | 1,239 | 26 | -16% |
| Bloomington | 3,192 | 4,748 | 2,740 | 1,369 | 639 | 49% |
| Boston | 7,791 | 11,042 | 8,396 | 1,499 | 1,147 | 42% |
| Buffalo | 534 | 782 | 588 | 0 | 194 | 46% |
| Charlotte | 5,880 | 9,449 | 8,416 | 479 | 554 | 61% |
| Chicago | 9,787 | 11,509 | 7,718 | 2,700 | 1,091 | 18% |
| Cleveland | 3,006 | 4,112 | 2,859 | 806 | 447 | 37% |
| Dallas | 11,501 | 13,236 | 11,393 | 1,183 | 660 | 15% |
| Denver | 1,824 | 2,714 | 2,053 | 241 | 420 | 49% |
| Detroit | 2,697 | 3,753 | 2,210 | 1,197 | 346 | 39% |
| El Paso | 1,091 | 1,741 | 1,422 | 38 | 281 | 60% |
| El Paso SPC | 3,950 | 3,462 | 2,171 | 1,248 | 43 | -12% |
| Elizabeth | 5,442 | 4,931 | 2,336 | 2,551 | 44 | -9% |
| Eloy | 7,154 | 8,040 | 3,582 | 4,383 | 75 | 12% |
| Fishkill | 170 | 169 | 157 | 0 | 12 | -1% |
| Florence | 5,300 | 3,991 | 2,486 | 1,448 | 57 | -25% |
| Harlingen | 3,554 | 3,429 | 2,448 | 0 | 981 | -4% |
| Hartford | 1,586 | 2,648 | 2,202 | 244 | 202 | 67% |
| Honolulu | 413 | 591 | 422 | 122 | 47 | 43% |
| Houston | 13,116 | 14,224 | 12,994 | 3 | 1,227 | 8% |
| Houston SPC | 10,454 | 14,363 | 8,859 | 5,279 | 225 | 37% |
| Imperial | 3,869 | 4,311 | 2,340 | 1,882 | 89 | 11% |
| Kansas City | 3,337 | 5,254 | 3,538 | 1,329 | 387 | 57% |
| Krome | 6,750 | 8,507 | 4,349 | 4,032 | 126 | 26% |
| Las Vegas | 3,179 | 4,447 | 2,817 | 1,166 | 464 | 40% |
| LaSalle | 4,979 | 5,998 | 3,071 | 2,902 | 25 | 20% |
| Los Angeles (N) | 16,209 | 26,188 | 21,300 | 14 | 4,874 | 62% |
| Los Angeles (D) | 4,786 | 4,697 | 1,939 | 2,721 | 37 | -2% |
| Louisville | 1,325 | 1,860 | 1,572 | 7 | 281 | 40% |
| Memphis | 5,143 | 6,430 | 5,278 | 41 | 1,111 | 25% |
| Miami | 11,921 | 16,575 | 13,918 | 53 | 2,604 | 39% |
| New Orleans | 3,866 | 5,180 | 4,616 | 0 | 564 | 34% |
| New York City | 18,445 | 27,131 | 23,895 | 5 | 3,231 | 47% |
| Newark | 5,163 | 8,708 | 7,872 | 2 | 834 | 69% |
| Oakdale | 4,206 | 4,782 | 2,405 | 2,329 | 48 | 14% |
| Omaha | 2,993 | 4,504 | 3,283 | 745 | 476 | 50% |
| Orlando | 5,271 | 8,241 | 6,012 | 1,100 | 1,129 | 56% |
| Otay Mesa | 3,284 | 4,938 | 2,145 | 2,751 | 42 | 50% |
| Otero | 350 | 1,904 | 1,179 | 715 | 10 | 444% |
| Pearsall | 6,658 | 8,168 | 5,366 | 2,764 | 38 | 23% |
| Philadelphia | 3,036 | 4,013 | 3,493 | 2 | 518 | 32% |
| Phoenix | 2,721 | 3,335 | 2,378 | 3 | 954 | 23% |
| Port Isabel | 3,895 | 4,062 | 2,605 | 1,394 | 63 | 4% |
| Portland | 1,558 | 1,357 | 1,108 | 13 | 236 | 11% |
| Saipan | 21 | 115 | 111 | 1 | 3 | 448% |
| Salt Lake City | 2,004 | 1,258 | 887 | 110 | 261 | -56% |
| San Antonio | 6,146 | 7,999 | 5,062 | 1,613 | 1,324 | 30% |
| San Diego | 2,752 | 2,842 | 2,125 | 9 | 708 | 3% |
| San Francisco | 17,127 | 20,328 | 15,162 | 3,171 | 1,995 | 19% |
| San Juan | 251 | 336 | 135 | 17 | 184 | 34% |
| Seattle | 2,687 | 2,757 | 2,164 | 0 | 593 | 3% |
| Stewart | 4,295 | 7,769 | 5,021 | 2,669 | 79 | 81% |
| Tacoma | 6,556 | 6,648 | 3,185 | 3,418 | 45 | 1% |
| Tucson | 680 | 608 | 489 | 0 | 119 | -11% |
| Ulster | 300 | 241 | 222 | 0 | 19 | -20% |
| Varick | 3,133 | 3,253 | 1,451 | 1,721 | 81 | 4% |
| York | 4,420 | 5,659 | 2,568 | 2,919 | 172 | 28% |
| **Total** | **316,343** | **405,947** | **291,258** | **78,483** | **36,206** | **22%** |

**Key**

25%+ **growth** in Total Matters Received

25%+ **decrease** in Total Matters Received

**Table 3. Total I-862 Immigration Court Matters Completed by Court and Type**

| Immigration Court | FY 2016 Total Matters | FY 2017 | | | | | Rate of Change: Total Matters | Key |
|---|---|---|---|---|---|---|---|---|
| | | Total Matters | Initial Case Completions | Subsequent Case Completions | Bonds | Motions Not Granted | | |
| Adelanto | 5,227 | 6,636 | 1,873 | 70 | 4,677 | 16 | 27% | |
| Arlington | 6,877 | 6,509 | 4,628 | 313 | 1,404 | 164 | -5% | 25%+ **growth** |
| Atlanta | 7,185 | 7,473 | 4,873 | 213 | 2,015 | 372 | 4% | in Total Matters |
| Aurora | 2,108 | 2,856 | 1,013 | 30 | 1,794 | 19 | 35% | Completed |
| Baltimore | 4,645 | 4,264 | 3,066 | 292 | 757 | 149 | -8% | |
| Batavia | 1,903 | 1,837 | 562 | 25 | 1,244 | 6 | -3% | 25%+ **decrease** |
| Bloomington | 2,059 | 2,795 | 1,358 | 84 | 1,235 | 118 | 36% | in Total Matters |
| Boston | 4,579 | 4,851 | 2,882 | 384 | 1,520 | 65 | 6% | Completed |
| Buffalo | 710 | 601 | 497 | 65 | 0 | 39 | -15% | |
| Charlotte | 4,652 | 4,505 | 3,731 | 203 | 479 | 92 | -3% | |
| Chicago | 5,705 | 7,879 | 4,688 | 378 | 2,699 | 114 | 38% | |
| Cleveland | 2,005 | 2,439 | 1,522 | 104 | 776 | 37 | 22% | |
| Dallas | 8,659 | 8,148 | 6,574 | 250 | 1,140 | 184 | -6% | |
| Denver | 735 | 1,781 | 1,336 | 151 | 229 | 65 | 142% | |
| Detroit | 2,097 | 2,959 | 1,629 | 92 | 1,138 | 100 | 41% | |
| El Paso | 938 | 1,421 | 1,214 | 60 | 38 | 109 | 51% | |
| El Paso SPC | 2,793 | 2,677 | 1,421 | 30 | 1,203 | 23 | -4% | |
| Elizabeth | 3,780 | 4,043 | 1,441 | 54 | 2,527 | 21 | 7% | |
| Eloy | 5,332 | 6,685 | 2,174 | 48 | 4,436 | 27 | 25% | |
| Fishkill | 125 | 163 | 150 | 6 | 0 | 7 | 30% | |
| Florence | 3,126 | 2,362 | 924 | 21 | 1,394 | 23 | -24% | |
| Harlingen | 2,338 | 2,535 | 1,794 | 206 | 0 | 535 | 8% | |
| Hartford | 1,214 | 1,263 | 898 | 91 | 240 | 34 | 4% | |
| Honolulu | 521 | 634 | 485 | 33 | 113 | 3 | 22% | |
| Houston | 6,137 | 7,302 | 6,776 | 355 | 3 | 168 | 19% | |
| Houston SPC | 6,037 | 9,564 | 4,513 | 55 | 4,947 | 49 | 58% | |
| Imperial | 2,369 | 2,434 | 519 | 25 | 1,873 | 17 | 3% | |
| Kansas City | 2,156 | 3,238 | 1,796 | 109 | 1,282 | 51 | 50% | |
| Krome | 5,083 | 7,062 | 3,002 | 86 | 3,899 | 75 | 39% | |
| Las Vegas | 2,646 | 3,766 | 2,338 | 216 | 1,147 | 65 | 42% | |
| LaSalle | 3,935 | 5,016 | 2,111 | 30 | 2,860 | 15 | 27% | |
| Los Angeles (N) | 11,641 | 11,807 | 9,761 | 1,312 | 14 | 720 | 1% | |
| Los Angeles (D) | 3,866 | 4,265 | 1,372 | 63 | 2,815 | 15 | 10% | |
| Louisville | 816 | 845 | 751 | 33 | 6 | 55 | 4% | |
| Memphis | 2,990 | 3,636 | 3,267 | 153 | 42 | 174 | 22% | |
| Miami | 5,833 | 7,950 | 6,814 | 695 | 51 | 390 | 36% | |
| New Orleans | 2,124 | 2,698 | 2,496 | 121 | 0 | 81 | 27% | |
| New York City | 14,662 | 12,887 | 11,445 | 1,059 | 1 | 382 | -12% | |
| Newark | 3,179 | 3,176 | 2,801 | 253 | 9 | 113 | 0% | |
| Oakdale | 2,907 | 3,850 | 1,460 | 21 | 2,334 | 35 | 32% | |
| Omaha | 1,611 | 2,625 | 1,697 | 122 | 765 | 41 | 63% | |
| Orlando | 3,105 | 5,333 | 3,780 | 359 | 1,056 | 138 | 72% | |
| Otay Mesa | 2,094 | 3,587 | 764 | 31 | 2,772 | 20 | 71% | |
| Otero | 238 | 1,804 | 1,116 | 5 | 679 | 4 | 658% | |
| Pearsall | 3,533 | 4,137 | 1,420 | 17 | 2,685 | 15 | 17% | |
| Philadelphia | 1,659 | 1,871 | 1,653 | 155 | 2 | 61 | 13% | |
| Phoenix | 1,797 | 2,320 | 2,093 | 159 | 3 | 65 | 29% | |
| Port Isabel | 2,450 | 2,599 | 1,160 | 36 | 1,367 | 36 | 6% | |
| Portland | 785 | 614 | 530 | 63 | 13 | 8 | -22% | |
| Saipan | 21 | 25 | 18 | 4 | 1 | 2 | 19% | |
| Salt Lake City | 1,714 | 1,286 | 991 | 89 | 148 | 58 | -25% | |
| San Antonio | 2,904 | 5,226 | 3,157 | 262 | 1,481 | 326 | 80% | |
| San Diego | 1,306 | 1,708 | 1,432 | 115 | 6 | 155 | 31% | |
| San Francisco | 10,357 | 10,115 | 6,267 | 392 | 3,268 | 188 | -2% | |
| San Juan | 193 | 158 | 105 | 24 | 17 | 12 | -18% | |
| Seattle | 2,115 | 1,806 | 1,540 | 167 | 0 | 99 | -15% | |
| Stewart | 3,799 | 6,979 | 4,153 | 86 | 2,694 | 46 | 84% | |
| Tacoma | 5,053 | 5,866 | 2,278 | 39 | 3,530 | 19 | 16% | |
| Tucson | 679 | 729 | 672 | 43 | 0 | 14 | 7% | |
| Ulster | 204 | 218 | 199 | 9 | 0 | 10 | 7% | |
| Varick | 2,468 | 2,560 | 892 | 53 | 1,598 | 17 | 4% | |
| York | 3,451 | 4,750 | 1,709 | 145 | 2,852 | 44 | 38% | |
| **Total** | **207,230** | **243,128** | **149,581** | **10,164** | **77,278** | **6,105** | **17%** | |

AR161

## CASES RECEIVED AND COMPLETED BY TYPE

### Table 4. Immigration Court Cases Received by Case Type

| Type of Case | FY 2013 | FY 2014 | FY 2015 | FY 2016 | FY 2017 |
|---|---|---|---|---|---|
| Removal | 193,689 | 226,669 | 189,674 | 224,962 | 291,258 |
| Credible Fear | 1,770 | 6,507 | 6,644 | 7,464 | 6,532 |
| Withholding Only | 2,328 | 3,145 | 3,061 | 3,261 | 3,388 |
| Reasonable Fear | 1,156 | 1,778 | 2,608 | 2,521 | 2,476 |
| Asylum Only | 393 | 294 | 255 | 227 | 399 |
| Rescission | 46 | 31 | 45 | 27 | 37 |
| Claimed Status | 31 | 22 | 21 | 11 | 6 |
| Continued Detention Review | 0 | 3 | 2 | 1 | 0 |
| Deportation | 1 | 1 | 2 | 1 | 0 |
| NACARA | 2 | 4 | 1 | 0 | 0 |
| **Total** | **199,416** | **238,454** | **202,313** | **238,475** | **304,096** |

### Table 5. Immigration Court Initial and Subsequent Case Completions by Case Type

| Type of Case | FY 2013 | | FY 2014 | | FY 2015 | | FY 2016 | | FY 2017 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Initial | Subsequent | Initial | Subsequent | Initial | Subsequent | Initial | Subsequent | Initial | Subsequent |
| Deportation | 601 | 1,592 | 472 | 1,157 | 452 | 1,100 | 477 | 1,082 | 381 | 818 |
| Exclusion | 48 | 154 | 35 | 103 | 19 | 103 | 35 | 83 | 22 | 62 |
| Removal | 136,680 | 15,765 | 124,142 | 13,188 | 126,981 | 12,447 | 127,689 | 11,268 | 149,178 | 9,284 |
| Credible Fear | 1,726 | 0 | 6,353 | 0 | 6,624 | 2 | 7,492 | 0 | 6,533 | 0 |
| Reasonable Fear | 1,135 | 0 | 1,707 | 0 | 2,559 | 0 | 2,536 | 2 | 2,437 | 0 |
| Claimed Status | 28 | 2 | 22 | 0 | 19 | 0 | 14 | 1 | 4 | 1 |
| Asylum Only | 307 | 72 | 296 | 75 | 230 | 49 | 200 | 51 | 261 | 64 |
| Rescission | 35 | 5 | 28 | 3 | 26 | 5 | 28 | 2 | 33 | 1 |
| Continued Detention Review | 2 | 0 | 2 | 0 | 3 | 0 | 2 | 0 | 0 | 0 |
| NACARA | 2 | 5 | 1 | 1 | 2 | 0 | 1 | 1 | 3 | 2 |
| Withholding Only | 1,300 | 64 | 2,553 | 107 | 2,209 | 127 | 2,501 | 132 | 2,865 | 163 |
| **Total** | **141,864** | **17,659** | **135,611** | **14,634** | **139,124** | **13,833** | **140,975** | **12,622** | **161,717** | **10,395** |

## I-862 CASE COMPLETIONS BY DECISION

**Figure 6.** I-862 ICCs increased 17 percent from FY 2016 to FY 2017.

**Figure 6. I-862 Case Completions**

| | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| ■ Subsequent Case Completion | 17,511 | 14,448 | 13,650 | 12,433 | 10,164 |
| ■ Initial Case Completion | 137,329 | 124,649 | 127,452 | 128,201 | 149,581 |
| Total | 154,840 | 139,097 | 141,102 | 140,634 | 159,745 |

**Figure 7.** All I-862 case outcomes except termination increased in FY 2017.

**Figure 7. I-862 ICCs by Decision**

| | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| ■ Other | 499 | 366 | 436 | 481 | 514 |
| ■ Removal | 75,384 | 72,715 | 75,727 | 75,092 | 97,457 |
| ■ Voluntary Departure | 17,902 | 13,666 | 9,911 | 9,055 | 13,603 |
| ■ Relief | 24,456 | 20,297 | 17,614 | 17,248 | 19,456 |
| ■ Termination | 19,088 | 17,605 | 23,764 | 26,325 | 18,551 |
| Total | 137,329 | 124,649 | 127,452 | 128,201 | 149,581 |

**Figure 8.** For I-862 cases, subsequent case completions have decreased by about seven percent between FY 2013 and FY 2017.

**Figure 8. I-862 Subsequent Case Completions by Decision**

| | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| ■ Removal | 6,781 | 5,824 | 6,049 | 4,626 | 3,988 |
| ■ Termination | 5,381 | 4,625 | 4,699 | 5,006 | 3,286 |
| ■ Relief | 3,905 | 2,897 | 2,204 | 2,129 | 2,166 |
| ■ Voluntary Departure | 1,192 | 836 | 507 | 459 | 540 |
| ■ Other | 252 | 266 | 191 | 213 | 184 |
| Total | 17,511 | 14,448 | 13,650 | 12,433 | 10,164 |

**Figure 9.** Administrative closures decreased by about 40 percent from FY 2016 to FY 2017.



**Figure 9. Administrative Closures**

| | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| Administrative Closure | 32,545 | 34,422 | 46,214 | 53,736 | 32,394 |

**Figure 10.** For I-862 cases, changes of venue have increased 35 percent since FY 2013 and transfers have increased 23 percent in the same period.



**Figure 10. Total I-862 Changes of Venue and Transfers**

| | FY 2013 | FY 2014 | FY 2015 | FY 2016 | FY 2017 |
|---|---|---|---|---|---|
| Changes of Venue | 50,909 | 64,520 | 50,303 | 56,239 | 68,949 |
| Transfers | 37,826 | 40,895 | 37,662 | 41,868 | 46,584 |
| Total | 88,735 | 105,415 | 87,965 | 98,107 | 115,533 |

**Table 6. Credible Fear (CF) and Reasonable Fear (RF) Review ICCs by Decision**

| Disposition | FY 13 | | FY 14 | | FY 15 | | FY 16 | | FY 17 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | CF | RF | CF | RF | CF | RF | CF | RF | CF | RF |
| Affirmed DHS Decision | 1,503 | 977 | 5,232 | 1,439 | 5,219 | 2,053 | 5,333 | 1,915 | 4,851 | 1,811 |
| Vacated DHS Decision | 206 | 131 | 1,055 | 230 | 1,347 | 451 | 2,088 | 571 | 1,647 | 588 |
| Other | 18 | 30 | 67 | 43 | 65 | 64 | 74 | 57 | 38 | 45 |
| Total | 1,727 | 1,138 | 6,354 | 1,712 | 6,631 | 2,568 | 7,495 | 2,543 | 6,536 | 2,444 |

**Table 7. FY 2017 I-862 Changes of Venue and Transfers**

| Immigration Court | Changes of Venue | Transfers | Total |
|---|---|---|---|
| Adelanto | 2,327 | 30 | 2,357 |
| Arlington | 2,154 | 2,053 | 4,207 |
| Atlanta | 2,543 | 2,961 | 5,504 |
| Aurora | 1,080 | 18 | 1,098 |
| Baltimore | 915 | 31 | 946 |
| Batavia | 394 | 442 | 836 |
| Bloomington | 216 | 668 | 884 |
| Boston | 432 | 981 | 1,413 |
| Buffalo | 516 | 110 | 626 |
| Charlotte | 660 | 37 | 697 |
| Chicago | 1,845 | 2,042 | 3,887 |
| Cleveland | 324 | 507 | 831 |
| Dallas | 593 | 2,068 | 2,661 |
| Denver | 697 | 170 | 867 |
| Detroit | 303 | 627 | 930 |
| El Paso | 1,648 | 243 | 1,891 |
| El Paso SPC | 20 | 1,188 | 1,208 |
| Elizabeth | 24 | 1,406 | 1,430 |
| Eloy | 1,933 | 1 | 1,934 |
| Fishkill | 28 | 25 | 53 |
| Florence | 1,887 | 11 | 1,898 |
| Harlingen | 3,675 | 232 | 3,907 |
| Hartford | 227 | 208 | 435 |
| Honolulu | 24 | 50 | 74 |
| Houston | 7,335 | 2,706 | 10,041 |
| Houston SPC | 210 | 5,556 | 5,766 |
| Imperial | 1,949 | 2,146 | 4,095 |
| Kansas City | 602 | 797 | 1,399 |
| Krome | 1,765 | 509 | 2,274 |
| Las Vegas | 486 | 669 | 1,155 |
| LaSalle | 1,219 | 186 | 1,405 |
| Los Angeles (N) | 3,598 | 317 | 3,915 |
| Los Angeles (D) | 148 | 1,367 | 1,515 |
| Louisville | 197 | 210 | 407 |
| Memphis | 559 | 831 | 1,390 |
| Miami | 1,839 | 23 | 1,862 |
| New Orleans | 1,496 | 10 | 1,506 |
| New York City | 3,061 | 232 | 3,293 |
| Newark | 1,868 | 765 | 2,633 |
| Oakdale | 826 | 454 | 1,280 |
| Omaha | 250 | 657 | 907 |
| Orlando | 781 | 464 | 1,245 |
| Otay Mesa | 281 | 1,274 | 1,555 |
| Otero | 6 | 407 | 413 |
| Pearsall | 444 | 3,775 | 4,219 |
| Philadelphia | 626 | 294 | 920 |
| Phoenix | 1,443 | 21 | 1,464 |
| Port Isabel | 36 | 1,242 | 1,278 |
| Portland | 265 | 60 | 325 |
| Saipan | 0 | 0 | 0 |
| Salt Lake City | 331 | 211 | 542 |
| San Antonio | 5,723 | 1,757 | 7,480 |
| San Diego | 1,635 | 279 | 1,914 |
| San Francisco | 1,436 | 2,375 | 3,811 |
| San Juan | 57 | 9 | 66 |
| Seattle | 376 | 3 | 379 |
| Stewart | 926 | 0 | 926 |
| Tacoma | 1,249 | 1 | 1,250 |
| Tucson | 181 | 2 | 183 |
| Ulster | 64 | 32 | 96 |
| Varick | 123 | 505 | 628 |
| York | 1,093 | 329 | 1,422 |
| **Total** | **68,949** | **46,584** | **115,533** |

## I-862 ICCs by Country of Nationality

EOIR IJs hear cases from many different nationalities each year.

**Figure 11.** About 75 percent of I-862 ICCs in FY 2017 were cases of nationals from Mexico, Guatemala, Honduras, or El Salvador.

**Table 8.** In the last five years, Mexico, Guatemala, Honduras, El Salvador, China, Ecuador, Dominican Republic, Cuba, and India were nine of the top ten countries of nationality.

**Figure 11. I-862 ICCs by Nationality**



| | Initial Case Completions |
|---|---|
| ■ Mexico | 47,309 |
| ■ Guatemala | 25,016 |
| ■ Honduras | 20,834 |
| ■ El Salvador | 19,633 |
| ■ Other | 36,789 |

### Table 8. I-862 ICCs by Top 25 Countries of Nationality

| Rank | FY 2013 | FY 2014 | FY 2015 | FY 2016 | FY 2017 |
|---|---|---|---|---|---|
| 1 | Mexico | Mexico | Mexico | Mexico | Mexico |
| 2 | Guatemala | Guatemala | Honduras | Guatemala | Guatemala |
| 3 | El Salvador | Honduras | Guatemala | Honduras | Honduras |
| 4 | Honduras | El Salvador | El Salvador | El Salvador | El Salvador |
| 5 | China | China | China | China | China |
| 6 | Cuba | Cuba | Ecuador | Ecuador | Haiti |
| 7 | Dominican Republic | Dominican Republic | Dominican Republic | Dominican Republic | Ecuador |
| 8 | Jamaica | Ecuador | India | Cuba | Dominican Republic |
| 9 | Ecuador | India | Cuba | India | Cuba |
| 10 | India | Jamaica | Jamaica | Jamaica | India |
| 11 | Colombia | Colombia | Haiti | Colombia | Brazil |
| 12 | Philippines | Haiti | Colombia | Haiti | Jamaica |
| 13 | Haiti | Philippines | Peru | Brazil | Colombia |
| 14 | Brazil | Peru | Philippines | Somalia | Nicaragua |
| 15 | Peru | Nicaragua | Nicaragua | Nicaragua | Romania |
| 16 | Nicaragua | Brazil | Brazil | Peru | Peru |
| 17 | Nigeria | Nepal | Somalia | Ghana | Philippines |
| 18 | Russia | Nigeria | Nigeria | Philippines | Nepal |
| 19 | Nepal | Ethiopia | Ethiopia | Nigeria | Pakistan |
| 20 | Pakistan | Russia | Nepal | Pakistan | Ghana |
| 21 | Ethiopia | Egypt | Bangladesh | Nepal | Nigeria |
| 22 | Kenya | Pakistan | Pakistan | Bangladesh | Eritrea |
| 23 | Canada | Vietnam | Ghana | Canada | Venezuela |
| 24 | Vietnam | Kenya | Vietnam | Romania | Canada |
| 25 | Egypt | Canada | Canada | Egypt | Cameroon |

## I-862 ICCs by Language

In parallel to the many nationalities that come before IJs, there are similarly hundreds of languages in which hearings are conducted. EOIR provides interpretation services for all aliens in proceedings as appropriate.

**Figure 12.** About 85 percent of I-862 ICCs in FY 2017 were cases of Spanish- or English-speaking aliens.

**Table 9.** In the last five years, seven of the top ten languages were Spanish, English, Mandarin, Creole, Punjabi, Arabic, or Russian.

### Figure 12. I-862 ICCs by Language



| | Initial Case Completions |
|---|---|
| ■ Spanish | 111,321 |
| ■ English | 16,383 |
| ■ Mandarin | 4,486 |
| □ Other | 17,391 |

### Table 9. I-862 ICCs by Top 25 Languages

| Rank | FY 2013 | FY 2014 | FY 2015 | FY 2016 | FY 2017 |
|---|---|---|---|---|---|
| 1 | Spanish | Spanish | Spanish | Spanish | Spanish |
| 2 | English | English | English | English | English |
| 3 | Mandarin | Mandarin | Mandarin | Mandarin | Mandarin |
| 4 | Unknown Language | Unknown Language | Unknown Language | Unknown Language | Creole |
| 5 | Russian | Russian | Arabic | Arabic | Unknown Language |
| 6 | Arabic | Arabic | Russian | Punjabi | Punjabi |
| 7 | Punjabi | Punjabi | Punjabi | Russian | Portuguese |
| 8 | Creole | Creole | Creole | Portuguese | Arabic |
| 9 | Portuguese | French | Somali | Mam | Russian |
| 10 | French | Portuguese | French | Creole | Mam |
| 11 | Korean | Korean | Portuguese | Somali | French |
| 12 | Foo Chow | Nepali | Quiche | Quiche | Quiche |
| 13 | Nepali | Somali | Nepali | French | Nepali |
| 14 | Amharic | Foo Chow | Bengali | Nepali | Tigrigna - Eritrean |
| 15 | Tagalog | Amharic | Mam | Foo Chow | Romanian-Moldovan |
| 16 | Romanian-Moldovan | Vietnamese | Foo chow | Bengali | Konjobal |
| 17 | Vietnamese | Gujarati | Korean | Amharic | Somali |
| 18 | Gujarati | Quiche | Amharic | Korean | Bengali |
| 19 | Tigrigna - Eritrean | Mam | Vietnamese | Tigrigna - Eritrean | Urdu |
| 20 | Urdu | Tagalog | Tigrigna - Eritrean | Konjobal | Foo Chow |
| 21 | Indonesian | Urdu | Gujarati | Romanian-Moldovan | Korean |
| 22 | Armenian | Albanian | Albanian | Urdu | Albanian |
| 23 | Somali | Armenian | Konjobal | Albanian | Amharic |
| 24 | Albanian | Indonesian | Tagalog | Vietnamese | Vietnamese |
| 25 | Tamil | Tigrigna - Eritrean | Urdu | Armenian | Gujarati |

## I-862 ICCs FOR DETAINED CASES

Detention locations include DHS Service Processing Centers (SPC), DHS contract detention facilities, state and local government jails, and Bureau of Prisons institutions. For the purpose of Figure 13, Institutional Hearing Program (IHP) cases are considered detained cases as are cases of unaccompanied alien children (UAC) in the custody of the Department of Health and Human Services.

**Figure 13.** Detained I-862 ICCs increased 36 percent from FY 2016 to FY 2017.

### Figure 13. I-862 ICCs by Detention Status

| | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| ■ Initial Case Completions for Detained Aliens | 58,813 | 51,145 | 40,358 | 39,912 | 54,098 |
| ▨ Initial Case Completions for All Aliens | 137,329 | 124,649 | 127,452 | 128,201 | 149,581 |
| Percent Detained | 43% | 41% | 32% | 31% | 36% |

**Figure 14.** The number of standard detained completions – aliens at least 18 years of age that are not at an IHP location, are not UAC or in HHS custody, and are not considered to have competency concerns or to be subject to the *Franco* litigation – have increased 39 percent from FY 2016 to FY 2017.

### Figure 14. I-862 Standard Detained ICCs



| | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| ■ Completions | 49,121 | 42,605 | 32,104 | 30,749 | 42,881 |

**Table 10. FY 2017 I-862 Detained ICCs**

| Immigration Court | Completions |
|---|---|
| Adelanto | 1,848 |
| Arlington | 1,132 |
| Atlanta | 2,072 |
| Aurora | 1,001 |
| Baltimore | 423 |
| Batavia | 539 |
| Bloomington | 735 |
| Boston | 804 |
| Buffalo | 0 |
| Charlotte | 8 |
| Chicago | 1,734 |
| Cleveland | 547 |
| Dallas | 3,095 |
| Denver | 91 |
| Detroit | 905 |
| El Paso | 113 |
| El Paso SPC | 1,421 |
| Elizabeth | 1,439 |
| Eloy | 2,152 |
| Fishkill | 150 |
| Florence | 921 |
| Harlingen | 62 |
| Hartford | 228 |
| Honolulu | 145 |
| Houston | 46 |
| Houston SPC | 4,513 |
| Imperial | 338 |
| Kansas City | 687 |
| Krome | 2,966 |
| Las Vegas | 1,036 |
| LaSalle | 2,106 |
| Los Angeles (N) | 58 |
| Los Angeles (D) | 1,368 |
| Louisville | 0 |
| Memphis | 26 |
| Miami | 198 |
| New Orleans | 5 |
| New York City | 6 |
| Newark | 2 |
| Oakdale | 1,459 |
| Omaha | 695 |
| Orlando | 729 |
| Otay Mesa | 750 |
| Otero | 1,115 |
| Pearsall | 1,419 |
| Philadelphia | 11 |
| Phoenix | 69 |
| Port Isabel | 1,158 |
| Portland | 5 |
| Saipan | 3 |
| Salt Lake City | 179 |
| San Antonio | 464 |
| San Diego | 29 |
| San Francisco | 1,491 |
| San Juan | 26 |
| Seattle | 0 |
| Stewart | 4,143 |
| Tacoma | 2,276 |
| Tucson | 379 |
| Ulster | 199 |
| Varick | 876 |
| York | 1,703 |
| **Total** | **54,098** |

# I-862 INSTITUTIONAL HEARING PROGRAM CASES RECEIVED AND COMPLETED

IHP is a cooperative effort between EOIR, DHS, and various federal, state, and municipal corrections agencies. IJs and court staff either travel to IHP facilities to conduct IHP hearings, or the IJs conduct the hearings by video teleconferencing.

**Figure 15.** New IHP case receipts declined in FY 2017.

**Figure 15. I-862 IHP Receipts and ICCs**



| | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| ■ New NTAs | 4,048 | 3,916 | 2,914 | 3,568 | 2,581 |
| ■ Initial Case Completions | 3,385 | 3,191 | 2,714 | 2,973 | 2,463 |

**Table 11. I-862 IHP ICCs by Decision**

| Disposition | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| Removal | 3,277 | 3,075 | 2,573 | 2,726 | 2,333 |
| Voluntary Departure | 2 | 3 | 7 | 28 | 10 |
| Termination | 80 | 86 | 91 | 94 | 53 |
| Relief | 23 | 27 | 39 | 117 | 63 |
| Other | 3 | 0 | 4 | 8 | 4 |
| Total Completions | 3,385 | 3,191 | 2,714 | 2,973 | 2,463 |

## I-862 ICCs with Applications for Relief

**Figure 16.** The percent of completed I-862 cases with applications for relief has been roughly constant over the past five years.



### Figure 16. I-862 ICCs by Application Filling Status

|  | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| ■ With Applications | 50,834 | 44,974 | 40,789 | 45,094 | 56,035 |
| ■ Without Applications | 86,495 | 79,675 | 86,663 | 83,107 | 93,546 |
| Total | 137,329 | 124,649 | 127,452 | 128,201 | 149,581 |

**Table 12. FY 2017 I-862 ICCs with Applications for Relief**

| Immigration Court | Initial Case Completions | Number of Completions with Applications | Percent with Applications |
|---|---|---|---|
| Adelanto | 1,873 | 837 | 45% |
| Arlington | 4,628 | 1,644 | 36% |
| Atlanta | 4,873 | 1,050 | 22% |
| Aurora | 1,013 | 320 | 32% |
| Baltimore | 3,066 | 981 | 32% |
| Batavia | 562 | 178 | 32% |
| Bloomington | 1,358 | 490 | 36% |
| Boston | 2,882 | 1,496 | 52% |
| Buffalo | 497 | 208 | 42% |
| Charlotte | 3,731 | 675 | 18% |
| Chicago | 4,688 | 1,530 | 33% |
| Cleveland | 1,522 | 535 | 35% |
| Dallas | 6,574 | 1,243 | 19% |
| Denver | 1,336 | 491 | 37% |
| Detroit | 1,629 | 664 | 41% |
| El Paso | 1,214 | 287 | 24% |
| El Paso SPC | 1,421 | 208 | 15% |
| Elizabeth | 1,441 | 698 | 48% |
| Eloy | 2,174 | 526 | 24% |
| Fishkill | 150 | 32 | 21% |
| Florence | 924 | 224 | 24% |
| Harlingen | 1,794 | 540 | 30% |
| Hartford | 898 | 394 | 44% |
| Honolulu | 485 | 315 | 65% |
| Houston | 6,776 | 2,735 | 40% |
| Houston SPC | 4,513 | 991 | 22% |
| Imperial | 519 | 190 | 37% |
| Kansas City | 1,796 | 529 | 29% |
| Krome | 3,002 | 1,283 | 43% |
| Las Vegas | 2,338 | 1,054 | 45% |
| LaSalle | 2,111 | 346 | 16% |
| Los Angeles (N) | 9,761 | 4,663 | 48% |
| Los Angeles (D) | 1,372 | 511 | 37% |
| Louisville | 751 | 48 | 6% |
| Memphis | 3,267 | 1,069 | 33% |
| Miami | 6,814 | 2,531 | 37% |
| New Orleans | 2,496 | 337 | 14% |
| New York City | 11,445 | 7,622 | 67% |
| Newark | 2,801 | 1,064 | 38% |
| Oakdale | 1,460 | 265 | 18% |
| Omaha | 1,697 | 640 | 38% |
| Orlando | 3,780 | 1,815 | 48% |
| Otay Mesa | 764 | 281 | 37% |
| Otero | 1,116 | 298 | 27% |
| Pearsall | 1,420 | 436 | 31% |
| Philadelphia | 1,653 | 680 | 41% |
| Phoenix | 2,093 | 1,040 | 50% |
| Port Isabel | 1,160 | 602 | 52% |
| Portland | 530 | 347 | 65% |
| Saipan | 18 | 2 | 11% |
| Salt Lake City | 991 | 477 | 48% |
| San Antonio | 3,157 | 890 | 28% |
| San Diego | 1,432 | 451 | 31% |
| San Francisco | 6,267 | 3,199 | 51% |
| San Juan | 105 | 42 | 40% |
| Seattle | 1,540 | 970 | 63% |
| Stewart | 4,153 | 710 | 17% |
| Tacoma | 2,278 | 959 | 42% |
| Tucson | 672 | 233 | 35% |
| Ulster | 199 | 66 | 33% |
| Varick | 892 | 457 | 51% |
| York | 1,709 | 636 | 37% |
| **Total** | **149,581** | **56,035** | **37%** |

| Key |
|---|
| >50% of completions had applications |
| <15% of completions had applications |

AR172

## ASYLUM CASES RECEIVED AND COMPLETED

There are two types of asylum processes – defensive and affirmative. The defensive asylum process applies to aliens who appear before EOIR and who request asylum before an IJ. The affirmative asylum process applies to aliens who initially file an asylum application with USCIS and, subsequently, have that application referred by USCIS to EOIR.

**Figure 17.** Defensive asylum receipts have increased significantly (423 percent) from FY 2013 to FY 2017. In the same period, affirmative asylum receipts have increased 12 percent.



**Figure 17. Asylum Receipts**

| | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| Affirmative | 19,931 | 16,267 | 17,339 | 12,753 | 22,252 |
| Defensive | 23,101 | 30,876 | 45,884 | 68,980 | 120,709 |
| Total | 43,032 | 47,143 | 63,223 | 81,733 | 142,961 |

**Figure 18.** Asylum receipts increased 232 percent from FY 2013 to FY 2017; completions increased by 51 percent over the same period.



**Figure 18. Asylum Receipts and ICCs**

| | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| Receipts | 43,032 | 47,143 | 63,223 | 81,733 | 142,961 |
| Completions | 28,623 | 27,788 | 27,699 | 33,116 | 43,137 |

**Table 13. Asylum ICCs by Court for FY 2017**

| Immigration Court | Completions |
|---|---|
| Adelanto | 738 |
| Arlington | 1,377 |
| Atlanta | 756 |
| Aurora | 225 |
| Baltimore | 831 |
| Batavia | 145 |
| Bloomington | 354 |
| Boston | 861 |
| Buffalo | 71 |
| Charlotte | 464 |
| Chicago | 955 |
| Cleveland | 409 |
| Dallas | 793 |
| Denver | 329 |
| Detroit | 365 |
| El Paso | 91 |
| El Paso SPC | 150 |
| Elizabeth | 531 |
| Eloy | 354 |
| Fishkill | 5 |
| Florence | 170 |
| Harlingen | 364 |
| Hartford | 316 |
| Honolulu | 289 |
| Houston | 2,493 |
| Houston SPC | 546 |
| Imperial | 143 |
| Kansas City | 352 |
| Krome | 1,011 |
| Las Vegas | 726 |
| LaSalle | 202 |
| Los Angeles (N) | 3,697 |
| Los Angeles (D) | 424 |
| Louisville | 31 |
| Memphis | 749 |
| Miami | 1,740 |
| New Orleans | 231 |
| New York City | 7,108 |
| Newark | 759 |
| Oakdale | 178 |
| Omaha | 434 |
| Orlando | 1,451 |
| Otay Mesa | 232 |
| Otero | 277 |
| Pearsall | 336 |
| Philadelphia | 500 |
| Phoenix | 603 |
| Port Isabel | 477 |
| Portland | 304 |
| Saipan | 0 |
| Salt Lake City | 286 |
| San Antonio | 808 |
| San Diego | 382 |
| San Francisco | 2,643 |
| San Juan | 10 |
| Seattle | 887 |
| Stewart | 541 |
| Tacoma | 776 |
| Tucson | 156 |
| Ulster | 13 |
| Varick | 235 |
| York | 453 |
| **Total** | **43,137** |

## ASYLUM CASES COMPLETED BY DECISION

An asylum application also generally serves as an application for withholding of removal under section 241(b)(3) of the Immigration and Nationality Act (INA). As such, EOIR reports on these two forms of relief from removal contemporaneously. Grant rates are calculated as percentages of all completed cases of the given type.

**Figure 19.** In the past five years, asylum grants have increased by about nine percent.



**Figure 19. Asylum ICCs by Decision**

|  | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| ■ Grants | 9,753 | 8,638 | 8,170 | 8,730 | 10,654 |
| ■ Denials | 8,665 | 9,152 | 8,752 | 11,695 | 17,677 |
| ■ Other | 10,193 | 9,996 | 10,775 | 12,690 | 14,805 |

**Figure 20.** The defensive grant rate is consistently lower than that of affirmative asylum applications. Similarly, the defensive denial rate is significantly higher than the affirmative asylum denial rate.

**Figure 20. Affirmative and Defensive Asylum ICCs by Decision**

■ Affirmative Grants   ■ Defensive Grants
■ Affirmative Denials   ■ Defensive Denials
■ Affirmative Other Closures   ■ Defensive Other Closures

**Figure 21.**
Administrative closures
of asylum cases
decreased by about 48
percent from FY 2016
to FY 2017.

**Figure 21. Administrative Closures of Asylum Cases**

|  | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| ■ Total | 7,568 | 7,335 | 12,215 | 18,630 | 9,626 |

**Figure 22.** The grant
rate for either asylum
or withholding of
removal has decreased
about 30 percent in the
last five years.

**Figure 22. Asylum and Withholding of Removal ICCs by Decision**



|  | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| ■ Asylum Grants | 9,753 | 8,638 | 8,170 | 8,730 | 10,654 |
| ■ Withholding of Removal Grants | 1,624 | 1,436 | 1,138 | 1,049 | 1,265 |
| ▢ Denials of Asylum and/or Withholding of Removal | 7,298 | 7,925 | 7,713 | 10,728 | 16,197 |

**Figure 23.** The withholding of
removal grant rate has
decreased about 48 percent
from FY 2013 to FY 2017.

**Figure 23. Withholding of Removal ICCs by Decision**

|  | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| ■ Grants | 1,624 | 1,436 | 1,138 | 1,049 | 1,265 |
| ■ Denials | 9,237 | 9,529 | 8,950 | 12,013 | 17,684 |
| ▢ Others | 12,810 | 11,677 | 11,818 | 13,369 | 17,040 |

## Table 14. Asylum Decision Rate by Immigration Court

| Immigration Court | Grants | | Denials | | Other Closures | | Administrative Closure | | Total |
|---|---|---|---|---|---|---|---|---|---|
| | Number | Rate | Number | Rate | Number | Rate | Number | Rate | |
| Adelanto | 98 | 13% | 498 | 67% | 142 | 19% | 0 | 0% | 738 |
| Arlington | 424 | 22% | 411 | 21% | 542 | 28% | 557 | 29% | 1,934 |
| Atlanta | 23 | 3% | 481 | 59% | 252 | 31% | 55 | 7% | 811 |
| Aurora | 29 | 13% | 147 | 65% | 49 | 22% | 1 | 0% | 226 |
| Baltimore | 355 | 36% | 221 | 22% | 255 | 26% | 166 | 17% | 997 |
| Batavia | 30 | 21% | 83 | 57% | 32 | 22% | 1 | 1% | 146 |
| Bloomington | 53 | 13% | 184 | 46% | 117 | 29% | 50 | 12% | 404 |
| Boston | 332 | 30% | 194 | 18% | 335 | 31% | 235 | 21% | 1,096 |
| Buffalo | 17 | 18% | 30 | 31% | 24 | 25% | 25 | 26% | 96 |
| Charlotte | 32 | 7% | 289 | 59% | 143 | 29% | 22 | 5% | 486 |
| Chicago | 336 | 29% | 294 | 26% | 325 | 28% | 192 | 17% | 1,147 |
| Cleveland | 39 | 7% | 175 | 33% | 195 | 37% | 114 | 22% | 523 |
| Dallas | 74 | 9% | 511 | 62% | 208 | 25% | 34 | 4% | 827 |
| Denver | 97 | 20% | 95 | 20% | 137 | 28% | 157 | 32% | 486 |
| Detroit | 46 | 11% | 184 | 43% | 135 | 32% | 58 | 14% | 423 |
| El Paso | 3 | 2% | 43 | 25% | 45 | 26% | 80 | 47% | 171 |
| El Paso SPC | 4 | 3% | 88 | 59% | 58 | 39% | 0 | 0% | 150 |
| Elizabeth | 199 | 37% | 238 | 45% | 94 | 18% | 0 | 0% | 531 |
| Eloy | 8 | 2% | 186 | 53% | 160 | 45% | 0 | 0% | 354 |
| Fishkill | 0 | 0% | 4 | 80% | 1 | 20% | 0 | 0% | 5 |
| Florence | 4 | 2% | 77 | 45% | 89 | 52% | 0 | 0% | 170 |
| Harlingen | 7 | 2% | 52 | 14% | 305 | 82% | 6 | 2% | 370 |
| Hartford | 96 | 24% | 110 | 28% | 110 | 28% | 84 | 21% | 400 |
| Honolulu | 214 | 73% | 53 | 18% | 22 | 8% | 3 | 1% | 292 |
| Houston | 205 | 8% | 1,736 | 68% | 552 | 22% | 43 | 2% | 2,536 |
| Houston SPC | 39 | 7% | 350 | 64% | 157 | 29% | 1 | 0% | 547 |
| Imperial | 24 | 16% | 79 | 54% | 40 | 27% | 4 | 3% | 147 |
| Kansas City | 59 | 13% | 176 | 39% | 117 | 26% | 105 | 23% | 457 |
| Krome | 55 | 5% | 553 | 55% | 403 | 40% | 2 | 0% | 1,013 |
| Las Vegas | 39 | 4% | 462 | 48% | 225 | 24% | 228 | 24% | 954 |
| LaSalle | 7 | 3% | 147 | 72% | 48 | 24% | 1 | 0% | 203 |
| Los Angeles (N) | 379 | 6% | 1,082 | 18% | 2,236 | 38% | 2,244 | 38% | 5,941 |
| Los Angeles (D) | 34 | 8% | 303 | 71% | 87 | 21% | 0 | 0% | 424 |
| Louisville | 0 | 0% | 4 | 7% | 27 | 47% | 27 | 47% | 58 |
| Memphis | 133 | 16% | 465 | 54% | 151 | 18% | 109 | 13% | 858 |
| Miami | 269 | 13% | 923 | 45% | 548 | 27% | 311 | 15% | 2,051 |
| New Orleans | 24 | 7% | 112 | 30% | 95 | 26% | 137 | 37% | 368 |
| New York City | 3,915 | 41% | 1,000 | 10% | 2,193 | 23% | 2,541 | 26% | 9,649 |
| Newark | 174 | 18% | 98 | 10% | 487 | 51% | 191 | 20% | 950 |
| Oakdale | 22 | 12% | 117 | 66% | 39 | 22% | 0 | 0% | 178 |
| Omaha | 34 | 6% | 187 | 35% | 213 | 40% | 95 | 18% | 529 |
| Orlando | 186 | 11% | 846 | 52% | 419 | 26% | 190 | 12% | 1,641 |
| Otay Mesa | 44 | 19% | 143 | 61% | 45 | 19% | 2 | 1% | 234 |
| Otero | 39 | 14% | 193 | 70% | 45 | 16% | 0 | 0% | 277 |
| Pearsall | 70 | 21% | 211 | 63% | 55 | 16% | 0 | 0% | 336 |
| Philadelphia | 178 | 29% | 129 | 21% | 193 | 32% | 104 | 17% | 604 |
| Phoenix | 71 | 7% | 42 | 4% | 490 | 50% | 370 | 38% | 973 |
| Port Isabel | 39 | 8% | 371 | 78% | 67 | 14% | 0 | 0% | 477 |
| Portland | 100 | 28% | 113 | 31% | 91 | 25% | 57 | 16% | 361 |
| Saipan | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 |
| Salt Lake City | 39 | 12% | 155 | 46% | 91 | 27% | 50 | 15% | 335 |
| San Antonio | 126 | 14% | 468 | 52% | 214 | 24% | 87 | 10% | 895 |
| San Diego | 62 | 13% | 183 | 40% | 137 | 30% | 78 | 17% | 460 |
| San Francisco | 1,300 | 39% | 437 | 13% | 906 | 27% | 670 | 20% | 3,313 |
| San Juan | 5 | 45% | 2 | 18% | 3 | 27% | 1 | 9% | 11 |
| Seattle | 201 | 20% | 496 | 49% | 190 | 19% | 121 | 12% | 1,008 |
| Stewart | 13 | 2% | 441 | 81% | 87 | 16% | 2 | 0% | 543 |
| Tacoma | 130 | 17% | 461 | 59% | 185 | 24% | 1 | 0% | 777 |
| Tucson | 17 | 10% | 120 | 71% | 19 | 11% | 12 | 7% | 168 |
| Ulster | 0 | 0% | 6 | 43% | 7 | 50% | 1 | 7% | 14 |
| Varick | 33 | 14% | 124 | 53% | 78 | 33% | 0 | 0% | 235 |
| York | 69 | 15% | 294 | 65% | 90 | 20% | 1 | 0% | 454 |
| **Total** | **10,654** | **20%** | **17,677** | **34%** | **14,805** | **28%** | **9,626** | **18%** | **52,762** |

## ASYLUM GRANTS BY COUNTRY OF NATIONALITY

**Figure 24.** In FY 2017, the top four nationalities accounted for 57 percent of asylum grants. China alone accounted for 26 percent of all asylum grants.

**Table 15.** For each of the five years, six of the top 10 countries from which aliens were granted asylum were China, El Salvador, Guatemala, India, Nepal, and Ethiopia.

**Figure 24. Asylum Grants by Country of Nationality**



| | Asylum Grants |
|---|---|
| ■ China | 2,794 |
| ■ El Salvador | 1,355 |
| ■ Honduras | 955 |
| ■ Guatemala | 951 |
| ■ Other | 4,599 |

### Table 15. Asylum Grants by Top 25 Countries of Nationality

| Rank | FY 2013 | FY 2014 | FY 2015 | FY 2016 | FY 2017 |
|---|---|---|---|---|---|
| 1 | China | China | China | China | China |
| 2 | Nepal | India | Guatemala | El Salvador | El Salvador |
| 3 | Ethiopia | Ethiopia | Honduras | Guatemala | Honduras |
| 4 | India | Nepal | India | Honduras | Guatemala |
| 5 | Egypt | Egypt | El Salvador | Mexico | Mexico |
| 6 | Soviet Union | El Salvador | Nepal | India | India |
| 7 | Eritrea | Guatemala | Ethiopia | Nepal | Nepal |
| 8 | Russia | Eritrea | Mexico | Ethiopia | Eritrea |
| 9 | El Salvador | Soviet Union | Somalia | Somalia | Cameroon |
| 10 | Guatemala | Honduras | Soviet Union | Eritrea | Ethiopia |
| 11 | Mexico | Somalia | Egypt | Egypt | Syria |
| 12 | Cameroon | Russia | Eritrea | Soviet Union | Egypt |
| 13 | Pakistan | Cameroon | Russia | Cameroon | Bangladesh |
| 14 | Sri Lanka | Mexico | Syria | Bangladesh | Soviet Union |
| 15 | Guinea | Pakistan | Bangladesh | Albania | Albania |
| 16 | Honduras | Venezuela | Cameroon | Russia | Pakistan |
| 17 | Somalia | Iraq | Nigeria | Syria | Haiti |
| 18 | Mali | Gambia | Albania | Burkina Faso | Somalia |
| 19 | Moldavia (Moldova) | Sri Lanka | Haiti | Pakistan | Guinea |
| 20 | Venezuela | Moldavia (Moldova) | Colombia | Nigeria | Ecuador |
| 21 | Indonesia | Colombia | Gambia | Ghana | Burkina Faso |
| 22 | Colombia | Syria | Pakistan | Iran | Ghana |
| 23 | Gambia | Albania | Iraq | Kirghizia (Kyrgyzstan) | Ukraine |
| 24 | Bangladesh | Burkina Faso | Burkina Faso | Guinea | Nigeria |
| 25 | Burkina Faso | Nigeria | Kirghizia (Kyrgyzstan) | Ukraine | Venezuela |

## CONVENTION AGAINST TORTURE

In 1999, the Department of Justice implemented regulations regarding the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (Convention Against Torture or CAT). There are two forms of protection under the Convention Against Torture, withholding of removal and deferral of removal.

**Table 16. Convention Against Torture Cases by Decision**

| Granted | | | Denied | Other | Withdrawn | Abandoned | Not Adjudicated | Total |
|---|---|---|---|---|---|---|---|---|
| Withholding | Deferral | Total | | | | | | |
| 760 | 175 | 935 | 17,061 | 25,249 | 6,455 | 2,044 | 14 | 51,758 |

AR179

**Table 17. Convention Against Torture Completions by Court**

| Immigration Court | Completions |
|---|---|
| Adelanto | 1,588 |
| Arlington | 2,269 |
| Atlanta | 883 |
| Aurora | 352 |
| Baltimore | 821 |
| Batavia | 203 |
| Bloomington | 405 |
| Boston | 733 |
| Buffalo | 163 |
| Charlotte | 579 |
| Chicago | 969 |
| Cleveland | 503 |
| Dallas | 825 |
| Denver | 460 |
| Detroit | 614 |
| El Paso | 200 |
| El Paso SPC | 198 |
| Elizabeth | 717 |
| Eloy | 806 |
| Fishkill | 33 |
| Florence | 517 |
| Harlingen | 311 |
| Hartford | 378 |
| Honolulu | 190 |
| Houston | 2,094 |
| Houston SPC | 856 |
| Imperial | 758 |
| Kansas City | 467 |
| Krome | 1,145 |
| Las Vegas | 973 |
| LaSalle | 247 |
| Los Angeles (N) | 3,699 |
| Los Angeles (D) | 665 |
| Louisville | 84 |
| Memphis | 786 |
| Miami | 2,219 |
| New Orleans | 354 |
| New York City | 5,915 |
| Newark | 791 |
| Oakdale | 215 |
| Omaha | 245 |
| Orlando | 1,863 |
| Otay Mesa | 846 |
| Otero | 321 |
| Pearsall | 539 |
| Philadelphia | 582 |
| Phoenix | 393 |
| Port Isabel | 603 |
| Portland | 426 |
| Saipan | 5 |
| Salt Lake City | 352 |
| San Antonio | 1,213 |
| San Diego | 645 |
| San Francisco | 3,541 |
| San Juan | 9 |
| Seattle | 1,002 |
| Stewart | 639 |
| Tacoma | 1,100 |
| Tucson | 116 |
| Ulster | 77 |
| Varick | 589 |
| York | 667 |
| **Total** | **51,758** |

## I-862 APPLICATIONS FOR RELIEF OTHER THAN ASYLUM

In addition to asylum, there is a variety of types of relief from removal available to aliens in immigration proceedings. These include, but are not limited to, different forms of cancellation of removal, adjustment of status, and different types of waivers.

**Table 18. I-862 Cases Grants of Relief**

| Fiscal Year | Relief Granted to Lawful Permanent Residents (LPR) | | Relief Granted to Non-LPR | | | | |
|---|---|---|---|---|---|---|---|
| | Relief Granted Under Section 212(c) | Cancellation of Removal | Not Subject to Annual Cap of 4,000 Grants | | | Subject to Annual Cap of 4,000 Grants | |
| | | | Adjustment of Status to LPR | Suspension of Deportation | Cancellation of Removal | Suspension of Deportation | Cancellation of Removal |
| FY 13 | 667 | 3,874 | 5,033 | 71 | 325 | 0 | 4,031 |
| FY 14 | 551 | 3,220 | 3,281 | 69 | 275 | 2 | 3,847 |
| FY 15 | 439 | 2,592 | 2,198 | 53 | 279 | 2 | 3,827 |
| FY 16 | 385 | 2,239 | 1,854 | 31 | 247 | 1 | 3,735 |
| FY 17 | 401 | 2,202 | 1,860 | 54 | 304 | 0 | 3,716 |

## I-862 *IN ABSENTIA* ORDERS

When an alien fails to appear for a hearing, the IJ may conduct a hearing in the alien's absence (*in absentia*). The *in absentia* rate refers to the proportion of all IJ decisions at the ICC where the removal order is issued *in absentia*.

**Figure 25.** From FY 2016 to FY 2017, the overall I-862 *in absentia* rate increased by about eight percent. In the same period, the never detained *in absentia* rate increased 18 percent. The released rate increased 13 percent.

### Figure 25. I-862 *In Absentia* Rates



**Table 19. I-862 *In Absentia* Orders and ICCs by Respondent Type**

| FY | Decision Subset | All Cases | Never Detained Cases | Released Cases | UAC Cases | Asylum Cases |
|---|---|---|---|---|---|---|
| FY 13 | In Absentia Orders | 18,747 | 10,394 | 8,278 | 836 | 1,742 |
| | Initial Case Completion | 136,761 | 51,152 | 26,798 | 2,565 | 28,459 |
| FY 14 | In Absentia Orders | 23,440 | 13,676 | 9,662 | 1,882 | 1,748 |
| | Initial Case Completion | 124,238 | 46,874 | 26,223 | 3,576 | 27,584 |
| FY 15 | In Absentia Orders | 35,166 | 24,646 | 10,464 | 6,481 | 1,847 |
| | Initial Case Completion | 127,350 | 59,550 | 27,442 | 13,435 | 27,644 |
| FY 16 | In Absentia Orders | 32,755 | 23,437 | 9,254 | 6,191 | 3,017 |
| | Initial Case Completion | 128,145 | 62,852 | 25,380 | 15,095 | 33,082 |
| FY 17 | In Absentia Orders | 41,384 | 30,010 | 11,292 | 6,759 | 4,776 |
| | Initial Case Completion | 149,436 | 67,966 | 27,376 | 13,872 | 43,013 |

## IMMIGRATION JUDGE HIRING

To better manage its caseload, EOIR focused on increased hiring of immigration judges in FY 2017.

**Figure 26.** The number of IJs on board increased 17 percent in FY 2017.



**Figure 26. Immigration Judge Hiring**

|  | FY 2010 | FY 2011 | FY 2012 | FY 2013 | FY 2014 | FY 2015 | FY 2016 | FY 2017 |
|---|---|---|---|---|---|---|---|---|
| Total IJs Hired | 17 | 39 | 4 | 8 | 0 | 20 | 56 | 64 |
| Total IJs on Board | 245 | 273 | 267 | 262 | 249 | 254 | 289 | 338 |

## BOARD OF IMMIGRATION APPEALS

### TOTAL CASES RECEIVED AND COMPLETED

The majority of cases BIA reviews arise from decisions IJs make in removal, deportation, or exclusion cases. A full list of case types heard by BIA originating from OCIJ is below. For purposes of this Statistics Yearbook, these types of cases are collectively referred to as appeals from IJ decisions.

- Case appeals from the decisions of IJs in removal, deportation, and exclusion cases at the court level;
- Appeals filed from the decisions of IJs on motions to reopen;
- Motions to reopen and/or reconsider filed in cases already decided by the BIA;
- Appeals pertaining to bond, parole, or detention;
- Interlocutory appeals; and
- Cases (or appeals) remanded from the Federal Court.

The BIA also has jurisdiction to review appeals arising from certain decisions that DHS officials render. These types of appeals are listed below. For purposes of this Statistics Yearbook, appeals from these DHS decisions are referred to as DHS decision appeals.

- Family-based visa petitions adjudicated by DHS district directors or regional service center directors;
- Waivers of inadmissibility for non-immigrants under INA § 212(d)(3)(A)(ii); and
- Fines and penalties imposed upon carriers for violations of immigration laws.

**Figure 27.** In FY 2017 completions decreased slightly while receipts increased slightly.



**Figure 27. Total BIA Cases Received and Completed**

|  | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| Receipts | 34,808 | 29,750 | 29,346 | 30,221 | 33,503 |
| Completions | 36,688 | 30,822 | 34,243 | 33,241 | 31,820 |

## CASES RECEIVED AND COMPLETED BY TYPE

BIA has jurisdiction over appeals from IJ decisions and certain DHS decisions. The majority of appeals from IJ decisions are from case appeals, and the majority of appeals from DHS decisions are from visa petitions.

**Figure 31.** Appeals from IJ decisions make up most of the BIA's work. Completions of appeals from IJ decisions increased about three percent in FY 2017. Completions from DHS decisions decreased by about 32 percent.

### Figure 28. BIA Receipts and Completions by Case Type



| | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| ■ Receipts: Appeals from DHS Decisions | 5,598 | 4,385 | 6,480 | 5,639 | 3,958 |
| ■ Receipts: Appeals from IJ Decisions | 29,210 | 25,365 | 22,866 | 24,582 | 29,545 |
| Receipts: Total Appeals | 34,808 | 29,750 | 29,346 | 30,221 | 33,503 |
| ■ Completions: Appeals from DHS Decisions | 5,411 | 3,293 | 6,641 | 6,767 | 4,586 |
| ■ Completions: Appeals from IJ Decisions | 31,277 | 27,529 | 27,602 | 26,474 | 27,234 |
| Completions: Total Appeals | 36,688 | 30,822 | 34,243 | 33,241 | 31,820 |

### Table 20. BIA Receipts and Completions by Type

| Appeal Type | FY 2013 | | FY 2014 | | FY 2015 | | FY 2016 | | FY 2017 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Receipts | Comp. | Receipts | Comp. | Receipts | Comp. | Receipts | Comp. | Receipts | Comp. |
| **Total Appeals from IJ Decisions** | 29,210 | 31,277 | 25,365 | 27,529 | 22,866 | 27,602 | 24,582 | 26,474 | 29,545 | 27,234 |
| *Case Appeal* | 16,495 | 17,933 | 13,557 | 15,775 | 11,475 | 15,474 | 12,737 | 14,563 | 17,106 | 15,966 |
| *Appeal of IJ Motion to Reopen* | 1,639 | 1,839 | 1,516 | 1,691 | 1,454 | 1,659 | 1,453 | 1,631 | 1,785 | 1,960 |
| *Motion to Reopen/Reconsider-BIA* | 7,692 | 8,603 | 6,691 | 6,394 | 5,908 | 6,427 | 5,639 | 5,586 | 5,898 | 5,000 |
| *Bond Appeal* | 1,816 | 1,700 | 2,091 | 1,990 | 2,253 | 2,220 | 3,002 | 2,805 | 3,621 | 3,124 |
| *Bond MTR* | 28 | 24 | 32 | 35 | 52 | 47 | 57 | 45 | 33 | 43 |
| *Interlocutory Appeal* | 209 | 194 | 163 | 169 | 240 | 216 | 352 | 287 | 433 | 404 |
| *Federal Court Remand* | 1,331 | 984 | 1,314 | 1,474 | 1,484 | 1,559 | 1,341 | 1,556 | 669 | 737 |
| *Continued Detention Review* | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 |
| *Zero Bond Appeal* | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Appeals from DHS Decisions** | 5,598 | 5,411 | 4,385 | 3,293 | 6,480 | 6,641 | 5,639 | 6,767 | 3,958 | 4,586 |
| *Decisions on Visa Petitions* | 5,539 | 5,348 | 4,333 | 3,266 | 6,435 | 6,573 | 5,612 | 6,734 | 3,911 | 4,550 |
| *212(d)(3)(A) Waiver Decisions* | 55 | 60 | 49 | 25 | 45 | 65 | 26 | 33 | 45 | 33 |
| *Decisions on Fines and Penalties* | 4 | 3 | 3 | 2 | 0 | 3 | 1 | 0 | 2 | 3 |
| **Grand Total** | 34,808 | 36,688 | 29,750 | 30,822 | 29,346 | 34,243 | 30,221 | 33,241 | 33,503 | 31,820 |

## APPEALS FROM IJ DECISIONS COMPLETED BY COUNTRY OF NATIONALITY

BIA hears appeals from IJ decisions involving hundreds of nationalities. Appeals from IJ decisions arise primarily in cases of aliens from Mexico and Central America.

**Figure 29.** Over half of completed appeals from IJ decisions involve an alien from one of three countries.

**Table 21.** For the past five years, nine countries ranked among the top ten: Mexico, El Salvador, Guatemala, Honduras, China, India, Haiti, Jamaica, and Dominican Republic.

**Figure 29. Completed Appeals from IJ Decisions by Nationality**



| | Completions |
|---|---|
| ■ Mexico | 7,737 |
| ■ El Salvador | 3,958 |
| ■ Guatemala | 2,857 |
| ■ Honduras | 2,584 |
| ■ Other | 10,098 |

**Table 21. BIA Appeals from ICCs by Top 25 Countries of Nationality**

| Rank | FY 2013 | FY 2014 | FY 2015 | FY 2016 | FY 2017 |
|---|---|---|---|---|---|
| 1 | Mexico | Mexico | Mexico | Mexico | Mexico |
| 2 | China | China | El Salvador | El Salvador | El Salvador |
| 3 | El Salvador | El Salvador | China | China | Guatemala |
| 4 | Guatemala | Guatemala | Guatemala | Guatemala | Honduras |
| 5 | Honduras | Honduras | Honduras | Honduras | China |
| 6 | India | India | India | India | India |
| 7 | Colombia | Jamaica | Haiti | Haiti | Haiti |
| 8 | Jamaica | Colombia | Jamaica | Jamaica | Jamaica |
| 9 | Indonesia | Haiti | Colombia | Dominican Republic | Dominican Republic |
| 10 | Dominican Republic | Dominican Republic | Dominican Republic | Colombia | Ecuador |
| 11 | Haiti | Brazil | Brazil | Bangladesh | Colombia |
| 12 | Brazil | Indonesia | Nigeria | Ecuador | Bangladesh |
| 13 | Pakistan | Nigeria | Ecuador | Brazil | Brazil |
| 14 | Nigeria | Peru | Philippines | Nigeria | Nigeria |
| 15 | Venezuela | Pakistan | Peru | Philippines | Ghana |
| 16 | Philippines | Ecuador | Indonesia | Peru | Philippines |
| 17 | Ecuador | Philippines | Nicaragua | Indonesia | Pakistan |
| 18 | Peru | Kenya | Bangladesh | Armenia | Somalia |
| 19 | Kenya | Venezuela | Pakistan | Nicaragua | Peru |
| 20 | Nicaragua | Nicaragua | Nepal | Ghana | Nicaragua |
| 21 | Armenia | Ghana | Kenya | Nepal | Venezuela |
| 22 | Nepal | Russia | Armenia | Pakistan | Kenya |
| 23 | Albania | Nepal | Venezuela | Venezuela | Cameroon |
| 24 | Russia | Albania | Russia | Kenya | Cuba |
| 25 | Ghana | Armenia | Ghana | Albania | Nepal |

## APPEALS FROM IJ DECISIONS (I-862) COMPLETED BY REPRESENTATION STATUS

**Figure 30.** Representation rate for appeals has remained roughly constant across the past five years, reaching a high of 80 percent of completed appeals from IJ decisions represented in FY 2017.

**Figure 30. Completed Appeals from IJ Decisions (I-862 Cases) by Representation Status**

|                | FY 13  | FY 14  | FY 15  | FY 16  | FY 17  |
|----------------|--------|--------|--------|--------|--------|
| ■ Represented  | 24,742 | 20,804 | 21,130 | 20,935 | 21,810 |
| ■ Unrepresented| 6,535  | 6,725  | 6,472  | 5,539  | 5,424  |
| Total          | 31,277 | 27,529 | 27,602 | 26,474 | 27,234 |
| % Represented  | 79%    | 76%    | 77%    | 79%    | 80%    |

## CASE APPEALS FROM IJ DECISION (I-862 ICCs) COMPLETED FOR DETAINED CASES

BIA handles detained cases (including aliens in IHP) as priority cases. For the purposes of Figure 31, figures for detained cases include IHP cases and cases of unaccompanied alien children in the custody of the Department of Health and Human Services.

**Figure 31.** The percent of completed case appeals from ICCs in I-862 detained cases has stayed approximately constant over the past five years, within a five-percentage point spread.



**Figure 31. Complete Case Appeals from I-862 ICCs by Detention Status**

| | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| ■ Detained Case Appeal Decisions | 4,589 | 4,796 | 4,398 | 3,577 | 4,243 |
| ■ Total Case Appeal Decisions | 17,933 | 15,775 | 15,474 | 14,563 | 15,966 |
| Percent Detained | 26% | 30% | 28% | 25% | 27% |

**Table 22.** The percent of total detained IHP completions has been consistently between six and seven percent for the past five years.

**Table 22. BIA Detained Completions**

| Fiscal Year | Total Detained Completions | IHP Completions | Percent IHP Completions |
|---|---|---|---|
| FY 13 | 4,589 | 302 | 7% |
| FY 14 | 4,796 | 273 | 6% |
| FY 15 | 4,398 | 280 | 6% |
| FY 16 | 3,577 | 265 | 7% |
| FY 17 | 4,243 | 293 | 7% |

## IJ DECISIONS (I-862 ICCS) APPEALED

**Figure 32.** The percentage of ICCs being appealed has fluctuated between nine and 12 percent across the past five fiscal years.



**Figure 32. I-862 ICCs Appealed to BIA**

| | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| IJ Decisions | 137,329 | 124,649 | 127,452 | 128,201 | 149,581 |
| Case Appeals Received | 16,495 | 13,557 | 11,475 | 12,737 | 17,106 |
| Percent Appealed | 12% | 11% | 9% | 10% | 11% |

# OFFICE OF THE CHIEF ADMINISTRATIVE HEARING OFFICER

## TOTAL CASES RECEIVED AND COMPLETED

OCAHO is headed by the Chief Administrative Hearing Officer, who is responsible for the general supervision of administrative law judges (ALJs), management of OCAHO and review of ALJ decisions relating to illegal hiring, employment eligibility verification violations and document fraud. OCAHO's ALJs hear cases and adjudicate issues arising under provisions of the INA relating to:

- Knowingly hiring, recruiting or referring for a fee unauthorized aliens, or the continued employment of unauthorized aliens, failure to comply with employment eligibility verification requirements, and/or requiring indemnity bonds from employees in violation of section 274A of the INA (employer sanctions provisions);
- Unfair immigration-related employment practices in violation of section 274B of the INA (anti-discrimination provisions); and
- Immigration-related document fraud in violation of section 274C of the INA (document fraud provisions).

Employer sanctions and document fraud complaints are brought by the U.S. Department of Homeland Security. Anti-discrimination complaints may be brought by the U.S. Department of Justice's Immigrant and Employee Rights Section or private litigants. All final agency decisions may be appealed to the appropriate federal circuit court of appeals.

**Figure 33.** Completions continued to outpace receipts in FY 2017. Note that completions may have been for cases received in a prior fiscal year.



**Figure 33. OCAHO Receipts and Completions**

|  | FY 16 | FY 17 |
|---|---|---|
| Receipts | 84 | 74 |
| Completions | 119 | 75 |

**Figure 34.** The bulk of OCAHO's workload is 274A and 274B complaints.

**Figure 34. OCAHO Receipts and Completions by Type**

|  | 274A and 274B Complaints | Subpoenas | Requests for Review | Attorney's Fees |
|---|---|---|---|---|
| FY 15 Receipts | 58 | 22 | 5 | 1 |
| FY 15 Completions | 77 | 22 | 5 | 0 |
| FY 16 Receipts | 37 | 21 | 2 | 0 |
| FY 16 Completions | 56 | 21 | 2 | 1 |
| FY 17 Receipts | 58 | 45 | 0 | 0 |
| FY 17 Completions | 62 | 45 | 0 | 0 |

## FREEDOM OF INFORMATION ACT (FOIA)

### FOIA RECEIPTS

**Figure 35.** Since FY 2013, the number of FOIA requests received by EOIR has increased by about 73 percent.



**Figure 35. FOIA Receipts**

| | FY 2013 | FY 2014 | FY 2015 | FY 2016 | FY 2017 |
|---|---|---|---|---|---|
| ■ Receipts | 25,336 | 26,614 | 31,513 | 35,500 | 43,859 |

**Executive Office for Immigration Review**
**Planning, Analysis, and Statistics Division**

**Asylum Median Processing Time (I-862 & I-863 Initial Case Completions).**
**Date Range: October 1, 2014 through June 30, 2019**
**Date of Data Run: July 12, 2019**

**Asylum Median Processing Time (I-862 & I-863 Initial Case Completions).**

| Fiscal Year | Asylum Median Processing Time |
|---|---|
| FY 2015 | 713 days |
| FY 2016 | 589 days |
| FY 2017 | 623 days |
| FY 2018 | 765 days |
| FY 2019 (through June 30, 2019) | 812 days |

**PRESIDENTIAL MEMORANDA**

# Presidential Memorandum on Additional Measures to Enhance Border Security and Restore Integrity to Our Immigration System

Issued on: April 29, 2019

MEMORANDUM FOR THE ATTORNEY GENERAL
THE SECRETARY OF HOMELAND SECURITY

SUBJECT:     Additional Measures to Enhance Border Security
and Restore Integrity to Our Immigration System

By the authority vested in me as President by the Constitution and the laws of the United States of America, and to ensure the safety and territorial integrity of the United States as well as to ensure that the Nation's immigration laws are faithfully executed, it is hereby ordered as follows:

Section 1.  Purpose.  As noted in Proclamations 9822 and 9842 of November 9, 2018, and February 7, 2019, respectively, our immigration and asylum system is in crisis as a consequence of the mass migration of aliens across our southern border.  In Proclamation 9844 of February 15, 2019, I declared a national emergency to address the security and humanitarian crisis at that border.  That emergency continues to grow increasingly severe.  In March, more than 100,000 inadmissible aliens were encountered seeking entry into the United States.  Many aliens travel in large caravans or other large organized groups, and many travel with children.  The extensive resources required to process and care for these individuals pulls U.S. Customs and Border Protection personnel away from securing our Nation's borders.  Additionally, illicit organizations benefit financially by smuggling illegal aliens into the United States and encouraging abuse of our asylum procedures.  This strategic exploitation of our Nation's humanitarian programs undermines our Nation's security and sovereignty.  The purpose of this memorandum is to strengthen asylum procedures to safeguard our system against rampant abuse of our asylum process.

Sec. 2.  Policy.  It is the policy of the executive branch to manage our humanitarian immigration programs in a safe, orderly manner that provides access to relief or protection from removal from the United States for aliens who qualify, and that promptly denies benefits to and facilitates the removal of those who do not.

Sec. 3.  Further Steps to Enhance the Integrity and Efficiency of the Existing Asylum System.  Within 90 days of the date of this memorandum, the Attorney General and the Secretary of Homeland Security, as applicable, shall take all appropriate actions to:

(a)  propose regulations to ensure that aliens who receive positive fear determinations pursuant to section 235(b)(1) of the Immigration and Nationality Act (INA) (8 U.S.C. 1225(b)(1)) or section 2242 of the Foreign Affairs Reform and Restructuring Act of 1998 (8 U.S.C. 1231 note) are placed in proceedings conducted under 8 CFR 208.2(c)(1) and 1208.2(c)(1) or, if not eligible for asylum, are placed in proceedings conducted under 8 CFR 208.2(c)(2) and 1208.2(c)(2);

(b)  propose regulations to ensure that, absent exceptional circumstances, all asylum applications adjudicated in immigration court proceedings receive final administrative adjudication, not including administrative appeal, within 180 days of filing, in accordance with section 208(d)(5)(A)(iii) of the INA (8 U.S.C. 1158(d)(5)(A)(iii));

(c)  propose regulations setting a fee for an asylum application not to exceed the costs of adjudicating the application, as authorized by section 208(d)(3) of the INA (8 U.S.C. 1158(d)(3)) and other applicable statutes, and setting a fee for an initial application for employment authorization for the period an asylum claim is pending; and

(d)  propose regulations under section 208(d)(2) of the INA (8 U.S.C. 1158(d)(2)) and other applicable statutes to bar aliens who have entered or attempted to enter the United States unlawfully from receiving employment authorization before any applicable application for relief or protection from removal has been granted, and to ensure immediate revocation of employment authorization for aliens who are denied asylum or become subject to a final order of removal.

Sec. 4.  Allocation of Immigration Officers.  The Secretary of Homeland Security shall reprioritize the assignment of immigration officers and any other employees of the Department as the Secretary deems necessary and appropriate to improve the integrity of adjudications of credible and reasonable fear claims, to strengthen the enforcement of the immigration laws, and to ensure compliance with the law by those aliens who have final orders of removal.

Sec. 5.  General Provisions.  (a)  Nothing in this memorandum shall be construed to impair or otherwise affect:

(i)   the authority granted by law to an executive department or agency, or the head thereof; or

(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)  This memorandum shall be implemented in a manner consistent with applicable law and subject to the availability of appropriations.

(c)  This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

DONALD J. TRUMP

Case 1:19-cv-03840-KBJ   Document 35-3   Filed 01/27/20   Page 205 of 655

### Credible Fear and Asylum Process:
### Fiscal Year (FY) 2008 – FY 2019 Quarter 2

**Out of 100 aliens who were to claim a credible fear...[1]**

**CREDIBLE FEAR INTERVIEW**
United States Citizenship and
Immigration Services (USCIS)
would refer **81 credible fear
claimants** to EOIR
*(81% of claims referred to EOIR)[2]*

**OPTION FOR EOIR TO REVIEW A NEGATIVE FEAR FINDING**

**7 cases are closed[3]**

**3 credible fear claimants** would not request review by
an immigration judge (IJ)                                         *Alien is
Removed*

**9 credible fear claimants**
would request review by an IJ

**CREDIBLE FEAR REVIEW (CFR)[4]**
IJs would **find credible fear** for
**2 credible fear claimants**
*(IJs find credible fear in 21% of CFRs)*

**REMOVAL PROCEEDINGS**
EOIR would receive and
complete **83 I-862 cases[5]**
originating from credible
fear claims

**... only 14 out of 100 would be granted asylum.**



Never Referred
to EOIR

Referred, but
Never Filed Asylum
(24 ordered
removed in
absentia)

**ASYLUM APPLICATION**
**44 credible fear claimants**
would file for asylum
*(Of completed I-862 cases originating from a
credible fear claim made to USCIS, 53 percent of
aliens filed for asylum)*

Referred & Filed,
but Not Granted (4
ordered removed in
absentia)

**ASYLUM DECISION**
IJs would **grant asylum to only
14 credible fear claimants** and
would not grant asylum to 30
credible fear claimants
*(Of completed I-862 cases originating from a
credible fear claim made to USCIS, IJs grant
asylum 17 percent of the time)*

Referred, Filed, &
Granted Asylum

EOIR Data Generated: April 23, 2019
[1] Percentages used in assessing this population may change as more
cases are completed over time and because some cases may be
reopened.
[2] Based on USCIS data (generated April 26, 2019). Includes claims
referred to EOIR in which USCIS did not make a credible fear finding
because it could not obtain an interpreter.
[3] Closed cases include those in which a claim is dissolved or

withdrawn or an alien is found to be ineligible for the credible fear
process.
[4] If USCIS finds that an alien has not established a credible fear, the
alien may request review of that finding by an IJ. If the IJ finds that an
alien has established a credible fear, then the alien (unless the alien
is a stowaway) is placed in removal proceedings.
[5] Includes completed removal, exclusion, and deportation case types.

# USCIS Credible Fear (CF) Process at the FRCs

| USCIS Receives ICE Referral of Fear Claim | → 0-1 Days later → | Data Entry into USCIS System – USCIS Support Staff | → 0-1 Days Later → | USCIS Officer Orients Adult on CF Process – Serves G-56 CF Interview Notice | → 3-5 Days Later → | USCIS Asylum Officer(AO) conducts CF interview | → 0-1 Days Later → | USCIS AO Issues CF Decision | → 0-1 Days Later → | Supervisory AO Conducts Reviews | → 0-1 Days Later → | CF [...] Do[...] Pr[...] for[...] |

**Relevant Statutory/Regulatory Provisions and Policies**

**- INA §235(b)(1)(B)(iv); 8 CFR § 235.3(b)(4)** CBP/ICE officer required to provide alien information about the CF process using the M-444. **(M-444 written disclosure of process is provided for by reg.)** - USCIS accepts jurisdiction on receipt of all properly completed Forms I-860, I-867 Parts A and B, and M-444.

**- INA § 235(b)(1)(B)(iv); 8 CFR § 208.30(d)(4).** Allows aliens to consult with person(s) of their choosing prior to the interview, but shall be at no expense to government and not unreasonably delay the process.
**- 8 CFR § 235.3(b)(4)(ii).** Requires alien be given time to contact and consult with consultant.
**- 8 CFR § 208.30(b)(d)(2).** Requires AO orient the alien to verify that alien received M-444 and determine that alien has an understanding of the CF process.
**- M-444.** Informs aliens that they can request female officer/interpreter, or male officer/interpreter.
**- M-444 and 1997 policy** (outlined in Supplementary Information section of ER/CF Interim Rule, 62 FR 44 – 10312, 10320 (March 6, 1997)). Alien given 48 hours from arrival at detention facility to rest and conduct such consultation prior to interview, unless 48 hours is waived.
**- Local FRC policy** (since March 2015). In order to limit the previously large number of reschedule requests at the FRCs, CF interviews are scheduled for 72 hours after orientation instead of 48 hours.
**- M-444 and noted in Supplementary Information section of ER/CF Interim Rule, 62 FR 44, 10320.** Aliens should have access to a phone while in detention to contact consultants.

**- 8 CFR § 208.30(d).** CF interview must be conducted separate and apart from general public.
**- 8 CFR § 208.30(d)(5).** Requires AO to arrange for the assistance of an interpreter for the CF interview, if necessary.
**- 8 CFR § 208.30(d)(1).** If AO conducting CF interview determines that alien is unable to participate effectively in interview because of illness/fatigue/other impediments, officer may reschedule interview.
**- M-444.** Allows alien to request for additional time to contact a consultant.
**- 8 CFR § 208.30(d)(4).** Allows the alien to have a consultant present at the interview.

**- 8 CFR § 208.30(e)(7).** A[...] not final until it is review[...] asylum officer (SAO).
**- 8 CFR § 208.30(f).** Issue[...] each family member who[...]
**- 8 § CFR 208.30(g)(1).** Is[...] of Negative Credible Fear[...] Review by Immigration Ju[...] member who is found ne[...] each individual if they wi[...] judge review of the nega[...] response or refusal to res[...] request for review.
**- 8 § CFR 208.30(g)(2)(ii).** [...] determinations, Asylum O[...] provide EOIR copies of th[...] Referral to Immigration J[...] notes, summary of the m[...] materials upon which the [...] based.

FACT SHEETS

# Our Nation's Weak Asylum Laws are Encouraging an Overwhelming Increase In Illegal Immigration

## IMMIGRATION

Issued on: November 1, 2018

**"We will not rest until our border is secure, our citizens are safe, and we finally end the immigration crisis once and for all."**

*President Donald J. Trump*

**MISUSED ASYLUM LAWS: Flaws in our asylum system allow illegal aliens with meritless claims to cross our borders and remain here for years.**

- Our Nation's asylum laws have allowed illegal aliens with meritless claims to easily enter and stay in the United States while awaiting legal proceedings.
- Asylum seekers at the border only have to meet the low bar for establishing a "credible fear" of returning under which they must show a "possibility" to qualify for asylum.
  - Aliens who claim a credible fear of returning do not have to provide any verification or corroboration of their claims in order to receive a positive determination and be released into the interior of the United States.
- As a result, illegal aliens with meritless cases that are released from detention are able to remain in our communities for years, while their cases are litigated in immigration courts.

**AN OVERWHELMING SURGE: Our country faces a growing and overwhelming surge of illegal aliens seeking to take advantage of our weak asylum laws.**

- Today, approximately one in 10 illegal aliens arriving at our southern border claims a credible fear of return, up from one out of every 100 prior to 2013.
  - Since 2010, these claims have spiked by 1,700 percent.

- o This staggering increase has contributed to a backlog of hundreds of thousands of cases in our immigration courts.
- This surge is only growing, with reports showing that asylum requests at the southern border have recently increased from 1,500 per week to approximately 2,000 per week.
- U.S. Citizenship and Immigration Services (USCIS) processed approximately 100,000 credible fear claims this last fiscal year (FY), surpassing the 94,000 record set in FY 2016.
  - o In FY 2018, USCIS received approximately 106,000 new asylum requests from those admitted legally, compared to only 25,500 in 2008.
  - o Immigration courts received approximately 160,000 asylum requests in FY 2018, compared to only 42,000 in FY 2008.

## A DRIVING FACTOR IN ILLEGAL IMMIGRATION: The standards that apply to the credible fear process is a major driver of our Nation's immigration crisis.

- While there has been an enormous spike in credible fear-initiated claims, relatively few asylum claims have ultimately been found to be meritorious.
- Approximately 80 percent of aliens arriving from Guatemala, Honduras, and El Salvador passed initial credible fear screenings, but only 15 percent of those were granted asylum.
- There has been a major increase in the number of illegal alien family units arriving at our border and family units now make up a significant percentage of credible fear claims.
  - o The number of family units apprehended by U.S. Customs and Border Protection has increased 620 percent during the past five years.
  - o Family units make up about 40 percent of all credible fear-initiated asylum claims.
  - o As a result of loopholes, nearly all asylum seekers in family units are permitted by the Department of Homeland Security to remain in the United States, pending their asylum hearing.

1
2
3
4
5
6
7
8              **UNITED STATES DISTRICT COURT**
9              **CENTRAL DISTRICT OF CALIFORNIA**
10
11   JENNY LISETTE FLORES, *et al.*,        ) Case No.: CV 85-4544 DMG (AGRx)
                                             )
12              Plaintiffs,                  )
                                             ) **PERMANENT INJUNCTION**
13         v.                                )
                                             )
14                                           )
     WILLIAM P. BARR, Attorney               )
15   General of the United States, *et al.*, )
                                             )
16              Defendants.                  )
17   _____

18
19         On September 27, 2019, the Court entered an Order granting Plaintiffs' Motion to
20   Enforce and denied Defendants' Motion to Terminate the *Flores* Settlement Agreement.
21   [Doc. # 688.]
22         Accordingly, IT IS HEREBY ORDERED as follows:
23
24         1. The *Flores* Settlement Agreement remains in effect and has not been
              terminated;
25
26         2. Because the regulations, published on August 23, 2019, entitled
27            "Apprehension, Processing, Care, and Custody of Alien Minors and
              Unaccompanied Children," 84 Fed. Reg. 44932–44,535 ("the New
28            Regulations"), fail to implement and are inconsistent with the relevant

and substantive terms of the *Flores* Settlement Agreement, including Paragraphs 9 and 40 of the Agreement, Defendants shall continue to comply with the *Flores* Settlement Agreement until they publish final regulations in compliance with the Agreement, including Paragraphs 9 and 40; and

3. Defendants are permanently enjoined from applying, implementing, or enforcing the New Regulations.

DATED:  September 27, 2019

_____
DOLLY M. GEE
UNITED STATES DISTRICT JUDGE

AR202

**44392**   **Federal Register** / Vol. 84, No. 164 / Friday, August 23, 2019 / Rules and Regulations

**DEPARTMENT OF HOMELAND SECURITY**

**8 CFR Parts 212 and 236**

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**45 CFR Part 410**

**RIN 1653–AA75, 0970–AC42**

**Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children**

**AGENCY:** U.S. Immigration and Customs Enforcement (ICE), U.S. Department of Homeland Security (DHS); U.S. Customs and Border Protection (CBP), DHS; Office of Refugee Resettlement (ORR), Administration for Children and Families (ACF), U.S. Department of Health and Human Services (HHS).

**ACTION:** Final rule.

**SUMMARY:** This final rule amends regulations relating to the apprehension, processing, care, custody, and release of alien juveniles. The rule replaces regulations that were promulgated in 1988 in response to a lawsuit filed in 1985 against the Attorney General and the Department of Justice's legacy U.S. Immigration and Naturalization Service (INS), in *Flores* v. *Meese.* In January 1997, the parties reached a comprehensive settlement agreement, referred to as the *Flores* Settlement Agreement (FSA). The FSA, as modified in 2001, provides that it will terminate forty-five days after publication of final regulations implementing the agreement. Since 1997, intervening legislation, including the Homeland Security Act of 2002 (HSA) and the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), have significantly altered the governing legal authorities relating to the detention, custody, processing, and release of alien juveniles. This final rule adopts regulations that implement the relevant and substantive terms of the FSA, consistent with the HSA and the TVPRA, with some modifications discussed further below to reflect intervening statutory and operational changes while still providing similar substantive protections and standards. The final rule satisfies the basic purpose of the FSA in ensuring that all alien juveniles in the government's custody pursuant to its authorities under the immigration laws are treated with dignity, respect, and special concern for their particular vulnerability as minors, while doing so in a manner that is workable in light of subsequent statutory, factual, and operational changes and builds on the government's extensive experience working under the FSA. Most prominently, in response to great difficulty working under the state-licensing requirement for family residential centers, the final rule creates an alternative to the existing licensed program requirement for ICE family residential centers, so that ICE may use appropriate facilities to detain family units together during their immigration proceedings, consistent with applicable law.

**DATES:** Effective October 22, 2019.

**ADDRESSES:** Comments and related materials received from the public, as well as background documents mentioned in this preamble as being available in the docket, are part of docket DHS Docket No. ICEB–2018–0002. For access to the online docket, go to *https://www.regulations.gov* and enter this rulemaking's eDocket number: DHS Docket No. ICEB–2018–0002 in the "Search" box.

**FOR FURTHER INFORMATION CONTACT:**

*For DHS:* Office of Policy and Planning, U.S. Immigration and Customs Enforcement, Department of Homeland Security, 500 12th Street SW, Washington, DC 20536. Telephone 202–732–6960 (not a toll-free number).

*For HHS:* Division of Policy, Office of the Director, Office of Refugee Resettlement, Administration for Children and Families, by email at *UACPolicy@acf.hhs.gov.* Office of Refugee Resettlement, 330 C Street SW, Washington, DC 20201. Telephone 202–401–9246.

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Table of Abbreviations
II. Executive Summary
  A. Purpose of the Regulatory Action
  B. Legal Authority
  C. Costs and Benefits
  D. Effective Date
III. Background and Purpose
  A. History
  1. The *Flores* Settlement Agreement
  2. The Reorganization of the Immigration and Naturalization Service
  3. The Change in Migration and the Creation of the Family Residential Centers
  B. Authority
  1. Statutory and Regulatory Authority
  2. *Flores* Settlement Agreement Implementation
  3. Recent Court Orders
  C. Basis and Purpose of Regulatory Action
  1. Need for Regulations Implementing the Relevant and Substantive Terms of the FSA
  2. Purpose of the Regulations
  D. Severability
IV. Summary of Changes in the Final Rule
V. Discussion of Public Comments and Responses
  A. Section-by-Section Discussion of the DHS Proposed Rule, Public Comments, and the Final Rule
  B. Section-by-Section Discussion of the HHS Proposed Rule, Public Comments, and the Final Rule
  C. Other Comments Received
VI. Statutory and Regulatory Requirements
  A. Executive Orders 12866 and 13563: Regulatory Review
  B. Regulatory Flexibility Act
  C. Small Business Regulatory Enforcement Fairness Act of 1996
  D. Unfunded Mandates Reform Act of 1995
  E. Congressional Review Act
  F. Paperwork Reduction Act
  G. Executive Order 13132: Federalism
  H. Executive Order 12988: Civil Justice Reform
  I. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use
  J. National Environmental Policy Act (NEPA)
  K. Executive Order 12630: Governmental Actions and Interference With Constitutionally Protected Property Rights
  L. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks
  M. National Technology Transfer and Advancement Act
  N. Family Assessment
List of Subjects and Regulatory Amendments

## I. Table of Abbreviations

ACF—Administration for Children and Families
BPA—U.S. Border Patrol Agent
CBP—U.S. Customs and Border Protection
DHS—U.S. Department of Homeland Security
DOJ—U.S. Department of Justice
EOIR—Executive Office for Immigration Review
FRC—Family Residential Center
FSA—*Flores* Settlement Agreement
HHS—U.S. Department of Health and Human Services
HSA—Homeland Security Act of 2002
ICE—U.S. Immigration and Customs Enforcement
IIRIRA—Illegal Immigration Reform and Immigrant Responsibility Act of 1996
INA—Immigration and Nationality Act
INS—Immigration and Naturalization Service
JFRMU—Juvenile and Family Residential Management Unit
OFO—Office of Field Operations, U.S. Customs and Border Protection
OMB—Office of Management and Budget
ORR—Office of Refugee Resettlement, U.S. Department of Health and Human Services
PREA—Prison Rape Elimination Act of 2003
TVPRA—William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008
UAC(s)—Unaccompanied Alien Child(ren)
USCIS—U.S. Citizenship and Immigration Services
USBP—U.S. Border Patrol, U.S. Customs and Border Protection
YTD—Year to Date

## II. Executive Summary

### A. Purpose of the Regulatory Action

On September 7, 2018, the Department of Homeland Security (DHS) and the Department of Health and Human Services (HHS), (the "Departments") published a notice of proposed rulemaking (NPRM or proposed rule) that would amend regulations related to the Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children. *See* Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children; Proposed Rule, 83 FR 45486 (Sept. 7, 2018). The proposed rule provided a 60-day public comment period ending on November 6, 2018.

This final rule adopts the proposed rule, with some changes in response to comments. The final rule parallels the relevant and substantive terms of the *Flores* Settlement Agreement (FSA), with changes as are necessary to implement closely-related provisions of the Homeland Security Act of 2002 (HSA), Public Law 107–296, sec. 462, 116 Stat. 2135, 2202, and the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), Public Law 110–457, title II, subtitle D, 122 Stat. 5044.

This final rule also takes into account changes in factual circumstances since the time the FSA was approved in 1997 as well as extensive experience over the past twenty years operating the immigration system under the FSA. The rule thus reflects the operational environment and ensures that the regulations accomplish a sound and proper implementation of governing Federal statutes—including statutes requiring DHS to retain custody of aliens arriving at or crossing our borders without inspection during the pendency of immigration proceedings. It carefully considers public comments, and sets forth for DHS a sustainable operational model of immigration enforcement, and for HHS, codifies existing policies, procedures, and practices related to the temporary care and custody of UACs.

For example, one shift since the FSA entered into force in 1997 has been the 2015 judicial interpretation of the agreement as applying to accompanied minors, *i.e.,* juveniles encountered with their parents or legal guardians. DHS strongly disagrees with that interpretation and disagrees that the FSA provisions were suited to handling the challenging circumstances that are presented—in exponentially more cases than in 1997—when aliens are apprehended in family units. Indeed, the Federal courts have agreed that the

FSA was not designed to address the current-day circumstances presented by accompanied minors. *See Flores,* 828 F.3d 898, 906 (9th Cir. 2016) ("the parties gave inadequate attention to some potential problems of accompanied minors"). The FSA's application to accompanied minors has created a series of operational difficulties for DHS, most notably with respect to a state-licensing requirement for an ICE Family Residential Center (FRC) in which such parents/legal guardians may be housed together with their children during immigration proceedings, the need for custody of parents and accompanied minors as required by the immigration laws in certain circumstances, and avoiding the need to separate families to comply with the FSA when immigration custody is necessary for a parent.

Additionally, changes to the operational environment since 1997, as well as the enactment of the HSA and the TVPRA, have rendered some of the substantive terms of the FSA outdated or unsuited to current conditions at the border, similarly making simultaneous compliance with the HSA, the TVPRA, other immigration laws, and the FSA problematic without modification. These provisions are designed to implement the substantive and underlying purpose of the FSA, by ensuring that alien juveniles detained by DHS pursuant to the immigration laws, and UACs who are transferred to the temporary care and custody of HHS, are provided protections that are substantively parallel to protections under the FSA, taking into account intervening developments and changed circumstances. The Departments have also considered comments from the public, and this rule incorporates some adjustments from the proposed regulations based on those comments. The primary purpose of this rule is to codify the purposes of the FSA in regulations, namely, to establish uniform standards for the custody and care of alien juveniles during their immigration proceedings and to ensure they are treated with dignity and respect. The rule accordingly implements the FSA.

### Summary of Key Provisions of the Final Rule

As part of the process of codifying the purpose of the FSA into regulations, the final rule clarifies and improves certain policies and practices related to:

- Parole

In the NPRM, DHS proposed to amend 8 CFR 212.5(b), *Parole of aliens into the United States,* by removing an

internal cross-reference to 8 CFR 235.3(b). Eliminating that cross-reference is required to clarify that the provisions in § 235.3(b) governing the parole of aliens in expedited removal proceedings (*i.e.,* those pending a credible fear determination or who have been ordered removed in the expedited removal process but still await removal) apply to all such aliens, including minors in DHS custody, and not just adults. The current cross-reference to § 235.3(b) within § 212.5(b) is confusing because it suggests, incorrectly, that the more flexible parole standards in § 212.5(b) might override the provisions in § 235.3(b) that govern parole when any alien, including a minor, is in expedited removal proceedings.

Many commenters expressed concern about a more restrictive parole standard that would allow minors in expedited removal proceedings who have not yet been found to have a credible fear of persecution (or who have been found to lack such a fear) to be paroled only on the basis of medical emergency or law enforcement necessity, the same standards applicable to adult aliens in expedited removal proceedings, while their credible fear claim remains pending.

Many commenters expressed concern about this standard, but it draws from the statute, which imposes a uniquely strong detention mandate for aliens in this cohort: such aliens "shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, *until removed.*" INA 235(b)(1)(B)(iii)(IV). Some commenters stated that accompanied minors would no longer be eligible for parole, which is incorrect, as they will be eligible under the same standard as adults in the same position. Additionally, other commenters mistakenly expressed that the FSA guaranteed parole, which it does not, nor does it provide a standard for parole. ICE will continue to exercise its parole authority, on a case-by-case basis, in appropriate circumstances, including when a family unit establishes credible fear of persecution or torture. The final rule preamble responds to these misconceptions, and the final regulatory text in § 236.3(j)(4) takes into account respondents' concerns by stating clearly that parole for minors who are detained pursuant to section 235(b)(1)(B)(ii) of the INA or 8 CFR 235.3(c) will generally serve an urgent humanitarian reason if DHS determines that detention is not required to secure the minor's appearance before DHS or the immigration court, or to ensure the minor's safety of the safety of others. DHS may also consider aggregate and

historical data, officer experience, statistical information, or any other probative information in making these determinations.

• Licensing

Under the FSA, facilities that house children must be licensed ''by an appropriate State agency to provide residential, group, or foster care services for dependent children.'' FSA paragraph 6. The state-licensing requirement is sensible for unaccompanied alien children (UACs), because all States have licensing processes for the housing of unaccompanied juveniles who are by definition ''dependent children,'' and accordingly the rule does not change that requirement for those juveniles. But the need for the license to come specifically from a ''State agency'' (rather than a Federal agency) is problematic for DHS now that the FSA has been held in recent years to apply to accompanied minors, including those held at FRCs, because States generally do not have licensing schemes for facilities to hold minors who are together with their parents or legal guardians. The application of the FSA's requirement for ''state'' licensing to accompanied minors has effectively required DHS to release minors and—to avoid family separation—their parents from detention in a non-state-licensed facility, even if the parent/legal guardian and child could and would otherwise continue to be detained together during their immigration proceedings, consistent with applicable law, including statutes that require detention in these circumstances pending removal proceedings or to effectuate a removal order. *See, e.g.,* INA 235(b)(1)(B)(iii)(IV).

DHS proposed to define ''licensed facility'' as an ICE detention facility that is licensed by the state, county or municipality in which it is located. But because most States do not offer a licensing program for family unit detention, DHS also proposed that where state licensing is unavailable, a facility will be licensed if DHS employs an outside entity to ensure that the facility complies with family residential standards established by ICE. Section 236.3(b)(9) requires DHS to employ third parties to conduct audits of FRCs to ensure compliance with ICE's family residential standards. This rule adopts these provisions as final, and thus eliminates the barrier to the continued use of FRCs by creating a Federal alternative to meet the ''licensed facility'' definition.[1] The goal is to

provide materially identical standards for these facilities as what the FSA and state licensing would otherwise require, and thus implement the underlying purpose of the FSA's licensing requirement, and in turn to allow families to remain together during their immigration proceedings in an appropriate environment.

Commenters stated that DHS has previously not shared the results of third-party audits. While ICE has publicly posted the results of all facility inspection reports submitted by third-party contractors within 60 days of inspection since May 2018, these posts have not included results of FRC inspections. *See* Facility Inspections, *https://www.ice.gov/facility-inspections* (last updated Mar. 15, 2019). To directly address the commenters' concerns, the final rule provides that third-party inspections of FRCs will be posted in the same manner and adds the phrase ''DHS will make the results of these audits publicly available'' to the definition of ''licensed facility.''

Commenters also stated that DHS should not be allowed to self-license detention facilities because current facilities do not have adequate oversight and, as a result, DHS is not currently capable of maintaining clean, humane, and safe detention centers. They cited the Office of the Inspector General, DHS, OIG–18–67 report, *ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements* (June 26, 2018) to highlight the deficiencies in the agency's self-inspections by third-party contractors. However, this report did not examine oversight of the FRCs. As such, it is of limited value in assessing ICE's oversight of the FRCs. FRCs are subject to a different set of detention standards than other facilities and receive inspections more frequently, and by a larger number of outside entities than those detention centers reviewed in the OIG report. DHS also notes that ICE has already taken several steps to address OIG's recommendations. The agency's existing commitment to considering seriously OIG's recommendations regarding detention facilities and instituting them as appropriate will not change as a result of this final rule. In this final rule, however, DHS has added to the definition of licensed facilities that audits will occur when an FRC opens and regularly going forward. In addition, DHS has added a more thorough explanation of its standards

and inspection processes to address the commenters' underlying concern, to emphasize the important role third parties play in this process, and to underscore DHS's commitment to ensuring that individuals in FRCs are indeed held in appropriate conditions and treated with dignity and respect.

The licensing change does not impact CBP facilities. Under the FSA, juveniles are transferred to licensed facilities ''in any case in which [DHS] does not release a minor . . . .'' FSA paragraph 19. Thus, the only facilities which must be licensed under the FSA are those facilities to which juveniles are transferred following their initial encounter. Facilities at which juveniles are held immediately following their arrest, including CBP holding facilities, are governed by paragraph 12 of the FSA, and are not required to be licensed under the FSA. Accordingly, these facilities are also not included within the definition of ''licensed facility'' in this rule. DHS notes that CBP facilities are also subject to regular oversight and inspection by entities such as CBP's Office of Professional Responsibility (OPR), DHS' Office of Inspector General, DHS' Office of Civil Rights and Civil Liberties, and the Government Accountability Office.

• Bond Hearings

DHS proposed revisions to § 236.3(m) to state that bond hearings are only required for minors in DHS custody who are in removal proceedings under section 240 of the INA, to the extent permitted by 8 CFR 1003.19. DHS also proposed updating the language regarding bond hearings to be consistent with the changes in immigration law. Several commenters supported or acknowledged that proposed 8 CFR 236.3(m) maintained the process required by FSA paragraph 24(A), while another set of commenters did not explicitly endorse the provision but acknowledged that it provided the protections and processes required by the FSA. Other commenters expressed due process concerns.

DHS agrees with commenters that the proposed regulatory text at 8 CFR 236.3(m) reflects the provisions of the FSA regarding existence of bond redetermination hearings for minors in DHS custody who are in removal proceedings pursuant to INA 240, to the extent permitted by 8 CFR 1003.19. The understanding that the term ''deportation hearings'' in paragraph 24(A) of the FSA refers to what are now known as removal proceedings has been reiterated throughout the *Flores* litigation. Accordingly, FSA paragraph 24(A) requires bond redetermination

---

[1] The FSA defines the term ''licensed program,'' but because DHS does not operate programs outside of facilities, the new DHS regulations would define the term ''licensed facility.'' The HHS regulations define the term ''licensed program.''

hearings solely for those alien minors in DHS custody who are in removal proceedings under INA 240. Minors who are in expedited removal proceedings are not entitled to bond hearings; rather, DHS may parole such aliens on a case-by-case basis. *See Jennings* v. *Rodriguez*, 138 S. Ct. 830, 844 (2018) (holding that INA 235(b)(1) unambiguously prohibits release on bond and permits release only on parole). Minors in removal proceedings under INA 240 may appeal bond redetermination decisions made by an immigration judge to the Board of Immigration Appeals, in accordance with existing regulations found in 8 CFR 1003.19, and are informed of their right to review. Accordingly, DHS is not amending regulatory provisions regarding the bond provisions for minors based on public comments.

Major Commenter Concerns

• Trauma

Many commenters expressed serious concerns about child trauma. Comments focused on the trauma juveniles experience during their dangerous journey to the United States (often at the hands of smugglers and traffickers), trauma associated with experiences in their country of origin, the possibility of government custody-induced trauma in the United States, and in particular trauma caused by detention itself, and the need for trauma-related training and awareness throughout the immigration lifecycle, to include repatriation. Some commenters suggested, incorrectly, that the FSA explicitly prohibits the custody of children entirely and therefore, temporarily detaining family units together is unjustified.

DHS disagrees with the view that the FSA altogether prohibits detention of juveniles (including in family units). The FSA clearly contemplates, allows, and articulates standards for the custody of juveniles in a variety of circumstances. The final rule accordingly allows for the detention of minors as well. Moreover, DHS's experience shows that family units who are released often abscond, and detention is an important enforcement tool, particularly in controlling the border.

DHS acknowledges, however, that detention and custody may have negative impacts for minors and adults, and acknowledges the importance of identifying signs of trauma and ensuring that personnel are properly trained to identify and respond to signs of trauma, particularly among juveniles. DHS notes that this rule does not mandate detention for all family units. On the

contrary, DHS will make and record continuous efforts to release a minor in its custody and, as discussed more fully below, will generally consider paroling minors detained pursuant to INA 235(b)(1)(B)(ii) or 8 CFR 235.3(c) who do not present a safety risk or risk of absconding as serving an urgent humanitarian reason.

Moreover, DHS has adopted rigorous standards for facilities precisely to minimize further negative impacts on minors. DHS mandates training for personnel who regularly interact with minors and UACs during the course of their official duties. For example, ICE Enforcement and Removal Operations (ERO) officers receive training on family units and UACs in the Basic Immigration Enforcement Training Program (BIETP). The BIETP is the basic training for ERO officers and occurs at the beginning of their career. Additionally, ERO's Field Office Juvenile Coordinators (FOJC) participate in annual training. This annual training focuses on policies, procedures and protocols in accordance with the FSA, HSA, and TVPRA. FOJCs constitute a specialized officer corps whose expertise informs colleagues and leaders often confronting high-profile cases involving UACs and family units. FOJCs liaise with HHS ORR's Federal Field Specialists, who make case-by-case placement decisions. FOJC training covers best practices for case processing, A-file management, docket management, age determination, child interviewing techniques, child development and trauma, screening for human trafficking, transport, the ORR placement process and an overview of FRCs and Family Residential Standards. FRCs are staffed with medical professionals and social workers specially trained to recognize the symptoms of trauma and provide appropriate treatment.

CBP generally employs contracted medical staff, who provide medical screening and appropriate triage to minors and UACs in custody along the southwest border. Where appropriations and funding permits, CBP also employs other contracted staff who are able to address the unique needs of juveniles. Additionally, all Border Patrol agents and CBP officers receive training related to the processing and interviewing of juveniles, screening UACs for trafficking concerns, and the appropriate custodial treatment of juveniles.

Separately, HHS ensures that ORR-funded care provider staff are trained in techniques for child-friendly and trauma-informed interviewing, ongoing assessment, observation, and treatment of the medical and behavioral health

needs of UACs. Care provider staff are trained to identify UACs who have been smuggled (*i.e.,* transported illegally over a national border) and/or trafficked into the United States. Care providers must deliver services that are sensitive to the age, culture, and native language of each child as well.

Each ORR-funded care provider program maintains ORR-approved policies and procedures for interdisciplinary clinical services, including standards on professional licensing and education for staff, according to staff role or discipline. Staff who are required to have professional certifications must maintain licensure through continuing education requirements, and all care provider staff must complete at a minimum 40 hours of training annually.

All UACs in HHS' care participate in weekly individual counseling sessions with trained social work staff, where the provider reviews the child's progress, establishes short term objectives, and addresses developmental and crisis-related needs. Clinical staff may increase these once-a-week sessions if a more intensive approach is needed. If children have acute or chronic mental health illnesses, HHS refers them for mental health services in the community.

UACs participate in informal group counseling sessions at least twice a week, where all children are present. The sessions give UACs who are new to the program the opportunity to get acquainted with staff, other children in HHS care, and the rules of the program. These sessions provide an open forum where everyone has an opportunity to speak. Together, UACs and care providers make decisions on recreational activities and resolve issues affecting the UACs in care.

• Best Interests of the Child

Commenters raised issues regarding what was in the best interests of the child. DHS and HHS recognize that this is the heart of the FSA. Both Departments take seriously their responsibility to provide appropriate care to juveniles, many of whom have recently endured a hazardous journey to the United States. Juveniles are subject to different custody protocols depending upon whether they are unaccompanied or part of a family unit. Under the HSA, responsibility for the apprehension, temporary detention, transfer, and repatriation of UACs is delegated to DHS; whereas the responsibility for coordinating and implementing the care and placement of UACs with sponsors is delegated to HHS.

CBP takes temporary custody of UACs apprehended and encountered at the border, while ICE handles custody transfer and repatriation responsibilities, apprehends UACs in the interior of the country, and represents the Federal Government in removal proceedings. Within 72 hours, UACs in DHS custody are generally transferred into HHS custody, absent exceptional circumstances. Minors who do not meet the statutory definition of a UAC, including accompanied minors who enter the country as part of a family unit, may be placed in FRCs. These FRCs are designed to take into account the best interests of children during custody, pursuant to applicable laws., including by keeping the child with his or her parent(s) as a family unit.

Several commenters suggested, incorrectly, that the FSA prohibits temporary custody of juveniles entirely and that, therefore, detention goes inherently against the best interests of a child. DHS notes that even the authors of the FSA understood some amount of physical custody was going to be necessary and appropriate, as discussed above. The conditions of facilities and shelters that house children in DHS custody are designed to afford a protective environment for the best interests of the child and must adhere to the statutory, regulatory, and court-ordered requirements and standards governing the care and custody of children. FRCs are also designed to allow the child to live with his or her family, and thus to preserve family unity even when custody is warranted. And HHS care-provider facilities undergo rigorous State licensing processes in order to serve as residential child care shelters for the temporary care of UACs. This final rule implements those care and custody requirements and standards in full force.

Summary of Changes From the Proposed Rule

Following careful consideration of the public comments received, the Departments have made several modifications to the regulatory text proposed in the NPRM. These changes are:

• Section 212.5(b) now provides that DHS is not precluded from releasing a minor who is not a UAC to someone other than a parent or legal guardian, specifically a brother, sister, aunt, uncle, or grandparent who is not in detention.

• Section 236.3(b)(2) defines *Special Needs Minor.* DHS agrees to remove "retardation" and replace it with "intellectual disability."

• Section 236.3(b)(9), which defines *Licensed Facility,* requires DHS to employ third parties to conduct audits of FRCs to ensure compliance with ICE's family residential standards. In response to comments and for full transparency, DHS is adding the phrase "DHS will make the results of these audits publicly available" to the definition. DHS has also included in the definition that audits will occur upon the opening of a facility and on a regular basis thereafter to address comments regarding oversight of current facilities.

• In § 236.3(b)(11), which defines a *Non-Secure Facility,* DHS agrees with commenters that the intention of the proposed rule was to provide a definition of non-secure when the term was not otherwise defined under the state law where the facility is located. Given commenters' concerns that the regulatory text was unclear, DHS will clarify the definition in this final rule and add "under state law" to the definition.

• In § 236.3(f)(1) regarding transfer of UACs from DHS to HHS, DHS agrees to amend the proposed regulatory text to clarify that the reference to 8 U.S.C. 1232(a)(2) refers to the processing of a UAC from a contiguous country. DHS is deleting "subject to the terms of" and replacing it with "processed in accordance with."

• In § 236.3(f)(4)(i) regarding the transportation of UACs, DHS is amending the regulatory text to make clear that, as a general matter, UACs are not transported with unrelated detained adults. The two situations described in the regulatory text are limited exceptions to this general rule. DHS is adding the reference to unrelated "detained" adults, for clarity.

• In § 236.3(g)(1)(i), DHS is amending the procedures applicable to the apprehension and processing of minors or UACs. The regulatory text will be clear that the notices required, including Form I–770, will be provided, read, or explained to all minors and UACs in a language and manner that they understand, not just to those minors believed to be less than 14 or who are unable to understand the notice, as was proposed in the NPRM.

• In § 236.3(g)(2)(i) regarding DHS custodial care immediately following apprehension, DHS agrees to delete the term "exigent circumstances," as it is redundant to "emergency."

• In § 236.3(i)(4), commenters requested additional language tracking the verbatim text of FSA Ex. 1 paragraph B and C. DHS reiterates that these standards in § 236.3(i)(4) apply to the non-secure, licensed facilities used for housing family units—FRCs.

• Section 236.3(j) and (n) now provide that DHS is not precluded from releasing a minor who is not a UAC to someone other than a parent or legal guardian, specifically a brother, sister, aunt, uncle, or grandparent who is not in detention and is otherwise available to provide care and physical custody.

• DHS has added new § 236.3(j)(2)– (4) to identify the specific statutory and regulatory provisions that govern the custody and/or release of non-UAC minors in DHS custody based on the type and status of immigration proceedings.

• DHS has added a new § 236.3(j)(4) to state clearly that the Department will consider parole for all minors who are detained pursuant to section 235(b)(1)(B)(ii) of the INA or 8 CFR 235.3(c), and that paroling such minors who do not present a safety risk or risk of absconding will generally serve an urgent humanitarian reason. Paragraph (j) now also states that DHS takes aggregate and historical data, officer experience, statistical information or any other probative information into account when determining whether release may be appropriate.

• Section 236.3(o) is amended to clarify that the Juvenile Coordinator's duty to collect statistics is in addition to the requirement to monitor compliance with the terms of the regulations.

• In § 410.101, HHS agrees to amend the definition of "special needs minor," replacing the term "retardation" with "intellectual disability."

• In § 410.201(e), HHS agrees with multiple legal advocacy organizations' analysis that the FSA and TVPRA run in contradiction to each other on the placement of UACs in secure facilities based solely on the lack of appropriate licensed program availability; therefore, ORR is striking the following clause from this section: ". . . or a State or county juvenile detention facility."

• In § 410.202, in response to commenters' concerns, HHS clarifies that it places UACs in licensed programs except if a reasonable person would conclude "based on the totality of the evidence and in accordance with subpart G" that the UAC is an adult.

• In § 410.203, in response to commenters' concerns, HHS clarifies that it reviews placements of UACs in secure facilities at least monthly and that the rule does not abrogate any requirements that HHS place UACs in the least restrictive setting appropriate to their age and any special needs.

• In § 410.302(a), in response to commenters' concerns, HHS clarifies that the licensed program providing care for a UAC shall make continual efforts at family reunification as long as the

UAC is in the care of the licensed program.

• In § 410.600(a) regarding transfer of UAC, the proposed regulatory text stated that, ''ORR takes all necessary precautions for the protection of UACs during transportation with adults.'' However, as ORR does not transport adult aliens, HHS has decided to strike this language from the final rule.

• In § 410.700 HHS is adding the ''totality of the evidence and circumstances'' for age determinations standards to mirror the DHS standard in compliance with statute. *See* 8 U.S.C. 1232(b)(4).

• In § 410.810(b), HHS declines to place the burden of evidence in the independent internal custody hearings on itself; however, it has modified the rule text to indicate that HHS bears the initial burden of production supporting its determination that a UAC would pose a danger or flight risk if discharged from HHS' care. The UAC bears the burden of persuading the independent hearing officer to overrule the government's position, under a preponderance of the evidence standard.

*B. Legal Authority*

The Secretary of Homeland Security derives authority to promulgate these regulatory amendments primarily from the Immigration and Nationality Act (INA or Act), as amended, 8 U.S.C. 1101 *et seq.* The Secretary may ''establish such regulations'' as he deems necessary for carrying out his authorities under the INA. INA sec. 103(a)(3), 8 U.S.C. 1103(a)(3). In addition, section 462 of the HSA and section 235 of the TVPRA prescribe substantive requirements and procedural safeguards to be implemented by DHS and HHS with respect to unaccompanied alien children (UACs).

Section 462 of the HSA also transferred to the Office of Refugee Resettlement (ORR) Director ''functions under the immigration laws of the United States with respect to the care of unaccompanied alien children that were vested by statute in, or performed by, the Commissioner of Immigration and Naturalization.'' 6 U.S.C. 279(a). The ORR Director may, for purposes of performing a function transferred by this section, ''exercise all authorities under any other provision of law that were available with respect to the performance of that function to the official responsible for the performance of the function'' immediately before the transfer of the program. 6 U.S.C. 279(f)(1).

Consistent with provisions in the HSA, the TVPRA places the responsibility for the care and custody of all UACs who are not eligible to be repatriated to a contiguous country with the Secretary of Health and Human Services.[2] Prior to the transfer of the program, the Commissioner of Immigration and Naturalization, through a delegation from the Attorney General, had authority ''to establish such regulations . . . as he deem[ed] necessary for carrying out his authority under the provisions of this Act.'' INA sec. 103(a)(3), 8 U.S.C. 1103(a)(3) (2002); 8 CFR 2.1 (2002). In accordance with the relevant savings and transfer provisions of the HSA, *see* 6 U.S.C. 279, 552, 557; *see also* 8 U.S.C. 1232(b)(1), the ORR Director now possesses the authority to promulgate regulations concerning ORR's administration of its responsibilities under the HSA and TVPRA, and the FSA at paragraph 40 (as modified) specifically envisions promulgation of such regulations.

*C. Costs and Benefits*

This rule implements the FSA by establishing uniform standards for the custody and care of alien juveniles during their immigration proceedings and to ensure they are treated with dignity and respect. The rule adopts regulatory measures that materially parallel the FSA standards and protections, and also by codifying the current requirements for complying with the FSA, the HSA, and the TVPRA, and respond to changed factual and operational circumstances.

U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement (ICE) encounter minors and UACs in different manners. CBP generally encounters UACs and minors at or near the border. In Fiscal Year (FY) 2017, CBP apprehended 113,920 juveniles.[3] In FY 2018, CBP apprehended 107,498 juveniles. Generally, ICE encounters minors either upon transfer from CBP to an FRC, or during interior enforcement actions. In FY 2017, 37,825 individuals were booked into ICE's three FRCs, 20,606 of whom were minors. In FY 2018, 45,755 individuals were booked into ICE's three FRCs, 24,265 of whom were minors. ICE generally encounters UACs when it transports UACs who are transferred from CBP custody to ORR custody, as well as during interior

enforcement actions. The Office of Refugee Resettlement (ORR) encounters UACs when they are referred to ORR custody and care by CBP, after border encounters, or by direct referral from ICE, after ICE-related interior immigration enforcement. It is important to note that HHS does not enforce immigration measures; that is the role and responsibility of HHS' Federal partners within DHS. ORR is a child welfare agency and provides shelter, care, and other essential services to UACs, while working to reunite them with family or other approved sponsors as soon as possible, with safety governing the process. In FY 2017, 40,810 UACs were placed in ORR's care. In FY 2018, 49,100 UACs were placed in ORR's care. (Please note that these numbers may reflect UACs who were in ORR's care from one fiscal year into the next.)

The Departments' current operations and procedures for implementing the terms of the FSA, the HSA, and the TVPRA are the primary baseline against which to assess the costs and benefits of this rule. DHS and HHS already incur the costs for these operations; therefore, they are not costs of this rule.

The primary changes to DHS's current operational environment resulting from this rule are implementing an alternative licensing process for FRCs and making changes to 8 CFR 212.5 to align parole for minors in expedited removal with all other aliens in expedited removal, consistent with the applicable statutory authority. Subject always to resource constraints, these changes may result in additional or longer detention for some groups of minors. Specifically, minors who are in expedited removal proceedings whose credible-fear determination is still pending or who lack a credible fear and are awaiting removal are more likely to be held until removal can be effectuated. Furthermore, minors who have been found to have a credible fear or who are otherwise in INA section 240 proceedings, and who pose a flight risk or danger if released, are more likely to be held until the end of their removal proceedings, although limited bed space in FRCs imposes a significant constraint on custody of this cohort. DHS estimates the total number of minors in FY 2017 in groups that might be detained longer was 2,787 and in FY 2018 was 3,663. The numbers of accompanying parents or legal guardians are not included in these estimates. While the above estimates reflects the number of minors in FY 2017 and FY 2018 in groups of individuals that would likely be held until removal can be effectuated, DHS is unable to forecast the future total

---

[2] Some UACs from contiguous countries may be permitted to withdraw their application for admission and be repatriated. These UACs are not referred to HHS. 8 U.S.C. 1232(a)(2).

[3] Throughout this final rule, the Departments generally use the term ''juvenile'' to refer to any alien under the age of 18. For further explanation, see below for discussion of the terms ''juvenile,'' ''minor,'' and ''unaccompanied alien child (UAC).''

number of such minors that may experience additional or longer detention as a result of this rule, or for how much longer individuals may be detained because there are many other variables that may affect such estimates. DHS also notes that resource constraints on the availability of bed space mean that if some individuals are detained for longer periods of time, then less bed space will be available to detain other aliens, who in turn could be detained for less time than they would have been absent the rule. DHS is unable to provide an aggregate estimate of the cost of any increased detention on the individuals being detained. To the extent this rule results in filling any available bed space at current FRCs, this may thereby increase variable annual costs paid by ICE to operators of current FRCs.

DHS notes that while additional or longer detention could result in the need for additional bed space, there are many factors that would be considered in opening a new FRC and at this time ICE is unable to determine if this rule would result in costs to build additional bed space. If ICE awarded additional contracts for expanded bed space as a result of this rule, ICE would also incur additional fixed costs and variable costs to provide contracted services beyond current FRC capacity.

The primary purpose of the rule is to implement applicable statutory law and the FSA through regulations, to respond to changes in law and circumstances, and in turn enable termination of the agreement as contemplated by the FSA itself, in doing so DHS will move away from judicial governance to executive government via regulation. The result is to provide for the sound administration of the detention and custody of alien minors and UACs to be carried out fully, pursuant to the INA, HSA, TVPRA, and existing regulations issued by the Departments responsible for administering those statutes, rather than partially carried out via a decades-old settlement agreement. The rule ensures that applicable regulations reflect the Departments' current operations with respect to minors and UACs in accordance with the relevant and substantive terms of the FSA and the TVPRA, as well as the INA. Further, by modifying the literal text of the FSA (to the extent it has been interpreted to apply to accompanied minors) in limited cases to reflect and respond to intervening statutory and operational changes, DHS ensures that it retains discretion to detain families, as appropriate and pursuant to its statutory and regulatory authorities, to meet its enforcement needs, while still providing protections to minors that the FSA intended.

### D. Effective Date

This final rule will be effective on October 22, 2019, 60 days from the date of publication in the **Federal Register**.

## III. Background and Purpose

### A. History

#### 1. The Flores Settlement Agreement

Prior to the enactment of the HSA, the Attorney General and the legacy INS had the primary authority to administer and enforce the immigration laws. In the period leading up to the *Flores* litigation in the mid-1980s, the general nationwide INS policy, based on regulations promulgated in 1963 and the Juvenile Justice and Delinquency Prevention Act of 1974, was that alien juveniles could petition an immigration judge for release from INS custody if an order of deportation was not final. *See Reno* v. *Flores,* 507 U.S. 292, 324–25 (1993). In 1984, the Western Region of the INS implemented a different release policy for juveniles, and the INS later adopted that policy nationwide. Under that policy, juveniles could only be released to a parent or a legal guardian. The rationale for the policy was two-fold: (1) To protect the juvenile's welfare and safety, and (2) to shield the INS from possible legal liability. The policy allowed such alien juveniles to be released to other adults only in unusual and extraordinary cases at the discretion of the District Director or Chief Patrol Agent. *See Flores* v. *Meese,* 942 F.2d 1352 (9th Cir. 1991) (en banc).

On July 11, 1985, four alien juveniles filed a class action lawsuit in the U.S. District Court for the Central District of California, *Flores* v. *Meese,* No. 85–4544 (C.D. Cal. filed July 11, 1985). The case "ar[ose] out of the INS's efforts to deal with the growing number of alien children entering the United States by themselves or without their parents (unaccompanied alien minors)." *Flores* v. *Meese,* 934 F.2d 991, 993 (9th Cir. 1990). The class was defined to consist of "all persons under the age of eighteen (18) years who have been, are, or will be arrested and detained pursuant to 8 U.S.C. 1252 by the INS within the INS' Western Region and who have been, are, or will be denied release from INS custody because a parent or legal guardian fails to personally appear to take custody of them." *Id.* at 994. The *Flores* litigation challenged "(a) the [INS] policy to condition juveniles' release on bail on their parents' or legal guardians' surrendering to INS agents for interrogation and deportation; (b) the procedures employed by the INS in imposing a condition on juveniles' bail that their parents' or legal guardians' [sic] surrender to INS agents for interrogation and deportation; and (c) the conditions maintained by the INS in facilities where juveniles are incarcerated." *See Flores* Compl. paragraph 1. The plaintiffs claimed that the INS's release and bond practices and policies violated, among other things, the INA, the Administrative Procedure Act, and the Due Process Clause and Equal Protection Guarantee under the Fifth Amendment. *See id.* paragraphs 66–69.

Prior to a ruling on any of the issues, on November 30, 1987, the parties entered into a Memorandum of Understanding (MOU) on the conditions of detention. The MOU stated that minors in INS custody for more than 72 hours following arrest would be housed in facilities that met or exceeded the standards set forth in the April 29, 1987, U.S. Department of Justice Notice of Funding in the **Federal Register** and in the document "Alien Minors Shelter Care Program—Description and Requirements." *See* Notice of Availability of Funding for Cooperative Agreements; Shelter Care and Other Related Services to Alien Minors, 52 FR 15569, 15570 (Apr. 29, 1987). The Notice provided that eligible grant applicants for the funding described in the Notice included organizations that were "appropriately licensed or can expeditiously meet applicable state licensing requirements for the provision of shelter care, foster care, group care and other related services to dependent children . . . ." *Id.*

At approximately the same time that the MOU was executed, the INS published a proposed rule on the Detention and Release of Juveniles to amend 8 CFR parts 212 and 242. *See* 52 FR 38245 (Oct. 15, 1987). The stated purpose of the rule was "to codify the [INS] policy regarding detention and release of juvenile aliens and to provide a single policy for juveniles in both deportation and exclusion proceedings." Again, however, the proposed regulations did not address the considerations that might arise if the INS ever held an accompanied minor in custody along with his or her parent, together as a unit. For example, the preamble discussed the need to coordinate "family *re*unification" and "locating suitable placement of juvenile detainees," but did not discuss preserving family unity when a minor is already in custody together with the parent. *Id.* (emphasis added).

The INS issued a final rule in May 1988. 53 FR 17449 (May 17, 1988). The rule provided for release to a parent,

guardian, or other relative, and discretionary release to other adults. *See* 53 FR at 17451. It also provided that when adults are in detention, INS would consider release of the adult and juvenile. *Id.*

On May 24, 1988, the district court where the original *Flores* case was filed held that the recently codified INS regulation, 8 CFR 242.24 (1988), governing the release of detained alien minors, violated substantive due process, and ordered modifications to the regulation. The district court also held that INS release and bond procedures for detained minors in deportation proceedings fell short of the requirements of procedural due process, and therefore ordered the INS "forthwith" to provide to any minor in custody an "administrative hearing to determine probable cause for his arrest and the need for any restrictions placed upon his release." *Flores* v. *Meese,* 934 F.2d 991, 993 (9th Cir. 1990) (quoting the district court). The INS appealed, and the Ninth Circuit reversed the district court's holdings that the INS exceeded its statutory authority in promulgating 8 CFR 242.24 and that the regulation violated substantive due process. The Ninth Circuit also reversed the district court's procedural due process holding, identified the legal standard that the district court should have applied, and remanded the issue for the district court to further explore the issue. *Id.* at 1013. On rehearing en banc, however, the Ninth Circuit vacated the original panel's opinion, affirmed the district court's holding, and held that INS's regulation was invalid because the regulation violated the alien child's due process and habeas corpus rights, and detention where the alien child was otherwise eligible for release on bond or recognizance to a custodian served no legitimate purpose of the INS. *Flores* v. *Meese,* 942 F.2d 1352 (9th Cir. 1991) (en banc) ("The district court correctly held that the blanket detention policy is unlawful. The district court's order appropriately requires children to be released to a responsible adult where no relative or legal guardian is available and mandates a hearing before an immigration judge for the determination of the terms and conditions of release.").

The INS appealed, and in 1993, the U.S. Supreme Court rejected Plaintiffs' facial challenge to the constitutionality of the INS's regulation concerning the care of alien juveniles. *Reno* v. *Flores,* 507 U.S. 292 (1993). The Supreme Court held that the regulations did not violate any substantive or procedural due process rights or equal protection principles. *Id.* at 306, 309. According to the Court, the regulations did not

exceed the scope of the Attorney General's discretion under the INA to continue custody over arrested aliens, because the challenged regulations rationally pursued the lawful purpose of protecting the welfare of such juveniles. *Id.* at 315.

The regulations promulgated in 1988 have remained in effect since publication but were moved to 8 CFR 236.3 in 1997. *See* 62 FR 10312, 10360 (Mar. 6, 1997). They were amended in 2002 when the authority to decide issues concerning the detention and release of juveniles was moved to the Director of the Office of Juvenile Affairs from the District Directors and Chief Patrol Agents. *See* 67 FR 39255, 39258 (June 7, 2002).

The Supreme Court's decision in *Reno* v. *Flores* did not fully resolve all of the issues in the case. After that decision, the parties agreed to settle the matter and resolved the remainder of the litigation in the FSA, which the district court approved on January 28, 1997. In 1998, the INS published a proposed rule having a basis in the substantive terms of the FSA, entitled Processing, Detention, and Release of Juveniles. *See* 63 FR 39759 (July 24, 1998). Over the subsequent years, that proposed rule was not finalized. In 2001, as the original termination date of the FSA approached, the parties added a stipulation in the FSA, which terminates the FSA "45 days following defendants' publication of final regulations implementing t[he] Agreement." Stipulated Settlement Agreement, *Flores* v. *Reno,* No. CV 85–4544–RJK(Px) (C.D. Cal. Dec. 7, 2001). In January 2002, the INS reopened the comment period on the 1998 proposed rule, 67 FR 1670 (Jan. 14, 2002), but the rulemaking was ultimately abandoned. Thus, as a result of the 2001 Stipulation, the FSA has not terminated. The U.S. District Court for the Central District of California has continued to rule on various motions filed in the case and oversee enforcement of the FSA.

After the 2001 Stipulation, Congress enacted the HSA and the TVPRA, both of which impact the treatment of alien juveniles. Among other changes, the HSA created DHS and, along with the TVPRA, transferred the functions under the immigration laws with respect to the care and then custody of UACs referred by other Federal agencies to HHS ORR. The TVPRA also further regulated the Departments' respective roles with respect to UACs. *See* 6 U.S.C. 111(a), 279; 8 U.S.C. 1232(b)(1).

The HSA also contained a general savings clause at 6 U.S.C. 552(a) with respect to the transfer of functions from the INS to ORR and DHS. The savings

clause has been interpreted by courts to have maintained the FSA as enforceable against HHS and DHS. By promulgating these final rules, HHS and DHS are completing an administrative action to terminate the FSA.

To summarize agency roles under the current statutory framework: DHS apprehends, provides care and custody for, transfers, and removes alien minors; DHS apprehends, transfers, and removes UACs; and HHS ORR provides for care and custody of UACs who are in Federal custody (other than those permitted to withdraw their application for admission) and referred to HHS ORR by other Departments.

## 2. The Reorganization of the Immigration and Naturalization Service

The FSA was entered into by the INS, which was under the U.S. Department of Justice, and the plaintiffs in the *Flores* lawsuit. INS had within it all of the immigration functions: Border patrol, detention, enforcement, deportation, investigations, and adjudication of immigration benefits. After the 9/11 attacks a major reorganization of the government took place, and most of the INS functions were transferred to the newly formed DHS in 2003 and divided into three distinct components. The U.S. Citizenship and Immigration Services (USCIS) took over adjudication of immigration benefits. ICE took over the investigative and enforcement functions of INS, which included longer-term detention of aliens when warranted. CBP took over the functions on the border, including apprehension of those entering illegally and inspections of individuals entering at ports of entry, as well as short-term detention for the purposes of processing aliens. The Homeland Security Act also transferred the responsibility for the care and custody of UACs to HHS' ORR. 6 U.S.C. 279(a). The obligations under the FSA therefore also had to be divided after the reorganization.

In 2008, Congress passed the TVPRA, which further provided that all UACs in government custody (other than those able to withdraw their application for admission and be immediately repatriated) must be transferred to HHS ORR.

## 3. The Change in Migration Patterns and the Creation of the Family Residential Centers as a Response

When the FSA was first entered into and even when DHS was first created, migration at the southern border primarily consisted of single adults and unaccompanied juveniles, mostly in their teens. Since then, the numbers of minors, both accompanied and

unaccompanied, has skyrocketed. In 1993, for instance, the Supreme Court recognized that a surge of "more than 8,500" unaccompanied minors represented a "problem" that is "serious." *Reno,* 507 U.S. at 294. Before 2012, the number of UACs encountered by the government stayed relatively consistent with an average of about 7,000 to 8,000 UACs typically placed in ORR custody each year before FY 2012.[4]

But that then changed. From Fiscal Year 2011 through 2018, apprehensions of UACs between ports of entry along the southwest border increased dramatically: Were as follows, resulting in a substantial net increase over that time period: FY 2011: 15,949; FY 2012: 24,403; FY 2013: 38,759; FY 2014: 68,541; FY 2015: 39,970; FY 2016: 59,692; FY 2017: 41,435; FY 2018: 50,036.[5] At ports of entry along the southwest border, 10,678 UACs were found inadmissible in FY 2016; 7,246 UACs were found inadmissible in FY 2017; and 8,624 UACs were found inadmissible in FY 2018.[6]

Additionally, a new trend also began of families with young children crossing the border. For family units, the overall numbers of apprehensions have increased dramatically: FY 2013: 14,855; FY 2014: 68,445; FY 2015: 39, 838; FY 2016: 77,674; FY 2017: 75,622; FY 2018: 107,212.[7] At ports of entry, 26,062 family units were found inadmissible in FY 2016, 29,375 family units were found inadmissible in FY 2017, and 53,901 family units were found inadmissible in FY 2018.[8]

In FY 2019 so far, from October 2018 through June 2019, the total number of UAC apprehensions along the Southwest border was 63,624, and the total number of family unit apprehensions was 390,308. An additional 3,572 UACs and 37,573 family units have been found inadmissible at ports of entry.[9]

As the number of family units increased, the Government faced a new challenge: Housing children primarily in adult facilities, even with their parents, while still trying to provide all of the services juveniles need. In the early 2000s, the government created ICE Family Residential Centers (FRCs). By 2016, there were three FRCs. Unlike the CBP facilities where juveniles are temporarily held following apprehension or encounter (which are designed for short-term detention), FRCs are more akin to a dormitory setting. For example, the first FRC in Berks, Pennsylvania, was converted from a senior living center. It has suites where each family is housed separately. Beds, tables, chests of drawers, and other standard amenities are provided. Bedding, towels, basic clothing, and toiletries are provided. There is also a laundry facility on premises. There is a large community "living room" that has a large screen television, large cushioned couches and lounge chairs, a gaming area and a separate library that contains books, smaller television sets, video games, and board games. The facility also has an entire wing dedicated to classroom learning where minors at the facility go to school five days a week and study English and other age appropriate subjects. Another wing is a medical facility where minors and their parents receive any necessary medical care, including all immunizations required for later admission to U.S. public schools, and a treatment area for those who have entered the country with a communicable disease, such as tuberculosis. There are also phone banks to call relatives, consulates, or attorney/representatives.

In all FRCs, three hot "all-you-can-eat" meals a day are provided, and snacks are available throughout the day. All three FRCs offer a variety of indoor and outdoor daily recreation activities for children and adults, and a monthly recreational schedule is posted within communal areas in each facility. Indoor activities offered include a variety of sports (*e.g.,* basketball, badminton, indoor soccer, and volleyball), group exercise classes, arts and crafts classes, karaoke, movie nights, and seasonal and holiday-themed activities. Outdoor recreational facilities include soccer fields, sand volleyball courts, handball courts, sand boxes, and play structures with slides and jungle gyms. The facility is non-secure and a family is not physically prevented from leaving the facility.

The FRCs have video conferencing set up for court hearings and private meeting rooms so that families can meet with their attorneys or representatives. Child care is provided to the parents while they meet with their attorneys/ representatives or attend their court hearings. Interpreting services are available 24 hours a day via telephone. Attorneys and representatives approved to appear at immigration court hearings are provided access to the residents at various times each week, enabling families to obtain counsel and not have to appear at immigration hearings as pro se respondents.

*B. Authority*

1. Statutory and Regulatory Authority

a. Immigration and Nationality Act and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996

The INA, as amended, provides the primary authority for DHS to detain certain aliens for violations of the immigration laws. Congress expanded legacy INS detention authority in IIRIRA, Public Law 104–208, 110 Stat. 3009. In that legislation, Congress amended the INA by providing that certain aliens were subject to either mandatory or discretionary detention by the INS. This authorization flowed to DHS after the reorganization under the HSA. Specifically, DHS's authority to detain certain aliens comes from sections 235, 236, and 241 of the INA, 8 U.S.C. 1225, 1226, and 1231. Section 235 of the INA, 8 U.S.C. 1225, provides that applicants for admission to the United States, including those subject to expedited removal, shall be detained during their removal proceedings, although such aliens may be released on parole in limited circumstances, consistent with the statutory standard set forth in INA 212(d)(5), 8 U.S.C. 1182(d)(5) and standards set forth in the regulations. Section 236 of the INA, 8 U.S.C. 1226, provides the authority to arrest and detain an alien pending a decision on whether the alien is to be removed from the United States, and section 241, 8 U.S.C. 1231, authorizes the detention of aliens during the period following the issuance of a final order of removal. Other provisions of the INA also mandate detention of certain classes of individuals, such as criminal aliens.

b. Homeland Security Act of 2002

As noted, the HSA, Public Law 107– 296, 116 Stat. 2135, transferred most of

---

[4] *See* U.S. Department of Health and Human Services, Administration for Children and Families, Office of Refugee Resettlement, Unaccompanied Alien Children Program, *Fact Sheet* (May 2014), *https://www.acf.hhs.gov/sites/default/files/orr/ unaccompanied_childrens_services_fact_sheet.pdf.*

[5] *See* U.S. Border Patrol, Total Unaccompanied Alien Children (0–17 years old Apprehensions, *https://www.cbp.gov/sites/default/files/assets/ documents/2019-Mar/bp-total-monthly-uacs-sector- fy2010-fy2018.pdf).*

[6] *See https://www.cbp.gov/newsroom/stats/ofo- sw-border-inadmissibles-fy2017, https:// www.cbp.gov/newsroom/stats/sw-border-migration/ fy-2018.*

[7] *See* U.S. Border Patrol, Total Family Unit Apprehensions, *https://www.cbp.gov/sites/default/ files/assets/documents/2019-Mar/bp-total-monthly- family-units-sector-fy13-fy18.pdf.*

[8] *See https://www.cbp.gov/newsroom/stats/ofo- sw-border-inadmissibles-fy2017, https:// www.cbp.gov/newsroom/stats/sw-border-migration/ fy-2018.*

[9] *See* U.S. Customs and Border Protection, Southwest Border Migration FY2019, available at: *https://www.cbp.gov/newsroom/stats/sw-border- migration.*

the functions of the INS from DOJ to the newly-created DHS. DHS and its various components are responsible for border security, interior immigration enforcement, and immigration benefits adjudication, among other duties. DOJ's EOIR retained its pre-existing functions relating to the immigration and naturalization of aliens, including conducting removal proceedings and adjudicating defensive filings of asylum claims.

The functions regarding care of UACs were transferred from the INS to HHS ORR. The HSA states ORR shall be responsible to coordinate and implement the care and placement of UACs who are in Federal custody by reason of their immigration status. ORR was also tasked with identifying a sufficient number of qualified individuals, entities, and facilities to house UACs, and with ensuring that the interests of the child are considered in decisions and actions relating to his or her care and custody.

### c. William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008

Section 235 of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), Public Law 110–457, Title II, Subtitle D, 122 Stat. 5044 (codified in principal part at 8 U.S.C. 1232), states that consistent with the HSA, and except as otherwise provided with respect to certain UAC from contiguous countries (*see* 8 U.S.C. 1232(a)), the care and custody of all UACs, including responsibility for their detention, where appropriate, shall be the responsibility of HHS. The TVPRA, among other things, requires Federal agencies to notify HHS within 48 hours of apprehending or discovering a UAC, or receiving a claim or having suspicion that an alien in their custody is under 18 years of age. 8 U.S.C. 1232(b)(2). The TVPRA further requires that, absent exceptional circumstances, any Federal agency transfer a UAC to the care and custody of HHS within 72 hours of determining that an alien in its custody is a UAC. 8 U.S.C. 1232(b)(3).

The Secretary of HHS delegated the authority under the TVPRA to the Assistant Secretary for Children and Families, 74 FR 14564 (2009), who in turn delegated the authority to the ORR Director, 74 FR 1232 (2009).

### 2. Flores Settlement Agreement Implementation

As discussed above, in the 1990s, the U.S. Government and *Flores* plaintiffs entered into the FSA to resolve nationwide the ongoing litigation

concerning the INS's detention regulations for alien minors. The FSA was executed on behalf of the Government on September 16, 1996. The U.S. District Court for the Central District of California approved the FSA on January 28, 1997. The FSA became effective 30 days after its approval by the district court and provided for continued oversight by that court.

Paragraph 9 of the FSA explains its purpose: To establish a "nationwide policy for the detention, release, and treatment of minors in the custody of the INS." Paragraph 4 defines a "minor" as "any person under the age of eighteen (18) years who is detained in the legal custody of the INS," but the definition excludes minors who have been emancipated or incarcerated due to a criminal conviction as an adult. The FSA established procedures and conditions for processing, transportation, and detention following apprehension, and set forth the procedures and practices that the parties agreed should govern the INS's discretionary decisions to release or detain minors and to whom they should or may be released.

The FSA was originally set to expire within five years, but on December 7, 2001, the Parties agreed to a termination date of "45 days following defendants' publication of final regulations implementing this Agreement." However, the proposed rule that was published for that purpose was never finalized. *See* 67 FR 1670 (reopening the comment period for the 1998 proposed rule). A copy of the FSA and the 2001 Stipulation is available in the docket for this rulemaking. A principal purpose of these regulations is to "implement[] the Agreement," and in turn to terminate the FSA.

### 3. Recent Court Orders

#### a. Motion to Enforce I

On January 26, 2004, Plaintiffs filed their first motion to enforce the agreement, alleging, among other things, that CBP and ICE: (1) Regularly failed to release minors covered by the FSA to caregivers other than parents when parents refused to appear; (2) routinely failed to place detained class members in the least restrictive setting; (3) failed to provide class members adequate education and mental health services, and (4) exposed minors covered by the FSA to dangerous and unhealthy conditions. Ultimately, after a lengthy discovery process in which the government provided Plaintiffs numerous documents related to the government's compliance with the FSA, Plaintiffs filed a Notice of Withdrawal of

Motion to Enforce Settlement on November 14, 2005. The court dismissed the matter on May 10, 2006.

#### b. Motion To Enforce II

On February 2, 2015, Plaintiffs filed a second motion to enforce the agreement, alleging that CBP and ICE were in violation of the FSA because: (1) ICE's supposed no-release policy—*i.e.,* an alleged policy of detaining all female-headed families, including children, for as long as it takes to determine whether they are entitled to remain in the United States—violated the FSA; (2) ICE's routine confinement of class members in secure, unlicensed facilities breached the Agreement; and (3) CBP exposed class members to harsh and substandard conditions, in violation of the Agreement.

On July 24, 2015, the district court granted Plaintiffs' second motion to enforce and denied Defendant DHS's contemporaneous motion to modify the agreement. *Flores* v. *Johnson,* 212 F. Supp. 3d 864 (C.D. Cal. 2015). The court found: (1) The FSA applied to all alien minors in government custody, including those accompanied by their parents or legal guardians; (2) ICE's continuing detention of minors accompanied by their mothers was a material breach of the FSA; (3) the FSA requires Defendant DHS to release minors with their accompanying parent or legal guardian unless this would create a significant flight risk or a safety risk; (4) DHS housing minors in secure and non-licensed FRCs violated the FSA; and (5) CBP violated the FSA by holding minors and UACs in facilities that were not safe and sanitary. *Id.* The Court ordered the government to show cause why certain remedies should not be implemented as a result of these violations.

The government filed a response to the Court's order to show cause on August 6, 2015. On August 21, 2015, the court issued a subsequent remedial order for DHS to implement six remedies. *Flores* v. *Lynch,* 212 F. Supp. 3d 907 (C.D. Cal. 2015). In the decision, the court clarified that, as provided in FSA paragraph 12(A), in the event of an emergency or influx, DHS need not transfer minors to a "licensed program" pursuant to the 3- and 5-day requirements of paragraph 12(A), but must transfer such minors "as expeditiously as possible." In the decision, the court referenced the Government's assertion that DHS, on average, would detain minors who are not UACs for 20 days—the general length of time required to complete credible or reasonable fear processing at that time for aliens in expedited

removal. The court agreed that if 20 days was "as fast as [the Government] . . . can possibly go," the Government's practice of holding accompanied minors in its FRCs, even if not "licensed" and "non-secure" per FSA paragraph 19, may be within the parameters of FSA paragraph 12(A). *Id.* at 914. In a decision issued on July 6, 2016, the Ninth Circuit agreed with the district court that during an emergency or influx, minors must be transferred "as expeditiously as possible" to a non-secure, licensed facility. *Flores* v. *Lynch,* 828 F.3d. 898, 902–03 (9th Cir. 2016). The Ninth Circuit affirmed the district court's holding that the FSA applies to all alien minors and UACs in government custody and concluded the district court did not abuse its discretion in denying the Government's motion to modify the FSA. The Ninth Circuit, however, reversed the district court's determination that the FSA required the release of accompanying parents. *Id.*

The government maintains that the terms of the FSA were intended to apply only to those alien children in custody who are unaccompanied.

Nonetheless, reflecting existing circuit precedent that the FSA applies to accompanied minors, this rule applies to both accompanied and unaccompanied minors.

c. Motion To Enforce III

On May 17, 2016, plaintiffs filed a third motion to enforce the agreement, claiming that DHS was violating the agreement by: (1) Holding class members in CBP facilities that did not meet the requirements of the FSA; (2) failing to advise class members of their rights under the FSA; (3) making no efforts to release or reunify class members with family members; (4) holding class members routinely with unrelated adults; (5) detaining class members for weeks or months in secure, unlicensed facilities in violation of the FSA; and (6) interfering with class members' right to counsel. The Government filed a response on June 3, 2016.

On June 27, 2017, the district court issued an opinion concluding that ICE had not complied with the FSA because it had failed to advise class members of their rights under the FSA, failed to make continuous efforts to release class members, and failed to release class members as required by FSA paragraphs 12(A) and 14. The Court also found that FRCs were unlicensed and secure. *Flores* v. *Sessions,* No. 2:85–cv–04544 (C.D. Cal. June 27, 2017). The district court, however, rejected the claims that ICE had impermissibly detained class members with unrelated adults and interfered with class members' right to counsel.

The district court also concluded that CBP acted in violation of the FSA in the Rio Grande Valley Border Patrol Sector. The court pointed to allegations that CBP failed to provide class members adequate access to food and water, detained class members in conditions that were not safe and sanitary, and failed to keep the temperature of the holding cells within a reasonable range. The court ordered the appointment of a Juvenile Coordinator for ICE and CBP, responsible for monitoring the agencies' compliance with the Agreement. On August 15, 2019, the Ninth Circuit dismissed the Government's appeal of that decision based on a lack of jurisdiction. *See Flores* v. *Barr,* No. 17–56297 (9th Cir. Aug. 15, 2019). On October 5, 2018, the U.S. District Court for the Central District of California appointed a Special Master/ Independent Monitor to oversee compliance with the Agreement and with the June 27, 2017 Order. The Court's order appointing the Monitor also allowed for oversight over HHS related to Motion to Enforce V, discussed below.

d. Motion To Enforce IV

On August 12, 2016, Plaintiffs filed a fourth motion to enforce the agreement, claiming that ORR violated the agreement by failing to provide UACs in ORR custody with a bond redetermination hearing by an immigration judge. The Government argued that the HSA and the TVPRA effectively superseded the FSA's bond-hearing requirement with respect to UACs, that only HHS could determine the suitability of a sponsor (an essential part of release decision-making), and that immigration judges lacked jurisdiction over UACs in ORR custody.

On January 20, 2017, the court found that HHS breached the FSA by denying UACs the right to a bond hearing as provided for in the FSA. *Flores* v. *Lynch,* No. 2:850–cv–04544, 2017 WL 6049373 (C.D. Cal. Jan. 20, 2017). The district court agreed that only HHS could determine the suitability of a sponsor, but disagreed that subsequent laws fully superseded the FSA. The Government appealed to the Ninth Circuit. On July 5, 2017, the Ninth Circuit affirmed the district court's ruling. The Ninth Circuit reasoned that if Congress had intended to terminate the settlement agreement in whole or in part through passage of the HSA or TVPRA, it would have said so specifically. *Flores* v. *Sessions,* 862 F.3d 863 (9th Cir. 2017). However, while

affirming the district court's decision, the Ninth Circuit also acknowledged that determinations made at hearings held under Paragraph 24A of the FSA will not compel a child's release, because "a minor may not be released unless the agency charged with his or her care identifies a safe and appropriate placement." *Id.* at 868. The Government did not seek further review of the decision.

e. Motion To Enforce V

On April 16, 2018, Plaintiffs filed a fifth motion to enforce the agreement, claiming ORR unlawfully denied class members licensed placements, unlawfully medicated youth without parental authorization, and peremptorily extended minors' detention on suspicion that available custodians may be unfit. On July 30, 2018, the district court issued an Order. *Flores* v. *Sessions,* 2:85–cv–04544– DMG–AGR (ECF No. 470, Jul. 30, 2018). The Order discussed the Shiloh Residential Treatment Center and placement therein, as well as informed consent for psychotropic drugs in such Center; placement in secure facilities; notice of placement in secure and staff-secure facilities; Director-level review of children previously placed in secure and staff-secure facilities; and other issues. Readers should refer to the full Order for details.

f. Motion for Relief From Settlement

On June 21, 2018, in accordance with the President's June 20, 2018, Executive Order "Affording Congress an Opportunity to Address Family Separation," the Government sought limited emergency relief from two provisions of the FSA—the release provision of Paragraph 14, as well as the licensing requirements of Paragraph 19. This relief was sought in order to permit DHS to detain alien family units together for the pendency of their immigration proceedings. The court denied this motion on July 9, 2018, and denied reconsideration of the motion on November 5, 2018.

That motion sought relief consistent with the proposed rule, although the proposed rule included some affirmative proposals (like the Federal-licensing regime) that were not in issue in that motion. For example, as discussed below, by creating an alternative for meeting the "licensed facility" definition for FRCs, the final rule will eliminate a barrier to keeping family units in custody during their immigration proceedings, consistent with applicable law, while still providing similar substantive protections to minors.

The issue of family separation and reunification continues to be the subject of litigation in multiple jurisdictions. This rule does not directly address matters related to that litigation. A significant purpose of this rule with regard to accompanied minors is to allow DHS to make decisions regarding the detention of families applying a single legal framework, and to enable DHS to hold a family together as a unit in an FRC when lawful and appropriate.

g. Motion To Enforce VI

On November 2, 2018, Plaintiffs filed their sixth motion to enforce, which requests the court to enjoin the Government from implementing regulations that fail to implement the FSA. Plaintiffs allege the Government's proposed rulemaking of September 2018 is an anticipatory breach of the FSA, claiming that DHS's portion of the proposed regulations proposed to detain accompanied children indefinitely and consign them to unlicensed family detention centers. Plaintiffs also claim that the proposed rule replaces mandatory protections with aspirational statements and does not provide certain the protections granted minors. Plaintiffs also requested the court to provisionally adjudicate the Government in civil contempt to make it clear to the Government that implementing the proposed regulations would place it in contempt. The motion is held in abeyance pending publication of this final rule and further briefing from the parties.

h. Motion To Enforce VII

On May 30, 2019, Plaintiffs filed a motion to enforce the FSA alleging that HHS' use of the Homestead influx shelter facility violates the FSA because the facility is not licensed, and, in Plaintiffs' opinion, HHS is not releasing UACs from the facility as expeditiously as possible. By agreement of the parties, the motion has been referred to mediation with the Monitor in order to avoid the need for adjudication by the district court.

i. Ex Parte Request for Temporary Restraining Order

On June 26, 2019, Plaintiffs filed an *ex parte* request for a temporary restraining order, which alleged that CBP facilities in the El Paso and Rio Grande Valley Border Patrol Sectors violated the terms of the FSA; that CBP failed to provide adequate medical care; and that CBP failed to comply with the release requirements of Paragraph 14 of the FSA. Plaintiffs requested emergency relief, including (1) immediate inspection of CBP facilities in the El Paso and RGV Sectors by a "public health expert authorized to mandate a remediation plan that [CBP] must follow to make these facilities safe and sanitary;" (2) immediate access to CBP facilities in the El Paso and RGV Sectors by medical professionals "who can assess the medical and psychological needs of the children and triage appropriately;" (3) "deployment of an intensive case management team to focus on expediting the release of [certain UACs] to alleviate the backlog caused by the inadequate [HHS ORR] placement array;" and (4) that CBP be held in contempt. On June 28, 2019, the Court referred the TRO to an expedited mediation schedule in front of the independent monitor. Dkt. 576. On July 8, 2019, the court appointed a medical expert, who would "consult with and assist the [court-appointed independent monitor] in assessing child health and safety conditions in [CBP facilities]." Dkt. 591. On July 10, 2019, the parties engaged in mediation, and agreed that the court-appointed monitor would submit a draft report of findings and recommendations to the parties and the monitor, and that the parties would reconvene in mediation following the submission of that report. *See* Joint Status Report, Dkt. 599.

*C. Basis and Purpose of Regulatory Action*

1. Need for Regulations Implementing the Relevant and Substantive Terms of the FSA.

When DHS encounters a removable alien parent or legal guardian with his or her removable alien child(ren), it has, following initiation of removal proceedings, three primary options for purposes of immigration custody: (1) Release all family members into the United States; (2) detain the parent(s) or legal guardian(s) and either release the juvenile to another parent or legal guardian or transfer the juvenile to HHS as a UAC; or (3) detain the family unit together as a family by placing them at an appropriate FRC during their immigration proceedings. The practical implications of the FSA, as interpreted by the Federal district court and the court of appeals (and the lack of state licensing for FRCs), is to prevent the Government from using the third option for more than a limited period of time. This final rule will eliminate that barrier to the use of FRCs.

DHS believes there are several advantages to maintaining family unity during immigration proceedings. These include the child being under the care of the parent, immigration proceedings occurring together and any removal or release occurring at the same time. But the practical implications of the FSA, as recently interpreted, and in particular the lack of state licensing for FRCs and the release requirements for minors who are not in state-licensed facilities, have effectively prevented DHS from using family detention for more than a limited period of time (typically approximately 20 days), and in turn often required the release of families regardless of the flight risk posed. DHS believes that combination of factors creates a powerful incentive for adults to bring juveniles on the dangerous journey to the United States and then put them in further danger by illegally crossing the United States border, in the expectation that coming as a family will result in an immediate release into the United States. At the same time, the alternative—that of separating family members so the adult may be detained pending immigration proceedings—should be avoided when possible, and has generated significant litigation. *See, e.g., Ms. L* v. *ICE,* No. 18–428 (S.D. Cal.).

This final rule serves to clear the way for the sensible use of FRCs when it is lawful and appropriate, to allow custody over a family unit as such. In particular, it creates a Federal licensing process to resolve the current problem caused by the FSA's state-licensing requirement that is ill-suited to family detention, and allows for compatible treatment of a family unit in immigration custody and proceedings by eliminating artificial barriers to that compatibility imposed by the FSA. Further, it helps to ensure that decisions to detain a family unit can be made under a single legal framework and that take into account the interest in family unity. In particular, the rule will ensure that custody decisions for both the parent and minor will be made pursuant to the existing statutes and regulations governing detention on bond or parole (not under a freestanding FSA standard). Moreover, when exercising its parole discretion, DHS will continue to consider a detainee's status as a minor as a factor in exercising its parole discretion, on a case-by-case basis, and consistent with all requisite statutory and regulatory authority.

It is important that family detention be a viable option not only for the numerous benefits that family unity provides for both the family and the administration of the INA, but also due to the significant and ongoing surge of adults who have made the choice to enter the United States illegally with juveniles or make the dangerous overland journey to the border with juveniles, a practice that puts juveniles at significant risk of harm. The expectation that adults with juveniles

will remain in the United States outside of immigration detention may incentivize these risky practices.

In the summer of 2014, an unprecedented number of family units from Central America illegally entered or were found inadmissible to the United States. In FY 2013, the total number of family units apprehended entering the United States illegally between ports of entry on the Southwest Border was 14,855. By FY 2014, that figure had increased to 68,445. *See* https://www.cbp.gov/sites/default/files/ assets/documents/2019-Mar/bp-total-monthly-family-units-sector-fy13-fy18.pdf. By June of 2019, that figure had increased to 390,308, with an additional 37,573 found inadmissible at ports of entry.

TABLE 1—FAMILY UNIT APPREHENSIONS AND INADMISSIBLES AT THE SOUTHWEST BORDER BY FISCAL YEAR [10]

| Fiscal year | Family unit apprehensions at the Southwest Border | Family units found inadmissible at the Southwest Border [11] |
|---|---|---|
| 2013 | 14,855 | |
| 2014 | 68,445 | |
| 2015 | 39,838 | |
| 2016 | 77,674 | 26,062 |
| 2017 | 75,622 | 29,375 |
| 2018 | 107,212 | 53,901 |
| 2019 * | 390,308 | 37,573 |

\* Partial year data for FY 2019; through June.



Figure 1: Family Unit Apprehensions and Inadmissibles at the Southwest Border by Fiscal Year

\* Partial year data for FY 2019; through June.

Prior to 2014, given the highly limited detention capacity, the only option available to the Government for the large majority of family units entering the United States was to issue the family Notices to Appear and release the alien family to temporarily remain in the United States pending their removal proceedings. Thus, when an unprecedented number of families decided to undertake the dangerous journey to the United States in 2014, DHS officials faced an urgent humanitarian situation. DHS encountered numerous alien families and juveniles who were hungry, thirsty, exhausted, scared, vulnerable, and at times in need of medical attention, with some also having been beaten, starved, sexually assaulted or worse during their journey to the United States.

DHS mounted a multi-pronged response to this situation. As one part of this response, DHS placed more families at the one existing FRC, stood up another FRC (which was later closed

---

[10] Note that Family Unit represents the number of individuals (either a child under 18 years old, parent or legal guardian) apprehended with a family member. *See* United States Border Patrol Total Family Unit Apprehensions By Month—FY 2013 through FY 2018 at *https://www.cbp.gov/ default/files/assets/documents/2019-Mar/bp-total-monthly-family-units-sector-fy13-fy18.pdf* (last visited May 10, 2019) *See also* U.S. Border Patrol Southwest Border Apprehensions by Sector Fiscal Year 2019 at *https://www.cbp.gov/newsroom/stats/ sw-border-migration/usbp-sw-border-apprehensions#* (last visited August 5, 2019) *See also* Southwest Border Migration FY 2019 at *https://*

*www.cbp.gov/newsroom/stats/sw-border-migration* (last visited August 5, 2019).

[11] OFO did not start tracking family units until March of 2016.

down), and oversaw the development of additional FRCs to detain family units together, in a safe and humane environment, during the pendency of their immigration proceedings, which typically involved expedited removal. Although it is difficult to definitively prove a causal link given the many factors that influence migration, DHS's assessment is that this change was one factor that helped stem the border crisis, as it correlated with a significant drop in family migration: Family unit apprehensions on the Southwest Border dropped from 68,445 in FY 2014 to 39,838 in FY 2015.

Although the border crisis prompted DHS to increase its use of FRCs to hold family units together, DHS quickly faced legal challenges asserting that the FSA applied to accompanied minors and that family detention did not comply with the provisions of the FSA. In July 2015, the *Flores* court rejected the Government's position that the FRCs comply with the FSA and declined to modify the FSA to allow DHS to address this significant influx of family units crossing the border and permit family detention. *See Flores* v. *Lynch,* 828 F.3d 898, 909–10 (9th Cir. 2016). The Government had explained to the district court that declining to modify the FSA as requested would ''mak[e] it impossible for ICE to house families at ICE [FRCs], and to instead require ICE to separate accompanied children from their parents or legal guardians.'' *Flores* v. *Lynch,* No. 85–4544, Defendants' Opposition to Motion to Enforce, ECF 121 at 17 (C.D. Cal. Feb. 27, 2015).

When the courts then found the FSA to apply to accompanied minors—an interpretation with which the Government continues to disagree—the agencies faced new practical problems. Indeed, the government has never understood the FSA to apply to accompanied minors. The Supreme Court in *Flores* understood the case to involve ''the constitutionality of institutional custody over unaccompanied juveniles.'' 507 U.S. at 305; *see id.* at 315 (''[T]he INS policy now in place is a reasonable response to the difficult problems presented when the Service arrests unaccompanied alien juveniles.'').

The FSA in turn has FSA has no language directly addressing the specific issues raised by custody over families as a unit. The FSA explains that the settlement arose from a lawsuit about ''detention and release of *unaccompanied* minors,'' FSA paragraph 1 (emphasis added); it provides for the INS to make efforts at releasing a minor ''to'' a parent or guardian, not ''with'' a parent or

guardian, FSA paragraph 14, suggesting an underlying assumption that the minor is not already together with the parent as a family; the FSA indicates that the purpose of the release ''to'' another relative is to promote ''family reunification,'' which makes little sense if the family is already together as a unit, *id.;* the FSA generally requires custody to occur in a facility ''licensed by an appropriate State agency,'' FSA paragraph 6, but no State in the country had at the time an agency that would license facilities for holding families together in custody as a unit. The government used FRCs for more than 10 years—from 2001, when it first used the Berks facility to hold families in custody until 2014—with the class counsel's knowledge, and without the government ever considering that the FSA applied to minors accompanied by their parents.

The FSA requires DHS to transfer minors to a non-secure, licensed facility ''as expeditiously as possible,'' and further provides that a ''licensed'' facility is one that is ''licensed by a State agency.'' FSA paragraphs 6, 12(A). That prompted significant and ongoing litigation regarding the ability to obtain state licensing of FRCs, as many States did not have, and have not succeeded in putting in place, licensing schemes governing facilities that hold family units together. That litigation severely limited the ability to maintain detention of families together. Those limitations correlated with a sharp increase in family migration: The number of family units apprehended by CBP between the ports of entry along the Southwest Border again spiked—from 39,838 in FY 2015 to the highest level ever up until that time, 77,674 in FY 2016. In FY 2016, CBP also found 26,062 family units inadmissible at ports of entry along the Southwest Border. The number of such apprehensions and individuals found inadmissible along the Southwest Border has continued to rise, and reached 107,212 apprehensions between the ports of entry, and 53,901 family units found inadmissible at ports of entry in FY 2018. In the first nine months of FY 2019 (through June 30, 2019), the number of family unit apprehensions has already reached 390,308, a 469 percent increase from the same period in FY 2018. During this same time period, 37,573 family units have been found inadmissible at ports of entry along the Southwest Border.[12]

As long as the licensing must come from a State specifically (rather than

from the Federal Government), DHS's ability to effectively use family detention is unduly limited. A Federal program (especially immigration enforcement) that the Constitution and Congress commit to Federal authority and discretion should not depend on state licensing. And that is particularly true when a well-established state-licensing process does not already exist and the FSA, as the Ninth Circuit pointed out, ''gave inadequate attention to some problems of accompanied minors'' and ''does not contain standards related to the detention of . . . family units.'' *Flores,* 828 F.3d at 906. In order to avoid separating family units, DHS must release adult family members in cases where detention would otherwise be mandatory and DHS determines parole is not appropriate, or in cases where DHS and/or immigration courts believe detention of the parent is needed to ensure appearance at future removal proceedings or to prevent danger to the community.[13] Because of ongoing litigation concerning state licensure for FRCs, ICE must release minors who are a part of family units as expeditiously as possible, which means that ICE rarely is able to hold family units for longer than approximately 20 days. As such, of the 107,212 FY 2018 family unit apprehensions at the Southwest border, 45,755 individuals were booked into FRCs in FY 2018. The result is that many families are released in the interior of the United States, even in cases when DHS or immigration courts deem detention is needed to effectuate removal proceedings or even when there are safety concerns.

According to EOIR, 43 percent of cases completed from January 1, 2014 through March 31, 2019 involving family unit aliens who were in detention, released, failed to appear at the required proceedings, and were issued final orders of removal *in absentia.*[14]

---

[12] *See* Southwest Border Migration FY 2019, *https://www.cbp.gov/newsroom/stats/sw-border-migration.*

[13] Current regulations address parole, including for juveniles in custody as well as parole for aliens subject to expedited removal. *See* 8 CFR 212.5(b)(3) (parole for juveniles); 8 CFR 235.3(b)(2)(iii), (b)(4)(ii) (limiting parole for those in expedited removal proceedings). While DHS is amending § 212.5(b) as a part of this regulation, this regulation is not intended to address or alter the standards contained in § 212.5(b) or § 235.3(b). To the extent that paragraph 14 of the FSA has been interpreted to require application of the juvenile parole regulation to release during expedited removal proceedings, *see Flores* v. *Sessions,* Order at 23–27 (June 27, 2017), this regulation is intended to permit detention in FRCs in lieu of release (except where parole is appropriate under 8 CFR 235.3(b)(2)(iii) or (b)(4)(ii)) in order to avoid the need to separate or release families in these circumstances.

[14] Of the 5,326 completed cases from January 1, 2014 through March 31, 2019 that started at an FRC,
Continued

### Table 2: I-862 by Immigration Judge Decisions, January 1, 2014-March 31, 2019

|  | Removal Orders | Relief Granted | Termination | Voluntary Departure | Other | Grand Total |
|---|---|---|---|---|---|---|
| Total | 3,969 | 883 | 275 | 187 | 12 | 5,326 |
| *In Absentia* | 2,281 |  |  |  |  |  |
| Not *In Absentia* | 1,168 |  |  |  |  |  |

Table 3 below reports DHS Office of Immigration Statistics (OIS) data on *in absentia* rates for aliens encountered at the Southwest Border by year of their initial enforcement encounter. For each of these initial encounter cohorts, the table reports on the number of aliens referred to EOIR, the number of EOIR cases completed (*i.e.* excluding cases that are still in proceedings), and the number of EOIR in absentia orders issued, as of the end of FY 2018. The bottom rows of the table show both the *in absentia* rate as a percentage of all referrals to EOIR, and as a percentage of all completed cases. DHS reports both statistics because DHS is aware that both indicators are biased indicators of the "true" rate at which people are

ordered removed *in absentia*. In absentia as a percent of all completed cases is biased upward (*i.e.*, tends to overestimate the true *in absentia* rate), especially for more recent fiscal years, because *in absentia* cases may take less time to complete cases with other types of final outcomes. The *in absentia* rates for people encountered in earlier years, such as FY 2014 and FY 2015, may be somewhat more meaningful than for those encountered more recently because the longer-standing cases have been working their way through proceedings for four to five years; but, more than half the cases remain in proceedings even for this longer-standing group. Viewing *in absentia* as a share of all referrals to EOIR is not

affected by that bias. However, this statistic is biased downward (*i.e.*, tends to be lower than the true in absentia rate), because it does not account for cases still in proceedings—again, more than half the cases—that may eventually result in an *in absentia* order. The "true" *in absentia* rate for encounters in any given fiscal year can't be observed until all the cases from that year are completed, at which time the two statistics will be the same number. As seen in Table 3, DHS OIS has found that when looking at all family unit aliens encountered at the Southwest Border from FY 2014 through FY 2018, the *in absentia* rate for completed cases as of the end of FY 2018 was 66 percent.

### Table 3: Estimated *in absentia* Rate, Southwest Border Family Unit Encounters FY 2014 – FY 2018[15]

| Year of Encounter | 2014 | 2015 | 2016 | 2017 | 2018 | Total 2014-2018 |
|---|---|---|---|---|---|---|
| Total Encounters | 67,060 | 39,838 | 77,674 | 105,009 | 161,293 | **450,874** |
| DHS referrals to EOIR | 53,727 | 34,270 | 70,037 | 91,306 | 141,172 | **390,512** |
| Completed EOIR cases* | 23,083 | 13,531 | 18,150 | 15,319 | 12,064 | **82,147** |
| EOIR *in absentia* orders** | 17,644 | 9,056 | 12,464 | 12,104 | 2,862 | **54,130** |
| Estimated *in absentia* rate - all referrals | 33% | 26% | 18% | 13% | 2% | **14%** |
| Estimated *in absentia* rate - completed cases | 76% | 67% | 69% | 79% | 24% | **66%** |

* DHS referrals to EOIR include CBP Notices to Appear (NTAs), ERO NTAs, positive USCIS fear determinations and negative USCIS fear determinations vacated by EOIR, and any other DHS NTAs reported by EOIR.

** Completed EOIR cases includes EOIR removal orders/grants of voluntary departure and grants of relief.

Based on the similar timeframes of the two rates from EOIR and DHS OIS, DHS can assume that family units who did

not start their cases in FRCs have a higher *in absentia* rate. However, this does not account for other factors that

may or may not have an impact the likelihood of appearance, such as enrollment in a monitoring program or

2,281 were issued final orders of removal *in absentia*.

[15] DHS OIS estimates the *in absentia* rate by linking DHS and DOJ/EOIR records at the person-level as part of OIS' Enforcement Lifecycle analysis. Family unit data are available for USBP

apprehensions beginning in FY 2014, and available for OFO encounters with inadmissible aliens beginning in FY 2016. Family unit data are available for USBP apprehensions beginning in FY 2014, and available for OFO encounters with inadmissible aliens beginning in FY 2016. DHS referrals to EOIR include CBP Notices to Appear

(NTAs), ERO NTAs, positive USCIS fear determinations and negative USCIS fear determinations vacated by EOIR, and any other DHS NTAs reported by EOIR. Completed EOIR cases include EOIR removal orders/grants of voluntary departure and grants of relief.

access to representation. However, DHS still concludes that the *in absentia* rates of family units even who started their cases at an FRC is a serious concern, and flight risk can warrant detention throughout proceedings. Statistics that purport to show lower *in absentia* rates often count all court appearances, rather than only completed cases, thus counting multiple times aliens who appear for multiple court appearances and often not counting the time when being absent is most likely—at hearings where proceedings are completed and likely to result in a removal order. Addressing DHS's ability to effectively use family detention through an alternative licensing that will help

ensure appropriate standards of care consistent with the terms of the FSA would enable DHS to ensure family units who are identified as flight risks appear at removal proceedings and for removal following the issuance of a final order.

ICE's mission is to remove individuals subject to final orders of removal. DHS OIS data show that, as of the end of FY 2018, aliens encountered from FY 2014 through FY 2018 and detained at the time a final order of removal was issued, were removed at a much higher rate than those not detained: 97 percent of aliens detained as compared to just over 18 percent of individuals not detained. *See* Table 4 below. The table reports for

all aliens (not just family units) who were encountered by DHS from FY 2014 through FY 2018 and ordered removed, if they have been removed or not removed as of the end of FY 2018, and if they were detained or not detained at the time the removal order was issued. As shown in the table, detaining a person until the time of removal correlates strongly with the likelihood that removal will be effectuated. ICE has finite resources and bed space at FRCs and this rule would provide DHS the ability to use its detention authority and existing space at FRCs where lawful and appropriate to effectuate removal of family units determined not to be eligible for relief.

**Table 4: Removal Status as of the end of FY 2018 by ICE Detention Status at the Time of Removal Order Issuance, for Aliens Encountered by DHS from FY 2014 – FY 2018 and Ordered Removed[16]**

| Status | Total | | Detained | | Not Detained | |
|---|---|---|---|---|---|---|
| | Count | Percent | Count | Percent | Count | Percent |
| Removed | 227,679 | 54.9 | 187,868 | 96.8 | 39,811 | 18.1 |
| Not Removed | 186,067 | 44.8 | 6,310 | 3.2 | 179,757 | 81.9 |
| Missing* | 1,191 | 0.3 | 0 | 0.0 | 0 | 0.0 |
| Total | 414,937 | 100.0 | 194,178 | 100.0 | 219,568 | 100.0 |

\* A total of 1,191 Alien Numbers provided by EOIR did not return a match in ICE data.

As described above, there have been several important changes in law and circumstance since the FSA was executed: (1) A significantly changed agency structure addressing the care and custody of juveniles, including the development of FRCs that can provide appropriate treatment for minors while allowing them to be held together with their families; (2) a new statutory framework that governs the treatment of UACs; (3) significant increases in the number of families and UACs crossing the border since 1997, thus affecting immigration enforcement priorities and national security; (4) a novel judicial interpretation that the FSA applies to accompanied minors; and (5) further recognition of the importance of keeping families together during immigration proceedings when appropriate, and the legal and practical implications of not providing uniform proceedings for family units in these circumstances. The Departments have thus determined that it is necessary to put into place regulations that will be consistent with the relevant and substantive terms of the FSA regarding the conditions for custodial settings for minors, but,

through Federal licensing of FRCs, will provide the flexibility necessary to protect the public safety, enforce the immigration laws, and maintain family unity given current challenges that did not exist when the FSA was executed. This rule provides DHS the option of keeping together families who must or should be detained at appropriately licensed FRCs for the time needed to complete immigration proceedings, subject to the sound implementation of existing statutes and regulations governing release on parole or bond.

### 2. Purpose of the Regulations

A principal purpose of this action is to implement the relevant and substantive terms of the FSA and provisions of the HSA and TVPRA where they necessarily intersect with the FSA's provisions, and taking into account the agencies' expertise in addressing current factual circumstances, thereby terminating the FSA, as provided for in FSA paragraph 40 as well as general principles governing termination of settlements or decrees in institutional litigation. As it accounts for circumstances that have

changed since the FSA was entered into and agency expertise in addressing current circumstances, the rule does not always track the literal text of the FSA, but provides similar substantive protections to juveniles. For example, the rule allows for detention of families together in federally-licensed programs (rather than facilities licensed specifically by a State). States generally do not have licensing schemes that apply to FRCs. Thus, the terms of the FSA currently impose a limitation on DHS's ability to detain family units together in an FRC during their immigration proceedings, consistent with applicable law. The Federal licensing process in turn will provide similar substantive protections regarding the conditions of such facilities, and thus implement the underlying purpose of the state-licensing requirement. These changes will allow for release in a manner consistent with the INA and applicable regulations. The rule also provides for third-party monitoring, and for publicizing the results of those inspections, to ensure that conditions

---

[16] DHS OIS.

on the ground in FRCs satisfy those standards.

This rule conforms to the FSA's guiding principle that the Government treats, and shall continue to treat, all juveniles in its custody with dignity, respect, and special concern for their particular vulnerability as minors.

The current DHS regulations on the detention and release of aliens under the age of 18 found at 8 CFR 236.3 have not been substantively updated since their promulgation in 1988.[17] DHS therefore is revising 8 CFR 236.3 to promulgate the relevant and substantive terms of the FSA as regulations. In addition, there are currently no HHS regulations on this topic. HHS is promulgating a new 45 CFR part 410 for the same reason.

As noted, these regulations implement the relevant and substantive terms of the FSA and related statutory provisions. Separate from the FSA, DHS has over time developed various policies and other sub-regulatory documents that address issues related to DHS custody of minor aliens and UACs.[18] In considering these regulations, DHS reviewed such policies, and determined that these regulations are compatible with them. Current policies on the custody, apprehension, and transportation of minors and UACs generally would not, therefore, need to be altered to bring them into conformity with this rule. This rule is not, however, intended to displace or otherwise codify such policies and procedures. Similarly, the rule is consistent with and does not abrogate existing ORR policies and procedures; nor does it necessitate any alteration in those policies and procedures, except in regards to the transfer of bond redetermination hearings from immigration courts to the HHS hearing officer as found at 8 CFR 410.810. Again, however, the idea is for the UAC to enjoy the same basic substantive protection (review of the

custody determination), but simply to shift review from DOJ to HHS given that Congress has made HHS responsible for custody and care of UACs.

Finally, this rule excludes those provisions of the FSA that are relevant solely by virtue of the FSA's existence as a settlement agreement. For instance, the FSA contains a number of provisions that relate specifically to class counsel and the supervising court with respect to the Departments' compliance with the FSA. Following termination of the FSA, such provisions will no longer be necessary, because compliance with the published regulations will replace compliance with the settlement agreement. As a result, they are not included in this rule.[19]

*D. Severability*

To the extent that any portion of this final rule is declared invalid by a court, the Departments intend for all other parts of the final rule that are capable of operating in the absence of the specific portion that has been invalidated to remain in effect. Thus, even if a court decision invalidating a portion of this final rule results in a partial reversion to the current regulations or to the statutory language itself, the Departments intend that the rest of the final rule continue to operate, if at all possible in tandem with the reverted provisions.

**IV. Summary of Changes in the Final Rule**

Following careful consideration of public comments received and relevant data provided by stakeholders, DHS and HHS have amended the regulatory text proposed in the NPRM published in the **Federal Register** on September 7, 2018. As discussed elsewhere in this preamble, these changes in this final rule include the following:

• Section 212.5(b) now considers that DHS is not precluded from releasing a minor who is not a UAC to someone other than a parent or legal guardian, specifically a brother, sister, aunt, uncle, or grandparent who is not in detention.

• Section 236.3(b)(2) defines *Special Needs Minor* and includes the term "retardation," which commenters noted was an outdated term and should be removed. DHS agrees to replace that

term with "intellectual disability." HHS likewise agrees to use "intellectual disability" in the corresponding definition of *Special Needs Minor* at § 410.101.

• Section 236.3(b)(9), which defines *Licensed Facility*, requires DHS to employ third parties to conduct audits of FRCs to ensure compliance with family residential standards. Commenters stated that DHS has previously not shared the results of such audits. While ICE has publicly posted the results of facility inspection reports submitted by third-party contractors since May 2018, these posts have not included results of FRC inspections. To directly address the comment, the phrase "DHS will make the results of these audits publicly available" is added to the definition. DHS also adds to the final rule that the audits of licensed facilities will take place at the opening of a facility and take place on an ongoing basis.

• In § 236.3(b)(11), which defines *Non-Secure Facility*, DHS agrees with commenters that a non-secure facility means a facility that meets the definition of non-secure under state law in the State in which the facility is located, as was intended by the language of the proposed rule, and is adding "under state law" to the definition to clarify this point.

• In § 236.3(f)(1) regarding transfer of UACs from DHS to HHS, DHS agrees to amend the proposed regulatory text to clarify that a UAC from a contiguous country who is not permitted to withdraw his or her application for admission, or if no determination can be made within 48 hours of apprehension or encounter, will be immediately transferred to HHS. The Departments believe that commenters misunderstood the intent of the regulatory text due to imprecise wording, which is now clarified by deleting "subject to the terms of" and replacing with "processed in accordance with."

• In § 236.3(f)(4)(i) regarding the transportation of UACs, DHS is amending the regulatory text to make it clear that, as a general matter, UACs are not transported with unrelated detained adults. The two situations described in the regulatory text are limited exceptions to this general rule. DHS is adding the specific reference to unrelated "detained" adults, for clarity.

• In § 236.3(g)(1)(i) regarding DHS procedures in the apprehension and processing of minors or UACs, Notice of Rights and Request for Disposition, DHS is removing the qualification that the notice will be read and explained when the minor or UAC is believed to be less than 14 years of age or is unable to

---

[17] *See* Detention and Release of Juveniles, 53 FR 17449 (May 17, 1988). When published as a final rule, the provisions applying to the detention and release of juveniles were originally placed in 8 CFR 242.24. After Congress passed IIRIRA, the former INS published a final rule updating several immigration-related provisions of the CFR and moved these provisions from § 242.24 of title 8 to § 236.3. *See* Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Proceedings, 62 FR 10312 (Mar. 6, 1997).

[18] *See, e.g.,* ICE, Family Residential Standards, *https://www.ice.gov/detention-standards/family-residential* (last visited May 1, 2019); CBP, National Standards on Transport, Escort, Detention, and Search (Oct. 2015), *https://www.cbp.gov/sites/default/files/assets/documents/2017-Sep/CBP%20TEDS%20Policy%20Oct2015.pdf* (last visited May 1, 2019).

[19] For instance, paragraphs 32(A), (B), and (D), and 33 of the FSA grants *Flores* class counsel special access to covered minors and UACs and to certain facilities that hold such minors and UACs; it is unnecessary to codify these provisions in regulation. Similarly, paragraphs 29 to 31 include special reporting requirements with respect to class counsel and the supervising court; reporting to these entities would be unnecessary following termination of the FSA.

comprehend the information contained in the Form I–770, and is clarifying that the notice will be provided, read, or explained to all minors and UACs in a language and manner that they understand. DHS is making this change to avoid confusion related to DHS's legal obligations regarding this notice, while still acknowledging that it may be necessary to implement slightly different procedures depending on the particular minor or UAC's age and other characteristics.

• In § 236.3(g)(2)(i) regarding DHS custodial care immediately following apprehension, the proposed regulatory text stated that UACs "may be housed with an unrelated adult for no more than 24 hours except in the case of an emergency or exigent circumstances." Commenters objected to the use of the term "exigent circumstances" as it was not defined. DHS agrees to delete the term "exigent circumstances" as it is redundant to "emergency."

• In § 236.3(i)(4), commenters requested additional language tracking the verbatim text of FSA Ex. 1. In response to these comments, DHS added language of FSA Ex. 1 paragraph.

• Section 236.3(j) and (n) now consider that DHS is not precluded from releasing a minor who is not a UAC to someone other than a parent or legal guardian, specifically a brother, sister, aunt, uncle, or grandparent who is not in detention and is otherwise available to provide care and physical custody.

• DHS has added a new § 236.3(j)(4) to state clearly that the Department will consider parole for all minors who are detained pursuant to section 235(b)(1)(B)(ii) of the INA or 8 CFR 235.3(c) and that paroling such minors who do not present a safety risk or risk of absconding will generally serve an urgent humanitarian reason. DHS will also consider aggregate and historical data, officer experience, statistical information, or any other probative information in determining the detention of a minor.

• Section 236.3(o) is amended to clarify that the Juvenile Coordinator's duty to collect statistics is in addition to the requirement to monitor compliance with the terms of the regulations.

• In § 410.101, HHS agrees to amend the definition of "special needs minor," replacing the term "retardation" with "intellectual disability."

• In § 410.201(e), HHS agrees with multiple legal advocacy organizations' analysis that the FSA and TVPRA run in contradiction to each other in placing UACs in secure facilities based solely on the lack of appropriate licensed program availability; therefore, ORR is striking the following clause from this section:

". . . or a State or county juvenile detention facility."

• In § 410.202, in response to commenters' concerns, HHS clarifies that ORR places UACs in licensed programs except if a reasonable person would conclude, "based on the totality of the evidence and in accordance with subpart G" that the UAC is an adult.

• In § 410.203, in response to commenters' concerns, HHS clarifies that it reviews placements of UACs in secure facilities at least monthly and that the rule does not abrogate any requirements that ORR place UACs in the least restrictive setting appropriate to their age and any special needs.

• In § 410.302(a), in response to commenters' concerns, HHS clarifies that the licensed program providing care for a UAC shall make continual efforts at family reunification as long as the UAC is in the care of the licensed program.

• In § 410.600(a) regarding transfer of UAC, the proposed regulatory text states that, "ORR takes all necessary precautions for the protection of UACs during transportation with adults." However, as ORR does not transport adult aliens, HHS has decided to strike this language from the final rule.

• In § 410.700 HHS is adding the "totality of the evidence and circumstances" for age determinations standards to mirror the DHS standard in compliance with statute. *See* 8 U.S.C. 1232(b)(4).

• In § 410.810(b), HHS declines to place the burden of evidence in the independent internal custody hearings on itself; however, it has modified the rule text to indicate that HHS does bear the initial burden of production supporting its determination that a UAC would pose a danger or flight risk if discharged from HHS' care. The UAC must bear the burden of persuading the independent hearing officer to overrule the government's position, under a preponderance of the evidence standard.

## V. Discussion of Public Comments and Responses

### A. Section-by-Section Discussion of the DHS Proposed Rule, Public Comments, and the Final Rule

#### 1. Parole (§ 212.5)

Summary of Proposed Rule

In § 212.5(b), DHS proposed to remove the cross-reference to § 235.3(b) as it currently appears in order to eliminate an ambiguity and to codify its longstanding understanding of how certain provisions in § 235.3(b)'s provisions relating to parole of aliens in

expedited removal proceedings who lack a credible fear (or have not yet been found to have a credible fear) apply both to adults and minors. Accordingly, such minors will be paroled only in cases of medical necessity or when there is a law enforcement need. This is the same standard that applies to adults in these same circumstances. These proposed changes also eliminate an existing tension with the text of the relevant statutory provision.

Public Comments and Responses

One commenter stated that it agreed with the determination that parole should be limited to cases of medical necessity or law enforcement need and that parole must be within the discretion of DHS. Many commenters, however, disagreed with the proposal and expressed concern about more restrictive parole standards, the impact on asylum seekers, and questioned the necessity for the proposed changes given existing discretionary parole authority.

Limiting Parole to Medical Necessity or Law Enforcement Need

*Comments.* Several commenters stated that the proposed parole standards are restrictive and will unnecessarily prevent the release of children who pose no flight or safety risk. Most of these commenters expressed concern that the removal of the cross-reference to § 235.3(b) allows for children to only be paroled if there is a "medical necessity or law enforcement need," whereas the FSA allows children to be paroled when there is an "urgent humanitarian need or significant public benefit." Some of these commenters stated that this limitation fails to consider the particular vulnerability of children as required by the FSA and is unnecessary due to the already high standard for the limited number of children who would qualify for parole under the prior standards.

Multiple commenters stated that children with urgent humanitarian needs such as pregnant young women and children with physical disabilities, cognitive impairments, or chronic medical conditions would no longer qualify for parole under the proposed regulations and the medical emergency standard.

A few commenters stated that DHS should continue the general policy to prioritize parole to ensure the best interests of minors and their placement in the least restrictive setting appropriate. Another commenter stated that the proposed regulations should be withdrawn and asked the following questions: (i) How large was the

population of minors who were in detention under § 235.3(c) and who were released on parole under § 212.5(b) on a yearly basis for the past five years; (ii) why is § 212.5(b) inappropriate for minors in removal proceedings under § 235.3(c); and (iii) why should accompanied minors not be permitted to be paroled on a case-by-case basis for an urgent humanitarian reason or a significant public benefit?

Fewer Minors Paroled

Multiple commenters stated that the proposed changes will result in children facing the same parole standards as adults and thereby being paroled less frequently. One of these commenters expressed concern that this would likely mean children will be detained beyond the 20 days that is generally the current practice permitted under the FSA. Another commenter stated that while the NPRM states that proposed § 236.3(j) "adds that any decision to release must follow a determination that such release is permitted by law, including parole regulations," it does nothing to specify DHS parole procedures favoring the release of children, which the commenter contended was required by the FSA.

Impact on Asylum Seekers

Multiple commenters expressed concern about how the proposed changes to parole would impact asylum seekers. One of these commenters stated that the proposed rule provides no explanation for eliminating DHS's authority to consider unique circumstances that may arise for children seeking asylum. Another commenter stated that asylum applicants in detention have historically had an opportunity to be released through parole provisions, and contended that the proposed parole standards would afford DHS broad discretion to apply a new narrow standard, leaving survivors of sexual violence and other forms of trauma with minimal hope of release pending a lengthy adjudication of their complex, evidence-driven asylum claims. A different commenter stated that the proposed rule uses the detention of children to disincentivize asylum seekers from going forward with their asylum claims and that the changes will make it more difficult for certain vulnerable children and families in DHS custody to be paroled as they await an assessment of whether they have a credible fear of persecution.

Existing Discretionary Parole Authority

Other commenters pointed to existing discretionary parole authority and questioned the necessity of the proposed changes. One commenter likened the choice between detention and parole for children to the choice between incarcerating a minor or releasing them on probation, contending that detention alternatives are healthier for children and avoid expenses. Another commenter contended that ICE has the discretion to release on parole and that the new regulations place no meaningful limit on the ability of ICE to detain families during their proceedings. This commenter stated that DHS's proposed regulations provided no review of a parole denial, and that the Attorney General indicated his intention to review and possibly reverse the long-standing precedent providing for individualized ICE custody determinations with review in immigration court for asylum seekers who have passed a credible fear interview.[20] The commenter urged that children and families be given a meaningful ability to seek redress of detention after a parole denial. Still another commenter, characterizing the change as "severely restrict[ing]" parole for these individuals, stated that DHS's claim that this change is intended by Congress is "belied" by INA 212(d)(5)(A), wherein Congress authorized discretionary parole on a case-by-case basis for urgent humanitarian reasons or significant public benefit.

General Opposition to Proposed Changes

Several commenters objected to any attempt to curtail parole in the name of family unity, contending that detention significantly harms children. Another commenter, perceived that this rule would limit opportunities for minors to be released from detention and asserted that the Administration should make every effort to ensure that children, and as applicable, children with families, spend as little time in detention as possible. This commenter stated that, in the case of a minor who is traveling with a family member, absent an indication of trafficking or unfitness on the part of the relative, it is in the best interest of the child to be paroled from detention with the relative. A different commenter requested that the final rule provide that all minors are bond and parole eligible.

*Response.* For more general concerns about the release of minors from DHS custody, see the discussion under § 236.3(j). For concerns about the negative effects of detention, see the discussion under § 236.3(h) regarding detention of family units.

DHS provides the following counts of adults and minors who were released from FRCs on parole in FY 2014 through 2018 in response to comments. There are also other means to effectuate release. *See* Table 10 for Average Length of Stay and Table 11 for reasons for release.

**Table 5: Release from Family Residential Centers on Parole**

| Fiscal Year | Release on Parole | Total Book-ins | Percent |
|---|---|---|---|
| 2014 | 235 | 601 | 39% |
| 2015 | 771 | 10,921 | 7% |
| 2016 | 7,107 | 42,695 | 17% |
| 2017 | 8,006 | 37,515 | 21% |
| 2018 | 10,146 | 45,755 | 22% |

DHS notes that the changes under this provision are limited in scope and intended not to foreclose the possibility of a minor's release, but to clarify that the provisions in § 235.3(b) governing the parole of aliens in expedited

---

[20] The Attorney General has since done so, in *Matter of M–S*, 27 I&N Dec. 509 (A.G. 2019).

removal (specifically those pending a credible fear interview or ordered removed in the expedited removal process) apply to all such aliens, and not merely adults. Parole of minors will be applied in accordance with applicable law, regulations, and policies, and DHS will consider parole for all minors in its custody who are eligible. The current cross-reference to § 235.3(b) within § 212.5(b) is confusing because it suggests, incorrectly, that the more flexible parole standards in § 212.5(b) might, for minors, override the provisions in § 235.3(b) that govern parole for any alien in expedited removal proceedings (*i.e.,* an alien who has been ordered removed or is still pending a credible-fear determination. *See* 8 CFR 235.3(b)(2)(iii), (b)(4)(ii). DHS disagrees with that interpretation of its current regulations, which, among other things, is in tension with the text of the relevant statutory provisions at 8 U.S.C. 1225(b)(1)(B)(iii)(IV) ("Any alien subject to [expedited removal] shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed."). By its terms, § 235.3(c) applies only to arriving aliens who are placed into section 240 proceedings. Many of the comments on the proposal—for example, those urging DHS to adopt a more flexible parole standard or a general practice of paroling alien juveniles—largely amount to disagreement with DHS's legal interpretation of INA 235(b)(1)(B)(iii)(IV), set out in the preamble of the NPRM, *see* 83 FR at 45502. But DHS is not persuaded that this legal interpretation is erroneous. Moreover, the FSA does not specifically discuss parole, much less require parole for urgent humanitarian reasons or significant public benefit. While the FSA expresses a preference for release for juveniles, it does not *require* release in all cases, and explicitly does not provide a specific standard for such release decisions.

DHS notes that many commenters appeared to confuse the proposed changes with changes that would be much broader in scope; for example, by eliminating from § 212.5(b) entire groups of aliens who have been or are detained from receiving case-by-case parole determinations and eliminating completely the "urgent humanitarian reasons" or "significant public benefit" justifications. As the regulatory language in the revised § 212.5(b) indicates, this is not the case. The intent of these provisions is only to remove the ambiguity in the current regulations that appears to erroneously apply the more

flexible standard of parole for arriving aliens ("urgent humanitarian reasons or significant public benefit") placed in section 240 proceedings to minors placed in expedited removal, rather than the standards generally applicable to all aliens placed in expedited removal who have yet to have a credible fear interview or who have been ordered removed ("required to meet a medical emergency or is necessary for a legitimate law enforcement objective").

The Attorney General's recent decision in *Matter of M-S,* 27 I&N Dec. 509 (A.G. 2019), does not affect the parole standard applicable to the narrow category of aliens to whom the amendments to § 212.5(b) apply—specifically, aliens who are pending a credible fear interview or who have been ordered removed through the expedited removal process. In *Matter of M-S-,* the Attorney General's decision addressed aliens who enter the United States between the ports of entry, are processed for expedited removal, and are then placed into removal proceedings pursuant to INA 240 after establishing a credible fear. *Matter of M-S-,* 27 I&N Dec. 509. Those aliens, he concluded, are ineligible for release on bond under INA 236(a) and may only be released from DHS custody through parole under INA 212(d)(5). *Id.* But that is a different category of aliens and the proposal here would do nothing to alter the standards governing the detention or release of those aliens. DHS will continue to apply its parole authority in these cases in accordance with applicable law, regulations, and policies. DHS also declines to adopt commenters' suggestions that DHS codify a review process for denials of parole, which has never existed, given that the decision to grant parole is entirely discretionary. However, as previously explained, DHS's current bed space at FRCs necessarily limits the number of family units who could be detained at any given time.

Changes to Final Rule

Accordingly, DHS is finalizing its regulation at 8 CFR 212.5(b) as proposed but is adding language to permit release of a minor to someone other than a parent or legal guardian, specifically an adult relative (brother, sister, aunt, uncle, or grandparent) not in detention. The reason for this change is explained in the section below regarding comments on proposed 8 CFR 236.3(j).

2. Definitions § 236.3(b)

Minor § 236.3(b)(1) and Unaccompanied Alien Child (UAC) § 236.3(b)(3)

Summary of Proposed Rule

DHS proposed revisions to § 236.3(b)(1) to define a minor as any alien under 18 years of age who has not been emancipated or incarcerated for an adult criminal offense. DHS proposed to remove the definition of juvenile as it is too broad and replace it with the more specific terms minor and UAC. The difference between minor and UAC is that the term "minor" captures any alien under the age of 18 that is not defined as a UAC, for example, minors accompanied by their parents. Also, under these definitions, a "minor" cannot be legally emancipated or have been incarcerated due to an adult conviction, whereas the definition of UAC does not exclude these categories.

Public Comments and Response

*Comments.* One commenter stated that it was inconsistent with the FSA to delete the definition of "juvenile" and replace it with separate definitions for "minor" and "UAC," thereby requiring different treatment between juveniles who are accompanied by their parent or legal guardians, and juveniles who are not. The commenter noted that although UACs must be transferred to ORR custody within 72 hours of apprehension, juveniles who did not meet this definition would not be transferred. The commenter also noted that under the NPRM, minors could be released only to a parent or legal guardian, whereas, the commenter contended, the FSA requires the release of all children to the least restrictive placement. The commenter concluded that adopting the two definitions would conflict with the FSA, which does not draw any distinctions between juveniles in ORR custody and juveniles in DHS custody.

*Response.* DHS disagrees that replacing the term juvenile with a definition for minor and a definition for UAC is inconsistent with the FSA or creates an improper distinction. The term "juvenile" originates not in the FSA, which did not use or define the term, but in existing DHS regulations. These regulations have not been updated since 1988 and do not reflect either the provisions of the FSA or any developments in law since that time. Accordingly, in updating the regulations to implement the FSA, DHS has adopted the same definition of "minor" as used in the FSA. Additionally, DHS has included the term UAC, as that term is defined in the HSA. Pursuant to the HSA and the TVPRA, ORR is

responsible only for the care and custody of UACs. *See* 6 U.S.C. 279(b)(1); 8 U.S.C. 1232(b)(1). Because the HSA and the TVPRA specifically define UACs and impose certain requirements related only to UACs, the regulatory text must be able to distinguish between UACs and minors who do not meet the UAC definition. The term juvenile is too broad to provide a meaningful definition and does not track the language of the FSA.

Changes to Final Rule

DHS finalizes its definitions of minor and UAC as proposed and declines to make changes in response to public comments.

Special Needs Minor § 236.3(b)(2)

Summary of Proposed Rule

DHS did not propose any revisions to the FSA for the definition of special needs minor. Special needs minor is defined as any minor with physical disabilities, cognitive impairments or chronic medical conditions that was identified in the individualized needs assessment.

Public Comments and Response

*Comments.* Some commenters asked for expanded definitions of "special needs minor" or additional provisions relating thereto. One commenter stated the definition should be broadened to include developmental disability and learning disability. The commenter urged that it is important for children, particularly unaccompanied children, to be able to understand and follow instructions or directions given to them by Federal officials, attorneys, and care custodians in licensed facilities. The commenter also asserted that children with learning or developmental disabilities would be less likely to take advantage of the resources for which they are eligible and may not fully comprehend the life-changing decisions that they are asked to make during their immigration proceedings. Another commenter contended that the rule does not adequately discuss special needs or require DHS to consider a child's disability in determining placement in a secure facility or even in a FRC.

One commenter also condemned the use of the "outdated" term "retardation" in the definition of special needs minor. The commenter stated that the term is used as a slur that dehumanizes, demeans, and does very real emotional harm to people with mental and developmental disabilities. The commenter acknowledged the term was used in the FSA agreement, but argued that it is inappropriate in a modern-day regulation.

*Response.* The regulatory language adopted the same definition of "special needs" as the definition used in the FSA. This definition includes any minor whose mental condition requires special services and treatment as identified during an individualized needs assessment. DHS disagrees that the definition should be expanded because the definition is broad enough to include minors with developmental and learning disabilities, if the special needs assessment determines that these conditions require special services and treatment.

The proposed regulatory language contains multiple provisions requiring DHS and HHS to consider a minor or UAC's special needs, including provisions requiring consideration of special needs when determining placement. For example, 45 CFR 410.208 states that ORR will assess each UAC to determine if he or she has special needs and will, whenever possible, place a UAC with special needs in a licensed program that provides services and treatment for the UAC's special needs. Title 8 CFR 236.3(g)(2) requires DHS to place minors and UACs in the least restrictive setting appropriate to the minor or UAC's age and special needs. Title 8 CFR 236.3(i)(4) requires that facilities conduct a needs assessment for each minor, which would include both an educational assessment and a special needs assessment. Additionally, 8 CFR 236.3(g)(1) requires DHS to provide minors or UACs with Form I–770 and states that the notice shall be provided, read, or explained to the minor or UAC in a language and manner that he or she understands. These provisions ensure that a minor or UAC's special needs are taken into account, including when determining placement.

Changes to Final Rule

DHS is amending the regulatory language to delete the term "retardation" and insert the term "intellectual disability." HHS has also deleted this term in its regulatory language.

Unaccompanied Alien Child § 236.3(b)(3)

Summary of Proposed Rule

DHS proposed to define a UAC as provided in 6 U.S.C. 279(g)(2), which states that a UAC is a child under the age of 18 who has no lawful immigration status in the United States and who has no parent or legal guardian present in the United States who is available to provide care and physical custody.

Public Comments and Response

The comments received are discussed above in conjunction with the definition of "minor."

Changes to Final Rule

DHS declines to change the proposed definition of UAC in response to public comments.

Custody § 236.3(b)(4)

Summary of Proposed Rule

The term custody is not defined in the FSA. DHS has defined custody as the physical and legal control of an institution or person.

Public Comments and Response

DHS did not receive any comments requesting a change to this definition.

Changes to Final Rule

DHS is not making changes from the proposed definition of custody in the final rule.

Emergency § 236.3(b)(5)

Summary of Proposed Rule

DHS proposed revisions to § 236.3(b)(5) to define emergency as an act or an event that prevents timely transport or placement of a minor, or could delay compliance with or temporarily excuse compliance with other provisions of the proposed rule. As discussed in the preamble to the proposed rule, the new definition of emergency has been added in the regulatory text. The new definition largely tracks the existing text of the FSA except that it reflects DHS's recognition that emergencies may not only delay placement of minors but could also delay compliance with other provisions of the proposed rule or excuse noncompliance on a temporary basis.

Public Comments and Response

*Comments.* Several commenters expressed concern that the proposed "expanded" definition of "emergency" would grant DHS too much discretion to suspend compliance with certain FSA provisions relating to standards of care and custody for children, such as timely transport or placement of minors and other conditions implicating their basic services.

Some of these commenters contended that the definition would allow DHS to declare any situation an emergency and deny any and all protections to children Several commenters stated that the expanded definitions of emergency would make ignoring limitations on transfer the "default" and compliance with the FSA timeframe the exception

rather than the rule. These commenters stated this would expose children to dangerous conditions documented repeatedly by government inspectors and outside researchers, including inadequate and inappropriate food, severely cold temperatures, bullying and abuse, and lack of medical care.

Other commenters had specific objections to the proposed definition. One contended that it was circular, defining an emergency primarily as an event that prevents compliance. Some expressed concern that events other than a natural disaster, facility fire, civil disturbance, and medical or public health concerns might also qualify as an emergency, leaving significant room for interpretation. Several commenters stated that the phrase "other conditions" would implicate the basic needs of the children which would further jeopardize their well-being, health, and safety and runs contrary to the explicit placement context of the FSA. Another commenter expressed concern that the language "medical or public health concerns at one or more facilities" which allow for a possible emergency in instances where several minors lack key vaccinations, or where a few minors may require treatment for chronic conditions such as asthma or diabetes.

With respect to the consequences of the emergency, commenters offered still other concerns. One commenter expressed concern with the language that minors must be transferred "as expeditiously as possible," instead of including a defined period of 3 or 5 days, as the commenter believed required by the TVPRA.

A few commenters noted that, as a result of the proposed definition, minors may be held indefinitely in temporary CBP facilities that are intended only for short-term use and that are assertedly notorious for frigid temperature, deficient medical care, and other poor conditions (*i.e.,* sleeping in office buildings without beds or showers, or in tents, vans or buses without water and sanitation). One commenter expressed concern that, even without invoking an emergency, CBP is often grossly negligent towards children and those in its custody.

Several commenters contended that the proposed definition contradicts FSA paragraph 12A which provides no exception for housing minors with unrelated adults for longer than 24 hours, because they viewed the broad interpretation of emergency as allowing DHS to house children with unrelated adults indefinitely and for virtually any reason.

One commenter stated that the example provided by DHS regarding delayed access to a snack or meal seems reasonable; however, it would provide DHS the flexibility to label any act or event an emergency and that recommended that DHS: (1) Look into the definition of emergency in the American Bar Association's (ABA) Unaccompanied Child Standards; and (2) adopt a more limited, non-circular definition of emergency, to avoid what the commenter considered an unnecessary relaxation of the FSA standards. Other commenters recommended that DHS instead ensure that non-perishable, nutritious food and bottled water in packs will be kept on site at all times in case of an emergency evacuation in order to ensure that nutritional needs of children are met.

Several commenters argued that DHS and HHS should provide more evidence and explanation of the need to expand the current definition; describe how the agencies arrived at these definitions; provide a timeframe for how long an emergency may last; and provide for the consequences for invoking the emergency when unwarranted.

One of these commenters recommended that DHS and HHS compile a comprehensive list of permissible emergency circumstances. One commenter noted that the proposed rule leaves the facility to decide the rationale and length of an emergency and recommended that DHS hold detainment centers accountable to the maximum safety and compliance requirements and make no exemptions to the minimum standards in FRCs for detainees.

Several commenters addressed conduct in the event of an emergency. Some, for example, recommended that the proposed rule should clarify the circumstances that the Government would consider constituting emergencies, establish that any corresponding exemptions be limited in scope, and ensure that the fundamental needs of children are met, regardless of the circumstances constituting the "emergency."

One commenter suggested that in cases of emergency, rather than basing means to delay the provision of basic services or care and timely placement or transfer, DHS should consider how provisions could be made to serve the children during transport and should prioritize emergency preparedness planning to ensure readiness to respond. And several commenters recommended that, from a public health perspective, designation of an emergency should trigger additional resources, prepared in advance through contingency planning

and made available through standing mechanisms.

*Response.* DHS notes that paragraph 12(B) of the FSA defines an emergency as "any act or event that prevents the placement of minors pursuant to paragraph 19 within the time frame provided" (*i.e.,* three days or five days, as applicable). The FSA also contains a non-exhaustive list of acts or events that constitute an emergency, such as "natural disasters (*e.g.,* earthquakes, hurricanes, etc.), facility fires, civil disturbances, and medical emergencies (*e.g.,* a chicken pox epidemic among a group of minors)." DHS notes that the definition of emergency contained within this provision does not depart from how the FSA defines an emergency act or event. Rather, this provision recognizes that, in rare circumstances, an emergency may arise, generally unanticipated, that affects more than just the transfer of a minor from one facility to another (*e.g.,* a natural disaster or facility fire may render CBP temporarily unable to provide contact between a minor and family members apprehended with him or her). As indicated in the NPRM, the impact, severity, and timing of a given emergency situation dictate the operational feasibility of providing certain items to minors, and thus the regulations cannot contain every possible reality DHS will face. The applicability of "emergency" is intended to be flexible to the extent it fits within the parameters set forth by the FSA. Therefore, DHS disagrees with commenters' claim that the definition of emergency creates excessive discretion, allows DHS to declare an emergency for any reason, or unnecessarily relaxes the existing FSA standards.

DHS also notes that, during an emergency situation, it continues to make every effort to transfer minors and UACs as expeditiously as possible, and to provide all other required amenities as set out in the FSA. Depending on the severity of the emergency, the provision of one or more FSA requirements may be temporarily delayed for some minors and UACs. For instance, if a child in a CBP facility has a medical emergency such that he or she must be provided with urgent medical care, it may be necessary to temporarily delay the provision of meals to other minors and UACs during the time required to provide such medical care. As soon as the medical emergency subsides, however, CBP would resume the provision of meals to all other minors and UACs. Similarly, if a facility suffers an electrical failure, such that the air conditioning breaks, all minors and UACs in that facility may temporarily be

held in temperatures that do not comply with the applicable standards set out in the FSA. CBP would work to rectify the problem as quickly as possible, and would take steps to mitigate the problem (*e.g.*, providing extra fans for the facility). Once the air conditioning is fixed, however, the minors and UACs would return to conditions consistent with the standards set out in the FSA. CBP also records the provision of food to minors and UACs, and records that CBP has routinely confirmed the availability of drinking water, operational toilets, and sinks, as well as the conditions in its hold cells (*e.g.*, temperature, cleanliness) in its electronic systems of records. Any emergency situations requiring temporary suspension of the requirements set out in the FSA, as well as the conclusion of that emergency, is also recorded in the electronic systems of records. To the extent it is able, CBP also maintains a sufficient stockpile of supplies, such as snacks, at its facilities to ensure that there are sufficient supplies available in an emergency situation.

DHS disagrees with commenters' concern about minors being held "indefinitely" as a result of a declared emergency and emphasizes that when emergency conditions exist, transfer must still occur "as expeditiously as possible." DHS notes that the "as expeditiously as possible" time frame is derived from the FSA itself. The existence of an emergency under these regulations does not excuse DHS from transferring minors or UACs to licensed programs or HHS custody, respectively. DHS must still move as expeditiously as possible, given the emergency, to place minors and/or UACs.

DHS notes that the ABA's Unaccompanied Child Standards' concept of "emergency" appears to apply to a much narrower situation than the concept of "emergency" in the FSA, and declines to apply these standards to DHS's regulatory definition of emergency. The ABA concept of "emergency" appears to govern when it may be permissible to house minors and UACs with unrelated adults. The FSA definition of emergency covers a wider variety of situations than the ABA's provision. Accordingly, DHS has described such situations in other provisions of this rule. *See, e.g.*, 8 CFR 236.3(g)(2)(ii). DHS notes that these provisions of the proposed rule do incorporate and contemplate certain emergency exceptions.

### Changes to Final Rule

DHS declines to change its proposed definition of emergency in response to public comments.

### Escape-Risk § 236.3(b)(6)

#### Summary of Proposed Rule

The term "escape-risk" is defined in paragraph 22 of the FSA. DHS proposed to define escape-risk as a minor who attempts to escape from custody. DHS proposed requirements and clarification for the definition of escape-risk. A minor is an escape-risk if he or she is subject to a final order of removal, has a prior breach of bond, has failed to appear before DHS or immigration court, or has previously absconded from state or Federal custody.

#### Public Comments and Response

*Comments.* One commenter stated that the proposed rule definition of escape risk includes a child who "has previously absconded or attempted to abscond from state or Federal custody." The commenter argued that the FSA refers only to Federal custody and that the revised definition could include a child who has been ordered into foster care by a state juvenile court and then ran away from foster care. The commenter concluded children should not face detention in a secure facility because of such circumstances.

*Response.* In paragraph 22 of the FSA, escape risk is defined as "a serious risk that the minor will attempt to escape from custody." The NPRM adopted that same definition. Paragraph 22 of the FSA also provides a non-exhaustive list of factors to consider when determining whether a minor is an escape risk. Because the list of factors to consider is not exhaustive, it is not inconsistent with the FSA for DHS to consider additional factors in determining a minor's escape risk. DHS continues to find that whether the minor has previously absconded or attempted to abscond from state or Federal custody to be relevant to whether there is a risk the minor will attempt to escape from DHS custody.

### Changes to Final Rule

DHS declines to change its proposed definition of escape risk in response to public comments.

### Family Unit § 236.3(b)(7)

#### Summary of Proposed Rule

The term family unit is not defined in the FSA. DHS proposed to define family unit as two or more aliens consisting of a minor accompanied by a parent or legal guardian. If evidence shows the minor has no relation to the purported parent or legal guardian, the individuals would not constitute a family unit, and, if no parent or legal guardian for the minor is in the United States or the/ parent or legal guardian in the United States is not available to provide care and physical custody, the minor would be a UAC.

#### Public Comments and Response

*Comments.* Commenters expressed concern that the proposed definition of family member seeks to narrow the definition of "family unit" by excluding adult family members other than the child and his/her biological parent(s) or legal guardian(s). The commenters wrote that DHS has ignored the reality in some foreign cultures that extended family members may be the sole caregivers for the children and recommended that DHS adopt a broad definition of "family unit" to comply with the FSA and accepted child welfare principles and practices.

One commenter stated that the proposed definition violates the best interest of the child standard because it separates children from their related, non-parent caregivers. The commenter stated that, although the FSA mandates that UACs be "segregated from unrelated adults," it requires that DHS provide access to "contact with family members that were arrested with the minor," hence recognizing a broader definition of "family." Likewise, the commenter stated that ORR's current definition of "family" and HHS' proposed regulations, which allow the release of a child to an adult seeking custody when family reunification is not possible, recognize a broader definition.

One commenter recommended that DHS adopt the broad definition of family similar to the "Standards for the Custody, Placement and Care; Legal Representation and Adjudication of Unaccompanied Alien Children in the United States" (UC Standards) and the ABA Civil Immigration Detention Standards. The commenter contends that nothing in the language of the TVPRA restricts DHS's ability to release a UAC to someone other than a parent or legal guardian and therefore there is no legal requirement to narrow the definition of "family member."

*Response.* DHS notes that the definition of "family unit" in this rule does not encompass a broader definition of family as proposed by the commenters because DHS must ensure it complies with the applicable laws and regulations governing the apprehension, processing, care, and custody of alien juveniles. The HSA and the TVPRA transferred to ORR HHS the

responsibility for the care and custody of UACs. A UAC, as defined in the HSA, is a minor under 18 years of age who lacks lawful immigration status in the United States and either lacks a parent or legal guardian in the United States or lacks a parent or legal guardian in the United States available to provide care and physical custody. *See* 6 U.S.C. 279(g)(2). Once an alien juvenile has been determined to be a UAC, DHS must transfer the UAC to the care and custody of HHS within 72 hours, absent exceptional circumstances (unless such a UAC is a national or habitual resident of a contiguous country and is permitted to withdraw his or her application for admission under section 1232(a)(2)). *See* 8 U.S.C. 1232(b)(3). Accordingly, DHS has no authority to release a UAC.

In accordance with the TVPRA, only non-UACs can be held in DHS custody at an FRC. By definition, a minor is not a UAC if he or she has an adult parent or legal guardian in the United States who is available to provide care and physical custody. The term "family unit" is defined to include those alien juveniles—minors who are accompanied by his/her/their adult parent(s) or legal guardian(s)—who are not UACs. Absent additional information available to DHS at the time of encounter indicating a parent or legal guardian was present in the United States and available to provide care and physical custody, if a juvenile alien is encountered or apprehended with an adult relative other than a parent or legal guardian, that juvenile alien lacks a parent or legal guardian in the United States available to provide care and physical custody of the juvenile. *See* 6 U.S.C. 279(g)(2). Thus, under the HSA and TVPRA, the juvenile alien would be determined to be a UAC and transferred to the care and custody of HHS. *See* 8 U.S.C. 1232(b)(3). Such a juvenile alien would not be detained in DHS custody at an FRC.

DHS notes that the commenter's suggestion that DHS adopt ORR's definition of "family" in the ORR proposed regulation at 45 CFR 410.300 is misguided, as that section does not contain a separate definition of "family" but instead identifies the types of potential sponsors to whom ORR may release a UAC. DHS notes that the term "family" encompasses a broader group of individuals than those individuals determined to be a "family unit." HHS has unique authorities under the TVPRA and the HSA to determine whether release of a UAC to a sponsor— which may include an adult who is a member of the child's family, but who is not a parent or legal guardian—is appropriate. DHS does not have any

similar authorities to release UACs to sponsors. For an additional discussion about the individuals to whom a non-UAC minor may be released, please see the discussion in Section B.10, Release of Minors from DHS Custody. The commenter also notes that the FSA requires DHS to provide "contact with family members that were arrested with the minor," FSA paragraph 12, and thus "recognizes the broader definition of family." However, this paragraph refers to procedures and temporary placement immediately following the arrest or apprehension of a minor. This paragraph acknowledges that a juvenile may be encountered with family members who are not parents or legal guardians, and that there is a meaningful benefit to providing contact with such family members. However, the FSA does not require DHS to detain juvenile aliens together with adult relatives who are not parents or legal guardians, and DHS is not permitted to detain UACs under the HSA and TVPRA.

DHS notes that the commenter recommends DHS adopt the broad definition of family similar to those described in the ABA "Standards for the Custody, Placement and Care; Legal Representation and Adjudication of Unaccompanied Alien Children in the United States" or the ABA Civil Immigration Detention Standards. However, those standards include family members who could not be detained together in DHS custody under the TVPRA and consistent with the HSA.

DHS also notes the commenter's disagreement with DHS's contention that the TVPRA restricts DHS's ability to release a UAC to someone other than a parent or a legal guardian. As stated in the proposed rule, following the passage of the TVPRA, HHS is solely responsible for the care and custody of UACs, and DHS no longer has the authority to release a UAC. However, upon further consideration of the commenter's contention and review of relevant statutes and case law, DHS has determined that the law does not prohibit DHS from releasing a non-UAC minor to someone who is not a parent or legal guardian. DHS acknowledges that this interpretation of the law differs from the interpretation represented to the U.S. Court of Appeals for the 9th Circuit in recent litigation, but is making this change upon due consideration. *See* Brief for Appellants, *Flores* v. *Sessions*, No. 17–56297 (9th Cir. Jan. 5, 2018). This is being permitted to facilitate transfers to non-parent family members when such a transfer is appropriate, that DHS has no

concerns about the minor's safety upon such release, and no concerns about the adult relative's ability to secure the non-UAC minor's timely appearance before DHS or the immigration courts. Any release of a non-UAC minor to an adult relative other than a parent or legal guardian will be within the unreviewable discretion of DHS. DHS reiterates, however, that if no parent or legal guardian is in the United States and available to provide care and physical custody for an alien under the age of 18 with no lawful status, the juvenile meets the definition of a UAC and must be transferred to HHS custody as only HHS has the responsibility for the care, custody, and placement of UACs. *See* 6 U.S.C. 279(g)(2); 8 U.S.C. 1232(b)(1), (3).

Changes to Final Rule

DHS declines to change its proposed definition of family unit in response to public comments, but will change certain provisions regarding the release of minors as explained in subsequent sections.

Licensed Facility § 236.3(b)(9)

Summary of Proposed Rule

In § 236.3(b)(9), DHS proposed a definition for "licensed facility." To parallel the provisions of FSA paragraph 6, DHS proposed that facilities that temporarily detain minors obtain licensing where appropriate licenses are available from a State, county, or municipality in which the facility is located. The proposed rule also eliminated existing barriers to the continued use of FRCs by creating an alternative to meet the licensed facility definition for such detention to provide reasonable assurances about the conditions of confinement at that facility, and thus to implement the underlying purpose of the FSA's licensing requirement. DHS's proposed definition considers a "licensed facility" to be one that is licensed by the State, county, or municipality in which it is located. If no such licensing scheme exists, DHS's proposed that the facility will meet the definition of "licensed facility" if it complies with ICE's family residential standards as confirmed by a third-party with audit experience hired for such a purpose.

Public Comments and Response

*Comments.* One commenter noted that she supports DHS-licensed facilities that would allow children to stay with their parents or relatives as long as possible, given that prolonged separation from families can be traumatic for children. The commenter stated that she would support these

facilities to detain families during their immigration proceedings if they are "consistent with applicable law." Many other commenters, however, raised issues such as a potential conflict of interest in permitting DHS to establish the licensing requirements for DHS facilities, whether Federal licensing standards would be as rigorous as state standards, alleged inconsistencies with the FSA, whether the Federal Government has authority to license detention facilities, and whether Federal licensing would provide adequate monitoring and oversight.

• Self-Licensing and Oversight

*Comments.* Numerous commenters recommended alternative language to the proposed definition of "licensed facility." One commenter suggested that in all cases where a state, county, or municipality licensing program is unavailable that ICE's family residential standards should align with applicable state child welfare laws and regulations—including all state and local building, fire, health, and safety codes. This commenter stated that in emergency situations where immediate or short-term solutions are needed, existing state licensed child welfare facilities should be considered as an option. Another commenter suggested that the period of detention should be shortened to 14 days. The commenter also objected to the proposed new limits on to whom children may be released, and the elimination of the requirement that detention centers be subject to State inspections. The commenter specifically suggested that detention centers be required to meet care requirements that apply to day care centers, such as having a small ratio of care givers to children, background checks, and check-in visits. Still other commenters stated that the proposed rule does not state who will propose the Federal licensing scheme for detention centers.

A few commenters stated that DHS's difficulty licensing facilities under state licensing regimes results from the unacceptable conditions of confinement within DHS's facilities rather than a failure of the state licensing processes. One commenter stated "In unlicensed facilities, children are at high risk for abuse and neglect, which in turn will ultimately result in high costs paid not only in the form of unnecessary suffering, the disintegration of the social fabric of our nation, but also by taxpayer money going towards Department of Children and Families, Department of Youth Services, and more state agencies responsible for welfare of youth."

Numerous commenters stated that DHS should not be allowed to self-license detention facilities because current facilities do not have adequate oversight and, as a result, DHS is not currently capable of maintaining clean, humane, and safe detention centers.

Multiple commenters cited to a June 2018 report from the DHS Office of Inspector General (OIG), which found that the Nakamoto Group, the third-party contractor ICE has most frequently used to conduct inspections at adult detention facilities, did not always examine actual conditions, was not consistently thorough, and frequently failed to identify compliance deficiencies.[21] According to the commenters, the report showed that the agency's self-inspections by the Nakamoto Group have been lax and severely lacking. The report found that, in some instances, the Nakamoto Group even misrepresented results in their reports to ICE. The commenters also stated that the Nakamoto Group had standards that were very difficult to fail, and one commenter requested that DHS verify that the Nakamoto Group not serve as a third-party contractor for these licensed facilities.

Commenters also discussed other aspects of the OIG report. One commenter noted that the OIG report found that DHS–ICE existing inspections and monitoring mechanisms for detention facilities neither "ensure consistent compliance with detention standards, nor do they promote comprehensive deficiency corrections." Some commenters noted that typically three to five inspectors have only three days to interview 85–100 detainees and perform and document their inspection, an amount of time that the OIG found insufficient to see if the facility was actually implementing its required policies. According to the commenters, the OIG also found that it could not characterize the interviews with detainees as sufficient because the conversations with detainees were not conducted in private and were in English only.

Yet another commenter cited the OIG report to state that inspections by third-party contractors did not insure minimum child welfare standards were met, and that although ICE completed oversight inspections every three years, it did not correct the problems it found.[22] Although the ICE Office of

Detention Oversight conducted more thorough inspections, the commenter noted that the OIG expressed concern that these inspections were done only once every three years with no follow-up to see if the problems were corrected.

A commenter stated that reports from private inspections are rarely available and, even when they are, do not inform the public about what standards were used as a base and how long non-compliance issues took to be resolved. These commenters pointed to the case of Danya International, a private contractor hired by DHS to inspect family detention centers for compliance with ICE's internal standards, to highlight their concerns with the quality and lack of transparency in the inspections carried out by ICE's third-party vendors. They stated that only three reports from Danya's inspections have been released publicly. According to the commenters, the only information available about the remaining reports is an assertion by an ICE official in a court declaration that "Danya has generally found the FRCs to be compliant with a majority" of standards, and "[w]here Danya observed individual issues of non-compliance, the facilities took corrective action as appropriate and achieved compliance although this is a continuous process." The commenters stated that the ICE descriptions were vague and provided very little information regarding which ICE standards were violated, or how severe or prolonged these violations were. The commenters claim that ICE denied requests for access to the reports even to DHS's Advisory Committee on Family Residential Centers. They also asserted that DHS's Office of Civil Rights and Civil Liberties (CRCL) has conducted more in-depth inspections of family detention centers, and what is publicly known from those inspections appears to undermine those conducted by DHS's third-party vendors.

*Response.* DHS understands commenters' concerns about the Federal Government setting its own standards instead of using state licensing standards; however, many States have no standards for facilities housing families. The Federal Government cannot require States to create regulatory structures to license and inspect FRCs. Therefore, to ensure compliance with the FSA in those States that do not have any applicable standards for the housing of family units, DHS established Family

---

[21] Department of Homeland Security Office of Inspector General, ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements: DHS OIG Highlights (OIG–18–67) (June 26, 2018) *https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-8-67-Jun18.pdf.*

[22] Department of Homeland Security Office of Inspector General, ICE's Inspections and Monitoring

of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements: DHS OIG Highlights (OIG–18–67) (June 26, 2018), *https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18-67-Jun18.pdf.; Id.* at 6–8.

Residential Standards (FRS) in 2007 with the FSA as its base after a review of contemporaneous state codes of Pennsylvania and Texas. The first edition of the ICE FRS, released in 2007, was developed by independent subject matter experts (SMEs), government officials, and the nongovernmental organization (NGO) community. ICE's Juvenile and Family Residential Management Unit (JFRMU) engaged other DHS components in reviewing and providing input. Further, JFRMU sought various SMEs in areas such as emergency planning, detention administration, trauma informed care, child development, and legal rights and representation to evaluate the draft standards.

After several years of operations and data collection through a rigorous monthly and semiannual inspection program, ICE commenced a top-to-bottom review of the first-edition FRS. This review included an analysis of past and current best practices at FRCs, and focused on improving the standards to more effectively accommodate a

residential program. JFRMU established a review team led by a child-focused SME with proficiency in assessing conditions of confinement and residential programming. The team assessed FRC practices and policies, and conducted interviews with existing FRC management and direct care staff, as well as with FRC ICE/Enforcement and Removal Operations (ERO) staff, health care and mental health providers, and case management staff. These interviews allowed participants the opportunity to recommend improvements based on their experiences. The review team also sought to implement improvements to the standards that directly addressed feedback received from numerous private sector agencies and NGOs. The review team synthesized those findings and incorporated relevant changes into a second-edition FRS. The FRS continue to be improved based on best practices.

DHS notes that while the June 26, 2018, report issued by DHS OIG did make recommendations on how ICE could improve oversight over detention facilities, OIG did not specifically

examine oversight of the FRCs as part of the report. *See* Office of the Inspector General, Dep't of Homeland Security, OIG–18–67, ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements 2 n.1 (2018). As such, the report is of limited value in assessing ICE's oversight of the FRCs. FRCs are subject to a different set of standards—the Family Residential Standards (FRS)—than other facilities and receive inspections more frequently, and by a larger number of outside entities, than those detention centers reviewed in the OIG report. For instance, despite the ongoing litigation surrounding state licensure of the FRCs, the State of Texas and the Commonwealth of Pennsylvania regularly conduct both announced and unannounced inspections of FRCs, and the reports of those inspections are publicly available on the States' websites. Table 6 demonstrates the number of inspections ICE FRCs typically receive on a regular basis.

TABLE 6—FRC INSPECTIONS

| FRC inspection type | Typical frequency of inspection |
| --- | --- |
| State inspectors | 1 Standard by Standard Review when submitting the license applications. |
| | 3 unannounced inspections prior to granting a temporary 6-month provisional license. |
| | 3 additional unannounced inspections prior to granting a permanent non-expiring license. |
| | Unlimited, randomized, unannounced audits. |
| Danya (ICE contractor) | Monthly. |
| PREA | Every two years. |
| CRCL (DHS office) | Annual audits until 2018. |
| | Presently, will inspect if warranted based on complaints received. |
| IHSC | Annual. |
| OIG/GAO | Variable. Driven by OIG hotline and/or Congressional inquiries. |
| ICE ERO COR/Compliance | Weekly compliance audits/logs. |
| | Weekly COR meetings with Service Providers, IHSC, and ICE ERO. |

Despite the OIG report's limited relevance to this situation, however, DHS notes that ICE has already taken several steps to address the recommendations set forth by OIG in the June 26, 2018 report. For instance, ICE has requested that OIG consider recommendation three, which addressed the development of a follow-up inspection process, resolved and closed due to progress made by ICE towards achieving this goal. In FY 2018, ICE Office of Detention and Oversight (ODO) conducted two follow-up inspections focused on areas where deficiencies were previously identified. And although not eliminating advanced notice for inspections because unannounced inspections would disrupt facility operations and the pre-

inspection documentation review, ODO has decreased the amount of advanced notice provided to facilities in preparation for an ODO inspection. Furthermore, ICE has continued to make progress addressing the other four recommendations.

The second recommendation regarded reinstatement of and documentation for a quality assurance program for contracted inspections of detention facilities, and in October 2018, the ERO Detention Standards Compliance Unit created a Quality Assurance Team (QAT) to perform quality management over ICE's contract inspectors. Moving forward, one QAT staff member will accompany ICE contract inspectors during their annual facility inspections. The fifth recommendation regarded the

development of protocols for ERO field offices to require facilities to implement corrective actions resulting from Detention Service Managers' identification of noncompliance with detention standards. The ERO Headquarters Detention Monitoring Unit (DMU) is continuing to work with field offices and unit staff enforce facility compliance to the ICE detention standards and to address deficiencies identified by the on-site Detention Services Manager and Detention Standards Compliance Officers.

More recent developments, specifically the release of the Joint Explanatory Statement (JES) to the Consolidated Appropriations Act, 2019, Public Law 116–6, have affected ICE's efforts to address certain

recommendations. The first recommendation was for ICE to revise the inspection scope and methodology and the JES cannot allow ICE inspection requirements that have directly impacted how ERO and OPR conduct inspections. The fourth recommendation focused on verification of identified deficiencies and tracking of corrective actions. How ICE addresses the fourth recommendation will flow directly from decisions made in addressing the first. ICE continues internal dialogue to discuss full implementation of both recommendations.

ICE's existing commitment to seriously considering OIG's recommendations regarding detention facilities and instituting them as appropriate will not change as a result of this final rule.

DHS disagrees with the commenters' assertions that reports from CRCL inspections have undermined the results of third-party auditor inspection reports. DHS responds to the allegations raised by commenters about the July 17, 2018, correspondence from Dr. Scott Allen and Dr. Pamela McPherson elsewhere in this document but notes that the correspondence from these two CRCL contractors does not reflect the complete posture of CRCL inspection reports. In particular, many of the broad negative assessments raised in the contractors' correspondence are inconsistent with formal findings they provided to ICE in CRCL's Expert Reports. More importantly, however, DHS notes that nothing in this rule will negatively affect the frequency or manner in which CRCL conducts FRC inspections.

With respect to concerns raised about the use of specific third-party contractors the Nakamoto Group and Danya, DHS notes that all contractors used to conduct inspections of FRCs are required to have child welfare experience, a requirement that will not change as a result of this rulemaking. DHS declines to identify the names of particular contractors that DHS will employ to conduct compliance inspections through this rulemaking. DHS complies with Federal contracting law and cannot pre-determine which contractors to employ via this rulemaking.

In response to concerns raised by the commenters about transparency and accountability in the proposed FRC inspection process, the final rule includes a provision requiring the results of third-party audits to be posted publicly. Since May 2018, ICE has publicly posted the results of all facility inspection reports submitted by third-

party contractors within 60 days of inspection. *See Facility Inspections, https://www.ice.gov/facility-inspections,* (last updated Mar. 15, 2019). The final rule stipulates that third-party inspections of FRCs will be posted in the same manner.

For commenters' concerns about past failures to inspect facilities, please see the discussion in Section C. Other Comments Received, DHS Track Record with Detention.

• Inspections by Outside Sources

*Comments.* Many commenters suggested that in the creation of an alternative Federal licensing scheme, the following questions should be answered: Which third parties will be conducting audits of such facilities; what standards will be applied by those third parties; and how will DHS and HHS provide oversight over the third party auditors. A few commenters wrote that the proposed rule does not show how the third-party oversight system would work in practice. Multiple commenters suggested that inspections of detention facilities should be inspected by an outside source instead of being run and inspected by DHS.

One commenter stated that under the FSA, the Center for Human Rights and Constitutional Law must still be allowed to inspect every child detention site and to interview and evaluate the children.

Another commenter suggested that ICE and ORR consider issuing guidance to contractors, non-profits, and faith-based organizations that are tasked with assisting the Federal Government in the care or education of immigrant youth. The commenter also recommended the creation of a Blue Ribbon Panel to Assist with Creation of a new Federal Standard for dealing with asylum seekers. The commenter specifically suggested that ICE request the National Institute of Child Health and Human Development (NICHD) to establish such a panel to review standards for detaining family units and UACs.

*Response.* DHS declines to include further details about the use of third parties to conduct FRC inspections in the text of this rule. DHS notes, as stated elsewhere, that the results of these inspections will be posted publicly on DHS's website. DHS will require third parties to conduct inspections to ensure compliance with the ICE Family Residential Standards as well as the terms of this rule. While commenters raise concerns about private, for-profit contractors used for inspection of DHS facilities, such as the Nakamoto Group and Danya, DHS has the ability to penalize contractors for failing to comply with ICE's FRS as described

further below in the section responding to comments on the topic of "Danger Due to Lack of Oversight."

Existing family residential standards were created with a view to care for vulnerable populations such as minors. DHS is currently working on updating these standards to implement further improvements at FRCs. For this reason, DHS declines to adopt commenter's suggestions to establish additional panels for this purpose.

• DHS Licensing Is Inconsistent With FSA

*Comments.* Several commenters stated that the proposed licensing scheme would violate the FSA because it would place children in facilities that have not been licensed by state agencies. The commenters also contended that DHS proposed the scheme to avoid the FSA state licensing requirement. Multiple commenters stated that state licensing standards for the care of children in out-of-home settings exist to provide a baseline of protection for the health and safety of children. The commenters stated, citing researchers, that such licensing regulations can mitigate risks of injury or death, reduce the spread of communicable diseases, and set up conditions that promote positive child development.

Multiple commenters stated that the myriad of licensing challenges that have faced detention facilities demonstrate the importance of the state licensing requirement and the crucial role that licensing and monitoring can play in guarding against and identifying inappropriate conditions for children. The commenters cited, as an example, the closing of the T. Don Hutto Center in Texas after three years of operation due to lawsuits related to the center's poor conditions. The commenters also cited a 2016 revocation of a state child care license for the Berks County Residential Center contending that it demonstrated DHS's disregard for child care licensure standards and regulations. As a final example, the commenters stated that in late 2015, the Texas Department of Family Protective Services introduced a regulation called the "FRC rule" that would allow the Dilley detention center to detain children while exempt from statewide health and safety standards but that, in June 2016, a judge ruled that such an exemption could put children at risk of abuse, particularly due to shared sleeping spaces with non-related adults, a decision the commenter stated was upheld by a Federal judge in December 2016.

*Response.* DHS reiterates that, to the extent state licensing is available, DHS will seek licensure. DHS did not propose this alternative licensing process to avoid the FSA state licensing requirements. Rather, DHS proposed this process because DHS cannot control whether a State will provide such licensing in the first place. In States where licensing is unavailable, the minimum requirements of this regulation, which mirror those in Exhibit 1 of the FSA, and the Family Residential Standards will create conditions that are identical to those envisioned by the Agreement. A robust schedule of inspections, along with compliance mechanisms that create consequences for contractors, and increased transparency through publication of audit results, will ensure that these standards are met. In creating standards for family detention, DHS has learned from past litigation, including *In Re Hutto Family Detention Center,* No. A–07–CA–164–SS (W.D. Tex. Aug. 29, 2007), which was resolved through a settlement agreement that terminated in 2009.

Regarding the Berks FRC, this facility has been licensed since December 1, 1999, as a Child Residential and Day Treatment Facility under 55 Pa. Code 3800. The facility has been used to house family units since 2001 and the State has been regularly subjecting the facility to inspections since that time. The license was renewed every year until October 22, 2015, when the Pennsylvania Department of Human Services sent a letter stating that the agency was unaware that Berks housed families and that the license for the facility would not be renewed unless it turned into a children-only facility. However, on November 9, 2015, a new license was issued for the 2016–2017 operating period. The licensing matter has been in active litigation since that time, but a state court has temporarily reinstated the license of this facility pending litigation. *In the Appeal of Berks Cty. Residential Ctr.,* Docket No. 061–15–0025 (Commonwealth of Pennsylvania Department of Human Services, Bureau of Hearings and Appeals filed November 23, 2015). The Berks facility continues to be regularly inspected by the Pennsylvania Department of Human Services.

In Texas, an appeals court reinstated the regulation that codifies licensing for FRCs. *Texas Dep't of Family and Protective Servs.* v. *Grassroots Leadership, Inc.,* No. 03–18–00261–CV, 2018 WL 6187433 (Tex. App. Nov. 28, 2018). Texas authorities have inspected the facilities at Dilley and Karnes regularly during the pendency of the

litigation, and the facilities will continue to seek licensure when that becomes available.

• Legally Insufficient Authority for Licensing

*Comments.* Numerous commenters questioned the legality of section 236.3(h). Most of these commenters stated that this provision violates the FSA and related court rulings. Specifically, commenters asserted that the proposed rule is contrary to the FSA because instead of expediting the release of children, it provides for the prolonged or indefinite detention of children and their families. One commenter stated that the arguments used to justify Federal licensure of FRCs in place of state licensure were unequivocally rejected on July 24, 2015, by the U.S. District Court for the Central District of California, which found that self-licensure would not satisfy the FSA's mandate to place unreleased children in a program, agency, or organization that is licensed by an appropriate State agency to provide residential, group, or foster care services. This commenter also stated that the requirement for state licensure attaches to all facilities used for temporary detention or placement of alien children and any attempt by DHS and HHS to go around this requirement is not allowed under the FSA. A few commenters contended that it would take legislation or judicial action to change the feature of the FSA that requires children be housed in facilities that are state-licensed for the care of dependent children.

Several commenters also wrote that the Federal Government lacks the authority to license facilities for children because ensuring child welfare is a police power reserved to the States. The commenters stated that, as a result of this responsibility, States have the licensing and child welfare infrastructure to care for the health and well-being of children in its custody.

Several commenters also stated that the proposed Federal licensing process fails to comply with the requirements of Executive Order 13132, which requires consultation with the states and a federalism impact statement when a proposed rule raises significant federalism concerns, which the commenters state this rule raises.

*Response.* DHS reiterates that, to the extent state licensing is available, DHS will seek licensure from the State. However, DHS cannot control whether states provide such licensing, and in states where this option is unavailable, the minimum requirements of this regulation, which mirror those in

Exhibit 1 of the FSA, and the Family Residential Standards will create conditions that are equivalent to those envisioned by the FSA. A robust schedule of inspections, along with compliance mechanisms that create consequences for contractors, and increased transparency through publication, will ensure that these standards are met. *See* sections on ''Danger due to lack of oversight'' and ''Self-Licensing and Oversight.'' DHS continues to disagree with court interpretations that extend the terms of the FSA to minors accompanied by their parents or legal guardians. DHS believes that it is preferable for family units to remain together during the pendency of immigration proceedings.

DHS has the sole legal authority to detain aliens for violations of immigration law; States do not. For this reason, the existence or non-existence of licensure in the States does not inform whether DHS can detain families who are in removal proceedings under Federal immigration law. DHS does not believe this rule raises significant federalism concerns under Executive Order 13132 because enforcing immigration laws falls within the sole purview of the Federal Government.

• Danger Due to Lack of Oversight

*Comments.* Commenters stated that the proposed regulations make clear that DHS does not intend to increase oversight of family detention centers as part of its new licensing authority. A commenter stated that DHS asserts in its proposed regulation that ICE currently meets the proposed licensing requirements because it currently requires family detention facilities to comply with ICE's detention standards and hires inspectors to monitor compliance, and therefore DHS would not incur additional costs in fulfilling the requirements of the proposed alternative licensing process.

Many commenters stated that holding children in facilities that are not licensed by state child welfare agencies is inhumane, dangerous, or unethical. Some commenters stated that there is no assurance of quality standards when the entity being licensed is setting the licensing standards and monitoring compliance with those standards and that there must be review or oversight by another entity. One commenter noted that the courts have already rejected DHS-licensed facilities and held that children who are not released should be housed in state-licensed facilities. Another commenter urged DHS to specify clear criteria for third party audits to ensure that any third party auditors are qualified to oversee

licensing of facilities holding children and apply appropriate criteria for the protection of children. The commenter requested that the public have an opportunity to comment on these criteria before a final rule was implemented.

Several commenters argued that DHS and HHS' track record for meeting state-licensing requirements heightened concerns that a self-licensing regime would not afford sufficient protection or oversight for children. A few commenters stated that self-inspections by DHS and its contractors are much weaker, and do not provide materially identical assurances about the conditions or protections that the FSA provides. One commenter pointed to its experience with the Pennsylvania facilities contracted to provide services to DHS, which had its license revoked by the State of Pennsylvania, and in the commenter's opinion reinforces the need for state licensing standards.

Several commenters stated that the lack of licensed facilities is due to problems with the facilities themselves, not with state licensing regimes. This commenter stated that a Texas judge denied licenses to family detention facilities in Karnes and Dilley because the emergency rule under which those facilities sought licenses would eliminate the minimum child safety standards applicable to childcare facilities in Texas. The commenter stated that, without accountability standards, there is no way to ensure conditions of care imposed by the Federal Government in detention facilities will meet the current minimum standard for keeping children safe. Another commenter stated that the absence of a general family detention licensing procedure is not an unexplained policy gap but the effect of a determination that such detention is neither recommended nor typically done.

*Response.* DHS disagrees with the assertion that it is incapable of providing meaningful oversight for FRCs. DHS employs third-party inspectors to ensure that DHS Service Providers (such as the contracted entities that run the daily operations of the FRCs) abide by the standards that DHS requires. The results of these inspections may prompt DHS to take corrective action against the Service Providers if necessary. For instance, ICE uses a Quality Assurance Surveillance Plan (QASP) for each service provider, and this QASP is based on the premise that the Service Provider is responsible for the day-to-day operation of the facility, as well as all management and quality control actions required to meet

the agreed-upon terms of the contract. The role of the Government in quality assurance and oversight is to ensure performance standards are achieved and maintained. The QASP is designed to provide an effective surveillance method to monitor the Service Provider's performance. Through the QASP, the Government validates that the Service Provider is complying with mandated quality standards in operating and maintaining facilities. These performance standards address all facets of detainee handling, including but not limited to safety, health, legal rights, and facility and records management.

The QASP contains a Performance Requirements Summary (PRS) which communicates what the Federal Government intends to qualitatively inspect. The PRS is based on the American Correctional Association (ACA) Standards for Adult Local Detention and ICE 2011 Performance Based National Detention Standards (PBNDS). The PRS identifies performance standards groups into nine functional areas, and quality levels essential for successful performance of each requirement. ICE uses the PRS when conducting quality assurance surveillance and oversight to guide inspections and review processes.

ICE monitors the Service Provider's compliance with performance standards using a variety of methods. All facilities are subject to a full annual inspection. Additionally, ICE may conduct routine, follow-up, or unscheduled ad hoc inspections as necessary (for instance, as a result of unusual incidents or data reflected in routine monitoring). At FRCs, ICE maintains an on-site presence in order to conduct more frequent oversight. Inspections and monitoring may involve direct observation of facility conditions and operations, review of documentation, and/or interviews with facility personnel and detainees.

In addition to routine and unscheduled monitoring, financial-based incentives are another way ICE holds Service Providers accountable. Performance of services and compliance with standards is essential for the Service Provider to receive the full payment identified in formal agreements or contracts. For example, ICE may withhold or deduct funds for unsatisfactory performance by the Service Provider that is recorded or observed through site inspections, document review, interviews, or other feedback. A Service Provider's performance is rated as either acceptable, deficient, or at-risk. Based on this rating, ICE may implement financial adjustments or penalties.

Financial deductions or withholdings may be a one-time event, or alternatively, may continue until the Service Provider has corrected the identified deficiency or made substantial progress toward correction.

In response to the commenter's concern about the status and availability of state licensure in Texas, DHS notes, as mentioned above, that an appeals court recently reinstated the regulation that codifies licensing for FRCs. *Texas Dep't of Family and Protective Servs.* v. *Grassroots Leadership, Inc.,* No. 03–18–00261–CV), 2018 WL 6187433 (Tex. App. Nov. 28, 2018).

Finally, DHS notes that although family detention is not needed as often at the state level does not mean that family detention is inappropriate in the Federal immigration context, particularly in circumstances involving control of the borders where Congress has generally expressed a mandate for detention of aliens pending removal proceedings and pending removal pursuant to a final order.

- Conflict of Interest

*Comments.* Several commenters asserted that allowing DHS to self-license facilities would be a conflict of interest ''tantamount to the fox guarding the henhouse.'' Many commenters stated that the Federal Government lacks the impartiality and expertise to ensure compliance with basic standards relating to the custody and care of migrant children. Another commenter asserted that the self-licensing process exists only to further the Administration's anti-immigration policy, and that a lack of oversight will result in facilities such as Tornillo in Texas with minimal safety and healthcare standards and several abuses. Several commenters contended that DHS would have no incentive to ensure compliance with baseline child protection standards since its principal objective is imprisonment rather than family detention. Some commenters stated that DHS's objective is to discriminate against Central American immigrants and one commenter said that removing the state licensing requirement is a cover allowing for more racial abuse ''under the guise of deterrence.''

Some commenters stated that because of the unique vulnerability of children and their high risk for trauma, trafficking, and violence, independent licensing standards for detention facilities are of the utmost importance. One commenter stated that DHS should not be allowed to self-license because ICE's Inspector General has found self-auditing methods are ''troubling and

inadequate." [23] Another commenter stated that reports from physicians within DHS CRCL have found serious compliance issues in DHS-run facilities resulting in imminent risk of significant mental health and medical harm. Other commenters stated that the proposed third-party monitor is not credible or impartial because the third-party monitor would be paid by DHS. Another commenter stated that the proposed rule's shift of the licensing authority from experienced and objective state licensers to an ICE contractor would have an inherent conflict of interest that would not assure the best welfare of traumatized children.

Relying on the alleged conflict of interest, several other commenters contended that the proposal would violate the FSA. For example, several commenters claimed that the licensing proposal would not comply with the FSA's requirements to place detained minors in the "least restrictive setting" and treat minors with "dignity, respect and special concern for their particular vulnerability." Another commenter stated that the licensing proposal is inconsistent with the FSA because it weakens oversight over FRCs and does not provide a way to ensure that residential standards set by ICE are a safe replacement for state licensing standards.

Another commenter stated that the purpose of the FSA, as confirmed by the district court, is to provide "the essential protection of regular and comprehensive oversight by an independent child welfare agency," which the commenter stated is absent from the proposed regulation.

*Response.* Regarding concerns about lack of accountability see section on "*Danger due to lack of oversight.*" Concerns about incentive to comply and lack of oversight are addressed in the section "Self-Licensing and Oversight."

DHS reiterates that it will seek state licensing where available. However, DHS disagrees with commenters that suggest DHS is unable to provide care for families due to perceived conflicts of interest in its alternative licensing proposal. DHS notes that the DHS has held families (at the Berks FRC) since 2001, long before courts extended the protection of the FSA to minors accompanied by their parents. In the ensuing decades, DHS has refined its standards to better accommodate the needs of family units.

DHS is statutorily authorized and indeed mandated in many

circumstances to detain aliens pending their removal from the United States. Congress has long been aware of the existence of alien family units seeking entry into the United States, but Congress has never specified the method through which DHS's detention facilities must obtain licensure. Thus while commenters perceive the application of standards developed by DHS and other stakeholders as a conflict of interest, Congress has not determined that the creation or application of these standards constitute a conflict of interest.

Further, in advocating for state licensure as the only method of meeting the "licensed program" requirement of the FSA, commenters appear to presume that States face no conflict of interest when they license facilities for the services or care of dependent children. DHS has created detention standards for all other facilities in which it detains aliens, just as the Bureau of Prisons has also created standards for their own detention operations. DHS believes that the Federal Government is equally capable of overseeing compliance with its standards, standards which incorporate and in certain cases go beyond the minimum requirements of the FSA, without negatively impacting the care of minors in its custody due to perceived conflicts of interest. Relatedly, the very financial incentive that commenters contend would bias third-party examiners is the same financial incentive that DHS uses to achieve quality control. If DHS's own inspections (*e.g.,* CRCL, OIG, third-party auditors, etc.) reveal that contractors are not adequately meeting DHS's standards, such contractors can be penalized and replaced.

• Indefinite Detention of Children Due to Alternative Licensing

*Comments.* Multiple commenters stated that the proposal to create and self-license FRCs contravenes the FSA by attempting to allow for children to be placed in detention indefinitely. The commenters stated that detention centers are inappropriate long-term (indefinite) housing arrangements for families. They contended that the government is required to expeditiously release children to a parent or other family and if this is not possible, the government must release the child to a program licensed by a state child welfare agency. Several commenters suggested that this new rule would restrict the ability to release families from government custody, resulting in indefinite detention. One commenter stated that indefinite detention would increase profits for

private companies and be more expensive for taxpayers.

*Response.* DHS disagrees with these assertions, and discusses commenters' mischaracterization of DHS detention authority and practices subsequently in this rule. DHS considers that "indefinite detention" is inconsistent with the mission of the Department. The purpose of immigration detention is to effectuate removal, or for the alien to establish eligibility for relief, as quickly as possible. If the alien establishes that she merits relief from removal, she will be released and if not, she will be removed. The period of detention will last for as long as it takes to complete removal proceedings and no longer. ICE reports that the majority of minor and family unit removals involve countries in the Northern Triangle, and removals are normally effectuated promptly. Minors and family units are not likely to face long periods in detention because immigration proceedings involving detained family units and minors are placed on a priority docket by the Department of Justice, Executive Office for Immigration Review. Family units and minors can also benefit from release during the pendency of removal proceedings if they qualify for release on recognizance, parole, or other conditions.

Aliens subject to final orders of removal may generally remain detained for a reasonable period necessary to effectuate removal. For aliens detained pursuant to INA 241, 8 U.S.C. 1231, this includes a presumptively reasonable period of 180 days after a final order of removal has been issued, and thereafter, the alien must generally be released absent a significant likelihood of removal in the reasonably foreseeable future (in compliance with current law and regulation).

As Congress has recognized, detention is an important tool to ensure that proceedings are completed and that the immigration laws are enforced. EOIR data shows that of closed cases from January 1, 2013 through March 31, 2019 that started in an FRC, 43 percent of family units have received *in absentia* final orders of removal. DHS OIS has found that when looking at all family unit aliens encountered at the Southwest Border from FY 2014 through FY 2018, the *in absentia* rate for completed cases as of the end of FY 2018 was 66 percent. As a result, exercising the authority to detain minors in family units continues to be an important component of immigration enforcement. The ability to consider FRCs licensed through adherence to ICE's Family Residential Standards is intended to facilitate that component of

[23] Office of Inspector General, "ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements" OIG 18–67 (June 26, 2018).

immigration enforcement, not to increase profits for private companies at the expense of taxpayers.

• Miscellaneous Concerns

*Comments.* Several commenters stated that ICE family detention standards which would be utilized in the proposal are typically not as stringent as state standards currently utilized. One commenter, for example, noted that ICE FRC standards permit the use of mechanical restraints on children over 14 years old, whereas the licensing regulations in Texas prohibit the use of such devices. The same commenter noted that the ICE FRC standard states that the facility must meet the "minimal nutritional needs of toddlers and infants," whereas the Texas regulation for licensed residential facilities states the facility must "feed an infant whenever the infant is hungry."

Several commenters suggested that FRCs do not exist under state licenses because States feel they are inadequate to house both adults and children. Such commenters noted that state agencies typically license only facilities for the care of children who are dependent on the State, typically due to child abuse and/or neglect and the need to be removed from the care of a parent or parents. The commenters argued that if parents are fit and available, a state government would never seek to lock up a child with a parent.

*Response.* Regarding any conflicts between state regulations and DHS standards, DHS will follow state regulations where there is licensing available for FRCs. The regulations express a preference for state licensing when that option is available at the location of the FRC. For example, if Texas licenses FRCs, state standards will be followed. Regarding the use of family detention in the state context, the role of the States and the Federal Government are different. States do not enforce immigration laws, only the Federal Government does so; consequently, the presence or absence of state regulations addressing the civil detention of family units for immigration purposes is not indicative of whether it is appropriate or not to detain family units in accordance with Federal law.

Changes to the Final Rule

In response to public comments, DHS is adding to the definition of licensed facility that DHS will make the results of audits publicly available. In addition the definition also now includes that audits will occur upon the opening of a facility and on a regular basis thereafter.

Influx § 236.3(b)(10)

Summary of Proposed Rule

The NPRM proposed to define *influx* as a situation when 130 or more minors or UACs are eligible for placement in a licensed facility. DHS is adopting this definition without change from the FSA except to reflect the transfer of responsibilities from legacy INS to DHS and ORR, and to reflect that DHS maintains custody of minors, as defined in this section, and UACs, for the short period pending their transfer to ORR.

Public Comments and Response

*Comments.* Numerous commenters expressed concern that the proposed definition of "influx" was developed based on data from the 1990s, is outdated, and, if implemented, will result in DHS and HHS operating within a *de facto* permanent state of "influx." If able to operate in that status, the commenters contended that DHS and HHS would have broad discretion to circumvent compliance with the FSA, HSA, and TVPRA provisions and the time limits on transferring children out of DHS custody.

Many commenters expressed the view that DHS and HHS disingenuously argued that they operate within a constant state of influx even while overall border crossings are 20 percent of what they were when that term was defined in the FSA and border staffing has increased by almost three times.

A few commenters stated that the 130-influx standard also does not account for the expansions and contractions of the number of UACs in custody at the border, which have fluctuated by tens of thousands of juveniles every year since the peak in 2014. They contended that the variable number requires a more flexible influx baseline.

Some commenters objected to the proposed definition of influx on the basis that it enables each agency to excuse noncompliance even where it is not itself experiencing influx conditions. Commenters stated that DHS conceded in the NPRM that it has been dealing with an influx of minors for years. The commenters claimed that as a result, even where HHS may not satisfy its own "influx" criteria, it may rely on DHS "influx" conditions because the definition allows HHS criteria to be met "under . . . corresponding provisions of DHS regulations."

One commenter recommended that the agencies include a third alternative criterion for designation of influx conditions to track the meaning of influx in the INA. The INA recognizes the threat posed to national security

where the Secretary of Homeland Security "determines that an actual or imminent influx of aliens arriving off the coast of the United States, or near a land border, presents urgent circumstances requiring an immediate federal response. . . ." 8 U.S.C. 1103(a)(10). The commenter urged the agencies to consider a regulation that would define "urgent circumstances" to include the release without bond of a significant percentage of such minors, with or without a parent or legal guardian, near to the relevant Coast Guard or Border Patrol sector. The commenter ultimately proposed that influx conditions could exist when some combination of three criteria were present—the legacy FSA criterion of 130 minors, an alternative criterion that takes into account the problems created by lack of resources other than bed space, and a third criterion that aligns influx designations for minors with designations of influx conditions applicable to humanitarian entry in general. The commenter contended that such a standard would provide flexibility to respond to migrant crises that involve minor aliens in unpredictably dangerous ways.

One commenter maintained that, because the proposed rule changes the word "program" to "facility," it could permit lengthier detention by a determination that there is an influx when more than 130 children are eligible for placement in any of the program's facilities even if the program has the capacity to provide placement resources for well over 130 children. The commenter viewed the proposed definition of influx as placing less focus on the needs of children than on the proposed facilities to detain them.

Some commenters were concerned that the proposed definition of influx lifts the requirement that UACs be transferred from DHS to HHS custody within three to five days and allows for broad exemptions to existing child protections that could impact basic needs, such as the provision of snacks and meals to children in custody. The commenters stated the rule should be changed to clarify that any such exemptions must be limited in scope and ensure that the fundamental needs of children are met in a timely manner.

*Response.* As stated in the proposed rule, DHS agrees with the commenters' observation that the definition of influx in the FSA, which was replicated in the proposed rule, renders the agency in an ongoing state of influx which has been the status quo for several years. DHS regularly has in its custody more than 130 minors and UACs eligible for placement in a licensed facility. For

instance, as described in Table 7, CBP encountered 107,498 minors and UACs in FY 2018. Additionally, in May of 2019, the USBP apprehended 11,507 UACs along the southwest border along with 84,532 family units (accompanied minors and their parents).[24] OFO encountered 386 UACs and 4,134 family units during the same time period. Thus, these numbers show that CBP regularly has more than 130 minors and UACs in custody eligible for placement in a licensed facility. However, DHS disagrees with the statement that such an operational reality permits it to circumvent compliance with requirements that stem from the FSA, given that this definition of ''influx'' was included in the FSA. DHS had determined that the definition of ''influx'' as it was written in the FSA remains relevant to current operational realities.

DHS believes that the FSA's definition of influx is still relevant to today's operations. Indeed, it is obvious that DHS has been in a state of influx, and has been for some period of time. As further explained in the proposed rule, the main implication of the threshold for an influx is that in general, under the FSA, DHS is required to transfer non-UAC minors to licensed facilities ''as expeditiously as possible'' rather than within either a 3- or 5-day timeframe. This makes sense given the need for DHS to have additional flexibility when it is dealing with anything other than a very small and manageable number of minors in its custody. Given that DHS is currently operating under an influx pursuant to the FSA, DHS currently moves to transfer all minors into licensed facilities as expeditiously as possible. CBP facilities are, as recognized by Congress in the Trade Facilitation and Trade Enforcement Act of 2015 (TFTEA), intended to be short-term detention facilities, generally designed to hold individuals for 72 hours or less, during the duration of their immigration processing. *See* 6 U.S.C. 211(m)(3) (defining ''short-term detention'' as ''detention in a U.S. Customs and Border Protection processing center for 72 hours or less, before repatriation to a country of nationality or last habitual residence''). CBP makes efforts to transfer all individuals, especially minors, out of CBP facilities as expeditiously as possible, and generally within 72 hours. Additionally, CBP prioritizes the processing of all minors and UACs, as a means to expedite the transfer of custody to ICE or HHS, and

to adhere to the TFTEA definition of short term holding, as well as the requirements currently applicable under the FSA, as well as the TVPRA. Thus, the definition of influx as provided in this rule would not change any aspect of current CBP operations, and therefore would not permit any change to the time that minors and UACs should remain in CBP custody.

DHS reiterates that the transfer time frames for the transfer of UACs from DHS to HHS are now governed by the TVPRA, rather than the timelines included in the FSA. The TVPRA requires DHS to transfer UACs to HHS within 72 hours of determining that an alien is a UAC, absent exceptional circumstances. This statute overrides any different period set out in the FSA.

As for the assertion that the proposed definition of influx could excuse non-compliance by one agency due to an influx facing the other, DHS notes that the definition as provided in the FSA does not establish the existence of an influx vis-à-vis each agency involved in the implementation of its terms. The 130 threshold in the FSA is the number of ''minors eligible for placement in a licensed program . . . including those who have been so placed or are awaiting such placement.'' FSA paragraph 12(B).

DHS disagrees with commenters' contention that changing the term ''licensed program'' to ''licensed facility'' has any impact on the understanding of what constitutes an influx. Changing the term from ''program'' to ''facility'' does not affect the requirement to transfer minors as expeditiously as possible during an influx. As previously stated, the definition of influx as proposed is designed to implement the terms of the FSA while accounting for current operations of the Agency and the TVPRA.

Changes to Final Rule

DHS declines to change its proposed definition of influx in response to public comments.

Non-Secure Facility § 236.3(b)(11)

Summary of Proposed Rule

Non-Secure Facility is not defined in the FSA, other than to say that ''homes and facilities operated by licensed programs, including facilities for special needs minors, shall be non-secure as required under state law.'' FSA paragraph 6. DHS proposed to define a non-secure facility as a facility that meets the applicable State or locality's definition of non-secure. If a State does not define ''non-secure,'' then a DHS facility shall be deemed non-secure if

egress from a portion of the facility's building is not prohibited through internal locks within the building or exterior locks and egress from the facility's premises is not prohibited through secure fencing around the perimeter of the building.

Public Comments and Response

*Comments.* Several commenters provided comments on the DHS definition of ''non-secure.'' Comments focused on the definition itself and its alignment with the meaning in the FSA, length of stay at a facility, reasons for placing an alien juvenile in a secure facility, having locked/un-locked areas, and ability of those in custody to come and go as they would like.

One commenter suggested that the proposed definition should explicitly defer to the definition of non-secure ''under state law,'' in order to comply with the language of FSA paragraph 6.

Several commenters objected to the idea that the definition would allow a family detention center to be a non-secure facility, stating that they were opposed to holding children in jail-like settings. One commenter stated that the fact that family detention centers are patrolled by ICE officers, commonly surrounded by barbed wire fencing, and have locked points of ingress and egress, invalidates the definition of non-secure. Another commenter stated that an environment that includes locks and fences does not align with the FSA which, though it did not define non-secure, said that children should be in the least restrictive environment. Another commenter expressed concerned that there is no provision stating families can come and go as they desire, so families would be restricted in their movements or freedom.

*Response.* DHS notes that the definition of ''non-secure'' was intended to be subordinate to any definition that currently exists under state law and is applicable to a setting that houses minors. Accordingly, DHS accepts the commenter's suggestion to add the language ''under state law'' into the definition of ''non-secure'' in this final rule.

DHS disagrees with the commenters' assertions that FRCs are ''jail-like settings.'' Factors identified by commenters that commenters feel make FRCs secure do more to prevent unwanted intrusions into FRC properties than they do to prevent individuals housed at FRCs from leaving the property. Protections such as fencing, staff monitoring, and locks on doors that lead to the outside are basic safety measures that are often a part of facilities that are responsible for the care

---

[24] *https://www.cbp.gov/newsroom/stats/sw-border-migration.*

of children on a regular basis. These measures protect the children from strangers who are not FRC residents, and from hazards such as traffic and weather in the event they accidentally become separated from a parent. Individuals housed at these facilities are free to move within the facility on a daily basis, and ICE does not restrict individuals' movement within the FRCs for punitive reasons.

Changes to Final Rule

DHS agrees to amend the definition of *non-secure facility* in response to public comments to clarify that facilities will be deemed non-secure if they meet the definition of non-secure under state law where the facility is located.

Office of Refugee Resettlement (ORR) § 236.3(b)(12)

Summary of Proposed Rule

The definition of ORR is not defined in the FSA. DHS proposed to define ORR as the U.S. Department of Health and Human Services, Administration for Children and Families, Office of Refugee Resettlement.

Public Comments and Response

DHS received no requests to change the definition as proposed in the regulatory text.

Changes to Final Rule

DHS is not changing the definition of ORR in the final rule.

3. Age Determination § 236.3(c)

Summary of Proposed Rule

DHS proposed to codify in § 236.3(c) the FSA's reasonable person standard to determine whether a child is under or over the age of 18 and proposed adding that age determinations shall be based on the "totality of the evidence and circumstances." At times, making age determinations could include medical or dental examinations.

Public Comments and Response

Commenters generally expressed concern about how the proposed changes incorporate the FSA's reasonable person standard and standards regarding medical and dental examinations. They also questioned whether the proposed procedures are consistent with the TVPRA's requirement to rely on multiple forms of evidence for determining whether an alien is under or over the age of 18. Commenters expressed concern about a lack of sufficient guidance informing the totality of the evidence and circumstances threshold and an apparent lack of an appeals process for challenging incorrect age determinations.

• Reasonable Person Standard

*Comments.* Several commenters expressed concern about how DHS would interpret and apply the FSA's reasonable person standard. Multiple commenters asserted that the proposed language fails to provide adequate specificity about the type and amount of evidence used to inform the standard. One commenter stated that the reasonable person standard must be informed by consideration of multiple forms of evidence pursuant to the TVPRA, whereas another commenter suggested incorporating informational interviews and attempts to gather documentary evidence as part of the standard. Another commenter stated that, pursuant to the FSA, the reasonable person standard must include consideration of and should be initially informed by the child's own statements regarding his or her own age. Multiple commenters expressed concern about how medical or dental examinations will or will not inform the reasonable person standard, with one commenter stating that the inclusion of unreliable medical procedures in the reasonable person standard introduces a further layer of arbitrariness to the process of age determination.

• Medical and Dental Examinations

*Comments.* Several commenters expressed concern about whether the proposed regulations adhere to the FSA's standards and medical ethics regarding medical and dental examinations. Some of the commenters referenced various reports and studies indicating that certain medical and dental examinations cannot provide accurate age estimates and that radiographs unnecessarily expose children to radiation when used for non-medical purposes. One medical professional cautioned against using dental radiographs for age determination, contending that such tests can only provide an approximate age estimate and may not be able to differentiate between an individual in his/her late teens versus an individual who is 20 or 21 years of age. The commenter also expressed concern about the possibility of the individual administering these tests not having the requisite expertise, and not obtaining the consent of the patient. One commenter referred to medical and dental examinations as "pseudo-science."

Multiple commenters expressed concern that the proposed procedures place inappropriate weight on medical tests to determine whether children are younger than or older than 18 years of age. The commenters stated that the proposed procedures do not match FSA or TVPRA requirements for considering medical tests and are inconsistent with agency practice. For example, the commenters stated that the proposed procedures fail to indicate that medical tests cannot serve as the sole basis for age determinations, limit medical testing to bone and dental radiographs, and to account for evidence demonstrating the unreliability of medical tests to make accurate age determinations. One commenter expressed concern about the lack of specificity governing when medical and dental examinations will be used, the absence of guidance regarding who will make the age determination, and the level of training or expertise required to conduct such examinations and determinations. Some commenters stated that medical and dental examinations have been used abusively by DHS in the past.

Multiple commenters recommended that age determination procedures be used as a last resort, that age determination findings be shared with the child in writing and in a language he/she understands, that the findings be subject to appeal, and that age determination procedures be conducted by an independent, multidisciplinary team of medical and mental health professionals, social workers, and legal counsel. The commenters also recommended that children have the right to refuse a procedure which subjects them to medical risks, pursuant to the international norm of what is in the best interest(s) of the child as well as medical ethical principles of patient autonomy.

• Totality of the Evidence and Circumstances/TVPRA Standards

*Comments.* Several commenters expressed concern about age determinations being based on the "totality of the evidence and circumstances" and questioned whether that basis is consistent with the TVPRA's requirement to use multiple forms of evidence for determining whether a child is under or over 18 years of age.

Another commenter expressed support for DHS and HHS personnel maintaining the flexibility to use multiple methods for age determinations. The commenter stated that the proposed standards and thresholds are mandated for jurisdictional as well as medical reasons, because ORR does not have

custodial authority over individuals 18 years of age or older.

• Incorrect Age Determinations/Appeal Process

*Comments.* Several commenters expressed concern about the possibility of incorrect age determinations. For example, one commenter stated that the rule would reduce or eliminate the current ORR policy requiring a 75 percent probability threshold for age determinations. Other commenters stated that an individual claiming to be a minor should continue to be treated as a minor until age is confirmed through multiple forms of evidence, pursuant to the FSA. One of these commenters stated that it is more dangerous for a minor to be detained with adults than to have an individual who claims to be a minor, but is not, detained with other minors.

Many commentators expressed concern that the rule promotes the discriminatory and xenophobic treatment of immigrant people based on their race, ethnicity, and national origin. Multiple commenters noted that differences in race, ethnicity, gender, nutritional standards, and poverty impact perceptions of age and may negatively influence the age determination process leading to inaccurate age determinations. For example, one commenter cited articles concluding that the age of young people is often overestimated and exacerbated when there are differences in race. This commenter expressed concern that this would have disproportionate effects on certain indigenous populations. Another commenter cited a study indicating that "black felony suspects were seen as 4.53 years older than they actually were."

Multiple commenters expressed concern about the lack of age determination appeal procedures. One of the commenters stated that the lack of an appeal mechanism compounds the possibility of arbitrary or baseless assessments, with serious consequences for minors in terms of their placement in and release from detention. Another commenter asked what remedy exists for a child falsely categorized as an adult and what repercussion a government official would face if he/she negligently or intentionally categorizes a child as an adult under this regulation. Another commenter stated that the ability to continually redetermine a child's age, as permitted under the proposed procedures, puts children at risk of losing critical and necessary substantive and procedural protections.

One commenter suggested that providing a presumption of minor status when there is doubt, considering only

reliable evidence, and providing an appeals process would ensure fewer children find themselves incorrectly designated as adults. Another commenter suggested placing individuals in HHS custody, not DHS custody, during the age determination process.

Finally, one commenter expressed general concern about DHS and HHS using different language within the proposed regulations that may lead to disparate processes for determining age. The commenter stated that the proposed HHS language does not discuss the reasonable person standard, does not include a specific evidentiary standard through which to assess multiple forms of evidence, does discuss the non-exclusive use of radiographs where the DHS language does not mention radiographs as an option, and does not require a medical professional to administer the radiographs. The commenter suggested that DHS and HHS propose specific and identical language regarding age determination procedures and requirements.

*Response.* DHS initially notes that the "reasonable person" standard for age determination comes directly from the FSA. FSA paragraph 13 states that "[i]f a reasonable person would conclude that an alien detained by [DHS] is an adult despite his claims to be a minor, the INS shall treat the person as an adult for all purposes, including confinement and release on bond or recognizance." The reasonable person standard does not require DHS to ignore claims made by an individual as to his or her age. Given that this language was agreed upon by all parties to the FSA as initially drafted, DHS disagrees that the standard lacks adequate specificity, and declines to further elaborate on the reasonable person standard in the regulatory text set forth in this rule.

DHS also disagrees with commenters that the text of this rule does not adhere to the FSA. First, FSA paragraph 13 states that aliens may be required to submit to a medical or dental examination or "other appropriate procedures" to verify his or her age. Second, despite commenters' concerns about the use of radiographs, this method of age determination is specifically authorized by Congress as one form of evidence in the multiple forms of evidence to support a determination of age; DHS lacks the authority to amend the TVPRA that codified this practice. *See* 8 U.S.C. 1232(b)(4). Third, DHS disagrees with commenters' assertions that DHS will place inappropriate weight on the use of medical tests in determining the age of an individual. DHS has incorporated a

totality of the evidence standard into this rule, and nowhere states that medical examinations will be the sole factor in determining the age of an individual. In fact, DHS internal guidance states that medical exams are a last resort after all other avenues have been exhausted. The guidance also acknowledges that cultural differences make medical examinations for age determination more difficult and requires at least a 75 percent probability of an alien being older than 18. HHS has similar guidance.

Commenters who proposed that age determination findings be shared with the child in writing, be subject to appeal, and be made by a multidisciplinary team of third parties fail to appreciate the operational necessity of determining an individual's age as quickly as possible. If CBP encounters an individual at a port of entry who claims to be a minor, and has no accompanying parent or legal guardian, CBP must immediately determine the age of the individual, and accordingly whether the individual is a UAC, because DHS must transfer UACs to HHS custody within 72 hours of determining that a juvenile is a UAC. The volume of apprehensions and encounters at the border has increased so significantly in recent months that instituting appeal procedures and assessments by third-party committees could unnecessarily delay the UAC from receiving the services that he or she is otherwise provided under the law. Additionally, while commenters were concerned that the rule does not provide for an individual to decline the medical or dental examination for the purposes of age determinations, the TVPRA authorizes requiring such examinations. DHS also believes that the type of medical and dental examinations conducted for the purpose of age determination are not so invasive as to present significant medical risks such that an individual would want to decline the examination, particularly if the results of the examination can help demonstrate that the individual is a minor where other evidence would suggest the individual is an adult.

DHS disagrees with commenters that the "totality of the evidence and circumstances" standard conflicts with the TVPRA's "multiple forms of evidence" requirement. DHS drafted the text of proposed 8 CFR 236.3(c)(1) specifically referencing 8 U.S.C. 1232(b)(4) to ensure that multiple forms of evidence were used in considering the totality of the evidence and circumstances. DHS declines to codify more specific processes for age determinations given the need for

flexibility in reviewing various types of evidence to make the most accurate age determination as possible.

Further, DHS notes that medical and dental examinations used in conjunction with the FSA's reasonable person standard are designed to protect against a situation in which a purported minor, who is in fact an adult, is placed in a facility with minors simply because he/she claims to be a minor. One commenter asserted that it is more dangerous for a minor to be detained with adults than to have an individual who claims to be a minor, but is not, detained with other minors. This commenter failed to appreciate, however, that the individual who claims to be a minor, but is not, is in fact, an adult. Similar to the commenter's initial concern, DHS strives to avoid situations in which an adult is unintentionally detained with minors simply because the adult claimed to be a minor because such situations may present danger to the minors. DHS also notes that the reasonable person standard coupled with the ability to conduct medical and dental examinations or other appropriate procedures is intended to defend against the effect of variables such as race, ethnicity, gender, etc., which could otherwise negatively impact an age determination. DHS strives to make the most accurate age determination possible, and may require various forms of evidence in order to make a valid assessment.

Changes to Final Rule

DHS declines to amend the proposed regulatory text regarding procedures for age determination in response to public comments.

4. Determining Whether an Alien Is a UAC § 236.3(d)

Summary of Proposed Rule

DHS proposed to determine whether an alien is an UAC at the time of encounter or apprehension by an immigration officer and to allow immigration officers to re-evaluate a child's UAC status at each encounter consistent with the statutory definition of a UAC. Once the alien has reached the age of 18, has obtained lawful immigration status, or has a parent or legal guardian in the United States available to provide care and physical custody to the alien, the alien is no longer a UAC. When an alien minor is no longer a UAC, relevant ORR and ICE procedures shall apply.

Public Comments and Response

*Comments.* Commenters generally opposed moving ahead with the proposed provision because they believe it will result in stripping UACs of vital protections mandated by Congress in the HSA and TVPRA. One commenter stated that the statutory language, the nature of the rights conferred, legislative history, and experience implementing the TVPRA, indicate that Congress intended for TVPRA protections to prevail throughout a UAC's legal proceedings, which would not be the case if UAC status was subject to limitless redeterminations. Another commenter stated that neither the HSA nor the TVPRA contain any mechanism for rescinding the protections accorded to UACs. The commenters recommended that once identified as a UAC, the individual should maintain this status for the duration of his/her immigration case. One commenter recommended striking proposed § 236.3(d) and the final sentence of proposed section 410.101 and codifying the current initial jurisdiction policy, set forth in USCIS' 2013 guidance, which provided that USCIS would take initial jurisdiction based on a previous UAC determination even after the applicant turns 18 or is reunited with a parent or legal guardian.

The commenters provided examples of the proposed provision undermining specific protections afforded by the TVPRA. Numerous commenters noted that the TVPRA provides UACs with a non-adversarial determination of their initial asylum claim at the USCIS Asylum Office, whereas the proposed provision would force children reuniting with their parent or turning 18 to immediately testify before an immigration judge in a more adversarial setting.

Another commenter stated that the one-year exemption given to UACs to file asylum claims is particularly important because it accommodates the needs and vulnerabilities of children fleeing persecution, who often require time before they feel comfortable confiding with the professionals preparing their legal cases.

Another commenter stated that the TVPRA requires HHS to make counsel available to UACs to the greatest extent practicable, including the appointment of counsel at government expense, where necessary, for all immigration processes and proceedings. The commenter suggested that UAC status should remain valid until the UAC's case concludes to ensure access to the resources needed to navigate the court system.

The commenters challenged the rationale for the proposed provision, stating that the act of reunifying with a parent or legal guardian or turning 18 does not eliminate the trauma and persecution a child may have experienced in his/her country or diminish the child's vulnerability in the U.S. immigration system. Nor do either of these conditions lead to the automatic joinder of the child's case with that of the adult. And the commenters contended that UACs often have a need for the protections and specialized services that UAC status affords them even after reaching age 18 or being reunited with a parent or legal guardian. One commenter cited the findings of "Children on the Run," a report issued by the United Nations High Commissioner for Refugees (UNHCR) that found that the majority of children from the Northern Triangle countries and Mexico needed protection under international law.

The commenters expressed concerns over due process and administrative costs and delays related to changing UAC status mid-stream. One commenter contended that the screening of UACs by child welfare professionals for protection needs and by legal service providers for eligibility for legal relief, facilitates efficient filings and adjudications. According to that commenter, stripping children of the UAC-related protections would create and compound burdens on the system and the child.

Another commenter predicted a rush to file claims before a change in the child's status occurs, resulting in less comprehensive and well-prepared filings. The commenter stated that the proposed provision duplicates the labor of Federal agencies, as claims first filed with USCIS may be shifted to the caseload of EOIR.

Still another commenter stated that UAC's immigration proceedings can take several years to conclude, and if a minor reaches 18 in that time, this will create logistical burdens for the EOIR and DHS as cases currently in process will suddenly need to be handled differently.

Some commenters complained that § 236.3(d) lacks guidance on the methods immigration officers would use to make determinations at each encounter, thereby heightening the potential for arbitrary and capricious decision-making. They also thought the rule should address the consequences of erroneous re-determinations.

One commenter stated that § 236.3(d) raises due process, economic, and judicial resource concerns and DHS should withdraw the proposal.

*Response.* DHS disagrees with commenters' concerns about the impact on juvenile aliens if DHS's proposal is codified as part of the final rule. While commenters are correct that individuals

who no longer meet the definition of UAC will not receive certain protections that the law otherwise provides UACs, the Departments have the responsibility to promulgate regulations that codify a reasonable interpretation of the statutes which they administer. The plain language of 8 U.S.C. 279(g)(2) provides criteria for determining whether an individual is a UAC, and this regulation applies those criteria. With regard to the filing of asylum applications, DHS notes that an individual who is a UAC at the time of filing his or her application, regardless of the time it takes to adjudicate the application, will still be subject to USCIS' initial jurisdiction.

DHS believes the proposal for immigration officers to make UAC determinations at each encounter will ensure greater fidelity to the laws affording special legal protections to UACs, including USCIS' initial jurisdiction over any asylum application filed by a UAC, by limiting treatment of individuals as UACs to those who are, in fact, UACs. Ensuring the correct classification and treatment of individuals as either a UAC or not for jurisdictional and other purposes is, by definition, consistent with and reinforcing the effective administration of judicial (and other) resources. Although in some instances the proposal may result in DHS expending additional resources to make more UAC determinations and may lead to more asylum claims being initially heard in immigration proceedings before EOIR rather than adjudicated by an asylum officer, there may also be instances wherein UAC redeterminations conserve resources by vesting jurisdiction with the proper entity at an earlier juncture. Whether resources are ultimately conserved or not will depend on the specific facts of the case at hand. Additionally, the TVPRA, 8 U.S.C. 1232(c)(5), does not require that counsel be provided at government expense to UACs. Rather, HHS is encouraged to use pro bono services, and the statute specifically says that counsel is at no expense to the government.

### Changes to Final Rule

This final rule adopts the language of the proposed rule without change.

### 5. Transfer of Minors Who Are Not UACs From One Facility to Another § 236.3(e)

#### Summary of Proposed Rule

DHS proposed that if there is an influx or emergency, DHS would transfer a minor who is not a UAC and who does not meet the criteria for

secure detention to a licensed facility as expeditiously as possible. The proposed rule also stated that DHS will abide by written guidance detailing all reasonable efforts that it takes to transfer non-UACs. The proposed provisions would make ''as expeditiously as possible'' a default for all transfers of non-UACs in an influx or emergency. The proposed provisions also made it clear that if an influx or emergency ceases to exist, the associated timelines for non-UAC minors would continue to apply.

#### Public Comments and Response

*Comment.* Commenters disagreed with the proposed language under § 236.3(e) for the transfer of minors who are not UACs from one DHS facility to another in the case of an emergency or influx. They said the proposed language allows DHS discretion that the FSA does not allow. In particular, they contended that the proposed language could allow DHS the authority to delay transfer or placement of minors, in addition to suspending other conditions, and lead to indefinite detention. They also stated that the written guidance referred to in § 236.3(e)(2) should be published and subject to public comments.

One commenter objected that the ORR regulation does not clearly identify specific behaviors or offenses that allow placement of a juvenile in a secure facility. The commenter further contended that the broad and non-specific list provided is not clear enough for children to understand and thus fails to put them on notice of the rules that may result in their being detained in a jail-like setting.

One commenter stated that the entire transfer section does not speak to a minor who is not a UAC being transported to a facility that is an FRC or being held with their family. The commenter believes this could potentially create situations where children are separated from their parents, contrary to the intent of the FSA. The commenter is also concerned that future guidance about transportation requirements may not align with the FSA after the FSA is terminated. Another commenter stated that the proposal excludes transfers between DHS facilities of minors who are subject to secure detention, which means that they will not be transferred to a licensed facility in case of an emergency or influx nor transferred within the required time frame under the FSA.

One commenter stated that the proposed rule is an attempt to undermine DHS's obligations to quickly

transfer children out of inappropriate facilities and to provide children with care within a licensed facility. The commenter opined that not transferring the children into licensed facilities quickly would impede the children's ability to meet with counsel, have privacy and liberty rights, be educated, have access to social services, and protect their due process rights. In this commenter's estimation, this would lead to increased likelihood of abuse and violations of children's human rights as protected under domestic and international law.

Another commenter stated that this section will result in the disparate treatment between accompanied minors and UACs. This commenter stated that the perceived disparate treatment is contrary to the FSA and not mandated by Federal law and will, therefore, prevent the termination of the FSA if left in the final rule.

*Response.* DHS emphasizes that this provision does not change the FSA-derived transfer timeframes that have applied to non-UAC minors for decades. As noted in the proposed rule, DHS has continuously been dealing with an ''influx'' of minors and UACs, as the term is defined in the FSA. Through this provision, DHS seeks to clarify that the requirement to transfer non-UAC minors ''as expeditiously as possible'' is only applicable (*i.e.,* the ''default'') insofar as influx or emergency conditions persist. Absent influx or emergency conditions, this provision requires DHS to adhere to the same three-day and five-day transfer timeframes set forth in the FSA. For a further discussion of the term ''emergency,'' please see the ''emergency'' definition in Section A. Definitions.

In response to one commenter's statement that this provision does not speak to FRCs, and another commenter's statement that it fails to address secure facilities, DHS notes that the NPRM specifically stated that licensed facilities must be non-secure and that ''the only non-secure facilities in which ICE detains minors who are not UACs are the FRCs.'' [25] This language was intended to demonstrate that under this provision, non-UAC minors in DHS custody would generally be transferred to licensed, non-secure, FRCs.

DHS notes that one commenter expressed concern about disparate treatment between accompanied minors and UACs. As noted in the NPRM, UAC transfer requirements are specifically governed by the TVPRA, whereas this provision codifies transfer requirements of non-UAC minors pursuant to

---

[25] See p. 45498 of the NPRM.

paragraph 12(A) of the FSA. Absent emergency or influx conditions, this provision requires DHS to transfer non-UAC minors to a licensed facility within three days if the minor is apprehended in a district in which a licensed program is located. This is the same timeframe set forth by the TVPRA for transferring UACs into ORR custody.

Changes to Final Rule

The Department is finalizing this section as proposed with no changes.

6. Transfer of UACs From DHS to HHS § 236.3(f)

Summary of the Proposed Rule

The standards contained in the proposed rule would require DHS to transfer UACs apprehended by DHS to ORR for care, custody, and placement. DHS would notify ORR of the apprehension within 48 hours and, transfer custody within 72 hours of determining that the juvenile is a UAC, absent exceptional circumstances. The proposed regulation recommended procedures for such transfer. For example, the proposed rule required that UACs only be transferred with an unrelated detained adult during initial encounter or apprehension to a DHS facility, or if separate transportation is impractical or unavailable. The proposal also provided that requirements consistent with TVPRA would govern the processing and transfer of UACs.

Public Comments and Response

*Comments.* A few commenters wrote that the FSA allows DHS to transport UACs with unrelated adults only if separate transportation "impractical," but that the language in § 236.3(f) would permit DHS to transport UACs with unrelated adults if it is not "operationally feasible" to separate them. The commenters pointed out that if "operationally feasible" is interpreted to mean "convenient," it would conflict with the FSA; therefore, they recommended that the final rule retain the language of the FSA or more clearly define "operationally feasible."

Other commenters also took issue with the use of the word "unavailable" and "impractical." One of these commenters did not agree with the government's characterization that "unavailable" is added for clarification. This commenter contended that statutory construction says that every word should be considered, and none ignored; therefore, the addition of the word "unavailable" is neither supplemental nor clarifying and does not comply with the FSA. Another commenter was concerned that this provision would allow DHS to transport

UACs with unrelated adults due to poor planning by DHS causing vehicles to be unavailable and placing vulnerable children at risk of harm. This commenter also took issue with the use of the term "DHS facility" as a place to which transportation with unrelated adults can take place, which could encompass facilities much farther away than Border Patrol stations and ports of entry near the site of apprehension.

*Response.* In response to comments, DHS is making a minor change to the regulatory text of § 236.3(f)(4)(i) to make it clear that, as a general matter, UACs will not be transported with unrelated adults. Specifically, pursuant to CBP's National Standards on Transport, Escort, Detention, and Search (TEDS) policy, UACs may not be transported with unrelated adults when separate transportation is immediately available. FSA paragraph 25A also provides that UACs may be transported with unrelated adults "when being transported from the place of arrest or apprehension to an INS office." Thus, DHS updates the text in § 236.3(f)(4)(i) to reflect the general statement that UACs may not be transported with unrelated adults, as well as the two potential exceptions to this provision.

DHS notes that there may be situations in which separate transportation for UACs and unrelated adults is unavailable or impractical. For instance, in situations in which CBP apprehends a large group of aliens in a remote location, it would be impractical to transport any UACs in that group separately from unrelated adults in separate vehicles. To do so would cause a significant delay in transporting all of the aliens to the nearest DHS facility for processing and all appropriate amenities (*e.g.,* the provision of food and water). Additionally, depending on the number of aliens encountered in a particular location or at a particular time, DHS's operational realities may result in there not being a sufficient number of vehicles with proper security available to transport a UAC separately.

Additionally, as the proposed regulation notes, where separate transportation is impractical or unavailable, DHS is committed to ensuring that necessary precautions will be taken to ensure the UAC's safety, security, and well-being. One of these precautions is ensuring that when a UAC is transported with any unrelated detained adult, DHS will separate the UAC from the unrelated adult(s) to the extent "operationally feasible." In this context, "operationally feasible" can be described as mitigating all risk factors associated with transporting UACs with unrelated adults to the extent that the

benefit of doing so favors the UAC, other aliens, and DHS. For instance, UACs may be separated from unrelated adults by either a separate passenger compartment or an empty row of seats.

With respect to the commenters who were concerned about the addition of the term "or unavailable" to the conditions of transfer standard, DHS reiterates that it considers the term "unavailable" to be clarification only and not a substantive change to the current standard set forth in paragraph 25 of the FSA.

A commenter also took issue with the term "DHS facility," but this language is consistent with paragraph 25A of the FSA, which states that "unaccompanied minors arrested or taken into custody by the INS should not be transported by the INS in vehicles with detained adults except when being transported from the place of arrest or apprehension to an INS office." DHS believes that the term "DHS facility" is equivalent to "INS office" after the reorganization under the HSA. As described above, there are occasions where it is impractical to transport UACs without unrelated adults. For instance, if DHS encounters a large group of aliens in a remote area, it is in the best interest of both the aliens and DHS to transport the aliens for humanitarian reasons to the nearest DHS facility for processing and assessment. This provision is not intended to permit DHS to transport UACs beyond the minimum distance required to accomplish the operational necessity.

*Comment.* One commenter stated that this provision is contrary to the TVPRA because it does not take into consideration the requirements for those from contiguous countries. The commenter explained that under the TVPRA, the government must screen children from contiguous countries within 48 hours of apprehension or before return to their home country and "if the child does not meet such criteria [of 8 U.S.C. 1232(a)(2)], or if no determination can be made within 48 hours of apprehension," these children must be transferred to ORR. This commenter feared that these children could face indefinite detention in unlicensed facilities in contravention with the TVPRA. This commenter also stated that the TVPRA does not allow for the exceptions to the 72-hour timeframe listed in the proposed rule because they do not meet the high bar of "exceptional circumstances" as intended under the TVPRA.

*Response.* DHS disagrees that proposed § 236.3(f) is contrary to the TVPRA provisions, but in light of the comment, is amending the regulatory

text to clarify that UACs from contiguous countries are be treated in accordance with the TVPRA. Pursuant to the TVPRA, an agency has 48 hours to determine if UACs who are nationals or habitual residents of a country that is contiguous with the United States meet the criteria listed in 8 U.S.C. 1232(a)(2)(A). *See* 8 U.S.C. 1232(a)(4). If a UAC does not meet the criteria, or a determination about the criteria cannot be made within 48 hours of apprehension or encounter, the UAC must immediately be transferred to HHS in accordance with the procedures set forth in 8 U.S.C. 1232(b). The timeframe provided in section 1232(b) is the time frame set forth in § 236.3(f). The only exception to the 72-hour timeframe is if a UAC is able to withdraw his or her application for admission pursuant to 8 U.S.C. 1232(a)(2). Therefore, the provisions of § 236.3(f) and the 72-hour timeframe apply to UACs who are treated in accordance with the terms of 8 U.S.C. 1232(a)(4).

DHS disagrees with the assertion that the proposed rule includes exceptions to the 72-hour timeframe that are inconsistent with the TVPRA. Section 236.3(f)(3) states that ''unless exceptional circumstances are present, DHS will transfer custody of a UAC as soon as practicable after receiving notification of an ORR placement, but no later than 72 hours after determining that the minor is a UAC.'' This strictly conforms to the TVPRA. *See* 8 U.S.C. 1232(b)(3). The emergency and influx exceptions are only applicable to minors who are not UACs. The only exception to the 72-hour timeframe for the transfer of UACs from DHS to HHS (other than those processed in accordance with 8 U.S.C. 1232(a)(2)) is exceptional circumstances.

*Changes to Final Rule*

In response to commenters' concerns about the operation of 8 U.S.C. 1232(a)(2), DHS is amending the proposed regulatory text in § 236.3(f)(1) to clarify that UACs from contiguous countries are be treated in accordance with the TVPRA; specifically, if a UAC from contiguous country is not permitted to withdraw his or her application for admission or if no determination can be made within 48 hours of apprehension, then the UAC will be immediately transferred to HHS.

Additionally, DHS is amending the proposed regulatory text in § 236.3(f)(4)(i) regarding conditions of transfer of UACs with unrelated adults. The revisions better reflect current operational practices and clarify that generally UACs will not be transported with unrelated detained adults. DHS has

added the specific reference to unrelated ''detained'' adults, for clarity on this point.

*7. DHS Procedures in the Apprehension and Processing of Minors § 236.3(g)*

Summary of the Proposed Rule

The proposed rule would require DHS to issue a Notice of Rights (Form I–770) and Request for Disposition and Custodial Care. It would also require the Form I–770 to be provided, read, or explained to the minor or UAC in a language or manner that the minor or UAC understands. The proposed regulation would also provide that the minors or UACs who enter DHS custody would be able to make a telephone call to a parent or close friend. The proposal would also require that every minor who is not a UAC and is in DHS custody will be given a list of free legal service providers. Additionally, section 236.3(g)(2) provides custodial standards immediately following apprehension.

Public Comments and Response

*Comments.* Several commenters asserted that the proposed rule disregards important legal protections provided by the TVPRA regarding DHS procedures upon apprehension of a minor or UAC. The commenters raised concerns about the possibility of indefinite detention, family separation, expanding the possibility of placing UACs in secure detention, failure of the proposed rule to adequately address conditions in CBP processing centers, and the treatment of apprehended minors.

Some commenters found § 236.3(g)(1) problematic because it does not provide a timeframe for the processing of children immediately following apprehension. A commenter asserted that the use of ''as expeditiously as possible'' rather than a specific timeframe will result in the indefinite detention of children and violate the protections afforded children under the International Covenant on Civil and Political Rights (ICCPR) Article 9. The commenter also raised concerns about the requirement that a child must request a voluntary departure or withdraw their application for admission before they are informed about the possibility of administrative or judicial review. The commenter asserted that a child has ''no practical mechanism to assert his or her rights under the ICCPR until after they are processed by DHS, yet the child can be detained for an indefinite period prior to processing.''

Another commenter objected to language in the proposed regulation

stating that all minors or UACs who enter DHS custody will be issued Form I–770, as compared to the requirement that minors be issued the form upon apprehension. The commenter stated that apprehension at the border does not equate to being in DHS custody nor does it always prompt DHS custody. The commenter argued that notifying children of their rights at the earliest point of contact with DHS will ensure that all children will receive information that will benefit them thereafter and that DHS officers are reminded of their obligations when apprehending children.

One commenter claimed that the proposed regulation deviates from referenced paragraph 12(A) of the FSA by not requiring notification to minors of their rights, including the right to a bond redetermination hearing, if applicable, and that the Form I–770 does not include such notice.

*Response.* Proposed § 236.3(g) preserves the intent of the current regulations and is consistent with FSA paragraphs 12(A) and 24(D), continues to comply with *Perez-Funez* v. *INS*, 611 F. Supp. 990 (C.D. Cal. 1984), and complies with the TVPRA requirements.

With regard to the TVPRA, DHS currently screens all UACs from contiguous countries upon encounter and initial processing to determine whether such a UAC may be permitted to withdraw his or her application for admission. As stated in the NPRM, a UAC is provided with a Form I–770 Notice of Rights during this screening and initial processing. UACs from non-contiguous countries are not permitted to withdraw their application for admission under the TVPRA, but are nevertheless provided with a Form I–770 Notice of Rights.

DHS disagrees with the commenter that the proposed regulations violate Article 9 of the ICCPR. Detention under these regulations is in accordance with procedures established by law. *See, e.g.,* sections 235, 236, and 241 of the INA, 8 U.S.C. 1225, 1226, and 1231. Furthermore, all minors and UACs who enter DHS custody are provided with a Form I–770, Notice of Rights and Request for Disposition. When a minor is transferred to or remains in a DHS detention facility, he or she is currently provided with a Notice of Right to Judicial Review.

DHS notes that the notice is confusing is some respects, because 8 U.S.C. 1226(e) broadly prohibits judicial review of custody determinations both in bond hearings and via parole. A regulation (and a form) cannot vest Federal courts with jurisdiction. DHS accordingly will, in a future action,

amend this form to more accurately reflect the judicial review limits set forth in 8 U.S.C. 1226(e).

Additionally, the commenter's statement that a child has "no practical mechanism to assert his or her rights under the ICCPR until after they are processed by DHS," reflects a misunderstanding of Article 9 of the ICCPR. Article 9 does not grant an individual the right to contest the grounds for his or her detention before he or she is detained.

With respect to paragraph 12(A) of the FSA, DHS reiterates that all minors taken into DHS custody will be notified of rights, including a bond redetermination hearing where applicable. Section 236.3(g) of the final rule preserves the requirement of notification of rights using Form I–770, Notice of Rights and Request for Disposition. All minors who are not UACs who are transferred to or who remain in DHS custody in removal proceedings will be given a Notice of Right to Judicial Review, which notifies the minor of the right to seek judicial review in appropriate circumstances. In addition, DHS serves all aliens, including minors, with a custody determination form that indicates whether they have the right to seek a bond redetermination. These actions are consistent with the requirements of FSA paragraphs 12(A) and 24(A).

*Comments.* One commenter noted that the proposed rule failed to require that every child be placed in the least restrictive placement in the best interests of the child, as required by the TVPRA and subsequent HHS policies.

*Response.* DHS notes that this section of the regulations applies only to minors and UACs when they are held in DHS processing facilities immediately following their initial arrest, and thus the TVPRA provisions regarding HHS' placement of UACs do not apply. Proposed § 236.3(g)(2)(i) states that "consistent with 6 CFR 115.114, minors and UACs shall be held in the least restrictive setting appropriate to the minor or UAC's age and special needs, provided that such setting is consistent with the need to protect the minor or UAC's well-being and that of others, as well as with any other laws, regulations, or legal requirements."

*Comments.* Several commenters raised concerns regarding conditions in CBP processing facilities, stating that conditions are subpar to those outlined in the FSA. Commenters identified a lack of access to legal counsel, lack of bedding, forcing children to sleep on cement floors, open toilets, confiscation of belongings, constant light exposure, insufficient food and water, no bathing

facilities, and extremely cold temperatures, which are traumatizing for children. Several commenters proposed that additional elements of custodial care following apprehension should be incorporated in § 236.3(g)(2) of the rule, including adding the term "bedding" to the listed elements facilities will provide; and striking the language "as appropriate" after "food and water" to avoid confusion, as food and water should never be withheld. Several commenters also recommended the rule should include custodial standards for architectural design, lighting, and mental health care services. Other commenters asked that DHS include provisions to address adequate temperature control in facilities that house children.

One commenter cited research and experience with family detention centers in the U.S. that shows that access to quality medical, dental and mental health care is limited for detainees. Specifically, the commenter contended that preventative care and mental health services are often lacking, and most detention centers relied on expensive emergency room visits to provide medical care, often after delay, increasing the detainees' severity of illness. The commenter also stated that the Infectious Disease Society of America has already found outbreaks of chicken pox, scabies and other infections among detainees, and that detention facilities are lacking in practices of hygiene and infection control, leading to conditions that will fuel the spread of infections.

One commenter also pointed out that contact with family members arrested at the same time should not be an issue because the family should all be housed together and this section should reflect the concept of family unity during apprehension and initial processing.

*Response.* DHS notes that the proposed text of § 236.3(g)(2) is, in substance, identical to the existing requirements in the FSA. Specifically, paragraph 12A of the Agreement requires that "following arrest, the INS shall hold minors in facilities that are safe and sanitary and that are consistent with the INS's concern for the particular vulnerability of minors. Facilities will provide access to toilets and sinks, drinking water and food as appropriate, medical assistance if the minor is in need of emergency services, adequate temperature control and ventilation, adequate supervision to protect minors from others, and contact with family members who were arrested with the minor." The text proposed in the NPRM at § 236.3(g)(2) provided that DHS will hold minors and UACs in facilities that

are safe and sanitary and that are consistent with DHS's concern for their particular vulnerability. Facilities will provide access to toilets and sinks, drinking water and food as appropriate, access to emergency medical assistance as needed, and adequate temperature and ventilation. DHS will provide adequate supervision and will provide contact with family members arrested with the minor or UAC in consideration of the safety and well-being of the minor or UAC, and operational feasibility. Thus, DHS has, through this provision, included the same terms used in the FSA, with such changes as are required by the HSA and the TVPRA.

DHS also notes that CBP policies serve to implement these protections and go beyond the requirements of the FSA and these regulations. Specifically, CBP's policy states that all individuals who may require additional care or oversight while in custody, including minors and UACs, will be treated with dignity, respect, and special concern for their particular vulnerability. TEDS also addresses the provision of all amenities provided for by the FSA. For example, TEDS provides that minors and UACs in CBP custody have access to restrooms and appropriate toiletry items (*e.g.*, toilet paper and sanitary napkins); have access to drinking water at all times; are provided with four meals daily; and have access to milk, juice, and snacks at all times. TEDS also provides that minors and UACs are provided access to basic hygiene items and clean bedding, and that CBP makes reasonable efforts to provide showers (including soap and a towel) to minors and UACs approaching 48 hours in CBP custody. Additionally, CBP documents the provision of all required amenities, as well as welfare checks of all minors and UACs, in its electronic systems of records. CBP also documents that the temperature is appropriate and that the cleanliness of its hold rooms has been checked in its electronic systems of record.

CBP also notes that it has recently taken several steps to enhance the provision of medical care to minors and UACs in its custody. Specifically, CBP currently provides medical screening and triage for all UACs and minors along the southwest border. Following a screening, any minor or UAC who requires emergency medical care is transferred to the hospital or other nearby medical facility for appropriate emergency treatment.

DHS declines to add "bedding" to the list of items provided by facilities, as that term does not appear and is not defined in the FSA. DHS notes, however, that generally CBP provides clean bedding to all minors and UACs,

and that the provision of bedding is documented in CBP's electronic systems of record. Additionally, as noted above, the TEDS standards address these topics and more, and in many ways go over and above the requirements of the FSA, and these regulations. DHS also declines to delete the words "as appropriate" after "food and drinking water" since this is a reasonable limitation. The "as appropriate" phrase is derived from FSA paragraph 12A, and might apply in a situation in which a minor or UAC is in custody for a very short period of time.

*Comments.* One commenter recommended that the rule require that processing facilities not only be safe and sanitary but also provide a sense of comfort, including by prohibiting the use of wire fencing to separate youth and by providing access to beds, blankets, outdoor space, and comfort items (*e.g.,* stuffed animals that be taken with the child/youth when they transfer to a licensed facility).

*Response.* The FSA requires that facilities in which minors and UACs are held immediately following arrest be "safe and sanitary" and reflect DHS's "concern for the particular vulnerability of minors." DHS's short-term holding facilities, in which minors and UACs are held immediately following arrest, are generally designed to hold individuals for 72 hours or less. *See* 6 U.S.C. 211(m)(3). Thus, they are not designed for long-term detention, and do not provide many of the characteristics of such long-term detention. As explained elsewhere in this rule, DHS makes efforts to transfer all minors and UACs out of such facilities as expeditiously as possible. Additionally, the TVPRA requires that DHS transfer all UACs to HHS within 72 hours absent "exceptional circumstances." Additionally, for the duration of time that minors and UACs do remain in CBP custody, CBP makes efforts to provide minors and UACs with appropriate safe and sanitary conditions, including hygiene products, showers where possible, and the opportunity to obtain clean clothes.

DHS notes that CBP facilities are also subject to several areas of oversight to ensure compliance with CBP policy and with the FSA requirements. First, CBP's Juvenile Coordinator conducts regular visits to CBP facilities across the southwest border, both announced and unannounced, to monitor compliance with the FSA requirements and with CBP policy related to the treatment of minors and UACs in CBP custody (including, for instance, determining whether facilities are safe and sanitary and whether minors and UACs have

access to adequate food and water). The Juvenile Coordinator also conducts reviews of juvenile custodial records as part of this monitoring roles. CBP also has Juvenile Coordinators in its field offices and sectors, who are responsible for managing all policies on the processing of juveniles within CBP facilities, coordinating within CBP and across DHS components to ensure the expeditious placement and transport of juveniles placed into removal proceedings by CBP, and informing CBP operational offices of any policy updates related to the processing of juveniles (*e.g.,* through correspondence, training presentations). Moreover, CBP's Juvenile Coordinators serve as internal and external agency liaisons for all juvenile processing matters.

CBP's own Management Inspections Division (MID) also conducts visits to CBP facilities and monitors compliance with CBP's policies. Additionally, CBP is subject to regular oversight and inspection by CBP's Office of Professional Responsibility (OPR), DHS' Office of Inspector General, DHS' Office of Civil Rights and Civil Liberties, and the Government Accountability Office. Such inspection and oversight helps ensure that CBP facilities continue to meet the FSA requirements and remain safe and sanitary for minors and UACs.

*Comments.* One commenter noted that there is no mention in the rule of a minor's or UAC's ability to contact his or her consulate upon apprehension. The commenter alleged that consistent with the ABA UC Standards, upon apprehension, a child should immediately be informed, both orally and in writing, in the child's best language and where applicable, dialect, of the right to contact the child's parents and consulate.

*Response.* Section 236.3(g)(1) codifies requirements that derive directly from the FSA. This section, like Paragraph 12(A) of the FSA, applies to facilities in which minors and UACs are held during their initial processing. Paragraph 12(A) of the FSA provides that, immediately following arrest, minors be "provided with a notice of rights." And as indicated in § 236.3(g)(1)(i), all minors and UACs who enter DHS custody are provided a Form I–770, Notice of Rights and Request for Disposition. This form informs the minor or UAC that he or she may contact a parent, close relative, or friend. Thus, § 236.3(g)(1) codifies the requirements under the FSA, and no additional changes are required. DHS also notes that existing regulations at 8 CFR 236.1(e) provide that "every detained alien shall be notified that he or she may communicate with the consular or diplomatic officers of the

country of his or her nationality in the United States."

*Comments.* One commenter recommended adding language that would keep minors together with the family members arrested with them, rather than simply providing contact; and recommended adoption of a rule governing housing minors with unrelated adults more closely mirroring the rules for UACs. The commenters noted that housing UACs with unrelated adults upon apprehension is addressed in the proposed rule but minors other than UACs are not mentioned in this section. The commenter stated that this could be highly problematic, pointing to studies that have shown children commingled with adults are more likely to commit suicide and to be physically or sexually assaulted.

Several commenters raised concerns that proposed language in 8 CFR 236.3(g) stating that children will be provided contact with family members only to the extent that it does not pose an "undue burden on agency operations" will weaken the protections against family separation and allow CBP to separate children from their families if the agency is merely inconvenienced. One commenter recommended that the rule should provide in § 236.3(g)(1) that every minor or UAC must receive assistance with contacting his or her parent, legal guardian, and/or counsel.

Another commenter objected to the provision that a child be provided contact with family members with whom the child was arrested "in consideration of the safety and well-being of the minor or UAC, and operational feasibility." The commenter claimed the reference to "operational feasibility" is not found in the FSA, which requires facilities to provide "contact with family members who were arrested with the minor" without qualification.[26] The commenter further stated that this language is also not found in existing regulations covering juvenile and family detainees.[27] The commenter concluded that the language conflicts with the FSA, as it allows the agency to restrict children's access to their families for its own convenience, with no specification as to the bounds of the vague term "operational feasibility."

*Response.* DHS notes that, as explained in the preamble to the NPRM, "DHS's use of 'operational feasibility' in

---

[26] FSA paragraph 12.

[27] *See* 6 CFR 114.14 (allowing juveniles to be held with adult family members "provided there are no safety or security concerns"); 115.114 (allowing unaccompanied juveniles to be held temporarily with non-parental adult family members when the agency determines it is appropriate).

this paragraph does not mean 'possible,' but is intended to indicate that there may be limited short-term circumstances in which, while a minor or UAC remains together with family members in the same CBP facility, providing such contact would place an undue burden on agency operations.'' 83 FR 45500. The preamble went to provide several examples: ''For instance, if a family member arrested with a minor or UAC requires short-term, immediate medical attention, CBP may be required to temporarily limit contact between that family member and the minor or UAC, in order to provide appropriate medical treatment. Or, CBP may have a legitimate law enforcement reason to temporarily limit contact between a minor or UAC and accompanying family members, such as when CBP decides it is in the minor or UAC's best interest to interview all family members separately.'' *Id.*

DHS reiterates its reasoning from the NPRM that CBP provides contact between the minor or UAC and accompanying family members unless CBP is concerned about the safety of the minor or UAC or there is a legitimate law enforcement reason not to provide contact on a temporary basis. It is never a matter of inconvenience. The proposed rule is much more detailed than FSA paragraph 12(A), which requires that the juvenile be provided contact with family members with whom he or she was arrested, and consistent with both FSA paragraph 11 and other DHS regulations on the prevention of sexual abuse and assault in its facilities. This provision takes into account the safety of the minor or UAC, and acknowledges that there may be some limited situations in which providing contact may not be in the minor or UAC's best interests (*e.g.*, the accompanying family member has been observed to physically harm the minor or UAC, or a minor or UAC alleges physical abuse by the family member). Additionally, the term ''operational feasibility'' covers limited short-term circumstances where providing such contact would place an undue burden on agency operations. For example, if a family member requires short-term, immediate medical attention, CBP may be required to temporarily limit contact between that family member and the minor or UAC in order to provide the medical treatment. There may also be legitimate law enforcement reasons to interview family members separately.

*Comments.* Commenters expressed concern about the flexibility given to DHS to hold and transport UACs separately from unrelated adults based on emergencies or exigent

circumstances. Some commenters commented that DHS failed to define the ''exigent circumstances'' that would allow it to house a UAC with an unrelated adult beyond 24 hours. The commentator stated that allowing UACs to be housed with an unrelated adult for emergency or exigent circumstances contradicts the FSA and endangers children.

A few commenters stated that the provision allowing DHS to house UACs with unrelated adults for more than 24 hours based on emergencies or exigent circumstances is inappropriate and is contrary to 6 CFR 115.14(b), which prohibits the housing of children with adults unless the child is in the presence of an adult family member. And a different commenter took issue with the proposed rule's distinction between UACs and minors when it comes to housing UACs with unrelated adults for up to 24 hours because minors should also not have to be housed with unrelated adults for more than 24 hours.

Other commenters focused on the term ''operationally feasible'' for purposes of the requirement to separate children from unrelated adults. Some commenters argued that the failure to define the term rendered the regulation unconstitutionally vague. One commenter requested that DHS and HHS clarify the percent of time they expect it will be operationally feasible to successfully transport and hold UACs separately from unrelated adults. The commenter asked whether DHS and HHS intend to rescind this policy and make it compliant with the FSA if they find that UACs are not held and transported separately from unrelated adults in most cases.

Another commenter asserted that DHS could dispense with contact with family members to accommodate ''operational concerns'' at a time when children need their family to insulate them from trauma and provide them comfort.

*Response.* The proposed regulation is designed to be consistent with the existing DHS regulations on the prevention of sexual abuse and assault in its facilities without diminishing any key protections set forth in the FSA. The proposed regulation at § 236.3(g)(2) contains the same limit as the FSA on the amount of time UACs can be housed with an unrelated adult (no more than 24 hours). The proposed regulation allows DHS to depart from this standard in emergencies, to the extent consistent with 6 CFR 115.14(b) and 115.114(b). DHS has decided to remove the reference to ''exigent circumstances,'' as DHS has already provided an explanation of the types of emergency

situations in which it may be necessary to hold a UAC with an unrelated adult for more than 24 hours. Any ''exigent circumstances'' would be largely redundant of such emergency situations. Thus, the proposed regulation at § 236.3(g)(2) is designed to be consistent with the existing DHS regulations on the prevention of sexual abuse and assault in its facilities without diminishing any key protections set forth in the FSA. DHS also notes that the proposed regulation addresses only DHS custodial care of UACs immediately following their apprehension. Pursuant to the TVPRA (and consistent with the HSA), once an alien juvenile is determined to be a UAC, DHS must transfer the UAC to the care and custody of HHS within 72 hours, absent exceptional circumstances.

DHS provides examples in the regulations of when it may be necessary to hold UACs with unrelated adults for more than 24 hours, including during a weather-related disaster or if an outbreak of a communicable disease requires the temporary commingling of the detainee population. These examples confirm that any emergencies would address temporary and unforeseen dangers or public safety threats. DHS is unable to provide an exact length of time, beyond 24 hours, that it may be necessary to house a UAC with an unrelated adult, as the length of time will vary based on the particular emergency warranting such a situation. However, DHS will not house a UAC with an unrelated adult for any longer than is required based on the specific facts of the particular emergency. Moreover, even under emergency circumstances, appropriate consideration is given to age, mental condition, physical condition, and other factors when placing UACs into space with unrelated adults.

Concerns about recognizing an exception to the 24-hour limit in an ''emergency'' are unfounded. The exceptions would only apply to the extent consistent with the existing DHS regulations on the prevention of sexual abuse and assault in DHS facilities at 6 CFR 115.14(b) and 115.114(b).

Similarly, the commenter's concerns about distinguishing between UACs and minors for this requirement is misplaced because the FSA's provision on the amount of time UACs can be housed with an unrelated adult applies only to unaccompanied *Flores* class members. *See* June 27, 2017 Order at 31, *Flores* v. *Sessions,* No. 85–4544 (C.D. Cal. filed July 11, 1985) (noting that ''Paragraph 12A of the Agreement states that upon apprehension, Defendants

'will segregate unaccompanied minors from unrelated adults.' '").

DHS also disagrees with commenters' concerns about the term "operationally feasible" because that term does not appear in the proposed regulatory text concerning the amount of time a UAC can be housed with an unrelated adult. This term is addressed above, in the discussion of providing contact between minors and UACs and family members with whom they were apprehended. And the proposed DHS regulatory text at § 236.3(f) contains a prohibition on transportation of UACs with unrelated adults in keeping with the FSA: A "UAC will not be transported with an unrelated detained adult(s) unless the UAC is being transported from the place of apprehension to a DHS facility or if separate transportation is otherwise impractical or unavailable."

Changes to Final Rule

DHS is amending the proposed regulatory text to remove the language "exigent circumstances" in response to public comments. DHS is also amending the regulatory text to clarify that the Form I–770 will be provided, read, or explained to all minors and UACs in a language and manner that they understand.

8. Detention of Family Units § 236.3(h)

Summary of Proposed Rule

DHS proposed to clarify that DHS may, pursuant to existing legal authorities, maintain and detain family units together in ICE custody. The proposal also provided that DHS would transfer family units to an FRC if DHS determined that detention of family units is required. The terms contained in the proposed rule set out and clarify requirements that must be met for a family to be detained together in an FRC.

Public Comments and Response

*Comments.* Some commenters noted that there may be times when a child needs to be detained, such as when no alternative exists that meets the needs of the child and ICE's security concerns. But most commenters on this topic expressed general opposition to the detention of family units. Many commenters discussed the negative impacts of detention on the well-being of children, while some commenters also stated that family detention has negative impacts on parents and the family unit itself. One commenter also stated that DHS has failed to justify detaining children because of a misdemeanor crime allegedly committed by a parent and that it must exhaust less restrictive alternatives.

Another stated that family immigration detention should only be used as a last resort where necessary to protect the best interests of the child, and only following an individualized assessment and judicial review.

With regard to the impact of family detention on family units, numerous commenters stated possible effects could include emotional distress, damage to family stability, the undermining of a parent's ability to appear as an authority figure and provide emotional support, and disruption of the parent/child bond, potentially leading to attachment issues. Several commenters also noted that, while they support the notion of family unity, they disagree with unity being created or maintained by family detention. Many commenters described the detention of family units as "inhumane," "immoral," "cruel," or contrary to our country's values. One commenter stated that the detention of family units is rooted in a white nationalist agenda.

• Trauma

*Comments.* As a reason for their opposition to the detention of family units, numerous commenters stated that the detention of families has serious and long-lasting negative impacts on the physical and mental well-being of children. Many commenters, including doctors, social workers, and organizations specializing in medicine or mental health, listed numerous possible negative effects of detention on children, such as: Trauma; developmental delays; anxiety; depression; Post Traumatic Stress Disorder (PTSD); regressive behaviors; withdrawal; self-injury; suicidal ideation; nightmares; night terrors; bed-wetting; delayed cognitive development; digestive disturbances; panic attacks; clinginess; withdrawal; attachment disorders; loss of appetite; and educational delays.

One commenter stated that parents who find themselves in this highly stressful situation are at risk of developing similar emotional problems, in addition to being less available and responsive to their children which, in turn, can interrupt the natural attachment between children and parents. One commenter, relying on such possible effects, stated that detention of innocent children should never occur in a civilized society, especially if there are less restrictive options, such as parole, because the risk of harm to children simply cannot be justified.

Several commenters relied on research in this area to support their

comments. For example, one commenter cited to a body of research linking the trauma of childhood detention with adverse outcomes, and a collection of articles that discusses the harm done to children from the toxic levels of stress and disruption in normal development that are inherent in being detained in U.S. custody.

Another commenter cited research to show that 44 percent of asylum seekers in the United States were torture survivors, and that detention was likely to compound the trauma already experienced by these individuals. Several commenters noted that detention is likely to re-traumatize mothers and children fleeing gender-based violence. Some commenters cited to the DHS Advisory Committee on Family Residential Centers Report that recommended DHS not detain families. One commenter suggested changes to the last sentence of the provision, "If DHS determines that detention of a family unit is required by law, or is otherwise appropriate, the family unit may be transferred to an FRC which is a licensed facility and non-secure." Specifically, the commenter suggested changing "may be" to "shall be." The commenter suggested adding "as available" or "as reasonably possible" to address a lack of space in FRCs.

• Indefinite Detention

Many commenters expressed concern that detention of family units would lead to prolonged or indefinite detention. For further discussion of this topic, see section "Indefinite Detention due to Alternative Licensing."

*Response.* DHS responses to the issues of alleged indefinite detention and the trauma caused by detention are in the sections devoted to these topics below. DHS believes that misconceptions about FRCs abound, and these misconceptions are reflected in the comments. Detention of family units in this context is related only to civil immigration proceedings and not criminal charges. FRCs are non-secure, meaning that families are not physically prevented from leaving the facility if they wish. While leaving an FRC could result in significant immigration consequences, the families are not in prison and the decision to stay or go is their own. FRCs have classrooms for the children's education, cafeterias for family meals, and outdoor and indoor recreation areas. There are no cages, prison cells, or prison bars. There are, however, windowed bedrooms with plenty of space for beds, chests of drawers, and tables. There are also communal areas with couches and television sets. There are entire medical

wings devoted to caring for the families, whether it is their initial intake screening where they are screened for communicable diseases, high blood pressure, and diabetes, or emergency situations where their trip from their home countries to the United States has caused them severe harm that requires hospitalization. ICE's Juvenile Family Residential Management Unit (JFRMU) is responsible for the ICE Family Residential program, and it periodically revises the Family Residential Standards that govern the program, consistent with best practices.

FRCs serve to encourage and strengthen family interaction and growth. Parents are expected to be responsible for their children and are encouraged to take an active role in their development. FRC staff counsel and mentor parents in appropriate non-physical behavior management techniques. Family units normally are assigned bedrooms together to further familial bonds. Centers provide age-appropriate play structures and recreational equipment for all residents. Mental health providers conduct weekly wellness checks on all juvenile residents. If additional treatment needs are identified during these checks, separate therapy sessions may also be established. Additionally, mental health providers are available to residents for adult counseling and family counseling needs. FRCs are not staffed by armed guards or uniformed ICE officers, rather they are staffed by facility counselors.

FRCs also provide liberal access to legal counsel and non-profit groups providing legal services. Interpreter services are available 24/7 via telephone. Private meetings rooms are available as is direct communication with the immigration courts.

FRCs also afford parents the ability to be parents; they exercise full parental rights. FRC staff do not make any decisions for the parents. If the parents do not want their children to participate in group activities, it is their choice. Similarly, if they do not want their children to be part of the individual or group mental health counseling sessions, it is the parent's choice. FRCs give parents and their children a chance to acclimate to the United States, get their bearings, find legal counsel, prepare their immigration cases, and in many cases be released after a finding of credible fear.

Medical issues at FRCs are managed by the ICE Health Service Corps (IHSC). The IHSC is responsible for providing direct care or oversight of care at FRCs to include medical, dental, and behavioral health care, and public health services. IHSC is made up of a multi-sector, multidisciplinary workforce of over 1,100 employees that include U.S. Public Health Service (PHS) Commissioned Corps officers, Federal civil servants, and contract health professionals. IHSC provides medical case management and oversight of detainees housed at non-IHSC staffed detention facilities and also oversees the management of off-site specialty and emergency care services for all detainees in ICE custody.

IHSC utilizes health care standards drawn from the American Correctional Association (ACA), the National Commission on Correctional Health Care (NCCHC), the ICE National Performance-Based Detention Standards (PBNDS), as well as the ICE Family Residential Standards to ensure that quality, culturally competent, and trauma-informed care is provided to detainees in ICE custody. These standards support IHSC's internal quality improvement program. Moreover, IHSC employs staffing models at its facilities tailored to the population and needs of the community under its care. IHSC's mandate to provide direct care for ICE detainees obligates IHSC to deliver individualized care that must be properly documented in medical records for the well-being of the detainees. IHSC takes seriously all allegations of inappropriate health care and investigates these allegations to remedy any identified deficiencies and ensure the integrity of the care it provides to ICE detainees.

With respect to the report of that the DHS Advisory Committee on Family Residential Centers, DHS notes that the report was issued by a committee of private citizens acting outside the scope of the committee's charter. The report states that any detention of families "should be only long enough to process a family for release into alternatives to detention." But the report ignored DHS's legal authority to detain aliens in removal proceedings when legally required and when appropriate to ensure the alien presents himself for removal.

While DHS respects the views of the writers of the report, alternatives to detention (ATD) do not provide a means to effectively remove those who subject to a final removal order. For further discussion of this topic, see section on Alternatives to Detention.

Lastly, DHS does not concur with commenters' suggested changes to the text of the regulation. The word "may" in the proposed regulation accounts for the possibility that family units may be released at the time of encounter. The language in the regulation that states "as reasonably possible" also accounts for a lack of bedspace.

*Changes to Final Rule*

DHS declines to change the proposed regulatory text in response to public comments.

*9. Detention of Minors Who Are Not UACs in DHS Custody § 236.3(i)*

*Summary of Proposed Rule*

The Departments proposed that a minor who is not a UAC and not released by DHS, may be held in DHS custody where he/she is detained in the least restrictive setting appropriate to the minor's age and special needs. Additionally, the proposal would permit minors to be placed temporarily in a non-secure licensed facility until they are released.

Section 236.3(i)(1) proposed to require that a minor who is not a UAC be transferred to state or county juvenile detention facilities, a secure DHS detention facility, or a DHS-contracted facility having separate accommodations for minors if the minor meets certain criteria, including the minor is charged with, is chargeable with, or convicted of a crime or has been charged with, is chargeable with, is the subject of delinquency proceedings or has been adjudicated as delinquent, committing, or making credible threats to commit, a violent or malicious act while in custody or while in the presence of an immigration officer; engaging, while in a licensed facility, in certain conduct that is unacceptably disruptive of the normal functioning of the licensed facility; being an escape risk; or for the minor's own security.

Section 236.3(i)(2) proposed to require DHS to place a minor in a less restrictive alternative if such an alternative is available and appropriate in the circumstances, even if the provisions of § 236.3(i)(1) apply. Additionally, it would require that the secure facilities used by DHS to detain non-UAC minors shall also permit attorney-client visits pursuant to applicable facility rules and regulations.

Section 236.3(i)(3) proposed that, unless a detention in a secure facility is otherwise required, DHS facilities would be non-secure.

Section 236.3(i)(4) proposed that all non-secure facilities used for the detention of non-UAC minors abide by the standards for "licensed programs." At a minimum, these standards must include, but are not limited to, proper physical care, including living accommodations, food, clothing, routine

medical and dental care, family planning services, emergency care (including a screening for infectious disease) within 48 hours of admission, a needs assessment including both educational and special needs assessments, educational services including instruction in the English language, appropriate foreign language reading materials for leisure time reading, recreation and leisure time activities, mental health services, group counseling, orientation including legal assistance that is available, access to religious services of the minor's choice, visitation and contact with family members, a reasonable right to privacy of the minor, and legal and family reunification services. Additionally, this section would require DHS to permit attorney-client visits pursuant to applicable facility rules and regulations in all licensed, non-secure facilities in which DHS places non-UAC minors.

Section 236.3(i)(5) would permit "licensed, non-secure facilities" to transfer temporary physical custody of minors prior to securing permission from the Government in the event of an emergency, provided that they notify the Government as soon as practicable, but in all cases within 8 hours.

Public Comments and Response

*Comments.* Some commenters argued that the proposals would eliminate important provisions in the FSA, including a guarantee that the standards would incorporate state welfare laws and the requirements to provide acculturation and adaptation services, provide family reunification services; to provide services in a manner that is sensitive to the age, culture, native language, and complex needs of each minor; to provide information regarding the right to request voluntary departure in lieu of deportation; to create an individualized plan for each minor that is tracked through a case-management system; to maintain protections to keep minor's personal information confidential and avoid unauthorized disclosures; and to maintain records and make regular reports to INS to ensure compliance with the FSA.

One commenter stated that § 236.3(i)(4) omits several provisions that were standards in the FSA, including family reunification services; the prohibition of "corporal punishment, humiliation, mental abuse, or punitive interference with the daily functions of living, such as eating or sleeping;" the development of a "comprehensive, realistic individual plan for the care of each minor," coordinated through a case management system, which should be safeguarded to

preserve and protect confidential records; and regular record keeping and reporting. The commenter acknowledged that these provisions are found in other parts of the proposed rule concerning children in HHS custody, but asserted that there is no reason for a distinction between "alien minors" and "UACs" when it comes to these issues.

*Response.* This section is specifically about ICE custody of minors once a decision has been made not to release a minor, and the minor is not a UAC. The standards described are taken from Exhibit 1 of the FSA. The individualized plans, as one commenter calls them, are in § 236.3(i)(4)(iii), which mirrors Exhibit 1, paragraph 3 of the FSA. Family reunification provisions are not needed in this part of these regulations because minors in ICE custody are already housed with their parents or legal guardians. Similarly, case management services for minors in ICE custody are not needed the same way they are needed for UACs in HHS custody because minors in ICE custody are supervised by their parent or legal guardian. The parent or legal guardian is responsible for seeking any services or care that the minor requires while in DHS custody and fulfill the role of a case manager in seeking a continuum of care and services such as pediatric care, mental health services.

DHS disagrees with the commenter that this regulation does not provide services in a manner that is sensitive to the age, culture, native language, and complex needs of each minor. DHS has put numerous programs in place since the FSA was signed to take into account such needs. For example, it can generally provide interpretation services 24 hours a day via telephone. Further, DHS abides by language access policies that comply with the Executive Order 13166, *Improving Access to Services for Persons with Limited English Proficiency,* although DHS declines to codify these language access policies in regulation in order to maintain necessary operational flexibility. Similarly, DHS declines to codify through this regulation any additional of the commenters' suggestions: Creating an individualized plan for each minor that is tracked through a case-management system; maintaining protections to keep minor's personal information confidential and avoid unauthorized disclosures; and maintaining records and making regular reports to DHS to ensure compliance with the FSA. Technology advances, privacy laws, and reporting over the last 20 years have now made these suggestions standard operating

practices, but codifying them through regulatory text limits DHS's operational flexibility to update and improve these practices as necessary.

DHS does not believe there is a need for advisals at FRCs regarding a minor's right to request voluntary departure in lieu of deportation. This is true because, DHS acknowledges parental rights for family units housed at FRCs and families are likely to make such decisions as a unit.

With respect to acculturation programs, DHS notes that the only difference between the FSA and the proposed language is that the FSA requires that the acculturation services contribute to the ability to "live independently and responsibly," whereas the proposed language requires that the services would contribute to the abilities needed "as age appropriate." After many years of experience, DHS has found that what a five-year-old needs to know about America is different from what teenager needs to know to successfully integrate into society.

DHS agrees to add the prohibitions in the FSA against corporal punishment, humiliation, mental abuse, and punitive interference with the daily functions of living, such as eating or sleeping to the regulation. DHS notes that these prohibitions have always been incorporated into personnel policies and contract vehicles with contractors who run ICE facilities. There are also mechanisms in place to monitor for such abuses. But DHS will add these provisions into the text of the regulation in response to commenters noting a lack of specific language addressing these issues in the proposed text. Such conduct is obviously inappropriate and has no place in any DHS facility.

Safety (§ 236.3(i))

*Comments.* Several commenters stated that there are numerous architectural layout and design problems with the facilities used to detain minors that would lead to an increase in injuries. DHS medical experts and non-profits reported instances of severe finger injuries resulting from the closure of heavy doors in a converted prison used as a family detention center. A few commenters stated that the facilities were likely to be inadequate because they would be hastily constructed. Several commenters also stated that the facilities often lack sufficient medical space and noted that in one case a gymnasium was used as an ad hoc overflow medical space.

Several commenters stated that there are not standards that limit the number

of room occupants or prevent minors from sharing a room with unrelated adults and/or adults of the opposite gender, which increases the risk of child abuse. Several commenters detailed that in current FRCs, families are typically placed in rooms that accommodate six people, which results in children sharing rooms with unrelated adults, including sleeping, dressing, and using the restroom without adequate privacy. Additionally, one commenter noted that most space in detention facilities are reserved for mothers and young children, so fathers and older siblings are often separated from their families.

Several commenters commented that placing children in detention is inherently abusive, that children are at an increased risk of physical, verbal, mental, and sexual abuse in detention, and cited reports of sexual or physical abuse in detention facilities. One commenter referenced a guard at the Berks facility who was convicted of raping a woman in front of her three-year old son. One commenter referenced a ProPublica investigation that found patterns of abuse of immigrant children in Federal custody.

*Response.* ICE facilities are inspected for safety by state and Federal inspectors. The examples put forth by commenters of injuries sustained by children are isolated incidences and not a pattern from unsafe conditions. DHS is acutely aware of safety standards and ensuring that anyone in DHS custody, but especially children, are housed in safe and sanitary conditions. With respect to housing at ICE facilities, DHS notes that it has systems in place to ensure the safety of the minors, such as the "Standards To Prevent, Detect, and Respond to Sexual Abuse and Assault in Confinement Facilities" (PREA) regulations and housing classifications that use restrictions by age and gender to inform the placement of families. Children remain in the care of their parents while housed at FRCs.

Regarding the commenter's reference to the incident at Berks, DHS followed the Prison Rape Elimination Act of 2003 (PREA) protocol and other applicable policies to appropriately address the situation. The guard involved was immediately terminated from his position and ultimately prosecuted for his crime. ICE fully cooperated with local law enforcement in all stages of the investigation and prosecution of the case. DHS strives to ensure that nothing remotely similar ever occurs in its facilities.

DHS notes that all ICE facilities, including FRCs, are subject to PREA regulations. DHS also has several policies on point and requires staff to participate in annual training related to PREA and sexual abuse and prevention initiatives.

Secure Facilities (§ 236.3(i)(1) and (2))

*Comments.* Several commenters expressed concern that factors proposed in the regulations for determining whether a child belongs in secure detention are overly broad, vague, or do not sufficiently incorporate the terms of the FSA. One commenter wrote that this section is in conflict with the TVPVA's rules for when the government may place a child in secure detention, section 235(c)(2) of the TVPRA, because it broadens the criteria under which a child may be placed in a secure facility beyond the two factors contained in the TVPRA. The commenter stated that it is inadequately clear what would constitute a "pattern or practice of criminal activity" for a minor under this regulation, that the term "probable cause" is too vague, and the agencies are not able or qualified to make such a determination. The commenter also argued that the language should include the FSA's list of examples of isolated and nonviolent offenses and petty offenses that would not rise to the level of justifying secure detention and its required finding that the child's action involved violence against a person or the use or carrying of a weapon.

Several commenters wrote that § 236.3(i) affords an inappropriate level of discretion to DHS and shelter staff in determining a minor's placement in a secure facility. The commenters stated that this section provides no clarity as to what would constitute an unacceptable level of disruption, how or on what basis staff will make the dangerousness determination, and which party will be responsible for making the determinations. One commenter recommended deleting provisions (i)(1)(i), (ii), (iv), and (v) as unacceptably broad and arbitrary language and noted that similar language included in the FSA has been interpreted by immigration officers to allow placement of a child in secure detention for minor matters such as shouting or smoking a cigarette. With respect to the language at (i)(1)(vi), the commenter recommended that the proposed rule add a separate provision that when a minor is at a demonstrated risk of harm from smugglers, traffickers, or others who might seek to victimize or otherwise engage him in criminal, harmful, or exploitative activity, the minor shall be placed in the least restrictive developmentally appropriate placement consistent with his safety and the safety of others. A few commenters stated that the rule must include a provision) for a periodic reassessment of a minor's placement in a secured facility at least every 30 days, as required by the TVPRA and a provision for independent review of a placement decision that satisfies due process requirements.

A few commenters wrote that studies show that LGBT youth face harsher penalties when engaging in the same behavior as their straight and cisgender counterparts, and that therefore the proposed rule's inclusion of "chargeable" offenses is more likely to subject LGBT youth to placement in secure facilities. One of the commenter also wrote that including "engagement in unacceptably disruptive behavior that interferes with the normal functioning" of the shelter as a chargeable offense will likely lead to placement of more LGBT in secured facilities, because studies have shown that in the juvenile justice context LGBT youth are more likely to face criminal consequences for engaging in consensual sexual activity than straight or cisgender youth, and also that such conduct may be considered "unacceptably disruptive behavior" in detention facilities. These commenters also wrote that the placement of more LGBT youth in restrictive settings would increase the vulnerability of those minors to abuse.

One commenter wrote that the proposed rule's omission of medium security facilities as an alternative detention facility is in violation of the FSA. The commenter noted that paragraph 23 of the FSA requires medium security facilities as one alternative in certain circumstances, but that the proposed rule states that because DHS only operates secure and non-secure facilities, a definition for medium security facilities is unnecessary. The commenter believed the proposed rule should be amended in order to implement the FSA's terms.

Other commenters argued for additional provisions that should have been included relating to the placement of children in restrictive settings. This included a proposal that in determining placement in a secure facility, threats from a juvenile be "credible *and verified*" (as opposed to just credible threats as discussed in the proposed rule). Further, one commenter was concerned that "disruptive behavior" is too subjective as a criterion for placement in a facility and should be replaced. Additionally, one commenter proposed that secure placements should include the consultation of a mental health specialist.

*Response.* As explained in the NPRM, the proposed regulation reframed the FSA requirements for placing a child in

a secure facility from a negatively worded list to an affirmatively worded list. The FSA says that the provisions ''shall not apply'' in many instances. The proposed rule explains exactly when the provisions will apply. Not only was this done for clarity, but because the former INS and now DHS have found over 20 years of practice, that the FSA provisions are confusing enough that they may, in fact, result in placing more children in secure facilities than DHS believed should be subject to such provisions. DHS has been using this limited interpretation to use secure placement even though a different reading of the FSA may have resulted in more secure placements.

DHS also notes that the FSA did not define probable cause and neither did the proposed regulation, because this is a legal term of art that is already well-defined in case law and does not need to be defined in regulation. DHS also disagrees with one commenter's assertion that the secure placement provisions conflict with the TVPRA's requirements. Section 235(c)(2) of the TVPRA applies specifically to UACs, and does not apply to the minors in DHS custody who are not UACs.

One commenter brought up the possible disparity in treatment for LGBT youth. Specifically, this commenter presented data that LGBT youth are more likely to be charged with crimes because they are more likely to get into altercations due to their LGBT status. DHS takes all of this into consideration, and as stated above uses its discretion to ensure that no one is placed in secure facility that does not need to be in one. DHS believes that the proposed text rewording this provision actually lowers the chance for LGBT youth to be placed in secure facilities, rather than increasing it.

DHS declines to implement one commenter's suggestion that threats be ''verified'' in addition to ''credible.'' The language of the FSA permits detention in a secure facility for ''credible threats.'' Implementing an additional requirement that the threat be ''verified'' imposes a vague, unduly restrictive requirement upon DHS officers that is not otherwise required under the law and could ultimately place other minors at risk.

DHS disagrees with one commenter's assertion that FSA paragraph 23 requires the use of medium security facilities as part of DHS operations and that DHS is accordingly failing to implement the terms of the FSA by not using medium security facilities. The purpose of FSA paragraph 23 is to ensure that minors are not placed in a secure facility if less restrictive

alternatives are available. Thus the paragraph, by its terms, does not require DHS to use medium security facilities for this purpose. DHS abides by the criteria of the FSA when determining whether a minor should be placed in a secure facility. Those requirements are codified in regulation through this final rule.

Non-Secure (§ 236.3(i)(3))

*Comments.* A commenter stated that the Federal Government should not give States the responsibility to determine whether their detention facilities are non-secure because this will mean that the definition of a non-secure facility may vary state by state.

*Response.* FSA paragraph 6 requires a licensed facility to be ''non-secure as required under state law'' and licensed by an appropriate State agency. The proposed regulations generally mirror the FSA. For additional discussion of the definition of non-secure, please see the non-secure definition in Section B.2. Definitions.

Standards (§ 236.3(i)(4))

*Comments.* Multiple commenters stated that the proposed regulations would result in inadequate conditions that were neither safe nor humane for children. Several commenters stated that the proposed standards failed to meet the FSA standards for adequate food, water, and medical care and that the FSA standards should be retained. Some commenters reiterated the Federal Government voluntarily entered into the FSA, which requires that facilities provide children in their custody with access to sanitary and temperature-controlled conditions, water, food, medical assistance, ventilation, and adequate supervision, and contact with family members and that facilities ensure that children are not held with unrelated adults.

Numerous commenters raised concerns about reports of children suffering from subpar conditions and abusive treatment in detention centers. One commenter argued that existing facilities fail to comply with nutritional standards of the FSA and that families often do not have access to adequate food, water, or clothing. Some commenters asserted that the current detention centers fail to provide basic necessities, with children being unable to sleep from the lights shining all night, a lack of bedding, open toilets, being crammed into cages, icy temperatures and a lack of pediatricians, child and adolescent psychiatrists and pediatric nurses. Some of these commenters stated that constant illumination causes sleep deprivation, affects circadian

rhythms, and causes loss of muscle strength and inflammation. One commenter reported that she had twice toured the Tornillo Port of Entry Shelter and witnessed young children suffering from separation anxiety and other negative mental and physical effects due to incarceration and separation from their families. Two DHS medical professionals who had inspected existing facilities reported instances of neglect of children caused by failure to assess or accommodate the nutritional and medical needs of child detainees, including an infant who lost a third of its body weight due to an untreated disease, children vaccinated with adult doses, and children not being visited by a pediatrician in a timely manner.[28] An immigration attorney commented that her client's nine-month old infant was not treated for pneumonia for over two days and that the mother and infant were not given any warm clothing and fed only three bologna sandwiches in a two-day period, which the child could not eat. Another commenter stated that in the Berks, Pennsylvania, facility, infants had been sent to the emergency room due to dehydration. Several commenters stated that there had been misconduct at existing government facilities, and cited a court order and a news report stating that facilities had provided medication to minors without parental consent, including psychotropic drugs, given psychotropic drugs disguised as vitamins and forcibly injected minors with sedatives. Commenters cited two DHS experts who reported that one facility was using medical housing for punitive segregation of families and children, which according to the commenters violates the standard of care for any detained person.

Several commenters objected to the proposed regulations on the ground that they would permit facilities to deny access to food, water or medical care in the event of an emergency. These commenters stated that emergency food and water should be readily available in advance of such emergencies and that the regulations should be amended to require provision for the basic needs of minors, regardless of whether there is an emergency. One commenter encouraged DHS to ensure that meals meet nutrition standards established by the U.S. Departments of Agriculture and Health and Human Services. The commenter said that breast-feeding infants should continue to have access to milk from

---

[28] Dr. Scott Allen and Dr. Pamela McPherson, Letter to the Senate Whistleblowing Caucus, July 17, 2018, *https://www.whistleblower.org/sites/default/files/Original%20Docs%20Letter.pdf.*

their mothers in all situations and DHS should identify those with special health care needs and to provide appropriate treatment according to evidence-based guidelines for care.

*Response.* DHS proposed to adopt the substantive standards of FSA Exhibit 1, and thus DHS disagrees with the commenters' characterization that the proposed standards fail to meet the requirements for food, water, and medical care required by the FSA. DHS proposed simply to adopt the substantive standards of FSA Exhibit 1. DHS notes that several of these comments appear to misunderstand the different types of facilities that are used to house minors by different components of DHS as well as its sister agencies.

DHS reiterates that these standards in § 236.3(i)(4) apply to the non-secure, licensed facilities used for housing family units—FRCs. At least some of the comments, however, appear to describe conditions at CBP facilities, which aliens may pass through during initial processing when first encountered. These facilities are not required to abide by the same Exhibit 1 standards under the FSA, which § 236.3(i)(4) incorporates. For instance, CBP processing facilities are very different from ICE FRCs. They operate 24/7 and thus need to have lights on at all times. These CBP facilities may also have temporary holding areas that are divided up that help separate minors and UACs from unrelated adults for the safety and protection of the children. Regardless of facility type, all DHS facilities (including CBP and ICE facilities) will continue to abide by the applicable standards that are consistent with the FSA, which are substantively incorporated into these regulations. Additionally, as described above, all DHS facilities are subject to inspection and monitoring by bodies such as the DHS OIG, DHS CRCL, and the GAO. CBP also has various internal methods for monitoring compliance with requirements that derive from the FSA, including the requirement that agents and officers document the provision or availability of all those requirements, as well as monitoring and inspection by CBP's Juvenile Coordinator and CBP's MID and OPR.

Regarding the comments relating to specific allegations of mistreatment and neglect of individuals in DHS custody, without sufficiently detailed information DHS is unable to investigate or otherwise substantiate these claims. DHS takes all allegations of misconduct seriously, and all allegations are referred to the appropriate investigative entity (*e.g.*, the ICE and CBP Offices of

Professional Responsibility, the DHS OIG) for investigation and appropriate action.

Regarding comments related to emergencies, DHS notes that DHS facilities are equipped to provide bare essentials during emergencies; however, if evacuation is warranted during weather-related or other situations, it may become necessary to abandon everything and move minors and UACs to safety, which may include not providing them with a meal or snack at the designated time. The FSA does not speak to the issue of meals during emergencies. It only spoke to the ability to transfer children during an emergency. The proposed regulations speak to the same provisions during emergencies, recognizing that true emergencies are fluid and it is thus difficult to codify specific requirements in regulations in advance.

Regarding the comments about the use of psychotropic drugs, DHS notes that the news articles mentioned referred to allegations against HHS. HHS emphasizes that the primary mission and daily commitment of its UAC Program is to safeguard the health and wellbeing of children in our custody and care. HHS does not condone medicating a child for punitive reasons. All ORR staff and contractors engaged in the direct care of UACs are mandated reporters with the expectation that they will immediately seek to protect any UAC in our care from such harm and report to law enforcement and other appropriate authorities any allegation of abuse. Many UACs have endured extraordinarily challenging and traumatic childhood experiences that can manifest into mental illnesses— whether acute or chronic. In some cases, UACs are diagnosed and prescribed psychotropic medication by licensed psychiatrists. Furthermore, ORR only authorizes UACs to receive psychotropic medication to treat the specific diagnosis identified by licensed mental health professionals. In cases where ORR is able to locate and correspond with a UAC's parent or legal guardian, ORR informs the parent of the UAC's diagnosis, seeks their input on the course of treatment, and obtains their consent to administer medication. ORR care provider facilities are required to abide by state law. State law regulates the facility and mental health professionals' usage of psychotropic medication as well as the manner and reasons for administering the medication.

Interpreting Services (§ 236.3(i)(4))

*Comments.* Several commenters stated that FRCs would be unable to

provide adequate medical care because the facilities lack the necessary interpretation services for non-English language speakers. Several commenters noted that DHS has had difficulty providing language services for detained individuals, especially those that speak indigenous languages and that even telephonic translation has not been available in emergency situations. These commenters explained that without adequate interpretation services, individuals will be unable to properly communicate with the medical professions or understand their medical situations. Additionally, several commenters pointed out that in emergency situations, there is no reliable mechanism to allow detention center staff members to communicate effectively with all detainees.

*Response.* As stated above, DHS has put systems in place to provide appropriate language services for communications with minors. Whether it is during an emergency or during normal business operations, DHS typically is able to get the needed interpreter services very quickly and efficiently.

Provision of Medical Services (§ 236.3(i)(4)(ii))

*Comments.* Several comments focused on deficiencies in the existing and proposed provision of medical services. A medical doctor commented that the standards should include specialized training of medical professionals and staff due to the unique and complex problems present in a detention setting with children, including language barriers, limited resources, and lack of information about previous care. One commenter noted that there is no mechanism for health professionals to regularly monitor the conditions in DHS facilities and their appropriateness for children. Another commenter stated that detained minors are not given access to adequate or appropriate immunizations. One commenter stated that medication was confiscated and that limited medical screenings are conducted by non-medical staff, and another commenter observed that DHS has been unable to provide adequate observation of minors with suicidal tendencies or screening of minors for trauma. Still another commenter objected that the proposed regulations fails to require trauma informed care programming and to require facilities to screen for trauma, requirements the commenter viewed as essential to providing adequate medical care to individuals.

One commenter stated that the proposed regulations create an

administrative process that is inconsistent with the health needs of infants and young children because detention facilities are inadequately staffed with medical, mental health, and nutrition professionals. This commenter cited to instances of neglect of infant and children's nutritional needs. Additionally, this commenter cited articles regarding the benefits of breastfeeding, expressed concern that detained infants may lose access to breastmilk because of a breastfeeding mother's lack of access to a breast pump, supplemental foods that ensure a breastfeeding mother can produce enough breastmilk, and complimentary foods that assist the infant with the transition to solid food.

Several commenters stated that while ICE detention facilities are legally required to act affirmatively to prevent disability discrimination, minors with disabilities in detention centers have not been consistently provided appropriate accommodations, specialized medical care necessary to treat minors with disabilities and chronic health problems is nonexistent, and other critical services such as physical, occupational, and speech therapy and other early interventions are not generally available. These commenters note that these minors are particularly vulnerable, particularly when separated from their parents they lose their primary caregivers who possess knowledge of their health problems and the care they need. One commenter noted that there are reports of children with disabilities being restrained or sent to psychiatric hospitals or secure facilities because of behavioral issues that they cannot control except with proper medical care.

One commenter wrote that long-term detention of alien children constitutes a serious risk for infection disease and that those coming from particular geographic regions or at-risk populations are more prone to serious, and highly infectious, diseases such as tuberculosis and pneumonia. This commenter wrote that a minimum standard of care in a detention setting requires administration of appropriate screening tests (including for tuberculosis, pneumonia, and sexually transmitted diseases), interpretation and patient follow up for at-risk individuals, and sufficient resources for separation or isolation of potentially infectious individuals.

*Response.* The proposed regulations mirrored the FSA requirements for medical care. Medical care is provided in accordance with American Medical Association standards. As stated above, FRCs have medical staff on-site to care

for family units. They provide age appropriate vaccines and care for minor illnesses. FRCs refer any emergent or serious cases to hospitals for care as needed. Medical staff also make referrals to specialists as appropriate. Since parents are housed with their children at FRCs, they can make decisions regarding the care and treatment children receive at FRCs. Minors with special needs are evaluated in accordance with the FSA. In addition, individuals with disabilities are treated in accordance with specific laws and policies that provide for the provision of reasonable accommodations. See the section titled ''Standards for Minors with Disabilities'' immediately below for a more detailed response.

Standards for Minors With Disabilities (§ 236.3(i)(4)(iii))

*Comments.* Several comments were submitted concerning the standards of care of minors with disabilities. Some commenters stated that the proposed regulations do not contain enough guidance regarding the consideration of disability as part of placement determinations for children, and that requiring a psychologist or psychiatrist to determine whether a child is a danger to themselves or others is too little, too late to protect those with disabilities. One commenter wrote that the proposed rule should take into account studies suggesting that youth with disabilities in secure facilities are at high risk of unmet health needs, failure to provide appropriate accommodations, and harmful conditions, including use of restraints and solitary confinement. Another commenter stated that few children, if any, are screened for disability-related issues upon transfer from ICE to ORR custody, and a different commenter expressed concern that the proposed rule fails to guarantee special education for children with disabilities, in conflict with the U.S. Supreme Court case *Plyer* v. *Doe*, 457 U.S. 202 (1982), and The Individuals with Disabilities Education Act.

*Response.* The proposed regulatory language requires DHS and HHS to consider a minor's special needs, including provisions requiring consideration of special needs when determining placement. For example, 45 CFR 410.208 states that ORR will assess each UAC to determine if he or she has special needs and will, whenever possible, place a UAC with special needs in a licensed program that provides services and treatment for the UAC's special needs. Title 8 CFR 236.3(g)(2) requires DHS to place minors and UACs in the least restrictive setting

appropriate to the minor or UAC's age and special needs. Title 8 CFR 236.3(i)(4) requires that facilities conduct a needs assessment for each minor, which would include both an educational assessment and a special needs assessment. Additionally, 8 CFR 236.3(g)(1) requires DHS to provide minors with Form I–770 and states that the notice shall be provided, read, or explained to the minor or UAC in a language and manner that he or she understands. These provisions ensure that a minor or UAC's special needs are taken into account, including when determining placement.

In addition to these provisions, ICE has policies and regulations in place that protect individuals with disabilities and implement section 504 of the Rehabilitation Act of 1973. For example, 8 CFR part 15 prohibits discrimination against individuals with a disability, and requires that DHS facilities be accessible. In addition, specific policies prohibit discrimination and address how detainees with a disability may be provided with a reasonable accommodation. The Family Residential Standards require that minors have an Initial Education Assessment completed within three days of their arrival at the facility. Through this process, minors with learning disabilities are identified and provided with an Individual Education Program and access to special education services.

Education (§ 236.3(i)(4)(iv))

*Comments.* Multiple commenters stated that the proposed regulations would fail to provide adequate educational opportunities for minors and that placing minors in detention would negatively impact their educational development. A few commenters cited multiple studies to show that long-term detention of any form, even with a parent, has lasting negative effects on learning and development of minors, and especially young children.[29] Several commenters stated that minors in detention facilities are not receiving appropriate and challenging coursework that align with state or local educational standards, and as a result typically are unable to make meaningful academic progress. One commenter stated that children should not be deprived of education during detention because that would result in uneducated or illiterate future members of the community, who would be a detriment to the country.

---

[29] R. Kronick et al. *Asylum-seeking Children's Experiences of Detention in Canada: A Qualitative Study,* 85(3) AM. J. Orthopsychiatry 287 (2015);

One commenter stated that the minors should be placed in public schools in order to obtain necessary health socialization with other children and adults and avoid becoming second class citizens. Other commenters cited reports to show that children succeed emotionally and academically when they live in a stable home with an adult they trust and learn in a normal, structured and supportive classroom and not when the children are kept in indefinite detention without adequate services and protections. Commenters also cited to a study of children in immigration detention facilities in Australia, the United Kingdom, and the United States that shows that children react to detention with extreme distress, fear, and helplessness, all of which can result in a deterioration of functioning and impair the ability to learn.

Commenters stated that the proposed rule provides no assurance that the detention facilities will comply with the FSA's minimum standards for educational services and that the proposed rule does not address how DHS and HHS specifically intend to provide educational services appropriate to the minor's level of development in a structured classroom setting, as required by the FSA. One commenter stated that the proposed standards eliminate the requirement to provide education in languages other than English and, as a result, fail to ensure the minors are instructed in a language they can understand. Some commenters noted that DHS has had problems staffing detention facilities with bilingual teachers to meet the necessary educational needs, including special education services. Other commenters asserted that in unlicensed "emergency" or "influx" facilities, the Departments may opt to provide no educational services at all.

*Response.* The proposed regulations mirror Exhibit 1, paragraph 4 of the FSA except that the requirement for instruction in the minor's native language, which is substituted with a requirement the educational program design be appropriate for the minor's estimated length of stay and can include the necessary skills appropriate for transition into the U.S. school system. In practice, most educators who teach at FRCs are bilingual, typically in English and Spanish, and provide individualized education in a manner designed to be most effective for the minor. However, during a true emergency where children are evacuated to a different facility, it is likely that educational programs will be suspended just as they would be in the

local public school system under those same circumstances.

It is unclear why commenters believe that this regulatory requirement would allow DHS not to provide educational services. The same requirements for a structured classroom setting are in both the FSA and the proposed regulation. There is no requirement in the FSA requiring the government to explain how it plans to provide the educational services. It has been doing so for 20 years and the regulations will mandate that it continue to do so.

Recreation Time (§ 236.3(i)(4)(vi))

*Comments.* Several commenters stated that the proposed standards would provide minors and their families with insufficient opportunity for recreational activities. One commenter stated that recreational and social enrichment activities, such as opportunities for physical activity and creative expression, should be required. This commenter stated that at a minimum, the outdoor and major muscle activity standards set by the FSA should be retained. Some commenters stated that 13,000 children in custody have no recreational and educational opportunities in tent cities, but these commenters provided no data to support this contention.

A mental health professional wrote that adequate opportunities for play should be provided for young children separated from their parents because at that age all psychological issues, including grieving, are resolved primarily through play. According to the commenter, younger children will need opportunities to focus on grieving to allow them to focus on other tasks when needed, and that adolescent children need structured opportunities to gain a sense of control in their lives and information about their early history so as to avoid suicidal or antisocial tendencies.

A different commenter stated that providing daily activities for minors in the detention center means that detention facility staff replace parents as authority figures, parents do not have a say in how their children are treated, and the staff that interact most with minors during their recreation time are the lowest paid staff with the least amount of training and experience, which leads to widespread behavioral problems and mistreatment of the children by the staff.

*Response.* As stated previously, § 236.3(i) is about ICE facilities. The proposed regulation reflected all of the requirements of paragraph 5 of the FSA in requiring recreation and leisure time activities, including outdoor activities

when weather permits. The commenters did not explain why the FSA requirements are not sufficient to implement the FSA. Some commenters stated that children's time was being taken up by activities that kept them from their parents, but any activities outside the 1–3 hours required by the FSA are strictly voluntary on the part of both the parents and children in ICE facilities. It is unclear from the examples provided by the commenters which particular activities they believe were causing parents to feel that they were being deprived of time with their children and creating antisocial and suicidal tendencies in their children.

In response to the comment about "tent cities," DHS believes commenters are referring to HHS operations. The commenter may be addressing concerns regarding the Tornillo Influx Care Facility, which was closed and dismantled in January 2019. HHS notes that at no point did ORR house 13,000 UAC in "tent cities." HHS addresses concerns and comments on the Tornillo Influx Care Facility in its response below at "Procedures During an Emergency or Influx (45 CFR 410.209)."

The effects of trauma from the journey to the United States and detention in general are discussed in the trauma section.

Mental Health and Counseling (§ 236.3(i)(4)(vii) and (viii))

*Comments.* Several commenters expressed concern that the proposed regulations would not ensure appropriate mental health services. One commenter stated that detention facilities are not covered by HIPAA and thus social workers' notes may be used against the minors and their families in their deportation hearings when the children believe that the information will be kept confidential. This commenter pointed out that minors are unlikely to confide in social workers if they know that the information will not be kept confidential and this is detrimental to the minors' well-being and mental health. Another commenter stated that the proposed language could lead to fewer minors receiving counseling and a reduction in the length or quality of group counseling because the proposed language only requires a mental health wellness interaction and allows to be performed during other activities. The commenter also stated that the standards fail to require facilities to create appropriate rules and discipline standards and also fail to maintain the FSA limits of discipline standards.

Several commenters expressed concern that the FRCs would be unable

to provide adequate mental health services in a compassionate and responsive manner. One commenter stated that facilities must have mental health professionals that speak Spanish, have training in cultural diversity, and have experience with trauma. One commenter stated that meaningful access to trauma-informed mental health care, especially in the cases of sexual assault, is critical. A medical association recommended that each facility staff their leadership teams with psychiatrists to care for persons suffering post-traumatic symptoms and other migration-related syndromes of distress.

*Response.* In response to comments expressing concern over alleged lack of confidentiality of ICE detainee health records and the potential that some minors may forgo mental health treatment because of this concern, IHSC advises that, although ICE health records are not subject to the Health Insurance Portability and Accountability Act of 1996 (HIPAA), ICE detainee health records are kept confidential as a matter of policy, and access to such records is restricted. In most cases, a detainee's health information will not be released unless the detainee signs an Authorization to Disclose/Obtain Information from their health record. In addition, employees are required to sign and annually affirm a statement to protect and maintain the confidentiality and privacy of patient care information. While it is true that detainee health records may, in some instances, be disclosed without consent, this practice is authorized under the Alien Health System of Records Notice (SORN) [30] consistent with DHS's mission to fully execute its law enforcement and immigration functions. In addition, such disclosures are also permitted under certain limited routine uses identified in the SORN. Pursuant to the SORN, however, DHS notes that this information may only be released for a purpose consistent with the purpose of the initial information collection. Thus, concerns that detainee health records will somehow always be relevant to a minor's removal proceeding such that an immigration judge will allow routine use of such records as part of a removal case are purely speculative and unfounded.

With respect to the remaining concerns about the provisions related to mental health counseling, DHS notes that the proposed regulatory text mirrored Exhibit 1, paragraphs 6 and 7 of the FSA regarding individual and group counseling sessions. DHS added provisions to allow for assessments when minors refused to participate in counseling sessions and to combine the group sessions with other structured activities to remove the stigma of a "group counseling session" and encourage all minors to attend. DHS's years of experience have shown that too many minors decline to participate in counseling sessions when they are designated as such, and that children are more likely to participate in DHS group sessions are combined with other events. For those instances where children decline individual sessions, a mental health wellness interaction at least allows a counselor to do a wellness check and may be to get the minor to open up and have what professionals would call a counseling session. Adhering to the strict requirements of the FSA would not be workable, especially for teenagers who do not believe they will benefit from counseling.

## Contact With Relatives and Attorneys (§ 236.3(i)(4)(xi), (xii), (xiii), and (xv))

*Comments.* Several commenters expressed concerns about the complexity of communications with individuals in detention. One commenter stated that it is extremely complicated for individuals, particularly children, to make phone calls in the detention center to their non-detained family and/or attorney because the detainee must either make a collect call or purchase a calling card. This commenter also noted that there is no method for non-detained individuals, such as attorneys or parents of detained minors, to make a phone call to a child in DHS custody. Another commenter stated that minors in existing facilities have been denied the opportunity to talk to family on the phone. One commenter expressed concern that the language in section 236.3(i)(4) regarding a minor's right to communicate privately and visit with guests, family members, and counsel is too restrictive and qualifying. The commenter recommended that detained minors have the right to receive regular and frequent visits from family and friends in circumstances that respect the minor's needs for privacy, contact, and unrestricted communication.

One commenter stated that proposed § 236.3(i)(4)(xiii) inappropriately restricts a child's ability to communicate with adult relatives in the United States and abroad to legal issues only when it is deemed "necessary." This commenter noted that there is no definition of "necessary" or who makes that determination, and no justification for why detained minors should not universally be afforded visitation and contact with family members.

A foreign government wrote that, in accordance with the provisions of the Vienna Convention on Consular Relations, the proposed rule should grant access to consular officials to visit and interview alien children in the different stages of their processing.

*Response.* Non-secure, licensed ICE facilities must abide by standards that are set forth in 8 CFR 236.3(i)(4). A minor has the right to visitation and contact with family members, regardless of their immigration status. *See* 8 CFR 236.3(i)(4)(xi). DHS structures the visitation and contact with family members to encourage this visitation including requiring the staff at the ICE facility to respect the minor's privacy while reasonably preventing the unauthorized release of the minor and the transfer of contraband. A minor has a reasonable right to privacy in the facility which specifically includes the right to talk privately on the phone and visit privately with guests, as permitted by applicable facility rules and regulations. *See* 8 CFR 236.3(i)(4)(xii)(C) and (D). In addition to the right to talk privately on the phone, the DHS regulations specifically note that when necessary, arrangements will be made for communication with adult relatives living in the United States and in foreign countries regarding legal issues related to the release and/or removal of the minor. *See* 8 CFR 236.3(i)(4)(xiii). A commenter expressed concern about the "when necessary" language, but that language is used to convey that in most cases there would not be a need to communicate with other adult relatives because the minor is in custody with his or her parent. But nevertheless, if there is such a need it can be accommodated. Additionally, the minor has the right to receive and send uncensored mail unless there is a reasonable belief that the mail contains contraband. *See* 8 CFR 236.3(i)(4)(xii)(E). All residents at FRCs have access to the internet to receive and send email.

One commenter stated that the regulations should grant access to consular officials to visit and interview minors in the different stages of their processing. The Vienna Convention on Consular Relations notes that consular functions include helping and assisting nationals, both individual and corporate, of the sending State; safeguarding the interests of minors; and representing or arranging appropriate representation for nationals of the sending State before tribunals and other authorities of the receiving State. *See* Article 5(e), (h), and (i). In addition, the

---

[30] DHS/ICE–013 Alien Health Records System, *see* 83 FR 12015 (Mar. 19, 2018).

Convention states that consular officers shall be free to communicate with nationals of the sending State and to have access to them; that the receiving State shall inform the consular post, if the national of the sending State so requests, of their detention; and that consular officers shall have the right to visit a national of the sending State who is in prison, custody or detention to converse and correspond with the national and to arrange their legal representation. *See* Article 36. DHS is compliant with the Vienna Convention on Consular Relations and does not believe any changes need to be made to the text of the regulations to accomplish this.

Access to Legal Services
(§ 236.3(i)(4)(xiv) and (xv))

*Comments.* Multiple commenters objected to the proposed rule on the ground that it would provide fewer legal protections for minors who may not understand the concept of the rights they are asked to waive, including an example of a five year old signing away her rights. One commenter asserted that minors must be provided with access to legal representation because children are the most vulnerable individuals in society with the most to lose and their human rights will otherwise be violated. Another commenter noted that children should never be presumed a threat to our society and that expecting minors to make legal arguments without an attorney is unreasonable and unacceptable when their liberty is at stake.

Several commenters expressed concern that the proposed rule would fail to provide minors with adequate access to legal services. Many commenters were concerned about how minors in detention centers would obtain access to legal services and whether minors were being properly apprised of their legal rights. Several commenters stated that minors would not have access to adequate legal services because most detention centers are located in rural and remote areas of the country where there is limited access to qualified immigration legal assistance. A commenter noted that non-profit organizations that provide pro bono immigration services to minors have encountered logistical difficulties accessing minors in detention and more resources must be allocated for each client.

Multiple commenters stated that numerous studies and data show that detention significantly raises barriers to access to legal counsel, but that legal representation was critical to obtaining relief before an immigration judge. One

commenter cited research explaining that in Houston from 2007–2012, 13 percent of detained respondents had counsel as opposed to 69 percent of those that were not detained. This commenter noted that immigrants without counsel are significantly more likely to be ordered removed than those with representation and cited supporting data including one study that stated that individuals without attorneys were granted relief at a rate of 4 percent compared to when all indigent immigrants in removal proceedings were provided attorneys and the rate increased to 48 percent.

Some commenters stated that the proposed rule improperly eliminates FSA provisions requiring class counsel's right to attorney-client visits for all types of placements and counsel's right to access facilities where minors have been placed. Another commenter stated that paragraph 32(A) of the FSA provided access to counsel to all children in custody including those whom counsel may not have met before the visit and expressed concern that the proposed regulations do not contain comparable language. One commenter recommended that the proposed rule should guarantee that minors will be permitted to visit with their attorney, child advocate, or other persons necessary for their representation, any day of the week, including holidays, and that such visits should be permitted at any time during the period of at least eight hours a day.

*Response.* DHS ensures that all minors know of their rights including their right to access counsel by providing them with this information during processing and when they are admitted to a detention facility.

Every minor who enters DHS custody, including minors and UACs who request voluntary departure or request to withdraw their application for admission, will be issued a Form I–770, Notice of Rights and Request for Disposition. *See* 8 CFR 236.3(g)(1)(iv). The Form I–770 includes a statement informing the minor or UAC that they can make a telephone call to a parent, close relative, or friend. This is to ensure that the minor or UAC can contact an individual who has their best interest in mind because, as the above commenter states, children are the most vulnerable individuals in society. Additionally, to make sure that the minor properly understands their rights, proposed § 236.3(g)(1)(i) required the notice to be read and explained to the minor or UAC in a language and manner he or she understands if it is believed (based on all available evidence) that the minor is less than 14 years old or is

unable to understand the information. As explained above, DHS is changing this section such that the notice will be provided, read, or explained to *all* minors and UACs in a language and manner that they understand. Every minor who is not a UAC transferred to or who remains in a DHS facility will also be advised of their right to judicial review and will be provided with a current list of free legal service providers. *See* 8 CFR 236.3(g)(1)(ii) and (iii).

Additional protections support the right to counsel. Upon admission to a non-secure facility, a minor is provided with a comprehensive orientation including information about the availability of legal assistance, the availability of free legal assistance, the right to be represented by counsel at no expense to the Government, the right to apply to asylum or to request voluntary departure, and the right to attorney-client visits in accordance with applicable facility rules and regulations. *See* 8 CFR 236.3(i)(4)(ix), (xiv), and (xv). Minors in secure facilities are also permitted attorney-client visits in accordance with applicable facility rules and regulations. *See* 8 CFR 236.3(i)(2). The Family Residential Standards require access to counsel.

Regarding one commenter's example of a five-year old child signing a legal document that deprived her of her rights, the example may be referring to a *New Yorker* article about a child who signed an ORR form to indicate she did not need a custody hearing before an immigration judge as allowed for by paragraph 24 of the FSA.[31] This example does not speak to DHS custody of children, but HHS has responded to all substantive comments about its proposal to replace custody determination hearings before immigration judges with independent, internal HHS proceedings at section 410.810 of this rule. With respect to this specific example, HHS notes that both custody hearings under the FSA and the proposed internal hearings under this rule are only for UACs whom ORR will not discharge solely because they would be a danger to community. ORR did not consider the child in the article to be a danger to self or others, nor would it consider any five-year old in its care to be a danger.

Technical Drafting

*Comments.* One commenter noted that § 236.3(i) lists, as an exception to the least restrictive setting requirement,

<hr>

[31] *Available at https://www.newyorker.com/news-desk/the-five-year-old-who-was-detained-at-the-border-and-convinced-to-sign-away-her-rights.*

"the need to ensure the minor's timely appearance before DHS and the immigration courts" and cross-references 6 CFR 115.14 in doing so. The commenter noted that no such language is included in 6 CFR 115.14, and the group recommended striking the referenced language, as it appears to prioritize appearances before DHS over the minor's special needs and well-being.

*Response.* DHS notes that 6 CFR 115.14 states that minors shall be detained in the least restrictive setting in accordance with the applicable laws, regulations, or legal requirements. FSA paragraph 14, which this section of the rule implements, recognizes that the Government has the authority to detain minors if it is necessary to secure the minor's timely appearance before the Government or the immigration court, or to ensure the minor's safety or that of others. DHS declines to amend this section.

Prison-Like Conditions

*Comments.* Multiple commenters stated that the proposed standards would result in conditions similar to prisons and that such conditions were inappropriate for minors. These commenters noted that prison-like facilities are antithetical to the healthy development of children and undermines the ability of parents to properly care for and nurture their children. Several commenters noted that it was never appropriate to place minors in prisons, jails, cages, or freezers and that the FSA explicitly prohibits jail-like conditions for minors.

One commenter said that, nevertheless, facilities for minors required badge checks three times a day, used electronically locked doors for access to basic areas such as the library, and limited and monitored access to telephones and email. Other commenters said that the detention standards would severely restrict the movement and freedom of minors, regulate meal breaks, and result in disruptive bed-checks every 15 minutes at night. They note that "non-secure" as defined in the regulation does not mean that families can come and go as they please, but rather that only one small portion of the facility must be unlocked.

*Response.* DHS does not put children in jails, prisons, cages, or freezers. Pursuant to § 236.3(i), when minors who are not UACs are detained in DHS custody (that is, when minors are detained together with their parents or legal guardians in a FRC), the minors shall be detained in the least restrictive setting appropriate to the minor's age and special needs. Unless a secure facility is

authorized under § 236.3(i), the minor will be placed in a licensed, non-secure facility. A non-secure facility means that a facility either meets the definition of non-secure in the State in which the facility is located or if no such definition exists under state law, a DHS facility is deemed non-secure if egress from a portion of the facility's building is not prohibited through internal locks within the building or exterior locks and egress from the facility's premises is not prohibited through secure fencing around the perimeter of the building. *See* 8 CFR 236.3(b)(11). All FRCs allow families open access during the day to libraries, gymnasiums, and other activities, and access to snacks and telephones in their living areas at all hours.

Although DHS maintains that its FRCs have been and continue to be non-secure, the comments received on this point demonstrate that DHS could take additional steps to ensure the public that DHS has no intention of running FRCs as secure facilities. To that end, DHS will be adding additional points of egress to the Dilley and Karnes facilities by September 30, 2019.

Changes to Final Rule

In response to comments, DHS adds additional language from FSA Exhibit 1 to the regulatory text at 8 CFR 236.3(i)(4).

10. Release of Minors From DHS Custody (§ 236.3(j))

Summary of Proposed Rule

The terms contained in paragraph (j)(1) permitted release of a minor only to a parent or legal guardian who is available to provide care and custody, in accordance with the TVPRA, using the same factors for determining whether release is appropriate as are contained in paragraph 14 of the FSA, once it is determined that the applicable statutes and regulations permit release. Included in the relevant factors typically is consideration of whether detention is "required either to secure his or her timely appearance before [DHS] or the immigration court, or to ensure the minor's safety or that of others."

The terms contained in paragraph (j)(2) required DHS to use all available evidence, such as birth certificates or other available documentation, to ensure the parental relationship or legal guardianship is bona fide when determining whether an individual is a parent or legal guardian. Additionally, the terms contained in this sub-paragraph required DHS to treat a juvenile as a UAC and transfer him or

her into HHS custody, if the relationship cannot be established.

The terms contained in paragraph (j)(3) required DHS to assist with making arrangements for transportation and maintaining the discretion to provide transportation to the DHS office nearest the parent or legal guardian, if the relationship is established, but the parent or legal guardian lives far away.

The terms contained in paragraph (j)(4) required DHS to not release a minor to any person or agency whom DHS has reason to believe may harm or neglect the minor or fail to comply with requirements to secure the minor's timely appearance before DHS or the immigration court.

Public Comments and Response

*Comments.* Commenters generally disagreed with DHS's assertion that it does not have the authority to release a minor to anyone other than a parent or legal guardian. Several commenters expressed concern that the proposed changes codify family separation by not requiring DHS to consider releasing a parent and child simultaneously. Several commenters pointed to what they generally perceived as flaws in DHS's interpretation of the FSA's "general policy favoring release" as well as the requirement to release minors "without unnecessary delay."

• Restricting Release to Parents and Legal Guardians Only

*Comments.* Many commenters expressed concern about restricting release of minors from DHS custody to parents and legal guardians. These commenters pointed to paragraph 14 of the FSA and the current language of 8 CFR 236.3, both of which articulate that minors may currently be released to parents, legal guardians, as well as other "adult relatives." These commenters stated that restricting release to parents and legal guardians will increase the likelihood of family separation and detention time.

A significant number of commenters expressed concern that the TVPRA did not justify changing the conditions imposed by paragraph 14 of the FSA with regard to families with children, because the TVPRA only addresses unaccompanied children. These commenters further noted that a District Court has held that the TVPRA is not inconsistent with the FSA, and the government abandoned its appeal.[32]

Multiple commenters asked DHS to provide a more detailed justification to

---

[32] *Flores* v. *Johnson,* 212 F. Supp. 3d at 868–869; *Flores* v. *Sessions* 2018 U.S. App. LEXIS 20461 (9th Cir. Cal. Apr. 27, 2018).

explain why DHS does not have the legal authority to release children to anyone other than a parent or legal guardian, especially in light of rigorous suitability assessments. One of these commenters asserted that "circular citations" in the NPRM made it difficult to assess the rationale behind changing this provision. Other commenters stated that there is evidence indicating that placing a child with extended family members when parental custody is not viable results in improved outcomes for children and that doing so is preferable to detaining children in government custody for an undetermined amount of time.

Multiple commenters stated that the proposed changes create an inconsistency between DHS and HHS release procedures. These commenters stated that it makes no sense for DHS to separate a child from his or her parent, re-designate that child as a UAC, and transfer the child into HHS custody, only to have HHS potentially release that same child to an adult relative sponsor. They questioned why DHS could not simply maintain existing procedures and release minors to adult relatives, as appropriate.

A commenter stated that children who do not have a parent or legal guardian to whom they can be released often have a stronger defense against removal, including but not limited to eligibility for Special Immigrant Juvenile status. One commenter stated that restricting release to parents and legal guardians goes against common cultural practices in other parts of the world where extended family members play a prominent role in providing care and custody of children. Another commenter stated that many refugee children do not have parents in-country and disallowing extended family members from accepting immigrant minors would keep many refugee children in detention unnecessarily.

Multiple commenters expressed concern about DHS not implementing paragraph 15 of the FSA, which according to commenters, allows a parent to appoint a guardian with a notarized affidavit. One of these commenters stated that discontinuing the use of affidavits allowing parents to approve release of their child to an adult relative unnecessarily limits the options available and goes against the FSA's general policy favoring release.

However, one commenter expressed support for the proposed changes and stated that given high absconder rates for minors and UACs, releasing minors to parents or legal guardians places the child in the best position to prepare for immigration proceedings. This commenter noted that the HSA and TVPRA supersede the FSA and therefore DHS does not have statutory authority to release minors to anyone other than parents, legal guardians, or HHS.

• Simultaneous Release of Parent and Child

*Comments.* Several commenters stated that the proposed changes further codify family separation by eliminating the current requirement that DHS consider releasing a parent and child simultaneously. One commenter pointed Supreme Court's opinion in *Flores* v. *Reno,* in which the majority stated, "[t]he parties to the present suit agree that the [INS] must assure itself that someone will care for those minors pending resolution of their deportation proceedings. That is easily done when the juvenile's parents have also been detained and the family can be released together." This commenter questioned how DHS and HHS can justify departing from the Supreme Court's opinion under the proposed regulations.

One commenter expressed concern that eliminating current requirements to consider simultaneous release of parent and child will lead to either longer detention time for children and/or increased instances of family separation. Other commenters said the proposed changes go too far and eliminate the required evaluation, thereby reducing the likelihood of discretionary exercises of this existing authority. Another commenter stated that forcible separation of children from their parents is generally considered a war crime, or at least morally reprehensible.

• FSA's "General Policy Favoring Release"

*Comments.* Several commenters expressed concern about the proposed changes not adhering to the FSA's general policy favoring release and family reunification. Another commenter stated that the proposed regulations codify a change from the FSA's general policy favoring release to indefinite detainment. Another commenter expressed concern about longer detention times and costs. This commenter cited a report noting that the Tornillo detention center began operating in June 2018, expanded from 1,200 to 3,800 beds, and now has an estimated monthly cost of $100 million.[33] A commenter expressed concern that the proposed changes contradict Congressional intent that children are to be reunified with a sponsor in the best interest of the child and in the "least restrictive" placement.[34] This commenter stated that the existing regulatory language comports with the fundamental right to family unity, whereas the proposed changes would interfere with this right.

• FSA's Requirement To Release Children "Without Unnecessary Delay"

*Comments.* Several commenters stated that the proposed changes would delay release and prolong institutionalization swelling an already overburdened HHS shelter system. For example, one expressed concern that parents will not be incentivized to come forward and sponsor their child once they are transferred to HHS, further adding to increased detention times for children. This commenter pointed to an April 2018 Memorandum of Agreement between DHS and HHS requiring the collection of sponsor fingerprints for the purposes of immigration enforcement. Another commenter stated that the proposed changes are at odds with paragraph 14 of the FSA which is the heart of the settlement's protections requiring DHS and HHS to release children without unnecessary delay. A commenter stated this would lead to long detention, placement in long-term foster care, or detention fatigue, potentially forcing a child to accept voluntary departure and risk re-exposure to the danger he or she fled from in the first place, rather than being able to pursue relief in the United States for which the child may qualify.

*Response.* DHS maintains its position that the FSA, when originally drafted, was never intended to apply to alien minors who were accompanied by their parents or legal guardians. DHS has also found that balancing its enforcement of immigration laws with its obligations to comply with the FSA as the courts have interpreted the Agreement has presented significant operational challenges. Nevertheless, this rule provides for the release of both accompanied minors and UACs, through the existing statutes and regulations, in a way that complies with the intent of the FSA, while allowing DHS to fulfill its statutory requirements.

The TVPRA mandates that the care and custody of UACs is solely the domain of HHS. Absent exceptional circumstances, DHS is required to transfer UACs to HHS within 72 hours of determining that an individual is a UAC. By definition, a UAC is a child

---

[33] Summary of Proposed Regulations Regarding Children and Immigration Detention, National Immigration Forum, *https://immigrationforum.org/article/summary-of-proposed-regulations-regarding-children-and-immigration-detention/* (last visited Nov 6, 2018).

[34] *See* 8 U.S.C. 1232(b)(4).

who has no lawful immigration status in the United States, has not attained 18 years of age, and with respect to whom there is no parent or legal guardian in the United States or no parent or legal guardian in the United States is available to provide care and physical custody. 6 U.S.C. 279(g)(2). If a juvenile is encountered with the juvenile's parent or legal guardian, DHS is likely to consider the group a family unit and is unlikely to consider the juvenile a UAC. However, if the parent or legal guardian is required to be detained in a setting in which he/she cannot provide care and physical custody of that juvenile, for instance in criminal custody, the juvenile may become a UAC by operation of law.

If the juvenile becomes a UAC, DHS no longer has the legal authority to provide for the care and custody of the juvenile and must transfer the juvenile to HHS. Because DHS has no authority to provide for the care and custody of UACs, DHS cannot release a UAC but instead must transfer a UAC to HHS.

Regarding commenters' concerns about the implementation of paragraph 15 of the FSA, DHS notes that paragraph 15 does not provide a means by which a parent can appoint a guardian; rather, it requires that a potential sponsor sign an affidavit of support. With respect to the Tornillo facility, DHS notes that it is an HHS facility and § 236.3 does not apply to HHS facilities.

Upon consideration of the comments, however, DHS now agrees that DHS is not statutorily barred by the HSA and TVPRA from releasing a non-UAC minor to someone other than a parent or legal guardian. DHS acknowledges that this interpretation of the law differs from the interpretation DHS represented to the U.S. Court of Appeals for the 9th Circuit in recent litigation,[35] but after considering the comments received on this rulemaking and further reviewing the language of the HSA and the TVPRA, DHS has determined that this revised interpretation of these statutes is the best reading of them, and that allowing for such releases here is necessary and appropriate.

The current text of 8 CFR 236.3(b) permits release of a juvenile to an adult relative, specifically a brother, sister, aunt, uncle, or grandparent, who is not presently in detention. DHS believes that release of non-UAC minors to these other adult relatives may be lawful and appropriate in certain circumstances, provided that the Government has no concerns about the minor's safety upon such release, and it has no concerns

about the adult relative's ability to secure the non-UAC minor's timely appearance before DHS or the immigration courts. However, DHS will maintain a presumption for keeping minors with parents or legal guardians. Any release of a non-UAC minor to an adult relative other than a parent or legal guardian will be within the unreviewable discretion of DHS. DHS notes that the TVPRA and HSA provisions that apply to UACs cannot be superseded by the FSA or by existing regulations. The court decisions cited by commenters state that the TVPRA and HSA do not supersede the FSA solely as to the point that the FSA applies to both minors and UACs, and the Government is currently appealing these decisions.

DHS reiterates that it does not hold minors for extended periods of time without their parents or legal guardians, unless these minors are subject to secure detention. Regarding the comments about the FSA generally favoring release, DHS must release minors pursuant to the existing statutes and regulations; this includes release on parole. Consistent with the language of paragraph 14 of the FSA, DHS will consider parole for all minors in its custody who are eligible, and such consideration will include whether the minor presents a safety risk or risk of absconding. DHS believes that paroling such eligible minors detained pursuant to INA 235(b)(1)(B)(ii) or 8 CFR 235.3(c) who present neither a safety risk or risk of absconding will generally present an urgent humanitarian need. For more general concerns about parole, see the discussion above regarding § 212.5.

*Changes to Final Rule*

Accordingly, DHS amends its proposed regulatory text in 8 CFR 236.3(j) to not preclude release of a non-UAC minor to an adult relative (brother, sister, aunt, uncle, or grandparent) who is not in detention and is available to provide care and physical custody. Such release, if deemed appropriate, will be effectuated within the discretion of DHS. DHS also adds paragraph (j)(4) stating that DHS will consider parole for all minors who are detained pursuant to section 235(b)(1)(B)(ii) of the INA or 8 CFR 235.3(c) and that paroling such minors who do not present a safety risk or risk of absconding will generally serve an urgent humanitarian reason, and may also consider the minor's well-being. Lastly, DHS adds that it may consider aggregate and historical data, officer experience, statistical information, or any other probative information in making these determinations.

11. Procedures Upon Transfer § 236.3(k)

*Summary of Proposed Rule*

DHS proposed revisions to § 236.3(k) state that all minors or UACs transferred from one ICE placement to another will be transferred with all possessions and legal property. The proposed regulations added that a minor or UAC will not be transferred until a notice has been provided to their counsel, except in an unusual or compelling circumstance.

*Public Comments and Response*

*Comments.* One commenter commented that the requirements for providing notice to counsel prior to transferring a UAC or minor do not align with the ABA UC Standards, which recommends both oral and written notice to the child and his or her attorney prior to transfer to include, (1) the reason for transfer; (2) the child's right to appeal the transfer; and (3) the procedures for an appeal.

The ABA UC Standards further recommend that the notice include the date of transfer and the location, address, and phone number of the new detention facility, and the commenter urged DHS to include these provisions in the rule.

The commenter also raised a concern with the use of the terms "unusual and compelling circumstance" without further guidance. The commenter suggested that DHS adopt the language from the ABA UC Standards, which define "compelling and unusual circumstances" as the child posing an immediate threat to himself or others or the child posing an escape risk. A state agency similarly commented that the exception to providing prior notice to counsel in "unusual and compelling circumstances" is too broad and will "result in arbitrary and capricious application." Finally, a commenter urged DHS to include language from the ABA UC Standards addressing a right to an independent review of a transfer decision that places the burden of persuasion that a transfer is necessary on DHS and allows a dissatisfied minor or UAC to seek further *de novo* review in Federal court.

*Response:* DHS declines to adopt this suggestion to adopt the ABA UC standards because the standards impose requirements on DHS that exceed what the FSA requires and may place an undue burden on DHS operations or compromise the security of UACs and/or minors or DHS personnel and facilities. The proposed regulation at § 236.3(k) incorporates the transfer standards required by the FSA, as amended to account for the changes in law made by the HSA and TVPRA.

---

[35] *See* Brief for Appellants, *Flores* v. *Sessions,* No. 17–56297 (9th Cir. Jan. 5, 2018).

The FSA does not require DHS to provide notice of the transfer of a UAC or minor to anyone other than legal counsel. The FSA does not specify the form in which notice be provided nor does it specify that any other details (*i.e.,* date of transfer, location, address and phone number of new facility) must be disclosed. The FSA does not require DHS to provide an explanation of the reasons for a transfer or provide a process of administrative review and appeal of DHS's decision to transfer a UAC or a minor. However, paragraph 24B of the FSA provides a UAC or minor an opportunity to challenge that placement determination by seeking judicial review in any U.S. District Court with jurisdiction and venue over the matter, and the proposed regulation in § 236.3(g)(1)(ii) and (iii) provide that minors will receive notice of his or her right to judicial review, as well as be provided with the free legal service provider list.

DHS notes that the commenter's concern about the use of the term "unusual and compelling circumstances" without further guidance is misplaced, because the term is taken from paragraph 27 of the FSA. Paragraph 27 provides guidance on what could be "unusual and compelling circumstances," including "where the safety of the minor or others is threatened, or the minor has been determined to be an escape-risk, or where counsel has waived such notice." FSA paragraph 27. These illustrative definitions are included in proposed regulation § 236.3(k).

DHS declines to adopt the commenter's suggestion to substitute "unusual and compelling circumstances" as defined in the FSA with the ABA's definition of "compelling and unusual circumstances"; namely: "i. the Child poses an immediate threat to himself or others; or ii. the Custodial Agency has made an individualized determination that the Child poses a substantial and immediate escape risk." UC Standards section VII.H.2.c. By imposing a heightened standard of danger and escape risk to trigger the exception, the UC Standard definition potentially exposes the UAC or minor and others to a risk of harm or flight that was otherwise mitigated in the FSA. The definition is also unworkable as applied to DHS, because the UC Standards define "Custodial Agency" to exclude an Immigration Enforcement Agency. The UC Standards definition places undue burden on DHS operations and compromises the security of UACs and/or minors and DHS personnel and facilities.

Changes to Final Rule

Accordingly, DHS declines to amend the proposed regulatory provisions regarding monitoring based on public comments, and adopts the language proposed in the NPRM through this final rule.

12. Notice to Parent of Refusal of Release or Application for Relief § 236.3(l)

Summary of Proposed Rule

DHS proposed to move and clarify current regulatory provisions in § 236.3(e) and (f) to a new § 236.3(l) to state that a parent shall be notified if a minor or UAC in DHS custody refuses to be released to his or her parent; or if the minor or UAC request any type of relief from DHS that would terminate the parent-child relationship, or the rights or interest are adverse to that of the parent(s). The proposed regulation balances the minor's or UAC's desire to take an action adverse to the wishes of his/her parent with the parent's or legal guardian's right to be notified and present their views to DHS, especially if the adverse action would terminate the parent-child relationship. The proposed regulatory text, as with existing regulations, does not allow the parent to request a hearing on the matter before an immigration judge.

Public Comments and Response

*Comments.* One commenter stated that the provision does not meet the stated purpose of this rulemaking because it does not implement the FSA, TVPRA, or HSA, but rather continues this dated provision. Several commenters stated that the proposed language does not explain how DHS will determine when a grant of relief will effectively terminate an inherent interest in a parent-child relationship or how DHS will determine when a child's rights and interests are adverse to the parents' rights and interests. One commenter is also worried that there is no provision in the proposed regulation about how DHS would determine whether such notification is prohibited by law or would pose a risk to the minor's safety or well-being. Another commenter urged a right to appeal.

When the original regulations were promulgated, the INS adjudicated applications and had custody of the children. Some commenters believe that ICE and CBP inherently lack the knowledge needed to understand the risks of revealing the type of application filed by a minor because neither organization knows about the content of immigration applications and might inadvertently put the child at risk or

thwart the child's ability to obtain humanitarian relief. These commenters suggest that the complex nature of the issues raised by this provision underscore the need for appointed counsel in immigration proceedings.

Several commenters recommended that DHS be required to appoint an independent advocate to be appointed for each child; one who represents the individual child's best interest and legal needs through the maze of bureaucracy.

*Response.* DHS has determined that the language of this provision is sufficiently detailed to guide decision-makers and that any further detailed explanation of terms is more appropriate for guidance documents and policies. Given DHS's experience that many legal representatives vigorously advocate for children in immigration proceedings, DHS declines to commit to appointing an independent child advocate at this time.

Changes to Final Rule

DHS declines to expand the provisions of 8 CFR 236.3(l) to provide a detailed explanation of the meaning of the terms in this paragraph.

13. Bond Hearings § 236.3(m)

Summary of Proposed Rule

DHS's proposed revisions to § 236.3(m) state that bond hearings are only applicable to minors who are in removal proceedings under INA 240, to the extent permitted by 8 CFR 1003.19, and who are in DHS custody. DHS has also removed the term "deportation proceeding" from the existing regulation and updated the language with bond hearings to be consistent with the changes in immigration law. The proposed rule also adds language to specifically exclude certain categories of minors over whose custody immigration judges do not have jurisdiction.

Public Comments and Response

*Comments.* Several commenters wrote about the proposal to update the provision for bond hearings under DHS proposed 8 CFR 236.3(m) and HHS proposed 45 CFR 410.810. Because both provisions related to paragraph 24(A) of the FSA, comments sometimes transitioned fluidly between being directed toward DHS and HHS. The comments submitted can be grouped into two main categories: (1) That the changes to the bond hearing provision are incompatible with the text of the FSA and case law interpreting it and (2) that such changes raise due process concerns.

The most frequent comment was that the proposed transition of bond hearings from an immigration court to an

administrative setting does not comply with the FSA and applicable case law. The commenters reasoned that paragraph 24(A) of the FSA requires minors in deportation proceedings to be afforded a bond redetermination hearing before an immigration judge in every case. They further pointed to the decision in *Flores* v. *Sessions,* 862 F.3d 863 (9th Cir. 2017), as evidence that the Ninth Circuit, in interpreting and applying the FSA had already ruled against the government when it argued that the limiting of bond hearings applied to minors in DHS custody only. Many of the commenters pointed to a quote from the court's decision discussing how the hearing is a ''forum in which the child has the right to be represented by counsel, and to have the merits of his or her detention assessed by an independent immigration judge.'' Another commenter also wrote that the TVPRA and the HSA do not supersede the FSA or allow for inconsistent standards, which the commenter believed would result from the implementation of the proposed rule.

Many commenters wrote that the change threatened the due process rights of UACs. They stated that the proposed rule reverses a child's right to a bond hearing and instead creates an agency-run administrative process that poses threats to due process. These commenters wrote that as a matter of policy, immigration judges are best suited to rule on UAC bond hearings, as they have the relevant background and knowledge base to understand the situation and determine the appropriate course of action. Some of these commenters objected to the standard of proof required in bond hearings and said it should be by clear and convincing evidence. They reasoned that the clear and convincing evidence standard governs almost all civil detentions, with the exception of immigration detention, and a higher standard of proof should be applied where children's rights are at stake. Similarly, one commenter stated that the burden should never be on the child to show that he or she is not a danger to the community or a flight risk and asked that the burden be on the government, not the minor. Commenters also suggested that children and families should have access to legal counsel throughout the ''immigration pathway'' and that alternatives to detention, specifically ''community-based case management'' should be the government's default policy. Another commenter wrote urging the appointment of child advocates, hearings within 48 hours of request by

child or counsel, and procedures to ensure that all minors are informed of their right to request review of continued detention.

Some commenters who differentiated between the provisions applicable to DHS and HHS, supported or acknowledged that proposed 8 CFR 236.3(m) maintained the process required by FSA paragraph 24(A). One commenter wrote in support of proposed 8 CFR 236.3(m) because the provision clarifies that minors detained in DHS custody but *not* in section 240 proceedings are ineligible to seek review by an immigration judge of their DHS custody determination, consistent with the TVPRA. Other commenters did not explicitly endorse the provision, but acknowledged that it provided the protections and processes required by the FSA.

*Response.* For responses to comments relating to the HHS proposed hearings in 45 CFR 410.810, please see below in the HHS section by section comment analysis under § 410.810.

DHS agrees with commenters that the proposed regulatory text at 8 CFR 236.3(m) reflects the requirements of the FSA regarding existence of bond redetermination hearings for minors in DHS custody who are in removal proceedings pursuant to INA 240. The understanding that the term ''deportation hearings'' in paragraph 24(A) of the FSA refers to what are now known as removal proceedings has been reiterated throughout the *Flores* litigation. *See* Order Re: Plaintiff's Motion to Enforce at 2 n.2, *Flores* v. *Sessions,* No. 85–4544, (C.D. Cal. Jan. 20, 2017) (''The Court will therefore treat ''deportation proceedings'' as written in the *Flores* Agreement as synonymous with ''removal proceedings.''); *see also Flores* v. *Sessions,* 862 F.3d 863, 869 n.5 (9th Cir. 2017) (''Administrative removal proceedings to determine a non-citizen's right to remain in the United States have been re-designated as 'removal' rather than 'deportation' under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. 104–208, 110 Stat. 3009 (1996)''). Accordingly, the terms of FSA paragraph 24(A) requires bond redetermination hearings solely for those aliens who are in removal proceedings under INA 240 and who are otherwise entitled to bond under relevant Executive Office for Immigration Review regulations. Minors who are in proceedings other than removal proceedings under INA 240 (*i.e.,* expedited removal proceedings) are not entitled to bond hearings under the FSA. Under the INA, minors in

expedited removal proceedings are not afforded bond hearings; rather, DHS may parole such aliens on a case-by-case basis. *See* INA 235(b)(1)(B)(iii)(IV); Order Re: Motion to Enforce and Appoint a Special Monitor at 23, *Flores* v. *Sessions,* No. 85–4544 (C.D. Cal. June 27, 2017). DHS also notes that arriving aliens, even those in section 240 proceedings, are not entitled to bond. *See* INA 235(b)(2)(A); 8 CFR 1003.19(h)(2)(i)(B). DHS, therefore, will maintain the proposed language of 8 CFR 236.3(m) in this final rule.

DHS reiterates that the provision applies to minors in DHS custody; DHS has no authority to regulate custody determinations for individuals in the custody of another agency. *See generally* INA 103(a)(3); 5 U.S.C. 706(2)(c) (considering agency regulations that are ''in excess of statutory jurisdiction'' to be unlawful). In accordance with the relevant savings and transfer provisions of the HSA, *see* 6 U.S.C. 279, 552, 557; *see also* 8 U.S.C. 1232(b)(1), the ORR Director now possesses the authority to promulgate regulations concerning ORR's administration of its responsibilities under the HSA and TVPRA. Commenters who disagree with DHS's limiting proposed 8 CFR 236.3(m) to minors in DHS custody cite to a case relating to UACs and seem to disregard the distinction between DHS's proposed 8 CFR 236.3(m) and HHS' proposed 45 CFR 410.810 custody redetermination regulations for UACs. The commenters aver that minors other than those in DHS custody are entitled to individualized custody hearings. Though it is true under governing case law that paragraph 24(A) applies to both accompanied and unaccompanied minors in removal proceedings such that those aliens are entitled to individualized custody assessments, proposed 8 CFR 236.3(m)—as a DHS regulation—cannot extend to the cases of UACs in ORR custody. The paragraph expressly applies only to ''*minors in DHS custody;*'' by its terms, the group covered in this regulation does not overlap with the group addressed in the Ninth Circuit's 2017 *Flores* decision. The Departments refer commenters to HHS' response below, with respect to the hearings under 45 CFR 410.810. Though DHS and HHS hearings are separate and distinct from one another, both Departments are issuing regulations that are consistent with the FSA, HSA, and the TVPRA, and are justified by the different roles of each agency.

Proposed § 236.3(a)(1) codifies the FSA's general policy statement, found in paragraph 11 of the FSA, that minors and UACs in DHS custody shall be

treated with dignity, respect, and special concern for their particular vulnerability. The proposed language at § 236.3(m) does not represent a shifting in the burden of proof applicable in bond proceedings for minors in DHS custody. Aliens in DHS custody who are seeking bond have the burden to show that they do not present a danger or flight risk. *See Matter of Guerra,* 24 I&N Dec. 37, 40 (BIA 2006). Immigration Judges have broad discretion in determining whether an alien merits release on bond. *See id.* But the regulations maintain language from the FSA provision which specifies that a minor be given notice of the right to judicial review in the United States District Court.[36] Thus, the proposed language does not represent a shift from current practices.

Moreover, minors in DHS custody are accorded rights in bond proceedings that extend to aliens generally. An alien in DHS custody who is otherwise entitled to bond may seek a bond hearing before an immigration judge prior to the filing of the Notice to Appear containing the charges of removability. An alien may submit evidence and present arguments as to whether his or her release is authorized under the immigration laws and whether he or she merits release as a matter of discretion. An alien may be represented by an attorney or other representative of his or her choice at no expense to the government; Congress has not provided for government-funded counsel in bond proceedings, or in fact, in any immigration proceedings. Minors subject to 236.3(m) are necessarily not UACs without a parent or legal guardian in the United States available to provide for their care and physical custody. Moreover, bond hearing standards are not so complicated that many minors without representation would be unable to participate in a bond hearing with the assistance of an immigration judge. Aliens may appeal bond redetermination decisions made by an immigration judge to the Board of Immigration Appeals and are informed of their right to review. *See* 8 CFR 1236.1(d)(4); 1003.19(f).

*Changes to Final Rule*

DHS declines to amend the proposed regulatory provisions regarding bond hearings based on public comments.

---

[36] As previously stated, the rule does not itself provide for the right to judicial review as a regulation cannot vest Federal courts with jurisdiction.

14. Retaking Custody of a Previously Released Minor § 236.3(n)

*Summary of Proposed Rule*

DHS proposed revisions to § 236.3(n) to state that if a minor is an escape-risk (as defined at § 236.3(b)(6)), a danger to the community or has a final order of removal, DHS may take the minor back into custody. The proposed regulation adds language to explain that if the minor no longer has a parent or legal guardian available to provide care and physical custody, the minor will be treated as a UAC and DHS will transfer him or her to the custody of HHS.

*Public Comments and Response*

*Comments.* Several commenters discussed § 236.3(n) in the proposed rule, which would provide for DHS to retake custody of a child when there is a material change of circumstances indicating the child is an escape risk, a danger to the community, or has a final order of removal. Several commenters expressed concern that § 236.3(n) is overly broad, is inconsistent with the FSA, or does not include adequate procedural safeguards to protect a child's rights.

One commenter stated that neither the FSA nor the current regulations provide for retaking custody of previously released juveniles if a juvenile becomes an escape-risk, becomes a danger to the community, or receives a final order of removal after being released. The commenter stated that this violates the FSA and lacks any limitations or procedural safeguards, including any independent review of the decision to retake custody of a child following release from ORR. The commenter additionally suggested, without providing any data to support this, that for-profit detention facilities would benefit from this as it would increase the number of detained persons and DHS could use the proposed regulation to retake custody of a child following an accidental or erroneous *in absentia* final order of removal.

Another commenter expressed concern that the proposed rule presents a danger for arbitrary application and needless traumatization. In considering retaking custody, this commenter recommended applying the standards for transfer outlined in the ABA's UC Standards.

Several commenters also stated concerns about adequate procedural protections to challenge DHS's actions after retaking custody of a previously released minor. One commenter wrote that the regulation is silent on who bears the burden of proof that there is a material change in circumstances.

Several commenters cited a recent ruling on *Saravia v. Sessions,* No. 18–15114 (9th Cir. 2017), by the U.S. Court of Appeals for the Ninth Circuit, which held that immigrant children are entitled to prompt hearings in which the Government bears the burden of demonstrating why there was a material change in circumstances. One commenter recommended the government immediately provide minors and UACs who are taken back into custody with an opportunity to contact family members as well as their attorneys.

One commenter stated that children who have been released from custody are at risk of receiving a final order of removal, and thus subject to DHS retaking custody, because they have a higher risk of missing a court appearance for reasons that are not intentional. This may be because they are under the control of the sponsor, lack the resources to travel to the immigration court, or are unable to independently seek legal counsel to assist with attendance. Several commenters opined that the rule would result in the increased policing of immigrant and non-immigrant members of communities of color in the country.

*Response.* DHS disagrees with commenters' statements that this provision presents a "danger of arbitrary application." Currently, there are no regulatory provisions for retaking custody of a previously released minor. Therefore, this provision is intended to provide regulatory guidance and clarity where it currently does not exist. As noted in the NPRM, a material change in circumstances could potentially be triggered by a released minor later becoming an escape-risk, becoming a danger to the community, receiving a final order of removal, and/or if there is no longer a parent or legal guardian available to care for the minor. DHS notes that the FSA's definition of escape risk allows consideration of, *inter alia,* whether "the minor has previously absconded or attempted to abscond from INS custody." This rule would specifically identify absconding from any Federal or state custody as a relevant factor, not just the custody of INS or its successor agencies. This change is consistent with the FSA, which provides only a non-exhaustive list of considerations. The purpose of providing this regulatory clarity is to ensure that release and custody determinations are generally informed by the same factors for consideration (*i.e.* if a minor is determined to be a danger to the community prior to release, that minor may not be released. Likewise, if that minor later becomes a

danger to the community, DHS seeks to regain custody of that minor).

In response to comments about the lack of procedural safeguards, including burden of proof and independent review of custody determinations, DHS notes that minors who are not UACs and who are taken back into DHS custody may request a custody redetermination hearing in accordance with 8 CFR 236.3(m) of this rule and to the extent permitted by 8 CFR 1003.19.

DHS notes the recommendation to ensure that minors and UACs who are taken back into custody are immediately provided with an opportunity to contact family members or legal counsel. These provisions and other detention standards are incorporated into § 236.3(i) describing standards for detention of minors in DHS custody who are not UACs.

Changes to Final Rule

DHS declines to amend the proposed regulatory provisions regarding retaking custody of previously released minors based on public comments.

15. Monitoring § 236.3(o)

Summary of Proposed Rule

The terms contained in the proposed rule required CBP and ICE each to identify a Juvenile Coordinator for the purpose of monitoring statistics about UACs and minors who remain in DHS custody for longer than 72 hours. The statistical information may include, but would not be limited to, biographical information, dates of custody, placement, transfers, removals, or releases from custody. The juvenile coordinators may collect such data, if appropriate, and may also review additional data points should they deem it appropriate given operational changes and other considerations.

Public Comments and Response

*Comments.* Multiple commenters expressed concern that DHS's proposed changes would remove important protections for children by limiting monitoring and oversight performed by agencies; decreasing data collection requirements; eliminating attorney monitoring responsibilities; and implementing vague or broad Juvenile Coordinators duties that lack standard and omitted provisions of the FSA.

Some commenters expressed concern with respect to the proposed rule's Juvenile Coordinator monitor provision. Although a few of the commenters acknowledged that language in the proposed rule in part reflects monitoring provisions in FSA paragraph 28A, the commenters argued that the proposed rule omits important

collections of information regarding the placement of minors in more restrictive or secure facilities. Additionally, the commenters claimed that the proposed regulation omits associated FSA provisions requiring the Juvenile Coordinator to share reports with Plaintiffs' counsel and permit Plaintiffs' counsel to engage with the Juvenile Coordinator regarding implementation of the FSA. Another commenter complained that the proposed rule would direct the collection of information about minors who had been held in CBP or ICE custody for longer than 72 hours, but this scenario would not require DHS to do anything with this information or to provide it for independent oversight and review, or corrective action. A few commenters cited that paragraph 28(A) of the FSA requires a weekly collection of specific data from all ICE and CBP district offices and Border Patrol stations; however, the proposed rule does not set forth how frequently data collection is required, nor does it require CBP/ICE to collect the same types of information. Another commenter added that the proposed regulations provided no mandatory qualifications for the Juvenile Coordinator and the requirements necessary to become one are broad and unclear. As general practice, the commenter advised that any government official charged with making placement determinations for children, particularly children who have experienced trauma, should be required to have child welfare experience and qualifications, rather than law enforcement expertise. Another commenter recommended expanding immigration courts and appointing guardians for children so they are not alone in the process.

Commenters expressed concern with the Juvenile Coordinators provision, which allows for collection of hearing dates and ''additional data points should they deem it appropriate given operational changes and other considerations'' for aliens in DHS custody. The commenters voiced concern that statement is extremely broad and does not provide meaningful standards for monitoring. The commenter cited the legal case of *Checkosky* v. *SEC,* 139 F.3d 221, 226 (D.C. Cir. 1998). This commenter recommended the Government withdraw the rule or provide specific information about the persons to whom Juvenile Coordinators will report; operational changes and who would determine them; accountability; recordkeeping; resources; qualifications for Juvenile Coordinators; data sharing;

the process to receive additional data points or statistical inquiry suggestions; etc.

Some commenters objected to the elimination of the third-party monitoring by *Flores* plaintiffs' counsel and oversight of compliance with the FSA that results when the FSA is terminated. The commenters recounted recent reports and lawsuits before and after the proposed rule was published that they allege demonstrate the Government has not followed the terms of the FSA with respect to monitoring.[37] Some of these examples involved ORR, (*i.e.,* a July 2018 court order in *Flores* v. *Sessions* regarding Shiloh Residential Treatment Center and prescription of psychotropic medications, as well as placement in secure and staff-secure shelters and residential treatment centers (RTCs), and certain policies regarding release (such as requiring post-release service providers to be in place prior to release)). The commenter also noted the appointment of a Special Master/Independent Monitor in October 2018, to monitor compliance with the court's orders and to make findings of fact reports and recommendations.[38] The commenter claimed that the ability of *Flores* counsel to interview detained children in a confidential way allows them to share information about how they are being treated and has been critical to identify ill-treatment and non-compliance with FSA standards.

*Response.* Although commenters are concerned that the proposed regulation § 236.3(o) limits the monitoring and oversight of the Government's responsibilities set forth in the FSA, such concerns are misplaced. Many of the data collection, monitoring, and oversight provisions included in the FSA are provisions that were included to guide the operation of the agreement itself and, as such, are not relevant or substantive terms of the FSA. The FSA, as modified in 2001, provides that it will terminate 45 days after publication of final regulations implementing the agreement and accordingly, the terms that are not relevant or substantive, such as certain requirements to report to plaintiffs' counsel and to the court, will cease to apply to the parties to the agreement. DHS, in § 236.3(o), is adopting a policy specifically to provide for the data collection and monitoring to

---

[37] *See, e.g.,* DHS OIG, ICE's Inspection and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements: DHS OIG Highlights (OIG–18–67), June 26, 2018 *https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18-67-Jun18.pdf.*

[38] Flores v. Sessions, CV 85–4544–DMG, at 2 (C.D. Cal. Oct. 5, 2018), Order Appointing Special Master/Independent Monitor.

assist in its own internal monitoring, and while the provisions reflect those, as set forth under paragraph 28A of the FSA, such provision is an internal agency practice. The provisions of paragraph 28A exist solely in order for the Court and plaintiff's counsel to monitor compliance with the terms of the Agreement on behalf of the Class (see, for example, paragraph 28B regarding what plaintiff's counsel should do if the reporting and monitoring lead to reasonable suspicion that a minor should have been released.). That of monitoring provision for counsel is not appropriate for Federal regulations. Moreover, this rule will result in the termination of the FSA making that type of monitoring provision inapt.

The current regulations at 8 CFR 236.3(c) describe the duties of the Juvenile Coordinator, including the responsibility of locating suitable placements for juveniles. The language proposed at § 236.3(o) will provide for monitoring by the Juvenile Coordinators. This regulation will also eliminate the requirement in the current regulations that the Juvenile Coordinator locate a suitable placement for minors, as these duties are generally exercised by immigration officers and other employees at DHS (or by HHS and its grantees for UACs). The Juvenile Coordinator as described in the FSA is tasked with overseeing the compliance with the FSA. The CBP and ICE Juvenile Coordinators as described in the proposed regulation will be tasked with overseeing CBP and ICE's compliance with the regulations. This monitoring may involve whatever actions the Juvenile Coordinators determine is appropriate to monitor compliance, (including, for instance, conducting facility visits, reviewing agency policies and procedures, or interviewing employees and/or detainees). They will not make placement decisions.

As the FSA requires, the Juvenile Coordinators will also continue to collect data about placement in a detention facility. DHS notes that this data is currently collected by the ICE Juvenile Coordinator, as CBP does not maintain data about a minor's placement in a detention facility. Collecting data will be an additional part of the Juvenile Coordinator's duties (in addition to their role monitoring compliance with the terms of the regulations). In this final rule, DHS is amending the regulatory text to clarify that the Juvenile Coordinator's duty to collect statistics is in addition to the requirement to monitor compliance with the terms of the regulations.

The commenters' concerns that this rule omits important collection of information regarding the placement of minors in more restrictive or secure facilities misapprehends the omission of collection of reasons for placement in a detention facility or medium secure facility. In the discussion to proposed regulation § 236.3(b)—Definitions, DHS explains that it does not propose to adopt the FSA's term "medium security facility" because DHS does not maintain any medium security facilities for the temporary detention of minors and the definition is now unnecessary. In addition, § 236.3(o) includes the "reasons for a particular placement" in the list of statistical information that may be collected routinely by the Juvenile Coordinators, and both the discussion of the proposed regulation and § 236.3(o) itself propose two Juvenile Coordinators—one for ICE and one for CBP—and charge each with monitoring compliance with the requirements of these regulations, and with monitoring statistics about UACs and minors who remain in DHS custody for longer than 72 hours.

This requirement to collect statistical information about UACs and minors who remain in CBP or ICE custody for longer than 72 hours will necessarily capture the data set forth in paragraph 28A of the FSA without reference to location or frequency of collection. The proposed regulation specifies the statistical information to be collected as a baseline and allows the Juvenile Coordinators to review additional data points as appropriate given operational changes or other considerations. DHS believes that the commenter's concern that the proposed regulation contains no mandatory qualifications for the Juvenile Coordinator and that any government official charged with making placement decisions should be required to have child welfare experience is misplaced. Section 236.3(o) eliminates the requirement in the current regulation at 8 CFR 236.3(c) that the Juvenile Coordinator locate suitable placements for minors. DHS declines to adopt the commenter's suggestion as the Juvenile Coordinators are not responsible for placement determinations.

DHS rejects the suggestion that the text allowing Juvenile Coordinators to collect information on hearing dates if appropriate and "additional data points should they deem it appropriate given operational changes and other considerations" is overbroad and ill-defined. The proposed regulation allows the Juvenile Coordinators to collect the statistical information, as under paragraph 28A of the FSA, relevant to

monitor compliance and allows the Juvenile Coordinators flexibility to consider other data points (including immigration court hearing dates) as appropriate given operational changes and other considerations. *Checkosky,* 139 F.3d at 226, in which the U.S. Circuit Court for the District of Columbia dismissed disciplinary proceedings against two accountants after the SEC issued multiple inconsistent interpretations of a Commission rule, is inapposite here, since the proposed regulation and discussion make clear the statistical information to be collected and that the Juvenile Coordinators have discretion to collect and review additional data points where appropriate. DHS declines to provide more specific information, as the proposed regulation already provides information adequate to the task of the Juvenile Coordinator and the information covered by paragraph 28A of the FSA.

DHS has carefully considered commenters' proposal to continue monitoring by and reporting to *Flores* counsel to enforce the FSA but declines to adopt it based on the parties' agreement in 2001 that the FSA will terminate 45 days after publication of final regulations implementing the agreement. DHS is unable to comment on pending litigation concerning the FSA but notes that, though not required, the final regulation will codify the monitoring and statistical information collection requirements in paragraph 28A of the FSA, which do not exist in the current regulations.

DHS also disagrees with the suggestion that it has failed to provide adequate oversight over its detention facilities. DHS is committed to ensuring adequate oversight over its facilities. As described above, ICE FRCs are subject to regular audits by outside entities. Additionally, all DHS facilities (both CBP and ICE) are subject to inspection and monitoring by bodies such as the DHS OIG, DHS CRCL, and the GAO. DHS is also making it clear in this final rule that the CBP and ICE Juvenile Coordinators will have responsibility for monitoring compliance with these regulations, and not merely the responsibility to maintain statistics. Such monitoring of ongoing compliance may include oversight of DHS facilities. The purpose of this change is to ensure that an independent monitor will remain in place to help to ensure that all DHS facilities satisfy applicable standards at all times.

Changes to Final Rule

DHS is amending the regulatory provisions to make it more clear that the

Juvenile Coordinators will monitor compliance with the requirements of these regulations and, as an independent requirement, maintain statistics related to the placement of minors and UACs.

Section-by-Section Discussion of the HHS Proposed Rule, Public Comments, and the Final Rule

Subpart A—Care and Placement of Unaccompanied Alien Children (45 CFR part 410) Definitions (45 CFR 410.101)

DHS

Summary of Proposed Rule

HHS proposed to define "DHS" as the Department of Homeland Security. This term is not defined in the FSA.

Public Comments and Response

HHS did not receive any comments requesting a change to this definition.

Changes to Final Rule

HHS is not making any changes to this definition in the final rule.

Director

Summary of Proposed Rule

HHS proposed to define "director" as the Director of the Office of Refugee Resettlement (ORR), Administration for Children and Families (ACF), Department of Health and Human Services. This term is not defined in the FSA.

Public Comments and Response

HHS did not receive any comments requesting a change to this definition.

Changes to Final Rule

HHS is not making any changes to this definition in the final rule.

Emergency

Summary of Proposed Rule

HHS proposed to define "emergency" as an act or event (including, but not limited to, a natural disaster, facility fire, civil disturbance, or medical or public health concerns at one or more ORR facility) that prevents timely transport or placement of UACs, or impacts other conditions provided by this part. This definition incorporates the existing text of the FSA except for HHS' recognition that emergencies may not only delay placement of UACs, but could also delay compliance with other provisions of the proposed rule or excuse noncompliance on a temporary basis.

Public Comments and Response

*Comments.* Several commenters expressed concern that the proposed

"expanded" definition of "emergency" would grant DHS too much discretion to suspend compliance with certain FSA provisions relating to standards of care and custody for children, such as timely transport or placement of minors and other conditions implicating their basic services.

Some commenters expressed concern that events other than a natural disaster, facility fire, civil disturbance, medical or public health concerns might also qualify as an emergency, leaving significant room for interpretation. Several commenters argued that the phrase "other conditions" would implicate the basic needs of the children, including timely transfer, provision of snacks and meals, prolonged detention, and would further jeopardize their well-being, health, and safety and runs contrary to the explicit placement context of the FSA.

Other commenters had specific objections to the proposed definition. One organization argued that the proposed rule defines emergency in a circular manner because the term is primarily defined as an event that prevents compliance.

A coalition expressed concern that the proposed provision that minors must be transferred "as expeditiously as possible," can be broadly interpreted, instead of a defined period of three to five days. The same commenter also argued that this provision contravenes the TVPRA because it creates exceptions to the 72-hour timeframe for the required transfer of UACs to ORR that do not meet the high bar of "exceptional circumstances" as intended under the TVPRA.

An organization expressed concern that the proposed rule replaces the term "medical emergencies" with "medical or public health concerns at one or more facilities," which would broaden the possible application of emergencies, allowing for a possible emergency in instances where several minors lack key vaccinations, or where a few minors may require treatment for chronic conditions such as asthma or diabetes.

An organization expressed concern that implementation of the proposed definition would take away the ability to monitor or check the decision whether to deem a situation as an emergency, as well as the conditions that would result from such a determination and recommended that the Departments provide the basis arriving at these definitions; provide a timeframe for how long may an emergency last; and provide for the consequences for invoking the emergency when unwarranted.

An organization recommended that DHS and HHS provide explanation and evidence of the need to expand the current definition and compile a comprehensive list of permissible emergency circumstances.

Two organizations recommended that the proposed rule clarify the circumstances under which emergency waivers would be implemented, that any such exemptions be limited in scope and ensure that the fundamental needs of children are met, regardless of the circumstances requiring a waiver.

Several organizations and individual commenters recommended that from a public health perspective, designation of an emergency should trigger additional resources, prepared in advance through contingency planning and made available through standing mechanisms.

*Response.* HHS notes that paragraph 12(B) of the FSA defines an emergency as "any act or event that prevents the placement of minors pursuant to paragraph 19 within the time frame provided" (*i.e.*, three days or five days, as applicable). The FSA also contains a non-exhaustive list of acts or events that constitute an emergency, such as "natural disasters (*e.g.* earthquakes, hurricanes, etc.), facility fires, civil disturbances, and medical emergencies (*e.g.* a chicken pox epidemic among a group of minors)." HHS notes that the definition of emergency contained within this provision does not depart from how the FSA defines an emergency act or event. Rather, this provision recognizes that, in rare circumstances, an emergency may arise, possibly unanticipated, that impacts more than just the transfer of UACs from one facility to another. As indicated in the NPRM, the impact, severity, and timing of a given emergency situation dictate the operational feasibility of providing certain elements of care and custody to UACs, and thus the regulations cannot capture every possible reality HHS will face. The applicability of "emergency" is intended to be flexible to the extent it fits within the parameters set forth by the FSA. Therefore, HHS disagrees with commenters' assertion that the definition of emergency creates "too much discretion" or allows HHS to declare an emergency "for whatever reason."

HHS also notes that, during an emergency situation, it continues to make every effort to provide all required services and provide for UACs' needs under the FSA as expeditiously as possible. Depending on the severity of the emergency, however, the provision of one or more FSA requirements may be temporarily delayed for some UACs.

For instance, if a facility is located in an area that is forecasted to be impacted by a hurricane and the UACs must be evacuated to another facility, it may be necessary to temporarily delay the provision of meals to those UACs during the time required to evacuate the facility. However, as soon as the UACs arrive at the other facility, ORR would resume the provision of meals to those UACs. Similarly, if a facility suffers an electrical failure, such that the air conditioning breaks, all UACs in that facility may temporarily be held in temperatures that do not comply with the FSA. ORR would work to rectify the problem as quickly as possible, and would take steps to mitigate the problem (e.g., providing extra fans for the facility). Once the air conditioning is fixed, however, the UACs would return to FSA-compliant conditions.

HHS also notes that placing UACs in licensed programs "as expeditiously as possible" is consistent with the spirit of the FSA's language, but is also a more appropriate standard, since it provides the flexibility needed to respond to emergencies on a case-by-case basis. We interpret "as expeditiously as possible" as what is reasonably possible considering the circumstances of the particular emergency. At the same time, HHS notes that the requirements of the TVPRA still apply to transfers of UACs to ORR custody, and that the "exceptional circumstances" standard would still apply even with the publication of this final rule.

In response to one commenter's concern that the proposed rule replaces the term "medical emergencies" with "medical or public health concerns at one or more facilities," which would broaden the possible application of emergencies, HHS respectfully disagrees, and notes that the rule is consistent with the FSA. The FSA provides, as an example of a medical emergency, "a chicken pox epidemic among a group of minors." The language of the rule is consistent with this example. HHS disagrees that the rule would broaden the scope of medical emergencies beyond what is already contemplated by the FSA.

Although many of the comments are beyond the scope of the FSA and the purposes of this rule in implementing the FSA, HHS will consider incorporating commenters' recommendations into the written guidance implementing this provision, as appropriate and to the extent they do not conflict with the FSA or other governing statutes. This includes but is not limited to the recommendations to mandate contingency planning if an emergency situation can be anticipated,

reviewing the American Bar Association's UC Standards, and clarifying roles and responsibilities regarding the officials who have the authority to declare an emergency.

### Changes to Final Rule

HHS is not making any changes to this definition in the final rule.

### Escape Risk

#### Summary of Proposed Rule

HHS proposed to define "escape risk" as a serious risk that a UAC will attempt to escape from custody. HHS is adopting this definition without change from the FSA.

#### Public Comments and Response

HHS did not receive any comments requesting a change to this definition that specifically named HHS, although please see the section of the preamble discussing § 236.3(b)(6) for responses to comments DHS received regarding its definition of escape risk.

#### Changes to Final Rule

HHS will not be making any changes to this definition in the final rule.

### Final Rule

*Escape risk* means there is a serious risk that an unaccompanied alien child (UAC) will attempt to escape from custody.

### Influx

#### Summary of Proposed Rule

The NPRM proposed to define "influx" as a situation when 130 or more minors or UACs are eligible for placement in a licensed facility under this part or corresponding provisions of DHS regulations, including those who have been so placed or are awaiting such placement. HHS is adopting this definition without change from the FSA with the clarification that DHS will maintain custody of UACs pending their transfer to ORR.

#### Public Comments and Response

*Comment.* Numerous commenters expressed concern that the proposed definition of "influx" was developed based on data from the 1990s and is outdated, and, if implemented, will result in DHS and HHS operating within a *de facto* permanent state of "influx." If able to operate in that status, the commenters contended that DHS and HHS would have broad discretion to circumvent compliance with the FSA, HSA, and TVPRA provisions and the time limits on transferring children out of DHS custody.

Many commenters expressed the view that DHS and HHS disingenuously

argued that they operate within a constant state of influx even while overall border crossings are 20 percent of what they were when that term was defined in the FSA and border staffing has increased by almost three times.

A few commenters argued that the 130-influx standard also failed to account for the expansions and contractions of the number of UACs in border custody, which have fluctuated by tens of thousands of juveniles every year since the peak in 2014. The variable yearly numbers of UACs require a more flexible influx baseline.

Some commenters objected to the proposed definition of influx on the basis that it enables each agency to excuse noncompliance even where it is not itself experiencing influx conditions. Commenters stated that DHS conceded in the NPRM that it has continuously been dealing with an influx of minors for years. The commenters claimed that as a result, even where HHS may not satisfy the "influx" criteria itself, it may rely on DHS's "influx" conditions because the definition allows HHS criteria to be met "under . . . corresponding provisions of DHS regulations."

One commenter recommended that the agencies include a third alternative criterion for designation of influx conditions to track the meaning of influx in the INA. The INA recognizes the threat posed to national security where the Secretary of Homeland Security "determines that an actual or imminent influx of aliens arriving off the coast of the United States, or near a land border, presents urgent circumstances requiring an immediate federal response." 8 U.S.C. 1103(a)(10). The commenter urged the agencies to consider a regulation that would define "urgent circumstances" to include the release without bond of a significant percentage of such minors, with or without a parent or legal guardian, near to the relevant Coast Guard or Border Patrol sector. The commenter ultimately proposed that influx conditions could exist when some combination of three criteria were present—the legacy FSA criterion of 130 minors, an alternative criterion that takes into account the problems created by lack of resources other than bed space, and a third criterion that aligns influx designations for minors with designations of influx conditions applicable to humanitarian entry in general. The commenter contended that such a standard would provide flexibility to respond effectively to migrant crises that involve minor aliens in unpredictably dangerous ways.

One commenter maintained that, because the proposed rule changes the

word "program" to "facility," it could permit lengthier detention by a determination that there is an influx when more than 130 children are eligible for placement in any of the program's facilities, even if the program has the capacity to provide placement resources for well over 130 children. The commenter viewed the proposed definition of influx as placing less focus on the needs of children than on the proposed facilities to detain them.

Some commenters were concerned that the proposed definition of influx lifts the requirement that UACs be transferred from DHS to HHS custody within three to five days, and allows for broad exemptions to existing child protections that could impact basic needs, such as the provision of snacks and meals to children in custody. The commenters stated the rule should be changed to clarify that any such exemptions must be limited in scope and ensure that the fundamental needs of children are met in a timely manner.

*Response.* When there is a sharp increase, or "influx," in the number of UACs entering the United States and Federal agencies are unable to transfer them into state-licensed, ORR-funded care provider facilities in a timely manner, ORR places certain UACs at an influx care facility. It is important to note that HHS does not enforce immigration laws or implement immigration policies. HHS provides shelter, care, and other essential services to UACs, while working to release them to appropriate sponsors, often members of the child's family, without unnecessary delay.

Periodically, ORR operates influx care facilities to meet its statutory obligations to care for UACs transferred from DHS, during a time of high numbers of arrivals. ORR maintains the ability to rapidly set-up, expand, or contract influx infrastructure and services as needed. ORR has detailed policies that set forth criteria for when UACs may be placed at an influx care facility. Some of the criteria include a minor's age (the minor must be between 13 and 17 years of age), medical and behavioral health conditions (no known special needs or issues), sibling status (no accompanying siblings below the age of 12), and pending reunification status (ability to be discharged to a sponsor expeditiously), among other considerations. (For a complete list of the requirements, please see the *ORR Policy Guide,* Section 1.7.3 Placement into Influx Care Facilities at *https:// www.acf.hhs.gov/orr/resource/children- entering-the-united-states- unaccompanied-section-1#1.7.3*)

HHS is the primary regulator of influx care facilities and is responsible for their oversight, operations, physical plant conditions, and service provision. States do not license or monitor ORR influx care facilities because they are located on Federal enclaves. However, ORR influx care facilities operate in accordance with applicable provisions of the FSA, HSA of 2002, TVPRA, the Interim Final Rule on Standards to Prevent, Detect, and Respond to Sexual Abuse and Sexual Harassment Involving Unaccompanied Alien Children, as well as ORR policy.

For the purposes of continuity of joint operations and for the reasons DHS explains above, HHS adopts the same definition of influx. DHS's response to comments related to the definition of influx can be found above in the Section-by-Section Discussion under Influx § 236.3(b)(10).

Changes to Final Rule

HHS is not making any changes to this definition in the final rule.

Licensed Program

Summary of Proposed Rule

HHS proposed to define a "licensed program" as any program, agency, or organization that is licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children, including a program operating group homes, foster homes, or facilities for special needs UACs. All homes and facilities operated by a licensed program, including facilities for special needs UACs, are non-secure as required under State law. However, a facility for special needs UACs may maintain a level of security permitted under State law which is necessary for the protection of UACs or others in appropriate circumstances (*e.g.,* cases in which a UAC has drug or alcohol problems or is mentally ill). HHS is adopting this definition without change from the FSA with the clarification that the standards a licensed program must meet are set forth in § 410.402 of this rule instead of Exhibit 1 of the FSA.

Public Comments and Response

HHS did not receive any comments requesting a change to this definition.

Changes to Final Rule

HHS is not making any changes to this definition in the final rule.

ORR

Summary of Proposed Rule

HHS proposed to define "ORR" as the Office of Refugee Resettlement,

Administration for Children and Families, Department of Health and Human Services. This term is not defined in the FSA.

Public Comments and Response

HHS did not receive any comments requesting a change to this definition.

Changes to Final Rule

HHS is not making any changes to this definition in the final rule.

Secure Facility

Summary of Proposed Rule

HHS proposed to define a "secure facility" as a State or county juvenile detention facility or a secure ORR detention facility, or a facility with an ORR contract or cooperative agreement having separate accommodations for minors. A secure facility does not need to meet the requirements of § 410.402, and is not defined as a "licensed program" or "shelter" under this part. This term is not defined in the FSA, but is consistent with the provisions of the FSA applying to secure facilities.

Public Comments and Response

*Comment.* Most public comments regarding the definition of secure were directed towards the DHS portion of the rule. HHS did receive several comments regarding the *placement* of UAC in secure facilities; those comments and responses are captured in the discussion of §§ 410.203 and 410.205. Regarding the definition of secure as it relates to the facility's physical plant, one commenter stated that the definition of non-secure does not comport with the intent of the FSA in the following areas: secure external fencing and locks (internal and external) effecting egress.

*Response.* The term "secure" is not defined in the FSA, however, HHS finds that the definition of "secure" in the proposed rule is consistent with the provisions in the FSA applying to secure facilities. In addition, HHS is committed to ensuring the security, safety, and well-being of all UACs, many of whom fled dangers in their home countries and endured abuse along their journey to the United States. Some children remain under threat of continued harm, including trafficking, fraud, ransom demands, and gang violence. Therefore, any security measures, such as fences and locked points of entry, are for the safety of UACs, to supervise public access to children, and protect them from harm, in keeping with child welfare practices in State-licensed facilities.

Changes to Final Rule

HHS will not be making any changes to this definition in the final rule.

Shelter

Summary of Proposed Rule

HHS proposed to define "shelter" as a licensed program that meets the standards set forth in § 410.402. Shelters include facilities defined as "licensed facilities" under the FSA, and also includes staff secure facilities (*i.e.*, medium secure facilities as defined by the FSA). Other types of shelters might also be licensed, such as long-term and transitional foster care facilities.

Public Comments and Response

HHS did not receive any comments requesting a change to this definition.

Changes to Final Rule

HHS is not making any changes to this definition in the final rule.

Special Needs Minor

Summary of Proposed Rule

HHS proposed to define a "special needs minor" as a UAC whose mental and/or physical condition requires special services and treatment by staff. A UAC may have special needs due to drug or alcohol abuse, serious emotional disturbance, mental illness or retardation, or a physical condition or chronic illness that requires special services or treatment. A UAC who has suffered serious neglect or abuse may be considered a special needs minor if the UAC requires special services or treatment as a result of neglect or abuse. This definition was adopted without change from the FSA.

Public Comments and Response

*Comment.* Some commenters asked for expanded definitions of "special needs minor" or additional provisions relating thereto. One commenter stated the definition should be broadened to include developmental disability and learning disability. The commenter urged that it is important for children, particularly unaccompanied children, to be able to understand and follow instructions or directions given to them by Federal officials, attorneys, and care custodians in licensed facilities.

Another commenter contended that the proposed rule does not adequately discuss special needs, even though many immigrant children entering the United States have disabilities.

The commenter also condemned the use of the outdated term "retardation" in the definition of special needs minor, stating that the term is used as a slur that dehumanizes, demeans, and does

real emotional harm to people with mental and developmental disabilities. The commenter acknowledged the term was used in the FSA agreement, but argued that it is inappropriate in a modern-day regulation.

*Response.* The regulatory language adopted the same definition of "special needs" as the definition used in the FSA. This definition includes any minor whose mental conditions require special services and treatment as identified during an individualized needs assessment. HHS disagrees that the definition should be expanded because the definition is broad enough to include minors with developmental and learning disabilities, if the special needs assessment determines that these conditions require special services and treatment.

The proposed regulatory language contains multiple provisions requiring DHS and HHS to consider a UAC's special needs, including provisions requiring consideration of special needs when determining placement. For example, section 45 CFR 410.208 states that ORR will assess each UAC to determine if he or she has special needs and will, whenever possible, place a UAC with special needs in a licensed program that provides services and treatment for the UAC's special needs. Section 8 CFR 236.3(g)(2) requires DHS to place minors and UACs in the least restrictive setting appropriate to the minor or UAC's age and special needs. Section 8 CFR 236.3(i)(4) requires that facilities conduct a needs assessment for each minor, which would include both an educational assessment and a special needs assessment. Additionally, section 8 CFR 236.3(g)(1) requires DHS to provide minors and UACs with Form I–770 and states that the notice shall be provided, read, or explained to the minor or UAC in a language and manner that he or she understands. These provisions ensure that a minor's or UAC's special needs are taken into account, including when determining placement.

HHS agrees that the term "retardation" is outdated and is amending the regulatory language to delete this term. DHS has also deleted this term in its regulatory language.

Changes to Final Rule

HHS removed the term "retardation" from the final rule.

Sponsor

Summary of Proposed Rule

HHS proposed to define "sponsor" as an individual (or entity) to whom ORR releases a UAC out of ORR custody.

Sponsor is comparable to the term custodian, which is used but not defined in the FSA.

Public Comments and Response

HHS did not receive any comments requesting a change to this definition.

Changes to Final Rule

HHS is not making any changes to this definition in the final rule.

Staff Secure Facility

Summary of Proposed Rule

HHS proposed to define a "staff secure facility" as a facility that is operated by a program, agency, or organization licensed by an appropriate State agency and that meets the standards for licensed programs set forth in § 410.402. A staff secure facility is designed for a UAC who requires close supervision but does not need placement in a secure facility. It provides 24-hour awake supervision, custody, care, and treatment. It maintains stricter security measures, such as intensive staff supervision, than a shelter in order to control problem behavior and to prevent escape. A staff secure facility may have a secure perimeter but is not equipped internally with major restraining construction or procedures typically associated with correctional facilities. The term "staff secure facility" is used in the same sense as the FSA uses the term "medium security facility."

Public Comments and Response

HHS did not receive any comments requesting a change to this definition.

Changes to Final Rule

HHS is not making any changes to this definition in the final rule.

Unaccompanied Alien Child (UAC)

Summary of Proposed Rule

HHS proposed to define a "UAC" as provided in 6 U.S.C 279(g)(2), which states that a UAC is a child under the age of 18 who has no lawful immigration status in the United States and who has no parent or legal guardian present in the United States or no parent or legal guardian in the United States is available to provide care and physical custody. When a child previously determined to have been a UAC has reached the age of 18, when a parent or legal guardian in the United States is available to provide care and physical custody for such a child, or when such a child has obtained lawful immigration status, the child is no longer a UAC. A child who is no longer a UAC is not eligible to receive legal protections limited to UACs.

## Public Comments and Response

*Comments.* Several organizations believed that the proposed rule directly contravenes the TVPRA and does not comport with the protective principles of the FSA by giving HHS and DHS unconstrained discretion to determine who meets the definition of a UAC, which could result in minors losing current protections under the FSA and TVPRA.

One commenter recommended striking proposed § 236.3(d) and the final sentence of proposed § 410.101 and codifying the current initial jurisdiction policy, as set forth in USCIS' 2013 guidance, which provided that USCIS would take initial jurisdiction based on a previous UAC determination even after the applicant turns 18 or is reunited with a parent or legal guardian.

Comments related to separate definitions for minor and UAC, as proposed by DHS in § 236.3(b)(1), are discussed above under the Section-by-Section Discussion of the DHS Proposed Rule, Public Comments, and the Final Rule.

*Response.* HHS adopted the definition of UAC as written in the HSA, 6 U.S.C 279(g)(2), with no change. HHS must abide by this definition when evaluating if a child in HHS custody meets the definition of a UAC and, as such, does not have unconstrained discretion to determine who qualifies as a UAC. Operationally, HHS will continuously evaluate whether an individual is a UAC, because it is unlawful for HHS to maintain custody of any child who has obtained lawful immigration status or obtained 18 years of age while in custody. 6 U.S.C. 279(g)(2). HHS is required to promptly release from its custody any individual who no longer meets the UAC definition of a UAC. HHS notes that USCIS' initial jurisdiction policy was implemented for the purpose of administratively tracking a child's case and is unconnected to the services provided to the child. Once a UAC is released from ORR care and custody, the child is no longer considered a UAC. HHS only tracks released children (former UACs) for the provision of post-release case management and a safety and well-being follow-up call. HHS has a system by which to track these released children for service provision.

## Changes to Final Rule

Between the FSA and final rule, the only change HHS is making is substitution of the word ''minor'' with the word ''UAC.'' The text of the FSA only uses the term minors, and HHS has interpreted this term to include UACs who may or may not meet the definition of ''minor'' in the FSA. Given the subsequent enactment of the TVPRA, and the fact that HHS does not have custody of juveniles who are not UAC, HHS is expressly stating in this subpart that the provision applies to UACs and not ''minors'' as a whole.

## ORR Care and Placement of Unaccompanied Alien Children (45 CFR 410.102)

## Subpart B—Determining the Placement of an Unaccompanied Alien Child (45 CFR part 410)

## Purpose of This Subpart (45 CFR 410.200)

## Summary of Proposed Rule

As stated in § 410.200, this subpart of the proposed rule set forth factors that ORR considers when placing UACs.

## Public Comments and Response

None.

*Changes to the Final Rule.* HHS is not making any changes to proposed § 410.200 in the final rule.

*Final rule.* 45 CFR 410.200—Purpose of this subpart.

This subpart sets forth what ORR considers when placing a UAC in a particular ORR facility, in accordance with the FSA.

## Considerations Generally Applicable to the Placement of an Unaccompanied Alien Child (45 CFR 410.201)

## Summary of Proposed Rule

Section 410.201 of the proposed rule addressed the considerations that generally apply to the placement of UAC. The provision generally paralleled the FSA requirements. The provision noted that ORR makes reasonable efforts to provide placements in the geographic areas where DHS apprehends the majority of UACs. ORR complied with this provision, as ORR maintains the highest number of UAC beds in the state of Texas where most UACs are currently apprehended.

*Comment.* Several organizations stated that the proposed rule conflicts with the FSA and current laws that encourage the placement of children in the least restrictive setting and favor release to a parent or family member.

In jointly submitted comments, multiple legal advocacy organizations argued that secure placement based on a lack of availability of licensed placements is statutorily barred by the TVPRA. The commenters cited the TVPRA's requirement that children under HHS custody ''shall be promptly placed in the least restrictive setting that is in the best interest of the child.'' 8 U.S.C. 1232(c)(2)(A). In making such placements, ''the [HHS] Secretary may consider danger to self, danger to the community, and risk of flight.'' *Id.* The TVPRA also provides that ''[a] child shall not be placed in a secure facility absent a determination that the child poses a danger to self or others or has been charged with having committed a criminal offense.'' *Id.* The commenters thus argued that Congress made clear that the ''best interest of the child'' evaluation permits placement in a secure facility only under the limited finding of a 'danger to self or others' or a criminal charge; no other grounds are permissible, even those previously recognized in the FSA. In other words, according to the commenters, 8 U.S.C. 1232(c)(2)(A) prohibits secure placement based on issues unrelated to the best interests of the child, such as licensed shelter availability. As a result, the commenters argued that §§ 410.201(e) and 410.205 in the proposed rule are inconsistent with the terms of the FSA as amended by Congress by passage of the TVPRA.

*Response.* HHS notes that consistent with the TVPRA, 8 U.S.C. 1232(c)(2)(A), under the proposed rule, ''ORR places each UAC in the least restrictive setting that is in the best interest of the child and appropriate to the UAC's age and special needs, provided that such setting is consistent with its interests to ensure the UAC's timely appearance before DHS and the immigration court.'' As specified in proposed rule § 410.203, however, ORR will only place a UAC in a secure facility if the UAC has been charged with or is chargeable with a crime, or has been determined to pose a danger to self or others. ORR does not place UACs in a secure facility such as a State or county juvenile detention facility based on issues unrelated to the best interests of the child. ORR does not consider emergency or influx facilities to be secure facilities.

*Comment.* Section 410.201 of the proposed rule outlined factors that determine where a child is placed including the timely appearance of children before DHS and the immigration courts. Two organizations commented that while this language is included in the FSA, it is not in the TVPRA, and this creates a conflict between the proposed regulation and Federal law. They argued that a child's appearance in immigration court should not be given priority over a child's best interest or special needs. One of these advocacy organizations argued that the proposed rule does not indicate how to prioritize each factor and that it allows HHS and DHS to focus on ''their own

**44456** **Federal Register** / Vol. 84, No. 164 / Friday, August 23, 2019 / Rules and Regulations

efficiencies for court and DHS adjudications'' instead of the best interest of the child.

*Response.* HHS reiterates that this rule implements the terms of the FSA, and these comments go beyond the scope of the rule. But in response, HHS notes that the TVPRA at 8 U.S.C. 1232(c)(2)(A), states that when placing UAC, the HHS Secretary (whose authority is delegated to ORR) may consider not only danger to self, and danger to the community, but also risk of flight. Neither the TVPRA nor the FSA prescribe how ORR, in its discretion, is to evaluate the permissible factors in determining placement of a UAC. Like the TVPRA and the FSA, the rule describes general principles that govern placements of UACs. Also, ORR notes that per its policy, *see* ORR Guide, 1.4.1, ''care providers must make every effort to place and keep children and youth in a least restrictive setting. For children who are initially placed in a least restrictive setting, care providers must provide support services and effective interventions, when appropriate, to help keep a child in the setting.'' Moreover, in the ORR Guide, 1.2.5, ORR delineates factors which may indicate that a minor poses a risk of escape from ORR custody which it considers in making an informed placement decision, such as consideration whether the minor has an immigration history that includes failure to appear before DHS or the immigration courts. Notably, however, per ORR policy, ''ORR does not place a child or youth in secure care solely because he or she may pose a risk of escape from ORR custody. However, ORR may place a child in a staff secure facility solely because he or she poses a risk of escape.'' *Id.*

*Comment.* One advocacy organization commented that proposed § 410.201(d) did not include children's access to showers or bedding and it limited children's access to medical care to only emergencies.

The commenter further expressed concern that even though a minor who is in ORR custody may have contact with their family members who are not parents or legal guardians (for example, siblings) with whom they traveled to the United States and were arrested, the child should be permitted to be housed in family detention with those relatives consistent with their best interest.

*Response.* The language referenced by the commenter in proposed section 410.201 derives directly from paragraph 12 of the FSA, which pertains to services provided at emergency or influx facilities, as described at Exhibit 3. While State licensing standards do

not apply to these temporary influx programs, HHS is the primary regulator of influx care facilities and is responsible for their oversight, operations, physical plant conditions, and service provision. Influx care facilities operate in accordance with provisions of the FSA, the HSA, the TVPRA, the Interim Final Rule on Standards to Prevent, Detect, and Respond to Sexual Abuse and Sexual Harassment Involving Unaccompanied Alien Children, as well as ORR policy. UACs at temporary influx programs still have access to services to the greatest extent possible UACs in ORR care at influx facilities always have access to showers and bedding, as well as necessary medical care services.

Additionally, § 410.101 defines UAC according to the definition set forth in the HSA. The HSA and the TVPRA only give ORR the authority to provide care and custody to individuals who meet that definition. DHS, not ORR, has the authority to detain minors and their family members together.

*Comment.* Several commenters including medical doctors and mental health professionals wrote about abuse allegedly taking place in detention facilities. They also mentioned allegations of abuse occurring within ORR custody such as in Southwest Key facilities in Arizona. An article in Reveal (Aura Bogado, Patrick Michels, Vanessa Swales, and Edgar Walters, published June 20, 2018), detailed several allegations of abuse at shelters serving children in ORR custody, including abuse allegations at Shiloh Treatment Center in Texas. These commenters expressed concern that the new rule would allow for longer periods of detention, which raises the risk of more abuse.

Some commenters cited an investigative report which they say showed that the Federal Government continues to place alien children in for-profit residential facilities where allegations of abuse have been raised and where the facilities have been cited for serious deficiencies. Allegations include failure to treat children's sickness and injuries; staff drunkenness; sexual assault; failure to check employees' backgrounds; failure to provide appropriate clothing for children; drugging; and deaths from restraint. The commenters stated that few companies lose grants from HHS based on such allegations.

*Response.* HHS agrees with the importance of immediately identifying and minimizing the risk that UACs suffer abuse. The rule is consistent with HHS' existing obligations to protect the welfare of children. For example, the

TVPRA requires HHS to establish policies and programs to ensure that UACs are ''protected from traffickers and other persons seeking to victimize or otherwise engage such children in criminal, harmful, or exploitative activity.'' 8 U.S.C. 1232(c)(1). Further, HHS operates under an Interim Final Rule, which describes HHS' comprehensive approach to preventing, detecting, and responding to allegations of sexual abuse, sexual harassment, sexually inappropriate behavior. *See* Standards To Prevent, Detect, and Respond to Sexual Abuse and Sexual Harassment Involving Unaccompanied Children, 45 CFR part 411 (the ''IFR''). Finally, in compliance with such IFR, ORR policies are designed to address any allegations of abuse swiftly and fully. As described in Section 5.5.2 of the ORR Guide, in addition to the routine monitoring process, ORR has an Abuse Review Team (ART) to review allegations of abuse (physical, sexual, negligent treatment) that are particularly serious or egregious. The team is composed of ORR staff with the appropriate expertise to assess and identify remedial measures to address these allegations, including ORR's Monitoring Team, the Division of Health for Unaccompanied Children and ORR's Prevention of Sexual Abuse Coordinator.

*Comment.* Various commenters wrote about the plight of Lesbian, Gay, Bisexual, Transgender, Queer, Intersex, and Asexual (LGBTQIA) and transgender and gender non-conforming (TGNC) children in custody. For brevity and because the vast majority of commenters used the acronym LGBTQ, HHS will do likewise; note that we also use the acronym LGBTQ consistent with ORR policy. Commenters expressed concern that LGBTQ youths would be mistreated and possibly abused if kept in custody for an extended period of time and one commenter was concerned in particular that their due process rights might be infringed. One commenter noted that youth who are identified as lesbian, gay, bisexual, or ''other'' reported a rate of sexual victimization by other youth in juvenile detention facilities at a rate of nearly seven times higher than straight youth.

*Response.* Even after publication of this rule, the IFR will continue to require ORR care provider programs to assess and periodically reassess UACs for risk of sexual victimization and abuse according to certain minimum criteria, including any gender nonconforming appearance or manner or identification as lesbian, gay, bisexual, transgender, questioning, or intersex and whether the UAC may

therefore be vulnerable to sexual abuse or sexual harassment; and train staff on communicating effectively and professionally with LGBTQ UACs. Further, as mandated by law, ORR places each UAC in the least restrictive setting that is in the best interests of the child. The rule is also consistent with, and would not abrogate existing ORR policies protecting LGBTQ youth from mistreatment and abuse. Per ORR Guide 1.2.1, when making a placement determination or recommendation, ORR and care providers consider whether the child or youth identifies as lesbian, gay, bisexual, transgender, questioning or intersex, or is gender non-conforming in appearance or manner. Moreover, section 3.5 of the ORR Guide articulates guiding principles for the care of UACs who identify as LGBTQ: "are treated with the same dignity and respect as other unaccompanied alien children"; "receive recognition of sexual orientation and/or gender identity"; "are not discriminated against or harassed based on actual or perceived sexual orientation or gender identity"; and "are cared for in an inclusive and respectful environment." ORR care providers must "house LGBTQI youth according to an assessment of the youth's gender identity and housing preference, health and safety needs, and State and local licensing standards." *Id.* Section 3.5.5 of the ORR guide sets forth specific principles for housing LGBTQI children and youth in ORR care in a manner that treats them fairly and protects them from discrimination and abuse. Finally, Section 4 of the ORR Guide offers further guidance for ORR care providers in how to prevent, detect, and respond appropriately to sexual abuse and harassment, consistent with the IFR.

*Comment.* One commenter noted that the proposed rule failed to require that every child be placed in the least restrictive placement in the best interests of the child, as required by the TVPRA and subsequent HHS policies.

*Response.* The proposed rule is consistent with the TVPRA and UACs shall be held in the least restrictive setting appropriate to the UAC's age and special needs, provided that such setting is consistent with the need to protect the minor or UAC's well-being and that of others, as well as with any other laws, regulations, or legal requirements.

*Comment.* One commenter believes that children should be placed as soon as possible in homes with family or community members, not kept in shelters or government care for long periods.

*Response.* The proposed rule did not impact HHS' policies or procedures for placing UACs in foster care, where UACs are placed in homes in the community, not in shelters or other ORR facilities. *See* ORR Policy Guide Sections 1.2.1 and 1.2.6. But, shelter placements are state-licensed and fully consistent with the FSA, which the rule implements.

Changes to the Final Rule

In response to public comments from multiple legal advocacy organizations that the FSA and TVPRA run in contradiction to each other on the placing of UACs in secure facilities based solely on the lack of appropriate licensed program availability, ORR is striking the following clause from § 410.201(e): ". . . or a State or county juvenile detention facility."

Placement of an Unaccompanied Alien Child in a Licensed Program (45 CFR 410.202)

Summary of Proposed Rule

Section 410.202 of the proposed rule stated that ORR places a UAC into a licensed program promptly after a UAC is referred to ORR custody, except in certain enumerated circumstances. The FSA also recognized that in some circumstances, a UAC may not be placed in a licensed program. These circumstances include emergencies or an influx as defined in § 410.101 (in which case the UAC shall be placed in a licensed program as expeditiously as possible); where the UAC meets the criteria for placement in a secure facility; and as otherwise required by any court decree or court-approved settlement. Like the DHS portion of the proposed rule, proposed § 410.202 did not include the exception, which appears at paragraph 12(A)(4) of the FSA, that allows transfer within 5 days instead of 3 days in cases involving transport from remote areas or where an alien speaks an "unusual" language that requires the Government to locate an interpreter. As noted above, DHS has matured its operations such that these factors no longer materially delay transfer.

*Comment.* Commenters stated that unlike licensed shelter placements, many of ORR's more restrictive settings closely resemble prison. Children may be under constant surveillance, required to wear facility uniforms, and have little control. These commenters stated that placement decisions have significant consequences for UACs.

*Response.* HHS recognizes that, as is consistent with paragraph 21 of the FSA and the TVPRA 8 U.S.C. 1232(c)(2)(A),

by definition a secure facility, such as a State or county juvenile detention facility, is a more restrictive setting than a shelter or a staff-secure facility. As stated in the proposed definition of "secure facility" (*see* § 401.101) and as is consistent with paragraph 21 of the FSA and the definition of "licensed program" in that agreement, such facilities do not need to meet the requirements of "licensed programs" as defined in § 401.101 under this subpart.

As the proposed rule indicates ORR only places a UAC in a secure facility in limited, enumerated circumstances where the UAC has been charged with a crime or is chargeable with a crime, or when the UAC is similarly a danger to self or others. This will be read in light of the other criteria in the regulations. In addition, the proposed rule is consistent with and does not abrogate ORR policies, under which the decision to place a UAC in a secure facility is then reviewed at least once monthly (*see* ORR Policy Guide, Section 1.4.2) to make sure that a less restrictive setting is not more appropriate.

The criteria for placement of UAC in a secure facility are discussed in accordance with section 410.203 of this part.

*Comment.* A commenter noted the importance of age determination because HHS only has jurisdiction over persons under 18 years of age.

*Response.* HHS agrees with the comment. Because HHS' authority is only for individuals under 18, if a person is determined to be an adult, that person cannot be placed in HHS custody. Procedures for determining the age of an individual, and criteria for the treatment of an individual who appears to be an adult are discussed at greater length in accordance with §§ 410.700 and 410.701 of subpart G.

Changes to the Final Rule

HHS is not making any changes in the final rule to proposed § 410.202 which is consistent with the FSA and the TVPRA. However, HHS clarifies that it places UACs in licensed programs except if a reasonable person would conclude "based on the totality of the evidence and in accordance with subpart G" that the UAC is an adult.

Criteria for Placing an Unaccompanied Alien Child in a Secure Facility (45 CFR 410.203)

Summary of Proposed Rule

Section 410.203 of the proposed rule set forth criteria for placing UACs in secure facilities. HHS followed the FSA criteria, except that under the TVPRA, "[a] child shall not be placed in a secure

**44458** **Federal Register** / Vol. 84, No. 164 / Friday, August 23, 2019 / Rules and Regulations

facility absent a determination that the child poses a danger to self or others or has been charged with having committed a criminal offense.'' 8 U.S.C. 1232(c)(2)(A). With respect to these regulations, therefore, HHS did not include factor of being an escape risk, even though that was a permissible ground under the FSA for placement of a UAC in a secure facility.

In addition, HHS chose not to include in the proposed regulatory text the specific examples of behavior or offense that could result in the secure detention of a UAC under paragraph 21 of the FSA, because the examples are non-exhaustive and imprecise. For instance, examples listed in paragraph 21 of what may be considered non-violent, isolated offenses (*e.g.,* breaking and entering, vandalism, or driving under the influence) could be violent offenses in certain circumstances depending upon the actions accompanying them. In addition, state law may classify these offenses as violent. Including these examples as part of codified regulatory text may inadvertently lead to confusion rather than clarity, and eliminate the ability to make case-by-case determinations of the violence associated with a particular act.

Under the proposed regulations, a UAC may be placed in a secure facility if ORR determines that the UAC has been charged with, is chargeable,[39] or has been convicted of a crime; or is the subject of delinquency proceedings, has been adjudicated delinquent, or is chargeable with a delinquent act; and where ORR assesses that the crimes or delinquent acts were not:

• Isolated offenses that (1) were not within a pattern or practice of criminal activity and (2) did not involve violence against a person, or the use or carrying of a weapon; or

• Petty offenses, which are not considered grounds for a stricter means of detention in any case.

• While in DHS or ORR's custody or while in the presence of an immigration officer, has committed, or has made credible threats to commit, a violent or malicious act (whether directed at himself/herself or others). Note: Because the FSA states that such acts would have occurred "while in INS custody" or "in the presence of an INS officer," we proposed to evaluate such activities in either DHS or HHS custody or in the presence of an "immigration officer."

• Has engaged while in a licensed program in conduct that has proven to be unacceptably disruptive of the

normal functioning of the licensed program in which the UAC is placed such that transfer is necessary to ensure the welfare of the UAC or others, as determined by the staff of the licensed program.

In addition, ORR proposed the following as warranting placement in a secure facility, even though the FSA does not specifically mention such criteria, if a UAC engages in unacceptably disruptive behavior that interferes with the normal functioning of a "staff secure" shelter, then the UAC may be transferred to secure facility. The FSA looks only to such disruptive behavior when it occurs in a "licensed" facility—which under the strict terms of the FSA does not include staff-secure facilities—even though all such facilities are indeed state-licensed, and the vast majority of such facilities receive the same licenses as non-secure shelters. Thus, under a strict interpretation of the FSA, UACs could be immediately transferred to a secure facility for disruptive behavior in a non-secure shelter, without first evaluating the UAC in a staff secure setting, where further disruption might lead a higher level of restriction in care.

The proposed rule would afford HHS the flexibility to first evaluate the UAC in a staff-secure setting, and then, if a UAC is significantly disrupting the operations of a staff-secure facility, transfer the UAC to protect the other children who remain within the staff secure facility.

In addition to the behaviors listed in paragraph 21 of the FSA as unacceptably disruptive—(*e.g.,* drug or alcohol abuse, stealing, fighting, intimidation of others, etc.).—HHS adds to this list "displays sexual predatory behavior."

In keeping with the July 30, 2018 order in *Flores* v. *Sessions,* the proposed rule stated that placement in a secure RTC may not occur unless a licensed psychologist or psychiatrist determined that the UAC poses a risk of harm to self or others. The proposed rule also stated that ORR may place a UAC in a secure facility if the UAC is "otherwise a danger to self or others," which HHS will read in light of the other criteria in the FSA and is consistent with the plain language of the TVPRA. *See* 8 U.S.C. 1232(c)(2)(A).

Section 410.203 also sets forth review and approval of the decision to place a UAC in a secure facility consistent with the FSA. The FSA states that the determination to place a minor in a secure facility shall be reviewed and approved by the "regional juvenile coordinator." The proposed rule used the term "Federal Field Specialist," as

this is the official closest to such juvenile coordinator for ORR. (Note: Although not covered in the proposed rule, ORR also recognizes that the TVPRA at 8 U.S.C. 1232(c)(2)(A) delegates to the Secretary of HHS the requirement for prescribing procedures governing agency review, on a monthly basis, of secure placements. ORR directs readers to sections 1.4.2. and 1.4.7 of the ORR Policy Guide (available at: *https:// www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied*) for these procedurals under the TVPRA.)

*Comment.* Various organizations expressed concern that proposed § 410.203(b) fails to provide that HHS will review all secure placements monthly, as required by the TVPRA, and fails to specify how placements in staff secure or residential treatment centers will be reviewed. Commenting organizations also stated that this section fails to take into consideration the best interest of the child.

*Response.* HHS intends for proposed § 410.203(b) incorporates legal requirements such as monthly review of secure placements required by the TVPRA; this is indicated by the provision's statement that review of secure placements is performed "consistent with legal requirements." In addition, the rule is consistent with and does not abrogate current ORR policies and practices. Section 1.4.2 of the ORR Policy Guide states that, at least every 30 days, the care provider staff, in collaboration with the independent Case Coordinator and the ORR/Federal Field Specialist (FFS), reviews the placement of UACs not only into secure facilities, but also staff secure and RTC facilities in order to determine whether a new, less restrictive level of care is more appropriate. ORR refers the reader to Section 1.4.6 of the ORR Guide, which discusses RTC placements. Consistent with the TVPRA, *see* 8 U.S.C. 1232(c)(2)(A), ORR generally places UACs in the least restrictive setting that is in the best interest of the child. *See* ORR Policy Guide, Section 1.2.1.

*Comment.* One advocacy organization stated that the provisions in the proposed rule regarding when UACs can be placed in secure facilities violates the FSA because it allows HHS to place individuals in secure custody based on "danger to self or others"—a requirement not found in the FSA and so vague as to compromise the government's obligation to place UACs in the least restrictive setting appropriate to their age and special needs.

*Response.* HHS notes that this language of "danger to self or others" as

---

[39] "Chargeable" means that ORR has probable cause to believe that the UAC has committed a specified offense.

permissible criteria for secure placements of UACs comes directly from the TVPRA. *See* 8 U.S.C. 1232(c)(2)(A). Additionally, as indicated in the proposed rule, the July 30, 2018 order in *Flores* v. *Sessions* mandated that placement of a UAC in a secure RTC may not occur unless a licensed psychologist or psychiatrist determined that the UAC poses a risk of harm to self or others. However, to respond directly to the concern that this provision is overly vague, HHS will add that nothing in the provision abrogates requirements to place UACs in the least restrictive setting appropriate to their age and special needs.

*Comment.* Several organizations stated that the language in § 410.203 is too vague and gives HHS broad discretion to place children in secure settings is contrary to the TVPRA and the FSA. A policy group stated, in particular, that the proposed regulation does not clearly identify specific behaviors or offenses that allow placement of a UAC in a secure facility. And where explanation of placement is authorized, it is not clear enough for children to understand because it is a broad and non-specific list, which is confusing for children and fails to put them on notice of the rules that may result in their being detained in a jail-like setting.

A couple of commenters discussed alleged missing provisions or provisions that should have been included related to the placement of children in restrictive settings. This included a proposal that HHS consider that in determining threats from children who the agency sought placement in a secure facility that those threats be "credible *and verified*" (as opposed to just credible threats as discussed in the proposed rule). Further, the commenter recommended removal of the term "disruptive behavior" as criteria for placement in a secure facility as the term is far too subjective. The commenter also stated that secure placements should include the consultation of a mental health specialist. Another commenter stated that HHS provisions to provide placement in the "least restrictive setting" require more specificity. Similarly, that commenter derided the use of criteria not directly related to violence as justification for placement in a restrictive setting and objected that there was no monthly review of these placements as required by 8 U.S.C. 1232(c)(1)(A).

*Response.* As explained in the proposed rule preamble, HHS chose not to include in the proposed regulatory text the specific examples of behavior or offense that could result in the secure detention of a UAC listed in paragraph 21 of the FSA, because the examples are non-exhaustive and imprecise. For instance, examples listed in paragraph 21 of what may be considered non-violent, isolated offenses (*e.g.,* breaking and entering, vandalism, or driving under the influence) could be violent offenses in certain circumstances depending upon the actions accompanying them. In addition, state law may classify these offenses as violent. Including these examples as part of codified regulatory text may inadvertently lead to confusion rather than clarity, and eliminate the ability to make case-by-case determinations of the violence associated with a particular act. Finally, ORR notes that the proposed rule does include a list of behaviors that may be considered unacceptably disruptive; HHS proposed to add "displays sexual predatory behavior" to the non-exhaustive list of examples provided at paragraph 21 of the FSA, including drug or alcohol abuse, stealing, fighting, and intimidation of others.

HHS discusses notification of secure placement further under § 410.206— Information for UACs concerning the reasons for his or her placement in a secure or staff secure facility. ORR also notes that all ORR programs have clinicians (see subpart D) that provide mental health services for UAC regardless of program type.

*Comment.* Two commenters also add that there is no consideration of disability as part of ORR's placement determinations, particularly for secure facilities.

*Response.* ORR Federal Field Specialists review and approve all placements of UACs in secure facilities consistent with legal requirements. This review includes consideration of any disabilities identified as part of ORR's intake assessment process for every UAC in care.

*Comment.* The commenter also found it unacceptable to move a child from "the least restrictive setting that is in the best interest of the child" for behaviors related to his or her disability without attempting first to ameliorate the need through the provisions of accommodations and individualized treatment.

*Response.* ORR acknowledges and appreciates the commenter's feedback. The proposed rule did not impact ORR's policies and procedures for ORR Federal Field Specialists to review and approve all placement changes of UAC in ORR care, including UACs with disabilities. (*See* ORR Policy Guide, Section 1.2.) Please see § 410.208 for information on the proposed rule regarding special needs minors in ORR care.

*Comment.* Multiple organizations noted that research shows the children with disabilities in secure facilities may not have their individual needs met. One disability-rights organization objected that Section 504 of the Rehabilitation Act of 1973 is not addressed in the rule.

*Response.* ORR acknowledges and appreciates commenters' feedback. The proposed rule did not impact ORR assessments or services based on each individual UAC needs, including any identified children with disabilities placed in any ORR facility, including secure facilities. ORR did not directly address Section 504 of the Rehabilitation Act of 1973, because the proposed rule did not impact ORR's assessments or services for disabled children. ORR assessments and services for disabled UAC meet all requirements laid out in Section 504 of the Rehabilitation Act of 1973.

*Comment.* Another commenter stated that the rule does not provide adequate notice or opportunity to be heard in the event that a mental health professional believes that a youth poses a risk of harm and must be moved into a more restrictive setting. The commenter noted that such notice and opportunity to be heard is necessary to safeguard against violations of section 504 of the Rehabilitation Act of 1973.

*Response.* HHS agrees that, in situations where an individual poses a risk of harm to self or others, it is in the best interest of the individual, those detained with the individual, as well as the Federal employees overseeing the individual, to ensure a mental health professional's concerns are addressed reasonably and efficiently. HHS provided specifically for this scenario (for purposes stemming from a licensed psychologist or psychiatrist determining the individual poses a risk of harm to self or others) in § 410.203(a)(4). Moreover, as noted in § 410.203(b), ORR Field Specialists review and approve all placements in this context consistent with the relevant legal requirements (including all relevant Acts of Congress).

Changes to the Final Rule

In response to public comments, HHS clarifies that it reviews placements of UACs in secure facilities on at least a monthly basis, and that, notwithstanding its ability under the rule to place UACs who are "otherwise a danger to self or others" in secure placements, this provision does not abrogate any requirements that HHS place UACs in the least restrictive

setting appropriate to their age and any special needs.

## Considerations When Determining Whether an Unaccompanied Alien Child Is an Escape Risk (45 CFR 410.204)

### Summary of Proposed Rule

Section 410.204 of the proposed rule described the considerations ORR takes into account when determining whether a UAC is an escape risk. This part is consistent with how the term "escape risk" is used in the FSA. Although the TVPRA removes the factor of being an escape risk as a ground upon which ORR may place a UAC in a secure facility, the factor of escape risk is still relevant to the evaluation of transfers between ORR facilities under the FSA as being an escape risk might cause a UAC to be stepped up from a non-secure level of care to a staff secure level of care where there is a higher staff-UAC ratio and a secure perimeter at the facility. Notably, an escape risk differs from a "risk of flight," which is a term of art used in immigration law regarding an alien's risk of not appearing for his or her immigration proceedings.

*Comment.* One organization noted that the TVPRA does not include escape risk as a factor for placement in a secure facility and disagrees with section 410.204 including this factor in placement decisions.

*Response.* HHS acknowledges that the TVPRA does not include escape risk as a factor for placement in a secure facility, and ORR does not propose to consider escape risk when determining whether to place UAC in a secure facility. As specified in proposed rule § 410.203, ORR will only place a UAC in a secure facility if the UAC has been charged with or is chargeable with a crime, or has been determined to pose a danger to self or others.

### Changes to the Final Rule

HHS is not making any changes to proposed § 410.204 in the final rule.

## Applicability of § 410.203 for Placement in a Secure Facility (45 CFR 410.205)

### Summary of Proposed Rule

Section 410.205 of the proposed rule provided that ORR does not place a UAC in a secure facility pursuant to § 410.203 if less restrictive alternatives, such as a staff secure facility or another licensed program, are available and appropriate in the circumstances.

*Comment.* Several organizations argued the FSA and current laws encourage the placement of children in the least restrictive setting and favor release to a parent or family member.

They argue that the proposed rule is designed to place more children in the most restrictive setting, which is not in the best interest of the child. One commenter stated that that the proposed rule eliminates the requirement that all UACs be housed in the least restrictive placement available.

*Response.* HHS agrees that the FSA and current laws encourage the placement of children in the least restrictive setting and that the FSA encourages release to a parent or family member. However, HHS disagrees that that the proposed rule is inconsistent with these goals. As the proposed rule indicates, for the protection of all UACs in its care and custody, HHS only places a UAC in a secure facility in limited, enumerated circumstances where the UAC has been charged with a crime or is chargeable with a crime, or when the UAC is a danger to self or others, which HHS reads in light of the other criteria in the FSA. When such placement criteria is met, a secure facility is in fact the least restrictive setting that is in the best interest of the child. Notably, ORR reviews the decision to place a UAC in a secure facility, in accordance with the TVPRA, at least once monthly to make sure that a less restrictive setting is not more appropriate. *See also* ORR Policy Guide, Section 1.4.2.

*Comment.* Several commenters contended that the proposed rule violates the TVPRA because it inserts availability and appropriateness factors as part of the placement decision. In 2008, Congress enacted a requirement that children under HHS custody "shall be promptly placed in the least restrictive setting that is in the best interest of the child." 8 U.S.C. 1232(c)(2)(A). In making such placements, "the [HHS] Secretary may consider danger to self, danger to the community, and risk of flight." *Id.* But "[a] child shall not be placed in a secure facility absent a determination that the child poses a danger to self or others or has been charged with having committed a criminal offense." *Id.* These commenters argued that 8 U.S.C. 1232(c)(2)(A) accordingly prohibits secure placement based on issues unrelated to the best interests of the child, such as licensed shelter availability.

*Response.* Consistent with the TVPRA, 8 U.S.C. 1232(c)(2)(A), under the proposed rule, "ORR places each UAC in the least restrictive setting that is in the best interest of the child and appropriate to the UAC's age and special needs, provided that such setting is consistent with its interests to ensure the UAC's timely appearance before DHS and the immigration court."

ORR will only place a UAC in a secure facility if the UAC has been charged with or is chargeable with a crime, or has been determined to pose a danger to self or others. Notwithstanding § 410.201(e) of the proposed rule, ORR does not place UAC in a secure facility such as a State or county juvenile detention facility based on issues unrelated to the best interests of the child, such as licensed shelter availability. ORR does not consider emergency or influx facilities to be secure facilities.

*Comment.* Several organizations stated that the final rule should have a mechanism that allows a minor to challenge their placement in a facility and whether the facility complies with FSA-required standards.

*Response.* HHS notes that nothing in the FSA contains the requirements commenters suggest with respect to an administrative appeal process (other than the hearings of paragraph 24(A) in the FSA). Nevertheless, pursuant to proposed § 410.206, within a reasonable period of time, minors transferred or placed in secure facilities are provided with a notice of the reasons for the placement in a language the UAC understands. In addition, ORR policy states that "After 30 days of placement in a secure or RTC facility, UAC may request the ORR Director, or the Director's designee, to reconsider their placement. The ORR Director, or designee, may deny the request, remand the request to the ORR/FFS for further consideration, or approve the request and order the youth transferred to a staff secure or other care provider facility." *See* ORR Guide, Section 1.4.7. Moreover, subpart H of this rule provides UAC with the opportunity to have an independent hearing officer review ORR's decision as to whether the UAC presents a danger to self or others, or is a risk of flight.

### Changes to the Final Rule

HHS is not making any changes in the final rule to proposed § 410.205 which is consistent with the FSA and the TVPRA.

## Information for Unaccompanied Alien Children Concerning the Reasons for His or Her Placement in a Secure or Staff Secure Facility (45 CFR 410.206)

### Summary of Proposed Rule

Section 410.206 of the proposed rule specified that, within a reasonable period of time, ORR must provide each UAC placed in or transferred to a secure or staff secure facility with a notice of the reasons for the placement in a language UAC understands.

*Comment.* A policy group stated that the proposed regulation does not clearly identify specific behaviors or offenses that allow placement of a UAC in a secure facility. Further, the commenter stated that the notice of restrictive placement it is not clear enough for children to understand because it is a broad and non-specific list, which is confusing for children and fails to put them on notice of the rules that may result in their being detained in a jail-like setting.

*Response.* As explained in the proposed rule preamble, HHS chose not to include in the proposed regulatory text (*see* proposed rule, § 410.203) the specific examples of behavior or offense that could result in the secure detention of a UAC in paragraph 21 of the FSA because the examples are non-exhaustive and imprecise. ORR notes, however, that in addition to standard check boxes to indicate reasons why a UAC is being placed in a secure, RTC, or staff-secure facility, ORR's Notice of Placement in a Restrictive Setting as is required by proposed rule, § 410.206, provides a space for a narrative to be included which explains in greater detail why a particular restrictive setting is being recommended for a given UAC. The ORR form also specifically encourages a UAC to seek out assistance from his or her case manager at the ORR care provider facility, attorney, or legal service provider, if the UAC has any questions about his or her placement, or their right to challenge it.

*Comment.* One commenter stated that the rule does not provide adequate notice or opportunity to be heard in the event that a mental health professional believes that a youth poses a risk of harm and must be moved into a more restrictive setting. The commenter stated that such notice and opportunity to be heard is necessary to safeguard against violations of section 504 of the Rehabilitation Act of 1973.

*Response.* HHS only places a UAC in an RTC if the youth is determined to be a danger to self or others by a licensed psychologist or psychiatrist. *See* ORR Policy Guide, Section 1.4.6. UACs have an opportunity to challenge such a placement in an RTC. Per ORR policy (see ORR Guide, Section 1.4.7): ''After 30 days of placement in a secure or RTC facility, UAC may request the ORR Director, or the Director's designee, reconsider their placement. The ORR Director, or designee, may deny the request, remand the request to the ORR/FFS for further consideration, or approve the request and order the youth transferred to a staff secure or other care provider facility.'' The right to such administrative review is set forth on

ORR's Notice of Restrictive Placement form, which is provided to UACs. Included in the notice is information on the UAC's right to seek judicial review in a Federal District Court with jurisdiction and venue. Immediately upon placement in a secure facility, staff secure facility, or RTC, a UAC may ask a lawyer to assist him or her in filing a lawsuit in a Federal District Court, if he or she believes they have been treated improperly and/or inappropriately placed in a restrictive setting. A judge will decide whether or not to review the UAC's case to determine whether the UAC should remain in a restrictive setting. Requests for reconsideration of placement in a restrictive facility is a separate process and a separate determination from the 810 hearings, which determine whether a UAC is a danger to the community or flight risk if released from ORR custody.

Consistent with the Ninth Circuit Court of Appeals decision in *Flores* v. *Sessions* and paragraph 24A of the FSA, UACs also have the opportunity to seek a bond hearing with an immigration judge. This rule, at § 410.810, creations of an independent hearing officer process (''810 hearings'') which would provide substantially the same ''practical benefits'' as a bond hearing under the FSA, as described by the Ninth Circuit. In a bond hearing, an immigration judge decides whether the child poses a danger to the community. Similarly, an independent hearing officer within HHS would decide on the same question in an 810 hearing under this rule. ORR would take such a decision into account when determining a UAC's continued placement while in care.

HHS notes that further information about the placement of special needs minors in ORR care is found in the discussion regarding proposed rule, § 410.208.

*Comment.* A commenter noted that there was no provision in the proposed rule for a periodic reassessment of a minor's placement at least every 30 days, as the commenter contends is required under 8 U.S.C. 1232(c)(2)(A), or for independent review of a placement decision that satisfies due process requirements. The commenter recommended the adoption of standards it developed for providing both of these protections, which the commenter believes are necessary to ensure secure placements are limited to extreme circumstances only.

*Response.* The proposed rule did not impact ORR's policies and procedures for the 30 day restrictive placement review, for all UACs placed in secure, staff secure, and RTCs. (*See* ORR Policy

Guide Section 1.4.2). HHS declines to adopt the standards suggested by the commenter because the rule implements and codifies both the FSA and other existing practices under the HSA and TVPRA.

*Comment.* Several commenters also expressed concern that the proposed rule § 410.206 weakened notice requirements for children placed in secure program.

*Response.* The proposed rule did not impact the notice requirements for children placed in secure programs. (*See* ORR Policy Guide Section 1.4.2)

Changes to Final Rule

HHS is not making any changes in the final rule to proposed § 410.206 which is consistent with the FSA.

Custody of an Unaccompanied Alien Child Placed Pursuant to This Subpart (45 CFR 410.207)

Summary of Proposed Rule

Section 410.207 of the proposed rule specified who has custody of a UAC under subpart B of these rules. The proposed regulation specified that upon release to an approved sponsor, a UAC is no longer in the custody of ORR. ORR would continue to have ongoing monitoring responsibilities under the HSA and TVPRA, but would not be the legal or physical custodian. *See, e.g.,* 6 U.S.C. 279(b)(1)(L); 8 U.S.C. 1232(c)(3)(B). This interpretation accords with ORR's longstanding position, as well as provisions of the FSA (see *e.g.,* paragraphs 15 through 17, discussing ''release'' from custody).

*Comment.* No public comments were submitted concerning this section of the proposed rule.

Changes to the Final Rule

HHS is not making any changes to the proposed rule.

Special Needs Minors (45 CFR 410.208)

Summary of Proposed Rule

In the proposed rule, ORR described ORR's policy regarding placement of a special needs minor. ORR also noted that an RTC may be considered a secure level of care and is discussed in proposed § 410.203.

*Comment.* Several comments submitted concerned the standards for ORR's care of children with disabilities. Two advocacy groups commented that the proposed regulations do not contain enough guidance regarding the consideration of a child's disability as part of a placement determination, and the provision which requires a psychologist or psychiatrist to determine whether a child is a danger

to themselves or others, is insufficient to protect children with disabilities.

Multiple legal and advocacy organizations noted that research shows that children with disabilities placed in secure facilities may not have their individual needs met. One of these commenters stated that the proposed rule should take into account studies suggesting youth with disabilities who are placed in secure facilities are at high risk of unmet health needs, fail to receive appropriate accommodations for their disabilities, and are subject to harmful conditions, including the use of restraints and solitary confinement. Another organization asserted that the proposed rule contains inadequate standards to address the needs of children with disabilities and fails to guarantee special education for children with disabilities, in conflict with the U.S. Supreme Court case *Plyler* v. *Doe,* 457 U.S. 202 (1982), and the Individuals with Disabilities Education Act. Another commenter, a disability-rights organization noted that Section 504 of the Rehabilitation Act of 1973 is not addressed in the rule.

Several organizations commented that education and special needs plans for UACs in ORR care are vague and that educational assessment needs to be defined. In addition, the organizations contended that the proposed rule needs to be more specific regarding how children's individualized educational needs will be met.

*Response.* Under the rule, ORR will individually assess each UAC to determine whether the UAC has special needs and place the UAC in the least restrictive setting appropriate to the UAC's age and individual needs. The proposed language also requires ORR, whenever possible, to place a UAC with disabilities in licensed programs where children without special needs are placed but that can provide the services and treatment needed to accommodate such special needs. UACs are placed in more restrictive settings, such as a RTC, only if the facility is the least restrictive placement available that meets the needs of the UAC as required by the TVPRA. *See* 8 U.S.C. 1232(c)(2)(A). Moreover, consistent with the July 30, 2018 Order in *Flores* v. *Sessions,* § 410.203 states that "placement in a secure RTC may not occur unless a licensed psychologist or psychiatrist determines that the UAC poses a risk of harm to self or others."

All UACs in ORR custody are provided access to educational services while in care. Under § 410.402, all licensed programs must identify a UAC's special needs, including any specific problems that appear to require

immediate intervention, as well as develop an individualized educational assessment and plan for each minor. ORR care providers must provide educational services appropriate to the UAC's level of development, literacy level, and linguistic or communication skills in a structured classroom setting, which concentrate mainly on the development of basic academic competencies and secondarily on English Language Training (ELT). Further guidance regarding academic educational services provided to UAC is included in ORR Guide, section 3.3.5, which again is consistent with and not abrogated by the rule. Care providers adapt or modify local educational standards to develop curricula and assessments, which must reflect cultural diversity and sensitivity. Remedial education and after school tutoring is provided as needed. Academic reports and progress notes are included and updated in the UAC's case file.

Changes to the Final Rule

HHS is not making any changes to proposed § 410.208 in the final rule, which adopts the special needs provision as found in the FSA, paragraph 7.

Procedures During an Emergency or Influx (45 CFR 410.209)

Summary of Proposed Rule

Section 410.209 describes the procedures ORR follows during an emergency or influx. The FSA defines "emergency" and "influx." Consistent with the FSA, the proposed rule states that UACs should be placed in a licensed program as "expeditiously as possible."

HHS proposed a written plan describing the reasonable efforts it will take to place all UACs as expeditiously as possible into a licensed shelter when there is an influx or emergency consistent with proposed § 410.209.

*Comment.* HHS received several comments on the use of influx facilities when there are not enough beds at licensed facilities during an emergency or influx. Many individuals wrote that UACs should not be detained in unlicensed or non-state licensed "tent cities," but instead should be treated with respect and dignity.

Commenters were concerned with ORR's use of unlicensed soft-sided structures to house UACs during an influx, referring to them as "tent cities." Commenters were concerned about the location of the Tornillo Influx Care Facility, especially the distance from El Paso, available services, and accommodations. Another commenter

compared "tent cities" to Japanese and German internment camps.

The commenters highlighted the facility's exemption from state oversight and licensing requirements and described cramped detention conditions existing there. Several commenters argued that placement of UACs in such facilities would be contrary to the TVPRA and the HSA, and undermine the FSA.

*Response.* The FSA contemplates scenarios when the U.S. government's ability to place every UAC in a licensed facility is not possible during an emergency or influx. The HSA and the TVPRA do not prohibit the use of unlicensed facilities in some circumstances. The proposed rule defines those circumstances in § 410.101—Definitions.

When there is a sharp increase, or "influx," in the number of UACs entering the United States and Federal agencies are unable to transfer them into state-licensed, ORR-funded care provider facilities in a timely manner, HHS may place certain UACs at influx care facilities. HHS has detailed policies for when children can be sheltered at a temporary influx care facility. The minor must be a youth between 13 and 17 years of age; have no known special medical or behavioral health conditions; have no accompanying siblings age 12 years or younger; and be able to be discharged to a sponsor quickly—among other considerations. (*See* ORR Policy Guide: Children Entering the United States Unaccompanied, Section 1.3.5).

HHS is the primary regulator of temporary influx care facilities and is responsible for their oversight, operations, physical plant conditions, and service provision. While states do not license or monitor influx care facilities, they operate in accordance with applicable provisions of the FSA, HSA, TVPRA, interim Final Rule on Standards to Prevent, Detect, and Respond to Sexual Abuse and Sexual Harassment Involving Unaccompanied Alien Children, and ORR policy and procedures, and contract requirements.

HHS monitors temporary influx care facilities through assigned Project Officers, Federal Field Specialists, Program Monitors, and an Abuse Review Team, and all have the authority to issue corrective actions if needed to ensure the safety and wellbeing of all children in HHS' care.

HHS choses locations for temporary influx care facilities based on a number of factors relevant to child welfare, which included size, types of housing structures, and time considerations. HHS assesses possible influx sites for suitability to temporarily house UACs.

HHS also seeks to limit the use of soft-sided temporary influx structures except as a last resort to prevent UACs from lengthy stays in U.S. Border Patrol stations or to address any other emergent issues that could cause a temporary inability to use one of our regular shelters.

HHS strives to provide a quality of care at temporary influx care facilities that is parallel to our state-licensed programs. Children in these facilities can participate in recreational activities and religious services appropriate to the child's faith, and receive case management, on-site education, medical care, legal services, and counseling.

HHS' goal is to place as many UACs as possible into permanent state-licensed facilities or transitional foster care while their sponsorship suitability determinations or immigration cases are adjudicated (in the event there is no sponsor available).

Changes to the Final Rule

HHS is not making any changes in the final rule to proposed § 410.209.

45 CFR Part 410, Subpart C, Releasing an Unaccompanied Alien Child From ORR Custody

This subpart covers the policies and procedures used to release, without unnecessary delay, a UAC from ORR custody to an approved sponsor.

45 CFR 410.300—Release a UAC From ORR Custody to an Approved Sponsor

Summary of Proposed Rule

In the proposed rule, HHS described the policies and procedures used to release a UAC from ORR custody to an approved sponsor.

*Comment.* HHS did not receive any comments on this section.

Changes to Final Rule

HHS adopts the standard in the proposed rule.

45 CFR 410.301—Sponsors to Whom ORR Releases an Unaccompanied Alien Child

Summary of Proposed Rule

In the NPRM, HHS proposed that it would release a UAC to a sponsor without unnecessary delay when ORR determines that continued custody of the UAC is not required to either secure the UAC's timely appearance before DHS or the Immigration Courts or to ensure the UAC's safety or the safety of others. HHS also listed individuals (and entities) to whom ORR releases a UAC. HHS refers to the individuals and entities in this list as '"approved sponsors," regardless of their specific

relationship with the UAC. The list of approved sponsors follows the order of preference set out in the FSA.

*Comment.* A few commenters disagreed with HHS' proposed language under § 410.301, which they believed afforded ORR broad authority to deny family reunification and raises serious due process concerns. For instance, the commenters pointed out that § 410.301 permits ORR to deny reunification on the basis that the child's sponsor will not secure the child's appearance before DHS or the Immigration Courts, which they believe improper. They also raised concerns that the proposed rule does not establish any process by which the child is protected from an erroneous decision by being provided a notice of such a determination; presented with evidence supporting ORR's determination; or given an opportunity to contest such a determination and to present their own evidence in opposition to ORR's determination.

Two commenters highlighted that the process also lacks a delineated timeline for decision-making or release. Multiple organizations argued that reuniting children with their families as quickly as possible is in the child's best interest. These organizations noted that it is in recognition of this interest that the FSA requires ORR to make ''prompt and continuous efforts'' towards family reunifications and to release children from immigration related custody ''without unnecessary delay.''

*Response.* As stated above, the purpose of this rulemaking is to implement the provisions of the FSA. ORR derived language on denying UAC release verbatim from paragraph 14 of the FSA, which in itself was intended to address and fully settle Constitutional concerns, including due process issues, on behalf of the full class of UACs in INS legal custody, now HHS legal custody. The FSA did not include any provisions for the process urged by commenters. Similarly, the TVPRA—which includes Congress' detailed protections for UACs in the legal custody of HHS—did not include the process for challenging reunification urged by some commenters. ORR nevertheless notes that the various protections specified by commenters are addressed by ORR's existing policies (*see* ORR Policy Guide, section 2.7). Additionally, ORR notes that each case is unique and release decisions, by necessity, must be based on multiple factors, some of which are outside the agency's control (*e.g.*, the time it takes for a sponsor to complete a sponsor application). ORR addresses timelines for its decision-making process and release recommendations in policies

and procedures that interpret ORR's authorities and require that the decision-making process and release recommendations be made in a timely manner.

*Comment.* A commenter who is a former director of ORR stated that during his tenure at ORR, the agency interpreted (and implemented) the TVPRA mandate of placing UACs in the ''least restrictive setting'' to require that children be released from congregate care to parents, other family members, or other responsible adults (''sponsors'') as promptly as possible. The commenter further stated that sponsors' requests for reunification were denied only in narrow circumstances where reuniting a child with the sponsor would not be in the child's best interest. He also objected to the Director-level review and approval policy of the current Administration as needlessly delaying the release of children from ORR custody, putting children at risk of considerable harm, and violating the TVPRA. The commenter said that in circumstances where even short delays can have serious implications for child well-being, the delays that necessarily accompany this new layer of review pose a serious risk of harm. He also asserted that the Director-level review for dangerousness of the entire category of children previously in staff-secure or secure placements serves no conceivable purpose and was put into place in a manner contrary to any notion of responsible agency administration and management.

*Response.* HHS notes that the language regarding denying release of a minor derives from paragraph 14 of the FSA, and does not specify a regulatory requirement for a Director-level review. Likewise, ORR's current release policy, *see* ORR Policy Guide, section 2.7, does not include such a mandate for Director-level review. Additionally, ORR has an appeals process for when sponsorship is denied in ORR Policy Guide, section 2.7.7. This rule does not affect the appeals process for denying sponsorship.

Changes to Final Rule

While recognizing that ORR policy includes some of the process urged by commenters, the purpose of this final rule is to implement provisions of the FSA. HHS accordingly is not deviating from the language of the proposed rule. The rule adopts the substantive terms of the corresponding release provisions of the FSA, paragraph 14.

45 CFR 410.302—Sponsor Suitability Assessment Process Requirements Leading to Release of an Unaccompanied Alien Child From ORR Custody to a Sponsor

Summary of Proposed Rule

In the proposed rule, HHS outlined the process requirements leading to release of a UAC from ORR custody to a sponsor (also referred to as a "custodian"). The FSA at paragraph 17 allows ORR the discretion to require a suitability assessment prior to release, and the TVPRA provides that ORR may not release a UAC to a potential sponsor unless ORR makes a determination that the proposed custodian is "capable of providing for the child's physical and mental well-being. Such determination shall, at a minimum, include verification of the custodian's identity and relationship to the child, if any, as well as an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child." 8 U.S.C. 1232(c)(3)(A). As such, the proposed rule requires a background check, including at least a verification of identity for potential sponsors in all circumstances. In accordance with the FSA, under the proposed rule, suitability assessments can include an investigation of the living conditions in which the UAC would be placed; the standard of care he or she would receive; interviews of household members; a home visit if necessary; and, follow-up visits after the child's release from care. Furthermore, where the TVPRA requires a home study, as specified in 8 U.S.C. 1232(c)(3)(B), the proposed regulations acknowledge such requirement. The FSA says that the proposed sponsor must agree to the conditions of release by signing a custodial affidavit (Form I–134) and release agreement. However, the Form I–134 is a DHS form, and ORR does not use this form. Therefore, the proposed rule would have the sponsor sign an affirmation agreeing to abide by the sponsor care agreement, which is the agreement and accompanying form ORR has used so that the sponsor acknowledges his or her responsibilities.

Further, consistent with the FSA and the TVPRA, ORR's suitability assessment includes biographic background checks (such as public records checks and sex offender registry checks) of potential sponsors, including biological parents, and household members, as well as fingerprinting only as is needed to ensure that release of a UAC to prospective sponsors is safe. Of note is that, in many, if not most cases,

as well, while a sponsor may be a biological parent, the child arrived unaccompanied, and may not have lived with the parent for much or a significant portion of his or her childhood, so background checks remain important for safety reasons. Such background checks of all potential sponsors and household members are consistent with various state child welfare provisions. For example, all states require background checks for prospective foster care and adoptive parents, and kinship caregivers typically must meet most of these same requirements. *See* "Background Checks for Prospective Foster, Adoptive, and Kinship Caregivers," available at: *https://www.childwelfare.gov/pubPDFs/background.pdf#page=2&view=Who* Aug. 4, 2018). As of the time of the publication of the report, in 48 states, all adults residing in the home also were subject to background checks. A criminal records check for adult sponsors and other household members will check the individual's name in State, local or Federal law enforcement agencies' records, including databases of records for any history of criminal convictions. Moreover, nearly all states require a check of national criminal records. *See also* 42 U.S.C. 671(a)(20) (providing that states receiving Federal funding for foster care and adoption assistance provide "procedures for criminal records checks, including fingerprint-based checks of national crime information databases (as defined in section 534(e)(3)(A) 1 of title 28), for any prospective foster or adoptive parent before the foster or adoptive parent may be finally approved for placement of a child.").

In § 410.302(e), HHS ORR proposed a list of conditions and principles of release. ORR also invited public comment on whether to set forth in the final rule ORR's general policies concerning the following:

1. Requirements for home studies (*see* 8 U.S.C. 1232(c)(3)(B) for statutory requirements for a home study);

2. Denial of release to a prospective sponsor, criteria for such denial, and appeal; and

3. Post-release services requirements.

*Note:* In accordance with the *Flores* v. *Sessions* July 30, 2018 court order, ORR stated in the preamble that it will not have a blanket policy of requiring post release services to be scheduled prior to release—for those UACs who required a home study—but will evaluate such situations on case-by-case basis, based on the particularized needs of the UAC as well as the evaluation of the sponsor, and whether the suitability of the sponsor may depend upon having post release services in place prior to any

release. It is not necessary to include the policy on post-release services being in place, discussed above, explicitly in the regulation text, as the requirement for release without "unnecessary delay" is already included in the substantive rule, and this process is an interpretation of that requirement. Current policies are set forth in the ORR Policy Guide available at *https://www.acf.hhs.gov/orr/resource/children-* entering-the-united-states-unaccompanied at: Sections 2.4 through 2.7.

*Comment.* Some organizations disagreed with HHS' proposed language under § 410.302 because they thought it lacked accountability and oversight for ORR and establishes discretionary factors ripe for discriminatory application. The commenters noted that § 410.302(a) fails to establish any timeline requirements or requirements for prompt release. One commenter noted that HHS lacked requirements to make continuous efforts at release, and referenced agency practice as opposed to statutory and *Flores* requirements.

*Response.* HHS wishes to reiterate that this final rule is intended to implement the terms of the FSA (and the TVPRA and HSA to the extent such statutes directly affect FSA provisions). It is not designed to address litigation related to children separated from their parents. HHS disagrees with commenters who indicated that the agency did not follow statutory or FSA requirements; the language in § 410.302 is verbatim of language in paragraph 18 of the FSA that the licensed program "shall make and record the prompt and continuous efforts on its part toward family reunification and the release of the minor." Issues of timeline requirements are not included in the FSA. With respect to separated children, HHS notes that this rule is intended to implement the FSA, and it is beyond the scope of this rulemaking to incorporate any requirements stemming from ongoing litigation. Such requirements govern how a Federal agency interacts with, monitors, and oversees its grantees and contractors and are more appropriately discussed and defined in ORR policy while this rule focuses exclusively on codifying the FSA.

*Comment.* Organizations and commenters raised concerns that § 410.302(b) may lead to discrimination on account of economic status due to the lack of specificity in describing what standard of care is satisfactory for reunification, and what living conditions would raise concerns. They argue that poverty alone should not prevent a child's release from government custody.

*Response.* HHS disagrees with the commenter's characterization of this requirement. Paragraph 17 of the FSA states specifically that the suitability assessment may include: "verification of identity and employment of the individuals offering support." ORR notes that the employment check is only one factor among many in the suitability assessment to ensure that the potential placement is in the child's best interest. Poverty, alone, will not prevent a UAC's release, but the TVPRA prohibits HHS from releasing a UAC unless it determines that a potential sponsor is "capable" of caring for the minor's "physical and mental well-being." Part of such analysis requires determining the sponsor's means to do so, which may include employment.

*Comment.* Many commenters believed that § 410.302(c) allows ORR to unnecessarily and inappropriately require a further suitability assessment and delay a child's placement with a sponsor. Several organizations argued that information obtained by ORR during the suitability assessment of a sponsor should not be shared with DHS for immigration enforcement purposes. In addition, some organizations said that sponsors should receive notice of the additional requirements and an opportunity to contest their necessity or to satisfy concerns in an alternate manner. One commenter suggested HHS could get the information it needs through its own Central Index System or the Executive Office for Immigration Review Hotline, which provides immigration hearing information. The commenter argued that the procedures in the proposed rule are contrary to children's best interests, which the law requires HHS to prioritize.

*Response.* The FSA does not include provisions for sponsors contesting the necessity of additional conditions. Instead, paragraph 17 of the FSA provides the discretion for the agency to conduct a suitability assessment prior to release. Such suitability assessment may include interviews of household members and may require home visits. In addition, ORR adheres to the TVPRA, which states that, "[b]efore placing the child with an individual, the Secretary of Health and Human Services shall determine whether a home study is first necessary." 8 U.S.C. 1232(c)(3)(B). ORR policies similarly allow the Office to use its discretion to provide home studies when it is in the best interest of the child, *see* ORR Policy Guide, section 2.4. Home studies—a common practice in State foster care systems—ensure that a home is investigated, especially in cases where there is concern about the sponsor, or the UAC is especially

vulnerable.[40] The agency is required to balance timely releases with ensuring the safety of UACs, including that they are not released to traffickers or others who would abuse or exploit them. Further, HHS notes section 224(a) of DHS's current fiscal year 2019 Appropriations Act[41] bars DHS, except in certain limited circumstances, from taking certain enforcement actions "against a sponsor, potential sponsor, or member of a household of a sponsor or potential sponsor of an unaccompanied alien child ['UAC'] . . . based on information shared by [HHS]."[42]

ORR notifies sponsors following its policies and procedures on the home study process.

Lastly, with regard to obtaining information through the Central Index System, HHS notes that this system is actually maintained by the U.S. Citizenship and Immigration Service, an agency within DHS.

*Comment.* Commenters also referred to the expanded suitability assessments, as described in § 410.302(c) and in the Memorandum of Agreement (MOA) between ORR, ICE, and CBP concerning information sharing (*see* ORR–ICE–CBP Memorandum of Agreement Security Regarding Consultation and Information Sharing in Unaccompanied Alien Children Matters (Apr. 13, 2018)), as unnecessary, likely to deter potential sponsors from coming forward, and violative of DHS's own privacy policy and the privacy rights of potential sponsors. One commenter stated that HHS and DHS have never convincingly articulated why immigration status determinations merit the privacy risk to parents and relatives. Several commenters believed that HHS' pre-MOA suitability assessments were sufficiently robust without expanding data collection and exchange and

argued that the proposed rule fails to justify why additional steps are necessary to assess sponsor suitability. To support the assertion that pre-MOA suitability assessment policies were sufficient, the commenters referenced three reports published by the Government Accountability Office (dated 4/26/2018, 2/5/2016, and 7/14/2015) recommending improvements to HHS' care of UACs and pointed out that none of the reports made recommendations calling for enhancements to HHS' sponsor suitability assessments. One commenter also referenced a report written by the Senate Permanent Subcommittee on Investigations (dated 8/15/2018) that focused on procedures for distant relatives or non-relatives but made no recommendations for procedures for parental or close relative sponsors. The commenters pointed out that neither the TVPRA nor the FSA require HHS to collect immigration status information on sponsors or other adult members of the household. They argued that the expanded collection and sharing of information about potential sponsors' immigration status serves no legitimate purpose in that, per the ORR Policy Guide, immigration status is not used to disqualify a potential sponsor. They also mentioned that there are alternative methods to obtain immigration status information that does not involve ICE, such as USCIS's Central Index System or the Executive Office for Immigration Review Hotline. The commenters posited that the practice of using information collected under the MOA for immigration enforcement purposes deters and/or delays family reunification because potential sponsors, many of whom are in the United States without legal immigration status, fear coming forward to sponsor children. The commenters also theorized that individuals who are lawfully present, including U.S. citizens, may also be deterred from sponsoring UAC in order to avoid interacting with ICE or exposing others living with or near them who lack legal immigration status to potential immigration enforcement. One commenter highlighted that further complications can arise when a household member refuses to undergo a background check. The commenter explained that sponsors may be forced to choose between leaving their home and leaving their child or loved one in Federal custody. The commenters suggested that HHS restrict access and use of data only to the vetting of potential sponsors. The commenters stated repurposing the data will

---

[40] *See* https://www.childwelfare.gov/topics/outofhome/foster-care/fam-foster/foster-care-home-studies/#sl_examples for discussion of home studies in foster care. The interstate compact on the placement of children (ICPC) state pages also allows a comparison of individual states with respect to requirements for foster care. The Texas state page shows that the state requires a home study even when a relative will be caring for a foster child. http://icpcstatepages org/texas/relativestudies/. The page for California shows that relative caregivers must be licensed, must receive a home study, must receive a criminal records check, must receive a child abuse and neglect check, and that the wait time is "3–6 Months" for "Complete applications for licensure and/or approval that do not have complications," and that "This process may take longer based on delays resulting from criminal background checks, exceptions and waivers, and need for corrections to foster family homes." http://icpcstatepages.org/california/relativestudies/.

[41] Consolidated Appropriations Act 2019, Public Law 116–6, section 224, 133 Stat. 13.

[42] CONSOLIDATED APPROPRIATIONS ACT, 2019, Public Law 116–6, February 15, 2019, 133 Stat 13.

contribute to the fear that interacting with any government agency will bring about an enforcement action.

*Response.* Consistent with the FSA and TVPRA, the proposed rule would codify the FSA standard to release UACs to sponsors promptly and without unnecessary delay. HHS disagrees with the commenters' assertion that additional information, such as information about a sponsor's immigration status, or fingerprinting in certain cases, is unnecessary. The TVPRA requires HHS to conduct a suitability assessment and is clear that the standards it requires (verification of the custodian's identity and relationship to the child, if any, as well as a determination that a proposed sponsor is "capable of providing for the child's physical and mental well-being," including an "independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child") are the *minimum* standards required. The TVPRA also sets forth a general principle that HHS "establish policies and programs to ensure that unaccompanied alien children in the United States are protected from traffickers and other persons seeking to victimize or otherwise engage such children in criminal, harmful, or exploitative activity." 8 U.S.C. 1232(c)(1).

In order to carry out the Department's mission to ensure safe release of UAC to their sponsors, while protecting vulnerable children from traffickers or others seeking to victimize or exploit them, ORR must be able to fingerprint or apply suitability assessments as appropriate. The rule does not require fingerprinting or immigration status checks for all cases; ORR uses the information from background check results to make release decisions in the child's best interest. ORR also engages in information sharing with other Federal agencies to ensure that children are protected from smugglers, traffickers, or others who might seek to victimize or otherwise engage the child in criminal, harmful or exploitative activity, as required by the TVPRA, 8 U.S.C. 1232(c)(1). HHS acknowledges that some requirements of suitability assessments and information sharing are factors that may contribute to a longer reunification process in some cases, however, HHS must balance its mandate to promptly release the child with its equally important mandate of ensuring that the child be released into a safe environment.

HHS continuously evaluates its UAC Program and operations. As part of this ongoing review process, ORR evaluated the effect expanded suitability assessments had on its mission of safe and timely release of UACs. This included evaluation of whether the expanded biometric background checks, as described in the ORR–ICE–CBP Information Sharing Memorandum of Agreement (Apr. 2018), yielded new information that enabled ORR to identify child welfare risks that the office would not have found under the prior policy, as well as whether a correlation existed between the expanded biometric background checks and UAC length of care in ORR custody ("length of care" refers to the total time that a UAC is under ORR care and custody; whereas "length of stay" refers to a UAC's placement at one specific care provider facility and does not account for time a UAC may have been placed at another care provider facility). ORR then issued a series of four operational directives (one in December 2018, one in March 2019, and two in June 2019) that modified the suitability assessment process to achieve an appropriate balance between safety and timeliness under the operating conditions faced by ORR.

Under the operational directives, ORR completes individualized suitability assessments of sponsors without obtaining fingerprints from all household members, or all parent/legal guardian or close relative sponsors in appropriate cases. ORR also permits under certain circumstances the release of children to other relatives who were their primary caregivers prior to receiving the results of a fingerprinting background check. Further, ORR no longer requires verification of immigration status information before releasing UAC to sponsors, or mandates Child Abuse and Neglect (CA/N) checks unless there is a specific and substantial child welfare concern.

Congress has prohibited HHS from using funds provided in the Emergency Supplemental Appropriations for Humanitarian Assistance and Security at the Southern Border Act, 2019 (Pub. L. 116–26) or previously appropriated funding to reverse the procedures of the first three operational directives, unless the Secretary determines that a change is necessary to protect an unaccompanied alien child from being placed in danger. Further the Secretary is required to submit the justification for the change in writing to the HHS/Office of Inspector General and to Congress prior to implementation of the proposed change. *See* section 403 of Public Law 116–26.

HHS disagrees with the commenters' assertion that immigration status checks are unnecessary. While ORR does not use immigration status to disqualify a proposed sponsor, ORR does use the proposed sponsor's immigration status to determine whether a sponsor care plan is necessary in the event the sponsor is required to leave the United States.

Additionally, HHS notes section 224(a) of DHS's fiscal year 2019 appropriations bars DHS from taking certain enforcement actions "against a sponsor, potential sponsor, or member of a household of a sponsor or potential sponsor of an unaccompanied alien child ['UAC'] . . . based on information shared by" HHS. Per the June 10, 2019 Operational Directive, case managers working with ORR grantee care providers are to share this information with persons subject to fingerprint background checks.

*Comment.* Another commenter urged HHS to resist cooperating with DHS enforcement activities relating to sponsors, citing several immigration related contexts in which access to data has been limited to further a greater societal need. This commenter shared that numerous police departments resist working with or sharing information with immigration enforcement entities because doing so has demonstrably limited their ability to respond to crime; that individuals who applied for Deferred Action for Childhood Arrivals (DACA) were promised that the data in their DACA applications would not be proactively shared with ICE for enforcement purpose; and that there are also restrictions on what data the Internal Revenue Service (IRS) can share with DHS, despite mounting pressure to enable DHS to use IRS data for enforcement purposes. Similarly, another commenter proposed that HHS require information that relates to sponsors' and household members' criminal status and immigration status be sealed upon the conclusion of a suitability assessment.

*Response.* The MOA and information sharing with other agencies is not the subject of the FSA and the rules implementing such Agreement. In addition, HHS does not control how another Federal agency may use information HHS shares in order for HHS to carry out its FSA and/or TVPRA requirements. However, HHS notes that section 224(a) of DHS's fiscal year 2019 appropriations bars DHS from taking certain enforcement actions "against a sponsor, potential sponsor, or member of a household of a sponsor or potential sponsor of an unaccompanied alien child ['UAC'] . . . based on information shared by [HHS]."

*Comment.* One organization asserted that HHS would be violating the Fair Information Practice Principles (FIPP)

and the privacy rights of potential sponsors by using information from background checks to deport sponsors and other relatives. The commenters cited an April 27, 2017, memorandum issued by DHS in which DHS extended FIPPs protections to all persons regardless of citizenship or legal status; the commenters stated that HHS is aiding DHS in violating the spirit of two of the FIPPs principles: Individual participation and use limitation.

The commenters believe that meaningful consent is impossible here because HHS presents parents with a Hobson's choice: Either consent to the release of your personal information to DHS and face possible deportation, or allow your child to languish in Federal custody until he or she turns 18 and is transferred into ICE custody.

*Response.* HHS disagrees that any information it shares with DHS would violate FIPPs. Once again, HHS does not share information with DHS for law enforcement purposes and notes that section 224(a) of DHS's fiscal year 2019 appropriations bars DHS from taking certain enforcement actions ''against a sponsor, potential sponsor, or member of a household of a sponsor or potential sponsor of an unaccompanied alien child ['UAC'] . . . based on information shared by [HHS].'' Additionally, HHS' March and June 10, 2019 Operational Directives, specifically exempts the vast majority of parent (and legal guardian) and close relative sponsors from fingerprint background check requirements.

*Comment.* The commenters pointed out that § 410.302(f) of the proposed rule permits ORR to deny reunification on the basis that the child's sponsor will not secure the child's appearance before DHS or the immigration courts; does not establish any process by which the child may be protected from an erroneous decision; or be provided notice of such a determination or the evidence used to make it.

One organization proposed expanding the use of affidavits to require sponsors of children to submit sworn statements attesting that their homes are safe for children. Additionally, the commenter proposed that HHS create an appeals process for denying sponsorship and produce aggregated annual reports on sponsors it denies. Another commenter urged HHS to put requirements regarding home studies, denial of release to sponsors, and post release services in the policy and procedure guide, not the final rule.

*Response.* HHS notes that the language regarding denying release of a minor derives from paragraph 14 of the FSA. HHS refers readers to earlier

responses regarding including additional process or timelines that were not outlined or included in the FSA. Regarding the various denial procedures specified by commenters, the safety of UACs and others is paramount when deciding whether to approve or deny release to a sponsor, and the sponsor denial procedures which ORR implements appear in section 2.7 of the ORR Policy Guide. ORR notes that is not possible to have specific timeframes for release because each case is unique, and decisions are based on multiple factors. However, ORR will address timelines for decision-making or release in policies and procedures interpreting the regulations with the understanding that all decisions be made in a timely manner. Historically, ORR utilizes a sponsor care agreement, in which the sponsor signs and affirms responsibility to provide for the physical and mental well-being of the minor, and the proposed rule will not affect this agreement. To ensure a sponsor's home is safe and appropriate for a UAC, ORR has policies and procedures in place to conduct a home study (see Section 2.4.2 of the ORR Policy Guide) and to provide post release services (see Section 6.2 of the ORR Policy Guide). ORR also has an appeal process for denying sponsorship (see section 2.7.7 of the ORR Policy Guide). The rule does not impact the requirements regarding home studies, post release services, and denial of release to sponsors in ORR's policies and procedures, nor the aggregated data reported by ORR in annual reports.

**Changes to Final Rule**

The rule adopts the substantive terms of the corresponding release and suitability provisions of the FSA, paragraphs 14 and 17. However, in response to commenters' concerns, HHS clarifies that the licensed program providing care for a UAC shall make continual efforts at family reunification as long as the UAC is in the care of the licensed program.

**45 CFR Part 410, Subpart D, Licensed Programs**

**45 CFR 410.400—Purpose of This Subpart**

**Summary of Proposed Rule**

In this subpart, HHS described the standards that licensed programs must meet in keeping with the FSA, including the general principles of the settlement agreement of treating all minors in custody with dignity, respect, and special concern for their particular vulnerability.

*Comment.* A commenter said that the United States government should utilize international rights-based standards for the care and treatment of children, who need special protections given their vulnerability.

*Response.* HHS notes that the proposed rule does not replace the requirements ORR has for licensed programs to provide a high-quality standard of care as outlined in ORR's Policy Guide. Rather, the rule adopts the FSA's minimum standards for licensed programs, found at Exhibit 1. Please see the introduction to the ORR Policy Guide and section 3.3 of the ORR Policy Guide for more information about ORR's special protections for vulnerable children.

**Changes to the Final Rule**

HHS is not making any changes in the final rule to § 410.400.

**45 CFR 410.401—Applicability of This Subpart**

**Summary of Proposed Rule**

This subpart applies to all ORR licensed facilities providing care in shelters, staff secure facilities, residential treatment centers, or foster care and group homes.

*Comment.* Some commenters cited research indicating that the best practice is to place immigrant youth in foster family placements and not large detention or shelter settings. A different commenter suggested that children be placed in orphanages until they reached a certain age.

*Response.* ORR has foster care programs for some immigrant youth, and the proposed rule does not impact minimum standards for those programs. *See* Exhibit 1 of the FSA; *see also* ORR Guide, Sections 1.4.4 and 3.6. ORR does not place children in orphanages; orphanages in the U.S. have been replaced by foster care systems.

**Changes to the Final Rule**

HHS is not making any changes in the final rule to § 410.401.

**45 CFR 410.402—Minimum Standards Applicable to Licensed Programs**

**Summary of Proposed Rule**

In this subpart, ORR described the specific minimum standards of care each licensed program must follow.

Section 410.402 reflected the minimum standards of care listed in Exhibit 1 of the FSA, which are consistent with the *Flores* v. *Sessions* Court order of July 30, 2018, as they require that licensed programs comply with applicable state child welfare laws and regulations and that UACs be

**44468** **Federal Register** / Vol. 84, No. 164 / Friday, August 23, 2019 / Rules and Regulations

permitted to "talk privately on the phone, as permitted by the house rules and regulations." ORR expected licensed programs to easily meet those minimum standards and, in addition, to strive to provide additional care and services to the UACs in their care.

*Comment.* Many commenters stated that holding children in facilities that are not licensed by state child welfare agencies is inhumane and dangerous. Several commenters suggested that the proposed rule is vague and would harm children by overturning longstanding conditions that the government previously agreed to and which have effectively protected children.

*Response.* The rule adopts the FSA's provisions regarding placement of UACs in state-licensed programs. Each licensed program must meet the minimum standards outlined by the FSA, which will effectively protect children.

*Comment.* One commenter urged HHS and DHS to protect the FSA, stating that knowingly exposing migrant children to prison like conditions, while simultaneously removing existing mechanisms for court monitoring and independent oversight, would be a deliberate violation of their human rights.

*Response.* ORR's standards for licensed care provider programs are adopted from the FSA. For the UAC program, all licensed facilities must meet the minimum standards set forth in Exhibit 1 of the FSA.

*Comment.* Commenters noted that even under the current requirements around licensing, conditions could result in trauma. Commenters contend that children's rooms are cramped and subject to uncomfortable temperatures and they cannot access medical attention right away. Commenters stated that unlike licensed shelter placements, many of ORR's more restrictive settings closely resemble prison. Children may be under constant surveillance, required to wear facility uniforms, and have little control.

*Response.* In § 410.402 of the proposed rule, HHS outlined all the minimum standards applicable to licensed care provider programs for children in ORR's care, and included requirements to comply with child welfare laws and regulations and all State and local building, fire, health, and safety codes. These minimum standards were adopted directly from Exhibit 1 of the FSA. Further, the proposed rule is consistent with and does not abrogate ORR's policies and procedures for UAC services, including items provided to each UAC, safety

planning, and living arrangements (*see* ORR Policy Guide, Section 3).

*Comment.* Several commenters wrote about allegations of abuse taking place in detention facilities. They also mentioned allegations of abuse occurring within ORR custody such as in Southwest Key facilities in Arizona. Commenters also submitted an article from Reveal (Aura Bogado, Patrick Michels, Vanessa Swales, and Edgar Walters, published June 20, 2018) that detailed several allegations of abuse at shelters serving children in ORR custody, including abuse allegations at Shiloh Treatment Center in Texas. These commenters expressed their concern that the new rule would allow for longer periods of detention, which would raise the risk of abuse.

*Response.* HHS takes any and all allegations of abuse of UACs seriously. The proposed rule will not change ORR's standards of care or reporting requirements. *See* IFR; ORR Guide, sections 3, 4, and 5.

*Comment.* Commenters wrote that many of the migrants who arrive in the United States have experienced trauma and thus, it is important for facilities to provide trauma-informed care to migrants to help them heal and achieve self-sufficiency.

*Response.* The proposed rule does not affect ORR's mental health services for UACs. It adopts the FSA's requirement that licensed programs provide appropriate mental health interventions when necessary and weekly individual counseling sessions by trained social services staff. Individual counseling sessions address crisis-related needs, including trauma. *See also* ORR Guide, section 3.3 for more information on counseling services for UAC.

*Comment.* Several commenters argued that education and special needs plans are vague and that educational assessment needs to be defined. In addition, they contended that the proposed rule needs to be more specific regarding how children's specific education needs will be met. One commenter noted that few children, if any, are screened for disability-related issues upon transfer from ICE to ORR custody. Another commenter advocated that ORR should take into account the special needs of children, as is required under the Individuals with Disabilities Education Act (34 U.S.C. 1400 *et seq.*) and 34 CFR 300.7.

*Response.* The provision adopts the standards of Exhibit 1, including a requirement for licensed programs to deliver services in a manner sensitive to the complex needs of each individual UAC. HHS takes into account the special needs of children, through

education assessments and education services. *See* ORR Guide, sections 3.3 and 3.3.5. The proposed rule will not affect assessments and services.

*Comment.* One medical faculty group recommended that HHS strive to reduce trauma among families by adopting Substance Abuse and Mental Health Services Administration (SAMHSA) guidelines for a trauma-informed approach, which include: (1) Safety; (2) trustworthiness and transparency; (3) peer support; (4) collaboration and mutuality; (5) empowerment, voice and choice; and (6) sensitivity to cultural, historical, and gender issues. The commenters believe that the proposed changes to current regulations violate standards of trustworthiness, transparency, collaboration, and empowerment, and they and they urge that the current FSA standards be retained.

*Response.* HHS notes that it provides care for UACs, not adults. The proposed rule does not impact ORR's policies and procedures for ORR services to UACs, as outlined. The proposed rule keeps the FSA minimum standards for licensed facilities. For responses regarding DHS FRCs, refer to Section 8 "Detention of Families."

*Comment.* Several commenters argued that HHS omitted certain minimum standards. For instance, one organization found the minimum standards at section 410.402 did not provide sufficient safeguards for children's health and safety, while another contended that HHS does not address the educational service requirement. Another interest group commented that the minimum standards do not address basic services such as the provision of food, water, and medical care.

*Response.* HHS notes that the proposed rule keeps the FSA standards for licensed facilities, including the provision of food, water, and medical care. The proposed rule does not impact the safeguards for child health and safety. *See* ORR Guide, sections 3.3 and 3.4. ORR's policies and procedures also address the education service requirement. *See* ORR Guide, section 3.3.5. The proposed rule does not impact ORR's education services.

*Comment.* An organization representing multiple welfare agencies recommended that HHS include trauma screenings and developmental learning; that outdoor activity time frames be expanded; that clinical services be trauma-informed; that celebration of cultural and religious celebrations be included; and that internet access for correspondence be required.

*Response.* HHS will address specific changes to UAC services through its policies and procedures.

*Comment.* Another organization found that service provisions in the proposed rule did not address the needs of victims of violence and sexual abuse, victims who are most likely going to be women and children.

*Response.* Because it adopted the provisions of Exhibit 1 of the FSA, the proposed rule did not change ORR's mental health services for UAC in care, including weekly individual counseling sessions by trained social work staff. Individual counseling sessions address any crisis-related needs, including sexual abuse and violence. *See* ORR Policy Guide, section 3.3.

*Comment.* One commenter contended that ''the proposed rules are, at worst, expressly prohibited by the FSA and, at best, incompatible with the letter and spirit of the agreement.'' It also argued that the proposed new layer of Federal rules was duplicative of State law requirements already in place.

*Response.* HHS disagrees that the rule is prohibited by or incompatible with the FSA. In fact, the proposed rule adopts the FSA's minimum standards for ORR licensed facilities. HHS recognizes that the proposed rule may be duplicative of State licensing requirements in some respects, and any duplication issues will be addressed in ORR policies and procedures.

*Comment.* Several commenters asserted that UACs are housed in prison-like conditions, sleeping on cement floors, using open toilets, and suffering from exposure to extreme cold and insufficient food and water.

*Response.* HHS believes these public comments specifically refer to allegations about CBP facilities (see § 236.3(g)). HHS provides living standards meeting the minimum standards of the FSA. The proposed rule, as well as ORR policies and procedures, address food and water for UACs in care.

*Comment.* Many commenters and organizations argued the rule removes child protections set in both U.S. child welfare standards and the FSA, undermining the safety, development, and well-being of children. The commenter argued that the procedures that the proposed rule would codify are contrary to children's best interests, which the law requires HHS to prioritize.

One commenter stated harms may surface or be aggravated when unaccompanied minors are placed in confined, institutional settings and are separated from family members and other community affiliations.

*Response.* HHS notes that the proposed rule adopts FSA standards for licensed facilities. It requires licensed facilities to comply with all applicable state child welfare laws and regulations. The proposed rule also did not change ORR's services for UAC, which prioritize safety, development, and well-being of children. ORR's services for UAC are outlined in section 3.3 of the ORR Policy Guide. The proposed minimum standards for licensed facilities do not change ORR's policies for UACs to have a minimum of two phone calls per week with their family, and access to community outings. Please see section 3.3 of the ORR Policy Guide for more details.

*Comment.* A commenter advocated hiring of Spanish speaking counselors to hear asylum claims and provide education on birth control.

*Response.* HHS notes that it is not an immigration enforcement or adjudication agency, and does not hear asylum claims. The proposed rule did not impact HHS' services for UACs, and it adopts the FSA's requirement to deliver services in a manner sensitive to UACs' cultures and native languages. The proposed rule did not impact ORR's UAC family planning services. *See* ORR Guide, section 3.3.

*Comment.* A commenter suggested that ICE and ORR consider issuing guidance to contractors, non-profits and faith-based organizations that are tasked with assisting the Federal Government in the care or education of immigrant youth.

*Response.* HHS notes that ORR already issues guidance in the form of policies and procedures to the grantees it funds to support the provision of care and custody to UACs in its custody. The minimum standards ORR communicates are based on the FSA's minimum standards, which the proposed rule has adopted. As a result, the proposed rule did not impact ORR's guidance to contractors, non-profits, and faith-based organizations regarding services for UAC. For more information on ORR's guidance for UAC services, please see section 3.3 of the ORR Policy Guide.

*Comment.* One commenter said that children, whether unaccompanied or accompanied, should receive timely, comprehensive medical care that is culturally and linguistically-sensitive by medical providers trained to care for children. The commenter said that trauma-informed mental health screening should be conducted once a child is in the custody of US officials via a validated mental health screening tool, with periodic re-screening, additional evaluation, and care available for children and their parents.

*Response.* The proposed rule did not impact medical services or mental health services for UAC, which are culturally- and linguistically-appropriate as required by the FSA. *See also* ORR Guide, sections 3.4 and 3.3. The proposed rule does not impact ORR's mental health screening tools.

*Comment.* One organization objected that the proposed rule did not include provisions for ensuring availability of licensed programs in geographic areas where children are apprehended.

*Response.* The proposed rule did not impact the location of ORR licensed programs, nor the cultural and linguistic requirements for UAC services in ORR care.

*Comment.* One commenter is concerned that the proposed rule will put LGBTQ youth in more restrictive settings, increasing their vulnerability to abuse. Other commenters noted that due to negative stereotypes about LGBTQ people as being more likely to engage in coercive sexual activity, LGBTQ youth are more likely than their straight and cisgender counterparts to face criminal consequences for consensual sexual activity. Commenters also asserted that, in the juvenile justice system, LGBTQ youth are sometimes even classified as sexual offenders at intake.

*Response.* HHS recognizes that LGBTQ youth may have unique needs and concerns, which its care providers must provide for, under both the FSA and the proposed rule. In addition, the IFR requires staff training and efforts to protect LGBTQ youth from abuse. Further, the proposed rule is consistent with and does not abrogate existing ORR policies to protect and care for LGBTQ youth. *See* ORR Guide, section 3.5. The proposed minimum standards for licensed facilities do not impact the quality of care for these vulnerable youth.

*Comment.* One commenter claimed that the proposed rule is immoral as well as illegal under international law. The commenter cited to a portion of Article 12 of the Universal Declaration of Human Rights which states: ''No one shall be subjected to arbitrary interference with his privacy, family, home, or correspondence, nor to attacks upon his honor or reputation. Everyone has the right to the protection of the law against such interference or attacks.''

*Response.* HHS notes that the proposed rule adopts the FSA's minimum standards for licensed programs, which explicitly include a UAC's reasonable right to privacy. Because the rule adopts the FSA's standards, this provision does not impact the privacy standards set forth by the FSA for licensed facilities.

*Comment.* One organization recommended the government immediately provide minors and UACs who are taken back into custody with an opportunity to contact family members as well as their attorneys.

*Response.* As stated in both the FSA and the proposed rule, all UACs are provided the opportunity to talk privately on the phone subject to house rules. The proposed minimum standards for licensed facilities do not change ORR's policies for UAC to have a minimum of two phone calls per week with their families, and unrestricted access to preprogrammed phone to contact legal service providers. Please see section 3.3 and 4.10.1 of the ORR Policy Guide for more details.

*Comment.* One commenter noted that in a study of immigration court cases involving unaccompanied minors over a two year period, the presence of an attorney proved crucial to the fate of the children in these cases. In nearly three quarters of the cases (73 percent) where the child was represented, the court allowed the child to remain in the United States. The child was ordered removed in only 12 percent of these cases while the remaining 15 percent filed a voluntary departure order. Where the child appeared in immigration court alone without legal representation, only 15 percent were allowed to remain in the country. The rest of the unrepresented minor children in immigration court were ordered deported, 80 percent through the entry of a removal order, and 5 percent with a voluntary departure order.

Several commenters cited government statistics [43] [44] that show that between 1997–2017, border arrests decreased from 1,412,953 to 310,531, while the number of border agents increased from 6,895 to 19,437. For unaccompanied children's cases in FY2017, nearly 60% were unrepresented.[45] Without an

attorney, children are five times more likely to be deported.[46]

*Response.* HHS notes that the proposed rule does not change ORR's policies for UAC in licensed facilities to have access to legal service providers. The proposed rule for minimum standards in licensed facilities states UAC in licensed facilities receive ''Legal services information regarding the availability of free legal assistance, the right to be represented by counsel at no expense to the government, the right to a removal hearing before an immigration judge, the right to apply for asylum or to request voluntary departure in lieu of removal.''

*Comment.* Another commenter supported locating children in facilities near relatives slated to receive custody, and streamlining the custody process.

*Response.* The proposed rule does not impact the location of ORR licensed programs, nor the procedures to approve release to appropriate sponsors.

Changes to the Final Rule

HHS is not making any changes in the final rule to § 410.402.

45 CFR 410.403—Ensuring That Licensed Programs are Providing Services as Required by These Regulations

In this subpart, HHS describes how ORR will ensure licensed programs are providing the services required under § 410.402. As stated in this section, to ensure that licensed programs continually meet the minimum standards and are consistent in their provision of services, ORR monitors compliance with these rules. The FSA does not contain standards for how often monitoring shall occur, and this regulation does not propose to do so. At present, ORR provides further information on such monitoring in section 5.5 of the ORR Policy Guide (available at: *https://www.acf.hhs.gov/ orr/resource/children-entering-the-united-states-unaccompanied-section-5#5.5*).

*Comment.* One commenter stated that having State licensing is important to ensure that facilities are investigated and violations are brought to light. The commenter noted that the Texas State health regulators documented roughly 150 standards violations at more than a dozen Southwest Key migrant children shelters across Texas, including: Children left unsupervised and harming themselves; staff members belittling children and shoving them; keeping

kids in un-air conditioned rooms in hot weather; and improper medical care. In the past five years, the commenter stated, police have responded to at least 125 calls reporting sex abuse offenses at shelters in Texas that primarily serve immigrant children, though psychologists have said that such records likely undercount the problems because many immigrant children do not report abuse for fear of affecting their immigration cases.

Commenters also cited an investigative report claiming that the Federal Government continues to place migrant children in for-profit residential facilities where allegations of abuse have been raised and where the facilities have been cited for serious deficiencies. Allegations include failure to treat children's sickness and injuries; staff drunkenness; sexual assault; failure to check employees' backgrounds; failure to provide appropriate clothing for children; drugging; and deaths from restraint. According to the commenters, few companies lose grants from DHS and HHS based on such allegations.

*Response.* HHS takes all and any allegations of abuse of UAC seriously. The proposed rule did not change ORR's standards of care of UAC and reporting requirements, as outlined in sections 3, 4, and 5 of the ORR Policy Guide. As under the FSA, licensed programs operating under the proposed rule are subject to state licensing standards, monitoring, and investigations. In addition, the proposed rule would not impact ORR's monitoring of licensed facilities for compliance with ORR policies and procedures, which occurs in addition to state monitoring. Please see section 5.5 of the ORR Policy Guide for more information on ORR monitoring of licensed facilities.

*Comment.* One commenter advocated HHS and other Federal departments should be held accountable for the fear and life-long psychological damage the commenter believes is being inflicted on alien minors coming into this country.

*Response.* HHS is committed to the physical and emotional safety and wellbeing of all children in ORR's care. HHS recognizes that many children and youth who come into the United States unaccompanied have experienced traumatic childhood events and that migration and displacement can contribute significantly to ongoing stressors and trauma in children. ORR care providers are trained in techniques for child-friendly and trauma-informed interviewing, assessment, and observation, and they deliver services in a manner that is sensitive to the age, culture, native, language, and needs of each child. In addition, when

[43] United States Border Patrol, Nationwide Illegal Alien Apprehensions Fiscal Years 1925–2017, *https://www.cbp.gov/sites/default/files/assets/documents/2017-Dec/BP%20Total%20Apps %20FY1925-FY2017.pdf*.

[44] United States Border Patrol, Border Patrol Agent Staffing by Fiscal Year, *https://www.cbp.gov/sites/default/files/assets/documents/2017-Dec/BP %20Staffing%20FY1992-FY2017.pdf*.

[45] *See* TRAC Immigration, ''Juveniles—Immigration Court Deportation Proceedings'' Tracker, *http://trac.syr.edu/phptools/immigration/juvenile/*. Select ''Fiscal Year Began'' from first drop-down menu and click ''2017''; select ''Outcome'' from the middle pull-down menu, click ''All''; select ''Represented'' from the last drop-down menu. Starting in FY2018, cases in TRAC include all juveniles, unaccompanied children and children who arrive as a family unit. This change was made because it is no longer possible to reliably distinguish these two separate groups in the court's records.

[46] Syracuse University, TRAC Immigration, ''Representation for unaccompanied children in immigration court'' (Nov. 24, 2014), *http://trac.syr.edu/immigration/reports/371/*.

discharging UACs, ORR may connect them with ongoing services as appropriate, for up to six months, at the discretion of the sponsor.

Changes to the Final Rule

HHS is not making any changes in the final rule to § 410.403.

45 CFR Part 410, Subpart E—Transportation of an Unaccompanied Alien Child

45 CFR 410.500—Conducting Transportation for an Unaccompanied Alien Child in ORR's Custody

Summary of Proposed Rule

In the proposed rule, HHS described how ORR conducts transportation for UACs in ORR's custody, substantively adopting the two provisions of the FSA that govern transportation. ORR proposed that UACs cannot be transported with unrelated detained adult aliens. The proposed rule also stated that when ORR plans to release a UAC from its custody under family reunification provisions (found in §§ 410.201 and 410.302), ORR assists without undue delay in making transportation arrangements. ORR may, in its discretion, provide transportation to a UAC.

Public Comments and Response

*Comment.* One commenter recommended that if an emergency or influx changes transportation rules, then such guidance, which is alluded to in the regulation, should be published and open to public comment or included in the regulatory text. The commenter is concerned that future guidance may not align with the FSA after the FSA is terminated.

*Response.* The proposed rule did not change the transportation rules for ORR transporting UACs during an emergency or influx. All ORR policies on influx facilities, including transportation, are publically online, in Section 1.7 of the ORR Guide. The proposed rule did not change ORR's policy of posting guidance publically online, including any future guidance that aligns with the proposed rule and the FSA, in the ORR Policy Guide.

*Comment.* An individual commenter stated that DHS did not define "operationally feasible," in § 236.3(f) for purposes of the requirement to transport and hold children separately from unrelated adults, and that DHS and HHS should clarify the percent of time they expect it will take to be operationally feasible to successfully transport and hold UAC separately from unrelated adults. The commenter asked whether DHS and HHS intend to rescind this

policy and make it compliant with the FSA if they find that UACs are not transported and held separately from unrelated adults in most cases.

Another individual suggested that the government should provide families and minors transportation to and from their immigration hearings.

Several advocacy organizations and a state's department of social services provided comments specific to DHS regarding a similar transportation provision in DHS's proposed rule as it related to transportation of children with unrelated detained adults. For more information on those comments please refer to the DHS comment sections regarding 8 CFR 236.3(f).

*Response.* The comments received by the Departments on transportation issues were more substantively concerned with DHS provisions than with ORR provisions. Although both ORR and DHS provided similar regulatory rules, HHS notes that it does not provide care to adult aliens but only for UACs as defined at 6 U.S.C. 279(g)(2).

There are only a few instances where ORR might transport an adult alien—in extremely limited emergency circumstances (*i.e.,* emergency medical care or evacuation); unknowingly, if ORR believes the person is a minor but he or she is later found to be an adult after making an age determination (*see* 8 CFR 236.3(c) and 45 CFR 410.700); or if a UAC turns 18 while in ORR custody.

Generally speaking, existing protocols between HHS and DHS provide that DHS is responsible for transferring a detained adult alien from ORR's care to DHS custody. *See* DHS–HHS Joint Concept of Operations, I. Transportation, July 31, 2018. In certain episodic emergencies, ORR may be required to transport an adult alien prior to DHS assuming custody of and transferring that adult alien to ICE detention. For instance, if the adult alien requires emergency medical care or evacuation from an ORR care provider facility due to a natural disaster, and transfer cannot possibly be completed by DHS due to the emergency, ORR may be responsible for transporting the adult alien to an emergency medical provider or assist in evacuating the adult alien. In these latter episodic emergencies (which are not exhaustive), under the rule, ORR does not transport UAC with unrelated adults in the agency's care.

In response to the comments regarding assisting UACs with transportation to immigration hearings, HHS notes that it is already required to transport UACs to immigration hearings by statute. *See* 6 U.S.C. 279(b)(2). HHS

also notes that these provisions of the rule are consistent with and do not abrogate existing ORR policies on transportation. *See* ORR Policy Guide, section 3.3.14 Transportation Services. As these provisions are intended to implement the FSA, HHS believes further specification in the final rule is unnecessary and redundant.

Changes to Final Rule

HHS is not deviating from the language of the proposed rule. The rule adopts the substantive terms of the corresponding transportation provisions of the FSA, paragraphs 25 and 26.

45 CFR Part 410, Subpart F, Transfer of an Unaccompanied Alien Child

In this subpart, HHS set forth provisions for transferring a UAC between HHS facilities. In some cases, HHS may need to change the placement of a UAC. This may occur for a variety of reasons, including a lack of detailed information at the time of apprehension, a change in the availability of licensed placements, or a change in the UAC's behavior, mental health situation, or immigration case.

45 CFR 410.600—Principles Applicable to Transfer of an Unaccompanied Alien Child

Summary of Proposed Rule

As specified in 45 CFR 410.600, HHS would adopt the FSA provisions concerning transfer of a UAC to ensure: (1) That a UAC is transferred with all of his or her possessions and legal papers, and (2) that the UAC's attorney, if the UAC has one, is notified prior to a transfer, with some exceptions.

*Public Comments and Response*

*Comment.* Two organizations commented that UACs should receive notice of placement in a more restrictive facility (*i.e.,* a "staff secure" facility) with enough time to protest the transfer before it happens.

*Response. See generally* response in § 410.206. With respect to the organizations' recommendation that UACs receive notice of placement in a more restrictive facility in such a manner as to allow them to argue against transfer before it occurs, HHS notes that the comment goes beyond the scope of the FSA, which this rule is intended to implement. As both the FSA and the proposed rule indicate, some circumstances necessitate quickly transferring a UAC (*e.g.,* threats to the safety of UACs or others). As a result, HHS will not add any new requirements to this provision. But HHS appreciates the commenter's contribution and will consider methods to enable greater

notice to UACs through subsequent policies.

*Comment.* One commenter stated that the rule does not provide adequate notice or opportunity to be heard in the event that a mental health professional believes that a youth poses a risk of harm and must be moved into a more restrictive setting. The commenter said that such notice and opportunity to be heard is necessary to safeguard against violations of section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794).

*Response.* HHS disagrees with the characterization that the final rule does not provide adequate notice or opportunity to be heard regarding a transfer to a more restrictive setting. In accordance with 45 CFR 410.206 of the final rule, ORR provides each UAC placed or transferred to a secure or staff secure facility with a notice of the reasons for the placement in a language the UAC understands, and does so within a reasonable amount of time. In addition, any UAC in ORR care also has an opportunity to challenge ORR Placement decisions in Federal District Court.

*Comment.* One commenter said that the requirements for providing notice to UAC counsel prior to transferring a UAC or minor do not align with the American Bar Association's standards for the custody, placement, care, legal representation, and adjudication of UACs, which recommends both oral and written notice to the child and the child's attorney prior to transfer to include the reason for transfer; the child's right to appeal the transfer; and the procedures for an appeal. The American Bar Association's standards further recommend that the notice include the date of transfer and the location, address, and phone number of the new facility.

The same commenter, along with a state agency, raised a concern that the exception to providing prior notice to counsel in "unusual and compelling circumstances" is too broad and will "result in arbitrary and capricious application."

*Response.* HHS declines to adopt the comment's suggestion that ORR adopt the ABA's standard for transfer of UAC in the "Standards for the Custody, Placement and Care; Legal Representation; and Adjudication of Unaccompanied Alien Children in the United States." The language used in §410.600 pulls its language directly from the FSA (paragraph 27), and the only difference between the ABA's suggested standard for transfer of UAC and the proposed rule is that counsel may be notified within 24 hours after a

UAC is transferred as opposed to 24 hours before. Specifically, under this rule, counsel maybe notified within 24 hours after a UAC is transferred (1) where the safety of the UAC or others has been threatened; (2) the UAC has been determined to be an escape risk consistent with §410.204; or (3) where counsel has waived such notice. In all other circumstances, counsel will have advance notice of any transfers. HHS is not changing the final rule to include the American Bar Association's standard for the transfer of UAC.

Changes to Final Rule

In the proposed rule, HHS stated that it would take all necessary precautions for the protection of UAC during transportation with adults. This language runs in contradiction to 45 CFR 410.500(a), which states that ORR does not transport UAC with unrelated detained adult aliens. Therefore, the sentence from 45 CFR 410.600(a) that, "ORR takes all necessary precautions for the protection of UACs during transportation with adults," will be struck from the final rule.

HHS notes that there will be instances when UACs are transferred with adult staff members. These situations are covered under 45 CFR 411.13(a) of the Interim Final Rule (IFR) on the Standards to Prevent, Detect, and Respond to Sexual Abuse and Sexual Harassment Involving Unaccompanied Children. The IFR states, "Care provider facilities must develop, document, and make their best effort to comply with a staffing plan that provides for adequate levels of staffing, and, where applicable under State and local licensing standards, video monitoring, to protect [UACs] from sexual abuse and sexual harassment." This provision applies to transfers as well.

45 CFR Part 410, Subpart G—Age Determinations

45 CFR 410.700—Conducting Age Determinations

Summary of Proposed Rule

Section 410.700 incorporates both the provisions of the TVPRA, 8 U.S.C.1232(b)(4), and the requirements of the FSA, in setting forth standards for age determinations. These take into account multiple forms of evidence, including the non-exclusive use of radiographs, and may involve medical, dental, or other appropriate procedures to verify age.

Public Comments and Response

*Comment.* A number of commenters expressed concern about whether the proposed regulations adhere to the

FSA's standards and medical ethics regarding medical and dental examinations. Some of the commenters referenced reports and studies indicating that certain medical and dental examinations cannot provide accurate age estimates and that radiographs unnecessarily expose children to radiation when used for non-medical purposes. One medical professional cautioned against using dental radiographs for age determination, contending that such tests can only provide an approximate age estimate and may not be able to differentiate between an individual in his/her late teens versus an individual who is 20 or 21 years of age. The commenter also expressed concern about the possibility of the individual administering these tests not having the requisite expertise, and not obtaining informed consent of the patient. One commenter referred to medical and dental examinations as "pseudo-science."

Multiple commenters expressed concern that the proposed procedures place inappropriate weight on medical tests to determine whether children are younger than or older than 18 years of age. The commenters stated that the proposed procedures do not match FSA or TVPRA requirements for considering medical tests and are inconsistent with agency practice. For example, the commenters stated that the proposed procedures fail to indicate that medical tests cannot serve as the sole basis for age determinations, limit medical testing to bone and dental radiographs, and to account for evidence demonstrating the unreliability of medical tests to make accurate age determinations.[47] One commenter expressed concern about the lack of specificity governing when medical and dental examinations will be used, the absence of guidance regarding who will make the age determination, and the level of training or expertise required to conduct such examinations and determinations.

Multiple commenters recommended that age determination procedures be used as a last resort, that age determination findings be shared with the child in writing and in a language he/she understands, that the findings be subject to appeal, and that age

---

[47] Section 235(b)(4) of the TVPRA ("to make a prompt determination of the age of an alien, which shall be used by the Secretary of Homeland Security and the Secretary of HHS for children in their respective custody. At a minimum, these procedures shall take into account multiple forms of evidence, including the non-exclusive use of radiographs, to determine the age of the unaccompanied alien.").

determination procedures be conducted by an independent, multidisciplinary team of medical and mental health professionals, social workers, and legal counsel. The commenters also recommended that children have the right to refuse a procedure that subjects them to medical risks, pursuant to the international norm of what is in the best interest(s) of the child as well as medical ethical principles of patient autonomy.

Several commenters expressed concern about age determinations being based on the "totality of the evidence and circumstances" and questioned whether that basis is consistent with the TVPRA's requirement to use multiple forms of evidence for determining whether a child is under or over 18 years of age. Another commenter expressed support for DHS and HHS personnel maintaining the flexibility to use multiple methods for age determinations. The commenter stated that the proposed standards and thresholds are mandated for jurisdictional as well as medical reasons, because ORR does not have custodial authority over individuals 18 years of age or older.

A number of commenters expressed concern about the possibility of incorrect age determinations. For example, one commenter stated that the rule would reduce or eliminate that the current ORR policy requiring a 75 percent probability threshold for age determinations.

Multiple commenters noted that differences in race, ethnicity, gender, nutritional standards, and poverty impact perceptions of age and may negatively influence the age determination process leading to inaccurate age determinations. For example, one commenter cited articles concluding that the age of young people is often overestimated and exacerbated when there are differences in race. This commenter expressed concern that this would have disproportionate effects on certain indigenous populations. Another commenter cited a study indicating that "black felony suspects were seen as 4.53 years older than they actually were."

Multiple commenters expressed concern about the lack of age determination appeal procedures. One of the commenters stated that the lack of an appeal mechanism compounds the possibility of arbitrary or baseless assessments, with serious consequences for minors in terms of their placement in and release from detention. Another commenter asked what remedy exists for a child falsely categorized as an adult and what repercussion a government official would face if he/she

negligently or intentionally categorizes a child as an adult under this regulation. Commenters and organizations argued that the continual re-determination of a child's UAC status would deny children of their right to due process, legal protections and access to social services if they were determined to not be a UAC.

One organization noted that the reassessment of a child exacerbates their vulnerability and contradicts the very purpose of U.S. anti-trafficking law. Organizations and commenters further noted if a child was determined to not be a UAC, many rights would be stripped from the child, including the right to have their asylum claims heard before the asylum office and the exception to the one-year filing deadline.

One commenter suggested that providing a presumption of minor status when there is doubt, considering only reliable evidence, and providing an appeals process would ensure fewer children find themselves incorrectly designated as adults. Another commenter suggested placing individuals in HHS custody, not DHS custody, during the age determination process.

One commenter expressed general concern about DHS and HHS using different language within the proposed regulations that may lead to disparate processes for determining age. The commenter stated that the proposed HHS language does not discuss the reasonable person standard, does not include a specific evidentiary standard through which to assess multiple forms of evidence, does discuss the non-exclusive use of radiographs whereas the DHS language does not mention radiographs as an option, and does not require a medical professional to administer the radiographs. The commenter suggested that DHS and HHS propose specific and identical language regarding age determination procedures and requirements.

Organizations and commenters argued that HHS should not have the authority to re-determine if a minor is a UAC or not because it impacts their immigration benefits and this is contrary to Federal law, *see e.g.,* 6 U.S.C. 279(a). They further argued that this would cause confusion to UAC on how and when they meet certain legal immigration obligations and it would likely impact their access to legal assistance. They noted that UAC receive access to *pro bono* legal services because of their UAC designation and by allowing ORR to re-determine their status would undercut ORR's responsibility to facilitate access

to legal services which is not in the best interest of the child.

*Response.* HHS disagrees with commenters who stated that HHS' proposals did not accord with the FSA, which states as follows: "If a reasonable person would conclude that an alien detained by the INS is an adult despite his claims to be a minor, the INS shall treat the person as an adult for all purposes, including confinement and release on bond or recognizance. The INS may require the alien to submit to a medical or dental examination conducted by a medical professional or to submit to other appropriate procedures to verify his or her age. If the INS subsequently determines that such an individual is a minor, he or she will be treated as a minor in accordance with this Agreement for all purposes." FSA paragraph 13. The FSA uses a "reasonable person" standard and specifically states that the INS "may require" submitting to a medical or dental examination. Such language does not place restrictions on the authority for ORR to require a medical or dental examination. In addition, the TVPRA states: "The Secretary of Health and Human Services, in consultation with the Secretary of Homeland Security, shall develop procedures to make a prompt determination of the age of an alien, which shall be used by the Secretary of Homeland Security and the Secretary of Health and Human Services for children in their respective custody. At a minimum, these procedures shall take into account multiple forms of evidence, including the non-exclusive use of radiographs, to determine the age of the unaccompanied alien." Again, nothing in such language places limits on when radiographs may be required, although it does state that procedures shall take into account multiple forms of evidence, which is also reiterated in the rules at § 410.700.

Commenters suggested types of information that an agency can use in addition to medical and dental examinations and radiographs. While the FSA, the TVPRA and the proposed rule specifically list medical and dental examinations and radiographs, HHS provides, in policy, a list of additional information that can be considered, including the types of evidence suggested by commenters like the child's statements.[48]

HHS believes the commenters' concerns about the reliability of

---

[48] Office of Refugee Resettlement, Children Entering the United States Unaccompanied: Section 1, U.S. DEP'T OF HEALTH & HUM. SERV. (Jan. 30, 2015, rev. Jul. 5, 2016), *https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-1.*

radiographs and medical or dental examinations as part of an age determination process are addressed by the regulatory text requiring multiple forms of evidence, including "non-exclusive use of radiographs," to determine age. Recognizing that there is no one test appropriate for every child in every case, HHS, in compliance with the TVPRA, requires in its rule "multiple" forms of evidence when conducting age determination. HHS interprets "multiple forms of evidence" to mean a totality of the evidence. Here, HHS is trying to avoid an instance where those determining age simply rely on two or three pieces of evidence, and ignore potentially reliable evidence merely because a standard of two or more pieces of evidence have been presented. But HHS notes that Congress chose to include radiographs as a type of evidence that agencies can use, and HHS will not exclude their consideration in this rule.

In addition, ORR states through guidance that the medical and dental examinations and radiographs, will be conducted by medical professionals with experience conducting age determinations and will take into account the child's ethnic and genetic background.[49] Relying on experienced medical professionals also addresses concerns raised by commenters that the proposed rule fails to specify reliability standards or who will perform the tests. HHS depends on the experience and professional opinion of the medical professional choosing and performing an examination.

Similarly, HHS expects those professionals who perform those tests to do so in accordance with medical and ethical standards. HHS declines to add additional standards beyond the current standards that apply to all medical professionals.

HHS agrees with the commenter who noted the importance of age determination because HHS only has jurisdiction over persons under 18. If a person is determined to be an adult, that person cannot be placed in HHS custody even if that person is undergoing an age redetermination. If DHS has determined that an individual in its custody is an adult, but the individual claims otherwise, HHS cannot place an alien into HHS custody while the individual contests DHS's determination.

Many commenters wrote about the requirement that age determinations be based on the "totality of the evidence and circumstances" DHS proposed in § 236.3(c). One commenter noted that HHS did not include this language in subpart G and expressed concern that this might create disparate processes. Based on the TVPRA, which requires HHS and DHS to use the same procedures, HHS has added the totality of the circumstances language to § 410.700 in this final rule. The explicit instruction that agencies use the totality of the evidence and circumstances when making an age determination enhances the TVPRA's language of "multiple sources."

In response to the request for additional clarity about what constitutes the totality of the evidence and the circumstances, HHS notes that each age determination is an adjudication, where the ORR responsible staff review the evidence in its totality. The ORR Guide at section 1.6 provides ample description of how ORR reviews the age determination process. While some evidence may be weighted more than other evidence, HHS will only make an age determination adjudication after weighing all of the evidence. Adding more specificity would take away from the holistic approach envisioned with the totality language and could lead to a situation where the agency is unable to consider relevant information because it was not listed.

One commenter was concerned that the totality of the evidence and circumstances language would impact HHS' 75 percent probability threshold for age determinations. Under current HHS policy, "[I]f an individual's estimated probability of being 18 or older is 75 percent or greater according to a medical age assessment, and this evidence has been considered in conjunction with the totality of the evidence, ORR may refer the individual to DHS."[50] Adopting the totality of the evidence and circumstances language would not eliminate the 75 percent threshold because similar language already exists with that threshold in policy. ORR does not intend to revise its policy in this regard. The 75 percent threshold is consistent with totality of the evidence and circumstances language, and adds an additional requirement on the agency when making an age determination.

Several commenters raised concerns that the rule does not provide for an appeals process or a limit on the number of age determinations, allowing for continuous redeterminations. HHS policy allows an individual or his/her designated legal representative to present new information or evidence related to an age determination at any time.[51] A limitation on the number of times an age determination can occur is inappropriate. An arbitrary limit may negatively affect an individual who wishes to have an age redetermination. And if there is reason to believe that an individual is not in an appropriate placement, then safety concerns and statutory limits on jurisdiction may demand that an age determination take place. Additionally, the totality of the evidence and circumstances language requires the agency to consider all new evidence, regardless of whether there has already been an age determination. Therefore, HHS does not believe a formal appeals process or limitation on the number of age determinations is necessary or in the best interest of the agencies or UACs. Moreover, neither the FSA nor the TVPRA requires an appeals process for the age determination.

Changes to Final Rule

HHS will add the "totality of the evidence and circumstances" language into § 410.700 so that the age determinations decisions by HHS and DHS have the same standard. While the language of the DHS regulation differs slightly from the HHS language, primarily because DHS transfers adults and HHS does not, both provisions contain the same fundamental standards. These standards are the use of a totality of the evidence standard, including the non-exclusive use of radiographs; compliance with the FSA reasonable person standard; and authorization to require an individual to submit to a medical or dental examination conducted by a medical professional or to submit to other appropriate procedures to verify age.

45 CFR 410.701—Treatment of an Individual Who Appears To Be an Adult

Summary of Proposed Rule

Section 410.701 states that if the procedures of § 410.700 would result in a reasonable person concluding that an individual is an adult, despite his or her claim to be a minor, ORR must treat that person as an adult for all purposes. As

---

[49] Office of Refugee Resettlement, Children Entering the United States Unaccompanied: Section 1, U.S. DEP'T OF HEALTH & HUM. SERV. (Jan. 30, 2015, rev. Jul. 5, 2016), *https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-1*.

[50] Office of Refugee Resettlement, Children Entering the United States Unaccompanied: Section 1, U.S. DEP'T OF HEALTH & HUM. SERV. (Jan. 30, 2015, rev. Jul. 5, 2016), *https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-1*.

[51] Office of Refugee Resettlement, Children Entering the United States Unaccompanied: Section 1, U.S. DEP'T OF HEALTH & HUM. SERV. (Jan. 30, 2015, rev. Jul. 5, 2016), *https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-1*.

with § 410.700, ORR may take into account multiple forms of evidence, including the non-exclusive use of radiographs, and may require such an individual to submit to a medical or dental examination conducted by a medical professional or other appropriate procedures to verify age.

Public Comments

Several commenters expressed concern about how DHS would interpret and apply the FSA's reasonable person standard and pointed to what they perceived as a lack of clarity on how the standard is defined. Multiple commenters expressed concern that the proposed language fails to provide adequate specificity about the type and amount of evidence used to inform the standard. For example, one commenter stated that the reasonable person standard must be informed by consideration of multiple forms of evidence pursuant to the TVPRA, whereas another commenter suggested incorporating informational interviews and attempts to gather documentary evidence as part of the standard. Another commenter stated that, pursuant to the FSA, the reasonable person standard must be initially informed by the child's own statements regarding his or her own age. Multiple commenters expressed concern about how medical or dental examinations will or will not inform the reasonable person standard, with one commenter stating that the inclusion of unreliable medical procedures in the reasonable person standard introduces a further layer of arbitrariness to the process of age determination.

Other commenters stated that an individual claiming to be a minor should continue to be treated as a minor until age is confirmed through multiple forms of evidence. One of these commenters stated that it is more dangerous for a minor to be detained with adults than to have an individual who claims to be a minor, but is not, detained with other minors.

Organizations noted that in the interest of administrative consistency, children designated as UACs should keep this designation throughout their removal proceedings.

*Response.* HHS notes that neither the FSA nor the TVPRA require that a specific amount of evidence be considered in an age determination; the TVPRA simply requires HHS to use multiple forms of evidence. Practically speaking, the same amount of evidence will not be available in every case, and requiring a specific amount of evidence would be arbitrary and operationally impractical. Relatedly, creating a

specific list of evidence that can be considered may lead to the exclusion of relevant information. Thus, HHS declines to make the suggestions made by the commenters; however, HHS has changed the proposed rule at § 410.700 to add the ''totality of the circumstances'' standard proposed by DHS to ensure that all evidence is included in the age determination process.

HHS declines to adopt a presumption that an individual is a minor until proven otherwise. Section 410.701 requires HHS to treat a person determined to be an adult as an adult and to follow the process outlined in § 410.700 to change an individual's status from a minor to adult. Additionally, in policy, HHS provides ''[u]ntil the age determination is made, the unaccompanied alien child is entitled to all services provided to UAC in HHS care and custody.'' [52] While it is not clear what commenters intended by the phrases ''presumption'' and ''proven otherwise,'' the commenters appeared to intend something more extensive than the ORR age determination process— such as, perhaps a judicial review or a standard higher than the reasonable person standard of the FSA. However, setting a presumption that individuals are minors until proven otherwise is not contemplated in the FSA nor by Congress. A presumption of minority is not consistent with the reasonable person standard, which allows for the agencies to look at the totality of the evidence and circumstances and determine whether someone is under 18. Thus, HHS declines to include this recommendation.

Relatedly, a commenter raised a concern that it is more dangerous for a minor to be housed with adults than it is for an adult to be housed with minors. However, this comment focused only on the individual adult who is the subject of the age determination and not the other UACs housed alongside him or her in a group home setting. HHS believes that both scenarios present a risk of harm and will not transfer a person until an age determination has been made.

Commenters wrote that, for administrative consistency, agencies should not conduct age determinations and the designation of UAC should last through the individual's removal proceedings. The comment about the UAC designation lasting throughout

removal proceedings is not related to the age determination regulation— which is about the proper placement of an individual (in DHS or ORR legal custody) and not removal proceedings. In addition, the suggestion is inconsistent with the FSA, which set standards specifically for people under 18. The suggestion also would violate the HSA and the TVPRA, both of which intended specific protections for people under 18. Congress also granted HHS and DHS the authority to conduct age determinations in 8 U.S.C. 1232(b)(4). The fact that Congress created the authority for DHS and HHS to conduct age determinations demonstrates that Congress recognized that children need protection and intended accuracy over administrative consistency.

Changes to Final Rule

HHS is not making any changes to the rule for § 410.701, but states that because such regulation refers back to § 410.700, it also will incorporate a totality of the evidence and circumstances standard.

45 CFR Part, 410 Subpart H, Unaccompanied Alien Children's Objections to ORR Determinations

45 CFR 410.800–410.801—Procedures

Summary of Proposed Rule

While the FSA at paragraph 24(B) and 24(C) contains procedures for judicial review of a UAC's shelter placement (including in secure or staff-secure), and a standard of review, the agreement is clear that a reviewing Federal District Court must have both ''jurisdiction and venue.'' Once those regulations are finalized and the FSA is terminated, it would be even clearer that any review by judicial action must occur under a statute where the government has waived sovereign immunity, such as the Administrative Procedure Act. Therefore, HHS did not propose regulations for most of paragraphs 24(B) and 24(C) of the FSA, although it did propose that all UACs continue to receive a notice stating as follows: ''ORR usually houses persons under the age of 18 in an open setting, such as a foster or group home, and not in detention facilities. If you believe that you have not been properly placed or that you have been treated improperly, you may call a lawyer to seek assistance. If you cannot afford a lawyer, you may call one from the list of free legal services given to you with this form.'' The proposed rule also contained a requirement parallel to that of the FSA that when UACs are placed in a more restrictive level of care, such as a secure or staff secure facility, they receive a notice—

---

[52] Office of Refugee Resettlement, Children Entering the United States Unaccompanied: Section 1, U.S. DEP'T OF HEALTH & HUM. SERV. (Jan. 30, 2015, rev. Jul. 5, 2016), *https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-1.*

within a reasonable period of time—explaining the reasons for housing them in the more restrictive level of care. Consistent with the July 30, 2018 order of the *Flores* court, the proposed rule stated that the notice must be in a language the UAC understands. Finally the proposed provision required that ORR promptly provide each UAC not released with a list of free legal services providers compiled by ORR and provided to UAC as part of a Legal Resource Guide for UAC (unless previously given to the UAC).

Public Comments and Response

*Comment.* Some commenters wrote that the proposed rule does not give UACs enough notice or access to information about his or her placement in a staff secure or secure facility; that UACs should be provided notice of the reasons for their placement in secure or staff secure placements, and have the opportunity to contest such placement, before they are referred to such facilities; and that placements must be accompanied by periodic reviews.

*Response.* This section is consistent with current ORR practice implementing statutory and FSA requirements (*see* paragraph 24A), by which children are provided a written explanation of the reasons for their placement at secure or staff secure care providers in a language they understand, within a reasonable time either before or after ORR's placement decision, *see* ORR Policy Guide, section 1.2.4 and 1.4.2. In many cases, ORR places children in restrictive placements because of new information or a child's disruptive behavior, which makes it impossible for the child to remain at a shelter care facility. For example, some shelter care providers are prohibited under their State licensing requirements to house children with violent criminal histories. When ORR discovers new information indicating such a history, it must immediately ensure the child is transferred or risk jeopardizing the shelter's licensing. Under ORR policy, care providers must provide written notice of the reasons for placement in secure or staff secure settings at least every 30 days a child is in such a placement. This requirement goes beyond the TVPRA, 8 U.S.C. 1232(c)(2)(A), which requires the Secretary to prescribe procedures to review placements in secure facilities, such as juvenile detention centers. The TVPRA is silent on staff-secure facilities—which generally are much like non-secure shelter facilities, but may include a higher staff-UAC ratio to manage behavior. In practice, care providers continuously assess a child's

behavior in order to ensure the child is properly placed in the least restrictive setting that is appropriate for the child's needs.

Changes to Final Rule

HHS has made no changes to the rule text at §§ 410.800–410.801 because the rule fully the relevant requirements of the FSA and TVPRA.

45 CFR 410.810 ''810 Hearings''

Summary of Proposed Rule

Consistent with subpart C, *see* § 410.301(a), HHS proposed an internal administrative hearing process to serve the relevant functions of bond redetermination hearings described in paragraph 24A of the FSA.

The proposed rule made no provision for immigration judges employed by the DOJ to conduct bond redetermination hearings for UACs under paragraph 24(A) of the FSA. DOJ has concluded that it no longer has statutory authority to conduct such hearings. In the HSA, Congress assigned responsibility for the ''care and placement'' of UACs to HHS' ORR, and specifically barred ORR from requiring ''that a bond be posted for [a UAC] who is released to a qualified sponsor.'' 6 U.S.C. 279(b)(1)(A), (4). In the TVPRA, Congress reaffirmed HHS' responsibility for the custody and placement of UACs. 8 U.S.C. 1232(b)(1), (c), and imposed detailed requirements on ORR's release of UACs to proposed custodians—including, for example, a provision authorizing ORR to consider a UAC's dangerousness and risk of flight in making placement decisions. 8 U.S.C. 1232(c)(2)(A). Congress thus appears to have vested HHS, not DOJ, with control over the custody and release of UACs, and to have deliberately omitted any role for immigration judges in this area.

Although in *Flores* v. *Sessions, the* Ninth Circuit concluded that neither the HSA nor the TVPRA superseded the FSA's bond-hearing provision. 862 F.3d at 881. The court did not identify any affirmative statutory authority for immigration judges employed by DOJ to conduct the custody hearings for UACs. ''[A]n agency literally has no power to act . . . unless and until Congress confers power upon it.'' *La. Pub. Serv. Comm'n* v. *FCC,* 476 U.S. 355, 374 (1986). HHS, however, as the legal custodian of UACs who are in Federal custody, clearly has the authority to conduct the hearings envisioned by the FSA. It also is sensible, as a policy matter, for HHS to conduct the hearings envisioned by the FSA, because unlike immigration courts, HHS as an agency has expertise in social welfare best practices, including child welfare

practices. Further, having an independent hearing process take place within the same Department is consistent the FSA at the time it was implemented, when both the former INS and EOIR were housed within DOJ.

HHS thus proposed regulations to afford the same type of hearing paragraph 24(A) calls for, while recognizing the transfer of responsibility of care and custody of UAC from the former INS to HHS ORR. Specifically, the proposed rule included provisions whereby HHS would create an independent hearing process that would be guided by the immigration judge bond hearing process currently in place for UACs under the FSA. The idea was to provide essentially the same substantive protections as immigration court custody hearings, but through a neutral adjudicator at HHS rather than DOJ.

Under the proposal, the Secretary would appoint independent hearing officers to determine whether a UAC, if released, would present a danger to community (or flight risk). The hearing officer would not have the authority to release a UAC, as the *Flores* court has already recognized that paragraph 24(A) of the FSA does not permit a determination over the suitability of a sponsor. Specifically, the Ninth Circuit explained that ''as was the case when the Flores Settlement first went into effect, [a bond hearing] permits a system under which UACs will receive bond hearings, but the decision of the immigration judge will not be the sole factor in determining whether and to whose custody they will be released. Immigration judges may assess whether a minor should remain detained or otherwise in the government's custody, but there must still be a separate decision with respect to the implementation of the child's appropriate care and custody.'' *Flores,* 862 F.3d at 878. The *Flores* district court, too, stated: ''To be sure, the TVPRA addresses the safety and secure placement of unaccompanied children. . . . But identifying appropriate custodians and facilities for an unaccompanied child is not the same as answering the threshold question of whether the child should be detained in the first place—that is for an immigration judge at a bond hearing to decide. . . . Assuming an immigration judge reduces a child's bond, or decides he or she presents no flight risk or danger such that he or she needs to remain in HHS/ORR custody, HHS can still exercise its coordination and placement duties under the TVPRA.'' *Flores* v. *Lynch,* No. CV 85–4544 DMG at 6 (C.D. Cal. Jan. 20, 2017).

Thus, the hearing officer would decide only the issues presented by paragraph 24(A) of the FSA—whether the UAC would present a danger to the community or a risk of flight (that is, not appearing for his or her immigration hearing) if released. For the majority of UACs in ORR custody, ORR has determined they are not a danger and therefore has placed them in shelters, group homes, and in some cases, staff secure facilities. For UACs that request a hearing, but ORR does not consider a danger, ORR will concur in writing and a hearing will not need to take place. In these cases, a hearing is not necessary or even beneficial and would simply be a misuse of limited government resources. However, for some children placed in secure facilities (or otherwise assessed as a danger to self or others), the hearing may assist them in ultimately being released from ORR custody in the event a suitable sponsor is or becomes available.

As is the case now, under section 2.9 of the ORR Policy Guide (available at: *https://www.acf.hhs.gov/orr/resource/children-entering-the-united-statesunaccompanied-section-2#2.9*), the hearing officer's decision that the UAC is not a danger to the community will supersede an ORR determination on that question. HHS does not have a two-tier administrative appellate system that mirrors the immigration judge-BIA hierarchy. To provide similar protections without such a rigid hierarchy, the proposed rule would allow appeal to the Assistant Secretary of ACF (if the appeal is received by the Assistant Secretary within 30 days of the original hearing officer decision). The Assistant Secretary would review factual determinations using a clearly erroneous standard and legal determinations on a de novo basis. Where ORR appeals, there would be no stay of the hearing officer's decision unless the Assistant Secretary finds, within 5 business days of the hearing officer decision, that a failure to stay the decision would result in a significant danger to the community presented by the UAC. That written stay decision must be based on clear behaviors of the UAC while in care, and/or documented criminal or juvenile behavior records from the UAC. Otherwise, a hearing officer's decision that a UAC would not be dangerous (or a flight risk) if released, would require ORR to release the UAC pursuant to its ordinary procedures on release as soon as ORR determined a suitable sponsor.

In accordance with the *Flores* district court's order analogizing *Flores* custody hearings to bond hearings for adults, immigration judges currently apply the standard of *Matter of Guerra,* 24 I&N Dec. 37 (BIA 2006).[53] Thus, under current practice, the burden is on the UAC to demonstrate that he or she would not be a danger to the community (or flight risk) if released. Due to the unique vulnerabilities of children and subsequent enactment of the TVPRA, however, HHS requested comments on whether the burden of proof should be on ORR to demonstrate that the UAC would be a danger or flight risk if released.

Under the proposed rule, ORR also would take into consideration the hearing officer's decision on a UAC's level of dangerousness when assessing the UAC's placement and conditions of placement, but, consistent with current practice under the FSA, the hearing officer would not have the authority to order a particular placement for a UAC.

If the hearing officer determines that the UAC would be a danger to the community (or a flight risk) if released, the decision would be final unless the UAC later demonstrates a material change in circumstances to support a second request for a hearing. Similarly, because ORR might not have yet located a suitable sponsor at the time a hearing officer issues a decision, ORR might find that circumstances have changed by the time a sponsor is found such that the original hearing officer decision should no longer apply. Therefore, the proposed regulation stated that ORR could request the hearing officer to make a new determination if at least one month had passed since the original decision, and ORR could show that a material change in circumstances meant the UAC should no longer be released due to danger (or flight risk).

Requests for hearings under this section ("810 hearings") could be made by the child in ORR care, by a legal representative of the child, or by parents/legal guardians on their child's behalf. These parties could submit a written request for the 810 hearing to the care provider using an ORR form[54] or through a separate written request that provides the same information requested in the ORR form, because the questions to be adjudicated at 810 hearings are relevant mainly to UACs placed in secure, RTC, and staff secure facilities. ORR would provide a notice of the right to request the 810 hearing to these UACs. Technically, a UAC in

any level of care may request an 810 hearing, but hearings for children in non-restrictive placements (*e.g.,* shelter placements) would likely be unnecessary, because ORR would likely stipulate that such children, by virtue of their placement type are not dangerous or flight risks. HHS also stated that it expected that the hearing officer would create a process for UACs or their representatives to directly request a hearing to determine danger (or flight risk). During the 810 hearing, the UAC could choose to be represented by a person of his or her choosing, at no cost to the government. The UAC could present oral and written evidence to the hearing officer and could appear by video or teleconference. ORR could also choose to present evidence either in writing, or by appearing in person, or by video or teleconference.

Because the 810 hearing process would be unique to ORR and HHS, if a UAC turned 18 years old during the pendency of the hearing, the deliberations would have no effect on DHS detention (if any).

HHS invited public comment on whether the hearing officers for the 810 hearings should be employed by the Departmental Appeals Board, either as Administrative Law Judges or hearing officers, or whether HHS would create a separate office for hearings, similar to the Office of Hearings in the Centers for Medicare & Medicaid Services. *See https://www.cms.gov/About-CMS/Agency-Information/CMSLeadership/Office_OHI.html.*

While the FSA contains procedures for judicial review of a UAC's placement in a secure or staff secure shelter, and a standard of review, once these regulations are finalized and the FSA is vacated, HHS did not propose any regulations for such review by Federal courts should occur under extant statutory authorizations, including, where applicable, the APA, and not via HHS regulations or a consent decree.

**Public Comments and Response**

Several commenters wrote about the proposal to update the provision for bond hearings under DHS proposed 8 CFR 236.3(m) and "810 hearings" under HHS proposed 45 CFR 410.810. Because both provisions related to paragraph 24A of the FSA, comments sometimes transitioned fluidly between being directed toward DHS and HHS. As with the comments related to 8 CFR 236.3(m), the comments related to 810 hearings largely concerned compatibility with the text of the FSA and case law interpreting the FSA, and due process concerns. However,

---

[53] The *Flores* District Court specifically cited the law of 8 U.S.C. 1226 and 8 CFR 1003.19, 1236.1(d). *See Flores* v. *Sessions,* 2:85–cv–04544, *supra* at 2, 6.

[54] The form currently used under the FSA is available at *https://www.acf.hhs.gov/sites/default/files/orr/request_for_a_flores_bond_hearing_01_03_2018e.pdf* (last visited Aug. 12, 2018).

commenters expressed various other concerns as well.

*Comment.* Many comments argued that the proposed transition of bond hearings from a DOJ-based administrative immigration court to an administrative setting in HHS does not comply with the FSA and applicable case law. The commenters reasoned that paragraph 24(A) of the FSA requires minors in deportation proceedings to be afforded a bond redetermination hearing before an immigration judge in every case. They further pointed to the decision in *Flores* v. *Sessions,* 862 F.3d 863 (9th Cir. 2017) as evidence that the Ninth Circuit, in interpreting and applying the FSA had already ruled against the government when it argued that the limiting of bond hearings applied to minors in DHS custody only. Many of the commenters pointed to a quote from the court's decision discussing how the hearing is a "forum in which the child has the right to be represented by counsel, and to have the merits of his or her detention assessed by an independent immigration judge." Another commenter also wrote that the TVPRA and the HSA do not supersede the FSA or allow for inconsistent standards, which the commenter believed would result from the implementation of the proposed rule.

*Response.* HHS disagrees with commenters who suggested that § 410.810 does not comply with the FSA and applicable case law. HHS submits that 810 hearings provide substantively the same functions as bond hearings under paragraph 24A of the FSA, as expressed by the *Flores* court and the Ninth Circuit (*e.g.,* independent review of ORR determinations as they relate to a child's dangerousness and risk of flight and due process protections). The Ninth Circuit found that bond hearings under paragraph 24A of the FSA "do not afford unaccompanied minors the same rights that may be gained through an ordinary bond hearing," and that a favorable finding does not entitle minors to release; however, it also stated that bond hearings provide UACs with certain "practical benefits." *Flores,* 862 F.3d at 867. These benefits include providing a forum in which a child has the right to be represented by counsel to examine and rebut the government's evidence, and build a record regarding the child's custody. *Id.* 810 hearings provide UACs with all of these benefits, and take place before an independent adjudicator in a role similar to immigration judges under current practice. In addition, commenters are incorrect that the immigration judge is any more independent than would be the hearing officer under the 810

hearing process. As noted below, at the time the FSA was signed, INS and the immigration courts both resided within the DOJ—similar to what HHS is finalizing in this rule, where an independent HHS office would operate the hearings. Moreover, immigration judges are not administrative law judges, but rather are "attorneys whom the Attorney General appoints as administrative judges." 8 CFR 1003.10(a). Immigration judges act as the Attorney General's "delegates" in the cases that come before them. Immigration judges are governed by decisions by the Attorney General (through a review of a decision of the BIA, by written order, or by determination and ruling pursuant to section 103 of the Immigration and Nationality Act). 8 CFR 1003.10(d). Thus, HHS does not believe that the administrative process of § 410.810 is any less independent than the process the Parties agreed to in the FSA.

*Comment.* A couple of commenters wrote that moving bond redetermination hearings from EOIR to HHS is inconsistent with protections for UACs in the FSA, the HSA, and the TVPRA— which protect children from prolonged detention.

*Response.* As stated above, HHS disagrees with commenters regarding the FSA, HSA, and TVPRA. Section 810 hearings would provide both practical benefits and due process in a manner consistent with paragraph 24A of the FSA, as interpreted most recently by the Ninth Circuit. The rule would allow requests to be made by UACs themselves, or their parents, legal guardians, or legal representatives. HHS notes that this provision mirrors current practice, and so there is no reason to expect a reduction in the number of UACs receiving 810 hearings, as compared to those who receive bond hearings. Since the Ninth Circuit held in 2017 that paragraph 24A of the FSA would require bond hearings for determinations of dangerousness and risk of flight, every child in ORR custody has been afforded the opportunity to request a bond hearing. In addition, legal service providers funded by ORR have explained the nature of bond hearings, including procedures to request them, to UACs during orientation and legal screenings. The alternative to allowing UACs to request such hearings would be to place every UAC in an 810 hearing as a default. This would impose a heavy burden on government resources while providing no benefit for the overwhelming majority of UACs, most of whom are in shelter-level care and therefore are not considered dangerous

or flight risks to begin with. The alternative to allowing UACs to request such hearings would be to place every UAC in an 810 hearing as a default. This would impose a heavy burden on government resources while providing no benefit for the overwhelming majority of UACs, most of whom are in shelter-level care and therefore are not considered dangerous or flight risks to begin with. The best solution is, as written in the rule, to notify children in more restrictive placements of their right to request 810 hearings, connect them with legal service providers, and allow them to decide whether to request a hearing. Consistent with existing practice, the rule does not impose any timeframe within which UACs must request 810 hearings. Also, if UACs can demonstrate a material change in circumstances, they are free to request 810 hearings even if they previously had one that resulted in a negative decision.

*Comment.* A commenter noted that that under the proposed rule, the hearing officers cannot make decisions on placement or release. To the commenter, this limitation does not make sense because in other child welfare determinations, judges do make decisions about placement and reunification for children that are not in the custody of their parents. This commenter also wrote that the limitation is inconsistent with the Ninth Circuit's interpretation of the FSA because the court rejected ORR's argument that it has sole authority to determine placement and make release decisions.

*Response.* HHS does agree that the original *Flores* court ruling created a bond hearing procedure whose utility relates mainly to providing due process protections to UACs, but does not extend to the ability to order ORR to release a child. However, that is explicit in the text of the Ninth Circuit's ruling, which HHS is now attempting to incorporate into this rule implementing the FSA.

*Comment.* A group of commenters recognized the distinction between the DHS and HHS provisions relating to bond hearings, but disagreed that proposed 8 CFR 236.3(m) properly implemented section 24(A) of the FSA in light of *Flores,* 862 F.3d 863. They restated the court's discussion of the important policy interests served by allowing children a bond hearing.

*Response.* These comments refer to the bond hearings proposed by DHS, which are separate and distinct from the 810 hearings proposed by HHS. HHS has proposed an independent adjudication process responsive to the policy interests served by immigration

judges in bond redetermination hearings. In 810 hearings, UACs, their legal representatives, or their parents or legal guardians would be able to request review of ORR findings regarding a child's danger to self or others, and the child's flight risk. The child's independent hearing officers would not have the authority to order release of UACs from ORR custody, and would not have authority to make placement decisions. *See Flores* v. *Sessions,* 862 F.3d 863, 867 (9th Cir. 2017) (acknowledging that a favorable finding in a hearing under paragraph 24A does not entitle minors to release because "the government must still find a safe and secure placement into which a child can be released.") The UAC would be permitted to have representation of his or her choosing at no cost to the government; and the UAC would be able to present oral and written evidence. The proposed rule would both provide these practical benefits while at the same time streamlining the current process. For example, under the current system, if a UAC is moved to a different venue during the pendency of a bond redetermination hearing, the case must also be transferred to the new venue, typically resulting in a delay of weeks. In contrast, such a case would not be interrupted under the proposed rule, because the proposed rule would establish a centralized hearing office.

*Comment.* Multiple commenters opposed the language proposed under § 410.810 because bond redetermination hearings would be conducted by HHS, not EOIR, a change that would, in the opinion of the commentators, remove the opportunity for a ruling by an independent or neutral arbiter. Commenters wrote that HHS would be the "judge and jailer" of UACs and that there would be no meaningful independent review of HHS decisions. Commenters argued that immigration judges, who are employed by DOJ can serve as neutral arbiters and afford UACs a meaningful opportunity to challenge HHS' decisions. Commenters wrote that the lack of independence undermines due process protections for UACs, and for this reason, immigration judges should continue to conduct bond redetermination hearings.

*Response.* HHS notes that by its own terms, § 410.810 calls for an independent hearing officer to preside over these hearings. This is a departure from what was envisioned in the FSA, because in 1997, both INS and EOIR were located within DOJ. In other words, *Flores* counsel agreed that immigration judges in EOIR were sufficiently independent from INS, such that they could make independent bond

redetermination rulings. Arguably, one of the reasons for inserting paragraph 24A into the FSA was to provide exactly the kind of independent review of decisions made by the former INS, which at the time was responsible for both the care of minors, and for initiating immigration enforcement actions against them. If they were sufficiently independent at that time, then having independent hearing officers located within HHS under the proposed rule should also be acceptable now, especially since ORR is not a law or immigration enforcement agency, and 810 hearings are not related to removal proceedings initiated by DHS. The same reasoning applies to comments questioning the independence of any appeal of 810 hearing decisions. Just as the BIA, like immigration courts, is an administrative appellate body within DOJ, so too in this case another office within the same department would serve as the appellate body for 810 hearings.

*Comment.* Other commenters were concerned simply with the change in process. They stated that the NPRM reverses a child's right to a bond hearing and instead creates an agency-run administrative process that poses threats to due process. While most of these commenters did not provide a justification for their opposition to the proposed change, one commenter stated he opposed the jailing of children and families on moral grounds and suggested the government focus on keeping families together, alternatives to detention, and full due process. Finally, in addition to the *Flores* v. *Sessions* justification, several groups wrote that as a matter of policy, immigration judges are best suited to rule on UAC bond hearings as they have the relevant background and knowledge base to understand the situation and determine the appropriate course of action—or, alternatively, that HHS lacks the appropriate expertise or experience with the issues associated with child custody or child welfare to conduct such hearings.

*Response.* HHS is unable to respond to comments stating that 810 hearings would violate due process, but offering no specifics. Ultimately the benefit of an administrative process is for the agency to avoid erroneous determinations, and HHS believes that the 810 hearings meet any relevant due process requirements for that process. HHS again notes that the rule provides substantially "practical benefits" as described by the Ninth Circuit, which largely described provision of due process (*e.g.,* an independent decision-making authority to review ORR child welfare decisions,

access to counsel, the ability for children to confront the evidence and establish a record).

With respect to comments arguing that the government has a moral duty to keep families together, HHS believes that these comments are really about other issues addressed in this preamble, not about the 810 hearings and exceed the scope of this rulemaking, especially because neither bond hearings under the FSA nor 810 hearings, in and of themselves, prevent family reunification. In providing for an independent review of ORR determinations of a child's dangerousness and risk of flight, 810 hearings serve a similar function to the bond hearings described by the Ninth Circuit in 2017 and thus may serve to promote family integrity. But ultimately, ORR has a statutory duty to ensure safe release of UACs under the HSA and TVPRA, and a similar duty under the FSA.

With respect to the comment that immigration judges are best situated to decide on the questions raised by these hearings, HHS respectfully disagrees. HHS believes that an independent hearing office within HHS, the government agency with specific and relevant expertise in child welfare, would be best suited to adjudicate 810 hearings. As acknowledged by the Ninth Circuit, in *Flores* custody hearings, even favorable rulings do not entitle UACs to release. This is because, under the HSA and TVPRA, the government must still identify safe and secure placements for UACs in its care. *Id.* In light of the separation of the former INS's functions in the HSA and TVPRA, at least one court has distinguished ORR custody of UACs, which it termed "child welfare custody," from immigration detention. *See Beltran* v. *Cardall,* 222 F. Supp. 3d 476, 488 (E.D. Va. 2016) (internal citations omitted) (noting that ORR does not withhold discharge of UACs to sponsors due to pending removal proceedings, but does withhold discharge due to child welfare concerns as established in the TVPRA; and noting that Congress intentionally withheld from ORR any role in removal proceedings pending against UACs). ORR's purposes for assessing a child's dangerousness and flight risk relate to its duty to effect safe releases of children, and not to any immigration detention purpose. This makes 810 hearings fundamentally a review of child welfare determinations, and we believe such reviews more appropriately occur within the government agency with direct child welfare expertise, rather than in immigration courts.

Congress itself endorsed HHS' child welfare expertise when it transferred responsibility for the care and custody of UACs from the former INS to HHS Immigration courts adhere closely to the language of the 9th Circuit decision in 2017 on bond hearings, including its understanding of the limited scope of the hearings (*i.e.,* to decide only on questions of dangerousness and flight risk, not on release or sponsor suitability). Especially with respect to issues associated with child custody or child welfare, an internal HHS hearing office could fulfill the same role as immigration judges, only with greater familiarity and expertise than judges trained to adjudicate cases relating more directly to immigration status and detention.

*Comment.* Several commenters wrote that the proposed rule would prolong detention of UACs, which is detrimental to the UACs. Some commenters wrote that detention would be prolonged because of the lack of process provided to UACs under the rule and a lack of access to counsel. Another commenter claimed that by placing the onus on UACs—who lack familiarity with their rights and the immigration process in general—to request a redetermination hearing, the rule will inevitably lead to fewer minors receiving such hearings and, therefore, prolonged detention.

*Response.* HHS notes that 810 hearings as described in the rule are modeled substantively after existing bond hearing practices. Under current practice, UACs do not receive automatic hearings before immigration judges. Also, like bond hearings, favorable 810 hearing decisions in and of themselves do not result in discharge of UACs from ORR custody. Also as with bond hearings, UACs are entitled to be represented by counsel at no expense to the government. HHS does not intend to use 810 hearings to prolong "detention" of UACs in ORR custody. As indicated already, ORR does not detain UACs, rather, it provides temporary care and custody of UACs and has a general policy favoring release to suitable sponsors. For these reasons, HHS disagrees that instituting the 810 hearings as proposed would prolong the length of time UACs remain in ORR custody.

*Comment.* Another commenter wrote regarding the practices that should be adopted to protect due process of minors in bond hearings including: Appointment of child advocates, hearings within 48 hours of request by child or counsel, and ensuring all minors are informed of their right to request review of their continued detention.

*Response.* Although this comment appears to be directed to bond hearings for minors in DHS custody, HHS responds as follows with respect to 810 hearings for UACs in ORR custody. HHS notes that, as previously discussed, 810 hearings preserve the substantive benefits of bond hearings as described by the *Flores* court and the Ninth Circuit. Regarding child advocates, HHS notes that ORR already appoints child advocates, where they are available, for victims of trafficking and other vulnerable children. HHS may establish further policies that include children seeking 810 hearings as another category of children for whom ORR should appoint child advocates, but believes it is not possible to mandate child advocates for all children requesting hearings because child advocates are not available in all ORR care provider locations. In any case, nothing in the FSA, or TVPRA, or case law requires child advocates during the bond or 810 hearings.

Regarding the commenter's suggestion that hearings be scheduled within 48 hours of request, HHS notes that bond hearings in the immigration court have rarely, if ever, occurred within 48 hours of the initial request. Where there have been special circumstances (*e.g.,* a child with an imminent 18th birthday), courts have made special arrangements to hear such cases. HHS intends that the independent hearing officer in 810 hearings will similarly prioritize such cases. But it would be inappropriate to apply a one-size-fits-all timeframe on these scheduling matters, and nothing in the FSA or TVPRA includes such time limits.

Regarding review of placement, § 410.810 already states that UACs placed in secure or staff secure facilities will receive a notice of the procedures under this section and may use a form to make a written request for an 810 hearing. Because the questions at issue in 810 hearings are dangerousness and flight risk, 810 hearings are relevant in almost all cases only to children in secure, and potentially staff secure facilities. For purposes of 810 hearings, HHS plans to treat RTCs as secure facilities. HHS does not consider children in shelter or other less restrictive placements to be dangerous or flight risks; if they were, they would not be placed there. As a result, such children would not require 810 hearings—though the rule would not preclude such children from requesting them. Based on HHS' experiences with bond hearings, except in unusual circumstances, in these cases ORR would stipulate to the independent hearing officer that it does not consider

the children to be dangerous or flight risks.

*Comment.* One commenter noted that if the only review of HHS decisions happens within HHS' apparatus, there is a high chance that due process rights will be violated and that Federal courts have struck down similar agency actions.

*Response.* HHS has already discussed both the procedural guarantees and other practical benefits that 810 hearings would afford UAC sand incorporates those discussions here. Similarly, HHS has discussed at length the point about the independence of 810 hearing officers and incorporates that discussion here as well.

With respect to the commenter's claim that this rule would violate a 2016 decision of the Eastern District of Virginia,[55] HHS notes that the process at issue in that case was distinguishable from 810 hearings. That case concerned ORR's release process with respect to a parent seeking to sponsor her child. In contrast, as already discussed, under the Ninth Circuit ruling in *Flores* v. *Sessions,* the purpose of custody hearings, and 810 hearings by extension, is to decide on the questions of a UAC's dangerousness and flight risk—not release from ORR custody. Considering that different context and the "practical benefits" for UACs discussed by the Ninth Circuit, HHS is confident that 810 hearings satisfy any applicable due process requirements.

*Comment.* Several commenters wrote that under the proposed rule UACs do not have adequate notice of the hearing, time to prepare for the hearing, or access to the evidence supporting HHS' determination of dangerousness and/or flight risk.

*Response.* HHS notes that under the rule, UACs have notice of their right to request an 810 hearing as soon as they enter a secure or staff secure care provider facility. Further, they have the right to counsel, and counsel has the ability request the child's full case file at any time. Even if a UAC who requests an 810 hearing does not have an attorney, ORR will provide the UAC with the information and evidence it used as its basis for determining dangerousness and flight risk. In HHS' experience participating in custody hearings before the immigration courts, representatives for UACs (almost all UACs requesting bond hearings have had free legal representation), and ORR have cooperated to ensure hearings take place promptly and that all stakeholders have access to the evidence provided by

---

[55] *See* Beltran v. *Cardall,* 222 F. Supp. 3d 476 (E.D. Va. 2016).

both parties. HHS anticipates that the 810 hearing process would similarly allow the parties and counsel for the parties to cooperate.

*Comment.* Some commenters claimed that HHS is incapable of or not authorized to provide a bond redetermination hearing.

*Response.* Under the proposed rule, 810 hearings would not mimic the proceedings of an Article 3 court but would instead serve to review ORR child welfare-based determinations regarding dangerousness and flight risk. Child welfare determinations are clearly within the responsibility vested in the Secretary of HHS under the TVPRA for the care and custody of UACs.

*Comment.* Many commenters wrote that without more information about procedures to protect due process rights in 810 hearings, the hearing process does not meet the requirements set out in the APA for agency decision making.

*Response.* disagrees with the suggestion that the proposed rule provides inadequate information about procedures in 810 hearings. As explained in the rule, 810 hearings will decide on specific questions noted in the rule, allow for the introduction of evidence, be subject to a preponderance of the evidence standard, result in a written decision, and subject to appeal.

810 hearings are not removal hearings, nor adjudications required by statute to be determined on the record after opportunity for an agency hearing. Where matters of immigration detention and removal are involved, this rule provides for bond hearings for accompanied children in § 236.3(m). HHS notes that 810 hearings flow from HHS' duty to provide care and custody to UACs, and the APA is satisfied by HHS' promulgation of this rule after notice and comment.

*Comment.* Commenters wrote that the role of a UAC's attorney in an 810 hearing was unclear. They also contended that UACs would not have adequate assistance because UACs would not receive government appointed attorneys to represent them during the 810 hearings.

*Response.* HHS anticipates that counsel for UACs would have the same role and ability to represent their clients in 810 hearings as they do for UACs in bond hearings. For example, they will be able to request their clients' case files, present evidence, and cross-examine the government's evidence. In practice, essentially all UACs in bond hearings have had counsel. Nevertheless, Congress did not require the government to pay for counsel in any circumstance, and that counsel may be present at no expense to the

Government. 8 U.S.C. 1232(c)(5), incorporating 8 U.S.C. 1362.

*Comment.* Several commenters took exception with placing the burden of proof in 810 hearings on the UAC, and with the standard of evidence applicable to hearings. Some commenters expressed concerns that the rule would result in a shifting of the burden of proof from the government to prove that the child is a safety or flight risk to the alien child to prove that he or she is not. The commenters suggest this is inconsistent with the FSA and *Flores* v. *Sessions,* 862 F.3d at 867–68.

*Response.* HHS believes that it may, in this rule, recognize the child welfare nature of ORR care and custody of UACs. As a result, although HHS will not place the burden of proof on the government in 810 hearings, it has modified the rule to state that the government does bear an initial burden to produce evidence supporting its determination of the UAC's dangerousness or flight risk. Once the government produces its evidence, the UAC bears the burden of persuading the hearing officer to overrule the government's determination, under a preponderance of the evidence standard.

*Comment.* Several commenters urged HHS to both assume the burden of proof and adopt a clear and convincing standard of proof for bond hearings. They stated that the clear and convincing evidence standard is the governing standard in almost all civil detentions, with the exception of immigration detention. Specifically, the standard of evidence for the government should be clear and convincing, which is a higher standard than preponderance of the evidence.

*Response.* HHS will assume the burden of producing documentation and evidence supporting its finding of a UAC's dangerousness or flight risk, which the UAC must then successfully rebut before an 810 hearing officer, under a preponderance of the evidence standard. *See Flores* v. *Lynch,* No. CV854544DMGAGRX, 2017 WL 6049373AsAsA20, 2017, at *2 (citing *Matter of Guerra,* 24 I & N Dec. 37 (BIA 2006) to support the proposition that aliens in custody must establish that they do not present a danger to persons or property and are not flight risks). Although ORR and EOIR implemented *Flores* bond redetermination hearings by immigration judges equivalent to bond hearings in the adult context (where the burden is on the alien to demonstrate they are not a danger or risk of flight), in practice ORR has produced the evidence supporting its determination of the UAC's dangerousness or level of flight risk, which the UAC has then

attempted to rebut. HHS believes it is closest to current bond hearings to have the burden of persuasion on the UAC, and to apply a preponderance of the evidence standard rather than a clear and convincing standard.

Requiring UACs to bear the burden of persuasion under a preponderance of the evidence standard allows HHS to balance the equities of UACs in care with its responsibility under the FSA to ensure public safety. *See* FSA paragraph 14 (describing ORR's general policy favoring release, together with its responsibility to ensure the safety of the UAC and others when it releases a UAC). To the extent the courts have ordered ORR to provide bond hearings to UAC under Paragraph 24A of the FSA, they have not imposed a standard of evidence. Rather, one of the cases cited by the *Flores* district court, *Matter of Guerra,* stated, ''An Immigration Judge has broad discretion in deciding the factors that he or she may consider in custody redeterminations. The Immigration Judge may choose to give greater weight to one factor over others, as long as the decision is reasonable.'' 24 I & N Dec. at 40. Further, ORR custody of UACs is not the equivalent of civil detention or immigration detention; and even if it were, determining the proper standard of proof for Paragraph 24A bond hearings or the proposed section 810 hearings would depend first on the text of any applicable statutes and case law.[56] The TVPRA and HSA do not speak to the issue of bond hearings or their equivalent for UAC in ORR custody, but the relevant case law has applied existing immigration court practices calling for broad discretion by the hearing officer in these cases. Finally, we also note that the regulation specifically provides that UACs will have access to counsel for 810 hearings.

*Comment.* Organizations noted § 410.810 fails to take the best interest of the child into consideration. Another organization argued that the hearing officer's work should be reviewed under ''substantial evidence'' to ensure they considered the best interest of the child.

*Response.* As mentioned above, Congress recognized that HHS has expertise in child welfare and is the most capable agency to make decisions that factor in the best interest of the child. In 2008, Congress enacted a requirement that children under HHS custody ''shall be promptly placed in

---

[56] *See Jennings* v. *Rodriguez,* 138 S. Ct. 830, 847 (2018) (finding in part, with respect to certain adult bond hearings, that nothing in the text of the relevant statute ''even remotely support[ed]'' the imposition of clear and convincing standard of proof).

the least restrictive setting that is in the best interest of the child.'' 8 U.S.C. 1232(c)(2)(A). In making such placements, ''the [HHS] Secretary may consider danger to self, danger to the community, and risk of flight.'' *Id.* The 810 hearing does not require a formal best interest determination, just as immigration courts and the FSA do not require a best interest determination for a bond hearing nor does the FSA require this. As noted above, the scope of an 810 hearing is also limited to the question of whether the UAC poses a danger or a flight risk, although these are not the only factors when determining release. ORR takes the best interest of the child into account, in addition to potential danger or flight risk, when making a decision about release.

HHS declines to require the hearing officer's work be reviewed under ''substantial evidence.'' As already explained, HHS will apply a preponderance of the evidence standard of evidence for 810 hearings.

*Comment.* Other comments concerned the appeals process for 810 hearings. Several commenters expressed concern about the proposed appeals of HHS hearing officers going to the Assistant Secretary for Children and Families. One commenter wrote the Assistant Secretary would create a bottleneck for cases, but others were concerned that, because the Assistant Secretary is a political appointee, the appeal decisions would be politicized.

*Response.* HHS believes that directing all 810 hearings appeals through a dedicated office will result in efficiencies. Only a limited number of bond hearings have been requested each year—approximately 70 in the past year—and an even smaller number were appealed. HHS anticipates a manageable number of appellate cases in any given year, not a bottleneck. In addition, HHS does not believe that it is improper to vest an appellate decision of this sort in the Assistant Secretary, who is an Officer of the United States and therefore legitimately exercises significant authority pursuant to our laws. *See Lucia* v. *SEC.,* 138 S.Ct. 2044 (2018).

*Comment.* Several commenters argued that 810 hearings should only occur in person because video or telephonic conferencing is not child friendly and that they should follow best practices used in state juvenile custody determinations.

*Response.* HHS anticipates that the procedures governing 810 hearings to develop more fully with experience. As written, the rule provides for minimum requirements. But HHS declines to impose the sorts of protocols recommended by the commenters recommended by the commenters. Just as ORR makes child welfare decisions on an individualized basis, so too does HHS envision a process by which the individual needs of UACs requesting 810 hearings can be accommodated. HHS accordingly declines to require all hearings to take place in person, or to state that video or telephonic conferencing is necessarily not child friendly. Neither the FSA nor the TVPRA impose such a requirement.

*Comment.* One commenter complained that the proposed rule does not provide information about the qualifications for HHS hearing officers.

*Response.* As indicated above, HHS invited comments on whether hearing officers should be employed by the Departmental Appeals Board, either as Administrative Law Judges or hearing officers, or whether HHS would create a separate office for hearings, similar to the Office of Hearings in the Centers for Medicare & Medicaid Services. But the comments received did not make responsive suggestions. As a result, HHS maintains that 810 hearings will be conducted by independent hearing officers to be identified by HHS.

*Comment.* Two commenters wrote that creating a new custody redetermination process at HHS would create a fragmented and uncoordinated administrative processes resulting in confusion and contradictory results between HHS and EOIR. One commenter wrote that in addition to bond redetermination cases remaining with EOIR, immigration judges should be charged with informing UACs of their rights, and appeals to the BIA should be heard and decided within 48 or 72 hours of the appeal.

*Response.* As an initial matter HHS disagrees with the commenter that housing hearings within HHS will result in a fragmented process. One of the benefits of moving these child welfare hearings to an independent HHS office is to allow continuity of child welfare decision-making within the Department. Moreover, HHS proposed an independent hearing process to replace the current regime of custody hearings before immigration judges. Immigration judges would play no role in informing UACs of their rights regarding 810 hearings, including information on the opportunity for appeal, which are distinct from immigration enforcement proceedings. HHS has, however, considered this comment with respect to the 810 hearing process and notes that, typically, immigration judges have informed UACs and ORR of their rights to appeal bond hearing decisions concurrently with the issuance of those decisions. HHS anticipates that it will create a new bilingual form that will explain the 810 hearings process, notify UACs of their rights within the administrative process, and allow UACs to formally request an 810 hearing—or withdraw a request. If a child speaks a language other than English or Spanish, HHS will use interpretation services to convey the form's meaning and content to the UAC. But the timetable for appellate decisions proposed by the commenter is not practically feasible, nor even required by regulations governing BIA appeals of bond determinations by immigration judges.

*Comment.* One commenter argued that according to his observations of bond redetermination hearings, the process is currently disorganized and inefficient, and insufficiently protects UACs. He further contended that that in the hearings he observed, the immigration judge disagreed with HHS' assessment of the dangerousness of the child. The commenter concluded that HHS officials are thus incapable of providing an adequate bond hearing to a UAC.

*Response.* Based on the context of this comment, the commenter appears to have confused bond hearings under paragraph 24A of the FSA, with *Saravia* hearings. *See Saravia* v. *Sessions,* 280 F. Supp. 3d 1168 (N.D. Cal. 2017), *aff'd sub nom. Saravia for A.H.* v. *Sessions,* 905 F.3d 1137 (9th Cir. 2018). *Saravia* hearings originated in a case in which DHS had re-apprehended based on gang affiliation certain UACs whom ORR had discharged to sponsors. The District Court for the Northern District of California ordered that, going forward, any such UACs must be afforded a hearing before an immigration judge, in which the burden is on the government to demonstrate that circumstances changed sufficiently to justify re-apprehension and referral to ORR custody. ICE counsel, not HHS, represents the government in *Saravia* hearings. In contrast, ICE counsel does not represent the government in UAC bond redetermination hearings under the FSA; HHS does. Anecdotal information that an immigration judge disagreed with ORR's original judgment to release a particular child to a sponsor, in the context of a *Saravia* hearing, is insufficient to establish that an independent hearing officer unaffiliated with ORR is unable to make an appropriate child welfare determination.

*Comment.* One commenter objected that the 810 hearings do not provide an opportunity for sponsors to participate in the bond redetermination case to

show that the child has an appropriate sponsor.

*Response.* HHS reiterates that neither bond hearings nor the proposed 810 hearings make determinations on release, let alone release to particular sponsors. Sponsor suitability determinations are within ORR's statutory mandate, and are a separate question from the analysis done in the current bond hearings or the proposed 810 hearings. As a result, potential sponsors need not always be afforded the right to participate in 810 hearings. Having said that, UACs are frequently sponsored by their parents, and the rule allows parents or legal guardians to request 810 hearings on their children's behalf, just as they are able to request bond hearings on their children's behalf presently. In these situations, the rule would not prevent parents from participating in the hearings. For example, they could testify or present evidence, or could argue on behalf of their children.

*Comment.* Some commenters disagreed with the agency's analysis that EOIR lacks the authority to hear UAC bond redetermination hearings because Congress did not authorize EOIR to hear these cases and because release authority for UAC rests solely with HHS. These commentators supported their objection by citing to the Ninth Circuit's analysis of these issues. One commenter noted that the BIA has held that immigration courts can rule on UAC bond redeterminations cases.

*Response.* HHS disagrees with the commenter's conclusion regarding the Ninth Circuit's analysis as it pertains to the bond hearing requirement under paragraph 24A of the FSA (for the reasons stated above, as well as in the NPRM). In addition, Congress also has already determined that HHS is the agency with expertise in child-welfare issues, including in making release determinations that are in best interest of the child. Immigration judges—sitting in a different Department of the Executive Branch, and generally able to release individuals "on bond" on their own recognizance, are unfamiliar with the HHS system and do not always recognize the limits of their authorities (*i.e.*, to determine only dangerousness or risk of flight, without necessarily being able to release a child for whom a suitable custodian has not yet been determined). While the Ninth Circuit itself recognized that the "bond hearing" under FSA paragraph 24A would not result in a dispositive release decision, this limitation on the authority of immigration courts is not a limitation typically experienced with such

administrative courts. Thus, not only do the statutory authorities support an HHS administrative process for the hearings that will affect HHS legal custody, but also, even if the statutes could be read to allow EOIR to retain authority over the UAC bond hearings, the Government nonetheless has the authority to implement the FSA by moving the hearings to an HHS framework. The language of the HSA shows that Congress knows how to preserve DOJ authorities where it chooses to do so. In the rule of construction governing immigration benefits, Congress stated that "Nothing in this section may be construed to transfer the responsibility for adjudicating benefit determinations under the Immigration and Nationality Act (8 U.S.C. 1101 *et seq.*) from the authority of any official of the Department of Justice, the Department of Homeland Security, or the Department of State." 6 U.S.C. 279(c). No similar language exists for bond hearings. Such a discrepancy shows that where Congress wished to preserve DOJ authority for UACs, it did so explicitly. In addition, Congress has recognized that HHS would assume responsibilities that previously resided within the Department of Justice. *See* 6 U.S.C. 279(f)(1) (authorizing Federal officials to perform the functions, and exercise the authorities under "any other provision of law," that were "available with respect to the performance of that function to the official responsible for the performance of the function immediately before the effective date" of the HSA). Finally, even assuming commenters are correct in their analysis (which HHS disputes), binding HHS (and EOIR) to the commenters' reading of Paragraph 24A would mean that the Government is indefinitely bound by a decades-old consent decree—a consent decree signed by an Administration no longer in office, that can never be altered, even through Congress' sanctioned method of adopting binding policies through notice and comment rulemaking under the Administrative Procedure Act. HHS does not believe such an unyielding and indefinite hold on agency policy-making, across Administrations, can arise from a consent decree, especially where, as here, Congress abolished the signatory to the Agreement and divided its responsibilities among new Parties. Decisions on whether a minor must be maintained in HHS custody solely due to his or her danger or risk of flight are properly within the purview of the very agency charged with making child-welfare determinations. Once Congress made clear that UACs are to be the

responsibility of an agency not involved in immigration enforcement, it does not make sense for the immigration courts—which are primarily involved in aspects of such immigration enforcement—to retain jurisdiction.

BIA precedent is not dispositive on the question of whether immigration judges may review custodial determinations of ORR. While the district court and Ninth Circuit may have altered this ruling as it pertained to implementation of the FSA, a final rule that provides the substantive elements and practical benefits of bond hearings, especially protection of UACs' due process rights, settles the matter as it relates to HHS custody of UACs. DHS immigration detention is a separate matter, and this rule provides for bond hearings for minors in DHS custody.

*Comment.* Commenters argue that it would be inefficient and more expensive to create a new type of tribunal system for UAC bond redetermination cases.

*Response.* Although it would arguably be less expensive for HHS to preserve UAC bond redetermination hearings in the immigration court system rather than creating a new process within HHS, there are at least two efficiencies that would result from a new independent hearing process. First, removing these cases from immigration court dockets would allow the courts to focus on cases within their expertise and authority (*i.e.,* immigration detention and removal hearings). It is well known that the immigration courts face an enormous backlog of cases, with many aliens waiting months if not longer for their hearings. The sudden addition of UAC custody hearings in 2017, which the immigration courts prioritized in terms of scheduling, only added to the already heavy caseload placed on the immigration courts. Second, placing 810 hearings within an independent HHS office would also promote the speed of adjudications and appeals through the development of specific expertise, and through centralization. Currently, bond hearings take place around the country, in courtrooms with varying rules and scheduling demands. By centralizing all 810 hearings in an independent office within HHS, protocols would be standardized. In addition, the independent hearing office would accrue specialized expertise and at least in theory be able to make adjudications more quickly and effectively than immigration judges who remain largely unfamiliar with ORR policies and practices.

*Comment.* One commenter asserted that 810 hearings fail to protect rights

under the INA and international customary law.

*Response.* As noted above, the purpose of this final rule is to promulgate final rules implementing the FSA, and HHS believes the 810 hearing process does so. HHS is not aware of any provision in the INA or customary international law that would preclude this process and so it does not accept that 810 hearings are governed by customary international law. The commenter appears to suggest that there are requirements of impartial custodial review under customary international law, but it is not clear what the commenter's argument is. Without taking a position on this assertion and as HHS already stated, 810 hearings will be conducted by independent hearing officers.

*Comment.* One commenter wrote that the proposed 810 hearings ignore the interest that state courts may have in the custody of a child in the state, particularly if state courts had previously been involved in the child's life through, for example, a custody hearing.

*Response.* State courts have no jurisdiction over UACs, who are in Federal custody, other than that which ORR specifically consents to in writing. *See, e.g.,* FSA at paragraph 24B (permitting UACs to seek judicial review of placement decisions not in state court, but rather in the United States District Court with jurisdiction and venue). *See also Perez-Olano, et al.* v. *Eric Holder et al.,* Case No. CV 05–3604 (C.D. Cal., Dec. 14, 2010) (creating a uniform notification process for notifying UAC in Federal custody of their right to seek Special Immigrant Juvenile status; establishing procedures for the Federal Government and UAC and UAC representatives to follow for filing specific consent requests to juvenile court jurisdiction).

Changes to Final Rule

HHS has changed the final rule text to make clear that once the UAC has made a claim that s/he is not dangerous or a risk of flight, HHS bears the initial burden to produce evidence supporting its determination of dangerousness or flight risk; however, the UAC, who may introduce his or her own evidence, bears the burden of persuading the independent hearing officer to overrule HHS, under a preponderance of the evidence standard.

## C. Other Comments Received

### 1. Detention as Deterrent

Public Comments and Response

*Comments.* Many commenters stated the Government failed to provide data and/or methodologies used to make an assessment regarding detention as a deterrent, and multiple others stated that detention has been shown to be an ineffective deterrent. Several commenters stated that while harsher enforcement may impact migration flows, so do push factors, something for which they say the proposed rule did not account.

Various commenters asserted that using detention of families or individuals as a way to deter migration is unlawful. One commenter added that deterrence is a concept that applies in the criminal justice context, not the civil immigration context. Commenters pointed out that the Supreme Court has ruled that civil detention may not be used as a mechanism for deterrence and that detention used as a deterrent abandons the protections of the due process clause of the Fifth Amendment. A few commenters insisted that the government must show the justification for detaining immigrants outweighs countervailing liberty interests and that detaining asylum seekers to deter other migrants does not meet the standard. A few commenters stated that detention as a deterrent has been both proven ineffective and decried as unlawful by a Federal judge.[57] Others stated that when the previous administration attempted a similar policy of detaining families for the purpose of deterring future migration, a Federal court issued a preliminary injunction blocking the practice.

Multiple commenters stated that DHS makes a flawed assertion in the proposed rule by stating that a 20-day limit on family detention imposed as part of a July 2015 court ruling "correlated with a sharp increase in family migration." These commenters argued that available evidence indicates the increase in migration is more directly related to root causes of poverty and violence in migrants' home countries and that the NPRM erroneously presented correlation as causation.

Numerous commenters cited research and testimonials indicating that the migration trend from the Northern Triangle is due to high rates of violence in that region. They cited statistics about significant danger accompanying travel to the United States to underscore

[57] *R.I.L.R.* v. *Johnson,* 80 F. Supp. 3d 164, (D.D.C. 2015).

the severity of the situation that they are fleeing. Several commenters asserted that the families who would be affected by this rule have grounds for asylum, citing USCIS data showing that nearly 88 percent of families in its detention centers have exhibited credible fear. The commenters stated that the rules set forth in the NPRM will not deter these individuals who are trying to save their lives and the lives of their children. Commenters suggested that by ignoring violence and persecution as a migratory cause, DHS evades its responsibilities as a signatory to the 1967 Protocol Relating to the Status of Refugees; increases likely litigation regarding protection of asylum seekers; risks returning asylum seekers to persecutory harm; and risks undermining confidence in the rule of law in the United States by both asylum seekers and U.S. citizens.

Several commenters mentioned that the migrants have no or minimal knowledge of U.S. immigration laws, while others noted that the policy is ineffective even if migrants are aware of the consequences of entering the United States illegally.

One commenter stated that the NPRM shows the government is struggling to comply with the FSA and is attempting to alter the standards agreed upon by the parties in the FSA. The commenter stated that the FSA was focused on establishing procedures and conditions that meet child welfare principles, but the purposes demonstrated in the NPRM are in direct contrast to the FSA's intent. The commenter asserted that the proposed rule cannot be interpreted as a good faith attempt to be consistent with the FSA's provisions.

Commenters also stated concern with family "incarceration." For example, one commenter stated that incarceration of families is a cruel response to the humanitarian crisis at the border and will exacerbate the trauma that survivors of violence have endured. The commenter stated that many women and children arriving at the border from the Northern Triangle are fleeing terrible violence at the hands of intimate partners, criminal gangs, or police or other authorities, who perpetrate these acts of violence without any accountability.

*Response.* As DHS specified in the proposed rule, the primary objective of the rule is to implement the FSA in regulations, thereby terminating the FSA; it is not to utilize detention as a deterrent to migration. Congress has authorized DHS, as a general matter, to detain aliens during the immigration enforcement process to ensure that, at the conclusion of that process, they can be removed if so ordered. In some

circumstances, detention is at the discretion of DHS and, in others, detention is mandatory. Detained cases are handled by the immigration courts on a priority basis, and DHS's policy preference is to be able to exercise its discretion to maintain custody in appropriate family unit cases pending the completion of removal proceedings. This rule will enable DHS to maintain family unity while also enforcing the laws passed by Congress, including appropriately exercising the enforcement discretion Congress has vested in DHS. To the extent that the effect of enforcing the laws passed by Congress is to deter some migrants from making the journey to the United States, that effect is merely a result of enforcing the laws currently in place.

Commenters misinterpreted DHS's position concerning the operational consequences of the FSA. In particular, the absence of state licensing for FRCs has prevented the Government from maintaining custody of many families for a period of time sufficient to resolve their immigration cases, including expedited removal proceedings. This often leads to the release of families, many of whom abscond, adding to a large alien fugitive backlog, as discussed elsewhere in this rule. DHS has encountered cases where this confluence of the FSA and its interpretation have created an incentive for adults to bring minors to the United States with the aim of securing prompt release from custody. That being said, consistent with the view expressed by many commenters, DHS acknowledges that the incentive structure informing the decision of migrants whether to travel to the United States is complex and multifaceted, and that potential detention for criminal or civil violations of U.S. law is not the only consideration at issue. This rule does not purport to—and indeed, cannot—address all potential incentives for migrants to travel to the United States, including ''push factors'' such as those described in the comments.

DHS declines to amend the proposed regulatory text in the final rule in response to these public comments.

## 2. Indefinite Detention

### Public Comments and Response

*Comments.* Many commenters stated that they were concerned that minors, particularly accompanied minors, could be detained indefinitely under the proposed rule. They requested that DHS maintain a fixed detention limitation for children and that families with children be released rather than detained. Many commenters also requested that DHS

maintain the existing list of relatives to whom it will release children.

Many commenters stated that the proposed rule is contrary to the principles underlying the FSA, namely that immigrant children are uniquely vulnerable and, thus, should be released from detention as quickly as possible. These commenters expressed concern that the proposed rule fails to prioritize community placement, and they argued that elimination of the 20-day limitation on detention conflicts with the FSA's general policy favoring release as ''expeditiously as possible'' without ''unnecessary delay.'' Many commenters wrote that the proposed rule constitutes a modification of the FSA, rather than a codification of it, and could not be used to justify termination of the FSA. These commenters noted that the FSA's detention limitation applies to both accompanied and unaccompanied children under a 2015 District Court ruling.

Several other commenters stated that the proposed rule violates the FSA's requirement that children be placed in the least restrictive setting, along with additional Federal laws. One commenter stated that the least restrictive setting requirement should be interpreted consistently with similar language in the Individuals with Disabilities Education Act (IDEA), which requires that students with disabilities be placed in the least restrictive appropriate setting possible. The commenter wrote that the IDEA and the FSA are both intended to prevent disadvantaged children from being taken advantage of by those in power, and that the FSA's ''least restrictive setting'' language should therefore be interpreted to prohibit detention in most circumstances. Another commenter stated that indefinite detention of children would violate the Child Abuse Prevention and Treatment Act, a Federal law which prohibits caretakers of children from causing, or failing to mitigate serious imminent threats of, physical and emotional harm. Still other commenters wrote that indefinite detention runs contrary to the spirit of the Family First Prevention Services Act, a Federal law which attempted to reduce the number of children in congregate settings. These commenters stated that indefinite detention contradicts best practices, state policy, and Federal policy in the criminal justice, juvenile detention, and child welfare areas.

Other commenters recommended specific changes to the language of the rule to avoid the prospect of indefinite detention. One commenter recommended adding language

regarding continuing efforts to release minors and reunify families for the duration of a child's time in custody to § 410.201(f). Another commenter wrote that the possibility of indefinite detention is exacerbated by the use of permissive and future-tense verbs (''may'' and ''will'') rather than the mandatory verbs found in the FSA (''shall'' and ''must''). This commenter recommended retaining the verbs used in the FSA. This commenter also wrote that the ''or is otherwise appropriate'' clause should be stricken from § 236.3(h) because it provides an opportunity for indefinite detention.

Many commenters stated that the TVPRA did not justify changing the conditions imposed by paragraph 14 of the FSA with regard to accompanied minors, because the TVPRA only addresses UACs and, in any event, is not inconsistent with the FSA.

Many commenters expressed concern that indefinite detention would violate detained children's human rights or civil liberties. These commenters asserted that detaining migrants in order to deter migration violates international prohibitions on torture. One commenter stated that prolonged detention of asylum seekers violates Article 31(1) of the UN Refugee Convention. Another commenter stated that detaining children for prolonged periods of time violates international law protecting the dignity of the family unit as well as guidance from the United Nations that children should not be detained due to migration status. Another commenter wrote that the indefinite detention of children violates Articles 37, 22, and 9 of the United Nations Convention on the Rights of the Child. One commenter wrote that the proposed rule should explicitly mandate consideration of the best interest of the child in order to comply with these provisions of international law. This commenter also stated that indefinite detention violates Article V of the American Declaration of the Rights and Duties of Man.

Many commenters expressed concern that prolonged or indefinite detention would negatively impact detained children's health, growth, and development. These commenters stated that, while there is no safe amount of detention, harms to children from detention increase as the length of detention increases. They argued that the conditions in existing detention facilities are inappropriate for, and dangerous to, children and do not provide sufficient medical and developmental services to children.

Specific concerns were raised with respect to the mental health of children including the prospect that detention

**44486** **Federal Register** / Vol. 84, No. 164 / Friday, August 23, 2019 / Rules and Regulations

could cause depression, suicidal ideation, and anxiety. Many commenters stated that indefinite detention could cause behavioral changes in children after release and inhibit their educational attainment and success in life. Several commenters worried that prolonged detention may cause "toxic stress," and one commenter stated that the trauma caused by detention could require years of psychotherapy and medications. Another commenter stated that, although parents can typically buffer children from stressful situations, when the parent is also experiencing intense stress, the parent's "buffering capacity" may be undermined and lead to additional harm to the child.

One commenter expressed concern that prolonged family detention would force children and their families to give up their culture. This commenter described a state's experience with Native American assimilation and Japanese-American internment and the negative effects these events had on those communities and noted that it does not want the United States to return to this past practice of childhood detention.

Finally, one commenter expressed concern that indefinite detention of immigrant children could lead to indefinite confinement of U.S. citizen children abroad because the proposed rule would damage the reputation and credibility of the United States abroad.

*Response.* This rule does not contemplate or authorize "indefinite detention" of anybody, much less minors. "Indefinite detention" is inconsistent with DHS's mission. The purpose of immigration detention is to effectuate removal and to keep custody over an alien while a decision is made on whether removal should occur. If the alien establishes that she merits relief from removal, she will be released at the end of the proceedings; if not, she will be removed. That is not "indefinite detention" because it has a definite end point, namely, the end of proceedings and removal itself. *See Jennings* v. *Rodriguez,* 138 S. Ct. 830, 846 (2018); *Demore* v. *Kim,* 538 U.S. 510, 529 (2003). ICE notes that the majority of minor and family unit removals involve countries in the Northern Triangle, and removals are normally effectuated promptly in these countries. DHS notes that minors and family units are not likely to face long periods in detention because immigration proceedings involving detained family units and minors are placed on a priority docket by EOIR. Family units and minors can also benefit from release during the pendency of removal proceedings if

they qualify for release on recognizance, bond, or parole.

Aliens subject to final orders of removal may remain in custody until removal can be effectuated. For those aliens detained pursuant to INA 241, this includes a presumptively reasonable period of 180 days after a final order of removal has been issued, and thereafter, the alien must generally be released absent a significant likelihood of removal in the reasonably foreseeable future (in compliance with current law and regulation).

Detention remains an important tool to ensure that proceedings are completed. EOIR found that for completed cases from January 1, 2014, through March 31, 2019 that started at an FRC, 43 percent of family unit members were issued final orders of removal *in absentia* out of a total of 5,326 completed cases. DHS OIS has found that when looking at all family unit aliens encountered at the Southwest Border from FY 2014 through FY 2018, the *in absentia* rate for completed cases as of the end of FY 2018 was 66 percent. As a result, the authority to detain minors in family units continues to be an important component of immigration enforcement. But "indefinite detention" is not consistent with DHS's mission.

DHS reiterates that while this rule would allow DHS to hold non-UAC minors with their parents or legal guardians at FRCs for more than 20 days, this intent does not clash with the intent of the FSA. The FSA provides that minors subject to its provisions will all be transferred to a licensed program until they can be released. FSA paragraphs 12A, 14, 19. The provisions of this rule will allow properly managed FRCs to qualify as licensed, non-secure facilities once its terms go into effect, and the FSA itself provides no specific time limit for a minor to be in a licensed program. That ICE generally does not hold family units in FRCs beyond approximately 20 days is a result of a district court opinion holding that ICE's FRCs, as they currently exist under law, are not appropriately licensed and are not "non-secure." Once this rule permits properly managed FRCs to qualify as licensed, non-secure facilities, their operation will be consistent with the operation of licensed programs under the FSA. Importantly, as explained previously, FRCs are designed to be a safe location where families can be together in an environment that will foster their children's development during the pendency of immigration proceedings. They are not secure facilities—which means that, while it is discouraged,

individuals in those facilities can exit them. Doing so, however, may give rise to arrest given that those in the facilities are subject to apprehension under the immigration laws and, in many instances, mandatory immigration detention.

Bond determinations will be made pursuant to the ordinary statutory and regulatory standards, under which an alien is released if he can establish he is not a flight risk or danger. *See* INA 236(a). The rule here would not alter such authorities governing custody, but instead would allow the determination of whether to detain a family to be made under all appropriate legal authorities, and not under the FSA system through which a different set of rules applies to the minor and another to his parent(s) even though they are being held together in the same place.

DHS has added new language at § 236.3(j)(4) to state clearly that paroling minors in DHS custody pursuant to section 235(b)(1)(B)(ii) of the INA or 8 CFR 235.3(c) who do not present a safety risk or risk of absconding will generally serve an urgent humanitarian reason. DHS adds that it may also consider aggregate and historical data, officer experience, statistical information, or any other probative information in determining whether detention of a minor is required to secure the minor's timely appearance before DHS or the immigration court or to ensure the minor's safety and well-being or the safety of others. Furthermore, current limitations on bed space in FRCs are significant and will likely mean that, as a practical matter, unless the amount of bed space is significantly expanded or the number of families drops dramatically, families that have established a credible fear and who are not a flight risk or danger will often be released from detention. For a discussion release of minors from DHS custody, please see Section B.10., Release of Minors from DHS Custody.

**Changes to Final Rule**

DHS is amending § 236.3(j)(4) to state that paroling minors in DHS custody pursuant to section 235(b)(1)(B)(ii) of the INA or 8 CFR 235.3(c) who do not present a safety risk or risk of absconding will generally serve an urgent humanitarian reason.

**3. Alternatives to Detention**

**Public Comments and Response**

*Comments.* Many commenters proposed alternatives to keeping family units or unaccompanied minors in detention. Several commenters pointed to the Juvenile Detention Alternatives

Initiative (JDAI) as evidence that alternatives to detention are effective and preferable over detention. Numerous commenters recommended use of the Family Case Management Program instead of detention, because the program is significantly cheaper and is effective at ensuring that a family appears for their immigration proceedings.

Commenters compared ATD programs such as the Intensive Supervision Appearance Program (ISAP) at $4 per day per person and the Family Case Management Pilot Program (FCMP) at approximately $36 per family per day to the cost of detention, which they cited as approximately $319 per individual per day in FY 2019. One commenter estimated that the costs of detention for a family of two in an FRC for 40 days, the average time to process an individual on the detained docket costs would be $25,520 ($319 × 2 people × 40 days). The commenter estimated the costs of ISAP for the head of household at $3,008 for 752 days, the average time to process an individual on the non-detained docket ($4 × 752 = $3,008).

The commenters noted that participants in the FCMP had a 100 percent attendance record at court hearings and a 99 percent rate of check-ins and appointments with ICE.[58] The commenters also stated that the FCMP would have fewer negative impacts on the well-being of minors when compared to detention, and that the Program resulted in, among other things, lower return-rates of children into foster programs and lower rates of abuse, neglect, or other crimes when compared to minors and families in detention.

Relatedly, several commenters stated that DHS should utilize a community-based, case-management program as an alternative to detention. The commenters stated that such a program should provide case management services, facilitate access to legal counsel, and facilitate access to safe and affordable housing. They cited studies showing that a sense of belonging in schools and neighborhoods is a strong factor for positive health outcomes for immigrant and refugee families. The commenters also stated that such a program has been shown to substantially increase program compliance, without the extensive use of electronic monitoring, and cited pilot programs conducted by the Lutheran Immigration and Refugee Service and

the Vera Institute of Justice as support. Still other commenters presented alternatives to detention. Some commenters stated DHS should more heavily rely on NGOs, non-profits, and religious organizations to provide necessary services, including housing, to immigrants and ensure that they attend their immigration hearings. One commenter focused on foster family placement, stating that it would provide better outcomes for youth than detention or large shelter placement.

Several commenters stated that DHS should release more aliens on bond, or if the aliens lack any indicia of being a flight risk, on their own recognizance. Several commenters supported electronic monitoring as an alternative to detention. Other commenters, however, expressed concern that electronic monitoring can be stigmatizing for aliens and interfere in daily life activities, and stated that such monitoring, while preferable to detention, should only be used as a last resort, such as when the alien is a flight risk, presents a safety concern, or otherwise would be a candidate for secure detention.

One commenter expressed support for a program that includes a combination of electronic ankle monitors, voice-recognition software, and unannounced home visits, and stated that similar programs have been found to be affordable and highly effective. One commenter, citing a GAO report,[59] noted that a similar program resulted in over 99 percent of aliens with a scheduled court hearing appearing at their scheduled court hearings, and more than 95 percent of aliens with a scheduled final hearing appearing at their final removal hearing.

Several commenters stated that providing needed services to alien families and minors would help ensure their attendance at court hearings. Several commenters stated that DHS should provide legal orientation programs to aliens to help ensure their appearance at hearings, as well as inform families of their legal rights and obligations. These commenters expressed a belief that the high rate of *in absentia* removal orders is because asylum seekers lack basic information about the immigration process. Another commenter suggested that the government provide the families and minors with case workers, transportation to and from their hearings, and a small financial incentive

for showing up at their hearings. The commenter also suggested that aliens who appear at their hearings should also have their immigration cases looked upon more favorably.

Finally, commenters cited to a report on a non-profit organization's case management program, the Family Placement Alternatives (FPA), piloted in 2015. The commenters present the FPA as a human-centric alternative to detention through a holistic social service approach. The report highlights the benefits of community-based services and cites several examples of immigrants who were able to navigate the asylum system better with the help of an assigned case manager. The report also annexes several findings directly related to compliance with removal proceedings, discusses the cost-effectiveness of running the program and recommends its adoption on a larger scale.

*Response.* DHS agrees with the commentators that ATD has an important role to play as an effective compliance tool for some aliens. DHS accordingly uses ATD in some cases, consistent with resource limitations, and will continue to do so. But ATD is only a partial solution, not a complete answer. Congress has authorized, and in some instances required, immigration detention as a tool for fulfilling ICE's mission. Although ATD can be used as an effective compliance tool, unlike detention, such alternatives generally do not provide a means to effectively remove those who are illegally present and have a final order of removal. Moreover, DHS does not have the resources to keep aliens on ATD throughout proceedings, or to locate and arrest those who abscond. Enrolling aliens in ATD instead of detaining and removing them also contributes to the growing immigration court backlog. Many of those in the program are enrolled for years (as opposed to an average length of stay in detention of 30–40 days). ATD thus cannot completely replace immigration detention.

ICE is, however, currently utilizing ATD for certain qualified family units. The current ATD—Intensive Supervision Appearance Program (ISAP) is a flight-mitigation program that uses technology and case management tools to facilitate compliance with release conditions, court appearance, and final orders of removal while allowing aliens to remain in their community—contributing to their families and community organizations and, if necessary, wrapping-up their affairs in the United

[58] Citing the U.S. Dept. of Homeland Security Office of Inspector General, Rep. No. OIG–18–22, U.S. Immigration and Customs Enforcement's Award of the Family Case Management Program Contract (2017).

[59] Report to Congressional Committees, Alternatives to Detention: Improved Data Collection and Analyses Needed to Better Assess Program, U.S. Government Accountability Office, Nov. 2014.

AR298

States—as they move through immigration proceedings.

ATD–ISAP may be appropriate for aliens who are in some stage of removal proceedings and released from DHS custody pursuant to an order of release on recognizance, an order of supervision, or a grant of parole or bond, *e.g.*, individuals considered not to be a danger to the community or a high flight risk. The ATD–ISAP contractor provides case managers who supervise participants utilizing a combination of home visits, office visits, alert response, court tracking, and technology. Case managers also provide referrals to a multitude of social services. Because of the nature of the program, juveniles cannot be participants, but family units (at least one adult and minor children) can be enrolled via an adult Head of Household. Of the approximately 100,000 participants currently enrolled in ATD–ISAP, about 50 percent are family units.

Data maintained by ICE show that historically family units on ATD tend to abscond at a higher rate than non-family unit participants. ICE considers an absconder from the ATD program to be an individual who has failed to report, who has been unresponsive to attempts by the Government to contact him or her, and whom the Government has been unable to locate. In FY 2018, the absconder rate for family units was 30 percent, significantly higher than the 19 percent absconder rate for non-family unit participants. Because ICE lacks sufficient resources to locate, arrest, and remove the tens of thousands of family units who have been ordered removed but are not in ICE custody, most of these aliens remain in the country, contributing to the more than 564,000 fugitive aliens as of September 8, 2018. Such at-large apprehensions present a danger to ICE officers, who are the victims of assaults in the line of duty, and significantly increases the operational burden of effectuating removal. Therefore, although ATD–ISAP is useful and indeed used by ICE for many families, it is not a complete answer for the enforcement of immigration law with respect to family units.

The Juvenile Detention Alternatives Initiatives (JDAI), was developed as a pilot project in the early 1990s by a private philanthropy based in Baltimore, and has since expanded to over 300 jurisdictions. The purpose of JDAI is to reduce reliance on local confinement of youth involved in the penal system, based on the premise that placing juveniles in locked detention pending court hearings increases the odds that the child would be found delinquent and committed to corrections facilities, in turn damaging prospects for future success. The JDAI's core strategies include collaboration with juvenile court officers, prosecutors and defense counsel, and objective risk assessment of the youth to determine whether home confinement and self-reporting instead of detention will assure compliance with court appearances. JDAI is essentially a flight mitigation tool for the penal system with some similarities to ATD–ISAP in administrative removal proceedings. Accordingly, the JDAI is not suitable for managing family units and/or juveniles who are not otherwise involved in the penal system.

Commenters referenced the FCMP as a much cheaper alternative than detention. While the ATD–ISAP program has some elements of a case management program, the FCMP itself is a program no longer used by DHS. The FCMP was launched by DHS in early 2016, as an alternative to detention for family units who illegally entered the United States with a credible fear that might qualify them for protection from removal. The FCMP, which was implemented in only a few cities, aimed to promote compliance with immigration obligations for Heads of Household who are a low public-safety risk and who were residing or intending to reside in those few cities, and who were not considered appropriate for traditional ATD programs or who were not eligible for placement in FRCs, *e.g.*, pregnant or nursing women, or mothers with young children. Under the program, families were given a caseworker who helped educate them on their rights and responsibilities, and helped families settle in, assisting with things like accessing medical care and attorneys, and ensuring they made it to their court appearances.

ICE terminated the FCMP in June 2017, after completing a top-down review of the pilot year (January 2016—June 2017), based on the finding that the FCMP cost around $38.47 per family, per day (or roughly $16.73 per individual), while traditional ATD—Intensive Supervision Appearance Program (ISAP III) cost ICE approximately $4.40 per individual, per day. FCMP subcontracted out many of its case management services to NGOs, non-profits and religious organization which drove up the average cost per participant. ICE concluded that money it would save by discontinuing the FCMP could be better used by instead supporting other ATD services for more families.

While it is true that *per day*, any ATD program could be less expensive than the daily cost of detention, immigration judges process the cases of those in custody much faster than those on the non-detained docket[60] meaning that the ultimate gap in cost is often considerably smaller than appears when looking only at the per day costs. Indeed, in some circumstances where a non-detained case takes unusually long, detention can be more cost effective in the long run even though the per day cost is higher.[61]

Additionally, in the long run, the most important factor that determines if an alien is removed when a final order is issued is whether the person is in detention when this occurs. If an alien is not detained at the time, in many cases ICE will have to expend significant resources to locate, detain, and subsequently remove the alien in accordance with the final order.

Regarding commenters' reference to the non-profit organizations' Family Placement Alternatives program, such a program, as with the FCMP, is not suitable for the purpose of effectuating removal.

Changes to Final Rule

DHS declines to amend the proposed regulatory provisions in the final rule in response to these public comments.

4. DHS Track Record With Detention

Public Comments and Response

*Comments.* Several commenters discussed DHS's track record with detention. In general, comments focused on the following areas: Inadequate conditions at existing facilities; and problems hiring staff in remote DHS facilities.

Multiple commenters stated that ICE-run facilities have a history of poor conditions and compliance issues and stated that ICE could not be trusted to detain families in adequate and safe conditions. Some commenters contended that governmental facilities had failed to provide adequate access to care and safety for children in DHS and HHS custody, even though those facilities were presumably operating in accordance with current FSA stipulations. These commenters stated

---

[60] *See* Trac Immigration, Table 1. Pending Cases and Wait Times Until Hearings Scheduled by Court Location, Report date June 8, 2018 *https:// trac.syr.edu/immigration/reports/516/include/ table1.html.*

[61] *See* Congressional Budget Justification FY 2018—Volume II, U.S. Immigration and Customs Enforcement, page 50, ''An average daily rate for family beds can be calculated by dividing the total funding requirement of $291.4 million by the projected average daily population (ADP) of 2,500 for a rate of $319.37.'' *https://www.dhs.gov/sites/ default/files/publications/DHS%20FY18%20CJ %20VOL%20II.PDF.*

that given the less rigorous standards and oversight envisaged by the proposed regulations, these breaches are likely to continue and proliferate if the FSA is weakened.

According to these commenters, a report by Human Rights First [62] supports their contention that ICE-run detention facilities historically and routinely fail to meet even their own minimum standards of care. Some commenters reported that visits to family detention centers reveal discrepancies between the standards outlined by ICE and the actual services provided, including inadequate or inappropriate immunizations, delayed medical care, inadequate education services, and limited mental health services.

Multiple commenters referenced a letter from two DHS physicians to the Senate Whistleblowing Caucus, in which the experts stated that after conducting ten investigations over four years at ICE family detention facilities, they had concluded that children housed in ICE family detention centers are at high risk of harm, due to serious compliance issues such as lack of timely access to medical care, lack of sufficient medical staffing, inadequate trauma care and counseling, and inadequate access to language services.[63]

Several commenters stated that DHS has been unable to staff facilities in a timely manner with qualified pediatricians, psychiatrists, child and adolescent psychiatrists, mental health clinicians, and pediatric nurses, particularly in remote areas. These commenters stated that without adequate staffing, the facilities could not provide adequate health services. Commenters cited to several incidents that they believe exhibited this lack of adequate care.

Commenters relied on several reports for these arguments. They pointed to a DHS Inspector General report on an ICE-run adult detention facility that they stated revealed astonishingly substandard and harmful conditions,[64]

and to July 2018 reports filed in Federal court that allegedly documented unsafe and unhealthy conditions in DHS-run facilities where children were housed after being separated from their parents at the border.

Commenters also pointed out that in January 2016, the Pennsylvania Department of Human Services revoked the child care license of the Berks County Residential Center because DHS was found to be using its license inappropriately. Yet, the facility continued to operate for a year with a suspended license. According to one of the commenters, the Berks County facility amassed an atrocious record of health concerns, inadequate medical attention, alleged sexual misconduct, and other harmful conditions because there was no proper oversight.

*Response.* DHS agrees with the commentators that it is critical that conditions in DHS facilities live up to applicable standards, particularly when it involves the treatment of children. That is the whole point of the standards. The proposed rule here would do nothing to weaken them.

To further emphasize its commitment to its standards, DHS is adding regulatory text to confirm that it will publicly post the results of the third-party inspections of ICE FRCs on DHS's website to ensure as much transparency as possible within the inspection and alternative licensing process. See discussion of inspection comments and responses. Moreover, DHS is modifying the regulatory text to provide that audits of licensed facilities will take place at the opening of a facility and take place on an ongoing basis, and DHS is modifying the language regarding the juvenile coordinators, to be clear that their role includes ongoing monitoring of compliance with the standards in the regulations.

DHS further notes that under this rule, FRCs will not be exempt from state licensing standards, so long as the State in which they are located maintains a licensing process for facilities that hold minors together with their parents. Accordingly, the Berks FRC will continue to receive regular scheduled and unscheduled inspections by the Commonwealth of Pennsylvania even after this rule goes into effect. CRCL conducted an onsite investigation at Berks in 2017 and sent the Expert Reports with Recommendations to ICE on July 21, 2017. The Medical Expert did not find alarming incidents of medical care failures. DHS notes that the only facilities required to be

licensed under this rule (and under the FSA) are the FRCs. Thus, these licensing requirements—and the public reporting of inspections—do not apply to DHS' short-term holding facilities (such as CBP facilities). DHS notes, however, as described above, that CBP facilities are subject to inspection and monitoring by outside entities.

DHS also disagrees with some of the commenters' specific assertions. Many of the commenters made broad, generalized allegations that ICE has abused children in detention, failed to uphold its own Family Residential Standards, and generally failed to provide care and safety to the minors in its custody, among other issues. Even though those commenters cited to studies such as the one provided by Human Rights First [65] or the American Academy of Pediatrics [66] and asserted that these studies supported their allegations, DHS review of these studies uncovered no specific instances of abuse, neglect, or failure to abide by standards provided with enough detail for DHS to investigate. For those generalized allegations that did not provide details sufficient for DHS to substantiate the allegations, DHS cannot respond to the commenters effectively. DHS declines to amend the proposed regulatory text of this rule based on those broad, unsubstantiated allegations.

However, DHS does have a complaint and grievance process in place. Aliens in DHS custody who have a specific complaint about a staff member can file a grievance either directly with OIG by emailing *DHSOIGHOTLINE@dhs.gov* or to the facility's grievance committee or designated grievance staff. Grievance forms are available in common areas along with a locked box where residents can deposit the grievances. Detailed procedures for filing grievances at FRCs are in the FRS. The procedures make accommodations for language barriers as well as physical and mental disabilities and allow for help with filling the forms by other staff members and legal representatives. They provide for informal and formal grievances, emergency grievances, and appeals. The FRS also prohibit retaliation by staff against residents for filing grievances.

Aliens in DHS custody, community faith-based organizations, non-governmental organizations (NGOs), community leaders, immigration lawyers, and members of the public

---

[62] Human Rights First, "Family Detention: Still happening, Still Damaging," (October 2015 Human Rights First report) (discussing reports of substandard care at family detention centers including Karnes, Dilley, and Berks).

[63] *Id.* at 4; *see also* Academic Pediatric Association, et al., July 24, 2018 Letter to Congress (letter submitted by 14 medical and mental health associations seeking congressional oversight of DHS-run facilities, and stressing that conditions in DHS facilities, which include open toilets, constant light exposure, insufficient food and water, no bathing facilities, extremely cold temperatures, and forcing children to sleep on cement floors, are traumatizing for children.)

[64] *See* September 27, 2018 Office of Inspector General Management Alert—Issues Requiring

Action at the Adelanto ICE Processing Center in Adelanto, California, OIG–18–86.

[65] *https://www.humanrightsfirst.org/resource/ family-detention-still-happening-still-damaging.*

[66] *https://pediatrics.aappublications.org/lens/ pediatrics/139/5/e20170483#content/citation_ reference_63.*

with allegations regarding conditions at DHS facilities can file complaints with either the DHS Office of the Inspector General (OIG) or with CRCL via the internet at *https://www.dhs.gov/file-civil-rights-complaint* or through the CBP infocenter (OIG and CBP forward the complaints to CRCL). Complaints filed with CRCL are processed and uploaded into a database housing all complaints. The CRCL team meets weekly to discuss all complaints received that week. They decide which allegations will be opened for formal investigation. Allegations that are not open for investigation, remain in the database and are reviewed quarterly to identify trends or systemic issues. If trends or systemic issues are found, then those cases can be opened for investigation.

Another method of receiving complaints is through DHS's CRCL Community Engagement Team. Team Members go out into community, develop a rapport with NGOs, faith-based organization leaders, lawyers, and community members. Team Members hold community roundtable events at which they discuss DHS policies, procedures implemented across the Department, and what it means for the community. The community in turn has the ability to identify how it has affected them and if necessary file complaints through these Team Members.

When CRCL opens a formal investigation, the OIG is contacted and given the right of first refusal to investigate. If OIG turns down the opportunity to investigate, then CRCL performs the investigation. Depending on the type of complaint, the investigation could be conducted offsite or onsite. If offsite, CRCL will work with the respective DHS component to gather documentation specific to the allegations. If onsite, CRCL will conduct the investigation at the facility, which, for ICE, includes interviewing ICE detainees.

On-site investigations are of the facility policy and operations, and do not address personnel misconduct issues. The CRCL Compliance Branch goes to the ICE or CBP facilities to conduct on-site investigations. The team is comprised of a combination of the following, depending on the allegations presented: Policy advisors with investigative authority, a medical consultant, a corrections consultant, an environmental health and safety consultant, a suicide prevention consultant, and a mental health consultant. The team will always look into medical care/treatment, and the overall conditions of detention (food preparation, cleanliness, safety issues,

grievance process, and the use of segregation). The team reviews the facilities policy and procedures to ensure the center is properly documenting its actions and incidences at the center and is in compliance with applicable standards. If problems are found at the facility, the team compiles a report of expert recommendations. The expert recommendations are issued to the relevant DHS component, who then has opportunity to concur, partially concur, or non-concur with recommendations and perform remediation. If recommendations are not implemented, CRCL has the ability to re-inspect facilities, and if necessary can issue a recommendation that DHS close a facility, or remove ICE detainees from a detention facility.

The public can find highlights of these Expert Recommendations in CRCL's Annual Report to Congress. CRCL also has a Transparency Initiative in which they are moving documents to the internet. As of this publication, two reports have been uploaded, but more are expected in the future.

CRCL conducts 10–12 site visits a year at ICE facilities with 1–2 of them at FRCs. These visits have brought about major improvements in recent years, and CRCL continues to monitor implementation of their Expert Recommendations.

Changes to Final Rule

For purposes of clarity, DHS is adding language to the final rule at 8 CFR 236.3(i)(4)(xx) explaining that licensed facilities will maintain a grievance filing process and requiring aliens in these facilities to avail themselves of this process if they wish to report a formal grievance. DHS also is adding language in 8 CFR 236.3(o) to make it more clear that the juvenile coordinator will monitor compliance with the regulation.

5. Due Process, Constitutional, Administrative Procedure Act, and International Law Violations

Public Comments and Response

*Comments.* Numerous commenters made general allegations that the rule was arbitrary and capricious and does not withstand the requirements of the APA. As case law makes clear, arbitrary and capricious review requires that an agency apply reasoned decision making when proposing new regulations and provide a rational explanation of the changes.[67] The commenters claimed that the Departments had failed to do so with respect to the cost calculations

(response in the E.O. 12866 section of this final rule), new licensing process, hearings, definitions of influx and emergency, age determinations, and redetermining of UAC status at every encounter. The commenters also faulted the Departments for allegedly not taking into account the trauma detention causes children and various reports related to detention.

One commenter asserted that the failure to discuss the preliminary injunction in the *Saravia* v. *Sessions,* lawsuit is *per se* arbitrary and capricious because it is a relevant source of law that governs their obligations on this issue.

*Response.* Many of these commenters' concerns about arbitrary and capricious decision-making will not be addressed in this section of the rule, but have been addressed throughout this rule in response to specific comments. This rule represents the result of reasoned decision making, and the Departments have provided rational explanations of their choices throughout. In particular, the Departments have discussed the *Saravia* injunction above and noted that it addressed a discrete legal issue not addressed by the FSA and therefore not the focus of this rule. *See Saravia* v. *Sessions,* 280 F. Supp. 3d 1168 (N.D. Cal. 2017), *aff'd sub nom. Saravia for A.H.* v. *Sessions,* 905 F.3d 1137 (9th Cir. 2018). The purpose of this rule is to implement the FSA in light of the changed circumstances and accumulated agency experience since the signing of the agreement over 20-years ago. In doing so, DHS has carefully assessed and explained its changes. The Departments will continue to abide by all relevant court orders.

*Comments.* Some commenters raised due process concerns. These comments included general attacks on the supposed ''deterrence rationale'' of the rule and the prospect of longer detention, which some commenters claimed would reduce access to legal services or prevent children from participating in their immigration proceedings. The comments also included more specific objections to the ongoing redetermination of UAC status, hearing provisions, and process surrounding re-taking custody of a previously released minor.

*Response.* The Departments disagree that the proposed regulations violate the due process clause of the Fifth Amendment for all of the reasons explained throughout the preamble. Multiple procedural safeguards exist in this context, including those contained in section 462 of the HSA and section 235 of the TVPRA with respect to UACs, the INA more broadly, and the

---

[67] *Motor Vehicle Mfrs. Ass'n of the U.S., Inc.* v. *State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)

AR301

provisions of this rule implementing the relevant and substantive terms of the FSA.

Regarding comments that detention will impact access to legal services, the rule specifically provides for attorney-client visits (in accordance with applicable facility rules and regulations) for those minors in ICE FRCs, as well as a comprehensive orientation session upon admission, including information on the availability of legal assistance. *See* 8 CFR 236.3(i)(4)(ix). While in a licensed facility each UAC in ORR custody will also be provided with information regarding the right to a removal hearing before an immigration judge, the right to apply for asylum, and the right to request voluntary departure in lieu of removal. *See* 45 CFR 410.402(c)(14). HHS care and custody will not prevent access to legal assistance or the possibility of administrative hearings.

DHS also disagrees that detention in FRCs will make it harder for children accompanied by their parents or legal guardians to meaningfully participate in their immigration proceedings; rather, keeping families together in custody as a unit will remove the possibility of the family missing a hearing, while also ensuring that the family can decide as a unit how to handle their ongoing removal proceedings.

When it comes to redetermining UAC status upon each encounter, DHS notes that the statutory definition of UAC indicates that the status could change if an individual turns 18, gains legal status, or is placed with a parent or legal guardian. *See* 6 U.S.C. 279(g). Reflecting that plain language, two circuit courts have held that an individual who was initially designated as a UAC can subsequently cease to be a UAC. *See e.g., Mazariegos-Diaz* v. *Lynch,* 605 Fed. Appx. 675, 676 (9th Cir. 2015) (unpublished) (finding a 20-year-old was no longer a UAC for purposes of applying for asylum under the TVPRA); *see also, Harmon* v. *Holder,* 758 F.3d 728, 733–34 (6th Cir. 2014) (finding asylum applications filed under TVPRA UAC provisions must be filed while the applicant remains in that status). And the Office of General Counsel for the Department of Justice, EOIR, has found that immigration judges have authority to assess whether a UAC continues to meet the statutory definition. *See* DOJ EOIR OGC Memorandum, *Legal Opinion re: EOIR's Authority to Interpret the Term Unaccompanied Alien Child for Purpose of Applying Certain Provisions of the TVPRA,* Sept. 19, 2017, at 9 (''Our interpretation is consistent with the purpose of the TVPRA, which is to provide protections and rights to

individuals who remain unaccompanied, under the age of eighteen, and without legal status during removal proceedings.''). Notably, however, a redetermination will not affect USCIS jurisdiction over an asylum application where it had initial jurisdiction based on the applicant's classification on the date of filing.

The proposed regulations on bond hearings also comport with due process. The proposed regulations (§ 236.3(m)) provide for a bond hearing by an immigration judge (to the extent permitted by 8 CFR 1003.19) for minors who are in removal proceedings under the INA 240 and who are in DHS custody. Those who are not in section 240 proceedings are ineligible to seek review by an immigration judge of their DHS custody determination, but may be considered for release on parole. And DHS is modifying the regulatory text to provide that parole of minors detained pursuant to section 235(b)(1)(B)(ii) of the INA or 8 CFR 235.3(c) who are not a flight risk or a danger will generally serve an urgent humanitarian reason. Separately, § 410.810 provides for an independent hearing officer process, guided by the immigration judge bond hearing process currently in place for UACs in ORR custody under the FSA.

The Department disagrees that the lack of a specific time frame in the rule governing re-apprehension of a previously released minor violates the minor's due process rights. Section 236.3(n) sets out the scenarios in which a previously released minor becomes an escape-risk, a danger to the community, subject to a final removal order, or lacking a parent or legal guardian available to care for the minor and must be taken back into custody. A custody redetermination hearing may be requested in accordance with § 236.3(m) (to the extent permitted by 8 CFR 1003.19). And although the regulations are silent as to how long after re-apprehension a redetermination hearing will occur, it will be within a reasonable time frame and any issues regarding the justification for the re-apprehension will be appropriately dealt with in the hearing (if necessary).

*Comments.* One individual stated that the proposed regulations violate the Constitution's separation of powers. The commenter stated that the Naturalization Clause in Article I, section 8, clause 4 gives Congress plenary power to establish a uniform Rule of Naturalization, and that the provisions contained in the proposed regulation are wholly within Congress' purview. This commenter stated the proposed regulations also usurp the role

of the judiciary in ensuring compliance with the FSA.

*Response.* As stated in the NPRM, Congress provided authority for DHS to detain certain aliens for violations of the immigration laws through the INA and expanded legacy INS's detention authority in IIRIRA. *See* 83 FR 45486 at 45490 (Sept. 7, 2018). As stated elsewhere in this document, this rulemaking is designed to implement the relevant and substantive terms of the FSA, in keeping with the terms of the FSA itself. For more detailed information regarding the authority to promulgate these regulations, please see the discussion of the statutory and regulatory authority in the NPRM. *Id.*

*Comments.* Another commenter stated that the proposed regulations ''implicate the Constitution's Article III prohibition on Advisory Opinions'' because the rule ''undermine[s] and nullif[ies]'' the FSA. This commenter also stated the proposed regulations implicate violations of the Fourth, Sixth, Seventh, and Eighth Amendments, but did not provide an explanation for this assertion. A second commenter stated that the proposed regulations violate the Eighth Amendment because, in the commenter's view, the proposed regulations can lead to indefinite detention in violation of the principle of proportionate sentencing.

*Response.* This rule does not implicate the Constitutional prohibition on Article III courts issuing advisory opinions. These regulations are being issued by Federal agencies, not courts, and the FSA itself provides that it will terminate upon issuance of regulations.

DHS cannot reply to vague assertions regarding violations of certain amendments without further explanations from the commenters, which were not provided. Regarding proportionate sentencing, this rulemaking does not address sentencing at all. DHS does not impose any kind of criminal punishment. Immigration detention is civil in nature and effectuates enforcement of the immigration laws. For a discussion on commenters' concerns regarding indefinite detention, see the section on this issue entitled ''Indefinite Detention due to Alternative Licensing.''

*Comments.* One commenter stated that the proposed regulations are in contravention of the due process clause of the Fourteenth Amendment.

*Response.* The Fourteenth Amendment's due process clause applies to States, not the Federal Government.

*Comments.* One commenter also stated that the proposed regulations do not provide for any notice to the UAC

of a custody determination or the evidence used to make it.

*Response.* As stated in the NPRM, independent hearing officers would determine whether a UAC, if released, would present a danger or a flight-risk and issue the decision in writing. *See* 83 FR 45486 at 45490 (Sept. 7, 2018). The government bears the initial burden of production, thereby giving the UAC notice of the custody determination and the evidence supporting it. The UAC then would bear the ultimate burden of proof would shift to the government, which would use a preponderance of the evidence standard.

*Comments.* Several commenters contended that the proposed regulations are unconstitutionally vague, *ultra vires,* overbroad, and "generally lack enforcement and oversight of the Government's actions." Specifically, the commenters stated that the rule is vague insofar as it fails to define the implications of giving DHS the power to handle immigration benefits and enforcement, unconstitutional insofar as it lacks specific standards of care and due process protections, and overbroad in failing to establish concrete guidelines with respect to "ongoing" determination of UAC qualifications.

*Response.* General comments regarding DHS's authority to handle immigration benefits and enforcement are beyond the scope of this rulemaking. With respect to the specific regulations at issue here, the Departments reject the suggestion that they are vague, *ultra vires,* or overbroad for all of the reasons already discussed above. The regulations contain appropriate standards of care and due process protections, as well as concrete guidelines with respect to the assessment of an individual's UAC status, consistent with the statutory protections and FSA that the regulations are designed to implement. The Departments also disagree with the commenter stating that the regulations lack enforcement and oversight, especially considering the portions of the rulemaking regarding licensed programs standards that licensed programs must meet in keeping with the principles of treating minors and UACs in custody with dignity, respect, and special concern for their particular vulnerability. *See e.g.,* § 410.402 concerning the minimum standards applicable for licensed programs. DHS is also modifying the regulatory text in several respects, in response to comments, to clarify requirements of oversight and monitoring to ensure that DHS facilities satisfy applicable standards.

*Comments.* Several commenters argued that the rule violates international laws, pointing to provisions of international documents relating to privacy, special care and concern for the wellbeing of children, and torture and cruel, inhuman or degrading treatment or punishment. Multiple commenters emphasized that the U.N. Special Rapporteur on torture has stated that ill treatment can amount to torture if it is "intentionally used to deter, intimidate, or punish migrants or their families . . . or to coerce people into withdrawing asylum requests." One commenter stated that the FSA is grounded in international human rights law principles, and therefore that these regulations must not violate them.

*Response.* The provisions codified in this rule are consistent with the FSA and international law. Nothing in the proposed rule authorizes the intentional infliction of ill treatment on families or anybody else, and much less for the purpose of intimidating, punishing, or coercing migrants and their families. To the contrary, consistent with the basic goal of the FSA, the proposed rule aims to avoid ill treatment of families who remain in custody by requiring FRCs to abide by stringent standards regarding conditions of confinement, and providing for third-party auditing of compliance and the public posting of the results of those audits.

## Changes to Final Rule

DHS declines to amend the proposed regulatory provisions to the final rule in response to these public comments, but notes that DHS is modifying the regulatory text in places to clarify oversight and monitoring requirements.

## 6. Adherence to the Flores Settlement Agreement

### Public Comments and Response

*Comments.* Many commenters provided comments regarding whether the proposed rule sufficiently implemented the FSA to trigger the termination of the FSA. Some commenters stated that the government cannot change the terms of the FSA through rulemaking, but can only do so with a motion to the court that approved the FSA. Others voiced opposition to ending the FSA at all, stating that it had sufficiently protected the well-being of minors.

Many commenters suggested that the rule did not adequately implement the FSA sufficient to trigger its termination. Some of these commenters stated that the rule removed mandatory terms, such as "shall" or "must," when describing the obligations of the government, and

that removing such terms would transform specific FSA provisions from express obligations into non-binding statements of agency activity.

One commenter stated that the government's proposed standards violate paragraph 12 of the FSA by creating exceptions for when the government will place minors with their family members based on the "well-being" of the minor or operational feasibility and expanding the emergency exception that would allow a minor to be detained with an unrelated adult for more than 24 hours. Another commenter stated that the provisions regarding when UACs can be placed in secure facilities violates the FSA because it allows HHS to place individuals in secure custody based on "danger to self or others"—a requirement the commenter stated is not found in the FSA. The commenter also expressed concern that the proposed rule fails to provide that HHS will review all secure placements monthly and to specify how placements in staff secure or residential treatment centers will be reviewed.

Several commenters stated that the final rule should have a mechanism such as paragraph 24B of the FSA that allows minors to challenge their placement in a facility and whether the facility complies with FSA-required standards. One of these commenters criticized the explanation in the NPRM that a child could utilize the legal procedures under the APA to challenge her placement as woefully lacking the protections afforded by the FSA. This commenter also states that any arguments by DHS or HHS that they are not subject to all of the provisions in the FSA is inaccurate because the FSA explicitly extends to any successors, therefore, these provisions must be included in the regulations of both agencies.

One commenter stated that the proposed regulations add additional requirements to the custodian affidavit that are not required by the FSA, and which could lead to a decrease in the number of willing custodians. Specifically, the requirements that the custodian ensure the UAC report for removal, if so ordered, and that the custodian report to ORR and DHS no later than 24 hours after learning that the UAC has disappeared are not required by the FSA, and could have negative impacts on the custodian/UAC relationship, which is not in the best interests of the minor. The commenter suggested that any required reporting after the disappearance of a UAC be made to the local police, who are better suited to find a missing person.

*Response.* It was never the intent of the Government when signing the original FSA or its modification in 2001 that the agreement would remain in place permanently, and the FSA expressly provides for termination upon issuance of regulations implementing the agreement. The public generally was not given a chance to comment on the FSA as it can with notice and comment rulemaking. Notice and comment rulemaking allows people to influence policy by providing thoughtful comments on proposed regulatory text so that agencies can make, where appropriate, corresponding changes in the final rule. Merely publishing the FSA online would not provide the safeguards and review process of a rulemaking that has gone through notice and comment and is published in the Code of Federal Regulations. Indeed, DHS and HHS are making several changes to this final rule based on comments received from the public.

Some commenters opined that the government cannot change the FSA without court approval and that this rulemaking process is, therefore, not valid. But the regulations here are not themselves changing the FSA; they are implementing it with appropriate modifications to reflect changes in circumstance and accumulated agency experience. The FSA also plainly contemplates that a notice-and-comment process would occur, which presupposes some flexibility in how to implement the agreement in regulations.

Commenters claimed that DHS (and presumably HHS) did not use mandatory implementation language such as "will" and "shall." But in those provisions that require the government to provide services or benefits to minors or UACs, the regulatory text does indeed use the words "will," "shall," and "must." For example, in § 236.3(i)(4) that replicates the requirements of Exhibit 1 of the FSA, it clearly states that the "standards shall include . . ." and then lists everything that must be provided when in ICE facilities. On the other hand, when it could benefit the minor or UAC that the government not act in a strict manner, the regulatory text uses "may." For example, in discussing re-assumption of custody by DHS of a previously released minor section, § 236.3(n), states "DHS may take a minor back into custody if there is a material change in circumstances . . ." DHS is also modifying the language of § 236.3(i) to provide that for minors detained pursuant to INA 235(b)(1)(B)(ii) or 8 CFR 235.3(C), parole "will" generally be warranted when the minor is not a flight risk or danger. Therefore, DHS does not agree with the

commenter's assessment. As for HHS' portion of the rule, the regulations are binding on the shelters that ORR regulates, whether or not the rule uses the words "will," "shall," and "must."

One commenter also stated that DHS is not complying with paragraph 12 of the FSA because it is carving out exceptions that do not appear in the FSA such as taking into consideration the well-being of a child or expanding the meaning of emergency in the FSA. DHS disagrees with this commenter. The provisions of paragraph 12 state that a child who could not be released according to paragraph 14 or transferred to a licensed program pursuant to paragraph 19 cannot be held with unrelated adults for more than 24 hours. The solution in such cases, according to paragraph 12, is that the INS could transfer the unaccompanied minor to a county juvenile detention center or any other INS detention facility. The proposed provision gives DHS some leeway to avoid such transfers in cases of emergencies, while maintaining the requirement that UACs are provided adequate supervision and that their safety and well-being is taken into consideration. The definition of emergency in paragraph 12B speaks to exactly the same principles as the proposed definition, *i.e.* natural disasters, facility fires, civil disturbances, and medical emergencies that prevent the timely transfer or placement of minors or UACs. Nothing in the proposed definition would allow the government the ability to house UACs with unrelated adults beyond 24 hours as a matter of course.

Commenters expressed concern over the HHS criteria that allows for UACs to be placed in a secure facility, asserting that the criteria—"danger to self or others"—is not found in the FSA. In Paragraph 21, the FSA defines conditions on which a minor may be placed in a State or juvenile detention facility (*i.e.,* a secure facility), which include a determination that the minor "has committed, or has made credible threats to commit, a violent or malicious act (whether directed at himself or others)" while in custody; "has engaged, while in a licensed program, in conduct that has proven to be unacceptably disruptive of the normal functioning of the licensed program in which he or she has been placed and removal is necessary to ensure the welfare of the minor or others;" and/or "must be held in a secure facility for his or her own safety." HHS' own policy and this rule's criteria on UAC placements in secure facilities parallel the conditions set forth in Paragraph 21 of the FSA.

Commenters also asserted that minors should have a mechanism for challenging their placement in a facility. Immediately upon placement in an HHS secure facility, staff secure facility, or residential treatment center (RTC), UACs have the right to file an APA claim in Federal District Court, if they believe they have been treated improperly and/or inappropriately placed in a restrictive setting. A judge will then decide whether or not to review the UAC's case to determine whether they should remain in a restrictive setting. After 30 days of placement of an HHS secure or RTC setting, UACs may request the ORR Director, or his or her designee, reconsider their placement, as described in ORR's Policy Guide at section 1.4.2. This policy also describes the requirements for 30 day placement reviews for UACs in restrictive settings.

Commenters also believed that DHS needs to add specific language similar to paragraph 24B of the FSA into the rule. But the provisions in § 236.3(g)(1)(ii) speak to this by stating that a minor will be given the same Notice of Right to Judicial Review under the regulation as is given under the FSA regarding judicial review in the United States District Court if the facility where he or she is housed does not meet the standards in § 236.3(i). And the preamble specifically stated that the Notice of Right to Judicial Review will be the same as in Exhibit 6 of the FSA (*see* 83 FR 45500). The Notice in Exhibit 6 states: "The INS usually houses persons under the age of 18 in an open setting, such as a foster or group home, and not in detention facilities. If you believe that you have not been properly placed or that you have been treated improperly, you may ask a Federal judge to review you case. You may call a lawyer to help you do this. If you cannot afford a lawyer, you may call one from the list of free legal services given to you with this form." Moreover, a regulation cannot confer jurisdiction on Federal court

Changes to Final Rule

DHS declines to amend the proposed regulatory provisions in the final rule in response to these public comments.

7. Appearance at Hearings

Public Comments and Response

*Comments.* Multiple commenters stated that the proposed regulation provides no support for its claim that families present a flight risk, fail to appear to the required proceedings, or do not seek asylum relief.

Commenters provided empirical research or anecdotal evidence indicating that asylum-seekers released from detention have a high appearance rate for their immigration hearings. For example, one commenter cited results from a 2016 study which used immigration court data from the Transactional Records Access Clearinghouse (TRAC) at Syracuse University, which estimated an overall appearance rate of 76.6 percent at immigration court in 2015 and found that releasing individuals on bond did not make a significant impact on who absconds. Another commenter cited a recent study published in the California Law Review, which found that 86 percent of families, and 96 percent of families applying for asylum, who were released from detention attended all their court hearings.

Commenters further pointed to the high compliance rates of those enrolled in an ATD program. In particular, commenters quoted from DHS's May 2017 Congressional Budget Justification, in which ICE stated that, historically, DHS has experienced strong cooperation from aliens in ATD through their immigration proceedings. The commenter added that any lack of data on rates of compliance or removal for those on ATD is a failure of the department for not collecting the information.

*Response.* ICE's objective and mission is to effectuate removals of individuals with final orders of removal. The most effective means to achieve this is using detention. This rule creates a path to ensure that individuals comply with their appearance obligations and are not issued orders of removal *in absentia*. In particular, through the alternative Federal licensing system, the rule enables ICE to hold families in custody during the full course of immigration proceedings, consistent with Congress's mandate of detention for certain aliens. The rule would also provide for custody (through the denial of bond or parole, as applicable) if a minor poses a flight risk or danger to the community.

DHS does not dispute that many families who are released thereafter appear at all their hearings throughout their immigration proceedings, but many fail to appear, which is a serious concern. The studies and data cited by commenters regarding percentage of final orders issued *in absentia* to members of a family unit are skewed by the fact that they review data over a period from 2001–2016. Several variables changed in the year 2014 that render the data from before that time an inaccurate reflection of current ICE operational concerns. With the

exception of the T. Don Hutto Residential Center between 2006–2009, the only facility used as an FRC from 2001–2014 was the Berks FRC (Berks) in Berks County, Pennsylvania, which has had a capacity of no more than 96 residents since its inception. In response to the influx of UACs and family units in 2014 in the Rio Grande Valley, ICE opened FRCs in Artesia, New Mexico, in June 2014 (closed in December 2014), Karnes County, Texas, in July 2014, and Dilley, Texas, in December 2014. The Artesia facility had a capacity of approximately 700 during its time as an FRC, while the Dilley FRC opened with a capacity of 2,400, and the Karnes FRC opened with a capacity of 830. Given that FRC capacity, the number of family units with the potential to be detained was drastically larger by mid-2014 than for the thirteen years prior. Accordingly, the data on *in absentia* removal order rates from 2014 to the present is a more reliable source of information for the purposes of this rulemaking. EOIR found that for completed cases from January 1, 2014 through March 31, 2019 that started at an FRC, 43 percent of family unit members were issued final orders of removal *in absentia* out of a total of 5,326 completed cases. DHS OIS has found that when looking at all family unit aliens encountered at the Southwest Border from FY 2014 through FY 2018, the *in absentia* rate for completed cases as of the end of FY 2018 was 66 percent.

While DHS does not dispute the data presented on past ATD programs, there continued to be a significant portion of participants who did not comply fully with final removal orders. The ATD program is not sufficiently resourced to ensure that all family units can be enrolled in ATD through the duration of their proceedings, or to ensure that ICE can quickly respond to alerts or provide adequate oversight of program participants. ATD is less effective than detention at ensuring compliance with removal orders issued by immigration judges, although the ATD program is effective at more closely monitoring a small segment of the non-detained population and allows for much greater oversight than traditional release with very little supervision at all.

Even if the commenters' studies and data accurately reflected the rates at which alien family unit members fail to show up to their immigration hearings, however, the number of aliens who fail to abide by immigration law and disappear into the interior of the United States would still be a significant problem. *See Demore,* 538 U.S. at 523 (describing as "striking" statistics

indicating that one in four to one in five released aliens failed to appear). ICE cannot carry out its mission to enforce the immigration laws if aliens fail to attend their immigration hearings and abscond into the interior in the United States. DHS's approach to immigration detention of family units reflected in this rule, which allows for immigration officers to make decisions about parole on a case-by-case basis, will allow ICE to appropriately use the statutorily-authorized tools to carry out its mission.

*Changes to Final Rule*

DHS declines to amend the proposed regulatory provisions in the final rule in response to these public comments.

*8. Asylum Is a Right*

*Public Comments and Response*

*Comments.* Many commenters submitted comments declaring that the government is obligated to uphold the rights of asylum seekers and accordingly: Asylum seekers should not be detained; should be given temporary asylum pending a formal determination; and should not be put at a disadvantage in pursuing their asylum claim through detention.

Some commenters stated that any person seeking asylum is not an illegal immigrant, but one who should be protected under international law and given temporary asylum with an opportunity to contribute to our society. One commenter stated that seeking asylum is a humanitarian right, not a crime, and it is inhumane to jail children to punish their families for seeking safety. The commenter further stated, citing *Plyler,* that the government cannot control the conduct of adults by punishing their children.

*Response.* Nothing in this rule changes an asylum-seeker's legal right to apply for asylum, nor prevents asylum-seekers from availing themselves of the procedures to which they are entitled under U.S. law. This rule also does not and cannot amend statutory provisions regarding the asylum process for minor aliens, their accompanying parents or legal guardians, or UACs.

DHS disagrees with the suggestion that detention infringes upon the asylum application process. Congress expressly provided for detention of certain aliens during section 240 removal proceedings, *see* 8 U.S.C. 1225(b)(2)(A) ("shall" detain), including for consideration of an application for asylum, 8 U.S.C. 1225(b)(1)(B)(ii). *See also* 8 U.S.C. 1226(a) ("may" detain, without any exception for aliens seeking asylum). Family units housed at FRCs have access to legal service providers

and law libraries to pursue their asylum claims during their stay. Furthermore, this rule codifies the FSA requirement that FRCs provide legal services information and allow attorney-client visits at the FRC itself. USCIS asylum officers can conduct credible-fear assessments on-site at FRCs or through virtual teleconferencing while the individuals are housed at FRCs. Similarly, UACs are able to file for asylum after they are issued Notices to Appear and placed into immigration proceedings under section 240 of the INA. And as stated in the proposed rule, USCIS maintains initial jurisdiction over their claims.

*Changes to Final Rule*

DHS declines to amend its proposed regulatory text in response to these public comments.

9. Legal Authority Questioned

*Public Comments and Response*

*Comments.* Thousands of commenters asked the Departments to withdraw the proposed rule. Most stated it did not comply with the principles in the FSA. Some even went so far as to say that ICE should be abolished. Many commenters stated that if the government believed the terms of the FSA were no longer appropriate or practicable it should file a motion under Federal Rules of Civil Procedure 60(b)(5) for relief from judgment in the district court that has retained jurisdiction over the implementation and enforcement of the FSA. One commenter stated that this regulation was a unilateral attempt to overturn a stipulated agreement and suggested that the administration should respond to comments by explaining under what legal authority it seeks to change the stipulated agreement.

*Response.* This regulation implements the relevant and substantive terms of the FSA. Codification of the regulations is authorized by the Agreement and needed to preserve the terms of the Agreement while adapting to the statutory changes made by the HSA and TVPRA that affect the processing and care of minors in DHS custody and UACs in HHS custody, as well as substantial changes in circumstance and agency experience. Codification of these regulations will allow DHS and HHS to realistically manage the treatment of minors and UACs, respectively, in their custody in a way that affords substantively equivalent protections as those in the settlement agreement while enforcing the immigration laws effectively. These regulations largely parallel the FSA, often in language

borrowed verbatim from the FSA, and DHS and HHS have noted the ways in which these regulations deviate from the precise scheme set forth in the FSA, as well as the reasons for the changes.

*Changes to Final Rule*

DHS declines to amend the proposed regulatory provisions of the final rule in response to these public comments.

10. LGBTQ

*Public Comments and Response*

*Comments.* Various commenters wrote about the plight of Lesbian, Gay, Bisexual, Transgender, Queer, Intersex, and Asexual (LGBTQIA) and transgender and gender non-conforming (TGNC) children in custody. For brevity and because the vast majority used the acronym LGBTQ, we will do likewise. Several commenters were worried that LGBTQ youths would be mistreated and possibly abused if kept in custody for an extended period of time, and one was concerned that their due process rights might be infringed. Some stated that detention centers often segregate the LGBTQ population because they are more likely to be subject to violence, including sexual abuse and assault. Others said that ICE's method of placing the LGBTQ population in solitary confinement is inappropriate and causes irreparable psychological harm. Others suggested that LGBTQ people, particularly those living with HIV, face delays in receiving life-saving treatment while in detention. Still others expressed concern that detention puts LGBTQ individuals at a disadvantage for establishing the facts of their asylum claims. Multiple commenters said that more and more LGBTQ individuals will be fleeing the Northern Triangle countries because civil society organizations there are reporting that LGBTQ people are at high risk for violence and extortion by gangs and organized criminal groups, hate crimes, and abuse by authorities.

*Response.* DHS takes very seriously the safety of LGBTQ individuals in ICE custody. Because this rule does not address the circumstances of detention for all aliens in ICE custody, and only addresses the circumstances of minors, their accompanying family members, and UACs, DHS limits the response that follows to the concerns raised by commenters as it pertains to these distinct categories of LGBTQ aliens.

DHS notes that the requirements of PREA and its implementing regulations apply to FRC operations and include provisions on LGBTQ screening and safety. ICE ERO also promulgated a Transgender Care Memorandum that it

provides to several facilities as a set of best practices. DHS notes that it has responded to concerns about medical care delays in the section on "DHS Track Record With Detention."

ICE does not segregate LGBTQ aliens in FRCs from the rest of the population. Minors are with their accompanying parents and would not be segregated. While segregation may occur in a secure juvenile facility, ICE only employs such measures for the alien's own safety.

DHS disagrees with the commenter's suggestion that LGBTQ individuals are disproportionately disadvantaged in establishing their claim to asylum while housed at an FRC. LGBTQ individuals have the same access to legal service providers and law libraries as any other alien housed at an FRC; there is no segregation.

*Changes to Final Rule*

DHS declines to amend the proposed regulatory provisions of the final rule in response to these public comments.

11. Family Reunification

*Public Comments and Response*

*Comments.* A few commenters disagreed with the proposed language under § 410.302(c), in which ORR may require further suitability assessment of proposed sponsors, including fingerprint-based background and criminal records checks on the prospective sponsors and on adult residents of the prospective sponsor's household. The commenters believed that expanded suitability assessments, as described in § 410.302(c) and in the Memorandum of Agreement (MOA) between ORR, ICE, and CBP concerning information sharing (see, ORR–ICE–CBP Memorandum of Agreement Security Regarding Consultation and Information Sharing in Unaccompanied Alien Children Matters (April 13, 2018)), are unnecessary and cause needless delays in the release of UAC by deterring potential sponsors from coming forward and violate DHS's own privacy policy and the privacy rights of potential sponsors.

*Response.* Under 8 U.S.C. 1232(c)(3)(C), "Not later than 2 weeks after receiving a request from the Secretary of Health and Human Services, the Secretary of Homeland Security shall provide information necessary to conduct suitability assessments from appropriate Federal, State, and local law enforcement and immigration databases." The provisions in § 410.302(c) pertaining to suitability assessments are consistent with paragraph 17 of the FSA; and to the extent the section updates the language

**44496** **Federal Register** / Vol. 84, No. 164 / Friday, August 23, 2019 / Rules and Regulations

of the FSA, does so to follow the requirements for safety and suitability assessments in the TVPRA. However, as noted previously, in its ongoing effort to streamline suitability assessments so as to reduce the time UAC spend in ORR care and prevent any unnecessary delay in releasing them safely to an appropriate sponsor, ORR has recently issued four new Operational Directives that eliminate the burden of fingerprinting for many sponsors, including most parents or legal guardians and close relatives, and allow for UAC to be released to other relative sponsors under most circumstances before fingerprint results are available. And, again, ORR refers to section 224(a) of DHS's current fiscal year 2019 Appropriations Act which generally preclude DHS from taking certain enforcement actions ''against a sponsor, potential sponsor, or member of a household of a sponsor or potential sponsor of an unaccompanied alien child ['UAC'] . . . based on information shared by [HHS].'' [68]

12. Executive Order 12866, 13563 and 13771

Comments. Public Comments and Response

*Comments.* Several commenters stated that the NPRM violates Executive Orders 12866, 13563, and 13771.

With respect to E.O. 12866, commenters stated that the rule should have been deemed economically significant. An economically significant rule is one where the Office of Information and Regulatory Affairs determines that the rule may have an impact of $100 million or more in any given year. Rules designated as such are reviewed by the Office of Information and Regulatory Affairs. Commenters complained that the rule did not provide a cost estimate, consider alternatives to detention, or account for construction costs of facilities or health related costs. They also said that HHS had not reasonably estimated the cost of the rule and that DHS failed to maximize net benefits as required by E.O. 12866. With respect to E.O. 13563, commenters similarly stated that the agencies had failed to provide a reasonable cost estimate, bypassing or violating the requirements of both E.O. 12866 and E.O. 13563. With respect to E.O. 13771, which directs the executive branch to prudently manage the cost of planned regulations, the commenter said the proposed rule creates an increased burden to the Federal Government to create and operationalize

the new licensing process and reduces states' flexibility in determining how facilities in their states should meet legal mandates.

*Response.* Because this rule codifies current HHS operations, including those regarding secure HHS facilities and UAC health-related costs, HHS anticipates no significant cost effect from this rule. HHS notes that the costs for implementing the 810 hearings is described later in this rule and are estimated to average $250,000 per year.

DHS disagrees that it failed to adequately assess the costs and benefits of this rule. DHS provided the costs of the current operations and procedures for implementing the terms of the FSA, the HSA, and the TVPRA in the NPRM at 83 FR 45513, discussed reasonable alternatives to the proposed rule at 83 FR 45520, and considered qualitative benefits such as protecting the safety of minors and the public at 83 FR 45520. In addition, as described in the proposed rule, a primary source of new costs due to this rule will be as a result of the alternative FRC licensing process and changes to ICE's current practice for parole determinations. These changes may result in additional or longer detention for certain minors and their accompanying adult, thereby increasing the per-person, per-day variable FRC costs paid by ICE. DHS provided an estimated number of minors in FY 2017 that would have been affected had the rule been in place, and per-person, per-day unit costs for each of the current FRCs. For those costs and benefits that DHS was not able to quantify and monetize, the NPRM included a qualitative description and a reasoned discussion about why they could not be quantified. DHS provided enough information on the unit costs of the rule so that commenters could provide meaningful comments. In fact, some commenters used the data DHS provided, along with their own assumptions, to make their own estimates of the cost of the rule.

DHS agrees with commenters, however, that this rule *may* result in costs, benefits, or transfers in excess of $100 million in any given year and therefore is economically significant, particularly in light of the urgent crisis at the border. DHS acknowledged in the proposed rule that, as the rule itself allows greater flexibility for operational decisions, but does not itself make those decisions, it did not know if this rule would result in the development of new FRCs, how many individuals would be detained at FRCs after the rule is effective, or for how much longer individuals will be detained, because such facts depend on many unknown

factors including the population of aliens crossing the border and how many aliens are processed for expedited removal, express a fear of return, are found to have a credible fear, and ultimately seek asylum. Since the proposed rule was published, DHS has seen a large spike in the number of family units apprehended or found inadmissible at the Southwest Border. As of June 2019, with three months remaining in FY 2019, CBP has apprehended over 390,000 family units between the ports of entry on the southwest border, as compared to 107,212 family units in all of FY 2018.[69] Consequently, because the costs of this rule are dependent on a number of factors outside of this rulemaking, some of which have changed since the NPRM was published, the Departments consider this rule to be economically significant. DHS has assessed the costs and benefits of the rule accordingly in the E.O. 12866 section of this rulemaking.

DHS responds to comments about ATD earlier in the rule.

Finally, DHS notes that E.O. 13771 determinations are made at the final rule stage of the rulemaking process. The Office of Information and Regulatory Affairs has determined that this is a regulatory action under E.O. 13771.

Changes to Final Rule

In this final rule, the Departments now consider this rule to be economically significant.

13. Alternative Methodology To Estimate Impacts

Public Comments and Response

*Comments.* Many commenters who stated the rule would lead to increased detention periods and a need to expand detention capacity cited the estimated costs derived from the published report by the Center for American Progress, *The High Costs of the Proposed Flores Regulation,* by Philip Wolgin, published on October 19, 2018, by the Center for American Progress.

That report estimated that, under the proposed rule, DHS would incur new annual costs of between $201 million and $1.3 billion. The paper considered two scenarios to establish this range of estimated costs. The first scenario included four assumptions: That the amount of people booked into FRCs

---

[68] CONSOLIDATED APPROPRIATIONS ACT, 2019, Pub. L. 116–6, February 15, 2019, 133 Stat 13.

[69] *See* United States Border Patrol Southwest Border Migration FY2018 at *https://www.cbp.gov/newsroom/stats/sw-border-migration/fy-2018* (last visited June 13, 2019). *See* also Southwest Border Migration FY 2019 at *https://www.cbp.gov/newsroom/stats/sw-border-migration* (last visited June 5, 2019).

AR307

would remain the same as in FY 2017, that the average length of stay for all individuals in FRCs would increase from 14.2 days to 47.4 days, that children who received negative credible fear determinations or final orders of removal would be held for longer periods of time, and that the average daily cost of a family detention bed would stay the same. Based on these assumptions, the paper estimated DHS would incur additional detention costs of approximately $194 million annually.

Under scenario two, the paper assumed that every alien apprehended in a family unit would be detained in an FRC; that the number of individuals apprehended as a part of a family unit in FY 2018 (which the paper indicated to be 107,063), would remain the same, and that the average length of detention would be 47.4 days. Applying an average daily cost, the paper estimated additional detention costs of approximately $1.24 billion annually.

Additionally, the paper assumed that ICE would need to acquire new facilities or beds in either scenario one or two, and it estimated that cost to be between $72 million and $520 million. It did so by modeling its anticipated daily detention populations from the scenarios above, factoring out the current detention capacity, and then estimating the number of new beds needed to house the number of detainees it projected under each of the two scenarios. Using the cost of converting the Karnes facility and the opening of the Dilley facility as baselines, the paper estimated ICE would need to spend between $72 million and $104 million in one-time startup costs to increase detention capacity for scenario one. For scenario two, the paper estimated that range to be between $468 million and $520 million. The paper concluded that as a result of the proposed rule, DHS would spend between $2 billion and $12.9 billion over a decade.

*Response.* While DHS appreciates the paper's input and further analysis, DHS does not believe that it supports a reliable quantified estimate. For example, the paper used average length of stay data from FY 2014 to assume the average length of stay after this rule would be 47.4 days, despite DHS's explanation in the NPRM that the average length of stay in the past is not a reliable source for future projections because it reflects other intervening policy decisions not directly affected by this rule. Additionally, the paper assumes that all family units will have their average length of stay increased as a result of this rule, but the proposed rule explained that generally only

certain groups of aliens are likely to have their length of stay at an FRC increased as a result of this rule, such as those who received a negative credible fear determination. The paper also assumes that ICE operates in an environment free of resource constraints and would be able to detain without regard to the agency's finite resource availability; as DHS explains in the final rule, expanding FRC capacity would require additional appropriations. This regulation alone is not sufficient. For more information about these groups of people, please see the E.O. 12866 section of this rule. The paper's estimates of the additional number of facilities needed relied upon these same questionable assumptions. This rule does not mandate operational requirements pertaining to new FRCs. Many factors, including factors outside of the scope of the final rulemaking that cannot be predicted (such as future congressional appropriations) or are presently too speculative, would need to be considered by DHS prior to opening new detention space. For example, DHS decisions to increase FRC capacity would consider the costs associated with housing families and the availability of future Congressional appropriations.

This commenter's analysis makes assumptions about the average length of stay, the population to be detained, and the need for and size of additional facilities, that ICE cannot reliably predict due to other factors outside the scope of this rulemaking, as discussed in the NPRM at 83 FR 45518 and 83 FR 45519. The large spike in the number of family units apprehended or found inadmissible at the Southwest Border since the publication of the proposed rule underscores the difficulties in reliably making quantitative estimates in this space. For all the reasons discussed above, DHS declines to incorporate in this final rule the commenter's proposed assumptions about the average length of stay, the increased number of family units held at FRCs, and the increased number of beds needed as a result of this rule.

Changes to Final Rule

As discussed previously, the Departments now consider this rule to be economically significant.

14. Congressional Review Act

Public Comments and Response

*Comments.* Relying on the same position paper discussed above, many commenters stated that the new costs of the rule would exceed $100 million annually, and it thus constitutes a major

rule under the terms of the Congressional Review Act.

*Response.* The CRA delays implementation, and provides a mechanism for congressional disapproval, of regulations designated as ''major rules'' by the Administrator of the Office of Management and Budget's Office of Information and Regulatory Affairs. Such a designation is made where OMB finds the rule has resulted in or is *likely* to result in (a) an annual effect on the economy of $100,000,000 or more; (b) a major increase in costs or prices for consumers, individual industries, Federal, State, or local government agencies, or geographic regions; or (c) significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and export markets. 5 U.S.C. 804(2). Determinations by OMB under the CRA are not subject to judicial review. 5 U.S.C. 805.

This regulation does not represent a decision on whether and in which circumstances to detain families for longer periods of time, though it does allow for such a decision to be made. Such decisions depend on operational and other considerations outside the scope of this regulation. For instance, DHS notes that it recently made the decision to use Karnes FRC for the detention of single adult women temporarily to deal with the ongoing migration influx.

While DHS cannot conclusively determine the impact on detention costs due to factors outside of the scope of this regulation, beginning with the fluctuating number of families apprehended at the Southwest border, it does acknowledge the three existing FRCs could potentially reach capacity as a result of additional or longer detention for certain individuals. There are many factors that would be considered in opening a new FRC or expanding a current FRC, some of which are outside the scope of this regulation, such as whether such a facility would be appropriate based on the population of aliens crossing the border, anticipated capacity, projected average daily population, competing detention needs for non-family populations, and projected costs. Moreover, such a decision depends on receiving additional resources from Congress, and ICE has to balance the detention of families with the detention and removal of single adults. If bed space were increased following this rule, the cost would depend on the type of facility, facility size, location, and a number of

other variables. However, ICE notes as an example that an additional 960 beds at Dilley would cost approximately $80 million.

While Executive Order 12866 has a standard of whether the rule *may* have an impact of $100 million or more in any given year, the CRA standard is whether a rule has or is *likely* to have an impact of $100 million or more. In the vast majority of cases, if a rule is economically significant it is also major. In this case, however, given budget uncertainties, ICE's overall need to prioritize bed space for operational considerations (such as the recent use of the Karnes FRC for single adult female detention), and other operational flexibilities left in place under the rule, it does not appear *likely* that this rule will result in an economic impact of $100 million or more. The Office of Information and Regulatory Affairs has thus determined that this rule is not major under 5 U.S.C 805.

Changes to Final Rule

Based in part on the developments discussed above, OIRA has determined that this rule is economically significant.

15. Cost Analysis

Comments and responses pertaining to the Departments' costs analysis, costs to taxpayers, data, and proposed alternatives follow.

Public Comments and Response

Many commenters objected that the Departments did not provide an estimated total cost for the proposed rule. Other commenters added that various issues should have been addressed in the rule's cost benefit analysis, such as the impact to detention costs, the need to quantify benefits, and other generalized statements about the added cost that would result from the proposed rule. Some commenters mistakenly suggested that the NPRM concluded that there would be no additional costs due to the proposed rule.

a. Costs Not Included in the Analysis

*Comments.* Multiple commenters suggested that the final rule should not proceed until HHS re-analyzes the cost of imposing the final rule. They said it could cost ORR as much as $800/day to house a UAC and thus, even without increase in the number of UACs housed in ORR shelters, it would cost ORR more than $5.1 million a day to house UACs, or $1.87 billion annually. This is more than $800 million beyond the requested amount for FY 2019, and does

not take into account any other functions of ORR.

Commenters implored HHS to provide a justification that the proposed rule does not create any significant new costs.

Commenters stated that DHS conceded that the proposed regulations could lead to "additional or longer detention for certain minors" and that the Departments could not evade their responsibility to assess the economic and other impacts of the proposal by referring to uncertainties largely of its own making. Various commenters stated the Departments should have considered the additional costs of providing education, food, medical care, and other services families in prolonged detention.

Three commenters requested that ORR specifically look into the cost of housing children at its secure facilities like Yolo County Juvenile Detention Facility, which can be significantly more expensive than shelter placements.

Others said that the Departments should quantify the social costs of care for the children who may experience trauma as a result of indefinite detention, including the potential lifetime economic burden for children who experienced maltreatment, which one commenter estimated to cost $124 billion.

Another commenter estimated that the cost to detain migrant children would be similar to the cost to incarcerate an juvenile, which the commenter asserted, without supporting detail, to be $148,767 per year, though the commenter also added that infants and toddlers would require additional costs.

Commenters stated the Departments should also have developed a cost analysis of the zero-tolerance policy for each state it impacted and the cost of the proposed new alternative licensing and auditing process for DHS facilities.

*Response.* The cost for education, food, medical care, unique care needs for infants and toddlers, or other services families are part of the current DHS operational costs described in the baseline of the rule. DHS agrees that there will be additional costs resulting from additional or longer detention for some families, as discussed in the proposed rule and in the E.O. 12866 section of this rule. Although current FRCs are largely funded through fixed-price agreements and thus generally are not dependent on the number of beds filled, there are some variable costs added on a monthly basis that depend on the number of individuals held at certain FRCs (*e.g.* a per student, per-day

education cost). DHS discusses increased variable costs at these FRCs in the NPRM and in the E.O. 12866 section of this final rule. A cost analysis of the zero-tolerance policy is not part of the scope of this rulemaking. The fixed costs for current FRCs would generally not change as a result of additional or longer detention for some families. If ICE awarded additional contracts for expanded bed space as a result of this rule, ICE would also incur additional fixed costs and variable costs.

DHS disagrees that this rule need account for the social economic impacts of indefinite detention and maltreatment, because this rule will not result in either indefinite detention or maltreatment of minors in DHS custody. While this rule may result in some minors being detained for a longer period of time, that detention (like the detention that currently occurs) will occur with those minors' parents or legal guardians and will be consistent with both the statutory frameworks governing detention and the DHS policies for parole of aliens, including family units who have demonstrated a credible fear. Such detention is also consistent with the FSA's recognition that the government may need to detain minors to secure their timely appearance in immigration proceedings or to ensure their safety, as has been underscored by the significant numbers of final orders of removal that have recently been entered *in absentia* for family units. Neither Congress nor the *Flores* court has ever taken the position that detention of minors is per se maltreatment; to the contrary, both the immigration statutes and the FSA recognize that detention may be appropriate in some circumstances. And any detention carried out by DHS is done while immigration proceedings are ongoing or removal orders effectuated; DHS is not in the business of indefinite detention and nothing in this rule authorizes it to be.

Families and minors often arrive at the border having faced trauma in their journey, and these are costs not attributed to this rule. Although numerous commenters have proffered arguments and evidence about potential trauma that may result from immigration detention itself, Congress has already made a judgment that detention of alien minors in some circumstances is appropriate. This rule merely facilitates DHS's efforts to comply with that judgment while maintaining the discretion that DHS has long exercised to parole aliens. DHS recognizes that detention and custody may have negative impacts for some individuals, but as experience has

shown a high rate of absconding for family units, detention is an important enforcement tool. DHS notes that this final rule does not mandate detention for all family units; on the contrary, parole will be considered for all minors in detention, and the minor's well-being will be considered when determining whether release may be appropriate.

Because this rule codifies current HHS operations, including those regarding secure HHS facilities and UAC health-related costs, HHS anticipates no significant cost effect from this rule. (HHS notes that the costs for implementing the 810 hearings is described later in this rule and could average $250,000.) Rather, the primary cost driver for HHS is the migration patterns that influence the number of children referred to HHS and the rate at which HHS discharges children to sponsors. Neither of those factors are influenced by this rule.

Additionally, DHS currently audits its FRCs in how they meet the standards of its Family Residential Standards and will continue to use this existing process, so that cost is included in the baseline of the rule and would not change as a result of the new licensing process. The new licensing process will not change the standards used in the audits and will not result in new costs.

b. Benefits Analysis

*Comments.* Commenters maintained that the benefits discussed in the proposed rule do not justify the costs. A commenter stated the benefits described in the proposed rule are not tangible benefits of implementing the rule and that any accounting of the benefits should include a contrasting of the current costs such as an estimate of the medical attention required for families and juveniles who DHS has apprehended, and how many would be dis-incentivized by the proposed rule to attempt entry to the United States. One commenter stated that although the proposed regulation claims to promote family unity, it is missing current "baseline" data on family unity (*i.e.,* how often accompanied minors are released with their parents, versus to a relative or family friend).

*Response.* DHS included a qualitative explanation of the benefits of this rule in the NPRM at 83 FR 44520. The primary purpose of the rule is to ensure that applicable regulations reflect the current conditions of DHS detention, release, and treatment of minors and UACs, in accordance with the relevant and substantive terms of the FSA, the HSA, and the TVPRA, as well as changed circumstances and operational experience. There is a benefit to having

set rules (in the CFR), such as the ability for the Departments to move from judicial governance via a settlement agreement to executive governance via regulation. Under the FSA, the government operates in an uncertain environment subject to future court interpretations of the FSA that may be difficult or operationally impractical to implement or could otherwise hamper operations. With the regulations, DHS and HHS, along with members of the public, would have certainty as to the agencies' legal obligations.

After considering the relevant factors, DHS believes the benefits of this rule justify the costs. ICE's objective and mission is to enforce immigration laws and effectuate removals. As discussed previously, the *in absentia* rate from EOIR of family unit members with completed cases that started at an FRC from January 1, 2014 through March 31, 2019 has been approximately 43 percent. DHS OIS has found that when looking at all family unit aliens encountered at the Southwest Border from FY 2014 through FY 2018, the *in absentia* rate for completed cases as of the end of FY 2018 was 66 percent. Restrictions placed on ICE's ability to detain families at FRCs through the pendency of their removal proceedings have stymied the effectiveness of FRCs as an immigration enforcement tool. The costs associated with this rule will thus ensure family detention remains an effective enforcement tool (NPRM at 83 FR 44520). The rule will thereby contribute to public safety and maintain the integrity of the U.S. immigration system by allowing ICE to better enforce immigration laws and effectuate removals.

c. Cost of New FRC

*Comments.* Commenters stated that DHS would need to increase the capacity of its current facilities to detain families, resulting in the acquisition or construction of a new FRC, and the cost of which was not specified in the NPRM.

*Response.* In the proposed rule, ICE said at that time it was unable to determine with certainty how the number of FRCs will change due to this rule because of the factors discussed in the NPRM at 83 FR 44519, such as whether a such a facility would be appropriate based on the population of aliens crossing the border, anticipated capacity, projected average daily population, projected costs, and available funding from Congress. ICE is still unable to determine how the number of FRCs may change due to the rule. Instead, this rule allows for the possibility of the existing FRCs to be

used to effectively enforce immigration consequences. If bed space were increased as a result of this rule, the cost would depend on the type of facility, facility size, location, and a number of other variables. ICE notes as an example that a buildout of 960 beds at Dilley would cost approximately $80 million.

d. Increased Length of Detention and Increased Detention Costs

*Comments.* Some commenters stated the rule would result in longer detention periods and an increased number of families detained. The commenters noted that immigration cases are currently waiting for review an average of 721 days, or multiple years, and immigrants would stay in detention during the process.

One commenter said that even minors in expedited removal proceedings could experience extended periods of detention based on the availability of asylum officers to conduct the credible-fear interview, the time to obtain a review from an immigration judge for a negative decision, and delays in filing a Notice to Appear. Another commenter said that detaining families during the entirety of their immigration proceedings, would likely cause the expensive costs of family detention to skyrocket by $2 billion at the low end, and as much as $12.9 billion at the high end.

*Response.* DHS agrees that this rule may result in longer detention of some minors, and their accompanying parent or legal guardian in FRCs as discussed in the proposed rule. But DHS continues to believe that the average effect of this rule on the length of stay cannot be predicted using historical data because of many factors, such as the number of arriving family units in a facility at a given day, the timing and outcome of immigration court proceedings before an immigration judge, whether an individual is eligible for and granted parole or bond, issuance of travel documents by foreign governments, transportation schedule and availability, the availability of bed space in an FRC, a family's composition (for instance, Dilley currently only houses families with female heads of household, Karnes is currently holding single adults, but was previously designated for families with male heads of household), and other laws, regulations, guidance, and policies regarding removal not subject to this rule (NPRM at 83 FR 44518). In addition, the average length of stay in the past, prior to the court decisions in 2015 and 2017, is not a reliable source for future projections because it reflects other intervening policy decisions made

but that will not be directly affected by this rule (NPRM at 83 FR 45518).

### e. Population in Detention Is Greater Than Estimated

*Comments.* Commenters stated the proposed rule would result in more families and minors being detained, citing data about the increase in CBP family unit apprehensions from 14,855 at the Southwest border in FY 2013 to 77,802 in FY 2018. Another commenter cited from an article in the New York Times that said since the summer of 2017, the number of migrant children being detained increased to 12,800, which was described as a concern given the proposal to detain more children.

Commenters lamented that HHS had failed to adjust its UAC residency growth rate or adjust any of the costs associated with increased UAC in the ORR system. The commenters claimed that HHS would need to shift essential resources away from their appropriated purpose to make up for the lack of funding.

*Response.* While the urgent humanitarian crisis at the border continues, the population in DHS custody will continue to change. But this rule will not result in prolonged detention of all family unit members encountered by CBP; as discussed previously, generally only certain groups of aliens are likely to have their length of stay in an ICE FRC increased as a result of this rule, among other factors.

HHS reiterates that, aside from 410.810 hearings for which HHS will incur some initial start-up costs, estimated at an average of $250,000, the rule codifies current HHS operations, including regarding secure HHS facilities as well as UAC health-related costs. There is no significant cost effect from the rule for HHS. Rather, the primary cost drivers for HHS are migration patterns that influence the number of UACs referred to HHS and the rate at which HHS discharges children to sponsors, and—neither of these factors is influenced by this rule.

### f. Rule Should Have Total Cost Estimate

*Comments.* Many commenters stated the NPRM should have included a total cost estimate. A few commenters stated the Department could have been made a cost estimate with the available data on detention operations discussed in the NPRM, as was done by a third party who applied the variable costs to estimate total detention costs. Another commenter indicated DHS has access to data sources that would have enabled DHS to provide a total cost estimate, or it could have consulted with vendors

who could provide facilities that would adhere to the proposed licensing standards.

Lastly, in response to the request for comments, on calculating costs to the government and individuals and on costs for 810 hearings, commenters added that the variables DHS sought comment on are under DHS's control.

*Response.* DHS explained in the proposed rule the many factors that would influence total costs are not within government—particularly the executive branch's—control. DHS described and monetized where possible the types of costs that would result from this rule. DHS provided the per-person, per-day variable costs that DHS would incur as a result of additional or longer detention for certain minors and their accompanying adult. DHS also provided an estimate of the number of minors who in FY 2017 comprised the groups of aliens who would likely have been detained longer at an FRC had this rule been in effect. In this final rule DHS has added the number of such minors for FY 2018. But DHS cannot provide a reliable forecast of the future number of such minors, the availability of bed space in an environment of finite resources, or the increased length of stay, and both are necessary to calculate a total cost for increased detention costs. DHS also cannot say with certainty if this rule will result in an increase in family beds.

DHS notes that some commenters have used unsupported assumptions about the important cost drivers of this rule and then applied such assumptions to the per-person, per-day costs in order to calculate a total cost. These commenters have not calculated a total cost of the rule. As previously explained, DHS is unable to forecast the future total number of such minors that may experience additional or longer detention as a result of this rule or for how much longer individuals may be detained because there are many other variables that may affect such estimates. In addition, DHS does not know how this rule might impact the number of FRCs as factors outside of the scope of the rulemaking cannot be predicted (such as future congressional appropriations). Consequently, providing a reliable total cost estimate of this rule is not possible given the many factors outside of the government's control.

This rule codifies current HHS operations—with the exception of § 410.810—so there is no significant cost effect from the rule for HHS. Rather, the primary cost drivers for HHS are migration patterns that influence the number of children referred to HHS and

the rate at which HHS discharges children to sponsors, and neither of these factors is influenced by this rule.

### g. Scope of Impact Should Include Parents

*Comments.* A commenter stated the data presented in Table 12 of the NPRM at 83 FR 45519, estimating the number of minors likely to experience an extended detention period, was inaccurate. The commenter explained that it was only because of the FSA licensing requirement that the 99 percent of the detained population in FRCs estimated in the NPRM were released, and allowing DHS-licensed facilities could prolong detention. In addition, the commenter stated that DHS had not calculated the costs of increased detention of parents in the rule.

*Response.* DHS agrees that Table 12 of the NPRM at 83 FR 45519 represents minors only, and stated as such in the title of the table: "FY 2017 Minors at FRCs Who Went Through Credible Fear Screening Process." The FSA only applies to juveniles. This rule parallels the FSA and is principally concerned with minors. The adults detained at FRCs are included in the number of book-ins (Table 9), average length of stay (Table 10), and release reasons (Table 11).

With respect to the 99 percent of the 14,993 minors who were found to have credible fear and released on parole or on their own recognizance, DHS disagrees with the commenter's assertion that they were released solely due to the practice of applying a 20-day limit for unlicensed facilities; other factors were relevant to those determinations, including limitations on bed space and decisions regarding release on bond or parole. This rule generally would not change how DHS exercises its authority to release minors with credible fear. The analysis in this final rule has been updated with FY 2018 data. See the E.O. 12866 section of this final rule. DHS's estimates of the impact of the rule on detention of families are discussed above.

### Changes to Final Rule

The Departments decline to amend the final rule analysis as proposed by commenters.

### h. Costs to Taxpayers

*Comments.* Multiple commenters stated the proposal's use of long-term detention would be expensive and burdensome for taxpayers, significantly expanding the Federal deficit. Many commenters stated that this use of taxpayer money would be wasteful, a

misuse of financial resources, and unnecessary given the less costly alternatives to detention available Some commenters stated that they did not want their or any other American's tax dollars, to pay for the detention of people seeking a better life.

Several commenters stated the government should re-direct those resources toward addressing root causes of child and family migration from Central America. This commenter recommended re-establishing the Central American Minors program instead of expanding detention capacity.

Several commenters raised specific fiscal concerns with utilizing soft-sided structures for influx purposes and transferring funds for that purpose from the National Institutes of Health, Head Start, Centers for Disease Control, or the National Cancer Institute.

*Response.* DHS acknowledges that this rule could increase costs to taxpayers, such as higher variable costs at FRCs, but believes the benefits of the ability of ICE to effectuate removal and carry out its mission justify the costs. The agency publishes detailed budget reports of the operations and resources required to fulfill its mission, including the current costs of family detention and alternatives to detention. The agency utilizes multiple types of resources in the course of enforcing immigration laws as needed to maximize the use of its budget.

The alternative uses of funds suggested by commenters do not meet the objectives of the proposed rule. As circumstances change at the southern border the agency can redirect resources in order to react in a timely manner.

HHS disagrees that using soft-sided structures during an influx necessitates exercising the Secretary's transfer authority as described in the comments.

Changes to Final Rule

The Departments decline to amend the final rule analysis as proposed by commenters.

i. Comments Regarding the Cost of Litigation

*Comments.* Several commenters stated that the proposed regulation will be enjoined by the Federal courts. One of these commenters stated that DHS is ignoring the history of the last 30 years and inviting expensive and time-consuming litigation.

*Response.* DHS notes that the original complaint in *Flores* v. *Meese,* No. 85–4544 (C.D. Cal.) was filed on July 11, 1985—more than 30 years ago. In 1996, the parties entered into the FSA, which was approved by the court on January 28, 1997. There has been litigation over

the meaning and enforcement of the FSA for many years, including six separate motions to enforce, one motion for relief, and one temporary restraining order. Recent litigation regarding the FSA began in February 2015 after the Federal Government's response to the surge of aliens crossing the U.S.-Mexico border in 2014, including the use of family detention at FRCs. DHS faces perpetual, recurring, and open-ended litigation over the FSA and its implementation, especially in light of the judicial determination that the FSA applies to accompanied minors, and the government anticipates litigation related to this rulemaking. Indeed, the *Flores* Plaintiffs already filed a motion alleging anticipatory breach of the FSA based on the publication of the NPRM. *See Flores* v. *Barr,* No. 85–4544 (C.D. Cal.) (ECF No. 516). The court deferred ruling on the motion until the publication of final regulations. *Id.* at ECF No. 525. Nevertheless, the clearest path forward to reduce the litigation burden and establish consistency with statutory law and to enhance the sound administration of the immigration laws is through the promulgation of regulations, governing the subjects that are committed to the authority of DHS and HHS, and to terminate the FSA, as the FSA itself contemplates. Among other things, the promulgation of regulations provides a single vehicle for further updates while allowing for future modification to adapt to operational and legal changes and to reflect appropriate input from the public as provided for by the APA.

As indicated in the NPRM, the Departments considered not promulgating this rule but ultimately concluded that continuing to operate absent regulatory action would likely require the Government to operate through non-regulatory means in an uncertain environment subject to unknown future court interpretations of the FSA that may be difficult or operationally impracticable to implement or could otherwise hamper operations. Failing to promulgate this rule also would leave unaddressed the statutory amendments in the HSA and TVPRA that have affected certain portions of the FSA. HHS, having not been an original party to the FSA but as a successor agency with respect to some of its requirements, will benefit from rules that clearly delineate ORR's responsibilities from that of other Federal partners.

Finally, DHS notes that legacy INS's successors are obligated under the FSA to initiate action to publish the relevant and substantive terms of the FSA as

regulations, pursuant to the 2001 Stipulation.

Changes to Final Rule

DHS declines to amend the final rule analysis as proposed by commenters.

j. GAO Report on Improving Cost Estimates for Detention

*Comments.* Commenters suggested that DHS implement the U.S. Government Accountability Office (GAO) guidelines for reliable cost estimates of detention resources. The commenters stated that GAO previously identified errors and inconsistencies in ICE's budgets and estimated costs and made recommendations for improvements. The commenters suggested that DHS improve its process for estimating costs of detention resources before promulgating regulations that would result in the expansion of its existing programs.

*Response.* As explained above, ICE is unable to estimate how the number of FRCs may change due to this rule alone. There is no reliable method to estimate what number of families encountered would be detained at an FRC, or for how long, due to factors outside of the scope of this rule, including the number of families apprehended or found inadmissible, the composition of families, the need of bed space for detention of single adults (such as with the conversion of Karnes to a single adult facility), funding, the need to balance the detention of families with the detention and removal of single adults, and outcomes from the credible fear process. However, this rule will allow DHS to use existing FRCs effectively. As a result, some families will experience longer detention periods, but—given finite resources and bed space—this also means that many other families will experience less detention than they do in the status quo.

Changes to Final Rule

Accordingly, DHS declines to change the final rule analysis as proposed by commenters.

k. Comments on Additional Costs to Sponsors

*Comments.* One commenter expressed concern that the proposed rule failed to account for the additional costs to HHS and to potential sponsors of UACs— which the commenter characterized as ''astronomical''—due to the additional burden on potential sponsors to secure release of their children and the increasing population of UACs in ORR custody resulting from the proposed rule.

The commenter contended that the expanded definitions of "emergency" and "influx," along with recently promulgated sponsorship review procedures, will require sponsors to spend more time and money to secure the release of children in HHS custody. This commenter expressed concern that the NPRM does not account for the public burden caused by sponsors dropping out of the onerous sponsorship process or being rejected from sponsorship.

*Response.* The proposed regulations for assessing a sponsor are consistent with the Departments' current operations and procedures for implementing the terms of the FSA, the HSA, and the TVPRA. As a result, there are no new burdens to sponsors based on this rule. Indeed, the DHS and HHS definitions of emergency and influx substantively mirror the definition in the FSA, and HHS' sponsorship review procedures are part of the baseline costs of existing operations. As a result, there are no new burdens to sponsors based on this rule.

Changes to Final Rule

The Departments decline to amend the final rule analysis as proposed by commenters.

l. Comments on Impact on Private Detention Centers

*Comments.* Various commenters said that the rule was partially driven by private companies who would profit from the widened use of detention.

One commenter added that the government historically has prioritized the profits of private companies ahead of the care for immigrant families. As an example of this profit motive, another commenter said that the GEO Group and its lobbyist attempted to have the Texas legislature pass a bill that would have waived the standards for childcare facilities, enabling the facility in Karnes County to hold families for longer periods.

Some commenters explicitly stated they did not want for profit facilities to be used, because it would lead to traumatized children, and families.

*Response.* The government is not adopting this rule to increase any third-party's profits. The government is adopting this rule for the many reasons discussed above. This rule would directly regulate DHS and HHS, indirectly affecting private entities to the extent that DHS or HHS contract with them. As permitted by Federal law, DHS contracts with private contractors and a local government to operate and maintain FRCs, and with private contractors to provide transportation of

minors and UACs. Nothing in this rule alters any aspect of government contracting law.

DHS does not exclusively contract with for-profit entities.

HHS currently contracts with one private contractor to operate and maintain an influx facility for UACs. Because this rule serves to implement and codify both the FSA and other existing practices under the HSA and TVPRA, HHS does not anticipate that publication of the rule would cause an increase in costs, as compared to anticipated costs in the absence of a rule.

Changes to Final Rule

DHS and HHS decline to amend the final rule as proposed by commenters.

m. Recommendations To Redirect Resources

*Comments.* Multiple commenters made alternative policy recommendations they deemed a better use of resources, to resolve the humanitarian crisis at the border.

Some commenters proposed hiring additional immigration judges to address the backlog of cases and urged the use of social workers and the provision of legal services to assist asylum seekers.

Several commenters stated the government should focus on addressing the root causes of migration from Central America by providing additional assistance in the region to strengthen the protection systems. They highlighted the Central American Minors Program as a means of avoiding children from having to migrate and make the dangerous journey without any guarantee of admission. Some of these commenters also suggested supporting infrastructure projects and job creation in the countries migrants are leaving or exploring solutions like the Marshall Plan, the American aid package provided in 1948 to rebuild Western Europe post World War II.

Another commenter stated the funds used for family detention would be better spent on domestic programs to benefit the American people such as infrastructure jobs, provide slots in a Head Start program, or fund healthcare for low income adults.

*Response.* These recommendations do not meet the objectives of the rulemaking and are largely beyond its scope. DHS has statutory obligations to fulfill with respect to immigration enforcement and custody of minors, including detention in some circumstances. HHS' statutory obligations govern the care and custody of UACs. This rule will better enable the

Departments to carry out these statutory obligations in the light of operational realities. Many of these objections would be better addressed to Congress.

Changes to Final Rule

The Departments declines to amend the final rule in response to these comments.

16. Executive Order 13045

Public Comments and Response

*Comments.* One commenter agreed with the Departments' assessment that the proposed rule would not create an environmental risk to children's health or safety. This commenter stated that the rule did not address the abuse and drugging of children at the Shenandoah Valley Juvenile Center or the Shiloh RTC (or at other detention facilities around the country). This commenter cited two articles from the website of the National Center for Biotechnology Information, which is part of the United States National Library of Medicine, and stated that the government's own data shows that detaining children is a risk to the children's health and development. Without providing support or specifics, the commenter said that "the claim that detention is not a risk to children's health or their safety is as false as it is absurd."

*Response.* E.O. 13045 applies to economically significant rules, and the Departments have now determined that this rule is economically significant. Executive Order 13045 addresses environment health risks and safety risks to children, which it defines as "risks to health or to safety that are attributable to products or substances that the child likely to come in contact with or ingest (such as air we breathe, the food we eat, the water we drink or use for recreation, soil we live on the products we use or are exposed." The commenter does not reference any such "products or substances." The Departments have determined that this rule does not create an environmental health risk or safety risk that may disproportionately affect children. The rule is largely codifying the Departments' current procedures and policies for implementing the FSA, HSA, and TVPRA.

Changes to Final Rule

The Departments are not making changes in the final rule in response to these comments.

17. Family Assessment

Public Comments and Response

*Comments.* One commenter disagreed specifically with DHS's assessment

under section 654 of the Treasury General Appropriations Act that the rule will not have an impact on family well-being and might even "strengthen the stability of the family and the authority and rights of parents in the education, nurture, and supervision of their children. . . ." 83 FR at 45524. The commenter relied on the finding of the U.S. Immigration and Customs Enforcement's Advisory Committee on Family Residential Centers that "detention is generally neither appropriate nor necessary for families—and . . . detention or the separation of families for purposes of immigration enforcement or management are never in the best interest of children."

*Response.* DHS has reviewed this final rule in light of the comment received and in accordance with the requirements of section 654 of the Treasury General Appropriations Act, 1999, Public Law 105–277. With respect to the criteria specified in section 654(c)(1), for DHS, the rule places a priority on the stability of the family and the authority and rights of parents in the education, nurture, and supervision of their children, within the immigration detention context, as parents maintain parental rights and supervision of their children within FRCs. This rule provides an option for families to stay together where detention is required. With respect to family well-being, this final rule codifies current requirements of settlement agreements, court orders, and statutes.

*Changes to Final Rule*

The Departments are not making changes in the final rule in response to this comment.

**18. Family Separation**

*Public Comments and Response*

*Comments.* Commenters wrote about the long-lasting effects of family separation on children and their families. Commenters stated that separating children from their parents causes toxic stress, which may place children at risk of developing post-traumatic stress disorder (PTSD) and substance abuse in later life.

Many commenters stated that evidence-based research has shown that even a short period of family separation is extremely harmful to infants and young children and a more prolonged separation can result in depression, high levels of anxiety and other symptoms including incessant crying, lack of appetite, failure to achieve cognitive and social learning, and loss of previously acquired skills. Commenters

referenced letters from mothers separated from their young children at the border of the United States where they sought asylum about the traumatic effects of such separation.

Some commenters believed that the trauma children experience from family separation and prolonged detention can turn into intergenerational trauma in families and cultural communities.

*Response.* DHS is sympathetic to the difficulties created by family separation, especially to children. This is precisely why the government's preference is to keep families together so that they can provide the necessary emotional support for each other as they go through their immigration proceedings, and thus to have the option to keep a family in detention as a unit, when detention rather than release is warranted for a family unit. This rule aims to ameliorate the disparate treatment of a parent and minor in the immigration system under the FSA. This rule does not address the circumstances in which it may be necessary to separate a parent from his or her child. For more on the services provided by FRCs see Section V. A. 8. *Detention of Family Units* above.

*Changes to Final Rule*

DHS is not making changes in the final rule in response to these comments.

**19. Trauma**

*Public Comments and Response*

*Comments.* Similar to the comments discussed above, the Departments received many comments about trauma associated with detention. Multiple commenters wrote that detaining children causes trauma, with some expressing the view that it amounts to abuse or child maltreatment and violates prohibitions against torture and ill treatment under U.S. and international law.

Many of these commenters referenced a policy statement by the American Academy of Pediatrics which stated "there is no evidence indicating that any time in detention is safe for children," and opined that "[q]ualitative reports about detained unaccompanied immigrant children in the United States found high rates of post-traumatic stress disorder, anxiety, depression, suicidal ideation, and other behavioral problems." [70] Another commenter wrote that extending detention beyond 20 days increases the risk for toxic stress which can negatively impact the child's

health and well-being. One commenter stated that traumas experienced by children are the most difficult to treat, particularly traumas that occurred before the child was able to talk about his or her feelings. Commenters also referred to studies that show detained children suffer from physical illnesses such as sleep disorders, loss in appetite, headaches and abdominal pain in addition to mental health illnesses such as depression and post-traumatic stress disorder (PTSD). Several commenters referred to a 2004 study conducted by the Australian Human Rights Commission and Equal Opportunities Commission that highlighted similar negative developmental and physical health consequences of detention for children.

Another commenter referenced a statement by the United Nations High Commissioner for Human Rights that states UNHCR is opposed to detention of children for immigration reasons because of the negative health impacts.

Additional commenters wrote that detention constitutes a type of adverse childhood experience (ACE) that can cause irreparable harm including negative health outcomes in adulthood, higher rates of mental health problems, substance abuse, poorer educational outcomes, and poorer vocational outcomes. Commenters also asserted that detention can have a negative effect on the academic, cognitive, and social development of children, leading to impaired or delayed cognitive development that continues after a child is released from detention. Commenters cited several studies reaching similar conclusions. Several commenters also wrote that the trauma experienced by children in detention can be passed through generations.

Commenters also wrote that detention negatively impacts family relationships because it undermines parental authority and parental capacity to respond appropriately to children's needs.

*Response.* DHS understands that trauma is an issue for asylum-seekers and others who have entered the United States, and tries to mitigate it where possible. But not all factors are in the control of DHS. For example, a study conducted by Danish scientists found that relocating several times during the asylum process and the length of the pendency of the asylum case contributed to the mental health issues experienced by asylum-seeking children, even children detained with their parents in Red Cross facilities. The study also stated that additional studies are needed to determine if other factors such as parental stress and previous

[70] American Academy of Pediatrics, "Detention of Immigrant Children" *Pediatrics* Volume 139, number 4, Apr. 2017.

trauma cause additional trauma for those seeking asylum.[71]

Consistent with the recommendations of scientists, ICE provides medical care and educational services in ICE facilities. CBP also provides medical screening to all minors and UACs who enter CBP custody along the southwest border. CBP's medical screenings are designed to ensure that any minors or UACs with emergent health needs are immediately referred for appropriate emergency care. It is difficult to gauge how much experiences in the juvenile's home country and the harsh trip to the United States, which is ripe with exploitation and abuse, affected a particular juvenile before he or she ever arrives at the border. But DHS has taken several important steps to address these issues.

The research on child detention states that children who are detained are at a significantly higher rate of psychological distress. Multiple accommodations for a Family Centered and Trauma Informed Approach are being implemented within the ICE residential facilities in order to decrease the effects of trauma on minors in detention.

Research of the Australian Psychological Society (APS) recommends that children and families should be accommodated separately from other detainees. Appropriate resources with indoor and outdoor spaces should be provided for children. The APS suggests that mental health services be offered to detainees, including children, which includes access to appropriately trained clinical providers. Educational opportunities should be available, along with medical care.

ICE currently has three facilities that house alien family units. From the outset, minors in FRCs are detained along with their parent or legal guardian, who can provide care and support. DHS believes that affording parents full control over their children at FRCs and respecting their rights as parents plays an important role in minimizing and addressing trauma.

Furthermore, all ICE-detained individuals have access to care on a 24/7 basis. Mental health services include crisis-intervention, various therapeutic treatment modalities to include, talk therapy, educational group behavior modification, medication treatment and case management services. Also included are groups on trauma,

domestic violence, grief and loss, parenting skills and information regarding minors in a residential setting. For minors there is a focus on Bullying Prevention and Social Skills Training. Each facility works with a local school providing education for each grade level along with IEP's if needed. Minors attend class and have access to both indoor and outdoor recreation. There is space for minors to play and explore in order to properly socialize among their peers. In a case where there may be abuse allegations, an investigation is documented under PREA Protocol and a minor will have both a medical and mental health evaluation. If necessary, Child Protective Services (CPS) will be contacted to do a full investigation. The parent and the minor will both be offered treatment as required or not by CPS. Children's Advocacy Centers will also be contacted to aid the minor and parent through the legal process and the forensic interview.

In addition, all minors along with their accompanying parent or legal guardian caregiver are seen weekly by a licensed mental health care provider through "Weekly Mental Health Checks." Mental health providers include psychiatrists, clinical social workers and psychologists and pediatricians.

Everyone entering an FRC is screened for both physical and mental health issues and trauma. ICE also maintains mental health professionals on staff to conduct both individual and group sessions to help residents with their trauma issues. Additionally, FRCs provide safe settings for minors to access educational services year round.

DHS believes affording parents full control over their children at FRCs and respecting their rights as parents can also play a role in addressing this problem.

DHS argues that this rule is about ensuring the care of minors in government custody while enforcing the immigration laws as laid out by Congress, in light of the FSA and operational realities. And those immigration laws set out detention as a key component of immigration enforcement. Enforcement of the immigration laws is a core DHS mission that cannot be ignored and must be balanced with the needs to ensure the care of minors in DHS custody and relevant legal obligations.

Separately, as the nation's leading immigrant child welfare agency, ORR is deeply committed to the physical and emotional safety and wellbeing of all UACs in its temporary care. ORR-funded care providers must be aware of the physical and psychological impacts

of forced displacement, migration, and childhood trauma and conduct holistic, child-centered assessments of the medical and behavioral health needs of UACs. Care providers must also understand the developmental stages of children and adolescents and how the stressors of temporary government custody affect children at each stage. UAC clinical services should be evidence-based therapeutic interventions and be structured so that clinicians have continuous supervision and access to the support they need as they work with vulnerable and traumatized children and youth.

DHS acknowledges that it must try to balance its mission of promoting homeland security and public safety against the vulnerabilities of many aliens in its custody, including juveniles in particular. HHS is committed to continuously reassessing its policies, procedures, and operations to align with state-of-the-science research and best practices in child welfare service provision.

Changes to Final Rule

The Departments are not making changes in the final rule in response to these comments.

## VI. Statutory and Regulatory Requirements

### A. Executive Orders 12866 and 13563: Regulatory Review and Executive Order 13771

Executive Orders 12866 ("Regulatory Planning and Review") and 13563 ("Improving Regulation and Regulatory Review") direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. Executive Order 13771 ("Reducing Regulation and Controlling Regulatory Costs") directs agencies to reduce regulation and control regulatory costs and provides that "for every one new regulation issued, at least two prior regulations be identified for elimination, and that the cost of planned regulations be prudently managed and controlled through a budgeting process."

This rule has been designated a "significant regulatory action" that is economically significant under section 3(f)(1) of Executive Order 12866.

---

[71] Signe S. Nielsen, "Mental health among children seeking asylum in Denmark—the effect of length of stay and number of relocations: A cross-sectional study," *BMC Public Health*, Aug. 19, 2008.

Accordingly, this rule has been reviewed by the Office of Management and Budget (OMB). This rule is a regulatory action per Executive Order 13771.

## Changes From the Proposed Rule

In response to commenters, DHS has made the following changes to the proposed rule in this final rule. Most of these changes are points of clarification and do not add costs or change the impact of the rule. Section 212.5(b) now considers that DHS is not precluded from releasing a minor who is not a UAC to someone other than a parent or legal guardian, specifically a brother, sister, aunt, uncle, or grandparent who is not in detention.

Section 236.3(b)(2), which defines *Special Needs Minor,* used the term "retardation." Commenters noted this was an outdated term, and DHS agrees to replace it with "intellectual disability." This clarification does not add new costs to the rule.

Section 236.3(b)(9), which defines *Licensed Facility,* includes the requirement that DHS employ third parties to conduct audits of FRCs to ensure compliance with the Family Residential Standards. Commenters stated that DHS has previously not shared the results of such audits. Although ICE has shared these results publicly, DHS is expressly providing that "DHS will make the results of these audits publicly available." DHS also adds to the final rule that the audits of licensed facilities will take place at the opening of a facility and take place on an ongoing basis. Since this procedure is already in practice, there is minimal burden from this change.

In § 236.3(b)(11), which defines a *Non-Secure Facility,* DHS agrees with commenters that a non-secure facility means a facility that meets the definition of non-secure under state law in the state in which the facility is located, as was intended by the language of the proposed rule, and is adding "under state law" to the definition to clarify this point. This clarification does not add new costs to the rule.

In § 236.3(f)(1) regarding transfer of UACs from DHS to HHS, DHS agrees to amend the proposed regulatory text to clarify that a UAC from a contiguous country who is not permitted to withdraw his or her application for admission or for whom no determination can be made within 48 hours of apprehension, will be immediately transferred to HHS. This clarification does not add new costs to the rule.

In § 236.3(f)(4)(i), DHS clarifies that UACs will generally not be transported with unrelated detained adults, subject to certain exceptions spelled out in the rule. This is a clarification and thus does not add any new costs to the rule.

In § 236.3(g)(1)(i) regarding DHS procedures in the apprehension and processing of minors or UACs, Notice of Rights and Request for Disposition, DHS is removing a qualification on the requirement that the notice be read and explained to a minor or UAC in a language and manner the minor or UAC understands if the minor is believed to be under 14 or is unable to comprehend the information on the form. DHS had proposed to do so only for minors or UACs believed to be less than 14 years of age, or unable to comprehend the information contained in the Form I–770. DHS is changing this language to make it clear that the form will be provided, read, or explained to *all* minors and UACs in a language and manner that they understand. DHS is making this change to avoid confusion related to DHS's legal obligations regarding this notice while still acknowledging that it may be necessary to implement slightly different procedures depending on the particular minor or UAC's age and other characteristics. This change will result in some additional operational burden. Specifically, while the Form I–770 is already issued to all minors and UACs, the updated language makes clear that the form will both be issued to all minors and UACs, and that CBP has some obligation to make sure that all minors and UACs understand the form's contents. The exact method by which this will happen may vary based on the particular minor or UAC. Thus, this language will require some degree of operational change, although CBP is not able to quantify the operational burden.

In § 236.3(g)(2)(i) regarding DHS custodial care immediately following apprehension, the proposed rule that UACs "may be housed with an unrelated adult for no more than 24 hours except in the case of an emergency or exigent circumstances." Commenters objected to the use of the term "exigent circumstances" as it was not defined. DHS believes "exigent circumstances" because it is redundant to "emergency" and thus agrees to delete the term. This is a clarification and does not add new costs to the rule.

In § 236.3(i)(4), commenters requested additional language tracking the verbatim text of FSA Ex. 1. In response to these comments, DHS added language of FSA Ex. 1 paragraph B and C. These standards have always been in place

and thus will not result in new costs to the rule.

Section 236.3(j) and (n) now provide that DHS is not precluded from releasing a minor who is not a UAC to someone other than a parent or legal guardian, specifically a brother, sister, aunt, uncle, or grandparent who is not in detention and is otherwise available to provide care and physical custody.

DHS has added new paragraphs at § 236.3(j)(2)–(4) to identify the specific statutory and regulatory provisions that govern the custody and/or release of non-UAC minors in DHS custody based on the type and status of immigration proceedings.

DHS has added a new § 236.3(j)(4) to state clearly that the Department will consider parole for all minors in its custody pursuant to section 235(b)(1)(B)(ii) of the INA or 8 CFR 235.3(c) and that paroling such minors who do not present a safety risk or risk of absconding will generally serve an urgent humanitarian reason. DHS adds that it may also consider aggregate and historical data, officer experience, statistical information, or any other probative information in determining whether detention of a minor is required to secure the minor's timely appearance before DHS or the immigration court. This change is a point of clarification on the process for discretionary release and does not add new costs or change the impact of the rule.

DHS clarifies in § 236.3(o) that the Juvenile Coordinator's duty to collect statistics is in addition to the requirement to monitor compliance with the terms of the regulations. This is a clarification point and does not add new costs or change the impact of the rule.

In response to comments on the status of the Dilley and Karnes FRCs to be non-secure, ICE has agreed to add several new points of egress along their perimeters by September 30, 2019. The estimated construction cost at Dilley is between $5,000 and $6,000. There is no additional cost to DHS for this construction at Karnes, and the private contractor, the GEO Group, did not provide an estimate of the cost they would incur for adding the new points of egress and thus DHS is unable to quantify this cost.

DHS agrees with commenters that this rule *may* result in costs, benefits, or transfers in excess of $100 million in any given year and therefore is economically significant. DHS stated in the proposed rule that the cost of this rule depended on a number of unknown factors, including the population of aliens crossing the border. Since the proposed rule was published, DHS has

seen a large spike in the number of family units apprehended or found inadmissible at the Southwest Border. As of June 2019, with three months remaining in FY 2019, CBP has apprehended over 390,000 family units between ports of entry on the Southwest Border, as compared to 107,212 family units in all of FY 2018.[72] Consequently, as noted in the NPRM, because the costs of this rule are dependent on a number of factors outside of this rulemaking, some of which have changed since the NPRM, the Departments now consider this rule to be economically significant.

In response to commenters, HHS has made the following changes to the proposed rule in this final rule. Most of these changes are points of clarification and do not add costs or change the impact of the rule.

Section 410.101, which defines *Special Needs Minor,* included the term "retardation." Commenters noted this was an outdated term, and HHS agrees to replace it with "intellectual disability." This clarification does not add new costs to the rule.

In § 410.203, HHS is making a change to make more explicit the fact that ORR reviews placements of minors in secure facilities on at least a monthly basis. HHS is also making a change to make more explicit the fact that, notwithstanding its ability under the rule to place UACs who are "otherwise a danger to self or others" in secure placements, this provision does not abrogate any requirements to place UACs in the least restrictive setting appropriate to their age and special needs. This clarification does not add new costs to the rule.

In 45 CFR 410.600(a), HHS stated that it would take all necessary precautions for the protection of UAC during transportation with adults. This language runs in contradiction to 45 CFR 410.500(a), which states that ORR does not transport UAC with adult detainees. Therefore, the sentence from 45 CFR 410.600(a) that reads, "ORR takes all necessary precautions for the protection of UACs during transportation with adults," will be struck from the final rule. This revision does not add new costs to the rule.

ORR notes that there will be instances when UACs are transferred with adult staff members. These situations are covered under 45 CFR 411.13(a) of the

Interim Final Rule (IFR) on the Standards to Prevent, Detect, and Respond to Sexual Abuse and Sexual Harassment Involving Unaccompanied Children. The IFR states, "Care provider facilities must develop, document, and make their best effort to comply with a staffing plan that provides for adequate levels of staffing, and, where applicable under State and local licensing standards, video monitoring, to protect UCs from sexual abuse and sexual harassment." This provision applies to transfers as well.

In § 410.700 relating to age determination decisions, HHS will add "totality of the evidence and circumstances" language so that the age determinations decisions by HHS and DHS are based on the same standard, as required by law (see 8 U.S.C. 1232(b)(4)). This addition does not add costs to the rule.

The NPRM proposed to include that bond hearings for UACs be transferred from the immigration courts to a hearing officer housed within HHS, where the burden would be on the UAC to show that s/he will not be a danger to the community (or risk of flight) if released, using a preponderance of the evidence standard. HHS declines to shift the ultimate burden of proof to itself. However, it clarifies that HHS bears the burden of initial production, under which it must present evidence supporting its determination of the UAC's dangerousness or flight risk. The UAC would bear the burden of persuasion, rebutting HHS' evidence to the hearing officer's satisfaction under a preponderance of the evidence standard. The changes to the 810 hearing process do not add new costs to the rule in beyond those that will be incurred by the Department to perform the hearings as envisioned in the NPRM.

1. Quantitative Background

The FSA has been in place for more than two decades and sets limits on the length of time and conditions under which children can be held in immigration detention. In 1985, two organizations filed a class action lawsuit on behalf of alien children detained by the former INS challenging procedures regarding the detention, treatment, and release of children. After many years of litigation (including an appeal to the United States Supreme Court) and advocacy (civil society organizations, including human rights groups, faith-based institutions, political leaders, and concerned citizens) the parties reached a settlement in 1997. HHS assumed responsibility of UACs and created, within ORR, the UAC Program in 2003. The FSA has served as the foundation

for ORR's UAC Program since its inception.

The FSA itself anticipated that its terms would be implemented through Federal regulations issued in accordance with the APA: "Within 120 days of the final district court approval of this Agreement, the INS shall initiate action to publish the relevant and substantive terms of this Agreement as a Service regulation. The final regulations shall not be inconsistent with the terms of this Agreement." This rule aims to codify the terms of the FSA as envisioned by the parties to the settlement more than 20 years ago, taking into account current circumstances and changes in the law since that time. The original FSA had a termination clause that terminated the agreement the earlier of five years from court approval of the agreement, or three years after the court determines the INS is in substantial compliance with the agreement. In 2001, the parties modified the agreement and agreed that it would terminate 45 days after the promulgation of regulations implementing the agreement. By codifying current requirements of the FSA and court orders enforcing terms of the FSA, as well as relevant provisions of the HSA and TVPRA, the Departments are implementing the intent of the FSA and make permanent the requirements to protect children and provide them with safe and sanitary accommodations. The Federal Government's care of minors and UACs has complied with the FSA and related court orders for more than 20 years, and complies with the HSA and TVPRA.

The rule applies to minors and UACs encountered by DHS, and in some cases, their families. CBP and ICE encounter minors and UACs in different manners. CBP generally encounters minors and UACs at the border. Generally, ICE encounters minors either upon transfer from CBP to an FRC, or during interior enforcement actions.

CBP

CBP's facilities at Border Patrol stations and ports of entry (POEs) are processing centers, designed for the temporary holding of individuals. CBP's facilities are not designed to accommodate large numbers of minors and UACs waiting for transfer to ICE or ORR, even for the limited period for which CBP generally expected to have custody of minors and UACs, 72 hours or less. Although minors and UACs in CBP facilities are not provided the same amenities that will be available to them in longer-term facilities, all minors and UACs in CBP facilities are provided access to safe and sanitary facilities;

---

[72] *See* United States Border Patrol Total Family Unit Apprehensions By Month—FY 2013 through FY 2018 at *https://www.cbp.gov/sites/default/files/assets/documents/2019-Mar/bp-total-monthly-family-units-sector-fy13-fy18.pdf* (last visited May 10, 2019). *See also* Southwest Border Migration FY 2019 at *https://www.cbp.gov/newsroom/stats/sw-border-migration* (last visited June 5, 2019).

functioning toilets and sinks; food; drinking water; emergency medical assistance, as appropriate; and adequate temperature control and ventilation. Minors and UACs are also provided access to basic hygiene items and clean bedding, and CBP makes reasonable efforts to provide minors and UACs with showers where approaching 48 hours in custody, and clean clothes. To ensure their safety and well-being, UACs in CBP facilities are supervised and are generally segregated from unrelated adults; older, unrelated UACs are generally segregated by gender. Additionally, CBP provides medical screening to all minors and UACs along the southwest border, and refers any minor or UAC with an emergent medical need to the hospital or other nearby medical facility for appropriate emergency treatment.

CBP has apprehended or encountered 65,593 minors accompanied by their parent(s) or legal guardian(s), and 56,835 UACs on average annually for the last three complete fiscal years. In FY 2018, CBP apprehended or encountered approximately 107,498 alien minors or UACs. Apprehensions or encounters in FY 2019 to date have surpassed FY 2018 annual totals.[73] The table below shows the annual number of accompanied minors (that is, minors accompanied by their parent(s) or legal guardian(s)) and UACs CBP has apprehended or encountered in FYs 2010 through 2018.

TABLE 7—U.S. CUSTOMS AND BORDER PROTECTION ACCOMPANIED MINORS AND UNACCOMPANIED ALIEN CHILDREN NATIONWIDE APPREHENSIONS AND ENCOUNTERS FY 2010—FY 2018

| Fiscal year | Accompanied minors | UACs | Total |
|---|---|---|---|
| 2010 | 22,937 | 19,234 | 42,171 |
| 2011 | 13,966 | 17,802 | 31,768 |
| 2012 | 13,314 | 27,031 | 40,345 |
| 2013 | 17,581 | 41,865 | 59,446 |
| 2014 | 55,644 | 73,421 | 129,065 |
| 2015 | 45,403 | 44,910 | 90,313 |
| 2016 | 74,798 | 71,067 | 145,865 |
| 2017 | 64,628 | 49,292 | 113,920 |
| 2018 | 57,353 | 50,145 | 107,498 |

CBP makes a case by case determination as to whether an alien is a UAC based upon the information and evidence available at the time of encounter. When making this determination, CBP follows section 462(g)(2) of the HSA, which defines a UAC as a child who—(A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom—(i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody.

Once CBP determines that an alien is a UAC, CBP must process the UAC consistent with the provisions of the TVPRA, which requires the transfer of a UAC who is not statutorily eligible to withdraw his or her application for admission into the custody of ORR within 72 hours of determining that the juvenile meets the definition of a UAC, except in exceptional circumstances.

If, upon apprehension or encounter, CBP determines that an alien is a minor who is part of a family unit, the family unit is processed accordingly and transferred out of CBP custody. If appropriate, the family unit may be transferred to an ICE FRC. If the FSA were not in place, CBP would still make a determination of whether an alien was a UAC or part of a family unit upon encountering an alien, in order to determine appropriate removal proceedings pursuant to the TVPRA.

ICE

When ICE encounters a juvenile during an interior enforcement action, ICE performs an interview to determine the juvenile's nationality, immigration status, and age. Pursuant to the TVPRA, an alien who has been encountered and has no lawful immigration status in the United States, has not attained 18 years of age, and has no parent or legal guardian in the United States available to provide care and physical custody will be classified as a UAC. The number of juvenile arrests made by ICE is significantly smaller than CBP across all fiscal years as shown in below. A non-UAC minor would have to be arrested to be booked into an FRC.

TABLE 8—FY 2014–FY 2018 JUVENILE BOOK-INS WITH ICE AS ARRESTING AGENCY

| Fiscal year | Book-ins of accompanied minors | UAC book-ins |
|---|---|---|
| 2014 | 3 | 285 |
| 2015 | 8 | 200 |
| 2016 | 108 | 164 |
| 2017 | 123 | 292 |

TABLE 8—FY 2014–FY 2018 JUVENILE BOOK-INS WITH ICE AS ARRESTING AGENCY—Continued

| Fiscal year | Book-ins of accompanied minors | UAC book-ins |
|---|---|---|
| 2018 | 102 | 343 |

Once ICE determines that an alien is a UAC, ICE must process the UAC consistent with the provisions of the TVPRA, which requires the transfer of a UAC into the custody of ORR within 72 hours of determining that the juvenile meets the definition of a UAC, except in exceptional circumstances.

At the time that the FSA was agreed to in 1997, INS enforcement efforts mainly encountered single adults, and only adult detention facilities were in operation. Prior to 2001, when a decision was made to detain an adult family member, the other family members were generally separated from that adult. However, beginning in 2001, in an effort to maintain family unity, INS began opening FRCs to accommodate families who were seeking asylum but whose cases had been drawn out. INS initially opened what today is the Berks FRC (Berks) in Berks, Pennsylvania, in 2001. ICE also operated the T. Don Hutto medium-

[73] See U.S. Customs and Border Protection, Southwest Border Migration FY 2019 at *https:// www.cbp.gov/newsroom/stats/sw-border-migration.*

security facility in Taylor, Texas as an FRC from 2006 to 2009. In response to the influx of UACs and family units in 2014 in the Rio Grande Valley, ICE opened FRCs in Artesia, New Mexico in June of 2014; Karnes County, Texas in July of 2014; and Dilley, Texas in December of 2014. The Artesia facility, which was intended as a temporary facility while more permanent facilities were contracted for and established, was closed on December 31, 2014.

The South Texas FRC in Dilley, Texas (Dilley) has 2,400 beds, Berks has 96 beds, and the Karnes County Residential Center in Karnes County, Texas (Karnes) has 830 beds. The capacity of the three FRCs provide for a total of 3,326 beds. Currently, the Karnes FRC houses male heads of household, the Berks FRC houses dual parent families, and the Dilley FRC houses female heads of household (though ICE has transitioned Karnes to housing single adult females as of the time of this rule to reflect operational considerations). As a practical matter, given varying family sizes and compositions, and housing standards, not every available bed will be filled at any given time, and the facilities may still be considered to be at capacity even if every available bed is not filled. ICE did not maintain a consistent system of records of FRC intakes until July 2014. Since 2015, there has been an annual average of 35,032 intakes of adults and minors at the FRCs. The count of FRC intakes from July 2014 through FY 2019 Year-to-Date (YTD) is shown in Table 9 below.

### TABLE 9—FRC INTAKES FY 2014–FY 2019 YTD

| Fiscal year | FRC intakes | FRC adult intakes | FRC minor intakes |
|---|---|---|---|
| Q4 2014 * | 1,589 | 711 | 878 |
| 2015 | 13,206 | 5,964 | 7,242 |
| 2016 | 43,342 | 19,452 | 23,890 |
| 2017 | 37,825 | 17,219 | 20,606 |
| 2018 | 45,755 | 21,490 | 24,265 |
| 2019 YTD ** | 26,869 | 12,654 | 14,215 |

*2014 only includes the fourth quarter of FY 2014: July, August, and September.
**Through April 4, 2019.

Due to court decisions in 2015 and 2017, DHS ordinarily uses its FRCs for the detention of non-UAC minors and their accompanying parent(s) or legal guardian(s) for periods of up to approximately 20 days. This is generally the period of time required for USCIS to conduct credible fear proceedings. Since 2016, the average number of days from the book-in date to the release date at all FRCs for both minors and adults has been less than 15 days. Table 10 shows the average number of days from book-in date to release date at FRCs for FY 2014 through FY 2019 YTD (April 4, 2019), based on releases by fiscal year. Data on releases are available for all four quarters of FY 2014.

### TABLE 10—AVERAGE NUMBER OF DAYS FROM BOOK-IN DATE TO RELEASE DATE AT FRCS FY 2014–FY 2019 YTD

| Fiscal year | Average number of days | Average days for minors (<18 years old) | Average days for adults (≥18 years old) |
|---|---|---|---|
| 2014 | 47.4 | 46.7 | 48.4 |
| 2015 | 43.5 | 43.1 | 44.0 |
| 2016 | 13.6 | 13.6 | 13.6 |
| 2017 | 14.2 | 14.2 | 14.1 |
| 2018 | 17.1 | 17.1 | 17.1 |
| 2019 YTD * | 12.4 | 12.3 | 12.5 |

*Through April 4, 2019.

Table 11 shows the reasons for the release of adults and minors from FRCs in FY 2017 and FY 2018. As it indicates, the large majority of such individuals were released on an order of their own recognizance or paroled.

### TABLE 11—REASONS FOR RELEASE

| Reason for release | FY 2017 percent | FY 2018 percent |
|---|---|---|
| Order of Recognizance | 76.9 | 76.7 |
| Paroled | 21.3 | 22.1 |
| Order of Supervision | 1.7 | 1.1 |
| Bonded Out | 0.1 | <0.0 |
| Prosecutorial Discretion | <0.0 | <0.0 |

Table 12 shows the number of adults and minors removed from the United States from FRCs since FY 2014. Removals include returns. Returns include Voluntary Departures (including Voluntary Returns)[74] and Withdrawals Under Docket Control.

### TABLE 12—REMOVALS FROM FRCS FY 2014–FY 2019 YTD

| Fiscal year | Removals |
|---|---|
| Q4 2014 * | 390 |

### TABLE 12—REMOVALS FROM FRCS FY 2014–FY 2019 YTD—Continued

| Fiscal year | Removals |
|---|---|
| 2015 | 430 |
| 2016 | 724 |
| 2017 | 977 |
| 2018 | 968 |
| 2019 YTD ** | 496 |

*2014 only includes the fourth quarter of 2014: July, August, and September.
**Includes October 2018–March 2019.

The FSA does not impose requirements on secure facilities used for the detention of juveniles. Juveniles may be placed in secure facilities if they meet the criteria listed in paragraph 21 of the FSA.

[74] For the purposes of this table, Voluntary Return refers to the DHS grant of permission for an alien to depart the United States, while Voluntary Departure refers to the immigration judge's grant of permission for an alien to depart the United States.

The rule also applies to UACs who have been transferred to HHS care and custody. Upon referral, HHS promptly places UACs in the least restrictive setting that is in the best interests of the child, taking into consideration danger to self or others and risk of flight. HHS considers the unique nature of each child's situation and incorporates child welfare principles when making placement and release decisions that are in the best interest of the child.

HHS places UACs in a network of more than 100 shelters in 17 states. For the first nine years of the UAC Program at HHS, less than 8,000 UACs were served annually. Since FY 2012, this number has increased dramatically, with a total of 13,625 children referred to HHS by the end of FY 2012. Between FY 2012 and FY 2018, HHS received a total of 316,454 UACs.

TABLE 13—UAC REFERRALS TO HHS FY 2008–FY 2018

| Fiscal year | Referrals |
|---|---|
| 2008 | 6,658 |
| 2009 | 6,089 |
| 2010 | 7,383 |
| 2011 | 6,560 |
| 2012 | 13,625 |
| 2013 | 24,668 |
| 2014 | 57,496 |
| 2015 | 33,726 |
| 2016 | 59,170 |
| 2017 | 40,810 |
| 2018 | 49,100 |

For FY 2018 the average length of care (the time a child has been in custody, since the time of admission) for UACs was approximately 60 days. The majority (more than 85 percent) of UACs are released to suitable sponsors who are family members within the United States. UACs who are not released to a sponsor typically age out or receive an order of removal and are transferred to DHS; are granted voluntary departure and likewise transferred to DHS for removal; or, obtain immigration legal relief and are no longer eligible for placement in ORR's UAC program.

TABLE 14—PERCENTAGE OF UACs BY DISCHARGE TYPE FY 18

| Discharge type | Percentage of UACs |
|---|---|
| Age Out | 4.0 |
| Age Redetermination | 2.2 |
| Immigration Relief Granted | 0.2 |
| Local Law Enforcement | 0.0 |
| Ordered Removed | 0.2 |
| Other | 4.5 |
| Runaway from Facility | 0.4 |
| Runaway on Field Trip | 0.1 |
| Reunified (Individual Sponsor) | 85.8 |

TABLE 14—PERCENTAGE OF UACs BY DISCHARGE TYPE FY 18—Continued

| Discharge type | Percentage of UACs |
|---|---|
| Reunified (Program/Facility) | 0.7 |
| Voluntary Departure | 2.0 |
| Total | 100.0 |

2. Baseline of Current Costs

In order to properly evaluate the benefits and costs of regulations, agencies must evaluate the costs and benefits against a baseline. OMB Circular A–4 defines the "no action" baseline as "the best assessment of the way the world would look absent the proposed action." It also specifies that the baseline "should incorporate the agency's best forecast of how the world will change in the future," absent the regulation. The Departments consider their current operations and procedures for implementing the terms of the FSA, the HSA, and the TVPRA to be the primary baseline for this analysis, from which they estimate the costs and benefits of the rule. The Departments also consider how current operations and procedures could change, in the absence of this rule, depending on a number of factors.

The baseline encompasses the FSA that was approved by the court on January 28, 1997. It also encompasses the 2002 HSA legislation transferring the responsibility for the care and custody of UACs, including some of the material terms of the FSA, to ORR, as well as the substantive terms of the 2008 TVPRA. Finally, it includes the July 6, 2016 decision of the Ninth Circuit affirming the district court's finding that the FSA applies to both accompanied and unaccompanied minors, and that such minors shall not be detained in unlicensed and secure facilities that do not meet the requirements of the FSA. *See Flores* v. *Lynch,* 828 F.3d 898 (9th Cir. 2016). The section below discusses some examples of the current cost for the Departments' operations and procedures under the baseline. Because the costs described below are already being incurred, they are not costs of this rule.

DHS

CBP incurs costs to comply with the FSA, including those related to facility configurations, custodial requirements, and compliance monitoring. To comply with the terms of the FSA, for example, CBP reallocates space in its facilities to allow for separate holding areas for families and/or UACs. Pursuant to the FSA, CBP provides minors and UACs

access to food; drinking water; functioning toilets and sinks; adequate temperature and ventilation; emergency medical care, if needed; and safe and sanitary facilities. Thus, CBP incurs costs for, among other things, the purchase of food; bottled water; first aid kits; hygiene items; blankets, mats, or cots; and age-appropriate transport and bedding. To ensure compliance with the FSA, CBP has also added fields in its electronic systems of records, so that CBP officers and Border Patrol agents can continuously record the conditions of the hold rooms and all custodial activities related to each minor or UAC, such as medical care provided, welfare checks conducted, and any separation from accompanying family members.

CBP experiences other baseline costs from its national and field office Juvenile Coordinators. Under current practice, as described above, the national CBP Juvenile Coordinator oversees agency compliance with the FSA requirements and with policy related to the treatment of minors and UACs in CBP custody. The national CBP Juvenile Coordinator monitors CBP facilities and processes through site visits and review of juvenile custodial records. Along with the national CBP Juvenile Coordinator role, CBP has field office and sector Juvenile Coordinators who are responsible for managing all policies on the processing of juveniles within CBP facilities, coordinating within CBP and across DHS components to ensure the expeditious placement and transport of juveniles placed into removal proceedings by CBP, and informing CBP operational offices of any policy updates related to the processing of juveniles (*e.g.,* through correspondence, training presentations). Moreover, CBP's Juvenile Coordinators serve as internal and external agency liaisons for all juvenile processing matters.

CBP's baseline costs also include the use of translation services, including contracts for telephonic interpretation services.

ICE also incurs facility costs to comply with the FSA. The costs of operation and maintenance of the ICE FRCs for FY 2015–2019 are listed in Table 15, provided by the ICE Office of Acquisition Management. The costs account for the implementation of the FSA requirements, including the cost for the facility operators to abide by all relevant state standards. Two of the FRCs are operated by private contractors, while one is operated by a local government, under contract with ICE. These are the amounts that have been paid to private contractors or to the

local government to include beds, guards, health care, and education.

TABLE 15—CURRENT COSTS FOR FRCs

| Fiscal year | FRC costs |
|---|---|
| 2015 | $323,264,774 |
| 2016 | 312,202,420 |
| 2017 * | 232,244,792 |
| 2018 | 224,321,766 |

*Revised from NPRM at 83 FR 45513 with final costs.

The FRC costs are fixed-price agreements with variable costs added on a monthly basis. Overall, the fixed-price agreements are not dependent on the number of detainees present or length of stay, with some exceptions. At Berks, the contract includes a per-person, per-day fee charged in addition to the monthly fixed rate. At two of the FRCs, Berks and Karnes, education is provided per the standards of a licensed program set forth in the FSA, at a per-student, per-day cost. Since FRCs are currently at limited available capacity and the configuration of limited available capacity varies from day to day across all FRCs, the number of children and adults vary at Berks day to day and the number of children at Karnes vary day to day. Thus, these costs charged to ICE vary from month to month.

In addition to the above example of baseline costs to operate the FRCs DHS (particularly CBP and ICE) incurs costs to process, transfer, and provide transportation of minors and UACs from the point of apprehension to DHS facilities; from the point of apprehension or from a DHS facility to HHS facilities; between facilities; for the purposes of release; and for all other circumstances, in compliance with the FSA, HSA, and TVPRA.

The baseline costs also include bond hearings for minors and family units who are eligible for such hearings. When a minor or family unit seeks a bond, ICE officers must review the request and evaluate the individuals' eligibility as well as, where appropriate, set the initial bond amount. Further, should the minor or family unit seek a bond redetermination hearing before an immigration judge, ICE must transport or otherwise arrange for the individuals to appear before the immigration court. ICE's baseline costs also include the use of translation services, including contracts for telephonic interpretation services.

ICE also incurs baseline costs related to its Juvenile and Family Residential Management Unit (JFRMU), which was created in 2007. JFRMU manages ICE's policies affecting alien juveniles and families. The role of ICE's Juvenile Coordinator is within JFRMU. In addition to the national ICE Juvenile Coordinator role, ICE has field office and sector Juvenile Coordinators whose responsibilities mirror those of CBP's. In addition, compliance with the Flores court's mandate is monitored by weekly reports identifying any minors in custody over 20 days at FRCs and reviewing the reasons provided by the field office. Additionally, weekly audits of 5 percent of the FRC population is done by reviewing files and ensuring that minors are served with the required forms—Notice of Rights, Designated Sponsor Form, and the Parole Review Worksheet. JFRMU consists of specialized Federal staff, as well as contract subject matter experts in the fields of child psychology, child development, education, medicine, and conditions of confinement. JFRMU establishes policies on the management of family custody, UACs pending transfer to the ORR, and UACs applying for Special Immigrant Juvenile status. JFRMU continues to pursue uniform operations throughout its program through implementation of family residential standards. These standards are continually reviewed and revised as needed to ensure the safety and welfare of families awaiting an immigration decision while housed in a family residential facility. DHS conducts an inspection of each FRC at least annually to confirm that the facility is in compliance with ICE Family Residential Standards.

The baseline costs include the monitoring of FSA compliance and reporting to the court. Since 2007, JFRMU has submitted *Flores* Reports annually, bi-annually, or monthly for submission to the court through DOJ.

In addition, DHS considered how DHS's current procedures and operations might change in the future in the absence of this rule. For example, DHS has seen a large spike in the number of family units apprehended or found inadmissible at the Southwest Border.[75] As of June 2019, with three months remaining in FY 2019, CBP has apprehended over 390,000 family units between the ports of entry on the Southwest Border, so far this fiscal year, as compared to 107,212 family units in all of FY 2018. As of this same date, 33,950 family units have been found

[75] *See* United States Border Patrol Total Family Unit Apprehensions By Month—FY 2013 through FY 2018 at *https://www.cbp.gov/sites/default/files/assets/documents/2019-Mar/bp-total-monthly-family-units-sector-fy13-fy18.pdf* (last visited May 10, 2019). *See* also Southwest Border Migration FY 2019 at *https://www.cbp.gov/newsroom/stats/sw-border-migration* (last visited June 5, 2019).

inadmissible at ports of entry along the Southwest border. This spike in numbers has placed significant strains on ICE and CBP. In light of this ongoing, urgent humanitarian crisis, and apart from this rule, ICE could potentially build out the existing space at the Dilley facility. An additional 960 beds at Dilley would cost approximately $80 million. The decision for a buildout would be based on emerging operational, policy, and agency needs and available funding. ICE could also require additional transportation funding to transport these family units out of CBP custody. CBP may also expend additional funding to build and maintain any appropriate temporary facilities. Because these change could happen in the absence of this rule, they would not be an impact of this rule but would be part of baseline costs.

HHS' baseline costs were $1.4 billion in FY 2017. HHS funds private non-profit and for-profit agencies to provide shelter, counseling, medical care, legal services, and other support services to UACs in custody. Funding levels for non-profit organizations totaled $912,963,474 in FY 2017. Funding levels for for-profit agencies totaled $141,509,819 in FY 2017. Program funded facilities receive grants or contracts to provide shelter, including therapeutic care, foster care, shelter with increased staff supervision, and secure detention care. The majority of program costs (approximately 80 percent) are for bed capacity care. Other services for UACs, such as medical care, background checks, and family reunification services, make up approximately 15 percent of the budget. In addition, some funding is provided for limited post-release services to certain UACs. Administrative expenses to carry out the program total approximately five percent of the budget.

Influx costs to the program vary year to year, and are dependent on migration patterns and the resulting numbers of UACs cared for by HHS. In FY 2016, for instance, HHS total approved funding for the UAC program was $743,538,991, with $224,665,994 going to influx programming. In FY 2017, the total funding was $912,963,474, with $141,509,819 for influx.

These are examples of the types of costs the Departments incur under current operations, and are not a result of this rule.

3. Costs

This rulemaking would implement the relevant and substantive terms of the FSA, with limited changes necessary to implement closely related provisions of

the HSA and TVPRA, and to ensure that the regulations set forth a sustainable operational model of immigration enforcement in light of changes in law, circumstance, as well as agency experience. While this rule itself does not require in any particular outcome, it does allow for several policy outcomes, to include longer detention periods for some individuals, in particular families during expedited removal proceedings or families in section 240 proceedings who pose a flight risk or danger, which may lead to the construction of additional bed space or facilities, given other external factors. This section assesses the cost of these possible policy outcomes as compared to the current operational environment (the Departments' primary assessment of what the world would be like absent this rule).

The primary changes to the current operational environment resulting from this rule are implementing an alternative licensing process, making changes to ICE parole determination practices to align them with applicable statutory and regulatory authority, and

shifting hearings from DOJ to HHS. The alternative license for FRCs and changes to parole determination practices may result in additional or longer detention for certain individuals, but DHS is unable to estimate the costs of this to the Government or to the individuals being detained because DHS is not sure how many individuals will be detained at FRCs after this rule is effective or for how much longer individuals may be detained because there are so many other variables that may affect such estimates. It is possible that some families will experience longer detention periods, but—given finite resources and bed space at FRCs—this also means that many other families will experience less detention than under the current status in which DHS generally detains for only 20 days. DHS is also unable to provide an estimate of the cost of any increased detention on the individuals being detained. ICE notes that while longer detention for certain family units could result in the need for additional space, the decision to increase bed space would be based on

a number of factors, and at this time ICE is unable to determine if this rule would result in additional bed space. This rule does not require the addition of new bed space, but by allowing alternative licensing for FRCs it does remove a barrier to DHS's use of its Congressionally-authorized detention authority, allowing families to stay together through the duration of their immigration proceedings. If bed space were increased, the cost would depend on the type of facility, facility size, location, available funding, and a number of other variables. However, ICE notes as an example that an additional 960 beds at Dilley would cost approximately $80 million.

Table 16 shows the changes to the DHS current operational status compared to the FSA. It contains a preliminary, high-level overview of how the rule would change DHS's current operations, for purposes of the economic analysis. The table does not provide a comprehensive description of all provisions and their basis and purpose.

TABLE 16—FSA AND DHS CURRENT OPERATIONAL STATUS

| FSA paragraph No. | Description of FSA provision | DHS cite (8 CFR) | DHS change from current practice |
|---|---|---|---|
| 1, 2, 3 .......................... | "Party, "plaintiff" and "class member" definitions ............ | N/A .......................... | None. (*Note:* These definitions are only relevant to the FSA insofar as the FSA exists in the form of a consent decree. Following promulgation of a final rule, the definitions would no longer be relevant. As a result, the rule does not include these definitions.) |
| 4 ................................... | "Minor" definition ....................................................... | 236.3(b)(1) ................. | None. |
| 5 ................................... | "Emancipated minor" definition ..................................... | 236.3(b)(1)(i) .............. | None. |
| 6 ................................... | "Licensed program" definition ....................................... | 236.3(b)(9) ................. | FSA defines a "licensed program" as one licensed by an appropriate State agency. DHS would not define "licensed program," but instead would define a "licensed facility" as an ICE detention facility that is licensed by the state, county, or municipality in which it is located. DHS would also add an alternative licensing process for FRCs, if the state, county, or municipality where the facility is located does not have a licensing process for such facilities. (*Note:* In response to comments, DHS will post the results of third-party audits of its licensed facility standards on a public-facing website. The definition now specifies that audits will occur upon the opening of an FRC and on a regular ongoing basis thereafter.) |
| 6+ Exhibit 1 ............... | Exhibit 1, standards of a licensed program ...................... | 236.3(i)(4) .................. | DHS provides requirements that licensed facilities must meet. (*Note:* Compared with Exhibit 1, these requirements contain a slightly broadened educational services description to capture current operations and add that program design should be appropriate for length of stay (see paragraph (i)(4)(iv)); amend "family reunification services" provision to more appropriately offer communication with adult relatives in the U.S. and internationally, since DHS only has custody of accompanied minors so reunification is unnecessary (see § 236.3(i)(4)(iii)(H)).) |
| 7 ................................... | "Special needs minor" definition and standard ................ | 236.3(b)(2) ................. | None. (*Note:* In response to public comments, DHS replacing the term "retardation" with the term "intellectual disability.") |
| 8 ................................... | "Medium security facility" definition ................................ | N/A .......................... | None. (*Note:* DHS only has secure or non-secure facilities, so a definition of "medium security facility" is unnecessary. As a result, the rule lacks such a definition, even though the FSA contains one.) |

TABLE 16—FSA AND DHS CURRENT OPERATIONAL STATUS—Continued

| FSA paragraph No. | Description of FSA provision | DHS cite (8 CFR) | DHS change from current practice |
|---|---|---|---|
| 9 ................................ | Scope of Settlement Agreement, Effective Date, and Publication. | N/A ................................ | None. (*Note:* This provision imposes a series of deadlines that passed years ago, and/or do not impose obligations on the parties that continue following termination of the FSA. As a result, the rule does not include this provision.) |
| 10 .............................. | Class Definition ................................................................ | N/A ................................ | None. (*Note:* Provision is specific to the litigation and is not a relevant or substantive term of the FSA, so it is not included in the rule.) |
| 11 .............................. | Place each detained minor in least restrictive setting appropriate for age and special needs. No requirement to release to any person who may harm or neglect the minor or fail to present minor before the immigration court. | 236.3(g)(2)(i), (i), (j)(4) | None. (*Note:* § 236.3(j) tracks FSA paragraph 14, which is consistent with FSA paragraph 11 but uses different terms.) |
| 11 .............................. | The INS treats, and shall continue to treat, all minors in its custody with dignity, respect and special concern for their particular vulnerability as minors. | 236.3(a)(1) ................... | None. |
| 12(A) .......................... | Expeditiously process the minor ........................................ | 236.3(e), (f), & (g)(2)(i). | None. (*Note:* The rule reflects the fact that the TVPRA (rather than the FSA) governs the processing and transfer of UACs. The rule also makes clear that generally, unless an emergency or influx ceases to exist, the transfer timelines associated with an emergency or influx continue to apply for non-UAC minors.) |
| 12(A) .......................... | Shall provide the minor with notice of rights ................... | 236.3(g)(1)(i) ................ | None (with the exception that the Form I–770 will be provided, read, or explained to *all* minors and UACs in a language and manner that they understand). |
| 12(A) .......................... | Facilities must be safe and sanitary including toilets and sinks, water and food, medical assistance for emergencies, temperature control and ventilation, adequate supervision to protect minor from others. | 236.3(g)(2)(i) ................ | None. |
| 12(A) .......................... | Contact with family members who were arrested with the minor. | 236.3(g)(2)(i) ................ | None. (*Note:* The rule contains a slightly different standard than appears in the FSA. The rule provides for contact with family members apprehended with both minors and UACs. Additionally, the rule invokes operational feasibility and consideration of the safety or well-being of the minor or UAC in facilitating contact. The FSA generally prioritizes the safety and well-being of the minor and that of others, but does not include these provisos.) |
| 12(A) .......................... | Segregate unaccompanied minors from unrelated adults, unless not immediately possible (in which case an unaccompanied minor may not be held with an unrelated adult for more than 24 hours). | 236.3(g)(2)(i) ................ | None. (*Note:* The rule would allow UACs to be held with unrelated adults for no more than 24 hours except in cases of emergency.) |
| 12(A), 12(A)(1)–(3), 12(B). | Transfer in a timely manner: Three days to five days max with exceptions, such as emergency or influx, which requires placement as expeditiously as possible. | 236.3(b)(5), (b)(10), (e)(1). | None. (*Note:* Following the TVPRA, the transfer provisions in FSA paragraph 12(A) apply to DHS only for accompanied minors. In addition, the 'rule's definition of "emergency" clarifies that an emergency may create adequate cause to depart from any provision of § 236.3, not just the transfer timeline.) |
| 12(A)(4) ..................... | Transfer within 5 days instead of 3 days in cases involving transport from remote areas or where an alien speaks an "unusual" language. | N/A ................................ | None. (*Note:* Although DHS is not proposing a change in practice, it does not propose to codify this exception from the FSA in § 236.3(e) because operational improvements have rendered the exception unnecessary.) |
| 12(C) .......................... | Written plan for "emergency" or "influx" ......................... | 236.3(e)(2) .................... | None. (*Note:* Like the FSA, the rule requires a written plan. The written plan is contained in a range of guidance documents.) |
| 13 .............................. | Age determination ............................................................. | 236.3(c) ......................... | None. (*Note:* The rule includes a "totality of the circumstances" standard; the FSA does not contain a standard that conflicts with "totality of the circumstances.") |
| 14 .............................. | Release from custody where the INS determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others. Release is to, in order of preference: Parent, legal guardian, adult relative, adult or entity, licensed program, adult seeking custody. | 236.3(j) (release generally). | The rule details the statutory and regulatory provisions that govern the custody and release of non-UAC minors. The rule also clarifies that for minors detained pursuant to INA 235(b)(1)(B)(ii) or 8 CFR 235.3(c), parole will generally serve an urgent humanitarian reason if DHS determines that detention is not required to secure the minor's timely appearance before DHS or the immigration court, or to ensure the minor's safety and well-being or the safety of others. In addition, the rule codifies the list of individuals to whom a non-UAC minor can be released. Per the TVPRA, DHS does not have the authority to release UACs. |
| 15 .............................. | Before release from custody, Form I–134 and agreement to certain terms must be executed. If emergency, then minor can be transferred temporarily to custodian but must notify INS in 72 hours. | N/A ................................ | None. (*Note:* The rule does not codify this portion of the FSA, because (1) the TVPRA has overtaken this provision in part, and (2) these requirements, which are primarily for DHS's benefit, are not currently implemented.) |

TABLE 16—FSA AND DHS CURRENT OPERATIONAL STATUS—Continued

| FSA paragraph No. | Description of FSA provision | DHS cite (8 CFR) | DHS change from current practice |
|---|---|---|---|
| 16 | INS may terminate the custody if terms are not met | N/A | None. (*Note:* The rule does not codify this portion of the FSA, because (1) the TVPRA has overtaken this provision in part, and (2) these requirements, which are primarily for DHS's benefit, are not currently implemented.) |
| 17 | Positive suitability assessment | N/A | None. (*Note:* The rule does not codify this portion of the FSA, because the TVPRA has overtaken this provision. Per the TVPRA, DHS does not have the authority to release UACs.) |
| 18 | INS or licensed program must make and record the prompt and continuous efforts on its part toward family reunification efforts and release of minor consistent with FSA paragraph 14. | 236.3(j) | None. |
| 19 | INS custody in licensed facilities until release or until immigration proceedings are concluded. Temporary transfers in event of an emergency. | 236.3(i), (i)(5) | None. |
| 20 | INS must publish a ''Program Announcement'' within 60 Days of the FSA's approval. | N/A | None. (*Note:* This provision imposes a deadline that passed years ago. As a result, the rule does not include this provision.) |
| 21 | Transfer to a suitable State or county juvenile detention facility if a minor has been charged or convicted of a crime with exceptions. | 236.3(i)(1) | None. (*Note:* The rule clarifies some of the exceptions to secure detention, consistent with current practice and in line with the intent underlying FSA paragraph 21(A)(i)–(ii). The rule also removes the specific examples used in FSA.) |
| 22 | Escape risk definition | 236.3(b)(6) | None. (*Note:* The rule uses final order of ''removal'' rather than deportation or exclusion, and considers past absconding from state or Federal custody; and not just DHS or HHS custody.) |
| 23 | Least restrictive placement of minors available and appropriate. | 236.3(i)(2) | None. |
| 24(A) | Bond redetermination hearing afforded | 236.3(m) | None. (*Note:* The rule adds language to specifically exclude those aliens for which IJs do not have jurisdiction, as provided in 8 CFR 1003.19.) |
| 24(B) | Judicial review of placement in a particular type of facility permitted or that facility does not comply with standards in Ex. 1. | N/A | None. (*Note:* The rule does not expressly provide for judicial review of placement/compliance, as a regulation cannot confer jurisdiction on Federal court.) |
| 24(C) | Notice of reasons provided to minor not in a licensed program/judicial review. | N/A | |
| 24(D) | All minors ''not released'' shall be given Form I–770, notice of right to judicial review, and list of free legal services. | 236.3(g)(1) | None. (*Note:* The rule requires DHS to provide the notice of right to judicial review and list of counsel to those minors who are not UACs and who are transferred to or remain in a DHS detention facility. The corresponding FSA provisions apply to minors ''not released.'' The difference in scope is a result of the TVPRA and reflects the relationship between paragraph 12(A), which applies to the provision of certain rights (largely contained on the I–770) immediately following arrest, and Paragraph 28(D), which applies to all minors who are ''not released,'' and so are detained by DHS. The language does not reflect a change in practice. The rule also includes more detailed language with respect to the Form I–770 than the FSA; this language comes from current 8 CFR 236.3, and is consistent with the requirements of Paragraph 12(A).) |
| 24(E) | Additional information on precursors to seeking judicial review. | N/A | None. (*Note:* Responsibilities of the minor prior to bringing litigation are not relevant or substantive terms of the FSA, and are not included in the rule.) |
| 25 | Unaccompanied minors in INS custody should not be transported in vehicles with detained adults except when transport is from place of arrest/apprehension to an INS office, or when separate transportation would otherwise be impractical. | 236.3(f)(4) | None. (*Note:* The rule makes a clarifying change: The rule adds ''or unavailable'' as an exception to ''impractical.'') |
| 26 | Provide assistance in making transportation arrangement for release of minor to person or facility to whom released. | 236.3(j)(3) | None. (*Note:* The rule would remove the reference to release to a ''facility.'' Referral to HHS is a transfer, not a release.) |
| 27 | Transfer between placements with possessions, notice to counsel. | 236.3(k) | None. |
| 28(A) | INS Juvenile Coordinator to monitor compliance with FSA and maintain records on all minors placed in proceedings and remain in custody for longer than 72 hours. | 236.3(o) | None. (*Note:* The rule requires collection of relevant data for purposes of monitoring compliance. The list of data points is similar to the list in 28(A) but not identical.) |
| 28(B) | Plaintiffs' counsel may contact INS Juvenile Coordinator to request an investigation on why a minor has not been released. | N/A | This provision would no longer apply following termination of the FSA. (*Note:* Special provisions for Plaintiffs' counsel are not relevant or substantive terms of the FSA, and are not included in the rule.) |
| 29 | Plaintiffs' counsel must be provided information pursuant to FSA paragraph 28 on a semi-annual basis; Plaintiffs' counsel have the opportunity to submit questions. | N/A | This provision would no longer apply following termination of the FSA. (*Note:* Special provisions for Plaintiffs' counsel are not relevant or substantive terms of the FSA, and are not included in the rule.) |

TABLE 16—FSA AND DHS CURRENT OPERATIONAL STATUS—Continued

| FSA paragraph No. | Description of FSA provision | DHS cite (8 CFR) | DHS change from current practice |
|---|---|---|---|
| 30 | INS Juvenile Coordinator must report to the court annually. | N/A | This provision would no longer apply following termination of the FSA. (*Note:* Special provisions for reporting to the court are not relevant or substantive terms of the FSA, and are not included in the rule.) |
| 31 | Defendants can request a substantial compliance determination after one year of the FSA. | N/A | None. (*Note:* This provision imposed a timeframe related to court supervision of the FSA. As a result, the rule does not include this provision.) |
| 32(A), (B), and (D) | Attorney-client visits with class members allowed for Plaintiffs' counsel at a facility. | N/A | Special provisions for Plaintiffs' counsel are not relevant or substantive terms of the FSA, and are not included in the rule. |
| 32(C) | Agreements for the placement of minors in non-INS facilities shall permit attorney-client visits, including by class counsel. | 236.3(i)(4)(xv) | None. (*Note:* Special provisions for Plaintiffs' counsel are not relevant or substantive terms of the FSA, so the reference to class counsel is not included in the rule.) |
| 33 | Plaintiffs' counsel allowed to request access to, and visit licensed program facility or medium security facility or detention facility. | N/A | Special provisions for Plaintiffs' counsel are not relevant or substantive terms of the FSA, and are not included in the rule. |
| 34 | INS employees must be trained on FSA within 120 days of court approval. | N/A | None. (*Note:* This provision imposed a deadline that passed years ago. As a result, the rule does not include this provision.) |
| 35 | Dismissal of action after court has determined substantial compliance. | N/A | None. (*Note:* Provisions specific to terminating the action are not relevant or substantive terms of the FSA, and are not included in the rule.) |
| 36 | Reservation of Rights | N/A | None. (*Note:* This provision is only relevant to the FSA insofar as the FSA exists in the form of a consent decree. Following promulgation of a final rule, it would no longer be relevant. As a result, the rule does not include this provision.) |
| 37 | Notice and Dispute Resolution | N/A | None. (*Note:* This provision provides for ongoing enforcement of the FSA by the district court. As a result, the rule does not include this provision.) |
| 38 | Publicity—joint press conference | N/A | None. (*Note:* This provision relates to an event that occurred years ago. As a result, the rule does not include this provision.) |
| 39 | Attorneys' Fees and Costs | N/A | None. (*Note:* This provision imposed a deadline that passed years ago. As a result, the rule does not include this provision.) |
| 40 | Termination 45 days after publication of final rule | N/A | None. (*Note:* Provisions specific to terminating the FSA are not relevant or substantive terms, and are not included in the rule.) |
| 41 | Representations and Warranty | N/A | None. (*Note:* This provision is only relevant to the FSA insofar as the FSA exists in the form of a consent decree. Following promulgation of a final rule, it would no longer be relevant. As a result, the rule does not include this provision.) |

TABLE 17—FSA AND HHS CURRENT OPERATIONAL STATUS

| FSA paragraph No. | Description of FSA provision | HHS cite (45 CFR) | HHS change from current practice |
|---|---|---|---|
| 1, 2, 3 | "Party," "plaintiff" and "class member" definitions | N/A | None. (Note: These definitions are only relevant to the FSA insofar as the FSA exists in the form of a consent decree. Following promulgation of a final rule, the definitions would no longer be relevant. As a result, the rule does not include these definitions.) |
| 4 | "minor" | N/A | HHS uses the statutory term "unaccompanied alien child" (UAC) as HHS only provides care and custody to UAC as defined under 6 U.S.C. 279(g)(2) pursuant to 8 U.S.C. 1232(b)(1). |
| 5 | "emancipated minor" | N/A | Term only has significant for DHS portion of the joint rule. |
| 6 | "licensed program" | 410.101 | Adopted in relevant part, but replaces "minor" with "UAC" as HHS only provides care and custody to UAC. |
| 7 | "special needs minor" | 410.101; 410.208 | None. (Note: In response to public comments, HHS is replacing the term "retardation" with the term "intellectual disability."). |
| 8 | "medium secure facility" | N/A | None. (Note: ORR does not use medium secure facilities). |
| 9 | Scope of Settlement Agreement, Effective Date, and Publication. | N/A | None. (Note: This provision imposes a series of deadlines that passed years ago, and/or do not impose obligations on the parties that continue following termination of the FSA. As a result, the rule does not include this provision.) |
| 10 | Class Definition | N/A | None. (Note: Provision is specific to the litigation and is not a relevant or substantive term of the FSA, so it is not included in the rule) |

**Federal Register**/Vol. 84, No. 164/Friday, August 23, 2019/Rules and Regulations **44515**

TABLE 17—FSA AND HHS CURRENT OPERATIONAL STATUS—Continued

| FSA paragraph No. | Description of FSA provision | HHS cite (45 CFR) | HHS change from current practice |
|---|---|---|---|
| 11 ............................... | Statements of General Applicability ................................. | 410.102 ..................... | None. (Note: The HHS portion of the rule only applies to UAC in HHS care and custody). |
| 12(A) ........................... | Procedures and Temporary Placement Following Arrest | 410.201(a)–(d); 410.209. | None. (Note: ORR is not involved in the apprehension of UAC or their immediate detention following arrest. HHS adopts standards of 12A for its care provider facilities). |
| 12(B); 12(C) ............... | Defining ''emergency'' and ''influx'' ................................. | 410.101 ..................... | None. |
| 13 ............................... | Placing aliens who appear to be adults; age determinations. | 410.202(a)(4); 410.700–410.701. | None (Note: Section 410.202(a)(4) conforms with the FSA requirement that allows the government to not place an alien who appears to the reasonable person to be an adult in HHS custody. Sections 410.700–410.701 set forth the requirements for age determinations in compliance with 8 U.S.C. 1232(b)(4)). |
| 14 ............................... | Release from custody where the INS determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others. Release is to, in order of preference: Parent, legal guardian, adult relative, adult or entity, licensed program, adult seeking custody. | 410.300–410.301 ...... | None. |
| 15 ............................... | Before release from custody, Form I–134 and agreement to certain terms must be executed. If emergency, then minor can be transferred temporarily to custodian but must notify INS in 72 hours. | 410.302(e) ................. | None. |
| 16 ............................... | INS may terminate the custody if terms are not met ....... | N/A ............................ | N/A. |
| 17 ............................... | Positive suitability assessment ....................................... | 410.302(c)–(d) ........... | None. |
| 18 ............................... | INS or licensed program must make and record the prompt and continuous efforts on its part toward family reunification efforts and release of minor consistent with FSA paragraph 14. | 410.201(f); 410.302(a) | None. |
| 19 ............................... | INS custody in licensed facilities until release or until immigration proceedings are concluded. Temporary transfers in event of an emergency. | 410.207 ..................... | None. |
| 20 ............................... | INS must publish a ''Program Announcement'' within 60 Days of the FSA's approval. | N/A ............................ | None. (Note: This provision imposes a deadline that passed years ago. As a result, the rule does not include this provision). |
| 21 ............................... | Transfer to a suitable State or county juvenile detention facility if a minor has been charged or convicted of a crime with exceptions. | 410.203 ..................... | None. (Note: Pursuant to 8 U.S.C. 1232(c)(2)(A), HHS can only place a UAC in a secure facility (which are state or county juvenile detention facilities) if they are a danger to self or others or has been charged with committing a criminal offense. Therefore HHS has removed the factors listed in FSA paragraph 21C–D as considerations for a secure placement (escape-risk and to protect UAC from smugglers, respectively). Additionally, HHS adds the requirements of the TVPRA to place a UAC in the least restrictive setting appropriate). |
| 22 ............................... | Escape risk definition ...................................................... | 410.101; 410.204 ...... | None. (Note: HHS does not use escape risk as a factor for placing a minor in an unlicensed ''secure'' facility as explained above). |
| 23 ............................... | Least restrictive placement of minors available and appropriate. | 410.201(a); 410.203(d); 410.205. | None. (Note: HHS adds that placement in the least restrictive setting include the best interest standard which was not included into the FSA. Additionally, as noted previously ORR does not maintain ''medium secure'' facilities. |
| 24(A) ........................... | Bond redetermination hearing afforded ............................ | 410.800–410.801; 410.810. | HHS is transferring bond hearings to an independent hearing officer housed within HHS who uses the same standards as immigration judges in bond hearings to determine whether a UAC is a danger to others or risk of flight. |
| 24(B) ........................... | Judicial review of placement in a particular type of facility permitted or that facility does not comply with standards in Ex. 1. | N/A ............................ | None. (Note: The rule does not expressly provide for judicial review of placement/compliance, as a regulation cannot confer jurisdiction on Federal court). |
| 24(C) ........................... | Notice of reasons provided to minor not in a licensed program/judicial review. | 410.206; 410.207 ...... | None. (Note: ORR provides UAC in secure or staff-secure the reasons for their placement and notice of judicial review). |
| 24(D) ........................... | All minors ''not released'' shall be given Form I–770, notice of right to judicial review, and list of free legal services. | 410.801(b) ................. | Provides administrative review notice for UAC. |
| 24(E) ........................... | Additional information on precursors to seeking judicial review. | N/A ............................ | None. (Note: Responsibilities of the minor prior to bringing litigation are not relevant or substantive terms of the FSA, and are not included in the rule). |
| 25 ............................... | Unaccompanied minors in INS custody should not be transported in vehicles with detained adults except when transport is from place of arrest/apprehension to an INS office, or when separate transportation would otherwise be impractical. | 410.500(a) ................. | None. (Note: HHS does not have adults in custody). |
| 26 ............................... | Provide assistance in making transportation arrangement for release of minor to person or facility to whom released. | 410.500(b) ................. | None. (Note: The provision references UAC sponsors). |

TABLE 17—FSA AND HHS CURRENT OPERATIONAL STATUS—Continued

| FSA paragraph No. | Description of FSA provision | HHS cite (45 CFR) | HHS change from current practice |
|---|---|---|---|
| 27 | Transfer between placements with possessions, notice to counsel. | 410.600 | None. |
| 28(A) | INS Juvenile Coordinator to monitor compliance with FSA and maintain records on all minors placed in proceedings and remain in custody for longer than 72 hours. | 410.403 | None. (Note: This provision is mainly specific to DHS. HHS monitors compliance to the rules provisions through its policies and procedures that implement the FSA). |
| 28(B) | Plaintiffs' counsel may contact INS Juvenile Coordinator to request an investigation on why a minor has not been released. | N/A | This provision would no longer apply following termination of the FSA. (Note: Special provisions for Plaintiffs' counsel are not relevant or substantive terms of the FSA, and are not included in the rule). |
| 29 | Plaintiffs' counsel must be provided information pursuant to FSA paragraph 28 on a semi-annual basis; Plaintiffs' counsel have the opportunity to submit questions. | N/A | This provision would no longer apply following termination of the FSA. (Note: Special provisions for Plaintiffs' counsel are not relevant or substantive terms of the FSA, and are not included in the rule). |
| 30 | INS Juvenile Coordinator must report to the court annually. | N/A | This provision would no longer apply following termination of the FSA. (Note: Special provisions for reporting to the court are not relevant or substantive terms of the FSA, and are not included in the rule). |
| 31 | Defendants can request a substantial compliance determination after one year of the FSA. | N/A | None. (Note: This provision imposed a timeframe related to court supervision of the FSA. As a result, the rule does not include this provision). |
| 32(A), (B), (C), and (D). | Attorney-client visits with class members allowed for Plaintiffs' counsel at a facility. | N/A | Special provisions for Plaintiffs' counsel are not relevant or substantive terms of the FSA, and are not included in the rule. |
| 33 | Plaintiffs' counsel allowed to request access to, and visit licensed program facility or medium security facility or detention facility. | N/A | Special provisions for Plaintiffs' counsel are not relevant or substantive terms of the FSA, and are not included in the rule. |
| 34 | INS employees must be trained on FSA within 120 days of court approval. | N/A | None. (Note: This provision imposed a deadline that passed years ago. As a result, the rule does not include this provision). |
| 35 | Dismissal of action after court has determined substantial compliance. | N/A | None. (Note: Provisions specific to terminating the action are not relevant or substantive terms of the FSA, and are not included in the rule). |
| 36 | Reservation of Rights | N/A | None. (Note: This provision is only relevant to the FSA insofar as the FSA exists in the form of a consent decree. Following promulgation of a final rule, it would no longer be relevant. As a result, the rule does not include this provision). |
| 37 | Notice and Dispute Resolution | N/A | None. (Note: This provision provides for ongoing enforcement of the FSA by the district court. As a result, the rule does not include this provision). |
| 38 | Publicity—joint press conference | N/A | None. (Note: This provision relates to an event that occurred years ago. As a result, the rule does not include this provision). |
| 39 | Attorneys' Fees and Costs | N/A | None. (Note: This provision imposed a deadline that passed years ago. As a result, the rule does not include this provision). |
| 40 | Termination 45 days after publication of final rule | N/A | None. (Note: Provisions specific to terminating the FSA are not relevant or substantive terms, and are not included in the rule). |
| 41 | Representations and Warranty | N/A | None. (Note: This provision is only relevant to the FSA insofar as the FSA exists in the form of a consent decree. Following promulgation of a final rule, it would no longer be relevant. As a result, the rule does not include this provision). |
| Exhibit 1 | Minimum Standards for Licensed Programs | 410.402 | None. |
| Exhibit 2 | Instructions to Service Officers re: Processing, Treatment, and Placement of Minors. | N/A | None (Note: ORR provides notice to its Federal, contractor, and care provider staff of provisions for the processing, treatment, and placement of UAC in the ORR Policy Guide and Manual of Procedures. The provisions specified in Ex. 2 are incorporated into these documents). |
| Exhibit 3 | Contingency Plan | 410.209 | None. (Note: The rule also makes provisions for influx care facilities). |
| Exhibit 4 | Agreement Concerning Facility Visits Under Paragraph 33. | N/A | Special provisions for Plaintiffs' counsel are not relevant or substantive terms of the FSA, and are not included in the rule. |
| Exhibit 5 | List of Organization to Receive Information | N/A | Special provisions for Plaintiffs' counsel are not relevant or substantive terms of the FSA, and are not included in the rule. |
| Exhibit 6 | Notice of Right to Judicial Review | N/A | None. (Note: The rule does not expressly provide for judicial review of placement/compliance, as a regulation cannot confer jurisdiction on Federal court. |

a. DHS

A primary change to DHS's current operational environment resulting from this rule is implementing an alternative licensing process. To codify the requirements of the FSA, facilities that hold minors obtain state, county, or municipal licensing where appropriate licenses are available. If no such

licensing regime is available, however, DHS will employ an outside entity to ensure that the facility complies with family residential standards established by ICE and that meet the requirements for licensing under the FSA, thus fulfilling the intent of obtaining a license from a state or local agency. This provides effectively the same substantive assurances that the state-licensing requirement exists to provide.

ICE currently meets the licensing requirements established by this rule by requiring FRCs to adhere to the Family Residential Standards and monitoring the FRCs' compliance through an existing contract. Thus, DHS will not incur additional costs in fulfilling the requirements of the alternative licensing process, given the third party licensing will continue to perform auditing reports that currently take place. However, most states do not offer licensing for facilities like the FRCs.[76] Therefore, to meet the terms of the FSA, minors who are not UACs are generally held in FRCs for less than approximately 20 days (*see* Table 10). As all FRCs would be licensed, or considered licensed, under this rule, the rule would allow the government to extend detention of some minors, and their accompanying parent or legal

guardian, in FRCs beyond the approximate 20 day point.

ICE is unable to estimate how long detention would be extended for some categories of minors and their accompanying adults in FRCs due to this rule. The average length of stay in the past is not a reliable source for future projections, and the average length of stay prior to the court decisions in 2015 and 2017 reflect other policy decisions that will not be directly affected by this rule. The number of days some minors and their accompanying adults may be detained depends on several factors, including a number of factors that are beyond the scope of this rule. These may include the number of minors and their accompanying adults who arrive in a facility on a given day; the timing and outcome of immigration court proceedings before an immigration judge; whether an individual is eligible for and granted parole or bond; issuance of travel documents by foreign governments; transportation schedule and availability; the availability of bed space in an FRC; and other laws, regulations, guidance, and policies regarding removal not subject to this rule.

Although DHS cannot reliably predict the increased average length of stay for

affected minors and their accompanying parents or legal guardians in FRCs, DHS recognizes that generally only certain groups of aliens are likely to have their length of stay in an FRC increased as a result of this rule, among other factors. For instance, aliens who have received a positive credible fear determination, and who are a flight risk or danger, may be more likely to be held throughout their asylum proceedings. Likewise, aliens who have received a negative credible fear determination, have requested review of the determination by an immigration judge, had the negative determination upheld, and are awaiting removal, are likely to be held until removal can be effectuated. In FY 2017, 16,807 minors in FRCs went through the credible fear screening process and were released. In FY 2018, 22,352 minors in FRCs went through the credible fear screening process and were released. Table 18 shows for FY 2017 and FY 2018 the number of minors who went through the credible fear screening process who were released from FRCs. It does not include those minors who were removed while detained at an FRC. Those minors who were removed from an FRC would not have their lengths of stay increased pursuant to the changes in this rule.

TABLE 18—FY 2017 & FY 2018 MINORS AT FRCs WHO WENT THROUGH CREDIBLE FEAR SCREENING PROCESS

|  | Numbers of minors at FRCs | |
|---|---|---|
|  | FY 2017 | FY 2018 |
| Positive Credible Fear Determinations | 14,993 | 20,219 |
| Negative Credible Fear Determinations | 349 | 358 |
| *Immigration Judge Review Requested* | *317* | *309* |
| *Immigration Judge Review Not Requested* | *32* | *49* |
| Administratively Closed | 1,465 | 1,775 |

Of the 14,993 minors in FY 2017 and the 20,219 in FY 2018 who had positive credible fear determinations, about 99 percent were paroled or released on their own recognizance. The remaining one percent of minors are those in categories that might have their length of stay in an FRC increased due to this rule.

Separate from the population of minors referenced in Table 18, members of a family unit with administratively final orders of removal are likely to be held until removed after this rule is finalized. 842 such minors who were detained and released at FRCs during FY 2017 and 1,434 such minors who were detained and released at FRCs during FY 2018 either had final orders

of removal at the time of their release or subsequently received final orders of removal following their release within the same FY. Minors like these 842 in FY 2017 and 1,434 in FY 2018 may be held in detention longer as a result of this rule. While DHS generally expects an increase in the average length of stay to affect only these groups, there may be others who may be affected such as family units who are not eligible for parole.

In FY 2017, the total number of minors who might have been detained longer at an FRC is estimated to be the number of minors in an FRC who were not paroled or released on their own recognizance (131), plus the number of such minors who had

negative credible fear determinations (349), plus administratively closed cases (1,465), plus those who were released and either had final orders of removals at the time of their release or subsequently received final orders following their release (842), or 2,787. In FY 2018, the total number of minors who might have been detained longer at an FRC is estimated to be the number of minors in an FRC who were not paroled or released on their own recognizance (96), plus the number of such minors who had negative credible fear determinations (358), plus administratively closed cases (1,775), plus those who were released and either had final orders of removal at the time of their release or subsequently received

---

[76] See the discussion of the definition of "licensed facility" supra.

final orders following their release (1,434), or 3,663. While the above analysis reflects the number of minors in these groups in the FY 2017 and 2018, DHS is unable to forecast the future total number of such minors. The numbers of accompanying parents or legal guardians are not included in this estimate. The 3,663 minors and their parents or legal guardians will not all be encountered at the same time, but over the course of a year, and would be detained at one of the three existing FRCs during their removal proceedings.

The remaining factor in estimating the costs attributed to a potentially increased length of stay for these groups of minors and their accompanying parent or legal guardian are the per-person per-day cost to provide detention services. As discussed previously, current FRCs are largely funded through fixed-price agreements based on the full capacity of our current facilities and thus are not primarily dependent on the number of beds filled. Accordingly, facilities are generally ready to accommodate the number of families stipulated in their contracts. Therefore, DHS believes the best proxy for the marginal cost of services for filling any available bed space at current FRCs are the variable contract costs paid by ICE to the private contractor and government entity who operate and maintain the FRCs. The fixed and variable contract costs were obtained from ICE Office of Acquisition Management. For Berks, there is a $16 per-person, per-day fee in addition to the monthly fixed contract rate. Assuming that the contract terms are the same in the future, an increased number of days that all individuals would be at an FRC may also increase this total variable fee amount. Due to the uncertainty surrounding estimating an increased length of stay and the number of aliens this may affect, the total incremental cost of this per-day per-person fee is not estimated.

Educational services are provided at the Berks and Karnes FRCs at a variable cost per-student, per-day. The cost at Karnes is $75 per-student, per-day. The FY 2018 costs for education at Berks was $75,976 per month. The FY 2017 costs at Berks for education was $79 per-student, per-day. There is a fixed monthly cost for educational services at Dilley of $342,083; it is not dependent on the number of students per day. Assuming again that future contract terms are the same, the total education cost may increase if certain aliens, like the groups described above, are detained longer. However, the incremental variable education cost is not estimated because of the uncertainty

surrounding the factors that make up the estimate of the average length of stay and the number of minors that may have an increased length of stay.

These variable costs represent the marginal cost for filling any available bed space at current facilities. They are not, however, representative of the total additional cost for bed space beyond existing contracts. If ICE awarded additional contracts for expanded bed space as a result of this rule, ICE would also incur additional fixed costs and variable costs. ICE estimates under existing contracts it would spend $319.37 per person per day ($319.37 includes both fixed and variable) to provide contracted services at an FRC and assumes a similar per-person per-day cost were ICE to expand the number of beds beyond current FRC capacity as a result of this rule.[77]

DHS notes that while additional or longer detention could result in the need for additional bed space—another potential policy outcome as a result of this rule—at this time, ICE is unable to determine how the number of FRCs may change due to this rule and thus if this rule would result in costs for building additional bed space. There are many factors that would be considered in opening a new FRC, some of which are outside the scope of this regulation, such as whether such a facility would be appropriate, based on the population of aliens crossing the border, anticipated capacity, projected average daily population, and projected costs. Moreover, such a decision depends on receiving additional resources from Congress, and ICE has to balance the detention of families with the detention and removal of single adults.

While DHS cannot conclusively determine the impact on detention costs due to factors outside of the scope of this regulation, beginning with the fluctuating number of families apprehended at the Southwest border, it does acknowledge the three existing FRCs could potentially reach capacity as a result of additional or longer detention for certain individuals. This estimate is based on current contract terms staying the same in the future and reflects an increase in the average length of stay for the affected groups of minors, potentially up to 2,878 using FY 2017 data and 3,663 using FY 2018 data, plus their accompanying parent or legal guardian. If bed space were increased as

a result of this rule, the cost would depend on the type of facility, facility size, location, and a number of other variables. ICE notes as an example that an additional 960 beds at Dilley would cost approximately $80 million.

This rule also changes current ICE practices for parole determinations to align them with applicable statutory and regulatory authority. ICE is currently complying with the June 27, 2017, court order while it is on appeal. In complying, every detained minor in expedited removal proceedings and awaiting a credible fear determination or determined not to have a credible fear receives an individualized parole determination under the considerations laid out in 8 CFR 212.5(b). However, under the rule, ICE would revert to its practice prior to the 2017 court order for those minors in expedited removal proceedings, using its parole authorities under 8 CFR 235.3 for this category of aliens in accordance with the standards implemented by Congress. *See* 8 U.S.C. 1225(b)(1)(B)(iii)(IV) ("Any alien subject to [expedited removal] shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed."). For aliens who are in expedited removal proceedings and are pending a credible fear determination or who have been found not to have such fear, release on parole can only satisfy this standard when there is a medical necessity or a law enforcement need. This change may result in fewer such minors or their accompanying parent or legal guardians being released on parole. Aliens in expedited removal proceedings are not generally detained in mandatory custody for long periods of time. Either a removal order is issued within a short amount of time or a Notice to Appear is issued, which may make the alien eligible for various forms of release. Consequently, DHS does not anticipate that these changes will result in extended periods of detention for minors who are in expedited removal proceedings.

The TVPRA reinterpretation may also change the current DHS operations of releasing minors only to parents or legal guardians by adding language to permit release of a minor to someone other than a parent or legal guardian, specifically an adult relative (brother, sister, aunt, uncle, or grandparent) not in detention. DHS is unable to estimate the potential costs and burden of training CBP and ICE officers to operationalize this change in regards to vetting these adult relatives and coordinating the releases. DHS expects that this change may increase the releases of accompanied minor children from DHS custody in

---

[77] *See* Congressional Budget Justification FY 2018—Volume II, U.S. Immigration and Customs Enforcement, page 50, "An average daily rate for family beds can be calculated by dividing the total funding requirement of $291.4 million by the projected average daily population (ADP) of 2,500 for a rate of $319.37."

FRCs and could increase the detention of single adults.

With respect to CBP, the rule is not anticipated to have an impact on current operations because CBP is currently implementing the relevant and substantive terms of the FSA, the HSA, and the TVPRA.

b. HHS

HHS has complied with the FSA since the HSA's transfer of responsibility to ORR for the care and custody of UAC in 2002. The rule would implement the provisions of the FSA, and related statutes. Accordingly, HHS does not expect this rule to impose any additional costs, beyond those costs incurred by the Federal Government to establish the 810 hearings process within HHS.

This rule will shift responsibility for custody redetermination hearings for UACs, now to be referred to as 810 hearings, from DOJ to HHS. We estimate that some resources will be required to implement this shift. We believe that this burden will fall on DOJ and HHS staff, and we estimate that it will require approximately 2,000–4,000 hours to implement. This estimate reflects six to 12 staff, at the Federal General Schedule (GS)13–15 pay level, working full-time for two months to create the new system. The costs to implement the 810 hearings could average $250,000 or more, paid for by ORR out of the Refugee and Entrant Assistance Appropriation Account. Ongoing annual costs would include one administrative judge or hearing officer, one full-time administrative assistant or law clerk, an estimated 50 hours of interpretation services based on an average of 70 cases per year (half of which the government anticipates that it will not dispute), and 1.5 FTE for ORR staff at the GS 13 level. HHS estimates annual costs to be an average of $445,000. After this shift in responsibility has been implemented, we estimate that the rule will lead to no change in net resources required for 810 hearings, and therefore estimate no incremental costs or savings.

4. Benefits

The primary purpose of the rule is to adopt uniform standards for the custody and care of alien juveniles during their immigration proceedings and to ensure that they are treated with dignity and respect, in light of intervening changes in law, circumstance, and agency experience. The rule would thus implement the FSA and thereby terminate it. There are added benefits of having set rules (in the CFR), such as the ability for the Departments to move from judicial governance via a consent decree and shift to executive government via regulation. Under the FSA, the government operates in an uncertain environment subject to future court interpretations of the FSA that may be difficult or operationally impractical to implement or could otherwise hamper operations. With the regulations, DHS and HHS, along with members of the public, would have certainty as to the agencies' legal obligations and operations.

Without codifying the FSA as in this rule, family detention is a less effective tool to meet the enforcement mission of ICE. In many cases, families do not appear for immigration court hearings after being released from an FRC, and even when they do, many more fail to comply with the lawfully issued removal orders from the immigration courts and some families engage in dilatory legal tactics when ICE works to enforce those orders. In addition, if an alien is not detained at the time a final order of removal is issued, in many cases ICE will have to expend significant resources to locate, detain, and subsequently remove the alien in accordance with the final order.

Further, according to EOIR, since January 1, 2014, there have been 3,969 final removal orders issued for 5,326 cases that began in FRCs and were completed as of March 31, 2019. Of these final removal orders, 2,281 were issued *in absentia*. In other words, of completed cases that began in FRCs, 43 percent were final orders of removal issued *in absentia*. (*See* Table 2.) DHS OIS has found that when looking at all family unit aliens encountered at the Southwest Border from FY 2014 through FY 2018, for family units who were detained at FRCs and for those who were not detained at FRCs, the *in absentia* rate for completed cases as of the end of FY 2018 was 66 percent. (*See* Table 3.) Based on the similar timeframes of these two rates, DHS can assume that family units who did not start their cases in FRCs have a higher *in absentia* rate. However, this does not account for other factors that may or may not have an impact the likelihood of appearance, such as enrollment in a monitoring program or access to representation. However, DHS still concludes that the *in absentia* rates of family units even who started their cases at an FRC warrants detention throughout proceedings.

By departing from the FSA in limited cases to reflect the intervening statutory and operational changes and agency experience, DHS is reflecting its existing discretion to detain families together, as appropriate, given enforcement needs, which will ensure that family detention remains an effective enforcement tool.

This rule does not require the addition of new bed space, but by allowing alternative licensing for FRCs it does remove a barrier to DHS's use of its Congressionally-authorized detention authority, allowing families to stay together through the duration of their immigration proceedings.

By codifying the FSA, HHS has opened the underlying basis for its policies and procedures for notice and comment. The discussion our final rule in the preamble explains that HHS is and large adopting the specific text from the FSA with little variance. The main exception would be the transfer bond redetermination hearings from courts to a hearing officer within HHS. HHS believes this will result in more expedient review of cases, with new added protections for UAC (by placing the burden of initial production on the government) to deny release of a UAC based on danger or risk of flight.

The regulations are also designed to eliminate judicial management, through the FSA, of functions Congress delegated to the executive branch.

5. Conclusion

This rule implements the provisions of the FSA, the HSA, and the TVPRA, in light of current circumstances and considering public input received on the NPRM. The Departments consider current operations and procedures for implementing the terms of the FSA, the HSA, and the TVPRA to be the baseline for this analysis. Because these costs are already being incurred, they are not costs of this rule. The primary source of new costs for the rule would be a result of the alternative licensing process, changes to current ICE parole determination practices to align them with applicable statutory and regulatory authority, and the costs of shifting hearings from DOJ to HHS. ICE expects the alternative licensing process and changes to current parole determination practices to extend detention of certain minors in FRCs. This may result in additional or longer detentions for certain minors, increasing annual variable costs paid by ICE to the operators of current FRCs and costs to the individuals being detained. In addition, if ICE awarded additional contracts for expanded bed space as a result of this rule, ICE would also incur additional fixed costs and variable costs. But due to the uncertainty surrounding estimating an increased length of stay and the number of aliens this may affect, this incremental cost is not quantified.

6. Alternatives

a. No Regulatory Action

The Departments considered not promulgating this rule. The Departments had been engaged in this alternative prior to proposing this rule, which has required the Government to adhere to the terms of the FSA, as interpreted by the courts, which also rejected the Government's efforts to amend the FSA to help it better conform to existing legal and operational realities. Continuing with this alternative would likely require the Government to operate through non-regulatory means in an uncertain environment subject to currently unknown future court interpretations of the FSA that may be difficult or operationally impracticable to implement and that could otherwise hamper operations. The Departments also reject this alternative because it does not address the current conflict between certain portions of the FSA, the HSA, and the TVPRA or the current operational environment, as the FSA is over twenty years old.

b. Comprehensive FSA/TVPRA/Asylum Regulation

The Departments considered proposing within this regulatory action additional regulations addressing further areas of authority under the TVPRA, to include those related to asylum proceedings for UACs. The Departments rejected this alternative in order to focus this regulatory action on implementing the terms of the FSA, and provisions of the HSA and TVPRA where they intersect with the FSA's provisions. Promulgating this more targeted regulation does not preclude the Departments from subsequently issuing regulations to address broader issues.

c. Promulgate Regulations—Preferred Alternative

Legacy INS's successors are obligated under the FSA to initiate action to publish the relevant and substantive terms of the FSA as regulations. In the 2001 Stipulation, the parties agreed to a termination of the FSA "45 days following the defendants' publication of final regulations implementing this Agreement." Under this alternative, the Departments are proposing to implement the FSA and thereby to terminate it. In particular, the Departments are publishing regulations that generally mirror the relevant and substantive terms of the FSA as regulations, while maintaining the operational flexibility necessary to continue operations and ensuring that

minors and UACs continue to be treated in accordance with the HSA, and the TVPRA, and accounting for changes in law, agency expertise, current operational circumstances, and public comment pursuant to the rulemaking provisions of the APA.

B. Regulatory Flexibility Act

The Regulatory Flexibility Act of 1980 (RFA), 5 U.S.C. 601–612, as amended, requires Federal agencies to consider the potential impact of regulations on small entities during rulemaking. The term "small entities" comprises small business, not-for-profit organizations that are independently owned and operated and are not dominant in their fields, and governmental jurisdictions with populations of less than 50,000. Individuals are not considered by the RFA to be a small entity.

A final regulatory flexibility analysis follows.

1. A statement of the need for, and objectives of, the rule.

The purpose of this action is to promulgate regulations that implement the relevant and substantive terms of the FSA. This rule implements the relevant and substantive terms of the FSA and provisions of the HSA and TVPRA where they necessarily intersect with the FSA's provisions. Publication of final regulations will result in termination of the FSA, as provided for in FSA paragraph 40.

2. A statement of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, a statement of the assessment of the agency of such issues, and a statement of any changes made in the proposed rule as a result of such comments.

DHS did not receive any public comments raising issues in response to the initial regulatory flexibility analysis and did not make any revisions to the final rule for small entities.

Section 462 of the HSA also transferred to the ORR Director "functions under the immigration laws of the United States with respect to the care of unaccompanied alien children that were vested by statute in, or performed by, the Commissioner of Immigration and Naturalization." 6 U.S.C. 279(a). The ORR Director may, for purposes of performing a function transferred by this section, "exercise all authorities under any other provision of law that were available with respect to the performance of that function to the official responsible for the performance of the function" immediately before the transfer of the program. 6 U.S.C. 279(f)(1).

Consistent with provisions in the HSA, and 8 U.S.C. 1232(a), the TVPRA places the responsibility for the care and custody of UACs with the Secretary of Health and Human Services. Prior to the transfer of the program, the Commissioner of Immigration and Naturalization, through a delegation from the Attorney General, had authority "to establish such regulations . . . as he deems necessary for carrying out his authority under the provisions of this Act." INA sec. 103(a)(3), 8 U.S.C. 1103(a)(3) (2002); 8 CFR 2.1 (2002). In accordance with the relevant savings and transfer provisions of the HSA, see 6 U.S.C. 279, 552, 557; see also 8 U.S.C. 1232(b)(1); the ORR Director now possesses the authority to promulgate regulations concerning ORR's administration of its responsibilities under the HSA and TVPRA.

The response of the agency to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration in response to the proposed rule, and a detailed statement of any change made to the proposed rule in the final rule as a result of the comments.

DHS did not receive comments from the Chief Counsel for Advocacy of the Small Business Administration in response to the proposed rule.

4. A description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available.

This rule would directly regulate DHS and HHS. DHS contracts with private contractors and a local government to operate and maintain FRCs, and with private contractors to provide transportation of minors and UACs. This rule would indirectly affect these entities to the extent that DHS contracts with them under the terms necessary to fulfill the FSA. To the degree this rule increases contract costs to DHS private contractors, it would be incurred by the Federal Government in the cost paid by the contract.

ICE currently contracts with three operators of FRCs, two of which are businesses and the other a local governmental jurisdiction. ICE and CBP also each have one contractor that provides transportation. To determine if the private contractors that operate and maintain FRCs and the private contractors that provide transportation are small entities, DHS references the Small Business Administration (SBA) size standards represented by business average annual receipts. SBA's Table of Small Business Size Standards is matched to the North American Industry Classification System (NAICS)

for these industries.[78] To determine if the local government that operates and maintains an FRC is a small entity, DHS applies the 50,000 size standard for governmental jurisdictions.

DHS finds that the revenue of the private contractors that operate and maintain two of the three FRCs to be greater than the SBA size standard of the industry represented by NAICS 531110: Lessors of Residential Buildings and Dwellings. The size standard classified by the SBA is $38.5 million for lessors of buildings space to the Federal Government by Owners.[79] The county population of the local government that operates and maintains the other FRC is over 50,000, based on 2018 U.S. Census Bureau annual resident population estimates.[80]

DHS finds that the revenue of the two private contractors that provide transportation to minors, in some cases their family members, and to UACs for DHS to be greater than the SBA size standard of these industries.[81] The SBA size standard for NAICS 561210 Facilities Support Services is $38.5 million. The SBA size standards for NAICS 561612 Security Guards and Patrol Services is $20.5 million.

The changes to DHS regulations would not directly impact any small entities.

Currently, HHS funds 53 grantees to provide services to UACs. HHS finds that most of the 53 current grantees, the majority of which are non-profits (49 out of 53), do not appear to be dominant in their field. Consequently, HHS believes all 53 grantees are likely to be small entities for the purposes of the RFA.

5. A description of the projected reporting, recordkeeping, and other compliance requirements of the rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record.

The rule would implement the relevant and substantive terms of the FSA in regulations. ICE believes the FRCs, which are operated and maintained by private contractors or a local government, comply with these provisions, and will continue to comply through future contract renewals. To the extent this rule increases variable contract costs, such as a per student per day education cost, to any detention facilities, the cost increases would be passed along to the Federal Government in the cost paid for the contract. However, DHS cannot say with certainty how much, if any, increase in variable education costs would result from this rule.

A primary source of new costs for the rule is as a result of the alternative licensing process. ICE currently fulfills the requirements being finalized as an alternative to licensing through its existing FRC contracts. To codify the requirements of the FSA, this rule requires that facilities that hold minors obtain state, county, or municipal licensing where appropriate licenses are available. If no such licensing regime is available, however, DHS will employ an outside entity with relevant audit experience to ensure that the facility complies with family residential standards established by ICE and that meet the requirements for licensing under the FSA. That would fulfill the goals of obtaining a license from a state or local agency. Most States do not offer licensing for facilities like the FRCs.[82] Therefore, to meet the terms of the FSA, minors are generally held in FRCs for less than 20 days (*see* Table 10). As all FRCs would be licensed under this rule, the rule may result in extending detention of some minors and their accompanying parent or legal guardian in FRCs beyond 20 days. Additionally, this rule would change ICE parole determination practices, which may result in fewer aliens being paroled.

An increase in the average length of detention may increase the variable costs paid by ICE to the private contractors who operate and maintain current FRCs, as compared to the current operational environment. In addition, if ICE awarded additional contracts for expanded bed space as a result of this rule, ICE would also incur additional fixed costs and variable costs. Due to many uncertainties surrounding the forecast, DHS is unable to estimate the incremental variable costs due to this rule. Refer to Section VI.A. Executive Orders 12866 and 13563: Regulatory Review for the description of the uncertainties. In addition, DHS notes that additional or longer detention could result in the need for additional bed space; however, there are many factors that would be considered in opening a new FRC and at this time ICE is unable to determine if this rule would result in additional bed space.

As discussed above, DHS would incur these potential costs through the cost paid for the contract with these facilities, and could incur costs to build new facilities or add additional beds. There are no cost impacts on the contracts for providing transportation because this rule codifies current operations.

6. A description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected.

The Departments are not aware any alternatives to the rule which accomplish the stated objectives that would minimize economic impact of the rule on small entities.

*C. Small Business Regulatory Enforcement Fairness Act of 1996*

As indicated in the Executive Orders 12866, 13563: Regulatory Review, Section VII, the rule may have an effect on the government and its contractors who provide operation and maintenance of its family residential facilities. DHS and HHS prepared both initial and final RFA analyses.

*D. Unfunded Mandates Reform Act*

The Unfunded Mandates Reform Act of 1995 (UMRA), Public Law 104–4, 109 Stat. 48 (codified at 2 U.S.C. 1501 *et seq.*), is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and tribal governments. Title II of the Act requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed or final agency rule that may result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector. 2 U.S.C. 1532(a). The value equivalent of $100 million in 1995 adjusted for inflation to 2017 levels by the Consumer Price Index for All Urban Consumer (CPI–U) is $161 million.

This rule may not exceed the $100 million expenditure threshold in any 1 year when adjusted for inflation. Though this rule would not result in such an expenditure, the Departments discuss the effects of this rule elsewhere

---

[78] U.S. Small Business Administration, Tables of Small Business Size Standards Matched to NAICS Codes (Oct. 1, 2017), available at *https://www.sba.gov/sites/default/files/files/Size_Standards_Table_2017.xlsx.*

[79] DHS obtained NAICS codes and 2018 annual sales data from *Hoovers.com.*

[80] Annual Estimates of the Resident Population for Counties: April 1, 2010 to July 1, 2018. Source: U.S. Census Bureau, Population Division, *https://www.census.gov/data/tables/time-series/demo/popest/2010s-counties-total.html.*

[81] DHS obtained NAICS codes and 2018 annual sales data from *Hoovers.com* and *ReferencesUSA.com.*

[82] See the discussion of the definition of "licensed facility" supra.

in this preamble. Additionally, UMRA excludes from its definitions of "Federal intergovernmental mandate," and "Federal private sector mandate" those regulations imposing an enforceable duty on other levels of government or the private sector which are a "condition of Federal assistance." 2 U.S.C. 658(5)(A)(i)(I), (7)(A)(i). The FSA provides the Departments with no direct authority to mandate binding standards on facilities of state and local governments or on operations of private sector entities. Instead, these requirements would impact such governments or entities only to the extent that they make voluntary decisions to contract with the Departments. Compliance with any standards that are not already otherwise in place resulting from this rule would be a condition of ongoing Federal assistance through such arrangements. Therefore, this rulemaking contains neither a Federal intergovernmental mandate nor a private sector mandate.

*E. Congressional Review Act*

While Executive Order 12866 has a standard of whether the rule *may* have an impact of $100 million or more in any given year, the CRA standard is whether a rule has or is *likely* to have an annual impact of $100 million or more. In the vast majority of cases, if a rule is economically significant it is also major. In this case, however, given budget uncertainties, ICE's overall need to prioritize bed space for operational considerations (such as the recent use of the Karnes FRC for single adult female detention), and other operational flexibilities preserved under this rule, it is not *likely* that this rule will result in an annual economic impact of $100 million or more. The Office of Information and Regulatory Affairs has thus determined that this rule is not major under 5 U.S.C. 804.

The Departments note, however, that the rule will still be published with a 60-day delayed effective date.

*F. Paperwork Reduction Act*

All Departments are required to submit to OMB for review and approval, any reporting or recordkeeping requirements inherent in a rule under the Paperwork Reduction Act of 1995, Public Law 104–13, 109 Stat. 163 (1995) (codified at 44 U.S.C. 3501 *et seq.*). This rule does not create or change a collection of information, therefore, is not subject to the Paperwork Reduction Act requirements.

However, as required by the Paperwork Reduction Act of 1995 (44 U.S.C. 3507(d)), ACF submitted a copy of this section to OMB for its review.

This rule complies with settlement agreements, court orders, and statutory requirements, most of whose terms have been in place for over 20 years. This rule would not require additional information collection requirements beyond those requirements. The reporting requirements associated with those practices have been approved under the requirements of the Paperwork Reduction Act and in accordance with 5 CFR part 1320. ACF received approval from OMB for use of its forms on June 26, 2019, with an expiration date of June 30, 2022 (OMB Control Number 0970–0278). Separately, ACF received approval from OMB for its placement and service forms on July 6, 2017, with an expiration date of July 31, 2020 (OMB Control Number 0970–0498); a form associated with the specific consent process is currently pending approval with OMB (OMB Control Number 0970–0385).

*G. Executive Order 13132: Federalism*

This final rule does not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. This final rule implements the FSA by codifying the Departments' practices that comply with the terms of the FSA and relevant law for the processing, transfer, and care and custody of alien juveniles. In codifying these practices, the Departments were mindful of their obligations to meet the requirements of the FSA while also minimizing conflicts between State law and Federal interests.

Insofar as the rule sets forth standards that might apply to immigration detention facilities and holding facilities operated by contract with State and local governments and private entities, this rule has the potential to affect the States, although it would not affect the relationship between the National Government and the States or the distribution of power and responsibilities among the various levels of government and private entities. With respect to the State and local agencies, as well as the private entities, that contract with DHS and operate these facilities across the country, the FSA provides DHS with no direct authority to mandate binding standards on their facilities. But these requirements will impact the State, local, and private entities only to the extent that they make voluntary decisions to contract with DHS for the processing, transportation, care, or custody of alien juveniles. This

approach is fully consistent with DHS's historical relationship to State and local agencies in this context.

Typically, HHS enters into cooperative agreements or contracts with non-profit organizations to provide shelter, care, and physical custody for UACs in a facility licensed by the appropriate State or local licensing authority. Where HHS enters into cooperative agreements or contracts with a state licensed facility, ORR requires that the non-profit organization administering the facility abide by all applicable State or local licensing regulations and laws. ORR designed agency policies and these regulations as well as the terms of HHS cooperative agreements and contracts with the agency's grantees/contractors to complement appropriate State and licensing rules, not supplant or replace the requirements.

Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

*H. Executive Order 12988: Civil Justice Reform*

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988, *Civil Justice Reform,* to minimize litigation, eliminate ambiguity, and reduce burden.

*I. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use*

Executive Order 13211 requires agencies to consider the impact of rules that significantly impact the supply, distribution, and use of energy. DHS has reviewed this rule and determined that it is not a "significant energy action" under the order because, while it is a "significant regulatory action" under Executive Order 12866, it does not have a significant adverse effect on the supply, distribution, or use of energy. The Administrator of the Office of Information and Regulatory Affairs has not designated it as a significant energy action. Therefore, this rule does not require a Statement of Energy Effects under Executive Order 13211.

*J. National Environmental Policy Act (NEPA)*

The Departments certified that the proposed rule did not require an Environmental Assessment or Environmental Impact Statement under the National Environmental Policy Act (NEPA) because it is an action that does

not individually or cumulatively have a significant effect on the human environment and it is covered within each Department's list of Categorically Excluded (CATEX) actions.

*Comments.* The Departments received two comments representing the views of eight organizations on this certification. The commenters contend that:

• None of the cited CATEXs apply to the proposed rule;

• the rulemaking will likely have significant effects resulting from the expansion of the detention system that would constitute "extraordinary circumstances" invalidating the use of any categorical exclusions;

• the rulemaking is part of a larger action, invalidating the reliance on a categorical exclusion;

• NEPA applies to broad Federal actions, such as the adoption of new agency programs;

• that the proposed rule significantly changes DHS's operation with regard to unaccompanied alien children and family units entering the United States;

• the proposed rule will cause the construction of dozens of new facilities;

• that the proposed rule, if implemented, would require indefinite detention of family units.

The commenters contend that if the final rule adopts everything in the proposed rule, new facilities will be required to be built, and the construction and operation of these facilities will produce environmental effects such as pollution, increased flooding risk, and destruction of wildlife habitats, wetlands, and scenic areas. The commenters also suggested that surrounding communities, migrant children, and construction workers might be exposed to toxic contaminants and increased traffic and garbage from the operations of these facilities.

One of the commenters stated that DHS was incorrect in its application of a CATEX to the proposed rule because DHS was evaluating the proposed rule only (the implementation of the FSA), instead of considering the rulemaking as part of a larger action that includes the Zero Tolerance Policy[83] and the implementation of Executive Order 13841, *Affording Congress an Opportunity to Address Family Separation,* June 20, 2018.

One commenter stated that neither DHS CATEX identified in the proposed rule, CATEX A3(b) or A3(d), is applicable and that the proposed rule is a new policy and regulation that would

require indefinite detention, which affects the quality of the human environment. Another commenter stated that neither the HHS CATEX nor the two DHS CATEXs identified in the proposed rule apply. The commenter said that HHS relied on a CATEX for grants for social services because its state licensed facilities are operated under social service grants, but that the CATEX includes an exception for projects that involve construction, renovation, or any changes in land use. The commenter suggested that HHS' contention that the exception does not apply because HHS lacks construction authority is simply an attempt to evade further NEPA review. Additionally, this commenter contended that HHS' authority and actions with respect to UACs reach beyond giving grants to state-licensed facilities because they make age determinations, transfer children between HHS facilities, determine if a child is an escape risk, and release the children from HHS custody. The same commenter claimed that the Departments' CATEXs fail because NEPA makes it unlawful to apply CATEXs if there is the potential for significant impacts.

*Response.* The commenters suggested that the proposed rule will likely have significant environmental effects resulting from the expansion of the detention system, but neither the proposed rule nor the final rule specify or compel any expansion in detention capacity. DHS has indicated in the NPRM that it is unable to determine how the number of FRCs might change due to this final rule. Many factors, including factors outside of the scope of the final rulemaking that cannot be predicted (such as congressional appropriations) or are presently too speculative, would need to be considered by DHS prior to opening new detention space.

While the new construction, renovation, or repurposing of facilities for FRCs is one potential future consequence of the final rule, the final rule itself does not prescribe increases in FRC capacity or any locations where new facilities might be built. The final rule also does not require longer detention of family units. Although longer detention is made possible by the final rule, the environmental impacts from the operation of existing FRCs would not foreseeably change with longer periods of detention for members of alien family units. Potentially longer detention times do not translate to changes in capacity of FRCs; it could just mean that certain members of alien family units are detained for longer periods of time

whilst others are released. Thus, existing FRC capacity levels would not necessarily change.

Substantive proposals regarding FRC space that could be meaningfully analyzed in accordance with the NEPA have not been proposed. The extent to which new FRCs are constructed, or existing FRCs are utilized, is dependent on numerous factors outside the scope of the final rule, which does not mandate operational requirements pertaining to new FRCs. For example, DHS/ICE decisions to increase FRC capacity would consider the costs associated with housing families and the availability of Congressional appropriations. The final rule neither prescribes expansion of detention space nor describes any substantive, reliable information regarding change in detention capacity that could be reasonably evaluated under NEPA. Thus, the commenters' suggestions that the proposed rule will result in "tremendous growth" in detention capacity with "cumulatively significant impacts on the human environment" or that it will result in the "construction of dozens of new encampments and detention facilities" are highly speculative and not supported by the rulemaking.

The commenters also suggested that extraordinary circumstances exist due to the degree to which the proposed rule will affect sensitive environments, public health and safety, and cumulative impacts. But again, the final rule has no immediate significant effect on the environment, and any future effect related to hypothetical circumstances is too speculative to evaluate. The final rule does not compel the new development or repurposing of FRCs or changes in FRC capacity. Thus, there is no substantive nexus of the final rule with environmental health and safety at FRCs that would pose an extraordinary circumstance.

One commenter suggested that an EIS should be prepared because the effects of the regulatory changes are highly controversial, but highly controversial for NEPA purposes means there is a substantial dispute as to the size, nature, or effect of an action. The existence of public opposition to a use does not of itself make a proposal highly controversial. DHS has determined that the effects of the final rule are not highly controversial in terms of scientific validity, are not likely to be highly uncertain, and are not likely to involve unique or unknown environmental risks. If, in the future, DHS were to propose the construction or renovation of facilities for FRCs, those projects would be subjected to

---

appropriate NEPA analysis for their potential environmental impact at that time. DHS has determined that this action is not highly controversial and does not require an environmental impact statement (EIS). No extraordinary circumstances exist that preclude reliance upon CATEX A3(d).

The final rule is not part of a larger action as some have suggested. The final rule is not a part of a larger action because it does not trigger other actions and does not depend on concurrent, previous, or future actions for its rationale. The final rule does not compel a program of detaining children and families. As noted in the NPRM, DHS currently has three primary options for purposes of immigration custody: (1) Release all family members into the United States, (2) detain the parent(s) or legal guardian(s) and either release the juvenile to another parent or legal guardian or suitable adult relative, or transfer the child to HHS to be treated as UAC, or (3) detain the family unit together by placing them at an appropriate FRC during their immigration proceedings.

If, in the future, DHS proposes to commit funds to acquire, build, or renovate facilities to house family units, DHS might be considering actions beyond administrative and regulatory activities falling under CATEX A3(d), and would need to evaluate the proper level of environmental review required under NEPA at that time. However, as noted previously, this final rule does not compel or prescribe that DHS commit funds for family residential detention space, and no substantive proposals for additional FRC space that could be meaningfully analyzed under NEPA have been proposed.

The final rule promulgates regulations that will reflect changes in the authorities governing the detention of unaccompanied alien children and alien family units. The final rule neither proposes any actions that would significantly impact the human environment nor compels irreversible and irretrievable commitments of resources. The final rule fits completely within CATEX A3(d), and there are no extraordinary circumstances that would preclude the application of this CATEX. Therefore, it is appropriate for DHS to exclude the final rule from further environmental review using CATEX A3(d).

HHS disagrees with commenters who contend NEPA applies to the HHS portion of the rule or requires an environmental assessment or impact statement for such portion. NEPA does not apply to the HHS portion of the rule, because that portion does not change

HHS' UAC Program's procedures. The UAC Program is already run in compliance with the FSA and applicable statutes, including as set forth in this final rule. NEPA applies when there are "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. 4332. However, in this rule HHS is not taking any Federal action that makes major changes the status quo or changes government policy such that it would "affect" the quality of the human environment. Rather, HHS merely memorializes some of the existing UAC program procedures in a regulation, rather than where they reside now, in a settlement agreement, statutes, and the ORR UAC policy guide. Because the rule does not change the UAC Program, it does not significantly affect the quality of the human environment to implicate NEPA. Some commenters have pointed out that the section "810" hearings as a change from the Flores settlement agreement. With respect to 810 hearings, those hearings also already occur, but at one component of the government—DOJ—instead of at HHS, as set forth in this rule.

The rule neither increases nor fundamentally changes the nature of those hearings, and transferring the hearings process has no environmental effect. Moreover, hearings, in themselves, do not affect human environment. Therefore, NEPA also does not apply to that part of the rule.

In addition, to the extent the HHS portion of the rule could be considered subject to NEPA, HHS has determined that it falls into several exclusions. First, it falls into a programmatic exclusion, by which HHS has determined that the rule will not significantly affect the human environment or affect an asset. Under HHS policy programmatic exclusions are available in instances where the program has reviewed the actions being taken and concluded that the program or activity will not normally "significantly affect" the human environment; or will not normally affect an asset. In this case, again, HHS is merely codifying provisions already found in a settlement agreement and thus has concluded that the final rule does not affect the human environment, because it does not change the human environment as compared to functions currently in operation. In addition, HHS is subject to the categorical exclusion listed in section 30–20–40 of the General Administration Manual (available at: *https://www.hhs.gov/hhs-manuals/gam-part-30/302000/index.html*) for grants for social services, as the UAC program operates pursuant to grants—and for

adoption of regulations and guidelines pertaining to such grants. It is notable that both the Homeland Security Act and the TVPRA encouraged HHS to use grant programs to carry out the program. 6 U.S.C. 279(b)(3) (encouraging ORR to use the "refugee children foster care system program" established using grants for unaccompanied refugee minors); 8 U.S.C. 1232(i) (authorizing use of grants to carry out the UAC program).

If, in the future, HHS will commit funds for projects involving construction, renovation, or changes in land use, HHS would go beyond the CATEX at 30–20–40, and thus would need to evaluate the proper level of environmental review required under NEPA at that time.

HHS disagrees with commenters who contend the HHS portion of the rule will involve a change in the capacity of the UAC program or will change activities such as the construction of facilities. Changes to the UAC program's capacity and need for facilities occur, or do not occur, under the norms that govern the UAC program preexisting this rule—the FSA, applicable statutes, and ORR's UAC policy guide. This rule does not change those norms, but merely places some in regulations. Changes to capacity of the program or to construction or use of facilities occur for other reasons, such as because of increases in UAC crossing the border, and are not attributable to the codification of these rules.

### K. Executive Order 12630: *Governmental Actions and Interference With Constitutionally Protected Property Rights*

This final rule will not cause a taking of private property or otherwise have taking implications under Executive Order 12630, *Governmental Actions and Interference with Constitutionally Protected Property Rights*.

### L. Executive Order 13045: *Protection of Children From Environmental Health Risks and Safety Risks*

Executive Order 13045 requires agencies to consider the impacts of environmental health risk or safety risk that may disproportionately affect children. The Departments have reviewed this final rule and determined that this rule is an economically significant rule but does not create an environmental risk to health or risk to safety that may disproportionately affect children. Therefore, the Departments have not prepared a statement under this executive order.

## M. National Technology Transfer and Advancement Act

The National Technology Transfer and Advancement Act of 1995 (15 U.S.C. 272 note) directs agencies to use voluntary consensus standards in their regulatory activities unless the agency provides Congress, through OMB, with an explanation of why using these standards would be inconsistent with applicable law or otherwise impracticable. Voluntary consensus standards are technical standards (*e.g.,* specifications of materials, performance, design, or operation; test methods; sampling procedures; and related management systems practices) that are developed or adopted by voluntary consensus standards bodies. This rule does not use technical standards. Therefore, the Departments did not consider the use of voluntary consensus standards.

## N. Family Assessment

The Departments have reviewed this rule in accordance with the requirements of section 654 of the Treasury General Appropriations Act, 1999, Public Law 105–277. The impacts of the rule on families and family well-being are myriad and complex, and discussed in greater detail elsewhere in the preamble. In general, with respect to family well-being, this final rule substantially codifies current requirements of settlement agreements, court orders, and statutes, most of whose terms have been in place for over 20 years, as well as HHS' related authorities. The changes implemented by this rule are a result of intervening statutes or operational realities. With respect to the criteria specified in section 654(c)(1), for DHS, the rule places a priority on the stability of the family and the authority and rights of parents in the education, nurture, and supervision of their children, within the immigration detention context, as parents maintain parental rights and supervision of their children within FRCs. This rule provides an option for families to stay together where detention is required and appropriate, but also provides for release in some circumstances. The rule also codifies in regulation certain statutory policies with respect to the treatment of UACs. For HHS, the primary specific change in the rule beyond current practice is the movement of hearings from DOJ to HHS pursuant to § 410.810. That specific change does not have a particular impact on family well being.

## List of Subjects

### 8 CFR Part 212

Administrative practice and procedure, Aliens, Immigration, Passports and visas, Reporting and recordkeeping requirements.

### 8 CFR Part 236

Administrative practice and procedure, Aliens, Immigration.

### 45 CFR Part 410

Administrative practice and procedure, Child welfare, Immigration, Reporting and recordkeeping requirements, Unaccompanied alien children.

## DEPARTMENT OF HOMELAND SECURITY

### 8 CFR Chapter I

For the reasons set forth in the preamble, parts 212 and 236 of chapter I of title 8 are amended as follows:

## PART 212—DOCUMENTARY REQUIREMENTS; NONIMMIGRANTS; WAIVERS; ADMISSION OF CERTAIN INADMISSIBLE ALIENS; PAROLE

■ 1. The authority citation for part 212 continues to read as follows:

**Authority:** 6 U.S.C. 111, 202(4) and 271; 8 U.S.C. 1101 and note, 1102, 1103, 1182 and note, 1184, 1185 note (section 7209 of Pub. L. 108–458), 1187, 1223, 1225, 1226, 1227, 1255, 1359; 8 CFR part 2.

■ 2. Amend § 212.5 by revising paragraphs (b) introductory text, (b)(3) introductory text, and (b)(3)(i) and (ii) to read as follows:

### § 212.5   Parole of aliens into the United States.

\*   \*   \*   \*   \*

(b) The parole of aliens within the following groups who have been or are detained in accordance with § 235.3(c) of this chapter would generally be justified only on a case-by-case basis for "urgent humanitarian reasons or "significant public benefit," provided the aliens present neither a security risk nor a risk of absconding:

\*   \*   \*   \*   \*

(3) Aliens who are defined as minors in § 236.3(b) of this chapter and are in DHS custody. The Executive Assistant Director, Enforcement and Removal Operations; directors of field operations; field office directors, deputy field office directors; or chief patrol agents shall follow the guidelines set forth in § 236.3(j) of this chapter and paragraphs (b)(3)(i) through (ii) of this section in determining under what conditions a minor should be paroled from detention:

(i) Minors may be released to a parent, legal guardian, or adult relative (brother, sister, aunt, uncle, or grandparent) not in detention.

(ii) Minors may be released with an accompanying parent or legal guardian who is in detention.

\*   \*   \*   \*   \*

## PART 236—APPREHENSION AND DETENTION OF INADMISSIBLE AND DEPORTABLE ALIENS; REMOVAL OF ALIENS ORDERED REMOVED

■ 3. The authority citation for part 236 is revised to read as follows:

**Authority:** 5 U.S.C. 301, 552, 552a; 6 U.S.C. 112(a)(2), 112(a)(3), 112(b)(1), 112(e), 202, 251, 279, 291; 8 U.S.C. 1103, 1182, 1224, 1225, 1226, 1227, 1231, 1232, 1357, 1362; 18 U.S.C. 4002, 4013(c)(4); 8 CFR part 2.

■ 4. Section 236.3 is revised to read as follows:

### § 236.3   Processing, detention, and release of alien minors.

(a) *Generally.* (1) DHS treats all minors and unaccompanied alien children (UACs) in its custody with dignity, respect and special concern for their particular vulnerability.

(2) The provisions of this section apply to all minors in the legal custody of DHS, including minors who are subject to the mandatory detention provisions of the INA and applicable regulations, to the extent authorized by law.

(b) *Definitions.* For the purposes of this section:

(1) *Minor* means any alien who has not attained eighteen (18) years of age and has not been:

(i) Emancipated in an appropriate state judicial proceeding; or

(ii) Incarcerated due to a conviction for a criminal offense in which he or she was tried as an adult.

(2) *Special needs minor* means a minor whose mental and/or physical condition requires special services and treatment as identified during an individualized needs assessment as referenced in paragraph (i)(4)(iii) of this section. A minor may have special needs due to drug or alcohol abuse, serious emotional disturbance, mental illness or intellectual disability, or a physical condition or chronic illness that requires special services or treatment. A minor who has suffered serious neglect or abuse may be considered a minor with special needs if the minor requires special services or treatment as a result of the neglect or abuse.

(3) *Unaccompanied alien child* (UAC) has the meaning provided in 6 U.S.C. 279(g)(2), that is, a child who has no

lawful immigration status in the United States and who has not attained 18 years of age; and with respect to whom: There is no parent or legal guardian present in the United States; or no parent or legal guardian in the United States is available to provide care and physical custody. An individual may meet the definition of UAC without meeting the definition of minor.

(4) *Custody* means within the physical and legal control of an institution or person.

(5) *Emergency* means an act or event (including, but not limited to, a natural disaster, facility fire, civil disturbance, or medical or public health concerns at one or more facilities) that prevents timely transport or placement of minors, or impacts other conditions provided by this section.

(6) *Escape-risk* means that there is a serious risk that the minor will attempt to escape from custody. Factors to consider when determining whether a minor is an escape-risk include, but are not limited to, whether:

(i) The minor is currently subject to a final order of removal;

(ii) The minor's immigration history includes: A prior breach of bond, a failure to appear before DHS or the immigration courts, evidence that the minor is indebted to organized smugglers for his transport, or a voluntary departure or previous removal from the United States pursuant to a final order of removal; or

(iii) The minor has previously absconded or attempted to abscond from state or Federal custody.

(7) *Family unit* means a group of two or more aliens consisting of a minor or minors accompanied by his/her/their adult parent(s) or legal guardian(s). In determining the existence of a parental relationship or a legal guardianship for purposes of this definition, DHS will consider all available reliable evidence. If DHS determines that there is insufficient reliable evidence available that confirms the relationship, the minor will be treated as a UAC.

(8) *Family Residential Center (FRC)* means a facility used by ICE for the detention of family units.

(9) *Licensed facility* means an ICE detention facility that is licensed by the state, county, or municipality in which it is located, if such a licensing process exists. Licensed facilities shall comply with all applicable state child welfare laws and regulations and all state and local building, fire, health, and safety codes. If a licensing process for the detention of minors accompanied by a parent or legal guardian is not available in the state, county, or municipality in which an ICE detention facility is

located, DHS shall employ an entity outside of DHS that has relevant audit experience to ensure compliance with the family residential standards established by ICE. Such audits will take place at the opening of a facility and on a regular, ongoing basis thereafter. DHS will make the results of these audits publicly available.

(10) *Influx* means a situation in which there are, at any given time, more than 130 minors or UACs eligible for placement in a licensed facility under this section or corresponding provisions of ORR regulations, including those who have been so placed or are awaiting such placement.

(11) *Non-secure facility* means a facility that meets the definition of non-secure under state law in the state in which the facility is located. If no such definition of non-secure exists under state law, a DHS facility shall be deemed non-secure if egress from a portion of the facility's building is not prohibited through internal locks within the building or exterior locks and egress from the facility's premises is not prohibited through secure fencing around the perimeter of the building.

(12) *Office of Refugee Resettlement (ORR)* means the U.S. Department of Health and Human Services, Administration for Children and Families, Office of Refugee Resettlement.

(c) *Age determination.* (1) For purposes of exercising the authorities described in this part, DHS shall determine the age of an alien in accordance with 8 U.S.C. 1232(b)(4). Age determination decisions shall be based upon the totality of the evidence and circumstances.

(2) If a reasonable person would conclude that an individual is an adult, despite his or her claim to be under the age of 18, DHS may treat such person as an adult for all purposes, including confinement and release on bond, recognizance, or other conditions of release. In making this determination, an immigration officer may require such an individual to submit to a medical or dental examination conducted by a medical professional or other appropriate procedures to verify his or her age.

(3) If an individual previously considered to have been an adult is subsequently determined to be under the age of 18, DHS will then treat such individual as a minor or UAC as prescribed by this section.

(d) *Determining whether an alien is a UAC.* (1) *Time of determination.* Immigration officers will make a determination as to whether an alien under the age of 18 is a UAC at the time

of encounter or apprehension and prior to the detention or release of such alien.

(2) *Aliens who are no longer UACs.* When an alien previously determined to have been a UAC has reached the age of 18, when a parent or legal guardian in the United States is available to provide care and physical custody for such an alien, or when such alien has obtained lawful immigration status, the alien is no longer a UAC. An alien who is no longer a UAC is not eligible to receive legal protections limited to UACs under the relevant sections of the Act. Nothing in this paragraph affects USCIS' independent determination of its initial jurisdiction over asylum applications filed by UACs pursuant to section 208(b)(3)(C) of the Act.

(3) *Age-out procedures.* When an alien previously determined to have been a UAC is no longer a UAC because he or she turns 18 years old, relevant ORR and ICE procedures shall apply.

(e) *Transfer of minors who are not UACs from one facility to another.* (1) In the case of an influx or emergency, as defined in paragraph (b) of this section, DHS will transfer a minor who is not a UAC, and who does not meet the criteria for secure detention pursuant to paragraph (i)(1) of this section, to a licensed facility as defined in paragraph (b)(9) of this section, which is non-secure, as expeditiously as possible. Otherwise, to the extent consistent with law or court order, DHS will transfer such minor within three (3) days, if the minor was apprehended in a district in which a licensed program is located, or within five (5) days in all other cases.

(2) In the case of an emergency or influx, DHS will abide by written guidance detailing all reasonable efforts that it will take to transfer all minors who are not UACs as expeditiously as possible.

(f) *Transfer of UACs from DHS to HHS.* (1) All UACs apprehended by DHS, except those who are processed in accordance with 8 U.S.C. 1232(a)(2), will be transferred to ORR for care, custody, and placement in accordance with 6 U.S.C. 279 and 8 U.S.C. 1232.

(2) DHS will notify ORR within 48 hours upon the apprehension or discovery of a UAC or any claim or suspicion that an unaccompanied alien detained in DHS custody is under 18 years of age.

(3) Unless exceptional circumstances are present, DHS will transfer custody of a UAC as soon as practicable after receiving notification of an ORR placement, but no later than 72 hours after determining that the minor is a UAC per paragraph (d) of this section. In the case of exceptional circumstances, DHS will abide by

written guidance detailing the efforts that it will take to transfer all UACs as required by law.

(4) The following relate to the conditions of transfer of UACs with unrelated detained adults:

(i) UACs will not generally be transported with unrelated detained adults. A UAC will not be transported with an unrelated detained adult(s) unless the UAC is being transported from the place of apprehension to a DHS facility or if separate transportation is otherwise impractical or unavailable.

(ii) When separate transportation is impractical or unavailable, necessary precautions will be taken to ensure the UAC's safety, security, and well-being. If a UAC is transported with any unrelated detained adult(s), DHS will separate the UAC from the unrelated adult(s) to the extent operationally feasible and take necessary precautions for protection of the UAC's safety, security, and well-being.

(g) *DHS procedures in the apprehension and processing of minors or UACs*—(1) *Processing*—(i) *Notice of rights and request for disposition.* Every minor or UAC who enters DHS custody, including minors and UACs who request voluntary departure or request to withdraw their application for admission, will be issued a Form I–770, Notice of Rights and Request for Disposition, which will include a statement that the minor or UAC may make a telephone call to a parent, close relative, or friend. The notice shall be provided, read, or explained to the minor or UAC in a language and manner that he or she understands. In the event that a minor or UAC is no longer amenable to voluntary departure or to a withdrawal of an application for admission, the minor or UAC will be issued a new Form I–770 or the Form I–770 will be updated, as needed.

(ii) *Notice of Right to Judicial Review.* Every minor who is not a UAC who is transferred to or remains in a DHS detention facility will be provided with a Notice of Right to Judicial Review, which informs the minor of his or her right to seek judicial review in United States District Court with jurisdiction and venue over the matter if the minor believes that his or her detention does not comply with the terms of paragraph (i) of this section. The Notice shall be read and explained to the minor in a language and manner that he or she understands.

(iii) *Current list of counsel.* Every minor who is not a UAC who is transferred to or remains in a DHS detention facility will be provided the free legal service provider list, prepared pursuant to section 239(b)(2) of the Act.

(2) *DHS custodial care immediately following apprehension.* (i) Following the apprehension of a minor or UAC, DHS will process the minor or UAC as expeditiously as possible. Consistent with 6 CFR 115.114, minors and UACs shall be held in the least restrictive setting appropriate to the minor or UAC's age and special needs, provided that such setting is consistent with the need to protect the minor or UAC's well-being and that of others, as well as with any other laws, regulations, or legal requirements. DHS will hold minors and UACs in facilities that are safe and sanitary and that are consistent with DHS's concern for their particular vulnerability. Facilities will provide access to toilets and sinks, drinking water and food as appropriate, access to emergency medical assistance as needed, and adequate temperature and ventilation. DHS will provide adequate supervision and will provide contact with family members arrested with the minor or UAC in consideration of the safety and well-being of the minor or UAC, and operational feasibility. UACs generally will be held separately from unrelated adult detainees in accordance with 6 CFR 115.14(b) and 115.114(b). In the event that such separation is not immediately possible, UACs in facilities covered by 6 CFR 115.114 may be housed with an unrelated adult for no more than 24 hours except in the case of an emergency.

(ii) Consistent with the statutory requirements, DHS will transfer UACs to HHS in accordance with the procedures described in paragraph (f) of this section.

(h) *Detention of family units.* DHS's policy is to maintain family unity, including by detaining families together where appropriate and consistent with law and available resources. If DHS determines that detention of a family unit is required by law, or is otherwise appropriate, the family unit may be transferred to an FRC which is a licensed facility and non-secure.

(i) *Detention of minors who are not UACs in DHS custody.* In any case in which DHS does not release a minor who is not a UAC, said minor shall remain in DHS detention. Consistent with 6 CFR 115.14, minors shall be detained in the least restrictive setting appropriate to the minor's age and special needs, provided that such setting is consistent with the need to protect the minor's well-being and that of others, as well as with any other laws, regulations, or legal requirements. The minor shall be placed temporarily in a licensed facility, which will be non-secure, until such time as release can be effected or until the minor's

immigration proceedings are concluded, whichever occurs earlier. If immigration proceedings are concluded and result in a final order of removal, DHS will detain the minor for the purpose of removal. If immigration proceedings result in a grant of relief or protection from removal where both parties have waived appeal or the appeal period defined in 8 CFR 1003.38(b) has expired, DHS will release the minor.

(1) A minor who is not a UAC referenced under this paragraph (i)(1) may be held in or transferred to a suitable state or county juvenile detention facility, or a secure DHS detention facility, or DHS contracted facility having separate accommodations for minors, whenever the Field Office Director and the ICE supervisory or management personnel have probable cause to believe that the minor:

(i) Has been charged with, is chargeable with, or has been convicted of a crime or crimes, or is the subject of delinquency proceedings, has been adjudicated delinquent, or is chargeable with a delinquent act or acts, that fit within a pattern or practice of criminal activity;

(ii) Has been charged with, is chargeable with, or has been convicted of a crime or crimes, or is the subject of delinquency proceedings, has been adjudicated delinquent, or is chargeable with a delinquent act or acts, that involve violence against a person or the use or carrying of a weapon;

(iii) Has committed, or has made credible threats to commit, a violent or malicious act (whether directed at himself or others) while in Federal or state government custody or while in the presence of an immigration officer;

(iv) Has engaged, while in the licensed facility, in conduct that has proven to be unacceptably disruptive of the normal functioning of the licensed facility in which the minor has been placed and transfer to another facility is necessary to ensure the welfare of the minor or others, as determined by the staff of the licensed facility;

(v) Is determined to be an escape-risk pursuant to paragraph (b)(6) of this section; or

(vi) Must be held in a secure facility for his or her own safety.

(2) DHS will not place a minor who is not a UAC in a secure facility pursuant to paragraph (i)(1) if there are less restrictive alternatives that are available and appropriate in the circumstances, such as transfer to a facility which would provide intensive staff supervision and counseling services or another licensed facility. All determinations to place a minor in a

secure facility will be reviewed and approved by the ICE Juvenile Coordinator referenced in paragraph (o) of this section. Secure facilities shall permit attorney-client visits in accordance with applicable facility rules and regulations.

(3) Unless a secure facility is otherwise authorized pursuant to this section, ICE facilities used for the detention of minors who are not UACs shall be non-secure facilities.

(4) Non-secure, licensed ICE facilities to which minors who are not UACs are transferred pursuant to the procedures in paragraph (e) of this section shall abide by applicable family residential standards established by ICE. At a minimum, such standards shall include provisions or arrangements for the following services for each minor who is not a UAC in its care:

(i) Proper physical care and maintenance, including suitable living, accommodations, food and snacks, appropriate clothing, and personal grooming items;

(ii) Appropriate routine medical, mental health and dental care, family planning services, and emergency health care services, including a complete medical examination (including screening for infectious disease) within 48 hours of admission, excluding weekends and holidays, unless the minor was recently examined at another facility; appropriate immunizations in accordance with the U.S. Public Health Service (PHS), Centers for Disease Control and Prevention; administration of prescribed medication and special diets; appropriate mental health interventions when necessary;

(iii) An individualized needs assessment which includes:

(A) Various initial intake forms;

(B) Essential data relating to the identification and history of the minor and family;

(C) Identification of the minor's special needs including any specific problem(s) which appear to require immediate intervention;

(D) An educational assessment and plan;

(E) An assessment of family relationships and interaction with adults, peers and authority figures;

(F) A statement of religious preference and practice;

(G) An assessment of the minor's personal goals, strengths and weaknesses; and

(H) Identifying information regarding immediate family members, other relatives, godparents, or friends who may be residing in the United States and

may be able to assist in family reunification;

(iv) Educational services appropriate to the minor's level of development and communication skills in a structured classroom setting, Monday through Friday, which concentrates primarily on the development of basic academic competencies and secondarily on English Language Training (ELT). The educational program should include subjects similar to those found in U.S. programs and include science, social studies, math, reading, writing, and physical education. The program design should be appropriate for the minor's estimated length of stay and can include the necessary skills appropriate for transition into a U.S. school district. The program should also include acculturation and adaptation services which include information regarding the development of social and inter-personal skills that contribute to those abilities as age appropriate;

(v) Appropriate reading materials in languages other than English for use during the minor's leisure time;

(vi) Activities according to a recreation and leisure time plan which shall include daily outdoor activity, weather permitting, at least one hour per day of large muscle activity and one hour per day of structured leisure time activities (this should not include time spent watching television). Activities should be increased to a total of three hours on days when school is not in session;

(vii) At least one individual counseling session or mental health wellness interaction (if the minor does not want to participate in a counseling session) per week conducted by trained social work staff with the specific objectives of reviewing the minor's progress, establishing new short-term objectives, and addressing both the developmental and crisis-related needs of each minor;

(viii) Group counseling sessions at least twice a week. This is usually an informal process and takes place with all the minors present and can be held in conjunction with other structured activities. It is a time when new minors present in the facility are given the opportunity to get acquainted with the staff, other children, and the rules of the program. It is an open forum where everyone gets a chance to speak. Daily program management is discussed and decisions are made about recreational activities, etc. It is a time for staff and minors to discuss whatever is on their minds and to resolve problems;

(ix) Upon admission, a comprehensive orientation regarding program intent, services, rules (written

and verbal), expectations and the availability of legal assistance;

(x) Whenever possible, access to religious services of the minor's choice;

(xi) Visitation and contact with family members (regardless of their immigration status) which is structured to encourage such visitation. The staff shall respect the minor's privacy while reasonably preventing the unauthorized release of the minor and preventing the transfer of contraband;

(xii) A reasonable right to privacy, which shall include the right to:

(A) Wear his or her own clothes, when available;

(B) Retain a private space in the residential facility for the storage of personal belongings;

(C) Talk privately on the phone, as permitted by applicable facility rules and regulations;

(D) Visit privately with guests, as permitted by applicable facility rules and regulations; and

(E) Receive and send uncensored mail unless there is a reasonable belief that the mail contains contraband;

(xiii) When necessary, communication with adult relatives living in the United States and in foreign countries regarding legal issues related to the release and/or removal of the minor;

(xiv) Legal services information regarding the availability of free legal assistance, the right to be represented by counsel at no expense to the Government, the right to apply for asylum or to request voluntary departure;

(xv) Attorney-client visits in accordance with applicable facility rules and regulations;

(xvi) Service delivery is to be accomplished in a manner which is sensitive to the age, culture, native language, and the complex needs of each minor;

(xvii) Parents/legal guardians will be responsible for supervising their children and providing parental support in managing their children's behavior. Licensed facility rules and discipline standards shall be formulated with consideration for the range of ages and maturity in the program and shall be culturally sensitive to the needs of alien minors. DHS shall not subject minors to corporal punishment, humiliation, mental abuse, or punitive interference with the daily functions of living, such as eating or sleeping. Any sanctions employed shall not adversely affect a minor's health, or physical or psychological well-being; or deny minors regular meals, sufficient sleep, exercise, medical care, correspondence privileges, or legal assistance;

(xviii) Licensed facilities will maintain and safeguard individual case records. Agencies and organizations will maintain a system of accountability which preserves the confidentiality of client information and protects the records from unauthorized use or disclosure;

(xix) Licensed facilities will maintain adequate records and make regular reports as required by DHS that permit DHS to monitor and enforce the regulations in this part and other requirements and standards as DHS may determine are in the best interests of the minors; and

(xx) Licensed facilities will maintain a grievance and complaint filing process for aliens housed therein and post information about the process in a common area of the facility. Aliens will be required to follow the proscribed process for filing formal and informal grievances against facility staff that comports with the ICE Family Residential Standards Grievance Procedures. Complaints regarding conditions of detention shall be filed under the procedures required by the DHS Office of the Inspector General or the DHS Office of Civil Rights and Civil Liberties. Staff is prohibited from retaliating against anyone who files, or on whose behalf is filed, a grievance or complaint. In the event of an emergency, a licensed, non-secure facility described in this paragraph (i) may transfer temporary physical custody of a minor prior to securing permission from DHS, but shall notify DHS of the transfer as soon as is practicable thereafter, but in all cases within 8 hours.

(j) *Release of minors who are not UACs from DHS custody.* (1) DHS will make and record prompt and continuous efforts on its part toward the release of the minor who is not a UAC.

(2) If a minor who is not a UAC is in expedited removal proceedings (including if he or she is awaiting a credible fear determination), or is subject to a final expedited removal order, custody is governed by § 235.3(b)(2)(iii) or (b)(4)(ii) of this chapter, as applicable.

(3) If a minor who is not a UAC is subject to pending removal proceedings under section 240 of the Act, DHS will consider whether to release the minor pursuant to section 212(d)(5) or section 236(a), and the implementing regulations in 8 CFR 212.5 and § 235.3, as applicable.

(4) The parole of minors who are not UACs who are detained pursuant to section 235(b)(1)(B)(ii) of the Act or § 235.3(c) of this chapter will generally serve an urgent humanitarian reason

warranting release on parole if DHS determines that detention is not required to secure the minor's timely appearance before DHS or the immigration court, or to ensure the minor's safety and well-being or the safety of others. In making this determination, DHS may consider aggregate and historical data, officer experience, statistical information, or any other probative information. The determination whether to parole a minor who is not a UAC is in the unreviewable discretion of DHS.

(5) If DHS determines to release a minor who is not a UAC during removal proceedings under section 240 of the Act, the following procedures shall apply:

(i) If a parent or legal guardian is available to provide care and physical custody, DHS will make prompt and continuous efforts to release the minor to that parent or legal guardian. Nothing in this paragraph (j)(5)(i) precludes the release of a minor who is not a UAC to an adult relative (brother, sister, aunt, uncle, or grandparent) who is not in detention and is available to provide care and physical custody. Release of a minor who is not a UAC to an adult relative other than a parent or legal guardian is within the unreviewable discretion of DHS.

(ii) Prior to releasing a minor who is not a UAC to an adult relative pursuant to paragraph (j)(5)(i) of this section, DHS will use all available reliable evidence to determine whether the relationship is bona fide. If no reliable evidence is available that confirms the relationship, DHS may continue to keep the minor who is not a UAC in custody or treat the minor as a UAC and transfer the UAC to HHS custody, as outlined in paragraph (f) of this section.

(iii) DHS shall assist without undue delay in making transportation arrangements to the DHS office nearest the location of the relative to whom a minor is to be released. DHS may, in its discretion, provide transportation to minors.

(iv) Nothing herein shall require DHS to release a minor to any person or agency whom DHS has reason to believe may harm or neglect the minor or fail to present him or her before DHS or the immigration courts when requested to do so.

(k) *Procedures upon transfer*—(1) *Possessions.* Whenever a minor or UAC is transferred from one ICE placement to another, or from an ICE placement to an ORR placement, he or she will be transferred with all possessions and legal papers; provided, however, that if the minor or UAC's possessions exceed the amount normally permitted by the

carrier in use, the possessions shall be shipped to the minor or UAC in a timely manner.

(2) *Notice to counsel.* A minor or UAC who is represented will not be transferred from one ICE placement to another, or from an ICE placement to an ORR placement, until notice is provided to his or her counsel, except in unusual and compelling circumstances, such as where the safety of the minor or UAC or others is threatened or the minor or UAC has been determined to be an escape-risk, or where counsel has waived such notice. In unusual and compelling circumstances, notice will be sent to counsel within 24 hours following the transfer.

(l) *Notice to parent of refusal of release or application for relief.* (1) A parent shall be notified of any of the following requests if the parent is present in the United States and can reasonably be contacted, unless such notification is otherwise prohibited by law or DHS determines that notification of the parent would pose a risk to the minor's safety or well-being:

(i) A minor or UAC in DHS custody refuses to be released to his or her parent; or

(ii) A minor or a UAC seeks release from DHS custody or seeks voluntary departure or a withdrawal of an application for admission, parole, or any form of relief from removal before DHS, and that the grant of such request or relief may effectively terminate some interest inherent in the parent-child relationship and/or the minor or UAC's rights and interests are adverse with those of the parent.

(2) Upon notification, the parent will be afforded an opportunity to present his or her views and assert his or her interest to DHS before a determination is made as to the merits of the request for relief.

(m) *Bond hearings.* Bond determinations made by DHS for minors who are in removal proceedings pursuant to section 240 of the Act and who are also in DHS custody may be reviewed by an immigration judge pursuant to 8 CFR part 1236 to the extent permitted by 8 CFR 1003.19. Minors in DHS custody who are not in section 240 proceedings are ineligible to seek review by an immigration judge of their DHS custody determinations.

(n) *Retaking custody of a previously released minor.* (1) In addition to the ability to make a UAC determination upon each encounter as set forth in paragraph (c) of this section, DHS may take a minor back into custody if there is a material change in circumstances indicating the minor is an escape-risk, a danger to the community, or has a final

order of removal. If the minor is accompanied, DHS shall place the minor in accordance with paragraphs (e) and (i) of this section. If the minor is a UAC, DHS shall transfer the minor into HHS custody in accordance with paragraph (e) of this section.

(2) DHS may take a minor back into custody if there is no longer a parent, legal guardian, or other adult relative (brother, sister, aunt, uncle, or grandparent) available to care for the minor. If the minor is a UAC, DHS will transfer custody to HHS as outlined in paragraph (e) of this section.

(3) Minors who are not UACs and who are taken back into DHS custody may request a custody redetermination hearing in accordance with paragraph (m) of this section and to the extent permitted by 8 CFR 1003.19.

(o) *Monitoring.* (1) CBP and ICE each shall identify a Juvenile Coordinator for the purpose of monitoring compliance with the terms of this section.

(2) In addition to the monitoring required by paragraph (o)(1) of this section, the Juvenile Coordinators shall collect and periodically examine relevant statistical information about UACs and minors who remain in CBP or ICE custody for longer than 72 hours. Such statistical information may include but not necessarily be limited to:

(i) Biographical information;

(ii) Dates of custody; and

(iii) Placements, transfers, removals, or releases from custody, including the reasons for a particular placement.

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

*45 CFR Chapter IV*

■ For the reasons set forth in the preamble, chapter IV of title 45 of the Code of Federal Regulations is amended by adding part 410 to read as follows:

## PART 410—CARE AND PLACEMENT OF UNACCOMPANIED ALIEN CHILDREN

### Subpart A—Care and Placement of Unaccompanied Alien Children

Sec.
410.100  Scope of this part.
410.101  Definitions.
410.102  ORR care and placement of unaccompanied alien children.

### Subpart B—Determining the Placement of an Unaccompanied Alien Child

Sec.
410.200  Purpose of this subpart.
410.201  Considerations generally applicable to the placement of an unaccompanied alien child.
410.202  Placement of an unaccompanied alien child in a licensed program.
410.203  Criteria for placing an unaccompanied alien child in a secure facility.
410.204  Considerations when determining whether an unaccompanied alien child is an escape risk.
410.205  Applicability of § 410.203 for placement in a secure facility.
410.206  Information for unaccompanied alien children concerning the reasons for his or her placement in a secure or staff secure facility.
410.207  Custody of an unaccompanied alien child placed pursuant to this subpart.
410.208  Special needs minors.
410.209  Procedures during an emergency or influx.

### Subpart C—Releasing an Unaccompanied Alien Child From ORR Custody

Sec.
410.300  Purpose of this subpart.
410.301  Sponsors to whom ORR releases an unaccompanied alien child.
410.302  Sponsor suitability assessment process requirements leading to release of an unaccompanied alien child from ORR custody to a sponsor.

### Subpart D—Licensed Programs

Sec.
410.400  Purpose of this subpart.
410.401  Applicability of this subpart.
410.402  Minimum standards applicable to licensed programs.
410.403  Ensuring that licensed programs are providing services as required by the regulations in this part.

### Subpart E—Transportation of an Unaccompanied Alien Child

Sec.
410.500  Conducting transportation for an unaccompanied alien child in ORR's custody.

### Subpart F—Transfer of an Unaccompanied Alien Child

Sec.
410.600  Principles applicable to transfer of an unaccompanied alien child.

### Subpart G—Age Determinations

Sec.
410.700  Conducting age determinations.
410.701  Treatment of an individual who appears to be an adult.

### Subpart H—Unaccompanied Alien Children's Objections to ORR Determinations

Sec.
410.800  Purpose of this subpart.
410.801  Procedures.
410.810  Hearings.

**Authority:** 6 U.S.C. 279, 8 U.S.C. 1103(a)(3), 8 U.S.C. 1232.

## Subpart A—Care and Placement of Unaccompanied Alien Children

### § 410.100  Scope of this part.

This part governs those aspects of the care, custody, and placement of unaccompanied alien children (UACs) agreed to in the settlement agreement reached in *Jenny Lisette Flores* v. *Janet Reno, Attorney General of the United States,* Case No. CV 85–4544–RJK (C.D. Cal. 1996). ORR operates the UAC program as authorized by section 462 of the Homeland Security Act of 2002, Public Law 107–296, 6 U.S.C. 279, and section 235 of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), Public Law 110–457, 8 U.S.C. 1232. This part does not govern or describe the entire program.

### § 410.101  Definitions.

*DHS* means the Department of Homeland Security.

*Director* means the Director of the Office of Refugee Resettlement (ORR), Administration for Children and Families, Department of Health and Human Services.

*Emergency* means an act or event (including, but not limited to, a natural disaster, facility fire, civil disturbance, or medical or public health concerns at one or more facilities) that prevents timely transport or placement of UACs, or impacts other conditions provided by this part.

*Escape risk* means there is a serious risk that an unaccompanied alien child (UAC) will attempt to escape from custody.

*Influx* means a situation in which there are, at any given time, more than 130 minors or UACs eligible for placement in a licensed facility under this part or corresponding provisions of DHS regulations, including those who have been so placed or are awaiting such placement.

*Licensed program* means any program, agency, or organization that is licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children, including a program operating group homes, foster homes, or facilities for special needs UAC. A licensed program must meet the standards set forth in § 410.402. All homes and facilities operated by a licensed program, including facilities for special needs minors, are non-secure as required under State law. However, a facility for special needs minors may maintain that level of security permitted under State law which is necessary for the protection of a UAC or others in appropriate circumstances, *e.g.,* cases in which a UAC has drug or alcohol problems or is mentally ill.

*ORR* means the Office of Refugee Resettlement, Administration for Children and Families, Department of Health and Human Services.

AR341

*Secure facility* means a State or county juvenile detention facility or a secure ORR detention facility, or a facility with an ORR contract or cooperative agreement having separate accommodations for minors. A secure facility does not need to meet the requirements of § 410.402, and is not defined as a ''licensed program'' or ''shelter'' under this part.

*Shelter* means a licensed program that meets the standards set forth in § 410.402.

*Special needs minor* means a UAC whose mental and/or physical condition requires special services and treatment by staff. A UAC may have special needs due to drug or alcohol abuse, serious emotional disturbance, mental illness, intellectual disability, or a physical condition or chronic illness that requires special services or treatment. A UAC who has suffered serious neglect or abuse may be considered a special needs minor if the UAC requires special services or treatment as a result of neglect or abuse.

*Sponsor,* also referred to as custodian, means an individual (or entity) to whom ORR releases a UAC out of ORR custody.

*Staff secure facility* means a facility that is operated by a program, agency or organization licensed by an appropriate State agency and that meets the standards for licensed programs set forth in § 410.402. A staff secure facility is designed for a UAC who requires close supervision but does not need placement in a secure facility. It provides 24-hour awake supervision, custody, care, and treatment. It maintains stricter security measures, such as intensive staff supervision, than a shelter in order to control problem behavior and to prevent escape. A staff secure facility may have a secure perimeter but is not equipped internally with major restraining construction or procedures typically associated with correctional facilities.

*Unaccompanied alien child* (UAC) means:

(1) An individual who: Has no lawful immigration status in the United States; has not attained 18 years of age; and with respect to whom:

(i) There is no parent or legal guardian in the United States; or

(ii) No parent or legal guardian in the United States is available to provide care and physical custody.

(2) When an alien previously determined to have been a UAC has reached the age of 18, when a parent or legal guardian in the United States is available to provide care and physical custody for such an alien, or when such alien has obtained lawful immigration

status, the alien is no longer a UAC. An alien who is no longer a UAC is not eligible to receive legal protections limited to UACs.

## § 410.102    ORR care and placement of unaccompanied alien children.

(a) ORR coordinates and implements the care and placement of UAC who are in ORR custody by reason of their immigration status.

(b) For all UACs in ORR custody, DHS and DOJ (Department of Justice) handle other matters, including immigration benefits and enforcement matters, as set forth in their respective statutes, regulations and other authorities.

(c) ORR shall hold UACs in facilities that are safe and sanitary and that are consistent with ORR's concern for the particular vulnerability of minors.

(d) Within all placements, UACs shall be treated with dignity, respect, and special concern for their particular vulnerability.

## Subpart B—Determining the Placement of an Unaccompanied Alien Child

### § 410.200    Purpose of this subpart.

This subpart sets forth what ORR considers when placing a UAC in a particular ORR facility, in accordance with the Flores settlement agreement.

### § 410.201    Considerations generally applicable to the placement of an unaccompanied alien child.

(a) ORR places each UAC in the least restrictive setting that is in the best interest of the child and appropriate to the UAC's age and special needs, provided that such setting is consistent with its interests to ensure the UAC's timely appearance before DHS and the immigration courts and to protect the UAC's well-being and that of others.

(b) ORR separates UACs from delinquent offenders.

(c) ORR makes reasonable efforts to provide placements in those geographical areas where DHS apprehends the majority of UAC.

(d) Facilities where ORR places UACs will provide access to toilets and sinks, drinking water and food as appropriate, medical assistance if a UAC is in need of emergency services, adequate temperature control and ventilation, adequate supervision to protect UAC from others, and contact with family members who were arrested with the minor.

(e) If there is no appropriate licensed program immediately available for placement of a UAC pursuant to this subpart, and no one to whom ORR may release the UAC pursuant to subpart C of this part, the UAC may be placed in an ORR-contracted facility, having

separate accommodations for minors, or a State or county juvenile detention facility. In addition to the requirement that UACs shall be separated from delinquent offenders, every effort must be taken to ensure that the safety and well-being of the UAC detained in these facilities are satisfactorily provided for by the staff. ORR makes all reasonable efforts to place each UAC in a licensed program as expeditiously as possible.

(f) ORR makes and records the prompt and continuous efforts on its part toward family reunification. ORR continues such efforts at family reunification for as long as the minor is in ORR custody.

### § 410.202    Placement of an unaccompanied alien child in a licensed program.

ORR places UACs into a licensed program promptly after a UAC is transferred to ORR legal custody, except in the following circumstances:

(a) A UAC meeting the criteria for placement in a secure facility set forth in § 410.203;

(b) As otherwise required by any court decree or court-approved settlement; or,

(c) In the event of an emergency or influx of UACs into the United States, in which case ORR places the UAC as expeditiously as possible in accordance with § 410.209; or

(d) If a reasonable person would conclude that the UAC is an adult despite his or her claims to be a minor.

### § 410.203    Criteria for placing an unaccompanied alien child in a secure facility.

(a) Notwithstanding § 410.202, ORR may place a UAC in a secure facility if the UAC:

(1) Has been charged with, is chargeable, or has been convicted of a crime, or is the subject of delinquency proceedings, has been adjudicated delinquent, or is chargeable with a delinquent act, and where ORR deems those circumstances demonstrate that the UAC poses a danger to self or others. ''Chargeable'' means that ORR has probable cause to believe that the UAC has committed a specified offense. The provision in this paragraph (a)(1) does not apply to a UAC whose offense is:

(i) An isolated offense that was not within a pattern or practice of criminal activity and did not involve violence against a person or the use or carrying of a weapon; or

(ii) A petty offense, which is not considered grounds for stricter means of detention in any case;

(2) While in DHS or ORR's custody or while in the presence of an immigration officer, has committed, or has made credible threats to commit, a violent or

malicious act (whether directed at himself/herself or others);

(3) Has engaged, while in a licensed program or staff secure facility, in conduct that has proven to be unacceptably disruptive of the normal functioning of the licensed program or staff secure facility in which he or she has been placed and removal is necessary to ensure the welfare of the UAC or others, as determined by the staff of the licensed program or staff secure facility (*e.g.*, drug or alcohol abuse, stealing, fighting, intimidation of others, or sexually predatory behavior), and ORR determines the UAC poses a danger to self or others based on such conduct;

(4) For purposes of placement in a secure residential treatment centers (RTC), if a licensed psychologist or psychiatrist determines that the UAC poses a risk of harm to self or others; or

(5) Is otherwise a danger to self or others.

(b) ORR Federal Field Specialists review and approve all placements of UAC in secure facilities consistent with legal requirements.

(c) ORR reviews, at least monthly, the placement of a UAC into a secure, staff secure, or RTC facility to determine whether a new level of care is more appropriate.

(d) Notwithstanding ORR's ability under the rules in this subpart to place UACs who are "otherwise a danger to self or others" in secure placements, the provision in this section does not abrogate any requirements to place UACs in the least restrictive setting appropriate to their age and special needs.

### § 410.204   Considerations when determining whether an unaccompanied alien child is an escape risk.

When determining whether a UAC is an escape risk, ORR considers, among other factors, whether:

(a) The UAC is currently under a final order of removal;

(b) The UAC's immigration history includes:

(1) A prior breach of a bond;

(2) A failure to appear before DHS or the immigration court;

(3) Evidence that the UAC is indebted to organized smugglers for his or her transport; or

(4) A voluntary departure or a previous removal from the United States pursuant to a final order of removal; and

(c) The UAC has previously absconded or attempted to abscond from state or Federal custody.

### § 410.205   Applicability of § 410.203 for placement in a secure facility.

ORR does not place a UAC in a secure facility pursuant to § 410.203 if less restrictive alternatives are available and appropriate under the circumstances. ORR may place a UAC in a staff secure facility or another licensed program as an alternative to a secure facility.

### § 410.206   Information for unaccompanied alien children concerning the reasons for his or her placement in a secure or staff secure facility.

Within a reasonable period of time, ORR provides each UAC placed or transferred to a secure or staff secure facility with a notice of the reasons for the placement in a language the UAC understands.

### § 410.207   Custody of an unaccompanied alien child placed pursuant to this subpart.

A UAC who is placed in a licensed program pursuant to this subpart remains in the custody of ORR, and may only be transferred or released under its authority. However, in the event of an emergency, a licensed program may transfer temporarily the physical placement of a UAC prior to securing permission from ORR, but must notify ORR of the transfer as soon as possible, but in all cases within eight hours of the transfer. Upon release to an approved sponsor, a UAC is no longer in the custody of ORR.

### § 410.208   Special needs minors.

ORR assesses each UAC to determine if he or she has special needs, and if so, places the UAC, whenever possible, in a licensed program in which ORR places unaccompanied alien children without special needs, but which provides services and treatment for such special needs.

### § 410.209   Procedures during an emergency or influx.

In the event of an emergency or influx that prevents the prompt placement of UAC in licensed programs, ORR makes all reasonable efforts to place each UAC in a licensed program as expeditiously as possible using the following procedures:

(a) ORR maintains an emergency placement list of at least 80 beds at programs licensed by an appropriate state agency that are potentially available to accept emergency placements.

(b) ORR implements its contingency plan on emergencies and influxes.

(c) Within one business day of the emergency or influx, ORR, if necessary, contacts the programs on the emergency placement list to determine available placements. To the extent practicable,

ORR will attempt to locate emergency placements in geographic areas where culturally and linguistically appropriate community services are available.

(d) In the event that the number of UAC needing placement exceeds the available appropriate placements on the emergency placement list, ORR works with governmental and nongovernmental organizations to locate additional placements through licensed programs, county social services departments, and foster family agencies.

(e) ORR maintains a list of UACs affected by the emergency or influx including each UAC's:

(1) Name;

(2) Date and country of birth;

(3) Date of placement in ORR's custody; and

(4) Place and date of current placement.

(f) Each year ORR reevaluates the number of regular placements needed for UAC to determine whether the number of regular placements should be adjusted to accommodate an increased or decreased number of UAC eligible for placement in licensed programs.

## Subpart C—Releasing an Unaccompanied Alien Child from ORR Custody

### § 410.300   Purpose of this subpart.

This subpart covers the policies and procedures used to release, without unnecessary delay, a UAC from ORR custody to an approved sponsor.

### § 410.301   Sponsors to whom ORR releases an unaccompanied alien child.

(a) ORR releases a UAC to an approved sponsor without unnecessary delay, but may continue to retain custody of a UAC if ORR determines that continued custody is necessary to ensure the UAC's safety or the safety of others, or that continued custody is required to secure the UAC's timely appearance before DHS or the immigration courts.

(b) When ORR releases a UAC without unnecessary delay to an approved sponsor, it releases in the following order of preference:

(1) A parent;

(2) A legal guardian;

(3) An adult relative (brother, sister, aunt, uncle, or grandparent);

(4) An adult individual or entity designated by the parent or legal guardian as capable and willing to care for the UAC's well-being in:

(i) A declaration signed under penalty of perjury before an immigration or consular officer; or

(ii) Such other document that establishes to the satisfaction of ORR, in

its discretion, the affiant's parental relationship or guardianship;

(5) A licensed program willing to accept legal custody; or

(6) An adult individual or entity seeking custody, in the discretion of ORR, when it appears that there is no other likely alternative to long term custody, and family reunification does not appear to be a reasonable possibility.

### § 410.302   Sponsor suitability assessment process requirements leading to release of an unaccompanied alien child from ORR custody to a sponsor.

(a) The licensed program providing care for the UAC shall make and record the prompt and continuous efforts on its part towards family reunification and the release of the UAC pursuant to the provisions of this section.

(b) ORR requires a background check, including verification of identity and which may include verification of employment of the individuals offering support, prior to release.

(c) ORR also may require further suitability assessment, which may include interviews of members of the household, investigation of the living conditions in which the UAC would be placed and the standard of care he or she would receive, a home visit, a fingerprint-based background and criminal records check on the prospective sponsor and on adult residents of the prospective sponsor's household, and follow-up visits after release. Any such assessment also takes into consideration the wishes and concerns of the UAC.

(d) If the conditions identified in TVPRA at 8 U.S.C. 1232(c)(3)(B) are met, and require a home study, no release to a sponsor may occur in the absence of such a home study.

(e) The proposed sponsor must sign an affidavit of support and a custodial release agreement of the conditions of release. The custodial release agreement requires that the sponsor:

(1) Provide for the UAC's physical, mental, and financial well-being;

(2) Ensure the UAC's presence at all future proceedings before DHS and the immigration courts;

(3) Ensure the UAC reports for removal from the United States if so ordered;

(4) Notify ORR, DHS, and the Executive Office for Immigration Review of any change of address within five days following a move;

(5) Notify ORR and DHS at least five days prior to the sponsor's departure from the United States, whether the departure is voluntary or pursuant to a grant of voluntary departure or an order of removal;

(6) Notify ORR and DHS if dependency proceedings involving the UAC are initiated and also notify the dependency court of any immigration proceedings pending against the UAC;

(7) Receive written permission from ORR if the sponsor decides to transfer legal custody of the UAC to someone else. Also, in the event of an emergency (*e.g.,* serious illness or destruction of the home), a sponsor may transfer temporary physical custody of the UAC prior to securing permission from ORR, but the sponsor must notify ORR as soon as possible and no later than 72 hours after the transfer; and

(8) Notify ORR and DHS as soon as possible and no later than 24 hours of learning that the UAC has disappeared, has been threatened, or has been contacted in any way by an individual or individuals believed to represent an immigrant smuggling syndicate or organized crime.

(f) ORR is not required to release a UAC to any person or agency it has reason to believe may harm or neglect the UAC or fail to present him or her before DHS or the immigration courts when requested to do so.

## Subpart D—Licensed Programs

### § 410.400   Purpose of this subpart.

This subpart covers the standards that licensed programs must meet in keeping with the principles of treating UACs in custody with dignity, respect and special concern for their particular vulnerability.

### § 410.401   Applicability of this subpart.

This subpart applies to all licensed programs, regardless of whether they are providing care in shelters, staff secure facilities, residential treatment centers, or foster care and group home settings.

### § 410.402   Minimum standards applicable to licensed programs.

Licensed programs must:

(a) Be licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children;

(b) Comply with all applicable state child welfare laws and regulations and all state and local building, fire, health and safety codes;

(c) Provide or arrange for the following services for each UAC in care, including:

(1) Proper physical care and maintenance, including suitable living accommodations, food, appropriate clothing, and personal grooming items;

(2) Appropriate routine medical and dental care, family planning services, and emergency health care services, including a complete medical examination (including screening for infectious disease) within 48 hours of admission, excluding weekends and holidays, unless the UAC was recently examined at another facility; appropriate immunizations in accordance with the U.S. Public Health Service (PHS), Center for Disease Control; administration of prescribed medication and special diets; appropriate mental health interventions when necessary;

(3) An individualized needs assessment that must include:

(i) Various initial intake forms;

(ii) Essential data relating to the identification and history of the UAC and family;

(iii) Identification of the UAC's special needs including any specific problems that appear to require immediate intervention;

(iv) An educational assessment and plan;

(v) An assessment of family relationships and interaction with adults, peers and authority figures;

(vi) A statement of religious preference and practice;

(vii) An assessment of the UAC's personal goals, strengths and weaknesses; and

(viii) Identifying information regarding immediate family members, other relatives, godparents or friends who may be residing in the United States and may be able to assist in family reunification;

(4) Educational services appropriate to the UAC's level of development and communication skills in a structured classroom setting, Monday through Friday, which concentrate primarily on the development of basic academic competencies and secondarily on English Language Training (ELT), including:

(i) Instruction and educational and other reading materials in such languages as needed;

(ii) Instruction in basic academic areas that include science, social studies, math, reading, writing, and physical education; and

(iii) The provision to a UAC of appropriate reading materials in languages other than English for use during the UAC's leisure time;

(5) Activities according to a recreation and leisure time plan that include daily outdoor activity, weather permitting, at least one hour per day of large muscle activity and one hour per day of structured leisure time activities, which do not include time spent watching television. Activities must be increased to at least three hours on days when school is not in session;

(6) At least one individual counseling session per week conducted by trained social work staff with the specific objectives of reviewing the UAC's progress, establishing new short-term objectives, and addressing both the developmental and crisis-related needs of each UAC;

(7) Group counseling sessions at least twice a week. This is usually an informal process and takes place with all the UACs present. This is a time when new UACs are given the opportunity to get acquainted with the staff, other children, and the rules of the program. It is an open forum where everyone gets a chance to speak. Daily program management is discussed and decisions are made about recreational and other program activities, etc. This is a time for staff and UACs to discuss whatever is on their minds and to resolve problems;

(8) Acculturation and adaptation services that include information regarding the development of social and inter-personal skills that contribute to those abilities necessary to live independently and responsibly;

(9) Upon admission, a comprehensive orientation regarding program intent, services, rules (provided in writing and verbally), expectations and the availability of legal assistance;

(10) Whenever possible, access to religious services of the UAC's choice;

(11) Visitation and contact with family members (regardless of their immigration status) which is structured to encourage such visitation. The staff must respect the UAC's privacy while reasonably preventing the unauthorized release of the UAC;

(12) A reasonable right to privacy, which must include the right to:

(i) Wear his or her own clothes, when available;

(ii) Retain a private space in the residential facility, group or foster home for the storage of personal belongings;

(iii) Talk privately on the phone, as permitted by the house rules and regulations;

(iv) Visit privately with guests, as permitted by the house rules and regulations; and

(v) Receive and send uncensored mail unless there is a reasonable belief that the mail contains contraband;

(13) Family reunification services designed to identify relatives in the United States as well as in foreign countries and assistance in obtaining legal guardianship when necessary for release of the UAC; and

(14) Legal services information regarding the availability of free legal assistance, the right to be represented by counsel at no expense to the government, the right to a removal hearing before an immigration judge, the right to apply for asylum or to request voluntary departure in lieu of removal;

(d) Deliver services in a manner that is sensitive to the age, culture, native language and the complex needs of each UAC;

(e) Formulate program rules and discipline standards with consideration for the range of ages and maturity in the program and that are culturally sensitive to the needs of each UAC to ensure the following:

(1) UAC must not be subjected to corporal punishment, humiliation, mental abuse, or punitive interference with the daily functions of living, such as eating or sleeping: And

(2) Any sanctions employed must not:

(i) Adversely affect either a UAC's health, or physical or psychological well-being; or

(ii) Deny UAC regular meals, sufficient sleep, exercise, medical care, correspondence privileges, or legal assistance;

(f) Develop a comprehensive and realistic individual plan for the care of each UAC in accordance with the UAC's needs as determined by the individualized needs assessment. Individual plans must be implemented and closely coordinated through an operative case management system;

(g) Develop, maintain and safeguard individual client case records. Licensed programs must develop a system of accountability that preserves the confidentiality of client information and protects the records from unauthorized use or disclosure; and

(h) Maintain adequate records and make regular reports as required by ORR that permit ORR to monitor and enforce the regulations in this part and other requirements and standards as ORR may determine are in the interests of the UAC.

### § 410.403   Ensuring that licensed programs are providing services as required by the regulations in this part.

ORR monitors compliance with the terms of the regulations in this part.

## Subpart E—Transportation of an Unaccompanied Alien Child

### § 410.500   Conducting transportation for an unaccompanied alien child in ORR's custody.

(a) ORR does not transport UACs with adult detainees.

(b) When ORR plans to release a UAC from its custody under the family reunification provisions at §§ 410.201 and 410.302, ORR assists without undue delay in making transportation arrangements. ORR may, in its discretion, provide transportation to UAC.

## Subpart F—Transfer of an Unaccompanied Alien Child

### § 410.600   Principles applicable to transfer of an unaccompanied alien child.

(a) ORR transfers a UAC from one placement to another with all of his or her possessions and legal papers.

(b) If the UAC's possessions exceed the amount permitted normally by the carrier in use, the possessions are shipped to the UAC in a timely manner.

(c) ORR does not transfer a UAC who is represented by counsel without advance notice to his or her legal counsel. However, ORR may provide notice to counsel within 24 hours of the transfer in unusual and compelling circumstances such as:

(1) Where the safety of the UAC or others has been threatened;

(2) The UAC has been determined to be an escape risk consistent with § 410.204; or

(3) Where counsel has waived such notice.

## Subpart G—Age Determinations

### § 410.700   Conducting age determinations.

Procedures for determining the age of an individual must take into account the totality of the circumstances and evidence, including the non-exclusive use of radiographs, to determine the age of the individual. ORR may require an individual in ORR's custody to submit to a medical or dental examination conducted by a medical professional or to submit to other appropriate procedures to verify his or her age. If ORR subsequently determines that such an individual is a UAC, he or she will be treated in accordance with ORR's UAC regulations in this part for all purposes.

### § 410.701   Treatment of an individual who appears to be an adult.

If, the procedures in § 410.700 would result in a reasonable person concluding that an individual is an adult, despite his or her claim to be under the age of 18, ORR must treat such person as an adult for all purposes.

## Subpart H—Unaccompanied Alien Children's Objections to ORR Determinations

### § 410.800   Purpose of this subpart.

This subpart concerns UACs' objections to ORR placement.

### § 410.801   Procedures.

(a) For UACs not placed in licensed programs, ORR shall—within a

reasonable period of time—provide a notice of the reasons for housing the minor in secure or staff secure facility. Such notice shall be in a language the UAC understands.

(b) ORR shall promptly provide each UAC not released with:

(1) A list of free legal services providers compiled by ORR and that is provided to UAC as part of a Legal Resource Guide for UAC (unless previously given to the UAC); and

(2) The following explanation of the right of potential review:

"ORR usually houses persons under the age of 18 in an open setting, such as a foster or group home, and not in detention facilities. If you believe that you have not been properly placed or that you have been treated improperly, you may call a lawyer to seek assistance. If you cannot afford a lawyer, you may call one from the list of free legal services given to you with this form."

§ 410.810   Hearings.

(a) A UAC may request that an independent hearing officer employed by HHS determine, through a written decision, whether the UAC would present a risk of danger to the community or risk of flight if released.

(1) Requests under this section may be made by the UAC, his or her legal representative, or his or her parent or legal guardian.

(2) UACs placed in secure or staff secure facilities will receive a notice of the procedures under this section and may use a form provided to them to make a written request for a hearing under this section.

(b) In hearings conducted under this section, HHS bears the initial burden of production to support its determination that a UAC would pose a danger or flight risk if discharged from HHS' care and custody. The burden of persuasion is then on the UAC to show that he or she will not be a danger to the community or flight risk if released, using a preponderance of the evidence standard.

(c) In hearings under this section, the UAC may be represented by a person of his or her choosing, at no cost to the government. The UAC may present oral and written evidence to the hearing officer and may appear by video or teleconference. ORR may also choose to present evidence either in writing, or by appearing in person, or by video or teleconference.

(d) A hearing officer's decision that a UAC would not be a danger to the community (or risk of flight) if released is binding upon ORR, unless the provisions of paragraph (e) of this section apply.

(e) A hearing officer's decision under this section may be appealed to the Assistant Secretary of the Administration for Children and Families. Any such appeal request shall be in writing, and must be received within 30 days of the hearing officer decision. The Assistant Secretary will reverse a hearing officer decision only if there is a clear error of fact, or if the decision includes an error of law. Appeal to the Assistant Secretary shall not affect a stay of the hearing officer's decision to release the UAC, unless within five business days of such hearing officer decision, the Assistant

Secretary issues a decision in writing that release of the UAC would result in a significant danger to the community. Such a stay decision must include a description of behaviors of the UAC while in care and/or documented criminal or juvenile behavior records from the UAC demonstrating that the UAC would present a danger to community if released.

(f) Decisions under this section are final and binding on the Department, and a UAC may only seek another hearing under this section if the UAC can demonstrate a material change in circumstances. Similarly, ORR may request the hearing officer to make a new determination under this section if at least one month has passed since the original decision, and ORR can show that a material change in circumstances means the UAC should no longer be released.

(g) This section cannot be used to determine whether a UAC has a suitable sponsor, and neither the hearing officer nor the Assistant Secretary may order the UAC released.

(h) This section may not be invoked to determine the UAC's placement while in HHS custody. Nor may this section be invoked to determine level of custody for the UAC.

**Kevin K. McAleenan,**

*Acting Secretary, Department of Homeland Security.*

**Alex M. Azar II,**

*Secretary, Department of Health and Human Services.*

[FR Doc. 2019–17927 Filed 8–22–19; 8:45 am]

**BILLING CODE 9111–28–P; 4184–45–P**

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

JENNY LISETTE FLORES,
*Plaintiff-Appellee*,

v.

LORETTA E. LYNCH, Attorney
General, Attorney General of
the United States; JEH JOHNSON,
Secretary of Homeland
Security; U.S. DEPARTMENT OF
HOMELAND SECURITY, and its
subordinate entities; U.S.
IMMIGRATION AND CUSTOMS
ENFORCEMENT; U.S. CUSTOMS
AND BORDER PROTECTION,
*Defendants-Appellants.*

No. 15-56434

D.C. No.
2:85-cv-04544-
DMG-AGR

OPINION

Appeal from the United States District Court
for the Central District of California
Dolly M. Gee, District Judge, Presiding

Argued and Submitted June 7, 2016
Pasadena, California

Filed July 6, 2016

AR347

Before: Ronald M. Gould, Michael J. Melloy[*],
and Andrew D. Hurwitz, Circuit Judges.

Opinion by Judge Hurwitz

---

## SUMMARY[**]

---

### Immigration

The panel affirmed in part and reversed in part the district court's order granting the motion of a plaintiff class to enforce a 1997 Settlement with the government which set a nationwide policy for the detention, release, and treatment of minors detained in Immigration and Naturalization Service custody, and remanded for further proceedings.

The panel held that the Settlement unambiguously applies both to minors who are accompanied and unaccompanied by their parents. The panel held, however, that the district court erred in interpreting the Settlement to provide release rights to accompanying adults. The panel also held that the district court did not abuse its discretion in denying the government's motion to amend the Settlement.

---

[*] The Honorable Michael J. Melloy, Senior Circuit Judge for the U.S. Court of Appeals for the Eighth Circuit, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## COUNSEL

Leon Fresco (argued), Deputy Assistant Attorney General; Sarah B. Fabian, Senior Litigation Counsel; William C. Peachey, Director, District Court Section; Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Civil Division; United States Department of Justice, Office of Immigration Litigation, Washington, D.C.; for Defendants-Appellants.

Peter Anthony Schey (argued) and Carlos R. Holguin, Center for Human Rights and Constitutional Law, Los Angeles, California; T. Wayne Harman and Elena Garcia, Orrick, Herrington & Sutcliffe LLP, Los Angeles, California; for Plaintiff-Appellee.

## OPINION

HURWITZ, Circuit Judge:

In 1997, the plaintiff class ("Flores") and the government entered into a settlement agreement (the "Settlement") which "sets out nationwide policy for the detention, release, and treatment of minors in the custody of the INS." Settlement ¶ 9.  The Settlement creates a presumption in favor of releasing minors and requires placement of those not released in licensed, non-secure facilities that meet certain standards.

In 2014, in response to a surge of Central Americans attempting to enter the United States without documentation, the government opened family detention centers in Texas and New Mexico.  The detention and release policies at these centers do not comply with the Settlement.  The government,

AR349

however, claims that the Settlement only applies to unaccompanied minors and is not violated when minors accompanied by parents or other adult family members are placed in these centers.

In 2015, Flores moved to enforce the Settlement, arguing that it applied to all minors in the custody of immigration authorities. The district court agreed, granted the motion to enforce, and rejected the government's alternative motion to modify the Settlement. The court ordered the government to: (1) make "prompt and continuous efforts toward family reunification," (2) release class members without unnecessary delay, (3) detain class members in appropriate facilities, (4) release an accompanying parent when releasing a child unless the parent is subject to mandatory detention or poses a safety risk or a significant flight risk, (5) monitor compliance with detention conditions, and (6) provide class counsel with monthly statistical information. The government appealed, challenging the district court's holding that the Settlement applied to all minors in immigration custody, its order to release parents, and its denial of the motion to modify.

Although the issues underlying this appeal touch on matters of national importance, our task is straightforward—we must interpret the Settlement. Applying familiar principles of contract interpretation, we conclude that the Settlement unambiguously applies both to accompanied and unaccompanied minors, but does not create affirmative release rights for parents. We therefore affirm the district court in part, reverse in part, and remand.

AR350

## BACKGROUND

### I.  History of the Litigation

In 1984, the Western Region of the Immigration and Naturalization Service ("INS") adopted a policy prohibiting the release of detained minors to anyone other than "a parent or lawful guardian, except in unusual and extraordinary cases." *Reno v. Flores*, 507 U.S. 292, 296 (1993) (quotation marks omitted).  The next year, Flores filed this action in the Central District of California, challenging that policy and the conditions under which juveniles were detained pursuant to the policy.  *Id.*

In 1986, the district court certified two classes:

> 1. All persons under the age of eighteen (18) years who have been, are, or will be arrested and detained pursuant to 8 U.S.C. § 1252 by the Immigration and Naturalization Service ("INS") within the INS' Western Region and who have been, are, or will be denied release from INS custody because a parent or legal guardian fails to personally appear to take custody of them.

> 2. All persons under the age of eighteen (18) years who have been, are, or will be arrested and detained pursuant to 8 U.S.C. § 1252 by the Immigration and Naturalization Service ("INS") within the INS' Western Region and who have been, are, or will be subjected to any of the following conditions:

> > a.  inadequate opportunities for exercise or recreation;

AR351

      b.  inadequate educational instruction;

      c.  inadequate reading materials;

      d.  inadequate opportunities for visitation with counsel, family, and friends;

      e.  regular contact as a result of confinement with adult detainees unrelated to such minors either by blood, marriage, or otherwise;

      f.  strip or body cavity search after meeting with counsel or at any other time or occasion absent demonstrable adequate cause.

In 1987, the court approved a consent decree settling the detention condition claims. *Id.* That agreement required the government to "house all juveniles detained more than 72 hours following arrest in a facility that meets or exceeds" certain standards, except in "unusual and extraordinary circumstances."

The district court then granted the Flores class partial summary judgment on the claim that the INS violated the Equal Protection Clause by treating alien minors in deportation proceedings differently from alien minors in exclusion proceedings, the latter of whom were sometimes released to adults other than their parents. *Id.* In response, the INS adopted a rule allowing juveniles to be released to their parents, adult relatives, or custodians designated by their parents; if no adult relative was available, the rule gave the INS discretion to release a detained relative with the child. *Id.* at 296–97; *see* Detention and Release of Juveniles,

53 Fed. Reg. 17449, 17451 (1988) (now codified, as amended, at 8 C.F.R. § 236.3). The Supreme Court upheld the INS rule against Flores' facial Due Process challenge. *Flores*, 507 U.S. at 315.

## II. The Settlement

In 1997, the district court approved the Settlement. The Settlement defines a "minor" as "any person under the age of eighteen (18) years who is detained in the legal custody of the INS," except for "an emancipated minor or an individual who has been incarcerated due to a conviction for a criminal offense as an adult." Settlement ¶ 4. The Settlement defines the contracting class similarly, as "[a]ll minors who are detained in the legal custody of the INS." *Id.* ¶ 10.

The Settlement provides that "[w]henever the INS takes a minor into custody, it shall expeditiously process the minor and shall provide the minor with a notice of rights." *Id.* ¶ 12(A). "Following arrest, the INS shall hold minors in facilities that are safe and sanitary and that are consistent with the INS's concern for the particular vulnerability of minors." *Id.* Within five days of arrest, the INS must transfer the minor to a non-secure, licensed facility; but "in the event of an emergency or influx of minors into the United States," the INS need only make the transfer "as expeditiously as possible." *Id.*

The Settlement creates a presumption in favor of release and favors family reunification:

> Where the INS determines that the detention
> of the minor is not required either to secure
> his or her timely appearance before the INS
> or the immigration court, or to ensure the

AR353

minor's safety or that of others, the INS shall release a minor from its custody without unnecessary delay, in the following order of preference, to:

    A.  a parent;

    B.  a legal guardian;

    C.  an adult relative (brother, sister, aunt, uncle, or grandparent);

    D.  an adult individual or entity designated by the parent or legal guardian . . .

    E.  a licensed program willing to accept legal custody; or

    F.  an adult individual or entity seeking custody . . .

*Id.* ¶ 14; *see also id.* ¶ 18 (requiring "prompt and continuous efforts . . . toward family reunification and the release of the minor"). But, if the INS does not release a minor, it must place her in a "licensed program." *Id.* ¶ 19. A "licensed program" is one "licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children," which must be "non-secure as required under state law" and meet the standards set forth in an exhibit attached to the Settlement. *Id.* ¶ 6. Those standards include food, clothing, grooming items, medical and dental care, individualized needs assessments, educational services, recreation and leisure time, counseling, access to religious services, contact with family members, and a reasonable right to privacy. Some minors, such as those who have

AR354

committed crimes, may be held in a juvenile detention facility instead of a licensed program. *Id.* ¶ 21.

The Settlement generally provides for the enforcement in the Central District of California, *id.* ¶ 37, but allows individual challenges to placement or detention conditions to be brought in any district court with jurisdiction and venue, *id.* ¶ 24(B). The Settlement originally was to terminate no later than 2002. *Id.* ¶ 40. But, in 2001, the parties stipulated that the Settlement would terminate "45 days following defendants' publication of final regulations implementing this Agreement." The government has not yet promulgated those regulations.

## III.    Developments Subsequent to the Settlement

Before 2001, "families apprehended for entering the United States illegally were most often released rather than detained because of a limited amount of family bed space; families who were detained had to be housed separately, splitting up parents and children." *Bunikyte ex rel. Bunikiene v. Chertoff*, No. 1:07-cv-00164-SS, 2007 WL 1074070, at *1 (W.D. Tex. Apr. 9, 2007). "In the wake of September 11, 2001, however, immigration policy fundamentally changed," with "more restrictive immigration controls, tougher enforcement, and broader expedited removal of illegal aliens," which "made the automatic release of families problematic." *Id.*

In 2001, the INS converted a nursing home in Berks County, Pennsylvania ("Berks") into its first family detention center. *Id.* Because Pennsylvania has no licensing requirements for family residential care facilities, Berks has been monitored and licensed by state authorities under the state standards applicable to child residential and day treatment facilities. *Id.* at *8.

AR355

In 2002, Congress enacted the Homeland Security Act, Pub. L. No. 107-296, 116 Stat. 2135, abolishing the INS and transferring most of its immigration functions to the newly-formed Department of Homeland Security ("DHS"), in which Immigration and Customs Enforcement ("ICE") is housed. 6 U.S.C. §§ 111, 251, 291. The Homeland Security Act transferred responsibility for the care and custody of unaccompanied alien children to the Office of Refugee Resettlement in the Department of Health and Human Services. 6 U.S.C. § 279(a), (b)(1)(A), (g)(2).

In 2006, DHS converted a medium security prison in Taylor, Texas into its second family detention facility, the Don T. Hutto Family Residential Center ("Hutto"). *Bunikyte*, 2007 WL 1074070, at *1. In 2007, three children at Hutto, who were not represented by Flores' class counsel, filed suit in the Western District of Texas, contending that the conditions at Hutto violated the Settlement. *Id.* at *1–2. In response, the government argued that the Settlement applied only to unaccompanied minors. The district court rejected that argument, holding that "by its terms, [the Settlement] applies to all 'minors in the custody' of ICE and DHS, not just unaccompanied minors." *Id.* at *2–3 (quoting Settlement ¶ 9). The court then concluded that the minors' confinement at Hutto violated the Settlement's detention standards, *id.* at *6–15, but rejected the claim that the Settlement entitled the plaintiffs to have their parents released with them, *id.* at *16. The suit settled before trial. *In re Hutto Family Det. Ctr.*, No. 1:07-cv-00164-SS, Dkt. 94, (W.D. Tex. Aug. 26, 2007).

In 2008, Congress enacted the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), Pub. L. No. 110-457, 122 Stat. 5044 (principally codified in relevant part at 8 U.S.C. § 1232).

AR356

TVPRA partially codified the Settlement by creating statutory standards for the treatment of unaccompanied minors. *See, e.g.*, 8 U.S.C. § 1232(c)(2)(A) (an unaccompanied alien child "shall be promptly placed in the least restrictive setting that is in the best interest of the child," subject to considerations of flight and danger).

## IV.    The Enforcement Action and *R.I.L-R v. Johnson*

In 2014, a surge of undocumented Central Americans arrived at the U.S.-Mexico border.  In response, ICE opened family detention centers in Karnes City and Dilley, Texas, and Artesia, New Mexico.  It closed the Artesia center later that year.  The detention centers operate under ICE's Family Residential Detention Standards, which do not comply with the Settlement.

In January 2015, a group of Central American migrants, who were not represented by *Flores* class counsel, filed a putative class action, claiming that the government had adopted a no-release policy as to Central American families, and challenging that alleged policy under the Due Process Clause.  *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 170 (D.D.C. 2015).  On February 20, 2015, the U.S. District Court for the District of Columbia granted the plaintiffs' motion for a preliminary injunction.  *Id.* at 171.  The court found that ICE had not adopted a blanket no-release policy, but found ample support for the plaintiffs' alternative contention that "DHS policy directs ICE officers to consider deterrence of mass migration as a factor in their custody determinations, and that this policy has played a significant role in the recent increased detention of Central American mothers and children."  *Id.* at 174.  The court preliminarily enjoined the government from using deterrence as a factor in detaining class members.  *R.I.L-R v. Johnson*, No. 1:15-cv-00011-JEB, Dkt. 32 (D.D.C. Feb. 20, 2015).

In May 2015, the government notified the court that it had decided "to discontinue, at this time, invoking deterrence as a factor in custody determinations in all cases involving families, irrespective of the outcome of this litigation," while maintaining that it could lawfully reinstate the policy. *Id.* Dkt. 40. In June 2015, by the agreement of the parties, the district court in *R.I.L-R* dissolved the preliminary injunction and closed the case, allowing plaintiffs to move to reinstate the preliminary injunction if the government again invoked deterrence in custody determinations. *Id.* Dkt. 43.

Meanwhile, on February 2, 2015, Flores filed a motion in the U.S. District Court for the Central District of California to enforce the Settlement, arguing that ICE had breached it by (1) adopting a no-release policy, and (2) confining children in the secure, unlicensed facilities at Dilley and Karnes.[1] The government argued in response that the Settlement does not apply to accompanied minors, and filed an alternative motion to amend the Settlement to so provide. On July 24, 2015, the district court granted Flores' motion, denied the government's motion to amend, and also held that the Settlement requires release of a minor's accompanying parent, "as long as doing so would not create a flight risk or a safety risk."[2] On August 21, 2015, the district court filed a remedial order. The government timely appealed. We have jurisdiction under 28 U.S.C. § 1292.

---

[1] Flores also argued that the government breached Paragraph 12(A) by exposing children in temporary Border Patrol custody to "harsh, substandard" conditions. That issue is not implicated in this appeal.

[2] The case was reassigned to Judge Dolly M. Gee, because the original judge, Robert J. Kelleher, had died.

AR358

## STANDARD OF REVIEW

The Settlement is a consent decree, which, "like a contract, must be discerned within its four corners, extrinsic evidence being relevant only to resolve ambiguity in the decree." *United States v. Asarco Inc.*, 430 F.3d 972, 980 (9th Cir. 2005). We review the district court's interpretation of the contract de novo. *Miller v. Safeco Title Ins. Co.*, 758 F.2d 364, 367 (9th Cir. 1985). "Motions for relief from judgment under Rule 60(b) are reviewed for abuse of discretion." *Asarco*, 430 F.3d at 978.

## DISCUSSION

### I. The Settlement Applies to Accompanied Minors

We agree with the district court that "[t]he plain language of the Agreement clearly encompasses accompanied minors." First, the Settlement defines minor as "any person under the age of eighteen (18) years who is detained in the legal custody of the INS"; describes its scope as setting "nationwide policy for the detention, release, and treatment of minors in the custody of the INS"; and defines the class as "[a]ll minors who are detained in the legal custody of the INS." Settlement ¶¶ 4, 9, 10. Second, as the district court explained, "the Agreement provides special guidelines with respect to unaccompanied minors in some situations," and "[i]t would make little sense to write rules making special reference to unaccompanied minors if the parties intended the Agreement as a whole to be applicable only to unaccompanied minors." *See id.* ¶ 12(A) ("The INS will segregate unaccompanied minors from unrelated adults."); *id.* ¶ 25 ("Unaccompanied minors arrested or taken into custody by the INS should not be transported by the INS in vehicles with detained adults except . . . ."). Third, as the district court reasoned, "the Agreement expressly identifies

AR359

those minors to whom the class definition would not apply"—emancipated minors and those who have been incarcerated for a criminal offense as an adult; "[h]ad the parties to the Agreement intended to exclude accompanied minors from the Agreement, they could have done so explicitly when they set forth the definition of minors who are excluded from the Agreement." *See id.* ¶ 4.

The government nevertheless argues that certain terms of the Settlement show that it was never meant to cover accompanied minors. The Settlement defines "licensed program" as "any program, agency or organization that is licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children, including a program operating group homes, foster homes, or facilities for special needs minors." *Id.* ¶ 6. The government contends that this makes only "dependent minors" eligible for licensed programs; that Black's Law Dictionary defines dependent minors to exclude accompanied minors, *see Child, Black's Law Dictionary* (10th ed. 2014); and that it would make little sense for the Settlement to apply to accompanied minors but exclude them from licensed programs. We reject this argument. That a program is "licensed . . . to provide . . . services for dependent children" does not mean that only dependent children can be placed in that program. And, the definition of "licensed program" does not indicate any intent to exclude accompanied minors; rather, its obvious purpose is to use the existing apparatus of state licensure to independently review detention conditions.

At oral argument, the government cited a provision of the Settlement requiring that, "[b]efore a minor is released from INS custody pursuant to Paragraph 14 above, the custodian must execute an Affidavit of Support (Form I-134)

and an agreement to," among other things, provide for the minor's well-being and ensure the minor's presence at immigration proceedings. Settlement ¶ 15. The government claims that the reference to the "custodian" demonstrates that the Settlement did not contemplate releasing a child to an accompanying parent.  The government is right in one sense—the Settlement does not contemplate releasing a child to a parent who remains in custody, because that would not be a "release."  But, it makes perfect sense to require an aunt who takes custody of a child to sign an affidavit of support, whether or not the child was arrested with his mother.

The government correctly notes that the Settlement does not address the potentially complex issues involving the housing of family units and the scope of parental rights for adults apprehended with their children.  For example, Exhibit 1, which sets forth requirements for licensed programs, does not contain standards related to the detention of adults or family units.  But, the fact that the parties gave inadequate attention to some potential problems of accompanied minors does not mean that the Settlement does not apply to them.  *See Bunikyte*, 2007 WL 1074070, at *3 ("Though it is no defense that the *Flores* Settlement is outdated, it is apparent that this agreement did not anticipate the current emphasis on family detention. . . .  Nonetheless, the *Flores* Settlement, by its terms, applies to all 'minors in the custody' of ICE and DHS, not just unaccompanied minors.") (quoting Settlement ¶ 9); *id.* ("Paragraph 19 sets out the foundation of the detention standards applicable to any minor in United States immigration custody, and there is no reason why its requirements should be any less applicable in a family detention context than in the context of unaccompanied minors.").

AR361

The government next argues that the Complaint and certified classes were limited to unaccompanied minors, and that the parties therefore could not have entered into a Settlement granting rights to accompanied minors. To be sure, this litigation initially focused on the problems facing unaccompanied minors, who then constituted 70% of immigrant children arrested by the INS. *See Flores*, 507 U.S. at 295. But, the Complaint was not limited to unaccompanied minors. The conduct Flores challenged—INS detention conditions and the Western Region release policy—applied to accompanied and unaccompanied minors alike. *See* Complaint ¶ 50 (challenging the INS' "policy to indefinitely jail juveniles, particularly those whose parents INS agents suspect may be aliens unlawfully in the United States, unless and until their parent or legal guardian personally appears before an INS agent for interrogation and to accept physical custody of the minor."); *id.* ¶¶ 65, 70–79 (challenging juveniles' condition of confinement in INS facilities, including the lack of education, recreation, and visitation, and the imposition of strip searches). So did the remedies sought and the classes the district court certified. *See id.* at 29 ¶ 4 (requesting an order that the INS admit juveniles to bail without requiring that their parents or legal guardians appear before INS agents); Order re Class Certification (certifying a class for the release claims and a class for the detention conditions claims).

The government has not explained why the detention claims class would exclude accompanied minors; minors who arrive with their parents are as desirous of education and recreation, and as averse to strip searches, as those who come alone. As for release, the government focuses narrowly on the release class definition. *See* Order re Class Certification at 2 (defining the release class to include all minors arrested in the INS' Western Region "who have been, are, or will be

AR362

denied release from INS custody because a parent or legal guardian fails to personally appear to take custody of them"). But, the release class was certified expressly to challenge the Western Region's policy of not releasing detained minors to anyone other than a parent or guardian. Complaint ¶ 50; *see also Flores*, 507 U.S. at 296. That policy applied equally to accompanied minors, such as a boy detained with his mother who wanted to be released to his aunt but was refused because his father "fail[ed] to personally appear to take custody of [him]." *See* Order re Class Certification at 2.**[3]**

The government also contends that, because the four named plaintiffs in the Complaint were unaccompanied, a class including accompanied minors would run afoul of the requirements of typicality and representativeness. *See* Fed. R. Civ. P. 23. The government's factual premise is questionable: one of the named plaintiffs was accompanied at the time of arrest by her adult brother, although he was released without her. Complaint ¶ 34. But, more importantly, the government waived its ability to challenge the class certification when it settled the case and did not timely appeal the final judgment. And, to the extent this and other arguments are aimed at providing extrinsic evidence of the meaning of the Settlement, they fail because the

---

[3] Even if the Complaint only sought to assert the detention and release rights of unaccompanied immigrant children, it is far from clear that a settlement governing detention and release for all immigration children would be invalid. A consent decree may "provide[ ] broader relief than the court could have awarded after a trial"; the law only requires that the agreement "come within the general scope of the case made by the pleadings." *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 525 (1986) (alterations, citations, and quotation marks omitted).

AR363

Settlement unambiguously applies to accompanied minors. *See Asarco*, 430 F.3d at 980.

## II. The Settlement Does Not Require the Government to Release Parents

Flores' motion to enforce argued that ICE's purported no-release policy, which allegedly denied accompanying parents "any chance for release," frustrated the minor class members' right to preferential release to a parent, and that to safeguard that right, ICE was required to give parents individualized custody determinations.   After the district court tentatively agreed, Flores went further, proposing an order providing that "Defendants shall comply with the Settlement ¶ 14(a) by releasing class members without unnecessary delay in first order of preference to a parent, including a parent subject to release who presented her or himself or was apprehended by Defendants accompanied by a class member."

While acknowledging that "the Agreement does not contain any provision that explicitly addresses adult rights and treatment in detention," the district court nonetheless reasoned that "ICE's blanket no-release policy with respect to mothers cannot be reconciled with the Agreement's grant to class members of a right to preferential release to a parent."   The court also found that the regulation upheld in *Flores*, 507 U.S. at 315, supported the release of an accompanying relative.   *See* 8 C.F.R. § 212.5(b)(3)(ii) ("If a relative who is not in detention cannot be located to sponsor the minor, the minor may be released with an accompanying relative who is in detention.").   It also found support for that conclusion in ICE's practice, until June 2014, of generally releasing parents who were not flight or safety risks.

AR364

The district court therefore concluded that the government "must release an accompanying parent as long as doing so would not create a flight risk or a safety risk," and it ordered:

> To comply with Paragraph 14A of the Agreement and as contemplated in Paragraph 15, a class member's accompanying parent shall be released with the class member in accordance with applicable laws and regulations unless the parent is subject to mandatory detention under applicable law or after an individualized custody determination sthe parent is determined to pose a significant flight risk, or a threat to others or the national security, and the flight risk or threat cannot be mitigated by an appropriate bond or conditions of release.

The district court erred in interpreting the Settlement to provide release rights to adults. The Settlement does not explicitly provide any rights to adults. *Bunikyte*, 2007 WL 1074070 at *16. The fact that the Settlement grants class members a right to preferential release to a parent over others does not mean that the government must also make a parent available; it simply means that, if available, a parent is the first choice. Because "the plain language of [the] consent decree is clear, we need not evaluate any extrinsic evidence to ascertain the true intent of the parties." *See Nehmer v. U.S. Dep't of Veterans Affairs*, 494 F.3d 846, 861 (9th Cir. 2007). In any case, the extrinsic evidence does not show that the parties intended to grant release rights to parents. "In fact, the context of the *Flores* Settlement argues against this result: the Settlement was the product of litigation in which unaccompanied minors argued that release to adults other

AR365

than their parents was preferable to remaining in custody until their parents could come get them." *Bunikyte*, 2007 WL 1074070 at *16. The regulation the district court relied upon at most shows that the parties might have thought about releasing adults when executing the Settlement, not that they agreed to do so in that document. And, there is no evidence that ICE once released most children and parents because of the Settlement, rather than for other reasons.

Flores suggests that we construe the district court's order narrowly, arguing that it only requires, as she initially requested, that the government grant accompanying parents individualized custody determinations "in accordance with applicable laws and regulations," just as it would single adults. But, the district court plainly went further. A non-criminal alien detained during removal proceedings generally bears the burden of establishing "that he or she does not present a danger to persons or property, is not a threat to the national security, and does not pose a risk of flight." *In re Guerra*, 24 I. & N. Dec. 37, 38 (BIA 2006). But, the district court placed the burden on the government, requiring it to release an accompanying parent "unless the parent is subject to mandatory detention under applicable law or after an individualized custody determination the parent is determined to pose a significant flight risk, or a threat to others or the national security." In addition, the order requires a "significant flight risk" to justify detention, while the usual standard is merely "a risk of flight." *Id.* More importantly, parents were not plaintiffs in the *Flores* action, nor are they members of the certified classes. The Settlement therefore provides no affirmative release rights

AR366

for parents, and the district court erred in creating such rights in the context of a motion to enforce that agreement.**4**

## III.   The District Court Correctly Denied the Government's Motion to Amend the Settlement

Even if the Settlement applies to accompanied minors, the government argues that it is "no longer equitable" to apply it as written.  *See* Fed. R. Civ. P. 60(b)(5) (allowing relief from judgment if "applying it prospectively is no longer equitable"); *Horne v. Flores*, 557 U.S. 433, 447 (2009) ("Rule 60(b)(5) serves a particularly important function in what we have termed 'institutional reform litigation.'").  The district court denied this motion.  We review that decision for abuse of discretion.  *Asarco*, 430 F.3d at 978.

"[A] party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree.  If the moving party meets this standard, the court should consider whether the proposed modification is suitably tailored to the changed circumstance." *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 383 (1992).  When the basis for modification is a change in law, the moving party must establish that the provision it seeks to modify has become "impermissible." *Id.* at 388.

---

**4** In so holding, we express no opinion whether the parents of accompanied minors have a right to release, or if so, the nature of that right.  Nor do we express an opinion whether the alleged no-release policy would violate the Settlement.  We hold only that the Settlement is not the source of any affirmative right to release.

The government first argues that the Settlement should be modified because of the surge in family units crossing the Southwest border.   "Ordinarily, however, modification should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree." *Id.* at 385.   The Settlement expressly anticipated an influx, and provided that, if one occurred, the government would be given more time to release minors or place them in licensed programs.   Settlement ¶ 12.   And, even if the parties did not anticipate an influx of this size, we cannot fathom how a "suitably tailored" response to the change in circumstances would be to exempt an entire category of migrants from the Settlement, as opposed to, say, relaxing certain requirements applicable to all migrants.   *See Rufo*, 502 U.S. at 383.

The government also argues that the law has changed substantially since the Settlement was approved.   It cites Congress' authorization of expedited removal—but that occurred in 1996, before the Settlement was approved.   *See* Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. 104–208, § 302, 110 Stat. 3009-546, 579–85 (1996).   The government also notes that the Homeland Security Act of 2002 reassigned the immigration functions of the former INS to DHS; but there is no reason why that bureaucratic reorganization should prohibit the government from adhering to the Settlement.   *See* Settlement ¶ 1 ("As the term [party] applies to Defendants, it shall include their . . . successors in office.").

The government also argues that some provisions of the TVPRA regarding the detention and release of unaccompanied minors are inconsistent with the Settlement. At most, that might support modification of the conflicting provisions so that they no longer apply to the unaccompanied minors covered by the TVPRA.   But, the

AR368

creation of statutory rights for *unaccompanied* minors does not make application of the Settlement to *accompanied* minors "impermissible."  The district court did not abuse its discretion in denying the motion to amend on the record before it.

## CONCLUSION

We hold that the Settlement applies to accompanied minors but does not require the release of accompanying parents.  We therefore affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.[5] Each party shall bear its own costs.

---

[5] We note that a second motion to enforce is pending in the district court.

AR369

to $44.00 per ton of assessable olives. The Committee unanimously recommended 2019 expenditures of $1,628,923 and an assessment rate of $44.00 per ton of assessable olives. The recommended assessment rate of $44.00 is $20.00 higher than the 2018 rate. The quantity of assessable olives for the 2019 Fiscal year is 17,953 tons. The $44.00 rate should provide $789,932 in assessment revenue. The higher assessment rate is needed because annual receipts for the 2018 crop year are 17,953 tons compared to 90,188 tons for the 2017 crop year. Olives are an alternate-bearing crop, with a small crop followed by a large crop. Income derived from the $44.00 per ton assessment rate, along with funds from the authorized reserve and interest income, should be adequate to meet this fiscal year's expenses.

The major expenditures recommended by the Committee for the 2019 fiscal year include $713,900 for program administration, $513,500 for marketing activities, $343,523 for research, and $58,000 for inspection equipment. Budgeted expenses for these items during the 2018 fiscal year were $401,200 for program administration, $973,500 for marketing activities, $297,777 for research, and $77,000 for inspection equipment. The Committee deliberated on many of the expenses, weighed the relative value of various programs or projects, and increased their expenses for marketing and research activities.

Prior to arriving at this budget and assessment rate, the Committee considered information from various sources including the Committee's executive, marketing, inspection, and research subcommittees. Alternate expenditure levels were discussed by these groups, based upon the relative value of various projects to the olive industry. The assessment rate of $44.00 per ton of assessable olives was derived by considering anticipated expenses, the low volume of assessable olives, and a late season freeze.

A review of NASS information indicates that the average producer price for the 2017 crop year was $974.00 per ton. Therefore, utilizing the assessment rate of $44.00 per ton, the assessment revenue for the 2019 fiscal year as a percentage of total producer revenue would be approximately 4.52 percent.

This action increases the assessment obligation imposed on handlers which are minimal and uniform on all handlers. Some of the additional costs may be passed on to producers. However, these costs would be offset by the benefits derived by the operation of

the marketing order. In addition, the Committee's December 11, 2018 meeting was widely publicized throughout the production area and all interested persons were invited to attend the meeting and participate in Committee deliberations on all issues.

In accordance with the Paperwork Reduction Act of 1995, (44 U.S.C. chapter 35), the marketing order's information collection requirements have been previously approved by OMB and assigned OMB No. 0581–0178 Vegetable and Specialty Crops. No changes in those requirements because of this action are necessary. Should any changes become necessary, they would be submitted to OMB for approval.

This final rule imposes no additional reporting or recordkeeping requirements on either small or large California olive handlers. As with all Federal marketing order programs, reports and forms are periodically reviewed to reduce information requirements and duplication by industry and public sector agencies. USDA has not identified any relevant Federal rules that duplicate, overlap, or conflict with this final rule.

AMS is committed to complying with the E-Government Act, to promote the use of the internet and other information technologies to provide increased opportunities for citizen access to Government information and services, and for other purposes.

A proposed rule concerning this action was published in the **Federal Register** on April 24, 2019 (84 FR 17089). Copies of the proposed rule were provided to all California olive handlers. The proposal was also made available through the internet by USDA and the Office of the Federal Register. A 30-day comment period ending May 24, 2019, was provided for interested persons to respond to the proposal. No comments were received. Accordingly, no changes will be made to the rule as proposed.

A small business guide on complying with fruit, vegetable, and specialty crop marketing agreements and orders may be viewed at: *http://www.ams.usda.gov/ rules-regulations/moa/small-businesses.* Any questions about the compliance guide should be sent to Richard Lower at the previously-mentioned address in the **FOR FURTHER INFORMATION CONTACT** section.

After consideration of all relevant material presented, including the information and recommendation submitted by the Committee and other available information, it is hereby found that this rule will tend to effectuate the declared policy of the Act.

## List of Subjects in 7 CFR Part 932

Olives, Marketing agreements, Reporting and recordkeeping requirements.

For the reasons set forth in the preamble, 7 CFR part 932 is amended as follows:

## PART 932—OLIVES GROWN IN CALIFORNIA

■ 1. The authority citation for 7 CFR part 932 continues to read as follows:

**Authority:** 7 U.S.C. 601–674.

■ 2. Section 932.230 is revised to read as follows:

### § 932.230   Assessment rate.

On and after January 1, 2019, an assessment rate of $44.00 per ton is established for California olives.

Dated: July 11, 2019.

**Bruce Summers,**
*Administrator, Agricultural Marketing Service.*

[FR Doc. 2019–15061 Filed 7–15–19; 8:45 am]

**BILLING CODE 3410-02-P**

---

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Part 208**

**RIN 1615–AC44**

## DEPARTMENT OF JUSTICE

**Executive Office for Immigration Review**

**8 CFR Parts 1003 and 1208**

**[EOIR Docket No. 19–0504; A.G. Order No. 4488–2019]**

**RIN 1125–AA91**

## Asylum Eligibility and Procedural Modifications

**AGENCY:** Executive Office for Immigration Review, Department of Justice; U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Interim final rule; request for comment.

---

**SUMMARY:** The Department of Justice and the Department of Homeland Security (''DOJ,'' ''DHS,'' or collectively, ''the Departments'') are adopting an interim final rule (''interim rule'' or ''rule'') governing asylum claims in the context of aliens who enter or attempt to enter the United States across the southern land border after failing to apply for protection from persecution or torture while in a third country through which

they transited en route to the United States. Pursuant to statutory authority, the Departments are amending their respective regulations to provide that, with limited exceptions, an alien who enters or attempts to enter the United States across the southern border after failing to apply for protection in a third country outside the alien's country of citizenship, nationality, or last lawful habitual residence through which the alien transited en route to the United States is ineligible for asylum. This basis for asylum ineligibility applies only prospectively to aliens who enter or arrive in the United States on or after the effective date of this rule. In addition to establishing a new mandatory bar for asylum eligibility for aliens who enter or attempt to enter the United States across the southern border after failing to apply for protection from persecution or torture in at least one third country through which they transited en route to the United States, this rule would also require asylum officers and immigration judges to apply this new bar on asylum eligibility when administering the credible-fear screening process applicable to stowaways and aliens who are subject to expedited removal under section 235(b)(1) of the Immigration and Nationality Act. The new bar established by this regulation does not modify withholding or deferral of removal proceedings. Aliens who fail to apply for protection in a third country of transit may continue to apply for withholding of removal under the Immigration and Nationality Act ("INA") and deferral of removal under regulations issued pursuant to the legislation implementing U.S. obligations under Article 3 of the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.

**DATES:**

*Effective date:* This rule is effective July 16, 2019.

*Submission of public comments:* Written or electronic comments must be submitted on or before August 15, 2019. Written comments postmarked on or before that date will be considered timely. The electronic Federal Docket Management System will accept comments prior to midnight eastern standard time at the end of that day.

**ADDRESSES:** You may submit comments, identified by EOIR Docket No. 19–0504, by one of the following methods:

• *Federal eRulemaking Portal: http:// www.regulations.gov.* Follow the instructions for submitting comments.

• *Mail:* Lauren Alder Reid, Assistant Director, Office of Policy, Executive

Office for Immigration Review, 5107 Leesburg Pike, Suite 2616, Falls Church, VA 22041. To ensure proper handling, please reference EOIR Docket No. 19–0504 on your correspondence. This mailing address may be used for paper, disk, or CD–ROM submissions.

• *Hand Delivery/Courier:* Lauren Alder Reid, Assistant Director, Office of Policy, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2616, Falls Church, VA 22041. Contact Telephone Number (703) 305–0289 (not a toll-free call).

**FOR FURTHER INFORMATION CONTACT:** Lauren Alder Reid, Assistant Director, Office of Policy, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2616, Falls Church, VA 22041. Contact Telephone Number (703) 305–0289 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

**I. Public Participation**

Interested persons are invited to participate in this rulemaking by submitting written data, views, or arguments on all aspects of this rule. The Departments also invite comments that relate to the potential economic or federalism effects that might result from this rule. To provide the most assistance to the Departments, comments should reference a specific portion of the rule; explain the reason for any recommended change; and include data, information, or authority that supports the recommended change. Comments received will be considered and addressed in the process of drafting the final rule.

All comments submitted for this rulemaking should include the agency name and EOIR Docket No. 19–0504. Please note that all comments received are considered part of the public record and made available for public inspection at *www.regulations.gov.* Such information includes personally identifiable information (such as a person's name, address, or any other data that might personally identify that individual) that the commenter voluntarily submits.

If you want to submit personally identifiable information as part of your comment, but do not want it to be posted online, you must include the phrase "PERSONALLY IDENTIFIABLE INFORMATION" in the first paragraph of your comment and precisely and prominently identify the information of which you seek redaction.

If you want to submit confidential business information as part of your comment, but do not want it to be posted online, you must include the phrase "CONFIDENTIAL BUSINESS

INFORMATION" in the first paragraph of your comment and precisely and prominently identify the confidential business information of which you seek redaction. If a comment has so much confidential business information that it cannot be effectively redacted, all or part of that comment may not be posted on *www.regulations.gov.* Personally identifiable information and confidential business information provided as set forth above will be placed in the public docket file of DOJ's Executive Office for Immigration Review ("EOIR"), but not posted online. To inspect the public docket file in person, you must make an appointment with EOIR. Please see the **FOR FURTHER INFORMATION CONTACT** paragraph above for the contact information specific to this rule.

**II. Purpose of This Interim Rule**

As discussed further below, asylum is a discretionary immigration benefit that generally can be sought by eligible aliens who are physically present or arriving in the United States, irrespective of their status, as provided in section 208 of the INA, 8 U.S.C. 1158. Congress, however, has provided that certain categories of aliens cannot receive asylum and has further delegated to the Attorney General and the Secretary of Homeland Security ("Secretary") the authority to promulgate regulations establishing additional bars on eligibility to the extent consistent with the asylum statute, as well as the authority to establish "any other conditions or limitations on the consideration of an application for asylum" that are consistent with the INA. *See* INA 208(b)(2)(C), (d)(5)(B), 8 U.S.C. 1158(b)(2)(C), (d)(5)(B). This interim rule will limit aliens' eligibility for this discretionary benefit if they enter or attempt to enter the United States across the southern land border after failing to apply for protection in at least one third country through which they transited en route to the United States, subject to limited exceptions.

The United States has experienced a dramatic increase in the number of aliens encountered along or near the southern land border with Mexico. This increase corresponds with a sharp increase in the number, and percentage, of aliens claiming fear of persecution or torture when apprehended or encountered by DHS. For example, over the past decade, the overall percentage of aliens subject to expedited removal and referred, as part of the initial screening process, for a credible-fear interview on claims of a fear of return has jumped from approximately 5

percent to above 40 percent. The number of cases referred to DOJ for proceedings before an immigration judge has also risen sharply, more than tripling between 2013 and 2018. These numbers are projected to continue to increase throughout the remainder of Fiscal Year ("FY") 2019 and beyond. Only a small minority of these individuals, however, are ultimately granted asylum.

The large number of meritless asylum claims places an extraordinary strain on the nation's immigration system, undermines many of the humanitarian purposes of asylum, has exacerbated the humanitarian crisis of human smuggling, and affects the United States' ongoing diplomatic negotiations with foreign countries. This rule mitigates the strain on the country's immigration system by more efficiently identifying aliens who are misusing the asylum system to enter and remain in the United States rather than legitimately seeking urgent protection from persecution or torture. Aliens who transited through another country where protection was available, and yet did not seek protection, may fall within that category.

Apprehending the great number of aliens crossing illegally into the United States and processing their credible-fear and asylum claims consumes an inordinate amount of resources of the Departments. DHS must surveil, apprehend, screen, and process the aliens who enter the country. DHS must also devote significant resources to detain many aliens pending further proceedings and to represent the United States in immigration court proceedings. The large influx of aliens also consumes substantial resources of DOJ, whose immigration judges adjudicate aliens' claims and whose officials are responsible for prosecuting and maintaining custody over those who violate Federal criminal law. Despite DOJ deploying close to double the number of immigration judges as in 2010 and completing historic numbers of cases, currently more than 900,000 cases are pending before the immigration courts. This represents an increase of more than 100,000 cases (or a greater than 13 percent increase in the number of pending cases) since the start of FY 2019. And this increase is on top of an already sizeable jump over the previous five years in the number of cases pending before immigration judges. From the end of FY 2013 to the close of FY 2018, the number of pending cases more than doubled, increasing nearly 125 percent.

That increase is owing, in part, to the continued influx of aliens and record numbers of asylum applications being filed: More than 436,000 of the currently pending immigration cases include an asylum application. But a large majority of the asylum claims raised by those apprehended at the southern border are ultimately determined to be without merit. The strain on the immigration system from those meritless cases has been extreme and extends to the judicial system. The INA provides many asylum-seekers with rights of appeal to the Article III courts of the United States. Final disposition of asylum claims, even those that lack merit, can take years and significant government resources to resolve, particularly where Federal courts of appeals grant stays of removal when appeals are filed. *See De Leon* v. *INS,* 115 F.3d 643 (9th Cir. 1997).

The rule's bar on asylum eligibility for aliens who fail to apply for protection in at least one third country through which they transit en route to the United States also aims to further the humanitarian purposes of asylum. It prioritizes individuals who are unable to obtain protection from persecution elsewhere and individuals who are victims of a "severe form of trafficking in persons" as defined by 8 CFR 214.11, many of whom do not volitionally transit through a third country to reach the United States. By deterring meritless asylum claims and de-prioritizing the applications of individuals who could have obtained protection in another country, the Departments seek to ensure that those refugees who have no alternative to U.S.-based asylum relief or have been subjected to an extreme form of human trafficking are able to obtain relief more quickly.

Additionally, the rule seeks to curtail the humanitarian crisis created by human smugglers bringing men, women, and children across the southern border. By reducing the incentive for aliens without an urgent or genuine need for asylum to cross the border—in the hope of a lengthy asylum process that will enable them to remain in the United States for years, typically free from detention and with work authorization, despite their statutory ineligibility for relief—the rule aims to reduce human smuggling and its tragic effects.

Finally, the rule aims to aid the United States in its negotiations with foreign nations on migration issues. Addressing the eligibility for asylum of aliens who enter or attempt to enter the United States after failing to seek protection in at least one third country through which they transited en route to the United States will better position the United States as it engages in ongoing diplomatic negotiations with Mexico and the Northern Triangle countries (Guatemala, El Salvador, and Honduras) regarding migration issues in general, related measures employed to control the flow of aliens into the United States (such as the recently implemented Migrant Protection Protocols [1]), and the urgent need to address the humanitarian and security crisis along the southern land border between the United States and Mexico.

In sum, this rule provides that, with limited exceptions, an alien who enters or arrives in the United States across the southern land border is ineligible for the discretionary benefit of asylum unless he or she applied for and received a final judgment denying protection in at least one third country through which he or she transited en route to the United States. The alien would, however, remain eligible to apply for statutory withholding of removal and for deferral of removal under the CAT.

In order to alleviate the strain on the U.S. immigration system and more effectively provide relief to those most in need of asylum—victims of a severe form of trafficking and refugees who have no other option—this rule incorporates the eligibility bar on asylum into the credible-fear screening process applicable to stowaways and aliens placed in expedited removal proceedings.

## III. Background

### A. Joint Interim Rule

The Attorney General and the Secretary publish this joint interim rule pursuant to their respective authorities concerning asylum determinations.

The Homeland Security Act of 2002 ("HSA"), Public Law 107–296, as amended, transferred many functions related to the execution of Federal immigration law to the newly created DHS. The HSA charged the Secretary "with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens," 8 U.S.C. 1103(a)(1), and granted the Secretary the power to take all actions "necessary for carrying out" the provisions of the INA, *id.* at 1103(a)(3). The HSA also transferred to DHS some responsibility for affirmative asylum applications, *i.e.,* applications for asylum made outside the removal context. *See* 6 U.S.C. 271(b)(3). That authority has been delegated within DHS to U.S. Citizenship and Immigration Services ("USCIS"). USCIS asylum officers

---

[1] *See* Notice of Availability for Policy Guidance Related to Implementation of the Migrant Protection Protocols, 84 FR 6811 (Feb. 28, 2019).

determine in the first instance whether an alien's affirmative asylum application should be granted. *See* 8 CFR 208.4(b), 208.9.

But the HSA retained authority over certain individual immigration adjudications (including those related to defensive asylum applications) for DOJ, under EOIR and subject to the direction and regulation of the Attorney General. *See* 6 U.S.C. 521; 8 U.S.C. 1103(g). Thus, immigration judges within DOJ continue to adjudicate all asylum applications made by aliens during the removal process (defensive asylum applications), and they also review affirmative asylum applications referred by USCIS to the immigration court. *See* INA 101(b)(4), 8 U.S.C. 1101(b)(4); 8 CFR 1208.2; *Dhakal* v. *Sessions,* 895 F.3d 532, 536–37 (7th Cir. 2018) (describing affirmative and defensive asylum processes). The Board of Immigration Appeals (Board), also within DOJ, hears appeals from certain decisions by immigration judges. 8 CFR 1003.1(b)–(d). Asylum-seekers may appeal certain Board decisions to the Article III courts of the United States. *See* INA 242(a), 8 U.S.C. 1252(a).

The HSA also provided "[t]hat determination and ruling by the Attorney General with respect to all questions of law shall be controlling." INA 103(a)(1), 8 U.S.C. 1103(a)(1). This broad division of functions and authorities informs the background of this interim rule.

### B. Legal Framework for Asylum

Asylum is a form of discretionary relief under section 208 of the INA, 8 U.S.C. 1158, that generally, if granted, keeps an alien from being subject to removal, creates a path to lawful permanent resident status and U.S. citizenship, and allows a variety of other benefits, such as allowing certain alien family members to obtain lawful immigration status derivatively. *See R–S–C* v. *Sessions,* 869 F.3d 1176, 1180 (10th Cir. 2017); *see also, e.g.,* INA 208(c)(1)(A), (C), 8 U.S.C. 1158(c)(1)(A), (C) (asylees cannot be removed subject to certain exceptions and can travel abroad with prior consent); INA 208(c)(1)(B), (d)(2), 8 U.S.C. 1158(c)(1)(B), (d)(2) (asylees shall be given work authorization; asylum applicants may be granted work authorization 180 days after the filing of their applications); INA 208(b)(3), 8 U.S.C. 1158(b)(3) (allowing derivative asylum for an asylee's spouse and unmarried children); INA 209(b), 8 U.S.C. 1159(b) (allowing the Attorney General or Secretary to adjust the status of an asylee to that of a lawful permanent resident); 8 CFR 209.2; 8 U.S.C. 1612(a)(2)(A) (asylees are eligible for certain Federal means-tested benefits on a preferential basis compared to most legal permanent residents); INA 316(a), 8 U.S.C. 1427(a) (describing requirements for the naturalization of lawful permanent residents).

Aliens applying for asylum must establish that they meet the definition of a "refugee," that they are not subject to a bar to the granting of asylum, and that they merit a favorable exercise of discretion. INA 208(b)(1), 240(c)(4)(A), 8 U.S.C. 1158(b)(1), 8 U.S.C. 1229a(c)(4)(A); *see Moncrieffe* v. *Holder,* 569 U.S. 184, 187 (2013) (describing asylum as a form of "discretionary relief from removal"); *Delgado* v. *Mukasey,* 508 F.3d 702, 705 (2d Cir. 2007) ("Asylum is a discretionary form of relief . . . . Once an applicant has established eligibility . . . it remains within the Attorney General's discretion to deny asylum."). Because asylum is a discretionary form of relief from removal, the alien bears the burden of showing both eligibility for asylum and why the Attorney General or Secretary should exercise the discretion to grant relief. *See* INA 208(b)(1), 240(c)(4)(A), 8 U.S.C. 1158(b)(1), 1229a(c)(4)(A)(ii); 8 CFR 1240.8(d); *see Romilus* v. *Ashcroft,* 385 F.3d 1, 8 (1st Cir. 2004).

Section 208 of the INA provides that, in order to apply for asylum, an applicant must be "physically present" or "arriving" in the United States, INA 208(a)(1), 8 U.S.C. 1158(a)(1). Furthermore, to obtain asylum, the alien must demonstrate that he or she meets the statutory definition of a "refugee," INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A), and is not subject to an exception or bar, INA 208(b)(2), 8 U.S.C. 1158(b)(2); 8 CFR 1240.8(d). The alien bears the burden of proof to establish that he or she meets these criteria. INA 208(b)(1)(B)(i), 8 U.S.C. 1158(b)(1)(B)(i); 8 CFR 1240.8(d).

For an alien to establish that he or she is a "refugee," the alien generally must be someone who is outside of his or her country of nationality and "is unable or unwilling to return to . . . that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." INA 101(a)(42)(A), 8 U.S.C. 1101(a)(42)(A). In addition, if evidence indicates that one or more of the grounds for mandatory denial may apply, *see* INA 208(b)(2)(A)(i)–(vi), 8 U.S.C. 1158(b)(2)(A)(i)–(vi), an alien must show not only that he or she does not fit within one of the statutory bars to granting asylum but also that he or she is not subject to any "additional limitations and conditions . . . under which an alien shall be ineligible for asylum" established by a regulation that is "consistent with" section 208 of the INA, *see* INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C). The asylum applicant bears the burden of establishing that the bar at issue does not apply. 8 CFR 1240.8(d); *see also, e.g., Rendon* v. *Mukasey,* 520 F.3d 967, 973 (9th Cir. 2008) (applying 8 CFR 1240.8(d) in the context of the aggravated felony bar to asylum); *Chen* v. *U.S. Att'y Gen.,* 513 F.3d 1255, 1257 (11th Cir. 2008) (applying 8 CFR 1240.8(d) in the context of the persecutor bar); *Gao* v. *U.S. Att'y Gen.,* 500 F.3d 93, 98 (2d Cir. 2007) (same).

Because asylum is a discretionary benefit, those aliens who are statutorily eligible for asylum (*i.e.,* those who meet the definition of "refugee" and are not subject to a mandatory bar) are not entitled to it. After demonstrating eligibility, aliens must further meet their burden of showing that the Attorney General or Secretary should exercise his or her discretion to grant asylum. *See* INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A) (the "Secretary of Homeland Security or the Attorney General may grant asylum to an alien" who applies in accordance with the required procedures and meets the definition of a "refugee"). The asylum statute's grant of discretion "[i]s a broad delegation of power, which restricts the Attorney General's discretion to grant asylum only by requiring the Attorney General to first determine that the asylum applicant is a 'refugee.' " *Komarenko* v. *INS,* 35 F.3d 432, 436 (9th Cir. 1994), *overruled on other grounds by Abebe* v. *Mukasey,* 554 F.3d 1203 (9th Cir. 2009) (en banc) (per curiam). Immigration judges and asylum officers exercise that delegated discretion on a case-by-case basis.

### C. Establishing Bars to Asylum

The availability of asylum has long been qualified both by statutory bars and by administrative discretion to create additional bars. Those bars have developed over time in a back-and-forth process between Congress and the Attorney General. The original asylum statute, as set out in the Refugee Act of 1980, Public Law 96–212, simply directed the Attorney General to "establish a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum, and the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee" within the meaning of the INA. *See* 8 U.S.C. 1158(a) (1982); *see also INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 427–

29 (1987) (describing the 1980 provisions).

In the 1980 implementing regulations, the Attorney General, in his discretion, established several mandatory bars to granting asylum that were modeled on the mandatory bars to eligibility for withholding of deportation under the then-existing section 243(h) of the INA. *See* Refugee and Asylum Procedures, 45 FR 37392, 37392 (June 2, 1980). Those regulations required denial of an asylum application if it was determined that (1) the alien was "not a refugee within the meaning of section 101(a)(42)" of the INA, 8 U.S.C. 1101(a)(42); (2) the alien had been "firmly resettled in a foreign country" before arriving in the United States; (3) the alien "ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular group, or political opinion"; (4) the alien had "been convicted by a final judgment of a particularly serious crime" and therefore constituted "a danger to the community of the United States"; (5) there were "serious reasons for considering that the alien ha[d] committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States"; or (6) there were "reasonable grounds for regarding the alien as a danger to the security of the United States." *See* 45 FR at 37394–95.

In 1990, the Attorney General substantially amended the asylum regulations while retaining the mandatory bars for aliens who (1) persecuted others on account of a protected ground; (2) were convicted of a particularly serious crime in the United States; (3) firmly resettled in another country; or (4) presented reasonable grounds to be regarded as a danger to the security of the United States. *See* Asylum and Withholding of Deportation Procedures, 55 FR 30674, 30683 (July 27, 1990); *see also Yang* v. *INS,* 79 F.3d 932, 936–39 (9th Cir. 1996) (upholding firm-resettlement bar); *Komarenko,* 35 F.3d at 436 (upholding particularly-serious-crime bar), *abrogated on other grounds, Abebe* v. *Mukasey,* 554 F.3d 1203 (9th Cir. 2009) (en banc). In the Immigration Act of 1990, Congress added an additional mandatory bar to applying for or being granted asylum for "an[y] alien who has been convicted of an aggravated felony." Public Law 101–649, sec. 515 (1990).

In the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Public Law 104–208, div. C, and the Antiterrorism and Effective Death Penalty Act of 1996, Public Law 104–132, Congress amended section 208

of the INA, 8 U.S.C. 1158, to include the asylum provisions in effect today: Among other things, Congress designated three categories of aliens who, with limited exceptions, are ineligible to apply for asylum: (1) Aliens who can be removed to a safe third country pursuant to a bilateral or multilateral agreement; (2) aliens who failed to apply for asylum within one year of arriving in the United States; and (3) aliens who have previously applied for asylum and had the application denied. Public Law 104–208, div. C, sec. 604(a); *see* INA 208(a)(2)(A)–(C), 8 U.S.C. 1158(a)(2)(A)–(C). Congress also adopted six mandatory bars to granting asylum, which largely tracked the pre-existing asylum regulations. These bars prohibited asylum for (1) aliens who "ordered, incited, or otherwise participated" in the persecution of others on account of a protected ground; (2) aliens convicted of a "particularly serious crime" in the United States; (3) aliens who committed a "serious nonpolitical crime outside the United States" before arriving in the United States; (4) aliens who are a "danger to the security of the United States"; (5) aliens who are inadmissible or removable under a set of specified grounds relating to terrorist activity; and (6) aliens who have "firmly resettled in another country prior to arriving in the United States." Public Law 104–208, div. C, sec. 604(a); *see* INA 208(b)(2)(A)(i)–(vi), 8 U.S.C. 1158(b)(2)(A)(i)–(vi). Congress further added that aggravated felonies, defined in 8 U.S.C. 1101(a)(43), would be considered "particularly serious crime[s]." Public Law 104–208, div. C, sec. 604(a); *see* INA 201(a)(43), 8 U.S.C. 1101(a)(43).

Although Congress enacted specific bars to asylum eligibility, that statutory list is not exhaustive. Congress, in IIRIRA, expressly authorized the Attorney General to expand upon two of those exceptions—the bars for "particularly serious crimes" and "serious nonpolitical offenses." While Congress prescribed that all aggravated felonies constitute particularly serious crimes, Congress further provided that the Attorney General may "designate by regulation offenses that will be considered" a "particularly serious crime," the perpetrator of which "constitutes a danger to the community of the United States." Public Law 104–208, div. C, sec. 604(a); *see* INA 208(b)(2)(A)(ii), (B)(ii), 8 U.S.C. 1158(b)(2)(A)(ii), (B)(ii). Courts and the Board have long held that this grant of authority also authorizes the Board to identify additional particularly serious

crimes (beyond aggravated felonies) through case-by-case adjudication. *See, e.g., Delgado* v. *Holder,* 648 F.3d 1095, 1106 (9th Cir. 2011) (en banc) (finding that Congress's decisions over time to amend the particularly serious crime bar by statute did not call into question the Board's additional authority to name serious crimes via case-by-case adjudication); *Ali* v. *Achim,* 468 F.3d 462, 468–69 (7th Cir. 2006) (relying on the absence of an explicit statutory mandate that the Attorney General designate "particular serious crimes" *only* via regulation). Congress likewise authorized the Attorney General to designate by regulation offenses that constitute "a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States." Public Law 104–208, div. C, sec. 604(a); *see* INA 208(b)(2)(A)(iii), (B)(ii), 8 U.S.C. 1158(b)(2)(A)(iii), (B)(ii).[2]

Congress further provided the Attorney General with the authority, by regulation, to "establish additional limitations and conditions, consistent with [section 208 of the INA], under which an alien shall be ineligible for asylum under paragraph (1)." Public Law 104–208, div. C, sec. 604(a); *see* INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C). As the Tenth Circuit has recognized, "the statute clearly empowers" the Attorney General and the Secretary to "adopt[ ] further limitations" on asylum eligibility. *R–S–C,* 869 F.3d at 1187 & n.9. By allowing the creation by regulation of "additional limitations and conditions," the statute gives the Attorney General and the Secretary broad authority in determining what the "limitations and conditions" should be. The additional limitations on eligibility must be established "by regulation," and must be "consistent with" the rest of section 208 of the INA. INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C).

Thus, the Attorney General has previously invoked section 208(b)(2)(C) of the INA to limit eligibility for asylum based on a "fundamental change in circumstances" and on the ability of an applicant to safely relocate internally within the alien's country of nationality or of last habitual residence. *See* Asylum Procedures, 65 FR 76121, 76126 (Dec. 6, 2000). More recently, the Attorney General and Secretary invoked section 208(b)(2)(C) to limit eligibility for asylum for aliens subject to a bar on entry under certain presidential proclamations. *See* Aliens Subject to a Bar on Entry Under Certain Presidential

---

[2] These provisions continue to refer only to the Attorney General, but the Departments interpret the provisions to also apply to the Secretary by operation of the HSA, Public Law 107–296. *See* 6 U.S.C. 552; 8 U.S.C. 1103(a)(1).

Proclamations; Procedures for Protection Claims, 83 FR 55934 (Nov. 9, 2018).[3] The courts have also viewed section 208(b)(2)(C) as conferring broad discretion, including to render aliens ineligible for asylum based on fraud. *See R–S–C,* 869 F.3d at 1187; *Nijjar* v. *Holder,* 689 F.3d 1077, 1082 (9th Cir. 2012) (noting that fraud can be "one of the 'additional limitations . . . under which an alien shall be ineligible for asylum' that the Attorney General is authorized to establish by regulation").

Section 208(d)(5) of the INA, 8 U.S.C. 1158(d)(5), also establishes certain procedures for consideration of asylum applications. But Congress specified that the Attorney General "may provide by regulation for any other conditions or limitations on the consideration of an application for asylum," so long as those limitations are "not inconsistent with this chapter." INA 208(d)(5)(B), 8 U.S.C. 1158(d)(5)(B).

In sum, the current statutory framework leaves the Attorney General (and, after the HSA, also the Secretary) significant discretion to adopt additional bars to asylum eligibility. As noted above, when creating mandatory bars to asylum eligibility in the IIRIRA, Congress simultaneously delegated the authority to create additional bars in section 1158(b)(2)(C). Public Law 104–208, sec. 604 (codified at 8 U.S.C. 1158(b)(2)). Pursuant to this broad delegation of authority, the Attorney General and the Secretary have in the past acted to protect the integrity of the asylum system by limiting eligibility for those who do not truly require this country's protection, and do so again here. *See, e.g.,* 83 FR at 55944; 65 FR at 76126.

In promulgating this rule, the Departments rely on the broad authority granted by 8 U.S.C. 1158(b)(2)(C) to protect the "core regulatory purpose" of asylum law by prioritizing applicants "with nowhere else to turn." *Matter of B–R–,* 26 I&N Dec. 119, 122 (BIA 2013) (internal quotation marks omitted) (explaining that, in light of asylum law's "core regulatory purpose," several provisions of the U.S. Code "limit an alien's ability to claim asylum in the United States when other safe options are available"). Such prioritization is consistent with the purpose of the statutory firm-resettlement bar (8 U.S.C. 1158(b)(2)(A)(vi)), which likewise was implemented to limit the availability of asylum for those who are seeking to choose among a number of safe

countries. *See Sall* v. *Gonzales,* 437 F.3d 229, 233 (2d Cir. 2006); *Matter of A–G–G–,* 25 I&N Dec. 486, 503 (BIA 2011); *see also* 8 U.S.C. 1158(a)(2)(A) (providing that aliens who may be removed, pursuant to a bilateral or multilateral agreement, to a safe third country may not apply for asylum, and further demonstrating the intention of Congress to afford asylum protection only to those applicants who cannot seek effective protection in third countries). The concern with avoiding such forum-shopping has only been heightened by the dramatic increase in aliens entering or arriving in the United States along the southern border after transiting through one or more third countries where they could have sought protection, but did not. *See infra* at 33–41; *Kalubi* v. *Ashcroft,* 364 F.3d 1134, 1140 (9th Cir. 2004) (noting that forum-shopping might be "part of the totality of circumstances that sheds light on a request for asylum in this country"). While under the current regulatory regime the firm-resettlement bar applies only in circumstances in which offers of permanent status have been extended by third countries, *see* 8 CFR 208.15, 1208.15, the additional bar created by this rule also seeks—like the firm-resettlement bar—to deny asylum protection to those persons effectively choosing among several countries where avenues to protection from return to persecution are available by waiting until they reach the United States to apply for protection. *See Sall,* 437 F.3d at 233. Thus, the rule is well within the authority conferred by section 208(b)(2)(C).

### D. Other Forms of Protection

Aliens who are not eligible to apply for or receive a grant of asylum, or who are denied asylum on the basis of the Attorney General's or the Secretary's discretion, may nonetheless qualify for protection from removal under other provisions of the immigration laws. A defensive application for asylum that is submitted by an alien in removal proceedings is deemed an application for statutory withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3). *See* 8 CFR 208.30(e)(2)–(4); 8 CFR 1208.16(a). And an immigration judge may also consider an alien's eligibility for withholding and deferral of removal under regulations issued pursuant to the implementing legislation regarding U.S. obligations under Article 3 of the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"). *See* Foreign Affairs Reform and Restructuring Act of 1998, Public Law 105–277, sec. 2242(b)

(1998); 8 CFR 1208.13(c); 8 CFR 1208.3(b), *see also* 8 CFR 1208.16(c) and 1208.17.

Those forms of protection bar an alien's removal to any country where the alien would "more likely than not" face persecution or torture, meaning that the alien would face a clear probability that his or her life or freedom would be threatened on account of a protected ground or a clear probability of torture. 8 CFR 1208.16(b)(2), (c)(2); *see Kouljinski* v. *Keisler,* 505 F.3d 534, 544 (6th Cir. 2007); *Sulaiman* v. *Gonzales,* 429 F.3d 347, 351 (1st Cir. 2005). Thus, if an alien proves that it is more likely than not that the alien's life or freedom would be threatened on account of a protected ground, but is denied asylum for some other reason—for instance, because of a statutory exception, an eligibility bar adopted by regulation, or a discretionary denial of asylum—the alien nonetheless may be entitled to statutory withholding of removal if not otherwise barred from that form of protection. INA 241(b)(3)(A), 8 U.S.C. 1231(b)(3)(A); 8 CFR 208.16, 1208.16; *see also Garcia* v. *Sessions,* 856 F.3d 27, 40 (1st Cir. 2017) ("[W]ithholding of removal has long been understood to be a mandatory protection that must be given to certain qualifying aliens, while asylum has never been so understood."). Likewise, an alien who establishes that he or she will more likely than not face torture in the country of removal will qualify for CAT protection. *See* 8 CFR 208.16(c), 208.17(a), 1208.16(c), 1208.17(a). In contrast to the more generous benefits available through asylum, statutory withholding and CAT protection do not: (1) Prohibit the Government from removing the alien to a third country where the alien would not face the requisite probability of persecution or torture (even in the absence of an agreement with that third country); (2) create a path to lawful permanent resident status and citizenship; or (3) afford the same ancillary benefits (such as derivative protection for family members) and access to Federal means-tested public benefits. *See R–S–C,* 869 F.3d at 1180.

### E. Implementation of International Treaty Obligations

The framework described above is consistent with certain U.S. obligations under the 1967 Protocol relating to the Status of Refugees ("Refugee Protocol"), which incorporates Articles 2–34 of the 1951 Convention relating to the Status of Refugees ("Refugee Convention"), as well as U.S. obligations under Article 3 of the CAT. Neither the Refugee Protocol nor the CAT is self-executing in the United States. *See Khan* v.

---

[3] This rule is currently subject to a preliminary injunction against its enforcement. *See East Bay Sanctuary Covenant* v. *Trump,* 354 F. Supp. 3d 1094, 1115, 1121 (N.D. Cal. 2018), *on remand from* 909 F.3d 1219 (9th Cir. 2018).

*Holder,* 584 F.3d 773, 783 (9th Cir. 2009) ("[T]he [Refugee] Protocol is not self-executing."); *Auguste* v. *Ridge,* 395 F.3d 123, 132 (3d Cir. 2005) (the CAT "was not self-executing"). These treaties are not directly enforceable in U.S. law, but some of their obligations have been implemented by domestic legislation. For example, the United States has implemented the non-refoulement provisions of these treaties—*i.e.,* provisions prohibiting the return of an individual to a country where he or she would face persecution or torture— through the withholding of removal provisions at section 241(b)(3) of the INA and the CAT regulations, rather than through the asylum provisions at section 208 of the INA. *See Cardoza-Fonseca,* 480 U.S. at 440–41; Foreign Affairs Reform and Restructuring Act of 1998 at sec. 2242(b); 8 CFR 208.16(b)– (c), 208.17–208.18; 1208.16(b)–(c), 1208.17–1208.18. Limitations on the availability of asylum that do not affect the statutory withholding of removal or protection under the CAT regulations are consistent with these provisions. *See R–S–C,* 869 F.3d at 1188 & n. 11; *Cazun* v. *U.S. Att'y Gen.,* 856 F.3d 249, 257 & n.16 (3d Cir. 2017); *Ramirez-Mejia* v. *Lynch,* 813 F.3d 240, 241 (5th Cir. 2016).

Courts have rejected arguments that the Refugee Convention, as implemented, requires that every qualified refugee receive asylum. For example, the Supreme Court has made clear that Article 34, which concerns the assimilation and naturalization of refugees, is precatory and not mandatory, and, accordingly, does not mandate that all refugees be granted asylum. *See Cardoza-Fonseca,* 480 U.S. at 441. Section 208 of the INA reflects that Article 34 is precatory and not mandatory, and accordingly does not provide that all refugees shall receive asylum. *See id.; see also R–S–C,* 869 F.3d at 1188; *Mejia* v. *Sessions,* 866 F.3d 573, 588 (4th Cir. 2017); *Cazun,* 856 F.3d at 257 & n. 16; *Garcia,* 856 F.3d at 42; *Ramirez-Mejia,* 813 F.3d at 241. As noted above, Congress has also recognized the precatory nature of Article 34 by imposing various statutory exceptions and by authorizing the creation of new bars to asylum eligibility through regulation.

Courts have likewise rejected arguments that other provisions of the Refugee Convention require every refugee to receive asylum. For example, courts have held, in the context of upholding the bar on eligibility for asylum in reinstatement proceedings under section 241(a)(5) of the INA, 8 U.S.C. 1231(a)(5), that limiting the ability to apply for asylum does not constitute a prohibited "penalty" under

Article 31(1) of the Refugee Convention. *Mejia,* 866 F.3d at 588; *Cazun,* 856 F.3d at 257 & n.16. Courts have also rejected the argument that Article 28 of the Refugee Convention, governing the issuance of international travel documents for refugees "lawfully staying" in a country's territory, mandates that every person who might qualify for statutory withholding must also be granted asylum. *R–S–C,* 869 F.3d at 1188; *Garcia,* 856 F.3d at 42.

## IV. Regulatory Changes

*A. Limitation on Eligibility for Asylum for Aliens Who Enter or Attempt To Enter the United States Across the Southern Land Border After Failing To Apply for Protection in at Least One Country Through Which They Transited En Route to the United States*

Pursuant to section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), the Departments are revising 8 CFR 208.13(c) and 8 CFR 1208.13(c) to add a new mandatory bar to eligibility for asylum for an alien who enters or attempts to enter the United States across the southern border, but who did not apply for protection from persecution or torture where it was available in at least one third country outside the alien's country of citizenship, nationality, or last lawful habitual residence through which he or she transited en route to the United States, such as in Mexico via that country's robust protection regime. The bar would be subject to several limited exceptions, for (1) an alien who demonstrates that he or she applied for protection from persecution or torture in at least one of the countries through which the alien transited en route to the United States, and the alien received a final judgment denying the alien protection in such country; (2) an alien who demonstrates that he or she satisfies the definition of "victim of a severe form of trafficking in persons" provided in 8 CFR 214.11; or (3) an alien who has transited en route to the United States through only a country or countries that were not parties to the 1951 Convention relating to the Status of Refugees, the 1967 Protocol, or the CAT.

In all cases the burden would remain with the alien to establish eligibility for asylum consistent with current law, including—if the evidence indicates that a ground for mandatory denial applies—the burden to prove that a ground for mandatory denial of the asylum application does not apply. 8 CFR 1240.8(d).

In addition to establishing a new mandatory bar for asylum eligibility for

an alien who enters or attempts to enter the United States across the southern border after failing to apply for protection from persecution or torture in at least one third country outside the alien's country of citizenship, nationality, or last lawful habitual residence through which he or she transited en route to the United States, this rule would also modify certain aspects of the process for screening fear claims asserted by such aliens who are subject to expedited removal under section 235(b)(1) of the INA, 8 U.S.C. 1225(b)(1). Under current procedures, aliens subject to expedited removal may avoid being removed by making a threshold showing of a credible fear of persecution or torture at an initial screening interview. At present, those aliens are often released into the interior of the United States pending adjudication of such claims by an immigration court in removal proceedings under section 240 of the INA, especially if those aliens travel as family units. Once an alien is released, adjudications can take months or years to complete because of the increasing volume of claims and the need to expedite cases in which aliens have been detained. The Departments expect that a substantial proportion of aliens subject to a third-country-transit asylum eligibility bar would be subject to expedited removal, since approximately 234,534 aliens in FY 2018 who presented at a port of entry or were apprehended at the border were referred to expedited-removal proceedings. The procedural changes within expedited removal would be confined to aliens who are ineligible for asylum because they are subject to a regulatory bar for contravening the new mandatory third-country-transit asylum eligibility bar imposed by the present rule.

1. Under existing law, expedited-removal procedures—streamlined procedures for expeditiously reviewing claims and removing certain aliens— apply to those individuals who arrive at a port of entry or those who have entered illegally and are encountered by an immigration officer within 100 miles of the border and within 14 days of entering. *See* INA 235(b), 8 U.S.C. 1225(b); Designating Aliens For Expedited Removal, 69 FR 48877, 48880 (Aug. 11, 2004). To be subject to expedited removal, an alien must also be inadmissible under section 212(a)(6)(C) or (a)(7) of the INA, 8 U.S.C. 1182(a)(6)(C) or (a)(7), meaning that the alien has either tried to procure documentation through misrepresentation or lacks such documentation altogether. Thus, an

alien encountered in the interior of the United States who entered the country after the publication of this rule imposing the third-country-transit bar and who is not otherwise amenable to expedited removal would be placed in proceedings under section 240 of the INA.

Section 235(b)(1) of the INA, 8 U.S.C. 1225(b)(1), prescribes procedures in the expedited-removal context for screening an alien's eligibility for asylum. When these provisions were being debated in 1996, the House Judiciary Committee expressed particular concern that "[e]xisting procedures to deny entry to and to remove illegal aliens from the United States are cumbersome and duplicative," and that "[t]he asylum system has been abused by those who seek to use it as a means of 'backdoor' immigration." H.R. Rep. No. 104–469, pt. 1, at 107 (1996). The Committee accordingly described the purpose of expedited removal and related procedures as "streamlin[ing] rules and procedures in the Immigration and Nationality Act to make it easier to deny admission to inadmissible aliens and easier to remove deportable aliens from the United States." *Id.* at 157; *see Am. Immigration Lawyers Ass'n* v. *Reno,* 18 F. Supp. 2d 38, 41 (D.D.C. 1998), *aff'd,* 199 F.3d 1352 (D.C. Cir. 2000) (rejecting several constitutional challenges to IIRIRA and describing the expedited-removal process as a "summary removal process for adjudicating the claims of aliens who arrive in the United States without proper documentation").

Congress thus provided that aliens "inadmissible under [8 U.S.C.] 1182(a)(6)(C) or 1182(a)(7)" shall be "removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under [8 U.S.C. 1158] or a fear of persecution." INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i); *see* INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii) (such aliens shall be referred "for an interview by an asylum officer"). On its face, the statute refers only to proceedings to establish eligibility for an affirmative grant of asylum, not to statutory withholding of removal or CAT protection against removal to a particular country.

An alien referred for a credible-fear interview must demonstrate a "credible fear," defined as a "significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum under [8 U.S.C. 1158]." INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). According to the House

report, "[t]he credible-fear standard [wa]s designed to weed out non-meritorious cases so that only applicants with a likelihood of success will proceed to the regular asylum process." H.R. Rep. No. 104–69, at 158.

If the asylum officer determines that the alien lacks a credible fear, then the alien may request review by an immigration judge. INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III). If the immigration judge concurs with the asylum officer's negative credible-fear determination, then the alien shall be removed from the United States without further review by either the Board or the courts. INA 235(b)(1)(B)(iii)(I), (b)(1)(C), 8 U.S.C. 1225(b)(1)(B)(iii)(I), (b)(1)(C); INA 242(a)(2)(A)(iii), (e)(5), 8 U.S.C. 1252(a)(2)(A)(iii), (e)(5). By contrast, if the asylum officer or immigration judge determines that the alien has a credible fear—*i.e.,* "a significant possibility . . . that the alien could establish eligibility for asylum," INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v)—then the alien, under current regulations, is placed in section 240 proceedings for a full hearing before an immigration judge, with appeal available to the Board and review in the Federal courts of appeals, *see* INA 235(b)(1)(B)(ii), (b)(2)(A), 8 U.S.C. 1225(b)(1)(B)(ii), (b)(2)(A); INA 242(a), 8 U.S.C. 1252(a); 8 CFR 208.30(e)(5), 1003.1.

By contrast, section 235 of the INA is silent regarding procedures for the granting of statutory withholding of removal and CAT protection; indeed, section 235 predates the legislation directing implementation of U.S. obligations under Article 3 of the CAT. *See* Foreign Affairs Reform and Restructuring Act of 1998 at sec. 2242(b) (requiring implementation of the CAT); IIRIRA at sec. 302 (revising section 235 of the INA to include procedures for dealing with inadmissible aliens who intend to apply for asylum). The legal standards for ultimately meeting the statutory standards for asylum on the merits versus statutory withholding or CAT protection are also different. Asylum requires an applicant to ultimately establish a "well-founded fear" of persecution, which has been interpreted to mean a "reasonable possibility" of persecution—a "more generous" standard than the "clear probability" of persecution or torture standard that applies to statutory withholding or CAT protection. *See INS* v. *Stevic,* 467 U.S. 407, 425, 429–30 (1984); *Santosa* v. *Mukasey,* 528 F.3d 88, 92 & n.1 (1st Cir. 2008); *compare* 8 CFR 1208.13(b)(2)(i)(B), *with* 8 CFR 1208.16(b)(2), (c)(2). As a result, applicants who establish eligibility for

asylum are not necessarily eligible for statutory withholding or CAT protection.

Current regulations instruct USCIS adjudicators and immigration judges to treat an alien's request for asylum in expedited-removal proceedings under section 1225(b) as a request for statutory withholding and CAT protection as well. *See* 8 CFR 208.13(c)(1), 208.30(e)(2)–(4), 1208.13(c)(1), 1208.16(a). In the context of expedited-removal proceedings, "credible fear of persecution" is defined to mean a "significant possibility" that the alien "could establish eligibility for asylum," not the CAT or statutory withholding. INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). Regulations nevertheless have generally provided that aliens in expedited removal should be subject to the same process and screening standard for considering statutory withholding of removal claims under INA 241(b)(3), 8 U.S.C. 1231(b)(3), and claims for protection under the CAT regulations, as they are for asylum claims. *See* 8 CFR 208.30(e)(2)–(4).

Thus, when the former Immigration and Naturalization Service provided for claims for statutory withholding of removal and CAT protection to be considered in the same expedited-removal proceedings as asylum, the result was that if an alien showed that there was a significant possibility of establishing eligibility for asylum and was therefore referred for removal proceedings under section 240 of the INA, any potential statutory withholding and CAT claims the alien might have had were referred as well. This was done on the assumption that it would not "disrupt[] the streamlined process established by Congress to circumvent meritless claims." Regulations Concerning the Convention Against Torture, 64 FR 8478, 8485 (Feb. 19, 1999). But while the INA authorizes the Attorney General and Secretary to provide for consideration of statutory withholding and CAT claims together with asylum claims or other matters that may be considered in removal proceedings, the INA does not mandate that approach, *see Foti* v. *INS,* 375 U.S. 217, 229–30 & n.16 (1963), or that they be considered in the same manner.

Since 1999, regulations also have provided for a distinct "reasonable fear" screening process for certain aliens who are categorically ineligible for asylum and can thus make claims only for statutory withholding or CAT protection. *See* 8 CFR 208.31. Specifically, if an alien is subject to having a previous order of removal reinstated or is a non-permanent

resident alien subject to an administrative order of removal resulting from an aggravated felony conviction, then he or she is categorically ineligible for asylum. *See id.* § 208.31(a), (e). Such an alien can be placed in withholding-only proceedings to adjudicate his statutory withholding or CAT claims, but only if he first establishes a ''reasonable fear'' of persecution or torture through a screening process that tracks the credible-fear process. *See id.* § 208.31(c), (e).

To establish a reasonable fear of persecution or torture, an alien must establish a ''reasonable possibility that [the alien] would be persecuted on account of his or her race, religion, nationality, membership in a particular social group or political opinion, or a reasonable possibility that he or she would be tortured in the country of removal.'' § 208.31(c). ''This . . . screening process is modeled on the credible-fear screening process, but requires the alien to meet a higher screening standard.'' Regulations Concerning the Convention Against Torture, 64 FR at 8485; *see also Garcia* v. *Johnson,* No. 14–CV–01775, 2014 WL 6657591, at *2 (N.D. Cal. Nov. 21, 2014) (describing the aim of the regulations as providing ''fair and efficient procedures'' in reasonable-fear screening that would comport with U.S. international obligations).

Significantly, when establishing the reasonable-fear screening process, DOJ explained that the two affected categories of aliens should be screened based on the higher reasonable-fear standard because, ''[u]nlike the broad class of arriving aliens who are subject to expedited removal, these two classes of aliens are ineligible for asylum,'' and may be entitled only to statutory withholding of removal or CAT protection. Regulations Concerning the Convention Against Torture, 64 FR at 8485. ''Because the standard for showing entitlement to these forms of protection (a clear probability of persecution or torture) is significantly higher than the standard for asylum (a well-founded fear of persecution), the screening standard adopted for initial consideration of withholding and deferral requests in these contexts is also higher.'' *Id.*

2. Drawing on the established framework for considering whether to grant withholding of removal or CAT protection in the reasonable-fear context, this interim rule establishes a bifurcated screening process for aliens subject to expedited removal who are ineligible for asylum by virtue of falling subject to this rule's third-country-transit eligibility bar, but who express a fear of return or seek statutory withholding or CAT protection. The Attorney General and Secretary have broad authority to implement the immigration laws, *see* INA 103, 8 U.S.C. 1103, including by establishing regulations, *see* INA 103(a)(3), 8 U.S.C. 1103(a)(3), and to regulate ''conditions or limitations on the consideration of an application for asylum,'' *id.* 1158(d)(5)(B). Furthermore, the Secretary has the authority—in his ''sole and unreviewable discretion,'' the exercise of which may be ''modified at any time''—to designate additional categories of aliens that will be subject to expedited-removal procedures, so long as the designated aliens have not been admitted or paroled nor continuously present in the United States for two years. INA 235(b)(1)(A)(iii), 8 U.S.C. 1225(b)(1)(A)(iii). The Departments have frequently invoked these authorities to establish or modify procedures affecting aliens in expedited-removal proceedings, as well as to adjust the categories of aliens subject to particular procedures within the expedited-removal framework.

This rule does not change the credible-fear standard for asylum claims, although the regulation would expand the scope of the inquiry in the process. An alien who is subject to the third-country-transit bar and nonetheless has entered the United States along the southern land border after the effective date of this rule creating the bar would be ineligible for asylum and would thus not be able to establish a ''significant possibility . . . [of] eligibility for asylum under section 1158.'' INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). Consistent with section 235(b)(1)(B)(iii)(III) of the INA, the alien could still obtain review from an immigration judge regarding whether the asylum officer correctly determined that the alien was subject to a limitation or suspension on entry imposed by the third-country-transit bar. Further, consistent with section 235(b)(1)(B) of the INA, if the immigration judge reversed the asylum officer's determination, the alien could assert the asylum claim in section 240 proceedings.

Aliens determined to be ineligible for asylum by virtue of falling subject to the third-country-transit bar, however, would still be screened, but in a manner that reflects that their only viable claims could be for statutory withholding or CAT protection pursuant to 8 CFR 208.30(e)(2)–(4) and 1208.16. After determining the alien's ineligibility for asylum under the credible-fear standard, the asylum officer would apply the long-established reasonable-fear standard to assess whether further proceedings on a possible statutory withholding or CAT protection claim are warranted. If the asylum officer determined that the alien had not established the requisite reasonable fear, the alien then could seek review of that decision from an immigration judge (just as the alien may under existing 8 CFR 208.30 and 208.31), and would be subject to removal only if the immigration judge agreed with the negative reasonable-fear finding. Conversely, if either the asylum officer or the immigration judge determined that the alien cleared the reasonable-fear threshold, the alien would be put in section 240 proceedings, just like aliens who receive a positive credible-fear determination for asylum. Employing a reasonable-fear standard in this context, for this category of ineligible aliens, would be consistent with DOJ's longstanding rationale that ''aliens ineligible for asylum,'' who could only be granted statutory withholding of removal or CAT protection, should be subject to a different screening standard that would correspond to the higher bar for actually obtaining these forms of protection. *See* Regulations Concerning the Convention Against Torture, 64 FR at 8485 (''Because the standard for showing entitlement to these forms of protection . . . is significantly higher than the standard for asylum[,] . . . the screening standard adopted for initial consideration of withholding and deferral requests in these contexts is also higher.'').

3. The screening process established by the interim rule accordingly will proceed as follows. For an alien subject to expedited removal, DHS will ascertain whether the alien seeks protection, consistent with INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii). All such aliens will continue to go before an asylum officer for screening, consistent with INA 235(b)(1)(B), 8 U.S.C. 1225(b)(1)(B). The asylum officer will ask threshold questions to elicit whether an alien is ineligible for a grant of asylum pursuant to the third-country-transit bar. If there is a significant possibility that the alien is not subject to the eligibility bar (and the alien otherwise demonstrates that there is a significant possibility that he or she can establish eligibility for asylum), then the alien will have established a credible fear.

If, however, an alien lacks a significant possibility of eligibility for asylum because of the third-country-transit bar, then the asylum officer will make a negative credible-fear finding.

The asylum officer will then apply the reasonable-fear standard to assess the alien's claims for statutory withholding of removal or CAT protection.

An alien subject to the third-country-transit asylum eligibility bar who clears the reasonable-fear screening standard will be placed in section 240 proceedings, just as an alien who clears the credible-fear standard will be. In those proceedings, the alien will also have an opportunity to raise whether the alien was correctly identified as subject to the third-country-transit ineligibility bar to asylum, as well as other claims. If an immigration judge determines that the alien was incorrectly identified as subject to the third-country-transit bar, the alien will be able to apply for asylum. Such aliens can appeal the immigration judge's decision in these proceedings to the Board and then seek review from a Federal court of appeals.

Conversely, an alien who is found to be subject to the third-country-transit asylum eligibility bar and who does not clear the reasonable-fear screening standard can obtain review of both of those determinations before an immigration judge, just as immigration judges currently review negative credible-fear and reasonable-fear determinations. If the immigration judge finds that either determination was incorrect, then the alien will be placed into section 240 proceedings. In reviewing the determinations, the immigration judge will decide de novo whether the alien is subject to the third-country-transit asylum eligibility bar. If, however, the immigration judge affirms both determinations, then the alien will be subject to removal without further appeal, consistent with the existing process under section 235 of the INA. In short, aliens subject to the third-country-transit asylum eligibility bar will be processed through existing procedures by DHS and EOIR in accordance with 8 CFR 208.30 and 1208.30, but will be subject to the reasonable-fear standard as part of those procedures with respect to their statutory withholding and CAT protection claims.

4. The above process will not affect the process in 8 CFR 208.30(e)(5) (to be redesignated as 8 CFR 208.30(e)(5)(i) under this rule) for certain existing statutory bars to asylum eligibility. Under that regulatory provision, many aliens who appear to fall within an existing statutory bar, and thus appear to be ineligible for asylum, can nonetheless be placed in section 240 proceedings and have their asylum claim adjudicated by an immigration judge, if they establish a credible fear of persecution, followed by further review of any denial of their asylum application before the Board and the courts of appeals.

### B. Anticipated Effects of the Rule

When the expedited procedures were first implemented approximately two decades ago, very few aliens within those proceedings claimed a fear of persecution. Since then, the numbers have dramatically increased. In FY 2018, USCIS received 99,035 credible-fear claims, a 175 percent increase from five years earlier and a 1,883 percent increase from ten years earlier. FY 2019 is on track to see an even greater increase in claims, with more than 35,000 credible-fear claims received in the first four months of the fiscal year. This unsustainable, increased burden on the U.S. immigration system also extends to DOJ: Immigration courts received over 162,000 asylum applications in FY 2018, a 270 percent increase from five years earlier.

This dramatic increase in credible-fear claims has been complicated by a demographic shift in the alien population crossing the southern border from Mexican single adult males to predominantly Central American family units and unaccompanied alien minors. Historically, aliens coming unlawfully to the United States along the southern land border were predominantly Mexican single adult males who generally were removed or who voluntarily departed within 48 hours if they had no legal right to stay in the United States. As of January 2019, more than 60 percent are family units and unaccompanied alien children; 60 percent are non-Mexican. In FY 2017, CBP apprehended 94,285 family units from the Northern Triangle countries at the southern land border. Of those family units, 99 percent remained in the country (as of January 2019). And, while Mexican single adults who are not legally eligible to remain in the United States may be immediately repatriated to Mexico, it is more difficult to expeditiously repatriate family units and unaccompanied alien children not from Mexico or Canada. And the long and arduous journey of children to the United States brings with it a great risk of harm that could be relieved if individuals were to more readily avail themselves of legal protection from persecution in a third country closer to the child's country of origin.

Even though the overall number of apprehensions of illegal aliens was relatively higher two decades ago than it is today (around 1.6 million in 2000), given the demographic of aliens arriving to the United States at that time, they could be processed and removed more quickly, often without requiring detention or lengthy court proceedings. Moreover, apprehension numbers in past years often reflected individuals being apprehended multiple times over the course of a given year.

In recent years, the United States has seen a large increase in the number and proportion of inadmissible aliens subject to expedited removal who claim a fear of persecution or torture and are subsequently placed into removal proceedings before an immigration judge. This is particularly true for non-Mexican aliens, who now constitute the overwhelming majority of aliens encountered along the southern border with Mexico, and the overwhelming majority of aliens who assert claims of fear. But while the number of non-Mexican aliens encountered at the southern border has dramatically increased, a substantial number of such aliens failed to apply for asylum or refugee status in Mexico—despite the availability of a functioning asylum system.

In May of FY 2017, DHS recorded 7,108 enforcement actions with non-Mexican aliens along the southern border—which accounted for roughly 36 percent of all enforcement actions along the southern border that month. In May of FY 2018, DHS recorded 32,477 enforcement actions with non-Mexican aliens along the southern border—which accounted for roughly 63 percent of that month's enforcement actions along the southern border. And in May of FY 2019, DHS recorded 121,151 enforcement actions with non-Mexican aliens along the southern border—which accounted for approximately 84 percent of enforcement actions along the southern border that month. Accordingly, the number of enforcement actions involving non-Mexican aliens increased by more than 1,600 percent from May FY 2017 to May FY 2019, and the percentage of enforcement actions at the southern land border involving non-Mexican aliens increased from 36 percent to 84 percent. Overall, southern border non-Mexican enforcement actions in FY 2017 totaled 233,411; they increased to 298,503 in FY 2018; and, in the first eight months of FY 2019 (through May) they already total 524,446.

This increase corresponds to a growing trend over the past decade, in which the overall percentage of all aliens subject to expedited removal who are referred for a credible-fear interview by DHS jumped from approximately 5 percent to above 40 percent. The total number of aliens referred by DHS for credible-fear screening increased from

fewer than 5,000 in FY 2008 to more than 99,000 in FY 2018. The percentage of aliens who receive asylum remains small. In FY 2018, DHS asylum officers found over 75 percent of interviewed aliens to have a credible fear of persecution or torture and referred them for proceedings before an immigration judge within EOIR under section 240 of the INA. In addition, EOIR immigration judges overturn about 20 percent of the negative credible-fear determinations made by asylum officers, finding those aliens also to have a credible fear. Such aliens are referred to immigration judges for full hearings on their asylum claims.

But many aliens who receive a positive credible-fear determination never file an application for asylum. From FY 2016 through FY 2018, approximately 40 percent of aliens who received a positive credible-fear determination failed to file an asylum application. And of those who did proceed to file asylum applications, relatively few established that they should be granted such relief. From FY 2016 through FY 2018, among aliens who received a positive credible-fear determination, only 12,062 aliens [4]—an average of 4,021 per year—were granted asylum (14 percent of all completed asylum cases, and about 36 percent of asylum cases decided on the merits).[5] The many cases that lack merit occupy a large portion of limited docket time and absorb scarce government resources, exacerbating the backlog and diverting attention from other meritorious cases. Indeed, despite DOJ deploying the largest number of immigration judges in history and completing historic numbers of cases, a significant backlog remains. There are more than 900,000 pending cases in immigration courts, at least 436,000 of which include an asylum application.

Apprehending and processing this growing number of aliens who cross illegally into the United States and invoke asylum procedures consumes an ever-increasing amount of resources of DHS, which must surveil, apprehend, screen, and process the aliens who enter the country and must represent the U.S. Government in cases before immigration judges, the Board, and the U.S. Courts of Appeals. The interim rule seeks to ameliorate these strains on the immigration system.

The rule also aims to further the humanitarian purposes of asylum by prioritizing individuals who are unable to obtain protection from persecution elsewhere and individuals who have been victims of a "severe form of trafficking in persons" as defined by 8 CFR 214.11,[6] many of whom do not volitionally transit through a third country to reach the United States.[7] By deterring meritless asylum claims and de-prioritizing the applications of individuals who could have sought protection in another country before reaching the United States, the Departments seek to ensure that those asylees who need relief most urgently are better able to obtain it.

The interim rule would further this objective by restricting the claims of aliens who, ostensibly fleeing persecution, chose not to seek protection at the earliest possible opportunity. An alien's decision not to apply for protection at the first available opportunity, and instead wait for the more preferred destination of the United States, raises questions about the validity and urgency of the alien's claim and may mean that the claim is less likely to be successful.[8] By barring such

claims, the interim final rule would encourage those fleeing genuine persecution to seek protection as soon as possible and dissuade those with non-viable claims, including aliens merely seeking employment, from further overburdening the Nation's immigration system.

Many of the aliens who wait to seek asylum until they arrive in the United States transit through not just one country, but multiple countries in which they may seek humanitarian protection. Yet they do not avail themselves of that option despite their claims of fear of persecution or torture in their home country. Under these circumstances, it is reasonable to question whether the aliens genuinely fear persecution or torture, or are simply economic migrants seeking to exploit our overburdened immigration system by filing a meritless asylum claim as a way of entering, remaining, and legally obtaining employment in the United States.[9]

All seven countries in Central America plus Mexico are parties to both the Refugee Convention and the Refugee Protocol. Moreover, Mexico has expanded its capacity to adjudicate asylum claims in recent years, and the number of claims submitted in Mexico has increased. In 2016, the Mexican government received 8,789 asylum applications. In 2017, it received 14,596. In 2018, it received 29,623 applications. And in just the first three months of 2019, Mexico received 12,716 asylum

---

[4] These numbers are based on data generated by EOIR on April 12, 2019.

[5] Completed cases include both those in which an asylum application was filed and those in which an application was not filed. Cases decided on the merits include only those completed cases in which an asylum application was filed and the immigration judge granted or denied that application.

[6] "Severe form of trafficking in persons means sex trafficking in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act is under the age of 18 years; or the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery." 8 CFR 214.11. Determinations made with respect to this exception will not be binding on Federal departments or agencies in subsequent determinations of eligibility for T or U nonimmigrant status under section 101(a)(15)(T) or (U) of the Act or for benefits or services under 22 U.S.C. 7105 or 8 U.S.C. 1641(c)(4).

[7] This rule does not provide for a categorical exception for unaccompanied alien children ("UAC"), as defined in 6 U.S.C. 279(g)(2). The Departments recognize that UAC are exempt from two of three statutory bars to applying for asylum: The "safe third country" bar and the one-year filing deadline, *see* INA 208(a)(2)(E), 8 U.S.C. 1158(a)(2)(E). Congress, however, did not exempt UAC from the bar on filing successive applications for asylum, *see* INA 208(a)(2)(C), 8 U.S.C. 1158(a)(2)(C), the various bars to asylum eligibility in INA 208(b)(2)(A), 8 U.S.C. 1158(b)(2)(A), or the bars, like this one, established pursuant to the Departments' authorities under INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C). But UAC, like others subject to this rule, will be able to apply for withholding of removal under INA section 241(b)(3), 8 U.S.C. 1231(b)(3), or the CAT regulations. UAC will not be returned to the transit country for consideration of these protection claims.

[8] Indeed, the Board has previously held that this is a relevant consideration in asylum applications. In *Matter of Pula*, 19 I&N Dec. 467, 473–74 (BIA 1987), the Board stated that "in determining whether a favorable exercise of discretion is warranted" for an applicant under the asylum statute, INA 208(a), 8 U.S.C. 1158(2)(a), "[a]mong those factors which should be considered are whether the alien passed through any other

countries or arrived in the United States directly from his country, whether orderly refugee procedures were in fact available to help him in any country he passed through, and whether he made any attempts to seek asylum before coming to the United States." Consistent with the reasoning in *Pula*, this rule establishes that an alien who failed to request asylum in a country where it was available is not eligible for asylum in the United States. Even though the Board in *Pula* indicated that a range of factors is relevant to evaluating discretionary asylum relief under the general *statutory* asylum provision, the INA also authorizes the establishment of additional limitations to asylum eligibility by *regulation*—beyond those embedded in the statute. *See* INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C). This rule uses that authority to establish one of the factors specified as relevant in *Pula* as the foundation of a new categorical asylum bar. This rule's prioritization of the third-country-transit factor, considered as just one of many factors in *Pula*, is justified, as explained above, by the increased numbers and changed nature of asylum claims in recent years.

[9] Economic migrants are not eligible for asylum. *See, e.g., In re: Brenda Leticia Sonday-Chavez*, No. A–7–969, 2017 WL 4946947, at *1 (BIA Sept. 7, 2017) ("[E]conomic reasons for coming to the United States . . . would generally not render an alien eligible for relief from removal."); *see also Sale* v. *Haitian Centers Council Inc.*, 509 U.S. 155, 161–62 & n.11 (1993); *Hui Zhuang* v. *Gonzales*, 471 F.3d 884, 890 (8th Cir. 2006) ("Fears of economic hardship or lack of opportunity do not establish a well-founded fear of persecution.").

applications, putting Mexico on track to receive more than 50,000 asylum applications by the end of 2019 if that quarterly pace continues. Instead of availing themselves of these available protections, many aliens transiting through Central America and Mexico decide not to seek protection, likely based upon a preference for residing in the United States. The United States has experienced an overwhelming surge in the number of non-Mexican aliens crossing the southern border and seeking asylum. This overwhelming surge and its accompanying burden on the United States has eroded the integrity of our borders, and it is inconsistent with the national interest to provide a discretionary benefit to those who choose not to seek protection at the first available opportunity.

The interim final rule also is in keeping with the efforts of other liberal democracies to prevent forum-shopping by directing asylum-seekers to present their claims in the first safe country in which they arrive. In 1990, European states adopted the Dublin Regulation in response to an asylum crisis as refugees and economic migrants fled communism at the end of the Cold War; it came into force in 1997. *See* Convention Determining the State Responsible for Examining Applications for Asylum Lodged in One of the Member States of the European Communities, 1997 O.J. (C 254). The United Nations High Commission for Refugees praised the Dublin Regulation's "commendable efforts to share and allocate the burden of review of refugee and asylum claims." *See* UN High Comm'r for Refugees, *UNHCR Position on Conventions Recently Concluded in Europe (Dublin and Schengen Conventions),* 3 Eur. Series 2, 385 (1991). Now in its third iteration, the Dublin III Regulation sets asylum criteria and protocol for the European Union ("EU"). It instructs that asylum claims "shall be examined by a single Member State." Regulation (EU) No 604/2013 of the European Parliament and of the Council of 26 June 2013, Establishing the Criteria and Mechanisms for Determining the Member State Responsible for Examining an Application for International Protection Lodged in One of the Member States by a Third-Country National or a Stateless Person (Recast), 2013 O.J. (L 180) 31, 37. Typically, for irregular migrants seeking asylum, the member state by which the asylum applicant first entered the EU "shall be responsible for examining the application for international protection." *Id.* at 40. Generally, when

a third-country national seeks asylum in a member state other than the state of first entry into the EU, that state may transfer the asylum-seeker back to the state of first safe entry. *Id.* at 2.

This rule also seeks to curtail the humanitarian crisis created by human smugglers bringing men, women, and children across the southern border. By reducing a central incentive for aliens without a genuine need for asylum to cross the border—the hope of a lengthy asylum process that will enable them to remain in the United States for years despite their statutory ineligibility for relief—the rule aims to reduce human smuggling and its tragic effects.

Finally, as discussed further below, this rule will facilitate ongoing diplomatic negotiations with Mexico and the Northern Triangle countries regarding general migration issues, related measures employed to control the flow of aliens (such as the Migrant Protection Protocols), and the humanitarian and security crisis along the southern land border between the United States and Mexico.

In sum, the rule would bar asylum for any alien who has entered or attempted to enter the United States across the southern border and who has failed to apply for protection from persecution or torture in at least one country outside the alien's country of citizenship, nationality, or last lawful habitual residence through which the alien transited en route to the United States, unless the alien demonstrates that the alien only transited through countries that were not parties to the 1951 United Nations Convention relating to the Status of Refugees, the 1967 Protocol Relating to the Status of Refugees, or the CAT, or the alien was a victim of "a severe form of trafficking in persons" as defined by 8 CFR 214.11.

Such a rule would ensure that the ever-growing influx of meritless asylum claims do not further overwhelm the country's immigration system, would promote the humanitarian purposes of asylum by speeding relief to those who need it most (*i.e.,* individuals who have no alternative country where they can escape persecution or torture or who are victims of a severe form of trafficking and thus did not volitionally travel through a third country to reach the United States), would help curtail the humanitarian crisis created by human smugglers, and would aid U.S. negotiations on migration issues with foreign countries.

## V. Regulatory Requirements

### A. Administrative Procedure Act

#### 1. Good Cause Exception

While the Administrative Procedure Act ("APA") generally requires agencies to publish notice of a proposed rulemaking in the **Federal Register** for a period of public comment, it provides an exception "when the agency for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. 553(b)(B). That exception relieves agencies of the notice-and-comment requirement in emergency situations, or in circumstances where "the delay created by the notice and comment requirements would result in serious damage to important interests." *Woods Psychiatric Inst.* v. *United States,* 20 Cl. Ct. 324, 333 (1990), *aff'd,* 925 F.2d 1454 (Fed. Cir. 1991); *see also United States* v. *Dean,* 604 F.3d 1275, 1279 (11th Cir. 2010); *Nat'l Fed'n of Federal Emps.* v. *Nat'l Treasury Emps. Union,* 671 F.2d 607, 611 (D.C. Cir. 1982). Agencies have previously relied on that exception in promulgating immigration-related interim rules.[10] Furthermore, DHS has relied on that exception as additional legal justification when issuing orders related to expedited removal—a context in which Congress explicitly recognized the need for dispatch in addressing large volumes of aliens by giving the Secretary significant discretion to "modify at any time" the classes of aliens who would be subject to such procedures. *See* INA 235(b)(1)(A)(iii)(I), 8 U.S.C. 1225(b)(1)(A)(iii)(I).[11]

---

[10] *See, e.g.,* Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (interim rule citing good cause to immediately require additional documentation from certain Caribbean agricultural workers to avoid "an increase in applications for admission in bad faith by persons who would otherwise have been denied visas and are seeking to avoid the visa requirement and consular screening process during the period between the publication of a proposed and a final rule"); Suspending the 30-Day and Annual Interview Requirements From the Special Registration Process for Certain Nonimmigrants, 68 FR 67578, 67581 (Dec. 2, 2003) (interim rule claiming the good cause exception for suspending certain automatic registration requirements for nonimmigrants because "without [the] regulation approximately 82,532 aliens would be subject to 30-day or annual re-registration interviews" over a six-month period).

[11] *See, e.g.,* Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769, 4770 (Jan. 17, 2017) (identifying the APA good cause factors as additional justification for issuing an immediately effective expedited removal order because the ability to detain certain Cuban nationals "while admissibility and identity are determined and protection claims are adjudicated, as well as to quickly remove those without protection claims or claims to lawful status,

The Departments have concluded that the good cause exceptions in 5 U.S.C. 553(b)(B) and (d)(3) apply to this rule. Notice and comment on this rule, along with a 30-day delay in its effective date, would be impracticable and contrary to the public interest. The Departments have determined that immediate implementation of this rule is essential to avoid a surge of aliens who would have strong incentives to seek to cross the border during pre-promulgation notice and comment or during the 30-day delay in the effective date under 5 U.S.C. 553(d). As courts have recognized, smugglers encourage migrants to enter the United States based on changes in U.S. immigration policy, and in fact "the number of asylum seekers entering as families has risen" in a way that "suggests a link to knowledge of those policies." *East Bay Sanctuary Covenant* v. *Trump*, 354 F. Supp. 3d 1094, 1115 (N.D. Cal. 2018). If this rule were published for notice and comment before becoming effective, "smugglers might similarly communicate the Rule's potentially relevant change in U.S. immigration policy, albeit in non-technical terms," and the risk of a surge in migrants hoping to enter the country before the rule becomes effective supports a finding of good cause under 5 U.S.C. 553. *See id.*

This determination is consistent with the historical view of the agencies regulating in this area. DHS concluded in January 2017 that it was imperative to give immediate effect to a rule designating Cuban nationals arriving by air as eligible for expedited removal because "pre-promulgation notice and comment would . . . . endanger[ ] human life and hav[e] a potential destabilizing effect in the region." Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769, 4770 (Jan. 17, 2017). DHS cited the prospect that "publication of the rule as a proposed rule, which would signal a significant change in policy while permitting continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to

travel to and enter the United States during the period between the publication of a proposed and a final rule." *Id.* DHS found that "[s]uch a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities. A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations." *Id.* DHS concluded that "a surge could result in significant loss of human life." *Id.; accord, e.g.,* Designating Aliens for Expedited Removal, 69 FR 48877 (Aug. 11, 2004) (noting similar destabilizing incentives for a surge during a delay in the effective date); Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (finding the good cause exception applicable because of similar short-run incentive concerns).

DOJ and DHS raised similar concerns and drew similar conclusions in the November 2018 joint interim final rule that limited eligibility for asylum for aliens, subject to a bar on entry under certain presidential proclamations. *See* 83 FR at 55950. These same concerns would apply to an even greater extent to this rule. Pre-promulgation notice and comment, or a delay in the effective date, would be destabilizing and would jeopardize the lives and welfare of aliens who could surge to the border to enter the United States before the rule took effect. The Departments' experience has been that when public announcements are made regarding changes in our immigration laws and procedures, there are dramatic increases in the numbers of aliens who enter or attempt to enter the United States along the southern border. *See East Bay Sanctuary Covenant*, 354 F. Supp. 3d at 1115 (citing a newspaper article suggesting that such a rush to the border occurred due to knowledge of a pending regulatory change in immigration law). Thus, there continues to be an "urgent need to deter foreign nationals from undertaking dangerous border crossings, and thereby prevent the needless deaths and crimes associated with human trafficking and alien smuggling operations." 69 FR at 48878.

Furthermore, an additional surge of aliens who sought to enter via the southern border prior to the effective date of this rule would be destabilizing to the region, as well as to the U.S. immigration system. The massive increase in aliens arriving at the southern border who assert a fear of persecution is overwhelming our

immigration system as a result of a variety of factors, including the significant proportion of aliens who are initially found to have a credible fear and therefore are referred to full hearings on their asylum claims; the huge volume of claims; a lack of detention space; and the resulting high rate of release into the interior of the United States of aliens with a positive credible-fear determination, many of whom then abscond without pursuing their asylum claims. Recent initiatives to track family unit cases revealed that close to 82 percent of completed cases have resulted in an *in absentia* order of removal. A large additional influx of aliens who intend to enter unlawfully or who lack proper documentation to enter this country, all at once, would exacerbate the existing border crisis. This concern is particularly acute in the current climate in which illegal immigration flows fluctuate significantly in response to news events. This interim final rule is thus a practical means to address the time-sensitive influx of aliens and avoid creating an even larger short-term influx. An extended notice-and-comment rulemaking process would be impracticable and self-defeating for the public.

2. Foreign Affairs Exemption

Alternatively, the Departments may forgo notice-and-comment procedures and a delay in the effective date because this rule involves a "foreign affairs function of the United States." 5 U.S.C. 553(a)(1), and proceeding through notice and comment may "provoke definitely undesirable international consequences," *City of New York* v. *Permanent Mission of India to United Nations*, 618 F.3d 172, 201 (2d Cir. 2010) (quoting the description of the purpose of the foreign affairs exception in H.R. Rep. No. 79–1980, 69th Cong., 2d Sess. 257 (1946)). The flow of aliens across the southern border, unlawfully or without appropriate travel documents, directly implicates the foreign policy and national security interests of the United States. *See, e.g.,* Exec. Order 13767 (Jan. 25, 2017) (discussing the important national security and foreign affairs-related interests associated with securing the border); Presidential Memorandum on Additional Measures to Enhance Border Security and Restore Integrity to Our Immigration System (Apr. 29, 2019) ("This strategic exploitation of our Nation's humanitarian programs undermines our Nation's security and sovereignty"); *see also, e.g., Malek-Marzban* v. *INS*, 653 F.2d 113, 115–16 (4th Cir. 1981) (finding that a regulation

is a necessity for national security and public safety"); Designating Aliens For Expedited Removal, 69 FR 48877, 48880 (Aug. 11, 2004) (identifying the APA good cause factors as additional justification for issuing an immediately effective order to expand expedited removal due to "[t]he large volume of illegal entries, and attempted illegal entries, and the attendant risks to national security presented by these illegal entries," as well as "the need to deter foreign nationals from undertaking dangerous border crossings, and thereby prevent the needless deaths and crimes associated with human trafficking and alien smuggling operations").

requiring the expedited departure of Iranians from the United States in light of the international hostage crisis clearly related to foreign affairs and fell within the notice-and-comment exception").

This rule will facilitate ongoing diplomatic negotiations with foreign countries regarding migration issues, including measures to control the flow of aliens into the United States (such as the Migrant Protection Protocols), and the urgent need to address the current humanitarian and security crisis along the southern land border between the United States and Mexico. *See City of New York,* 618 F.3d at 201 (finding that rules related to diplomacy with a potential impact on U.S. relations with other countries fall within the scope of the foreign affairs exemption). Those ongoing discussions relate to proposals for how these other countries could increase efforts to help reduce the flow of illegal aliens north to the United States and encourage aliens to seek protection at the safest and earliest point of transit possible.

Those negotiations would be disrupted if notice-and-comment procedures preceded the effective date of this rule—provoking a disturbance in domestic politics in Mexico and the Northern Triangle countries, and eroding the sovereign authority of the United States to pursue the negotiating strategy it deems to be most appropriate as it engages its foreign partners. *See, e.g., Am. Ass'n of Exps. & Imps.-Textile & Apparel Grp.* v. *United States,* 751 F.2d 1239, 1249 (Fed. Cir. 1985) (the foreign affairs exemption facilitates "more cautious and sensitive consideration of those matters which so affect relations with other Governments that . . . public rulemaking provisions would provoke definitely undesirable international consequences" (internal quotation marks omitted)). During a notice-and-comment process, public participation and comments may impact and potentially harm the goodwill between the United States and Mexico and the Northern Triangle countries— actors with whom the United States must partner to ensure that refugees can more effectively find refuge and safety in third countries. *Cf. Rajah* v. *Mukasey,* 544 F.3d 427, 437–38 (2d Cir. 2008) ("[R]elations with other countries might be impaired if the government were to conduct and resolve a public debate over why some citizens of particular countries were a potential danger to our security.").

In addition, the longer that the effective date of the interim rule is delayed, the greater the number of people who will pass through third countries where they may have

otherwise received refuge and reach the U.S. border, which has little present capacity to provide assistance. *Cf. East Bay Sanctuary Covenant* v. *Trump,* 909 F.3d 1219, 1252 (9th Cir. 2018) ("Hindering the President's ability to implement a new policy in response to a current foreign affairs crisis is the type of 'definitely undesirable international consequence' that warrants invocation of the foreign affairs exception."). Addressing this crisis will be more effective and less disruptive to long-term U.S. relations with Mexico and the Northern Triangle countries the sooner that this interim final rule is in place to help address the enormous flow of aliens through these countries to the southern U.S. border. *Cf. Am. Ass'n of Exps. & Imps.-Textile & Apparel Grp.,* 751 F.2d at 1249 ("The timing of an announcement of new consultations or quotas may be linked intimately with the Government's overall political agenda concerning relations with another country."); *Rajah,* 544 F.3d at 438 (finding that the notice-and-comment process can be "slow and cumbersome," which can negatively impact efforts to secure U.S. national interests, thereby justifying application of the foreign affairs exemption); *East Bay Sanctuary Covenant,* 909 F.3d at 1252–53 (9th Cir. 2018) (suggesting that reliance on the exemption is justified where the Government "explain[s] how immediate *publication* of the Rule, instead of *announcement* of a proposed rule followed by a thirty-day period of notice and comment" is necessary in light of the Government's foreign affairs efforts).

The United States and Mexico have been engaged in ongoing discussions regarding both regional and bilateral approaches to asylum. This interim final rule will strengthen the ability of the United States to address the crisis at the southern border and therefore facilitate the likelihood of success in future negotiations. This rule thus supports the President's foreign policy with respect to Mexico and the Northern Triangle countries in this area and is exempt from the notice-and-comment and delayed-effective-date requirements in 5 U.S.C. 553. *See Am. Ass'n of Exps. & Imps.-Textile & Apparel Grp.,* 751 F.2d at 1249 (noting that the foreign affairs exception covers agency actions "linked intimately with the Government's overall political agenda concerning relations with another country"); *Yassini* v. *Crosland,* 618 F.2d 1356, 1361 (9th Cir. 1980) (because an immigration directive "was implementing the President's foreign policy," the action "fell within the

foreign affairs function and good cause exceptions to the notice and comment requirements of the APA").

Invoking the APA's foreign affairs exception is also consistent with past rulemakings. In 2016, for example, in response to diplomatic developments between the United States and Cuba, DHS changed its regulations concerning flights to and from the island via an immediately effective interim final rule. Flights to and From Cuba, 81 FR 14948, 14952 (Mar. 21, 2016). In a similar vein, DHS and the State Department recently provided notice that they were eliminating an exception to expedited removal for certain Cuban nationals. The notice explained that the change in policy was consistent with the foreign affairs exception for rules subject to notice-and-comment requirements because the change was central to ongoing negotiations between the two countries. Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 4902, 4904–05 (Jan. 17, 2017).

*B. Regulatory Flexibility Act*

The Regulatory Flexibility Act, 5 U.S.C. 601 *et seq.,* as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, requires an agency to prepare and make available to the public a regulatory flexibility analysis that describes the effect of the rule on small entities (*i.e.,* small businesses, small organizations, and small governmental jurisdictions). A regulatory flexibility analysis is not required when a rule is exempt from notice-and-comment rulemaking.

*C. Unfunded Mandates Reform Act of 1995*

This interim final rule will not result in the expenditure by state, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

*D. Congressional Review Act*

This interim final rule is not a major rule as defined by section 804 of the Congressional Review Act. 5 U.S.C. 804. This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based companies to compete with foreign-

based companies in domestic and export markets.

## E. Executive Order 12866, Executive Order 13563, and Executive Order 13771 (Regulatory Planning and Review)

This rule is not subject to Executive Order 12866 as it implicates a foreign affairs function of the United States related to ongoing discussions with potential impact on a set of specified international relationships. As this is not a regulatory action under Executive Order 12866, it is not subject to Executive Order 13771.

## F. Executive Order 13132 (Federalism)

This rule will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

## G. Executive Order 12988 (Civil Justice Reform)

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

## H. Paperwork Reduction Act

This rule does not propose new, or revisions to existing, ''collection[s] of information'' as that term is defined under the Paperwork Reduction Act of 1995, Public Law 104–13, 44 U.S.C. chapter 35, and its implementing regulations, 5 CFR part 1320.

## List of Subjects

### 8 CFR Part 208

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

### 8 CFR Part 1003

Administrative practice and procedure, Aliens, Immigration, Legal services, Organization and functions (Government agencies).

### 8 CFR Part 1208

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

## Regulatory Amendments

## DEPARTMENT OF HOMELAND SECURITY

Accordingly, for the reasons set forth in the preamble, the Secretary of Homeland Security amends 8 CFR part 208 as follows:

## PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 1. The authority citation for part 208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Public Law 110–229; 8 CFR part 2.

■ 2. Section 208.13 is amended by adding paragraphs (c)(4) and (5) to read as follows:

### § 208.13   Establishing asylum eligibility.

\* \* \* \* \*

(c) \* \* \*

(4) *Additional limitation on eligibility for asylum.* Notwithstanding the provisions of § 208.15, any alien who enters, attempts to enter, or arrives in the United States across the southern land border on or after July 16, 2019, after transiting through at least one country outside the alien's country of citizenship, nationality, or last lawful habitual residence en route to the United States, shall be found ineligible for asylum unless:

(i) The alien demonstrates that he or she applied for protection from persecution or torture in at least one country outside the alien's country of citizenship, nationality, or last lawful habitual residence through which the alien transited en route to the United States, and the alien received a final judgment denying the alien protection in such country;

(ii) The alien demonstrates that he or she satisfies the definition of ''victim of a severe form of trafficking in persons'' provided in 8 CFR 214.11; or

(iii) The only countries through which the alien transited en route to the United States were, at the time of the transit, not parties to the 1951 United Nations Convention relating to the Status of Refugees, the 1967 Protocol Relating to the Status of Refugees, or the United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.

(5) *Non-binding determinations.* Determinations made with respect to paragraph (c)(4)(ii) of this section are not binding on Federal departments or agencies in subsequent determinations of eligibility for T or U nonimmigrant status under section 101(a)(15)(T) or (U) of the INA or for benefits or services

under 22 U.S.C. 7105 or 8 U.S.C. 1641(c)(4).

■ 3. In § 208.30, revise the section heading, the first sentence of paragraph (e)(2), and paragraphs (e)(3) and (5) to read as follows:

### § 208.30   Credible fear determinations involving stowaways and applicants for admission who are found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act, whose entry is limited or suspended under section 212(f) or 215(a)(1) of the Act, or who failed to apply for protection from persecution in a third country where potential relief is available while en route to the United States.

\* \* \* \* \*

(e) \* \* \*

(2) Subject to paragraph (e)(5) of this section, an alien will be found to have a credible fear of persecution if there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, the alien can establish eligibility for asylum under section 208 of the Act or for withholding of removal under section 241(b)(3) of the Act. \* \* \*

(3) Subject to paragraph (e)(5) of this section, an alien will be found to have a credible fear of torture if the alien shows that there is a significant possibility that he or she is eligible for withholding of removal or deferral of removal under the Convention Against Torture, pursuant to § 208.16 or § 208.17.

\* \* \* \* \*

(5)(i) Except as provided in this paragraph (e)(5)(i) or paragraph (e)(6) of this section, if an alien is able to establish a credible fear of persecution but appears to be subject to one or more of the mandatory bars to applying for, or being granted, asylum contained in section 208(a)(2) and 208(b)(2) of the Act, or to withholding of removal contained in section 241(b)(3)(B) of the Act, the Department of Homeland Security shall nonetheless place the alien in proceedings under section 240 of the Act for full consideration of the alien's claim, if the alien is not a stowaway. If the alien is a stowaway, the Department shall place the alien in proceedings for consideration of the alien's claim pursuant to § 208.2(c)(3).

(ii) If the alien is found to be an alien described in § 208.13(c)(3), then the asylum officer shall enter a negative credible fear determination with respect to the alien's intention to apply for asylum. The Department shall nonetheless place the alien in proceedings under section 240 of the Act for full consideration of the alien's

claim for withholding of removal under section 241(b)(3) of the Act, or for withholding or deferral of removal under the Convention Against Torture, if the alien establishes, respectively, a reasonable fear of persecution or torture. However, if an alien fails to establish, during the interview with the asylum officer, a reasonable fear of either persecution or torture, the asylum officer will provide the alien with a written notice of decision, which will be subject to immigration judge review consistent with paragraph (g) of this section, except that the immigration judge will review the reasonable fear findings under the reasonable fear standard instead of the credible fear standard described in paragraph (g) and in 8 CFR 1208.30(g).

(iii) If the alien is found to be an alien described as ineligible for asylum in § 208.13(c)(4), then the asylum officer shall enter a negative credible fear determination with respect to the alien's application for asylum. The Department shall nonetheless place the alien in proceedings under section 240 of the Act for consideration of the alien's claim for withholding of removal under section 241(b)(3) of the Act, or for withholding or deferral of removal under the Convention Against Torture, if the alien establishes, respectively, a reasonable fear of persecution or torture. The scope of review shall be limited to a determination of whether the alien is eligible for withholding or deferral of removal, accordingly. However, if an alien fails to establish, during the interview with the asylum officer, a reasonable fear of either persecution or torture, the asylum officer will provide the alien with a written notice of decision, which will be subject to immigration judge review consistent with paragraph (g) of this section, except that the immigration judge will review the reasonable fear findings under the reasonable fear standard instead of the credible fear standard described in paragraph (g) and in 8 CFR 1208.30(g).

* * * * *

## DEPARTMENT OF JUSTICE

Accordingly, for the reasons set forth in the preamble, the Attorney General amends 8 CFR parts 1003 and 1208 as follows:

## PART 1003—EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

■ 4. The authority citation for part 1003 continues to read as follows:

**Authority:** 5 U.S.C. 301; 6 U.S.C 521; 8 U.S.C. 1101, 1103, 1154, 1155, 1158, 1182, 1226, 1229, 1229a, 1229b, 1229c, 1231,

1254a, 1255, 1324d, 1330, 1361, 1362; 28 U.S.C. 509, 510, 1746; sec. 2 Reorg. Plan No. 2 of 1950; 3 CFR, 1949–1953 Comp., p. 1002; section 203 of Pub. L. 105–100, 111 Stat. 2196–200; sections 1506 and 1510 of Pub. L. 106–386, 114 Stat. 1527–29, 1531–32; section 1505 of Pub. L. 106–554, 114 Stat. 2763A–326 to –328.

■ 5. In § 1003.42, revise paragraph (d) to read as follows:

## § 1003.42   Review of credible fear determination.

* * * * *

(d) *Standard of review.* (1) The immigration judge shall make a de novo determination as to whether there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the immigration judge, that the alien could establish eligibility for asylum under section 208 of the Act or withholding under section 241(b)(3) of the Act or withholding or deferral of removal under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.

(2) If the alien is determined to be an alien described in 8 CFR 208.13(c)(3) or 1208.13(c)(3) and is determined to lack a reasonable fear under 8 CFR 208.30(e)(5)(ii), the immigration judge shall first review de novo the determination that the alien is described in 8 CFR 208.13(c)(3) or 1208.13(c)(3) prior to any further review of the asylum officer's negative determination.

(3) If the alien is determined to be an alien described as ineligible for asylum in 8 CFR 208.13(c)(4) or 1208.13(c)(4) and is determined to lack a reasonable fear under 8 CFR 208.30(e)(5)(iii), the immigration judge shall first review de novo the determination that the alien is described as ineligible for asylum in 8 CFR 208.13(c)(4) or 1208.13(c)(4) prior to any further review of the asylum officer's negative determination.

* * * * *

## PART 1208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 6. The authority citation for part 1208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Public Law 110–229.

■ 7. In § 1208.13, add paragraphs (c)(4) and (5) to read as follows:

## §1208.13   Establishing asylum eligibility.

* * * * *

(c) * * *

(4) *Additional limitation on eligibility for asylum.* Notwithstanding the

provisions of 8 CFR 208.15, any alien who enters, attempts to enter, or arrives in the United States across the southern land border on or after July 16, 2019, after transiting through at least one country outside the alien's country of citizenship, nationality, or last lawful habitual residence en route to the United States, shall be found ineligible for asylum unless:

(i) The alien demonstrates that he or she applied for protection from persecution or torture in at least one country outside the alien's country of citizenship, nationality, or last lawful habitual residence through which the alien transited en route to the United States and the alien received a final judgment denying the alien protection in such country;

(ii) The alien demonstrates that he or she satisfies the definition of ''victim of a severe form of trafficking in persons'' provided in 8 CFR 214.11; or

(iii) The only country or countries through which the alien transited en route to the United States were, at the time of the transit, not parties to the 1951 United Nations Convention relating to the Status of Refugees, the 1967 Protocol, or the United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.

(5) *Non-binding determinations.* Determinations made with respect to paragraph (c)(4)(ii) of this section are not binding on Federal departments or agencies in subsequent determinations of eligibility for T or U nonimmigrant status under section 101(a)(15)(T) or (U) of the Act or for benefits or services under 22 U.S.C. 7105 or 8 U.S.C. 1641(c)(4).

■ 8. In § 1208.30, revise the section heading and paragraph (g)(1) to read as follows:

## § 1208.30   Credible fear determinations involving stowaways and applicants for admission who are found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act, whose entry is limited or suspended under section 212(f) or 215(a)(1) of the Act, or who failed to apply for protection from persecution in a third country where potential relief is available while en route to the United States.

* * * * *

(g) * * *

(1) *Review by immigration judge of a mandatory bar finding.* (i) If the alien is determined to be an alien described in 8 CFR 208.13(c)(3) or 1208.13(c)(3) and is determined to lack a reasonable fear under 8 CFR 208.30(e)(5), the immigration judge shall first review de novo the determination that the alien is described in 8 CFR 208.13(c)(3) or 1208.13(c)(3). If the immigration judge

finds that the alien is not described in 8 CFR 208.13(c)(3) or 1208.13(c)(3), then the immigration judge shall vacate the order of the asylum officer, and DHS may commence removal proceedings under section 240 of the Act. If the immigration judge concurs with the credible fear determination that the alien is an alien described in 8 CFR 208.13(c)(3) or 1208.13(c)(3), the immigration judge will then review the asylum officer's negative decision regarding reasonable fear made under 8 CFR 208.30(e)(5) consistent with paragraph (g)(2) of this section, except that the immigration judge will review the findings under the reasonable fear standard instead of the credible fear standard described in paragraph (g)(2).

(ii) If the alien is determined to be an alien described as ineligible for asylum in 8 CFR 208.13(c)(4) or 1208.13(c)(4) and is determined to lack a reasonable fear under 8 CFR 208.30(e)(5), the immigration judge shall first review de novo the determination that the alien is described as ineligible for asylum in 8 CFR 208.13(c)(4) or 1208.13(c)(4). If the immigration judge finds that the alien is not described as ineligible for asylum in 8 CFR 208.13(c)(4) or 1208.13(c)(4), then the immigration judge shall vacate the order of the asylum officer, and DHS may commence removal proceedings under section 240 of the Act. If the immigration judge concurs with the credible fear determination that the alien is an alien described as ineligible for asylum in 8 CFR 208.13(c)(4) or 1208.13(c)(4), the immigration judge will then review the asylum officer's negative decision regarding reasonable fear made under 8 CFR 208.30(e)(5) consistent with paragraph (g)(2) of this section, except that the immigration judge will review the findings under the reasonable fear standard instead of the credible fear standard described in paragraph (g)(2).

\*     \*     \*     \*     \*

Approved:
Dated: July 12, 2019.

**Kevin K. McAleenan,**

*Acting Secretary of Homeland Security.*

Approved:
Dated: July 12, 2019.

**William P. Barr,**

*Attorney General.*

[FR Doc. 2019–15246 Filed 7–15–19; 8:45 am]

**BILLING CODE 4410–30–P; 9111–97–P**

---

# DEPARTMENT OF TRANSPORTATION

**Federal Aviation Administration**

**14 CFR Part 73**

**[Docket No. FAA–2018–0984; Airspace Docket No. 18–ASW–8]**

**RIN 2120–AA66**

## Expansion of R–3803 Restricted Area Complex; Fort Polk, LA

**AGENCY:** Federal Aviation Administration (FAA), DOT.

**ACTION:** Final rule.

**SUMMARY:** This action expands the R–3803 restricted area complex in central Louisiana by establishing four new restricted areas, R–3803C, R–3803D, R–3803E, and R–3803F, and makes minor technical amendments to the existing R–3803A and R–3803B legal descriptions for improved operational efficiency and administrative standardization. The restricted area establishments and amendments support U.S. Army Joint Readiness Training Center training requirements at Fort Polk for military units preparing for overseas deployment.

**DATES:** *Effective date:* 0901 UTC, September 13, 2019.

**FOR FURTHER INFORMATION CONTACT:** Colby Abbott, Airspace Policy Group, Office of Airspace Services, Federal Aviation Administration, 800 Independence Avenue SW, Washington, DC 20591; telephone: (202) 267–8783.

**SUPPLEMENTARY INFORMATION:**

### Authority for This Rulemaking

The FAA's authority to issue rules regarding aviation safety is found in Title 49 of the United States Code. Subtitle I, Section 106 describes the authority of the FAA Administrator. Subtitle VII, Aviation Programs, describes in more detail the scope of the agency's authority. This rulemaking is promulgated under the authority described in Subtitle VII, Part A, Subpart I, Section 40103. Under that section, the FAA is charged with prescribing regulations to assign the use of the airspace necessary to ensure the safety of aircraft and the efficient use of airspace. This regulation is within the scope of that authority as it establishes restricted area airspace at Fort Polk, LA, to enhance aviation safety and accommodate essential U.S. Army hazardous force-on-force and force-on-target training activities.

### History

The FAA published a notice of proposed rulemaking for Docket No.

FAA–2018–0984 in the **Federal Register** (83 FR 60382; November 26, 2018) establishing four new restricted areas, R–3803C, R–3803D, R–3803E, and R–3803F, and making minor technical amendments to the R–3803A and R–3803B descriptions for improved operational efficiency and administrative standardization in support of hazardous U.S. Army force-on-force and force-on-target training activities. Interested parties were invited to participate in this rulemaking effort by submitting written comments on the proposal. Two comments were received.

### Discussion of Comments

While supportive of the U.S. Army's need to train as they fight, the first commenter noted that modern general aviation aircraft have longer flight endurance today, making timely NOTAM publication of restricted area activations necessary for effective flight planning. To overcome the possibility of the restricted areas being activated with no advance notification, the commenter recommended adding "at least 4 hours in advance" to the "By NOTAM" time of designation proposed for the R–3803A, R–3803C, and R–3803D restricted areas. Additionally, the commenter requested the effective date of the proposed restricted areas, if approved, coincide with the next update of the Houston Sectional Aeronautical Chart.

It is FAA policy that when NOTAMs are issued to activate special use airspace, the NOTAMs should be issued as far in advance as feasible to ensure the widest dissemination of the information to airspace users. The FAA acknowledges that the addition of the "at least 4 hours in advance" provision to the proposed "By NOTAM" time of designation, as recommended by the commenter, would contribute to ensuring the widest dissemination of the restricted areas being activated to effected airspace users. As such, the FAA adopts the commenter's recommendation to amend the time of designation for R–3803A, R–3803C, and R–3803D to reflect "By NOTAM issued at least 4 hours in advance."

Additionally, the establishment of R–3803C, R–3803D, R–3803E, and R–3803F, and the minor technical amendments to the existing R–3803A and R–3803B legal descriptions are being made effective to coincide with the upcoming Houston Sectional Aeronautical Chart date.

The second commenter raised aerial access concerns of the area in which the new restricted areas were proposed to be established. The commenter stated

UNCLASSIFIED//FOR OFFICIAL USE ONLY

*Source: EID*




U.S. Customs and
Border Protection

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

*Source: EID*





UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

*Source: EID*





UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

*Source: EID*





UNCLASSIFIED//FOR OFFICIAL USE ONLY

*Source: EID*





UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

*Source: EID*

**U.S. Border Patrol – Southwest Border**
**Total Apprehensions by Country of Citizenship**
**FY14 – 19**



U.S. Customs and Border Protection

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

*Source: EID*





U.S. Customs and Border Protection

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

*Source: EID*





U.S. Customs and
Border Protection

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

*Source: EID*





U.S. Customs and
Border Protection

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

*Source: EID*





U.S. Customs and
Border Protection

UNCLASSIFIED//FOR OFFICIAL USE ONLY

**UNCLASSIFIED//FOR OFFICIAL USE ONLY**

*Source: EID*





**UNCLASSIFIED//FOR OFFICIAL USE ONLY**

UNCLASSIFIED//FOR OFFICIAL USE ONLY

*Source: EID*





UNCLASSIFIED//FOR OFFICIAL USE ONLY

**UNCLASSIFIED//FOR OFFICIAL USE ONLY**

*Source: EID*





**UNCLASSIFIED//FOR OFFICIAL USE ONLY**

**UNCLASSIFIED//FOR OFFICIAL USE ONLY**

*Source: EID*





U.S. Customs and
Border Protection

**UNCLASSIFIED//FOR OFFICIAL USE ONLY**

**UNCLASSIFIED//FOR OFFICIAL USE ONLY**

*Source: EID*





U.S. Customs and
Border Protection

**UNCLASSIFIED//FOR OFFICIAL USE ONLY**

**UNCLASSIFIED//FOR OFFICIAL USE ONLY**

*Source: EID*





**UNCLASSIFIED//FOR OFFICIAL USE ONLY**

UNCLASSIFIED//FOR OFFICIAL USE ONLY

F
Source: EID 10/7/20

**Office of Field Operations - Southwest Border**
**Family Unit Alien (FMUA) Inadmissible Aliens**
**FY17 - 19**

|      | OCT   | NOV   | DEC   | JAN   | FEB   | MAR   | APR   | MAY   | JUN   | JUL   | AUG   |
|------|-------|-------|-------|-------|-------|-------|-------|-------|-------|-------|-------|
| FY19 | 4,178 | 4,989 | 4,390 | 4,229 | 4,210 | 4,215 | 3,600 | 4,101 | 3,604 | 4,248 | 5,480 |
| FY18 | 3,631 | 4,269 | 5,423 | 4,107 | 4,504 | 5,867 | 6,302 | 5,323 | 3,639 | 3,651 | 3,723 |
| FY17 | 7,477 | 5,621 | 4,469 | 3,147 | 1,161 | 1,108 | 998   | 1,279 | 1,441 | 1,951 | 2,589 |



U.S. Customs and
Border Protection

UNCLASSIFIED//FOR OFFICIAL USE ONLY

CBP S
CBP /

ing Unit

isional

ern Triangle, and Other Nationals

30/2019 (IIDS v1 34 run date 10/06/2019; EID as of 10/04/2019)

oluntary Returns, Voluntary Departures and Withdrawals Under Docket Control

ted Removal (ER) or Voluntary Return (VR) that are turned over to ERO for detention   Aliens processed for ER and not

ot detained by ERO are primarily processed by Border Patrol   CBP should be contacted for those statistics

ere and Non-Western Hemisphere is based on information from:   **https://2009-2017.state.gov//s/d/rm/rls/dosstrat/2007/html/82977.htm**

y of Citizenship and Week

| 2019-<br>2019 | 09/22/2019-<br>09/28/2019 |
|---|---|
| 1,024 | 5,066 |
| 414 | 2,127 |
| 208 | 454 |
| 13 | 989 |
| 252 | 1,150 |
| 137 | 346 |
| 25 | 132 |
| *112* | *214* |

y of Citizenship and Month

| er | November | December | January | February | March | April | May | June | July | August | September | FY2019<br>Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4,202 | 22,384 | 21,107 | 20,019 | 20,344 | 24,129 | 24,680 | 25,074 | 21,556 | 22,845 | 20,901 | 20,017 | 267,258 |
| 2,899 | 11,080 | 10,396 | 9,911 | 9,997 | 12,096 | 10,992 | 10,975 | 9,740 | 10,531 | 9,894 | 8,981 | 127,492 |
| ,496 | 1,603 | 1,217 | 1,544 | 1,209 | 1,507 | 1,623 | 1,658 | 1,818 | 1,822 | 1,586 | 1,898 | 18,981 |
| 4,653 | 4,463 | 4,562 | 4,211 | 4,423 | 5,071 | 5,676 | 5,952 | 4,262 | 4,755 | 3,645 | 3,246 | 54,919 |
| 3,075 | 3,259 | 2,996 | 2,479 | 3,042 | 3,551 | 4,473 | 4,475 | 3,818 | 3,526 | 3,389 | 3,717 | 41,800 |
| 2,079 | 1,979 | 1,936 | 1,874 | 1,673 | 1,904 | 1,916 | 2,014 | 1,918 | 2,211 | 2,387 | 2,175 | 24,066 |
| *888* | *902* | *869* | *804* | *665* | *786* | *768* | *719* | *623* | *856* | *810* | *644* | *9,334* |
| *,191* | *1,077* | *1,067* | *1,070* | *1,008* | *1,118* | *1,148* | *1,295* | *1,295* | *1,355* | *1,577* | *1,531* | *14,732* |

AR404



**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director* (MS 2000)
Washington, DC  20529-2000

**U.S. Citizenship
and Immigration
Services**

July 2, 2019

**INFORMATION**

MEMORANDUM FOR THE ACTING SECRETARY

FROM:            Ken Cuccinelli II
                 Director

SUBJECT:         **Reduction of Credible Fear Consultation Period**

---

**Purpose:** To inform you that effective July 8, 2019, USCIS is reducing the credible fear (CF) consultation period to one full calendar day from the date of arrival at a detention facility (including at the Family Residential Centers) and will deny requests for extensions, as unreasonably delaying the process, except in the most extraordinary circumstances.

**Background:** The Immigration and Nationality Act (INA) § 235(b)(1)(B)(iv) provides the right for aliens in the credible fear process to consult with a person(s) of their choosing, as long as the consultation is at no expense to the government and does not unreasonably delay the process. The regulations at 8 C.F.R. § 235.3(b)(4)(ii) require that aliens be given time to contact and consult such person(s).  Under present practice:
  o  At the Family Residential Centers (FRCs), the alien is given 72 hours after arrival at the facility and re-orientation by USCIS to seek and receive consultation.  The CF interview is scheduled after this period.
  o  At all other detention facilities, single adults are generally not interviewed until at least 48 hours after arrival at the detention facility in order to seek and receive consultation before the interview takes place.

**Considerations:** USCIS provides a consultation period as the governing statute expressly provides.  INA § 235(b)(1)(B)(iv).  However, USCIS can choose to modify the consultation period as a matter of policy.  The current 72-hour (FRC) and 48-hour (non-FRC) consultation timeframes were established by policy in March 2015 and March 1997, respectively.

Importantly, on June 6, 2019, USCIS completed revisions to the Form M-444, *Information About Credible Fear Interview*.  As required by statute and regulation, the M-444 must be provided to an alien in Expedited Removal who has made a fear/asylum claim in order to provide the alien information about the credible fear interview process, the right to consult with other persons prior to the interview, and the right to seek review by an immigration judge of any negative credible fear determination made by an asylum officer.  The form was recently revised using

PRE-DECISIONAL/DELIBERATIVE

Reduction of Credible Fear Consultation Period
Page 2

plain language principles in order to provide greater clarity to the alien during the consultation process.

USCIS must do its part to ensure the processing of aliens is not unduly delayed in light of the situation at the Southwest Border. Given this critical need, coupled with the improvements made to the M-444 which makes the process easier for aliens to understand, I have decided to reduce the timeframe for consultation to one full calendar day at both FRCs and all other facilities. In practice, this means individuals will have longer than 24 hours to consult depending on when they arrive at the facility. Reducing the time period for consultation could lead to longer delays at a later point in the process for some cases, as USCIS may receive more frequent requests to reschedule interviews. However, USCIS is also establishing a new policy of requiring extraordinary circumstances warranting approval of a request to reschedule so that USCIS can ensure, consistent with the statute, that the consultation period does not unreasonably delay the overall process.



U.S. Department of Homeland Security
Washington, DC 20229



**U.S. Customs and
Border Protection**

AUG 1 1 2004

MEMORANDUM FOR:   CHIEF PATROL AGENTS
                  Tucson and Laredo Sectors ▮

FROM:             David V. Aguilar ▮
                  Chief
                  U.S. Border Patrol ▮

SUBJECT:          Expedited Removal Policy

Authorized by Section 235(b) of the Immigration and Nationality Act (INA), the
Expedited Removal (ER) process authorizes immigration officers, under certain
circumstances, to formally remove certain aliens from the United States. While ER has
been applied to inadmissible aliens arriving at designated ports of entry (POE) for years,
it has not been applied to aliens who have illegally entered the United States along our
land borders between the POEs.

The Department of Homeland Security (DHS), through U.S. Customs and Border
Protection, has the critical task of safeguarding the borders of the United States.
Through Federal Register Notice 1651ZA01, to be published on August 11, 2004, DHS
is expanding ER to include certain aliens who illegally enter across a land border
between the POEs. Expanding ER between POEs will provide Border Patrol Agents
with a valuable tool to help establish greater control over our borders. The Border
Patrol's authority to implement ER was effective immediately upon publication of the
notice.

ER will be deployed incrementally to the Border Patrol sectors, beginning with Tucson
and Laredo. ER will be expanded into other southwest and northern borders sectors in
the future. ER will be primarily used for illegal entries by nationals of countries other
than Mexico and Canada and by Mexican and Canadian nationals with histories of
criminal or repeated immigration violations, such as recidivists, alien smugglers, guides,
drivers, etc. ER will not be applied to unaccompanied juveniles, citizens and nationals
of Cuba and El Salvador, and aliens who are members of the Class Action Settlement in
*American Baptist Churches* v. *Thornburgh* (*ABC*), which settled the claims of a specific
class of Salvadorans and Guatemalans regarding handling of asylum claims.

No Border Patrol Agent will be authorized to process an alien for ER until the agent and approving supervisors have attended a comprehensive course of instruction on ER. By regulation, the review of the ER processing paperwork must be completed by the processing agent's second line supervisor.   When processing a case for ER, agents should err on the side of caution and apply a liberal application of the guidelines, referring to an asylum officer any questionable cases, including cases that might raise a question about whether the alien faces persecution.

Staff may direct questions to

Attachment



1300 Pennsylvania Avenue NW
Washington, DC 20229



SEP 3 0 2015



**U.S. Customs and
Border Protection**

MEMORANDUM FOR:     All Chief Patrol Agents
                    All Directorate Chiefs

FROM:               Michael J. Fisher
                    Chief
                    U.S. Border Patrol

SUBJECT:            Clarification of Processing Procedures for Credible Fear

Recently, the Office of the Inspector General (OIG) conducted an audit of the U.S. Border Patrol's processing of credible fear claims. Based on the OIG report, non-governmental organizations have expressed a concern about the prosecution of individuals claiming credible fear. Due to the scrutiny of credible fear claims and the possible prosecution of those individuals, the attached *Credible Fear Processing Procedures Guide* must be followed and the required information documented in all A-Files when a subject claims credible fear. If a subject claims credible fear at any time while in U.S. Border Patrol custody, up to and including while being transported by G4S, then the subject should be returned to a U.S. Border Patrol station to be processed as such. Stations and processing centers need to coordinate with G4S to ensure adherence to this process.

Ensuring that the credible fear processing procedures are adhered to maintains the credibility of the Consequence Delivery Program by ensuring that all of an individual's rights are upheld. For example, the expedited removal process allows for the removal of certain aliens without an immigration hearing unless the alien indicates an intention to apply for asylum or expresses a fear of persecution, fear of torture, or a fear of return. It is important to maintain the integrity of the expedited removal process by ensuring the required questions are asked and detainees are provided the appropriate avenue to make credible fear claims. U.S. Border Patrol Headquarters will review credible fear claims regularly to ensure compliance with policy and processing guidelines.

The attached *Credible Fear Processing Procedures Guide* was developed to remind agents that they have the responsibility to ask credible fear questions during processing and to utilize the Notice of Rights and Request for Disposition, Form I-826; the Record of Sworn Statement, Form I-867A; the Jurat Record of Sworn Statement, Form, I-867B; and the Information about Credible Fear Interview, Form M-444. It is also important to document the encounter and the circumstances of the subject's credible fear claim in the narrative of the Record of Deportable Alien, Form I-213.

Please ensure that the attached *Credible Fear Processing Procedures Guide* is briefed to all agents and supervisors. In addition, the *Credible Fear Processing Procedures Guide* should be posted where all agents will have it available to reference during processing.

Staff may direct questions to Operations Officer ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ at U.S. Border Patrol Headquarters ▮▮▮▮▮▮▮▮▮▮.

Attachment

# Credible Fear Processing Procedures Guide

The purpose of this guide is to clarify the internal procedures used by the U.S. Border Patrol when identifying and processing aliens who claim credible fear. The process by which the U.S. Border Patrol documents credible fear claims is being scrutinized. To ensure proper processing of these claims, please adhere to the guidelines below.

*When documenting CF claims in sworn statements it is imperative that the information documented is that of the subject making the CF claim. All data must be correct and accurate.*

**Example of Inaccurate Information Entered:** An unaccompanied child 3 years old with a sworn statement stating that the subject was looking for work and the occupation marked as "Laborer".

The Credible Fear (CF) process is administrative in nature but can include criminal charges. The guidelines for documenting a CF claim and prosecuting a subject have been broken down separately below:

**Documenting CF for Adults:**

1. Agents are to thoroughly document a subject's claim of CF and the reason for expressing fear. Agents are not the deciding official as to whether a CF claim is valid or not; the validity of a CF claim is determined by the asylum officer. Agents are to document the CF claim in the e3 Detention Module using forms I-867A, I-867B and M-444. A subject may claim credible fear at any time while in U.S. Border Patrol custody up to the point that they are turned over to ICE/ERO. Upon hearing a claim of credible fear, the subject should be immediately returned to a processing center to process the claim. Stations must coordinate with G4S to ensure this happens.
2. Agents should also document any information that could be relevant to the subject's CF claim in the narrative of the I-213. Some examples of questions that should be considered are:
   a. Did the subject attempt to abscond or flee while agents were attempting to arrest?
   b. Did the subject present themselves immediately for inspection?
   c. Did the subject resist the arrest at any point?
   d. Did the subject immediately state to any agent he/she had fear or wait until being informed of possible prosecution?
3. Supervisors will verify that all subjects that express CF have been identified in e3 Processing, have an accurate disposition and ensure that all relevant information is included in the I-213 narrative. The supervisor will also ensure that each CF file contains the necessary CF forms: I-867A, I-867B and M-444.

Note: The validity of a CF claim is determined by an asylum officer and not the agent.

**Documenting CF for Unaccompanied Alien Children (UACs):**

All UACs are required to be properly screened as per the Trafficking Victim Protection Act (TVPRA) using the current CBP Form 93. CBP Form 93 includes four specific questions related to determining if a UAC may have a CF claim. The four questions must be asked in their entirety and the answers must be documented. Agents are not limited to asking only the questions on CBP Form 93. The provided questions, in CBP Form 93, are intended to establish a dialogue with the UAC that may allow agents to gather additional information to assist in their determination.

**Prosecution of Aliens Claiming CF:**

1. The decision to prosecute will fall on the processing supervisor. If a subject is to be prosecuted due to criminal history or other circumstances this information must be clearly annotated in the I-213

AR411

## Credible Fear Processing Procedures Guide

narrative.  When taking into account whether to prosecute a subject, all options should be explored so that the most fitting consequence is utilized.

By documenting all relevant information pertaining to CF claims we can prosecute and remove aliens through the most effective means possible.

**How to document CF in e3 Processing:**

Credible Fear can be documented in multiple locations and in every pathway in e3 Processing.  With the recent updates done to e3, checking a box in any of these places will auto-populate across the rest of the pages.

The first place an agent can indicate CF is on the first page of e3 Processing.  Agents can click the I-826/I-770 button (screenshot below) to open the I-826 / I-770.  On these forms, the agent can select either the "I believe I face harm if I return to my country.  My case will be referred…" or "Subject claims fear?" checkbox.  Agents do not have to select both, as selecting either will automatically check the other box.



AR412

# Credible Fear Processing Procedures Guide

I-826/770 



CF can also be documented through the Disposition page (page 4) by selecting any disposition that has "CF", such as ER/CF.

AR413

# Credible Fear Processing Procedures Guide

During the ER Pathway, CF can be indicated on the 867-B as well.



If CF is indicated on any of the forms, the M-444 will be mandatory.

AR414

## Credible Fear Processing Procedures Guide

**Documenting and/or verifying CF through e3 Detention Module (e3DM):**

In e3DM, agents can add CF to an alien before processing has begun, and/or verify/view the aliens that have CF indicated. They can view these subjects using the filters built into e3DM, printing a roll call with CF selected, or clicking "view more details" for any subject. They can also add CF to an alien by clicking "view more details" and checking the appropriate box. It should be noted that aliens that have been marked as CF through e3 Processing will not be able to have their CF removed through e3DM.

Recently input subject with no CF (View Details clicked)



Recently input Subject being able to be marked as having CF (Edit Subject clicked)

AR415

# Credible Fear Processing Procedures Guide

Subject with CF Indicator checked (Through Edit Subject link)



Subject indicated as having CF (View Details only)

AR416

# Credible Fear Processing Procedures Guide

**Authorities**

**Section 235(b)(1)(A)(iii)** of the Act provides the Secretary of Homeland Security with the authority to apply the expedited removal provisions.

This section of the INA applies to aliens in the U.S. who have not been admitted or paroled, and who have not affirmatively shown, to the satisfaction of the immigration officer that they have been continuously physically present in the U.S. for the 2-year period immediately preceding the date of determination of inadmissibility. Although these provisions were not initially applied to aliens who entered without inspection, the regulations provide that the Secretary may elect to apply the expedited removal provisions at any time, to any aliens specified in this section, by publication of a notice in the Federal Register.

A Federal Register Notice was published August 11, 2004.  This Notice applies only to aliens encountered within:

- 14 days of entry and
- 100 air miles of the U.S. international border.

**Section 235(b)(1)** provides that if an Immigration Officer determines that an alien who is arriving in the U.S. is inadmissible under section 212(a)(6)(C) or 212(a)(7) of the INA, the officer will order the alien removed from the U.S., without further hearing or review, unless the alien indicates an intention to apply for asylum, or expresses a fear of persecution, a fear of torture, or a fear of return to his or her country.

**Section 212(a)(6)(C)** relates to fraud or willful misrepresentation of a material fact to procure a visa, other documentation, or admission into the U.S. or other benefit provided under the Act, or false claim to U.S. citizenship for any purpose or benefit under the INA including section 274(a) or any other Federal or State law. Use of the section 212(a)(6)(C) charges is complex.

Some key points to consider regarding fraud and misrepresentation are:

1. The procurement of a document, admission or benefit by fraud or misrepresentation, must have been done from a government official, not a counterfeiter.  OR
2. The fraud or misrepresentation must have been practiced on a U.S. Government official.
3. The procurement by fraud must relate to a person who has done so to obtain his or her own admission, not someone else's.
4. The fraud or misrepresentation must be material.
5. Silence or failure to volunteer information does not in itself constitute a misrepresentation.
6. Generally, an alien should not be charged with misrepresentation if he or she makes a timely retraction of the misrepresentation, usually at the first opportunity.

All charges must make sense and must be well documented, supported by the evidence, and addressed in the sworn statement.

**Section 212(a)(7)** relates to lack of valid immigrant or nonimmigrant entry documents.

If another ground of inadmissibility applies, the government may decide to charge the alien with an additional ground or grounds of inadmissibility.

If the government charges any other grounds, the alien must be referred for 240 proceedings rather than using the expedited removal process.

**Memorandum and policy dated August 11, 2004 titled Expedited Removal Policy**

AR417

1300 Pennsylvania Avenue NW
Washington, DC 20229





**U.S. Customs and
Border Protection**

SEP 2 5 2019

MEMORANDUM FOR:    All Chief Patrol Agents
All Directorate Chiefs

FROM:    Carla L. Provost
Chief
U.S. Border Patrol

SUBJECT:    Prioritization of Removal Pathways Guidance

The Department of Homeland Security, U.S. Customs and Border Protection, U.S. Immigration
and Customs Enforcement, and the U.S. Citizenship and Immigration Services have crafted a
comprehensive immigration removal pathways prioritization guidance to address the migration
crisis along the Southwest Border. The Prioritization of Removal Pathways Guidance uses
available processing options, programs, and consequences. This guidance is designed to achieve
the removal of amenable aliens and reduce the number of aliens released into the United States
where not required by law or merit.

Removal pathways are prioritized in the following order:

1. Electronic Nationality Verification;
2. Migrant Protection Protocols;
3. Asylum Cooperative Agreement–Ongoing negotiation and development; and
4. ICE Detention

Effective immediately, Chief Patrol Agents are directed to adhere to this guidance. This
implementation will require considerable local coordination between the U.S. Border Patrol,
Enforcement and Removal Operations and other partner agencies to ensure the success of these
efforts.

Field leadership should take into account the regional operational environment and available
resources. They should ensure the applicability of any options, beginning with the most effective
and lasting consequence consistent with these guiding principles and the law, and requirements
of each individual removal pathway.

In addition to the aforementioned removal pathways, all Order of Release (OR) considerations
will be strictly limited and issued judiciously in special circumstances. Further guidance on the
issuance of an OR will be forthcoming.

Staff may direct questions to USBP Prosecutions,

Attachments

AR418



**U.S. Department of Homeland Security**
Washington, DC 20229



**U.S. Customs and
Border Protection**

**JUN 0 2 2008**

| | |
|---|---|
| MEMORANDUM FOR: | All Chief Patrol Ag **(b)(6) & (b)(7)(C)** |
| FROM: | David V. Aguilar<br>Chief<br>U.S. Border Patrol |
| SUBJECT: | Hold Rooms and Short Term Custody |

Attached is the new Hold Rooms and Short Term Custody policy. Effective immediately, this policy will supersede all existing detention and hold room policies utilized by the U.S. Border Patrol, including the "Interim Guidance Regarding Unaccompanied Juveniles in Custody" memorandum, dated September 2, 2005.

This directive establishes national policy for the short term custody of persons arrested or detained by Border Patrol Agents and detained in hold rooms at Border Patrol stations, checkpoints and processing facilities. It also contains requirements regarding the handling of juveniles. Chief Patrol Agents will ensure that this policy is made available to all managers, supervisors, and agents in their sectors and that they are familiar with it. A training roster should be completed at each station, which documents receipt of the policy. Forward all training rosters to your respective sector training department. Additionally, you will ensure that a copy of this policy is posted and visible in all station processing areas.

This policy has been reviewed by representatives from both the Office for Civil Rights and Civil Liberties of the Department of Homeland Security (DHS) and the DHS Inspector General and remedies a number of issues raised during previous inspections.

Staff may direct questions to the Detention and Removal Operations liaison officer within the Planning Branch, Operations Planning and Analyses Division at **(b)(6),(b)(7)(C)**

## U.S. BORDER PATROL POLICY

**SUBJECT:  DETENTION STANDARDS**
**Reference Number:** (b)(7)(E)
**DATE:  January 31, 2008**

### HOLD ROOMS AND SHORT TERM CUSTODY

**1.     PURPOSE.**  This directive establishes national policy for the short-term custody of persons arrested or detained by Border Patrol Agents and detained in hold rooms at Border Patrol stations, checkpoints, processing facilities, and other facilities that are under the control of U.S. Customs and Border Protection (CBP).

**2.     AUTHORITIES/REFERENCES.**

2.1.    Title 8, United States Code, Section 236

2.2.    Title 8, Code of Federal Regulations, Section 236

2.3.    *Border Patrol Handbook*

2.4.    *Officers Handbook* (M-68)

2.5.    *The Law of Arrest, Search and Seizure for Immigration Officers* (M-69)

2.6.    *Flores v. Reno,* Stipulated Settlement Agreement, No. CV 85-4544-RJK (Px) (C.D. Cal. Jan. 17, 1997). Also, *"Flores."*

2.7.    Homeland Security Act of 2002, Section 462

2.8.    "Interim Guidance Regarding Unaccompanied Juveniles in Custody" Memorandum to All Chief Patrol Agents from David V. Aguilar, Chief, U.S. Border Patrol (September 2, 2005).

2.9.    Immigration and Customs Enforcement guidelines on age determination.

**3.     DEFINITIONS.**

3.1.    <u>Bedding</u>.  Any combination of pillow, sheets, blanket, sleeping bag, or mattress.

3.2.    <u>Custody</u>.  The period of time in which a detainee is under arrest or is detained in a Border Patrol hold room.

-2-

3.3.   Hold Room.  An area such as a detention cell, a search room, or an interview room in which detained persons are temporarily held pending processing or transfer.

3.4.   Open Area.  An area within a secure facility where the detainee is not in a locked room but where there are locked doors to prevent escape (e.g., a processing room).

3.5.   Direct Supervision.  Detaining a person in a location where the employee assigned detention duties can constantly observe or hear the detainee.

3.6.   Family Group.  ████████ (b)(7)(E) ████████
████████████████████████████████████

3.7.   Intermittent Supervision.  Detaining a person in a hold room where a detainee may be occasionally out of view and/or hearing of the employee assigned detention duties.

3.8.   Juvenile.  A person under 18 years of age.

3.8.1.  Persons under the age of 18 who have been emancipated by a state court or convicted and incarcerated for a criminal offense as an adult are NOT considered juveniles.  Such individuals must be treated as adults for all purposes, including confinement and release on bond.

3.8.2.  If a reasonable person would conclude that an individual claiming to be a juvenile is really an adult, that person will be treated as an adult for all purposes, including transportation, confinement, and release on bond or own recognizance.  Age determination will be conducted, if necessary, in accordance with Immigration and Customs Enforcement guidelines on age determination.

3.8.3.  An unaccompanied alien child (UAC) is defined in Section 462 (g) (2) of the Homeland Security Act of 2002 as a child who:

    a.  Has no lawful immigration status in the United States;

    b.  Has not attained 18 years of age; and

    c.  With respect to whom—

        1.  There is no parent or legal guardian in the United States; or

        2.  No parent or legal guardian in the United States is available to provide care and physical custody.

4.   RESPONSIBILITIES.

-3-

4.1.    The Chief, Office of Border Patrol, is responsible for policy oversight, which includes formulating and implementing guidelines and procedures.

4.2.    Chief Patrol Agents (CPAs) are responsible for managing the implementation of this program at the sector level and monitoring compliance with the procedures to ensure uniformity of application, as well as for ensuring that all employees under their direction receive proper training concerning this policy and these procedures.

4.3.    Patrol Agents in Charge (PAIC) are responsible for monitoring compliance at the station level.

4.4.    Supervisory Border Patrol Agents are responsible for fulfilling all of their duties specified herein, and for ensuring that Border Patrol Agents under their direction are familiar with this policy and these procedures, and comply with them.

## 5.    POLICY.

5.1.    All persons arrested or detained by the Border Patrol will be held in facilities that are safe, secure, and clean.  Detainees will be provided food, water, properly equipped restrooms and hygiene supplies as set forth in this directive.

5.2.    Detainees will be promptly processed and turned over to U.S. Immigration and Customs Enforcement (ICE), Office of Detention and Removal Operations (DRO); the Office of Refugee Resettlement (ORR); the U.S. Marshals Service; or an other agency (OA), as appropriate.

## 6.    PROCEDURES.

6.1.    <u>Detention Cells, Search Rooms, and Hold Rooms.</u>

6.1.1. Supervisors are responsible for designating areas as detention cells, search rooms, and/or hold rooms and ensuring that employees under their direction are familiar with such designations and intended uses.  Dual designation of a particular room is authorized, i.e, a detention cell may also be used as a search room.

6.2.    <u>Duration of Detention.</u>

6.2.1. Whenever possible, a detainee should not be held for more than (b)(7)(E) Every effort will be made to promptly process, transfer, transport, remove, or release those in custody as appropriate and as operationally feasible.

6.2.2. The PAIC or the senior shift supervisor will be notified of all detentions at the station level that reach or exceed ██(b)(7)(E)██, and they shall make every effort to promptly move the detainee(s).

6.2.3. The Sector Staff Duty Officer must be notified when the detention period reaches or exceeds ██(b)(7)(E)██, and the Staff Duty Officer or their designee shall make every effort to promptly move the detainee(s).

6.2.4. When the detainee is an unaccompanied alien child (UAC), every effort must be made to move them out of the Border Patrol facility and into ORR placement within ██(b)(7)(E)██; however, there are times when placement by ORR may take longer than ██(b)(7)(E)██. The PAIC must be notified immediately when a UAC's detention exceeds ██. ...ever, it is strongly encouraged that the PAIC be notified when the detention exceeds ██(b)(7)(E)██. The PAIC or their designee will ensure that the ICE/DRO Field Office Juvenile Coordinator (FOJC) has been notified and ensure that the UAC is being held in accordance with this policy. The reason for the extended detention and the time and date that the PAIC and FOJC were notified will be documented in the Unaccompanied Alien Children Detention Log and retained for a period of two years.

6.2.4.1. In accordance with the *Flores v. Reno* Stipulated Settlement Agreement, UAC must be placed in an ORR-approved facility within ██(b)(7)(E)██. In cases where the PAIC has reason to believe that the UAC's detention will exceed ██(b)(7)(E)██ or exceeds ██(b)(7)(E)██ hours, the PAIC or their designee will notify a sector staff officer immediately. This notification may occur well before the ██(b)(7)(E)██ time period is reached if information is provided at an earlier time that indicated the UAC placement won't be met under current conditions. The sector staff officer will contact the local ICE DRO Field Office Director for assistance and intervention.

6.2.4.2. Under extenuating circumstances, the maximum time allowed for placing UAC in an ORR-approved facility is five days. In cases where UAC are detained longer than five days, sector staff will immediately contact the DRO liaison officer at the Office of Border Patrol via telephone and e-mail for further guidance and assistance, ensuring that all pertinent information and actions taken thus far are provided. Sector staff may contact the DRO liaison officer earlier when they deem appropriate or necessary.

6.3.    Exceptions to Short-Term Detention in Border Patrol Hold Rooms.



6.3.1. ████████████(b)(7)(E)████████████.

6.3.2. ████████████(b)(7)(E)████████████



6.3.5. Direct supervision and control of detainees must be maintained at all facilities that do not have hold rooms.

6.4.    Master Detention Log.

6.4.1. The ENFORCE apprehension log will serve as the master detention log. It will contain at a minimum the detainee's:

    a.     Name

    b.     Sex

    c.     Age and date of birth

    d.     Alien registration number

    e.     Nationality

    f.     Reason detained

    g.     Final disposition

6.4.2.  Any alien detained in custody for removal proceedings or voluntarily returned must be transferred via an I-216 created in ENFORCE.

6.5.   Hold Room Monitoring.

6.5.1.  Although video surveillance is an outstanding tool, it is not a replacement for physical checks.  Holding cells must be physically checked regularly.  Physical checks give processing agents better control of the aliens in their hold rooms, provide a deterrent for misconduct, and provide detainees with an opportunity to communicate issues such as health or safety concerns to the processing agent.

6.5.2.  Juveniles.  Unaccompanied alien children require direct supervision.  Physical checks are a critical aspect of monitoring UACs.  Holding cells must be physically checked regularly and recorded in a log.  Each station will be responsible for creating a hold room check sheet to verify the physical checks of juveniles.

6.5.3. (b)(7)(E)



6.6.   Alien Booking Record (I-385).  An Alien Booking Record (I-385) will be generated for each detainee that requires **special handling** (i.e., a detainee held for prosecution or removal or a detainee awaiting a voluntary return with a medical condition, or an unaccompanied juvenile).  The Alien Booking Record will be posted near the entrance to the hold room or in a secure area. (b)(7)(E) The sheet will be maintained until the detainee is released from CBP custody. (b)(7)(E) .  The Alien Booking Record will be created in ENFORCE and contain the following detainee information:

    a.    Name

    b.    Alias

    c.      Sex

    d.      Date of birth

    e.      Place of birth

    f.      Country of citizenship

    g.      Alien registration number

    h.      Date apprehended

    i.      Responsible station or office

    j.      Medical alert—an annotation indicating that the person has a medical condition that requires medical care or prescribed medication, has a communicable disease, is suffering from depression, or appears to be suicidal.

    k.      Remarks—for example, the person is an escape or flight risk, is a high risk detainee, is an asylum claimant, or is an accompanied or unaccompanied alien child.

6.7.    <u>Medical Issues</u>.

6.7.1.   (b)(7)(E)

6.7.2.  Such detainees will be evaluated by qualified personnel:

    a.      an emergency medical technician (EMT) or a paramedic (Border Patrol or local); or

    b.      a physician, physician's assistant, or nurse practitioner.

6.7.3.   b)(7)(E)

6.7.4.  A supervisor will be notified as soon as possible of detainees needing medical attention.

6.7.5. <u>Medications.</u> Border Patrol Agents will **not** administer or inject any medication unless they are certified EMTs or paramedics practicing under the direction of a medical director and the administration of such medicine is within their scope of practice and is authorized under the protocols of their medical practice. Medication prescribed in the United States, in a properly identified container, with the specific dosage indicated, may be self-administered under the supervision of a Border Patrol Agent. Administration of prescribed medication, medical assistance, or refusal of the same will be noted on the Alien Booking Record. Medications will not be left in the possession of the detainee. They will be secured separately, preferably with the detainee's property. ████████████ (b)(7)(E) ████████████ .

6.8. <u>Meals.</u> Detainees will be provided snacks and juice every four hours. Detainees whether in a hold room or not, will be provided a meal if detained more than 8 hours or if their detention is anticipated to exceed 8 hours. Regardless of the time in custody, juveniles will be provided with meal service, and at least every six hours thereafter; two of three meals must be hot. Juveniles, small children, toddlers, babies, and pregnant women will have regular access to snacks, milk, or juice at all times. When an adult detainee requests a snack or meal before the next meal service, the processing agent may grant the request on the basis of the circumstances. Agents should be sensitive to the culinary, cultural, and religious dietary restrictions and/or differences of all detainees and should provide a meal that conforms to the dietary restrictions, if feasible.

6.9. <u>Drinking Water.</u> Potable drinking water will be available to detainees. The supervisor is responsible for ensuring that drinking water is available.

6.10. <u>Restrooms.</u> Restrooms will be available to detainees. Detainees using the restrooms will have access to toilet items, such as soap, toilet paper, and sanitary napkins. Families with small children will also have access to diapers and wipes.

6.11. <u>Bedding.</u> Detainees requiring bedding will be given clean bedding. Only one detainee will use this bedding between cleanings. This bedding will be changed every three days and cleaned before it is issued to another detainee. Vinyl or rubber-coated mattresses will be disinfected before being reissued.

6.12. <u>Inspection of Personal Property.</u> Purses, handbags, backpacks, and luggage will be inspected for weapons and contraband. They will be secured separately from the detainee until release or removal.

6.13. <u>Control and Safeguarding of Detainees' Personal Property.</u> The control and safeguarding of detainees' personal property will include the secure storage of funds, valuables, baggage, and other personal property. All property will be receipted on the appropriate Form I-77. All items belonging to the detainee will be properly receipted and placed in a secure area.

-9-

6.13.1. All property and legal papers that are in the juvenile's possession, or are served upon the juvenile during processing, shall accompany the juvenile upon transfer to any other agency or facility.  Property of the juvenile that is in the custody of the Border Patrol that exceeds the limit of the transporting agency shall be shipped to that facility in a timely manner.

6.14.   Showers.  Agents will make reasonable efforts to provide a shower for any detainee held for more than 72 hours.  Detainees that are showering will be provided a clean towel and basic toiletries.  Agents will make every reasonable effort to provide unaccompanied alien children who are held more than 48 hours with access to a shower and clean towel, clean clothing, and basic hygiene articles as soon as practicable.  These items may be provided to UACs sooner, depending on availability and the condition of the juvenile.

6.15.   Inspection.  Detention cells will be routinely inspected for evidence of tampering.

6.16.   Cleaning and Sanitization.  Supervisors will ensure that detention cells are regularly cleaned and sanitized.  Employees will not be expected nor required to perform such tasks.

6.17.   Smoking.  Smoking is prohibited in hold rooms.

6.18.   Evacuation.  Every station will have an evacuation plan and will post it in the processing area.  The PAIC is responsible for ensuring that agents are familiar with procedures in the evacuation plan.

6.19.   Search Procedures.  All detainees that are under arrest will be thoroughly searched before being placed into a Border Patrol hold room. (b)(7)(E)

6.20.   Restraint Procedures. (b)(7)(E)  This should be annotated on an Alien Booking Record.  Any detainee restrained in a holding room requires direct supervision. (b)(7)(E)

6.21.   Telephones.  Persons detained more than 24 hours will be given access to a telephone for the purposes of contacting an attorney or other party as stated on the I-826 Notice of Rights and Request for Disposition and will be given access at a minimum of once per day until they are no longer in Border Patrol custody.  Detainees who wish to make other than a local call must use a calling card or collect call.  Processing agents may, at their discretion, grant telephone access to any alien.  Unaccompanied alien children will be given access to telephones as soon as practicable to aid in locating family members.

6.22.  <u>Segregation.</u> 

6.23.  <u>Privacy.</u>  Border Patrol hold rooms should have privacy screens in toilet areas whenever possible.  (b)(7)(E)

6.24.  <u>Juveniles.</u>  The following is a summary of guidelines from the *Flores v. Reno* Settlement Agreement, and the Homeland Security Act of 2002.  The terms of the Settlement are binding and must be adhered to.

6.24.1.  <u>Access to Legal Counsel and Consular Officials.</u>  All UACs shall be advised of their rights as per Form I-770 *Notice of Rights and Request for Disposition*, which includes their right to make a telephone call to any persons mentioned in the notice.  If the juvenile is under 14 or is unable to understand the form, the I-770 must be read and explained in a language that the juvenile understands.  The UAC's consular official must be notified as soon as possible, and notification of the UAC's family must be in accordance with Form I-770.  All UAC processed for removal must be given a list of free legal service providers.  Each CPA, or designee, will ensure that the lists of free legal services providers are current, accurate, and provided to juvenile detainees.  Free legal service providers must represent juveniles in removal proceedings.  Updated lists will be distributed regularly to all Border Patrol stations.

6.24.2.  <u>Authority of the Office of Refugee Resettlement.</u>  ORR has assumed authority for decisions related to the care and placement of UACs detained in federal custody.  The current procedure requires stations to immediately contact an ICE/DRO Field Office Juvenile Coordinator (FOJC) to coordinate UAC placement in an ORR facility.

6.24.3.  <u>Procedures for Processing Juveniles.</u>  ((b)(7)(E)

(b)(7)(E)                                  .  As soon as practicable after determining that a detainee is a UAC and will require detention, the processing agent should contact an ICE/DRO FOJC to obtain pre-authorization to place the unaccompanied alien child with ORR.  The agent must obtain pre-authorization from the FOJC regardless of a UAC's anticipated time in detention and must provide the following information:  the juvenile's name, any aliases, alien registration number, country of citizenship, sex, date of birth, age, date of entry, place of entry, manner of entry, date of custody, custody location, and indication regarding whether or not the juvenile is a criminal or non-criminal.  The FOJC must have this information to secure placement for the UAC with ORR.  The FOJC will contact the local ORR representative who will locate an appropriate

-11-

placement and notify the FOJC when that is completed.  The FOJC will coordinate the placement transfer.

6.24.4. 

6.24.5. **(b)(7)(E)**

6.24.6. <u>Requirements for Juvenile Hold Rooms</u>.  Juveniles detained longer than 24 hours will be given access to basic hygiene articles, a blanket, and a mattress (a pillow is optional), etc.  If showers are available, the juveniles will be permitted to take one shower every 48 hours and be provided with a clean towel.  Agents and supervisors may give these items and privileges to any juvenile at any time based on the availability and the condition of the juvenile.

6.24.7. All hold rooms used for unaccompanied alien children must provide access to the following:

    a.    Toilets and sinks

    b.    Drinking water

    c.    Adequate temperature control and ventilation

    d.    Clean blankets and mattresses

    e.    Meals, which must be offered every six hours (two of three meals must be hot)

    f.    Emergency medical assistance

    g.    Direct supervision

6.24.8. <u>Unaccompanied Alien Children Detention Log.</u>  Each Border Patrol station must maintain a separate detention log (example attached) for all juveniles placed in custody.  The log will be kept on file at the station for two years.  The log will contain, at minimum, the following information about each juvenile:

    a.    Name

b.    Sex

c.    Age

d.    Alien registration number

e.    Nationality

f.    Reason for placement

g.    Date and time in

h.    Date and time FOJC was notified

i.    Date and time out (transferred or released)

j.    Final disposition

k.    Comments

l.    Times that meals were provided

6.24.9. <u>Meals.</u>  Juveniles must receive the next meal served, regardless of the time in custody and must have regular access to snacks, milk, juice, etc.  Meals must be offered every six hours (two of three meals must be hot).

6.24.10. <u>Transfers</u>.  Each station must complete an I-216 in ENFORCE for all UACs transferred to ORR or DRO custody.  A hard copy of the I-216 will be kept on file at the station for two years for the purposes of auditing and oversight.

6.24.11. <u>Training Requirements</u>.  The Border Patrol Academy will include training on the conditions of the *Flores* v. *Reno* Settlement Agreement as a part of Border Patrol basic training.  All CPA's, PAIC's and Border Patrol Agents will take at least one hour per year of refresher training on *Flores* and associated Border Patrol policy.  Pertinent training updates will be well-posted in Border Patrol station processing areas to ensure awareness and adherence.

6.24.12. <u>Family Groups (with Juveniles)</u>.  The following are examples of family groups as defined in section 4.6 of this directive.  The following groups will be detained as a unit.



a. ▮▮▮▮▮▮ (b)(7)(E) ▮▮▮▮▮▮

b. ▮▮▮ (b)(7)(E) ▮▮▮

c. ▮▮▮ (b)(7)(E) ▮▮▮

d. 

e. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

6.24.13 <u>Documentation.</u>  Times of meals, showers, telephone use, and visual checks of juveniles who are held in custody will all be recorded.

**7.   PERFORMANCE MEASUREMENTS.**  All detainees will be held under safe and humane conditions.  Unaccompanied alien children in Border Patrol custody will be treated with dignity, respect and special concern for their particular vulnerability as minors.

7.1.   <u>Performance Measurement 1</u>:  All detainees will be held in appropriate conditions of confinement that ensure their safety and security.  Juveniles will be held in the least restrictive setting appropriate for their age and special needs as minors.

7.1.1. Detainees are segregated according to sex, age, risk, family group.

7.1.2. Detention space capacity will not be exceeded.

7.1.3. Hold rooms will be kept clean and free of contraband and other potentially hazardous or dangerous materials.

7.2.   <u>Performance Measurement 2</u>:  All detainees will be held under humane conditions of confinement that provide for their well being and general good health.

7.2.1. Detainees have access to sanitary facilities and restrooms.

7.2.2. Detainees are provided food and water.

7.2.3. Detainees have access to appropriate medical services, prescriptions, medications, and emergency medical treatment.

7.2.4. Detention spaces are appropriately maintained and provide detainees with appropriate comfort items – housekeeping and clean bedding.

7.3.   <u>Performance Measurement 3</u>:  The time of detention for detainees is minimized.

7.3.1. The period of detention does not exceed (b)(7)(E) and commonly does not exceed (b)(7)(E) for UACs.

7.4.   <u>Performance Monitoring Tools:</u>

a.   Sector and/or Station Detention Logs

-14-

    b.      Form I-216 Record of Persons and Property Transferred

    c.      Supervisor oversight

    d.      Local inspection programs

    e.      Reporting of deficiencies

    f.      Periodic compliance summary reports

**8.**    **CANCELLATION.**  This policy remains in effect until cancellation by an updated version.

**9.**    **NO PRIVATE RIGHTS CREATED.**  This document is an internal policy statement of U.S. Customs and Border Protection and does not create or confer any rights, privileges, or benefits on any person or party.

**10.**    **ATTACHMENTS.**

Appendix 1: Unaccompanied Alien Children Detention Log

(b)(6) & (b)(7)(C)

David V. Aguilar
Chief
U.S. Border Patrol

1

2

3

4

5

6 **IN THE UNITED STATES DISTRICT COURT**

7 **FOR THE DISTRICT OF ARIZONA**

8

9 Unknown Parties, et al.,        No. CV-15-00250-TUC-DCB

10        Plaintiffs,        **ORDER**

11 v.

12 Jeh Johnson, et al.,

13        Defendants.

14

15        Plaintiffs filed this action on June 8, 2015, asserting six claims for relief related to

16 alleged inhumane and punitive treatment of Tucson Sector[1] civil immigration detainees.

17 Plaintiffs allege five claims of violations of the Due Process Clause of the Fifth

18 Amendment based on deprivation of sleep, of hygienic and sanitary conditions, of

19 adequate medical screening and care, of adequate food and water, and of warmth. (Doc. 1

20 ¶¶ 184-218.) Plaintiffs also alleged the Defendants violated the Administrative

21 Procedures Act (APA) by failing to enforce their own procedures related to the operation

22 of holding cells in Tucson Sector facilities, *id.* ¶¶ 219-24, but this claim was dismissed,

23 (Order (Doc. 118)). Previously in addition to granting in part and denying in part

24 Defendants' Motion to Dismiss, the Court certified the case as a class action. (Order

25 (Doc. 117)). The Court now considers Plaintiffs' Motion for a Preliminary Injunction.

26

---

27      [1] The Tucson Sector includes Border Patrol facilities at Bisbee (Brian A. Terry

Station/ Naco Station), Casa Grande, Douglas, Nogales, Sonoita, Tucson, Why (Ajo

28 Station), Willcox, and Three Points. The Motion for Preliminary Injunction relied on

early discovery conducted at Tucson, Douglas, Nogales, and Casa Grande.

AR434

1   Following an evidentiary hearing, the Court finds the evidence supports the Plaintiffs'

2   experts' declarations attached to the Motion for a Preliminary Injunction,[2] and grants the

3   motion for the reasons that follow.

4                          A.  Preliminary Injunction: Standard of Review

5          Preliminary injunctions are an "extraordinary remedy never awarded as of right."

6   *Winter v. NRDC*, 555 U.S. 7, 24 (2008).  In *Winter,* the Supreme Court explained the

7   four-factor test. "A plaintiff seeking a preliminary injunction must show that: (1) she is

8   likely to succeed on the merits, (2) she is likely to suffer irreparable harm in the absence

9   of preliminary relief, (3) the balance of equities tips in her favor, and (4) an injunction is

10  in the public interest." *Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012) (citing

11  *Winter*, 555 U.S. at 20).  "The first factor under *Winter* is the most important—likely

12  success on the merits."  *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (citing

13  *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C.Cir. 2014) ("We begin with the first and

14  most important factor: whether petitioners have established a likelihood of success on the

15  merits.")).  "Because it is a threshold inquiry, when 'a plaintiff has failed to show the

16  likelihood of success on the merits, we 'need not consider the remaining three [Winter

17  elements].'"  *Id.* (quoting *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*,

18  729 F.3d 937, 944 (9th Cir. 2013) (quoting *DISH Network Corp. v. F.C.C.*, 653 F.3d 771,

19  776–77 (9th Cir. 2011)).

20         When a plaintiff is requesting a mandatory injunction, the burden is doubly

21  demanding because then the plaintiff must establish that the law and facts clearly favor

22  _____

23         [2] Motion for Preliminary Injunction (MPI) (Doc. 206); Opposition (Response)
    (Doc. 141); Reply (Doc. 145).  The Plaintiffs' experts are: Eldon Vail, a corrections
24  administrator; Robert Powitz, a forensic Sanitarian, with expertise in correctional public
    health; Joe Goldenson, M.D., Medical Director for Jail Health Services for the San
25  Francisco Department of Public Health; Joseph Gaston, Plaintiffs' attorney responsible
    for data analysis, and Kevin Coles, Plaintiffs attorney responsible for reviewing video
26  surveillance tapes.  Defendants experts are: George Allen, the Assistant Chief Patrol
    Agent for the Tucson Sector; Diane Skipworth, Sanitarian; Richard Bryce, retired
27  Undersheriff of Ventura County Sheriff's Department in California; Philip Harber, M.D.,
    Professor of Medicine with expertise in occupational-environmental (preventative)
28  medicine, and Justin Bristow, Border Patrol's Acting Chief, Strategic Planning and
    Analysis, overseeing various programs including the e3 Processing Module/e3 Detention
    Module (e3DM data system).

AR435

her position, not simply that she is likely to succeed on the merits. *Id.* This was the standard applied when an actress requested an injunction requiring Google to take affirmative action—to remove (and to keep removing) *Innocence of Muslims* from YouTube and other sites under its auspices. This relief was treated as a mandatory injunction because it "orders a responsible party to 'take action.'" *Id.* (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009). This heightened standard is necessary because a mandatory injunction "goes well beyond simply maintaining the status quo *pendente lite* [and] is particularly disfavored," *id.* (quoting *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994)). Therefore, "mandatory injunctions should not issue in 'doubtful cases.'" *Id.* (quoting *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1160 (9th Cir. 2011)).

Following *Winter*,[3] the Ninth Circuit applies a sliding scale test where serious questions going to the merits and a balance of hardships that tips sharply in favor of the plaintiff can support issuance of a preliminary injunction if plaintiff also shows that there is a likelihood of irreparable injury and the injunction is in the public interest. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

Harm that is merely monetary "will not usually support injunctive relief." *American Trucking Associations v. City of Los Angeles*, 559 F.3d 1046, 1057 (9th Cir. 2009). Harm that is "merely speculative" will not support injunctive relief. *Id.* This is because "[a] preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 55. In balancing the competing claims of injury and consequences resulting from the granting or withholding of the requested relief, a court

---

[3] Before *Winter*, a plaintiff could demonstrate either: (1) a likelihood of success on the merits and the <u>possibility</u> of irreparable injury; or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor. These two alternatives represented extremes of a single continuum, rather than two separate tests. Thus, the greater the relative hardship to the party seeking the preliminary injunction, the less probability of success the party had to show. In *Winter*, the Supreme Court definitively refuted the "possibility of irreparable injury" standard as too lenient. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1126–27 (9th Cir. 2009)

AR436

exercises its sound discretion, and, in equity, a court "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312 (1982). The government cannot be harmed, however, from an injunction that merely ends an unconstitutional practice. *Rodriguez v. Robbins,* 715 F.3d 1127, 1145 (9th Cir. 2013).

The Court "'need not consider public consequences that are highly speculative.'" *Stormans*, 586 F.3d at 1139. (quoting *Golden Gate Restaurant Association v. City & County of San Francisco*, 512 F.3d 1112, 1126 (9th Cir. 2008)). "In other words, the court should weigh the public interest in light of the likely consequences of the injunction. Such consequences must not be too remote, insubstantial, or speculative and must be supported by evidence." *Id.*

In the Ninth Circuit "the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Melendres v. Arpaio,* 695 F.3d 990, 1002 (9th Cir. 2012). This is because "constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm." *Am. Trucking Ass'ns, Inc.,* 559 F.3d at 1059. In the Ninth Circuit, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres,* 695 F.3d at 1002 (quoting *Sammarano v. First Jud. Dist. Ct.,* 303 F.3d 949, 974 (9th Cir. 2002)). If plaintiffs "show that a constitutional rights claim is likely to succeed, the remaining preliminary injunction factors weigh in favor of granting an injunction." *Vivid Entm't, LLC v. Fielding,* 956 F. Supp. 2d 1113, 1136 (C.D. Calif. 2013) (citing *Melendres,* 695 F.3d at 1002; *Klein v City of San Clemente,* 584 F.3d 1196, 1208 (9th Cir. 2009)).

In summary, as a threshold matter under *Winter*, the Plaintiffs must establish a likelihood of success on the merits of their claims before the Court can grant a preliminary injunction. If the Plaintiffs are unable to establish the threshold element of likely success on the merits, the request for a preliminary injunction must be denied and the Court need not review whether the remaining requirements for issuance of a preliminary injunction are satisfied. If the threshold is met, the Plaintiffs must establish

- 4 -

1   the other three elements: they are likely to suffer irreparable harm without the injunction,

2   the balance of equity tips in favor of the injunction, and the public interest favors the

3   injunction. Alternatively, under the "sliding scale" approach, a preliminary injunction

4   may be granted if there are "serious questions going to the merits and a hardship balance

5   that tips sharply toward the [Plaintiffs]," so long as "the other two elements of the *Winter*

6   test, [irreparable harm and public interest], are also met."

7        If a mandatory injunction is sought, the Plaintiffs must make a doubly burdensome

8   threshold showing: that the law and facts clearly favor their position, not simply that

9   there is a likelihood of success on the merits. This is because mandatory injunctions are

10   not granted unless extreme or very serious damage will result and are not issued in

11   doubtful cases.

12        <u>B. Mandatory Injunction or Injunction to Maintain the Status Quo?</u>

13        A mandatory injunction orders a party to take action, while a prohibitory

14   injunction prohibits action and preserves the status quo pending a determination of the

15   action on the merits. *Marlyn Nutraceuticals,* 571 F.3d at 878–79. "The relevant status

16   quo is that 'between the parties pending a resolution of a case on the merits.'" *Arizona*

17   *Dream Act Coalition (DACA) v. Brewer,* 757 F.3d 1053, 1061 (9th Cir. 2014) (quoting

18   *McCormack v. Hiedeman*, 694 F.3d 1004, 1019 (9th Cir. 2012)). In the context of a

19   preliminary injunction, the "status quo" refers to the legally relevant relationship between

20   the parties before the controversy arose. *McCormack,* 694 F.3d 1020. It is not enough

21   that the result of an injunction may be an action taken in response to it; as long as the

22   injunction does not mandate a change in the status quo it is prohibitory. *Id.* (citing *see*

23   *Marlyn Nutraceuticals*, 571 F.3d at 879).

24        It is not a defense that "Border Patrol has done everything possible with the

25   resources provided by Congress to ensure that conditions at its stations protect the health

26   and safety of the individuals in its custody." (Response at 3.) The Court is not

27   unsympathetic, but a deprivation of constitutional rights cannot be justified by fiscal

28   necessity, *Golden Gate Rest. Ass'n.,* 512 F.3d at 1126, and the government may be

AR438

1    compelled to expand the pool of resources to remedy a constitutional violation, *Peralta v.*
2    *Dillard*, 744 F.3d 1076, 1083 (9th Cir.2014) (en banc).  The role of the judiciary is a
3    limited one—restricted to assessing the constitutionality of government conduct.  It is for
4    the elected officials, both legislative and executive, and their administrators to determine
5    this Country's immigration policies and how to finance and implement them.

6          Accordingly, the Court turns to the question of whether or not the government's
7    actions are constitutional.  Defendants submit that they provide medical care, warmth,
8    sanitation, food, and water, and allow detainees to sleep.  Defendants assert they provide
9    for detainees basic human needs pursuant to Border Patrol's 2008 Hold Rooms and Short
10   Term Custody Policy (2008 Policy) and the National Standards on Transport, Escort,
11   Detention, and Search (TEDS standards).

12         The Court accepts for purposes of this preliminary injunction that these guidelines,
13   the 2008 Policy and TEDS, provide for constitutional conditions of confinement, which
14   Defendants assert is the status quo.  Plaintiffs have presented persuasive evidence that the
15   basic human needs of detainees are not being met pursuant to the current practices being
16   implemented by Defendants pursuant to these guidelines.  The Court preliminarily orders
17   full and immediate compliance with these guidelines, with the clarification that the
18   guideline requiring Defendants to give clean bedding to detainees includes mats for
19   detentions exceeding 12 hours.

20                    C.   Unconstitutional Conditions of Confinement

21         "When the State takes a person into custody and holds him there against his will,
22   the Constitution imposes upon it a corresponding duty to assume some responsibility for
23   his safety and general well-being: Under this rationale, the State must provide for a
24   detainee's "basic human needs—e.g., food, clothing, shelter, medical care, and
25   reasonable safety—."*DeShaney v. Winnebago Cty. Dep't of Soc. Servs.,* 489 U.S. 189,
26   199-200 (1989).

27         It is undisputed that Border Patrol holds the Plaintiffs as civil detainees, pursuant
28   to civil immigration laws, *Zadvydas v. Davis,* 533 U.S. 678, 690 (2001), therefore, they

AR439

are protected under the Fifth Amendment from being held without due process of law under conditions that amount to punishment. *Wong Wing v. United States,* 163 U.S. 228, 237 (1896). Similarly, the Eighth Amendment's prohibition against cruel and unusual punishment requires prison officials to provide humane conditions of confinement, including adequate food, clothing, shelter, sanitation, and medical care, and take reasonable measures to guarantee the safety of the inmates. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). But to be liable under the Eighth Amendment, a prison official must act with deliberate indifference to an inmate's health or safety. *Id.* at 834. Conditions of confinement that violate the Eighth Amendment necessarily violate the Fifth Amendment, but the reverse is not necessarily true. In other words, Plaintiffs are protected by both the Fifth and Eighth Amendments.

Because Plaintiffs are civil detainees and <u>not</u> prisoners, the Court applies the Fifth Amendment, mirrored by the Fourteenth Amendment,[4] Due Process Clause. Both the Fifth and Fourteenth Amendments protect a non-convicted detainee from punishment prior to an adjudication of guilt**.** *Bell v. Wolfish*, 441 U.S. 520, 534–35 (1979). "This standard differs significantly from the standard relevant to convicted prisoners, who may be subject to punishment so long as it does not violate the Eighth Amendment's bar against cruel and unusual punishment." *Pierce v. County of Orange*, 526 F.3d 1190, 1205 (9th Cir. 2008). The "more protective" Fourteenth Amendment standard requires the government to do more than provide minimal necessities, *Jones v. Blanas*, 393 F.3d 918, 931 (9th Cir. 2004),[5] but, a detainee does not have a fundamental liberty interest under the

---

[4] The Due Process Clause of the Fourteenth Amendment bars any State from depriving any person of rights secured under the Bill of Rights (the first eight amendments). Therefore, the Court relies equally on cases applying the Fourteenth and Fifth Amendment Due Process Clauses.

[5] Overruled in part by *Peralta*, 744 F.3d at 1083 (holding monetary damages as a retroactive remedy is unavailable against an official capacity defendant who lacks authority over budgeting decisions; applying subjective intent standard allowing fiscal considerations to factor into deliberate indifference analysis in Eighth Amendment case). The government cannot assert a lack of resources defense against an injunction because it is prospective relief, and the government may be compelled to expand the pool of resources to remedy a constitutional violation. *Id.*.

AR440

Fourteenth Amendment to be free from discomfort, *Bell*, 441 U.S. at 537. Under the Fourteenth Amendment, "due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Jackson v. Indiana*, 406 U.S. 715, 738, (1972).

To evaluate the constitutionality of a pretrial detention condition, a district court must determine whether those conditions amount to punishment of the detainee. *Bell*, 441 U.S. at 535; *Pierce*, 526 F.3d at 1205; *Demery v. Arpaio*, 378 F.3d 1020, 1029 (9th Cir. 2004). For a particular governmental action to constitute punishment, (1) that action must cause the detainee to suffer some harm or disability, and (2) amount to punishment. *Pierce*, 526 F.3d at 1205 (quoting *Bell*, 441 U.S. at 538). To constitute punishment, the governmental action must cause harm or disability that either significantly exceeds or is independent of the inherent discomforts of confinement. *Demery*, 378 F.3d at 1030. In the absence of evidence of express intent, a court may infer that the purpose of a particular restriction or condition is punishment if the restriction or condition is not reasonably related to a legitimate governmental objective or is excessive in relation to the legitimate governmental objective. *Pierce*, 526 F.3d at 1205 (citing *Bell*, 441 U.S. at 539); *Demery*, 378 F.3d at 1028 (citing *Bell*, 441 at 538).

"Maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." *Bell*, 441 U.S. at 546; *Pierce*, 526 F.3d at 1205. In the absence of substantial evidence that indicates officials have exaggerated their responses, courts should ordinarily defer to the expert judgment of correction officials to determine whether detention restrictions or conditions are reasonably related to maintaining security and order and operating the institution in a manageable fashion. *Bell*, 441 U.S. at 540 n. 23.

A reasonable relationship between the governmental objective and the challenged condition does not require an "exact fit," proof that the policy in fact advances the legitimate governmental objective, or even that it is the "least restrictive alternative."

AR441

1    *Valdez v. Rosenbaum*, 302 F.3d 1039, 1045 (9th Cir. 2002). However, the correction

2    official must have reasonably thought that the policy would advance a legitimate

3    governmental objective. *Id.* The relevant question is whether the official's judgment was

4    rational, that is whether the Defendants might reasonably have thought that their policies

5    and practices would advance legitimate interests. *Id.* at 1046 (citing *Mauro v. Arpaio,*

6    188 F.3d 1054, 1060 (9th Cir. 1999)).

7         In summary, a condition of confinement for an inmate who has not been convicted

8    violates the Fifth and Fourteenth Amendments if it imposes some harm to the detainee

9    that significantly exceeds or is independent of the inherent discomforts of confinement

10   and is not reasonably related to a legitimate governmental objective or is excessive in

11   relation to the legitimate governmental objective. *Kingsley v. Hendrickson,* 135 S. Ct.

12   2466, 2473-74 (2015). Under the Fourteenth Amendment, the Court makes an objective

13   assessment whether there is a reasonable relationship between the government's conduct

14   and a legitimate purpose. *Id.* at 2469. This is the measurement for harm relevant for

15   assessing the merits of Plaintiffs' constitutional claims that the conditions of confinement

16   are punitive.

17        Importantly, the Court notes that Plaintiffs are not pretrial detainees and that the

18   civil nature of their confinement provides an important gloss on the meaning of

19   "punitive" in the context of their confinement. Because they are detained under civil,

20   rather than criminal, process, they are most decidedly entitled to "more considerate

21   treatment" than those who are criminally detained. *Cf. Estelle v. Gamble*, 429 U.S. 97,

22   104, (1976); *Youngberg v. Romeo*, 457 U.S. 307, 321–22, (1982). In this way, decisions

23   defining the constitutional rights of prisoners establish a floor for the constitutional rights

24   of the Plaintiffs. *Padilla v. Yoo*, 678 F.3d 748, 759 (9th Cir. 2012) (citations omitted).

25   Therefore, the Court should presume the Plaintiffs are being subjected to punishment if

26   they are confined in conditions identical to, similar to, or more restrictive than those

27   under which the criminally convicted are held. *See Sharp v. Weston*, 233 F.3d 1166,

28   1172–73(9th Cir. 2000) (finding that *Youngberg* required that individuals civilly confined

AR442

1    at a commitment center receive "more considerate" treatment than inmates at the

2    correctional center in which the commitment center was located).  Similarly, "[i]f pretrial

3    detainees cannot be punished because they have not yet been convicted, [citing *Bell* ],

4    then [civil] detainees cannot be subjected to conditions of confinement substantially

5    worse than they would face upon commitment." *Lynch v. Baxley*, 744 F.2d 1452, 1461

6    (9th Cir. 1984).    "Or, to put it more colorfully, purgatory cannot be worse than hell."

7    *Jones,* 393 F.3d at 933.

8            This is precisely the case here.  Assistant Chief Patrol Agent for the Tucson

9    Sector, George Allen, admitted, when this Court asked him to compare the conditions of

10   confinement at Tucson Sector Border Patrol stations with those afforded criminal

11   detainees at the Santa Cruz County jail, that in jail, detainees have a bed, with blankets,

12   clean clothing, showers, toothbrushes and toothpaste, warm meals, and an opportunity for

13   uninterrupted sleep.  Likewise, the conditions of confinement for civil immigration

14   detainees improve once they are transferred from Border Patrol holding cells to detention

15   centers operated by the United States Marshals.

16                                    D.  Discussion

17           The Tucson Sector stations are designed for short-term civil detention for

18   processing of immigrant detainees for transfer to Immigration and Customs Enforcement

19   (ICE) for civil immigration removal proceedings or Enforcement and Removal Office

20   (ERO) for juvenile custody determinations, to the United States Marshal for prosecution,

21   or for repatriation.  (Allen Decl. ¶ 7.)  There is no dispute that upon transfer to detention

22   by ICE, ERO or the United States Marshal affords conditions of confinement like those

23   found in the county jails where detainees have beds, blankets, clean clothing, showers,

24   personal hygiene items like toothbrushes, etc., hot meals, and the opportunity to sleep

25   uninterrupted.

26           Defendants argue the constitutionality of the conditions of confinement in the

27   Border Patrol stations must be assessed with due consideration given to the nature,

28   purpose, and duration, of an individual's time in a Border Patrol station."  (Response at

                                            - 10 -

24.)  "[B]order Patrol stations are twenty-four hour operations, and in fact a significant number of individuals who are detained in Border Patrol stations are apprehended during the evening and night time hours."  *Id.*  Defendants assert that providing sleeping facilities and turning off lights would require structural changes at the facilities, create safety risks, and impede its purpose to provide 24-7 immigration processing.  *Id.* at 24-25, *see also*: (Allen Decl. ¶¶ 46-47; Bryce Decl.  ¶¶ 100-02; Skipworth Decl. ¶¶ 153; Harber Decl. ¶ 65.)  Accordingly, the hold rooms are not designed for sleeping and, therefore, have no beds.  (MPI, Ex. 81:Hold Room Policy (sealed) (Doc. 193)).

Assistant Chief Allen explains that Border Patrol processing begins in the field, but on arrival at the detention facility intake begins in the "sally port" where detainees' outer-clothing is removed for security reasons, (Allen Decl. ¶ 1-4), leaving detainees without sweatshirts, jackets, or second layers of clothing for warmth.  Detainees are placed into group-holding rooms based on age, gender, family units, or criminal suspects. *Id.* ¶ 4.  Processing consists of obtaining biographical information and biometrics and submitting this information through the e3Nex Generation Identification system to determine prior criminal and immigration arrests.  *Id.* ¶ 5.  Fully processing a detainee includes preparing an arrest report, immigration processing, service of immigration forms, consular notifications, and communication with family members and attorneys as appropriate.  *Id.*  If uninterrupted and if there is no remarkable criminal or immigration history, processing would take between two and two and one-half hours.  *Id.*

But there are interruptions, which can be caused by a large number of prior apprehensions and the criminal background of the detainees awaiting processing, the need to dispense meals, medical or health care, to arrange consular communications, phone calls to family members or attorneys, to conduct investigations, and computer system outages.  *Id.*  Evidence at the hearing revealed that detention in Border Patrol holding rooms is also extended because of delays by the receiving agencies ICE, ERO, and the United States Marshal in accepting the Border Patrol transfers.  *See also* (Allen Decl. ¶ 9.)

- 11 -

Discovery in this case reflects that between June 10, 2015 and September 28, 2015, only about 3,000 of approximately 17,000 detainees were processed out of Border Patrol station detention within 12 hours. (Gaston Decl. ¶ 20.) Of these 17,000 detainees, 8,644 people were held at Border Patrol stations up to 23 hours, 6,807 were held up to 47 hours, 1,207 were held up to 71 hours, and 476 were held for 72 hours or more. (Response at 6.) Defendants' expert, Diane Skipworth, indicated that based on her review "BP tries diligently to process detainees promptly, and generally does so within 24 hours." (Skipworth Decl. ¶ 154.) Defendants' other expert, Richard Bryce, believes that nearly all detainees were processed within 48 hours. (Bryce Decl. ¶ 38.)

The conditions of confinement challenged by the Plaintiffs include: 1) deprivation of sleep; 2) failure to provide a safe and sanitary environment, including potable water; 3) inadequate and insufficient food, and 6) inadequate medical screening and care.

### 1.  Success on the Merits

Sleeping:

"Detention facilities (and prisons) must provide detainees held overnight with beds *and* mattresses.  The absence of *either* violates detainees' due process rights." (MPI at 10 (citing *Thompson v. City of Los Angeles,* 885 F.2d 1439, 1448 (9th Cir. 1989); *accord Anela v. City of Wildwood,* 790 F.2d 1063, 1069 (3rd Cir. 1986)).  "Indeed, the use of floor mattresses—i.e., mattresses without bed frames—is unconstitutional 'without regard to the number of days a prisoner is so confined.'" *Id.* (quoting *Lareau v. Manson,* 651 F.2d 96, 105 (2nd Cir. 1981)).

According to Plaintiffs' analysis of the Defendants' e3DM data system,[6] "out of 16,992 detainees between June 10 and September 28, 2015, only 122 were recorded to have received a mat." (Vail Decl. ¶ 62 (citing Gaston Decl. ¶ 25.)  The remainder of detainees' bedding needs was met with a Mylar sheet/blanket.  The 2008 Policy provides

---

[6] This is an electronic data system designed by Defendants to track each action taken by Border Patrol for each detainee, including the time of arrest; check-in and out at the station; when meals are served, mats are provided, personal hygiene items are delivered, health care is administered, and when a transfer is made to a hospital facility, etc.

AR445

that "detainees requiring bedding will be given clean bedding."  (Ex. 87 at 000330.)
Under TEDS, only juveniles receive mats.  (Ex. 95: TEDS at 000634).  Adults get clean
blankets, which are Mylar sheets, upon request when available.  *Id.*  Video releases by
Defendants reflect overcrowded hold rooms with wall to wall detainees lying cocooned in
Mylar blankets and adjacent empty cells with some of the empty cells having mattresses
piled high.  (Coles Decl. ¶ 37.)  Plaintiffs found no mats in videos from the Casa Grande,
Willcox, Sonoita, and the Brian A. Terry stations.  (Coles Decl. ¶ 37.)

Plaintiffs add that the harshness caused by the lack of mats and the inadequacy of
the Mylar blankets is compounded by the Defendants' practices of keeping holding-cell
lights turned on 24-7, feeding one of the three regular hot meals to detainees at 4:00 a.m.,
moving detainees in and out of holding cells throughout the night for processing,
overcrowding cells which causes people to lie cramped together and next to toilet
facilities or to sit or stand up, and because the hard concrete floors and benches retain the
cold caused by low thermostat temperatures and make it too hard and cold to sleep.[7]

Plaintiffs attest that there are prison standards for short-term detentions, defined as
being less than 10 hours, which require at least 25 square feet of unencumbered space per
occupant.  (Vail Decl. ¶ 42).  Prison standards for detaining two to 64 occupants requires
25 square feet of unencumbered space per occupant, *id.* ¶ 44, and 35 square feet when
confinement exceeds ten hours per day, *id.* (relying on American Correctional
Association (ACA) CORE Jail Standards, United States Department of Justice National

---

[7] *Toussaint v. McCarthy,* 597 F. Supp. 1388, 1409-10 (N.D. Calif. 1984) (noise occurring every night, often all night interrupting or preventing sleep gives rise to due process claim), *reversed on other grounds*; *Keenan v. Hall,* 83 F.3d 1083, 1090 (9th Cir. 1996) (no penological justification for psychological harm caused by living in constant illumination), *amended on other grounds*; *King v. Frank,* 328 F. Supp.2d 940, 946-47 (W.D. Wis. 2004) (constant illumination leading to sleep deprivation may violate Eighth Amendment); *Bowers v. City of Philadelphia,* 2007 WL 219651 (E.D. Pa. Jan. 25 2007) (unconstitutional where overcrowding caused detainees to sleep overlapping one another and on every inch of concrete floors with heads next to toilets and on metal benches); *United States v. Wilson,* 344 F. App'x 134, 137, 143 (6th Cir. 2009) (cells with only concrete bench and floors stated Eighth Amendment claim for subjection to cold); *Knop v. Johnson,* 667 F. Supp. 467, 475-77 (W.D. Mich. 1987) (clothing must be minimally adequate for conditions of confinement); *Henderson v. DeRobertis,* 940 F.2d 1055, 1059 (7th Cir. 1991) (same).

- 13 -

1    Institute of Corrections (NIC), and United Nations Body of Principles for the Protection

2    of all Persons Under any form of Detention or Prison).

3         In comparison, the capacity numbers for the border patrol holding cells is

4    calculated as 35 square feet for the first detainee, plus an additional seven square feet for

5    each additional detainee.  *Id.* ¶ 41, ¶ 29 (citing 2009 Border Patrol Handbook).  At the

6    evidentiary hearing, the evidence reflected that holding-cell occupancy limits are

7    established for detainees sitting up, and the problem of overcrowding is compounded by

8    the need to lie down and would be further compounded if detainees were given mats to

9    lie down in the holding cells.  Detainees need to lie down to sleep because they are

10   detained at the Border Patrol stations in excess of 12 hours.  The Court finds the holding-

11   cell capacity numbers cannot accommodate the number of detainees being detained

12   longer than twelve hours because detention of this duration requires them to lie down to

13   sleep rather than sit up.

14        Defendants' expert, Richard Bryce, objects to Plaintiffs' comparison between

15   Border Patrol short-term immigration processing facilities and detention facilities like

16   prisons and jails.   (Bryce Decl. ¶ 32.)  He opines the Border Patrol facilities are on par

17   with short-term [prison] holding cells, *id.* ¶ 35, of the type which is used during the

18   booking process in jail facilities.  He explains that "[n]o other law enforcement agency in

19   the United States faces the unique issue of populations subject to fluctuation based on the

20   entry patterns of aliens." *Id.*  The processing time depends on immigration patterns and

21   the characteristics of those apprehended, but generally he believes that nearly all

22   detainees are processed within 48 hours.  *Id.* ¶ 38.

23        The Court rejects Bryce's suggestion to allow conditions of confinement

24   appropriate for holding cells used at a jail facility for its booking process, which does

25   take hours instead of days.  The processing being conducted at the Border Patrol stations,

26   whether or not it is being done for booking purposes, takes days (48 hours).

27        It is undisputed that the holding-cells are illuminated 24-7 for security reasons and

28   there is constant coming and going during the night, which Defendants assert is

- 14 -

1   necessary, given the very essence of the facility is to provide 24-7 immigration

2   processing.  The Court accepts Defendants' assertion that the holding cells need to be

3   illuminated for security where security cameras are not technologically capable of

4   recording in dimmed light.  In terms of interruptions of sleep, the Court finds no security

5   reason nor any reason related to the processing activities being conducted at these

6   facilities to wake up detainees by scheduling one of the three burrito meals at 4:00 a.m.

7           As to warmth, without mats, the Mylar sheets are the only barriers between the

8   detainee and the cold, including the cold concrete floors and benches in the holding cells

9   upon which they are forced to lie.  Defendants admit that the Mylar sheets do not provide

10  insulation but merely prevent evaporation so that when wrapped around the body the

11  Mylar blankets reflect approximately 80% of body heat back to the body and provide a

12  barrier between the body and air currents or drafts.  (Skipworth Decl. ¶ 150.) The efficacy

13  of the Mylar blanket depends on comfortable room temperatures being maintained at

14  Border Patrol stations.  *Id.*

15          Defendants report holding cell temperatures are set between 71 and 74 degrees,

16  (Response at 10 (citing Allen Decl ¶¶ 13-14; Skipworth Decl. ¶¶ 35, 133-134, 137-141,

17  147-48 (citing Ex. 2) Bryce Decl. ¶¶ 82, 83 (citing Ex. 3); Harber Decl. ¶ 66 (citing Ex.

18  4), and at the hearing the evidence reflected a variability of 2 degrees up or down.

19  Defendants assert the acceptable institutional standard is 68 to 80 degrees.  (Skipworth

20  Decl. ¶ 133 (citing ANSI and ASHRAE standards).   In addition to room temperature,

21  body heat is affected by the sedentary nature of the detention and whether or not

22  detainees have the ability to move around can be a factor in warmth.   The Court

23  recognizes that Plaintiffs have a constitutional right to clothing that is at least minimally

24  adequate for the conditions of confinement, *Knop v. Johnson*, 66 F. Supp. 467, 475-77

25  (Mich. 1987), but when mats are provided for detentions exceeding 12 hours the analysis

26  regarding adequate clothing and comfortable room temperature may change.  As of now,

27  the Court will require Defendants to continue monitoring cell temperatures.

28          The Court finds that the law and the facts clearly favor Plaintiffs' position that

- 15 -

1    Defendants are violating Plaintiffs' constitutional right to sleep. Preliminary, the Court

2    orders that clean bedding, which Defendants assert they are providing to all detainees,

3    must include a mat and a Mylar blanket for all detainees being held longer than 12 hours.

4                                          Sanitation:

5         "A sanitary environment is a basic human need that a penal institution must

6    provide for all inmates," *Toussaint,* 597 F.Supp. at 1411, which includes a "right to

7    personal hygiene supplies such as toothbrushes and soap," *Keenan v. Hall,* 83 F.3d 1083,

8    1091 (9th Cir. 1996), and "sanitary napkins for female prisoners," *Atkins v. County of

9    Orange,* 372 F. Supp.2d 377, 406 (S.D.N.Y 2005). *See also Dawson v Kendrick,* 527 F.

10   Supp. 1252, 1288-89 (S.D.W.Va. 1981) (failing to provide clean bedding, towels,

11   clothing and sanitary mattresses, as well as toilet articles including soap, razors, combs,

12   toothpaste, toilet paper, access to a mirror and sanitary napkins for women constitutes

13   denial of sanitary living conditions). Sanitation includes "the control of vermin and

14   insects, food preparation, medical facilities, lavatories and showers, clean places for

15   eating, sleeping, and working." *Rhodes v. Chapman*, 452 U.S. 337, 364 (1981).

16        Plaintiffs offer the opinion of Robert Powitz, a practicing forensic sanitarian, who

17   has expertise in correctional public health. He opines that Defendants do not comply

18   with their own Border Patrol standards, which do not comply with national standards for

19   correctional facilities with respect to hygiene. *Id.* ¶ 18-22 (relying on Performance-Based

20   Standards for Adult Local Detention Facilities (ALDF), American Public Health

21   Association Standards for health Services in Correctional Institutions, and U.S. Depart. of

22   Justice ICE Detention Standards).

23        He personally observed holding rooms with floors, walls, benches, drains, toilets,

24   sinks, stalls, and other fixtures—all of which were badly soiled. *Id.* ¶ 23. ICE detention

25   standards require garbage and refuse be collected and removed from common areas daily.

26   *Id.* ¶ 25. The hold rooms lacked trash receptacles, *id.* ¶ 27, and toilet stalls lacked waste

27   receptacles for sanitary napkins, diapers, and other bathroom waste. *Id.* ¶ 28. Cleaning

28   supplies did not appear to be segregated so as to prevent interchangeable use in toilet

                                          - 16 -

1   areas and food storage or sleeping areas.  *Id.* ¶ 88.  Cleaning crews did not appear to

2   clean and sanitize common-touch points in detainee areas. *Id.* ¶ 89.  He concluded that

3   cleaning was not sufficient to sanitize the holding cells.  *Id.* ¶¶ 88,89.  He explains that

4   exposure to garbage increases the risk of disease and presence of vermin, and is

5   psychologically stressful.  Blood-born transmission can occur from exposure to diapers

6   and sanitary napkins.  *Id.* ¶ 31.

7       According to Powitz, the CORE prison standard 4-4137 requires one toilet for

8   every twelve male prisoners and one toilet for every eight female detainees.  *See also*

9   TEDS § I.A.7.  He reports that "in most cases, the number of toilets in a hold room was

10  inadequate for the contemplated occupancy numbers posted or produced by Defendants."

11  *Id.* ¶ 51.  One large hold room at Nogales station, with capacity up to 88, had one

12  working toilet and one non-flushing toilet.  *Id.* ¶ 52, *see also* ¶¶ 83-86 (relying on Border

13  Patrol logs[8] reflecting long-term out of order sinks and toilets supporting his conclusion

14  that there is no regular maintenance program and policy), *see also* (Vail Decl. 51; Powitz

15  Decl. ¶ 52) (some rooms where over 40 detainees were forced to share one toilet).

16      Powitz explains that the toilet is a sink/toilet combination fixture, with the sink

17  fixture on top of the toilet and the water spigot is designed for use as a water fountain.

18  *Id.* ¶ 38.  This explains the lack of hot water and why the fixtures were not capable of

19  providing an uninterrupted water flow of at least ten seconds, which is the minimal flow

20  required for adequate hand washing.  *Id.*  ¶ 64. This also creates a potential for

21  contamination from fecal matter and saliva.  *Id.* ¶ 39. Plaintiffs complain that the

22  toilet/sink combination system for dispensing drinking water creates a potable water

23  problem. At the Tucson and Nogales stations, 5-gallon Igloo water coolers are placed in

24  many hold cells, without cups and there are no sinks, kitchens, or any other means at

25  these facilities to properly clean the Igloo containers.  *Id.* ¶ 73.  One video recorded

26  _____

27      [8] The Court is not clear on whether these logs are part of the e3DM data system or
    were designed for purposes of conducting discovery in this case.  Regardless, the Court
28  will rely on them for the purposes of monitoring compliance with TEDS standards for the
    working sinks and toilets per detainee.

AR450

detainees all drinking from the same one-gallon water jug because cups were not provided. *Id.* ¶ 75.

A person who has been trudging across the Arizona desert will likely arrive at a detention station dirty and in need of a shower, but Plaintiffs report that only two stations, Nogales and Tucson, have shower facilities, and these were sparsely used, generally for detainees who have scabies. (Vail Decl. ¶ 116.) The Defendants e3DM data system showed that only 115 detainees were given showers out of the 16,992 held between June 10 and September 28, 2015. Of those 115 showers, 20 reportedly occurred at Casa Grande station where Border Patrol agents said no shower facilities existed. *Id.*

Plaintiffs tender first-hand accounts from detainees that there were no sanitary napkins, or available diapers. (Vail Decl. ¶ 125.) The Defendants e3DM data confirms that personal hygiene items, including those necessary for feminine hygiene and dental care, were routinely denied. (Powitz Decl. ¶ 60.)

Defendants offer explanations to present a different picture. They report the holding cells are cleaned twice a day, except for the Casa Grande station which is cleaned only once a day, (Allen Decl. ¶¶ 29-30), and admit there were problems with the Casa Grande custodial services, but assert that things are being rectified, (Allen Decl. ¶¶ 29-30).

Defendants also report that in 2015, they began placing trash receptacles in the holding cells, *id.* ¶ 31, whereas previously "there were no trashcans in the hold rooms for safety reasons," (Response to Motion for Expedited Discovery, Padilla Decl. ¶ 14 (Doc. 39-1)). Defendants admit that dirty toilet paper is on the floor next to the toilets rather than flushed because detainees are from countries where plumbing cannot tolerate flushing toilet paper and instead it is common practice to dispose of it in trash receptacles. *Id.* ¶ 32. This is no excuse. Instead, it suggests that toilet receptacles are especially important.

Cleanliness is monitored by walk-throughs of the holding cells during each shift turnover, and the review is logged in e3DM. *Id.* ¶36. Defendants' sanitarian, Skipworth,

- 18 -

inspected the Tucson station, reviewed Defendants' contracts with cleaning companies, and it was her opinion that the facility is kept clean and sanitary. (Skipworth Decl. ¶¶ 36-67 (citing TEDS)). According to her, the ACA Plumbing Fixture Standard (one toilet per 12 male detainees; one toilet per 8 female detainees) is met. *Id.* ¶ 69. Personal hygiene items are regularly dispensed, *id.* ¶¶ 78-91, and children had toys and games and were watching television in the Tucson station, *id.* ¶ 87

Defendants assert soap has been available to detainees upon request and in 2014, it was decided to fit the hold rooms with soap dispensers. Due to "security, functionality and durability" concerns, these dispensers had to be specially fabricated. The process of installing them in hold rooms was completed in 2015. *Id.* ¶ 34. The cleaning services are now responsible for filling the dispensers.

Defendants assert that if the water fountain in the cell is inoperable, the five gallon water coolers provide a sufficient source of drinking water, and disposable cups are provided. (Allen Decl. ¶ 44 (citing TEDS)). They do not explain how the Igloo water coolers are kept clean and sanitary. Skipworth's inspection found compliance with TEDS: "functioning drinking fountains or clean drinking water along with clean drinking cups must always be available to detainees." (Skipworth Decl. ¶¶ 126-131.) Defendants explain the one-gallon jug seen in the video is the container of water, which was distributed in the field at the time of apprehension—some stations allow detainees to retain these jugs of water, and detainees choose to share them even though other sources of water are available. (Allen Decl. ¶ 44.) The video did not, however, reflect another water source.

The evidence reflects that Defendants are making ongoing efforts to rectify personal hygiene and sanitation problems, which in large part appear to be noncompliance issues. Preliminarily, the Court will order compliance monitoring to ensure detainees have access to working toilets and sinks, soap, toilet paper, garbage receptacles, tooth brushes and toothpaste, feminine hygiene items, baby food, diapers, and clean drinking water.

AR452

The Court turns to the admitted lack of shower facilities and lack of access to hot running water. Jail standards require access to showers and washbasins with temperature controlled hot and cold running water 24 hours per day, (Vail Decl. ¶ 121), with daily shows being available to general population jail-inmates, *id.* ¶ 123.

Defendants assert that the lack of shower accommodations is not a problem because detainees are transferred when approaching 72 hours, and TEDS only requires that reasonable efforts be made to provide showers to those approaching 72 hour detentions. *Id.* ¶ 33. Like Defendants' failure to provide for the necessity of sleeping when detention exceeds 12 hours, Defendants fail to recognize the basic human need to wash during these detentions. "The more basic the particular need, the shorter the time it can be withheld." *Hoptowit v. Ray*, 682 F.2d 1237, 1259 (9th Cir. 1982). So for example, it is doubtful that any circumstance would permit a denial of access to emergency medical care, but less critical needs may be denied for reasonable periods of time when warranted by exceptional circumstances such as an emergency or disciplinary need. *Id.* (citing *Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979)). The Court's task is to "determine whether a challenged punishment comports with human dignity," *Furman v. Georgia*, 408 U.S. 238, 282 (1972) (BRENNAN, J., concurring), and requires careful scrutiny of challenged conditions and application of realistic yet humane standards, *Rhodes*, 452 U.S. at 361.

It has been held to be self-evident that adequate and functional plumbing providing neither too hot nor too cold water is necessary so as to not discourage prisoners from taking showers, which would result in an increased risk of skin problems and transmission of disease from person to person and a foul and malodorous environment, *Benjamin v. Fraser*, 161 F. Supp.2d 151, 171 (S.D. N.Y. 2001). Nevertheless, courts are extremely reluctant to find constitutional violations based on temporary deprivations of personal hygiene and grooming items. *Id.* at 175 (citations omitted). Additionally, courts have found that when other materials are made available for a prisoner to clean himself, a constitutional violation has been averted. *Shakka v. Smith,* 71 F.3d 162, 168 (4th Cir.

- 20 -

1   1995).

2        This Court does not mean to suggest that a lack of daily showers for a few days

3   would necessarily rise to the level of a constitutional violation in a prison setting, *see e.g.*

4   *Griffin v. Southern Health Partners, Inc.,* 2013 WL 530841, *9 (W.D. Kentucky,

5   February 11, 2013) (finding six day, eight day, and 72 hour deprivation of showers and

6   being subjected to unsanitary conditions insufficient to violate the constitution), but

7   Border Patrol detainees are not pretrial detainees or prisoners.  They are civil detainees

8   who are being denied the ability to wash or clean themselves for several days.

9   Transferring them when detention approaches 72 hours does not solve this problem.

10   Given the admitted lack of showers, the Court preliminarily finds that Defendants need

11   only provide some means or materials for washing and/or maintaining personal hygiene

12   when detainees are held longer than 12 hours.

13        Given the evidence of noncompliance related to conditions of sanitation,

14   compliance monitoring is warranted.  Plaintiffs are likely to prevail on this claim unless

15   there is full compliance by Defendants with the guidelines for sanitation and there are

16   materials available for detainees held longer than 12 hours to clean themselves.

17   <u>Food</u>

18        It is undisputed that "[p]rison officials are 'obligt[ed] to provide inmates with

19   nutritionally adequate meals on a regular basis.'"  (MPI at 16 (quoting *Foster v. Runnels,*

20   554 F.3d 807, 816 (9th Cir. 2009)).  Prison food does not need to be tasty or aesthetically

21   pleasing, it must simply be adequate to maintain health.  (Response at 22 (citing *Keenan*

22   *v. Hall,* 83 F.3d 1083, 1091 (9th Cir. 1996)).

23        Detainees receive a diet of burritos (bean, beef, or beef and bean (330 to 360

24   calories), cheese or peanut-butter filled crackers (200 calories), and boxes of fruit juice

25   (60 calories).  (Vail Decl. ¶ 90); (Allen Decl. ¶ 37).  Snacks include cookies, cereal bars,

26   graham crackers, and goldfish crackers.  (Allen Decl. 38.)  There is baby food and

27   formula. (Vail Decl. ¶ 91.)  There is no evidence in the Defendants' data base of any

28   fluctuation in this regimen except for pregnant and nursing women. *Id.* ¶ 92.

- 21 -

AR454

There are no food preparation areas in the detention stations. The burritos are heated up in microwaves or warming trays. *Id.* ¶ 93. The Defendants' e3DM data system reflects that the average time between meals/burritos is 7.336 hours, and at the Tucson station the average time between meals/burritos is 8.239 hours. *Id.* ¶ 94.

According to Defendants, this diet adequately satisfies the basic nutritional needs of detainees. (Skipworth Decl. ¶ 122.) Skipworth believes that food preparation is performed under safe and sanitary conditions, with food being commercially prepared and packaged, and agents heating it to adequate temperatures. (Skipworth Decl. ¶¶ 109-112.)

The CORE jail standards require: three meals, including at least two hot meals to be served at regular times during each 24 hour period, with no more than 14 hours between the evening meal and breakfast. *Id.* ¶¶ 96-97. TEDS mirrors this, with regularly scheduled meal times and snacks to be provided between regularly scheduled meal times. Two meals must be hot. Juveniles and pregnant detainees are to be offered a snack upon arrival and meals at least every six hours thereafter. Juveniles, pregnant and nursing detainees must have access to snacks, milk and juice. *Id.* ¶¶ 98-100.

According to Defendants, meals are served 3 times per day at 4:00 a.m., 12:00 p.m., and 8:00 p.m.; snacks are served three times per day at 8:00 a.m., 4:00 p.m., and 12:00 a.m. (Allen Decl. ¶ 38.) This creates approximately an eight-hour interval between the evening burrito meal and the burrito breakfast, and eight-hour intervals between the three regularly served burrito meals. To ensure that no more than four hours elapses between eating times, an internal auditing function exists within the e3DM system that warns agents when a detainee is approaching the timelines. *Id.* ¶ 38. When an individual is scheduled for transfer, "it is incumbent on each individual station to identify whether the transfer will cause a detainee to exceed the four hour limit to provide a snack and juice or burrito, accordingly. *Id.* ¶ 39.

With the exception of changing the 4:00 a.m. meal schedule to accommodate sleeping, the question is one of compliance with TEDS. Preliminarily, compliance

AR455

1    monitoring is warranted.

2                               Medical Care:

3          "Denying, delaying, or mismanaging intake screening violates the Constitution.

4    (MPI at 18 (citing *Gibson v. Cty. of Washoe, Nev.,* 290 F.3d 1175, 1188-90 (9th Cir.

5    2002); *Lareau v. Manson,* 651 F.2d 96, 109 (2nd Cir. 1981)).  Defendants agree that the

6    Constitution does require them to "'provide a system of ready access to adequate medical

7    care.'" (Response at 13 (quoting *Madrid v. Gomez,* 889 F. Supp. 1146, 1554 (N.D. Calif.

8    1995) (citing *Hoptowit,* 682 F.2d at 1253; *Casey v. Lewis,* 834 F. Supp. 1477, 1545 (Ariz.

9    1993)).  The parties are, however, at odds regarding the boundaries of this constitutional

10   right.

11         Plaintiffs challenge the adequacy of Defendants' intake screening.  (MPI at 18

12   (relying on *Graves v. Arpaio,* 48 F. Supp. 3d 1318, 1340-1344 (Ariz. 2014) and *Madrid,*

13   889 F. Supp. at 1257)).  They bring the following challenges: 1) screening is performed

14   by border patrol agents, not doctors, nurses, or other qualified or specially trained

15   personnel; 2) Defendants do not maintain a medical treatment program capable of

16   responding to emergencies that arise after detainees are placed in holding cells because

17   they do not have medical staff on site, and 3) the practice of confiscating  incoming

18   detainees' medication creates impermissible and heightened risk that detainees will

19   experience a medical emergency.  (MPI at 18-20.)

20         Defendants assert that TEDS provides a system of ready access to adequate

21   medical care.  Before detainees are placed into a Border Patrol hold room, a Border

22   Patrol agent "must ask detainees about and visually inspect for any sign of injury, illness,

23   or physical or mental health concerns and question . . . about any prescription

24   medications."  (Harber Decl. ¶ 26-32 (citing TEDS § 4.3, 4.10)) *but see also* (Harber

25   Decl. ¶ 30, Attachment B: Medical Screening Form used by agents) (missing questions

26   required about physical and mental health concerns, and prescription medications)).

27   Observed or reported injuries or illnesses should be communicated to a supervisor,

28   documented in the appropriate electronic system, and appropriate medical care should be

                                    - 23 -

provided or sought in a timely manner. *Id.* Treatment plans and medication accompany detainees when they are transferred or discharged. TEDS § 4.10.

Defendants assert that they either have EMTs who can treat emergencies at the detention centers, (Harber Decl. ¶ 33), or they routinely transfer detainees to hospitals for emergency care, *id.* ¶¶ 29, 34.)

Under TEDS prescription medication may be used by incoming detainees, if it is in a properly identified container with the specific dosage indicated, but non-U.S. prescribed medication must be validated by a medical professional, or the detainee should be taken in a timely manner to a medical practitioner to obtain an equivalent United States prescription. TEDS § 4.10. It is standard practice to send detainees to the hospital for appropriate care and prescriptions for medication by U.S. doctors. (Allen Decl. ¶ 22; Harber Decl. ¶ 34.)

Plaintiffs' expert, Joe Goldenson, M.D., has extensive experience in jail and state correctional facilities. (Goldenson Decl. ¶¶ 1-3.) He based his opinion on declarations of individual Plaintiffs, review of the e3DM data system, and depositions by Vail and Powitz. *Id.* ¶¶ 8-9. He found there was no evidence of any formalized screening process being carried out by agents at the detention centers. *Id.* ¶¶ 19-23. The e3DM data system reflects approximately 527 incidents of medical treatment being provided to detainees out of the approximately 17,000 detained individuals for the period of time from June 10 to September 28, 2015. *Id.* ¶ 42.

He explains there are two components of screening: 1) immediate medical triage to determine if there are any issues that would preclude acceptance into the facility and 2) a more thorough medical and mental health screening. *Id.* ¶ 13. He explains that in some facilities, the first triage-step is performed upon entry into the facility, with the more thorough screening done soon after the person is accepted into the facility. *Id.* ¶ 14. The screening includes both a face-to-face interview using a structured questionnaire and, whenever possible, a review of the individual's prior medical record. The questionnaire covers the detainee's current problems and medications; past history, including

AR457

1  hospitalizations; mental health history, including current or past suicidal ideation;

2  symptoms of chronic illness; medication and/or food allergies, and dental problems.

3  Female detainees are asked about current and past history related to pregnancy and date

4  of last menstrual period. *Id.*

5          Whenever possible, intake screening is performed by qualified health

6  professionals, but in smaller detention settings, where health staff is not present at times,

7  specially trained custodial staff conduct the screening. *Id.* ¶ 15. This staff should be

8  trained, including on-going training, on conducting medical screening, and there should

9  be procedures for officers to obtain guidance and direction from a health care

10  professional for problems beyond the scope of their training and experience. *Id.* ¶ 16. It

11  is important to record the information obtained during screening and have the records

12  accessible during detention so it can be provided to health care professionals as needed.

13  *Id.* ¶ 17.

14          Dr. Goldenson believes that field screening is not an adequate replacement for

15  intake screening because field screening is not done pursuant to a type of standardized

16  protocol or procedure that would suffice as "intake screening." *Id.* ¶ 25, *see also* (Harber

17  Decl. ¶ 30, Attachment B: Medical Screening Form used by agents) (missing questions

18  required under TEDS about physical and mental health concerns, and prescription

19  medications).

20          Proper intake screening is critical to identifying newly arriving detainees with

21  urgent or emergent health care needs, who are suffering from potentially communicable

22  diseases which require isolation and enhanced disinfection processes, or to identify

23  continuity of care issues like medication or prescription needs, or to identify medical or

24  mental health conditions that require referrals. (Goldenson Decl. ¶28.) Dr. Goldenson

25  suggests detainees are high risk for medical problems because they have just crossed the

26  desert under extreme physical hardship, lacking in water and food, without access to

27  medication and medical supplies. *Id.* ¶¶ 31-39.)

28          The number of medical/hospital referrals, 527 out of approximately 17,000

AR458

detainees from June 10 to September 28, 2015, support Dr. Goldenson's opinion, especially when considered in the context of the TEDS requirement that all foreign prescriptions be rewritten by U. S. doctors. The cursory medical screening performed at the detention stations is problematic as the duration of detention lengthens because intake screening becomes more important if it must be relied on for detention extending over several days rather than for a few hours. Defendants are already using an intake screening questionnaire, but it does not meet the TEDS standards because it fails to ask about physical and mental health concerns and prescription medications. It also fails to ask about pregnancy and whether a detainee is nursing. TEDS § 4.2. And, Defendants do not know whether the screening form is being used at all the stations.

Preliminarily, the Court requires compliance with TEDS, including measures to ensure the Medical Screening Form currently being used by Defendants at some stations is used at all stations, and that the form asks questions to ensure compliance with TEDS standards for screening and delivering medical care. Without this compliance, the Court finds that Plaintiffs are likely to prevail on this constitutional claim.

2. Irreparable Harm

Plaintiffs have presented evidence of harm related to the conditions of confinement, such as the physiological effects of sleep deprivation or constant discomfort that comes from an inadequate food supply, or health risks related to exposure due to contaminated water or unsanitary cells, or medical risks associated with being unable to continue taking prescription medications or being exposed to communicable diseases. These are the types of harm relevant to the 14th Amendment assessment of whether the challenged conditions of confinement exceed or are independent of the inherent discomforts of confinement and are not reasonably related to a legitimate government objective, or are excessive in relation to legitimate government objectives.

For the purpose of assessing whether Plaintiffs are likely to suffer irreparable harm in the absence of an injunction, this Court looks at the deprivation of constitutional rights. If, like here, a court finds that plaintiffs are likely to succeed on the merits of their

AR459

1    constitutional claims, then "the deprivation of constitutional rights unquestionably

2    constitutes irreparable injury." *Melendres,* 695 F.3d at 1002.  This is because

3    "constitutional violations cannot be adequately remedied through damages and therefore

4    generally constitute irreparable harm." *Am. Trucking Ass'ns, Inc.,* 559 F.3d at 1059.

5                        3.   Balance of equities and Public Interest

6            Likewise, because the Court finds the Plaintiffs have established a likelihood of

7    success on the merits of their constitutional claims and that they are likely to suffer

8    irreparable harm without an injunction, all that remains is for Plaintiffs to persuade the

9    Court that the balance of equity and the public interest tips in favor of the injunction.

10   "Once a plaintiff shows that a constitutional claim is likely to succeed, the remaining

11   preliminary injunction factors weigh in favor of granting an injunction." *Vivid Entm't*

12   *LLC,* 65 F. Supp.2d at 1136 (citing *Melendres,* 695 F.3d at 1002; *Klein,* 584 F.3d at 1208.

13   "'[I]t is always in the public interest to prevent the violation of a party's constitutional

14   rights.'" *Melendres,* 695 F.3d at 1002 (quoting *Sammarano,* 303 F.3d at 974.   The

15   government suffers no harm from an injunction that merely ends unconstitutional

16   practices and/or ensures that constitutional standards are implemented. *Rodriguez,* 715

17   F.3d at 1145 (citing *cf. Zepeda v. I.N.S.,* 753 F.2d 719, 727 (9th Cir. 1983) (INS cannot

18   assert harm in any legal sense by being enjoined from constitutional violations).

19                              D.   Conclusion

20           Defendants cannot sidestep reality by relying on the structural limitations of the

21   Border Patrol detention facilities, i.e., that they are not designed for sleeping.  If anything,

22   this cuts against the 72-hour definition of short-term.  If detainees are held long enough to

23   require them to sleep in these facilities, take regular meals, need showers, etc., then the

24   Defendants must provide conditions of confinement to meet these human needs.  Where

25   there is no evidence of an express intent to punish, the Court may infer that the purpose

26   of the condition is punishment if it is not reasonably related to a legitimate governmental

27   objective or is excessive in relation to the legitimate governmental objective.  The Court

28   finds that there is no objectively reasonable relationship between 24-7 immigration

AR460

processing or security and the conditions of confinement which Plaintiffs have preliminary shown exist in the Tucson Sector Border Patrol stations related to sleeping, sanitation, food, and medical care. Therefore, there is a likelihood of success on the merits of Plaintiffs' constitutional claims.  The deprivation of a constitutional right unquestionably constitutes irreparable injury.  It is always in the public interest to prevent the violation of a party's constitutional rights, and the government suffers no harm from an injunction that merely ends unconstitutional practices and/or ensures that constitutional standards are implemented.

**Accordingly,**

**IT IS ORDERED** that the Motion for a Preliminary Injunction (Doc. 206) is GRANTED as follows:

1.      Clean bedding, which Defendants assert they are providing to all detainees, must include a mat and a Mylar blanket for all detainees being held longer than 12 hours.

2.      Personal hygiene needs of detainees held longer than 12 hours include the need to wash or clean themselves.

3.      Defendants shall implement the universal use of their Medical Screening Form at all stations and ensure that the form questions reflect the TEDS requirements for delivery of medical care to detainees.

4.      Defendants shall monitor for compliance the following: availability of working sinks and toilets and/or other materials sufficient to meet the personal hygiene needs of detainees on a per cell per station basis; cell temperatures; cell sanitation and cleanliness; delivery to detainees of bedding, including mats, personal hygiene items such as toilet paper, toothbrushes and toothpaste, feminine hygiene items, baby food, diapers, and meals.

/ / /

/ / /

/ / /

AR461

1    **IT IS FURTHER ORDERED** that Defendants monitoring responsibilities shall

2    be met by using the e3DM data system and Border Patrol logs, shall be released to

3    Plaintiffs on a quarterly basis.

4    Dated this 18th day of November, 2016.

5

6

7                                                    _____

8                                                    Honorable David C. Bury
                                                     United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AR462

*Administration of Donald J. Trump, 2017*

## Executive Order 13767—Border Security and Immigration Enforcement Improvements
*January 25, 2017*

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (8 U.S.C. 1101 *et seq*.) (INA), the Secure Fence Act of 2006 (Public Law 109–367) (Secure Fence Act), and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (Public Law 104–208 Div. C) (IIRIRA), and in order to ensure the safety and territorial integrity of the United States as well as to ensure that the Nation's immigration laws are faithfully executed, I hereby order as follows:

*Section 1. Purpose*. Border security is critically important to the national security of the United States. Aliens who illegally enter the United States without inspection or admission present a significant threat to national security and public safety. Such aliens have not been identified or inspected by Federal immigration officers to determine their admissibility to the United States. The recent surge of illegal immigration at the southern border with Mexico has placed a significant strain on Federal resources and overwhelmed agencies charged with border security and immigration enforcement, as well as the local communities into which many of the aliens are placed.

Transnational criminal organizations operate sophisticated drug- and human-trafficking networks and smuggling operations on both sides of the southern border, contributing to a significant increase in violent crime and United States deaths from dangerous drugs. Among those who illegally enter are those who seek to harm Americans through acts of terror or criminal conduct. Continued illegal immigration presents a clear and present danger to the interests of the United States.

Federal immigration law both imposes the responsibility and provides the means for the Federal Government, in cooperation with border States, to secure the Nation's southern border. Although Federal immigration law provides a robust framework for Federal-State partnership in enforcing our immigration laws—and the Congress has authorized and provided appropriations to secure our borders—the Federal Government has failed to discharge this basic sovereign responsibility. The purpose of this order is to direct executive departments and agencies (agencies) to deploy all lawful means to secure the Nation's southern border, to prevent further illegal immigration into the United States, and to repatriate illegal aliens swiftly, consistently, and humanely.

*Sec. 2. Policy*. It is the policy of the executive branch to:

(a) secure the southern border of the United States through the immediate construction of a physical wall on the southern border, monitored and supported by adequate personnel so as to prevent illegal immigration, drug and human trafficking, and acts of terrorism;

(b) detain individuals apprehended on suspicion of violating Federal or State law, including Federal immigration law, pending further proceedings regarding those violations;

(c) expedite determinations of apprehended individuals' claims of eligibility to remain in the United States;

1

(d) remove promptly those individuals whose legal claims to remain in the United States have been lawfully rejected, after any appropriate civil or criminal sanctions have been imposed; and

(e) cooperate fully with States and local law enforcement in enacting Federal-State partnerships to enforce Federal immigration priorities, as well as State monitoring and detention programs that are consistent with Federal law and do not undermine Federal immigration priorities.

*Sec. 3. Definitions.* (a) "Asylum officer" has the meaning given the term in section 235(b)(1)(E) of the INA (8 U.S.C. 1225(b)(1)).

(b) "Southern border" shall mean the contiguous land border between the United States and Mexico, including all points of entry.

(c) "Border States" shall mean the States of the United States immediately adjacent to the contiguous land border between the United States and Mexico.

(d) Except as otherwise noted, "the Secretary" shall refer to the Secretary of Homeland Security.

(e) "Wall" shall mean a contiguous, physical wall or other similarly secure, contiguous, and impassable physical barrier.

(f) "Executive department" shall have the meaning given in section 101 of title 5, United States Code.

(g) "Regulations" shall mean any and all Federal rules, regulations, and directives lawfully promulgated by agencies.

(h) "Operational control" shall mean the prevention of all unlawful entries into the United States, including entries by terrorists, other unlawful aliens, instruments of terrorism, narcotics, and other contraband.

*Sec. 4. Physical Security of the Southern Border of the United States.* The Secretary shall immediately take the following steps to obtain complete operational control, as determined by the Secretary, of the southern border:

(a) In accordance with existing law, including the Secure Fence Act and IIRIRA, take all appropriate steps to immediately plan, design, and construct a physical wall along the southern border, using appropriate materials and technology to most effectively achieve complete operational control of the southern border;

(b) Identify and, to the extent permitted by law, allocate all sources of Federal funds for the planning, designing, and constructing of a physical wall along the southern border;

(c) Project and develop long-term funding requirements for the wall, including preparing Congressional budget requests for the current and upcoming fiscal years; and

(d) Produce a comprehensive study of the security of the southern border, to be completed within 180 days of this order, that shall include the current state of southern border security, all geophysical and topographical aspects of the southern border, the availability of Federal and State resources necessary to achieve complete operational control of the southern border, and a strategy to obtain and maintain complete operational control of the southern border.

2

*Sec. 5. Detention Facilities.* (a) The Secretary shall take all appropriate action and allocate all legally available resources to immediately construct, operate, control, or establish contracts to construct, operate, or control facilities to detain aliens at or near the land border with Mexico.

(b) The Secretary shall take all appropriate action and allocate all legally available resources to immediately assign asylum officers to immigration detention facilities for the purpose of accepting asylum referrals and conducting credible fear determinations pursuant to section 235(b)(1) of the INA (8 U.S.C. 1225(b)(1)) and applicable regulations and reasonable fear determinations pursuant to applicable regulations.

(c) The Attorney General shall take all appropriate action and allocate all legally available resources to immediately assign immigration judges to immigration detention facilities operated or controlled by the Secretary, or operated or controlled pursuant to contract by the Secretary, for the purpose of conducting proceedings authorized under title 8, chapter 12, subchapter II, United States Code.

*Sec. 6. Detention for Illegal Entry.* The Secretary shall immediately take all appropriate actions to ensure the detention of aliens apprehended for violations of immigration law pending the outcome of their removal proceedings or their removal from the country to the extent permitted by law. The Secretary shall issue new policy guidance to all Department of Homeland Security personnel regarding the appropriate and consistent use of lawful detention authority under the INA, including the termination of the practice commonly known as "catch and release," whereby aliens are routinely released in the United States shortly after their apprehension for violations of immigration law.

*Sec. 7. Return to Territory.* The Secretary shall take appropriate action, consistent with the requirements of section 1232 of title 8, United States Code, to ensure that aliens described in section 235(b)(2)(C) of the INA (8 U.S.C. 1225(b)(2)(C)) are returned to the territory from which they came pending a formal removal proceeding.

*Sec. 8. Additional Border Patrol Agents.* Subject to available appropriations, the Secretary, through the Commissioner of U.S. Customs and Border Protection, shall take all appropriate action to hire 5,000 additional Border Patrol agents, and all appropriate action to ensure that such agents enter on duty and are assigned to duty stations as soon as is practicable.

*Sec. 9. Foreign Aid Reporting Requirements.* The head of each executive department and agency shall identify and quantify all sources of direct and indirect Federal aid or assistance to the Government of Mexico on an annual basis over the past five years, including all bilateral and multilateral development aid, economic assistance, humanitarian aid, and military aid. Within 30 days of the date of this order, the head of each executive department and agency shall submit this information to the Secretary of State. Within 60 days of the date of this order, the Secretary shall submit to the President a consolidated report reflecting the levels of such aid and assistance that has been provided annually, over each of the past five years.

*Sec. 10. Federal-State Agreements.* It is the policy of the executive branch to empower State and local law enforcement agencies across the country to perform the functions of an immigration officer in the interior of the United States to the maximum extent permitted by law.

(a) In furtherance of this policy, the Secretary shall immediately take appropriate action to engage with the Governors of the States, as well as local officials, for the purpose of preparing to enter into agreements under section 287(g) of the INA (8 U.S.C. 1357(g)).

3

(b) To the extent permitted by law, and with the consent of State or local officials, as appropriate, the Secretary shall take appropriate action, through agreements under section 287(g) of the INA, or otherwise, to authorize State and local law enforcement officials, as the Secretary determines are qualified and appropriate, to perform the functions of immigration officers in relation to the investigation, apprehension, or detention of aliens in the United States under the direction and the supervision of the Secretary. Such authorization shall be in addition to, rather than in place of, Federal performance of these duties.

(c) To the extent permitted by law, the Secretary may structure each agreement under section 287(g) of the INA in the manner that provides the most effective model for enforcing Federal immigration laws and obtaining operational control over the border for that jurisdiction.

*Sec. 11. Parole, Asylum, and Removal.* It is the policy of the executive branch to end the abuse of parole and asylum provisions currently used to prevent the lawful removal of removable aliens.

(a) The Secretary shall immediately take all appropriate action to ensure that the parole and asylum provisions of Federal immigration law are not illegally exploited to prevent the removal of otherwise removable aliens.

(b) The Secretary shall take all appropriate action, including by promulgating any appropriate regulations, to ensure that asylum referrals and credible fear determinations pursuant to section 235(b)(1) of the INA (8 U.S.C. 1125(b)(1)) and 8 CFR 208.30, and reasonable fear determinations pursuant to 8 CFR 208.31, are conducted in a manner consistent with the plain language of those provisions.

(c) Pursuant to section 235(b)(1)(A)(iii)(I) of the INA, the Secretary shall take appropriate action to apply, in his sole and unreviewable discretion, the provisions of section 235(b)(1)(A)(i) and (ii) of the INA to the aliens designated under section 235(b)(1)(A)(iii)(II).

(d) The Secretary shall take appropriate action to ensure that parole authority under section 212(d)(5) of the INA (8 U.S.C. 1182(d)(5)) is exercised only on a case-by-case basis in accordance with the plain language of the statute, and in all circumstances only when an individual demonstrates urgent humanitarian reasons or a significant public benefit derived from such parole.

(e) The Secretary shall take appropriate action to require that all Department of Homeland Security personnel are properly trained on the proper application of section 235 of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (8 U.S.C. 1232) and section 462(g)(2) of the Homeland Security Act of 2002 (6 U.S.C. 279(g)(2)), to ensure that unaccompanied alien children are properly processed, receive appropriate care and placement while in the custody of the Department of Homeland Security, and, when appropriate, are safely repatriated in accordance with law.

*Sec. 12. Authorization to Enter Federal Lands.* The Secretary, in conjunction with the Secretary of the Interior and any other heads of agencies as necessary, shall take all appropriate action to:

(a) permit all officers and employees of the United States, as well as all State and local officers as authorized by the Secretary, to have access to all Federal lands as necessary and appropriate to implement this order; and

4

(b) enable those officers and employees of the United States, as well as all State and local officers as authorized by the Secretary, to perform such actions on Federal lands as the Secretary deems necessary and appropriate to implement this order.

*Sec. 13. Priority Enforcement.* The Attorney General shall take all appropriate steps to establish prosecution guidelines and allocate appropriate resources to ensure that Federal prosecutors accord a high priority to prosecutions of offenses having a nexus to the southern border.

*Sec. 14. Government Transparency.* The Secretary shall, on a monthly basis and in a publicly available way, report statistical data on aliens apprehended at or near the southern border using a uniform method of reporting by all Department of Homeland Security components, in a format that is easily understandable by the public.

*Sec. 15. Reporting.* Except as otherwise provided in this order, the Secretary, within 90 days of the date of this order, and the Attorney General, within 180 days, shall each submit to the President a report on the progress of the directives contained in this order.

*Sec. 16. Hiring.* The Office of Personnel Management shall take appropriate action as may be necessary to facilitate hiring personnel to implement this order.

*Sec. 17. General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

DONALD J. TRUMP

The White House,
January 25, 2017.

[Filed with the Office of the Federal Register, 11:15 a.m., January 27, 2017]

NOTE: This Executive order was published in the *Federal Register* on January 30.

*Categories:* Executive Orders : Border security and immigration enforcement, improvement efforts.

*Subjects:* Defense and national security : Border security; Immigration and naturalization : Illegal immigration.

*DCPD Number:* DCPD201700071.

5

*Administration of Donald J. Trump, 2017*

## Executive Order 13768—Enhancing Public Safety in the Interior of the United States
*January 25, 2017*

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA) (8 U.S.C. 1101 *et seq.*), and in order to ensure the public safety of the American people in communities across the United States as well as to ensure that our Nation's immigration laws are faithfully executed, I hereby declare the policy of the executive branch to be, and order, as follows:

*Section 1. Purpose.* Interior enforcement of our Nation's immigration laws is critically important to the national security and public safety of the United States. Many aliens who illegally enter the United States and those who overstay or otherwise violate the terms of their visas present a significant threat to national security and public safety. This is particularly so for aliens who engage in criminal conduct in the United States.

Sanctuary jurisdictions across the United States willfully violate Federal law in an attempt to shield aliens from removal from the United States. These jurisdictions have caused immeasurable harm to the American people and to the very fabric of our Republic.

Tens of thousands of removable aliens have been released into communities across the country, solely because their home countries refuse to accept their repatriation. Many of these aliens are criminals who have served time in our Federal, State, and local jails. The presence of such individuals in the United States, and the practices of foreign nations that refuse the repatriation of their nationals, are contrary to the national interest.

Although Federal immigration law provides a framework for Federal-State partnerships in enforcing our immigration laws to ensure the removal of aliens who have no right to be in the United States, the Federal Government has failed to discharge this basic sovereign responsibility. We cannot faithfully execute the immigration laws of the United States if we exempt classes or categories of removable aliens from potential enforcement. The purpose of this order is to direct executive departments and agencies (agencies) to employ all lawful means to enforce the immigration laws of the United States.

*Sec. 2. Policy.* It is the policy of the executive branch to:

(a) Ensure the faithful execution of the immigration laws of the United States, including the INA, against all removable aliens, consistent with Article II, Section 3 of the United States Constitution and section 3331 of title 5, United States Code;

(b) Make use of all available systems and resources to ensure the efficient and faithful execution of the immigration laws of the United States;

(c) Ensure that jurisdictions that fail to comply with applicable Federal law do not receive Federal funds, except as mandated by law;

(d) Ensure that aliens ordered removed from the United States are promptly removed; and

(e) Support victims, and the families of victims, of crimes committed by removable aliens.

1

*Sec. 3. Definitions*. The terms of this order, where applicable, shall have the meaning provided by section 1101 of title 8, United States Code.

*Sec. 4. Enforcement of the Immigration Laws in the Interior of the United States*. In furtherance of the policy described in section 2 of this order, I hereby direct agencies to employ all lawful means to ensure the faithful execution of the immigration laws of the United States against all removable aliens.

*Sec. 5. Enforcement Priorities*. In executing faithfully the immigration laws of the United States, the Secretary of Homeland Security (Secretary) shall prioritize for removal those aliens described by the Congress in sections 212(a)(2), (a)(3), and (a)(6)(C), 235, and 237(a)(2) and (4) of the INA (8 U.S.C. 1182(a)(2), (a)(3), and (a)(6)(C), 1225, and 1227(a)(2) and (4)), as well as removable aliens who:

(a) Have been convicted of any criminal offense;

(b) Have been charged with any criminal offense, where such charge has not been resolved;

(c) Have committed acts that constitute a chargeable criminal offense;

(d) Have engaged in fraud or willful misrepresentation in connection with any official matter or application before a governmental agency;

(e) Have abused any program related to receipt of public benefits;

(f) Are subject to a final order of removal, but who have not complied with their legal obligation to depart the United States; or

(g) In the judgment of an immigration officer, otherwise pose a risk to public safety or national security.

*Sec. 6. Civil Fines and Penalties*. As soon as practicable, and by no later than one year after the date of this order, the Secretary shall issue guidance and promulgate regulations, where required by law, to ensure the assessment and collection of all fines and penalties that the Secretary is authorized under the law to assess and collect from aliens unlawfully present in the United States and from those who facilitate their presence in the United States.

*Sec. 7. Additional Enforcement and Removal Officers*. The Secretary, through the Director of U.S. Immigration and Customs Enforcement, shall, to the extent permitted by law and subject to the availability of appropriations, take all appropriate action to hire 10,000 additional immigration officers, who shall complete relevant training and be authorized to perform the law enforcement functions described in section 287 of the INA (8 U.S.C. 1357).

*Sec. 8. Federal-State Agreements*. It is the policy of the executive branch to empower State and local law enforcement agencies across the country to perform the functions of an immigration officer in the interior of the United States to the maximum extent permitted by law.

(a) In furtherance of this policy, the Secretary shall immediately take appropriate action to engage with the Governors of the States, as well as local officials, for the purpose of preparing to enter into agreements under section 287(g) of the INA (8 U.S.C. 1357(g)).

(b) To the extent permitted by law and with the consent of State or local officials, as appropriate, the Secretary shall take appropriate action, through agreements under section 287(g) of the INA, or otherwise, to authorize State and local law enforcement officials, as the

2

Secretary determines are qualified and appropriate, to perform the functions of immigration officers in relation to the investigation, apprehension, or detention of aliens in the United States under the direction and the supervision of the Secretary. Such authorization shall be in addition to, rather than in place of, Federal performance of these duties.

(c) To the extent permitted by law, the Secretary may structure each agreement under section 287(g) of the INA in a manner that provides the most effective model for enforcing Federal immigration laws for that jurisdiction.

*Sec. 9. Sanctuary Jurisdictions.* It is the policy of the executive branch to ensure, to the fullest extent of the law, that a State, or a political subdivision of a State, shall comply with 8 U.S.C. 1373.

(a) In furtherance of this policy, the Attorney General and the Secretary, in their discretion and to the extent consistent with law, shall ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary. The Secretary has the authority to designate, in his discretion and to the extent consistent with law, a jurisdiction as a sanctuary jurisdiction. The Attorney General shall take appropriate enforcement action against any entity that violates 8 U.S.C. 1373, or which has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law.

(b) To better inform the public regarding the public safety threats associated with sanctuary jurisdictions, the Secretary shall utilize the Declined Detainer Outcome Report or its equivalent and, on a weekly basis, make public a comprehensive list of criminal actions committed by aliens and any jurisdiction that ignored or otherwise failed to honor any detainers with respect to such aliens.

(c) The Director of the Office of Management and Budget is directed to obtain and provide relevant and responsive information on all Federal grant money that currently is received by any sanctuary jurisdiction.

*Sec. 10. Review of Previous Immigration Actions and Policies.* (a) The Secretary shall immediately take all appropriate action to terminate the Priority Enforcement Program (PEP) described in the memorandum issued by the Secretary on November 20, 2014, and to reinstitute the immigration program known as "Secure Communities" referenced in that memorandum.

(b) The Secretary shall review agency regulations, policies, and procedures for consistency with this order and, if required, publish for notice and comment proposed regulations rescinding or revising any regulations inconsistent with this order and shall consider whether to withdraw or modify any inconsistent policies and procedures, as appropriate and consistent with the law.

(c) To protect our communities and better facilitate the identification, detention, and removal of criminal aliens within constitutional and statutory parameters, the Secretary shall consolidate and revise any applicable forms to more effectively communicate with recipient law enforcement agencies.

*Sec. 11. Department of Justice Prosecutions of Immigration Violators.* The Attorney General and the Secretary shall work together to develop and implement a program that ensures that adequate resources are devoted to the prosecution of criminal immigration

3

offenses in the United States, and to develop cooperative strategies to reduce violent crime and the reach of transnational criminal organizations into the United States.

Sec. 12. *Recalcitrant Countries*. The Secretary of Homeland Security and the Secretary of State shall cooperate to effectively implement the sanctions provided by section 243(d) of the INA (8 U.S.C. 1253(d)), as appropriate. The Secretary of State shall, to the maximum extent permitted by law, ensure that diplomatic efforts and negotiations with foreign states include as a condition precedent the acceptance by those foreign states of their nationals who are subject to removal from the United States.

Sec. 13. *Office for Victims of Crimes Committed by Removable Aliens*. The Secretary shall direct the Director of U.S. Immigration and Customs Enforcement to take all appropriate and lawful action to establish within U.S. Immigration and Customs Enforcement an office to provide proactive, timely, adequate, and professional services to victims of crimes committed by removable aliens and the family members of such victims. This office shall provide quarterly reports studying the effects of the victimization by criminal aliens present in the United States.

Sec. 14. *Privacy Act*. Agencies shall, to the extent consistent with applicable law, ensure that their privacy policies exclude persons who are not United States citizens or lawful permanent residents from the protections of the Privacy Act regarding personally identifiable information.

Sec. 15. *Reporting*. Except as otherwise provided in this order, the Secretary and the Attorney General shall each submit to the President a report on the progress of the directives contained in this order within 90 days of the date of this order and again within 180 days of the date of this order.

Sec. 16. *Transparency*. To promote the transparency and situational awareness of criminal aliens in the United States, the Secretary and the Attorney General are hereby directed to collect relevant data and provide quarterly reports on the following:

(a) the immigration status of all aliens incarcerated under the supervision of the Federal Bureau of Prisons;

(b) the immigration status of all aliens incarcerated as Federal pretrial detainees under the supervision of the United States Marshals Service; and

(c) the immigration status of all convicted aliens incarcerated in State prisons and local detention centers throughout the United States.

Sec. 17. *Personnel Actions*. The Office of Personnel Management shall take appropriate and lawful action to facilitate hiring personnel to implement this order.

Sec. 18. *General Provisions*. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

DONALD J. TRUMP

The White House,
January 25, 2017.

[Filed with the Office of the Federal Register, 11:15 a.m., January 27, 2017]

NOTE: This Executive order was published in the *Federal Register* on January 30.

*Categories:* Executive Orders : Public safety in U.S. interior, enhancement efforts.

*Subjects:* Immigration and naturalization : Illegal immigration; Law enforcement and crime : Illegal immigration, deportation of criminals.

*DCPD Number:* DCPD201700072.

AR472

8/12/96

CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos Holguín
Peter A. Schey
256 South Occidental Boulevard
Los Angeles, CA  90057
(213) 388-8693

NATIONAL CENTER FOR YOUTH LAW
Alice Bussiere
James Morales
114 Sansome Street, Suite 905
San Francisco, CA  94104
(415) 453-3307

Attorneys for Plaintiffs

Michael Johnson
Assistant United States Attorney
300 N. Los Angeles St., Rm. 7516
Los Angeles, CA  90012

Allen Hausman
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC  20044

Attorneys for Defendants

Additional counsel listed next page

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JENNY LISETTE FLORES, et al., | ) | Case No. CV 85-4544-RJK(Px) |
| | ) | |
| Plaintiffs, | ) | Stipulated Settlement |
| | ) | Agreement |
| -vs- | ) | |
| | ) | |
| JANET RENO, Attorney General | ) | |
| of the United States, et al., | ) | |
| | ) | |
| Defendants. | ) | |

AR473

Plaintiffs' Additional Counsel

ACLU FOUNDATION OF SOUTHERN CALIFORNIA
Mark Rosenbaum
Sylvia Argueta
1616 Beverly Boulevard
Los Angeles, CA  90026
Telephone: (213) 977-9500

STREICH LANG
Susan G. Boswell
Jeffrey Willis
1500 Bank of America Plaza
33 North Stone Avenue
Tucson, AZ  85701
Telephone: (602) 770-8700

Defendants' Additional Counsel:

Arthur Strathern
Mary Jane Candaux
Office of the General Counsel
U.S. Immigration & Naturalization Service
425 I St. N.W.
Washington, DC  20536
/ / /

2

AR474

STIPULATED SETTLEMENT AGREEMENT

WHEREAS, Plaintiffs have filed this action against Defendants, challenging, *inter alia*, the constitutionality of Defendants' policies, practices and regulations regarding the detention and release of unaccompanied minors taken into the custody of the Immigration and Naturalization Service (INS) in the Western Region; and

WHEREAS, the district court has certified this case as a class action on behalf of all minors apprehended by the INS in the Western Region of the United States; and

WHEREAS, this litigation has been pending for nine (9) years, all parties have conducted extensive discovery, and the United States Supreme Court has upheld the constitutionality of the challenged INS regulations on their face and has remanded for further proceedings consistent with its opinion; and

WHEREAS, on November 30, 1987, the parties reached a settlement agreement requiring that minors in INS custody in the Western Region be housed in facilities meeting certain standards, including state standards for the housing and care of dependent children, and Plaintiffs' motion to enforce compliance with that settlement is currently pending before the court; and

WHEREAS, a trial in this case would be complex, lengthy and costly to all parties concerned, and the decision of the district court would be subject to appeal by the losing parties with the final outcome uncertain; and

WHEREAS, the parties believe that settlement of this action is in their best interests and best serves the interests of justice by avoiding a complex, lengthy and costly trial, and subsequent appeals which could last several more years;

NOW, THEREFORE, Plaintiffs and Defendants enter into this Stipulated Settlement

3

Agreement (the Agreement), stipulate that it constitutes a full and complete resolution of the issues raised in this action, and agree to the following:

I        DEFINITIONS

As used throughout this Agreement the following definitions shall apply:

1.  The term "party" or "parties" shall apply to Defendants and Plaintiffs.  As the term applies to Defendants, it shall include their agents, employees, contractors and/or successors in office.  As the term applies to Plaintiffs, it shall include all class members.

2.  The term "Plaintiff" or "Plaintiffs" shall apply to the named plaintiffs and all class members.

3.  The term "class member" or "class members" shall apply to the persons defined in Paragraph 10 below.

4.  The term "minor" shall apply to any person under the age of eighteen (18) years who is detained in the legal custody of the INS.  This Agreement shall cease to apply to any person who has reached the age of eighteen years.  The term "minor" shall not include an emancipated minor or an individual who has been incarcerated due to a conviction for a criminal offense as an adult.  The INS shall treat all persons who are under the age of eighteen but not included within the definition of "minor" as adults for all purposes, including release on bond or recognizance.

5.  The term "emancipated minor" shall refer to any minor who has been determined to be emancipated in an appropriate state judicial proceeding.

6.  The term "licensed program" shall refer to any program, agency or organization that is licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children, including a program operating group homes, foster homes, or facilities for special needs minors.  A licensed program must also meet those standards for licensed programs set forth in

4

Exhibit 1 attached hereto.  All homes and facilities operated by licensed programs, including facilities for special needs minors, shall be non-secure as required under state law; provided, however, that a facility for special needs minors may maintain that level of security permitted under state law which is necessary for the protection of a minor or others in appropriate circumstances, *e.g.*, cases in which a minor has drug or alcohol problems or is mentally ill.  The INS shall make reasonable efforts to provide licensed placements in those geographical areas where the majority of minors are apprehended, such as southern California, southeast Texas, southern Florida and the northeast corridor.

       7.  The term "special needs minor" shall refer to a minor whose mental and/or physical condition requires special services and treatment by staff.  A minor may have special needs due to drug or alcohol abuse, serious emotional disturbance, mental illness or retardation, or a physical condition or chronic illness that requires special services or treatment.  A minor who has suffered serious neglect or abuse may be considered a minor with special needs if the minor requires special services or treatment as a result of the neglect or abuse. The INS shall assess minors to determine if they have special needs and, if so, shall place such minors, whenever possible, in licensed programs in which the INS places children without special needs, but which provide services and treatment for such special needs.

       8.  The term "medium security facility" shall refer to a facility that is operated by a program, agency or organization licensed by an appropriate State agency and that meets those standards set forth in Exhibit 1 attached hereto. A medium security facility is designed for minors who require close supervision but do not need placement in juvenile correctional facilities.  It provides 24-hour awake supervision, custody, care, and treatment.  It maintains stricter security measures, such as intensive staff supervision, than a facility operated by a licensed program in order to control problem behavior and to prevent escape.  Such a facility may have a secure perimeter but shall not be equipped internally with

5

major restraining construction or procedures typically associated with correctional facilities.

II        SCOPE OF SETTLEMENT, EFFECTIVE DATE, AND PUBLICATION

9.  This Agreement sets out nationwide policy for the detention, release, and treatment of minors in the custody of the INS and shall supersede all previous INS policies that are inconsistent with the terms of this Agreement.  This Agreement shall become effective upon final court approval, except that those terms of this Agreement regarding placement pursuant to Paragraph 19 shall not become effective until all contracts under the Program Announcement referenced in Paragraph 20 below are negotiated and implemented.  The INS shall make its best efforts to execute these contracts within 120 days after the court's final approval of this Agreement.  However, the INS will make reasonable efforts to comply with Paragraph 19 prior to full implementation of all such contracts.  Once all contracts under the Program Announcement referenced in Paragraph 20 have been implemented, this Agreement shall supersede the agreement entitled Memorandum of Understanding Re Compromise of Class Action: Conditions of Detention (hereinafter "MOU"), entered into by and between the Plaintiffs and Defendants and filed with the United States District Court for the Central District of California on November 30, 1987, and the MOU shall thereafter be null and void.  However, Plaintiffs shall not institute any legal action for enforcement of the MOU for a six (6) month period commencing with the final district court approval of this Agreement, except that Plaintiffs may institute enforcement proceedings if the Defendants have engaged in serious violations of the MOU that have caused irreparable harm to a class member for which injunctive relief would be appropriate.  Within 120 days of the final district court approval of this Agreement, the INS shall initiate action to publish the relevant and substantive terms of this Agreement as a Service regulation.  The final regulations shall not be inconsistent with the terms of this Agreement.  Within 30 days of final court approval of this

6

Agreement, the INS shall distribute to all INS field offices and sub-offices instructions regarding the processing, treatment, and placement of juveniles.  Those instructions shall include, but may not be limited to, the provisions summarizing the terms of this Agreement, attached hereto as Exhibit 2.

III     CLASS DEFINITION

10.  The certified class in this action shall be defined as follows: "All minors who are detained in the legal custody of the INS."

IV     STATEMENTS OF GENERAL APPLICABILITY

11.  The INS treats, and shall continue to treat, all minors in its custody with dignity, respect and special concern for their particular vulnerability as minors.  The INS shall place each detained minor in the least restrictive setting appropriate to the minor's age and special needs, provided that such setting is consistent with its interests to ensure the minor's timely appearance before the INS and the immigration courts and to protect the minor's well-being and that of others.  Nothing herein shall require the INS to release a minor to any person or agency whom the INS has reason to believe may harm or neglect the minor or fail to present him or her before the INS or the immigration courts when requested to do so.

V     PROCEDURES AND TEMPORARY PLACEMENT FOLLOWING ARREST

12.A.  Whenever the INS takes a minor into custody, it shall expeditiously process the minor and shall provide the minor with a notice of rights, including the right to a bond redetermination hearing if applicable.  Following arrest, the INS shall hold minors in facilities that are safe and sanitary and that are consistent with the INS's concern for the  particular vulnerability of minors.  Facilities will provide access  to toilets and sinks, drinking water and food as appropriate, medical assistance if the minor is in need of emergency services, adequate temperature control and ventilation, adequate

7

supervision to protect minors from others, and contact with family members who were arrested with the minor.  The INS will segregate unaccompanied minors from unrelated adults.  Where such segregation is not immediately possible, an unaccompanied minor will not be detained with an unrelated adult for more than 24 hours.  If there is no one to whom the INS may release the minor pursuant to Paragraph 14, and no appropriate licensed program is immediately available for placement pursuant to Paragraph 19, the minor may be placed in an INS detention facility, or other INS-contracted facility, having separate accommodations for minors, or a State or county juvenile detention facility.  However, minors shall be separated from delinquent offenders.  Every effort must be taken to ensure that the safety and well-being of the minors detained in these facilities are satisfactorily provided for by the staff.  The INS will transfer a minor from a placement under this paragraph to a placement under Paragraph 19, (i) within three (3) days, if the minor was apprehended in an INS district in which a licensed program is located and has space available; or (ii) within five (5) days in all other cases; except:

1.     as otherwise provided under Paragraph 13 or Paragraph 21;

2.     as otherwise required by any court decree or court-approved settlement;

3.     in the event of an emergency or influx of minors into the United States, in which case the INS shall place all minors pursuant to Paragraph 19 as expeditiously as possible; or

4.     where individuals must be transported from remote areas for processing or speak unusual languages such that the INS must locate interpreters in order to complete processing, in which case the INS shall place all such minors pursuant to Paragraph 19 within five (5) business days.

B.  For purposes of this paragraph, the term "emergency" shall be defined as any act or event that prevents the placement of minors pursuant to Paragraph 19 within the time frame provided.  Such

8

emergencies include natural disasters (e.g., earthquakes, hurricanes, etc.), facility fires, civil disturbances, and medical emergencies (e.g., a chicken pox epidemic among a group of minors). The term "influx of minors into the United States" shall be defined as those circumstances where the INS has, at any given time, more than 130 minors eligible for placement in a licensed program under Paragraph 19, including those who have been so placed or are awaiting such placement.

C.  In preparation for an "emergency" or "influx," as described in Subparagraph B, the INS shall have a written plan that describes the reasonable efforts that it will take to place all minors as expeditiously as possible. This plan shall include the identification of 80 beds that are potentially available for INS placements and that are licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children. The plan, without identification of the additional beds available, is attached as Exhibit 3. The INS shall not be obligated to fund these additional beds on an ongoing basis. The INS shall update this listing of additional beds on a quarterly basis and provide Plaintiffs' counsel with a copy of this listing.

13.  If a reasonable person would conclude that an alien detained by the INS is an adult despite his claims to be a minor, the INS shall treat the person as an adult for all purposes, including confinement and release on bond or recognizance. The INS may require the alien to submit to a medical or dental examination conducted by a medical professional or to submit to other appropriate procedures to verify his or her age. If the INS subsequently determines that such an individual is a minor, he or she will be treated as a minor in accordance with this Agreement for all purposes.

VI      GENERAL POLICY FAVORING RELEASE

14.  Where the INS determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or

9

that of others, the INS shall release a minor from its custody without unnecessary delay, in the following order of preference, to:

A.    a parent;

B.    a legal guardian;

C.    an adult relative (brother, sister, aunt, uncle, or grandparent);

D.    an adult individual or entity designated by the parent or legal guardian as capable and willing to care for the minor's well-being in (i) a declaration signed under penalty of perjury before an immigration or consular officer or (ii) such other document(s) that establish(es) to the satisfaction of the INS, in its discretion, the affiant's paternity or guardianship;

E.    a licensed program willing to accept legal custody; or

F.    an adult individual or entity seeking custody, in the discretion of the INS, when it appears that there is no other likely alternative to long term detention and family reunification does not appear to be a reasonable possibility.

15.  Before a minor is released from INS custody pursuant to Paragraph 14 above, the custodian must execute an Affidavit of Support (Form I-134) and an agreement to:

A.    provide for the minor's physical, mental, and financial well-being;

B.    ensure the minor's presence at all future proceedings before the INS and the immigration court;

C.    notify the INS of any change of address within five (5) days following a move;

D.    in the case of custodians other than parents or legal guardians, not transfer custody of the minor to another party without the prior written permission of the District Director;

10

E.      notify the INS at least five days prior to the custodian's departing the United States of such departure, whether the departure is voluntary or pursuant to a grant of voluntary departure or order of deportation; and

F.      if dependency proceedings involving the minor are initiated, notify the INS of the initiation of such proceedings and the dependency court of any immigration proceedings pending against the minor.

In the event of an emergency, a custodian may transfer temporary physical custody of a minor prior to securing permission from the INS but shall notify the INS of the transfer as soon as is practicable thereafter, but in all cases within 72  hours.  For purposes of this paragraph, examples of an "emergency" shall include the serious illness of the custodian, destruction of the home, etc.  In all cases where the custodian, in writing, seeks written permission for a transfer, the District Director shall promptly respond to the request.

16.  The INS may terminate the custody arrangements and assume legal custody of any minor whose custodian fails to comply with the agreement required under Paragraph 15.  The INS, however, shall not terminate the custody arrangements for minor violations of that part of the custodial agreement outlined at Subparagraph 15.C above.

17.  A positive suitability assessment may be required prior to release to any individual or program pursuant to Paragraph 14.  A suitability assessment may include such components as an investigation of the living conditions in which the minor would be placed and the standard of care he would receive, verification of identity and employment of the individuals offering support, interviews of members of the household, and a home visit.  Any such assessment should also take into consideration the wishes and concerns of the minor.

11

18.  Upon taking a minor into custody, the INS, or the licensed program in which the minor is placed, shall make and record the prompt and continuous efforts on its part toward family reunification and the release of the minor pursuant to Paragraph 14 above.  Such efforts at family reunification shall continue so long as the minor is in INS custody.

VII    INS CUSTODY

19.  In any case in which the INS does not release a minor pursuant to Paragraph 14, the minor shall remain in INS legal custody.  Except as provided in Paragraphs 12 or 21, such minor shall be placed temporarily in a licensed program until such time as release can be effected in accordance with Paragraph 14 above or until the minor's immigration proceedings are concluded, whichever occurs earlier.  All minors placed in such a licensed program remain in the legal custody of the INS and may only be transferred or released under the authority of the INS; provided, however, that in the event of an emergency a licensed program may transfer temporary physical custody of a minor prior to securing permission from the INS but shall notify the INS of the transfer as soon as is practicable thereafter, but in all cases within 8 hours.

20.  Within 60 days of final court approval of this Agreement, the INS shall authorize the United States Department of Justice Community Relations Service to publish in the Commerce Business Daily and/or the Federal Register a Program Announcement to solicit proposals for the care of 100 minors in licensed programs.

21.  A minor may be held in or transferred to a suitable State or county juvenile detention facility or a secure INS detention facility, or INS-contracted facility, having separate accommodations for minors whenever the District Director or Chief Patrol Agent determines that the minor:

A.        has been charged with, is chargeable, or has been convicted of a crime, or is the subject

12

of delinquency proceedings, has been adjudicated delinquent, or is chargeable with a delinquent act; provided, however, that this provision shall not apply to any minor whose offense(s) fall(s) within either of the following categories:

i.   Isolated offenses that (1) were not within a pattern or practice of criminal activity and (2) did not involve violence against a person or the use or carrying of a weapon (Examples: breaking and entering, vandalism, DUI, etc.  This list is not exhaustive.);

ii.   Petty offenses, which are not considered grounds for stricter means of detention in any case (Examples: shoplifting, joy riding, disturbing the peace, etc.  This list is not exhaustive.);

As used in this paragraph, "chargeable" means that the INS has probable cause to believe that the individual has committed a specified offense;

B.   has committed, or has made credible threats to commit, a violent or malicious act (whether directed at himself or others) while in INS legal custody or while in the presence of an INS officer;

C.   has engaged, while in a licensed program, in conduct that has proven to be unacceptably disruptive of the normal functioning of the licensed program in which he or she has been placed and removal is necessary to ensure the welfare of the minor or others, as determined by the staff of the licensed program (Examples: drug or alcohol abuse, stealing, fighting, intimidation of others, etc.  This list is not exhaustive.);

D.   is an escape-risk; or

E.   must be held in a secure facility for his or her own safety, such as when the INS has

13

reason to believe that a smuggler would abduct or coerce a particular minor to secure payment of smuggling fees.

22.  The term "escape-risk" means that there is a serious risk that the minor will attempt to escape from custody.  Factors to consider when determining whether a minor is an escape-risk or not include, but are not limited to, whether:

A.     the minor is currently under a final order of deportation or exclusion;

B.     the minor's immigration history includes: a prior breach of a bond; a failure to appear before the INS or the immigration court; evidence that the minor is indebted to organized smugglers for his transport; or a voluntary departure or a previous removal from the United States pursuant to a final order of deportation or exclusion;

C.     the minor has previously absconded or attempted to abscond from INS custody.

23.  The INS will not place a minor in a secure facility pursuant to Paragraph 21 if there are less restrictive alternatives that are available and appropriate in the circumstances, such as transfer to (a) a medium security facility which would provide intensive staff supervision and counseling services or (b) another licensed program.  All determinations to place a minor in a secure facility will be reviewed and approved by the regional juvenile coordinator.

24.A.  A minor in deportation proceedings shall be afforded a bond redetermination hearing before an immigration judge in every case, unless the minor indicates on the Notice of Custody Determination form that he or she refuses such a hearing.

B.  Any minor who disagrees with the INS's determination to place that minor in a particular type of facility, or who asserts that the licensed program in which he or she has been placed does not comply with the standards set forth in Exhibit 1 attached hereto, may  seek judicial review in any

14

United States District Court with jurisdiction and venue over the matter to challenge that placement determination or to allege noncompliance with the standards set forth in Exhibit 1.  In such an action, the United States District Court shall be limited to entering an order solely affecting the individual claims of the minor bringing the action.

C.  In order to permit judicial review of Defendants' placement decisions as provided in this Agreement, Defendants shall provide minors not placed in licensed programs with a notice of the reasons for  housing the minor in a detention or medium security  facility.   With respect to placement decisions reviewed under this paragraph, the standard of review for the INS's exercise of its discretion shall be the abuse of discretion standard of review.  With respect to all other matters for which this paragraph provides judicial review, the standard of review shall be *de novo* review.

D.  The INS shall promptly provide each minor not released with (a) INS Form I-770, (b) an explanation of the right of judicial review as set out in Exhibit 6, and (c) the list of free legal services available in the district pursuant to INS regulations (unless previously given to the minor).

E.  Exhausting the procedures established in Paragraph 37 of this Agreement shall not be a precondition to the bringing of an action under this paragraph in any United District Court.  Prior to initiating any such action, however, the minor and/or the minors' attorney shall confer telephonically or in person with the United States Attorney's office in the judicial district where the action is to be filed, in an effort to informally resolve the minor's complaints without the need of federal court intervention.

VIII    TRANSPORTATION OF MINORS

25.  Unaccompanied minors arrested or taken into custody by the INS should not be transported by the INS in vehicles with detained adults except:

A.  when being transported from the place of arrest or apprehension to an INS office, or

15

B.  where separate transportation would be otherwise impractical.

When transported together pursuant to Clause B, minors shall be separated from adults.  The INS shall take necessary precautions for the protection of the well-being of such minors when transported with adults.

26.  The INS shall assist without undue delay in making transportation arrangements to the INS office nearest the location of the person or facility to whom a minor is to be released pursuant to Paragraph 14.  The INS may, in its discretion, provide transportation to minors.

IX      TRANSFER OF MINORS

27.  Whenever a minor is transferred from one placement to another, the minor shall be transferred with all of his or her possessions and legal papers; provided, however, that if the minor's possessions exceed the amount permitted normally by the carrier in use, the possessions will be shipped to the minor in a timely manner.  No minor who is represented by counsel shall be transferred without advance notice to such counsel, except in unusual and compelling circumstances such as where the safety of the minor or others is threatened or the minor has been determined to be an escape-risk, or where counsel has waived such notice, in which cases notice shall be provided to counsel within 24 hours following transfer.

X  MONITORING AND REPORTS

28A.  An INS Juvenile Coordinator in the Office of the Assistant Commissioner for Detention and Deportation shall monitor compliance with the terms of this Agreement and shall maintain an up-to-date record of all minors who are placed in proceedings and remain in INS custody for longer than 72 hours.  Statistical information on such minors shall be collected weekly from all INS district offices and Border Patrol stations.  Statistical information will include at least the following: (1)

16

biographical information such as each minor's name, date of birth, and country of birth, (2) date placed in INS custody, (3) each date placed, removed or released, (4) to whom and where placed, transferred, removed or released, (5) immigration status, and (6) hearing dates. The INS, through the Juvenile Coordinator, shall also collect information regarding the reasons for every placement of a minor in a detention facility or medium security facility.

B. Should Plaintiffs' counsel have reasonable cause to believe that a minor in INS legal custody should have been released pursuant to Paragraph 14, Plaintiffs' counsel may contact the Juvenile Coordinator to request that the Coordinator investigate the case and inform Plaintiffs' counsel of the reasons why the minor has not been released.

29. On a semi-annual basis, until two years after the court determines, pursuant to Paragraph 31, that the INS has achieved substantial compliance with the terms of this Agreement, the INS shall provide to Plaintiffs' counsel the information collected pursuant to Paragraph 28, as permitted by law, and each INS policy or instruction issued to INS employees regarding the implementation of this Agreement. In addition, Plaintiffs' counsel shall have the opportunity to submit questions, on a semi-annual basis, to the Juvenile Coordinator in the Office of the Assistant Commissioner for Detention and Deportation with regard to the implementation of this Agreement and the information provided to Plaintiffs' counsel during the preceding six-month period pursuant to Paragraph 28. Plaintiffs' counsel shall present such questions either orally or in writing, at the option of the Juvenile Coordinator. The Juvenile Coordinator shall furnish responses, either orally or in writing at the option of Plaintiffs' counsel, within 30 days of receipt.

30. On an annual basis, commencing one year after final court approval of this Agreement, the INS Juvenile Coordinator shall review, assess, and report to the court regarding compliance with the

17

terms of this Agreement.  The Coordinator shall file these reports with the court and provide copies to

the parties, including the final report referenced in Paragraph 35, so that they can submit comments on

the report to the court.  In each report, the Coordinator shall state to the court whether or not the INS is

in substantial compliance with the terms of this Agreement, and, if the INS is not in substantial

compliance, explain the reasons for the lack of compliance.  The Coordinator shall continue to report

on an annual basis until three years after the court determines that the INS has achieved substantial

compliance with the terms of this Agreement.

31.  One year after the court's approval of this Agreement, the Defendants may ask the court to

determine whether the INS has achieved substantial compliance with the terms of this Agreement.

XI     ATTORNEY-CLIENT VISITS

32.A.  Plaintiffs' counsel are entitled to attorney-client visits with class members even though

they may not have the names of class members who are housed at a particular location.  All visits shall

occur in accordance with generally applicable policies and procedures relating to attorney-client visits

at the facility in question.  Upon Plaintiffs' counsel's arrival at a facility for attorney-client visits, the

facility staff shall provide Plaintiffs' counsel with a list of names and alien registration numbers for the

minors housed at that facility.  In all instances, in order to memorialize any visit to a minor by

Plaintiffs' counsel, Plaintiffs' counsel must file a notice of appearance with the INS prior to any

attorney-client meeting.  Plaintiffs' counsel may limit any such notice of appearance to representation

of the minor in connection with this Agreement.  Plaintiffs' counsel must submit a copy of the notice of

appearance by hand or by mail to the local INS juvenile coordinator and a copy by hand to the staff of

the facility.

B.  Every six months, Plaintiffs' counsel shall provide the INS with a list of those attorneys who

18

may make such attorney-client visits, as Plaintiffs' counsel, to minors during the following six month

period.  Attorney-client visits may also be conducted by any staff attorney employed by the Center for

Human Rights & Constitutional Law in Los Angeles, California or the National Center for Youth Law

in San Francisco, California, provided that such attorney presents credentials establishing his or her

employment prior to any visit.

C.  Agreements for the placement of minors in non-INS facilities shall permit attorney-client

visits, including by class counsel in this case.

D.  Nothing in Paragraph 32 shall affect a minor's right to refuse to meet with Plaintiffs'

counsel.  Further, the minor's parent or legal guardian may deny Plaintiffs' counsel permission to meet

with the minor.

XII     FACILITY VISITS

33.  In addition to the attorney-client visits permitted pursuant to Paragraph 32,  Plaintiffs'

counsel may request access to any licensed program's facility in which a minor has been placed

pursuant to Paragraph 19 or to any medium security facility or detention facility in which a minor has

been placed pursuant to Paragraphs 21 or 23.  Plaintiffs' counsel shall submit a request to visit a facility

under this paragraph to the INS district juvenile coordinator who will provide reasonable assistance to

Plaintiffs' counsel by conveying the request to the facility's staff and coordinating the visit.   The rules

and procedures to be followed in connection with any visit approved by a facility under this paragraph

are set forth in Exhibit 4 attached, except as may be otherwise agreed by Plaintiffs' counsel and the

facility's staff.  In all visits to any facility pursuant to this Agreement, Plaintiffs' counsel and their

associated experts shall treat minors and staff with courtesy and dignity and shall not disrupt the normal

functioning of the facility.

19

XIII  TRAINING

34.  Within 120 days of final court approval of this Agreement, the INS shall provide appropriate guidance and training for designated INS employees regarding the terms of this Agreement. The INS shall develop written and/or audio or video materials for such training.  Copies of such written and/or audio or video training materials shall be made available to Plaintiffs' counsel when such training materials are sent to the field, or to the extent practicable, prior to that time.

XIV    DISMISSAL

35.  After the court has determined that the INS is in substantial compliance with this Agreement and the Coordinator has filed a final report, the court, without further notice, shall dismiss this action.  Until such dismissal, the court shall retain jurisdiction over this action.

XV    RESERVATION OF RIGHTS

36.  Nothing in this Agreement shall limit the rights, if any, of individual class members to preserve issues for judicial review in the appeal of an individual case or for class members to exercise any independent rights they may otherwise have.

XVI    NOTICE AND DISPUTE RESOLUTION

37.  This paragraph provides for the enforcement, in this District Court, of the provisions of this Agreement except for claims brought under Paragraph 24.  The parties shall meet telephonically or in person to discuss a complete or partial repudiation of this Agreement or any alleged non-compliance with the terms of the Agreement, prior to bringing any individual or class action to enforce this Agreement.  Notice of a claim that a party has violated the terms of this Agreement shall be served on plaintiffs addressed to:

/ / /

20

CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos Holguín
Peter A. Schey
256 South Occidental Boulevard
Los Angeles, CA  90057

NATIONAL CENTER FOR YOUTH LAW
Alice Bussiere
James Morales
114 Sansome Street, Suite 905
San Francisco, CA  94104

and on Defendants addressed to:

Michael Johnson
Assistant United States Attorney
300 N. Los Angeles St., Rm. 7516
Los Angeles, CA  90012

Allen Hausman
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC  20044

XVII   PUBLICITY

        38.  Plaintiffs and Defendants shall hold a joint press conference to announce this Agreement.

The INS shall send copies of this Agreement to social service and voluntary agencies agreed upon by

the parties, as set forth in Exhibit 5 attached.  The parties shall pursue such other public dissemination

of information regarding this Agreement as the parties shall agree.

 XVIII  ATTORNEYS' FEES AND COSTS

        39.  Within 60 days of final court approval of this Agreement, Defendants shall pay to Plaintiffs

the total sum of $374,110.09, in full settlement of all attorneys' fees and costs in this case.

/ / /

21

AR493

XIX   TERMINATION

40.  All terms of this Agreement shall terminate the earlier of  five years after the date of final court approval of this Agreement or three years after the court determines that the INS is in substantial compliance with this Agreement, except that the INS shall continue to house the general population of minors in INS custody in facilities that are licensed for the care of dependent minors.

XX   REPRESENTATIONS AND WARRANTY

41.  Counsel for the respective parties, on behalf of themselves and their clients, represent that they know of nothing in this Agreement that exceeds the legal authority of the parties or is in violation of any law.  Defendants' counsel represent and warrant that they are fully authorized and empowered to enter into this Agreement on behalf of the Attorney General, the United States Department of Justice, and the Immigration and Naturalization Service, and acknowledge that Plaintiffs enter into this Agreement in reliance on such representation.  Plaintiffs' counsel represent and warrant that they are fully authorized and empowered to enter into this Agreement on behalf of the Plaintiffs, and acknowledge that Defendants enter into this Agreement in reliance on such representation.  The undersigned, by their signatures on behalf of the Plaintiffs and Defendants, warrant that upon execution of this Agreement in their representative capacities, their principals, agents, and successors of such principals and agents shall be fully and unequivocally bound hereunder to the full extent authorized by law.

For Defendants:   Signed:                                          Title:

                             Dated:

For Plaintiffs:    Signed:                                          Title:

                             Dated:

22

EXHIBIT 1

MINIMUM STANDARDS FOR LICENSED PROGRAMS

A.  Licensed programs shall comply with all applicable state child welfare laws and regulations and all state and local building, fire, health and safety codes and shall provide or arrange for the following services for each minor in its care:

1.      Proper physical care and maintenance, including suitable living accommodations, food, appropriate clothing, and personal grooming items.

2.      Appropriate routine medical and dental care, family planning services, and emergency health care services, including a complete medical examination (including screening for infectious disease) within 48 hours of admission, excluding weekends and holidays, unless the minor was recently examined at another facility; appropriate immunizations in accordance with the U.S. Public Health Service (PHS), Center for Disease Control; administration of prescribed medication and special diets; appropriate mental health interventions when necessary.

3.      An individualized needs assessment which shall include: (a) various initial intake forms; (b) essential data relating to the identification and history of the minor and family; (c) identification of the minors' special needs including any specific problem(s) which appear to require immediate intervention; (d) an educational assessment and plan; (e) an assessment of family relationships and interaction with adults, peers and authority figures; (f) a statement of religious preference and practice; (g) an assessment of the

1

minor's personal goals, strengths and weaknesses; and (h) identifying information regarding immediate family members, other relatives, godparents or friends who may be residing in the United States and may be able to assist in family reunification.

4.    Educational services appropriate to the minor's level of development, and communication skills in a structured classroom setting, Monday through Friday, which concentrates primarily on the development of basic academic competencies and secondarily on English Language Training (ELT). The educational program shall include instruction and educational and other reading materials in such languages as needed. Basic academic areas should include Science, Social Studies, Math, Reading, Writing and Physical Education. The program shall provide minors with appropriate reading materials in languages other than English for use during the minor's leisure time.

5.    Activities according to a recreation and leisure time plan which shall include daily outdoor activity, weather permitting, at least one hour per day of large muscle activity and one hour per day of structured leisure time activities (this should not include time spent watching television). Activities should be increased to a total of three hours on days when school is not in session.

6.    At least one (1) individual counseling session per week conducted by trained social work staff with the specific objectives of reviewing the minor's progress, establishing new short term objectives, and addressing both the developmental and crisis-related needs of each minor.

7.    Group counseling sessions at least twice a week. This is usually an informal process and takes place with all the minors present. It is a time when new minors are given the

2

opportunity to get acquainted with the staff, other children, and the rules of the program. It is an open forum where everyone gets a chance to speak.  Daily program management is discussed and decisions are made about recreational activities, etc.  It is a time for staff and minors to discuss whatever is on their minds and to resolve problems.

8.  Acculturation and adaptation services which include information regarding the development of social and inter-personal skills which contribute to those abilities necessary to live independently and responsibly.

9.  Upon admission, a comprehensive orientation regarding program intent, services, rules (written and verbal), expectations and the availability of legal assistance.

10.  Whenever possible, access to religious services of the minor's choice.

11.  Visitation and contact with family members (regardless of their immigration status) which is structured to encourage such visitation.  The staff shall respect the minor's privacy while reasonably preventing the unauthorized release of the minor.

12.  A reasonable right to privacy, which shall include the right to: (a) wear his or her own clothes, when available; (b) retain a private space in the residential facility, group or foster home for the storage of personal belongings; (c) talk privately on the phone, as permitted by the house rules and regulations; (d) visit privately with guests, as permitted by the house rules and regulations; and (e) receive and send uncensored mail unless there is a reasonable belief that the mail contains contraband.

13.  Family reunification services designed to identify relatives in the United States as well as in foreign countries and assistance in obtaining legal guardianship when necessary for the release of the minor.

3

14.     Legal services information regarding the availability of free legal assistance, the right to be represented by counsel at no expense to the government, the right to a deportation or exclusion hearing before an immigration judge, the right to apply for political asylum or to request voluntary departure in lieu of deportation.

B.  Service delivery is to be accomplished in a manner which is sensitive to the age, culture, native language and the complex needs of each minor.

C.  Program rules and discipline standards shall be formulated with consideration for the range of ages and maturity in the program and shall be culturally sensitive to the needs of alien minors. Minors shall not be subjected to corporal punishment, humiliation, mental abuse, or punitive interference with the daily functions of living, such as eating or sleeping.  Any sanctions employed shall not: (1) adversely affect either a minor's health, or physical or psychological well-being; or (2) deny minors regular meals, sufficient sleep, exercise, medical care, correspondence privileges, or legal assistance.

D.  A comprehensive and realistic individual plan for the care of each minor must be developed in accordance with the minor's needs as determined by the individualized need assessment.  Individual plans shall be implemented and closely coordinated through an operative case management system.

E.  Programs shall develop, maintain and safeguard individual client case records.  Agencies and organizations are required to develop a system of accountability which preserves the confidentiality of client information and protects the records from unauthorized use or disclosure.

F.  Programs shall maintain adequate records and make regular reports as required by the INS that permit the INS to monitor and enforce this order and other requirements and standards as the INS may determine are in the best interests of the minors.

4

Exhibit 2

Instructions to Service Officers re:
Processing, Treatment, and Placement of Minors

These instructions are to advise Service officers of INS policy regarding the way in which minors in INS custody are processed, housed and released. These instructions are applicable nationwide and supersede all prior inconsistent instructions regarding minors.

**(a) Minors.** A minor is a person under the age of eighteen years. However, individuals who have been "emancipated" by a state court or convicted and incarcerated for a criminal offense as an adult are not considered minors. Such individuals must be treated as adults for all purposes, including confinement and release on bond.

Similarly, if a reasonable person would conclude that an individual is an adult despite his claims to be a minor, the INS shall treat such person as an adult for all purposes, including confinement and release on bond or recognizance. The INS may require such an individual to submit to a medical or dental examination conducted by a medical professional or to submit to other appropriate procedures to verify his or her age. If the INS subsequently determines that such an individual is a minor, he or she will be treated as a minor for all purposes.

**(b) General policy.** The INS treats, and will continue to treat minors with dignity, respect and special concern for their particular vulnerability. INS policy is to place each detained minor in the least restrictive setting appropriate to the minor's age and special needs, provided that such setting is consistent with the need to ensure the minor's timely appearance and to protect the minor's well-being and that of others. INS officers are not required to release a minor to any person or agency whom they have reason to believe may harm or neglect the minor or fail to present him or her before the INS or the immigration courts when requested to do so.

**(c) Processing.** The INS will expeditiously process minors and will provide a Form I-770 notice of rights, including the right to a bond redetermination hearing, if applicable.

Following arrest, the INS will hold minors in a facility that is safe and sanitary and that is consistent with the INS's concern for the particular vulnerability of minors. Such facilities will have access to toilets and sinks, drinking water and food as appropriate, medical assistance if the minor is in need of emergency services, adequate temperature control and ventilation, adequate supervision to protect minors from others, and contact with family members who were arrested with the minor. The INS will separate unaccompanied minors from unrelated adults whenever possible. Where such segregation is not immediately possible, an unaccompanied minor will not be detained with an unrelated adult for more than 24 hours.

If the juvenile cannot be immediately released, and no licensed program (described below) is available to care for him, he should be placed in an INS or INS-contract facility that has separate accommodations for minors, or in a State or county juvenile detention facility that separates minors in

1

INS custody from delinquent offenders.  The INS will make every effort to ensure the safety and well-being of juveniles placed in these facilities.

**(d)  Release.**  The INS will release minors from its custody without unnecessary delay, unless detention of a juvenile is required to secure her timely appearance or to ensure the minor's safety or that of others. Minors shall be released, in the following order of preference, to:

> (i)  a parent;

> (ii) a legal guardian;

> (iii) an adult relative (brother, sister, aunt, uncle, or grandparent);

> (iv) an adult individual or entity designated by the parent or legal guardian as capable and willing to care for the minor's well-being in (i) a declaration signed under penalty of perjury before an immigration or consular officer, or (ii) such other documentation that establishes to the satisfaction of the INS, in its discretion, that the individual designating the individual or entity as the minor's custodian is in fact the minor's parent or guardian;

> (v) a state-licensed juvenile shelter, group home, or foster home willing to accept legal custody; or

> (vi) an adult individual or entity seeking custody, in the discretion of the INS, when it appears that there is no other likely alternative to long term detention and family reunification does not appear to be a reasonable possibility.

**(e)  Certification of custodian.**  Before a minor is released, the custodian must execute an Affidavit of Support (Form I-134) and an agreement to:

> (i) provide for the minor's physical, mental, and financial well-being;

> (ii) ensure the minor's presence at all future proceedings before the INS and the immigration court;

> (iii) notify the INS of any change of address within five (5) days following a move;

> (iv) if the custodian is not a parent or legal guardian, not transfer custody of the minor to another party without the prior written permission of the District Director, except in the event of an emergency;

> (v) notify the INS at least five days prior to the custodian's departing the United States of such departure, whether the departure is voluntary or pursuant to a grant of voluntary departure or order of deportation; and

AR500

(vi) if dependency proceedings involving the minor are initiated, notify the INS of the initiation of π such proceedings and the dependency court of any deportation proceedings pending against the minor.

In an emergency, a custodian may transfer temporary physical custody of a minor prior to securing permission from the INS, but must notify the INS of the transfer as soon as is practicable, and in all cases within 72 hours.  Examples of an "emergency" include the serious illness of the custodian, destruction of the home, etc.  In all cases where the custodian seeks written permission for a transfer, the District Director shall promptly respond to the request.

The INS may terminate the custody arrangements and assume legal custody of any minor whose custodian fails to comply with the agreement.  However, custody arrangements will not be terminated for minor violations of the custodian's obligation to notify the INS of any change of address within five days following a move.

**(f)  Suitability assessment.**  An INS officer may require a positive suitability assessment prior to releasing a minor to any individual or program.  A suitability assessment may include an investigation of the living conditions in which the minor is to be placed and the standard of care he would receive, verification of identity and employment of the individuals offering support, interviews of members of the household, and a home visit.  The assessment will also take into consideration the wishes and concerns of the minor.

**(g)  Family reunification.**  Upon taking a minor into custody, the INS, or the licensed program in which the minor is placed, will promptly attempt to reunite the minor with his or her family to permit the release of the minor under Paragraph (d) above.  Such efforts at family reunification will continue as long as the minor is in INS or licensed program custody and will be recorded by the INS or the licensed program in which the minor is placed.

**(h)  Placement in licensed programs.**  A "licensed program" is any program, agency or organization licensed by an appropriate state agency to provide residential, group, or foster care services for dependent children, including a program operating group homes, foster homes, or facilities for special needs minors.  Exhibit 1 of the *Flores v. Reno* Settlement Agreement describes the standards required of licensed programs.  Juveniles who remain in INS custody must be placed in a licensed program within three days if the minor was apprehended in an INS district in which a licensed program is located and has space available, or within five days in all other cases, except when:

(i) the minor is an escape risk or delinquent, as defined in Paragraph (i) below;

(ii) a court decree or court-approved settlement requires otherwise;

(iii) an emergency or influx of minors into the United States prevents compliance, in which case all minors should be placed in licensed programs as expeditiously as possible; or

(iv) the minor must be transported from remote areas for processing or speaks an unusual

3

language such that a special interpreter is required to process the minor, in which case the minor must be placed in a licensed program within five business days.

**(i) Secure and supervised detention.** A minor may be held in or transferred to a State or county juvenile detention facility or in a secure INS facility or INS-contracted facility having separate accommodations for minors, whenever the District Director or Chief Patrol Agent determines that the minor —

> (i) has been charged with, is chargeable, or has been convicted of a crime, or is the subject of delinquency proceedings, has been adjudicated delinquent, or is chargeable with a delinquent act, unless the minor's offense is
>
>> (a) an isolated offense not within a pattern of criminal activity which did not involve violence against a person or the use or carrying of a weapon (Examples: breaking and entering, vandalism, DUI, etc.); or
>>
>> (b) a petty offense, which is not considered grounds for stricter means of detention in any case (Examples: shoplifting, joy riding, disturbing the peace, etc.);
>
> (ii) has committed, or has made credible threats to commit, a violent or malicious act (whether directed at himself or others) while in INS legal custody or while in the presence of an INS officer;
>
> (iii) has engaged, while in a licensed program, in conduct that has proven to be unacceptably disruptive of the normal functioning of the licensed program in which he or she has been placed and removal is necessary to ensure the welfare of the minor or others, as determined by the staff of the licensed program (Examples: drug or alcohol abuse, stealing, fighting, intimidation of others, etc.);
>
> (iv) is an escape-risk; or
>
> (v) must be held in a secure facility for his or her own safety, such as when the INS has reason to believe that a smuggler would abduct or coerce a particular minor to secure payment of smuggling fees.

"Chargeable" means that the INS has probable cause to believe that the individual has committed a specified offense.

The term "escape-risk" means that there is a serious risk that the minor will attempt to escape from custody. Factors to consider when determining whether a minor is an escape-risk or not include, but are not limited to, whether:

> (a) the minor is currently under a final order of deportation or exclusion;

4

(b) the minor's immigration history includes: a prior breach of a bond; a failure to appear before the INS or the immigration court; evidence that the minor is indebted to organized smugglers for his transport; or a voluntary departure or a previous removal from the United States pursuant to a final order of deportation or exclusion;

(c) the minor has previously absconded or attempted to abscond from INS custody.

The INS will not place a minor in a State or county juvenile detention facility, secure INS detention facility, or secure INS-contracted facility if less restrictive alternatives are available and appropriate in the circumstances, such as transfer to a medium security facility that provides intensive staff supervision and counseling services or transfer to another licensed program. All determinations to place a minor in a secure facility will be reviewed and approved by the regional Juvenile Coordinator.

**(j) Notice of right to bond redetermination and judicial review of placement.** A minor in deportation proceedings shall be afforded a bond redetermination hearing before an immigration judge in every case, unless the minor indicates on the Notice of Custody Determination form that he or she refuses such a hearing. A juvenile who is not released or placed in a licensed placement shall be provided (1) a written explanation of the right of judicial review as set out in Exhibit 6 of the *Flores v. Reno* Settlement Agreement, and (2) the list of free legal services providers compiled pursuant to INS regulations (unless previously given to the minor).

**(k)  Transportation and transfer.** Unaccompanied minors should not be transported in vehicles with detained adults except when being transported from the place of arrest or apprehension to an INS office or where separate transportation would be otherwise impractical, in which case minors shall be separated from adults. INS officers shall take all necessary precautions for the protection of minors during transportation with adults.

When a minor is to be released, the INS will assist him or her in making transportation arrangements to the INS office nearest the location of the person or facility to whom a minor is to be released. The INS may, in its discretion, provide transportation to such minors.

Whenever a minor is transferred from one placement to another, she shall be transferred with all of her possessions and legal papers; provided, however, that if the minor's possessions exceed the amount permitted normally by the carrier in use, the possessions must be shipped to the minor in a timely manner. No minor who is represented by counsel should be transferred without advance notice to counsel, except in unusual and compelling circumstances such as where the safety of the minor or others is threatened or the minor has been determined to be an escape-risk, or where counsel has waived notice, in which cases notice must be provided to counsel within 24 hours following transfer.

**(l)  Periodic reporting.** Statistical information on minors placed in proceedings who remain in INS custody for longer than 72 hours must be reported to the Juvenile Coordinator by all INS district offices and Border Patrol stations. Information will include:  (a) biographical information, including the minor's name, date of birth, and country of birth, (b) date placed in INS custody, (c) each date placed, removed or released, (d) to whom and where placed, transferred, removed or released, (e) immigration

5

status, and (f) hearing dates.  INS officers should also inform the Juvenile Coordinator of the reasons for placing a minor in a medium-security facility or detention facility as described in paragraph (i).

**(m) Attorney-client visits by Plaintiffs' counsel.**  The INS will permit the lawyers for the *Flores v. Reno* plaintiff class to visit minors, even though they may not have the names of minors who are housed at a particular location.  A list of Plaintiffs' counsel entitled to make attorney-client visits with minors is available from the district Juvenile Coordinator.  Attorney-client visits may also be conducted by any staff attorney employed by the Center for Human Rights & Constitutional Law of Los Angeles, California, or the National Center for Youth Law of San Francisco, California, provided that such attorney presents credentials establishing his or her employment prior to any visit.

Visits must occur in accordance with generally applicable policies and procedures relating to attorney-client visits at the facility in question.  Upon Plaintiffs' counsel's arrival at a facility for attorney-client visits, the facility staff must provide Plaintiffs' counsel with a list of names and alien registration numbers for the minors housed at that facility.  In all instances, in order to memorialize any visit to a minor by Plaintiffs' counsel, Plaintiffs' counsel must file a notice of appearance with the INS prior to any attorney-client meeting.  Plaintiffs' counsel may limit the notice of appearance to representation of the minor in connection with his placement or treatment during INS custody.  Plaintiffs' counsel must submit a copy of the notice of appearance by hand or by mail to the local INS juvenile coordinator and a copy by hand to the staff of the facility.

A minor may refuse to meet with Plaintiffs' counsel.  Further, the minor's parent or legal guardian may deny Plaintiffs' counsel permission to meet with the minor.

**(n) Visits to licensed facilities.**  In addition to the attorney-client visits, Plaintiffs' counsel may request access to a licensed program's facility (described in paragraph (h)) or to a medium-security facility or detention facility (described in paragraph (i)) in which a minor has been placed.  The district juvenile coordinator will convey the request to the facility's staff and coordinate the visit.  The rules and procedures to be followed in connection with such visits are set out in Exhibit 4 of the *Flores v. Reno* Settlement Agreement, unless Plaintiffs' counsel and the facility's staff agree otherwise.  In all visits to any facility, Plaintiffs' counsel and their associated experts must treat minors and staff with courtesy and dignity and must not disrupt the normal functioning of the facility.

6

EXHIBIT 3

CONTINGENCY PLAN

In the event of an emergency or influx that prevents the prompt placement of minors in licensed programs with which the Community Relations Service has contracted, INS policy is to make all reasonable efforts to place minors in programs licensed by an appropriate state agency as expeditiously as possible.  An "emergency" is an act or event, such as a natural disaster (e.g. earthquake, fire, hurricane), facility fire, civil disturbance, or medical emergency (e.g. a chicken pox epidemic among a group of minors) that prevents the prompt placement of minors in licensed facilities.  An "influx" is defined as any situation in which there are more than 130 minors in the custody of the INS who are eligible for placement in licensed programs.

1.  The Juvenile Coordinator will establish and maintain an Emergency Placement List of at least 80 beds at programs licensed by an appropriate state agency that are potentially available to accept emergency placements.  These 80 placements would supplement the 130 placements that the INS normally has available, and whenever possible, would meet all standards applicable to juvenile placements the INS normally uses.  The Juvenile Coordinator may consult with child welfare specialists, group home operators, and others in developing the List.  The Emergency Placement List will include the facility name; the number of beds potentially available at the facility; the name and telephone number of contact persons; the name and telephone number of contact persons for nights, holidays, and weekends if different; any restrictions on minors accepted (e.g. age);  and any special services that are available.

2.  The Juvenile Coordinator will maintain a list of minors affected by the emergency or influx, including (1) the minor's name, (2) date and country of birth, (3) date placed in INS custody, and (4)

1

place and date of current placement.

 3. Within one business day of the emergency or influx the Juvenile Coordinator or his or her designee will contact the programs on the Emergency Placement List to determine available placements. As soon as available placements are identified, the Juvenile Coordinator will advise appropriate INS staff of their availability. To the extent practicable, the INS will attempt to locate emergency placements in geographic areas where culturally and linguistically appropriate community services are available.

 4. In the event that the number of minors needing emergency placement exceeds the available appropriate placements on the Emergency Placement List, the Juvenile Coordinator will work with the Community Relations Service to locate additional placements through licensed programs, county social services departments, and foster family agencies.

 5. Each year the INS will reevaluate the number of regular placements needed for detained minors to determine whether the number of regular placements should be adjusted to accommodate an increased or decreased number of minors eligible for placement in licensed programs. However, any decision to increase the number of placements available shall be subject to the availability of INS resources. The Juvenile Coordinator shall promptly provide Plaintiffs' counsel with any reevaluation made by INS pursuant to this paragraph.

 6. The Juvenile Coordinator shall provide to Plaintiffs' counsel copies of the Emergency Placement List within six months after the court's final approval of the Settlement Agreement.

EXHIBIT 4

AGREEMENT CONCERNING FACILITY VISITS UNDER PARAGRAPH 33

The purpose of facility visits under paragraph 33 is to interview class members and staff and to observe conditions at the facility.  Visits under paragraph 33 shall be conducted in accordance with the generally applicable policies and procedures of the facility to the extent that those policies and procedures are consistent with this Exhibit.

Visits authorized under paragraph 33 shall be scheduled no less than seven (7) business days in advance.  The names, positions, credentials, and professional association (e.g., Center for Human Rights and Constitutional Law) of the visitors will be provided at that time.

All visits with class members shall take place during normal business hours.

No video recording equipment or cameras of any type shall be permitted.  Audio recording equipment shall be limited to hand-held tape recorders.

The number of visitors will not exceed six (6) or, in the case of a family foster home, four (4), including interpreters, in any instance.  Up to two (2) of the visitors may be non-attorney experts in juvenile justice and/or child welfare.

No visit will extend beyond three (3) hours per day in length.  Visits shall minimize disruption to the routine that minors and staff follow.

1

EXHIBIT 5

LIST OF ORGANIZATIONS TO RECEIVE INFORMATION RE: SETTLEMENT AGREEMENT

Eric Cohen, Immig. Legal Resource Center, 1663 Mission St. Suite 602, San Francisco, CA 94103

Cecilia Munoz, Nat'l Council Of La Raza, 810 1st St. NE  Suite 300, Washington, D.C. 20002

Susan Alva, Immig. & Citiz. Proj Director, Coalition For Humane Immig Rights of LA, 1521 Wilshire Blvd., Los Angeles, CA 90017

Angela Cornell, Albuquerque Border Cities Proj., Box 35895, Albuquerque, NM 87176-5895

Beth Persky, Executive Director, Centro De Asuntos Migratorios, 1446 Front Street, Suite 305, San Diego, CA 92101

Dan, Kesselbrenner, , National Lawyers Guild, National Immigration Project, 14 Beacon St.,#503, Boston, MA 02108

Lynn Marcus , SWRRP, 64 E. Broadway, Tucson, AZ 85701-1720

Maria Jimenez, , American Friends Service Cmte., ILEMP, 3522 Polk Street, Houston, TX 77003-4844

Wendy Young, , U.S. Cath. Conf., 3211 4th St. NE, , Washington, DC, 20017-1194

Miriam Hayward , International Institute Of The East Bay, 297 Lee Street , Oakland, CA 94610

Emily Goldfarb, , Coalition For Immigrant & Refugee Rights, 995 Market Street, Suite 1108 , San Francisco, CA 94103

Jose De La Paz, Director, California Immigrant Workers Association, 515 S. Shatto Place , Los Angeles, CA, 90020

Annie Wilson, LIRS, 390 Park Avenue South, First Asylum Concerns, New York, NY 10016

Stewart Kwoh, Asian Pacific American Legal Center, 1010 S. Flower St., Suite 302, Los Angeles, CA 90015

Warren Leiden, Executive Director, AILA, 1400 Eye St., N.W., Ste. 1200, Washington, DC, 20005

Frank Sharry, Nat'l Immig Ref & Citiz Forum, 220 I Street N.E., Ste. 220, Washington, D.C. 20002

Reynaldo Guerrero, Executive Director, Center For Immigrant's Rights, 48 St. Marks Place , New York, NY 10003

1

Charles Wheeler , National Immigration Law Center, 1102 S. Crenshaw Blvd., Suite 101  , Los Angeles, CA 90019

Deborah A. Sanders, Asylum & Ref. Rts Law Project, Washington Lawyers Comm., 1300 19th Street, N.W., Suite 500 , Washington, D.C. 20036

Stanley Mark, Asian American Legal Def.& Ed.Fund, 99 Hudson St, 12th Floor, New York, NY 10013

Sid Mohn, Executive Director, Travelers & Immigrants Aid, 327 S. LaSalle Street, Suite 1500, Chicago, IL, 60604

Bruce Goldstein, Attornet At Law, Farmworker Justice Fund, Inc., 2001 S Street, N.W., Suite 210, Washington, DC 20009

Ninfa Krueger, Director, BARCA, 1701 N. 8th Street, Suite B-28, McAllen, TX 78501

John Goldstein, , Proyecto San Pablo, PO Box 4596,, Yuma, AZ 85364

Valerie Hink, Attorney At Law, Tucson Ecumenical Legal Assistance, P.O. Box 3007 , Tucson, AZ 85702

Pamela Mohr, Executive Director, Alliance For Children's Rights, 3708 Wilshire Blvd. Suite 720, Los Angeles, CA 90010

Pamela Day, Child Welfare League Of America, 440 1st St. N.W., , Washington, DC 20001

Susan Lydon, Esq., Immigrant Legal Resource Center, 1663 Mission St. Ste 602, San Francisco, CA 94103

Patrick Maher, Juvenile Project, Centro De Asuntos Migratorios, 1446 Front Street, # 305, San Diego, CA 92101

Lorena Munoz, Staff Attorney, Legal Aid Foundation of LA-IRO, 1102 Crenshaw Blvd., Los Angeles, CA 90019

Christina Zawisza, Staff Attorney, Legal Services of Greater Miami, 225 N.E. 34th Street, Suite 300, Miami, FL 33137

Miriam Wright Edelman, Executive Director, Children's Defense Fund, 122 C Street N.W.  4th Floor, Washington, DC 20001

Rogelio Nunez, Executive Director, Proyecto Libertad, 113 N. First St., Harlingen, TX  78550

AR509

EXHIBIT 6
NOTICE OF RIGHT TO JUDICIAL REVIEW

"The INS usually houses persons under the age of 18 in an open setting, such as a foster or group home, and not in detention facilities.  If you believe that you have not been properly placed or that you have been treated improperly, you may ask a federal judge to review your case.  You may call a lawyer to help you do this.  If you cannot afford a lawyer, you may call one from the list of free legal services given to you with this form."

Case 2:85-cv-03640-KBD Document 85-3 Filed 04/27/20 Page 519 of 655 ID #:2674

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544 DMG (AGRx)** | Date | July 24, 2015 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | Page | 1 of 25 |
|---|---|---|---|

Present: The Honorable    DOLLY M. GEE, UNITED STATES DISTRICT JUDGE

| KANE TIEN | NOT REPORTED |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiff(s) | Attorneys Present for Defendant(s) |
|---|---|
| None Present | None Present |

## Proceedings: IN CHAMBERS—ORDER RE PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT OF CLASS ACTION AND DEFENDANTS' MOTION TO AMEND SETTLEMENT AGREEMENT [100, 120]

### I.
### INTRODUCTION

The original complaint in this action was filed on July 11, 1985. [Doc. # 1.] On January 28, 1997, the Court approved a class-wide settlement of this action pursuant to Fed. R. Civ. P. 23. (*See* Plaintiffs' First Set of Exhibits in Support of Motion to Enforce Settlement ("Ps' First Set"), Exh. 1 ("Agreement").)

Plaintiffs Jenny L. Flores and other class members filed a motion to enforce the Agreement on February 2, 2015.[1] [Doc. # 100.] On February 27, 2015, Defendants Jeh Johnson and the U.S. Department of Homeland Security ("DHS") and its subordinate entities, U.S. Immigration and Customs Enforcement ("ICE") and U.S. Customs and Border Protection ("CBP"), filed an opposition to Plaintiffs' motion.[2] [Doc. # 121.] On March 13, 2015, Plaintiffs filed a reply. [Doc. # 127.]

---

[1] According to the parties' 2001 Stipulation extending the Agreement, "[a]ll terms of this Agreement shall terminate 45 days following defendants' publication of final regulations implementing this Agreement." (*See* Ps' First Set, Exh. 3 ("Stipulation Extending Settlement of Class Action, December 7, 2001").) Because such regulations were never published, the Agreement is still in force.

[2] Defendants explain that the original Complaint named as Defendants Edwin Meese, Attorney General of the United States; Immigration and Naturalization Service ("INS"); Harold W. Ezell, Western Regional Commissioner, INS; Behavior Systems Southwest; and Corrections Corporation of America. The Agreement names as Defendants Attorney General Janet Reno, *et al.*, but does not indicate who the other Defendants were at the time. Under Fed. R. Civ. P. 25(d), Attorney General Loretta Lynch replaces Attorney General Reno as the named Defendant. In Plaintiffs' motion, Plaintiffs named Jeh Johnson, Secretary of Homeland Security, *et al.* Plaintiffs' counsel, however, confirmed that the intended Defendants are DHS and its subordinate entities, ICE and CBP. (Defendants' Motion to Amend at 1, n.1 [Doc. # 120].)

| **CIVIL MINUTES—GENERAL** |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544 DMG (AGRx)** | Date | July 24, 2015 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | | Page 2 of 25 |
|---|---|---|---|

On February 27, 2015, Defendants filed a motion to amend the Agreement. [Doc. # 120.] On March 6, 2015, Plaintiffs filed an opposition. [Doc. # 122.] On March 13, 2015, Defendants filed a reply. [Doc. # 126.]

A hearing on the motions was held on April 24, 2015.

Having duly considered the respective positions of the parties as presented in their briefs and at oral argument, the Court now renders its decision.

**II.**
**MOTION TO ENFORCE**

Beginning in the summer of 2014, in response to a "surge" of Central Americans arriving at the U.S.-Mexico border, ICE adopted a blanket policy to detain all female-headed families, including children, in secure,[3] unlicensed facilities for the duration of the proceedings that determine whether they are entitled to remain in the United States. (Mot. to Enforce at 2; *see* Ps' First Set, Exh. 9 ("U.S. Immigrations & Customs Enforcement, News Release, November 18, 2014"); Ps' First Set, Exh. 10 (Declaration of Bridget Cambria ("Cambria Decl.")) ¶¶ 3-5 ("Since June, ICE has begun detaining all Central American families without the possibility of release on bond, recognizance, supervision or parole if it believes that those families arrived in the United States as part of the 'surge' of unauthorized entrants—mostly children—that purportedly began in the summer of 2014.").)

Plaintiffs argue that this "no-release" policy violates the Agreement. More specifically, Plaintiffs challenge the following policies and practices: (1) ICE's no-release policy, which Plaintiffs argue breaches the Agreement's requirements that Defendants must minimize the detention of children and must consider releasing class members to available custodians in the order of preference specified in the Agreement; (2) ICE's practice of confining children in secure, unlicensed facilities; and (3) ICE's practice of exposing children in Border Patrol custody to "harsh, substandard" conditions and treatment. (Mot. to Enforce at 5-21.)

///
///
///
///

---

[3] "Secure" in this context refers to a detention facility where individuals are held in custody and are not free to leave. Conversely, "non-secure" facilities are those where individuals are not held in custody.

AR512

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544 DMG (AGRx)** | Date | July 24, 2015 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | | Page | 3 of 25 |
|---|---|---|---|---|

## A.    **Legal Standard**

This Court has the inherent power to enforce the terms of the Agreement because, with certain exceptions not relevant here, the Agreement "provides for the enforcement, in this District Court, of the provisions of this Agreement. . . ." (*See* Agreement ¶ 37; Ps' First Set, Exh. 2 ("Order Approving Settlement of Class Action, January 28, 1997").) *See also Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 380-81, 114 S. Ct. 1673, 128 L. Ed. 2d 391 (1994); *Dacanay v. Mendoza*, 573 F.2d 1075, 1078 (9th Cir. 1978). "[T]he construction and enforcement of settlement agreements are governed by principles of local law which apply to interpretation of contracts generally." *O'Neil v. Bunge Corp.*, 365 F.3d 820, 822 (9th Cir. 2004) (quoting *United Commercial Ins. Serv., Inc. v. Paymaster Corp.*, 962 F.2d 853, 856 (9th Cir. 1992)).

Moreover, the parties agree that the Agreement is a consent decree. "Consent decrees have the attributes of both contracts and judicial acts," and in interpreting consent decrees, courts use contract principles, specifically the contract law of the situs state. *Thompson v. Enomoto*, 915 F.2d 1383, 1388 (9th Cir. 1990). Under California law, a court must interpret a contract with the goal of giving effect to the mutual intention of the parties as it existed at the time of contracting. Cal. Civ. Code § 1636. "It is the outward expression of the agreement, rather than a party's unexpressed intention, which the court will enforce." *Winet v. Price*, 4 Cal. App. 4th 1159, 1166, 6 Cal. Rptr. 2d 554 (1992). Where the parties dispute the meaning of specific contract language, "the court must decide whether the language is 'reasonably susceptible' to the interpretations urged by the parties." *Badie v. Bank of Am.*, 67 Cal. App. 4th 779, 798, 79 Cal. Rptr. 2d 273 (1998). Where the contract is clear, the plain language of the contract governs. *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1264, 10 Cal. Rptr. 2d 538 (1998).

The Court must construe the contract as a whole, being sure "to give effect to every part, if reasonably practicable, each clause helping to interpret the other." *Pinel v. Aurora Loan Servs., LLC*, 814 F. Supp. 2d 930, 943 (N.D. Cal. 2011) (quoting Cal. Civ. Code § 1641) (internal quotation marks omitted). "Courts must interpret contractual language in a manner that gives force and effect to every provision, and not in a way that renders some clauses nugatory, inoperative or meaningless." *Id.* When necessary, a court can look to the subsequent conduct of the parties as evidence of their intent. *See Crestview Cemetery Assn. v. Dieden*, 54 Cal. 2d 744, 754, 8 Cal. Rptr. 427 (1960). Finally, "[i]n cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." Cal. Civ. Code § 1654.

///
///

---

AR513

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544 DMG (AGRx)** | Date | July 24, 2015 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | Page | 4 of 25 |
|---|---|---|---|

## B.    Discussion

### 1.    "Preference for Release" Provision

Plaintiffs argue that Defendants' no-release policy—*i.e.*, the policy of detaining all female-headed families, including children, for as long as it takes to determine whether they are entitled to remain in the United States—violates material provisions of the Agreement.

These provisions require ICE (1) to "release a minor from its custody without unnecessary delay" to a parent, a legal guardian, or other qualified adult custodian, except where the detention of the minor is required "either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others"; and (2) "[u]pon taking a minor into custody, . . . [to] make and record prompt and continuous efforts on its part toward family reunification and the release of the minor . . . ." (Agreement ¶¶ 14, 18.)

Plaintiffs contend that Defendants, by making no effort to locate custodians for minors who are apprehended with their mothers and by refusing to release these minors even when a qualified custodian is available, have not only breached the Agreement but also have unilaterally revised it to create an additional exception to release—for minors who have been apprehended as part of a female-headed family. *See Walnut Creek Pipe Distrib., Inc. v. Gates Rubber Co. Sales Div.*, 228 Cal. App. 2d 810, 816, 39 Cal. Rptr. 767 (1964) (courts should not imply additional terms, except in cases of "obvious necessity").

#### a.    The Agreement Encompasses Accompanied Minors

As a threshold matter, the parties dispute whether minors who are apprehended as part of a female-headed family are class members covered by the Agreement. The plain language of the Agreement clearly encompasses accompanied minors.    First and most importantly, the Agreement defines the class as the following: "*All minors* who are detained in the legal custody of the INS." (*See* Agreement ¶ 10 (emphasis added).) The Agreement defines a "minor" as "any person under the age of eighteen (18) years who is detained in the legal custody of the INS." (*See id.* ¶ 4.) Defendants argue in their brief that this definition should not be dispositive of who was intended to be in the class because the parties' purpose in defining "minor" in that manner was merely to distinguish the Agreement's definition of a minor from the INA's definition of a "child" as "an unmarried person under 21 years of age," 8 U.S.C. § 1101(b)(1). The language defining "minor" in the Agreement, however, is wholly unambiguous and Defendants have offered no reasonable alternative reading that would make it ambiguous.    As such, extrinsic evidence of intent is inadmissible, even if Defendants had proffered any, which they did not.

| CV-90 | **CIVIL MINUTES—GENERAL** | Initials of Deputy Clerk KT |
|---|---|---|

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544 DMG (AGRx)** | Date | July 24, 2015 |
|----------|---------------------------|------|---------------|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | Page | 5 of 25 |
|-------|--------------------------------------------------|------|---------|

The text of the Agreement provides further support for the finding that the Agreement encompasses all minors who are in custody, without qualification as to whether they are accompanied or unaccompanied. In Paragraph 9, for example, the parties describe the scope of the Agreement in the following way: "This Agreement sets out nationwide policy for the detention, release, and treatment of minors in the custody of the INS." In Paragraph 12A, the Agreement specifically acknowledges the possibility of accompanied minors when it notes that "[f]acilities will provide . . . contact with family members who were arrested with the minor." Moreover, the Agreement provides special guidelines with respect to unaccompanied minors in some situations—*e.g.*, Paragraph 12A ("The INS will segregate unaccompanied minors from unrelated adults. Where such segregation is not immediately possible, an unaccompanied minor will not be detained with an unrelated adult for more than 24 hours."), and Paragraph 25 ("Unaccompanied minors arrested or taken into custody by the INS should not be transported by the INS in vehicles with detained adults . . . ."). It would make little sense to write rules making special reference to unaccompanied minors if the parties intended the Agreement as a whole to be applicable only to unaccompanied minors. Finally, the Agreement expressly identifies those minors to whom the class definition would not apply—"an emancipated minor or an individual who has been incarcerated due to a conviction for a criminal offense as an adult" (*see* Agreement ¶ 4)—an exclusion that does not mention accompanied minors. Had the parties to the Agreement intended to exclude accompanied minors from the Agreement, they could have done so explicitly when they set forth the definition of minors who are excluded from the Agreement.

Defendants contend that the definition of a class member should be read narrowly to exclude accompanied minors because Plaintiffs' lawsuit originally challenged "the constitutionality of INS's policies, practices, and regulations regarding the detention and release of *unaccompanied* minors." (*See* Agreement at 3 (emphasis added); *see also* Order re Class Certification [Doc. # 142-1].) This argument is unavailing in light of the fact that a consent decree may benefit individuals who were not victims of a defendant's illegal practices and provide "broader relief than the court could have awarded after a trial." *Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 525, 106 S. Ct. 3063, 92 L. Ed. 2d 405 (1986). To the extent that Defendants are arguing that Plaintiffs' original intent in filing the lawsuit should inform the Court's understanding of what the parties meant when they defined the class in their Agreement, Defendants' argument is not sufficiently compelling to outweigh the plain language of the Agreement indicating the parties' intent to make "all minors," without qualification, part of the class.

Because the plain language of the Agreement is clear that accompanied minors are part of the class, the inquiry can end here. Nonetheless, the Court notes that other evidence supports its

| CV-90 | **CIVIL MINUTES—GENERAL** | Initials of Deputy Clerk KT |
|-------|---------------------------|------------------------------|

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544 DMG (AGRx)** | Date | July 24, 2015 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | Page | 6 of 25 |
|---|---|---|---|

interpretation of the Agreement. For example, the regulatory framework in place at the time the parties formed the Agreement further reinforces the Court's conclusion that the Agreement applies to all minors. Defendants' primary argument is that the "preference for release" provision should not be construed to apply to accompanied minors in family residential centers because the procedures and conditions of release, as discussed in Section VI of the Agreement, "clearly contemplate" that the parent or other individual to whom the child would be released would already be present in the interior of the United States. As discussed in greater detail *infra*, however, the Court finds strong evidence to the contrary. Furthermore, just because the Agreement does not explicitly provide for the release of parents and legal guardians or address the rights of adult detainees does not mean that the Agreement does not apply to accompanied minors. To the extent Defendants are asserting that releasing accompanying relatives would have been considered an unusual step at the time the Agreement was formed, the following regulation governing the release of detained minors in a narrower context, which was in place when the parties formed the Agreement and which is still in force, belies Defendants' assertion:

> (i)     Juveniles may be released to a relative (brother, sister, aunt, uncle, or grandparent) not in Service detention who is willing to sponsor a minor and the minor may be released to that relative *notwithstanding that the juvenile has a relative who is in detention*.
> (ii)    If a relative who is not in detention cannot be located to sponsor the minor, the minor may be released *with an accompanying relative* who is in detention.

8 C.F.R. § 212.5(a)(3) (1997) (emphasis added). Given the regulatory context in which the parties formed the Agreement, it is reasonable to infer that the parties contemplated the release of an accompanied minor together with a relative in detention.

Finally, at least one other district court has held, at the preliminary injunction stage, that the Agreement applies to all minors, including accompanied minors, even though it saw the preference for release provision as having limited utility in the context of family detention. *See Bunikyte, ex rel. Bunikiene v. Chertoff*, No. A-07-CA-164-SS, 2007 WL 1074070, at \*3 (W.D. Tex. Apr. 9, 2007) ("[T]he *Flores* Settlement, by its terms, applies to all 'minors in the custody' of ICE and DHS, not just unaccompanied minors."). The Court finds the reasoning in *Bunikyte* persuasive on this issue, and Defendants have not offered a reason why this case is distinguishable.

| CV-90 | **CIVIL MINUTES—GENERAL** | Initials of Deputy Clerk <u>KT</u> |
|---|---|---|

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544 DMG (AGRx)** | Date | July 24, 2015 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | | Page | 7 of 25 |
|---|---|---|---|---|

In light of the Agreement's clear and unambiguous language, which is bolstered by the regulatory framework in which the Agreement was formed and Defendants' past practice,[4] the Court finds that the Agreement applies to accompanied minors.

### b.    Defendants' No-Release Policy is a Material Breach of the Agreement

Even if the Agreement applies to accompanied minors, Defendants assert that ICE's no-release policy nonetheless complies with the Agreement. Defendants argue that, because separating a child from his or her parent endangers the minor's safety, its policy of detaining an

---

[4] Plaintiffs point out that Defendants' no-release policy unfairly penalizes women who are apprehended with children. According to Plaintiffs, until June 2014, Defendants exercised individualized discretion to release women who were statutorily eligible, such as bona fide asylum seekers, regardless of whether they were apprehended with their children. (*See* Ps' First Set, Exh. 17 (Declaration of Barbara Hines ("Hines Decl.")) ¶ 9; Cambria Decl. ¶ 2.) Furthermore, Defendants, even now, individually assess women apprehended *without* children and nearly all adult males to see whether detention is warranted. (*See* Hines Decl. ¶ 17.) Starting in June 2014, however, Defendants ceased exercising such individualized discretion for women who are apprehended *with* children. (*See* Hines Decl. ¶ 14.)

On May 13, 2015, Defendants lodged a press release announcing a series of changes with respect to the family residential centers. (Defendants' May 13, 2015 Press Release ("May 13, 2015 Press Release") [Doc. # 153-1].) These changes included a policy of reviewing the cases of any families detained beyond 90 days, and every 60 days thereafter, to evaluate whether detention or the designated bond amount continues to be appropriate during the pendency of their immigration case. On July 8, 2015, Defendants announced additional reforms, including "a plan to offer release with an appropriate monetary bond or other condition of release to families at residential centers who are successful in stating a case of credible or reasonable fear of persecution in their home countries." (Defendants' July 8, 2015 Press Release ("July 8, 2015 Press Release") [Doc. # 164-1].)

Defendants contend that these reforms should "affect the content and/or ultimate disposition of the Court's order such that the Court should rule in Defendants' favor on the pending motions." (Defendants' Notice of Objection to Premature Lodging of Amended Proposed Order ("Ds' Objection") [Doc. # 175].) This rather cryptic comment does not clarify Defendants' reasons for filing these press releases with the Court. If Defendants are trying to argue that the intervening reforms render the case moot, then Defendants are incorrect. *See Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014), *cert. denied sub nom. Rosebrock v. Hoffman*, 135 S. Ct. 1893 (2015) ("The voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed."). "A defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *McCormack v. Herzog*, 788 F.3d 1017, 1025 (9th Cir. 2015).

Merely issuing a press release announcing a change in policy from detaining all female-headed families to releasing those who have successfully stated a case of credible or reasonable fear of persecution does not satisfy Defendants' substantial burden of showing that it is "absolutely clear" that the violations of the Agreement could not reasonably be expected to recur. Even assuming Defendant's new policy complies with the Agreement, Defendants could easily revert to the former challenged policy as abruptly as they adopted the new one.

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544 DMG (AGRx)** | Date | July 24, 2015 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | | Page | 8 of 25 |
|---|---|---|---|---|

accompanied minor together with his or her parent, rather than releasing the minor to another individual, falls within the exception set forth in Paragraph 14 of the Agreement, which allows for continued detention "to ensure the minor's safety or that of others."

In their reply, Plaintiffs do not squarely address this argument. Plaintiffs do contend, however, that the Agreement's "preference for release" provision requires ICE to exercise its discretion to release the accompanying mothers, so long as they do not present a danger or flight risk. (*See* Agreement ¶ 14 ("[T]he INS shall release a minor from its custody without unnecessary delay, in the following order of preference, to: a parent . . . .").) If true, Plaintiffs' contention could resolve the issue Defendants identified—of potentially endangering the minor's safety by separating a minor from his or her parent—by releasing rather than detaining the parent and child together if no danger or flight risk is identified.

To determine whether the Agreement requires Defendants to release an accompanying parent, the Court examines the Agreement's text, Defendants' conduct subsequent to the formation of the Agreement, and the regulatory framework at the time the Agreement was formed and as it exists today. It is true that the Agreement does not contain any provision that explicitly addresses adult rights and treatment in detention. But ICE's blanket no-release policy with respect to mothers cannot be reconciled with the Agreement's grant to class members of a right to preferential release to a parent. (*See* Agreement ¶ 14.) Although Defendants argue that the provision could be read to mean a child should be released to a parent only if that parent is already lawfully in the United States, Paragraph 15 clearly contemplates the possible release of a child to an adult who is not lawfully in the United States:

> Before a minor is released from INS custody pursuant to Paragraph 14 above, the custodian must execute an Affidavit of support (Form I-134) and an agreement to . . . notify the INS at least five days prior to the custodian's departing the United States of such departure, whether the departure is voluntary or pursuant to *a grant of voluntary departure or order of deportation* . . . .

(Agreement ¶ 15 (emphasis added).) In light of the contract interpretation principle that a "written contract must be read as a whole and every part interpreted with reference to the whole," *Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1032 (9th Cir. 1989), this provision makes clear that the Agreement does not require that the parent to whom the child is released in Paragraph 14 must already be lawfully in the United States.

Defendants' conduct over the last two decades since the Agreement was signed also clarifies what the parties understood to be the meaning of the preference for release provision.

| CV-90 | **CIVIL MINUTES—GENERAL** | Initials of Deputy Clerk KT |
|---|---|---|

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544 DMG (AGRx)** | Date | July 24, 2015 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | | Page 9 of 25 |

*See Crestview Cemetery*, 54 Cal. 2d at 754 (when necessary, a court can look to the subsequent conduct of the parties as evidence of their intent). It is uncontroverted that, prior to June 2014, ICE generally released children and parents upon determining that they were neither a significant flight risk nor a danger to safety. (*See* Cambria Decl. ¶ 2; Ps' First Set, Exh. 11 (Declaration of Carol Ann Donohoe) ¶ 2.) Thus, ICE's conduct subsequent to the formation of the Agreement bolsters Plaintiffs' argument that the preference for release provision requires the release of the accompanying mother along with the child, so long as she does not present a significant flight risk or danger to safety.

Finally, the existing regulatory framework, discussed *supra*, suggests that the parties would have contemplated releasing an accompanying relative. Whereas the regulation provides for the release of an accompanying relative only if no other suitable relative can be found, the Agreement, under the preference for release provision, would presumably release the accompanying parent first. Despite this difference between the regulation and the preference for release provision in the Agreement, the regulation provides contextual support for Plaintiffs' contention that the parties intended to allow for the release of the accompanying parent, so long as the release does not create a flight risk or safety risk.

In light of all the evidence, the Court agrees with Plaintiffs' interpretation of the preference for release provision, described in Paragraph 14 of the Agreement. As such, Defendants must release an accompanying parent as long as doing so would not create a flight risk or a safety risk. Since releasing the parent along with the child in this case would, in most instances, obviate Defendants' concern that releasing the child alone would endanger the child's safety, Defendants' argument that this policy falls within the safety risk exception as a blanket matter is unavailing.[5] Therefore, the Court finds that Defendants' blanket no-release policy with respect to minors accompanied by their mothers is a material breach of the Agreement.

### c. **Defendants' Policy Argument In Favor of Detaining Children**

Defendants make a separate policy argument to justify detaining children who are accompanied by their mothers even though the Agreement requires otherwise. Defendants

---

[5] Neither side directly addresses the possibility that releasing the mother and child together might create a risk to safety of both mother and child, if neither has a place to stay within the United States. The parties also do not address the situation where the mother chooses to stay in the detention facility or has been deemed a flight or safety risk. As a practical matter, Defendants would be justified in detaining both mother and child in that case, but the examples presented in this case typically concern a mother and child who have relatives already residing in the United States who are willing to ensure their safety.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544 DMG (AGRx)** | Date | July 24, 2015 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | Page | 10 of 25 |
|---|---|---|---|

contend that release of accompanied children and their parents gives families a strong incentive to undertake the dangerous journey to this country. Defendants support this argument with the following observations of Border Patrol officer Kevin W. Oaks:

> [F]amily units apprehended by Border Patrol . . . claimed that a principal motive for entering the United States was to take advantage of the "permisos" that the United States was granting to family units. The term "permiso" in this context is used to refer to a Notice to Appear which permits aliens to depart the Border Patrol station without detention. . . .
>
> While this impression [that the U.S. government was planning to stop issuing 'permisos' in June or July 2014] was incorrect, it speaks to the understanding of the family units that detention, and the ability to simply depart a Border Patrol station, factor strongly into their determination on when and whether to cross into the United States. . . .
>
> Based on my experience as a Border Patrol Agent, the use of detention has historically been effective at deterring aliens (specifically aliens from countries other than Mexico) from entering the United States through the South Texas region. For example, in 1989 when there was a dramatic increase of Central American aliens illegally entering the United States, the former Immigration and Naturalization Service detailed staff to South Texas, opened temporary detention camps, and instituted a one-day expedited review of asylum applications, which dramatically reduced the average daily apprehensions of non-Mexicans along the Texas border. Similarly, in 2005 when the RGV Sector was experiencing an influx of Brazilian nationals, the implementation of expedited removal with detention quickly and significantly reduced the number of Brazilian nationals illegally entering the United States.
>
> Consistent with the information contained in paragraphs 26 and 27, Border Patrol apprehension statistics demonstrate that, year-over-year, there has been an approximate 16% reduction in family units apprehended in the RGV Border Patrol Sector. Moreover, from July 10, 2014 until the present, there has been an approximate 63% reduction in family units apprehended in the RGV Border Patrol Sector as compared to the period between December 1, 2013 to July 9, 2014.

(Declaration of Kevin W. Oaks ("Oaks Decl.") ¶¶ 25-29.)

| CV-90 | **CIVIL MINUTES—GENERAL** | Initials of Deputy Clerk <u>KT</u> |
|---|---|---|

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544 DMG (AGRx)** | Date | July 24, 2015 |
| --- | --- | --- | --- |

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | Page | 11 of 25 |
| --- | --- | --- | --- |

Setting to one side the question of whether this policy argument is relevant to interpreting the Agreement, the Court is unconvinced of the persuasive value of the statistical evidence Defendants proffer in support of this argument. Without discounting the value of Oaks' personal observations, the Court finds that the statistical evidence he cites, as presented in his declaration, is insufficient to establish causation between Defendants' current policy of detaining female-headed families in family detention centers and the decline in family units apprehended at the border. Oaks bases his conclusion on evidence that past actions taken by Defendant in 1989 and 2005 resulted in reductions in apprehensions. But even assuming the prior reductions in apprehensions were in fact caused by the actions Defendant took in 1989 and 2005 (which itself is not clearly established), those actions, which consisted of expedited review and removal, are notably different from the policy that is now being contested, of detaining minors accompanied by their mothers in family detention centers for the duration of their asylum proceedings. Thus, the helpfulness of the outcomes of measures taken by Defendants in 1989 and 2005 in assessing the effectiveness of Defendants' current family detention policy is minimal at best.

Moreover, although apprehensions of family units in his sector have declined 63% from an approximately six-month period immediately before the challenged policy took effect, Oaks also mentions that apprehensions of family units had been declining 16% year-over-year for an unspecified period of time. This statistic further calls into question whether and to what extent the decline in apprehensions of family units is attributable to Defendants' recent family detention policy, given that such apprehensions were already on the decline prior to the implementation of the policy in 2014.[6]

In sum, even assuming the dubious proposition that the Court can consider a policy argument to alter the terms of the Parties' Agreement, the Court is not persuaded by the evidence presented in support of Defendants' policy argument.[7]

---

[6] Further, at the hearing, Defendants mentioned that summer is the "high season" in border crossings. Defendants failed to account for how much of the 63% decline in family unit apprehensions from the prior six-month period could have been attributable to normal seasonal fluctuation. At the very least, Defendants could have provided family unit apprehension statistics by season from prior years so that the statistical significance of the 63% decline could be more readily determined.

[7] In the May 13, 2015 Press Release, ICE announced that, following a Washington, D.C. federal district court's injunction against invoking general deterrence in custody determinations, it "has presently determined that it will discontinue invoking general deterrence as a factor in custody determinations in all cases involving families." [Doc. # 153-1.] This announcement does not clarify, however, whether ICE has decided that it will no longer invoke general deterrence as an argument for amending the Agreement. In the absence of such clarification, the

AR521

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 85-4544 DMG (AGRx) | Date | July 24, 2015 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | Page | 12 of 25 |

## 2.    "Non-Secure, Licensed Facilities" Provision

Plaintiffs assert that Defendants have materially breached the Agreement because they are obligated, but have failed, to house the children they do *not* release in non-secure facilities that are licensed to care for dependent children. (Mot. to Enforce at 2-3; *see* Ps' First Set, Exh. 23 (Declaration of Carlos Holguín ("Holguín Decl.")) ¶¶ 4-5; Ps' First Set, Exh. 16 ("Affidavit of Adriana Piñon") (confirming that the Karnes Family Residential Center, in Karnes City, Texas, and the T. Don Hutto Residential Center, in Taylor, Texas, are not licensed by the state's Department of Family and Protective Services).)

The Agreement provides the following: "In any case in which the INS does not release a minor pursuant to Paragraph 14, . . . [e]xcept as provided in Paragraphs 12 or 21, such minor shall be placed temporarily in a licensed program . . . ." (Agreement ¶ 19.) A "licensed program" is defined as a "program, agency or organization that is licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children . . . ." (*Id.* ¶ 6.) The Agreement further requires that '[a]ll homes and facilities operated by licensed programs . . . shall be non-secure as required under state law . . . ." (*Id.* ¶ 23.) Thus, according to the language of the Agreement, Defendants must house children who are not released in a non-secure facility that is licensed by an appropriate state agency to care for dependent children.

Defendants argue that the licensing provision cannot be interpreted to apply to family residential centers because (1) these centers did not exist at the time the agreement was formed, and (2) there is no state licensing process available now—nor was there in 1997—for facilities that hold children in custody along with their parents or guardians.    Defendants reason backwards. Rather than considering whether the policy Defendants decided to enact in 2014 was contemplated by the parties to the Agreement in 1997, the Court's task is to examine whether Defendants' actions in 2014 satisfy the obligations set forth in the 1997 Agreement. Under the Agreement, Defendants are required to provide children who are not released temporary placement in a licensed program. The fact that the family residential centers cannot be licensed

Court proceeds on the assumption that general deterrence continues to be Defendants' primary policy justification for their detention of accompanied minors.

Alternatively, if Defendants mean they are no longer invoking general deterrence as a reason to amend the Agreement as well, this change would only strengthen the Court's finding, discussed *infra*, that no change in factual circumstances warrants modification of the Agreement. The primary, if not *only*, justification that Defendants presented for detaining female-headed families was the supposed deterrent effect that such a measure would have on prospective entrants. If Defendants have indeed abandoned this rationale for family detention, then Defendants have no other basis—at least, none that they have presented to this Court—for detaining female-headed families.

| CV-90 | **CIVIL MINUTES—GENERAL** | Initials of Deputy Clerk KT |
|---|---|---|

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544 DMG (AGRx)** | Date | July 24, 2015 |

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | | Page | 13 of 25 |

by an appropriate state agency simply means that, under the Agreement, class members cannot be housed in these facilities except as permitted by the Agreement.[8]

Furthermore, Defendants contend that even if they are not following the letter of the law, they are following the spirit. Defendants argue that ICE family residential facilities substantially comply with the requirements of the Agreement despite the absence of licensing. *See Jeff D. v. Otter*, 643 F.3d 278, 283-84 (9th Cir. 2011) ("Because consent decrees have many of the attributes of ordinary contracts [and] . . . should be construed basically as contracts, the doctrine of substantial compliance, or substantial performance, may be employed.") (internal citation and quotation marks omitted).

According to Defendants, ICE family residential centers comply with ICE Family Residential Standards (available at http://www.ice.gov/detention-standards/family-residential), which were developed with input from medical, psychological, and educational experts, as well as civil rights organizations. These centers, according to Defendants, afford detainees many amenities, including meals, medical and dental services, recreational opportunities, and education for school-age children.[9]

---

[8] Defendants concede that the logical outcome of applying the licensing provision to family residential centers would be to make it impossible for ICE to house families at the family residential centers. Defendants also contend that it would have to mean separating accompanied children from their parents or legal guardians. Although the Agreement does not mandate that Defendants must release parents or legal guardians in all circumstances, Defendants certainly can and must make individualized determinations about whether releasing the parent is appropriate in a given situation. Defendants can also use the family residential centers as temporary facilities consistent with Paragraph 12A of the Agreement.

[9] Chief of Juvenile and Family Residential Management Unit ("JFRMU") Stephen M. Antokowiak attests to the conditions described below at the Karnes Family Residential Center ("KFRC"), in Karnes, Texas, which opened on July 31, 2014 and has 532 beds, and the South Texas Family Residential Center ("STFRC"), in Dilley, Texas, which opened on December 18, 2014 and has 480 beds. (*See* Declaration of Stephen M. Antkowiak ("Antkowiak Decl.") ¶¶ 5, 18.)

Upon arrival at the KFRC, families are brought into the intake room, where there is seating and a refrigerator stocked with beverages and snacks. (*See* Antkowiak Decl. ¶ 6, Exh. 2 ("Photograph of KFRC Intake Room").) Families may then select their own non-institutional clothing from a clothing storage room or wear the clothing they brought with them. (*See* Antkowiak Decl. ¶ 7, Exh. 2 ("Photograph of KFRC Clothing Storage Room").) For every two KFRC housing suites, each of which contains six beds to accommodate one or more families, there is an indoor day room, which features a flat-screen television, access to telephones, a refrigerator with snacks and beverages, and playpens and toys. (*See* Antkowiak Decl. ¶ 8, Exh. 4 ("Photograph of a KFRC Sleeping Area of Housing Suite"); Antkowiak Decl. ¶ 9, Exh. 5 ("Photograph of a KFRC Day Room").) Meanwhile, a typical STFRC housing unit consists of two bedrooms of four beds each, which can accommodate one or more families. (*See* Antkowiak Decl. ¶ 17, Exh. 16, 17 ("Photographs of STFRC Bedroom Areas of a Housing Unit").) Each housing unit has a family room featuring a sitting area, a flat-screen television, a telephone, and a kitchenette

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544 DMG (AGRx)** | Date | July 24, 2015 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | | Page | 14 of 25 |
|---|---|---|---|---|

With evidence in the form of declarations, Plaintiffs contradict aspects of Defendants' rosy account of the conditions in the centers and contend that they are not acceptable. (*See, e.g.*, Ps' First Set, Exh. 12 ("J_H_M Decl.") ¶¶ 10, 11 ("There are no classes for my children here; we are told they will start the 29th of this month. . . . We are not permitted visits with our family members."); Ps' First Set, Exh. 14 ("M_F_S Decl.") ¶ 9 ("My two sons have both been ill since we arrived in Artesia. They had fever and coughs for about a week, and were also vomiting and diarrhea [sic]. . . . The doctor told me they didn't have medicine for them and that they should just drink water. More recently medicine arrived, and now both are getting better.").

Assuming the conditions are acceptable or even outstanding, however, Defendants cannot be in substantial compliance with the Agreement because the facilities are secure and non-licensed. The purpose of the licensing provision is to provide class members the essential protection of regular and comprehensive oversight by an independent child welfare agency. Defendants agree with Plaintiffs that oversight was the animating concern behind the licensing provision. Defendants respond that the facilities are subject to inspections by the ICE Office of Professional Responsibility's Office of Detention Oversight and an independent compliance inspector. (*See* Declaration of Tae D. Johnson ("Johnson Decl.") ¶ 19.) Furthermore, Defendants have filed a motion to modify the Agreement to allow for Plaintiffs to have oversight regarding compliance. Nonetheless, Defendants' responses do not satisfy the Agreement's unambiguous mandate to place children it does not release in "a program, agency or organization that is licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children." (Agreement ¶ 6.)

---

with a refrigerator that is re-stocked with beverages and snacks twice a day. (*See* Antkowiak Decl. ¶ 18, Exh. 18, 19 ("Photographs of an STFRC Family Room of a Housing Unit").)

The centers also contain open recreational areas for sports and play areas for younger children. (*See* Antkowiak Decl. ¶ 10, Exh. 6, 7 ("Photographs of the KFRC Soccer Field and Play Area"); Antkowiak Decl. ¶ 19, Exh. 20 ("Photograph of STFRC Recreational Areas").) In addition, the centers provide state-licensed teachers to all school-age children, where the classroom ratio is one teacher to 20 students, and both recreational and law library services to residents. (*See* Antkowiak Decl. ¶ 11, Exh. 8 ("Photograph of a KFRC Classroom"); Antkowiak Decl. ¶ 12, Exh. 9 ("Photograph of KFRC's Recreational Library with Play Areas"); Antkowiak Decl. ¶ 20, Exh. 21, 22, 23, 24 ("Photographs of STFRC Classrooms"); Antkowiak Decl. ¶ 22, Exh. 27, 28 ("Photographs of STFRC's Recreational and Law Libraries").) Residents have access to medical, dental, and social services. (*See* Antkowiak Decl. ¶ 13, Exh. 10, 11 ("Photographs of KFRC Dental Examining Rooms"); Antkowiak Decl. ¶ 24, Exh. 32, 33 ("Photographs of STFRC Medical Examining/Treatment Rooms").) Finally, the centers also serve three dietician-approved meals a day. (*See* Antkowiak Decl. ¶ 14, Exh. 12, 13 ("Photographs of KFRC's Salad Bar and Snack Refrigerator"); Antkowiak Decl. ¶ 23, Exh. 29, 30, 31 ("Photographs of STFRC's Dining Room and Food Service").)

---

AR524

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544 DMG (AGRx)** | Date | July 24, 2015 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | | Page | 15 of 25 |
|---|---|---|---|---|

Moreover, even if the Court disregards the conditions in, and the unlicensed status of, the facilities, the facilities are secure, which violates the Agreement's requirement that "[a]ll homes and facilities operated by licensed programs . . . shall be non-secure as required under state law . . . ." (Agreement ¶ 23.) Plaintiffs proffer evidence showing that ICE's detention facilities are secure.

The Karnes City facility is a large block building, which appeared to have only one entrance. To enter, my colleagues and I were required to deposit our cell phones in a metal locker, exchange our driver's licenses for visitor's badges, pass our personal items through an X-ray machine, and walk through a metal detector. We were then directed to a sally port, which comprised two heavy metal doors with a small room between. We passed through one door, it closed behind us; we were then directed to display our visitor's badges to a guard behind heavy glass; the second door was opened, we walked through, and we then reached the interior of the facility.

The Karnes facility is constructed of concrete block. A staff member stated the facility had been designed to house adult male prisoners. . . . In the central open area I saw neither a direct view nor access to the outside: it was effectively surrounded by the high block walls of the facility itself, denying those inside any means of ingress or egress except via the secure entrance I earlier described. Facility staff stated that children detained at Karnes have never been permitted outside the facility to go to the park, library, museum, or other public places. Children attend school exclusively within the walls of the facility itself. Detainees, including children, are required to participate in a "census" or head-count three times daily.

(Holguín Decl. ¶¶ 4-5.)

Defendants do not dispute that the facilities are secure. Nor have Defendants argued that this provision is not a material term in the Agreement. Plaintiffs present evidence that secure confinement can inflict long-lasting psychological, developmental, and physical harm on children regardless of other conditions. (*See* Ps' First Set, Exh. 24 (Declaration of Luis H. Zayas ("Zayas Decl.")) ¶¶ 1-6.) Plaintiffs also proffer evidence that the children at KFRC specifically "are suffering emotional and other harms as a result of being detained." (*Id.* ¶ 10.)

Because the centers are secure, unlicensed facilities, and the provision is a material term in the Agreement, Defendants cannot be deemed in substantial compliance with the Agreement.

| CV-90 | **CIVIL MINUTES—GENERAL** | Initials of Deputy Clerk KT |
|---|---|---|

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544 DMG (AGRx)** | Date | July 24, 2015 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | Page | 16 of 25 |
|---|---|---|---|

Thus, Defendants have materially breached the Agreement's requirement that children who are not released be housed in non-secure, licensed facilities.

### 3. **"Custody" Provision**

Upon apprehension, class members are taken to a Border Patrol station, where they spend one to several nights in holding cells before they are turned over to the Office of Refugee Resettlement, if unaccompanied, or to ICE for longer-term housing, if accompanied. *See* 6 U.S.C. § 279. Plaintiffs argue that Defendants have materially breached the Agreement by holding recently apprehended children in facilities that do not comply with the following provision:

> Following arrest, the INS shall hold minors in facilities that are safe and sanitary and that are consistent with the INS's concern for the particular vulnerability of minors. Facilities will provide access to toilets and sinks, drinking water and food as appropriate, medical assistance if the minor is in need of emergency services, adequate temperature control and ventilation; . . . .

(Agreement ¶ 12.)

Plaintiffs proffer evidence, in the form of numerous declarations from recent detainees, testifying to conditions that do not meet the "safe and sanitary" standard described in Paragraph 12 of the Agreement. These conditions include extreme cold. Numerous declarants referred to CBP facilities as *hieleras* or "iceboxes" and described being given coverings of aluminum foil that were inadequate to keep them warm. (*See, e.g.*, Ps' First Set, Exh. 18 ("D_V_A Decl.") ¶ 4 ("We were given nothing to keep warm except a cover of aluminum foil"); Ps' First Set, Exh. 44 ("A_F_D Decl.") ¶ 5 ("The very big room was very cold. It was like a 'hielera' (ice box). . . . There were no blankets or mattresses, and they only gave us one aluminum blanket each to keep ourselves warm. It was not enough, and my daughter and I were both very cold."); Ps' First Set, Exh. 45 ("H_M_P Decl.") ¶ 8 ("When I was in the 'Perrera,' I was with 8 moms, with their small babies. We were given a small mattress and an aluminum blanket. . . . It was also super cold in that place . . . .").)

Recent detainees also testified to overcrowding. Children and their mothers were held for one to three days in rooms with 100 or more unrelated adults and children, which forced children to sleep standing up or not at all. (*See, e.g.*, D_V_A Decl. ¶ 4 ("The Border Patrol put us in a cell with 100 other women and children. There were so many of us that only perhaps half of us could lie down."); A_F_D Decl. ¶ 5 ("There were about one hundred and fifty people in the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544 DMG (AGRx)** | Date | July 24, 2015 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | | Page | 17 of 25 |
|---|---|---|---|---|

room. It was very crowded, and there was no space to even lie down on the floor. . . . My daughter and I had to sleep standing up.").)

Inadequate nutrition and hygiene were also reported. (*See, e.g.*, D_V_A Decl. ¶ 5 ("The cell had only two toilets for all of us to use. . . . There was no waste basket in the stalls, so people had to throw used Kotex and used toilet paper on the floors."); Ps' First Set, Exh. 49 ("L_B_S Decl.") ¶ 6 ("In the jail in McAllen . . . [t]he moms slept there in the bathroom, with their babies in their arms. . . . The immigration officials, when the people asked for something to drink or to eat they answered that it wasn't their country, it wasn't their house. So they didn't bring them anything."); Ps' First Set, Exh. 39 ("S_B_D Decl.") ¶ 5 ("We were fed twice, and both times it was just bread with ham and a juice box.").)

In response, Defendants contend that given the volume of individuals passing through a Border Patrol station each day as well as the short duration of their stay at a Border Patrol station, it would be impossible to provide the same level of care at a Border Patrol station as one would expect at a longer-term facility. Nevertheless, Defendants argue that they have met the minimal standards set forth in the Agreement. Defendants rely solely on their Hold Rooms and Short Term Custody Policy and Oaks' declaration to support the proposition that they have met the appropriate standards.

According to Oaks, after an individual has been brought to a Border Patrol station, the individual undergoes a preliminary health screening. (*See* Oaks Decl. ¶ 10.) If the individual displays any symptoms of illness or complains of illness, the individual is either treated by a contract medical provider at the facility or taken to the appropriate medical facility, such as the local emergency department. (*Id.* ¶¶ 10, 11.) After the health screening, the detainees are separated by age and gender, although "every effort is made to keep young children with their parents." (*Id.* ¶ 12.) Border Patrol policy mandates that each facility be kept "safe, secure, and clean with sufficient space and the appropriate number of toilets for the occupants it is designed to accommodate." (*Id.* ¶ 13.) A hold room is typically constructed of "impervious materials that can be easily cleaned and are hygienic," and "supervisors are required to ensure that each cell is regularly cleaned and sanitized." (*Id.* ¶ 15.) There are no trash cans in the hold rooms for safety reasons, as they may be used as a weapon. (*Id.* ¶ 16.) Similarly, the lights are kept on at all times for security reasons and operational necessity. (*Id.* ¶ 19.) According to Defendants, the temperature is maintained at a "comfortable temperature," although "those who are not accustomed to air conditioning at times find it cooler than they are accustomed to." (*Id.* ¶ 20.) Defendants also explain that the use of mylar blankets is necessary in order to provide cost-effective, sanitary bedding that does not require routine laundering or transmit communicable diseases such as lice or scabies. (*Id.* ¶ 21.)

| CV-90 | **CIVIL MINUTES—GENERAL** | Initials of Deputy Clerk KT |
|---|---|---|

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544 DMG (AGRx)** | Date | July 24, 2015 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | | Page | 18 of 25 |
|---|---|---|---|---|

The testimony of one Border Patrol official regarding CBP's policies is insufficient to outweigh the evidence presented by Plaintiffs of the widespread and deplorable conditions in the holding cells of the Border Patrol stations. It is true that the Agreement holds Defendants to a lower standard—"safe and sanitary"—with respect to the temporary holding cells. But Defendants have wholly failed to meet even that minimal standard. With respect to the overcrowded and unhygienic conditions of the holding cells, all that Defendants have done is point to their own policies requiring sufficient space, an appropriate number of toilets, and regular cleaning and sanitizing. The mere existence of those policies tells the Court nothing about whether those policies are actually implemented, and the current record shows quite clearly that they were not. Furthermore, with respect to the temperature of the cells, the provision of mylar coverings, the absence of trash cans, and the policy of keeping the lights on at all times, Defendants have only confirmed the veracity of Plaintiffs' testimony in the course of attempting to justify these conditions. Finally, Defendants have said nothing to contradict Plaintiffs' accounts of inadequate nutrition, nor to offer impossibility or similar doctrines as a defense to the apparent contractual violation.

In light of the voluminous evidence that Plaintiffs have presented of the egregious conditions of the holding cells, the Court finds that Defendants have materially breached the Agreement's term that Defendants provide "safe and sanitary" holding cells for class members while they are in temporary custody.

### III.
### MOTION TO AMEND

Because the Court has found Defendants in material breach of the Agreement in the respects described *supra*, Defendants move to modify the Agreement pursuant to Fed. R. Civ. P. 60(b)(5) and (6).

Defendants seek to modify the Agreement in four ways. First, Defendants seek to eliminate or amend portions of the Agreement that have been superseded by, or are inconsistent with, the HSA and the TVPRA. Defendants ask that the Agreement reflect the changed responsibilities of DHS and HHS, and the abolishment of the INS, following the HSA and the TVPRA. In particular, Defendants seek to amend Section VI of the Agreement relating to the "General Policy Favoring Release," which provides:

Where the INS determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or immigration court, or to

| CV-90 | **CIVIL MINUTES—GENERAL** | Initials of Deputy Clerk KT |
|---|---|---|

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544 DMG (AGRx)** | Date | July 24, 2015 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | | Page | 19 of 25 |
|---|---|---|---|---|

ensure the minor's safety or that of others, the INS shall release a minor from its custody without unnecessary delay, in the following order of preference, to: A. a parent; B. a legal guardian; C. an adult relative (brother, sister, aunt, uncle, or grandparent) . . . .

(Agreement ¶ 14.) Defendants argue that "significant portions of this paragraph have been substantially superseded by the TVPRA," and to the extent the Agreement is inconsistent with the statute it should be modified.

Second, Defendants would like clarification that the preference for release of alien minors to a parent, legal guardian, or adult relative, does not apply to minors who arrive in the United States accompanied by a parent or legal guardian. Defendants argue that, if the provision is enforced as written, ICE would be required to separate families if it wishes to detain an adult alien accompanied by a child. This outcome would negatively impact ICE's ability to exercise its discretion to detain individuals as necessary and as it is authorized to do under the INA. The enforcement of the provision would also hamper Defendants' ability to operate the family residential facilities, which in turn would deprive Defendants of a tool in sending a message to families that they cannot illegally cross the border.

Third, Defendants would like to make clear that the state licensing requirement for housing minors does not apply to family residential facilities. Defendants reason that, because state licensing requirements cannot be applied to the facilities, the licensing requirement should be eliminated. Defendants have instead proposed that ICE be bound by the requirements in Attachment 1 with respect to the conditions at these facilities, as well as independent monitoring and reporting requirements to ensure compliance.

Fourth, Defendants seek to amend ongoing reporting requirements to eliminate the reporting requirements that applied to the implementation of the original Agreement in 1997 and to add reporting requirements related to the inspection of family residential facilities.

## A.   Legal Standard

A court may, on "motion and just terms," "relieve a party or its legal representative from a final judgment, order, or proceeding" if "applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5); *see Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383, 112 S. Ct. 748, 116 L. Ed. 2d 867 (1992) ("Rule 60(b)(5) provides that a party may obtain relief from a court order when it is no longer equitable that the judgment should have prospective application, not

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544 DMG (AGRx)** | Date | July 24, 2015 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | | Page | 20 of 25 |
|---|---|---|---|---|

when it is no longer convenient to live with the terms of a consent decree.") (internal quotation marks omitted).

"[The] party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree." *Id.* "A party seeking modification of a consent decree may meet its initial burden by showing either a significant change either in factual conditions or in law." *Id.* The change in the law must be so significant that complying with both statute and a prior agreement would be "impermissible." *Miller v. French*, 530 U.S. 327, 347-48, 120 S. Ct. 2246, 147 L. Ed. 2d 326 (2000) (internal quotation marks omitted). Modification of a consent decree may also be appropriate when changed factual conditions make compliance with the decree "substantially more onerous," "unworkable because of unforeseen obstacles," or "when enforcement . . . without modification would be detrimental to the public interest." *Rufo*, 502 U.S. at 383.

A court may also "relieve a party or its legal representative from a final judgment, order, or proceeding" for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). "Rule 60(b)(6) has been used sparingly as an equitable remedy to prevent manifest injustice." *United States v. Alpine Land & Reservoir Co.*, 984 F.2d 1047, 1049 (9th Cir. 1993). "The rule is to be utilized only where extraordinary circumstances prevented a party from taking timely action to prevent or correct an erroneous judgment." *Id.* (citing, as an example, an instance where the rule was used to set aside a default judgment in a denaturalization proceeding because the petitioner had been ill, incarcerated, and without counsel for the four years following the judgment).

## B. Discussion

Defendants assert that two changes—one in the law and the other in factual conditions—justify modification of the Agreement.

### 1. There Has Been No Change in Law Warranting Modification

First, with respect to changes in the law, Defendants contend that the Agreement applied only to the U.S. Department of Justice ("DOJ") and the legacy U.S. Immigration and Nationality Service ("INS"). The Homeland Security Act of 2002 ("HSA") abolished the latter agency and transferred several of its functions related to the detention, transportation, and removal of minors to the newly formed DHS and its components, including CBP and ICE.[10] Plaintiffs argue that

---

[10] Defendants mention that HSA transferred INS's functions with respect to unaccompanied minors to Health and Human Services ("HHS"), Office of Refugee Resettlement. *See* 6 U.S.C. §§ 279, 552. The William

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544 DMG (AGRx)** | Date | July 24, 2015 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | Page | 21 of 25 |
|---|---|---|---|

there are no actual conflicts between the Agreement and subsequent legislation. In fact, under HSA § 1512, *codified at* 6 U.S.C. § 552, Congress, in the following provisions, directed that ICE should remain bound by agreements existing before the enactment of the HSA:

> (a)(1) Completed administrative actions of an agency *shall not be affected by the enactment of this Act* or the transfer of such agency to the Department, but shall continue in effect according to their terms . . . .
>
> (2) For purposes of paragraph (1), the term "completed administrative action" includes . . . *agreements*, [and] *contracts* . . . .
>
> (c) PENDING CIVIL ACTIONS.—Subject to the authority of the Secretary under this Act, pending civil actions shall continue notwithstanding the enactment of this Act or the transfer of an agency to the Department, and in such civil actions, . . . *judgments [shall be] enforced in the same manner and with the same effect as if such enactment or transfer had not occurred.*

*Id.* (emphasis added).

Furthermore, Defendants have proffered no evidence that they have experienced any difficulty implementing the Agreement with respect to unaccompanied children and children apprehended with their fathers in the 13 years since the HSA was passed. In light of the HSA's savings clause and Defendants' practice with respect to minors for the last 13 years since the enactment of the HSA, Defendants' argument that the change in the law created by the HSA compels modification of the Agreement falls flat.

Defendants also allege that a second change in the law, the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), Pub. L. No. 110-457, § 235 (codified in principal part at 8 U.S.C. § 1232), conflicts with the Agreement and is reason to modify the Agreement. The TVPRA requires CBP to determine whether the child is a national or habitual resident of a country contiguous to the United States, and if so, to screen the child to see if she is a victim of trafficking, fears return because of a credible fear of persecution, or is otherwise unable to consent to return. 8 U.S.C. § 1232(a)(2)(A). If none of those factors are present, the child is offered an opportunity to withdraw his application for admission to the United States and return to his country. 8 U.S.C. § 1232(a)(2)(B). When the necessary

---

Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), Pub. L. No. 110-457, § 235 (codified in principal part at 8 U.S.C. § 1232), also directed DHS to develop policies and procedures to ensure that unaccompanied minors are safely repatriated to their country of nationality or of last habitual residence. Because this action concerns Defendants' policy regarding minors who are accompanied by their mothers, these changes with respect to unaccompanied minors do not appear relevant to the Court's analysis.

---

| CV-90 | **CIVIL MINUTES—GENERAL** | Initials of Deputy Clerk KT |
|---|---|---|

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544 DMG (AGRx)** | Date | July 24, 2015 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | Page | 22 of 25 |
|---|---|---|---|

screening determination cannot be made within 48 hours of the child's apprehension, or the child does not or cannot voluntarily withdraw her application for admission, or the child is from a non-contiguous country, the child is transferred to HHS within 72 hours of determining that the child is an unaccompanied minor and may be placed in removal proceedings before an immigration judge. 8 U.S.C. §§ 1232(a)(4), (a)(5)(D), (b)(3). HHS must then place the child "in the least restrictive setting that is in the best interest of the child," taking into consideration "danger to self, danger to the community, and risk of flight." 8 U.S.C. § 1232(c)(2). Accompanied minors do not fall under the provisions of the TVPRA. *See* 6 U.S.C. § 279(g)(2); 8 U.S.C. § 1232.

Defendants argue that because CBP, under the TVPRA, may not release an unaccompanied minor from its custody other than by returning her to her home country if she is from a contiguous country, 8 U.S.C. § 1232(a)(2)(B), or by transferring her to HHS custody within 72 hours of determining that she is an unaccompanied minor, 8 U.S.C. § 1232(b)(3), Defendants cannot comply with (1) Paragraph 14 of the Agreement, which requires release of minors following a certain order of preference; (2) Paragraph 12A of the Agreement, which provides the government up to 3 days to transfer an unaccompanied minor to a licensed program in the same district, and up to 5 days to transfer an unaccompanied minor to a licensed facility outside the area; and (3) Paragraph 21 of the Agreement, which provides that a minor may be transferred to a suitable state or county juvenile detention facility (or secure INS facility) under certain conditions.

Defendants' argument regarding the TVPRA misses the mark since the Agreement's provision controls release *pending removal proceedings* and does not interfere with the grounds for removal itself. Further, the Agreement does not interfere with the TVPRA's requirement that CBP transfer a minor to HHS custody within 72 hours of determining that she is an unaccompanied minor. Once CBP makes the determination that a minor is unaccompanied and transfers her to HHS custody, it is then HHS's responsibility to comply with the provisions cited *supra*. Defendants have not demonstrated that HHS has had any difficulty complying with the Agreement's provisions.

Moreover, Plaintiffs have pointed to provisions in the TVPRA that are consistent with the Agreement's preference for release provision, such as the TVPRA's requirement that CBP find "[s]afe and secure placements" for children "in the least restrictive setting that is in the best interests of the child"—typically, "a suitable family member." 8 U.S.C. § 1235(c)(2). The same argument can be made that, similar to the Agreement's non-secure facilities provision, the TVPRA also mandates that "[a] child shall not be placed in a secure facility absent a determination that the child poses a danger to self or others or has been charged with having committed a criminal offense." *Id.*

| CV-90 | **CIVIL MINUTES—GENERAL** | Initials of Deputy Clerk KT |
|---|---|---|

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544 DMG (AGRx)** | Date | July 24, 2015 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | Page | 23 of 25 |
|---|---|---|---|

Finally, the TVPRA is simply inapplicable to accompanied children. The fact that the TVPRA requires HHS to decide whether unaccompanied children should be released or housed in secure facilities has little relevance to whether ICE is unable to do the same with accompanied children.

Accordingly, Defendants have not met their burden of showing that a significant change in the law, such that complying with the Agreement would be impermissible, has occurred, thus requiring modification of the Agreement. *See Miller*, 530 U.S. at 347-48.

### 2.      There is No Change in Factual Circumstances Warranting Modification

With respect to changed factual conditions, Defendants note that, unlike in 1993, when an influx of approximately 8,500 children was considered a "serious" problem, *Reno v. Flores*, 507 U.S. 292, 295 (1993), the number of unaccompanied and accompanied children has increased. In fiscal year 2014, the number of accompanied children apprehended was 38,845 and the number of unaccompanied minors apprehended reached 68,541. (Mot. to Amend at 5.) Defendants contend that the surge is due to the mistaken belief that the release of detained individuals with a Notice to Appear is equivalent to a *permiso*, allowing them to stay in the United States. Defendants also appear to assert not only that the Agreement caused the surge but also that their female-headed family detention policy has deterred others who would have come. Defendants are effectively proposing that the Court unilaterally modify the Agreement because enforcement of the Agreement without modification would be detrimental to the public interest. *See Rufo*, 502 U.S. at 383.

The Court agrees that what Defendants describe is a serious problem, even though it appears the problem has abated somewhat. With respect to whether the Agreement's provisions caused the surge, Defendants do not satisfactorily explain why the Agreement, after being in effect since 1997, should only now encourage others to enter the United States without authorization. Nor do Defendants proffer *any* competent evidence that ICE's detention of a subset of class members in secure, unlicensed facilities has deterred or will deter others from attempting to enter the United States. As discussed *supra*, the Court has considered in detail the evidence Defendants presented of the deterrent effect of the detention policy and finds the evidence distinctly lacking in scientific rigor. It is astonishing that Defendants have enacted a policy requiring such expensive infrastructure without more evidence to show that it would be compliant with an Agreement that has been in effect for nearly 20 years or effective at achieving

| CV-90 | **CIVIL MINUTES—GENERAL** | Initials of Deputy Clerk KT |
|---|---|---|

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544 DMG (AGRx)** | Date | July 24, 2015 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | Page | 24 of 25 |
|---|---|---|---|

what Defendants hoped it would accomplish.[11] It is even more shocking that after nearly *two decades* Defendants have not implemented appropriate regulations to deal with this complicated area of immigration law. In light of the evidence, or lack thereof, the Court finds that Defendants have failed to meet their burden of showing that a change in factual circumstances requires modification of the Agreement.

## IV.
## CONCLUSION

Based on the foregoing, the Court finds that Defendants are in breach of the Agreement and **GRANTS** Plaintiffs' motion to enforce the Agreement. Defendants' motion to amend the Agreement is **DENIED**. Defendants are hereby ordered to show cause why the following remedies should not be implemented within 90 days.

1. As required by Paragraph 18 of the Agreement, Defendants, upon taking an accompanied class member into custody, shall make and record prompt and continuous efforts toward family reunification and the release of the minor pursuant to Paragraph 14 of the Agreement.

2. Unless otherwise required by the Agreement, Defendants shall comply with Paragraph 14A of the Agreement by releasing class members without unnecessary delay in first order of preference to a parent, including a parent who either was apprehended with a class member or presented herself or himself with a class member. Class members not released pursuant to Paragraph 14 of the Agreement will be processed in accordance with the Agreement, including, as applicable, Paragraphs 6, 9, 21, 22, and 23.

3. Accompanied class members shall not be detained by Defendants in unlicensed or secure facilities that do not meet the requirements of Paragraph 6 of the Settlement, or

---

[11] Even were there such evidence that Defendants' modifications would act as a successful deterrent, Plaintiffs contend that deterrence is not a lawful criterion for denying release. *See R.I.L.R. v. Johson*, No. 15-0011, Opinion ECF No. 33, at 34-35 (D.D.C. Feb. 20, 2015) ("The justifications for detention previously contemplated by the Court relate wholly to characteristics inherent in the alien himself or in the category of aliens *being* detained—that is, the Court countenanced detention . . . on the basis of *those aliens'* risk of flight or danger to the community . . . . In discussing civil commitment more broadly, the Court has declared . . . 'general deterrence' justifications impermissible.") (internal citation omitted) (emphasis in original). Because Defendants have failed to present any evidence that the policy they have implemented either causes or addresses the recent change in factual circumstances, the Court need not rule on the issue of whether deterrence is a lawful criterion for denying release.

---

AR534

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544 DMG (AGRx)** | Date | July 24, 2015 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | Page | 25 of 25 |
|---|---|---|---|

in appropriate cases, as set forth in the Agreement, in facilities that do not meet the requirements of Paragraphs 12A, 21, and 23. Defendants shall not selectively apply the "influx" provision of Paragraph 12C of the Agreement to house class members apprehended with a parent in facilities that do not comply with the Agreement.

4. To comply with Paragraph 14A of the Agreement and as contemplated in Paragraph 15, a class member's accompanying parent shall be released with the class member in a non-discriminatory manner in accordance with applicable laws and regulations unless after an individualized custody determination the parent is determined to pose a significant flight risk, or a threat to others or the national security, and the flight risk or threat cannot be mitigated by an appropriate bond or conditions of release.

5. In consultation with Plaintiffs, Defendants shall propose standards, and procedures for monitoring compliance with such standards, for detaining class members in facilities that are safe and sanitary, consistent with concern for the particular vulnerability of minors, and consistent with Paragraph 12 of the Agreement, including access to adequate drinking water and food, toilets and sinks, medical assistance if the minor is in need of emergency services, temperature control, ventilation, adequate supervision to protect minors from others, and contact with family members who were arrested with the minor. Defendants shall file such proposed standards within 90 days of the date of this Order. Plaintiffs shall file objections thereto, if any, 14 days thereafter.

6. Defendants shall monitor compliance with the Agreement and this Order and shall provide Class Counsel on a monthly basis statistical information collected pursuant to Paragraph 28A of the Agreement.

Defendants shall file a response to the OSC by August 3, 2015. Plaintiffs shall file a response thereafter by August 10, 2015, after which the matter will stand submitted.

**IT IS SO ORDERED.**

AR535

1
2
3
4
5
6
7
8          **UNITED STATES DISTRICT COURT**
9         **SOUTHERN DISTRICT OF CALIFORNIA**
10

11   Ms. L.; et al.,                              Case No.:  18cv0428 DMS (MDD)

12                      Petitioners-Plaintiffs,
                                                  **ORDER GRANTING PLAINTIFFS'**
13   v.                                           **MOTION FOR CLASSWIDE**
                                                  **PRELIMINARY INJUNCTION**
14   U.S Immigration and Customs
     Enforcement ("ICE"); et al.,
15
16                      Respondents-Defendants.

17

18       Eleven weeks ago, Plaintiffs leveled the serious accusation that our Government was

19   engaged in a widespread practice of separating migrant families, and placing minor

20   children who were separated from their parents in government facilities for

21   "unaccompanied minors."     According to Plaintiffs, the practice was applied

22   indiscriminately, and separated even those families with small children and infants—many

23   of whom were seeking asylum.  Plaintiffs noted reports that the practice would become

24   national policy.  Recent events confirm these allegations.  Extraordinary relief is requested,

25   and is warranted under the circumstances.

26       On May 7, 2018, the Attorney General of the United States announced a "zero

27   tolerance policy," under which all adults entering the United States illegally would be

28   subject to criminal prosecution, and if accompanied by a minor child, the child would be

AR536

1    separated from the parent.[1]  Over the ensuing weeks, hundreds of migrant children were

2    separated from their parents, sparking international condemnation of the practice.  Six days

3    ago on June 20, 2018, the President of the United States signed an Executive Order ("EO")

4    to address the situation and to require preservation of the "family unit" by keeping migrant

5    families together during criminal and immigration proceedings to the extent permitted by

6    law, while also maintaining "rigorous[]" enforcement of immigration laws.  *See* Executive

7    Order, Affording Congress an Opportunity to Address Family Separation § 1, 2018 WL

8    3046068 (June 20, 2018).    The EO did not address reunification of the burgeoning

9    population of over 2,000 children separated from their parents.  Public outrage remained

10   at a fever pitch.  Three days ago on Saturday, June 23, 2018, the Department of Homeland

11   Security ("DHS") issued a "Fact Sheet" outlining the government's efforts to "ensure that

12   those adults who are subject to removal are reunited with their children for the purposes of

13   removal."[2]

14        Plaintiffs assert the EO does not eliminate the need for the requested injunction, and

15   the Fact Sheet does not address the circumstances of this case.  Defendants disagree with

16   those assertions, but there is no genuine dispute that the Government was not prepared to

17   accommodate the mass influx of separated children.  Measures were not in place to provide

18   for communication between governmental agencies responsible for detaining parents and

19   those responsible for housing children, or to provide for ready communication between

20   separated parents and children.  There was no reunification plan in place, and families have

21   been separated for months.  Some parents were deported at separate times and from

22

23

24   [1]  *See* U.S. Att'y. Gen., *Attorney General Sessions Delivers Remarks Discussing the Immigration Enforcement Actions of the Trump Administration* (May 7, 2018),
25   https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-discussing-immigration-enforcement-actions.

26   [2]  *See* U.S. Dep't of Homeland Sec.*, Fact Sheet: Federal Regulations Protecting the Confidentiality   of   Asylum   Applicants* (June   23,   2018),
27   https://www.dhs.gov/news/2018/06/23/fact-sheet-zero-tolerance-prosecution-and-family-
28   reunification.

2

1   different locations than their children.  Migrant families that lawfully entered the United

2   States at a port of entry seeking asylum were separated.  And families that were separated

3   due to entering the United States illegally between ports of entry have not been reunited

4   following the parent's completion of criminal proceedings and return to immigration

5   detention.

6       This Court previously entered an order finding Plaintiffs had stated a legally

7   cognizable claim for violation of their substantive due process rights to family integrity

8   under the Fifth Amendment to the United States Constitution based on their allegations the

9   Government had separated Plaintiffs from their minor children while Plaintiffs were held

10  in immigration detention and without a showing that they were unfit parents or otherwise

11  presented a danger to their children.  *See Ms. L. v. U.S. Immigration & Customs Enf't*, 302

12  F. Supp. 3d 1149, 2018 WL 2725736, at *7-12 (S.D. Cal. June 6, 2018).  A class action

13  has been certified to include similarly situated migrant parents.  Plaintiffs now request

14  classwide injunctive relief to prohibit separation of class members from their children in

15  the future absent a finding the parent is unfit or presents a danger to the child, and to require

16  reunification of these families once the parent is returned to immigration custody unless

17  the parent is determined to be unfit or presents a danger to the child.

18      Plaintiffs have demonstrated a likelihood of success on the merits, irreparable harm,

19  and that the balance of equities and the public interest weigh in their favor, thus warranting

20  issuance of a preliminary injunction.  This Order does not implicate the Government's

21  discretionary authority to enforce immigration or other criminal laws, including its

22  decisions to release or detain class members.  Rather, the Order addresses only the

23  circumstances under which the Government may separate class members from their

24  children, as well as the reunification of class members who are returned to immigration

25  custody upon completion of any criminal proceedings.

26  / / /

27  / / /

28  / / /

3

## I.

## BACKGROUND

This case started with the filing of a Complaint by Ms. L., a Catholic citizen of the Democratic Republic of the Congo fleeing persecution from her home country because of her religious beliefs.  The specific facts of Ms. L.'s case are set out in the Complaint and this Court's June 6, 2018 Order on Defendants' motion to dismiss.  *See Ms. L.*, 2018 WL 2725736, at *1-3.  In brief, Ms. L. and her then-six-year-old daughter S.S., lawfully presented themselves at the San Ysidro Port of Entry seeking asylum based on religious persecution.  They were initially detained together, but after a few days S.S. was "forcibly separated" from her mother.  When S.S. was taken away from her mother, "she was screaming and crying, pleading with guards not to take her away from her mother."  (Am. Compl. ¶ 43.)  Immigration officials claimed they had concerns whether Ms. L. was S.S.'s mother, despite Ms. L.'s protestations to the contrary and S.S.'s behavior.  So Ms. L. was placed in immigration custody and scheduled for expedited removal, thus rendering S.S. an "unaccompanied minor" under the Trafficking Victims Protection and Reauthorization Act ("TVPRA"), Pub. L. No. 110-457 (Dec. 23, 2008), and subjecting her to the "care and custody" of the Office of Refugee Resettlement ("ORR").[3]  S.S. was placed in a facility in

---

[3]  The TVPRA provides that "the care and custody of all unaccompanied alien children, including responsibility for their detention, where appropriate, shall be the responsibility of" HHS and its sub-agency, ORR.  8 U.S.C. § 1232(b)(1).  An "unaccompanied alien child" ("UAC") is a child under 18 years of age with no lawful immigration status in the United States who has neither a parent nor legal guardian in the United States nor a parent nor legal guardian in the United States "available" to care for them.  6 U.S.C § 279(g)(2).  According to the TVPRA, a UAC "may not be placed with a person or entity unless the Secretary of Health and Human Services makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being.  Such determination shall, at a minimum, include verification of the custodian's identity and relationship to the child, if any, as well as an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child."  8 U.S.C. § 1232(c)(3)(A).

4

Chicago over a thousand miles away from her mother.  Immigration officials later determined Ms. L. had a credible fear of persecution and placed her in removal proceedings, where she could pursue her asylum claim.  During this period, Ms. L. was able to speak with her daughter only "approximately 6 times by phone, never by video." (Am. Compl. ¶ 45.)  Each time they spoke, S.S. "was crying and scared." (*Id.* ¶ 43.)  Ms. L. was "terrified that she would never see her daughter again." (*Id.* ¶ 45.)  After the present lawsuit was filed, Ms. L. was released from ICE detention into the community.  The Court ordered the Government to take a DNA saliva sample (or swab), which confirmed that Ms. L. was the mother of S.S.  Four days later, Ms. L. and S.S. were reunited after being separated for nearly five months.

In an Amended Complaint filed on March 9, 2018, this case was expanded to include another Plaintiff, Ms. C.  She is a citizen of Brazil, and unlike Ms. L., she did not present at a port of entry.  Instead, she and her 14-year-old son J. crossed into the United States "between ports of entry," after which they were apprehended by U.S. Border Patrol.  Ms. C. explained to the agent that she and her son were seeking asylum, but the Government, as was its right under federal law, charged Ms. C. with entering the country illegally and placed her in criminal custody.  This rendered J. an "unaccompanied minor" and he, like S.S., was transferred to the custody of ORR, where he, too, was housed in a facility in Chicago several hundred miles away from his mother.  Ms. C. was thereafter convicted of misdemeanor illegal entry and served 25 days in criminal custody.  After completing that sentence, Ms. C. was transferred to immigration detention for removal proceedings and consideration of her asylum claim, as she too had passed a credible fear screening.  Despite being returned to immigration custody, Ms. C. was not reunited with J.  During the five months she was detained, Ms. C. did not see her son, and they spoke on the phone only "a handful of times[.]" (*Id.* ¶ 58.)  Ms. C. was "desperate" to be reunited with her son, worried about him constantly and did not know when she would be able to see him.  (*Id.*)  J. had a difficult time emotionally during the period of separation from his mother.  (*Id.* ¶ 59.)  Ms. C. was eventually released from immigration detention on bond, and only recently reunited

with J.  Their separation lasted more than eight months despite the lack of any allegations or evidence that Ms. C. was unfit or otherwise presented a danger to her son.[4]

Ms. L. and Ms. C. are not the only migrant parents who have been separated from their children at the border.  Hundreds of others, who have both lawfully presented at ports of entry (like Ms. L.) and unlawfully crossed into the country (like Ms. C.), have also been separated.  Because this practice is affecting large numbers of people, Plaintiffs sought certification of a class consisting of similarly situated individuals.  The Court certified that class with minor modifications,[5] and now turns to the important question of whether Plaintiffs are entitled to a classwide preliminary injunction that (1) halts the separation of class members from their children absent a determination that the parent is unfit or presents a danger to the child, and (2) reunites class members who are returned to immigration custody upon completion of any criminal proceedings absent a determination that the parent is unfit or presents a danger to the child.

Since the present motion was filed, several important developments occurred, as previously noted.  First, on May 7, 2018, the Government announced its zero tolerance policy for all adult persons crossing the border illegally, which resulted in the separation of hundreds of children who had crossed with their parents.  This is what happened with Ms. C., though she crossed prior to the public announcement of the zero tolerance policy.

---

[4]  As stated in the Court's Order on Defendants' motion to dismiss, Plaintiffs do not challenge Ms. C.'s initial separation from J. as a result of the criminal charge filed against her.  Plaintiffs' only complaint with regard to Ms. C. concerns the Government's failure to reunite her with J. after she was returned to immigration custody.

[5]  The class is defined to include: "All adult parents who enter the United States at or between designated ports of entry who (1) have been, are, or will be detained in immigration custody by the [DHS], and (2) have a minor child who is or will be separated from them by DHS and detained in ORR custody, ORR foster care, or DHS custody absent a determination that the parent is unfit or presents a danger to the child."  (See Order Granting in Part Mot. for Class Cert. at 17.)  The class does not include parents with criminal history or communicable disease, or those apprehended in the interior of the country or subject to the EO.  (See id. at 4 n.5.)

AR541
18cv0428 DMS (MDD)

She is not alone.  There are hundreds of similarly situated parents, and there are more than 2,000 children that have now been separated from their parents.

When a parent is charged with a criminal offense, the law ordinarily requires separation of the family.  This separation generally occurs regardless of whether the parent is charged with a state or federal offense.  The repercussions on the children, however, can vary greatly depending on status.  For citizens, there is an established system of social service agencies ready to provide for the care and well-being of the children, if necessary, including child protective services and the foster care system.  This is in addition to any family members that may be available to provide shelter for these minor children. Grandparents and siblings are frequently called upon.  Non-citizens may not have this kind of support system, such as other family members who can provide shelter for their children in the event the parent is detained at the border.  This results in immigrant children going into the custody of the federal government, which is presently not well equipped to handle that important task.

For children placed in federal custody, there are two options.  One of those options is ORR, but it was established to address a different problem, namely minor children who were apprehended at the border without their parents, *i.e.*, true "unaccompanied alien children."  It was not initially designed to address the problem of migrant children detained with their parents at the border and who were thereafter separated from their parents.  The second option is family detention facilities, but the options there are limited.  Indeed, at the time of oral argument on this motion, Government counsel represented to the Court that the "total capacity in [family] residential centers" was "less than 2,700."  (Rep. Tr. at 9, May 9, 2018, ECF No. 70.)  For male heads of households, *i.e.*, fathers traveling with their children, there was only one facility with "86 beds."  (*Id.* at 43.)

The recently issued EO confirms the government is inundated by the influx of children essentially orphaned as a result of family separation.  The EO now directs "[h]eads of executive departments and agencies" to make available "any facilities … appropriate" for the housing and care of alien families.  EO § 3(d).  The EO also calls upon the *military*

AR542
18cv0428 DMS (MDD)

1    by directing the Secretary of Defense to make available "any existing" facility and to

2    "construct such facilities[,]" if necessary, *id.* § 3(c), which is an extraordinary measure.

3    Meanwhile, "tent cities" and other make-shift facilities are springing up.  That was the

4    situation into which Plaintiffs, and hundreds of other families that were separated at the

5    border in the past several months, were placed.

6        This situation has reached a crisis level.  The news media is saturated with stories of

7    immigrant families being separated at the border.  People are protesting.  Elected officials

8    are weighing in.  Congress is threatening action.  Seventeen states have now filed a

9    complaint against the Federal Government challenging the family separation practice.  *See*

10   *State of Washington v. United States*, Case No. 18cv0939, United States District Court for

11   the Western District of Washington.  And the President has taken action.

12       Specifically, on June 20, 2018, the President signed the EO referenced above.  The

13   EO states it is the Administration's policy "to maintain family unity, including by detaining

14   alien families together where appropriate and consistent with law and available resources."

15   *Id.* § 1.[6]  In furtherance of that policy, the EO indicates that parents and children who are

16   apprehended together at the border will be detained together "during the pendency of any

17   criminal improper entry or immigration proceedings" to the extent permitted by law.  *Id.* §

18   3.  The language of the EO is not absolute, however, as it states that family unity shall be

19   maintained "where appropriate and consistent with law and available resources[,]" *id.* § 1,

20   and "to the extent permitted by law and subject to the availability of appropriations[.]"  *Id.*

21   § 3.  The EO also indicates rigorous enforcement of illegal border crossers will continue.

22   *Id.* § 1 ("It is the policy of this Administration to rigorously enforce our immigration

23   laws.").  And finally, although the Order speaks to a policy of "maintain[ing] family unity,"

24

25   ────────────

26   [6] The Order defines "alien family" as "any person not a citizen or national of the United

27   States who has not been admitted into, or is not authorized to enter or remain in, the United

28   States, who entered this country with an alien child or alien children at or between
     designated ports of entry and who was detained[.]"  *Id.* § 2(a)(i).

8

it is silent on the issue of reuniting families that have already been separated or will be separated in the future." *Id.*

In light of these recent developments, and in particular the EO, the Court held a telephonic status conference with counsel on June 22, 2018. During that conference, the Court inquired about communication between ORR and DHS, and ORR and the Department of Justice ("DOJ"), including the Bureau of Prisons ("BOP"), as it relates to these separated families. Reunification procedures were also discussed, specifically whether there was any affirmative reunification procedure for parents and children after parents were returned to immigration detention following completion of criminal proceedings. Government counsel explained the communication procedures that were in place, and represented, consistent with her earlier representation to the Court, that there was no procedure in place for the reunification of these families.[7]

The day after the status conference, Saturday, June 23, DHS issued the Fact Sheet referenced above. This document focuses on several issues addressed during the status conference, *e.g.*, processes for enhanced communication between separated parents and children, but only "for the purposes of removal." It also addresses coordination between and among three agencies, CBP, ICE, and HHS agency ORR, but again for the purpose of removal. The Fact Sheet does not address reunification for other purposes, such as immigration or asylum proceedings, which can take months. It also does not mention other vital agencies frequently involved during criminal proceedings: DOJ and BOP.

At the conclusion of the recent status conference, the Court requested supplemental briefing from the parties. Those briefs have now been submitted. After thoroughly

---

[7] The Court: "Is there currently any affirmative reunification process that the government has in place once parent and child are separated? Government counsel: I would say … when a parent is released from criminal custody and taken into ICE custody is the practice to reunite them in family detention[?] And at that [previous hearing] I said no, that that was not the practice. I think my answer on that narrow question would be the same." (Rep. Tr. at 29-30, June 22, 2018, ECF No. 77.)

considering all of the parties' briefs and the record in this case, and after hearing argument from counsel on these important issues, the Court grants Plaintiffs' motion for a classwide preliminary injunction.

## II.

## DISCUSSION

Plaintiffs seek classwide preliminary relief that (1) enjoins Defendants' practice of separating class members from their children absent a determination that the parent is unfit or presents a danger to their child, and (2) orders the government to reunite class members with their children when the parent is returned to immigration custody after their criminal proceedings conclude, absent a determination that the parent is unfit or presents a danger to the child. Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To meet that showing, Plaintiffs must demonstrate "'[they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest.'" *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20).[8]

---

[8] The Ninth Circuit applies separate standards for injunctions depending on whether they are prohibitory, *i.e.*, whether they prevent future conduct, or mandatory, *i.e.*, "they go beyond 'maintaining the status quo[.]'" *Hernandez v. Sessions*, 872 F.3d 976, 997 (9th Cir. 2017). The standard set out above applies to prohibitory injunctions, which is what Plaintiffs seek here. To the extent Plaintiffs are also requesting mandatory relief, that request is "subject to a higher standard than prohibitory injunctions," namely that relief will issue only "when 'extreme or very serious damage will result' that is not capable of compensation in damages,' and the merits of the case are not 'doubtful.'" *Id.* at 999 (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009)). The Ninth Circuit recognizes that application of these different standards "is controversial[,]" and that other Circuits have questioned this approach. *Id.* at 997-98. This Court need not, and does not, address that discrepancy here. Suffice it to say that to the extent some portion of Plaintiffs' requested relief is subject to a standard higher than

10

1    Before turning to these factors, the Court addresses directly Defendants' argument

2    that an injunction is not necessary here in light of the EO and the recently released Fact

3    Sheet.  Although these documents reflect some attempts by the Government to address

4    some of the issues in this case, neither obviates the need for injunctive relief here.  As

5    indicated throughout this Order, the EO is subject to various qualifications.  For instance,

6    Plaintiffs correctly assert the EO allows the government to separate a migrant parent from

7    his or her child "where there is a *concern* that detention of an alien child with the child's

8    alien parent would pose a risk to the child's welfare."  EO § 3(b) (emphasis added).

9    Objective standards are necessary, not subjective ones, particularly in light of the history

10   of this case.  Furthermore, the Fact Sheet focuses on reunification "at time of removal[,]"

11   U.S. Dep't of Homeland Sec., *supra*, note 2, stating that the parent slated for removal will

12   be matched up with their child at a location in Texas and then removed.  It says nothing

13   about reunification during the intervening time between return from criminal proceedings

14   to ICE detention or the time in ICE detention prior to actual removal, which can take

15   months.  Indeed, it is undisputed "ICE has no plans or procedures in place to reunify the

16   parent with the child other than arranging for them to be deported together after the parent's

17   immigration case is concluded."  (Pls.' Supp. Mem. in Supp. of Classwide Prelim. Inj., Ex.

18   31 ¶ 11.)  Thus, neither of these directives eliminates the need for an injunction in this case.

19   With this finding, the Court now turns to the *Winter* factors.

20   **A.   Likelihood of Success**

21   "The first factor under *Winter* is the most important—likely success on the merits."

22   *Garcia v. Google, Inc*., 786 F.3d 733, 740 (9th Cir. 2015).  While Plaintiffs carry the burden

23   of demonstrating likelihood of success, they are not required to prove their case in full at

24   the preliminary injunction stage but only such portions that enable them to obtain the

25   injunctive relief they seek.  *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

26   _____

27

28   the traditional standard for injunctive relief, Plaintiffs have met their burden for the reasons
     set out below.

1    Here, the only claim currently at issue is Plaintiffs' due process claim.[9]  Specifically,

2   Plaintiffs contend the Government's practice of separating class members from their

3   children, and failing to reunite those parents who have been separated, without a

4   determination that the parent is unfit or presents a danger to the child violates the parents'

5   substantive due process rights to family integrity under the Fifth Amendment to the United

6   States Constitution.  To prevail on this claim, Plaintiffs must show that the Government

7   practice "shocks the conscience."  In the Order on Defendants' motion to dismiss, the Court

8   found Plaintiffs had set forth sufficient facts to support that claim.  *Ms. L.*, 2018 WL

9   2725736, at *7-12.  The evidence submitted since that time supports that finding, and

10  demonstrates Plaintiffs are likely to succeed on this claim.

11    As explained in the Court's Order on Defendants' motion to dismiss, the "shocks the

12  conscience" standard is not subject to a rigid list of established elements.  *See County of*

13  *Sacramento v. Lewis*, 523 U.S. 833, 850 (1998) (stating "[r]ules of due process are not …

14  subject to mechanical application in unfamiliar territory.")  On the contrary, "an

15  investigation into substantive due process involves an appraisal of the totality of the

16  circumstances rather than a formalistic examination of fixed elements[.]"  *Armstrong v.*

17  *Squadrito*, 152 F.3d 564, 570 (7th Cir. 1998).

18    Here, each Plaintiff presents different circumstances, but both were subjected to the

19  same government practice of family separation without a determination that the parent was

20  unfit or presented a danger to the child.  Ms. L. was separated from her child without a

21  determination she was unfit or presented a danger to her child, and Ms. C. was not reunited

22  with her child despite the absence of any finding that she was unfit or presented a danger

23

24

_____

25  [9]  In their supplemental brief, Defendants assert Plaintiffs are raising new claims based on
     events that transpired after the Complaints were filed, *e.g.*, the announcement of the zero
26  tolerance policy and the EO.  The Court disagrees.  Plaintiffs' claims are not based on these
     events, but are based on the practice of separating class members from their children.  The
27  subsequent events are relevant to Plaintiffs' claim, but they have not changed the claim
     itself, which remains focused on the practice of separation.
28

AR547
18cv0428 DMS (MDD)

1    to her child.  Outside of the context of this case, namely an international border, Plaintiffs

2    would have a high likelihood of success on a claim premised on such a practice.  *See D.B.*

3    *v. Cardall*, 826 F.3d 721, 741 (4th Cir. 2016) (citing cases finding due process violation

4    where state action interfered with rights of fit parents); *Heartland Academy Community*

5    *Church v. Waddle*, 595 F.3d 798, 808-811 (8th Cir. 2010) (finding removal of children

6    from religious school absent evidence the students were "at immediate risk of child abuse

7    or neglect" was violation of clearly established constitutional right); *Brokaw v. Mercer*

8    *County*, 235 F.3d 1000, 1019 (7th Cir. 2000) (citing *Croft v. Westmoreland County*

9    *Children and Youth Services*, 103 F.3d 1123, 1126 (3d Cir. 1997) ("courts have recognized

10   that a state has no interest in protecting children from their parents unless it has some

11   definite and articulable evidence giving rise to a reasonable suspicion that a child has been

12   abused or is in imminent danger of abuse.")

13          The context of this case is different.  The Executive Branch, which is tasked with

14   enforcement of the country's criminal and immigration laws, is acting within its powers to

15   detain individuals lawfully entering the United States and to apprehend individuals illegally

16   entering the country.  However, as the Court explained in its Order on Defendants' motion

17   to dismiss, the right to family integrity still applies here.  The context of the family

18   separation practice at issue here, namely an international border, does not render the

19   practice constitutional, nor does it shield the practice from judicial review.

20          On the contrary, the context and circumstances in which this practice of family

21   separation were being implemented support a finding that Plaintiffs have a likelihood of

22   success on their due process claim.  First, although parents and children may lawfully be

23   separated when the parent is placed in criminal custody, the same general rule does not

24   apply when a parent and child present together lawfully at a port of entry seeking asylum.

25   In that situation, the parent has committed no crime, and absent a finding the parent is unfit

26   or presents a danger to the child, it is unclear why separation of Ms. L. or similarly situated

27   class members would be necessary.  Here, many of the family separations have been the

28   result of the Executive Branch's zero tolerance policy, but the record also reflects that the

practice of family separation was occurring before the zero tolerance policy was announced, and that practice has resulted in the casual, if not deliberate, separation of families that lawfully present at the port of entry, not just those who cross into the country illegally. Ms. L. is an example of this family separation practice expanding beyond its lawful reach, and she is not alone. (*See, e.g.*, Pls.' Reply Br. in Supp. of Mot. for Class Cert., Exs. 22-23, 25-26) (declarations from parents attesting to separation at border after lawfully presenting at port of entry and requesting asylum); Pls.' Supp. Mem. in Supp. of Classwide Prelim. Inj., Ex. 32 ¶¶ 9, 10b, 11a (listing parents who were separated from children after presenting at ports of entry)).

As set out in the Court's prior Order, asylum seekers like Ms. L. and many other class members may be fleeing persecution and are entitled to careful consideration by government officials. Particularly so if they have a credible fear of persecution. We are a country of laws, and of compassion. We have plainly stated our intent to treat refugees with an ordered process, and benevolence, by codifying principles of asylum. *See, e.g.,* The Refugee Act, PL 96-212, 94 Stat. 102 (1980). The Government's treatment of Ms. L. and other similarly situated class members does not meet this standard, and it is unlikely to pass constitutional muster.

Second, the practice of separating these families was implemented without any effective system or procedure for (1) tracking the children after they were separated from their parents, (2) enabling communication between the parents and their children after separation, and (3) reuniting the parents and children after the parents are returned to immigration custody following completion of their criminal sentence. This is a startling reality. The government readily keeps track of personal property of detainees in criminal and immigration proceedings. Money, important documents, and automobiles, to name a few, are routinely catalogued, stored, tracked and produced upon a detainees' release, at all levels—state and federal, citizen and alien. Yet, the government has no system in place to keep track of, provide effective communication with, and promptly produce alien children. The unfortunate reality is that under the present system migrant children are not

accounted for with the same efficiency and accuracy as *property*. Certainly, that cannot satisfy the requirements of due process. *See Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982) (quoting *Lassiter v. Dept. of Soc. Services of Durham County, N.C.*, 452 U.S. 18, (1981)) (stating it is "'plain beyond the need for multiple citation' that a natural parent's 'desire for and right to the companionship, care, custody, and management of his or her children' is an interest far more precious than any property right.") (internal quotation marks omitted).

The lack of effective methods for communication between parents and children who have been separated has also had a profoundly negative effect on the parents' criminal and immigration proceedings, as well as the childrens' immigration proceedings. *See United States v. Dominguez-Portillo*, No:EP-17-MJ-4409-MAT, 2018 WL 315759, at *1-2 (W.D. Tex. Jan. 5, 2018) (explaining that criminally charged defendants "had not received any paperwork or information concerning the whereabouts or well-being of" their children). In effect, these parents have been left "in a vacuum, without knowledge of the well-being and location of their children, to say nothing of the immigration proceedings in which those minor children find themselves." *Id.* at *14. This situation may result in a number of different scenarios, all of which are negative – some profoundly so. For example, "[i]f parent and child are asserting or intending to assert an asylum claim, that child may be navigating those legal waters without the benefit of communication with and assistance from her parent; that defendant, too, must make a decision on his criminal case with total uncertainty about this issue." *Id.* Furthermore, " a defendant facing certain deportation would be unlikely to know whether he might be deported before, simultaneous to, or after their child, or whether they would have the opportunity to even discuss their deportations[.]" *Id.* Indeed, some parents have already been deported without their children, who remain in government facilities in the United States.[10]

---

[10] *See*, *e.g.*, Pls.' Supp. Mem. in Supp. of Classwide Prelim. Inj., Ex. 32 ¶ 16k, Ex. 36 ¶ 7a; Nelson Renteria, *El Salvador demands U.S. return child taken from deported father*,

AR550
18cv0428 DMS (MDD)

1      The absence of established procedures for dealing with families that have been

2 separated at the border, and the effects of that void on the families involved, is borne out

3 in the cases of Plaintiffs here.  Ms. L. was separated from her child when immigration

4 officials claimed they could not verify she was S.S.'s mother, and detained her for

5 expedited removal proceedings.  That rendered S.S. "unaccompanied" under the TVPRA

6 and subject to immediate transfer to ORR, which accepted responsibility for S.S.  There

7 was no further communication between the agencies, ICE and ORR.  The filing of the

8 present lawsuit prompted release and reunification of Ms. L. and her daughter, a process

9 that took close to five months and court involvement.  Ms. C. completed her criminal

10 sentence in 25 days, but it took nearly eight months to be reunited with her son.  She, too,

11 had to file suit to regain custody of her son from ORR.

12      These situations confirm what the Government has already stated: it is not

13 affirmatively reuniting parents like Plaintiffs and their fellow class members for purposes

14 other than removal.  Outside of deportation, the onus is on the parents, who, for the most

15 part, are themselves in either criminal or immigration proceedings, to contact ORR or

16 otherwise search for their children and make application for reunification under the

17 TVPRA.  However, this reunification procedure was not designed to deal with the present

18 circumstances.  (*See* Pls.' Supp. Mem. in Supp. of Classwide Prelim. Inj., Ex. 33 ¶¶ 6-9.)

19 Rather, "ORR's reunification process was designed to address the situation of children who

20 come to the border or are apprehended outside the company of a parent or legal guardian."

21 (*Id.* ¶ 6.)  Placing the burden on the parents to find and request reunification with their

22 children under the circumstances presented here is backwards.  When children are

---

26 REUTERS (June 21, 2018, 4:03 PM),  https://www.reuters.com/article/us-usa-immigration-
el-salvador/el-salvador-demands-us-return-child-taken-from-deported-father-
27 idUSKBN1JH3ER; Miriam Jordan,  *'I Can't Go Without My Son': A Deported Mother's*
*Plea*, N.Y. TIMES (June 17, 2018), https://www.nytimes.com/2018/06/17/us/immigration-
28 deported-parents.html.

1   separated from their parents under these circumstances, the Government has an affirmative

2   obligation to track and promptly reunify these family members.

3         This practice of separating class members from their minor children, and failing to

4   reunify class members with those children, without any showing the parent is unfit or

5   presents a danger to the child is sufficient to find Plaintiffs have a likelihood of success on

6   their due process claim.  When combined with the manner in which that practice is being

7   implemented, *e.g.*, the lack of any effective procedures or protocols for notifying the

8   parents about their childrens' whereabouts or ensuring communication between the parents

9   and children, and the use of the children as tools in the parents' criminal and immigration

10  proceedings, (*see* Pls.' Supp. Mem. in Supp. of Classwide Prelim. Inj., Ex. 29 ¶¶ 8, 14), a

11  finding of likelihood of success is assured.  A practice of this sort implemented in this way

12  is likely to be "so egregious, so outrageous, that it may fairly be said to shock the

13  contemporary conscience," *Lewis*, 523 U.S. at 847 n.8, interferes with rights "'implicit in

14  the concept of ordered liberty[,]'" *Rochin v. Cal.*, 342 U.S. 165, 169 (1952) (quoting *Palko*

15  *v. State of Conn.*, 302 U.S. 319, 325 (1937)), and is so "'brutal' and 'offensive' that it

16  [does] not comport with traditional ideas of fair play and decency." *Breithaupt v. Abram*,

17  352 U.S. 432, 435 (1957).

18        For all of these reasons, the Court finds there is a likelihood of success on Plaintiffs'

19  due process claim.

20  **B.    Irreparable Injury**

21        Turning to the next factor, Plaintiffs must show they are "'likely to suffer irreparable

22  harm in the absence of preliminary relief.'" *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th

23  Cir. 2017) (quoting *Winter*, 555 U.S. at 20).  "'It is well established that the deprivation of

24  constitutional rights unquestionably constitutes irreparable injury.'"  *Id.* (quoting

25  *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (internal quotation marks

26  omitted).  As explained, Plaintiffs have demonstrated the likelihood of a deprivation of

27  their constitutional rights, and thus they have satisfied this factor.

28

AR552
18cv0428 DMS (MDD)

The injury in this case, however, deserves special mention. That injury is the separation of a parent from his or her child, which the Ninth Circuit has repeatedly found constitutes irreparable harm. *See Leiva–Perez v. Holder*, 640 F.3d 962, 969–70 (9th Cir. 2011); *Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017) (identifying "separated families" as an irreparable harm).

Furthermore, the record in this case reflects that the separations at issue have been agonizing for the parents who have endured them. One of those parents, Mr. U., an asylum seeker from Kyrgyzstan, submitted a declaration in this case in which he stated that after he was told he was going to be separated from his son he "felt as though [he] was having a heart attack." (Reply in Supp. of Mot. for Class Cert., Ex. 21 ¶ 4.) Another asylum-seeking parent from El Salvador who was separated from her two sons writes,

> The separation from my sons has been incredibly hard, because I have never been away from them before. I do not want my children to think that I abandoned them. [My children] are so attached to me. [One of my children] used to sleep in bed with me every night while [my other child] slept in his own bed in the same room.… It hurts me to think how anxious and distressed they must be without me.

(Reply in Supp. of Mot. for Class Cert., Ex. 24 ¶ 9.) And another asylum-seeking parent from Honduras described having to place her crying 18-month old son in a car seat in a government vehicle, not being able to comfort him, and her crying as the officers "took [her] son away." (Reply in Supp. of Mot. for Class Cert., Ex. 25 ¶ 7.) There has even been a report that one father committed suicide in custody after being separated from his wife and three-year-old child. *See* Molly Hennessy-Fiske, *Honduran Migrant Who Was Separated From Family is Found Dead in Texas Jail in an Apparent Suicide*, L.A. Times (June 9, 2018, 5:35 PM), http://www.latimes.com/nation/la-na-border-patrol-suicide-20180609-story.html.

The parents, however, are not the only ones suffering from the separations. One of the *amici* in this case, Children's Defense Fund, states,

18

there is ample evidence that separating children from their mothers or fathers leads to serious, negative consequences to children's health and development. Forced separation disrupts the parent-child relationship and puts children at increased risk for both physical and mental illness.... And the psychological distress, anxiety, and depression associated with separation from a parent would follow the children well after the immediate period of separation—even after eventual reunification with a parent or other family.

(ECF No. 17-11 at 3.) Other evidence before the Court reflects that "separating children from parents is a highly destabilizing, traumatic experience that has long term consequences on child well-being, safety, and development." (ECF No. 17-13 at 2.) That evidence reflects:

Separation from family leaves children more vulnerable to exploitation and abuse, no matter what the care setting. In addition, traumatic separation from parents creates toxic stress in children and adolescents that can profoundly impact their development. Strong scientific evidence shows that toxic stress disrupts the development of brain architecture and other organ systems, and increases the risk for stress-related disease and cognitive impairment well into adult years. Studies have shown that children who experience such traumatic events can suffer from symptoms of anxiety and post-traumatic stress disorder, have poorer behavioral and educational outcomes, and experience higher rates of poverty and food insecurity.

(ECF No. 17-13 at 2.) And Martin Guggenheim, the Fiorello LaGuardia Professor of Clinical Law at New York University School of Law and Founding Member of the Center for Family Representation, states:

Children are at risk of suffering great emotional harm when they are removed from their loved ones. And children who have traveled from afar and made their way to this country to seek asylum are especially at risk of suffering irreversible psychological harm when wrested from the custody of the parent or caregiver with whom they traveled to the United States.

(Mem. in Supp. of Classwide Prelim. Inj., Ex. 17 ¶ 16.) All of this evidence, combined with the constitutional violation alleged here, conclusively shows that Plaintiffs and the

19

1  class members are likely to suffer irreparable injury if a preliminary injunction does not
2  issue.

**C.     Balance of Equities**

4        Turning to the next factor, "[t]o obtain a preliminary injunction, a plaintiff must also
5  demonstrate that 'the balance of equities tips in his favor.'" *Hernandez*, 872 F.3d at 995
6  (quoting *Winter*, 555 U.S. at 20).  As with irreparable injury, when a plaintiff establishes
7  "a likelihood that Defendants' policy violates the U.S. Constitution, Plaintiffs have also
8  established that both the public interest and the balance of the equities favor a preliminary
9  injunction." *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014).

10        Plaintiffs here assert the balance of equities weighs in favor of an injunction in this
11  case.  Specifically, Plaintiffs argue Defendants would not suffer any hardship if the
12  preliminary injunction is issued because the Government "cannot suffer harm from an
13  injunction that merely ends an unlawful practice[.]" *Rodriguez v. Robbins*, 715 F.3d 1127,
14  1145 (9th Cir. 2013); *see also Arizona Dream Act Coalition*, 757 F.3d at 1069 (quoting
15  *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)) (stating balance of equities favors
16  "'prevent[ing] the violation of a party's constitutional rights.'").  When the absence of harm
17  to the Government is weighed against the harms to Plaintiffs set out above, Plaintiffs argue
18  this factor weighs in their favor.  The Court agrees.

19        The primary harm Defendants assert here is the possibility that an injunction would
20  have a negative impact on their ability to enforce the criminal and immigration laws.
21  However, the injunction here—preventing the separation of parents from their children and
22  ordering the reunification of parents and children that have been separated—would do
23  nothing of the sort.  The Government would remain free to enforce its criminal and
24  immigration laws, and to exercise its discretion in matters of release and detention
25  consistent with law.  *See EO §§ 1, 3(a) & (e)* (discussing *Flores v. Sessions*, CV 85-4544);
26  *see also Comm. of Cent. Am. Refugees v. I.N.S.,* 795 F.2d 1434, 1439-40 (9th Cir. 1986)
27  (stating "prudential considerations preclude[] interference with the Attorney General's
28  [exercise of] discretion" in selecting the detention facilities where aliens are to be

AR555
18cv0428 DMS (MDD)

1    detained).   It would just have to do so in a way that preserves the class members'

2    constitutional rights to family association and integrity.   *See Rodriguez*, 715 F.3d at 1146

3    ("While ICE is entitled to carry out its duty to enforce the mandates of Congress, it must

4    do so in a manner consistent with our constitutional values.")   Thus, this factor also weighs

5    in favor of issuing the injunction.

6    **D.    Public Interest**

7         The final factor for consideration is the public interest.   *See Hernandez*, 872 F.3d at

8    996 (quoting *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009)) ("When, as

9    here, 'the impact of an injunction reaches beyond the parties, carrying with it a potential

10   for public consequences, the public interest will be relevant to whether the district court

11   grants the preliminary injunction.'")   To obtain the requested relief, "Plaintiffs must

12   demonstrate that the public interest favors granting the injunction 'in light of [its] *likely*

13   consequences,' i.e., 'consequences [that are not] too remote, insubstantial, or speculative

14   and [are] supported by evidence.'"   *Id.* (quoting *Stormans*, 586 F.3d at 1139).   "'Generally,

15   public interest concerns are implicated when a constitutional right has been violated,

16   because all citizens have a stake in upholding the Constitution.'"   *Id.* (quoting *Preminger*

17   *v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005)).

18        This case involves two important public interests: the interest in enforcing the

19   country's criminal and immigration laws and the constitutional liberty interest "of parents

20   in the care, custody, and control of their children[,]" which "is perhaps the oldest of the

21   fundamental liberty interests recognized by" the Supreme Court.   *Troxel v. Granville*, 530

22   U.S. 57, 65 (2000).   Both of these interests are valid and important, and both can be served

23   by the issuance of an injunction in this case.

24        As stated, the public's interest in enforcing the criminal and immigration laws of this

25   country would be unaffected by issuance of the requested injunction.   The Executive

26   Branch is free to prosecute illegal border crossers and institute immigration proceedings

27   against aliens, and would remain free to do so if an injunction were issued.   Plaintiffs do

28   not seek to enjoin the Executive Branch from carrying out its duties in that regard.

AR556

18cv0428 DMS (MDD)

Case 3:18-cv-00428-DMS-MDD   Document 635-3   Filed 09/26/17   Page 565 of 655
Case 1:19-cv-08640-KBJ   Document 35-3   Filed 01/27/20   Page 565 of 655
Case 3:18-cv-00428-DMS-MDD   Document 83-3   Filed 09/26/17   Page 22 of 24

What Plaintiffs do seek by way of the requested injunction is to uphold their rights to family integrity and association while their immigration proceedings are underway. This right, specifically, the relationship between parent and child, is "constitutionally protected," *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978), and "well established." *Rosenbaum v. Washoe Cty.*, 663 F.3d 1071, 1079 (9th Cir. 2011). The public interest in upholding and protecting that right in the circumstances presented here would be served by issuance of the requested injunction. *See Arizona Dream Act Coalition*, 757 F.3d at 1069 (quoting *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) ("'[I]t is clear that it would not be equitable or in the public's interest to allow the state … to violate the requirements of federal law, especially when there are no adequate remedies available.'") Accordingly, this factor, too, weighs in favor of issuing the injunction.

### III.

### CONCLUSION

The unfolding events—the zero tolerance policy, EO and DHS Fact Sheet—serve to corroborate Plaintiffs' allegations. The facts set forth before the Court portray reactive governance—responses to address a chaotic circumstance of the Government's own making. They belie measured and ordered governance, which is central to the concept of due process enshrined in our Constitution. This is particularly so in the treatment of migrants, many of whom are asylum seekers and small children. The extraordinary remedy of classwide preliminary injunction is warranted based on the evidence before the Court. For the reasons set out above, the Court hereby GRANTS Plaintiffs' motion for classwide preliminary injunction, and finds and orders as follows:

(1)   Defendants, and their officers, agents, servants, employees, attorneys, and all those who are in active concert or participation with them, are preliminarily enjoined from detaining Class Members in DHS custody without and apart from their minor children, absent a determination that the parent is unfit or presents a danger to the

AR557

18cv0428 DMS (MDD)

child, unless the parent affirmatively, knowingly, and voluntarily declines to be reunited with the child in DHS custody.[11]

(2)  If Defendants choose to release Class Members from DHS custody, Defendants, and their officers, agents, servants, employees and attorneys, and all those who are in active concert or participation with them, are preliminary enjoined from continuing to detain the minor children of the Class Members and must release the minor child to the custody of the Class Member, unless there is a determination that the parent is unfit or presents a danger to the child, or the parent affirmatively, knowingly, and voluntarily declines to be reunited with the child.

(3)  Unless there is a determination that the parent is unfit or presents a danger to the child, or the parent affirmatively, knowingly, and voluntarily declines to be reunited with the child:

(a)  Defendants must reunify all Class Members with their minor children who are under the age of five (5) within fourteen (14) days of the entry of this Order; and

(b)  Defendants must reunify all Class Members with their minor children age five (5) and over within thirty (30) days of the entry of this Order.

(4)  Defendants must immediately take all steps necessary to facilitate regular communication between Class Members and their children who remain in ORR custody, ORR foster care, or DHS custody.  Within ten (10) days, Defendants must provide parents telephonic contact with their children if the parent is not already in contact with his or her child.

---

[11]  "Fitness" is an important factor in determining whether to separate parent from child.  In the context of this case, and enforcement of criminal and immigration laws at the border, "fitness" could include a class member's mental health, or potential criminal involvement in matters other than "improper entry" under 8 U.S.C. § 1325(a), (see EO § 1), among other matters.  Fitness factors ordinarily would be objective and clinical, and would allow for the proper exercise of discretion by government officials.

AR558

1    (5)   Defendants must immediately take all steps necessary to facilitate regular

2           communication between and among all executive agencies responsible for the

3           custody, detention or shelter of Class Members and the custody and care of their

4           children, including at least ICE, CBP, BOP, and ORR, regarding the location and

5           well-being of the Class Members' children.

6    (6)   Defendants, and their officers, agents, servants, employees, attorneys, and all those

7           who are in active concert or participation with them, are preliminarily enjoined from

8           removing any Class Members without their child, unless the Class Member

9           affirmatively, knowingly, and voluntarily declines to be reunited with the child prior

10          to the Class Member's deportation, or there is a determination that the parent is unfit

11          or presents a danger to the child.

12    (7)   This Court retains jurisdiction to entertain such further proceedings and to enter such

13          further orders as may be necessary or appropriate to implement and enforce the

14          provisions of this Order and Preliminary Injunction.

15        A status conference will be held on **July 6, 2018**, at **12:00 noon**, to discuss all

16   necessary matters.  A notice of teleconference information sheet will be provided in a

17   separate order.

18        **IT IS SO ORDERED.**

19   Dated:  June 26, 2018



20

21

22

23

24

25

26

27

28

*Secretary*
U.S. Department of Homeland Security
Washington, DC 20528

 **Homeland Security**

February 20, 2017

MEMORANDUM FOR:    Kevin McAleenan
Acting Commissioner
U.S. Customs and Border Protection

Thomas D. Homan
Acting Director
U.S. Immigration and Customs Enforcement

Lori Scialabba
Acting Director
U.S. Citizenship and Immigration Services

Joseph B. Maher
Acting General Counsel

Dimple Shah
Acting Assistant Secretary for International Affairs

Chip Fulghum
Acting Undersecretary for Management

FROM:    John Kelly
Secretary

SUBJECT:    **Enforcement of the Immigration Laws to Serve the National Interest**

This memorandum implements the Executive Order entitled "Enhancing Public Safety in the Interior of the United States," issued by the President on January 25, 2017. It constitutes guidance for all Department personnel regarding the enforcement of the immigration laws of the United States, and is applicable to the activities of U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS). As such, it should inform enforcement and removal activities, detention decisions, administrative litigation, budget requests and execution, and strategic planning.

With the exception of the June 15, 2012, memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," and the November 20, 2014 memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents,"[1] all existing conflicting directives, memoranda, or field guidance regarding the enforcement of our immigration laws and priorities for removal are hereby immediately rescinded—to the extent of the conflict—including, but not limited to, the November 20, 2014, memoranda entitled "Policies for the Apprehension, Detention and Removal of Undocumented Immigrants," and "Secure Communities."

## A. The Department's Enforcement Priorities

Congress has defined the Department's role and responsibilities regarding the enforcement of the immigration laws of the United States. Effective immediately, and consistent with Article II, Section 3 of the United States Constitution and Section 3331 of Title 5, United States Code, Department personnel shall faithfully execute the immigration laws of the United States against all removable aliens.

Except as specifically noted above, the Department no longer will exempt classes or categories of removable aliens from potential enforcement. In faithfully executing the immigration laws, Department personnel should take enforcement actions in accordance with applicable law. In order to achieve this goal, as noted below, I have directed ICE to hire 10,000 officers and agents expeditiously, subject to available resources, and to take enforcement actions consistent with available resources. However, in order to maximize the benefit to public safety, to stem unlawful migration and to prevent fraud and misrepresentation, Department personnel should prioritize for removal those aliens described by Congress in Sections 212(a)(2), (a)(3), and (a)(6)(C), 235(b) and (c), and 237(a)(2) and (4) of the Immigration and Nationality Act (INA).

Additionally, regardless of the basis of removability, Department personnel should prioritize removable aliens who: (1) have been convicted of any criminal offense; (2) have been charged with any criminal offense that has not been resolved; (3) have committed acts which constitute a chargeable criminal offense; (4) have engaged in fraud or willful misrepresentation in connection with any official matter before a governmental agency; (5) have abused any program related to receipt of public benefits; (6) are subject to a final order of removal but have not complied with their legal obligation to depart the United States; or (7) in the judgment of an immigration officer, otherwise pose a risk to public safety or national security. The Director of ICE, the Commissioner of CBP, and the Director of USCIS may, as they determine is appropriate, issue further guidance to allocate appropriate resources to prioritize enforcement activities within these categories—for example, by prioritizing enforcement activities against removable aliens who are convicted felons or who are involved in gang activity or drug trafficking.

---

[1] The November 20, 2014, memorandum will be addressed in future guidance.

2

**B. Strengthening Programs to Facilitate the Efficient and Faithful Execution of the Immigration Laws of the United States**

Facilitating the efficient and faithful execution of the immigration laws of the United States—and prioritizing the Department's resources—requires the use of all available systems and enforcement tools by Department personnel.

Through passage of the immigration laws, Congress established a comprehensive statutory regime to remove aliens expeditiously from the United States in accordance with all applicable due process of law. I determine that the faithful execution of our immigration laws is best achieved by using all these statutory authorities to the greatest extent practicable. Accordingly, Department personnel shall make full use of these authorities.

Criminal aliens have demonstrated their disregard for the rule of law and pose a threat to persons residing in the United States. As such, criminal aliens are a priority for removal. The Priority Enforcement Program failed to achieve its stated objectives, added an unnecessary layer of uncertainty for the Department's personnel, and hampered the Department's enforcement of the immigration laws in the interior of the United States. Effective immediately, the Priority Enforcement Program is terminated and the Secure Communities Program shall be restored. To protect our communities and better facilitate the identification, detention, and removal of criminal aliens within constitutional and statutory parameters, the Department shall eliminate the existing Forms I-247D, I-247N, and I-247X, and replace them with a new form to more effectively communicate with recipient law enforcement agencies. However, until such forms are updated they may be used as an interim measure to ensure that detainers may still be issued, as appropriate.

ICE's Criminal Alien Program is an effective tool to facilitate the removal of criminal aliens from the United States, while also protecting our communities and conserving the Department's detention resources. Accordingly, ICE should devote available resources to expanding the use of the Criminal Alien Program in any willing jurisdiction in the United States. To the maximum extent possible, in coordination with the Executive Office for Immigration Review (EOIR), removal proceedings shall be initiated against aliens incarcerated in federal, state, and local correctional facilities under the Institutional Hearing and Removal Program pursuant to section 238(a) of the INA, and administrative removal processes, such as those under section 238(b) of the INA, shall be used in all eligible cases.

The INA § 287(g) Program has been a highly successful force multiplier that allows a qualified state or local law enforcement officer to be designated as an "immigration officer" for purposes of enforcing federal immigration law. Such officers have the authority to perform all law enforcement functions specified in section 287(a) of the INA, including the authority to investigate, identify, apprehend, arrest, detain, and conduct searches authorized under the INA, under the direction and supervision of the Department.

There are currently 32 law enforcement agencies in 16 states participating in the 287(g)

3

Program. In previous years, there were significantly more law enforcement agencies participating in the 287(g) Program. To the greatest extent practicable, the Director of ICE and Commissioner of CBP shall expand the 287(g) Program to include all qualified law enforcement agencies that request to participate and meet all program requirements. In furtherance of this direction and the guidance memorandum, "Implementing the President's Border Security and Immigration Enforcement Improvements Policies" (Feb. 20, 2017), the Commissioner of CBP is authorized, in addition to the Director of ICE, to accept State services and take other actions as appropriate to carry out immigration enforcement pursuant to section 287(g) of the INA.

## C. Exercise of Prosecutorial Discretion

Unless otherwise directed, Department personnel may initiate enforcement actions against removable aliens encountered during the performance of their official duties and should act consistently with the President's enforcement priorities identified in his Executive Order and any further guidance issued pursuant to this memorandum. Department personnel have full authority to arrest or apprehend an alien whom an immigration officer has probable cause to believe is in violation of the immigration laws. They also have full authority to initiate removal proceedings against any alien who is subject to removal under any provision of the INA, and to refer appropriate cases for criminal prosecution. The Department shall prioritize aliens described in the Department's Enforcement Priorities (Section A) for arrest and removal. This is not intended to remove the individual, case-by-case decisions of immigration officers.

The exercise of prosecutorial discretion with regard to any alien who is subject to arrest, criminal prosecution, or removal in accordance with law shall be made on a case-by-case basis in consultation with the head of the field office component, where appropriate, of CBP, ICE, or USCIS that initiated or will initiate the enforcement action, regardless of which entity actually files any applicable charging documents: CBP Chief Patrol Agent, CBP Director of Field Operations, ICE Field Office Director, ICE Special Agent-in-Charge, or the USCIS Field Office Director, Asylum Office Director or Service Center Director.

Except as specifically provided in this memorandum, prosecutorial discretion shall not be exercised in a manner that exempts or excludes a specified class or category of aliens from enforcement of the immigration laws. The General Counsel shall issue guidance consistent with these principles to all attorneys involved in immigration proceedings.

## D. Establishing the Victims of Immigration Crime Engagement (VOICE) Office

Criminal aliens routinely victimize Americans and other legal residents. Often, these victims are not provided adequate information about the offender, the offender's immigration status, or any enforcement action taken by ICE against the offender. Efforts by ICE to engage these victims have been hampered by prior Department of Homeland Security (DHS) policy extending certain Privacy Act protections to persons other than U.S. citizens and lawful permanent residents, leaving victims feeling marginalized and without a voice. Accordingly, I am establishing the Victims of Immigration Crime Engagement (VOICE) Office within the Office of

4

the Director of ICE, which will create a programmatic liaison between ICE and the known victims of crimes committed by removable aliens. The liaison will facilitate engagement with the victims and their families to ensure, to the extent permitted by law, that they are provided information about the offender, including the offender's immigration status and custody status, and that their questions and concerns regarding immigration enforcement efforts are addressed.

To that end, I direct the Director of ICE to immediately reallocate any and all resources that are currently used to advocate on behalf of illegal aliens (except as necessary to comply with a judicial order) to the new VOICE Office, and to immediately terminate the provision of such outreach or advocacy services to illegal aliens.

Nothing herein may be construed to authorize disclosures that are prohibited by law or may relate to information that is Classified, Sensitive but Unclassified (SBU), Law Enforcement Sensitive (LES), For Official Use Only (FOUO), or similarly designated information that may relate to national security, law enforcement, or intelligence programs or operations, or disclosures that are reasonably likely to cause harm to any person.

### E. Hiring Additional ICE Officers and Agents

To enforce the immigration laws effectively in the interior of the United States in accordance with the President's directives, additional ICE agents and officers are necessary. The Director of ICE shall—while ensuring consistency in training and standards—take all appropriate action to expeditiously hire 10,000 agents and officers, as well as additional operational and mission support and legal staff necessary to hire and support their activities. Human Capital leadership in CBP and ICE, in coordination with the Under Secretary for Management and the Chief Human Capital Officer, shall develop hiring plans that balance growth and interagency attrition by integrating workforce shaping and career paths for incumbents and new hires.

### F. Establishment of Programs to Collect Authorized Civil Fines and Penalties

As soon as practicable, the Director of ICE, the Commissioner of CBP, and the Director of USCIS shall issue guidance and promulgate regulations, where required by law, to ensure the assessment and collection of all fines and penalties which the Department is authorized under the law to assess and collect from aliens and from those who facilitate their unlawful presence in the United States.

### G. Aligning the Department's Privacy Policies With the Law

The Department will no longer afford Privacy Act rights and protections to persons who are neither U.S. citizens nor lawful permanent residents. The DHS Privacy Office will rescind the DHS *Privacy Policy Guidance memorandum*, dated January 7, 2009, which implemented the DHS "mixed systems" policy of administratively treating all personal information contained in DHS record systems as being subject to the Privacy Act regardless of the subject's immigration status. The DHS Privacy Office, with the assistance of the Office of the General Counsel, will

5

develop new guidance specifying the appropriate treatment of personal information DHS maintains in its record systems.

## H. Collecting and Reporting Data on Alien Apprehensions and Releases

The collection of data regarding aliens apprehended by ICE and the disposition of their cases will assist in the development of agency performance metrics and provide transparency in the immigration enforcement mission. Accordingly, to the extent permitted by law, the Director of ICE shall develop a standardized method of reporting statistical data regarding aliens apprehended by ICE and, at the earliest practicable time, provide monthly reports of such data to the public without charge.

The reporting method shall include uniform terminology and shall utilize a format that is easily understandable by the public and a medium that can be readily accessed. At a minimum, in addition to statistical information currently being publicly reported regarding apprehended aliens, the following categories of information must be included: country of citizenship, convicted criminals and the nature of their offenses, gang members, prior immigration violators, custody status of aliens and, if released, the reason for release and location of their release, aliens ordered removed, and aliens physically removed or returned.

The ICE Director shall also develop and provide a weekly report to the public, utilizing a medium that can be readily accessed without charge, of non-Federal jurisdictions that release aliens from their custody, notwithstanding that such aliens are subject to a detainer or similar request for custody issued by ICE to that jurisdiction. In addition to other relevant information, to the extent that such information is readily available, the report shall reflect the name of the jurisdiction, the citizenship and immigration status of the alien, the arrest, charge, or conviction for which each alien was in the custody of that jurisdiction, the date on which the ICE detainer or similar request for custody was served on the jurisdiction by ICE, the date of the alien's release from the custody of that jurisdiction and the reason for the release, an explanation concerning why the detainer or similar request for custody was not honored, and all arrests, charges, or convictions occurring after the alien's release from the custody of that jurisdiction.

## I. No Private Right of Action

This document provides only internal DHS policy guidance, which may be modified, rescinded, or superseded at any time without notice. This guidance is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS.

In implementing these policies, I direct DHS Components to consult with legal counsel to ensure compliance with all applicable laws, including the Administrative Procedure Act.

**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

MAY 7 2019

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| INNOVATION LAW LAB; CENTRAL AMERICAN RESOURCE CENTER OF NORTHERN CALIFORNIA; CENTRO LEGAL DE LA RAZA; UNIVERSITY OF SAN FRANCISCO SCHOOL OF LAW IMMIGRATION AND DEPORTATION DEFENSE CLINIC; AL OTRO LADO; TAHIRIH JUSTICE CENTER, | No.    19-15716<br><br>D.C. No. 3:19-cv-00807-RS<br><br><br>OPINION |
| Plaintiffs-Appellees, | |
| v. | |
| KEVIN K. MCALEENAN, Acting Secretary of Homeland Security, in his official capacity; U.S. DEPARTMENT OF HOMELAND SECURITY; LEE FRANCIS CISSNA, Director, U.S. Citizenship and Immigration Services, in his official capacity; JOHN L. LAFFERTY, Chief of Asylum Division, U.S. Citizenship and Immigration Services, in his official capacity; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; TODD C. OWEN, Executive Assistant Commissioner, Office of Field Operations, U.S. Customs and Border Protection, in his official capacity; U.S. CUSTOMS AND BORDER PROTECTION; RONALD D. VITIELLO, Acting Director, U.S. Immigration and Customs Enforcement, in his official capacity; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, | |

(2 of 32)

Case: 19-15716, 05/07/2019, ID: 11289387, DktEntry: 22-2, Page 575 of 655
Case 1:19-cv-03640-KBJ   Document 35-3   Filed 01/27/20   Page 575 of 655

Page 2 of 11

Defendants-Appellants.

Appeal from the United States District Court
for the Northern District of California
Richard Seeborg, District Judge, Presiding

Argued and Submitted April 24, 2019
San Francisco, California

Before:  O'SCANNLAIN, W. FLETCHER, and WATFORD, Circuit Judges.

PER CURIAM:

In January 2019, the Department of Homeland Security (DHS) issued the

Migrant Protection Protocols (MPP), which initiated a new inspection policy along

the southern border.  Before the MPP, immigration officers would typically

process asylum applicants who lack valid entry documentation for expedited

removal.  If the applicant passed a credible fear screening, DHS would either

detain or parole the individual until her asylum claim could be heard before an

immigration judge.  The MPP now directs the "return" of asylum applicants who

arrive from Mexico as a substitute to the traditional options of detention and

parole.  Under the MPP, these applicants are processed for standard removal

proceedings, instead of expedited removal.  They are then made to wait in Mexico

until an immigration judge resolves their asylum claims.  Immigration officers

exercise discretion in returning the applicants they inspect, but the MPP is

categorically inapplicable to unaccompanied minors, Mexican nationals, applicants

(3 of 32)

Case 1:19-cv-03640-KBJ Document 35-3 Filed 01/27/20 Page 576 of 655
Case: 19-15716, 05/07/2019, ID: 11289987, DktEntry: 29-2, Page 3 of 32

Page 3 of 11

who are processed for expedited removal, and any applicant "who is more likely than not to face persecution or torture in Mexico."

Eleven Central American asylum applicants who were returned to Tijuana, Mexico, and six organizations that provide asylum-related legal services challenged the MPP on several grounds in the district court. After concluding that the MPP lacks a statutory basis and violates the Administrative Procedure Act (APA), the district court enjoined DHS on a nationwide basis "from continuing to implement or expand the [MPP]."

DHS has moved for a stay of the preliminary injunction pending its appeal to this court. Our equitable discretion in ruling on a stay motion is guided by four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (internal quotation marks omitted). We begin with a discussion of the first factor, which turns largely on the plaintiffs' likelihood of success on their claim that the MPP lacks statutory authorization.

## I

Some background is in order before addressing the merits of the plaintiffs' statutory claim. Congress has established an exhaustive inspection regime for all

Case 1:19-cv-03640-KBJ Document 35-3 Filed 01/27/20 Page 577 of 655
Case 1:19-cv-03640-KBJ Document 35-3 Filed 01/27/20 Page 4 of 11
(4 of 32)

Page 4 of 11

non-citizens who seek admission into the United States.  *See* 8 U.S.C.

§ 1225(a)(3).  Applicants for admission are processed either through expedited

removal proceedings or through regular removal proceedings.  Section 1225(b)(1)

outlines the procedures for expedited removal and specifies the class of non-

citizens who are eligible for expedited removal:

> If an immigration officer determines that an alien (other
> than an alien described in subparagraph (F)) who is
> arriving in the United States or is described in clause (iii)
> is inadmissible under section 1182(a)(6)(C) or 1182(a)(7)
> of this title, the officer shall order the alien removed from
> the United States without further hearing or review
> unless the alien indicates either an intention to apply for
> asylum under section 1158 of this title or a fear of
> persecution.

§ 1225(b)(1)(A)(i).  Simply put, an applicant is eligible for expedited removal only

if the immigration officer determines that the individual is inadmissible on one of

two grounds: fraud or misrepresentation (§ 1182(a)(6)(C)) or lack of

documentation (§ 1182(a)(7)).

All applicants for admission who are not processed for expedited removal

are placed in regular removal proceedings under § 1225(b)(2)(A).  That process

generally entails a hearing before an immigration judge pursuant to § 1229a.

Section 1225(b)(2)(B) provides exceptions to § 1225(b)(2)(A), while

§ 1225(b)(2)(C) permits applicants processed under § 1225(b)(2)(A) to be returned

Case 1:19-cv-03640-KBJ Document 35-3 Filed 01/27/20 Page 578 of 655 (5 of 32)
Case 1:19-cv-03640-KBJ Document 35-3 Filed 01/27/20 Page 5 of 11

Page 5 of 11

to the contiguous territory from which they arrived for the duration of their

removal proceedings.  Section 1225(b)(2) provides in full:

> **(A) In general**
>
> Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.
>
> **(B) Exception**
>
> Subparagraph (A) shall not apply to an alien—
>
> > **(i)** who is a crewman,
> >
> > **(ii)** to whom paragraph (1) applies, or
> >
> > **(iii)** who is a stowaway.
>
> **(C) Treatment of aliens arriving from contiguous territory**
>
> In the case of an alien described in subparagraph (A) who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 1229a of this title.

DHS relies on the contiguous-territory provision in subsection (b)(2)(C) as

the statutory basis for the MPP.  That provision authorizes DHS to return "alien[s]

described in subparagraph (A)" to Mexico or Canada.  § 1225(b)(2)(C).  The

phrase "described in" refers to the "salient identifying features" of the individuals

subject to this provision.  *Nielsen v. Preap*, 139 S. Ct. 954, 965 (2019) (emphasis

and internal quotation marks omitted).  Because the plaintiffs in this case are not

"clearly and beyond a doubt entitled to be admitted," they fit the description in

§ 1225(b)(2)(A) and thus seem to fall within the sweep of § 1225(b)(2)(C).

As the district court interpreted the statute, however, the contiguous-territory

provision may not be applied to applicants for admission who could have been

placed in expedited removal under § 1225(b)(1), even if they were placed in

regular removal proceedings. The crux of this argument is § 1225(b)(2)(B)(ii),

which provides that "[s]ubparagraph (A) shall not apply to an alien . . . to whom

paragraph (1) applies." So long as the applicant is eligible for expedited removal,

the district court reasoned, § 1225(b)(1) "applies" to that individual. On this

account, it is immaterial that the plaintiffs were not in fact processed for expedited

removal during their inspection at the border.

The primary interpretive question presented by this stay motion is

straightforward: Does § 1225(b)(1) "apply" to everyone who is *eligible* for

expedited removal, or only to those *actually processed* for expedited removal?

The interpretive difficulty arises mainly because the inadmissibility grounds

contained in subsections (b)(1) and (b)(2) overlap. A subset of applicants for

admission—those inadmissible due to fraud or misrepresentation, § 1182(a)(6)(C),

and those who do not possess a valid entry document, § 1182(a)(7)—may be

placed in expedited removal. § 1225(b)(1)(A)(i). But as we read the statute,

anyone who is "not clearly and beyond a doubt entitled to be admitted" can be

processed under § 1225(b)(2)(A).  Section 1225(b)(2)(A) is thus a "catchall"

provision in the literal sense, and Congress' creation of expedited removal did not

impliedly preclude the use of § 1229a removal proceedings for those who could

otherwise have been placed in the more streamlined expedited removal process.

*See Matter of E-R-M- & L-R-M-*, 25 I. & N. Dec. 520, 522–24 (BIA 2011).

Because the eligibility criteria for subsections (b)(1) and (b)(2) overlap, we

can tell which subsection "applies" to an applicant only by virtue of the processing

decision made during the inspection process.  Take first the procedures for

designating an applicant for expedited removal.  When the immigration officer

"determines" that the applicant "is inadmissible" under § 1182(a)(6)(C) or (a)(7),

he "shall order the alien removed from the United States without further hearing"

unless the applicant requests asylum or expresses a fear of persecution, in which

case the officer "shall refer the alien for an interview by an asylum officer under

subparagraph (B)."  8 U.S.C. § 1225(b)(1)(A)(i)–(ii).  In other words, the officer

decides inadmissibility on the spot without sending the matter to an immigration

judge.  DHS's regulations further explain that a § 1225(b)(1) determination entails

either the issuance of a Notice and Order of Expedited Removal or the referral of

the applicant for a credible fear screening.  8 C.F.R. § 235.3(b)(2)(i), (4); *see also

id.* § 208.30.  And to "remove any doubt" on the issue, § 1225(b)(2)(B) clarifies

that applicants processed in this manner are not entitled to a proceeding under

§ 1229a. *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 226 (2008).

In contrast, § 1225(b)(2) is triggered "if the examining immigration officer

determines that an alien seeking admission is not clearly and beyond a doubt

entitled to be admitted." 8 U.S.C. § 1225(b)(2)(A). Following this determination,

the officer will issue a Notice to Appear, which is the first step in a § 1229a

proceeding. 8 C.F.R. § 235.6(a)(1)(i); *see also id.* § 208.2(b). A Notice to Appear

can charge inadmissibility on *any* ground, including the two that render an

individual eligible for expedited removal. 8 U.S.C. § 1229a(a)(2). The officer

then sets a date for a hearing on the issue before an immigration judge. *See*

*Pereira v. Sessions*, 138 S. Ct. 2105, 2111 (2018).

The plaintiffs were not processed under § 1225(b)(1). We are doubtful that

subsection (b)(1) "applies" to them merely because subsection (b)(1) *could have*

*been* applied. And we think that Congress' purpose was to make return to a

contiguous territory available during the pendency of § 1229a removal

proceedings, as opposed to being contingent on any particular inadmissibility

ground. Indeed, Congress likely believed that the contiguous-territory provision

would be altogether unnecessary if an applicant had already been processed for

expedited removal. The plaintiffs are properly subject to the contiguous-territory

provision because they were processed in accordance with § 1225(b)(2)(A).

(9 of 32)

Case 1:19-cv-03640-KBJ  Document 35-3  Filed 01/27/20  Page 582 of 655
Case 19-5767, 05/07/2019, document 35-3, Docket Entry 22-1, Page 582 of 655

Page 9 of 11

Though the plaintiffs contend otherwise, our approach is consistent with the subsections' headings.  Section 1225(b)(1) is titled "Inspection of aliens arriving in the United States and certain other aliens who have not been admitted or paroled," and § 1225(b)(2) is labeled "Inspection of other aliens."  The plaintiffs interpret § 1225(b) to create two mutually exclusive *pre-inspection* categories of applicants for admission; as explained above, we read the statute to create two mutually exclusive *post-inspection* categories.  In our view, those who are not processed for expedited removal under § 1225(b)(1) are the "other aliens" subject to the general rule of § 1225(b)(2).

Our interpretation is also consistent with *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018), the principal authority on which the plaintiffs rely.  There, the Supreme Court explained that "applicants for admission fall into one of two categories, those covered by § 1225(b)(1) and those covered by § 1225(b)(2)."  *Id.* at 837.  As the Court noted, "Section 1225(b)(1) applies to aliens *initially determined* to be inadmissible due to fraud, misrepresentation, or lack of valid documentation."  *Id.* (emphasis added).  "Section 1225(b)(2) is broader," since it "serves as a catchall provision that applies to all applicants for admission not covered by § 1225(b)(1)."  *Id.*  We think our interpretation more closely matches the Court's understanding of the mechanics of § 1225(b), as it is attentive to the

AR574

(10 of 32)

Case 1:19-cv-03640-KBJ Document 35-3 Filed 01/27/20 Page 583 of 655
Case 1:19-cv-03640-KBJ Document 35-3 Filed 01/27/20 Page 583 of 655

Page 10 of 11

role of the immigration officer's initial determination under § 1225(b)(1) and to

§ 1225(b)(2)'s function as a catchall.

For the foregoing reasons, we conclude that DHS is likely to prevail on its

contention that § 1225(b)(1) "applies" only to applicants for admission who are

processed under its provisions. Under that reading of the statute, § 1225(b)(1) does

not apply to an applicant who is processed under § 1225(b)(2)(A), even if that

individual is rendered inadmissible by § 1182(a)(6)(C) or (a)(7). As a result,

applicants for admission who are placed in regular removal proceedings under

§ 1225(b)(2)(A) may be returned to the contiguous territory from which they

arrived under § 1225(b)(2)(C).

The plaintiffs have advanced only one other claim that could justify a

nationwide injunction halting the implementation of the MPP on a wholesale basis:

that the MPP should have gone through the APA's notice-and-comment process.

DHS is likely to prevail on this claim as well, since "general statements of policy"

are exempted from the notice-and-comment requirement. 5 U.S.C. § 553(b)(A).

The MPP qualifies as a general statement of policy because immigration officers

designate applicants for return on a discretionary case-by-case basis. *See Regents

of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 507 (9th Cir.

2018); *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1013 (9th Cir. 1987).

(11 of 32)

Case 1:19-cv-03640-KBJ Document 35-3 Filed 01/27/20 Page 584 of 655
Case: 19-cv-03640-KBJ/2 Document 35-3 Filed 01/27/20-1 Page 584 of 655

Page 11 of 11

## II

The remaining factors governing issuance of a stay pending appeal weigh in the government's favor. As to the second factor, DHS is likely to suffer irreparable harm absent a stay because the preliminary injunction takes off the table one of the few congressionally authorized measures available to process the approximately 2,000 migrants who are currently arriving at the Nation's southern border on a daily basis. *See East Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1250–51 (9th Cir. 2018). DHS has therefore made a strong showing on both the first and second factors, which are the "most critical." *Nken*, 556 U.S. at 434.

The other two factors support the issuance of a stay as well. The plaintiffs fear substantial injury upon return to Mexico, but the likelihood of harm is reduced somewhat by the Mexican government's commitment to honor its international-law obligations and to grant humanitarian status and work permits to individuals returned under the MPP. We are hesitant to disturb this compromise amid ongoing diplomatic negotiations between the United States and Mexico because, as we have explained, the preliminary injunction (at least in its present form) is unlikely to be sustained on appeal. Finally, the public interest favors the "efficient administration of the immigration laws at the border." *East Bay Sanctuary Covenant*, 909 F.3d at 1255 (quoting *Landon v. Plasencia*, 459 U.S. 21, 34 (1982)).

The motion for a stay pending appeal is **GRANTED**.

(12 of 32)

Case 1:19-cv-03640-KBJ Document 35-3 Filed 01/27/20 Page 585 of 655
Case 9:19-15716, 05/07/2019, ID: 11289987, DktEntry: 22-2, Page 1 of 6

*Innovation Law Lab v. McAleenan*, No. 19-15716

FILED

MAY 7 2019

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

WATFORD, Circuit Judge, concurring:

I agree that the Department of Homeland Security (DHS) is likely to prevail

on the plaintiffs' primary claim, as 8 U.S.C. § 1225(b) appears to authorize DHS's

new policy of returning applicants for admission to Mexico while they await the

outcome of their removal proceedings.  But congressional authorization alone does

not ensure that the Migrant Protection Protocols (MPP) are being implemented in a

legal manner.  As then-Secretary of Homeland Security Kirstjen Nielsen

recognized, the MPP must also comply with "applicable domestic and international

legal obligations."  One of those legal obligations is imposed by Article 33 of the

1951 Convention Relating to the Status of Refugees, which provides:

> No Contracting State shall expel or return ("refouler") a
> refugee in any manner whatsoever to the frontiers of
> territories where his life or freedom would be threatened
> on account of his race, religion, nationality, membership
> of a particular social group or political opinion.

Protocol Relating to the Status of Refugees art. I, Jan. 31, 1967, 19 U.S.T. 6223,

6225, 6276 (binding the United States to comply with Article 33).  Article 3 of the

Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or

Punishment similarly provides:

> No State Party shall expel, return ("*refouler*") or extradite
> a person to another State where there are substantial
> grounds for believing that he would be in danger of being
> subjected to torture.

AR577

(13 of 32)

Case 1:19-cv-03640-KBJ Document 35-3 Filed 01/27/20 Page 586 of 655
Case 9:19-cv-03640,0970/2019 ment 3569987 DktEntry: 22-2 Page 82 of 65

Page 2 of 5

Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100-20, at 20 (1988).

DHS's stated goal is to ensure that the MPP is implemented in a manner that complies with the *non-refoulement* principles embodied in these treaty provisions. Specifically, Secretary Nielsen's policy guidance on implementation of the MPP declares that "a third-country national should not be involuntarily returned to Mexico pursuant to Section 235(b)(2)(C) of the INA if the alien would more likely than not be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion . . . , or would more likely than not be tortured, if so returned pending removal proceedings."

In my view, DHS has adopted procedures so ill-suited to achieving that stated goal as to render them arbitrary and capricious under the Administrative Procedure Act.  *See* 5 U.S.C. § 706(2)(A).  Under DHS's current procedures, immigration officers do not ask applicants being returned to Mexico whether they fear persecution or torture in that country.  Immigration officers make inquiries into the risk of *refoulement* only if an applicant affirmatively states that he or she fears being returned to Mexico.

DHS's policy is virtually guaranteed to result in some number of applicants being returned to Mexico in violation of the United States' *non-refoulement* obligations.  It seems fair to assume that at least some asylum seekers subjected to

the MPP will have a legitimate fear of persecution in Mexico. Some belong to protected groups that face persecution both in their home countries and in Mexico, and many will be vulnerable to persecution in Mexico because they are Central American migrants. It seems equally fair to assume that many of these individuals will be unaware that their fear of persecution in Mexico is a relevant factor in determining whether they may lawfully be returned to Mexico, and hence is information they should volunteer to an immigration officer. If both of those assumptions are accurate, DHS will end up violating the United States' treaty obligations by returning some number of asylum seekers to Mexico who should have been allowed to remain in the United States.

There is, of course, a simple way for DHS to help ensure that the United States lives up to its *non-refoulement* obligations: DHS can ask asylum seekers whether they fear persecution or torture in Mexico. I'm at a loss to understand how an agency whose professed goal is to comply with *non-refoulement* principles could rationally decide *not* to ask that question, particularly when immigration officers are already conducting one-on-one interviews with each applicant. This policy of refusing to ask seems particularly irrational when contrasted with how DHS attempts to uphold the United States' *non-refoulement* obligations in expedited removal proceedings. In that context, immigration officers are required to ask applicants whether they fear being removed from the United States and

returned to their home countries.  *See* 8 C.F.R. § 235.3(b)(2)(i) (requiring immigration officers to use Form I-867B).  Since the same *non-refoulement* principles apply to removal and return alike, DHS must explain why it affirmatively asks about fear of persecution in the removal context but refrains from asking that question when applying the MPP.

DHS has not, thus far, offered any rational explanation for this glaring deficiency in its procedures.  (One suspects the agency is not asking an important question during the interview process simply because it would prefer not to hear the answer.)  As the record stands now, then, it seems likely that the plaintiffs will succeed in establishing that DHS's procedures for implementing the MPP are arbitrary and capricious, at least in the respect discussed above.

Success on this claim, however, cannot support issuance of the preliminary injunction granted by the district court.  We explained recently that the "scope of the remedy must be no broader and no narrower than necessary to redress the injury shown by the plaintiff."  *California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018).  Here, the plaintiffs' injury can be fully remedied without enjoining the MPP in its entirety, as the district court's preliminary injunction currently does.  I expect that appropriate relief for this arbitrary and capricious aspect of the MPP's implementation will involve (at the very least) an injunction directing DHS to ask applicants for admission whether they fear being returned to Mexico.  The precise

scope of such relief would need to be fashioned after further proceedings in the

district court.  In the meantime, the government is entitled to have the much

broader preliminary injunction currently in place stayed pending appeal.

(17 of 32)

Case 1:19-cv-03640-KBJ Document 35-3 Filed 01/27/20 Page 590 of 655
Case: 19-15716, 05/07/2019, ID: 11289987, DktEntry: 22-3, Page 2 of 33

FILED

*Innovation Law Lab v. McAleenan*, No. 19-15716

MAY 7 2019

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

W. FLETCHER, Circuit Judge, concurring only in the result:

I strongly disagree with my colleagues.

The question of law in this case can be stated simply:   The Government relies on 8 U.S.C. § 1225(b)(2)(C) for authority to promulgate its new Migrant Protection Protocols ("MPP").  If § 1225(b)(2)(C) provides such authority, the MPP is valid.  If it does not, the MPP is invalid.  The question is thus whether § 1225(b)(2)(C) provides authority for promulgation of the MPP.  The answer can also be stated simply:  The Government is wrong.  Not just arguably wrong, but clearly and flagrantly wrong.  Section 1225(b)(2)(C) does not provide authority for the MPP.

\* \* \*

I begin with a short summary of established law.  Under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), arriving aliens applying for admission into the United States fall into two separate and non-overlapping categories.

First, there are aliens described in 8 U.S.C. § 1225(b)(1).  These are alien applicants for admission who are traveling with fraudulent documents or no documents.  Immigration officers are required by regulation to ask whether these

applicants fear persecution in their home country. If so, they are referred for a "credible fear" interview with an asylum officer. If they are found to have a credible fear of persecution in their home country, and are therefore potentially eligible for asylum, they are placed in a regular removal proceeding under 8 U.S.C. § 1229a. In that proceeding, an Immigration Judge ("IJ") can find them either eligible or ineligible for asylum. Applicants who are referred to regular removal proceedings are entitled to remain in the United States while their eligibility for asylum is determined. Applicants found not to have a credible fear are subject to expedited removal without any formal proceeding.

Second, there are aliens described in 8 U.S.C. § 1225(b)(2). These are all alien applicants for admission not described in § 1225(b)(1). In the words of the statute, they are "other aliens." § 1225(b)(2) (heading). Section (b)(2) applicants include aliens who are suspected of being, inter alia, drug addicts, convicted criminals, terrorists, or alien smugglers, and who would therefore be inadmissible. *See* 8 U.S.C. § 1182(a)(1)(A)(iv); (a)(2); (a)(3)(B); (a)(6)(E). Unlike § (b)(1) applicants, § (b)(2) applicants are automatically referred to regular removal proceedings under § 1229a. In those proceedings, an IJ can determine whether the applicants are, in fact, inadmissible on a ground specified in § 1182(a). Also unlike § (b)(1) applicants, § (b)(2) applicants are not entitled to remain in the

2

United States while their admissibility is determined.  At the discretion of the Government, they may be "returned" to a "contiguous territory" pending determination of their admissibility.  § 1225(b)(2)(C).

This statutory structure has been well understood ever since the passage of IIRIRA in 1996, and until now the Government has consistently acted on the basis of this understanding.  The Government today argues for an entirely new understanding of the statute, based on arguments never before made or even suggested.

* * *

It is undisputed that plaintiffs are bona fide asylum applicants under § (b)(1).  Although it has long been established that § (b)(1) applicants are entitled to stay in the United States while their eligibility for asylum is determined, the Government is now sending § (b)(1) applicants back to Mexico.  The Government refuses to treat them as § (b)(1) applicants.  Instead, the Government improperly treats them under the MPP as § (b)(2) applicants who can be "returned" to Mexico under § 1225(b)(2)(C).  The Government's arguments in support of the MPP are not only unprecedented.  They are based on an unnatural and forced—indeed, impossible—reading of the statutory text.

The relevant text of 8 U.S.C. § 1225 is as follows:

3

(20 of 32)

Case 1:19-cv-03640-KBJ   Document 35-3   Filed 01/27/20   Page 593 of 655
Case 1:19-cv-03640-KBJ   Document 11-3   Filed 11/14/19   Page 4 of 55

**(a) Inspection**

**(1)  Aliens treated as applicants for admission**

An alien present in the United States who has not been admitted . . . shall be deemed for purposes of this chapter an applicant for admission.

. . .

**(b)  Inspection of applicants for admission**

**(1)  Inspection of aliens arriving in the United States and certain other aliens who have not been admitted or paroled**

**(A)  Screening**

**(i)  In general**

If an immigration officer determines that an alien . . . who is arriving in the United States . . . is inadmissible under section 1182(a)(6)(C) or 1182(a)(7) of this title, the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution.

**(ii)  Claims for asylum**

If an immigration officer determines that an alien . . . is inadmissible under section 1182(a)(6)(C) or 1182(a)(7) of this title and the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution, the officer shall refer the alien for an interview by an asylum officer under subparagraph (B).

. . .

**(B)  Asylum interviews**

. . .

**(ii)  Referral of certain aliens**

If the [asylum] officer determines at the time of the interview that an alien has a credible fear of persecution . . . , the alien shall be detained for further consideration of the application for asylum.

. . .

**(2)  Inspection of other aliens**

**(A)  In general**

Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration

4

(21 of 32)

Case 1:19-cv-03640-KBJ   Document 35-3   Filed 01/27/20   Page 594 of 655
Case 1:19-cv-02261-05/07/2019   Document 35-3   Docket 1/27/20   B, Page 24 of 66

officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.

**(B) Exception**

Subparagraph (A) shall not apply to an alien —

**(i)** who is a crewman

**(ii)** to whom paragraph (1) applies, or

**(iii)** who is a stowaway.

**(C) Treatment of aliens arriving from contiguous territory**

In the case of an alien described in subparagraph (A) who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 1229a of this title.

The statutory text is unambiguous. There are two categories of "applicants for admission." § 1225(a). First, there are applicants described in § 1225(b)(1). Second, there are applicants described in § 1225(b)(2).

Applicants described in § 1225(b)(1) are those who may be inadmissible under § 1182(a)(6)(C) (applicants traveling with fraudulent documents) or under § 1182(a)(7) (applicants with no valid documents).

Applicants described in § 1225(b)(2) are distinct. In the words of the statute, they are "other aliens." § 1225(b)(2) (heading). Put differently, again in the words of the statute, § (b)(2) applicants are applicants "to whom paragraph [b](1)" does not apply. § 1225(b)(2)(B)(ii). That is, § (b)(1) applicants are those who may be inadmissible on either of the two grounds specified in that subsection. Section

5

(b)(2) applicants are all other potentially inadmissible applicants.

Section (b)(1) applicants are more numerous than § (b)(2) applicants, but § (b)(2) is a broader category in the sense that applicants under § (b)(2) are inadmissible on more grounds than applicants under § (b)(1). Applicants inadmissible under § (b)(2) include, for example, aliens with "a communicable disease of public health significance" or who are "drug abuser[s] or addict[s]" (§ 1182(a)(1)(A)(i), (iv)); aliens who have "committed . . . a crime involving moral turpitude" or who have "violat[ed] . . . any law or regulation . . . relating to a controlled substance" (§ 1182(a)(2)(A)(i)); aliens who "seek to enter the United States . . . to violate any law of the United States relating to espionage or sabotage," or who have "engaged in a terrorist activity" (§ 1182(a)(3)(A), (B)); aliens who are "likely . . . to become a public charge" (§ 1182(a)(4)(A)); and aliens who are alien "smugglers" (§ 1182(a)(6)(E)).

Just last year, the Supreme Court distinguished between § (b)(1) and § (b)(2) applicants, stating clearly that they fall into two separate categories:

> [*A*]*pplicants for admission fall into one of two categories*, those covered by § 1225(b)(1) and those covered by § 1225(b)(2). Section 1225(b)(1) applies to aliens initially determined to be inadmissible due to fraud, misrepresentation, or lack of valid documentation. . . . Section 1225(b)(2) is broader. It serves as a catchall provision that applies to all *applicants for admission not covered by § 1225(b)(1).*

6

AR587

*Jennings v. Rodriguez*, 138 S. Ct. 830, 837 (2018) (emphasis added).

Less than a month ago, the Attorney General of the United States drew the same distinction and briefly described the procedures applicable to the two categories:

> Under section 235 of the Act [8 U.S.C. § 1225], all aliens "arriv[ing] in the United States" or "present in the United States [without having] been admitted" are considered "applicants for admission," who "shall be inspected by immigration officers." INA § 235(a)(1), (3). [8 U.S.C. § 1225(a)(1), (3).] In most cases, those inspections yield one of three outcomes. First, if an alien is "clearly and beyond a doubt entitled to be admitted," he will be permitted to enter, or remain in, the country without further proceedings. *Id.* § 235(b)(2)(A). [8 U.S.C. § 1225(b)(2)(A).] Second, if the alien is not clearly admissible, then, generally, he will be placed in "proceeding[s] under section 240 [8 U.S.C. § 1229a]" of the Act—that is, full removal proceedings. *Id.* Third, if the alien is inadmissible on one of two specified grounds and meets certain additional criteria, DHS may place him in either expedited or full proceedings. *Id.* § 235(b)(1)(A)(i) [8 U.S.C. § 1225(b)(1)(A)(i)]; *see Matter of E R M & L R M*, 25 I&N Dec. 520, 524 (BIA 2011).

*Matter of M S*, 27 I. & N. Dec. 509, 510 (BIA April 16, 2019).

The procedures specific to the two categories of applicants are given in their respective subsections.

To some extent, the statutorily prescribed procedures are the same for both categories. If a § (b)(1) applicant passes his or her credible fear interview he or she will be placed in regular removal proceedings under 8 U.S.C. § 1229a. *See* 8 C.F.R. § 208.30(f). A § (b)(1) applicant may also be placed directly into regular

7

(24 of 32)

Case 1:19-cv-03640-KBJ   Document 35-3   Filed 01/27/20   Page 597 of 655
Case 1:19-cv-02336-DSF   Document 115-8   Filed 11/17/22   Page 23 of 55

removal proceedings under § 1229a at the discretion of the Government.  *See*

*Matter of E R M  & L R M* , 25 I. & N. Dec. 520 (BIA 2011).  A § (b)(2) applicant

who is "not clearly and beyond a doubt entitled to be admitted" will also be placed

in removal proceedings under § 1229a.  *See* § 1225(b)(2)(A).

Both § (b)(1) and § (b)(2) applicants can thus be placed in regular removal

proceedings under § 1229a, though by different routes.  But the fact that an

applicant is in removal proceedings under § 1229a does not change his or her

underlying category.  A § (b)(1) applicant does not become a § (b)(2) applicant, or

vice versa, by virtue of being placed in a removal proceeding under § 1229a.  A

homely analogy may help make the point.  Dogs and cats can both be placed in the

pound.  But they still retain their separate identities.  Dogs do not become cats, or

vice versa.

However, the statutory procedures for the two categories are not identical.

Some of the procedures are exclusive to one category or the other.  For example, if

a § (b)(1) applicant fails to pass his or her credible fear interview, he or she may be

removed in an expedited proceeding without a removal proceeding under § 1229a.

*See* § 1225(b)(1)(A), (B).  There is no comparable procedure for expedited removal

of a § (b)(2) applicant.  Further, in some circumstances a § (b)(2) applicant may be

"returned" to a "territory contiguous to the United States" pending his or her

8

removal proceeding under § 1229a.  *See* § 1225(b)(2)(C).  There is no comparable procedure for a § (b)(1) applicant.

The precise question in this case is whether a § (b)(1) applicant may be "returned" to a contiguous territory under § 1225(b)(2)(C).  That is, may a § (b)(1) applicant be subjected to a procedure specified for a § (b)(2) applicant?  A plain-meaning reading of § 1225(b)—as well as the Government's longstanding and consistent practice—tell us that the answer is "no."

There is nothing in § 1225(b)(1) to indicate that a § (b)(1) applicant may be "returned" under § 1225(b)(2)(C).  Section (b)(1)(A)(i) tells us with respect to § (b)(1) applicants that an "officer shall order the alien removed . . . without further hearing or review unless the alien indicates either an intention to apply for asylum . . . or a fear of persecution."  Section (b)(1)(A)(ii) tells us that § (b)(1) applicants who indicate an intention to apply for asylum or a fear of persecution "shall" be referred by the immigration officer to an "asylum officer" for an interview.  The remainder of § 1225(b)(1) specifies what happens to a § (b)(1) applicant depending on the determination of the asylum officer—either expedited removal or detention pending further consideration.  § 1225(b)(1)(B)(ii)-(iii).  There is nothing in § 1225(b)(1) stating, or even suggesting, that a § (b)(1) applicant is subject to the "return" procedure of § 1225(b)(2)(C).

9

(26 of 32)

Case 1:19-cv-03640-KBJ Document 35-3 Filed 01/27/20 Page 599 of 655
Case 1:19-cv-03640-KBJ Document 35-3 Filed 01/27/20 Page 599 of 655

Nor is there anything in § 1225(b)(2) to indicate that a § (b)(1) applicant may be "returned" under § 1225(b)(2)(C).  Taking § 1225(b)(2) subparagraph by subparagraph, it provides as follows.  Subparagraph (A) tells us that unless a § (b)(2) applicant is "clearly and beyond a doubt entitled to be admitted," she or he "shall be detained" for a removal proceeding under § 1229a.  § 1225(b)(2)(A). Subparagraph (A) is "[s]ubject to subparagraphs (B) and (C)."  *Id.*  Subparagraph (B) tells us that subparagraph (A) does not apply to three categories of aliens—"crewm[e]n," § (b)(1) applicants, and "stowaway[s]."  § 1225(b)(2)(B). Finally, subparagraph (C) tells us that a § (b)(2) applicant who arrives "on land . . . from a foreign territory contiguous to the United States," instead of being "detained" under subparagraph (A) pending his or her removal proceeding under § 1229a, may be "returned" to that contiguous territory pending that proceeding. § 1225(b)(2)(C).  Section (b)(1) applicants are mentioned only once in § 1225(b)(2), in subparagraph (B)(ii).  That subparagraph specifies that subparagraph (A)—which tells us what happens to § (b)(2) applicants—does not apply to § (b)(1) applicants.

The "return-to-a-contiguous-territory" provision of § 1225(b)(2)(C) is available only for § (b)(2) applicants.  There is no way to read the statute otherwise.  Under a plain-meaning reading of the text, as well as the Government's

(27 of 32)

Case 1:19-cv-03640-KBJ Document 35-3 Filed 01/27/20 Page 600 of 655
Case 1:19-cv-03640-KBJ Document 35-3 Filed 01/27/20 Page 11 of 55

longstanding and consistent practice, the statutory authority upon which the Government now relies simply does not exist.

* * *

In support of its motion to stay the order of the district court pending appeal, the Government makes several arguments.  None is persuasive.

The Government first argues that § (b)(1) applicants are included within the category of § (b)(2) applicants.  *See* Govt. Brief at 10.  Under the Government's argument, there are two categories of applicants, but the categories are overlapping.  There are § (b)(1) applicants, who are defined in § (b)(1), and there are § (b)(2) applicants, who are defined as all applicants, including, but not limited to, § (b)(1) applicants.

For this argument, the Government relies on the phrase "an alien seeking admission" in § 1225(b)(2)(A).  The Government argues that because § (b)(1) and § (b)(2) applicants are both "aliens seeking admission," subparagraph (A) of § (b)(2) refers to both categories of applicants.  Then, because subparagraph (A) is, by its terms, "[s]ubject to subparagraphs (B) and (C)," the Government argues that a § (b)(1) applicant may be "return[ed]" to a "foreign territory contiguous to the United States" under subparagraph (C).

The Government's argument ignores the statutory text, the Supreme Court's

11

(28 of 32)
Case 1:19-cv-03640-KBJ Document 35-3 Filed 01/27/20 Page 601 of 655
Case 1:19-cv-03640-KBJ Document 35-3 Filed 01/27/20 Page 12 of 655

opinion in *Jennings* last year, and the opinion of its own Attorney General in *Matter of M S* less than a month ago.

The text of § 1225(b) tells us that § (b)(1) and § (b)(2) are separate and non-overlapping categories. Section 1225(b) specifies that § (b)(1) applicants are aliens who are inadmissible either under § 1182(a)(6)(C) or under § 1182(a)(7). Section (b)(2) aliens are "*other* aliens." *See* § 1225(b)(2) (heading) ("Inspection of *other* aliens") (emphasis added). That is, § (b)(2) covers applicants "other" than § (b)(1) applicants. In case a reader has missed the significance of the heading of § (b)(2), the statute makes the point again, this time in the body of § (b)(2). Section (b)(2)(B)(ii) specifically provides that subparagraph (A) of § (b)(2) "shall not apply to an alien . . . to whom paragraph [b](1) applies."

In *Jennings*, the Supreme Court last year told us explicitly that § (b)(1) and § (b)(2) applicants fall into separate and non-overlapping categories. It wrote, "[*A*]*pplicants for admission fall into one of two categories*, those covered by § 1225(b)(1) and those covered by § 1225(b)(2). . . . Section 1225(b)(2) . . . applies to all applicants for admission *not* covered by § 1225(b)(1)." *Jennings*, 138 S. Ct. at 837 (emphasis added). Finally, in *Matter of M S*, the Attorney General wrote on April 16 of this year that an applicant is subject to different procedures depending on whether he or she is a § (b)(1) or § (b)(2) applicant. *Matter of M S*,

(29 of 32)

Case 1:19-cv-03640-KBJ Document 35-3 Filed 01/27/20 Page 602 of 655
Case 1:19-cv-03640-KBJ Document 35-3 Filed 01/27/20 Page 602 of 655

27 I. & N. Dec. at 510.

The Government's second argument follows from its first. *See* Govt. Brief at 10–13. For its second argument, the Government relies on subparagraph (B)(ii), which provides: "Subparagraph (A) shall not *apply* to an alien . . . to whom paragraph [b](1) *applies*." § 1225(b)(2)(B)(ii) (emphasis added). The Government argues that subparagraph (B)(ii) allows a government official to perform an act. The act supposedly authorized is to "apply" the expedited removal procedures of § (b)(1) to some of the aliens under § (b)(2), as the Government defines § (b)(2) applicants. (The Government needs to make this argument in order to avoid the consequence of treating all § (b)(1) applicants as § (b)(2) applicants, who are automatically entitled to regular removal proceedings.)

There is a fundamental textual problem with the Government's argument. "Apply" is used twice in the same sentence in § (b)(2)(B)(ii). The first time the word is used, it refers to the application of a statutory section ("Subparagraph (A) shall not apply"). The second time the word is used, it is used in the same manner, again referring to the application of a statutory section ("to whom paragraph [b](1) applies"). When the word is used the first time, it tells us that subparagraph (A) shall not apply. When the word is used the second time, it tells us to whom subparagraph (A) shall not apply: It does not apply to applicants to whom § (b)(1)

13

(30 of 32)

Case 1:19-cv-03640-KBJ Document 35-3 Filed 01/27/20 Page 603 of 655
Case 1:19-cv-03640-KBJ Document 35-3 Filed 01/27/20 Page 31 of 55

applies. Neither time does the word "apply" refer to an act performed by a government official.

The Government's third argument is disingenuous. The Government argues that § (b)(1) applicants are more "culpable" than § (b)(2) applicants, and that they therefore deserve to be forced to wait in Mexico while their asylum applications are being adjudicated. The Government argues that returning § (b)(2), but not § (b)(1), applicants to a contiguous territory would have "the perverse effect of privileging aliens who attempt to obtain entry to the United States by fraud . . . over aliens who follow our laws." Govt. Brief at 14. In its Reply Brief, the Government compares § (b)(1) and § (b)(2) applicants, characterizing § (b)(2) applicants as "less-culpable arriving aliens." Govt. Reply Brief at 5. The Government has it exactly backwards.

Section (b)(1) applicants are those who are "inadmissible under section 1182(a)(6)(C) or 1182(a)(7)" of Title 8. Section 1182(a)(6)(C), entitled "Misrepresentation," covers, inter alia, aliens using fraudulent documents. That is, it covers aliens who travel under false documents and who, once they arrive at the border or have entered the country, apply for asylum. Section 1182(a)(7), entitled "Documentation requirements," covers aliens traveling without documents. In other words, § (b)(1) applies to bona fide asylum applicants, who commonly have

AR595

(31 of 32)

Case 1:19-cv-03640-KBJ Document 35-3 Filed 01/27/20 Page 604 of 655
Case 1:19-cv-03640-KBJ Document 35-3 Filed 01/27/20 Page 15 of 655

fraudulent documents or no documents. Indeed, for many applicants, fraudulent documents are their only means of fleeing persecution, even death, in their own countries. The structure of § (b)(1), which contains detailed provisions for processing asylum seekers, demonstrates that Congress recognized that § (b)(1) applicants may have valid asylum claims and should therefore receive the procedures specified in § (b)(1).

The history of § 1225(b)(2)(C) confirms that Congress did not have § (b)(1) applicants in mind. Section 1225(b)(2)(C) was added to IIRIRA late in the drafting process, in the wake of *Matter of Sanchez Avila*, 21 I. & N. Dec. 444 (BIA 1996). The petitioner in *Sanchez Avila* was a Mexican national who applied for entry as a "resident alien commuter" but who was charged as inadmissible due to his "involvement with controlled substances." *Id.* at 445. In adding § 1225(b)(2)(C) to what was to become IIRIRA, Congress had in mind § (b)(2) applicants like the petitioner in *Sanchez Avila*. It did not have in mind bona fide asylum seekers who arrive with fraudulent documents or no documents at all.

Contrary to the Government's argument, § (b)(1) applicants are not more "culpable" than § (b)(2) applicants. Quite the opposite. The § (b)(1) applicants targeted by the MPP are innocent victims fleeing violence, often deadly violence, in Central America. In stark contrast, § (b)(2) applicants include suspected drug

(32 of 32)

Case 1:19-cv-03640-KBJ Document 35-3 Filed 01/27/20 Page 605 of 655
Case: 19-15716 03/07/2019, ID: 11835998, DktEntry: 22-3, Page 45 of 55

addicts, convicted criminals, terrorists, and alien smugglers.  *See*
§ 1182(a)(1)(A)(iv); (a)(2); (a)(3)(B); (a)(6)(E).  Section (b)(2) applicants are
precisely those applicants who should be "returned" to a "contiguous territory,"
just as § 1225(b)(2)(C) provides.

* * *

Acting as a motions panel, we are deciding the Government's emergency
motion to stay the order of the district court pending appeal.  Because it is an
emergency motion, plaintiffs and the Government were severely limited in how
many words they were allowed.  Our panel heard oral argument on an expedited
basis, a week after the motion was filed.

I regret that my colleagues on the motions panel have uncritically accepted
the Government's arguments.  I am hopeful that the regular argument panel that
will ultimately hear the appeal, with the benefit of full briefing and regularly
scheduled argument, will be able to see the Government's arguments for what they
are—baseless arguments in support of an illegal policy that will, if sustained,
require bona fide asylum applicants to wait in Mexico for years while their
applications are adjudicated.

16

1

2

3

4

5

6                          UNITED STATES DISTRICT COURT

7                          CENTRAL DISTRICT OF CALIFORNIA

8

9    CROSBY WILFREDO ORANTES-              )   CASE NO. CV 82-01107 MMM (VBKx)
     HERNANDEZ, et al.,                    )
10                                         )
                 Plaintiffs,               )
11                                         )
                                           )
12           vs.                           )   MODIFIED, CONSOLIDATED
                                           )   INJUNCTION
13   ALBERTO R. GONZALES, Attorney         )
     General of the United States, et al., )
14                                         )
                 Defendants.               )
15                                         )
                                           )
16   _____)

17         This order consolidates the operative provisions of the permanent injunction first issued by Judge

18   David Kenyon on April 29, 1988, and later m odified on July 2, 1991 and Septem ber 28, 2004. I n

19   addition, it incorporates the modifications to the injunction that this court made on October 11, 2006,

20   and July 24, 2007 in response to the government's motion to dissolve the injunction.[1]  Except where a

21   different date is specified, the language is that of the Stipulated Order of July 2, 1991.

22

23                              **MODIFIED PERMANENT INJUNCTION**

24   Defendants, their agents and successors in office are permanently enjoined as follows:

25   1.       Defendants shall not em ploy threats, m isrepresentation, subterfuge or other form s of

26            coercion, or in any other way attem pt to persuade or dissuade class m embers when

27   _____

     [1]This order is entered pursuant to the court's order granting plaintiffs' motion to consolidate the
28   current provisions of the permanent injunction in a single order.

AR598

1     informing them of the availability of voluntary departure pursuant to 8 U.S.C. § 1252(b).

2     The prohibited acts include, but are not limited to:

3     a.     Misrepresenting the m eaning of political asylum  and giving im  proper and

4            incomplete legal advice to detained class members;

5     b.     Telling class members that if they apply for asylum they will remain in detention

6            for a long period of time, without mentioning the possibility of release on bond

7            or indicating that bond can be lowered by a immigration judge and that there are

8            bond agencies which can provide assistance;

9     c.     Telling Salvadoran detainees the amount of bond given to other class members,

10           without indicating that the      bond    amount ultim ately depends upon the

11           circumstances of the individual class member;

12    d.     Telling class m embers that their asylum   applications will be denied, that

13           Salvadorans do not get asylum, or that asylum is only available to guerillas or

14           soldiers;

15    e.     Representing to class m embers that the inform ation on the asylum  application

16           will be sent to El Salvador;

17    f.     Representing to class members that asylum applicants will never be able to return

18           to El Salvador;

19    g.     Indicating that Salvadoran detainees will be transf erred to rem ote locations if

20           they do not elect voluntary departure;

21    h.     Advising Salvadorans of the negative aspects of choosing a deportation hearing

22           without informing them of the positive options that are available;

23    i.     Refusing to allow class members to contact an attorney; and

24    j.     Making daily announcem ents a t deten tion facilities of the availability of

25           voluntary departure.

26    The Court highly recommends the use of videotaped information on immigration proceedings,

27    such as is now being used at El Centro and Oakdale, and suggests that all interested parties cooperate

28    in the production of such videos for use in all detention facilities.

2

AR599

2.    [This paragraph modified by October 11, 2006 order.]  At the time any class member is processed in secondary inspection at the border or processed after being found within the territorial boundaries of the United States, whether or not he or she is automatically processed for a hearing, Defendants shall inform the class member of the existence of his or her right to apply for political asylum Defendants shall also inform(1) each class member placed in section 240 proceedings thathe or she has the right to be represented by an attorney and to request a removal hearing before an immigration judge; and (2) each class member placed in expedited removal that he or she will have the right to be represented by an attorney and to request a removal hearing before an immigration judge if, and only if, he or she applies for asylum and is found to have a credible fear of persecution.  For those class members who are informed of the availability of voluntary departure pursuant to 8 U.S.C. § 1252(b), such notice shall be given before voluntary departure is discussed.

Defendants shall:

    a.    Provide the class member with a copy of the advisal of rights form approved by the Court and a copy of free legal services list compiled pursuant to 8 C.F.R. § 292a.1 and permit the class member to retain these in his or her possession;

    b.    Inquire as to whether the class member can read, and if the class member indicates that he or she cannot read, the advisal shall be read verbatim to the class member in Spanish; and

    c.    Obtain a signed acknowledgment on a separate copy of the approved advisal from the class member showing that the aforesaid notices have been provided.

3.    If, after receiving the above notice, the class member informs Defendants that he or she wishes to apply for political asylum and/or a deportation hearing, or otherwise indicates that he or she fears returning to El Salvador, Defendants shall not advise, encourage, or persuade the class member to change his or her decision.  Specifically, Defendants are to avoid the practices indicated in paragraph 1(a)-(j) above, although that listing is not exhaustive.

3

1    4.    Defendants shall provide class members with access to telephones during processing.

2    5.    Defendants shall revise and maintain updated and accurate legal service lists.

3    a.    Such lists must include all organizations that wish to be included who "are

4    available to render such free legal services by representation in deportation or

5    exclusion proceedings." 8 C.F.R. §292a.2. Organizations should be permitted

6    to identify the scope of their representation on the legal services lists.

7    b.    Defendants shall cooperate with other interested parties in compiling and

8    maintaining legal services lists.

9    c.    Defendants shall provide such lists to detainees at the time of processing and

10    whenever a class member is transferred to a new facility. Such lists should also

11    be made freely available at all detention facilities.

12    6.    The INS shall assign an officer with published phone number in each of its four regional

13    offices to provide information on Salvadorans detained in the region.

14    a.    Interested relatives and counsel, if they give the person's name to the INS officer,

15    will be informed of this person's location. If the class member is scheduled for

16    voluntary departure, the inquiring individual should also be informed of the date,

17    time, and place from which the class member is scheduled to leave.

18    b.    This information may be obtained by calling the designated phone number only

19    during the normal working hours of the region. The above information will be

20    made available as soon as practicable. For persons scheduled for departure, the

21    information should be available as soon as practicable after travel documents

22    have been obtained, but in any event, at least 24 hours prior to actual departure.

23    c.    If an attorney informs the officer that he or she wishes to communicate with a

24    specifically identified member of the plaintiff class who is scheduled for

25    voluntary departure, and that he or she has not yet been able to do so, Defendants

26    shall not expel the plaintiff class member until such counsel has had a reasonable

27    opportunity for such communication.

28    7.    Once a written notice of appearance has been made by an attorney on behalf of any

AR601

member of the plaintiff class,

Defendants shall:

a.  Give counsel 24 hours actual advance notice of the date, time, and place of the intended removal before removing the class member from the United States;

b.  Permit counsel to rescind an agreement to voluntarily depart on behalf of the class member;

c.  Allow paralegal assistants working under the supervision of counsel to have access to class members even though the paralegals are unaccompanied by counsel;

d.  Allow counsel or paralegals working under the supervision of counsel reasonable access to class members between the hours of 9:00 a.m and 9:30 p.m, excluding such time as is necessary for reasonable security procedures. Detainees should be given the option to meet with their legal representatives during meal hours; and

e.  Provide at least one telephone per twenty-five (25) detainees at detention centers. Defendants shall ensure the privacy of attorney-client communications, through the use of privacy panels between telephones or other effective means. The Court wishes to ensure the utmost confidentiality between detainees and their legal representatives.

8.  Defendants shall permit detained class members to receive and possess legal materials explaining United States immigration law and procedure, and any other written materials unless possession of such materials would conflict with the maintenance of institutional security. Incoming written materials should not be confiscated except for materials reasonably defined as contraband or matters which pose a genuine risk to security. Writing materials, including papers, pencils, pens, and access to typewriters, must be made available in detention facilities.

9.  Defendants shall provide detained class members with those legal materials regarding immigration matters which are currently available in both English and Spanish, and

5

AR602

should work in conjunction with counsel for plaintiffs to produce additional materials in Spanish. Detention center law libraries should be sufficiently accessible to detainees.

10. [Removed by July 26, 2007 Order].

11. a. Defendants shall not transfer detained class members who are unrepresented by counsel from the district of their apprehension for at least seven (7) days to afford class members the opportunity to obtain counsel.

   b. Where a class member is represented by counsel or obtains counsel during the seven-day period described above, he or she can be transferred to other locations in accordance with 8 U.S.C. §1252(c); however, venue shall remain in the district where the class member's counsel is located. Furthermore, the class member must be returned to the district in which venue is set sufficiently in advance of any proceeding in order to allow the detainee adequate time to consult with counsel. The class member must be returned within a reasonable time after receiving a request to do so from the detainee's counsel.

   The term "transfer" as used in this paragraph refers to the relocation from one detention facility to another of class members who are held in detention pending the initiation or resolution of their immigration proceedings. The restrictions of this paragraph do not apply to the detention, transfer, or other transportation of individuals who are subject to final orders of removal entered as a result of expedited removal proceedings. [This paragraph added by Oct. 11, 2006 Order].

The following provisions apply only to the Defendants' Port Isabel Service Processing Center in Texas:

12. [Removed by July 26, 2007 Order].

13. All Burns or other private security company guards and INS officers working at PISPC should receive training in the requirements of this permanent injunction. Refresher courses should be provided periodically.

14. Defendants must provide at all visitation times a sufficient number of personnel assigned

6

AR603

1        to escort duties in order to assure attorneys and paralegals prompt access to detainees.

2        Generally, if an attorney or paralegal has advised INS in advance of the clients he or she

3        seeks to visit, he or she should have access to at least one client within 15 minutes of

4        arrival at visitation, and without subsequent delays. Even when such advance notice is

5        not given, access must be provided promptly, generally within 30 minutes of arrival.

6        Advance notice means that defendants are provided with the name and the administrative

7        number (A-number) of the detainee(s) by telephone to a number designated by

8        defendants, by fax (if available) to a number designated by defendants, or by in-person

9        delivery to the detention center of a list atleast two "business hours" (i.e. between 8:00

10      a.m. and 4:30 p.m. daily) in advance of the visit. Defendants will accept telephone calls

11      from 4:30 to 6:00 p.m. daily. Although the Court declines to provide a specific number

12      of escorts, defendants should consider their experiences during the 1989 population

13      increase to determine how many escorts would adequately serve this purpose. Moreover,

14      whenever a client is not presented for visitation, INS must provide the attorney or

15      paralegal with the reason.

16    15.   Legal rights materials must be made freely available. Counsel for plaintiffs and

17      defendants should cooperate on identifying and locating relevant materials for inclusion

18      in camp libraries. Self-help materials must also be freely available. Defendants must

19      clearly indicate to plaintiffs' counsel t he required procedures for approval of new

20      materials, and for submission of additional copies of previously-approved materials.

21      Review and approval of legal rights materials must be prompt. Defendants should also

22      continue their current practice of providing the self-help materials to class members at

23      the time of processing.

24

25

26    DATED: November 26, 2007

27                              MARGARET M. MORROW
                                   UNITED STATES DISTRICT JUDGE

28

AR604

# U.S. Customs and Border Protection

## National Standards on Transport, Escort, Detention, and Search

**October 2015**



U.S. Customs and
Border Protection

# TABLE OF CONTENTS

FOREWORD FROM THE COMMISSIONER ... 3

AUTHORITIES / REFERENCES ........................... 3

1.0 GENERAL STANDARDS ................................. 4

1.1 Safety During CBP Operations .................... 4

1.2 Integrity and Professionalism...................... 4

1.3 Zero Tolerance Policy Related to Sexual
Abuse ................................................................ 4

1.4 Non-Discrimination Policy ......................... 4

1.5 Religious Sensitivity..................................... 4

1.6 Treatment of Juveniles................................ 4

1.7 Reasonable Accommodations and
Language Access ............................................ 4

1.8 Duration of Detention.................................. 4

1.9 Family Unity ................................................ 4

2.0 TRANSPORT AND ESCORT
STANDARDS ......................................... 5

2.1 Vehicle Standards......................................... 5

2.2 Use of Restraints.......................................... 5

2.3 Transport Communication .......................... 5

2.4 Transport and Escort Assessment ............... 5

2.5 Transporting and Escorting Officer/Agent
Responsibilities .............................................. 5

2.6 Ground Transportation and Escort
Standards......................................................... 6

2.7 Commercial Air Transportation................... 6

2.8 Medical Precautions..................................... 6

2.9 Emergency Situations during Transport..... 7

2.10 Transfer of Detainee Documents and
Medication....................................................... 8

3.0 SEARCHES OF INDIVIDUALS ..................... 9

3.1 Requirements................................................ 9

3.2 Use of Restraints.......................................... 9

3.3 Communication ............................................ 9

3.4 Gender of Searching Officer/Agent............. 9

3.5 Medical Emergencies.................................... 9

3.6 Pat-Down Search ........................................ 10

3.7 Strip Search................................................. 10

3.8 Body Cavity Search .................................... 11

3.9 Medical X-Rays ........................................... 11

3.10 Monitored Bowel Movement (MBM)
Search ............................................................ 12

3.11 Medical Treatment and Authority at a
Medical Facility............................................. 13

4.0 SECURE DETENTION STANDARDS ........ 14

4.1 Duration of Detention................................ 14

4.2 At-Risk Detainee Determination
Process........................................................... 14

4.3 General Detention Procedures................... 14

4.4 Restraints Procedures ................................ 15

4.5 Electronic System(s) of Record.................. 15

4.6 Hold Room Monitoring............................... 16

4.7 Hold Room Standards................................ 16

4.8 Consular Contact and List of Legal Service
Providers ....................................................... 16

4.9 Telephones ................................................. 16

4.10 Medical .................................................... 17

4.11 Hygiene..................................................... 17

4.12 Bedding .................................................... 17

4.13 Food and Beverage ................................... 18

4.14 Drinking Water ......................................... 18

4.15 Restroom Facilities................................... 18

4.16 Open Area Security................................... 18

5.0 AT-RISK POPULATIONS.............................. 19

5.1 General ........................................................ 19

5.2 UAC Screenings.......................................... 19

5.3 Documentation ........................................... 19

5.4 Transport .................................................... 20

5.5 Search......................................................... 20

5.6 Detention.................................................... 22

5.7 Use of Restraints........................................ 23

6.0 SEXUAL ABUSE VICTIMIZATION ............ 24

7.0 PERSONAL PROPERTY ............................... 26

7.1 General........................................................ 26

7.2 Processing and Storage of Detainees'
Personal Property......................................... 26

7.3 Notice to Detainees .................................... 27

7.4 Possessions Kept on the Detainee ............. 27

7.5 Medications................................................. 27

7.6 Identification Documents............................ 27

8.0 DEFINITIONS................................................. 28

# FOREWORD FROM THE COMMISSIONER

*I am announcing the implementation of an agency-wide policy that sets forth the first nationwide standards which govern CBP's interaction with detained individuals.  This policy continues our commitment to the safety, security and care of those in our custody. The policy, titled U.S. Customs and Border Protection (CBP) National Standards on Transport, Escort, Detention, and Search (TEDS), is the result of collaborative work among various offices.*

*The new policy document is grounded firmly in the experience and policies of the Office of Field Operations and the United States Border Patrol. It incorporates best practices developed in the field, and it reflects key legal and regulatory requirements. In addition to transport, escort, detention and search provisions, TEDS also includes requirements related to: sexual abuse and assault prevention and response; care of at-risk individuals in custody; and personal property.*

*I commend the many offices across CBP and DHS who worked together to produce this important policy document.*

*R. Gil Kerlikowske*
*Commissioner*
*U.S. Customs and Border Protection*

# AUTHORITIES / REFERENCES

**Authorities/References (including, but not limited to, the following):** *19 United States Code (USC) §§ 482, 1461, 1581, 1582, 1589a; Title 8 Code of Federal Regulations (CFR) Parts 232, 235, 236, and 287; 6 CFR Part 115; 79 FR 13100 (Standards To Prevent, Detect, and Respond to Sexual Abuse and Assault in Confinement Facilities); The Immigration and Nationality Act (INA); Personal Search Handbook, CIS HB 3300-04B revised July 2004; Use of Force Policy, Guidelines and Procedures Handbook, HB 4500-01C, revised May 2014; Motor Vehicle Management Handbook, HB 5200-14B, revised June 2014; Occupational Safety and Health Handbook, HB 5200-08B, revised September 2012; Secure Detention, Transport and Escort Procedures at Ports of Entry, 3340-030B, August 8, 2008; The Law of Arrest, Search, and Seizure Manual, M-69; Enforcement Standards – Body Searches, May 28, 1997; Hold Rooms and Short Term Custody, OBP 50/10.2-P; CBP Policy on Nondiscrimination in Law Enforcement Activities and all other Administered Programs, February 6, 2014; CBP Zero-Tolerance Policy, March 11, 2015.*

# 1.0 GENERAL STANDARDS

## 1.1 SAFETY DURING CBP OPERATIONS

The safety of CBP employees, detainees, and the public is paramount during all aspects of CBP operations.

## 1.2 INTEGRITY AND PROFESSIONALISM

CBP employees must speak and act with the utmost integrity and professionalism.  CBP employees must conduct themselves in a manner that reflects positively on CBP at all times.

## 1.3 ZERO TOLERANCE POLICY RELATED TO SEXUAL ABUSE

CBP has a zero tolerance policy prohibiting all forms of sexual abuse of individuals in CBP custody, including in detention facilities, during transport, and during processing.

## 1.4 NON-DISCRIMINATION POLICY

CBP employees must treat all individuals with dignity and respect.  CBP employees will perform their duties in a non-discriminatory manner, with respect to all forms of protected status under federal law, regulation, Executive Order, or policy, with full respect for individual rights including equal protection under the law, due process, freedom of speech, and religion, freedom from excessive force, and freedom from unreasonable searches and seizures.

## 1.5 RELIGIOUS SENSITIVITY

Without compromising officer/agent safety, officers/agents should remain cognizant of an individual's religious beliefs while accomplishing an enforcement action in a dignified and respectful manner.

## 1.6 TREATMENT OF JUVENILES

Officers/Agents will consider the best interest of the juvenile at all decision points beginning at the first encounter and continuing through processing, detention, transfer, or repatriation. Officers/Agents should recognize that juveniles experience situations differently than adults (see Section 5.0).

## 1.7 REASONABLE ACCOMMODATIONS AND LANGUAGE ACCESS

Reasonable accommodations must be made for a detainee's known or reported mental, physical and/or other special needs consistent with safety, and security requirements. All instructions and relevant information must be communicated to the detainee in a language or manner the detainee can comprehend.

## 1.8 DURATION OF DETENTION

Every effort must be made to promptly transfer, transport, process, release, or repatriate detainees as appropriate according to each operational office's policies and procedures, and as operationally feasible.

## 1.9 FAMILY UNITY

CBP will maintain family unity to the greatest extent operationally feasible, absent a legal requirement or an articulable safety or security concern that requires separation.

AR608

# 2.0 TRANSPORT AND ESCORT STANDARDS

For transport and escort standards related to at-risk detainees, see Section 5.4. The at-risk determination process can be found in Section 4.2.

## 2.1 VEHICLE STANDARDS

*Safety and Compliance:* CBP vehicles used for transporting detainees must be properly equipped, maintained and operated. Additionally, these vehicles must comply with safety inspection requirements in accordance with applicable federal and state law.

*Vehicle Interiors:* CBP vehicle interiors must be kept as clean as operationally feasible.

*Search for Weapons, Dangerous Items and Contraband:* All CBP vehicles, including the confinement space and the immediate area surrounding the confinement space, must be searched prior to and following each transport to ensure that no weapons, dangerous items (including items that could be used for suicide), or contraband are present.

## 2.2 USE OF RESTRAINTS

*General:* The use of restraints on detainees during transport must be in a manner that is safe, secure, humane, and professional. It is the responsibility of officers/agents to ensure that the need and level of restraints used is consistent with the operational office's policies and procedures. At no time will restraints be used in a punitive manner or in a manner that causes detainees undue pain.

*Testing Restraints:* Officers/Agents must regularly test handcuffs, leg restraints, belly chains, or other restraining devices to ensure that they are functioning properly.

## 2.3 TRANSPORT COMMUNICATION

Officers/Agents transporting detainees must follow established communication procedures especially as they relate to juveniles, females, and other at-risk populations.

## 2.4 TRANSPORT AND ESCORT ASSESSMENT

*Assessment:* Prior to transport or escort, officers/agents must conduct a detainee transport assessment to evaluate each detainee's safety, known or reported medical or mental health issues and level of risk to themselves, other detainees, and staff based on the information available at the time of the assessment. Officers/Agents assigned transport or escort duties must be informed of any known adverse assessment pertaining to a detainee being transported or escorted.

*At-Risk Indicator:* If a transport assessment indicates that a detainee could be an at-risk detainee (see Section 4.2), officers/agents must exercise particular care during transport and escort.

## 2.5 TRANSPORTING AND ESCORTING OFFICER/AGENT RESPONSIBILITIES

*Compliance:* Officers/Agents must comply with all operational office's policies and procedures pertaining to the use of government vehicles as articulated in the most recent Motor Vehicle Management Handbook, and must operate vehicles in accordance with all appropriate traffic laws and regulations.

*Pat-down Search:* No detainee will be transported or escorted without the officer/agent conducting a pat-down search of the detainee, except when exigent circumstances pose a safety hazard or danger to the officer/agent, detainee, or public.

*Vehicle Security:* Officers/Agents must secure the vehicle before leaving it unattended. This includes removing the keys from the ignition.

*Unattended Detainees:* Officers/Agents must not leave detainees unattended in a vehicle.

*Vehicle Inspection:* At the beginning and end of each shift, a physical inspection of the vehicle's confinement area is required.

*Authorized Attire:* Officers/Agents must follow the operational office's policies and procedures related to attire. Badges and nameplates should be worn on the outermost uniform garment and be visible to the public when practicable.

*Medical Issues:* Officers/Agents must be alert to

medical symptoms such as coughing, fever, diarrhea, rashes or emaciation, in addition to obvious wounds, injuries, cuts, bruising or bleeding, heat related injury or illness, and dehydration. Any observed or reported injury or illness must be reported, and appropriate medical care must be provided or sought in a timely manner.

**Detainee Distress:** In addition to verbal communication, officers/agents must be alert to non-verbal cues exhibited by detainees that might indicate that the detainee is in mental or physical distress. This might include expressions of suicidal thoughts, hallucinations, or other signs of disorientation.

## 2.6 Ground Transportation and Escort Standards

**Transport Determination:** In determining the number of officers/agents and vehicles that are required for a particular transport, the transport assessment, duration of travel, destination, and other appropriate factors must be considered.

**Unsecured Vehicles:** Using an unsecured vehicle to transport detainees should be avoided; however, operational circumstances may require officers/agents to use an unsecured vehicle to transport a detainee.

**Gender of Transporting/Escorting Officer/Agent:** Whenever operationally feasible, transport/escort must be conducted by two officers/agents with at least one being of the same gender or gender identity as the detainee(s).

**Criminals:** Whenever operationally feasible, detainees who are in CBP custody for a non-immigration criminal offense, or who are known to have a violent criminal history, must be separated from other detainees when being transported. Exceptions may be made on a case-by-case basis based on family unity.

**Personal Property Access:** No baggage, luggage, parcel, or personal property shall be accessible to detainees during transport unless the items have been thoroughly searched by officers/agents and determined to present no risk to officers/agents or

any detainee. When exigent circumstances pose a safety hazard or danger to an officer/agent, detainee, or member of the public that require a delay in searching personal property, a search must be conducted as soon as practicable.

**Seatbelts:** All CBP employees in all seats of any motor vehicle used on official business must have their seatbelt properly fastened at all times when the vehicle is in motion. This includes CBP-owned and leased vehicles and rental vehicles operated by CBP employees while in temporary duty or travel status. Detainees should always be in seatbelts if available in the vehicle.

**Safety and Security:** Officers/Agents must maintain a clear view of immediate confinement areas to the extent permitted by the transport vehicle, and remain alert to behavior that could jeopardize the safety and security of the officers/agents, detainees, and the public. In the event a transport vehicle contains more than one officer/agent, the secondary officer/agent is responsible for detainee oversight during transport.

**Meals:** Meals and snacks will be made available during any transfer that exceeds six hours for juveniles and eight hours for adults.

**Temperature:** Officers/Agents should maintain vehicle temperature within a reasonable and comfortable range for both detainees and officers/agents. Under no circumstances will officers/agents use temperature controls in a punitive manner.

## 2.7 Commercial Air Transportation

Prior to transporting detainees, officers/agents must conduct an air transportation assessment. The evaluation must include the detainees' potential risk for flight or escape, behavior, medical condition, and if a request for accompanying medical personnel should be made, based on the information available at the time of the assessment.

## 2.8 Medical Precautions

If officers/agents suspect that a detainee has an observed or reported medical condition, such as a contagious disease, appropriate protective precautions must be taken and any required

notifications made according to the operational office's policies and procedures.

In cases where a detainee expresses, either verbally or symptomatically, a desire to harm themselves, officers/agents should maintain a line of sight with the individual at all times.

## 2.9 EMERGENCY SITUATIONS DURING TRANSPORT

Operational offices will establish a written policy to address emergency situations.  This policy must direct local offices, ports or stations to establish written procedures for transporting staff to follow in an en-route emergency and proper documentation procedures after such an emergency.

It is understood that based on the totality of the circumstances, different officers/agents may have different responses to the same situation, any of which may be both reasonable and necessary.  Actions taken during an emergency situation must reflect the totality of the circumstances surrounding the situation, including the presence of imminent danger to the officers/agents or others.

At a minimum these policies and procedures must include the following situations and actions:

***Imminent Loss of Life:*** If an emergency situation is life-threatening, officers/agents will take immediate action to address the situation and make appropriate notifications.

***Unconscious or Unresponsive Detainee:*** If a detainee becomes unconscious or unresponsive during transport, officers/agents will immediately request emergency medical services, and render aid.  If a detainee is pronounced dead by qualified medical personnel, officers/agents must make appropriate notifications.

***Illness or Injury:*** If a detainee becomes ill or injured prior to boarding the vehicle or while in transit, officers/agents must alert the receiving office.  If deemed appropriate, emergency medical services must be notified.

***External Threat:*** Officers/Agents should request immediate assistance and take appropriate action to mitigate the situation.  If the vehicle is incapacitated, officers/agents will do everything possible to protect the safety of everyone in the vehicle.

***Escape:*** In the event of an escape, pursuit of the escapee by officers/agents should only be conducted when it does not jeopardize the security of the remaining detainees or members of the public.  Officers/Agents must notify appropriate law enforcement agencies with a description of the subject and known biographic data and make appropriate notifications.

***Fire:*** In case of a vehicle fire, officers/agents must immediately stop the vehicle and evacuate the detainees in a safe and orderly fashion.  Officers/Agents are responsible for maintaining accountability of all detainees and requesting assistance from the local fire department and law enforcement agency.

***Natural Disasters:*** In the event of a natural disaster, officers/agents must contact the appropriate authorities to assess current conditions along the planned route.  If driving conditions are unlikely to improve, transport must be delayed until the emergency has passed.  If officers/agents are in transit and a natural disaster occurs, officers/agents must stop the vehicle in a safe area, take appropriate actions for the safety and security of all employees and detainees, make appropriate notifications, and await further instructions.  Should it become necessary to exit the vehicle, the detainees must be maintained in a safe area.  Officers/Agents must maintain a heightened state of alertness for the duration of the emergency.  When the emergency has passed, the officers/agents must return all detainees to the vehicle while ensuring accountability of all detainees.

***Traffic Accident:*** In the event of a traffic accident involving the transport vehicle, officers/agents must secure the area, obtain medical assistance for anyone who may be injured, and request assistance from the appropriate law enforcement agency.  Officers/Agents must make appropriate notifications.

***Vehicle Failure:*** If a vehicle develops serious mechanical problems en route, officers/agents will take appropriate actions for the safety and security of all detainees and make appropriate notifications.

AR611

***Disturbances by Detainees:*** If a detainee becomes violent or creates a disturbance that affects their or another individual's safety and security, officers/agents will take appropriate action to de-escalate the situation, and make appropriate notifications.

## 2.10 Transfer of Detainee Documents and Medication

When transferring a detainee, officers/agents must ensure that all appropriate documentation accompanies the detainee including all appropriate medical records and medication as required by the operational office's policies and procedures.

AR612

# 3.0 SEARCHES OF INDIVIDUALS

For search standards related to at-risk detainees, see Section 5.5.  The at-risk determination process can be found in Section 4.2.

## 3.1 REQUIREMENTS

*Legal Authority and Standards:* All searches must be conducted under the appropriate legal authority and standards.  Officers/Agents must be diligent in their efforts to protect a detainee's legal rights and treat detainees with respect, dignity, and an appropriate level of privacy.

*Decision to Search:* Officers/Agents must consider the totality of the circumstances and articulable factors when making a decision to search.

*Privacy:* Recognizing the potential intrusiveness of these searches on an individual's sense of privacy, searches must be conducted only with the proper legal authority and justification, with due recognition and deference for the human dignity of those being searched, and in accordance with the operational office's policies and procedures.

*Conduct of Search:* Searches must be conducted in a professional, thorough, and reasonable manner, consistent with the type of search required.  In no case should any complaint, threat of complaint, or physical resistance result in a detainee not being searched, or being searched less thoroughly than is warranted by the circumstances.

*Documentation:* Each operational office determines search documentation requirements.  However, all strip searches, X-ray searches, body cavity searches, and monitored bowel movements (MBM) must be recorded in the appropriate electronic system(s) of record.  The report must contain the reason for the search, results of the search, a description of any contraband recovered, who conducted the search, and who authorized the search.

## 3.2 USE OF RESTRAINTS

*General:* The use of restraints on detainees during the search process must be in a manner that is safe, secure, humane, and professional.  It is the responsibility of officers/agents to ensure that the need and level of restraints used is consistent with the operational office's policies and procedures.  At no time will restraints be used in a punitive manner or in a manner that causes detainees undue pain.

*Testing Restraints:* Officers/Agents must regularly test handcuffs, leg restraints, belly chains, or other restraining devices to ensure that they are functioning properly.

## 3.3 COMMUNICATION

All search instructions must be communicated to the detainee in a language or manner the detainee can comprehend.  For safety reasons, an explanation of an immediate pat-down for weapons or dangerous objects may be conducted after the search.  Officers/Agents will explain the search process, in general terms, as the search progresses.

## 3.4 GENDER OF SEARCHING OFFICER/AGENT

Whenever operationally feasible, officers/agents conducting a search or that are present at a medical examination, must be of the same gender, gender identity, or declared gender as the detainee being searched.

Cross-gender strip searches or cross-gender visual body cavity searches must not be conducted except in exigent circumstances including consideration of officer safety, or when performed by medical practitioners.  When officers/agents of the opposite gender perform a strip search or are present at a medical examination such as a body cavity search, MBM, or X-ray, it is mandatory that two officers/agents be present.

## 3.5 MEDICAL EMERGENCIES

Officers/Agents have a responsibility to safeguard detainees during a search.  If there is any observed or reported indication that the detainee is injured or in any way may require medical treatment, appropriate medical care must be provided or sought in a timely manner.

## 3.6 Pat-Down Search

*Immediate Pat-down/Terry Frisk:* An immediate pat-down or *Terry* frisk is an external search necessary to ensure officer safety.  The scope of an immediate pat-down must be limited to those areas on a detainee where an officer/agent suspects a weapon or dangerous object may be concealed.  There may be cases where it is necessary to search the entire detainee to ensure a weapon and/or dangerous object is not present.  This may include the removal of a detainee's shoes to ensure there is no weapon present, but not the removal for the purpose of checking for merchandise (including contraband).

*Search Incident to Arrest:* An external search incident to a lawful arrest includes a search for both dangerous weapons and evidence.  The facts and circumstances surrounding an arrest will dictate the degree of intrusiveness necessary to properly conduct the search.

*Non-search Related Examinations:* For the purposes of this policy, examinations of detainees conducted by officers/agents for the documentation of illness, injury, tattoos, or other identifying markings do not constitute a search.  This includes examinations that involve the manipulation of or removal of a detainee's clothes or garments except to the extent that such manipulation reveals breasts, buttocks, or genitalia.

## 3.7 Strip Search

*General:* A strip search requires a person to remove or arrange some or all clothing to permit a visual inspection of the person's breasts, buttocks, or genitalia related to searches for contraband.

*Supervisory Approval:* Officers/Agents must obtain supervisory approval authorized by the operational office's policies and procedures before conducting a strip search. (Telephonic approval is permitted).

*Strip Search Documentation:* All strip searches, the reason for the search, and the authorizing supervisor must be documented in the appropriate electronic system(s) of record.

*Privacy:* All strip searches must be conducted in a manner and location that provides the greatest degree of privacy possible.  The number of officers/

agents present must be limited to the minimum number needed to conduct and witness the search.

*Strip Search Conduct:* Generally during a strip search, the detainee being searched should remove their own clothing unless they refuse to cooperate.  Officers/Agents should not touch the detainee during a strip search unless the detainee refuses to remove any article of clothing or otherwise impedes the officer/agent in the performance of their duties.  In those rare instances where an officer/agent is required to touch a detainee or remove clothing, the circumstances must be documented.

*Communication:* Officers/Agents must ensure that the explanation of the search process is in a language or manner the detainee comprehends.

*Search of Clothing:* Each article of clothing that is removed must be thoroughly searched by the officer/agent.

*Search of Prosthetic Devices:* Removal of prosthetic devices such as an artificial limb is considered to be part of a strip search.  If there is reasonable suspicion that contraband may be concealed within the device, the detainee being searched should remove the device if they can do so without medical assistance.  If they cannot, or refuse to do so, the officer/agent must seek the assistance of medical personnel.

*Search of Casts:* Removal of a cast is considered to be part of a strip search.  If there is reasonable suspicion that contraband may be concealed within a cast, officers/agents must take the detainee to a medical facility to have the cast X-rayed and/or removed.  Under no circumstances will a cast be probed or removed by an officer/agent while it is attached to a detainee's body.

*Search of Splints:* Splints that are not able to be removed by the detainee should be removed by a medical practitioner such as a credentialed EMT.  If there is any concern for the safety of the detainee, this should be done at a medical facility.

*Objects in the Rectal Cavity:* Officers/Agents should not ask a detainee to remove an object from the rectal cavity or attempt to remove it themselves.  If there is reasonable suspicion that the detainee is carrying contraband in the rectal cavity, officers/

agents must consult and receive approval from a supervisor, and immediately proceed to a medical facility for a body cavity search conducted by a medical practitioner.  Further action must be consistent with the operational office's policies and procedures.

***Objects in the Vaginal Cavity:*** If an object in the vaginal cavity is detected and it is reasonably suspected that the object may contain contraband, officers/agents must stop the search and consult a supervisor.  If the supervisor concurs that reasonable suspicion exists, the supervisor may authorize the officer/agent to ask the detainee to voluntarily remove the object.  If the detainee refuses to voluntarily remove the object, officers/agents must consult and receive approval from a supervisor, and immediately proceed to a medical facility for a body cavity search conducted by a medical practitioner. Further action must be consistent with the operational office's policies and procedures.

## 3.8 BODY CAVITY SEARCH

***General:*** A body cavity search is any internal search consisting of the visual or physical intrusion into the rectal or vaginal cavity.

***Medical Practitioner and Medical Facility Requirement:*** Officers/Agents are prohibited from conducting physically intrusive body cavity searches. This type of body cavity search should be conducted only under the most exceptional circumstances, and only by medical practitioners at a medical facility.

***Supervisory Approval for Body Cavity Searches:*** Body cavity searches will be conducted only after being approved by a supervisor authorized by the operational office's policies and procedures and after obtaining consent or a search warrant.  If a qualified medical practitioner determines that immediate action must be taken to protect the health of the detainee, such action is authorized. (Telephonic approval is permitted).

***Documentation of a Body Cavity Search:*** All body cavity searches, the reason for the search, the authorizing supervisor, and the outcome must be documented in the appropriate electronic system(s) of record.  In the case of more physically intrusive body cavity searches, the name of the medical

facility where the search was performed must also be documented in the appropriate electronic system(s) of record.

***Communication:*** Officers/Agents must ensure that the explanation of the search process is in a language or manner the detainee comprehends.

***Use of Restroom:*** When a detainee who is suspected of internally carrying contraband requests to use the restroom prior to being taken to a medical facility, the detainee will be escorted to a restroom without flushable toilet facilities.

***Prohibition on Observation:*** Only medical practitioners may observe a physically intrusive body cavity search.  Officers/Agents may be in the room only for the purposes of corroborating any evidence found and to provide safety and security.  Officers/Agents are prohibited from serving as a medical witness (standby).

***Negative Results Determination:*** When a medical practitioner has determined that foreign objects are not present via a body cavity search and that no further medical treatment is required, the detainee must be immediately transported back to the CBP facility, unless the CBP supervisor determines that additional actions should be taken.

***Inconclusive Results Determination:*** If a medical practitioner deems the body cavity search inconclusive, a decision must be made by the CBP supervisor after obtaining legal advice from CBP counsel to determine the next appropriate steps.

***Positive Results Determination:*** If a medical practitioner believes that the body cavity search indicates the presence of foreign objects, a CBP supervisor must be notified to approve the detention of the detainee for further medical treatment, consistent with the operational office's policies and procedures.

## 3.9 MEDICAL X-RAYS

***General:*** An X-ray search is an internal search consisting of the use of a medical X-ray by medical practitioners to determine the presence of contraband within the body.

***Supervisory Approval:*** An X-ray search will be conducted only after being approved by a supervisor

authorized by the operational office's policies and procedures and after obtaining consent or a search warrant.  If a qualified medical practitioner determines that immediate action must be taken to protect the health of the detainee, such action is authorized. (Telephonic approval is permitted).

*Documentation of an X-Ray Search:* All x-ray searches, the reason for the search, the authorizing supervisor, the name of the medical facility, and the outcome must be documented in the appropriate electronic system(s) of record.

*Medical Practitioner and Medical Facility Requirement:* Medical practitioners will conduct the X-ray search at a medical facility.  Officers/Agents are prohibited from conducting X-ray examinations or utilizing any CBP equipment to conduct an X-ray examination. Only qualified medical practitioners may read and interpret the X-ray.

*Communication:* Officers/Agents must ensure that an overview of the X-ray process, including a request for consent, is in a language or manner the detainee comprehends.

*Consent:* Consent to search must be freely and voluntarily given as it relates to X-rays before the X-ray is administered.  Involuntary X-ray searches require a court order.  Involuntary X-ray searches will be conducted only under the most extraordinary circumstances, and never on detainees who are pregnant or a detainee who refuses to have a pregnancy test after having been determined by medical personnel to require a pregnancy test.

*Pregnancy Test:* When a detainee is taken to a medical facility for an X-ray search, medical personnel will determine if a pregnancy test is required prior to an X-ray.  If medical personnel determine a pregnancy test is necessary and the detainee refuses the pregnancy test, a decision to determine the next appropriate steps must be made by a CBP supervisor after obtaining legal advice from CBP counsel.

*Revocation of Consent:* A detainee may revoke consent for an X-ray search at any time, even at the medical facility.  The revocation may be verbal or by actions.  If the detainee revokes consent, officers/agents must immediately inform the medical practitioner to stop the X-ray search based on the revocation of consent and notify their supervisor.  Revocation of consent must be documented in the appropriate electronic system(s) of records.

*Negative Results Determination:* When a medical practitioner has determined that foreign objects are not present in the body and that no further medical treatment is required, the detainee must be immediately transported back to the CBP facility, unless the CBP supervisor determines that additional actions should be taken.

*Inconclusive Results Determination:* If a medical practitioner deems the X-ray inconclusive, a decision must be made by the CBP supervisor after obtaining legal advice from CBP counsel to determine the next appropriate steps.

*Positive Results Determination:* If a medical practitioner believes that the X-ray indicates the presence of foreign objects, a CBP supervisor must be notified to approve the detention of the detainee for further medical treatment, consistent with the operational office's policies and procedures.

## 3.10 Monitored Bowel Movement (MBM) Search

*General:* An MBM search is an internal search consisting of detaining a suspect, under close observation, to permit time for a swallowed object to be expelled by the body through natural means. The MBM involves both an extended period of detention coupled with close observation of the detainee and inspection of all fecal material, and may be necessary where the detainee refuses to submit to an examination to confirm the existence of swallowed contraband or where such examination is not considered medically appropriate.  Prior to the detainee being transported to a medical facility, he or she may be placed in a CBP hold room or other designated area without flushable toilet facilities.

*Medical Supervision and Medical Facility Requirement:* Because of the danger that internally swallowed or stuffed drug containers may rupture, the detainee must be taken to a medical facility as soon as possible and placed under medical supervision (with appropriate security) to minimize possible injury.  Officers/Agents are prohibited from conducting MBM.  MBM must not be conducted at CBP facilities.

***Supervisory Approval:*** Officers/Agents must obtain supervisory approval authorized by the operational office's policies and procedures before a detainee undergoes an MBM. (Telephonic approval is permitted).

***Documentation of an MBM Search:*** All MBM searches, the reason for the search, the authorizing supervisor, the name of the medical facility, and the outcome must be documented in the appropriate electronic system(s) of record.

***Communication:*** Officers/Agents must ensure that an overview of the MBM process is in a language or manner the detainee comprehends.

## 3.11 Medical Treatment and Authority at a Medical Facility

***Medical Decision Making:*** Once a detainee is at a medical facility, medical practitioners make all medical decisions which may include medical release or fitness for travel.  Officers/Agents have no authority over the detainee's medical treatment, but remain responsible for enforcement decisions regarding the detainee.

***Officer/Agent Medical Prohibition:*** Except for assistance with lifesaving emergency medical care which they feel comfortable rendering and are trained to render, officers/agents will not administer medical techniques or medications, unless they are qualified emergency medical technicians or paramedics rendering care.

***Medical Treatment Protocols:*** While medical treatment is based on the local standard of care and at the discretion of the medical practitioner, recommended medical treatment protocols from the DHS Chief Medical Officer are available.

AR617

# 4.0 SECURE DETENTION STANDARDS

For detention standards related to at-risk detainees, see Section 5.6. The at-risk determination process can be found in Section 4.2.

## 4.1 DURATION OF DETENTION

Detainees should generally not be held for longer than 72 hours in CBP hold rooms or holding facilities. Every effort must be made to hold detainees for the least amount of time required for their processing, transfer, release, or repatriation as appropriate and as operationally feasible.

## 4.2 AT-RISK DETAINEE DETERMINATION PROCESS

Before placing any detainees together in a hold room or holding facility, officers/agents shall assess the information before them to determine if the detainee may be considered an at-risk detainee, or at risk of posing a threat to others.  This assessment will include:

- Whether the detainee has or demonstrates a mental, physical, or developmental disability;
- Whether the detainee has an observed or reported serious physical/mental injury or illness;
- The age of the detainee;
- Whether the detainee is pregnant or nursing;
- The physical build and appearance of the detainee;
- The detainee's own stated concerns about his or her physical safety;
- Whether the detainee has self-identified as gay, lesbian, bisexual, transgender, intersex, or gender nonconforming;
- Whether the detainee has self-identified as having previously experienced sexual victimization;
- The detainee's risk of being sexually abused by other detainees;
- Whether a detainee may be sexually abusive toward other detainees; and
- Whether the detainee has previously been incarcerated or detained (this should include the nature of the detainee's criminal or violent history, and/or gang affiliation, and whether the detainee has any convictions for sex offenses against an adult or child).

*Privacy:* Efforts should be taken to ensure that all assessments are conducted in a way that provides detainees the greatest level of privacy possible.  All CBP facilities must implement appropriate controls on the dissemination of private and/or sensitive information provided by detainees under this section.  Officers/Agents will disclose this information only to those personnel with a need to know according to the operational office's policies and procedures.  If the information obtained under this section is maintained in a Privacy Act compliant system of records, the information may be disclosed pursuant to the routine uses identified in the applicable System of Records Notice.

## 4.3 GENERAL DETENTION PROCEDURES

*Medical Issues:* Upon a detainee's entry into any CBP hold room, officers/agents must ask detainees about, and visually inspect for any sign of injury, illness, or physical or mental health concerns and question the detainee about any prescription medications.  Observed or reported injuries or illnesses should be communicated to a supervisor, documented in the appropriate electronic system(s) of record, and appropriate medical care should be provided or sought in a timely manner.

*Medical Precautions:* If officers/agents suspect that a detainee has an observed or reported medical condition, such as a contagious disease, appropriate protective precautions must be taken and any required notifications made according to the operational office's policies and procedures.

*Search:* Detainees must be searched for weapons and contraband prior to being placed in a CBP hold room.

*Gender of Searching Officer/Agent:* Whenever operationally feasible, officers/agents conducting a search or that are present at a medical examination must be of the same gender, gender identity, or declared gender as the detainee being searched. Cross-gender strip searches or cross-gender visual body cavity searches must not be conducted except in exigent circumstances including consideration of officer/agent safety, or when performed by medical practitioners.

AR618

**Safety and Security Reporting:** During shift change officers/agents must convey all known information of vulnerabilities, escape risks, criminal background or involvement, and/or violence to oncoming officers/agents.

**Gender Segregation:** Male and female adult detainees will be segregated at all times when in hold rooms. Particular care should be afforded to at-risk populations, including transgender and intersex detainees. Exceptions may be made on a case by case basis, based on family unity.

**Juvenile/Adult Segregation:** Detainees under the age of 18 years will not be held with adult detainees, unless the adult is an immediate relative or legal guardian responsible for the care and custody of the juvenile, and no other adult detainees are present in the area. Exceptions may be made on a case-by-case basis, based on family unity.

**Family Units:** Generally, family units with juveniles should not be separated. When it is necessary to separate juveniles from the parent(s) and/or legal guardian(s), officers/agents must follow their operational office's policies and procedures and appropriate legal requirements. In circumstances where family units must be separated due to different immigration dispositions, such separation much be documented in the appropriate electronic system(s) of record.

**Evacuation Plan:** Every CBP facility will have an evacuation plan that is posted in the processing area. The supervisor is responsible for ensuring that all staff members are familiar with evacuation procedures.

## 4.4 Restraints Procedures

**General:** The use of restraints on detainees during detention must be in a manner that is safe, secure, humane, and professional. It is the responsibility of officers/agents to ensure that the need and level of restraints used is consistent with the operational office's policies and procedures. Detainees who are restrained must be monitored at all times. At no time will restraints be used in a punitive manner or in a manner that causes detainees undue pain.

**Testing Restraints:** Officers/Agents must regularly test handcuffs, leg restraints, belly chains, or other restraining devices to ensure that they are functioning properly.

## 4.5 Electronic System(s) of Record

All custodial actions, notifications, and transports that occur after the detainee has been received into a CBP facility must be accurately recorded in the appropriate electronic system(s) of record as soon as practicable. The electronic system(s) of record must contain the information listed below:

    Name of the person detained
    Country of birth (COB)
    Date of birth (DOB)
    Date and time placed into a hold room or unattended secure area
    Date and time removed from a hold room or unattended secure area
    Reason detained
    Officer's/Agent's name
    Supervisor's name
    Final disposition

Whenever possible, the electronic system(s) of record should also include any of the following that apply:

    Personal belongings secured, receipted, and/or returned
    Screened for trafficking (yes/no)
    Telephone use
    Language services provided and language spoken if other than English or Spanish (including services provided to the hearing impaired)
    Medical care requested/provided/declined
    Detainee's receipt of list of legal services providers
    Bedding provided/declined
    Meals provided/meals refused
    Visual and/or verbal checks completed
    Showers, if provided
    Transporting agency, personnel identification, and mode of transportation
    Date/time departing the facility

In the event that the appropriate electronic system is inoperable, paper logs must be used until the electronic system is operational. Any information recorded on paper logs must be entered into the appropriate electronic system(s) of record once the system is available.

## 4.6 Hold Room Monitoring

***Supervision and Inspections:*** Officers/Agents must closely supervise hold rooms when in use. Monitoring must occur in a regular and frequent manner.  In hold rooms with visual limitations, a physical check is required.  Direct supervision and control of detainees must be maintained at all facilities that do not have secure areas.

***Non-24 Hour Holding Facilities:*** Prior to the closing of any hold room facility that does not operate on a 24 hour basis, a physical inspection of the hold room is required.

***Checks:*** Officers/Agents will physically check hold rooms on a regular and frequent manner, according to each operational office's policies and procedures. Physical inspections must be recorded in the appropriate electronic system(s) of record as soon as practicable.

***Privacy:*** Officers/Agents will enable detainees to shower (where showers are available), perform bodily functions, and change clothing without being viewed by staff of the opposite gender, except in exigent circumstances or when such viewing is incidental to routine cell checks or is otherwise appropriate in connection with a medical examination or MBM under medical supervision.

***Officer/Agent Hold Room Entry:*** Officers/Agents of the opposite gender will announce their presence when entering an area where detainees are likely to be showering, performing bodily functions, or changing clothing, except in exigent circumstances or when such viewing is incidental to routine cell checks.

***Use of Restrooms:*** If restrooms are not available in the secure area, supervisors must ensure that an officer/agent is within visible or audible range of the secure area to allow detainees to access restrooms upon request.

***Voyeurism:*** Officers/Agents must not engage in any act of voyeurism.

## 4.7 Hold Room Standards

***Capacity:*** Every effort must be made to ensure that hold rooms house no more detainees than prescribed by the operational office's policies and procedures.  Capacity may only be exceeded with supervisory approval.  However, under no circumstances should the maximum occupancy rate, as set by the fire marshal, be exceeded.

***Hold Room Checks:*** Regular hold room checks should be conducted and recorded to ensure proper occupancy levels, safety, hygiene, and the availability of drinking water.  Such checks should be recorded in the appropriate electronic systems of record as soon as practicable.

***Weapons and Tampering:*** Hold rooms will be regularly inspected for evidence of tampering and must be cleared of all items that could be used to facilitate an escape, or as a weapon to do bodily harm to the detainee or others.

***Cleanliness:*** All facilities or hold rooms used to hold detainees must be regularly and professionally cleaned and sanitized.  Officers/Agents or detainees will not be expected nor required to perform such tasks.

***Use of Tobacco Products:*** Use of tobacco products by detainees is strictly prohibited in hold rooms.

***Temperature Controls:*** When it is within CBP control, officers/agents should maintain hold room temperature within a reasonable and comfortable range for both detainees and officers/agents.  Under no circumstances will officers/agents use temperature controls in a punitive manner.

## 4.8 Consular Contact and List of Legal Service Providers

As appropriate, detainees must be advised of their right to consular access in a language or manner the detainee comprehends. If requested by a detainee, consular contact will be afforded as soon as operationally feasible.  Detainees referred for removal proceedings shall be provided with a list of legal service providers and their contact information.

## 4.9 Telephones

Officers/Agents must grant detainees telephone access per the operational office's policies and procedures and may, at their discretion, grant telephone access to any detainee even if not required.  Detainees who wish to make other than a

AR620

local call must use a calling card or call collect. Unaccompanied Alien Children (UAC) must be offered use of a telephone.

## 4.10 MEDICAL

***Medical Emergencies:*** Emergency medical services will be called immediately in the event of a medical emergency (e.g., heart attack, difficulty breathing) and the call will be documented in the appropriate electronic system(s) of record. Officers/Agents must notify the shift supervisor of all medical emergencies as soon as possible after contacting emergency services.

***Contagious Disease:*** If an officer/agent suspects or a detainee reports that a detainee may have a contagious disease, the detainee should be separated whenever operationally feasible, and all other appropriate precautions must be taken and required notifications made, according to the operational office's policies and procedures.

***Medication:*** Except for assistance with lifesaving emergency medical care which they feel comfortable rendering and are trained to render, officers/agents will not administer medical techniques, medications, or preparations unless they are qualified emergency medical technicians or paramedics rendering care. Medication prescribed in the United States, validated by a medical professional if not U.S.-prescribed, or in the detainee's possession during general processing in a properly identified container with the specific dosage indicated, must be self-administered under the supervision of an officer/agent. If a detainee is unable to self-administer their medications due to age or disability, officers/agents may assist the detainee. All detainee refusals of prescribed medication or medical assistance must be noted in the appropriate electronic system(s) of record.

***Non U.S.-Prescribed Medication:*** Any detainee, not in general processing, with non U.S.-prescribed medication, should have the medication validated by a medical professional, or should be taken in a timely manner to a medical practitioner to obtain an equivalent U.S. prescription. Exceptions to this requirement may only be made by a supervisor in collaboration with a medical professional and based on expected duration of detention and/or elective nature of the medication. If such an exception is made, it must be recorded in the appropriate electronic system(s) of record.

***Emergency Medical Services Transfer:*** If a detainee is transferred by emergency medical services for further medical treatment, at least one officer/agent shall escort or follow the emergency vehicle and remain with the detainee until medical authorities determine whether the situation will require hospitalization or continued medical care.

***Hospitalization:*** If the detainee is hospitalized, officers/agents will follow their operational office's policies and procedures, and document the hospitalization in the appropriate electronic system(s) of record. At a minimum, the discharge summary, treatment plans, and prescribed medications from any medical evaluation should accompany the detainee upon transfer or repatriation.

***Health Information Privacy:*** A detainee's private health/medical information must be protected, and disseminated only to those personnel with a legitimate need to know, according to the operational office's policies and procedures.

## 4.11 HYGIENE

***Basic Hygiene Items:*** Detainees must be provided with basic personal hygiene items, consistent with short term detention and safety and security needs. Families with small children will also have access to diapers and baby wipes.

***Showers:*** Reasonable efforts will be made to provide showers, soap, and a clean towel to detainees who are approaching 72 hours in detention.

***Restrooms:*** Detainees using the restroom will have access to toiletry items, such as toilet paper and sanitary napkins. Whenever operationally feasible, soap may be made available.

## 4.12 BEDDING

Clean bedding must be provided to juveniles. When available, clean blankets must be provided to adult detainees upon request.

## 4.13 FOOD AND BEVERAGE

*General:* Food and water should never be used as a reward, or withheld as punishment. Food provided must be in edible condition (not frozen, expired or spoiled).

*Meal Timeframe:* Adult detainees, whether in a hold room or not, will be provided with food at regularly scheduled meal times.  All meal service must be documented in the appropriate electronic system(s) of record. For juvenile meal timeframes, see Section 5.6.

*Snack Timeframe:* Adult detainees, whether in a hold room or not, will be provided with snacks between regularly scheduled meal times.  For juvenile snack timeframes, see Section 5.6.

*Requests:* When an adult detainee requests a snack or food before the next food service, officers/agents may grant the request on the basis of the circumstances.

*Dietary Restrictions:* Officers/Agents should remain cognizant of a detainee's religious or other dietary restrictions.

## 4.14 DRINKING WATER

Functioning drinking fountains or clean drinking water along with clean drinking cups must always be available to detainees.

## 4.15 RESTROOM FACILITIES

*Restroom Facilities:* Restroom accommodations will be available to all detainees and a reasonable amount of privacy will be ensured.  If the detainee is suspected of being an internal carrier, restroom use may be monitored.

*Privacy:* Officers/Agents must make a reasonable effort to afford privacy to all detainees of the opposite gender consistent with the prohibition on voyeurism.

## 4.16 OPEN AREA SECURITY

Additional caution must be exercised to ensure the safety of the public and staff in open areas.  Officers/Agents working in or transiting this area must exercise due diligence to safeguard their firearms and other weapons.  Staff must also ensure that all potential egress points are utilized in a manner that reduces escape risk.

# 5.0 AT-RISK POPULATIONS

The at-risk determination process can be found in Section 4.2.

## 5.1 GENERAL

*At-Risk Populations:* Individuals in the custody of CBP who may require additional care or oversight, who may include: juveniles; UAC; pregnant individuals; those known to be on life-sustaining or life-saving medical treatment; those at higher risk of sexual abuse (including but not limited to gender nonconforming, intersex, and transgender); reported victims of sexual abuse; those who have identified mental, physical or developmental disabilities; those of advanced age; or family units.

*General Standard:* CBP staff will treat all at-risk populations with dignity, respect and special concern for their particular vulnerability.

*Reasonable Accommodations:* Reasonable accommodations must be made for at-risk detainees with known or reported mental and/or physical disabilities, in accordance with security and safety needs and all applicable laws and regulations.

*Hold Room Supervision:* Officers/Agents will physically check hold rooms on a regular and frequent manner, according to each operational office's policies and procedures.  Physical inspections must be recorded in the appropriate electronic system(s) of record as soon as practicable.

*Communication:* Extra efforts may be required to ensure an at-risk detainee's ability to comprehend officer/agent instructions, questions and applicable forms (such as age and/or developmentally appropriate communication, translation/ interpretation services).

*Detainees with Communication Disabilities:* Officers/Agents should take steps to communicate with detainees who have communication disabilities (e.g., detainees who are hearing impaired, those who are blind or have low vision, or those who have intellectual, psychiatric, or speech disabilities) in an effective manner, utilizing available auxiliary aides and services, such as access to in-person, telephonic, or video interpretive services.

*Detainee Age:* If a detainee presents themselves as a juvenile, they will be treated as a juvenile, until established otherwise.  If a detainee presents themselves as an adult they will be processed as an adult, unless a preponderance of evidence indicates they are a juvenile, in which case they will be treated as a juvenile.

*Release of At-Risk Detainees:* Officers/Agents must not release an at-risk detainee to any person or entity that officers/agents have reason to believe may harm or neglect the at-risk detainee.

*Personal Property and Legal Papers – Juveniles:* All personal property (including any U.S.-prescribed medications) and legal papers that are in the juvenile's possession, or are served upon the juvenile during processing, must accompany the juvenile upon transfer to any other agency or facility.

## 5.2 UAC SCREENINGS

In addition to the at-risk determination process in Section 4.2, CBP will ensure that all UAC will be screened for the following:

    Credible Fear determination;
    Human trafficking victimization; and
    Ability to make an independent decision.

A reasonable effort must be made to afford privacy to UAC during screening.

## 5.3 DOCUMENTATION

All custodial actions, notifications, and transports that occur after the at-risk detainee has been received into a CBP facility must be accurately recorded in the appropriate electronic system(s) of record as soon as practicable.  The electronic system of record must contain the information listed below:

    Name of the person detained
    Country of birth (COB)
    Date of birth (DOB)
    Date and time placed into unattended secure area
    Date and time removed from unattended secure
        area
    Reason detained
    Apprehending officer's/agent's name
    Processing officer's/agent's name
    Supervisor's name

Personal belongings secured, receipted, and/or returned

Screened for trafficking (yes/no)

Telephone use, including the identity and/or relationship of the person contacted

Language services provided and language spoken if other than English or Spanish

Reasonable medical care requested/provided/ declined

Detainee receipt of list of legal services providers

Bedding provided/declined

Meals provided/meals refused

Visual and/or verbal checks completed

Showers, if provided

Hospitalizations

Any U.S. medications prescribed

Transporting agency, and mode of transportation

Date/time departing the station

Time in and time out of each CBP facility

Required forms provided

Date/time of notice to ICE FOJC (if applicable)

Date/time of notice to ORR (if applicable)

Date/time of response from ICE FOJC (if applicable)

Date/time of response from ORR (if applicable)

Date/time of placement in ORR custody (if applicable)

Final disposition

*Electronic Systems of Record:* Documentation must be maintained for all detainees placed in CBP hold rooms in the appropriate electronic system(s) of record. In the event that the electronic system is inoperable, paper logs must be used until the electronic system is operational. Any information recorded on paper logs must be entered into the appropriate electronic system(s) of record once the system is available.

## 5.4 TRANSPORT

*Gender of Transporting Officer/Agent:* Whenever operationally feasible, the transporting of at-risk detainees must be conducted by two officers/agents with at least one officer/agent of the same gender or gender identity as the detainee. When transporting at-risk detainees of the opposite gender or gender identity, transportation staff must call in their time of departure and odometer reading, and then do so

again upon arrival, according to the operational office's policies and procedures.

*Transport of Family Units and Adult Females:* Whenever operationally feasible, family units and adult females must be separated from unrelated adult males by separate passenger compartments, an empty row of seats, or transported separately. During scheduled transport, family units and adult females must be separated from unrelated adult males by either a separate passenger compartment or an empty row of seats.

*Transport of UAC:* UAC must not be transported in vehicles with unrelated adults when separate transportation is immediately available. When separate transportation is unavailable, all necessary precautions must be taken to ensure the UAC's safety, security, and well-being, including separation from unrelated adults by either a separate passenger compartment or an empty row of seats.

*Child Safety Restraints:* All juveniles must be transported as safely as possible given the circumstances, which must include the use of child safety restraints when available.

*Notification of Accompanying Adult:* Whenever possible, officers/agents must inform or notify any accompanying adult relative or legal guardian when the transport of a juvenile to a medical facility is necessary for an X-ray search, body cavity search, or MBM. Such persons may be allowed to be present at the medical facility at the discretion of the CBP supervisor, and consistent with the operational office's policies and procedures.

## 5.5 SEARCH

*Gender of Searching Officer/Agent:* Whenever operationally feasible, officers/agents conducting a search, or present at a medical examination, must be of the same gender, gender identity, or declared gender as the detainee being searched.

*Gender Determination:* Officers/Agents must not search or physically examine a detainee for the sole purpose of determining the detainee's gender-related characteristics. If the detainee's gender is unknown, officers/agents will ask the detainee their gender or gender identity. If the detainee declines to state their gender, the gender will be recorded in

the appropriate electronic system(s) of record as unknown.

**Search of Individuals– Juvenile:** When a search involves a juvenile, prior supervisory authorization must be obtained in all cases with the exception of pat-down searches.  Although officers/agents have the same authority to search a juvenile as to search an adult, officers/agents should weigh all factors before requesting authorization to further search a juvenile.

**Visual Body Cavity Search – Juvenile:** Officers/ Agents must not conduct visual body cavity searches of juveniles and, instead, shall refer all such body cavity searches of juveniles to a medical practitioner.

**Accompanying Adult:** If an adult parent or legal guardian accompanies the juvenile, officers/agents should explain the reasons for the search to the adult, as well as the juvenile.

**Adult Consent and Presence:** If a strip search, X-ray search, body cavity search, or MBM is necessary during the processing of a juvenile, officers/agents should seek consent from the parent or legal guardian.  If the adult does not give their consent, a decision to determine the next appropriate steps must be made by a CBP supervisor after obtaining legal advice from CBP counsel.  In most cases, the adult should be present during searches.  If the adult is of a different gender than the juvenile, and/or the juvenile does not want the adult present when a strip search, X-ray search, body cavity search, or MBM is conducted, the adult should wait immediately outside the search room in order to afford the juvenile as much privacy as possible.

**Consultation Requirement for Certain UAC Searches:** In the case of a UAC, although consent may be granted by the UAC or HHS under limited circumstances, supervisors must consult with CBP counsel prior to conducting a strip search or before a UAC undergoes an X-ray search, body cavity search, or MBM.

**Supervisory Approval for an X-ray Search:** An X-ray search will be conducted only after being approved by a supervisor authorized by the operational office's policies and procedures and after obtaining consent or a search warrant.  If a qualified medical practitioner determines that immediate action must

be taken to protect the health of the detainee, such action is authorized.  The approval requirement cannot be further delegated.

**Medical Facility Requirement for X-ray Search:** Medical practitioners will conduct the X-ray at a medical facility.  Officers/Agents are prohibited from conducting X-ray examinations, or utilizing any CBP equipment to conduct an X-ray examination.  Only qualified medical practitioners may read and interpret the X-ray.

**Consent for an X-ray Search:** Consent to search must be freely and voluntarily given as it relates to X-rays before the X-ray is administered.  Involuntary X-ray searches require a court order.  Involuntary X-ray searches will be conducted only under the most extraordinary circumstances, and never on detainees who are pregnant or a detainee who refuses to have a pregnancy test after having been determined by medical personnel to require a pregnancy test.

**Revocation of Consent for an X-ray Search:** A detainee, including an at-risk detainee, may revoke consent for an X-ray search at any time, even at the medical facility.  The revocation may be verbal or by actions.  If the detainee revokes consent, officers/ agents must immediately inform the medical practitioner to stop the X-ray search based on the revocation of consent and notify their supervisor. Revocation of consent must be documented in the appropriate electronic system(s) of record.

**Communication:** Officers/Agents must ensure that the explanation of the X-ray process and consent agreement is in a language or manner the detainee comprehends.

**Pregnancy Test:** When a detainee is taken to a medical facility for an X-ray search, medical personnel will determine if a pregnancy test is required prior to an X-ray.  If medical personnel determine a pregnancy test is necessary and the detainee refuses the pregnancy test, a decision to determine the next appropriate steps must be made by a CBP supervisor after obtaining legal advice from CBP counsel.

**Documentation:** When performing a strip searches on at-risk detainees or when an at-risk detainee undergoes an X-ray searches, a body cavity search, or an MBM, all relevant facts of the search, such as

witnesses, authorizing supervisors, and consent, must be recorded in the narrative section of the appropriate electronic system(s) of record.

## 5.6 DETENTION

*Least Restrictive Setting:* Officers/Agents will place each at-risk detainee in the least restrictive setting appropriate to their age and special needs, provided that such setting is consistent with the need to ensure the safety and security of the detainee and that of others. Adult at-risk detainees will not simply be placed in the least restrictive setting available, if they strongly communicate a preference for being held in a hold room.

*Expeditious Processing:* Whenever operationally feasible, at-risk individuals will be expeditiously processed to minimize the length of time in CBP custody.

*Family Units:* Generally, family units with juveniles should not be separated. When it is necessary to separate juveniles from the parent(s) and/or legal guardian(s), officers/agents must follow legal requirements and their operational office's policies and procedures. In circumstances where family units must be separated due to different immigration dispositions, such separation must be documented in the appropriate electronic system(s) of record.

*Unaccompanied Juvenile Siblings:* Whenever operationally feasible, UAC siblings should not be separated, unless deemed necessary for safety purposes. In circumstances where siblings must be separated due to different immigration dispositions, such separation must be documented in the appropriate electronic system(s) of record.

*Nursing Mother and Children:* In situations where a detained female is nursing, the child will not be removed from the care of the mother unless she poses a danger to the child or if she will be transferred to the custody of another agency for criminal prosecution.

*Separation of Children from Parents or Legal Guardians:* In those instances where a parent or legal guardian and U.S. citizen child must be separated, social services may need to be contacted to take custody of the child. CBP should ensure parents have the opportunity to arrange for care of their children before contacting a social service agency. In those instances where a parent or legal guardian and a non-U.S. citizen child must be separated, the non-U.S. citizen child will be classified as a UAC and will be processed accordingly.

*Detention – UAC and Juveniles:* UAC must be held separately from adult detainees. A juvenile may temporarily remain with a non-parental adult family member where: 1) the family relationship has been vetted to the extent feasible, and 2) the CBP supervisor determines that remaining with the non-parental adult family member is appropriate, under the totality of the circumstances.

*Transfer to the Department of Health and Human Services, Office of Refugee Resettlement (ORR):* Every effort must be made to transfer UAC from CBP to ORR custody as soon as possible, but no later than 72 hours after determining that a child is a UAC. Requested placement notifications for the UAC must be conducted and logged in the appropriate electronic system(s) of record. The reasons for any detention longer than 72 hours must be logged in the appropriate electronic system(s) of record.

*Hygiene Articles, Bedding and Clean Clothing - Juveniles:* Juveniles will be given access to basic hygiene articles, and clean bedding. When available, juveniles will be provided clean and dry clothing. Officers/Agents may give access to these provisions to any juvenile at any time.

*Meals and Snacks – Juveniles, Pregnant, and Nursing Detainees:* Juveniles and pregnant detainees will be offered a snack upon arrival and a meal at least every six hours thereafter, at regularly scheduled meal times. At least two of those meals will be hot. Juveniles and pregnant or nursing detainees must have regular access to snacks, milk, and juice.

*Age and Capabilities Appropriate Food:* Food must be appropriate for at-risk detainees' age and capabilities (such as formula and baby food).

*Showers – Juveniles:* Reasonable efforts will be made to provide showers, soap, and a clean towel to juveniles who are approaching 48 hours in detention.

***Showers – Transgender or Intersex Detainees:***
Whenever showers are provided, transgender and intersex detainees will be given the opportunity to shower separately from other detainees.

***Hold Rooms – UAC:*** Hold rooms for UAC must provide the following:
- Toilets and sinks;
- Professional cleaning and sanitizing at least once per day;
- Drinking fountains or clean drinking water along with clean drinking cups;
- Adequate temperature control and ventilation; and
- Clean bedding.

***Access to Medical Care:*** Any physical or mental injury or illness observed by or reported to an officer/agent should be reported to a supervisor and appropriate medical care should be provided or sought.  Emergency services will be called immediately in the event of a medical emergency. Officers/Agents must notify the shift supervisor of all medical emergencies as soon as possible after contacting emergency services and document the incident in the appropriate electronic system(s) of record.

***Consular and Telephone Access – UAC:*** All UAC must be advised of their right to consular and telephone access in a language or manner the detainee comprehends.

## 5.7 Use of Restraints

***General:*** The use of restraints on at-risk detainees must be in a manner that is safe, secure, humane, and professional.  It is the responsibility of officers/agents to ensure that the need and level of restraints used is consistent with the operational office's policies and procedures.  At no time will restraints be used in a punitive manner or in a manner that causes detainees undue pain.

***Pregnant Detainees and Juveniles:*** Barring exigent circumstances, officers/agents must not use restraints on pregnant detainees or juveniles unless they have demonstrated or threatened violent behavior, have a history of criminal and/or violent activity, or an articulable likelihood of escape exists. Even in the extraordinary circumstance when restraints are deemed necessary, no detainee known to be pregnant will be restrained in a face-down position, on her back, or in a restraint belt that constricts the area of the pregnancy.  All exceptions must be documented in the appropriate electronic system(s) of record, including the facts and the reasoning behind the decision.

***Post-delivery Recuperation:*** A detainee in post-delivery recuperation must not be restrained absent extraordinary circumstances that render restraints absolutely necessary.

***Active Labor or Delivery:*** Restraints are never permitted on detainees who are in active labor or delivery.

AR627

# 6.0 SEXUAL ABUSE VICTIMIZATION

**General:** Sexual abuse includes: 1) sexual abuse and assault of a detainee by another detainee; and 2) sexual abuse and assault of a detainee by a staff member, contractor, or volunteer.

**Heightened Protection:** Officers/Agents must provide detainees identified under the at-risk determination process in Section 4.2 to be at high risk of sexual abuse victimization, with heightened protection. This includes continuous direct sight and sound supervision, single-occupancy hold room, monitoring in open areas or placement in a hold room actively monitored on video by an officer/agent sufficiently proximate to intervene, unless no such option is determined to be feasible.

**Imminent Risk:** When an officer/agent has a reasonable belief that a detainee is subject to a substantial risk of imminent sexual abuse, he or she shall take immediate action to protect the detainee.

**Disabilities:** Detainees with disabilities (e.g., detainees who are hearing impaired, those who are blind or have low vision, or those who have intellectual, psychiatric, or speech disabilities), must have access to CBP efforts to prevent, detect, and respond to sexual abuse. When necessary to ensure effective communication with detainees who are hearing impaired, such steps must include providing access to in-person, telephonic, or video interpretive services that enable effective, accurate, and impartial interpretation, both receptively and expressively, using any necessary specialized vocabulary. In addition, any written materials related to sexual abuse will be provided in formats or through methods that ensure effective communication with detainees with disabilities, including detainees who have intellectual disabilities, limited reading skills, or who are blind or have low vision. Whenever translation or interpretation services are provided, it must be recorded in the appropriate electronic system(s) of record.

**Interpretation Services Access Related to Allegations of Sexual Abuse:** In matters relating to allegations of sexual abuse, officers/agents will provide in-person or telephonic interpretation services that enable effective, accurate, and impartial interpretation, by someone other than another detainee, unless the detainee expresses a preference for another detainee to provide interpretation, and the supervisor determines that such interpretation is appropriate and consistent with the operational office's policies and procedures. The provision of interpreter services by minors, alleged abusers, detainees who witnessed the alleged abuse, and detainees who have a significant relationship with the alleged abuser is not appropriate in matters relating to allegations of sexual abuse.

**U Nonimmigrant Status Information:** Officers/Agents must provide timely access to U nonimmigrant status information to any detainee alleging criminal sexual abuse.

**Officer/Agent Responder Responsibilities:** Upon learning of an allegation that a detainee was sexually abused, the first law enforcement staff member to respond to the report, or his or her supervisor, must:

  Separate the alleged victim and abuser/assailant;
  Preserve and protect, to the greatest extent possible, any crime scene until appropriate steps can be taken to collect any evidence;
  Request that the alleged victim not to take any actions that could destroy physical evidence, including, as appropriate, washing, brushing teeth, changing clothes, urinating, defecating, smoking, drinking, or eating if the sexual abuse occurred within a time period that still allows for the collection of physical evidence; and
  Ensure that the alleged abuser/assailant does not take any actions that could destroy physical evidence, including, as appropriate, washing, brushing teeth, changing clothes, urinating, defecating, smoking, drinking, or eating if the abuse occurred within a time period that still allows for the collection of physical evidence

**Non-Officer/Agent Responder Duties:** If the first staff responder is not law enforcement staff, the responder must request that the alleged victim not take any actions that could destroy physical evidence and then notify law enforcement staff.

***Detainee Reporting Mechanisms:*** Staff must:

Accept sexual abuse reports made verbally, in writing, anonymously, and from third parties;

Inform detainees of multiple ways to privately report sexual abuse; retaliation for reporting sexual abuse, or staff neglect or violations of responsibilities that may have contributed to such incidents;

Provide instructions on how detainees may contact the DHS Office of Inspector General;

Promptly record such reports according to the operational office's policies and procedures; and

Provide and inform the detainees of at least one way for detainees to report sexual abuse anonymously to a public or private entity or office outside of CBP in accordance with the operational office's policies and procedures.

***Staff Reporting Requirements:*** In accordance with the operational office's policies and procedures, staff must immediately report:

Any knowledge, suspicion, or information regarding an incident of sexual abuse against any detainee;

Retaliation against detainees or staff who reported or participated in an investigation about such an incident; and

Staff neglect or violation of responsibilities that may have contributed to an incident or retaliation.

***Sexual Abuse Reporting:*** If a known or reported victim of sexual abuse is transferred within CBP or to the custody of another component within DHS, the officer/agent must, as permitted by law, inform the receiving CBP office or DHS component of the incident and the victim's potential need for medical or social services.

If a known or reported victim of sexual abuse is transferred outside of DHS, the officer/agent must, as permitted by law, inform the receiving agency or office of the incident and the victim's potential need for medical or social services, unless the victim requests otherwise.

***Access to Medical Services:*** Detainee victims of sexual abuse must have timely, (including emergency) unimpeded access to medical treatment and crisis intervention services, including sexual assault forensics medical exam, emergency contraception and sexually transmitted infections prophylaxis, in accordance with professionally accepted standards of care.  The forensic medical examination should be done by qualified health care personnel, including a Sexual Assault Forensic Examiner (SAFE) or Sexual Assault Nurse Examiner (SANE) where practicable.  If SAFEs or SANEs cannot be made available, the examination can be performed by other qualified health care personnel.

***Access to Victim Services:*** If, in connection with an allegation of sexual abuse, the detainee is transported for a forensic examination to a medical facility that offers victim advocacy services, officers/agents will permit the detainee to use such services to the extent available, consistent with security needs.

***Cost of Medical Treatment Services:*** Emergency medical treatment services provided to the victim will be without financial cost and regardless of whether the victim names the abuser or assailant, or cooperates with any investigation arising out of the incident.

***Prohibition against Retaliation:*** CBP staff must not retaliate against any person, including a detainee, who alleges or complains about mistreatment, participates in an investigation into an allegation of staff misconduct, including sexual abuse, or for participating in sexual activity as a result of force, coercion, threats, or fear of force.

# 7.0 PERSONAL PROPERTY

## 7.1 GENERAL

***Operational Office Policies and Procedures:***
Operational offices are responsible for creating policies and procedures relating to the handling, retention, retrieval, and return of detainee personal property.

***Personal Property:*** All detainees' personal property discovered during apprehension or processing and not deemed to be contraband will be safeguarded, itemized according to the operational office's policies and procedures, and documented in the appropriate electronic system(s) of record.

***Monetary Personal Property:*** Special attention must be given to the security and return of the detainee's cash, currency, negotiable instruments, and debit/credit cards.  The type, amount, and value of all detainee's cash, currency, and negotiable instruments must be recorded in the appropriate electronic system(s) of record.

***Legal Papers:*** Copies of any legal papers signed by the detainee shall be provided to the detainee according to the operational office's policies and procedures.

***Personal Property and Legal Papers – Juveniles:*** All personal property (including any U.S.-prescribed medications) and legal papers that are in the juvenile's possession, or are served upon the juvenile during processing, must accompany the juvenile upon transfer to any other agency or facility.

***Contraband:*** Contraband will be properly disposed of according to the operational office's policies and procedures.

***Seized Property:*** Personal property seized as evidence or seized for possible forfeiture will be handled according to the operational office's policies and procedures.

***Transfer:*** Whenever operationally feasible, officers/agents will transfer a detainee's personal property with the detainee when the detainee is transferred within CBP.  Officers/Agents will make every effort to transfer a detainee's personal property with the detainee when the detainee is transferred to another agency, repatriated, and/or released. If personal property cannot be transferred with the detainee, CBP will generally hold personal property for a minimum of 30 days from the processing of a detainee.  After 30 days personal property will be considered abandoned and may be destroyed.

***Retention and Retrieval of Personal Property:***
Detainees may designate a third-party to retain or retrieve their personal property on their behalf, including the consulate of their country of nationality.

## 7.2 PROCESSING AND STORAGE OF DETAINEES' PERSONAL PROPERTY

***Inventory:*** The inventory of a detainee's personal property must be conducted in the presence of the detainee and recorded according to the operational office's policies and procedures.

***Storage of Personal Property:*** A detainee's personal property will be stored in a secure storage room or area.  The secure storage room or area must be maintained in a clean and orderly manner and inspected as often as necessary to protect detainee property.

***Supervisor Responsibilities:*** Supervisors must routinely inspect the secure storage room or area to ensure unclaimed property is handled according to the operational office's policies and procedures.

***Supervisor Notification:*** Supervisors must be notified when itemized personal property, including monetary personal property, is reported missing or damaged.  Supervisors will investigate and make the appropriate notifications according to the operational office's policies and procedures.

## 7.3 NOTICE TO DETAINEES

All personal property instructions must be communicated to the detainee in a language or manner the detainee can comprehend.

Detainees with personal property who are not being immediately repatriated to a contiguous country must receive notice of CBP's procedures relating to personal property, including:

- The process for claiming personal property upon release, transfer or removal.
- The process for having a third party claim personal property.
- The process for claiming lost property.

## 7.4 POSSESSIONS KEPT ON THE DETAINEE

At the discretion of officers/agents, a detainee may keep some personal items in their possession, as long as a particular item does not pose a threat to the security or good order of the facility.

## 7.5 MEDICATIONS

All medications will generally be maintained with the detainee's personal property unless other conditions warrant, such as the medication needing to be regularly administered due to need, and/or needing to be properly stored as the prescription requires.

## 7.6 IDENTIFICATION DOCUMENTS

Documents determined to be genuine, unaltered, and issued under the proper authority to the detainee, must be returned to the detainee upon release, removal or repatriation or maintained in the detainees' personal property.  Documents will not be retained based solely on apparent gender-related discrepancies in gender designations, names, or photographs, absent any other indication the document is not genuine or unaltered.

# 8.0 DEFINITIONS

Solely for purposes of this document, the below terms are defined as follows:

**Adult:** A person known or reasonably believed to be 18 years of age or older.

**Agent:** Any class of CBP employees designated by the Commissioner to perform the functions of a Border Patrol and/or Air & Marine Agent.

**At-Risk Populations/At-Risk Detainees:** Individuals in the custody of CBP who may require additional care or oversight, who may include: juveniles; UAC; pregnant individuals; those known to be on life-sustaining or life-saving medical treatment; those at higher risk of sexual abuse (including but not limited to gender nonconforming, intersex, and transgender); reported victims of sexual abuse; those who have identified mental, physical or developmental disabilities; those of advanced age; or family units.

**Bedding:** A (or any combination of) blanket, mat, or cot.

**Body Cavity Searches:** A body cavity search is any internal search consisting of the visual or physical intrusion into the rectal or vaginal cavity.

**Contraband:** Any item possessed by a detainee that is prohibited under CBP policies or federal, state or local law and/or regulation.

**Commercial Air Transport:** The use of aircraft not owned or controlled by the U.S. Government, to move detainees.

**Contractor:** A person who, or entity that, provides services pursuant to a contractual agreement with CBP or other federal entity.

**Custody:** The control of the detainee whose freedom of movement is directly limited.

**De-escalation:** The reasonable use of words and actions to reduce a heightened emotional and physical state, in order to facilitate a calm, rational interaction.

**Detainee:** Any person, regardless of citizenship or nationality, under arrest, restrained, or confined by CBP.

**Detention:** Restraint from freedom of movement. Physical restraint is not an essential element of detention.

**Direct Supervision:** The constant sight and sound observation of a detainee by an officer/agent. This does not include video monitoring of detainees.

**Electronic System(s) of Record:** A group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual.

**Employee:** A person who works directly for CBP.

**Escape:** The departure of a detainee from CBP custody without authorization.

**Escape Risk:** Any detainee whom an officer/agent believes may attempt to flee from CBP custody if not prevented.

**Escort:** The accompanied movement of a detainee in CBP custody by an officer/agent.

**Exigent Circumstances:** Any set of temporary and unforeseen circumstances that requires immediate action in order to combat a threat to the security or institutional order of a facility or a threat to the safety or security of any person.

**External Search:** Non-intrusive searches conducted to determine if detainees are carrying contraband/weapons outside of their bodies, including immediate pat-downs/terry frisks, and pat-downs.

**Facility:** A place, building (or part thereof), set of buildings, structure, or area that was constructed or retrofitted for the purpose of detaining individuals and is routinely used by CBP to detain individuals in its custody.

**Family Unit:** A group of detainees that includes one or more non-United States citizen juvenile(s) accompanied by his/her/their parent(s) or legal guardian(s), whom the agency will evaluate for safety purposes to protect juveniles from sexual abuse and violence.

**Gender identity:** How a person sees themselves and understands their own gender identity (a man, a woman, other).

**Gender Nonconforming:** Having an appearance or manner that does not conform to traditional societal gender expectations.

**Holding Facility:** A structure that contains hold rooms, or other secure enclosures that are:
Under the control of CBP; and
Primarily used for the short-term confinement of individuals who have recently been detained, or are being transferred to or from a court, jail, prison, other agency, or elsewhere within CBP.

**Hold Room:** A secure area in a holding facility used for temporary confinement of detainees.

**Human Trafficking:** A modern day form of slavery involving the illegal trade of people for exploitation, or commercial gain. The use of force, fraud or coercion is used to lure victims into forced labor, commercial sexual exploitation or slavery. In cases of sex trafficking, for children under the age of 18, no force, fraud, or coercion is needed.

**Immediate Pat-down/*Terry* Frisk:** An external search necessary to ensure officer safety. A limited search for weapons, generally the outer clothing.

**Immediate Relative:** A person related to a detainee in one of the following ways: spouse, parent, grandparent, child, sibling, aunt, uncle, or legal guardian.

**Internal Search:** Searches conducted to determine if detainees are carrying contraband close to or inside their bodies. Internal searches include and are limited to medical x-rays, body cavity searches, and monitored bowel movement (MBM) searches.

**Intersex:** Having sexual or reproductive anatomy that does not seem to fit typical definitions of male or female. Intersex individuals may have organs of both sexes, present at birth, due to chromosomal circumstances.

**Juvenile:** A person known or reasonably believed to be less than 18 years of age.

**Law Enforcement Staff:** Officers or Agents of CBP or a CBP facility that are responsible for the supervision and control of detainees in a holding facility.

**Medical Facility:** An accredited location where medical practitioners conduct medical exams, diagnostics, and/or provide care.

**Medical Practitioner:** A health professional who, by virtue of education, credentials, and experience, is permitted by law to evaluate and care for patients within the scope of his or her professional practice.

**Medical Witness:** A credentialed or qualified medical provider (such as a doctor, nurse, medical student, paramedic) of a healthcare facility legally competent to serve as a witness to a medical event such as a procedure or exam. Medical bystanders often provide assistance to the event and may be called on for legal testimony related to the event.

**Medication:** A medicine used to treat an illness or injury.

**Monitored Bowel Movement (MBM):** An MBM search is an internal search consisting of detaining a suspect in a room or holding cell without flushable toilet facilities, under close observation, to permit time for a swallowed object to be expelled by the body through natural means.

**Officer:** Class of CBP employees designated by the Commissioner, responsible for the inspection of arriving and departing persons, conveyances and baggage at ports of entry.

**Open Area:** An area within a holding facility where the detainee is not in a locked room but where there are locked doors to prevent escape (e.g., a processing room).

**Operational Office:** Components within CBP including the Office of Field Operations, the U.S. Border Patrol, and the Office of Air and Marine.

**Pat-down Search:** An external search consisting of the sliding or patting of the hands over the clothed body of a detainee by staff to determine whether the individual possesses weapons and/or contraband. A pat-down search may require the detainee to reveal pocket contents.

**Personal Property:** Belongings found on the detainee's person or carried by a detainee (e.g., a detainee's baggage, money, personal identification, clothing, jewelry, mobile device, medication). This does not include items deemed to be contraband.

**Probe/Probing:** The use of an instrument to explore the inside of an object physically attached to a detainee (e.g., cast, brace, etc.).

**Processing Area:** The secure location in a CBP facility where officers/agents conduct interviews, record detainee responses, and enter required information into appropriate electronic system(s) of record.

**Reasonable Suspicion:** A particularized and objective basis supported by specific and articulable facts for suspecting a person of violating the law.

**Restraints:** CBP-approved equipment used to restrict a detainee's movement.

**Search of an Individual:** Any search of a person conducted for an official law enforcement purpose. This includes: immediate pat-down/*Terry* frisk, pat-down search, search incident to lawful arrest, strip search, medical X-ray search, body cavity search, and monitored bowel movement.

**Secure Area:** An area, including a hold room, processing area, or open area where an individual is detained for a temporary period of time and where the likelihood of escape is minimized because points of egress are secured to prevent unauthorized use.

**Secured Vehicle:** A transport vehicle that is equipped with security measures that separate detainees from officers/agents, and limits detainee egress from the vehicle.

**Sexual Abuse:** Sexual abuse includes: 1) Sexual abuse and assault of a detainee by another detainee; and 2) Sexual abuse and assault of a detainee by a staff member, contractor, or volunteer.

**Sexual Abuse of a Detainee by Another Detainee:** Sexual abuse of a detainee by another detainee includes any of the following acts by one or more detainees, prisoners, inmates, or residents of the facility in which the detainee is housed who, by force, coercion, or intimidation, or if the victim did not consent or was unable to consent or refuse, engages in or attempts to engage in:

 Contact between the penis and the vulva or anus and, for purposes of this subparagraph, contact involving the penis upon penetration, however slight;

 Contact between the mouth and the penis, vulva, or anus;

 Penetration, however slight, of the anal or genital opening of another person by a hand or finger or by any object;

 Touching of the genitalia, anus, groin, breast, inner thighs or buttocks, either directly or through the clothing, with an intent to abuse, humiliate, harass, degrade or arouse or gratify the sexual desire of any person; or

 Threats, intimidation, or other actions or communications by one or more detainees aimed at coercing or pressuring another detainee to engage in a sexual act.

**Sexual Abuse of a Detainee by a Staff Member, Contractor, or Volunteer:** Sexual abuse of a detainee by a staff member, contractor, or volunteer includes any of the following acts, if engaged in by one or more staff members, volunteers, or contract personnel who, with or without the consent of the detainee, engages in or attempts to engage in:

 Contact between the penis and the vulva or anus and, for purposes of this subparagraph, contact involving the penis upon penetration, however slight;

 Contact between the mouth and the penis, vulva, or anus;

 Penetration, however slight, of the anal or genital opening of another person by a hand or finger or by any object that is unrelated to official duties or where the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;

 Intentional touching of the genitalia, anus, groin, breast, inner thighs or buttocks, either directly or through the clothing, that is unrelated to official duties or where the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;

 Threats, intimidation, harassment, indecent, profane or abusive language, or other actions or communications, aimed at coercing or pressuring a detainee to engage in a sexual act;

 Repeated verbal statements or comments of a sexual nature to a detainee;

Any display of his or her uncovered genitalia, buttocks, or breast in the presence of an inmate, detainee, or resident; or Voyeurism.

**Staff:** Employees or contractors of CBP or CBP facility, including any entity that operates within the CBP facility.

**Short Term Detention:** The temporary detention of a person at a CBP facility for the least amount of time necessary to complete processing, transfer, and/or repatriation.

**Strip Search:** An external search that requires a person to remove or arrange some or all clothing so as to permit a visual inspection of the person's breasts, buttocks, or genitalia.

**Supervisor:** Any permanent or acting officer/agent, designated and authorized to oversee staff and make management level decisions.

**Trafficking Victim:** A person forced into human trafficking.

**Transgender Individual:** A person whose gender identity (i.e., internal sense of feeling male or female) is different from the person's assigned sex at birth.

**Transport:** The physical movement of a detainee by vehicle, vessel or commercial air transport.

**Unaccompanied Alien Child (UAC):** A child who:
has no lawful immigration status in the United States;
has not attained 18 years of age; and
with respect to whom:
(i) there is no parent of legal guardian in the United States; or
(ii) no parent or legal guardian in the United States is available to provide care and physical custody.

**Unsecured Vehicle:** A transport vehicle that is not equipped with security measures that separate detainees from officers/agents, and may not limit detainee egress from the vehicle.

**U Non-Immigrant Status:** U nonimmigrant status for victims of criminal activity designated in INA §101(a)(15)(U) (qualifying crimes) who have suffered substantial mental or physical abuse as a result of being a victim of criminal activity, possess information concerning the crime, and are being helpful to law enforcement and government officials in the investigation or prosecution of the criminal activity.

**Vehicle:** A craft designed for land-based transportation.

**Vessel:** A craft designed for water-based transportation.

**Volunteer:** An individual who donates time and effort on a recurring basis to enhance the activities and programs of CBP.

**Voyeurism:** Inappropriate visual surveillance of a detainee for reasons unrelated to official duties. Where not conducted for reasons relating to official duties, the following are examples of voyeurism: staring at a detainee who is using a toilet in his or her cell to perform bodily functions; requiring an inmate detainee to expose his or her buttocks, genitals, or breasts; or taking images of all or part of a detainee's naked body or of a detainee performing bodily functions.

**Weapon:** Any object, item, or device that may be used to cause physical injury, incapacitate, or diminish capability, temporarily or permanently.

**X-ray Search:** The use of a medical X-ray by a medical practitioner to determine the presence of contraband within the body.

U.S. Department of Homeland Security
Washington, DC 20528


Homeland
Security

## INFORMATION

MEMORANDUM FOR: Kevin K. McAleenan
        Acting Secretary
        Department of Homeland Security

FROM:      Mark A. Morgan ▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐
        Acting Commissioner
        U.S. Customs and Border Protection▐▐▐▐

        Matthew T. Albence ▐▐▐▐▐▐▐▐▐▐▐▐▐▐
        Deputy Director and
        Senior Official Performing the Duties of the Director
        U.S. Immigration and Customs Enforcement

        Kenneth T. Cuccinelli ▐▐▐▐▐▐▐▐▐▐
        Acting Director
        U.S. Citizenship and Immigration Services

SUBJECT:     Prioritization of Removal Pathways

In order to effectuate removals of amenable aliens and reduce the number of aliens released into the interior of the United States where such releases are not required by law or merited as a matter of enforcement discretion, the Department of Homeland Security (DHS) and its immigration components U.S. Customs and Border Protection (CBP), U.S. Immigration and Customs Enforcement (ICE), and U.S. Citizenship and Immigration Services (USCIS) have a broad suite of immigration removal pathways available to address the migration crisis along the Southwest Border.

Immigration removal pathway prioritization rests in two guiding principles:

1. Deliver enduring consequences through timely and efficient removals; and
2. Leveraging cross-component field discretion, flexibility, and coordination to account for local conditions and available resources and infrastructure.

The following primary pathways for removing amenable aliens are listed and described in order of general priority, recognizing that field leadership may consider application of any option in a cascading fashion that begins with the most effective and lasting pathway available, consistent with the law and the requirements of each individual removal pathway.

- Electronic Nationality Verification (ENV)
- Migrant Protection Protocol (MPP)

FOUO//LAW ENFORCEMENT SENSITIVE

Prioritization of Removal Pathways
Page 2

- Asylum Cooperative Agreements (ACA)
- ICE Detention (expedited processing)

The applicability and frequency by which each option is utilized shall be determined by field leadership, understanding that some tools (ENV and MPP) are active and ready for maximization, while others (ACA and expedited processing in ICE detention) remain in development. Such determinations should take into account the regional operational environment, available resources, and be consistent with the guiding principles stated above. The utilization of these pathways is also subject to the availability of such tools as applied to available countries of origin or participation as specified in *Attachment A* (as updated), and the general workflow procedures referenced in *Attachment B* (as updated).

Component headquarters leadership hereby commit to provide the requisite guidance and available resources for the implementation of each removal pathway below based on operational requirements developed by the field leadership. We also commit to directing our respective field leadership to work collaboratively with each other towards the success of these efforts, because implementation and decisions to shift among potential outcomes can and will affect each of our agencies.

*Current Tools*

**Electronic Nationality Verification**

The Governments of Guatemala, El Salvador, and Honduras[1] have agreed to pilot the ENV program, which may expedite removals by eliminating the requirement for issuance of paper travel documents for certain Guatemalan, Salvadoran, and Honduran nationals. ENV is being implemented bilaterally and entails agreed upon criteria for eligibility. While eligibility varies, at a minimum, an alien must have made an affirmative claim to Guatemalan, Salvadoran, or Honduran citizenship, and have an executable final order of removal.

Aliens eligible for ENV may be processed for Expedited Removal (ER), as specified within the guidelines presented in *Attachment C;* however, an ER order is not a mandatory qualification for ENV, as any alien with a final order of removal and no legal impediments to removal, is eligible to ENV. Despite the fact that the ENV process will likely increase CBP time in custody, the likelihood of effectuating removal for the illegal alien population renders this process the most desirable. ENV removals likely will correspondingly decrease length of time in ICE custody and clear space for other aliens not subject to any of the aforementioned pathways.

In order for ENV expansion to be successful, CBP commits to identify, process, transport as applicable, and hold amenable aliens. ICE commits to providing appropriately routed removal flights to remove amenable aliens from where CBP's in-custody populations are highest.

Aliens with pending credible fear claims are not amenable to ENV because they do not have an executable final order of removal initially. However, if the aliens are subject to another pathway below, USCIS commits to effectively and efficiently adjudicate fear claims and surge resources as necessary to relieve CBP or ICE detention volume.

---

[1] Honduras agreed to pilot ENV on August 30, 2019. The first flight is set for September 12, 2019.

FOUO//LAW ENFORCEMENT SENSITIVE

Prioritization of Removal Pathways
Page 3

## Migrant Protection Protocols

While fully leveraging the ENV removal capacity, the simultaneous intent is to maximize returns of aliens amenable to MPP at already established locations: San Diego, Calexico, El Paso, Laredo, and Brownsville. Through an informal arrangement with the Government of Mexico (GOM), CBP returns aliens from Spanish-speaking countries to Mexico to await their immigration proceedings before the Executive Office for Immigration Review (EOIR). Aliens amenable to MPP are processed for a Notice to Appear. Hearings are scheduled by CBP in EOIR's Interactive Scheduling System prior to the alien being returned to Mexico.

Maximization efforts will require continued DHS negotiations with the GOM toward unlimited returns and extended return hours. The components will follow established MPP protocols. CBP will determine amenability, coordinate with local GOM partners, and process alien returns and attendance for immigration hearings. CBP, with possible support from ICE as locally requested and agreed to, will ensure the maximum aliens are returned to Mexico daily by transporting aliens from one port of entry (POE) that may have met the daily quota to a nearby POE that has the ability to return additional aliens. ICE will transport aliens to hearing locations located in the interior, represent the U.S. Government in immigration court, and take custody of aliens issued final orders. USCIS will devote sufficient resources for efficient screening procedures at the onset and at any time necessary during the sequence of hearings.

*Future Tools*

## Asylum Cooperative Agreements

DHS is negotiating with Central American countries to share the burden of providing protections to aliens seeking asylum. At present, Guatemala is the only country to sign an agreement, and the agreement is currently constrained by challenges in Guatemala's legal and legislative system. The implementation of the ACA will closely mirror that of the CBP and ICE coordination under ENV, the Honduran Pilot Initiative, and the Guatemalan Pilot Initiative. ACA may also potentially compete with other removal pathways for a limited number of ICE flights.

Like the aforementioned removal pathway options, CBP will determine initial amenability to an ACA and process the amenable aliens for removal, likely through ER, possibly internally transfer and hold amenable populations. Unlike ENV (which will not be applied to aliens asserting a fear of return), aliens who are amenable to ACA who make fear claims will be referred to USCIS for a threshold screening to determine whether the ACA, in fact, applies and whether there is any other screening that is required. A threshold screening determination that the ACA does not apply (including that the alien falls within one of its exceptions) would result in the alien referral to USCIS. Aliens to whom the ACA is determined to apply and who do not fall under an exception, will instead be processed by ICE for removal to the partner country. ICE will need to commit a sufficient number of properly routed removal flights to ensure that aliens in custody for the ACA process are promptly removed where appropriate under ACA and implementing procedures.[2]

---

[2] DHS implementation procedures are subject to change, pending inter-component coordination, legal interpretation, and further negotiations with the Government of Guatemala.

FOUO//LAW ENFORCEMENT SENSITIVE

FOUO//LAW ENFORCEMENT SENSITIVE

Prioritization of Removal Pathways
Page 4

The ACA remains in the planning and conceptual stage; therefore, a timeline for implementation cannot be adequately gauged.

### ICE Detention (expedited processing)

Given resource constraints, detention in an ICE facility is the most limited tool available to support the delivery of consequences to those who violate our immigration laws. This is especially true for family units. Due to a 2015 judicial reinterpretation of the *Flores* Settlement Agreement, it is extremely challenging to detain family units in an ICE Family Residential Center throughout their case. DHS is working to use legal, policy, and regulatory tools to change this dynamic, and to apply an immigration consequence to family units not amenable to other tools (ENV, MPP, or ACA). In the meantime, as resources permit, ICE, USCIS, and CBP commit to using existing capabilities for the expeditious transportation, screening, and processing of aliens to/in ICE detention facilities.

Attachments

FOUO//LAW ENFORCEMENT SENSITIVE

OFFICIAL USE ONLY// LAW ENFORCEMENT SENSITIVE

**Attachment D**
**Streamlined Processing Procedures and Third Country Pilot Guidelines**

As authorized by section 208 of the Immigration and Nationality Act (INA), the Interim Final Rule, Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33829 (July 16, 2019) (Third Country IFR), modifies asylum regulations to bar from asylum eligibility, with limited exception, aliens who have entered or arrived in the United States across the southern land border on or after July 16, 2019, after failing to apply for protection in at least one third country through which he or she transited en route to the United States.

Single Adults (SAs) and Family Unit Aliens (FMUA) who have traveled through at least one prior country that is a signatory to relevant international instruments governing consideration of protection claims are subject to the Third Country IFR, unless there is an applicable exception. Mexico and all seven countries in Central America (Belize, Costa Rica, El Salvador, Guatemala, Honduras, Nicaragua, and Panama) are parties to both the Refugee Convention and the Refugee Protocol. Aliens subject to the bar remain eligible for statutory withholding of removal and protection under the regulations implementing U.S. obligations pursuant to Article 3 of the Convention Against Torture and no alien will be returned to a country where it is more likely than not that he or she will be persecuted or tortured, in accordance with the non-refoulement obligations of the United States Government.

This paper outlines a proof of concept on the more effective processing of aliens amendable to the Third Country Transit IFR as a pilot.

In order for this pilot to be successful, U.S. Customs and Border Protection (CBP), U.S. Immigration and Customs Enforcement (ICE), and U.S. Citizenship and Immigration Services (USCIS) commit to providing the appropriate resources and guidance necessary to implement the processes below. These Department of Homeland Security (DHS) components also commit to directing their respective field leadership to work collaboratively with each other towards the success of these efforts, because implementation and decisions to shift among potential outcomes can and will affect each agency. Specifically, CBP and ICE will leverage cross-component field discretion, flexibility, and coordination to account for local conditions and available resources and infrastructure. USCIS commits to efficiently adjudicate fear claims telephonically and surge resources to the pilot location, including Asylum Officers and administrative personnel as needed, to address CBP volume, including extended evening hours and weekends. CBP will identify for the pilot those individuals to whom the Third Country Transit IFR may apply (e.g., individuals subjected to expedited removal who will be referred for a credible fear determination). CBP will not include Mexican nationals or unaccompanied alien children (UACs) in this pilot and will continue to process them in accordance with current regulations, policies, and procedures.

Furthermore, the below factors should be considered for aliens referred for this pilot:
- Only SA and FMUA are applicable;
- Criminal history is not an excluding factor;
- Have made an affirmative claim to a claimed country of citizenship;

1

OFFICIAL USE ONLY// LAW ENFORCEMENT SENSITIVE

OFFICIAL USE ONLY// LAW ENFORCEMENT SENSITIVE

- Have no medical concerns, no imminent health concerns, or must be cleared (or be able to be cleared) medically for travel;
- Must be processed as an expedited removal; and,
- FMUAs may not be separated solely for participation in the program.

**Pilot Location**:  Only aliens apprehended in El Paso Sector (EPT) subjected to expedited removal and who express a fear of return, excluding Mexican nationals, will initially be considered for this pilot.  EPT has a significant volume and EPT participation in Electronic Nationality Verification (ENV) and proximity to available transportation will ensure sufficient and routine ENV flights from EPT.  USCIS continues to use all standard processes to adjudicate credible fear claims, except as explicitly stated or changed by the IFR.

Following the pilot, the DHS components may expand beyond the initial location to the entire Southwest Border.

<u>**Five to Seven Day Streamlined Procedures**</u>
This document outlines the six steps for implementing streamlined procedures, along with resources needed to complete these procedures in five to seven days at EPT.  DHS can move timelines up in accordance with law, policy, and operations.  If at any time an alien's case does not meet this timeline, local CBP and ICE will coordinate and ICE will make every effort to take custody within 48 hours, with the exclusion of FMUAs with positive fear determinations.  The local operators on a case-by-case basis may consider emergent needs for additional time.

**Step 1 – Apprehension and Processing**
- CBP apprehends an alien in EPT.
- CBP procedures for processing for identity and inadmissibility remain unchanged.
- Aliens who are amenable to this pilot would have already been placed in expedited removal.

**Step 2 – Transport, Intake at Soft-sided Facility, Preparation for Interview, and Consultation Period**
- CBP will generally transport aliens to an EPT soft-sided facility, intake/in-processing, including medical screenings, and provision of materials (i.e., M-444 explaining credible fear process and legal services provider list are provided to the alien upon arrival).
- Aliens who assert an intention to apply for asylum, claim a fear of return to his or her country of origin, or express a fear of persecution or torture, will be referred to USCIS by CBP personnel for a credible fear interview.
- Aliens who are referred for a credible fear interview will be given one calendar day after arrival at the facility to access phones, as often as operationally feasible, and contact/consult with any person of their choosing, including an attorney.  Aliens may request to waive the consultation time if they are prepared to discuss their case immediately with USCIS.

OFFICIAL USE ONLY// LAW ENFORCEMENT SENSITIVE

OFFICIAL USE ONLY// LAW ENFORCEMENT SENSITIVE

**Step 3 – Interview by Asylum Officer**
- After USCIS receives a complete referral package from CBP, including forms I-860, I-867A&B and M-444, the asylum office will schedule the case for a telephonic interview.
- USCIS will interview immediately following the one-full calendar day consultation period (or earlier if the alien requests to waive the consultation period).
- CBP will escort the alien to the interviewing location within the facility.
- All interviews will be conducted in a location that is separate, apart from other individuals such as those detained in CBP custody, and allows the alien privacy and the ability to be free from being overheard. USCIS must also be able to hear the alien.
- The alien's consultant or attorney may participate in the interview telephonically.
- USCIS will engage the telephonic interpreter service, and consultant or attorney, if any, for the interview.
- If USCIS is prepared to proceed with the interview after the one full calendar day consultation period has passed, or earlier, if the alien requests to waive this period, asylum offices normally will deny requests for extensions of the consultation period, as unreasonably delaying the process, except in extraordinary circumstances, or as the officer conducting the credible fear interview deems necessary under 8 CFR 208.30(d)(1). Extraordinary circumstances may include, but are not limited to, serious illness or mental or physical disability of the alien, a member of the alien's immediate family, or the alien's consultant, and facility issues that prevent the alien from contacting a consultant.
- USCIS conducts the screening interview by telephone and drafts the determination documents.
- When an applicant seeks to dissolve their protection request, an asylum officer must promptly speak to the applicant to confirm their desire to depart, that he or she aware of the consequences of doing so, and that he or she is dissolving voluntarily and knowingly.
- USCIS will promptly notify CBP of the alien's wish to dissolve their protection request after completing necessary dissolution paperwork.

**Step 4 – Post Interview Processing**
- A Supervisory Asylum Officer must review the asylum officer's determination and sign the determination documents before serving a determination.
- An asylum officer or other asylum office employee prepares a service packet, and ensures service of the determination in-person to the individual, and to ICE, the immigration court as applicable, and the applicant's attorney, if any.
- Individuals found to have a credible fear ("positive determination"), will be placed into removal proceedings under section 240 of the INA. ICE will then make custody determinations or parole determinations, as appropriate. Individuals that ICE determines they will take custody of will be moved out of the EPT space and transferred to ICE custody, excluding FMUAs. Emergent needs for additional time may be considered by the local operators on a case-by-case basis, mindful of timelines within this guideline.
- Where individuals are found not to have a credible fear ("negative determinations"), an asylum office employee asks if the applicant wants to seek Immigration Judge review. If the alien requests Immigration Judge review or refuses to request or decline such review, USCIS will serve the alien, ICE and immigration court Form I-863.

3

OFFICIAL USE ONLY// LAW ENFORCEMENT SENSITIVE

AR642

OFFICIAL USE ONLY// LAW ENFORCEMENT SENSITIVE

**Step 5 – Immigration Judge Review**

- If the alien elects Immigration Judge review or refuses to request or decline such review of a negative USCIS credible fear determination, the Immigration Judge will conduct a review of the negative fear finding.
- DHS (CBP, ICE, and CIS) will coordinate facilities and transport to the extent that the Department of Justice will provide Immigration Judges.

**Step 6 – Removal or Referral to ICE for Detention Determination and Further Proceedings**

- ICE will expeditiously remove SAs and FMUAs after Immigration Judge concurrence with USCIS negative fear determination.
- ICE ERO will expeditiously assume custody of any SAs and FMUAs, including those awaiting Immigration Judge review of a negative CF determination, who are in CBP custody past day seven.
- If at any time an alien's processing is not completed within this timeline, the SA or FMUA will be referred to ICE for a custody determination. An exception applies to FMUAs with positive CF determinations who cannot be placed into ICE detention.

OFFICIAL USE ONLY// LAW ENFORCEMENT SENSITIVE



**<u>Humanitarian Asylum Review Process (HARP) Info Sheet</u>**

**<u>Who is Amenable?</u>**

Aliens in the following categories <u>are</u> amenable to processing under HARP:
- ➢ Must be Mexican nationals
- ➢ Must have been processed for Expedited Removal and have claimed fear of return to their native county

*In SIGMA/USEC, officer must select the CDS program classification of HARP.*

**<u>How Many Cases are Amenable?</u>**

Space constraints, both in terms of holding and available phone lines for consultation and interview, will determine the number of cases/individuals processed in a timely manner through this process.

USCIS, in consultation with CBP, will provide to OFO and USBP recommendations regarding the number of referrals accepted on a given day for interview the following day.  In general, the number of available phone lines anticipated at the holding location will dictate the number of cases accepted daily and USCIS will endeavor to project out referral capacity for the week forward. USCIS will confirm recommended referral capacity on a daily basis. (OFO and USBP will locally manage the case input and interview requests with USCIS).

**<u>Port Encounter Timeline</u>**

- Processed as ER;
- Claim fear of return to native country;
- Identified as HARP amenable;
- M-444 served by OFO, along with List of Free Legal Services;
- Transferred custody to USBP where 24-hr consult period begins*;
- OFO sends the CF referral package to USCIS after the alien arrives at holding**;
- Alien given opportunity to contact an attorney {initial 1 hour; 30-minute follow-up as needed} via phone supplied at USBP after arriving at the USBP station.

*\* The 24-hour consult clock begins once alien is served M-444, provided with List of Free Services and after the alien has physically arrived to the location where the interview and subsequent processing will take place. The location for consultation calls must allow sufficient privacy to allow for discussion of confidential matters.*

**\*\****Referral package: I-213, I-860, I-867 A&B, signed M-444 (English and Spanish), signed List of Free Legal Services, completed I-216 with date/time stamp indicating beginning of 24-hr consult period.*

Alien(s) attend scheduled telephonic USCIS interview.

USCIS officer prepares determination documents and Supervisory Asylum Officer conducts review of the determination.  Service of determination is coordinated between USCIS and USBP as outlined below.

**Positive determination by USCIS:**

- OFO coordinates with USBP to reprocess case and serve alien(s) with I-862.
- OFO coordinates with USBP to request placement for alien(s) with ICE/ERO.

  - ➢ The following documents from CBP and USCIS provided in a service packet for the alien.
    - ▪ I-870:  Record of Determination (electronically signed by Asylum Officer and Supervisory Asylum Officer).
    - ▪ Credible Fear Interview Notes.
    - ▪ Credible Fear Determination Checklist.
    - ▪ I-862: NTA with certificate of service completed.
    - ▪ I-870: Record of Determination (electronically signed by Asylum Officer and Supervisory Asylum Officer).
    - ▪ Credible Fear Interview Notes from Asylum Officer.
    - ▪ Credible Fear Determination Checklist.
    - ▪ List of Free Legal Services.
    - ▪ EOIR 33 – Change of Address Form.
    - ▪ Form I-867, Parts A&B, Sworn Statement and Jurat – copy (only if not previously provided a copy of the form).
    - ▪ Form I-860, Notice and Order of Expedited Removal – copy (only if not previously provided a copy of the form).
    - ▪ M-444 (with alien's A# on top) (only if the alien was not previously given a copy of the form).
  - ➢ The following documents provided by USCIS for inclusion in the A-file (includes FOUO information):
    - ▪ I-870: Record of Determination (electronically signed by Asylum Officer and Supervisory Asylum Officer).
    - ▪ Credible Fear Interview Notes.
    - ▪ Credible Fear Determination Checklist.
    - ▪ Credible Fear/Reasonable Fear Background Identity and Security Checklist (and attachments).
    - ▪ Memo to File, if any.

**Negative determination by USCIS:**

- OFO coordinates with USBP to request return of the alien(s) by ICE/ERO.

  - ➢ USCIS serves the negative determination on the I-869A to the alien in-person or via telephone. Where served the negative determination via telephone, USCIS will arrange for either the USCIS onsite staff or USBP staff to obtain the required signatures.

- ➢ Alien afforded review of their case by an immigration judge (IJ)
  - ▪ If IJ review declined, alien turned over by USBP to ICE/ERO for repatriation.
  - ▪ If alien requests IJ review USCIS serves on EOIR the I-863 and referral packet via email.
- ➢ EOIR schedules the negative review hearing and coordinates with USBP to have the alien appear telephonically for the hearing.
  - ▪ If the IJ issues order of removal, alien turned over to ICE/ERO for repatriation.
  - ▪ If the IJ vacates the negative determination , OFO prepares and USBP serves the I-862, alien turned over to ICE/ERO for execution of release documents  follow processing steps for Positive found above
- ➢ The following documents from CBP and USCIS provided in a service packet for the alien and a copy of documents for the A-file.
  - ▪ I-863: Filed by USCIS, only if alien requests IJ review, otherwise not issued
  - ▪ I-869: Record of Negative Credible Fear Finding; updated to reflect whether the alien requests IJ review and signed by alien
  - ▪ I-870:  Record of Determination (electronically signed by Asylum Officer and Supervisory Asylum Officer).
  - ▪ Interview Notes from Asylum Officer
  - ▪ Credible Fear Checklist provided by Asylum Officer
  - ▪ List of Free Legal Services
  - ▪ Form I-867, Parts A&B, Sworn Statement and Jurat – copy (only if the alien not previously given a copy of the form).
  - ▪ Form I-860, Notice and Order of Expedited Removal – copy (only if the alien not previously given a copy of the form).
  - ▪ M-444 (with alien's A# on top) (only if the alien was not previously given a copy of the form).

## USCIS Negative Determination of Credible Fear (IJ Review)

- Where the alien requests IJ review, USCIS will file I-863 and credible fear referral packet with EOIR via email.
- IJ has 48 hours to review the determination (unless alien waives the IJ review)
- If the IJ affirms the negative determination, EOIR notifies USBP and OFO of the removal order, and alien(s) removed.
- If the IJ vacates the negative determination, OFO prepares and USBP serves the I-862.