## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LAS AMERICAS IMMIGRANT
ADVOCACY CENTER, *et al.*,

              Plaintiffs,

    v.

CHAD WOLF,
in his official capacity, Acting Secretary of the
U.S. Department of Homeland Security, *et al.*,

              Defendants.

No. 1:19-cv-3640 (KBJ)

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

I.    The Court Has Jurisdiction Over All of Plaintiffs' Claims ................................................. 2

II.   Plaintiffs Have Standing ......................................................................................... 4

   A.   The Individual Plaintiffs Have Standing .......................................................... 4

   B.   Las Americas Has Both Direct Organizational and Third-Party Standing ..................... 6

      1.   Section 1252(e)(3) Does Not Bar Review of Las Americas' Claims. .......................... 6

      2.   Las Americas Has Standing of Its Own Accord. ........................................................ 8

      3.   Las Americas Meets the Zone-of-Interests Test ...................................................... 11

      4.   Las Americas Also Has Third Party Standing. ......................................................... 12

III.  Defendants' New Policy Violates the APA ......................................................................... 16

   A.   Review Is Available Under the APA. ............................................................................ 16

   B.   Defendants' Policy is Arbitrary and Capricious Under the APA ................................... 19

      1.   Defendants Did Not Offer Any Reasoned Explanation for their Policy .................... 20

      2.   Defendants' Policy Shift Is Not a Product of Reasoned Decisionmaking ................ 22

         a.   Defendants Failed to Acknowledge or Consider the Shift from Conducting The
              Credible Fear Process In ICE to CBP Custody ........................................................ 22

         b.   Defendants Can Provide No "Good Reasons" for the New Policy and Entirely
              Failed to Consider Key Aspects of the Problem .................................................... 24

         c.   Defendants' New Policy Is Contrary to Record Evidence ..................................... 26

         d.   Defendants' New Policy Is Antithetical to Effectuation of Congress's Credible Fear
              Process ................................................................................................................... 28

IV.   Defendants' New Policy Violates Asylum Seekers' Statutory and Regulatory Rights to
      Access Counsel and Contact Third Parties ..................................................................... 29

   A.   Defendants' New Policy Unlawfully Deprives Asylum Seekers of In-Person Access and
        Regular Telephonic Access To Counsel And Others .......................................................... 30

      1.   Statute and Regulation Entitle Asylum Seekers To Meaningful Access to Counsel: In-
           Person Access and Regular Telephonic Access .......................................................... 30

      2.   Defendants' Erroneous Interpretations Are Not Owed Deference ........................... 34

      3.   Defendants' New Policy Is Unlawful Because It Does Not Permit Access To
           Consultation After The Credible Fear Interview And Before Review Thereof ............... 36

V.    PACR and HARP Effectively Deprive Asylum Seekers of a Meaningful Right to Apply
      for Asylum, Withholding, and Protection under CAT ......................................................... 38

VI.   The New Policy Violates the Due Process Right to Seek Asylum and Other Protection .. 40

VII.  Plaintiffs' Requested Relief Is Warranted ......................................................................... 40

A.   Vacatur Is Appropriate And Is Not Limited To As-Applied Relief ............................... 41

B.   Section 1252(e)(1)(A) and 1252(f) Does Not Limit the Availability of Relief ............. 43

CONCLUSION ......................................................................................................................... 45

# TABLE OF AUTHORTIES

**Cases**

*Abigail All. for Better Access to Developmental Drugs v. Eschenbach,*
    469 F.3d 129 (D.C. Cir. 2006) ..................................................................................... 9

*Action on Smoking & Health v. Dep't of Labor,*
    28 F.3d 162 (D.C. Cir. 1994) ..................................................................................... 17

*AILA v. Reno,*
    18 F. Supp. 2d 38 (D.D.C. 1998) ................................................................... 11, 15, 31

*Al Otro Lado, Inc. v. Nielsen,*
    327 F. Supp. 3d 1284 (S.D. Cal. 2018) ..................................................................... 12

*Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't, Inc.,*
    659 F.3d 13 (D.C. Cir. 2011) .................................................................................. 8, 9

*Angelex Ltd v. United States,*
    723 F.3d 500 (4th Cir. 2013).................................................................................... 19

*Ardestani v. INS,*
    502 U.S. 129 (1991) .................................................................................................. 38

*Arpaio v. Obama,*
    797 F.3d 11 (D.C. Cir. 2015) ..................................................................................... 6

*Arroyo v. DHS,*
    2019 WL 2912848 (C.D. Cal. 2019)......................................................................... 33

*Baker v. Carr,*
    369 U.S. 186 (1962) .................................................................................................... 4

*Bennett v. Spear,*
    520 U.S. 154 (1997) .................................................................................................. 17

*Bowen v. Mich. Acad. of Family Physicians,*
    476 U.S. 667 (1986) .................................................................................................... 7

*CAIR v. Trump,*
    2019 WL 3436501 (D.D.C. July 24, 2019)................................................................ 12

*Castillo v. Nielsen,*
   2018 WL 6131172 (C.D. Cal. June 21, 2018) .................................................. 30, 32

*Cheung v. INS,*
   418 F.2d 460 (D.C. Cir. 1969) .......................................................................... 6, 44

Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,
   467 U.S. 837 (1984) ................................................................................................ 34

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
   401 U.S. 402 (1971) ................................................................................................ 18

Communities Against Toxics v. EPA,
   934 F.3d 627 (D.C. Cir. 2019) ............................................................................... 18

Ctr. for Biological Diversity v. Envtl. Prot. Agency,
   861 F.3d 174 (D.C. Cir. 2017) ................................................................................. 5

Dada v. Mukasey,
   554 U.S. 1 (2008) .................................................................................................... 36

Defs. of Wildlife v. Gutierrez,
   532 F.3d 913 (D.C. Cir. 2008) ................................................................................. 6

E. Bay Sanctuary Covenant v. Trump,
   932 F.3d 742 (9th Cir. 2018) ........................................................................... 10, 12

El Rescate Legal Servs., Inc. v. EOIR,
   959 F.2d 742 (9th Cir. 1991) .................................................................................. 10

Entergy Corp. v. Riverkeeper, Inc.,
   556 U.S. 208 (2009) ................................................................................................ 34

Exodus Refugee Immig., Inc. v. Pence,
   165 F. Supp. 3d 718 (S.D. Ind. 2016) ............................................................... 14, 15

Fair Employment Council of Greater Washington, Inc. v. BMC Mktg. Corp.,
   28 F.3d 1268 (D.C. Cir. 1994) ................................................................................ 10

*FCC v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009) .................................................................. 22, 23, 24, 25

*Fed'n for Am. Immigration Reform, Inc. v. Reno* ("*FAIR*"),
   93 F.3d 897 (D.C. Cir. 1996) ................................................................. 12

*Food & Water Watch, Inc. v. Vilsack*,
   808 F.3d 905 (D.C. Cir. 2015) ................................................................. 8

*Gill v. Whitford*,
   138 S. Ct. 1916 (2018) ........................................................................... 42

*Grace v. Whitaker*,
   344 F. Supp. 3d 96 (D.D.C. 2018) ................................................... passim

*Haitian Refugee Ctr. v. Gracey*,
   809 F.2d 794 (D.C. Cir. 1987) ................................................................ 16

*Harmon v. Thornburgh*,
   878 F.2d 484 (D.C. Cir. 1989) ................................................................ 41

*Havens Realty Corp v. Coleman*,
   455 U.S. 363 (1982) .......................................................................... 8, 10

*Hibbs v. Winn*,
   542 U.S. 88 (2004) .................................................................................. 31

*Innovation Law Lab v. Nielsen*,
   310 F. Supp. 3d 1150 (D. Or. 2018)................................................... 14, 15

*Innovation Law Lab v. Nielsen*,
   342 F. Supp. 3d 1067 (D. Or. 2018)................................................... 30, 32

*INS v. Legalization Assistance Project of L.A. Cty.*,
   510 U.S. 1301 (1993) .............................................................................. 12

*Judulang v. Holder*,
   565 U.S. 42 (2011) .................................................................................. 19

*Kansas v. Crane*,
   534 U.S. 407 (2002) ................................................................................ 22

*Kisor v. Wilkie*,
   139 S. Ct. 2400 (2019) ....................................................................... 35, 36

*Kowalski v. Tesmer*,
  543 U.S. 125 (2004) ................................................................................................... 16

*Landon v. Plasencia*,
  459 U.S. 21 (1982) ..................................................................................................... 40

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014) ................................................................................................... 11

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) ................................................................................................... 18

*Linda R.S. v. Richard D.*,
  410 U.S. 614 (1973) ................................................................................................... 16

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ..................................................................................................... 4

*Lujan v. Nat'l Wildlife Federation*,
  497 U.S. 871 (1990) ............................................................................................ 17, 41

*Maldonado-Perez v. I.N.S.*,
  865 F.2d 328 (D.C. Cir. 1989) .................................................................................. 40

*Marcello v. Bonds*,
  349 U.S. 302 (1955) ................................................................................................... 38

*Marincas v. Lewis*,
  92 F.3d 195 (3d Cir. 1996) ........................................................................................ 39

*Mellouli v. Lynch*,
  135 S. Ct. 1980 (2015) ............................................................................................... 35

*Mendoza v. Perez*,
  754 F.3d 1002 (D.C. Cir. 2014) ................................................................................ 11

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) ................................................................................................... 42

*Montes-Lopez v. Holder*,
  694 F.3d 1085 (9th Cir. 2012) ..................................................................................... 6

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,
  463 U.S. 29 (1983) ..................................................... 24, 26, 27

Nat'l Lifeline Ass'n v. FCC,
  921 F.3d 1102 (D.C. Cir. 2019) ..................................................... 26

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,
  145 F.3d 1399 (D.C. Cir. 1998) ..................................................... 41

Nat'l Treasury Emps. Union v. U.S.,
  101 F.3d 1423 (D.C. Cir. 1996) ..................................................... 9

Nebraska Dep't of Health & Human Servs. v. Dep't of Health & Human Servs.,
  435 F.3d 326 (D.C. Cir. 2006) ..................................................... 42

O.A. v. Trump,
  404 F. Supp. 3d 109 (D.D.C. 2019) ..................................... 8, 10, 11, 12

Powers v. Ohio,
  499 U.S. 400 (1991) ..................................................... 13, 16

R.I.L-R v. Johnson,
  80 F. Supp. 3d 164 (D.D.C. 2015) ..................................... 22, 43, 45

Renal Physicians Ass'n v. U.S. HHS,
  489 F.3d 1267 (D.C. Cir. 2007) ..................................................... 5

Republican Nat. Comm. v. FEC,
  76 F.3d 400 (D.C. Cir. 1996) ..................................................... 26

Reyna as next friend of J.F.G. v. Hott,
  921 F.3d 204 (4th Cir. 2019) ..................................................... 4

Rodriguez v. Hayes,
  591 F.3d 1105 (9th Cir. 2010) ..................................................... 43, 45

Rosa v. McAleenan,
  2019 WL 5191095 (S.D. Tex. Oct. 15, 2019) ..................................................... 36

Safe Extensions, Inc. v. F.A.A.,
  509 F.3d 593 (D.C. Cir. 2007) ..................................................... 7

*Saldivar v. Sessions*,
   877 F.3d 812 (9th Cir. 2017) ................................................................................ 38

*Humane Society of U.S. v. Zinke*,
   865 F.3d 585 (D.C. Cir. 2017) ............................................................................. 19

*Sessions v. Morales-Santana*,
   137 S. Ct. 1678 (2017) .......................................................................................... 16

*Singleton v. Wulff*,
   428 U.S. 106 (1976) ............................................................................................... 14

*Sugar Cane Growers Coop. of Fla. v. Veneman*,
   289 F.3d 89 (D.C. Cir. 2002) ................................................................................. 5

*Tabor v. Joint Bd. for Enrollment of Actuaries*,
   566 F.2d 705 (D.C. Cir. 1977) ............................................................................. 21

*Thomas Jefferson Univ. v. Shalala*,
   512 U.S. 504 (1994) ............................................................................................... 36

*Ungar v. Sarafite*,
   376 U.S. 575 (1964) ............................................................................................... 32

*United States v. Barajas-Alvarado*,
   655 F.3d 1077 (9th Cir. 2011) ............................................................................. 31

*United States v. Quinteros Guzman*,
   2019 WL 3220576 (W.D. Va. July 17, 2019) ..................................................... 31

*Utility Air Regulatory Group v. EPA*,
   573 U.S. 302 (2014) ......................................................................................... 35, 36

*Vill. of Barrington, Ill. v. Surface Transp. Bd.*,
   636 F.3d 650 (D.C. Cir. 2011) ............................................................................. 36

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001) ............................................................................................... 18

*WildEarth Guardians v. Jewell*,
   738 F.3d 298 (D.C. Cir. 2013) ............................................................................... 5

*Wis. Gas Co. v. FERC*,

758 F.2d 669 (D.C. Cir. 1985) ................................................................................................ 44

*Wong Wing v. United States*,
   163 U.S. 228 (1896) ........................................................................................................ 22

**Statutes**

5 U.S.C. § 555 ........................................................................................................................ 38
5 U.S.C. § 701 ........................................................................................................................ 18
5 U.S.C. § 704 ........................................................................................................................ 16
5 U.S.C. § 706 ........................................................................................................................ 41
6 U.S.C. § 211 ........................................................................................................................ 28
8 C.F.R. § 1208 ...................................................................................................................... 38
8 C.F.R. § 235 ........................................................................................................... 34, 35, 37
8 U.S.C. § 1158 ................................................................................................................ 11, 21
8 U.S.C. § 1225 ................................................................................................................ passim
8 U.S.C. § 1229a ............................................................................................................. 11, 38
8 U.S.C. § 1231 ........................................................................................................................ 3
8 U.S.C. § 1252 ................................................................................................................ passim
8 U.S.C. § 1362 ................................................................................................................ 37, 38

**Other Authorities**

H.R. Rep. No. 104-469 (1996) ......................................................................................... 29, 32
Letter from Rep. Joaquin Castro, et al., to DHS Secretary Chad Wolf (Jan. 31, 2020) ............... 28

Defendants' new policy of conducting the credible fear process within Customs and Border Protection ("CBP") facilities with new procedures strictly limiting access to counsel is blatantly unlawful. Asylum seekers are forced through a potentially life-or-death process without in-person access to attorneys or others, with minimal (if any) telephonic access, and in conditions entirely unsuitable to ensuring a fair process. Defendants' assertion that somehow "PACR and HARP promote and complement the credible-fear process" is at best uninformed and at worst simply disingenuous.

Until now, Defendants held asylum seekers in Immigration and Customs Enforcement ("ICE") facilities designed and required to provide in-person access to attorneys and others, as well as basic human necessities. And until now, Defendants recognized that they must maintain policies that effectuate Congress's intent to ensure that no asylum seeker is erroneously sent back to danger. Defendants' ICE detention standards explicitly state that "[b]ecause expedited removal procedures occur within short time frames, each facility shall develop procedures that *liberally allow for consultation visitation, to ensure compliance with statutory and regulatory requirements*" and that detention facilities "shall facilitate consultation visitation by telephone *and face-to-face*." It is exceedingly obvious that stripping the credible fear process of these safeguards is irrational and places asylum seekers at grave risk of being wrongly returned to danger and possible death. Yet, there is no record evidence that Defendants even considered the impact of this shift, despite its extraordinary ramifications for the credible fear process.

The trivial access that the new policy purports to provide in CBP detention fails even the thinnest reading of statutory and regulatory requirements. It does not allow for consultation at any point following the credible fear interview, as is expressly guaranteed by statute. It certainly does not provide for the required meaningful access to counsel—both in-person and telephonic.

1

Under Defendants' new policy, the best that asylum seekers can hope for, in the limited window they have to access phones prior to a credible fear interview, is that (1) they will successfully cold-call an attorney; (2) the attorney will be able to immediately clear their calendar to speak with the asylum seeker; and (3) in the limited remaining time, the attorney will attempt the entirety of preparation for the credible fear interview. This means the asylum seeker will place their trust in a stranger whom they have never met in person, recount the entirety of the traumatic reasons they are fleeing their home country, understand the credible fear process, and receive advice based on the attorneys' on-the-fly application of the law to their specific facts. Such limited telephonic communication falls short of adequate consultation. And as Las Americas' and the Individual Plaintiffs' experiences show, that is likely the asylum seeker's only chance: there is no way to call the person back, and any connection through CBP takes so long that it is all but guaranteed it will not happen *before* the credible fear interview.

Defendants' position is extreme—that whatever level of access any DHS detention facility provides is all the access an asylum seeker should receive—and, equally extreme, that the Court must defer to whatever determination that may be. In shifting the credible fear process to CBP custody, Defendants also believe that they did not even need to consider that the process would no longer be held in facilities mandated to provide them meaningful attorney access. Ultimately, Defendants' new policy must fail.

## I.      The Court Has Jurisdiction Over All of Plaintiffs' Claims.

Defendants' arguments on jurisdiction are a scattershot assortment of theories previously rejected by this and other courts. This is an action under 8 U.S.C. § 1252(e)(3) challenging a new written policy, implementing the expedited removal statute, with "written policy guideline[s]" and "written procedure[s]"—the new policy of detaining individuals in CBP facilities with

procedures limiting access to counsel or others during the credible fear process.[1]

First, Plaintiffs timely challenge Defendants' new policy of keeping asylum seekers[2] in CBP custody for the duration of the credible fear process. Defendants concede that they began this policy with respect to non-Mexican asylum seekers on October 7, 2019 (PACR) and for Mexican asylum seekers on October 28 (HARP). Defs.' Br. 9-10. Defendants misconstrue the scope of Plaintiffs' challenge in claiming that Plaintiffs challenge policies that began *before* October 7. Plaintiffs do not challenge in isolation the (also unlawful) reduction in the time afforded to asylum seekers prior to the credible fear interview, *see* Pls.' Br. 7 n.3, or the pre-existing, horrendous conditions of CBP facilities. Instead, Plaintiffs challenge Defendants' new policy of keeping asylum seekers in CBP custody for the duration of the credible fear process with new procedures limiting access to counsel.[3] The amount of time provided for asylum seekers to access counsel and the conditions of CBP facilities are *relevant* to Plaintiffs' challenge to this shift as arbitrary and capricious and otherwise unlawful. But, as described below, Plaintiffs' challenge is to Defendants' decision to conduct the credible fear process in CBP facilities *in light of* these problems, without adequate consideration and contrary to record evidence.

Second, Defendants argue that the new policy is unreviewable under § 1252(e)(3) because it is not an implementation of the expedited removal statute but instead an

---

[1] Plaintiffs have not abandoned jurisdiction under 28 U.S.C. § 1331, which "provides subject-matter jurisdiction for a federal court to consider challenges to agency action such as . . . APA [challenges to the implementation of expedited removal], as a general matter." *Make the Rd. N.Y. v. McAleenan*, 405 F. Supp. 3d 1, 27 (D.D.C. 2019). Absent jurisdiction under § 1252(e)(3), jurisdiction would exist under § 1331. For example, were the Court to find that § 1252 did apply only to claims by individuals, organizational claims would fall outside of its jurisdiction-stripping.

[2] Throughout Plaintiffs' briefing, Plaintiffs use "asylum seekers" to refer to those who express fear of return to their country of origin or an intent to apply for asylum. *See* Pls.' Br. 4 n.1.

[3] Described in writing as a new pilot program, PACR applies only to non-Mexican asylum seekers placed in credible fear proceedings and sets forth a new "Five to Seven Day Streamlined Process." AR 604-43. HARP is a new program that applies to Mexican asylum seekers placed in credible fear proceedings and sets forth a new "Port Encounter Timeline." AR 645-47.

implementation of § 1231(g). But § 1231(g) "relate[s] more centrally to the government's brick and mortar obligations for obtaining facilities in which to detain aliens." *Reyna as next friend of J.F.G. v. Hott*, 921 F.3d 204, 209 (4th Cir. 2019). It provides generally for expenditures "to acquire land and to acquire . . . and operate facilities." The expedited removal statute contains specific provisions regarding detention of asylum seekers. 8 U.S.C. § 1225 (b)(1)(B)(ii)-(iii)(IV). Moreover, the new policy specifically implements the credible fear process set out in § 1225(b)(1). The policy documents implement asylum seekers' access to counsel, pursuant to Section 1225(b)(1)(A). *See* AR641-42 (limiting the consultation right as "operationally feasible" within CBP facilities and setting out that the credible fear process will occur in CBP facilities).

## II.   Plaintiffs Have Standing.

### A.  The Individual Plaintiffs Have Standing.

The Individual Plaintiffs have a clear "personal stake in the outcome" of this challenge. *Baker v. Carr*, 369 U.S. 186, 204 (1962). They fled specific death threats. Plaintiffs' Statement of Undisputed Material Facts ("Pls.' SUF") 72-74. It is undisputed that they were subject to the new policy, Defs.' Br. 11, and that none of them were able to speak with an attorney at any point during their credible fear processes, Pls.' SUF 82. Without meaningful access to counsel, they had no opportunity to develop their claims or meaningfully access the credible fear process. *Id.* 82-88. All received a negative credible fear determination. *Id.* 95. As a result, they have been removed to their home countries where they now all live in fear. *Id.* 95-96. This is an injury-in-fact traceable to Defendants' conduct. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The Court can redress this by allowing Plaintiffs to go through the credible fear process with a lawful opportunity to access counsel. *See id.* at 561-62.

Defendants argue that because the Individual Plaintiffs have not shown that but for

4

Defendants' policy "the *outcome* of their credible-fear determinations" would have been different, they have not demonstrated causation and redressability. Defs.' Br. 23 (emphasis added). However, in the D.C. Circuit, "[a] plaintiff who alleges a deprivation of a procedural protection to which he is entitled never has to prove that if he had received the procedure the substantive result would have been altered." *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 94 (D.C. Cir. 2002); *Renal Physicians Ass'n v. HHS*, 489 F.3d 1267, 1278-79 (D.C. Cir. 2007). Causation here requires "connecting the omitted procedural step to some substantive government decision that *may have been* wrongly decided because of the lack of that procedural requirement and . . . connecting that substantive decision to the plaintiff's particularized injury." *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 184 (D.C. Cir. 2017) (emphasis added). For procedural injuries, courts apply a "relaxed redressability requirement." *WildEarth Guardians v. Jewell*, 738 F.3d 298, 306 (D.C. Cir. 2013). Plaintiffs need only show that meaningful access to an attorney during the process *could* lead to a different result. *See id.*

Accordingly, the Individual Plaintiffs need not show that but for PACR and HARP they would have received positive credible fear determinations. The harm would be redressed simply by providing them with a new and lawful credible fear process. Defendants do not dispute that absent placement in PACR and HARP, the Individual Plaintiffs could receive a positive determination. Such a positive determination requires only a low threshold showing that they have a fraction of a chance of establishing, in full removal proceedings, that they are eligible for protection. Pls.' Br. 4. As Plaintiffs have demonstrated, meaningful access to an attorney has a significant impact on an asylum seeker's preparation for the credible fear process. Pls.' Br. 21-27; Pls.' SUF 71. This is more than sufficient to establish that Plaintiffs *could* receive a positive determination if given a meaningful opportunity to access counsel.

5

That Individual Plaintiffs need not show that the outcome of the credible fear process *would* have been different is also consistent with case law holding that immigrants need not show prejudice when their right of access to counsel is violated. *Cheung v. INS*, 418 F.2d 460, 464 (D.C. Cir. 1969) ("some rights, like the assistance of counsel, are so basic to a fair trial that their infraction can never be treated as harmless error"); *Montes-Lopez v. Holder*, 694 F.3d 1085, 1093-94 (9th Cir. 2012).[4] This lack of a prejudice requirement makes sense in light of the counsel's critical importance in immigration proceedings. *Cheung*, 418 F.2d at 464.[5]

Finally, Defendants argue that the Individual Plaintiffs lack standing because they all had an opportunity to contact counsel. Defs.' Br. 22. But this impermissibly requires the Court to resolve the *merits* in evaluating standing. Plaintiffs argue that under the new policy, they lacked meaningful access to counsel and to the credible fear process—notwithstanding the brief window they had to make phone calls. Pls.' SUF 75-82. The Court must assume that "the plaintiffs would be successful in their claims." *Defs. of Wildlife v. Gutierrez*, 532 F.3d 913, 925 (D.C. Cir. 2008).

## B. Las Americas Has Both Direct Organizational and Third-Party Standing.

### 1. Section 1252(e)(3) Does Not Bar Review of Las Americas' Claims.

Defendants' continued insistence that the Court may not review challenges to new expedited removal policies brought by any organizational plaintiff is wrong.

*AILA* does not foreclose or even address judicial review of direct claims by organizations. *AILA* held only that the specific allegations set forth by those organizations were inadequate for

---

[4] *Arpaio v. Obama*, 797 F.3d 11 (D.C. Cir. 2015), is distinguishable. There, the court held that the plaintiff lacked standing because the allegation that programs that could not benefit migrants would nevertheless lead to increased migration formed too attenuated a causal chain. *Id*. at 20. No irrational intervening actor is posited here.

[5] Even if the Individual Plaintiffs were required to demonstrate prejudice to have standing, Plaintiffs would meet that burden. Plaintiffs were extremely confused during the credible fear process, did not understand what was happening, and were unprepared. Pls.' SUF 83-88. That Plaintiffs proceeded without an attorney does not indicate that they had a reasonable opportunity to obtain an attorney, or that having an attorney would not have helped them to understand and prepare for the credible fear process. Defendants' allegations that Plaintiffs "were being treated well in CBP facilities," Defs.' Br. 22, are contradicted by Plaintiffs' signed declarations. Pls.' SUF 90-94.

*third-party standing* to raise claims on behalf of all noncitizens affected by the new expedited removal system. *Make the Rd. N.Y.*, 405 F. Supp. 3d at 30. It does not address whether direct organizational standing, where the organization itself is injured, is available in a challenge to a written policy implementing § 1225(b). While *AILA* described § 1252 as leaving "the distinct impression that Congress meant to allow litigation challenging the new system by, and only by, aliens against whom the new procedures had been applied," 199 F.3d at 1359-60, this observation was made in the context of third-party standing on behalf of "nearly all aliens anywhere in the world" and not as to organizations that have suffered direct harm. *Id.* at 1359; *cf. Make the Rd. N.Y.*, 405 F. Supp. 3d at 30.

The text of § 1252(e)(3) does not preclude review of an organizational challenge. There is a "strong presumption that Congress intends judicial review of administrative action" by aggrieved parties. *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986). Overcoming this presumption requires "clear and convincing evidence of a legislative intention to bar such review." *Safe Extensions, Inc. v. F.A.A.*, 509 F.3d 593, 601 (D.C. Cir. 2007). Here, there is no evidence to indicate that Congress intended to preclude organizations from the scope of § 1252(e)(3). In fact, the open-ended language of sections 1252(a)(2)(A)(iv) and 1252(e)— contrasted with repeated references to "individual aliens" elsewhere in § 1252—indicates the contrary. Specifically, § 1252(a)(2)(A)(iv), the provision precluding review of expedited removal "procedures and policies" "except as provided in subsection (e)," does not specify any limitation to actions involving individual determinations.

And in *restoring* jurisdiction, § 1252(e)(3) also does not limit the scope of those who may sue. Ultimately, by its plain language, § 1252(e)(3)(A) affirmatively provides that judicial review "is available" for both "determinations under Section 1225(b) . . . *and its implementation,*"

demonstrating that Congress intended for challenges beyond only where there is a determination against a specific individual. *Make the Rd. N.Y.*, 405 F. Supp. 3d at 29 (holding that challenges under § 1252(e)(3) do not require existing determinations); *O.A. v. Trump*, 404 F. Supp. 3d 109, 140 (D.D.C. 2019) ("The language of § 1252(e)(3) is plain: it applies to both 'judicial review of determinations' . . . *and* to judicial review of the 'implementation' of that provision.").

### 2. Las Americas Has Standing of Its Own Accord.

Pursuant to *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), an organization has Article III standing where the defendants' unlawful action "frustrate[s]" the organization's ability to fulfill its mission and requires it "to devote significant resources to identify and counteract" that action. *Id.* at 379. To establish *Havens* standing, an organization must demonstrate both (1) "injury to its interest" and (2) that it has "used its resources to counteract that harm." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015).

Here, there is "a direct conflict between" Defendants' new policy and "the organization's mission" of providing direct legal services to low-income immigrants, including asylum seekers. *Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 26 (D.C. Cir. 2011) (*ASPCA*). Las Americas seeks to provide legal services to detained asylum seekers in the El Paso area, "engag[ing] in full representation for" them and "conduct[ing] individual preparations for credible fear interviews." Decl. of Linda Corchado ("Corchado Decl."), Dkt. No. 21-9 at ¶ 6. Defendants' new policy frustrates that mission by directly interfering with Las Americas' attempts to consult with and represent these asylum seekers and, ultimately, preventing the organization from meaningfully doing so. Las Americas has "los[t] the opportunity to provide legal services" to detained asylum seekers in credible fear proceedings, due to its inability "to establish meaningful communication with them." Corchado Decl. ¶ 7.

Before the new policy, Las Americas received one to two calls *per day* from asylum

seekers in credible fear proceedings. Supp. Decl. of Linda Corchado ("Corchado 2 Decl."), Dkt.

No. 35-7 ¶ 6. But "[s]ince implementation in October, Las Americas has received only one call

directly from an individual placed in PACR or HARP" and has been in contact with only a few

others before their credible fear interview ("CFI"). *Id.* ¶¶ 6, 8. For those individuals whom Las

Americas *does* identify as prospective clients, representation efforts "require[] a significantly

greater expenditure of . . . organizational resources." Corchado Decl. ¶ 9. It typically takes Las

Americas "more than a day" to simply verify the location of someone in CBP custody. *Id.* ¶ 12.

Las Americas' efforts have *not once* ultimately been successful: as its legal director

explains, *no* consultation with an asylum seeker in CBP custody "has been sufficient to

meaningfully consult with a person before their credible fear interview." *Id*. ¶ 13. Defendants'

new policy is plainly "at loggerheads with" Las Americas' mission of representing detained

asylum seekers and "perceptibly impair[s]" its ability to carry out that mission. *Nat'l Treasury

Emps. Union v. U.S.*, 101 F.3d 1423, 1428-29 (D.C. Cir. 1996). This injury—"imped[ing]" Las

Americas' "activities"—is "directly attributable to [Defendants'] polic[y]." *Abigail All. for

Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006)

(active engagement in "counseling, referral, advocacy, and educational services" impeded by

agency's action provided injury for organizational standing).

And Las Americas has certainly "used its resources to counteract th[e] injury" from the

new policy, *ASPCA*, 659 F.3d at 25: it has undertaken major efforts to attempt to consult with

and represent detained asylum seekers in CBP custody. Las Americas' legal director has

reallocated a huge amount of her time—at the time the complaint was filed, 60% of her time, and

as of late January, 75%—to attempting to reach and consult with asylum seekers held in CBP's

legal black hole. Pls.' SUF 118-19. Such efforts require extensive back-and-forth with CBP; when asylum seekers were previously transferred to ICE custody, no such efforts were required. Las Americas therefore must spend significantly more time on each case, solely in attempting to contact the prospective client. Corchado Decl. ¶¶ 10-12. Las Americas has also sent staff to Mexico to sign up asylum seekers who might be placed in PACR or HARP on arrival. Pls.' SUF 117. Finally, the organization has altered its intake system to account for and track calls from asylum seekers potentially subject to Defendants' new policy. Pls.' SUF 116.

Defendants suggest that this injury to Las Americas is somehow self-inflicted. Defs.' Br. 18 (citing *Fair Employment Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1277 (D.C. Cir. 1994) (finding that diversion of resources to increase "legal pressure" is insufficient for organizational standing)). But Las Americas would not have "been totally unaffected if it had simply refrained from making the re-allocation" of resources. *Id*. Instead, Defendants' new policy would continue to directly interfere with its ability to carry out its mission—to provide legal services to asylum seekers in the El Paso area—by preventing it from effectively providing services to detained asylum seekers, as it had done before.

In the immigration context, courts have not hesitated to find direct organizational standing available. *O.A.*, 404 F. Supp. 3d at 142 (organizations providing direct services to asylum seekers had *Havens* standing to challenge new bar on asylum eligibility); *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 766 (9th Cir. 2018) (same, for organizations providing legal aid to individuals who would now be ineligible for asylum); *El Rescate Legal Servs., Inc. v. EOIR*, 959 F.2d 742, 748 (9th Cir. 1991) (organizations aiding Central American refugees in asylum efforts had standing to challenge failure to interpret immigration hearings).

And, as described above, *AILA* did not address direct organizational standing. 199 F.3d at

1354 (affirming judgment of district court "in all other respects" except as to third-party

standing); *AILA v. Reno*, 18 F. Supp. 2d 38, 49-50 (D.D.C. 1998). The Court also need not reach

the question of Las Americas' direct organizational standing so long as it concludes that the

Individual Plaintiffs have standing. *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014).

### 3.   Las Americas Meets the Zone-of-Interests Test.

Defendants fail to cite the key authority on the statutory zone of interests, which holds

that the zone-of-interests test "forecloses suit only when a plaintiff's interests are so marginally

related to or inconsistent with the purposes implicit in the statute" that Congress cannot have

intended to allow the litigation. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S.

118, 130 (2014). Defendants also fail to acknowledge that this is a "lenient approach": "[T]he

test is not especially demanding," and "the benefit of any doubt goes to the plaintiff." *Id.* Of

note, Defendants' Supreme Court and appellate authorities all predate the Supreme Court's

clarification in *Lexmark* of the governing standard.

Las Americas is well within the zone of interests here. It seeks to protect its interest in

providing legal services to asylum seekers, which "furthers the purposes of the INA." *O.A.*, 404

F. Supp. 3d at 144. The INA and the Refugee Act not only protect but affirmatively provide for

asylum seekers' access to pro bono legal services, including in the credible fear process. 8 U.S.C.

§§ 1158(d)(4), 1229(a)(1)(E), 1229(b)(1)-(2). They also, of course, provide for asylum seekers'

access to counsel in this specific context. *E.g.*, *id.* §§ 1225(b)(1)(B)(iv), 1362.

Courts have repeatedly held that pro bono legal organizations' interest in representing

asylum seekers is within the zone of interests of the INA. *See O.A.*, 404 F. Supp. 3d at 144

(finding that pro bono legal service organizations' interest "in providing legal assistance to as

many asylum seekers as they can" both was consistent with the INA's purpose of creating a

procedure for asylum and furthered the INA's purpose of "ensur[ing] that pro bono legal services of the type that the organizational plaintiffs provide are available to asylum seekers"); *E. Bay Sanctuary Covenant*, 932 F.3d at 768-69 (same); *CAIR v. Trump*, 2019 WL 3436501, at *1 (D.D.C. July 24, 2019) (legal services organizations likely fell within "asylum statute['s]" zone of interests); *Al Otro Lado, Inc. v. Nielsen*, 327 F. Supp. 3d 1284, 1302 (S.D. Cal. 2018) (legal services organization's interest in representing asylum seekers was "related to the basic purposes of the INA's goal of permitting aliens to apply for asylum" at ports of entry).

Defendants instead rely on a single non-binding opinion concerning an entirely different statute, the Immigration Reform and Control Act ("IRCA"). Defs.' Br. 20 (quoting *INS v. Legalization Assistance Project*, 510 U.S. 1301, 1305 (1993) (O'Connor, J., in chambers)). Such reliance is inappropriate. *See E. Bay Sanctuary Covenant*, 932 F.3d at 769 n.10 (describing Justice O'Connor's opinion as "concededly 'speculative'" and explaining that "the interest asserted . . . conserving organizational resources to better serve nonimmigrants—is markedly different from [an] interest in aiding immigrants"). In any event, "[c]ourts have not interpreted the INA's zone of interests as narrowly as IRCA's and non-alien plaintiffs, including organizational plaintiffs, have been permitted to assert claims based on the INA." *Al Otro Lado, Inc.*, 327 F. Supp. 3d at 1301 (collecting cases). Defendants' reliance on *Fed'n for Am. Immig. Reform, Inc. v. Reno* ("*FAIR*"), 93 F.3d 897 (D.C. Cir. 1996), is similarly misplaced. As explained in *O.A.*, the D.C. Circuit in *FAIR* "held that the organization's mission bore no more than a 'marginal[ ] rela[tionship]' to the statutory purposes of the INA, because it pointed to no language of congressional intent that 'even hint[ed] at a concern about regional impact' of immigration"—the basis of the organization's legal challenge. 404 F. Supp. 3d at 145 n.14.

### 4. Las Americas Also Has Third Party Standing.

Defendants' new policy of holding asylum seekers in CBP facilities—effectively incommunicado—is the exact circumstance necessitating third-party standing. Defendants do not address any of the bases through which Las Americas may assert the rights of those who were impacted by the new policy during the window available for challenges, arguing instead that third-party standing is simply barred by statute.

First, there is no statutory bar to actions under § 1252(e)(3) by an organizational plaintiff or a third party. Defendants argue that Las Americas is attempting to circumvent § 1252(e)(1)(B) on class actions. But Las Americas seeks to assert the rights of only individuals who could have challenged the new policy within the 60-day window provided by statute *and only* for those who meet the standard for third-party standing—individuals to whom Las Americas would have attempted to provide legal services if not for the obstacles directly resulting from Defendants' policy. Pls.' Br. 43; *see* Pls.' SUF 107-09. In *AILA*, the Court was concerned with relief that would "sweep in nearly all aliens anywhere in the world who have tried or will try to enter the United States," but importantly found that such claims should be brought by the very individuals for whom Las Americas seeks relief through third-party standing—"individual aliens who—during the sixty-day period—were aggrieved by the statute's implementation." 199 F.3d at 1359. Likewise, *Grace v. Whitaker*, 344 F. Supp. 3d 96 (D.D.C. 2018), noted that relief in the form of parole for "all similarly situated individuals"—in the absence of any assertion of third-party standing—would be impermissible class-wide relief. *Id.* at 144 n.31. Further, Las Americas seeks only vacatur of the unlawfully procured negative credible fear findings and removal orders for these individuals, not "for the government to return to the United States *all* deported individuals who were affected by the policies at issue in this case." *Id.* (emphasis added).[6]

As explained in Plaintiffs' opening brief, the individuals subject to this new policy were

---

[6] As noted in Plaintiffs' opening brief, Plaintiffs also seek this relief as result of vacatur of the unlawful policy itself.

"hind[ered]" in asserting their own rights, *Powers v. Ohio*, 499 U.S. 400, 411 (1991), through a

"genuine obstacle" to filing suit on their own behalf, *Singleton v. Wulff*, 428 U.S. 106, 116

(1976). Pls.' Br. 43. Through the new policy, Defendants have effectively foreclosed an asylum

seeker's ability to meaningfully access counsel: closed off from the outside world in CBP

custody, these individuals had no meaningful ability to file suit on their own behalf. And Las

Americas has a close relationship to these individuals. Las Americas is on the list of legal

services providers given to them, and but for the new policy, Las Americas would have provided

legal assistance to them. Pls.' SUF 107-09, 113.

Innovation Law Lab v. Nielsen*, 310 F. Supp. 3d 1150 (D. Or. 2018), and *Exodus Refugee

Immig., Inc. v. Pence*, 165 F. Supp. 3d 718 (S.D. Ind. 2016), *aff'd*, 838 F.3d 902 (7th Cir. 2016),

are instructive. In *Innovation Law Lab*, the court held that a nonprofit organization that sought to

represent detained asylum seekers in their credible fear proceedings had third-party standing to

litigate on behalf of the detainees, including those they did not formally represent. 310 F. Supp.

3d at 1161-62. Although "Defendants' policies, practices, and actions ha[d] prevented Law Lab

attorneys from formalizing their legal relationship with many . . . . detainees," the nonprofit

"ha[d] a sufficiently close relationship with the detainees to advocate on their behalf." *Id.* at

1161. Many detainees, unlike those here, had been able to communicate out and sought

representation either from the nonprofit or from another entity. Such "lack of access to

immigration lawyers" established hindrance. *Id.* at 1162. *Exodus* found that a refugee

resettlement agency had third-party standing to raise an equal protection claim on behalf of

Syrian refugees, following government efforts to keep Syrian refugees out of Indiana. 327 F.

Supp. 3d at 733. The court found the necessary close relationship with future Syrian refugees

because the organization had previously resettled Syrians and planned to settle more soon. *Id*. at

732. The court also explained that the existence of a hindrance was "a low threshold," and found that the refugees faced significant hindrances as "newly arrived refugees, escaping political or religious persecution, who quite understandably have a desire to 'lay-low' and not draw the attention to themselves that this suit would necessarily bring." *Id*.

Here, Las Americas has provided legal services to thousands of asylum seekers and would have attempted to provide services to those in PACR and HARP if not for the new policy, and individuals subject to the new policy had obstacles to filing their own challenge far greater than those in *Exodus* and greater even than those in *Innovation Law Lab*.

*AILA* does not foreclose third-party standing under § 1252(e)(3): it evaluated whether the allegations made by the plaintiff organizations there satisfied the requirements for third-party standing. 199 F.3d at 1360-64 (also noting that "Congress may not have gone so far" here as to expressly state that third-party standing is prohibited). *AILA* rejected a claim of third-party standing because the plaintiffs had not shown adequate "hindrance to the third party's ability to protect his or her own interests." *AILA*, 199 F.3d at 1362 (quoting *Powers*, 499 U.S. at 411). Not only are the concerns present in *AILA*'s analysis of third-party standing not present here, but this is the exact context contemplated by *AILA* as necessitating third-party actions. The *AILA* court found that the "claimed violation of aliens' rights—impeded access to attorneys—is but a side effect of the expedited removal system." *Id*. at 1361. Here, in contrast, the new policy of detaining individuals in CBP custody directly causes the impediment to access to counsel, where such access existed before. These are also not noncitizens "removed directly from secondary inspection [and statutorily] prohibited from communicating with anyone throughout their stay in the country." *Id*. at 1362. These are individuals who have expressed a fear of return and are therefore entitled to communicate with counsel. 8 U.S.C. § 1225(b)(1)(B)(iv). Congress clearly

intended that they be able to access counsel, which would have provided them an opportunity to challenge the new policy on their own behalf. Nor was the period of detention here "quite short," as is the secondary inspection period at issue in *AILA*. 199 F.3d at 1363. And neither Las Americas nor the individuals impacted by the new policy "knew well ahead of time what was coming": the policy was not publicly issued or announced. Las Americas was unable to provide legal assistance to the asylum seekers despite its herculean attempts to do so, and the obstacles were not simply the result of the system Congress put in place but were instead due to the unlawful new policy. Pls.' Br. 44 (quoting *AILA*, 199 F.3d at 1363-64).

Defendants' authority is inapposite. *Linda R.S. v. Richard D.* found no causation because the chance of prosecution leading to future child-support payment was "at best . . . only speculative." 410 U.S. 614, 619 (1973). Here, the policy directly denies access to counsel. *Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 809 (D.C. Cir. 1987) applies an older, incorrect standard in conflict with the current close relationship and hindrance test. *Powers*, 499 U.S. at 411. Defendants' quotation from *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1689 (2017), that a party "must assert his own legal rights," omits the qualifier "ordinarily" and fails to note that the next line recognizes the exception in *Powers.* Finally, *Kowalski v. Tesmer*, 543 U.S. 125, 131-32 (2004), found insufficient hindrance for standing because the criminal defendants there were able to challenge the system through the criminal process itself, via an appeal.

## III.   Defendants' New Policy Violates the APA.

### A.   Review Is Available Under the APA.

Defendants' new policy is subject to review under the APA. As a threshold matter, the Court need not determine whether Defendants' new policy is a final agency action, because it is agency action reviewable under 8 U.S.C. § 1252(e)(3). "Agency action made reviewable by

*statute and* final agency action . . . are subject to judicial review." 5 U.S.C. § 704 (emphasis added); *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 882 (1990) (*both* types of agency action reviewable by statute). Section 1252(e)(3) thus makes implementation of the expedited removal statute reviewable, regardless of finality. "There is no suggestion that Congress limited the application of section 1252(e)(3) to only claims involving legislative rules or final agency action." *Grace*, 344 F. Supp. 3d at 118.

Even were "final agency action" necessary, however, it exists here. Defendants' new policy "mark[s] the 'consummation' of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). Defendants have implemented a new policy: Prior to the policy's issuance, asylum seekers were never held in CBP facilities during the credible fear process and subjected to such extreme limitations on their ability to contact and rely on the aid of counsel; now they are. By late November, Defendants had applied the policy to over 500 asylum seekers; they have now applied it to more than 1,000 asylum seekers and have announced their intent to expand to the entire southern border. Pls.' SUF 10. For those, "legal consequences . . . flow." *Bennett*, 520 U.S. at 178. They have been forced to undergo the entirety of the process in CBP detention rather than, as before, in ICE custody; as a result, they have not been afforded the opportunity to meaningfully access counsel or seek protection in the United States—as required by law. *Action on Smoking & Health v. DOL*, 28 F.3d 162, 165 (D.C. Cir. 1994) ("Agency action is final when it imposes an obligation, denies a right, or fixes some legal relationship.").

Defendants suggest that the PACR guidance's recognition that DHS subcomponents "commit to providing the appropriate resources and guidance necessary to implement the processes" and "commit to . . . work[ing] collaboratively" toward the success of the program, AR640, somehow render the guidance non-final. But they cite no authority for this proposition.

17

In fact, this and other language in the PACR document supports finality by committing the agency's subcomponents to the implementation. *See id.* (stating that, *inter alia*, "CBP and ICE will leverage"; "USCIS commits to"; and "CBP will identify"); *see also Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 479 (2001) (agency's "own behavior" as evidence that agency action is final). Defendants cite no comparable language in the HARP document but suggest that the fact "that resource and space constraints will affect whether" an asylum seeker is placed in HARP makes it non-final. Defs.' Br. 32**.** But the agency action of implementing the new policy—which is what Plaintiffs challenge—is final, with direct legal consequences for those asylum seekers placed in HARP.

Defendants' argument that the guidance "does not create any substantive rules or rights . . . or 'bind' immigration officers to any specific result," Defs.' Br. 32, is beside the point. Those factors speak to whether the action is a legislative rule, not to whether it is a final agency action. *Communities Against Toxics v. EPA*, 934 F.3d 627, 634-35 (D.C. Cir. 2019).

Defendants also try to shield the PACR and HARP documents from reviewability by claiming that they are "committed to agency discretion by law," 5 U.S.C. § 701(a), because they "simply explain" DHS's "discretion" as to whether to place a particular asylum seeker in PACR or HARP. Defs.' Br. 32. Defendants identify no authority for the proposition that their new policy fits within this "very narrow exception" to APA review. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971). To the contrary, this exception is only "applicable in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." *Id.* There is clearly "law to apply" here: statutory provisions providing for access to counsel and implementing both the credible fear process and, more broadly, asylum and other protection from removal. "[A]n agency is not free simply to disregard statutory

responsibilities." *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993). Defendants do not and could not

cite any case that supports their ability to implement policies *in contravention of law*.[7] *See*

*Humane Soc'y of U.S. v. Zinke*, 865 F.3d 585, 603 (D.C. Cir. 2017) (noting invalidation of

"agency action that constituted an end run around important statutory limitations and thus

contravened Congress' will and subverted the careful balance of the statute"). In fact, Defendants

recognize that the requirement that asylum seekers have the opportunity to consult in the credible

fear process constrains their detention choices. Defs.' Br. 36-37. Further, even if the decision to

place individuals in CBP custody throughout the credible fear process were discretionary, it

would not give "the agency the sole discretion to determine the *manner* in which that decision

will be made." *Make the Rd. N.Y.*, 405 F. Supp. 3d. at 39 (emphasis in original).

    The fact that DHS is choosing to apply the policy to some and not all asylum seekers

does not shield the *decision to implement the policy* from judicial review—if anything, it

provides a further reason to hold the policy arbitrary and capricious. *Cf. Judulang v. Holder*, 565

U.S. 42, 55 (2011) (explaining that "if the BIA proposed to narrow the class of deportable aliens

eligible to seek § 212(c) relief by flipping a coin—heads an alien may apply for relief, tails he

may not—we would reverse the policy in an instant" as arbitrary and capricious). If Defendants

were correct, they could defeat any judicial review under § 1252(e)(3) of any new policy

implementing expedited removal by simply making only a subset of individuals subject to it, and

providing some choice to the agency as to which individuals that would be.

### B.  Defendants' Policy Is Arbitrary and Capricious Under the APA.

    Defendants' policy shift is arbitrary and capricious because Defendants (1) have provided

no rational justification for it; (2) Defendants have failed to acknowledge the shift from ICE to

---

[7] In *Angelex Ltd v. United States*, 723 F.3d 500 (4th Cir. 2013), a statute expressly granted discretion to the agency, and there were no "judicially manageable standards" that constrained the agency's exercise of discretion. *Id.* at 507.

CBP custody or its ramifications, particularly limitations on access to counsel; (3) Defendants have failed to consider key aspects of the problem, including the downsides for the credible fear process if conducted in CBP detention, the need for regular in-person and telephonic access to counsel in credible fear proceedings, and asylum seekers' heightened need for access to counsel due to their particular needs; (4) the decision is contrary to AR evidence regarding the *Orantes-Hernandez* injunction and conditions in CBP custody; and (5) the policy is antithetical to the credible fear process.

As an initial matter, as Plaintiffs describe in detail in their Opposition to Defendants' Motion to Strike, Plaintiffs' extra-record evidence is reviewable. *See* Pls.' Opp'n to Mot. to Strike (filed concurrently). Nevertheless, even if the Court were not to consider some or any of this extra-record evidence, the new policy still fails. Defendants' policy change is arbitrary and capricious for the simple reason that Defendants have failed to offer any rational justification for the new policy in the record. And many of Plaintiffs' arguments do not depend on extra-record evidence, including that Defendants failed to consider that meaningful access to counsel is required for asylum seekers and that the shift to CBP custody is contrary to evidence in the AR regarding the *Orantes-Hernandez* injunction and the conditions in CBP custody. *See infra.*

### 1. Defendants Did Not Offer Any Reasoned Explanation for their Policy.

Defendants' policy is arbitrary and capricious for the sole reason that Defendants' proffered justifications fail on their own terms. First, Defendants justify their new policy on the ground that "ICE detention facilities cannot feasibly continue to accommodate every person in expedited removal who claims a fear of return." Defs.' Br. 35. But Defendants cite no support for this proposition in the AR—and there is no evidence that Defendants evaluated or considered the capacity of ICE detention facilities, or the "feasib[ilit]y" of continued ICE detention of asylum

seekers, in creating their new policy.[8] At best, Defendants' rationale is a "'post hoc' rationalization[] supplied during judicial review" that cannot support DHS's decision. *Tabor v. Joint Bd. for Enrollment of Actuaries*, 566 F.2d 705, 709-10 (D.C. Cir. 1977).

Second, Defendants justify DHS's decision as the result of its "[r]ecogni[tion] [of] the 'resource constraints' of ICE detention facilities to effectively 'deliver[] consequences to those who violate our immigration laws.'" Defs.' Br. 9 (citing AR639); AR636 (explaining that the new policy is part of a "broad suite of immigration removal pathways" guided by the principle of "[d]eliver[ing] *enduring consequences* through timely and efficient removals" (emphasis added)). Any concern with "violation of our immigration laws" is particularly untenable for those who express fear of return at a port of entry. These individuals are taken into the United States by an immigration officer pursuant to law, yet they too are subject to Defendants' policy that seeks to "deliver[] consequences." AR636. Moreover, as to everyone at the border or in the United States, there is a fundamental statutory right to seek fear-based protections, including withholding and CAT relief.  Defendants' rationale is illogical because seeking asylum is consistent with "our immigration laws." This is true for those who enter without inspection: asylum law *specifically contemplates* that those "who arrive[] in the United States (whether or not at a designated port of arrival . . .), irrespective of . . . status, may apply for asylum." 8 U.S.C. § 1158(a)(1).

Defendants may argue that they construe only those who receive negative credible fear determinations as "violat[ing] our immigration laws." Even if true, Defendants' rationale for their new policy *for those in the credible fear process* falls apart. Defendants' policy

---

[8] Defendants cite to AR640 for support that the reasoned decision was based on the need to "alleviate the burden on ICE detention facilities." But there is no mention of such a burden or even of ICE facilities generally on that page. AR639, the memo underlying PACR, vaguely refers to "resource constraints" with respect to ICE detention, but it does not mention capacity issues or describe the resource constraints in any greater detail, nor have Defendants identified any other area of the AR that evaluates any strain on ICE detention.

encompasses *all* who go through the credible fear process—even those who receive (or should receive) positive determinations. Moreover, by isolating asylum seekers and holding them in appalling conditions, Defendants' new policy will *change* the outcome of credible fear proceedings: it will lead to asylum seekers erroneously receiving negative credible fear determinations and orders of removal when they in fact can demonstrate that under U.S. law they should be screened into the country to receive a full hearing on their claim for protection. It will therefore "deliver[] consequences" to people who do not merit such consequences at all. AR639.[9] The new policy must be vacated on this basis alone.

### 2. Defendants' Policy Shift Is Not a Product of Reasoned Decisionmaking.

Contrary to Defendants' contention, Defs.' Br. 35, their decision to implement the new policy fails to meet *any* prong of the *Fox* standard or otherwise satisfy arbitrary and capricious review. To provide a "reasoned explanation" for their policy shift, Defendants must show that the action "is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better, which the conscious change of course adequately indicates." Defs.' Br. 35 (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). Defendants' new policy is arbitrary and capricious because, as described *infra*, it is not "permissible under" 8 U.S.C. § 1225 or other relevant statutory and regulatory provisions. Defendants' policy also fails the other prongs of the *Fox* standard.

### a. Defendants Failed to Acknowledge or Consider the Shift from Conducting the Credible Fear Process in ICE to CBP Custody.

Defendants have engaged in no "conscious change of course" demonstrating "that the agency believes [the new policy] to be better." *Fox*, 556 U.S. at 515. Defendants concede that

---

[9] If Defendants intend to deliver consequences to *punish* "those who violate our immigration laws," doing so would be unlawful. *Kansas v. Crane*, 534 U.S. 407, 412 (2002). The government cannot impose punitive measures on noncitizens ordered removed. *Wong Wing v. United States*, 163 U.S. 228, 238 (1896); *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 189 (D.D.C. 2015) (rejecting general deterrence rationale for detention of asylum-seeking families).

they did not acknowledge the effects of the shift away from the procedures for conducting the credible fear process in ICE custody and simply argue that they did not need to do so. Defs.' Br. 35-36 (arguing that "Defendants are not required to explicitly consider every possible consequence that could result from the PACR and HARP guidance" and failing to show consideration of *even one* possible consequence of the shift from ICE custody to CBP custody). But the APA requires this consideration. *Fox*, 556 U.S. at 515.

The absence of DHS's own ICE detention standards from the AR is telling here. It is undisputed that prior to Defendants' new policy individuals underwent the credible fear process in ICE detention. Defs.' Br. 8. Defendants do not dispute that ICE facilities must offer regular in-person access to prospective and retained counsel. They do not dispute that ICE facilities likewise must provide for regular telephonic access to counsel. They do not dispute that ICE facilities must also provide the infrastructure to ensure that such access is meaningful—attorney-client consultation rooms and visiting areas for others and regularly maintained telephones, with a minimum ratio of telephones to detainees. They do not dispute that ICE facilities must provide law libraries and access to legal orientation programs. They do not dispute that CBP facilities categorically bar in-person attorney access, do not provide for regular telephonic access, and have no comparable infrastructure requirements. Nor do they dispute that ICE facilities provide for basic human needs to a greater extent than do CBP facilities, or that CBP facilities lack beds and keep the lights on for 24 hours a day. *See* Defs.' Br. 36 (stating "[j]ust because ICE facilities provide certain accommodations does not mean that those are required in all DHS facilities"). As a result, and as detailed in Plaintiffs' MSJ, the shift from ICE to CBP detention had significant implications for asylum seekers' access to counsel and ultimately their ability to meaningfully access the credible fear process. Pls.' Br. 17-21.

23

But the AR provides no indication that Defendants acknowledged what they were giving up in formulating their new policy. It does not indicate that they made a conscious decision that the new policy was a better method than ICE custody of effectuating the credible fear process with its safeguards. Defendants provided no "reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Fox*, 556 U.S. at 516. The new policy is therefore arbitrary and capricious.

> **b. Defendants Can Provide No "Good Reasons" for the New Policy and Entirely Failed to Consider Key Aspects of the Problem.**

Defendants could not and cannot provide any "good reasons" for their new policy that withstand judicial scrutiny under the APA. *Id.* at 515. Defendants fail to recognize that a court is "not a rubber stamp" for agency action. *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 934 F.3d 649, 663 (D.C. Cir. 2019). Because "the agency 'entirely failed to consider an important aspect of the problem'" and "the agency's explanation 'runs counter to the evidence before the agency'" Defendants' action is arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).

Defendants do not address their failure to consider numerous important aspects of the problem. Defendants do not dispute that they failed to consider the enormous differences between conducting the credible fear process in ICE detention and CBP detention for access to counsel and conditions conducive to the credible fear process, or that they failed to consider on its own terms the inadequacy of CBP detention with respect to both issues. *See* Pls.' Br. 17-21; Defs.' Br. 35-36. Nor do they dispute that they failed to consider the need for asylum seekers to have meaningful access to counsel, including in-person access, to prevent erroneous returns to danger contrary to congressional intent. Pls.' Br. 21-27. They merely claim that such access is not legally required under the plain text of statute and regulation. Defs.' Br. 36. Similarly,

Defendants also do not dispute that they did not consider asylum seekers' particular vulnerabilities, arguing only that "the plain statutory and regulatory text" does not support such a requirement. *Id.* Defendants misread the statutes and regulations. And, even if the statutes and regulations did not require it, "reasoned decisionmaking" requires them to take into account these essential practicalities when determining how they will effectuate a statutory scheme.

Defendants' argument that the law did not require them to consider asylum seekers' need for timely and regular in-person and telephonic access to counsel, because "meaningful access to counsel" is not legally required, fails on its own terms. As explained *infra* IV.A.1, this argument is legally wrong. It is also contrary to Defendants' *own written judgment* that statutory and regulatory provisions require meaningful access to counsel, including in-person access, for those in credible fear proceedings. Pls.' Br. 7. As Defendants' standards for ICE detention facilities explain, "Because expedited removal procedures occur within short time frames, each facility shall develop procedures that *liberally allow for consultation visitation, to ensure compliance with statutory and regulatory requirements* . . . ." PBNDS 5.7.V.K.2. This expressly includes both regular telephonic and "in-person" or "face-to-face" access. *Id.*; FRS Visitation V.11.b. ICE detention standards also mandate that ICE facilities must provide in-person access every day, for eight hours a day on weekdays and four on weekends, and confidential legal visitation rooms. PBNDS 5.7.V.J.2, 5.7.V.J.9; FRS Visitation V.10,i, V.11.b. Defendants do not explain why they have *sub silentio* abandoned that legal judgment, which "underlay . . . the prior policy." *Fox*, 556 U.S. at 516.

But even if meaningful access—regular in-person and telephonic access—were not *legally* required, and Defendants' policy met minimum statutory and regulatory requirements for consultation, Defendants' policy would still be irrational in light of Defendants' failure "to ask

the right questions, to look at all the facts, and to evaluate, fully, the best course of action with

respect to the [credible fear process]." *Make the Road N.Y.*, 405 F. Supp. 3d at 58; *RNC v. FEC*,

76 F.3d 400, 407 (D.C. Cir. 1996) ("a permissible statutory construction . . . is not always

reasonable under *State Farm*: we might determine that although not barred by statute, an

agency's action is arbitrary and capricious because the agency has not considered certain

relevant factors or articulated any rationale for its choice").

Ultimately, an agency must consider *the practical implications* of the policy shift. For

example, an FCC policy change limiting a subsidy for telecommunications on tribal lands was

arbitrary and capricious where it failed to "consider[] facilities-based providers' unwillingness to

offer" the relevant services and therefore "failed to address the problem that would be created as

a result of changing its policy," a lack of effective minimum service delivery, and also failed to

consider "that many low-income consumers on Tribal lands will lose access to affordable

telecommunications service." *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1112-13 (D.C. Cir.

2019). Defendants' assertion that the plain text of relevant statutes does not require consideration

of the practical ramifications of their policy shift or the realities of the credible fear process

therefore has no bearing on the APA's requirement of reasoned decisionmaking. The agency's

failure to even consider many of the key negative ramifications of their new policy for the

credible fear process is arbitrary and capricious.

### c.  Defendants' New Policy Is Contrary to Record Evidence.

Defendants' new policy is also contrary to record evidence. First, Defendants do not

dispute that they did not take into account that their new policy would violate the requirements of

the *Orantes-Hernandez* injunction, included in its entirety in the AR. Their argument that they

need not have done so, because no attorney entered a notice of appearance on behalf of the

Individual Plaintiffs in this litigation, misconstrues Plaintiffs' argument. For arbitrary and capricious purposes, the problem is that the new policy is facially illogical in light of the requirements of *Orantes-Hernandez*. When Defendants were contemplating the shift to CBP custody, reasoned decisionmaking required them to consider the effect of that shift on their fulfillment of legal obligations to asylum seekers. *See Humane Soc'y*, 865 F.3d at 603. Because their new policy fails to provide for Salvadoran asylum seekers' in-person access to retained counsel, it violates *Orantes-Hernandez*—which Defendants do not dispute. There is no logical reason for an agency to violate a federal court order, and so there is no rational connection between the facts on which Defendants relied, AR598-604, and Defendants' new policy.[10]

Second, Defendants fail to directly address Plaintiffs' argument that the record evidence demonstrates the incompatibility of CBP conditions with a meaningful credible fear process. *State Farm*, 463 U.S. at 43. Defendants do not address the evidence in the AR from the *Unknown Parties* and *Flores* litigation that CBP facilities are *designed* not to provide conditions for sleep. Pls.' Br. 29-30. It is plain, and was plain on the record, that such conditions are incommensurate with preparation for a potentially life-or-death interview requiring the coherent recounting of traumatic events. AR446. Nor do Defendants attempt to justify their decision in light of any of the other ample evidence in the record that CBP conditions are inconsistent with high-stakes interview preparation. Pls.' Br. 30. Defendants' assertion that their new policy "promote[s] . . . the credible-fear process," Defs.' Br. 37, is therefore contrary to the evidence before the agency.

Ignoring this point, Defendants instead attempt to argue that the new policy is justifiable because they *did* "consider[] that CBP facilities are generally not designed for long-term detention, and thus instituted the streamlined process." *Id.* This argument is irrelevant to

---

[10] An attorney may enter a notice of appearance with DHS on behalf of an asylum seeker in credible fear proceedings via DHS Form G-28, *available at* https://www.uscis.gov/g-28 (last accessed Feb. 13, 2020).

Plaintiffs' argument that CBP facilities—regardless of the time asylum seekers are detained there, including for even a day—are not suitable to detain individuals *while they undergo the credible fear process*. It also is illogical on its own terms. The "streamlined process" provides for "five to seven days" in CBP detention and efforts to transfer to ICE "within 48 hours" if a case does not meet the timeline—so, up to nine days in CBP custody. AR641. But CBP detention standards, which are also included in the AR, provide that "[d]etainees should generally not be held for longer than 72 hours" in CBP custody—*one-third* the time contemplated by Defendants' "streamlined" policy. AR618; *see also* 6 U.S.C. § 211(c)(8)(B), (m)(3). Defendants' new policy is in fact contrary to the record evidence as to appropriate length of detention in CBP facilities.

### d.  Defendants' New Policy Is Antithetical to Effectuation of Congress's Credible Fear Process.

Defendants' assertion that "PACR and HARP promote and complement the credible-fear process" is preposterous. Defs.' Br. 37. Keeping asylum seekers in CBP custody is, for all the reasons adduced by Plaintiffs, Pls.' Br. 15-33, antithetical to a *meaningful* credible fear process that effectuates Congress's purpose of ensuring that no asylum seeker is erroneously sent back to danger.[11] Taking away the safeguards previously provided to asylum seekers—in-person access to counsel, regular telephonic access, and conditions providing for sleep and showers, among other things—cannot seriously be viewed as a move to promote the credible fear process. Rather, without those protections, asylum seekers who merit further protection will not be able to successfully navigate the credible fear process—contrary to Congress's intent. Defendants have long recognized this need to prevent errors in the process in providing these safeguards. But in

---

[11] The chairs of the Congressional Hispanic Caucus; the House Committees on the Judiciary, Homeland Security, and Oversight and Reform; and the House Subcommittee on Immigration and Citizenship "call[ed] for the immediate end to" Defendants' new policy, informing Defendant Wolf that it "appear[s] to be dismantling our established asylum system [and] undermining due process . . . by swiftly returning vulnerable populations to life-threatening situations." Letter from Rep. Joaquin Castro, et al., to DHS Secretary Chad Wolf (Jan. 31, 2020), https://chc.house.gov/sites/congressionalhispaniccaucus.house.gov/files/Letter%20to%20DHS%20on%20PACR%20and%20HARP.pdf.

formulating their new policy, they failed to continue to do so.

Defendants do not address Plaintiffs' argument that they failed to consider the effect of their policy shift on the accuracy of credible fear determinations. They do not address that, as a result and contrary to congressional purpose, it is all but guaranteed that asylum seekers who meet the threshold for protection in the United States will be tortured or killed in the countries they fled. Pls.' SUF 97-99.[12] Defendants also fail to address the record evidence that, in creating their new policy, they misapprehended how the credible fear process is intended to function—as a low threshold in order to prevent asylum seekers' return to danger. Nowhere in the AR or even in their briefing do they explain how isolating asylum seekers from counsel, in appalling conditions, is consonant with Congress's goal—or even that they considered this question.

Defendants failed to consider the right questions in light of Congress's goal that "there should be no danger that an alien with a genuine asylum claim will be returned to persecution." H.R. Rep. No. 104-469, pt. 1, at 158 (1996). An agency must consider not only the upsides but the potential drawbacks to their new policy—including the potential practical effects "on the people and communities the policy would affect." *Make the Rd. N.Y.*, 405 F. Supp. 3d at 56.

## IV.   Defendants' New Policy Violates Asylum Seekers' Statutory and Regulatory Rights to Access Counsel and Contact Third Parties.

Defendants' new policy of conducting the credible fear process in CBP custody violates the statutory and regulatory right to consult with counsel. First, the policy categorically denies asylum seekers the right to in-person attorney access. *Id.* at 36. Second, the policy does not allow for regular telephonic access. *Id.* at 36-38. Third, the policy categorically denies asylum seekers the right to consult after their CFI and through the immigration judge review. Pls.' Br. 35-36.

---

[12] *See also* Human Rights Watch, *Deported to Danger* (2020), https://www.hrw.org/report/2020/02/05/deported-danger/united-states-deportation-policies-expose-salvadorans-death-and (identifying 138 Salvadorans killed following deportation since 2013 and explaining that "[i]n many of these . . . cases, we found a clear link between the killing . . . and the reasons they had fled El Salvador in the first place").

Defendants do not contest these key facts. Instead, Defendants argue that this lack of access to counsel is *consistent with* statute and regulation and that attorney access is not required at any point following the CFI. These arguments would render the statutory right to consult with attorneys or others meaningless and are wrong.

### A.   Defendants' New Policy Unlawfully Deprives Asylum Seekers of In-Person Access and Regular Telephonic Access To Counsel And Others.

#### 1.   Statute and Regulation Entitle Asylum Seekers To Meaningful Access to Counsel: In-Person Access and Regular Telephonic Access.

Defendants do not dispute that under their new policy asylum seekers are categorically denied in-person access to an attorney and are given only minimal telephonic access prior to the CFI. Defendants' proposition that asylum seekers in credible fear proceedings have no right of "access to counsel" at all—let alone *meaningful* access, Defs.' Br. 24 is contrary to statute and regulation and to case law recognizing asylum seekers' right of meaningful access to counsel, including in the credible fear process.

By its plain terms the expedited removal statute allows an individual to consult with whomever they choose, which includes attorneys. 8 U.S.C. § 1225(b)(1)(B)(iv) (a noncitizen "may consult with a person or persons of [their] choosing prior to the interview or any review thereof"). In fact, the statute's limitation that "such consultation shall be at no expense to the Government" makes sense only in the context of attorney access—for which an individual presumably may have to pay. *Id.*; *compare* § 1362; *see also Innovation Law Lab v. Nielsen*, 342 F. Supp. 3d 1067, 1080 (D. Or. 2018) (citing, *inter alia*, § 1225(b)(1)(B)(iv) in holding that asylum seekers in credible fear proceedings had a right to access counsel); *Castillo v. Nielsen*, 2018 WL 6131172 at *3 (C.D. Cal. June 21, 2018) (requiring access to counsel for detained asylum seekers in credible fear proceedings).

Defendants have previously recognized that asylum seekers in credible fear proceedings have the right to access an attorney. Defendants' ICE detention standards recognize that the consultation right stems from statute and regulation. Pls.' Br. 7 (citing Pls.' SUF 17; PBNDS 5.7.V.K.1; *see also* FRS Visitation V.11.a; NDS 5.5.H.1; 2008 PBNDS Visitation V.K.1). They require that asylum seekers "be permitted to consult with whomever they choose," including "attorneys and other legal representatives" and "prospective legal representatives." Pls.' SUF 21; PBNDS 5.7.V.K.3; FRS Visitation V.11.c; *see also* Dkt. No. 21-3 at Ex. 16, p. 275 (Form M-444 telling asylum seekers that they "may choose to hire an attorney or representative"); Dkt. No. 21-3 at Ex. 17, p. 281 (USCIS CFI script requiring asylum officer to tell asylum seeker, "it is your right to have an attorney or consultant present if you would like one").

Defendants' proposition that "[n]or do the statute and regulations require 'access to counsel'" is unsupported. Defs.' Br. 24. *AILA v. Reno*, 18 F. Supp. 2d 38 (D.D.C. 1998), held that the government's interpretation that the right to access counsel *did apply after* a person was placed in credible fear proceedings, but not before, was a reasonable reading of the consultation provision. *Id.* at 54-55. Defendants' other cases do not address the right to access counsel *after* placement in credible fear proceedings. *United States v. Barajas-Alvarado*, 655 F.3d 1077, 1088 (9th Cir. 2011); *United States v. Quinteros Guzman*, 2019 WL 3220576, at *9 (W.D. Va. July 17, 2019) (citing § 1225(b)(1)(B)(iv) and noting its applicability to credible fear proceedings).

Any argument that Congress intended that the right to access counsel in the credible fear process be "an empty formality" would run contrary to fundamental principles of statutory interpretation. *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (statutory provisions should not be read to be "inoperative or superfluous, void or insignificant"). It is clear that Congress sought to ensure that "there should be no danger that an alien with a genuine asylum claim will be returned to

persecution"—and provided corresponding procedural safeguards. H.R. Rep. No. 104-469, pt. 1, at 158 (1996); Pls.' Br. 4, 39 & n.8. Defendants' interpretation that the statutory and regulatory right to counsel need not be meaningful runs directly contrary to Congress's purpose.

Accordingly, *Innovation Law Lab* and *Castillo*, discussed *supra*, required the government to provide *meaningful* access to counsel in the credible fear context. *Innovation Law Lab* enjoined government practices which it found had the "cumulative effect" of denying legal access prior to asylum seekers' CFIs, and explained that such impermissible practices included "the detention of aliens far from where potential or existing counsel was located, limited attorney visitation hours, and the processing of aliens at locations where telephones were not available to them." 342 F. Supp. 3d at 1080-81. *Castillo* required the government to provide both in-person and telephonic access to attorneys. 2018 WL 6131172 at *3-4.

While Defendants fault Plaintiffs for relying upon cases that discuss access to counsel in the § 1229a context, these cases both stand for the generally applicable proposition that where Congress grants a right of access to counsel, as it has done here, that right must be meaningful and illuminate what is required for *meaningful* access to counsel for detained noncitizens. *See* Pls.' Br. 34-35. As these cases establish, courts have rejected any interpretation that would allow "a 'myopic insistence upon expeditiousness' to render the right to counsel 'an empty formality.'" *Biwot*, 403 F.3d at 1099 (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)). And Defendants do not squarely address the case law set forth by Plaintiffs in which courts have repeatedly held that interference with meaningful access to counsel is unlawful in the immigration context, including for those in credible fear proceedings, and have required regular in-person and telephonic access. Pls.' Br. 35-39.

Critically, Defendants do not directly refute Plaintiffs' arguments as to what meaningful

access to counsel requires. They do not refute Plaintiffs' argument that such access must include *in-person* access. *See* Pls.' Br. 36 (citing, *inter alia, Arroyo v. DHS*, 2019 WL 2912848, at *17 (C.D. Cal. 2019) ("healthy counsel relationship in the immigration context requires confidential in-person visitation, especially where an immigrant must be forthcoming about sensitive matters such as past trauma, mental health issues, and criminal history"). They fail to refute that *regular telephonic* access is necessary. Pls.' Br. 36-39. Defendants also do not dispute that, as described above, their very own policies have explicitly recognized that due to the nature of the credible fear process in-person and regular telephonic access must be provided. Pls.' Br. 6-10, 36.

Instead of refuting Plaintiffs' arguments, Defendants merely assert that because asylum seekers in PACR and HARP, including Individual Plaintiffs, have *some* opportunity to make calls, there is no violation. Defs.' Br. 24. Tellingly, Defendants make no effort to demonstrate that the opportunities provided to individuals in CBP custody are in any sense meaningful or adequate. Defendants do not dispute that the "opportunity" for Plaintiffs was a single 30-minute or one-hour window to make such calls and that Plaintiffs had no ability to leave a call-back number or otherwise have their call returned. Pls.' Br. 12-13, 37. Defendants assert that Las Americas has answered calls from individuals in PACR and HARP, but they ignore that in the over three months that PACR and HARP have been in effect, Las Americas has received only one call directly from an individual in the program, in stark contrast to the 1-2 calls *per day* that they regularly received from those in ICE detention. Pls.' Br. 37; Pls.' SUF 102-105; Declaration of Linda Corchado in support of Plaintiffs' Opposition ("Corchado 3 Decl.") at ¶ 3). Other legal service providers in El Paso similarly report they are receiving few or no calls. Pls.' Br. 37; Pls.' SUF 103. And broadly, Defendants do not dispute that PACR and HARP have erected a multitude of roadblocks preventing meaningful access to counsel. Pls.' SUF 110-114; Corchado

3 Decl. at ¶¶ 6-13; Declaration of Thelma Garcia ¶¶ 6-15.

Lacking any support for their assertion that PACR and HARP satisfy asylum seekers' statutory and regulatory right to access counsel, Defendants fall back on an inapposite implementing regulation, which specifies that "[s]uch consultation shall be made available in accordance with the policies and procedures of the detention facility where the alien is detained." 8 C.F.R. § 235.3(b)(4)(ii); Defs.' Br. 24-26. In essence, Defendants argue that whatever consultation is provided by a specific detention facility is all that is required—even if the detention facility does not provide for meaningful access to counsel. Under Defendants' logic, a detention facility could deny asylum seekers access to attorneys in totality, and, as long as the denial was consistent with the facility's policies and procedures, it would be lawful.

This is flatly wrong: Defendants cannot interpret the right to access counsel away by deferring to detention facilities' polices or procedures that render the right meaningless. *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 n.4 (2009) ("[I]f Congress has directly spoken to an issue then any agency interpretation contradicting what Congress has said would be unreasonable."). It does not matter whether Defendants' categorical denial of in-person access and denial of regular telephonic access to asylum seekers is consistent with policies and procedures for CBP facilities; it is still unlawful.

### 2.    Defendants' Erroneous Interpretations Are Not Owed Deference.

Contrary to Defendants' argument, their interpretation of the consultation statute and implementing regulations is not owed deference. Defs.' Br. 25-26. As an initial matter, the consultation statute is not ambiguous, and so Defendants' interpretation is not owed deference. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984) ("[i]f the intent of Congress is clear, that is the end of the matter"). As set forth above, there is no statutory

ambiguity that asylum seekers are entitled to access to counsel. Nor is there any ambiguity that

such a right must be *meaningful*. In order for the right to access counsel to have meaning, it must

include in-person access and regular telephonic access. Defendants' contrary interpretation,

eviscerating the statutory scheme, is not owed deference. *Mellouli v. Lynch*, 135 S. Ct. 1980,

1989 (2015) (no *Chevron* deference to agency interpretation that "makes scant sense"). As

Defendants recognize, even in the event of ambiguity the agency must "act[] reasonably" in

order to "stay[] within the bounds of its statutory authority." *Utility Air Regulatory Group v.

EPA*, 573 U.S. 302, 315 (2014); Defs.' Br. 25.

Consequently, no deference is owed to the implementing regulation stating that

"consultation shall be made available in accordance with the policies and procedures of the

detention facility where the alien is detained." 8 C.F.R. § 235.3(b)(4)(ii).[13] As Defendants

recognize, regulations are entitled to deference only if they resolve any ambiguity *reasonably*.

As described above, Defendants' interpretation that individual DHS facilities could through their

policies and procedures gut statutory access to counsel is unreasonable and contrary to the

unambiguous statute. To the extent that Defendants' interpretation of the implementing

regulation devolves responsibility for interpreting statute or regulation to individual detention

facilities, it is certainly not entitled to deference—individual facilities' policies and procedures

do not reflect the authoritative or official position of DHS. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2416

(2019) (explaining that deference requires "the agency's 'authoritative' or 'official position'"

and explaining that an interpretation must "emanate from" "the Secretary or his chief advisors").

Finally, Defendants' litigation position that PACR and HARP satisfy the statutory and

regulatory requirements of the right to access counsel, Defs.' Br. 2-25, is not owed deference.

---

[13] Defendant's implementing regulations that largely parrot the statute and their interpretations thereof are generally not owed deference. *Compare* 8 U.S.C. § 1225(b)(1)(B)(iv) *with* 8 C.F.R. §§ 208.30(d)(4), 235.3(b)(4)(ii); *Fogo De Chao Inc. v. DHS*, 769 F.3d 1127, 1135 (D.C. Cir. 2014).

*Vill. of Barrington, Ill. v. Surface Transp. Bd.*, 636 F.3d 650, 660 (D.C. Cir. 2011); *Kisor*, 139 S.

Ct. at 2417. And such a position is not a reasonable agency interpretation of the statutory and

regulatory landscape. *Utility Air Regulatory Group*, 573 U.S. at 315; *Kisor*, 139 S. Ct. at 2415-

16. Further, Defendants' assertion takes the inverse position of Defendants' prior policy

statements—a shift Defendants do not explain. *See supra* III.B.2.b. This too militates against

deference. *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 515 (1994) ("considerably less

deference" to "[a]n agency's interpretation of a statute or regulation that conflicts with a prior

interpretation").

### 3.    Defendants' New Policy Is Unlawful Because It Does Not Permit Access to Consultation After The CFI.

Defendants' interpretation that the consultation provision does not apply after the

credible fear interview is contrary to the text of the statute, implementing regulations, and DHS's

own legal interpretation. The plain text of 8 U.S.C. § 1225(b)(1)(B)(iv) provides that a

noncitizen "may consult with a person or persons of the alien's choosing prior to the interview or

any review thereof." Defendants' interpretation reads "or any review thereof" out of the statute,

but those words are not superfluous. Congress would not have provided for the right to consult

during review of the CFI unless it wanted consultation to be available then. Defendants'

argument to the contrary misreads the statute. The statute does not say that DHS *may* give

asylum seekers a right to consult; it says that *asylum seekers may* consult with a person of their

choosing.[14] 8 U.S.C. § 1225(b)(1)(B)(iv); *Dada v. Mukasey*, 554 U.S. 1, 14-15 (2008) (statute

providing that a non-citizen "may file one motion to reopen proceedings under this section"

---

[14] Defendants' cases are therefore inapposite. *Prof'l Drivers Council v. Bureau of Motor Carrier Safety*, 706 F.2d 1216, 1221 (D.C. Cir. 1983) (interpreting statute providing that *agency* "may establish reasonable requirements"); *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1401 (D.C. Cir. 1995) (similar). Defendants cite *Rosa v. McAleenan*, 2019 WL 5191095 (S.D. Tex. Oct. 15, 2019), Defs.' Br. 28. But that case does not purport to interpret the scope of the statutory right to access counsel; it evaluates fulfillment of the requirement to *notify* asylum seekers of the right to consult. *Id.* at *22.

"plain[ly]" "guarantees to each alien the right" to file one motion).

Further, Defendants' interpretation is contrary to their own regulations and statements. These explicitly recognize that asylum seekers have the right to consult with others following the CFI review. *See, e.g.*, 8 C.F.R. § 235.3(b)(4)(i) (requiring that Form M-444 inform asylum seekers of "[t]he right to consult with other persons prior to the interview **and any review thereof**") (emphasis added); PBNDS 5.7.V.K.1 (consultation right exists "**both** prior to the interview **and** while the asylum officer's decision is under review" (emphasis added)); FRS Visitation V.11.a (same); *see also* Pls.' SUF 20.

Notably, Defendants' interpretation is at odds with Defendants' own statement on the Notice of Referral to Immigration Judge. The Notice of Referral—*which Defendants state they provided to the Individual Plaintiffs*—states that the asylum seeker may be "represented in this proceeding, at no expense to the government," and "may consult with a person or persons of your own choosing prior to your appearance in Immigration Court," provided that the "consultation is at no expense to the government." Defs.' SUF ¶¶ 6, 14; *supra* IV.A.1 ("no expense to the government" language as relevant to attorney representation). Defendants make no effort to reconcile that statement, which they say they made to the Individual Plaintiffs during their proceedings, with their current litigation position. For those reasons alone, the new policy violates asylum seekers' rights to access counsel and consult.

The new policy also violates the clear command that individuals have a right to be represented at proceedings before the immigration judge. 8 U.S.C. § 1362 (right of access to counsel "[i]n any removal proceedings before an immigration judge"). Contrary to Defendants' representation that the immigration judge simply reviews the CFI determination "and nothing more," Defs.' Br. 27, that review is a "removal proceeding[]," § 1362: the consequence of the

review is, explicitly, removal. *See* 8 C.F.R. § 1208.30(g)(2)(iv)(A) ("If the immigration judge concurs with the determination of the asylum officer. . ., the case shall be returned to the Service for removal of the alien."); 8 U.S.C. § 1225(b)(1)(B)(iii)(I), (III) (consequence of removal). Nothing in § 1362 limits its applicability to proceedings under § 1229a. § 1362 uses very broad language, stating that "in **any** removal proceeding before an immigration judge," the right of access to counsel attaches. *Saldivar v. Sessions*, 877 F.3d 812, 819 (9th Cir. 2017) ("'any,' in its plain meaning, is all-inclusive"). Moreover, because § 1229a already includes its own counsel guarantee, § 1229a(b)(4)(A), Defendants' interpretation would render § 1362 superfluous.

Finally, were the Court to find any silence or ambiguity in the INA as to the right to access counsel in the credible fear process, it would be overcome by the APA's counsel provision. 5 U.S.C. § 555(b). Defendants argue that the APA is entirely superseded here, but their cited cases do not sweep so broadly. *Marcello v. Bonds,* 349 U.S. 302 (1955), analyzed § 242(b) of the INA, the precursor to § 1229a. Based on the history and text of the statute, the Court found an express intent to displace the APA with respect to proceedings under that statute. *Id.* (noting "clear and categorical direction . . . meant to exclude the application of the [APA]"); *Ardestani v. INS,* 502 U.S. 129, 134 (1991) (confirming this interpretation).[15] Defendants do not point to any part of the expedited removal statute to demonstrate an equivalent express intent to displace the APA or its procedural safeguards in the event of statutory silence.

## V.   PACR and HARP Effectively Deprive Asylum Seekers of a Meaningful Right to Apply for Asylum, Withholding, and Protection under CAT.

Defendants dismiss Plaintiffs' argument "that the statutory credible-fear procedures are

---

[15] Defendants' other citations are inapposite or unpersuasive. *Barajas-Alvarado* does not discuss the APA at all. 655 F.3d at 1088. *Quinteros Guzman* explicitly recognized that the INA did not supersede the APA with respect to all immigration matters. 2019 WL 3220576 at *9 ("the immigration statutes have changed since *Marcello* and in some situations the APA has been applied by the courts to certain immigration matters"). *Quinteros Guzman* held that application of the APA in expedited removal *not* in the credible fear context was inappropriate, in part because it would "run[] counter to the intent of a simplified, expedited process with limited issues considered." *Id.* at *10.

'undermine[d]' by 'depriving asylum seekers of meaningful access to counsel' and detaining them in 'conditions fundamentally incompatible with a meaningful and fair credible fear determination.'" Defs.' Br. 31 (quoting Pls.'s Br. 39-40). Defendants argue that they complied with the letter of the law because allegedly "Plaintiffs received all of the procedures . . . to which they were statutorily entitled" and have no right to meaningful access to counsel or detention in a particular location. *Id.*

However, Defendants do not refute that when Congress established the right to apply for asylum and other protections, Congress intended that these procedures be *meaningful* and fair. *Marincas v. Lewis*, 92 F.3d 195, 203 (3d Cir. 1996) (interpreting Refugee Act of 1980 and concluding that "[w]hen Congress directs an agency to establish a procedure . . . it can be assumed that Congress intends that procedure to be a fair one"); Pls.' Br. 39. As courts have repeatedly affirmed, Congress has guaranteed asylum seekers a meaningful right to apply for protection, and the government cannot interfere with that right. Pls.' Br. 39-40.

Under Defendants' theory, the executive branch could—as here—completely eviscerate Congress's system for protection so long as it complied with Defendants' extraordinarily narrow reading of section 1225(b)(1)(B)(iv)'s "consult[ation]" requirement. Defendants' argument that strict compliance with the letter of the law regarding specific provisions is all that is required is absurd. The expedited removal statutes do not explicitly require, for example, that Defendants provide detained asylum seekers with a pen or other means to fill out documents (such as signing a notice of appearance for an attorney). If Defendants withheld all writing implements, they could not possibly deny that they were interfering with the right to apply for asylum. So too, the obstacles here interfere with meaningful access to asylum and are accordingly unlawful.

**VI.    The New Policy Violates Due Process.**

Plaintiffs *do* have a protected interest in the right to apply for asylum and in withholding

and protection under CAT. The D.C. Circuit has squarely held that asylum seekers have a due

process right to apply for asylum. *Maldonado-Perez v. I.N.S.*, 865 F.2d 328, 332 (D.C. Cir. 1989)

(a noncitizen "who has unlawfully entered the United States has a Fifth Amendment procedural

due process right to petition the government for political asylum"). A fortiori, they have the right

to apply for statutory withholding and protection under CAT. Pls.' Br. 40-41. *Landon v.

Plasencia*, 459 U.S. 21 (1982), on which Defendants' rely, did not concern the right to apply for

asylum or other protection; it held that a returning permanent resident had due process rights in

an exclusion hearing, and its observation regarding a bare initial application for admission was in

the context of evaluating that separate question. *Id.* at 32.

Defendants argue that asylum seekers are due only the procedure set forth by statute.

*Even if* this were the case, as Plaintiffs have explained, Defendants have failed to comply with

these procedures—violating due process. Moreover, Defendants ignore that the Court must

interpret such provisions to require a meaningful opportunity to meet constitutional due process

standards for those in the credible fear process. Pls.' Br. 41. This requires, at a minimum

adequate time and a meaningful opportunity to contact counsel or prospective counsel and to

meet with an attorney both in-person and telephonically in a confidential manner conducive to

applying for asylum and other protection. Because Defendants' policy does not provide this

meaningful opportunity, it violates due process. *Id.*

**VII.    Plaintiffs' Requested Relief is Warranted.**

Plaintiffs request relief that is typical in APA cases and cases under § 1252(e)(3): (1) an

order vacating and declaring unlawful Defendants' challenged policy and related guidance and

(2) return of the Individual Plaintiffs to the status quo. Plaintiffs also request, under the unusual circumstances of this case, (3) vacatur of negative credible fear determinations and expedited removal orders for those subject to the new policy before the 60-day deadline passed, relief requested by Las Americas asserting third-party standing. Such relief is warranted.

### A.  Vacatur Is Appropriate And Is Not Limited To As-Applied Relief.

Defendants argue that if Plaintiffs prevail, this Court should set aside the policy only with respect to the Individual Plaintiffs. Def.' Br. 38-40. Defendants' theory misapplies controlling law in this circuit concerning vacatur and does not make sense in the context of § 1252(e)(3). 5 U.S.C. § 706(2) provides that a reviewing court shall "hold unlawful and set aside agency action" that violates the APA. Accordingly, when a federal court determines that agency action is unlawful "'*the ordinary result* is that the *rules* are vacated—not that their application to the individual petitioners is proscribed.'" *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989)) (emphasis added); *Lujan*, 497 U.S. at 890 n.2. This relief is not limited to as-applied relief. *Id.* at 913 (Blackmun, J., dissenting) ( "the result is that the rule is invalidated, not simply that the court forbids its application to a particular individual"); *Nat'l Mining Ass'n*, 145 F.3d at 1409 (Justice Blackmun's dissent in *Lujan* "express[ed] the view of all nine Justices").

Vacatur is *clearly* the appropriate remedy for challenges under section 1252(e)(3) to the "validity of the *system*." *Id.* (emphasis added). Under Defendants' proposed approach, Congress would have provided for systemic challenges to the executive's implementation of expedited removal in section 1252(e)(3), but only for "set[ting] aside agency action" for those who were adversely affected by the policy and able to bring suit within 60 days. The executive branch could implement a manifestly unlawful policy that effectively guts the credible fear process or

other aspects of the expedited removal system, as here, and in Defendants' view the policy could

go into effect for everyone after 60 days—with no possibility of further (e)(3) litigation. This

cannot possibly have been Congress's intent. *See Grace*, 344 F. Supp. 3d at 144 (setting aside

policy and noting that "the government cites no authority to support the proposition that a Court

may declare an action unlawful but have no power to prevent that action from violating the rights

of the very people it affects"); *see also Make the Rd. N.Y.*, 405 F. Supp. 3d at 68 ("It would be

manifestly unreasonable for the agency to argue . . . that the court can only deem [a contract]

*in*valid with respect to the particular plaintiff who brought the defect to the court's attention.").

Thus, courts have vacated agency action in section 1252(e)(3) cases. *Grace*, 344 F. Supp.

3d at 141-44; *Make the Rd. N.Y.*, 405 F. Supp. 3d at 72 (preliminary injunction treating rule "as

void *ab initio*"). Moreover, Defendants' apparent concern with "nationwide injunctive relief,"

Defs.' Br. 39, makes no sense—litigation can only be brought in the District of Columbia, so

concerns like percolation among multiple courts of appeal are not implicated.[16]

Defendants' arguments seeking to limit the scope of relief rely on inapposite or contrary

precedent. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 159-60 (2010), found further

injunctive relief unnecessary *in light of vacatur pursuant to the APA*.[17] *Nebraska Dep't of Health*

*& Human Servs. v. Dep' t of Health & Human Servs.*, 435 F.3d 326 (D.C. Cir. 2006), is entirely

inapposite: that case overturned vacatur because only the application of the rule in a specific

adjudicative decision, *not* the underlying rule itself, had been challenged. 435 F.3d at 329-30.

Reliance on *Gill v. Whitford*, 138 S. Ct. 1916 (2018), is likewise misplaced: its observation

regarding the redressability of injury is in the *standing* context, and it was not an APA case. *Id.*

---

[16] Given that this challenge could only be brought in D.C., the reasoning in the out-of-circuit decision that Defendants rely upon is at odds with precedent and this context. *Va. Soc. for Human Life, Inc. v. FEC*, 263 F.3d 379, 394 (4th Cir. 2001) (declining to vacate to avoid "imposing our view of the law on all the other circuits").

[17] *Monsanto* does not bear on the injunctive relief that Individual Plaintiffs seek and Las Americas seeks on behalf of specific asylum seekers: in *Monsanto*, "vacatur was sufficient to redress respondents' injury." 561 U.S. at 166.

at 1934. Defendants cite *no* APA case that stands for the proposition that vacatur is unavailable or not the "ordinary" remedy in the APA context.

### B.  Section 1252(e)(1)(A) and 1252(f) Do Not Limit the Availability of Relief.

Neither § 1252(e)(1)(A) nor § 1252(f) limits the relief here. As to § 1252(e)(1)(A), Defendants conflate remedy and the availability of a cause of action. Defs.' Br. 40-42. Section 1252(e)(1)(A) forecloses equitable relief only where an action is not "specifically authorized in a subsequent paragraph" of subsection (e). And § 1252(e)(3) specifically authorizes this action. Defendants' interpretation, limiting relief to "determinations," is inconsistent with the language of § (e)(3)—which limits the scope of "[j]udicial review," *not* of available relief. *See Make the Rd. N.Y.*, 405 F. Supp. 3d at 68 n.37 (characterizing Defendants' "interpretation of 'determinations' in section 1252(e)(3)" as "seem[ing] implausible").

Regarding § 1252(f), "[a]n injunction in this case does not obstruct the operation of section 1225. Rather, it enjoins conduct that violates that provision. Therefore, section 1252(f) poses no bar." *Grace*, 344 F. Supp. 3d at 143; *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015) (same); *Rodriguez v. Hayes*, 591 F.3d 1105, 1120 (9th Cir. 2010). Plaintiffs seek relief from Defendants' new policy that *violates* the statutory limitations put in place by Congress to protect asylum seekers and the integrity of the credible fear process.

### C.  Plaintiffs Meet The Standards For Injunctive Relief.

As described above, the Individual Plaintiffs have demonstrated that Defendants' actions have caused their injuries and are redressable. Defendants assert that "[t]he record belies" the denial of meaningful process for Plaintiffs, because they "received credible-fear interviews and had the opportunity to seek immigration judge review." Defs.' Br. 43. This again betrays a fundamental misunderstanding of the need for a *meaningful* credible fear process, in compliance

with statutory requirements and in furtherance of congressional purpose.

Plaintiffs were denied a meaningful opportunity to access counsel, did not speak to counsel throughout the credible fear process, were confused throughout their interviews, received a negative credible fear determination, and were removed to their home countries. As Plaintiffs have detailed in their declarations, they now all fear for their lives in the countries they fled, all know of similarly situated individuals who have been murdered, and all are aware that the authorities in their country will not protect them. Pls.' SUF 96. Additionally, they all experienced death threats before leaving their home countries. *Id.* 72-74. Reports from Plaintiffs' home countries support that Plaintiffs are in danger. *Id.* 97-99; *see Grace*, 344 F. Supp. 3d at 146 & n.32. Defendants have proffered no evidence to the contrary.

The harm that Plaintiffs now face is the direct result of their removal following an inadequate process, and absent relief, they "will continue to live in fear every day," with the accompanying psychological toll and restrictions on their activities (such as living in hiding), and be subject to the threat of violence that they fled. *Id.* at 146. The application of an unlawful credible fear process in such circumstances results in irreparable harm. *Id.*; *see Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (describing irreparable harm while noting that it "does not readily lend itself to definition"). Defendants have adduced no evidence to contravene Plaintiffs' arguments that access to an attorney will provide the meaningful process they seek.

As the D.C. Circuit has recognized, access to counsel and consultation is critical in rapid immigration proceedings. *Cheung*, 418 F.2d at 463. Plaintiffs' injury can be redressed through the injunctive relief they seek, which would allow them an opportunity to go through the credible fear process under lawful circumstances. Plaintiffs need not demonstrate prejudice, as explained above, and Plaintiffs do not request that the Court order a specific outcome of the process. Courts

routinely require the return of individuals who were unlawfully removed where they require further access to process—including where *ultimate* relief in the proceedings for which they are returned is not certain. Pls.' Br. 42 n.10.

Likewise, the individuals for whom Las Americas seeks only vacatur of their negative credible fear determinations and expedited removal orders have been irreparably harmed by being subject to this unlawful process. As discussed above, Las Americas has third-party standing to obtain this relief for this limited group, and such relief does not run afoul of 1252(e)(1)(B)'s prohibition of class actions to enjoin an unlawful implementation of the expedited removal system. *Supra* II.B.4.[18]

Defendants' assertion that the equities favor their unlawful actions is wrong. There is no public interest in the executive branch violating the law—regardless of what interest it invokes. *See R.I.L-R*, 80 F. Supp. 3d at 191 (quoting *Rodriguez*, 715 F.3d at 1145) (explaining that the "[g]overnment 'cannot suffer harm from an injunction that merely ends an unlawful practice'").

## CONCLUSION

Respectfully, Plaintiffs request that the Court grant Plaintiffs' Motion.

---

[18] The "higher threshold" language that Defendants quote, Defs.' Br. 44, as from *League of Women Voters v. Newby*, 838 F.3d 1 (D.C. Cir. 2016), does not appear in that decision.

Dated: February 13, 2020                    Respectfully submitted,

                                            /s/ Andre Segura

Arthur B. Spitzer (D.C. Bar No. 235960)     Andre Segura* TX Bar No. 24107112
Scott Michelman (D.C. Bar No. 1006945)      Thomas Buser-Clancy* TX Bar No. 24078344
American Civil Liberties Union Foundation   Kathryn Huddleston* AZ Bar No. 033622
 of the District of Columbia                ACLU Foundation of Texas, Inc.
915 15th Street, NW - 2nd floor             5225 Katy Freeway, Suite 350
Washington, DC 20005-2302                   Houston, TX 77007
Tel. (202) 601-4266                         Tel. (713) 942-8146
aspitzer@acludc.org                         Fax: (713) 942-8966
smichelman@acludc.org                       asegura@aclutx.org
                                            tbuser-clancy@aclutx.org
                                            khuddleston@aclutx.org
Anand Balakrishnan* CT Bar No. 430329
American Civil Liberties Union
Foundation, Immigrants' Rights Project      Bernardo Rafael Cruz* TX Bar No. 24109774
125 Broad Street, 18th Floor                Brantley Shaw Drake* NY Bar No. 5407440
New York, NY 10004                          ACLU Foundation of Texas, Inc.
Tel. (212) 549-2600                         109 N. Oregon St., Suite 600
abalakrishnan@aclu.org                      El Paso, TX 79901
                                            Tel. (915) 533-8091
                                            Fax: (915) 308-7188
                                            brcruz@aclutx.org
                                            sdrake@aclutx.org

*Admitted Pro Hac Vice*