### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LAS AMERICAS IMMIGRANT ADVOCACY CENTER, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> CHAD WOLF, *in his official capacity as Acting Secretary of Homeland Security, et al.*, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )        No. 19-cv-3640 (KBJ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

### <u>MEMORANDUM OPINION</u>

This Court recently discerned an impermissible conflict between parts of a training manual that the United States Citizenship and Immigration Services ("USCIS") issues to assist its asylum officers in making determinations regarding whether or not asylum seekers who are subject to expedited removal have a credible fear of persecution and the terms of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, and that statute's implementing regulations. *See Kiakombua v. Wolf*, No. 19-cv-1872, 2020 WL 6392824, at *3 (D.D.C. Oct. 31, 2020). In the instant case, the Court has been similarly called upon to determine the lawfulness of certain other written policies that the Department of Homeland Security ("DHS") has crafted to implement the federal government's statutory process for the evaluation of asylum requests made by noncitizens who arrive at the U.S. border.[1] In October of 2019, DHS issued two

---

[1] This Memorandum Opinion uses the term "noncitizen" in lieu of the term "alien" to refer to "any person who is not a citizen or national of the United States." *Pereira v. Sessions*, 138 S. Ct. 2105, 2110 n.1 (2018). The latter is commonly used in immigration-related statutes and regulations. *See, e.g.*, 8

guidance memoranda that instituted new programs for faster processing of the asylum requests of individuals who are subject to expedited removal and who have either traveled through another country on their way to the United States or are Mexican nationals.  Pursuant to the "Prompt Asylum Claim Review" ("PACR") process and the "Humanitarian Asylum Review Process" ("HARP"), such asylum seekers are afforded only one full calendar day to prepare for the initial screening stage of the statutory asylum application process, known as the credible fear interview.  *Cf. Kiakombua*, 2020 WL 6392824, at *4–5 (describing the statutory and regulatory scheme that governs the interview and credible fear evaluation).  Moreover, under both PACR and HARP, that one-day timeframe encompasses the statutorily required opportunity to consult with a person of the asylum seeker's choosing, such as an attorney.

Significantly for present purposes, PACR and HARP further establish that noncitizens who are awaiting credible fear interviews, as well as those who have requested an immigration judge's review of a negative credible fear determination, will be detained in facilities that are run by U.S. Customs and Border Protection ("CBP"), rather than in facilities that U.S. Immigration and Customs Enforcement ("ICE") operates, as used to be the case.  Plaintiffs Las Americas Immigrant Advocacy Center and ten pseudonymous individuals (collectively, "Plaintiffs") have filed the instant action against DHS, USCIS, CBP, the Department of Justice ("DOJ"), and various leaders of those agencies, in their official capacities (collectively, "Defendants") to challenge this detention-placement policy on the grounds that, due to institution-related constraints, persons who are detained in CBP custody have restricted opportunities to

U.S.C. § 1101(a)(3).

consult with a person of their choosing during the credible fear interview process, as the immigration statutes require.  (*See* Am. Compl. ("Compl."), ECF No. 2, ¶ 1.) Plaintiffs' six-count complaint primarily alleges that there is an unlawful inconsistency between the PACR and HARP mandate that such persons be detained in a facility that is not equipped to facilitate interactions between such detained persons and their counsel, on the one hand, and the statutory and regulatory requirement that detained asylum seekers "may consult with a person or persons of [their] choosing prior to" a credible fear interview, 8 U.S.C. § 1225(b)(1)(B)(iv); 8 C.F.R. § 208.30(d)(4), and the fact that such persons have a right to counsel during full removal proceedings, *see* 8 U.S.C. § 1362, on the other.  Plaintiffs also maintain that Defendants' new detention-placement policy was adopted in an arbitrary and capricious fashion in violation of the Administrative Procedure Act ("APA"), and that it deprives asylum seekers of not only the procedural safeguards conferred by the INA and the Convention Against Torture but also their Fifth Amendment due process rights.

Before this Court at present are the parties' cross-motions for summary judgment.  (Pls.' Mot. for Summ. J., ECF No. 35; Defs.' Cross-Mot. for Summ. J., ECF No. 49.)  Plaintiffs' motion reiterates their core arguments that DHS's policy of placing asylum seekers in CBP custody prior to their credible fear interview violates various statutory rights (*see* Pls.' Mem. in Supp. of Cross-Mot. for Summ. J. ("Pls.' Mot."), ECF No. 35-1, at 10); that the agency's decision making process with respect to the changed detention-placement policy was arbitrary and capricious under the APA (*see id.* at 9); and that the resulting asylum-review procedure violates the Due Process

Clause (*id.* at 10).[2]  Defendants' cross-motion for summary judgment contends, as a threshold matter, that the Court lacks subject-matter jurisdiction over Plaintiffs' claims, that Plaintiffs lack standing, and that Plaintiffs' claims have become moot.  (*See* Defs.' Mem. in Opp'n to Pls.' Mot. for Summ. J. and in Supp. of Defs.' Cross-Mot. for Summ. J. ("Defs.' Mot."), ECF No. 49-1, at 11–12; Defs.' Notice of Suppl. Authority, ECF No. 71, at 1.)  Defendants also argue that the detention-placement policy does not violate any statutory or constitutional rights of Plaintiffs, and that the policy resulted from decision making procedures that are consistent with the APA.  (*See* Defs.' Mot. at 12.)

As explained below, this Court concludes that Defendants' threshold arguments about the Court's subject-matter jurisdiction, Plaintiffs' standing, and the mootness of the claims in this legal action are baseless, largely for the reasons that the D.C. Circuit recently articulated in *Make the Rd. New York v. Wolf*, 962 F.3d 612 (D.C. Cir. 2020) ("*MTRNY II*"), and *Grace v. Barr*, 965 F.3d 883 (D.C. Cir. 2020).  However, this Court cannot find that the detention-placement policy at issue here transgresses the INA's prescriptions regarding the initial stage of the asylum application process or any other statute or regulation, nor can it conclude that the detention-placement policy was adopted in an arbitrary or capricious manner in violation of the APA.  Moreover, given binding case law, the Court must also find that the detention-placement policy at issue here does not violate the Constitution's Due Process Clause.  Accordingly, Plaintiffs' motion for summary judgment must be **DENIED**, and Defendants' cross-motion for

---

[2] Page-number citations to the documents that the parties have filed refer to the page numbers that the Court's electronic filing system automatically assigns.

summary judgment must be **GRANTED**.  A separate Order consistent with this Memorandum Opinion will follow.

## I.     BACKGROUND

### A.     Overview Of The Procedures Afforded To Asylum Applicants Under Federal Law

The statutory and regulatory scheme that governs the United States government's consideration of asylum applications is described in detail in this Court's Memorandum Opinions in *Kiakombua*, *see* 2020 WL 6392824, at *4–5, and *Make the Rd. New York v. McAleenan*, 405 F. Supp. 3d 1, 12–21 (D.D.C. 2019) ("*MTRNY I*"), *rev'd on other grounds*, 962 F.3d 612 (D.C. Cir. 2020).  Those descriptions are incorporated into the instant opinion by reference, and the Court will assume general familiarity with their discussion of the applicable legal framework.

As relevant here, the reader is reminded that, as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, § 302, 110 Stat. 3009-546, 3009-579 (1996), Congress created the process of "expedited removal[,]" which "enables federal immigration officers to slate certain undocumented noncitizens for rapid deportation 'without further hearing or review[.]'" *MTRNY I*, 405 F. Supp. 3d at 10 (quoting 8 U.S.C. § 1225(b)(1)(A)(i)).  Congress determined that "rapid removal procedures were 'necessary' because 'thousands of aliens arrive in the U.S. at airports each year without valid documents and attempt to illegally enter the U.S.[,]'" *id.* at 15 (citation omitted), and "[e]xisting procedures to deny entry to and to remove illegal aliens from the United States" were too "cumbersome and duplicative" to address this influx at the nation's borders, *see id.* at 13 (citation omitted).

Consequently, Congress "adopted IIRIRA's expedited removal scheme to substantially shorten and speed up the removal process." *MTRNY II*, 962 F.3d at 618.

With the addition of expedited removal, Congress effectively established a bifurcated set of procedures for determining whether an asylum seeker will be granted authorization to remain in the United States or will be removed.  Per the pre-existing formal removal pathway (which applies to most noncitizens who are not already authorized to remain in the United States), the government provides a number of procedural guarantees as an asylum application is being processed, including the right to written notice of the charge of removability, *see* 8 U.S.C. § 1229(a)(1); to a hearing before an immigration judge, *see id.* § 1229a(a)(1); to representation by counsel, *see id.* § 1229a(b)(4)(A); to examine and cross-examine witnesses and present evidence, *id.* § 1229a(b)(4)(B); to appeal an adverse decision to the Board of Immigration Appeals, *see* 8 C.F.R. §§ 1003.1(b)(3), 1240.15; and to seek judicial review, *see* 8 U.S.C. § 1252(a)(1).  Under the expedited removal pathway—which applies to certain limited categories of noncitizens[3]—DHS may remove the individual from the United States "without further hearing or review[,] unless the alien indicates either an intention to

---

[3] As this Court explained in *Kiakombua*, by statute, DHS "has 'sole and unreviewable discretion' to 'designate[]' for expedited removal 'any or all' noncitizens who are deemed inadmissible (as defined by sections 1182(a)(6)(C) and (a)(7) of the INA) and who have 'not affirmatively shown' that they have 'been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility[.]'" *Kiakombua*, 2020 WL 6392824, at *4 n.3 (quoting 8 U.S.C. § 1225(b)(1)(A)(iii)(I)–(II)).  Until recently, the agency "opted to designate for expedited removal only those inadmissible noncitizens who were encountered near the border and had been in the country for no longer than 14 days"; however, "[i]n July of 2019, DHS issued a notice that expands the categories of individuals who are subject to expedited removal, to include all inadmissible noncitizens located 'anywhere in the United States' who have 'not been physically present in the United States continuously for the [preceding] two-year period[.]'" *Id.* (quoting *Designating Aliens for Expedited Removal*, 84 Fed. Reg. 35,409, 35,414 (July 23, 2019)).

apply for asylum under [8 U.S.C. § 1158] or a fear of persecution" in her home country, supporting a claim to withholding of removal.  8 U.S.C. § 1225(b)(1)(A)(i).[4]

The instant case involves this second pathway—*i.e.*, the circumstance in which a noncitizen is deemed presumptively removable without additional process unless the person expresses an intention to apply for asylum or a fear of persecution.  Once such a noncitizen "indicates either an intention to apply for asylum . . . or a fear of persecution, the [immigration] officer [is required to] refer the alien for an interview by an asylum officer[,]" who must determine whether the individual has a credible "fear of persecution[.]"  *Id*. § 1225(b)(1)(A)(ii), (B).  This credible fear interview allows the government to "quickly identify potentially meritorious claims to protection" while "resolv[ing] frivolous ones with dispatch[,]" *Kiakombua*, 2020 WL 6392824, at *4 (citation omitted), and it is the first stage of a two-stage process for establishing the asylum eligibility of such noncitizens, *see id*. at *23 (explaining that the expedited removal scheme subjects noncitizens to "(1) an initial screening to determine whether or not the noncitizen has a credible fear of persecution or torture in their home country (if she does not, she is slated for expedited removal without an additional hearing), and (2) full removal proceedings, during which the noncitizen bears the burden of establishing her eligibility for asylum").  Moreover, making the credible fear determination requires the asylum officer to assess whether "there is a significant

---

[4] Although the language of IIRIRA vests authority in "the Attorney General," Congress primarily transferred the INA enforcement functions to the Secretary of Homeland Security in 2002, when DHS was created.  *See* Consolidated Appropriations Resolution, 2003, Pub. L. No. 108-7, § 105, 117 Stat. 11, 531 (codified at 8 U.S.C. § 1103); Homeland Security Act of 2002, Pub. L. No. 107-296, § 441, 116 Stat. 2135, 2192 (codified at 6 U.S.C. § 251); *see also* 6 U.S.C. § 251 (as amended by Pub. L. No. 114-125, § 802(g)(1)(B)(v)(I), 130 Stat. 122, 212 (2016)); 8 C.F.R. § 2.1.  However, the Attorney General retains authority "with respect to all questions of law[.]"  8 U.S.C. § 1103(a)(1).

possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum[,]" 8 U.S.C. § 1225(b)(1)(B)(v), which the Supreme Court has characterized as a "low bar[,]" *Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1967 (2020).  By regulation, this credible fear assessment is typically made based solely upon the statements and representations that the noncitizen makes during the interview concerning her experiences in her home country.  *Cf.* 8 C.F.R. § 208.30(d)(4) (providing that a noncitizen "may present other evidence" only "if available").

In addition, and most relevant to the instant case, the governing statute expressly provides that a noncitizen who is eligible for a credible fear interview *must* be held in detention leading up to and throughout that assessment process, *see* 8 U.S.C. § 1225(b)(1)(B)(iii)(IV), and "may consult with a person or persons of [his] choosing prior to the interview or any review thereof, according to regulations prescribed by the Attorney General[,]" *id.* § 1225(b)(1)(B)(iv).  The implementing regulations state that "[s]uch consultation shall be made available in accordance with the policies and procedures of the detention facility where the alien is detained," 8 C.F.R. § 235.3(b)(4)(ii), and that "[a]ny person or persons with whom the alien chooses to consult may be present at the interview and may be permitted, in the discretion of the asylum officer, to present a statement at the end of the interview[,]" *id.* § 208.30(d)(4).

## B.   Prompt Asylum Claim Review ("PACR") And The Humanitarian Asylum Review Process ("HARP")

Until the summer of 2019, if certain noncitizens—namely, those who arrived at a point of entry at the U.S. border, or those who were encountered within 100 miles of the

border after recently entering the United States without inspection—expressed a fear of persecution or an intent to apply for asylum, they were placed in ICE custody pending their credible fear interviews, and they remained in ICE detention up to, and through, the credible fear interview and any review of the asylum officer's negative credible fear determination by an immigration judge.  (*See* Compl. ¶ 64.)  The facilities that ICE uses to detain asylum seekers allegedly provide detainees with unrestricted access to telephones for contacting legal counsel, private meeting spaces for attorneys to meet with their clients, and an online system for attorneys and others to locate detainees in ICE custody.  (*See id.* ¶¶ 74–76, 79.)  According to Plaintiffs, such unfettered access to counsel "can assist an asylum seeker in preparing for their [credible fear] interview or [immigration judge] review."  (*See id.* ¶ 93.)

In July and October of 2019, DHS made two significant changes to its asylum-related policies that allegedly affect an asylum-seeker's ability to prepare for the credible fear interview and her chances of being deemed to have successfully cleared that hurdle.  First, on July 16, 2019, the agency promulgated a rule—known as the "Transit Rule"—that prohibited asylum officers from seriously entertaining the asylum requests of noncitizens who had passed through another country en route to the U.S. border if they did not apply for asylum in the pass-through countries before reaching the United States.  (*See id.* ¶ 55 n.5; *see also* Admin. R., ECF No. 35-3, at AR370–86.)  Pursuant to the Transit Rule, if an asylum seeker who is subject to expedited removal has not first applied for asylum in a country through which he had traveled prior to his arrival in the United States, the asylum officer is required to make a negative credible fear determination with respect to that person's asylum application.  (Compl. ¶ 55 n.5;

*see also* Admin. R. at AR376–78.)[5]  Mexican nationals are not subject to the Transit Rule, given that they do not pass through another country prior to entering the United States.

Second, in October of 2019, DHS issued the two guidance documents at issue in the instant case in order to implement, *inter alia*, the challenged new policy concerning the circumstances of a noncitizen's pre-interview detention.  The first document, which DHS issued on October 7, 2019, instituted PACR as a pilot program in El Paso, Texas, with the purported goal of achieving "more effective processing" of noncitizens who are subject to the Transit Rule.  (*See* Defs.' Mot. at 19; Admin. R. at AR640–41.) Asylum seekers identified as "Single Adults" and "Family Unit Aliens" are eligible for PACR, and immigration officers retain discretion as to whether such persons should be placed in the program or be subjected to standard expedited-removal procedures.  (*See id.* at AR641, AR644.)  For noncitizens who are placed into the PACR program, there is a total timeline of five to seven days for removal, and such persons are required to be detained at CBP facilities during the pendency of the credible fear screening process. (*See id.* at AR641.)  In addition, as mentioned above, an asylum seeker in PACR is afforded one full calendar day to prepare for a credible fear interview, to include the time that must be afforded for consultation with a person of the asylum seeker's

---

[5] Asylum consideration is effectively precluded through this mechanism, but such a noncitizen may still be eligible for statutory withholding, 8 U.S.C. § 1231(b)(3), or for protection under the Convention Against Torture ("CAT"), *id.* § 1231 note; 8 C.F.R. §§ 208.16–208.18, 1208.16–1208.18, both of which require a finding of "reasonable fear" rather than "credible fear" of persecution, 8 C.F.R. § 208.30(e)(5)(iii).  "Reasonable fear" is a significantly higher burden than credible fear; it requires a "reasonable possibility that [an asylum seeker] would be persecuted on account of his or her race, religion, nationality, membership in a particular social group or political opinion, or a reasonable possibility that [the alien] would be tortured in the country of removal."  *Id.* § 208.31(c).

choosing.  (*Id.*)[6]  USCIS also undertakes to conduct the credible fear interview

"immediately" after the 24-hour period, in a private location within the CBP facility,

allowing the person with whom the noncitizen has consulted (including his or her

attorney) to "participate in the interview telephonically."  (*Id.* at AR642.)

The second guidance document, which DHS issued on October 28, 2019,

instituted HARP, which is a policy that is substantially similar to PACR but applies

only to Mexican nationals.  (Defs.' Mot. at 20; *see also* Admin. R. at AR645–47.)

Noncitizens who have been "[i]dentified as HARP amenable"—*i.e.*, "Mexican

nationals" who "have been processed for Expedited Removal and have claimed fear of

return to their native country"—are "[t]ransferred" to CBP custody, where a "24-[hour]

consult period begins[.]"  (Admin. R. at AR645.)  During that consultation period,

asylum seekers in HARP are "given [an] opportunity to contact an attorney . . . via [a]

phone supplied" by the detention facility, for "initial[ly] 1 hour[,]" with "30-minute

follow-up as needed[.]"  (*Id.*)  And after the "24-hour consult clock" has elapsed, the

noncitizen "attend[s] [a] scheduled telephonic USCIS [credible fear] interview."  (*Id.*)

DHS has now expanded PACR beyond El Paso, Texas—it is currently also in effect in

Rio Grande Valley, Texas, and Yuma, Arizona—but HARP remains limited to El Paso.

(*See* Defs.' Mot. at 21.)

Notably, there is no dispute that CBP facilities are designed for *short-term*

---

[6] The 24-hour, or one full day, window has been challenged independently, in the context of a different lawsuit filed in this jurisdiction.  *See L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 8–9 (D.D.C. 2020).  The court in *L.M.-M.* found that the Acting Director of USCIS "was not lawfully appointed to that position under the [Federal Vacancies Reform Act of 1998] and thus lacked the authority to issue the Directive[]" that implemented the 24-hour window.  *Id.* at 23.  The defendants in *L.M.-M.* initially appealed the district court's judgment, but later stipulated to dismiss the appeal voluntarily.  *See L.M.-M. v. Cuccinelli*, No. 20-5141, 2020 WL 5358686, at *1 (D.C. Cir. Aug. 25, 2020).

detention—they are set up to hold asylum seekers for up to 72 hours.  (*See* Admin. R. at AR618.)  As a result, CBP facilities generally lack beds and other living amenities (*see id.* at AR444), and the holding-cell lights are kept on 24 hours a day, seven days a week (*see id.* at AR447).  According to Plaintiffs' complaint, CBP facilities also do not permit "in-person" visits with detainees (Compl. ¶¶ 7, 9), and the detained individuals only have access to telephones for "approximately 30 minutes to one hour to call family members or retained counsel, or to call prospective attorneys from a limited list provided by CBP" (*id.* ¶ 8).  Plaintiffs allege that "[t]here is no callback number or other means" to return a phone call (*see id.*), and that CBP does not provide a mechanism for attorneys to locate, or otherwise verify the location of, a client detained in CBP custody (*see id.* ¶ 7).

### C.    Factual Background

The organizational plaintiff in this case, Las Americas Immigrant Advocacy Center ("Las Americas"), is a non-profit legal aid organization with a mission that "includes providing consultation and legal services to noncitizens detained by the federal government in the El Paso area, including by representing individuals through the credible fear interview process through a staff of four attorneys and three legal assistants."  (*Id.* ¶ 30.)  Las Americas contends that PACR and HARP have frustrated this mission because the organization's attorneys have been "unable to communicate with prospective clients in PACR and HARP, whether telephonically or in person, prior to their credible fear interview or immigration judge review."  (*Id.* ¶ 114.)  The ten individual Plaintiffs (four adults and their six children) are asylum seekers who were detained in CBP custody and placed into the PACR or HARP programs during the

credible fear process; each was removed from the United States after an asylum officer found that he or she lacked a credible fear of persecution.  (*See* Pls.' Mot. at 18.)

The individual Plaintiffs have submitted a series of declarations that recount the alleged circumstances of their experiences during the asylum application process, including the difficulties each Plaintiff, or family, allegedly encountered in trying to contact an attorney in order to prepare for the credible fear interview.  For example, Plaintiff A.R.R.D.—who avers that she fled El Salvador with her minor son, Plaintiff L.E.R.D., and arrived in the United States on October 8, 2019—was allegedly given a list of attorneys' phone numbers and thirty minutes to use a phone on October 11, 2019, prior to her credible fear interview.  (*See* Decl. of A.R.R.D., Ex. B to Pls.' Mot. for Prelim. Inj., ECF No. 21-5, ¶¶ 10–11, 13.)  When no attorneys answered her calls, A.R.R.D. called her sister-in-law.  (*Id.* ¶ 13.)  A.R.R.D. talked to an asylum officer for four hours over the phone to conduct the credible fear interview on October 13, 2019, while she was still detained in a CBP facility.  (*See id.* ¶ 14.)  A.R.R.D. avers that she felt she was not prepared for the interview, and that she did not have "a fair chance to explain the danger [she] was fleeing[.]"  (*Id.* ¶ 16.)  A.R.R.D. further maintains that she had no opportunity to recover from her "grueling trip" and was forced "to sleep on the freezing floor in horrible conditions" prior to her interview.  (*Id.*)  A.R.R.D. also allegedly had to hold her crying baby during the interview itself, because there was no place to set her baby down or anyone who could help by holding the child.  (*Id.* ¶ 17.)  A.R.R.D. learned the day after she spoke with the asylum officer that she "had not passed the interview" (*id.* ¶ 19), and she then sought review of her negative credible fear determination from an immigration judge, which was held over the phone on

October 17, 2019 (*see id.* ¶ 20).  On October 18, 2019, A.R.R.D. was told that she and her son were going to be deported.  (*See id.* ¶¶ 25–26.)

Plaintiff A.S.C.R.—A.R.R.D.'s sister, who also fled from El Salvador with her immediate family members—had an allegedly similar experience.  (*See* Compl. ¶ 20.) A.S.C.R., Plaintiff K.M.V. (A.S.C.R.'s husband), and their child, Plaintiff F.B.G.C., entered the United States on October 8, 2019.  (*See* Suppl. Decl. of A.S.C.R. ("A.S.C.R. Decl."), Ex. S to Pls.' Mot. for Summ. J., ECF No. 35-6, ¶ 9; Decl. of K.M.V., Ex. E to Pls.' Mot. for Prelim. Inj., ECF No. 21-8, ¶ 9.)  The family was immediately detained in a CBP facility, where A.S.C.R. and F.B.G.C. were separated from K.M.V.  (*See* A.S.C.R. Decl. ¶ 11.)  On October 10, 2019, A.S.C.R. was allegedly taken to a room with a phone and given a list of attorneys and 30 minutes in which to make any calls. (*See id.* ¶ 13.)  A.S.C.R. contends that after trying to call two attorneys on the list and receiving no response, she instead called her sister-in-law.  (*See id.* ¶ 15.)  The next day, an asylum officer conducted a five-hour interview with the family over the phone. (*See id.* ¶ 17.)  A.S.C.R. describes the interview as "very confusing" because she thought she would have the opportunity to present her case in person; she had trouble understanding the interpreter's Spanish; and her baby "would not stop crying" which "made it very difficult to concentrate[.]"  (*Id.* ¶¶ 17–19.)  A.S.C.R. also avers that she "was not adequately prepared" for the interview.  (*Id.* ¶ 19.)  When A.S.C.R. and K.M.V. learned that they "had not passed the [credible] fear interview[,]" they requested a review of the negative credible fear determination by an immigration judge. (*Id.* ¶ 21.)  On October 18, 2019, the family had a call with an immigration judge that lasted approximately "five minutes[,]" at the conclusion of which the judge informed

the family that he was affirming the asylum officer's determination.  (*Id.* ¶ 22.)
Thereafter, the family learned that they would be deported.  (*See id.* ¶ 30.)

Plaintiff B.G.R. and her four children—Plaintiffs B.C.F.G., D.M.F.G., J.M.F.G.,
and S.F.G.—left Mexico and entered the United States on November 20, 2019, to seek
asylum.  (*See* Decl. of B.G.R., Ex. C to Pls.' Mot. for Prelim. Inj., ECF No. 21-6, ¶ 10.)
Upon entry, B.G.R. and her children were detained in a CBP facility pursuant to the
HARP program.  (*See id.* ¶¶ 10, 14.)  The next day, B.G.R. was given a phone and a list
of attorneys' phone numbers, and was told that she had an hour to make calls.  (*See id.*
¶ 15.)  B.G.R. attempted to call "several" of the phone numbers, but "no one answered
[her] calls[,]" and after being unable to reach any family members, she left the room
after "approximately 15 minutes[.]"  (*Id.*)  On November 22, 2019, B.G.R. had a
credible fear interview with an asylum officer, which was conducted over the phone and
lasted approximately two hours.  (*See id.* ¶¶ 16–17.)  B.G.R. was informed that she had
"failed [her] interview" the following day (*id.* ¶ 19), and although she was informed
that she could appeal to an immigration judge, she was also told that she would have to
remain detained during the pendency of her appeal (*id.*).  B.G.R. declined to appeal
allegedly due to a concern over her children's health in light of the conditions of their
detention.  (*See id.*)

The individual Plaintiffs contend that by virtue of the detention facilities'
constraints on their access to counsel, they were not able to get assistance in preparing
for their credible fear interviews, and as a result, they were erroneously found not to
have a credible fear of persecution and were removed back to their home countries.
(*See* Pls.' Mot. at 19–20.)

### D.      Procedural Background

Plaintiffs filed the complaint in the instant case on December 5, 2019, exactly 59 days after DHS issued the PACR memorandum.  As noted above, the complaint makes six claims concerning the alleged unlawfulness of PACR and HARP.  Claim One, Claim Two, and Claim Three allege that PACR and HARP violate statutory or regulatory provisions that provide either a right to consult with a person of an asylum seeker's choosing or an affirmative right to counsel.  (*See* Compl. ¶¶ 200–06 (alleging violations of 8 U.S.C. §§ 1225(b)(1)(B)(iv), 1362; 8 C.F.R. § 208.30(d)(4); and 5 U.S.C. § 555(b)).)  Claim Four alleges that, in promulgating PACR and HARP, Defendants acted arbitrarily and capriciously in violation of the APA.  (*See id.* ¶¶ 207–08.)  Claim Five asserts that PACR and HARP unlawfully frustrate asylum seekers' ability to secure asylum, withholding of removal, or protections under the Convention Against Torture (*see id.* ¶ 209), and Claim Six alleges that PACR and HARP violate asylum seekers' rights under the Due Process Clause of the Fifth Amendment to the United States Constitution (*see id.* ¶¶ 210–13).  Plaintiffs seek declaratory and injunctive relief, including an order vacating the individual Plaintiffs' removal orders and an injunction against any application of the PACR and HARP programs.  (*See id.*, Prayer for Relief, ¶¶ 1–5.)  Plaintiffs also seek relief broadly on behalf of persons who have been subject to PACR and HARP, including an order enjoining Defendants to provide people previously subject to PACR and HARP new credible fear evaluations and requiring that such persons be returned to the United States at no expense.  (*See id.* ¶¶ 6–7.)

Plaintiffs originally filed a motion for a preliminary injunction (*see* Pls.' Mot. for Prelim. Inj., ECF No. 21), which the Court converted into an expedited cross-motion for summary judgment by consent of the parties (*see* Joint Proposed Briefing Schedule,

ECF No. 25; Min. Order of Jan. 7, 2020).  The parties then proceeded to briefing, and

their summary judgment motions ripened on February 15, 2020.  (*See* Pls.' Mot.; Defs.'

Mot.; Pls.' Opp'n to Defs.' Cross-Mot. for Summ. J. and Reply in Supp. of Pls.' Mot.

for Summ. J. ("Pls.' Reply"), ECF No. 57; Defs.' Reply in Supp. of Defs.' Cross-Mot.

for Summ. J. ("Defs.' Reply"), ECF No. 59.)[7]  Along with their cross-motion for

summary judgment, Defendants also filed a motion to strike the attachments to

Plaintiffs' motions for a preliminary injunction and for summary judgment, contending

that much of the material was extra-record evidence outside of the administrative

record.  (*See* Defs.' Mot. to Strike, ECF No. 51.)[8]  Plaintiffs filed a memorandum in

opposition to the motion to strike on February 13, 2020 (*see* Pls.' Opp'n to Mot. to

Strike, ECF No. 56), and Defendants filed a reply on February 15, 2020 (*see* Defs.'

Reply to Opp'n to Mot. to Strike, ECF No. 58).  The Court held a hearing on the

---

[7] Three organizations and one U.S. Senator filed amicus briefs in support of Plaintiffs: Innovation Law Lab (*see* ECF No. 45); American Immigration Council and American Immigration Lawyers Association (*see* ECF No. 46); and Senator Ron Wyden (*see* ECF No. 48).

[8] The parties' briefs regarding the motion to strike concern the fact that Plaintiffs have submitted additional materials outside of the administrative record, including declarations from the individual Plaintiffs and documents prescribing standards for ICE detention facilities, in support of their motions for a preliminary injunction and for summary judgment.  (*See generally* Exs. A–R to Pls.' Mot. for Prelim. Inj., ECF Nos. 21-2–21-21; Exs. A–C to Pls.' Mot. for Leave to File Under Seal, ECF Nos. 22-1–22-3; Exs. S–W to Pls.' Mot. for Summ. J., ECF Nos. 35-5–35-9.)  Plaintiffs assert that this extra-record evidence "is necessary to evaluate Plaintiffs' argument that failing to acknowledge or consider these prior policies and important factors" involving detention in ICE custody "is arbitrary and capricious" under the APA.  (Pls.' Opp'n to Defs.' Mot. to Strike, ECF No. 56, at 9.)  Plaintiffs also argue that "extra-record evidence is also relevant to numerous issues that are independent of APA analysis[,]" such as "to establish standing, in support of their due process claim, and to show their entitlement to injunctive relief beyond vacatur of the challenged policy."  (*Id.*)  Defendants have moved to strike these documents because, "[u]nder the APA, the district court's review of merits issues must be based on the record the agency presents to the reviewing court."  (Defs.' Mem. in Supp. of Mot. to Strike Evidence Outside of Admin. R., ECF No. 51-1, at 4 (internal quotation marks and citation omitted).)  Ultimately, the Court relies only on the individual Plaintiffs' declarations, in conjunction with its analysis of the individual Plaintiffs' Article III standing, which is entirely permissible.  *See Sierra Club v. E.P.A.*, 292 F.3d 895, 899 (D.C. Cir. 2002).  Moreover, the Court concludes that Plaintiffs' extra-record evidence does not advance their arbitrary-and-capricious claim under the APA, for the reasons explained in footnote 16 (Part III.C.2, *infra*), and thus it has not relied on any such evidence in connection with its evaluation of that argument.  Accordingly, Defendants' motion to strike evidence outside of the administrative record is **GRANTED IN PART AND DENIED IN PART**.

parties' motions on February 18, 2020.  (*See* Min. Entry of Feb. 18, 2020.)

## II.   LEGAL STANDARDS

In the normal course, summary judgment may be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits [or declarations] show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as matter of law." *Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 719 F. Supp. 2d 26, 31–32 (D.D.C. 2010) (citing Fed. R. Civ. P. 56), *aff'd*, 663 F.3d 476 (D.C. Cir. 2011).  A factual dispute is not alone sufficient to bar summary judgment, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); instead, a dispute must be both material, in that it "might affect the outcome of the suit[,]" *id.* at 248, and genuine, in that "the evidence presents a sufficient disagreement to require submission to a jury[,]" *id.* at 251–52.

When a plaintiff invokes the APA to seek review of an administrative agency's decision, however, she ordinarily presents a pure question of law, and thus, the standard articulated in Federal Rule of Civil Procedure 56 is inapplicable.  *See Wilhelmus v. Geren*, 796 F. Supp. 2d 157, 160 (D.D.C. 2011).  Rather, in the APA context, "it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Catholic Health Initiatives v. Sebelius*, 658 F. Supp. 2d 113, 117 (D.D.C. 2009) (internal quotation marks and citations omitted).  "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise

consistent with the APA standard of review." *Wilhelmus*, 796 F. Supp. 2d at 160 (citation omitted).

Summary judgment is also the means by which a district court resolves the dispute "if a plaintiff alleges that an agency has engaged in conduct that directly contravenes a substantive statute that has a cause of action for that violation—such as claims brought under section 1252(e)(3) of the INA for agency conduct that is 'not consistent with applicable provisions of this subchapter [of the INA] or is otherwise in violation of law[.]'" *Kiakombua*, 2020 WL 6392824, at *12 (quoting 8 U.S.C. § 1252(e)(3)(A)(ii)). In that circumstance, the "legal authorities are binding on both the court and the agency, and the court will analyze them to determine which party, if any, is entitled to judgment as a matter of law with respect to the plaintiff's challenge to the agency's administrative action." *Id.*

## III. ANALYSIS

The clear gravamen of Plaintiffs' complaint is that Defendants' policy of detaining noncitizens in facilities run by CBP prior to their credible fear interviews violates the INA, the APA, and the Due Process Clause, because persons detained in CBP custody have limited opportunities to consult with a person of their choosing during the credible fear interview process. (*See* Compl. ¶ 1.) This Court has no doubt that asylum seekers who are faced with difficult detention circumstances such as those that the individual Plaintiffs have recounted are severely limited in their ability to locate and communicate with counsel, and it might well be next to impossible for them to otherwise prepare for the critical credible fear assessment. Unfortunately for Plaintiffs, however, the only question for the Court at this juncture is whether

Defendants' decision to place noncitizens who have been designated for expedited removal in such challenging straits contradicts the will of Congress as expressed in applicable statutes or the Constitution?  And this Court cannot conclude as much, for the reasons explained fully below.

The short version is that, as this Court has explained elsewhere, when Congress amended the INA to establish expedited removal, it unquestionably intended to permit the government to remove certain noncitizens from the United States expeditiously.  *See Kiakombua*, 2020 WL 6392824, at *4–5; *MTRNY I*, 405 F. Supp. 3d at 13–15; *see also MTRNY II*, 962 F.3d at 618.  And under the procedures that Congress adopted for the new expedited removal process, persons who are properly designated for such treatment are distinguishable *precisely because* persons who fit within the designated expedited removal categories and who lack a credible fear of persecution can be removed from the United States "without further hearing or review" or any other pre-removal process.  8 U.S.C. § 1225(b)(1)(A)(i); *see also id*. § 1225(b)(1)(B)(iii)(I).  It is also clear that Congress intended for the credible fear interview to be a mere initial screening assessment, *see Thuraissigiam*, 140 S. Ct. at 1965, and although interviewees have the right to consult with a person of their choosing prior to being questioned, 8 U.S.C. § 1225(b)(1)(B)(iv), established law plainly provides that "[s]uch consultation shall be made available in accordance with the policies and procedures of the detention facility where the alien is detained," 8 C.F.R. § 235.3(b)(4)(ii).

As such, in this Court's view, the statutory scheme that Congress has enacted does not guarantee or necessarily facilitate extensive pre-interview preparation by noncitizens who are subject to expedited removal.  Thus, it is not inconsistent with the

INA, its regulations, or any other authority that Plaintiffs have identified for DHS to implement a detention-placement policy that indirectly impacts a noncitizen's ability to reach or retain legal counsel prior to the credible fear interview, nor is it arbitrary for the agency to prioritize efficient processing of the asylum requests of noncitizens subject to expedited removal, at the expense of such individuals' ability to build a case for asylum during the initial stage of the process.  Moreover, the Supreme Court has long held that noncitizens seeking initial entry to the United States lack due process rights regarding their applications—a conclusion that is binding on the parties and this Court.  Consequently, although the Court rejects Defendants' threshold arguments concerning the non-justiciability of Plaintiffs' legal claims, it concludes that Plaintiffs' statutory and constitutional contentions fail on the merits.

**A.**     **Plaintiffs' Claims Are Not Non-Justiciable**

Defendants argue, as a threshold matter, that this Court lacks the power to reach the merits of Plaintiffs' claims for three reasons: (1) because Plaintiffs' challenge to PACR and HARP does not satisfy the jurisdictional requirements of section 1252(e)(3) (*see* Defs.' Mot. at 25), (2) because no Plaintiff has Article III standing (*see id.* at 27–33), and/or (3) because all of the complaint's claims are now moot (*see* Defs.' Notice of Suppl. Authority at 1).  The Court disagrees with each of Defendants' contentions for the reasons that follow.

1.     The INA Preserves This Court's Subject-Matter Jurisdiction Over Plaintiffs' Challenge

First of all, the weight of authority in this judicial circuit now strongly supports the conclusion that section 1252(e)(3) of the INA preserves this Court's subject-matter jurisdiction over Plaintiffs' claims under section 1331.  Specifically, relying on the

express terms of section 1252(e)(3), courts in this circuit have found that if a plaintiff is challenging a written policy or procedure that implements the expedited removal statute (section 1225(b)) and brings such challenge in the U.S. District Court for the District of Columbia within the 60-day window that section 1252(e)(3) establishes, there is subject matter jurisdiction to review the plaintiff's claims.  *See, e.g.*, *Grace v. Barr*, 965 F.3d 883, 891–94 (D.C. Cir. 2020); *MTRNY II*, 962 F.3d at 623–31; *Kiakombua*, 2020 WL 6392824, at *17–20; *see also* 8 U.S.C. § 1252(e)(3)(A)–(B).

That is precisely the kind of challenge that Plaintiffs have brought in the instant case.  The complaint clearly assails written policy directives of DHS—both PACR and HARP are memorialized in writing (*see* Admin. R. at AR636–47)—and those directives provide instructions for the implementation of the credible fear process with respect to certain noncitizens detained within CBP facilities.  In addition, Plaintiffs filed the instant lawsuit within 60 days of the first implementation of PACR, and they did so in the District Court for the District of Columbia, thereby satisfying all of the statutory criteria.[9]

Moreover, and notably, the D.C. Circuit has now considered—and rejected— each of the primary arguments concerning the absence of subject-matter jurisdiction that Defendants make here.  (*See* Defs.' Mot. at 24–27.)  Indeed, it is by now well established that there is no legal basis for Defendants' contention that section 1252(e) authorizes judicial review only in a circumstance in which the plaintiff has undergone a

---

[9] In response to Defendants' concern that certain aspects of the PACR and HARP program for expedited removals were in place prior to 60 days before the initiation of the lawsuit (*see* Defs.' Mot. at 26), Plaintiffs have clarified that they are not challenging the conditions of confinement or the 24-hour period of consultation prior to the credible fear interview, both of which were implemented prior to the 60-day window (*see* Pls.' Reply at 13).

"determination" in addition to DHS's implementation of a policy or procedure concerning the expedited removal system.  *See MTRNY II*, 962 F.3d at 625–27.  The D.C. Circuit has also confirmed that section 1252(a)(2)(A) does not strip the district courts of jurisdiction under section 1331 under the circumstances presented in this case.  *See MTRNY II*, 962 F.3d at 624–28; *Grace*, 965 F.3d at 894.

To the extent that Defendants further maintain that PACR and HARP do not qualify as the types of written policies that give rise to subject-matter jurisdiction under section 1252(e)(3) because they "implement" section 1231(g) of Title 8 rather than section 1225(b) (*see* Defs.' Mot. at 26–27), that argument mischaracterizes those policies, and is, therefore, unpersuasive.  In section 1231(g) of Title 8, Congress instructs the agency to "arrange for appropriate places of detention for aliens detained pending removal or a decision on removal[,]" 8 U.S.C. § 1231(g)(1), but it is clear beyond cavil that DHS was undertaking to do much more than that when it crafted PACR and HARP.  The memoranda that establish those programs explicitly express the agency's intent to address "the implementation of each removal pathway" that federal law identifies (Admin. R. at AR637), including "outlin[ing] a proof of concept on the more effective processing of aliens amendable [sic] to the [Transit Rule] as a pilot" (*id*. at AR640).  What is more, DHS generally clarified that "[i]n order for this pilot to be successful," various DHS sub-agencies must "commit to providing the appropriate resources and guidance necessary to implement the processes" described.  (*Id.*)

Thus, the documents that establish these pilot programs unquestionably "outline the . . . steps for implementing streamlined procedures" for the efficient processing of noncitizens who are subject to expedited removal (*id*. at AR641) in a manner that

relates to section 1225's pre-credible fear interview detention requirement and that therefore gives rise to this Court's subject matter jurisdiction under section 1252(e)(3). *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(IV).  And to the particular point that Defendants have raised: the fact that PACR and HARP *also* arguably pertain to section 1231(g) does not divest the Court of the authority to consider Plaintiffs' challenge to these written policies under section 1252(e)(3), as Defendants maintain.  *Cf. Grace*, 965 F.3d at 892 (rejecting a similar argument that a guidance document did not "implement" section 1225(b) because it pertained to section 1158).

### 2.    The Individual Plaintiffs Have Article III Standing

Defendants' standing argument primarily focuses on refuting Las Americas' claim that it has organizational or third-party standing.  (*See* Defs.' Reply at 9–13.)  But only one plaintiff needs Article III standing in order for a claim to be justiciable.  *See Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2379 n.6 (2020) (concluding that the Third Circuit had "erred by inquiring into [one of the plaintiff's] independent Article III standing[,]" where another plaintiff "clearly had standing to invoke the Third Circuit's appellate jurisdiction, and both [plaintiffs] asked the court" for the same relief).  And this Court has little doubt that the individual Plaintiffs here—each of whom was previously detained in CBP custody pursuant to PACR or HARP, and was removed to his or her home country after an asylum officer found that he or she lacked a credible fear of persecution in the wake of a credible fear interview—have standing to sue, largely for the reasons that the Court explained in *Kiakombua*.  *See Kiakombua*, 2020 WL 6392824, at *13–15.

In sum, "it is well established that a plaintiff has standing to bring a claim concerning a procedural injury if she can show that the agency failed to abide by a

procedural requirement that was 'designed to protect some threatened concrete interest' of the plaintiff." *Id.* at *13 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573 n.8 (1992)).  The individual Plaintiffs aver that their unlawful placement in CBP custody pursuant to PACR or HARP prevented them from consulting with an attorney and adequately preparing for their credible fear interviews, which purportedly contributed to their negative credible fear determinations and subsequent deportations.  (*See, e.g.*, A.R.R.D. Decl. ¶¶ 11–20; A.S.C.R. Decl. ¶¶ 9–22; B.G.R. Decl. ¶¶ 10–19.)  Thus, assuming *arguendo* that the INA and its implementing regulations required the individual Plaintiffs to be detained in a facility that permitted them greater access to counsel, as Plaintiffs maintain (*see* Compl. ¶¶ 200–06), the alleged circumstances of the individual Plaintiffs' detention was a procedural violation that provides a sufficient basis to ground their subsequent deportation harm, because there is a substantial connection between the claimed violation and the individual Plaintiffs' removal.  *See Kiakombua*, 2020 WL 6392824, at *14 (noting that "[a] plaintiff who alleges a deprivation of a procedural protection to which he is entitled" need only "show that the procedural step *was connected to* the substantive result" (quoting *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 94–95 (D.C. Cir. 2002))).

Accordingly, Defendants are mistaken to suggest that there must be "evidence that an attorney could have helped *the specific individual Plaintiffs here*[.]"  (Defs.' Reply at 14 (emphasis in original); *see also id.* (insisting that both the individual Plaintiffs from El Salvador and Mexico lacked Article III standing, because the Salvadorans "were categorically ineligible for asylum" and the Mexicans "waived immigration-judge review of their negative credible-fear determination").)  This line of

25

reasoning, which sounds in lack of traceability and/or redressability (*see* Defs.' Mot. at 32–33; *see also* Defs.' Reply at 16 (asserting that "Plaintiffs . . . must show that but for PACR and HARP, their credible-fear interview results would be different")), ignores the alleged *procedural* violation at issue, insofar as it evaluates the injury by assessing whether any of the individual Plaintiffs could have successfully established that they had a credible fear.  Instead, it suffices under the circumstances presented here that asylum seekers have a procedural right to consult with a person of their choosing, *see, e.g.*, 8 U.S.C. § 1225(b)(1)(B)(iv), and that such right pertains to Plaintiffs' concrete interest in avoiding removal and potential persecution in their home countries, *see, e.g.*, H.R. Rep. No. 104-469, pt. 1, at 158 (1996) (explaining that, under the credible fear process, "there should be no danger that an alien with a genuine asylum claim will be returned to persecution"); *L.M.-M.*, 442 F. Supp. 3d at 20 ("It is difficult to imagine an interest more 'particularized' than a person's interest in seeking asylum and avoiding the risk of deportation.").  Plaintiffs have alleged that, as a result of being held in CBP custody, they were denied this procedural right, which resulted in a negative credible fear determination and deportation.  (*See* Pls.' Reply at 14.)  Therefore, they have sufficiently identified an alleged procedural violation that relates to their concrete interest in obtaining asylum such that it qualifies as a cognizable injury-in-fact.[10]

The Court also finds that, in addition to demonstrating a connection between the procedural requirement and the substantive result, *see L.M.-M.*, 442 F. Supp. 3d at 20–

---

[10] Defendants' insistence that Plaintiffs suffered no procedural injury for standing purposes given that there is no statutory or constitutional right to counsel (*see* Defs.' Reply at 15–16) is unavailing, both because it is does not address the alleged violation of the Plaintiffs' statutory right to consult with a person of their choosing, *see* 8 U.S.C. § 1225(b)(1)(B)(iv), and because denying the alleged procedural violation begs the question of the merits of Plaintiffs' legal claims, which must be assumed at the standing analysis juncture, *see City of Waukesha v. E.P.A.*, 320 F.3d 228, 235 (D.C. Cir. 2003).

21, Plaintiffs have done enough to fulfill the traceability requirement of showing a "substantial probability" that the agency action caused the alleged injury, *Ctr. for Biological Diversity v. E.P.A.*, 861 F.3d 174, 184 (D.C. Cir. 2017) (citation omitted). The adult individual Plaintiffs aver that, because they were unable to consult with a person of their choosing (an attorney) prior to their credible fear interviews, they felt unprepared for and confused by the interview that was the basis for their negative credible fear determinations. (*See* A.R.R.D. Decl. ¶¶ 13, 16, 18; A.S.C.R. Decl. ¶¶ 15, 17, 19; B.G.R. Decl. ¶¶ 15, 17.) In addition, the complaint cites statistics that establish that there is a significant reduction in removal outcomes when asylum seekers *are* afforded counsel (*see* Compl. ¶ 102), which provides support for the conclusion that there is a substantial probability that DHS's violation of the consultation right in these Plaintiffs' individual cases contributed to the negative credible fear determinations that led to their subsequent expedited removal. (*See also* Pls.' Mot. at 20–22 (describing how counsel aid asylum seekers in preparing for credible fear interviews).)

It is also reasonably clear that, under the "relaxed redressability requirement[,]" Plaintiffs need only show that the agency's decision *could be* altered as a result of compliance with the procedural requirement. *Ctr. for Biological Diversity*, 861 F.3d at 185 (citation omitted). The individual Plaintiffs' declarations explain the challenges each of them endured when asylum officers interviewed them, including, in particular, their inability to communicate effectively, their confusion that the interview was not being held in person, and their belief that evidence they had brought with them was not before the asylum officer during their interview. (*See, e.g.*, A.R.R.D. Decl. ¶¶ 15–16; A.S.C.R. Decl. ¶¶ 17, 19; B.G.R. Decl. ¶ 17.) Thus, it is at least possible that, if the

individual Plaintiffs had been able to communicate with counsel ahead of their credible fear interviews, they would have altered their approaches such that the outcome of the interview might have been different, which is all that is required to satisfy the "undemanding" redressability requirement in the context of a legal claim that is brought by a plaintiff whose Article III standing is predicated on a procedural injury.  *L.M.-M.*, 442 F. Supp. 3d at 21.

        3.    <u>Defendants Have Not Shown That Plaintiffs' Claims Are Moot</u>

Defendants' mootness argument fares no better.  "The initial 'heavy burden' of establishing mootness lies with the party asserting a case is moot," *Honeywell Int'l, Inc. v. Nuclear Regul. Comm'n*, 628 F.3d 568, 576 (D.C. Cir. 2010), and the mootness contention that Defendants make here hinges on the fact that one aspect of the PACR and HARP programs—the 24-hour consultation policy—has already been set aside, *see L.M.-M.*, 442 F. Supp. 3d at 37, and that DHS has both voluntarily dismissed its appeal in that case and reverted to the prior consultation period of at least 48 hours.  (*See* Defs.' Notice of Suppl. Authority at 1.)  Defendants argue that, because "the 24-hour consultation policy [that] was a central part of the PACR and HARP programs" is no longer in effect, it is "impossible for this Court to assess the lawfulness of PACR and HARP as challenged in the complaint and presented to the Court in the government's administrative record."  (*Id.*; *see also* Defs.' Resp. to Ct.'s Apr. 23, 2020 Min. Order, ECF No. 63, at 5–10.)  But Defendants do not adequately explain *why* that is so.

Indeed, Defendants provide no authority for the suggestion that the invalidation of one aspect of an agency's new policy renders challenges to other non-invalidated parts of that agency action moot.  And, here, according to Plaintiffs, the 24-hour consultation policy was *not* the "fundamental problem" with PACR and HARP; instead,

the core issue is that, "by keeping asylum seekers in CBP facilities, where communication with the outside world is nearly impossible and inside which no attorney can ever step foot," Defendants have deprived noncitizens of "*any* meaningful opportunity for consultation[,]" allegedly in violation of the law.  (Pls.' Resp. to Defs.' Suppl. Br. Pursuant to Ct.'s Apr. 23, 2020 Min. Order, ECF No. 65, at 2–3 (emphasis added).)  Thus, in Plaintiffs' view, whether the uncounseled consultation period lasts 24 or 48 hours simply "does not matter" for purposes of Plaintiffs' claim.  (*Id.* at 3.)

From the standpoint of evaluating Defendants' mootness argument, this Court agrees.  Regardless of the *L.M.-M.* litigation and the agency's voluntary cessation of PACR and HARP's 24-hour consultation requirement, Defendants are apparently still housing certain noncitizens in CBP facilities during the credible fear review process, and Plaintiffs' complaint is challenging *that* detention-related policy on the grounds that it allegedly has detrimental ramifications with respect to access to counsel.  (*See* Compl. ¶¶ 73–102.)  Consequently, Defendants have not carried their burden of showing that Plaintiffs' claims are moot.

### B.    DHS's New Detention-Placement Policy Is Not Inconsistent With Any Provision Of The INA Or Its Implementing Regulations, Nor Does It Violate Any Other Statute Or Convention Concerning Asylum

Finding no threshold impediment to considering Plaintiffs' legal claims, the Court now turns to an evaluation of the merits of the claims that Plaintiffs have brought in this case.  To start, it is important to reiterate that the policy decision that Plaintiffs are challenging pursuant to 8 U.S.C. § 1252(e)(3) is Defendants' determination that certain noncitizens awaiting credible fear interviews will be detained in CBP custody rather than ICE custody, per the requirements of the pilot programs known as PACR and HARP, and to emphasize that, according to Plaintiffs, this detention-placement

decision violates the law in several respects.[11]   In this section of the instant Memorandum Opinion, the Court addresses Plaintiffs' claims that housing noncitizens in CBP custody conflicts with the INA and its implementing regulations, as well as other provisions of law concerning the granting of asylum, including the Convention Against Torture.   (*See* Compl. ¶¶ 200–06 (First, Second, and Third Claims); *id.* ¶ 209 (Fifth Claim).)

    To evaluate these claims properly, the Court must apply two related doctrines of deference to agencies' interpretations of the law.  First, to the extent that Plaintiffs are challenging Defendants' interpretation of certain statutory provisions, the Court asks "whether Congress has directly spoken to the precise question at issue[,] . . . for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress[,]" *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43 (1984), and "if the statute is silent or ambiguous with respect to the specific issue, the question for the court [becomes] whether the agency's answer is based on a permissible construction of the statute[,]" *id.* at 843.  If, instead, Plaintiffs are challenging the Defendants' interpretation of the DHS regulations that implement certain statutes, then the Court asks whether the regulation is "genuinely" or "truly" ambiguous, "even after a court has resorted to all the standard tools of interpretation[,]"

---

[11] This clarification is crucial, because Plaintiffs spend a significant portion of their briefing discussing the allegedly superior conditions that detainees are afforded when they are housed in ICE facilities (*see, e.g.*, Pls.' Mot. at 13–17, 24–28); yet, notwithstanding the relative virtues of the ICE housing system, the legal question raised by the claims in Plaintiffs' complaint is whether Defendants' decision to detain noncitizens in CBP custody pending their credible fear review *is unlawful*.  This Court's analysis must be confined to *that* determination, despite the perceived benefits of detaining such individuals elsewhere. *Cf. U.S. Telecom Ass'n v. F.C.C.*, 825 F.3d 674, 697 (D.C. Cir. 2016) (observing that courts "do not inquire as to whether the agency's decision is wise as a policy matter" and "are forbidden from substituting [their] judgment for that of the agency" (internal quotation marks and citation omitted)).

*Kisor v. Wilkie*, 139 S. Ct. 2400, 2414–15 (2019), and if it is, then the general question for the Court becomes whether the agency's interpretation is "reasonable" or "within the zone of ambiguity the court has identified after employing all its interpretive tools[,]" *id*. at 2415–16.  If so, the Court must also inquire "into whether the character and context of the agency interpretation entitles it to controlling weight[,]" *id*. at 2416, including whether the agency's interpretation reflects the agency's "fair and considered judgment" or whether it creates "unfair surprise to regulated parties" by "substitut[ing] one view of a rule for another[,]" *id*. at 2417–18 (internal quotation marks and citations omitted).

As explained herein, this Court finds that Congress has not spoken to the detention-placement policy that PACR and HARP adopt, such that there is no direct conflict between that policy and either the text of the INA itself or its implementing regulations.  Moreover, given Congress's clear intentions when it established the expedited removal scheme, the Court further concludes that the challenged detention-placement policy relies upon a reasonable interpretation of the applicable statutory and regulatory provisions.  The Court also finds that the detention-placement determination does not violate any of the provisions of law that "entitle individuals to a meaningful opportunity to apply for asylum, withholding of removal, and CAT relief[.]"  (Compl. ¶ 209.)  Therefore, summary judgment must be granted in Defendants' favor with respect to the Complaint's First, Second, Third, and Fifth Claims.

1.  The INA And Its Implementing Regulations Require That Noncitizens Who Are Subject To Expedited Removal Be Detained, And Congress Has Otherwise Limited Pre-Removal Process With Respect To Such Individuals

As previously explained, the INA and its implementing regulations set out a

comprehensive scheme that governs the detention of noncitizens subject to expedited removal and prescribes certain procedural rights to such individuals.  First, section 1225(b)(1)(B)(iii)(IV) requires the "[m]andatory detention" of "[a]ny alien subject to [expedited removal] . . . pending a final determination of [a] credible fear of persecution and, if found not to have such a fear, until removed."  8 U.S.C. § 1225(b)(1)(B)(iii)(IV); *see also* 8 C.F.R. § 235.3(b)(4)(ii) ("Pending the credible fear determination by an asylum officer and any review of that determination by an immigration judge, the alien shall be detained.").  Second, section 1225(b)(1)(B)(iv) provides that "[a]n alien who is eligible for [a credible fear] interview may consult with a person or persons of the alien's choosing prior to the interview or any review thereof, according to regulations prescribed by the Attorney General[,]" though "[s]uch consultation shall be at no expense to the Government and shall not unreasonably delay the process."  8 U.S.C. § 1225(b)(1)(B)(iv); *see also* 8 C.F.R. §§ 208.30(d)(4) ("The alien may consult with a person or persons of the alien's choosing prior to the interview or any review thereof," and "[a]ny person or persons with whom the alien chooses to consult may be present at the interview and may be permitted, in the discretion of the asylum officer, to present a statement at the end of the interview."), 235.3(b)(4)(ii) ("Prior to the interview, the alien shall be given time to contact and consult with any person or persons of his or her choosing.")  The regulations that implement expedited removal, as referenced in section 1225(b)(1)(B)(iv), further clarify that "[s]uch consultation shall be made available in accordance with the policies and procedures of the detention facility where the alien is detained[.]"  8 C.F.R. § 235.3(b)(4)(ii).  Read together, the text of these provisions provide noncitizens with a right to consultation

while they are detained pending expedited removal, but also plainly establish that the consultation right is subordinate to the expedition that this removal process is designed to facilitate, and that the scope of the right to consult is determined by the facility in which these noncitizens are detained.

Critically, this limited right to consultation in accordance with the policy and procedures of the detention facility also arises only during the threshold credible fear screening phase of the expedited removal process. As explained in Part I.A above, "federal immigration law plainly establishes that, for those noncitizens who are designated for expedited removal[,] . . . applying for asylum is a two-stage process[,]" *Kiakombua*, 2020 WL 6392824, at *4, the first of which is specifically intended to allow for the rapid identification and removal of noncitizens who do not have credible claims for asylum. At the time that it crafted the expedited removal scheme, Congress was unquestionably concerned about the "thousands of aliens [who were] arriv[ing] in the U.S. at airports each year without valid documents and attempt[ing] to illegally enter the U.S.[,]" and it observed, in particular, that "[e]xisting procedures to deny entry to and to remove illegal aliens from the United States [were] cumbersome and duplicative[.]" *MTRNY I*, 405 F. Supp. 3d at 13, 15 (quoting H.R. Rep. No. 104-469, at 107, 158 (1996)) (alterations in original). Consequently, the IIRIRA's expedited removal provisions require certain noncitizens to make a preliminary showing of their potential eligibility for asylum before being placed in full removal proceedings, which "expedite[s] the removal from the United States of aliens who indisputably have no authorization to be admitted to the United States, while providing an opportunity for such an alien who claims asylum to have the merits of his or her claim promptly

assessed by officers with full professional training in adjudicating asylum claims." *Id.*
at 15 (quoting H.R. Rep. No. 104-828, at 209 (1996) (Conf. Rep.)).

The result of this two-step expedited removal system is that noncitizens at the
initial screening stage are necessarily granted fewer procedural protections than
noncitizens undergoing full removal proceedings.  For instance, during formal removal
proceedings, noncitizens are given at least 10 days before their first hearing date to
secure counsel, *see* 8 U.S.C. § 1229(a)(1)(E), (b)(1), and they "have the privilege of
being represented" during those proceedings "by counsel of the alien's choosing[,]" *see
id.* §§ 1229a(b)(4)(A), 1362.  And the text, structure, and legislative history of
IIRIRA's expedited removal provisions make clear that Congress did *not* intend for
such procedural safeguards to apply during the initial credible fear stage of the
expedited removal process.  *See O.A. v. Trump*, 404 F. Supp. 3d 109, 119 (D.D.C. 2019)
(noting that expedited removal "affords considerably less process" than formal removal
proceedings).

2.     The INA Is Silent Regarding Detention Placement With Respect To
       Noncitizens Who Are Subject To Expedited Removal, And Is At
       Most Ambiguous With Respect To Consultation, But There Is No
       Right To Counsel At The Credible Fear Stage

The Court must evaluate Plaintiffs' claim that it violates the INA and its
implementing regulations for DHS to place noncitizens who are subject to expedited
removal in CBP-run facilities that are not equipped for counsel visits during the
credible fear evaluation process with this statutory and regulatory framework in mind.
(*See* Compl., Prayer for Relief, ¶ 1 (challenging those aspects of PACR and HARP that
"requir[e] that individuals and families remain in CBP custody for the duration of their
credible fear proceedings").)  Thus, "the precise question at issue" for purposes of the

agency-deference doctrines, *see Chevron*, 467 U.S. at 842, is whether "Congress has directly spoken to" *where* noncitizens subject to expedited removal are to be detained, *see id*. at 842–43.  And there can be no dispute that, despite mandating detention, *see* 8 U.S.C. § 1225(b)(1)(B)(iii)(IV), the statute is silent as to the placement issue.  Neither Plaintiffs nor Defendants have identified any statutory text, nor has the Court identified any, that would evince a congressional intent to ensure asylum seekers are detained in any particular facility.

Instead, the statute merely entrusts DHS with specific authority to "arrange for appropriate places of detention for aliens detained pending removal or a decision on removal[,]" *id.* § 1231(g)(1), and if government-run detention facilities "are unavailable[,]" or if other facilities that may be "adapted" for detention or "suitably located for detention" are "unavailable for rental," DHS is authorized to "expend" from specified appropriations "amounts necessary to acquire land and to acquire, build, remodel, repair, and operate facilities (including living quarters for immigration officers if not otherwise available) necessary for detention[,]" *id*.  This statutory provision evidently relates to "the government's brick and mortar obligations for obtaining facilities in which to detain aliens[,]" *Reyna ex rel. J.F.G. v. Hott*, 921 F.3d 204, 209 (4th Cir. 2019), and it plainly falls short of unambiguously requiring asylum seekers to be detained in ICE facilities, rather than CBP facilities.  Indeed, if anything, it suggests that Congress was well aware that such noncitizens might be detained in different kinds of facilities, either government owned or otherwise, depending on need and availability.

It appears to be precisely because the INA is silent about detention placement that Plaintiffs have grounded their challenge in another provision of that statute: the requirement that noncitizens who are subject to expedited removal "may consult with a person or persons of the alien's choosing prior to the [credible fear] interview or any review thereof[.]"  8 U.S.C. § 1225(b)(1)(B)(iv).  Plaintiffs contend that this "right to access counsel in credible fear proceedings is a right of *meaningful* opportunity to *meaningfully* access counsel" (Pls.' Mot. at 41; *see also* Pls.' Reply at 44–45), which they say requires "in-person access to attorneys or others and regular telephonic access" to counsel (*see* Pls.' Mot. at 46).  But after employing the "traditional tools of statutory construction," *Chevron*, 467 U.S. at 843 n.9, the Court finds that the statute's right to consult provision is ambiguous, or at least does not unambiguously mandate the specific means of consultation that Plaintiffs propose.

Beginning with the text itself, the INA does not define "consult" or provide any statutory boundaries on what consultation entails.  To the extent that divining whether a term is ambiguous comes from the possibility of multiple interpretations, it is clear that "consult" is susceptible to different meanings—that is, consult might mean an in-person meeting between two people, but it might also mean one or more phone calls.  The statute's statement that a noncitizen who is eligible for a credible fear interview "may" consult with a person of her choosing is also seemingly ambiguous insofar as it could mean that providing such noncitizen an opportunity for such consultation (such as giving her access to a phone and a list of numbers) suffices, or it could indicate that the noncitizen must be placed in a circumstance in which actual contact with a person of her choosing is assured, as Plaintiffs maintain.  And while it is important to "read" the

36

contested provision of a statute, it is crucial to "read on." *MTRNY II*, 962 F.3d at 625 (internal quotation marks, citation, and alteration omitted).  Congress did not *just* provide a right to consultation, it provided a right to "consult with a person or persons of the alien's choosing . . . *according to regulations prescribed by the Attorney General*." 8 U.S.C. § 1225(b)(1)(B)(iv) (emphasis added).  This additional caveat strongly suggests that Congress intended the agency itself to utilize its expertise to determine the scope of the right to consult that the statute prescribes.

Undaunted, Plaintiffs point to two other statutory mandates that they say unambiguously eliminate DHS's prerogative to detain noncitizens who are awaiting expedited removal in facilities that limit their ability to consult with counsel: (1) the statement in the INA that, "[i]n any removal proceedings before an immigration judge . . . , the person concerned shall have the privilege of being represented (at no expense to the Government) by such counsel, authorized to practice in such proceedings, as he shall choose[,]" 8 U.S.C. § 1362, and (2) the APA's requirement that "[a] person compelled to appear in person before an agency or representative thereof is entitled to be accompanied, represented, and advised by counsel[,]" 5 U.S.C. § 555(b).  (*See* Pls.' Mot. at 40–41.)  These provisions are plainly inapposite during the credible fear stage of expedited removal proceedings, for several reasons.

First of all, section 1362 of the INA expressly pertains only to "removal proceedings before an immigration judge," 8 U.S.C. § 1362, and it is clear from the text of the statute that expedited removal proceedings under section 1225(b) are *not* "removal proceedings" within the meaning of section 1362 of the INA.  Indeed, section 1229a of the INA is specifically titled "Removal proceedings[,]" and that section

establishes various procedures that are applicable to such a proceeding, including that an immigration judge "shall administer oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses[,]" *id.* § 1229a(b)(1), and that the noncitizen has the "opportunity to examine the evidence against the alien, to present evidence on the alien's own behalf, and to cross-examine witnesses[,]" *id.* § 1229a(b)(4)(B).  None of those procedures are available when an immigration judge is reviewing an asylum officer's negative credible fear determination in the context of the expedited removal scheme.  *See id.* § 1225(b)(1)(B)(iii)(III) (providing that "[s]uch review shall include an opportunity for the alien to be heard and questioned by the immigration judge").  Furthermore, nowhere in section 1225(b)—the statutory provision governing expedited removal and the credible fear process—does Congress refer to an immigration judge's review of a negative credible fear determination as a "removal proceeding," even though that phrase is otherwise used liberally throughout the INA. Its conspicuous absence in section 1225(b) is plainly indicative of Congress's intent to distinguish expedited removal processes.  *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (citation omitted)).

The text of section 1362 itself further undermines any inference that Congress intended that provision's right to counsel to apply to an immigration judge's review of a negative credible fear determination.  Section 1362 provides a right to counsel in "removal proceedings" *and* in "appeal proceedings before the Attorney General from any such removal proceedings," 8 U.S.C. § 1362, but, in the expedited removal context,

there is no right to appeal from an immigration judge's affirmance of a negative credible fear determination, *see id*. § 1225(b)(1)(C). Thus, an immigration judge's review of a negative credible fear determination (which has no appeal mechanism) cannot be the kind of removal proceeding contemplated by section 1362 (which envisions an appeal from the removal proceeding). *See McDonnell v. United States*, 136 S. Ct. 2355, 2368 (2016) ("Under the familiar interpretive canon *noscitur a sociis*, a word is known by the company it keeps." (internal quotation marks and citation omitted)).

Plaintiffs' invocation of the right to counsel in section 555(b) of the APA is similarly unavailing. In *Ardestani v. I.N.S.*, 502 U.S. 129 (1991), the Supreme Court reaffirmed its prior holding in *Marcello v. Bonds*, 349 U.S. 302 (1955), that, in enacting the INA, Congress "'expressly supersede[d]' the hearing provisions of the APA[.]" *Ardestani*, 502 U.S. at 133 (quoting *Marcello*, 349 U.S. at 310). Although those cases assessed the applicability of the APA to traditional removal proceedings, as they were decided before the expedited removal system was introduced (*see* Pls.' Reply at 48), the reasoning of *Ardestani* and *Marcello* is not limited to proceedings in the traditional removal process; instead, *Ardestani* generally explains that "immigration proceedings . . . are not governed by the APA[,]" and again, as relevant here, "that the INA 'expressly supersedes' the hearing provisions of the APA[.]" *Ardestani*, 502 U.S. at 133 (quoting *Marcello*, 349 U.S. at 310). Because section 1225(b) is a part of the INA, and because proceedings related to expedited removal under section 1225(b) qualify as immigration proceedings, *Ardestani*'s holding precludes application of the APA's counsel provision in the context of the credible fear evaluation process.

The bottom line is this: despite mandating that noncitizens who are awaiting credible fear assessment must be detained and may consult with a person of their choosing during that detention, the INA does not speak to the issue of *where* such persons are to be housed, nor does it establish that such noncitizens have a right to access counsel prior to the credible fear interview.  Therefore, the Court cannot accept Plaintiffs' argument that PACR and HARP's detention-placement policy (which effectively limits access to counsel by housing noncitizens in CBP facilities) conflicts with the INA and the unambiguous will of Congress as expressed in that statute.

3.     The PACR And HARP Detention-Placement Policy Is Both Reasonable And Entitled To Deference

Because the applicable provisions of the INA are silent as to where an asylum seeker subject to expedited removal may be detained, and are at most ambiguous as to the scope of the consultation right during the credible fear screening process, the Court next considers whether PACR and HARP's detention-placement policy "is based on a permissible construction of the statute."  *Chevron*, 467 U.S. at 843.  As explained below, in this Court's view, Defendants' interpretation of the statute to authorize placement in CBP facilities is not unreasonable in light of Congress's clear intent that the expedited removal process be highly truncated and subject to fewer procedural guarantees than formal removal proceedings.

Where the relevant statute is ambiguous or silent on the relevant issue, as is the case with the INA here, the Court looks to the "agency regulations, which are entitled to deference if they resolve the ambiguity in a reasonable manner[,]" and if they, too, are ambiguous, the Court then looks "to the agencies' subsequent interpretation of those regulations."  *Coeur Alaska, Inc. v. Se. Alaska Conservation Council*, 557 U.S. 261,

40

277–78 (2009).  "No matter how it is framed, the question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, whether the agency has stayed within the bounds of its statutory authority."  *District of Columbia v. Dep't of Labor*, 819 F.3d 444, 449 (D.C. Cir. 2016) (emphasis omitted) (quoting *City of Arlington v. F.C.C.*, 569 U.S. 290, 297 (2013)); *see also Kisor*, 139 S. Ct. at 2414–15 (interpretations of regulations).

Here, the implementing regulations provide that "the alien shall be given time to contact and consult with any person or persons of his or her choosing" and that "[s]uch consultation shall be made available in accordance with the policies and procedures of the detention facility where the alien is detained, shall be at no expense to the government, and shall not unreasonably delay the process."  8 C.F.R. § 235.3(b)(4)(ii). Under PACR and HARP, an asylum seeker's consultation with a person of his or her choosing is available in accordance with the policies and procedures of the CBP facilities where noncitizens who are subject to those programs are detained, and while CBP facilities do not allow in-person visitation, consultation is available telephonically. (*See* Admin. R. at AR641 (concerning PACR), AR645 (concerning HARP).)  The PACR guidance document specifically states that asylum seekers shall have access to telephones "as often as operationally feasible" to "consult with any person of their choosing, including an attorney" (*id.* at AR641), and that "[t]he alien's consultant or attorney may participate in the interview telephonically" (*id.* at AR642).  Similarly, the HARP guidance document requires that asylum seekers have an "opportunity to contact an attorney" through an initial one-hour period for telephonic consultation, with "30-minute follow-up as needed[,]" and instructs that "[t]he location for consultation calls

must allow sufficient privacy to allow for discussion of confidential matters." (*Id.* at AR645.)  Given the latitude that the INA and its implementing regulations provide, it was reasonable for DHS to conclude that the means of communication with counsel or prospective counsel that are established with the PACR and HARP pilot programs provide noncitizens with a legally sufficient opportunity to consult with others, including a lawyer, before their credible fear interviews or immigration judge review.

Congress's intent in creating the expedited removal system further underscores the reasonableness of the agency's interpretation.  Again, Congress imposed the threshold credible fear "screening interview[,]" *Thuraissigiam*, 140 S. Ct. at 1965, to permit the agency to "quickly identify potentially meritorious claims to protection and to resolve frivolous ones with dispatch[,]" *Kiakombua*, 2020 WL 6392824, at *4 (internal quotation marks and citation omitted).  The credible fear interview is intended to pose a "low bar" for asylum applicants, *Thuraissigiam*, 140 S. Ct. at 1967; thus, the noncitizen need only demonstrate "a significant possibility" that he or she "could establish eligibility for asylum[,]" 8 U.S.C. § 1225(b)(1)(B)(v), not that "he or she *is in fact eligible* for asylum[,]" *Thuraissigiam*, 140 S. Ct. at 1965.  Accordingly, Congress provided for "considerably less process" in expedited removal proceedings than in full removal proceedings, *see O.A.*, 404 F. Supp. 3d at 119, as exemplified by the fact that the statute provides only a limited right during expedited removal to "*consult with* a person or persons of the alien's choosing prior to the [credible fear] interview or any review thereof," *see* 8 U.S.C. § 1225(b)(1)(B)(iv) (emphasis added), whereas noncitizens in full removal proceedings "shall have the privilege of *being represented* . . . by counsel of the alien's choosing" at all stages of the removal proceedings, *see id.*

§ 1229a(b)(4)(A) (emphasis added).  And this clear congressional purpose belies the contention that DHS has exceeded the bounds of its statutory authority in deciding that in-person counsel visits are not statutorily mandated and that the telephone access available at CBP facilities satisfies asylum seekers' limited consultation rights under section 1225(b)(1)(B)(iv).

In addition to the substantive reasonableness of the agency's interpretation, the other factors for determining that deference to the agency's interpretation is proper, *see Kisor*, 139 S. Ct. at 2416–18, support deference here.  The heads of the DHS subcomponent agencies have attached their names to the PACR and HARP guidance documents, which means that these programs have now been implemented by the relevant subcomponent agencies and qualify as the authoritative position of DHS concerning the detention placement of persons who are selected for those programs. *See id.* at 2416 ("[T]he regulatory interpretation must be . . . the agency's 'authoritative' or 'official position[.]'" (citation omitted)).  Similarly, PACR and HARP plainly implicate DHS's "substantive expertise" in the enforcement of the immigration laws, *id.* at 2417, particularly in light of Congress's mandate that asylum seekers be detained pending the credible fear process.  The PACR and HARP detention-placement policy also reflects DHS's "fair and considered judgment"—it is not a "convenient litigating position" or "*post hoc* rationalization[,]" nor is it based on a "new interpretation" of the governing regulations, *see id.* at 2417–18 (citations and alteration omitted); indeed, the agency has held the view that an asylum seeker's ability to consult is determined based upon the policies and procedures of the detention facility since at least 1997, *see Inspection and Expedited Removal of Aliens*, 62 Fed. Reg. 10,312,

10,356 (Mar. 6, 1997).  To be sure, the detention facility for noncitizens who are subject to expedited removal has changed, and thus the scope of the consultation right of such detainees has changed, but DHS has consistently interpreted the agency's statutory and regulatory authority to decide the circumstances under which consultation is to be achieved with respect to noncitizens facing expedited removal.  Therefore, under the circumstances presented here, the agency is owed deference with respect to its determination that PACR and HARP satisfy all statutory and regulatory requirements. *See Kisor*, 139 S. Ct. at 2418; *see also United States v. Mead Corp.*, 533 U.S. 218, 229– 31 (2001) (discussing similar factors in context of agency interpretations of statutes).

Plaintiffs raise only one other argument as to why PACR and HARP are inconsistent with the INA that requires a brief discussion here.  Plaintiffs point out that PACR and HARP do not prescribe a period of consultation *after* a negative credible fear determination and prior to any immigration judge review thereof, and they assert that the INA requires such a period.  (*See* Pls.' Reply at 46–47.  *But see* Hr'g Tr., ECF No. 62, at 75:8–21 (defense counsel explaining that PACR and HARP both require Form M-444 to be provided to asylum seekers, and that Form M-444 informs asylum seekers of their right to consult prior to any immigration judge review).)  The Court observes that the statute does require that asylum seekers have the opportunity to consult with a person of their choosing "prior to the [credible fear] interview or any review thereof," 8 U.S.C. § 1225(b)(1)(B)(iv), and that neither PACR nor HARP expressly mandates a consultation period before the immigration judge review.  But it cannot read the *absence* of an express reference to such a consultation period in PACR and HARP as a *prohibition* of such consultation, and only the latter would qualify as a true conflict for

the purpose of this Court's review.  This is because the Court only has the statutory

authority to determine whether a *written* policy or procedure is inconsistent with the

INA and its implementing regulations, *see id.* § 1252(e)(3)(A)(ii), and to the extent

Plaintiffs ask this Court to find the absence of any particular language to be

inconsistent with the applicable statutory or regulatory schemes, it appears that the

Court lacks jurisdiction to do so, *cf. Am. Immigr. Laws. Ass'n v. Reno*, 18 F. Supp. 2d

38, 58 (D.D.C. 1998) ("*AILA I*") (holding that "unwritten" policies are unreviewable),

*aff'd*, 199 F.3d 1352 (D.C. Cir. 2000).[12]

Thus, although Plaintiffs ask this Court to engraft their conception of

"meaningful" consultation onto the statutory text (*see* Pls.' Mot. at 41–44), Congress

has broadly entrusted DHS with the operation of the expedited removal system, and has

limited the Court's review to a determination of whether any of the agency's written

policies that implement the system is inconsistent with the INA.  In the absence of any

indication in the INA that the meaning of the word "consult" entails more than the

availability of a phone and a period of time to make phone calls, the Court discerns no

such conflict.  Furthermore, given Congress's clear intent to afford noncitizens who are

subject to expedited removal fewer procedural rights in order to facilitate the

expeditious processing of their asylum claims, the Court cannot find that DHS acted

unreasonably when it adopted detention-placement policies that have the effect of

restricting counsel access.  *Cf. AILA I*, 18 F. Supp. 2d at 56 (noting that the court

---

[12] Nor can any such conflict determination be made based on the alleged experiences of the individual Plaintiffs who were not provided with an opportunity to consult with anyone prior to the immigration judge's review of the asylum officer's negative credible fear decision (*see* Hr'g Tr. at 80:25–81:2), because, again, in this context, the scope of the Court's authority is limited to the agency's *written* policies and procedures, *see* 8 U.S.C. § 1252(e)(3)(A)(ii).

"cannot impose upon the Attorney General any obligation to afford more procedures than the governing statute explicitly requires" (citing *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 524–25 (1978))).

4.    The PACR And HARP Detention-Placement Policy Does Not Violate Any Other Provision Of Law The Plaintiffs Have Identified

The Court is also not persuaded that PACR and HARP's policy of detaining asylum seekers in CBP custody during the credible fear process violates the rights of such individuals to seek relief under the asylum laws, *see* 8 U.S.C. § 1158, statutory withholding of removal, *id.* § 1231(b)(3)(A), and the Convention Against Torture ("CAT").  (*See* Pls.' Mot. at 46–47.)[13]  In this regard, Plaintiffs maintain that when Congress created statutory rights to these protections, "it intend[ed] that they be *meaningful*—with a fair process" (*id.* at 46), and Plaintiffs insist that detention in CBP custody, and its constraints on consultation with counsel, deprive asylum seekers of a meaningful opportunity to seek refuge in violation of these provisions of law.

As an initial matter, the Court notes that a grant of asylum under the INA and the "withholding of removal" or CAT "protection against removal" are different legal constructs, and, on its face, the limited process available in the expedited removal scheme appears to "refer[] only to proceedings to establish eligibility for an affirmative grant of asylum[.]"  (Admin. R. at 377 (Transit Rule)); *see also* 8 U.S.C. § 1225(b)(1)(A)(ii) (requiring a credible fear screening interview when a noncitizen "indicates either an intention to apply for asylum under section 1158" or "a fear of persecution").  DHS's regulations suggest that noncitizens in expedited removal

_____

[13] CAT is codified through the Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, div. G., tit. XXII, § 2242, 112 Stat. 2681 (*see* 8 U.S.C. § 1231 note), and is implemented through various regulations, *see* 8 C.F.R. §§ 208.16–208.18, 1208.16–1208.18.

proceedings may still raise claims for statutory withholding or CAT protection, regardless of whether they are eligible for asylum, *see* 8 C.F.R. §§ 208.13(c)(1), 208.30(e)(2)–(4), 1208.13(c)(1), 1208.16(a), and Defendants here do not argue otherwise (*see* Defs.' Mot. at 39–41). Therefore, this Court assumes without deciding that noncitizens subject to expedited removal retain the right to apply for statutory withholding of removal and CAT protection, and *that* finding is tantamount to a conclusion that Plaintiffs' claim that PACR and HARP deprive individuals of "a meaningful opportunity to apply for . . . withholding of removal, and CAT relief" (Compl. ¶ 209 (Fifth Claim)) fails as a matter of law.

In any event, Plaintiffs do not illuminate the contours of the alleged deprivation of the "meaningful opportunity" to apply for asylum, withholding, and CAT protection (*see id.*), and their claim in this regard otherwise appears to be entirely derivative of Plaintiffs' consultation claims, which the Court has already rejected. That is, other than the right to consult, Plaintiffs have not assailed any DHS actions pursuant to PACR and HARP as a violation of some specified procedural requirement of any of these statutory schemes.[14] And having already provided a lengthy explanation of both why the law does not grant asylum seekers any particular right to access counsel during the credible fear process, and also why PACR and HARP do not violate the right to consult generally, the Court cannot conclude that asylum seekers are nevertheless being

---

[14] Plaintiffs' briefs do assert that the "inhumane conditions" of CBP confinement deprive asylum seekers of "meaningful access" to the protections of the asylum laws, statutory withholding of removal, and CAT. (Pls.' Mot. at 47.) But this contention, too, is entirely undeveloped, and Plaintiffs concede that they are not challenging the conditions of confinement. (*See* Pls.' Reply at 13.) Thus, this Court has not considered any such argument.

effectively denied the right to seek relief under any of these other statutory mechanisms as a result of PACR and HARP.

###   C.   PACR And HARP Do Not Violate The APA's Reasoned Decisionmaking Requirements

With respect to the claim that the detention-placement policies in PACR and HARP were promulgated in an arbitrary and capricious fashion in violation of the APA (*see* Compl. ¶¶ 207–08 (Fourth Claim)), Plaintiffs argue, *inter alia*, that Defendants failed to "provide any reason for their shift to keeping asylum seekers in CBP custody throughout the credible fear process" (Pls.' Mot. at 23), and did not "acknowledge or explain their departure from keeping asylum seekers in ICE facilities—subject to ICE standards—during that process" (*id.* at 23–24).  According to Plaintiffs, Defendants also ignored "the flaws with this plan, namely how it would obliterate asylum seekers' ability to adequately prepare for the credible fear process and effectively prohibit them from meaningfully accessing counsel[.]" (*Id.* at 24).  In support of these arguments concerning the alleged unreasonableness of the agency's decision making, Plaintiffs offer evidence outside of the administrative record concerning the conditions of detention in CBP facilities, as well as evidence about the policies and procedures for conducting the credible fear process in ICE detention.  (*See* Index of Exs. Accompanying Pls.' Mot. for Summ. J., ECF No. 35-4.)  Plaintiffs further maintain that the challenged detention-placement decision "is illogical in light of the evidence in the [administrative record]" (Pls.' Mot. at 24), because "the new policy fundamentally misunderstands the purpose of the credible fear process and makes it meaningless" (*id.*).

This Court rejects Defendants' threshold argument that the detention-placement policy is not subject to judicial review under the APA, for the reasons that follow, but

concludes that Plaintiffs' arbitrariness claim fails on the merits.  And, notably, the Court reached the latter conclusion without relying on Plaintiffs' extra-record evidence, which is not relevant to the legal challenge over administrative action that Plaintiffs are bringing in this case.

> 1.   PACR And HARP Are Reviewable Under The APA

Defendants argue that "if [the INA's] section 1252(e)(3) is what provides Plaintiffs' cause of action, then they cannot separately allege that PACR and HARP are arbitrary and capricious" under the APA.  (Defs.' Reply at 25.)  This contention fails to account for the well-established principle that there must be a cause of action *for each legal claim* that is asserted in a complaint, and as this Court explained in *Kiakombua*, "section 1252(e)(3) creates a cause of action to review the [challenged policy's] consistency with the INA (as amended) and its implementing regulations[,]" *Kiakombua*, 2020 WL 6392824, at *22 n.13, while an entirely different claim—one that pertains to the alleged unlawfulness of the agency's decision making process—exists, where applicable, under the APA, *see MTRNY I*, 405 F. Supp. 3d at 38–39.

It is certainly true that section 704 of the APA provides a cause of action to challenge only "[a]gency action made reviewable by statute" and/or "final agency action for which there is no other adequate remedy in a court[,]" 5 U.S.C. § 704, and that, if a statute otherwise "define[s] the specific procedures to be followed in reviewing a particular agency's action[,]" the APA should not be construed to create a duplicative cause of action, *see Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988) (explaining that Congress did not intend the APA to "duplicate existing procedures for review of agency action" or "provide additional judicial remedies in situations where the Congress has provided special and adequate review procedures").  But the INA

itself creates only a limited cause of action—one that permits a plaintiff to claim that an agency's "written policy directive, written policy guideline, or written procedure" concerning the implementation of the expedited removal scheme "is not consistent with applicable provisions of" the INA, 8 U.S.C. § 1252(e)(3)(A)(ii)—and under the circumstances presented here, there is no "clear and convincing evidence" of any "legislative intent" to preclude non-duplicative legal claims that would otherwise be available under the APA or any other statute that expressly creates a cause of action, *see Garcia v. Vilsack*, 563 F.3d 519, 523 (D.C. Cir. 2009) (internal quotation marks and citation omitted).  Indeed, section 1252(e)(3) specifically authorizes claims that an agency policy directive, guideline, or procedure concerning expedited removal is "otherwise in violation of law."  8 U.S.C. § 1252(e)(3)(A)(ii); *cf. MTRNY II*, 962 F.3d at 631–34 (holding that APA review of DHS's designation decision pursuant to section 1225(b)(1)(A)(iii)(I) is precluded based on Congress's expressed intent to confer to the agency "sole and unreviewable discretion" over that determination, but *not* indicating that section 1252(e)(3) itself generally precludes all claims brought under the APA).  Thus, section 1252(e)(3) of the INA appears to make the detention-placement policy in PACR and HARP "reviewable by statute" within the meaning of section 704 of the APA, such that the APA's cause of action to claim unlawful arbitrary decision making is available to Plaintiffs under the circumstances presented here.  *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990) (suggesting that "[a]gency action made reviewable by statute" encompasses when review is sought "pursuant to specific authorization in the substantive statute" rather than "the general review provisions of the APA"); *see also MTRNY I*, 405 F. Supp. 3d at 42 (distinguishing between "a

challenge to the substantive decision that the agency has made" and a challenge to the agency's "decision making process" (emphasis omitted)).

Defendants' alternative contention that Plaintiffs cannot rely upon the APA cause of action because there is no "final" agency action when it comes to PACR and HARP (Defs.' Mot. at 42) also fails, because section 704's finality requirement is plainly met here.  To be final, an agency action (i) "must mark the 'consummation' of the agency's decisionmaking process" such that it is not of "a merely tentative or interlocutory nature"; and (ii) "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'"  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted).  Defendants are correct to observe that PACR and HARP are "pilot program[s]" (Defs.' Mot. at 42), and that DHS agencies will be required to "work together" to assess these policies' effectiveness, to "adjust resources and procedures as necessary[,]" and to evaluate where a noncitizen should be detained based on "resource and space constraints" (*id.*).  But the D.C. Circuit has been clear that "the issuance of a [mere] guideline or guidance may constitute final agency action[,]" *Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 48 (D.C. Cir. 2000), and there is no question that the "impact" of PACR and HARP is "sufficiently direct and immediate" that they "directly affect the parties" in this case, *Franklin v. Massachusetts*, 505 U.S. 788, 796–97 (1992) (internal quotation marks and citation omitted).  In fact, it is undisputed that the individual Plaintiffs were directly and immediately affected by PACR and HARP: they were detained in CBP custody instead of ICE custody, and were subjected to an expedited timeframe of five to seven days for the completion of their credible fear process.  Thus, PACR and HARP

unquestionably qualify as "final agency action" for the purpose of section 704 of the APA.

To the extent that Defendants further contend that this Court may not review Plaintiffs' APA claims concerning the detention-placement policy because the PACR and HARP programs constitute "agency action" that is "committed to agency discretion by law" (Defs.' Mot. at 42 (quoting 5 U.S.C. § 701(a)(2))), the Court is not persuaded that is so.  Because "immigration officers have discretion on whether to place an alien in PACR and HARP" as a general matter, there is a sense in which the detention-placement policy is committed to agency discretion within the context of each application.  (*Id.* at 43.)  But the narrow question that arises under that APA exception is whether the "relevant *statute*" that confers discretion to the agency provides so much discretion that a court "would have no meaningful standard against which to judge the agency's exercise of discretion."  *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2568 (2019) (emphasis added) (internal quotation marks and citation omitted).  And Defendants have made no argument that the INA itself provides so much discretion to DHS concerning the placement of detained noncitizens that PACR and HARP are shielded from arbitrary and capricious review.  *Cf. MTRNY II*, 962 F.3d at 632 (finding that Congress's grant of authority to the Secretary to designate populations amenable to expedited removal, where "[s]uch designation shall be in the sole and unreviewable discretion of the [Secretary][,]" fell into the discretionary exception to the APA (quoting 8 U.S.C. § 1225(b)(1)(A)(iii)(I))).  Therefore, this Court sees no good argument for invoking here the exceedingly narrow exception to APA review for agency actions that are committed to agency discretion by law.

2.    DHS Did Not Issue PACR And HARP In An Arbitrary And Capricious Manner

That said, this Court cannot conclude that Defendants undertook to adopt the challenged detention-placement policy in a manner that violates the APA's reasoned decision making standards, as Plaintiffs claim.  (*See* Pls.' Mot. at 23 (citing 5 U.S.C. § 706(2)(A)).)  To buttress the contention that PACR and HARP resulted from arbitrary and capricious decision making, Plaintiffs point to various alleged deficiencies in DHS's decision making process—they say, for example, that the agency did not adequately explain the change in its detention policy (*see id.* at 24); Defendants failed to consider the consequences of detaining asylum seekers in CBP custody rather than ICE custody (*see id.* at 24–25), or the particular needs of individuals undergoing the credible fear process (*see id.* at 28–34); PACR and HARP are inconsistent with the record evidence (*see id.* at 36); and these programs are incompatible with the credible fear process itself (*see id.* at 37).  This Court finds that these contentions are not supported by the record for the following reasons, and it concludes, to the contrary, that Defendants' new policies were sufficiently reasoned to meet the procedural requirements of the APA.

First of all, the administrative record amply demonstrates that, when determining whether or not a new protocol for expediting the removal of certain noncitizens should be established, "DHS considered the migration crisis along the southwest border, the increase in asylum claims, and the limited resources of ICE detention."  (Defs.' Mot. at 44 (citing record evidence of the statistical increase in the number of persons entering the United States along the Southwest border, as well as statistics on the number of persons seeking asylum).)  In particular, the record reflects that DHS was seeking to

"effectuate removals of amenable aliens" in order to "address the migration crisis along
the Southwest Border" (Admin. R. at AR636), and that, because ICE facilities are
subject to significant "resource constraints," the agency determined that "detention in
an ICE facility" was a "limited tool" for expeditiously processing aliens amenable to
removal (*id.* at AR639).[15]   The agency also noted that it was "extremely challenging to
detain family units in an ICE Family Residential Center" because of "a 2015 judicial
reinterpretation of" a consent decree (*id.*), which prohibited ICE from detaining family
units for longer than 20 days at facilities that are not licensed under state law (*see id.* at
AR212–13).

   It also appears that PACR was implemented to process the asylum prospects of
noncitizens who were subject to the Transit Rule, and that DHS decided that it could do
so expeditiously, given that such individuals are barred from asylum eligibility and
must meet the higher bar for statutory withholding of removal and CAT protections.
(*See id.* at AR640; *see also supra* note 5.)   DHS also explained that the goal of PACR
and HARP was to expedite the credible fear process for certain asylum seekers and
simultaneously reduce resource constraints at ICE facilities.   (*See* Defs.' Mot. at 44; *see
also* Admin. R. at AR640 (asserting that CBP and ICE can "leverage cross-component
field discretion, flexibility, and coordination to account for local conditions and
available resources and infrastructure"), AR641 (noting that the El Paso location where
PACR was piloted "has a significant volume[,]" and discussing "streamlined

---

[15] DHS's invocation of "resource constraints" is somewhat oblique, but apparently refers to the greater
cost of detaining noncitizens, particularly family units, in ICE detention facilities, and the limited
capacity of such facilities.   (*See, e.g.*, Admin. R. at AR14 (noting "record increases in particular types
of migrants, such as family units, travelling to the border who require significantly more resources to
detain and remove"); *id.* at AR211, AR218 (stating that "ICE has finite resources and bed space at"
family residential centers, which are "more akin to a dormitory setting[,]" including "suites where each
family is housed separately").

procedures" for processing noncitizens subject to PACR).)  In this Court's considered judgment, these and other observations are sufficient to demonstrate that DHS "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks and citation omitted).

Plaintiffs' primary response is that Defendants have nonetheless failed to "acknowledge *the significance* of their shift away from detaining individuals in ICE custody[.]"  (Pls.' Mot. at 24 (emphasis added).)  In this regard, Plaintiffs insist that ICE facilities have more favorable practices with respect to detained noncitizens—as if it is the ICE procedures from which the agency is now departing (thereby necessitating an explanation as to why DHS is no longer providing those processes).  (*See id.* at 25–27.)  But as far as this Court can tell, there has been no change concerning the policies and procedures that pertain to persons detained in ICE facilities; instead, as Defendants note, what has changed is the agency's decision to keep some asylum seekers in CBP custody during an accelerated credible fear review process.  (*See* Defs.' Mot. at 46.)  And, in this Court's view, DHS has provided a rational explanation for *that* change, given the volume of asylum seekers, the agency's resource needs, and the fact that certain noncitizens are not eligible for positive credible fear determinations under the Transit Rule, as explained above.  It is also clear that, to the extent that the memoranda that establish PACR and HARP also provide guidance as to how the credible fear process will operate under the institutional constraints of CBP facilities, those appear to be entirely *new* policies—CBP did not previously have any policies with respect to

credible fear interviewees detained in their facilities—so there is no argument that, with respect to these policies, Defendants have departed from prior policies without a sufficiently reasoned explanation.

Thus, when the policy at issue is identified properly, it appears that what Defendants have said about the perceived need to detain certain noncitizens in CBP custody, when such persons were previously placed in ICE detention facilities, is sufficient to demonstrate the agency's "awareness that it *is* changing position[,]" which is the minimum that reasoned decision making requires. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  Furthermore, the impact of the changed detention-placement policy on the noncitizens who are placed in the PACR and HARP programs is self-evident under the circumstances presented here—*i.e.*, the agency rationally concluded that detaining certain noncitizens in CBP custody would mean that fewer procedural protections would have to be provided, which, in turn, would result in the faster processing of noncitizens who are slated for expedited removal in the context of a resource-constrained immigration system.  (*See* Admin. R. at AR639–40.)  The agency nevertheless specifically acknowledged that asylum seekers must be provided both an opportunity to consult with a person of their choosing and a list of attorneys to contact, and it explained that noncitizens in CBP custody would have access to telephones for that purpose (*see* Admin. R. at AR641, AR645).  And, unlike prior cases in which agencies were found to have engaged in arbitrary decision making, there is no evidence here that shifting away from the prior policy of detaining such individuals in a facility that provided more and better access to counsel "engendered serious reliance

interests[,]" *Fox Television*, 556 U.S. at 515, at least as far as asylum seekers who are slated for expedited removal are concerned.

Thus, this Court cannot find that Defendants failed to consider the relevant consequences of the detention-placement policy when it promulgated PACR and HARP. (*See* Pls.' Mot. at 24–27.)  To the contrary, it appears that more efficient processing of certain noncitizens who are subject to expedited removal *was the entire goal* of the challenged policy, and the agency not only fully articulated that goal, but its objective was consistent with applicable statutory and regulatory requirements, as explained in Part III.B.3, *supra*.  Consequently, PACR and HARP's detention-placement policy cannot be deemed arbitrary and capricious in violation of the APA.[16]

### D.     PACR And HARP Do Not Violate Any Due Process Rights Of These Particular Plaintiffs

Plaintiffs' final claim is that PACR and HARP violate noncitizens' "Fifth Amendment procedural due process right to petition the government" for asylum, statutory withholding, and CAT protection.  (Pls.' Mot. at 47 (quoting *Maldonado-Perez v. I.N.S.*, 865 F.2d 328, 332 (D.C. Cir. 1989)); *see also* Compl. ¶¶ 210–13 (Sixth Claim).)  Claims of constitutional violations have a cause of action that derives directly from the Constitution itself, *see McKesson Corp. v. Islamic Republic of Iran*, 539 F.3d

---

[16] The Court has reached this conclusion without relying on the extra-record evidence that Plaintiffs have submitted concerning the policies and procedures for conducting the credible fear process in ICE detention, and the conditions of confinement in ICE detention. (*See, e.g.*, Exs. A–R to Pls.' Mot. for Prelim. Inj., ECF Nos. 21-2–21-21; Exs. A–C to Pls.' Mot. for Leave to File Under Seal, ECF Nos. 22-1–22-3; Exs. S–W to Pls.' Mot. for Summ. J., ECF Nos. 35-5–35-9).)  As the above discussion demonstrates, the detention policies and procedures applicable to ICE facilities are not themselves relevant to this Court's determination of whether PACR and HARP's decision to place noncitizens in CBP custody was the product of arbitrary and capricious decision making, and "it is black-letter administrative law that in an APA case, a reviewing court should have before it neither more nor less information than did the agency when it made its decision." *Cf. Hill Dermaceuticals, Inc. v. F.D.A.*, 709 F.3d 44, 47 (D.C. Cir. 2013) (internal quotation marks and citation omitted).

485, 490 (D.C. Cir. 2008) ("Inferring a cause of action from the Constitution squares with the 'presum[ption] that justiciable constitutional rights are to be enforced through the courts.'" (citation omitted)), but such a cause of action is not always fully available to every claimant.  As relevant here, the Supreme Court recently clarified that, for a noncitizen who is undergoing the credible fear process and has not yet "effected an entry" within the territory of the United States, "the Due Process Clause provides nothing more" than the right, provided under section 1225(b) of the INA, to a "'determination' [of] whether he had 'a significant possibility' of 'establishing eligibility for asylum[.]'" *Thuraissigiam*, 140 S. Ct. at 1982–83 (original alterations incorporated) (quoting 8 U.S.C. § 1225(b)(1)(B)(ii), (v)).  In *Thuraissigiam*, the Court further held that—regardless of whether a noncitizen is "detained shortly after unlawful entry" (for example, "25 yards into U.S. territory"), or is detained "at a port of entry" such as an international airport (which is, technically, U.S. soil), or is first detained at the border and then paroled into the country pending removal—noncitizens who have not "effected an entry" into the United States are only entitled to the process that Congress has afforded them by statute.  *Id.*; *see also id.* at 1982 (citing numerous precedents for the proposition that, for aliens seeking entry, due process is what Congress provides, such as *Ekiu v. United States*, 142 U.S. 651, 660 (1892), *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950), *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953), and *Landon v. Plasencia*, 459 U.S. 21, 32 (1982)).

This means that the only process that was due to the individual Plaintiffs in this case under the Constitution was the process that Congress has afforded by statute.  And

that contention brings us back to Plaintiffs' primary claim that PACR and HARP prevent an asylum seeker from meaningful access to counsel in violation of the INA and similar statutes.  (*See* Pls.' Reply at 50.)  But this Court has already found that PACR and HARP conform with the statutory requirement that asylum seekers have the right to consult, and that Defendants did not unlawfully deprive these Plaintiffs of the requisite evaluation process by detaining them in a facility with limited access to counsel.  (*See supra* Parts III.B.2–4.)  Accordingly, PACR and HARP do not violate the Fifth Amendment rights of the individual Plaintiffs in the instant case (each of whom was detained upon arrival pending a credible fear assessment pursuant to 8 U.S.C. § 1225(b)).[17]

## IV.   CONCLUSION

This Court has reviewed the record and the declarations of the individual Plaintiffs, and is cognizant of the hardships that certain noncitizens who arrive at the southern border seeking asylum face.  But Plaintiffs' arguments about the detention-placement policy that DHS has adopted cannot be squared with the manifest purpose of the expedited removal scheme, which is to authorize the agency that administers the federal government's immigration laws to make efficient distinctions between noncitizens who have potentially meritorious claims to protection and those who do not. Congress has also given considerable discretion to DHS to implement the expedited removal process, and the fact that DHS previously afforded asylum seekers greater

---

[17] The organizational Plaintiff, Las Americas, concedes that it does not have "direct organizational standing" to assert a Fifth Amendment due process claim.  (*See* Pls.' Mot. at 48 n.9); *see also Am. Immigr. Laws. Ass'n v. Reno*, 199 F.3d 1352, 1364 (D.C. Cir. 2000) ("[P]laintiff organizations do not have standing to raise claims, whether statutory or constitutional, on behalf of aliens subjected to IIRIRA's expedited removal system.").

access to counsel than the law requires does not demonstrate that it is unlawful for the agency to scale back such practices in a resource-constrained environment and in the context of a congressional determination that expeditious removal of certain noncitizens is warranted.  Thus, as explained herein, this Court cannot find that the detention-placement policy of the PACR and HARP programs is inconsistent with statutory, regulatory, or constitutional requirements, or that it was adopted in an arbitrary and capricious manner in violation of the APA.  Accordingly, as set forth in the accompanying Order, Plaintiffs' motion for summary judgment (ECF No. 35) will be **DENIED**, and Defendants' motion for summary judgment (ECF No. 49) will be **GRANTED**.

DATE:  November 30, 2020

*Ketanji Brown Jackson*

KETANJI BROWN JACKSON
United States District Judge