UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LAS AMERICAS IMMIGRANT ADVOCACY CENTER, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> CHAD WOLF, <br> in his official capacity, Acting Secretary of the U.S. Department of Homeland Security, *et al.*, <br><br> Defendants. | No. 1:19-cv-3640 (KBJ) |

**PLAINTIFFS' MOTION FOR RECONSIDERATION**

**TABLE OF CONTENTS**

**ARGUMENT** ..................................................................................................................... 2

    I.    Reconsideration of Plaintiffs' Administrative Procedure Act Claim is Warranted. ............. 2

        A.   Because PACR/HARP Is a Departure from Past Policy, Defendants Were ..................... 3
            Required to Acknowledge the Ramifications of the Shift from ICE Custody................. 3

        B.   The Court's APA Reasoning Is Otherwise Clearly Erroneous. ....................................... 6

    II.   Reconsideration of Plaintiffs' Statutory Consultation Claim Is Warranted......................... 9

**CONCLUSION** ................................................................................................................. 10

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Berge v. United States*,
    949 F. Supp. 2d 36 (D.D.C. 2013) ............................................................................................. 1

*Castillo v. Nielsen*,
    2018 WL 6131172 (C.D. Cal. June 21, 2018) ......................................................................... 10

*Defs. of Wildlife v. Salazar*,
    842 F. Supp. 2d 181 (D.D.C. 2012) ........................................................................................... 1

\*Dept. of Homeland Sec. v. Regents of Univ. of Cal.,
    140 S. Ct. 1891 (2020) .............................................................................................................. 7

\*FCC v. Fox,
    556 U.S. 502 (2009) ............................................................................................................ 5, 8

*Firestone v. Firestone*,
    76 F.3d 1205 (D.C. Cir. 1996) ................................................................................................... 1

*Innovation Law Lab v. Nielsen*,
    310 F. Supp. 3d 1150 (D. Or. 2018) ........................................................................................ 10

*Jicarilla Apache Nation v. U.S. Dep't of Interior*,
    613 F.3d 1112 (D.C. Cir. 2010) ................................................................................................. 7

\*Make the Road N.Y. v. McAleenan,
    405 F. Supp. 3d 1 (D.D.C. 2019), *vacated on other grounds*, 962 F.3d 612
    (D.C. Cir. 2020) ......................................................................................................................... 8

\*Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.,
    463 U.S. 29 (1983) .......................................................................................................... 4, 6, 7

*Muwekma Ohlone Tribe v. Kempthorne*,
    452 F. Supp. 2d 105 (D.D.C. 2006) ........................................................................................... 5

*NASDAQ v. SEC*,
    961 F.3d 421 (D.C. Cir. 2020) ................................................................................................... 9

*Nat'l Lifeline Ass'n v. FCC*,
    921 F.3d 1102 (D.C. Cir. 2019) ................................................................................................. 8

*Nunez v. Boldin*,
    537 F. Supp. 578 (S.D. Tex. 1982) .......................................................................................... 10

*Orantes-Hernandez v. Thornburgh*,
    919 F.2d 549 (9th Cir. 1990) ............................................................................................... 10

*Safe Extensions, Inc. v. F.A.A.*,
    509 F.3d 593 (D.C. Cir. 2007) ................................................................................................ 7

*Turkmani v. Republic of Bolivia*,
    273 F. Supp. 2d 45 (D.D.C. 2002) .......................................................................................... 1

**Statutes**

8 U.S.C. § 1252(e)(3) .................................................................................................................... 2

33 U.S.C. § 1906(a) ....................................................................................................................... 9

**Other Authorities**

H.R. Rep. No. 104-469, pt. 1 (1996) ............................................................................................. 2

Pursuant to Rule 59(e), Plaintiffs respectfully move for reconsideration of this Court's Order, Dkt. 77, which upholds PACR/HARP—an extreme and unprecedented shift in Department of Homeland Security ("DHS") asylum policy. Prior policy placed *all* detained asylum seekers in Immigration and Customs Enforcement ("ICE") facilities for the credible fear process—facilities in which liberal access to counsel, including in-person access, was guaranteed. Under the challenged policy, DHS forces some asylum seekers to, for the first time, be held in Customs and Border Protection ("CBP") facilities—facilities where access to counsel is functionally eliminated and which lack other basic human necessities present in ICE detention that are conducive to preparation for this process.

Reconsideration is appropriate "to correct a clear error or prevent manifest injustice." *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996). This includes "a clear error of law" or "when there were facts or legal issues properly presented but overlooked by the court in its decision . . . or when the court's decision rests on an incorrect premise." *Berge v. United States*, 949 F. Supp. 2d 36, 41 (D.D.C. 2013). Reconsideration is warranted where the original decision erroneously construed the agency action's rationale. *Defs. of Wildlife v. Salazar*, 842 F. Supp. 2d 181, 184-85 (D.D.C. 2012). Additionally, it is appropriate where "theories or arguments" could not "have been advanced earlier" in the litigation—as here, where the Court has adopted several theories that Defendants never raised in this litigation and that Plaintiffs thus have not previously addressed. *Turkmani v. Republic of Bolivia*, 273 F. Supp. 2d 45, 52 (D.D.C. 2002).

First, reconsideration of the APA claim is warranted: PACR/HARP is a departure from past policy that requires consideration of the ramifications of the shift from ICE to CBP custody for the credible fear process and, even were this not the case, the Court's reasoning is contrary to APA jurisprudence. The Court erred in focusing on whether CBP, a DHS component, had a prior

1

policy for treatment of asylum seekers in the credible fear process—rather than the effect of the departure from prior *DHS* policy that placed *all* asylum seekers in ICE detention, with policies to ensure broad access to counsel and a meaningful process, to the challenged policy of placing some in CBP detention. Second, reconsideration of Plaintiffs' statutory consultation claim is warranted. The Court's interpretation of the INA is the first decision to find that the scope of the right to consult does not include in-person and liberal telephonic access in order to effectuate its purpose and can be wholly defined in the agency's discretion, such that the agency may issue policies that render the right effectively meaningless—by, for example as here, entirely denying in-person visitation or practicable telephonic access to asylum seekers attempting to present their claims for protection. And contrary to the Court's finding, the agency has already determined that more robust protections are required, not "fewer," in order to prevent delay—*i.e.*, to ensure "faster processing"—while meeting statutory requirements.

Third, the Court failed to consider Congress's intent that "there should be no danger that an alien with a genuine asylum claim will be returned to persecution." H.R. Rep. No. 104-469, pt. 1, at 158 (1996). Congress intended for the credible fear process to *protect* asylum seekers, and designed the expedited removal statute to provide meaningful safeguards to ensure individuals are not wrongly removed even when subjected to a more truncated process. For Congress, the expedience of this process is subordinate to the rights needed to protect those fleeing persecution—not the other way around.

Moreover, this is the *only* case that challenged the PACR/HARP policy under 8 U.S.C. § 1252(e)(3) within the 60-day statutory deadline. Correction of clear error is essential here.

## ARGUMENT

I. **Reconsideration of Plaintiffs' Administrative Procedure Act Claim is Warranted.**

### A. Because PACR/HARP Is a Departure from Past Policy, Defendants Were Required to Acknowledge the Ramifications of the Shift from ICE Custody.

The Court erred in determining that ICE policies are "not . . . relevant" to whether PACR/HARP is arbitrary and capricious. Dkt. 76 ("Op.") at 57 n.16. The Court determined that once an asylum seeker is placed in CBP custody, they are subject to new credible fear policies because *CBP* had no prior policies for this process. This skips over the actual policy change—had there been no departure from prior policy, all such asylum seekers would have been processed in ICE custody, in a place where the agency provides access to liberal consultation to this group of people and basic human amenities, like beds, showers, and darkened rooms for sleeping, that facilitate rest and preparation for the credible fear interview.

*DHS*, of which CBP and ICE are components, clearly shifted *its* policy. *See* Op. 55. In fact, Defendants—the very entities that created PACR/HARP—conceded that this new policy was a specific change, stating that "the agency has set forth its justification for a policy change," namely based on "DHS's decision" to permit "hold[ing] certain aliens in CBP custody during" the credible fear process. Dkt. 52 (Defs.' Mot.) 45-46. The AR demonstrates that PACR/HARP is a DHS policy that involves both CBP and ICE. AR 640 (CBP, ICE, and USCIS "commit to providing the appropriate resources and guidance necessary to implement the processes below"); *see* Op. 23. As DHS did "previously have . . . policies with respect to credible fear interviewees detained in their facilities," as articulated in the detention standards of its component ICE, Defendants "have departed from [those] prior policies without a sufficiently reasoned explanation." *Compare* Op. 55-56 (focusing solely on whether CBP had prior relevant policies).

The ICE detention standards are necessarily relevant to DHS's change from the policy of detaining *all* asylum seekers in ICE custody for this process to detaining some in CBP custody—in facilities that, unlike ICE facilities, bar in-person attorney access and access for any visitors;

3

lack private consultation rooms; severely restrict telephone access; do not require a minimum number of telephones; have no system to locate those in custody; lack beds and showers; keep the lights on at all times; and do not require provision of soap, toothpaste, shampoo, menstrual products, clean bedding, and towels. Dkt. 35-1 (Pls.' Mot.) 24-28. ICE did not arbitrarily set forth its policy to provide for effectuation of the right to access consultation. Instead, ICE—a component of DHS—determined that "[b]ecause expedited removal procedures occur within short time frames, each facility shall develop procedures that *liberally* allow for consultation visitation, *to ensure compliance with statutory and regulatory requirements* . . . ." PBNDS 5.7.V.K.2 (emphasis added).

      This Court's conclusion that those prior policies are irrelevant here because they apply to ICE, not CBP, cannot be squared with precedent. In *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983), the Department of Transportation issued and modified a rule, and then the National Highway Traffic Safety Administration—a component of the DOT— rescinded a portion of that rule. *Id.* at 34-36. *State Farm* did not treat the DOT and its component NHTSA as analytically distinct: NHTSA's agency action was "the rescission of an agency rule." *Id.* at 41. Similarly, here, the agency's policy shift implicates DHS's past policies regarding credible fear interviewees detained in their facilities—those of DHS's component, ICE.

      Absent reconsideration, this Court's decision would open significant APA loopholes. An agency could transfer responsibility for a particular set of actions (here, detention during the credible fear process) from one component to another. The new component could perform that set of actions in a radically different way and yet, under this Court's decision, no "change in policy" would have occurred. The agency would be able to evade APA requirements for a change in policy: that it "display awareness that it *is* changing position" and not "depart from a

4

prior policy *sub silentio*"; that it "provide a more detailed justification than what would suffice for a new policy created on a blank slate" in certain circumstances, such as "when . . . its new policy rests upon factual findings that contradict those which underlay its prior policy"; and that it provide "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *FCC v. Fox*, 556 U.S. 502, 515-16 (2009). For example, the State Department could internally shift passport renewals to a different component and place restrictions on the process—requiring only some to appear in person at a single remote location for renewal, for example—and the agency would not be held to the APA standard for a policy change, including acknowledging the prior policy that applied to *all* passport applicants.

Similarly, a *partial* transfer of agency responsibility, where *some* asylum seekers may remain subject to DHS's old policy in ICE custody, does not mean there is no change in policy. This too would open a major loophole: the agency could further insulate the change by keeping some subject to the old policy. Yet, such disparity is another reason that the policy is arbitrary and capricious: "an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently." *Muwekma Ohlone Tribe v. Kempthorne*, 452 F. Supp. 2d 105, 115 (D.D.C. 2006). The Court's failure to consider this disparate treatment is clear error.

Defendants conceded that they did not take into account the ICE detention standards or differences between ICE and CBP detention, arguing that they "are not required to explicitly consider every possible consequence that could result from the PACR and HARP guidance" and that "[j]ust because ICE facilities provide certain accommodations does not mean that those are required in all DHS facilities or all situations." Defs.' Mot. 45-46. Defendants' failure to acknowledge these differences, much less account for their effects, meant that "Defendants provided no 'reasoned explanation . . . for disregarding facts and circumstances that underlay or

were engendered by the prior policy.'" Dkt. 57 (Pls.' Reply) 34 (quoting *Fox*, 556 U.S. at 516).

### B.     The Court's APA Reasoning Is Otherwise Clearly Erroneous.

Other clear errors warrant reconsideration—independent of whether CBP detention is a departure from policy. First, the Court accurately cited the AR for only the potential upsides, such as "faster processing"; it erroneously assumed agency consideration of "fewer procedural protections," possibly as a downside to asylum seekers, but there is no such evidence in the AR. Op. 56. The Court found "the impact of the changed detention-placement policy on the noncitizens who are placed in the PACR and HARP programs is self-evident . . . *i.e.*, the agency rationally concluded that detaining certain noncitizens in CBP custody would mean fewer procedural protections would have to be provided, which, in turn, would result in . . . faster processing." Op. 56. However, the agency must "*articulate* a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (emphasis added). *Nowhere*—not in the AR or litigation—did the agency state that the new policy "would mean fewer procedural protections would have to be provided, which, in turn, would result in . . . faster processing." Op. 56. The Court cites AR 639-40, but nothing there articulates such conclusion. Indeed, the AR makes no reference to a policy decision to provide "fewer procedural protections": instead, this rationale was derived by the Court.

Further, this "self-evident" finding is directly at odds with the agency's own prior policy rationale that "each facility shall develop procedures that liberally allow for consultation visitation, to ensure compliance with statutory and regulatory requirements and *to prevent delay*." PBNDS 5.7.V.K.2 (emphasis added). The agency previously found that robust—not fewer—procedures must be readily available so as to not delay (or to ensure "faster processing") while waiting for the required safeguards to be provided. The finding that it is "self-evident" that the agency *sub silentio* reached a contrary conclusion is clear error.

It is bedrock law that a court "may not supply a reasoned basis for the agency's action that the agency itself has not given." *State Farm*, 463 U.S. at 43. There are other hypothetical explanations that could be more readily assumed. For example, the Court could have assumed instead that DHS wished to increase the number of facilities wherein the process could occur, given the Court's reference to the AR's discussion of ICE constraints, or to reduce overall time spent solely by eliminating the transfer to ICE.

Second, that the effect of agency action seems "self-evident" to a reviewing court is not enough—the agency must still provide evidence to support its rationale. *E.g.*, *Safe Extensions, Inc. v. F.A.A.*, 509 F.3d 593, 604-05 (D.C. Cir. 2007) ("If true, this rationale might support [the agency action]. But the FAA has provided absolutely no evidence to back it up."). Defendants provided no evidence to support a conclusion that the lack of procedural protections specifically "would result in . . . faster processing." *See* Op. 56.

Third, the Court's decision clearly errs in overlooking Defendants' "fail[ure] to consider the complete incompatibility of CBP custody with a meaningful credible fear process." Pls.' Mot. 28. An agency cannot "entirely fail[] to consider [an] important aspect of the problem." *Regents*, 140 S. Ct. at 1913; *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1118-19 (D.C. Cir. 2010). This "alone" makes a decision arbitrary and capricious. *Regents*, 140 S. Ct. at 1913. Defendants failed to consider relevant circumstances in detaining those in credible-fear proceedings in CBP custody, including the need for "*timely and regular* access to counsel"; "the effects of asylum seekers' particular vulnerabilities on their needs regarding access to counsel"; and "the importance of *in-person* access" and "*regular* telephonic access to counsel." Pls.' Mot. 28-34. More broadly, "Congress intentionally designed the credible fear process as a safety net . . . that is overly inclusive" and, without considering this purpose,

7

"Defendants have effectively eviscerated Congress's system designed to ensure that, notwithstanding expedited removal, no asylum seeker be returned to face potential harm" for an entire subset of people. *Id.* at 37-39.[1]

Defendants acted arbitrarily and capriciously because they "only considered the *upsides* of the [new policy]," not "the considerable *downsides* of adopting a policy that, in many respects, could significantly impact people's everyday lives in many substantial, tangible, and foreseeable ways." *Make the Road N.Y. v. McAleenan*, 405 F. Supp. 3d 1, 55 (D.D.C. 2019), *vacated on other grounds*, 962 F.3d 612 (D.C. Cir. 2020). Defendants' failure to weigh any of the even obvious downsides here to accuracy in the credible-fear process—ensuring that the United States does not erroneously send asylum seekers back to the danger they have fled, which clearly has huge ramifications for asylum seekers' "everyday lives"—was arbitrary and capricious. *Id.*; *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1113 (D.C. Cir. 2019).

Finally, the decision clearly errs in distinguishing this case from "prior cases in which agencies were found to have engaged in arbitrary decision making," Op. 56, because in those other cases the prior policies had "'engendered serious reliance interests.'" *Id.* at 56-57 (quoting *Fox*, 556 U.S. at 515). Failure to consider reliance interests is sufficient to render agency action arbitrary and capricious, but it is not *necessary*. *Fox*, 556 U.S. at 515 (more detailed justification for a policy change is necessary "when, *for example* . . . [an agency's] prior policy has engendered serious reliance interests that must be taken into account" (emphasis added)).

---

[1] Plaintiffs did not concede the challenge to CBP conditions regarding the right to apply for protection. Plaintiffs' briefing explained, "Plaintiffs do not challenge *in isolation* . . . the pre-existing, horrendous conditions of CBP facilities. . . . [T]he conditions of CBP facilities are *relevant* to Plaintiffs' challenge to this shift . . . . Plaintiffs' challenge is to Defendants' decision to conduct the credible fear process in CBP facilities *in light of* these problems." Pls.' Reply 13.

## II.  Reconsideration of Plaintiffs' Statutory Consultation Claim Is Warranted.

The Court also erred in its rejection of Plaintiffs' claim that PACR/HARP violates the statutory right to consultation with others, including attorneys. First, the Court reasoned that "according to regulations prescribed by the [agency]" meant that "Congress intended the agency itself to utilize its expertise to determine the scope of the right to consult that the statue prescribes." Op. 37. Defendants never advanced this interpretation. The phrase "according to regulations" is not intended to delegate to an agency determination of the scope of statutory language—rather, it directs the agency to establish regulations for effectuation of the statutory mandate. For example, 33 U.S.C. § 1906(a) provides that a ship operator "shall report [an] incident in the manner prescribed by Article 8 of the Convention in accordance with regulations promulgated by the Secretary for that purpose." The statute is not deferring interpretation of Article 8; it is contemplating the promulgation of such regulations and requiring them to comply with Article 8. An agency may never adopt an unreasonable statutory construction. *NASDAQ v. SEC*, 961 F.3d 421, 426 (D.C. Cir. 2020).

Second, the Court erred in determining that the Executive has since 1997 consistently interpreted the scope of "consultation" to be whatever a facility makes available. Op. 43. Defendants did not present that interpretation, stating that "[t]he statute has to mean the same thing, regardless of . . . what location an individual is detained. . . . The statute means the same thing for [ICE and CBP facilities]." Tr. of Feb. 18, 2020 Hearing 28:14-15, 29:2-4. And ICE policies were designed to meet, *not exceed*, statutory requirements: "[b]ecause expedited removal procedures occur within short time frames," there must be "procedures that liberally allow for consultation visitation, *to ensure compliance with statutory and regulatory requirements*." PBNDS 5.7.V.K.2 (emphasis added).

Absent reconsideration, this Court's decision would permit the Executive Branch to vitiate the right of consultation in credible-fear proceedings and rights to meaningfully seek protection. Under the Court's reasoning, these rights are subordinate to whatever procedures DHS, CBP, ICE, or even individual detention centers set forth—with no limiting principle. For example, under the Court's reasoning, a facility could provide for only a single attempted phone call out of the facility, provide only 10 minutes to access a phone in the middle of the night, or decline to provide a pen to the detainee to prepare for and complete the process. So long as DHS has not expressly violated any explicit statutory provision, it can put in place any policies or practices that it wishes—even if they create obstacles that functionally prevent real consultation or real access to the process of applying for protection. And it need not even *consider* the effect of policies and practices on the ability of asylum seekers to access counsel or seek protection.

Every prior federal court, to Plaintiffs' knowledge, has determined that in-person access to counsel is required for asylum seekers. *See*, *e.g.*, *Innovation Law Lab v. Nielsen*, 310 F. Supp. 3d 1150, 1162 (D. Or. 2018) (policies that denied attorneys in-person access to asylum seekers to prepare for credible fear interviews violated right to access counsel); *Castillo v. Nielsen*, 2018 WL 6131172 at *3 (C.D. Cal. June 21, 2018) (requiring access to communication "both in person and by phone" with attorneys before credible fear interview); *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 565-66 (9th Cir. 1990) (hindrances to in-person and telephonic access violated asylum seekers' right to access counsel); *Nunez v. Boldin*, 537 F. Supp. 578, 580 & n.1, 582 (S.D. Tex. 1982) (same). Reconsideration is warranted to ensure the agency's decisions comport with Congress's intent to ensure rights to consult and apply for protection.

## CONCLUSION

For the foregoing reasons, the Motion for Reconsideration should be granted.

Dated: December 28, 2020                              Respectfully Submitted,

                                                      */s/Andre Segura*

| | |
|---|---|
| Arthur B. Spitzer (D.C. Bar No. 235960)<br>Scott Michelman (D.C. Bar No. 1006945)<br>American Civil Liberties Union Foundation<br>  of the District of Columbia<br>915 15th Street, NW - 2nd floor<br>Washington, DC 20005-2302<br>Tel. (202) 601-4266<br>aspitzer@acludc.org<br>smichelman@acludc.org | Andre Segura*, TX Bar No. 24107112<br>Thomas Buser-Clancy*, TX Bar No. 24078344<br>Kathryn Huddleston*, AZ Bar No. 033622<br>ACLU Foundation of Texas, Inc.<br>5225 Katy Freeway, Suite 350<br>Houston, TX 77007<br>Tel. (713) 942-8146<br>Fax: (713) 942-8966<br>asegura@aclutx.org<br>tbuser-clancy@aclutx.org<br>khuddleston@aclutx.org |
| Bernardo Rafael Cruz*, TX Bar No. 24109774<br>Brantley Shaw Drake*, NY Bar No. 5407440<br>ACLU Foundation of Texas, Inc.<br>109 N. Oregon St., Suite 600<br>El Paso, TX 79901<br>Tel. (915) 533-8091<br>Fax: (915) 308-7188<br>brcruz@aclutx.org<br>sdrake@aclutx.org | Anand Balakrishnan,* CT Bar No. 430329<br>American Civil Liberties Union<br>Foundation, Immigrants' Rights Project<br>125 Broad Street, 18th Floor<br>New York, NY 10004<br>Tel. (212) 549-2600<br>abalakrishnan@aclu.org |

*Admitted p*ro hac vice*

## CERTIFICATE OF SERVICE

I certify that I filed this motion via the ECF system, which serves this briefing on all counsel of record.

                                                      */s/ Andre Segura*
                                                      Andre Segura

11