UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LAS AMERICAS IMMIGRANT
ADVOCACY CENTER, *et al.*,

          Plaintiffs,

v.

CHAD WOLF,
in his official capacity, Acting Secretary of the
U.S. Department of Homeland Security, *et al.*,

          Defendants.

No. 1:19-cv-3640 (KBJ)

**NOTICE OF SUPPLEMENTAL AUTHORITY**

**INTRODUCTION**

On January 25, 2021, the Department of Homeland Security ("DHS") Office of Inspector General ("OIG") issued *DHS Has Not Effectively Implemented the Prompt Asylum Pilot Programs* ("the Report"). Ex. 1.[1] The Report confirms that Defendants adopted PACR/HARP in violation of the Administrative Procedure Act ("APA") and that PACR/HARP violates asylum seekers' rights to access counsel and the asylum process. The Report is based on DHS OIG's review of DHS's implementation of PACR/HARP, pursuant to a request from nine Senators, including the Chairman of the Senate Committee on Homeland Security and Governmental Affairs. This newly available Report further demonstrates that reconsideration is warranted "to correct a clear error" and "prevent manifest injustice." *Firestone v. Firestone*, 76 F.3d 1205,

---

[1] DHS OIG, *DHS Has Not Effectively Implemented the Prompt Asylum Pilot Programs* (Jan. 25, 2021), *available at* https://www.oversight.gov/sites/default/files/oig-reports/DHS/OIG-21-16-Jan21.pdf.

1

1208 (D.C. Cir. 1996). Plaintiffs respectfully submit the Report for this Court's consideration in evaluating Plaintiffs' pending Motion for Reconsideration. Dkt. 78.

Specifically, several of the Report's findings are directly relevant to the Motion for Reconsideration. First, the Report demonstrates that DHS in fact departed from its own prior practice of holding *all* asylum seekers in ICE detention and subject to ICE detention policy by now holding *some*, under PACR/HARP, in CBP detention and subject to new policies. This supports Plaintiffs' APA arbitrary and capricious claim: there *has* been a departure from past policy with respect to the standards and conditions of detention that the agency did not acknowledge before implementing PACR/HARP. The Report expressly compares the ICE detention standards with the CBP detention standards, viewing the standards as "relevant background information." Ex. 1 at 33. The fact, recognized by this Court, that DHS did not engage in this comparison shows that the agency failed to acknowledge its departure from past practice and failed to consider an important aspect of the problem—what it was abandoning by holding asylum seekers in CBP jails throughout the credible fear process, including regarding asylum seekers' ability to seek protection through that process.

Second, the Report concludes that PACR/HARP, on its own terms, is inconsistent with CBP detention standards and detention facilities. By DHS policy, detention in CBP facilities is limited to a maximum of 72 hours. Yet, as the Report demonstrates, PACR/HARP's "goal of 7 to 10-day maximum detention is inconsistent with CBP detention standards and was routinely exceeded." *Id.* at 11. Further, CBP detention facilities do not provide for requisite access to basic necessities, legal services, or meaningful in-person and telephonic consultation. In adopting PACR/HARP, Defendants entirely failed to consider that the detention standards and conditions in CBP custody are fundamentally incompatible with a meaningful credible fear process—

thereby violating the APA.

Third, the Report concludes that "consultation areas and legal amenities [at CBP detention facilities] are not conducive to allowing aliens to prepare for credible-fear screening interviews." *Id.* at 16. This conclusion supports Plaintiffs' claim that PACR/HARP violates statutory access to counsel provisions, including the consultation provision for those in credible fear proceedings.

Finally, the Report confirms that very few asylum seekers have made it through the credible fear screening process in PACR and HARP. Just 29% of those in HARP and 20% of those in PACR have passed their credible fear interviews. *Id.* at 20. This is an extraordinarily low pass rate: in the year preceding the implementation of PACR/HARP, 74% of asylum seekers passed their credible fear interviews.[2] In sum, the Report demonstrates that PACR/HARP severely undermine the fairness and accuracy of the credible fear process.

The Report therefore further supports reconsideration, demonstrating that the Court's November 30 decision fundamentally misunderstood the significance of DHS's decision to adopt the PACR/HARP policy.

## I.     The Report Demonstrates that PACR/HARP is an Arbitrary and Capricious Departure from Past Policy.

The Report supports reconsideration on the ground that PACR/HARP is an unexplained departure from past policy, as Plaintiffs have argued. Dkt. 78 at 2-6. First, the Report demonstrates that DHS, as an agency, *did* depart from past policy in adopting PACR/HARP by holding asylum seekers in CBP custody subject to CBP standards during the credible fear process—whereas before, the same asylum seekers would have been placed in ICE custody

---

[2] USCIS, *Credible Fear Workload Report Summary: FY2019 Total Caseload*, https://www.uscis.gov/sites/default/files/document/data/Credible_Fear_Stats_FY19.pdf.

subject to ICE standards. The Report describes the change in policy by DHS:

> CBP transfers aliens placed into expedited removal proceedings to U.S. Immigration and Customs Enforcement (ICE) for detention. ICE refers aliens who express a fear of persecution, torture, or a fear of return, or otherwise indicate an intention to apply for asylum to U.S. Citizenship and Immigration Services (USCIS), whose asylum officers conduct a credible-fear screening interview. . . .
>
> In early October 2019, *DHS* began implementing the Prompt Asylum Claim Review (PACR) pilot program in the El Paso sector . . . . Border Patrol agents complete initial assessments of those aliens subject to the pilot, and then transfer them to a temporary, modular Central Processing Center (CPC) for USCIS to conduct credible fear screenings. . . . Under HARP, [CBP's Office of Field Operations] handles the initial processing of those subject to the pilot program at the port of entry, and then transfers them to Border Patrol's CPC facility to continue the asylum claim process. The goal of both . . . is to complete the credible fear screening process in 7 to 10 days, while applicants remain in CBP custody.

Ex. 1. at 3, 5 (footnotes omitted; emphasis added).

Moreover, the Report confirms—particularly in light of this change—the relevance of both the ICE and the CBP detention standards to the agency's evaluation of PACR/HARP. As conceded by Defendants, DHS did not consider any ICE detention standards that would have been previously applicable to all asylum seekers. In the Report, DHS OIG recognizes that these standards are "relevant background information," explaining that it reviewed documents including the CBP standards and repeatedly citing and describing both CBP and ICE standards throughout the Report's evaluation of the efficacy of PACR/HARP. *Id.* at 11-14, 16, 19, 33.

In fact, the Report repeatedly compares the ICE and CBP detention standards and conditions, to conclude that CBP detention centers under PACR/HARP do not measure up to ICE detention centers for holding asylum seekers. Specifically, the Report finds that:

- "ICE detention standards for single adults and families include procedures for aliens to have access to a legal orientation program in which representatives from nonprofit organizations" explain "basic legal information"; there is no such program in PACR/HARP. *Id.* at 19. For

PACR/HARP CBP provided only a "credible fear orientation video." *Id.*

- "ICE detention standards . . . provide access to a law library, with up-to-date legal material and the ability to print or photocopy documents and keep them in [asylum seekers'] living quarters." By contrast, those in PACR/HARP lacked "access to pens or paper, the ability to conduct legal research, or the opportunity to keep any documents with them." *Id.*

- CBP detention standards "do[] not contain provisions regarding items such as health, hygiene, clothing and bedding for detainees held longer than 72 hours." *Id.* at 13. The standards "do[] not require CBP to provide clean clothing or undergarments at regular intervals and only require[] the issuance of clean bedding upon detainee request and when available." *Id.* As the Report explains, "These standards are in stark contrast to the ICE *Family Residential Standards*, which require a daily change of socks and undergarments, a twice-weekly exchange of outer garments, and a weekly exchange of bedding items." *Id.*

- ICE family detention standards provide for "full physical exams within 48 hours of arrival for children." *Id.* at 16. They further provide that children shall "have immediate access to education, medical care, religious services, and other amenities" and "an initial educational assessment within 3 business days of arrival." *Id.* at 16. CBP standards require only that children be held "in the least restrictive setting appropriate to their age and special needs . . . consistent with the need to ensure . . . safety and security" of the child and others. *Id.*

- The El Paso Central Processing Center "was not designed to offer conditions of detention comparable to the ICE FRCs [family residential centers]." *Id.* at 15. "[C]onditions at the CPC were not comparable to those in the ICE Family Residential Centers . . . where detained families slept in designated sleeping quarters." *Id.* The Report provides concrete examples of differences between CBP and ICE detention for families, including that "families at the FRCs

5

received physical exams, immunizations, and preventive care"; "had access to a variety of food options, including fresh fruit and vegetables, at each meal"; "shared sleeping quarters with only a few other families"; "had beds and cloth bedding, and could keep personal possessions, including up to 10 changes of clothing, in their sleeping quarters"; and had toilets that were "separate from bedrooms and afforded some privacy." *Id.* at 15-16.

As set out in Plaintiffs' Motion for Reconsideration, "Defendants' failure to acknowledge these differences, much less account for their effects, meant that Defendants provided no 'reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy'"—in violation of the APA. Dkt. 78 at 5-6 (quoting *FCC v. Fox*, 556 U.S. 502, 515-16 (2009)).

## II. The Report Demonstrates that PACR/HARP Is Inconsistent with CBP Detention Standards and CBP Facility Design, In Violation of the APA.

The Report also supports reconsideration by further confirming that DHS failed to consider important aspects of the problem—the complete incompatibility of CBP custody with a meaningful credible fear process, and the associated downsides to conducting the process in CBP custody—in violation of the APA. *See* Dkt. 78 at 6-8. The Report finds that those in PACR/HARP lacked a legal orientation program, the ability to conduct research, and even— which Plaintiffs had posited only as an extreme hypothetical—access to pens and paper. *See* Dkt. 57 at 39 ("If Defendants withheld all writing implements, they could not possibly deny that they were interfering with the right to apply for asylum."). It further finds significant barriers to access to counsel in PACR/HARP. Ex. 1 at 16-19.

Moreover, the Report concludes that PACR/HARP is inconsistent with the short-term nature of CBP detention. "On its face, the 7-10 day timeline developed for the PACR and HARP pilots is inconsistent with TEDS [the CBP detention standards] on detention duration." *Id.* at 12.

CBP detention standards "govern[] CBP's interactions with individuals detained in CBP facilities," and "CBP must comply with" them. *Id.* at 11. As the Report explains, these standards "generally limit[] detention in CBP facilities to 72 hours with the expectation that CBP will transfer . . . families and single adults to ICE's long-term detention facilities." *Id.* at 11-12 (footnotes omitted). PACR/HARP is, on its face, incommensurate with CBP detention standards.

Further, the Report demonstrates that CBP detention facilities are simply not designed for stays beyond the few hours necessary for processing individuals. As described above, the Report concludes that El Paso's Central Processing Center "was not designed to offer conditions of detention comparable to" those of family detention centers designed for longer-term stays. *Id.* at 15. For all these reasons, DHS's failure to consider the pragmatic and policy constraints of CBP detention—and their negative effects on asylum seekers—in adopting PACR/HARP renders the policy arbitrary and capricious. Dkt. 78 at 6-8.

### III. The Report Demonstrates that PACR/HARP Violates Asylum Seekers' Statutory Consultation Right.

Finally, the Report's findings confirm that PACR/HARP violates asylum seekers' right to access counsel, including their right of consultation—showing the appropriateness of reconsideration on this basis. *See* Dkt. 78 at 9-10. The Report concludes that "consultation areas and legal amenities are not conducive to allowing aliens to prepare for credible-fear screening interviews." *Id.* at 17. The Report's observations and analysis show that asylum seekers in PACR/HARP lack adequate access to counsel or consultation.

The Report finds a host of deficiencies with access to consultation for asylum seekers in PACR/HARP. These deficiencies are facial ones, stemming from the very nature of CBP detention facilities, which are designed for short-term processing and do not provide for access to counsel or other consultation. CBP facilities are by design fundamentally incompatible with

7

access to consultation. First, the Report shows that CBP detention does not provide for in-person access to counsel or other consultation *at all*. *Id.* Second, the Report confirms that telephonic access to counsel under PACR/HARP has *severe* limitations. As the Report explains, "Border Patrol has struggled to provide access to phones and private space for aliens to consult with representatives or participate in telephonic screening interviews and immigration court proceedings." *Id.* At the El Paso detention center, recently created phone booths for screenings only provide for speakerphone, so conversations are *not* in fact private—as is, of course, critical for legal consultation. Instead, "conversations were partially discernible from outside the booths." *Id.* at 18. This lack of soundproofing also creates problems for hearing conversations. During a credible fear interview, for example, "OIG team members could hear a constant muffled background noise emanating from the other phone booths," which "created a distraction during the interview" and "at times" required "either the asylum officer or interpreter . . . to repeat questions or answers." *Id.*

Further, these structural deficiencies confirm that those in PACR/HARP lack even minimal access to a meaningful credible fear process. It is entirely unsurprising that only 29% of those in HARP and 20% of those in PACR—rather than roughly 75% in the year preceding these policies—have passed the credible fear interviews. *See id.* at 20. The Report confirms that, fundamentally, PACR/HARP eviscerates the credible fear process created by Congress. This additional information demonstrates that Plaintiffs' Motion for Reconsideration should be granted, "to ensure the agency's decisions comport with Congress's intent to ensure rights to consult and apply for protection." Dkt. 78 at 10.

**IV.    Judicial Notice or, In the Alternative, Supplementation of the Record with the Report Is Appropriate.**

In light of DHS OIG's findings and analysis in the Report, judicial notice or, in the

alternative, supplementation of the record is appropriate. Courts may take "judicial notice of publicly available information, including "information posted on official public websites of government agencies." *Pharm. Research & Manufacturers of Am. v. United States Dep't of Health & Human Servs.*, 43 F. Supp. 3d 28, 33 (D.D.C. 2014). The Report is a publicly available government document, posted on an official public government website.

In the alternative, were the Court to view the Report as extra-record material that requires supplementation of the record, such supplementation is appropriate here, for similar reasons as those set forth in Plaintiffs' prior briefing on extra-record evidence. Dkt. 56. First, the Report facilitates the Court's consideration of Plaintiffs' arbitrary and capricious claim by providing relevant background information. Supplementation of the record is permissible where additional "background information" is necessary for the district court "to determine whether the agency considered all of the relevant factors" in reaching its decision. *See Banner Health v. Price*, 867 F.3d 1323, 1335 (D.C. Cir. 2017); *see also*, *e.g.*, *Grace v. Whitaker*, 344 F. Supp. 3d 96, 113 (D.D.C. 2018) (considering extra-record evidence to evaluate argument that government impermissibly departed from a prior policy without explanation). For this kind of consideration of extra-record evidence, "what matters . . . is whether DHS *disputes* any of" the evidence and, if not, whether the agency *took that into account* when it" made the policy change. *Make the Rd. N.Y. v. McAleenan*, 405 F. Supp. 3d 1, 53-55 (D.D.C. 2019) (considering extra-record evidence as to the effects of DHS's policy change, on an APA failure-to-consider argument).

Here, Defendants did not include in the initial administrative record ICE detention standards, including the standards the DHS OIG references here as relevant. Nor did they include relevant information about the predicate conditions in CBP detention and in ICE detention—*i.e.*, the conditions in both sets of detention centers that formed the backdrop for the PACR/HARP

decision. The DHS OIG report makes clear that such information is necessary to an evaluation of PACR/HARP's efficacy, and it provides the direct comparisons between CBP and ICE detention that the agency *should have* performed before adopting the new policy. Further, it makes the obvious and relevant logical connection that DHS failed to make in the administrative record: that the CBP detention standards and the conditions in CBP detention are inconsistent with the 7-10 day detention contemplated by PACR/HARP and with a meaningful credible fear process. Moreover, DHS cannot reasonably dispute the existence of the ICE and CBP detention standards—and so the only remaining question is "whether the agency *took that* [evidence] *into account* when it" made the policy change. *Make the Rd. N.Y.*, 405 F. Supp. 3d at 55; *see* Dkt. 56 at 8-10. Defendants did not. *See* Dkt. 78 at 5-8.

Second, DHS OIG's observations merit consideration for Plaintiffs' claims because they "bear[] directly upon the plausibility of" the assumptions underlying PACR/HARP—including CBP detention's fundamental incompatibility with access to consultation and with a fair and accurate credible fear process. *Amoco Oil Co. v. EPA*, 510 F.2d 722, 729 n.10 (permitting consideration of "public testimony . . . to a governmental body" evincing "events [that] indicate the truth or falsity of agency predictions"); *see* Dkt. 56 at 10-12. In fact, they provide additional information that bears directly on the pending Motion for Reconsideration. Judicial notice or supplementation of the record with the Report is appropriate.

## CONCLUSION

Plaintiffs respectfully submit this Report for the Court's consideration.

//

Dated: February 1, 2021  Respectfully submitted,

/s/ Andre Segura
Andre Segura,* TX Bar No. 24107112

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
American Civil Liberties Union Foundation
 of the District of Columbia
915 15th Street, NW - 2nd floor
Washington, DC 20005-2302
Tel. (202) 601-4266
aspitzer@acludc.org
smichelman@acludc.org

Thomas Buser-Clancy,* TX Bar No. 24078344
Kathryn Huddleston,* AZ Bar No. 033622
ACLU Foundation of Texas, Inc.
5225 Katy Freeway, Suite 350
Houston, TX 77007
Tel. (713) 942-8146
Fax: (713) 942-8966
asegura@aclutx.org
tbuser-clancy@aclutx.org
khuddleston@aclutx.org

Anand Balakrishnan,* CT Bar No. 430329
American Civil Liberties Union
Foundation, Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
Tel. (212) 549-2600
abalakrishnan@aclu.org

Bernardo Rafael Cruz,* TX Bar No. 24109774
Brantley Shaw Drake,* NY Bar No. 5407440
ACLU Foundation of Texas, Inc.
109 N. Oregon St., Suite 600
El Paso, TX 79901
Tel. (915) 533-8091
Fax: (915) 308-7188
brcruz@aclutx.org
sdrake@aclutx.org

*Admitted Pro Hac Vice

## CERTIFICATE OF SERVICE

I certify that I filed this notice of supplemental authority via the ECF system, which serves this document on all counsel of record.

/s/ Andre Segura
Andre Segura